MATTHEW M. YELOVICH (NYBN 4897013)
Attorney for the United States
Acting under Authority Conferred by 28 U.S.C. § 515

MATTHEW M. YELOVICH (NYBN 4897013)
Acting Chief, Criminal Division

GLENN S. LEON (NYBN 250785)
Chief, Fraud Section

JACOB FOSTER (CABN 250785)
Principal Assistant Chief
Fraud Section, Criminal Division

    950 Constitution Avenue, NW
    Washington, D.C. 20530
    Telephone: (202) 514-2000
    FAX: (202) 514-3708
    Jacob.Foster@usdoj.gov

KRISTINA GREEN (NYBN 5226204)
KATHERINE M. LLOYD-LOVETT (CABN 276256)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-6912
    FAX: (415) 436-7234
    Kristina.Green@usdoj.gov
    Katherine.Lloyd-Lovett@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>RUTHIA HE, A/K/A RUJIA HE, and DAVID BRODY,<br><br>    Defendants. | Case No. CR 24-329 CRB (TSH)<br><br>UNITED STATES' SUPPLEMENTARY MEMORANDUM IN OPPOSITION TO DEFENDANT RUTHIA HE'S APPEAL FROM DETENTION ORDER AND MOTION FOR RELEASE |

SUPP. MEM. RE DEFENDANT'S DETENTION    1

The United States respectfully submits this supplementary memorandum to address the Court's request for any additional information that it intends to rely upon at tomorrow's hearing. In addition to the issues previously raised by the Court regarding access to funds and foreign ties, evidence continues to emerge that defendant cannot be trusted to abide by conditions of release. The evidence of obstructive conduct and disrespect for the law are what makes this case unique.

**I.     Intent to Flee and Obstruct**

Today, federal agents interviewed a former Done employee (Done Employee-1) who was one of the close ties who was contacted as a proposed surety upon defendant's arrest in the Central District of California. Done Employee-1 stated, among others:

- Defendant's "main goal right now if released would be to leave the country."

- If released, defendant "would harm more patients."

- After the investigation began, defendant shifted company functions and personnel to China. Chinese personnel were hired by defendant and answer only to defendant. Personnel in the United States were let go. Essentially, "all functions" of Done are now in China.

- After the investigation began, company records on platforms including Slack and Coda were deleted. A few days before defendant's arrest, email accounts of U.S. personnel who had left the company were deleted.

- Defendant falsely stated that she was stepping away from active involvement in the company; in fact, defendant instructed Done Employee-1 and other Done employees to switch to an encrypted messaging platform, WhatsApp. Defendant continued her active management of the company unabated. Defendant enabled the disappearing messaging function of the messaging platform, such that messages she sent would disappear within a certain time after defendant sent them. After another Done employee turned the disappearing message function off, defendant turned it back on so that messages would disappear.

- Days before her arrest, defendant contacted Done Employee-1 and instructed her to lie to the government and tell the government that the WhatsApp messages were personal communications and that conversations about business matters occurred at in-person meetings. Defendant also instructed Done Employee-1 to call others in the WhatsApp chat and tell them to lie to the government about the

SUPP. MEM. RE DEFENDANT'S DETENTION     2

WhatsApp messages.

- Defendant does not respect the law – defendant would routinely disregard legal concerns that were raised about the company's prescription practices. Defendant "did not take law enforcement requests seriously" and would "break the law as long as she believed she could get away with it." Ex. 32.[1]

These statements are consistent with other witness statements and evidence proffered by the government,[2] and further support Magistrate Judge Hixson's conclusion that the evidence of defendant's specific intent to flee is so strong that she must be detained.

## II. Defendant's Access to Funds

Defendant controls Done. She owns almost 100% of the shares outstanding. Ex. 33.[3] Defense counsel at the August 21 hearing alluded to an independent board of Done. Company counsel has informed the government that the Done "board" was established in 2023 and consists of two individuals— defendant and one other individual. Counsel for the other individual stated that his client has virtually no role in overseeing Done and has little understanding of what is occurring at Done.

Accounts for defendant and Done contained approximately $9.99 million, as of the most recent date the government has obtained records. Ex. 34. The most recent records in the government's possession show that defendant is the "admin" on what is currently being used as the main company account. Ex. 35.

---

[1] Following defendant's arrest, company counsel informed the government that it believed unauthorized transfers were made from the company's account, including a couple of attempted transactions to Employee-1's contractor company in Asia (these transactions did not go through).

[2] ECF No. 52, Ex. 1 ("Singapore does not require on-site presence to open an account. But it seems there is an extradition clause. If I had known this, I would have opened [the bank account] when I went to Hong Kong last time"); Id. at Exs. 2-3 (discussing the opening of foreign bank accounts, unknown to the government); Id. at Ex. 8 ("I'll delete the Slack records"); Id. at Ex. 9 (unsending messages after she learned the recipient had been approached by law enforcement); Id. at Ex. 10 (searching online to determine "[i]f a Gmail account is deleted, can the police check Google's search history"); Id. at Ex. 11 (changing WhatsApp settings to ensure that messages would disappear after 24 hours); Id. at Ex. 12 ("hurry up to move our marketing team to China . . . feel there will be an investigation"); Id. at Ex. 25 at 10-11 ("if the investigators . . . press criminal charges against you and brody, your best bet is to be in china so they don't extradite you").

[3] There are certain SAFE investors in Done but their shares have not vested. Even if those investors' shares vested, defendant would still own approximately 80% of the company. Ex. 33.

SUPP. MEM. RE DEFENDANT'S DETENTION      3

Financial analysis also shows that defendant and Done have transferred approximately $13 million to overseas individuals or entities (underlying records for these transactions are voluminous and have been provided to the defense).  The government does not contend that all of these funds are available to the defendant – or that none were for paying foreign contractors – and notes that it is difficult to ascertain the purposes and uses of these funds in foreign jurisdictions.  The transfers are indicative of the defendant's foreign ties, ability to operate Done overseas, and it is a reasonable inference that there are funds available to defendant because she has communicated in encrypted messages with associates who have expressed a willingness to help her open foreign bank accounts in their own names, "and later transfer the account to [the defendant] afterwords."  ECF No. 52, at Ex. 26. As mentioned, Done's main company account was recently closed by a financial institution in connection with concerns of international money laundering; while defense counsel proffered that the transactions that led to the closure of the account (two June 2024 payments) were legitimate business transactions, agents interviewed a representative of the company involved in processing these transactions who stated that the round-dollar amounts, a related suspicious invoice, and the lack of apparent legitimate purpose were indicative of fraud.[4]  Ex. 38.

### III. Defendant's Presence in the District

Over the five-year period preceding defendant's arrest, she spent 1,458 days (or 80% of her time) in the U.S. and 369 days (or 20% of her time) outside the U.S.  Of the time in the U.S., approximately 33% has been since she was stopped by the government on her way to an international flight.

---

[4] Between January and May 2024, there were five payments to Makebelieve (one each month) ranging from $160,000 to $198,000 (there were no payments prior to January 2024). Ex. 36.  While defense counsel represented Makebelieve hires contractors in Asia, on June 21, 2024, just days after defendant's arrest, the payments increased to $250,020. *Id.*  There was also a second payment to Makebelieve on June 24, 2024, also of $250,020. *Id.*  This was the first time that there were two payments in one month, and it was over $300,000 more than ever had previously been paid in a month. These two payments also match the bail amount. The June 19 payment invoice was found to be suspicious.  Ex. 37, Ex. 38.  The invoice shows that it was issued by Done, when, in the ordinary course, the invoice should be issued by the company expecting payment (here, Makebelieve). *Id.*  The purpose is just listed as "others" and the due date is listed only one day after the issue date. *Id.*  The two June payments were effectuated by a China-based contractor, who reports to defendant. Ex. 32, Ex. 38.

DATED: August 22, 2024

Respectfully submitted,

MATTHEW M. YELOVICH
Attorney for the United States


GLENN S. LEON
Chief, Fraud Section
U.S. Department of Justice

_____/s/_____
JACOB FOSTER
Principal Assistant Chief
RAYMOND E. BECKERING III
Trial Attorney

_____/s/_____
KRISTINA GREEN
KATHERINE M. LLOYD-LOVETT
Assistant United States Attorneys