WILLKIE FARR & GALLAGHER LLP
Koren Bell (SBN 268614)
kbell@willkie.com
2029 Century Park East
Los Angeles, CA 90067
T: 310-855-3016
F: 310-855-3099

Michael S. Schachter (*Pro Hac Vice*)
Steven J. Ballew (*Pro Hac Vice*)
mschachter@willkie.com
sballew@willkie.com
787 Seventh Avenue
New York, NY 10019-6099
T: 212-728-8102
F: 212-728-9102

Attorneys for Defendant
RUTHIA HE

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RUTHIA HE, A/K/A RUJIA HE, and DAVID BRODY,<br><br>Defendants. | CASE NO. 3:24-cr-00329-CRB<br><br>**DEFENDANT RUTHIA HE'S OPPOSITION TO THE GOVERNMENT'S MOTION TO EXCLUDE DEFENSE EXPERT TESTIMONY.**<br><br>DATE: September 9, 2025<br>TIME: 2:00 PM<br>Courtroom 6—17th Floor<br>Hon. Charles R. Breyer |

# TABLE OF CONTENTS

**Page**


INTRODUCTION ....... 1

ARGUMENT ....... 1

I. THE COURT SHOULD NOT EXCLUDE DR. LEE'S TESTIMONY ....... 1

A. Dr. Lee is Qualified to Serve As An Expert in This Case. ....... 1

B. Dr. Lee's Opinions Are Unique and Not Cumulative of the Opinions That Will be Offered By Dr. Saint Martin. ....... 4

II. THE COURT SHOULD NOT EXCLUDE ANY PORTION OF DR. SAINT MARTIN'S TESTIMONY. ....... 6

III. THE COURT SHOULD NOT EXCLUDE DR. CHANDRA'S TESTIMONY. ....... 8

CONCLUSION ....... 12

# TABLE OF AUTHORITIES


**Page(s)**

**Cases**

*Abaxis, Inc. v. Cepheid*,
No. 10-CV-02840-LHK, 2012 WL 2979019 (N.D. Cal. July 19, 2012) .......... 2, 3

*Daubert v. Merrell Dow Pharms., Inc.*,
43 F.3d 1311 (9th Cir. 1995) .......... *passim*

*Ruan v. United States*,
597 U.S. 450 (2022) .......... 6

*United States v. Baras*,
No. CR 11-00523 YGR, 2013 WL 6502846 (N.D. Cal. Dec. 11, 2013) .......... 9

*United States v. Cohen*,
510 F.3d 1114 (9th Cir. 2007) .......... 10

*United States v. Finley*,
301 F.3d 1000 (9th Cir. 2002) .......... 11

*United States v. Morales*,
108 F.3d 1031 (9th Cir. 1997) .......... 11

*United States v. Onumonu*
967 F.2d 782 (2d Cir. 1992) .......... 10, 11

**Other Authorities**

Fed. R. Evid. § 702 .......... 2, 10

Fed. R. Evid. § 704 .......... 9

## INTRODUCTION

The Government has moved *in limine* to preclude testimony from defense experts Dr. Steve Lee, Dr. Manuel Saint Martin, and Dr. Amitabh Chandra. *See* ECF No. 330 ("Gov. *Daubert* Mot."). For the reasons set forth below, the Court should deny the Government's *Daubert* Motion in its entirety.

## ARGUMENT

### I. THE COURT SHOULD NOT EXCLUDE DR. LEE'S TESTIMONY.

The Government seeks to exclude, in its entirety, Dr. Lee's testimony on two baseless grounds. First, the Government argues that because Dr. Lee is an expert psychologist, not a M.D., he does not have "prescription privileges" and thus, according to the Government, Dr. Lee "lacks the clinical experience necessary to provide a reliable foundation for his opinions." Gov. *Daubert* Mot. at 8. Second, the Government objects to Dr. Lee's testimony on the basis that it is "cumulative" to the testimony that will be offered by Ms. He's other expert witness, Dr. Saint Martin. *See id*. at 6-8. Neither of these arguments justify the pre-trial exclusion of Dr. Lee's testimony, in part or in whole.

#### A. *Dr. Lee is Qualified to Serve As An Expert in This Case.*

As an initial matter, there is no merit to the Government's claim that Dr. Lee lacks suitable credentials to serve as an expert in this case. As explained in Ms. He's Expert Disclosure, Dr. Lee is a Professor of Psychology at UCLA, as well as the Principal Investigator of UCLA's ADHD and Development Lab, which is a lab dedicated to studying the origins, development, and consequences of ADHD—the disorder that the Government has placed at issue in this case. *See* ECF No. 330-1 (Ms. He's "Expert Disclosure") at 4-8 (describing Dr. Lee's background and anticipated testimony), 23-49 (describing the *several hundred* academic papers and presentations concerning ADHD that Dr. Lee has authored and presented over the course of his career). Dr. Lee conducts his research by using "longitudinal studies," which observe patterns of behavior in the same individuals over extended periods. *Id.* at 5. Indeed, Dr. Lee has dedicated the last *thirty*

*years* to studying ADHD, including not only the science behind ADHD's cause(s), but also how ADHD is diagnosed and treated and how those concepts and practices have evolved and developed over the course of time. Moreover, while Dr. Lee does not personally write prescriptions, he is intimately familiar with the stimulant medications prescribed to treat ADHD—the medications that the Government has placed at issue in this case—because Dr. Lee has been studying ADHD for decades and these stimulant medications have been the primary treatment for the condition since it was first recognized as a disorder. In other words, Dr. Lee is not only "an" expert on ADHD but rather is one of *the most credentialed and respected ADHD experts in the world;* the argument that he is not qualified to present the opinions described in the Expert Disclosure do not square with reality, given the breadth and depth of his knowledge and research about ADHD. Fed. R. Evid. 702 ("A witness [may be] qualified as an expert by *knowledge*, skill, experience, training, or *education*.") (emphasis added); *Abaxis, Inc. v. Cepheid*, No. 10-CV-02840-LHK, 2012 WL 2979019, at *3 (N.D. Cal. July 19, 2012) (denying motion to exclude opinions about "the designing or making of freeze-dried materials and lyophilization"—even though the proffered expert "never personally executed a freeze-drying or lyophilization procedure"—because "Rule 702 imposes no requirement that experts have personal experience in an area to offer admissible testimony relating to that area" and "the record makes clear that Dr. William's research group had experience" with these procedures); *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) ("One very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation . . . That an expert testifies based on research he has conducted independent of the litigation provides important, objective proof that the research comports with the dictates of good science.").

Despite moving to exclude *all* of Dr. Lee's testimony, the Government identifies only one specific "opinion" that it argues Dr. Lee is not qualified to provide: that is, Dr. Lee's opinion that a "trial" period in which a patient is prescribed ADHD medication is "relatively low risk." *See* Gov. *Daubert* Mot. at 8. The Government argues that because Dr. Lee is not himself a

"prescriber," he is not qualified to offer this opinion. This objections does not stand up to scrutiny. The question of whether a medication is "safe," generally speaking, is not a judgment that each "prescriber" makes anew and for himself. Rather, prescribers, and persons in the medical field, including Dr. Lee, are guided by the vast amounts of clinical research that are carried out before a medication goes to market, the FDA's approval of the medication, and any subsequent studies demonstrating how patients "in the real world" react to the medication. Dr. Lee is just as qualified—in fact, given his dedication to research and study, he is *more* qualified—to opine on the risks inherent in a medication trial of an ADHD stimulant as would be any "M.D." whose opinion on "risk" was based exclusively on his or her own slice of personal "prescribing" experiences. *Id.* at 7-8. Indeed, the Government's expert, David Goodman, relies on academic literature authored by psychologists with the same credentials as Dr. Lee in his expert report. *See* ECF No. 332-5 (Goodman Report) at 24 ns. 2, 4, 5, & 9.

Furthermore, the Government's complaint that Dr. Lee does not have sufficient "experience" to qualify as an expert in this case is particularly dubious given the scope of Dr. Lee's anticipated testimony. Dr. Lee's testimony will focus primarily on the science behind ADHD, which is squarely within his area of expertise—in fact, it is what he has spent his career studying. *See* ECF No. 330-1 at 23-49. Dr. Lee will not offer the jury any opinion about whether he agrees or disagrees with any decision by a Done medical provider to prescribe ADHD medication to any particular patient. As such, even assuming that there was some merit to the Government's complaints about Dr. Lee's lack of experience writing Adderall prescriptions—which there is not, given that it is well settled that an expert's basis for his opinions can be research and study, not just personal experience, *see Cepheid,* 2012 WL 2979019, at *3—this particular "lack" is immaterial, given that Dr. Lee will not offer any opinion about any particular "prescribing decisions" made by Done's providers to individual patients. None of the opinions that Dr. Lee plans to espouse require him to have "personal" prescribing experience in order to serve as a reliable authority on that subject.

Finally, the Government offers a half-hearted objection to Dr. Lee's testimony on the basis that much of his research over the decades has involved the study of ADHD in children and adolescents, rather than adults. *See* Gov. *Daubert* Mot. at 8. To begin, this is incorrect as a factual matter. As described above, Dr. Lee uses longitudinal studies to conduct his research, which observe the development of ADHD and its consequences in certain subjects from adolescence to adulthood. *Supra* at 1. In any event, most specialists in this area who have studied ADHD for as long as Dr. Lee has would focus primarily on children, because it was not until recently that ADHD was even recognized as a disorder experienced outside of childhood—a fact that Dr. Lee intends to explain to the jury. *See* ECF No. 330-1 at 5-6, ¶ 6. Moreover, given that it is apparently the Government's view, as espoused by its expert, Dr. David Goodman, that the only "adult" ADHD diagnoses that are legitimate are those based on the "onset of symptoms in childhood/early adolescence," *see* ECF No. 332-5 (Goodman Report) at 2-3, Dr. Lee's particularly deep expertise in how ADHD manifests itself in children and adolescents is a credential that should render him, in the eyes of the Government, as *more* qualified, rather than less qualified, to serve as an expert in this case.

There is no credible basis for excluding any of Dr. Lee's testimony on the ground that he is not qualified to offer such testimony to the jury. Should the Government seek to explore any of these issues on cross examination, it can do so.

**B. *Dr. Lee's Opinions Are Unique and Not Cumulative of the Opinions That Will be Offered By Dr. Saint Martin.***

The Government's second contention, that Dr. Lee's testimony should be excluded because it is merely "cumulative" of testimony that will be offered by Dr. Saint Martin, is also unavailing. *See* Gov. *Daubert* Mot. at 6-7. As an initial matter, the Government is just *wrong* on the facts: there are *substantial* differences between the testimony that Dr. Lee and Dr. Saint Martin each intend to offer. While the Government was able to pull out nine "phrases" which happen to exist in both Expert Disclosures, *id.*, any *actual review* of the proffered testimony clearly demonstrates that these two experts will each offer *unique* testimony, with no meaningful repetition between

them. *Compare* ECF No. 330-1 at 6-8, ¶¶ 1, 3-5, 7, 12-14 (unique opinions offered exclusively by Dr. Lee) *with id.* at 8-17, at ¶¶ 1-3, 6(d)-(k), 6(m)-(n), 8, 10-15 (unique opinions offered exclusively by Dr. Saint Martin). Their unique testimony is based on their unique training and experiences, both of which are relevant to educating the jury about important issues in this case. Dr. Lee's testimony focuses primarily on the science behind ADHD, how the scientific community's understanding of ADHD has evolved over time, and how this evolution shapes our understanding of ADHD as a neurodevelopmental disorder. In particular, Dr. Lee will explain that the realization that adults can suffer from ADHD is relatively new in the scientific community, which has led to substantial uncertainty about the best ways to diagnose and treat it. Dr. Saint Martin, on the other hand, as a practicing psychiatrist, will primarily focus his testimony on the prescribing practices that the Government alleges led to the purportedly "unlawful" prescriptions at issue in this case.

Moreover, Ms. He has no interest in prolonging this trial unnecessarily and certainly has no interest in boring the jury with unnecessarily repetitive testimony. To that end, while Ms. He "noticed" both Dr. Lee and Dr. Saint Martin as providing testimony on certain general topics—such as the fact that there are "no established guidelines for treating ADHD"—Ms. He anticipates that during trial, the testimony of Dr. Lee and Dr. Saint Martin will *not* overlap, because defense counsel will not elicit repetitive testimony, and if it does, the Government can object. Indeed, even in Ms. He's Expert Disclosures, the "cumulative" concepts and facts that the Government now complains about are largely included only because they serve as background context and support for Dr. Lee's or Dr. Saint Martin's individual and unique opinions.

For example, while the Expert Disclosures for both Dr. Lee and Dr. Saint Martin each describe the fact that "stimulants are the first line treatment for ADHD," that fact—which can be stated in approximately 30 seconds—serves primarily as scaffolding for Dr. Lee's "opinion" that it is "unusual for someone to be treated for ADHD with therapy, but without medication, while it is common for an individual to be treated for ADHD with medication, but without therapy." *See* ECF No. 330-1 at 6, ¶ 7. For Dr. Saint Martin, on the other hand, the fact that "stimulants are the

first line treatment for ADHD" serves as support for his "opinion" that certain prescribing decisions made by Done providers were not outside the usual course of professional practice, *see e.g.*, *id.* at 15, ¶ 12(a), and his opinion that there is nothing "medically inappropriate" about an image of a pill being used to advertise ADHD care. *Id.* at 9, ¶ 5. Because witnesses are entitled to "explain" themselves, some repetition of basic facts is present in *every* case and the possibility that a fact may be briefly repeated in front of the jury is certainly not a basis for granting the wholesale exclusion of Dr. Lee's testimony, as requested by the Government. Moreover, the Government always retains its ability to raise objections on the basis of "cumulative" questions during trial itself, which should adequaelty address any concerns about the "needless presentation of cumulative testimony." *See* Gov. *Daubert* at 6. The Government's request that the Court exclude, in its entirety, Dr. Lee's testimony, should be denied.

## II. THE COURT SHOULD NOT EXCLUDE ANY PORTION OF DR. SAINT MARTIN'S TESTIMONY.

The Government offers four objections to "portions" of Dr. Saint Martin's testimony. *See* Gov. *Daubert* Mot. at 8-11. Two of the four objections have nothing to do with Dr. Saint Martin, or his qualifications, or the reasoning or basis underlying his opinions, but rather are rooted in the Government's disagreement about what is required in order to demonstrate that a prescription for ADHD medication was "unauthorized" under the Controlled Substances Act. In particular, and despite the clear language of *Ruan v. United States,* the Government disagrees that it is obligated to prove that such medication was prescribed (i) for "no legitimate medical purpose;" *and* (ii) outside the "usual course" of "professional practice." *See Ruan v. United States*, 597 U.S. 450, 454 (2022); *see* Gov *Daubert* Mot. at 9. Likewise, the Government disagrees that the "usual course" of professional practice constitutes a "subjective" standard, based on the prescriber's own experience. *See* Gov. *Daubert* Mot. at 11. The parties' respective positions on these legal questions will be set forth in their "Objections" to each other's Proposed Jury Instructions, which are due to the Court on September 2, 2025 and thus, are not repeated here. It is sufficient, for purposes of responding to this *Daubert* motion, for Ms. He to assure the Court that Dr. Saint

Martin's testimony will adhere to the Court's ruling on the applicable legal standard. As such, the precise "wording" of Dr. Saint Martin's opinions is not an issue that requires a pre-trial ruling from the Court.

Likewise, the Government also objects, on a "theoretical" basis, to any opinion from Dr. Saint Martin in which he concludes that Done's treatment of a patient was appropriate, for a legitimate medical purpose or within the usual course of professional care, *see* Gov. *Daubert* Mot. at 10, pursuant to its insupportable position that Ms. He should not be permitted to proffer "good conduct" evidence that refutes the central premise of the Government's case, for the reasons described by the Government in its Ninth Motion in Limine. *See* ECF No. 319 at 17. But, as set forth in her Opposition to the Government's Ninth Motion in Limine, the Government's position would deprive Ms. He of her constitutional right to present a defense: the Government has alleged that Ms. He's policies "caused" licensed medical practitioners to act as drug dealers, fueling an Adderall "pill mill" that generated "over 40 million pills" of stimulant prescriptions and "over $100 million in revenue," *see* Ind. at ¶ 50, ECF No. 319 at 1-2, and Ms. He must be permitted to respond. *See* ECF No. 334 at 12-13

The fourth and "final" objection that the Government raises in connection with Dr. Saint Martin's testimony is its claim that Dr. Saint Martin is not "qualified" to offer an opinion that "given the core role that stimulant medications play in ADHD care, there is nothing medically inappropriate about the use of pill imagery to advertise ADHD care." S*ee* Gov. *Daubert* Mot. at 10 (citing ECF No. 330-1 at 9, ¶ 5). As a threshold matter, the Government's objection is ironic, given that it intends to offer testimony from *its* psychiatric expert, Dr. Goodman, that "misinformation" about ADHD on the "internet" may lead to a patient "misdirecting" their provider into an inaccurate ADHD diagnosis, which is clearly outside the scope of his expertise. ECF No. 332-5 (Goodman Report) at 3-4. In any event, the Government mischaracterizes Dr. Saint Martin's testimony. While the Government argues that Dr. Saint Martin cannot offer this testimony because he is not an expert in "advertising or marketing," Dr. Saint Martin's opinion is not based on "advertising or marketing." Instead, it is cabined to the question of whether such an

image is "medically inappropriate"—which he opines it is not, because stimulant medications play a "core role" in ADHD care and Done was a medication management platform. Indeed, Dr. Saint Martin's opinion on this point should not be controversial. As even the Government's expert, Dr. Goodman, agrees, the "most often first prescribed" medications used to treat ADHD are stimulants. ECF No. 332-5 (Goodman Report) at 12. As such, from a medical perspective, there is nothing inappropriate about advertising ADHD care through an image of a pill and the Government articulates no basis for excluding an opinion about "medical appropriateness" from a doctor who has been licensed in the medical field for four decades.

## III. THE COURT SHOULD NOT EXCLUDE DR. CHANDRA'S TESTIMONY.

The Government also seeks to exclude, in its entirety, testimony from defense expert Dr. Amitabh Chandra, who is a professor at Harvard University specializing in the economics of the health care industry, including pricing and innovation, the effects of cost sharing on health care spending and utilization, and sources of inefficiency within the health care system. *See* ECF No. 330-1 at 17-19, ¶¶ 1-6, *see also* 118-138 (describing Dr. Chandra's qualifications and anticipated testimony). The Government's objection lacks any credible basis. It is no more than a transparent attempt to exclude testimony that powerfully refutes a central claim in the Government's case—that Ms. He's compensation model was one of the "policies and procedures" that "caused" independent licensed medical providers to act as drug dealers—and corroborates Ms. He's defense that she did not in fact utilize this pay structure to "further an unlawful [drug] distribution conspiracy," as alleged. *See* Gov. *Daubert* Mot. at 14.

In particular, the Indictment expressly alleges that in 2020, Ms. He implemented a new "panel pay" compensation structure for medical providers at Done, in which they were paid "solely on patient load" rather than being paid for every appointment with a patient. *See* Ind. at ¶ 68. "The purpose" of this change, the Indictment further alleges, "was to 'use the comp structure to discourage follow-up' and, as a result, co-conspirator Done Prescribers were able to obtain lucrative pay for minimal work[.]" *See id.* As the Government acknowledges in its *Daubert* Motion, it intends to argue to the jury that when Ms. He made this change to Done's compensation

model, she did so in order to "further an unlawful [drug] distribution conspiracy" in which providers simply prescribed Adderall and then never interacted with their patients again. *See* Gov. *Daubert* Mot. at 1, 14.

Ms. He is constitutionally entitled to defend herself against the Government's allegations, including by presenting evidence that directly responds to the Government's erroneous claims. In particular, as Dr. Chandra will explain, it is a *fact* that across the healthcare industry, a "panel pay" structure—the technical name for which is a "capitated" model of pay—is routinely and regularly used. *See* ECF No. 330-1 at 17-19, at ¶¶ 1-6. Indeed, insurance companies, which are the entities in our healthcare system which are most often responsible for "paying" prescribers for services, have experienced a definitive "trend" away from the traditional "fee for service" models to a capitated system. *Id.* As such, there is nothing inherently nefarious about Done's change from a "fee for service" model to a "capitated" model; to the contrary, this change was consistent with the broader trend in the U.S. healthcare system, a critical context.

Dr. Chandra will also explain that—contrary to the Government's express claim in the Indictment, *see* Ind. at ¶ 68—the economic incentives of capitation models are viewed as real positives by many notable public and private bodies. ECF No. 330-1 at 15-16, ¶ 5. In particular, he will describe that capitation models incentivize efficient care, as well as system-wide activities such as the development and use of high-value innovations (*e.g.*, technologies that reduce administrative burdens), and he will explain that that using capitation can unlock patient-provider interactions that are more convenient to, and result in better outcomes for, patients with chronic illnesses without a loss in care quality. *Id.* at 15, ¶¶ 3-4. This too powerfully refutes the Government's allegation that Ms. He's use of the "panel pay" compensation system to "discourage follow-up," *see* Ind. at ¶ 68, should be equated with an intent to "further an unlawful [drug] distribution conspiracy," *see* Gov. *Daubert* Mot. at 1, 14.

In the face of this critical expert testimony, which is directly responsive to its core allegations, the Government's objections to Dr. Chandra's proposed testimony lack any credible basis. As an initial matter, Dr. Chandra will not offer an opinion about what was in the mind of

Ms. He and as such, his testimony will not run afoul of Rule 704. Instead, Dr. Chandra's testimony is being offered to "corroborate" Ms. He's position about her state of mind. Expert testimony for this purpose clearly falls within the bounds of a permissible defense presentation. *United States v. Baras,* No. CR 11-00523 YGR, 2013 WL 6502846, at *10 (N.D. Cal. Dec. 11, 2013) ("opinions of Defendant's medical experts [] offered to corroborate Defendant's claim that he did not evade paying taxes intentionally or knowingly steal money from the Government with the intention of depriving the Government of the use or benefit of that money" could "assist the trier of fact within the meaning of Rule 702 because the testimony will offer an explanation as to how Defendant could believe that he was acting in accordance with the law, thereby negating the *mens rea* element of the charges in the Superseding Indictment"); *see also United States v. Cohen*, 510 F.3d 1114, 1123 (9th Cir. 2007) (reversing exclusion of expert testimony offered to "bolster[] the contention that Cohen had a good faith belief that he was acting in accordance with the law, thereby negating the *mens rea* element [], which requires that a defendant 'willfully' assist in the filing of a false return").

*United States v. Onumonu* serves as a particular apt example. 967 F.2d 782 (2d Cir. 1992). In *Onumonu*, the Second Circuit reversed a defendant's conviction and ordered a new trial because the defendant was precluded from presenting scientific evidence that made his arguments about his subjective beliefs more plausible. *Id*. at 787. The defendant in *Onumonu* was charged with "knowingly or intentionally" importing heroin into the United States. *Id.* at 785- 86. He was arrested with packages of heroin inside his stomach, wrapped in opaque rubber condoms. *Id*. At trial, Onumonu "conceded the objective, physical fact[s]" that he had transported these heroin balloons into the United States, but argued that he had not done so "intentionally" but instead had "believed" the packages contained diamonds, not heroin. *Id*. at 786-87. In order to "corroborate this testimony" and demonstrate that Onumonu's claim was, in fact, consistent with the "physical and economic realities" of diamond-smuggling, the defense sought to call a gemologist as an expert, on the theory that the gemologist's "expertise and impartiality" would be of assistance in

persuading the jury that Onumonu's claims were plausible. *Id.* at 787. The district court excluded the expert's testimony on relevance grounds and Onumonu was convicted.

The Second Circuit, however, reversed Onumonu's conviction and ordered a new trial. It explained that Onumonu's expert should have been permitted to testify because Onumonu's "subjective belief was the critical issue" at his trial and the expert's testimony "made the existence of Onumonu's belief about diamonds more probable than it would have been without the evidence." *Id.* at 786-87. That same reasoning holds true here: Dr. Chandra's testimony about well-established merits of a "panel pay" system that incentivizes efficient care, as demonstrated by the increasing trend towards that compensation structure in the healthcare industry, is evidence that renders Ms. He's position on her legitimate business reasons for switching compensation models "more probable than it would [be]" without Dr. Chandra's testimony. *Id.*; *see also United States v. Morales,* 108 F.3d 1031, 1040 (9th Cir. 1997) (reversing conviction and holding "district court erred by excluding the preferred expert testimony" because the "exclusion [] deprived Morales of the only corroborating evidence she had" supporting her "defense . . . that she did not know her [bookkeeping] entries were false"); *United States v. Finley*, 301 F.3d 1000, 1013 (9th Cir. 2002) (reversing district court's exclusion of expert testimony that "would have offered an explanation as to how an otherwise normal man could believe that these financial instruments were valid" and "'provide[d] a counterweight to the government's allegations against Finley").

The fact that the Government will urge the jury to reach the opposite conclusion about the switch in compensation structures, *see* Gov. *Daubert* at 12—*i.e.,* that Ms. He sought to discourage follow-up," *see* Ind. at ¶ 68, in order to "further an unlawful [drug] distribution conspiracy," *see* Gov. *Daubert* Mot. at 1, 14—is not a basis for excluding Dr. Chandra's testimony. To the contrary, it only underscores the central nature of this expert testimony. The Government is free to cross-examine Dr. Chandra and ask him whether he has any actual evidence of why Ms. He made the decisions she did. Dr. Chandra will agree that he has no evidence on that topic and the Government is free to argue to the jury that it should therefore assign little importance to Dr. Chandra's testimony. Likewise, the Government is free to cross examine Dr. Chandra on the differences

between provider pay when issued by a health care insurer versus a private medical clinic, since it seems to believe that there is a meaningful distinction between the two. *See* Gov. *Daubert* at 13-14. But, the question of evidentiary *weight* is different from *admissibility* and there can be no dispute that Dr. Chandra is qualified to explain these competing compensation models and their utilization in the healthcare industry to the jury.

As for the Government's articulated concerns about "confusing the jury" and wasting time, *see* Gov. *Daubert* Mot. at 14, these objections are equally unfounded. Dr. Chandra's testimony is unlikely to take more than a couple of hours total, perhaps less, and given that the jury will already have heard much about the "patient panel" model—given that the Government has chosen to make this a central tenet of its case against Ms. He—his testimony about that subject and its prevalence will not create any "confus[ion]" but, to the contrary, will bring clarity and perspective to the jury's understanding about the at-issue payment models and the incentives inherent to each. The Court should deny the Government's transparent attempt to preclude critical testimony that powerfully refutes a central claim in the Government's case.

The Court should deny the Government's motion to preclude Dr. Chandra's testimony.

**CONCLUSION**

For the foregoing reasons, the Court should deny the Government's motion *in limine* to exclude expert testimony from Dr. Lee, Dr. Saint Martin, and Dr. Chandra.

Dated: August 26, 2025

WILLKIE FARR & GALLAGHER LLP

By: */s/ Koren Bell*
Koren Bell
Michael S. Schachter
Steven J. Ballew

*Attorneys for Defendant*
RUTHIA HE