# Government's
# Trial Exhibit No. 1505

# PLATFORM ACCESS AND SERVICES AGREEMENT

**THIS PLATFORM ACCESS AND SERVICES AGREEMENT** (the "**Agreement**") is made and entered into and effective as of 4/9/2020, 2020 (the "**Effective Date**"), by and between **Okay Health, a [Delaware corporation]** ("**Company**") and **[Health Care Professional Name],** a licensed [______] (the "**Practitioner**").

Nwamaka Emeruem

**W I T N E S S E T H:**

WHEREAS, Company is an organization which provides, services to health care professionals to facilitate the provision of care to patients with mental health disorders; and

WHEREAS, the Practitioner is a [Texas] licensed nurse practitioner, psychiatrist or physician assistant and desires to obtain services as set forth herein from Company.

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants and promises hereinafter contained, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged by each party hereto to the other, and intending to be legally bound hereby, the parties represent, warrant, promise, covenant and agree as follows:

**1. Term of Agreement.** This Agreement shall commence on the Effective Date and shall continue in full force and effect for three (3) years from such date, unless earlier terminated in accordance with the terms and conditions set forth herein. This Agreement shall be renewed automatically for successive one (1) year terms on the same terms unless either party notifies the other not less than ninety (90) days prior to the end of the then current term of its intent not to renew this Agreement.

**2. Access to Platform and Services.** During the term of this Agreement, pursuant to the terms and conditions of this Agreement, Company will (a) make its platform for patient scheduling, provision of telehealth consultations, managing patient care, communicating with patients and maintaining clinical records available to Practitioner via the Internet or via its software application (in object code format only), and related services (the "**Company Platform**"); (b) provide Practitioner with marketing services; (c) allow Practitioner to continuously manage his or her patients through Company's platform; and (d) provide Practitioner with billing and collection services. Company hereby grants Practitioner a limited, nonexclusive, nontransferable, non-sublicensable right to access and use the Company Platform during the term of the Agreement solely for Customer's internal use in connection with the treatment and care of Patients, subject to the terms and conditions of the Terms of Service and the Privacy Policy, as each may be modified or updated. Practitioner hereby acknowledges that such Terms of Service and Privacy Policy are hereby incorporated into this Agreement and are binding upon the Practitioner. In the event of any conflict between the Terms of Service and/or the Privacy Policy, on the one hand, and this Agreement, on the other, the terms of the Terms of Service and/or the Privacy Policy shall control with respect to use of the App Services, and this Agreement shall control with respect to all other matters. Except as expressly set forth herein, Company retains all right, title and interest in and to the Company Platform.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
TRIAL EXHIBIT NO. 1505
CASE NO.: 3:24-cr-00329-CRB
DATE ENTERED________
BY__________________
DEPUTY CLERK

**3. Provision of Health Care Services.** The parties hereto acknowledge that Company is not authorized or qualified to engage in any activity which may be construed or deemed to constitute the practice of nursing or any other medical or health care practice in any jurisdiction where Practitioner furnishes clinical services. Company shall not provide or otherwise engage in services or activities which constitute the practice of nursing as defined by the laws of [Texas] or any other jurisdiction where the Practitioner furnishes clinical services. Company shall neither have nor exercise any control or discretion over the methods by which the Practitioner shall practice nursing or provide ancillary services. The rendition of all professional services, including, but not limited to, diagnosis, treatment, and the prescription or administration of medicine and drugs, and the supervision and preparation of medical records and reports, shall be the sole responsibility of the Practitioner.

(a) Practitioner shall be solely and exclusively in control of all aspects of the practice of nursing and the provision of professional services to his or her patients.

(b) Practitioner shall at all times be solely responsible for supervising other personnel performing medical services under its orders or on its behalf. Company shall in no way determine or set the methods, standards or conduct of the practice of nursing or medical care at or by the Practitioner.

(c) All medical records, charts, and records pertaining to the Practitioner's active and/or inactive patients shall be and remain property of and shall be maintained by and under the control of the Practitioner; provided, however, that any such records may be stored by Company while separately identified as belonging to Practitioner, and provided further that after termination of this Agreement, Company shall be entitled to be provided with continuing access to such records and charts as needed to perform Company's duties and obligations under this Agreement, any other agreement to which Company and Practitioner are parties and as may be reasonably necessary for the defense of any judicial, administrative or disciplinary proceeding in which Company is a party, provided that such access does not violate any applicable law.

(d) The Company shall establish default prices for the services furnished by Practitioner through the Company Platform. Company may adjust such default prices in its discretion from time to time. Practitioner in his or her sole discretion may elect to charge prices for services furnished through the Company Platform that are different than the default prices established by Company. All claims and bills which may be submitted or delivered on behalf of Practitioner by Company shall be restricted to professional services and items rendered by Practitioner.

(e) Any advertising, marketing or public relations services facilitated by Company at the request and pursuant to the direction of Practitioner, shall be conducted in compliance with [Texas] law and, to the extent applicable, the law in other jurisdictions.

**4. Intellectual Property.**

(a) During the term of this Agreement, Company hereby grants to the Practitioner a non-exclusive, non-transferable, non-sublicensable right and license to use, solely in connection with the provision of nursing services and to perform under this Agreement, all

intellectual property owned by Company that is made available to Practitioner pursuant to this Agreement, including: (i) processes, procedures, methods, methodologies, know-how, (ii) materials, documentation, or other original work of authorship; (iii) trade names, trademarks, service marks, domain names, whether or not registered, together with the goodwill of the business connected with and symbolized thereby; and (vi) trade secrets (collectively, but excluding the Company Platform, the "**Company IP**").

(b) Practitioner agrees to use the Company IP only in accordance with the terms of this Agreement and as may be directed by Company. With respect to any trade names, trademarks, service marks, domain names included in the Company IP (the "**Company Marks**), the Practitioner agrees to: (i) comply with all trademark, style and/or quality control guidelines and requirements concerning the style, design, display, and use of the Company Marks provided to Practitioner; (ii) prior to the display, publication or any public use of any advertising, promotional or informational materials, or other publicly published materials, utilizing or bearing any Company Marks, submit to Company all such materials for Company's prior approval, which shall not be unreasonably withheld; and (iii) permit Company or its representatives the right to take action necessary to monitor Practitioner's compliance with the terms of this Section 4. During the term of this Agreement, the Practitioner agrees not to create, adopt or use in connection with its practice or otherwise any trade name, domain name, trademark or service mark, whether registered or not, that incorporates, or that may be confusingly similar to, any Company Mark. All uses of any Company Mark shall inure solely to benefit of Company.

(c) Practitioner agrees that Company exclusively owns all right, title and interest in and to the Company IP and the Company Platform, and reserves all rights thereto, except as explicitly granted in this Agreement.[1] During the term of this Agreement and thereafter, Practitioner agrees not to challenge, contest or question the validity of the Company's right, title and interest to any Company IP or the Company Platform.

(d) Practitioner agrees to immediately notify Company of any suspected or alleged infringement, misappropriation or improper use of any Company IP or Company Platform thereof by any person, which comes to its attention. Company shall have the sole right to take whatever action it deems reasonable and necessary to protect its rights, title and interest to the Company IP and Company Platform, and Practitioner agrees not to take any related action without the prior express written consent of Company.

(e) Practitioner may from time to time provide suggestions, comments or other feedback to Company with respect to the Services provided hereunder ("**Feedback**"). Practitioner shall, and hereby does, grant to Company a nonexclusive, worldwide, perpetual, irrevocable, transferable, sub-licensable, royalty-free, fully paid-up license to use and exploit the Feedback for any purpose.

(f) Except as expressly set forth herein, Practitioner shall not (and shall not permit any third party to), directly or indirectly: (i) reverse engineer, decompile, disassemble, or otherwise attempt to discover the source code, object code, or underlying structure, ideas, or

[1] Note to Okay Health: Do you anticipate the NPs creating any IP or developing work product that should be owned by you? For example, will they create any patient forms that Okay should own?

algorithms of any software that may be included in the Company IP or Company Platform (except to the extent applicable laws specifically prohibit such restriction); (ii) modify, translate, or create derivative works based on the Company IP or Company Platform; (iii) license, sublicense, sell, resell, rent, lease, transfer, assign, distribute, time share, or make the Company IP or Company Platform available to any third party (other than, for the avoidance of doubt, the Practitioner's patients); (iv) interfere or attempt to interfere with the proper working of any software that may be included in the Company IP or Company Platform; (v) use the Company IP or Company Platform to build an application or product that is competitive with any Company product or service; or (vi) use Company IP or Company Platform other than for its legitimate purposes as contemplated by this Agreement.

**5. Equipment.** Practitioner acknowledges that Company makes no representation or warranty, express or implied, as to the fitness, suitability or adequacy of any furniture, fixtures, office equipment and supplies ("FF&E"), which are leased or provided pursuant to this Agreement, for the conduct of the Practitioner or for any other particular purpose. Practitioner shall not make any changes, alterations or additions to the FF&E without the prior written consent of Company.

**6. Billing and Collection.** Company shall, on behalf of Practitioner, provide directly, or through a contract, for billing and collection of the charges made with respect to professional and ancillary services provided by Practitioner.

(a) Practitioner agrees to maintain and to provide to Company all documents and other evidence and records necessary to support the billings. Company agrees to maintain, complete and accurate records of all fees, charges and billings for professional and ancillary services.

(b) All payments for professional and ancillary services provided to Practitioner shall be the property of Practitioner, subject to Company's right to payment for its services hereunder.

(c) To enable Company to perform its billing and collection responsibilities hereunder, Practitioner hereby irrevocably appoints Company as its true and lawful attorney-in-fact for such purposes. The parties acknowledge and agree that Company's appointment as Practitioner's attorney-in-fact is limited to the term of this Agreement and shall extend beyond the term of this Agreement only as necessary to allow Company to bill and collect for services provided by Practitioner during the term of this Agreement, as provided hereunder. Company shall have full power to (i) take possession of and endorse in the name of Practitioner, for the purposes of deposit into Practitioner's account, any notes, checks, money orders, insurance payments, and any other documents received in payment, (ii) facilitate normal billing follow-up, including assignment for collection and arranging for such collection services and attorney services as Company deems necessary, and (iii) sue for, and give satisfaction for monies due on account. Company's cost of collections and enforcement, including attorneys' fees and out-of-pocket expense, shall be borne by Company as one of its obligations to Practitioner pursuant to this Agreement.

**7. Access to Books, Records; Patient Files.** The Practitioner shall give to Company, or its designees, full access to and custody of its books, records and patient files

order to enable Company to perform its duties hereunder. Company shall maintain all files and records relating to the Practitioner's operation of the nursing practice consistent with records management practices. Practitioner shall have full access to the Practitioner's business, financial and other records (including, but not limited to, billing and collection records) kept by Company on behalf of Practitioner by virtue of this Agreement. All patient records, reports and information obtained, generated, or encountered relating to Practitioner's nursing practice, shall at all times be the property of Practitioner.

**8. <u>Compensation</u>.**

(a) In consideration for the services, space, non-clinical equipment, and the services furnished to Practitioner by the Manger hereunder, Practitioner shall pay to the Company a fee (the "**Fee**") equal to one hundred dollars ($100) per patient per initial visit and ten dollars ($10) per patient per follow-up visit. The Company may deduct the Fee from amounts collected on behalf of the Practitioner.

(b) The parties agree that the Fee payable to Company by Practitioner for the services rendered pursuant to this Agreement shall be reviewed and subject to adjustment during the Term of this Agreement. In the event of an adjustment to the Fee, Practitioner shall not incur the adjusted Fee until future services are rendered. Services agreed to prior to the Fee adjustment shall be subject to the original Fee.

(c) The parties, having considered various compensation formulae, acknowledge and agree that in order for Company to receive a fair and reasonable return for its expenses and obligations, and for providing the services contemplated hereunder, that the agreed Fee is not excessive, is commercially reasonable under the circumstances, and represents fair market value for the services rendered.

**9. <u>Independent Contractors; No Partnership.</u>** Under the terms of this Agreement, and in the performance of all obligations hereunder, Company shall be considered an independent contractor of non-clinical services to Practitioner, and the Practitioner shall not withhold or in any way be responsible for the payment of any federal, state or local income withholding or occupational taxes, social security taxes, unemployment compensation or workers' compensation contributions, vacation pay, sick leave, retirement benefits or any other payments for or on behalf of Company. Nothing herein shall be construed to create a partnership or principal-agent, employer-employee, master-servant, partner or joint venture relationship between the parties. Except as otherwise set forth herein, neither party shall have the authority to bind the other party. The parties hereto expressly disclaim any intent to create a partnership or joint venture and nothing in this Agreement shall be construed as evidence that a partnership has or will be created. None of the parties hereto shall assert any claim or bring any action before any court, arbitrator, agency or tribunal that this Agreement and the performance of the obligations of any party hereto results in the creation of a partnership or joint venture of any kind.

**10. <u>Insurance</u>.**

(a) <u>Malpractice Insurance</u>. Practitioner shall procure and maintain, at the Practitioner's sole cost and expense, throughout the entire term of this Agreement, professional liability insurance coverage on Practitioner and all professionals who are employed by

Practitioner in the minimum amount of ($1,000,000.00) per occurrence and ($3,000,000.00) per annual aggregate. The professional liability insurance policies maintained by Practitioner shall name Company, as additional insured parties thereunder, and shall provide for at least thirty (30) days advance written notice from the insurer as to any alteration of coverage, cancellation, or other termination. In the event of any alteration of coverage or termination of this Agreement, Practitioner will continue to insure Company under a tail-coverage policy for the period of time that Company provided services to Practitioner under this Agreement.

(b) Other. Practitioner shall not alter, cancel or terminate any insurance coverage without the Company's prior written consent.

**11. Termination.**

(a) Termination Without Cause. This Agreement may be terminated by either party without cause upon thirty (30) days' written notice to the other party. In no event shall termination relieve Practitioner of the obligation to Company for Services furnished prior to termination.

(b) Termination by Company. If any one or more of the following events shall occur, Company may, at its option, immediately terminate this Agreement upon notice to the Practitioner of such termination:

(i) if there shall occur any revocation or suspension of Practitioner's ability to furnish clinical services in the State of [Texas] or any other jurisdiction;

(ii) if there shall occur any revocation or termination of Practitioner's malpractice insurance;

(iii) if this Agreement or any part thereof is transferred to or assigned by Practitioner to any person or entity, except as may be otherwise herein permitted;

(iv) upon the filing of a petition in voluntary bankruptcy or an assignment for the benefit of creditors by Practitioner, or upon other action taken or suffered, voluntarily or involuntarily, under any federal or state law for the benefit of insolvents by Practitioner, except for the filing of a petition in involuntary bankruptcy against Practitioner with the dismissal thereof within thirty (30) days thereafter;

(v) if material default shall be made by Practitioner in the performance of or compliance with any of the covenants, agreements, terms or conditions of this Agreement, and such default shall continue for a period sixty (60) days after written notice thereof from Company to Practitioner specifying the items in default; or

(vi) in the event that legal counsel determines that more likely than not this Agreement is in violation of any federal statute, rule or regulation, or any statute, rule or regulation of any jurisdiction where Practitioner furnishes clinical services, including but not limited to, any medical and state health care programs, fraud and abuse or state laws governing fee-splitting, then the parties agree to negotiate, in good faith, amendments to this Agreement to conform to such statute, rule or regulation. If the parties are unable to negotiate such amendment

in good faith within sixty (60) days, then, in such event, this Agreement may be immediately terminated by either party upon written notice to the other party.

(b) Termination by Practitioner.

(i) Immediate Termination by Practitioner. Practitioner may, at its option, terminate this Agreement upon its determination that any of the following events has occurred: A receiver has been appointed for Company's assets or the assignment by Company for the benefit of its creditors, or any relief taken or suffered by Company under any bankruptcy or insolvency act except for the filing of a petition in involuntary bankruptcy against Practitioner with the dismissal thereof within thirty (30) days thereafter. Such termination shall be effective immediately upon notice by Practitioner to Company.

(ii) Material Breach. In the event of a material breach of this Agreement by Company, Practitioner may, at its option, terminate this Agreement if such breach continues for sixty (60) days after the parties have met to resolve such material breach following receipt by Company of notice specifying such breach in reasonable detail; provided, however, (i) if upon the expiration of the cure period, the Company is still diligently pursuing effectuation of such cure, or if the Company has diligently attempted to effect such a cure within such cure period but cannot complete such cure because of the failure of a third party (such as a governmental agency) to act within such period, then the Company shall have a reasonable time beyond such cure period to complete its cure, and (ii) no action to terminate this Agreement can be taken by Practitioner until the dispute resolution mechanism set forth in this Agreement is completed.

(c) Effect of Termination. Termination of this Agreement shall release and discharge Practitioner from any obligation, debt or liability which shall have previously accrued and remained to be performed upon the date of termination; however, termination of this Agreement shall not release or discharge Company from any obligation, debt or liability which shall have previously accrued and remained to be performed upon the date of termination. Within thirty (30) days after any termination of this Agreement pursuant to this Section, an accounting shall be made by each party of monies which may be due and owing the other and payment shall be forthcoming to settle any such balance within fifteen (15) days after each such accounting. No failure or delay on the part of any party to exercise its right of termination hereunder for any one or more causes shall be considered to prejudice said party's right of termination for such or for any other subsequent cause. Furthermore, no termination of this Agreement shall in any way affect the survival of any right, duty, or obligation which is expressly stated elsewhere in this Agreement to survive such termination. In the event of a conflict between this Section 11(d) and a future agreement between the parties, this Section 11(d) shall be superseded by the future agreement.

**12. Confidential Information.**

(a) Each party (the **"Receiving Party"**) understands that the other party (the **"Disclosing Party"**) has disclosed or may disclose Confidential Information. **"Confidential Information"** shall mean any such information or data disclosed under the Agreement that (i) is clearly marked as confidential, proprietary or with a similar designation, (ii) is identified by the Disclosing Party as confidential or proprietary at the time of disclosure, or (iii) understood

or should be understood by a reasonable person familiar with the business or operations of the Disclosing Party to be confidential or proprietary to the Disclosing Party. For the avoidance of doubt, (1) the terms and conditions (but not the existence of) this Agreement is considered Confidential Information and (2) any information concerning the management, structure, marketing and general operations of Company, and any and all documents bearing Company form number or other identifying mark of Company, any operating manuals or similar materials that constitute the non-dental systems, policies and procedures, methods of doing business developed by Company administrative, advertising or marketing techniques, financial affairs and other information utilized by Company, technical know-how, processes, designs, drawings, customer lists, fees, data, reports, records, plans, policies, applications, or other documents or information which is not in the public domain concerning the assets, liabilities, business, operations and/or prospects of Company, is considered the Confidential Information of Company. Notwithstanding anything to the contrary, Protected Health Information shall not be considered Confidential Information and its treatment shall be addressed elsewhere herein.

(b) The Receiving Party agrees that, without the explicit prior written consent of the Disclosing Party, not to disclose, allow to be disclosed, divulge, provide or otherwise make available to any third person any of the Disclosing Party's Confidential Information, except to (i) its employees and consultants who have a "need-to-know" or are required to access such Confidential Information in connection with the exercise of Receiving Party's rights and performance of its obligations under this Agreement; (ii) professional advisers (*e.g.*, lawyers and accountants); or (iii) existing and potential investors, lenders and acquirers and the accountants, advisors and other professional representatives of any of the foregoing; provided, however, that any and all such employees, consultants and advisers are bound by written agreements or, in the case of professional advisers, ethical duties, to treat, hold and maintain such Confidential Information in accordance with the terms and conditions of this Agreement. The Receiving Party agrees not to use the Disclosing Party's Confidential Information for any purpose other than to perform their obligations or exercise their rights under this Agreement. The Receiving Party agrees to take the same security precautions to protect against disclosure or unauthorized use of such Confidential Information that the party takes with its own Confidential Information, but in no event will a party use less than its reasonable best efforts to protect such Confidential Information.

(c) The Disclosing Party agrees that the foregoing will not apply with respect to any information that: (i) is or is becoming generally available to the public without breach of any this Agreement, or any other confidentiality obligation, of the Receiving Party, (ii) was known to the Receiving Party prior to receipt from the Disclosing Party from a source having lawful possession of such information that does not have an obligation of confidentiality to the Disclosing Party, (iii) becomes known (independently of disclosure by the Disclosing Party) to the Receiving Party directly or indirectly from a source having lawful possession of such information that does not have any obligation of confidentiality to the Disclosing Party, or (iv) was independently developed by the Receiving Party without use or reference of any Confidential Information of the Disclosing Party. Notwithstanding the foregoing, the Receiving Party shall have the right to disclose Confidential Information if such disclosure is required by law, provided that if the Receiving Party is required by law to disclose Confidential Information, then, prior to any such disclosure, the Receiving Party shall (1) give prompt written notice of such requirement to the Disclosing Party so it can have the opportunity to seek a protective order or other appropriate remedy; and (2) reasonably cooperate in the Disclosing Party's attempts to obtain confidential treatment or otherwise limit the disclosure of such Confidential Information.

(d) Practitioner agrees to return, or, at Company's election, destroy, all copies of Confidential Information of Company related thereto to Company at Practitioner's expense, promptly upon the expiration or earlier termination of this Agreement

**13. <u>Compliance with Laws and Regulations</u>**

(a) Each party hereto represents and warrants to the other party that it is not knowingly violating any federal, state or local laws or regulations by entering into this Agreement or performing its obligations hereunder.

(b) Contemporaneously with the execution of this Agreement, the parties will enter into the HIPAA Business Associate Agreement between Company and the Practitioner, attached hereto as **<u>Exhibit A</u>** and incorporated into this Agreement (the "**Business Associate Agreement**"). The confidentiality obligations established under this Section and the Business Associate Agreement shall survive the termination of this Agreement. The damages and relief upon a violation of this Section and the Business Associate Agreement shall be those available at law and in equity.

**14. <u>Representations and Warranties of the Practitioner</u>.** Practitioner hereby makes the following representations and warranties to Company, each of which is material and is being relied upon by Company, and each of which shall be true as of the date hereof and shall continue to be true throughout the term of this Agreement.

(a) <u>Professional Services</u>. The professional services to be provided by Practitioner shall be provided only by Practitioner or its employees or independent contractors who are duly licensed to engage in the practice of their profession in any jurisdiction where Practitioner or Practitioner's employee or independent contractor furnishes services on behalf of Practitioner, who are not suspended, terminated or otherwise sanctioned by a professional licensing agency, and who have never been denied appointment or reappointment of, or been terminated from, membership on the staff of any hospital or any other medical or health care facility for reasons of ethics or competency, and against whom no proceedings are pending which could result in such denial or termination.

(b) <u>Notification</u>. During the term of this Agreement and for a period of one (1) year following the termination or expiration of this Agreement, Practitioner shall notify Company of (a) any Adverse Actions or any basis therefor relating to or arising from actions occurring during the periods prior to and during the term of this Agreement or relating to the Services provided hereunder within five (5) business days of the occurrence of any such Adverse Actions or any basis therefor; or (b) any complaint, investigation, inquiry or review by any governmental or non-governmental agency or third party payor relating to or arising from actions occurring during the periods prior to and during the term of this Agreement or relating to the services provided hereunder. Such notice shall include a description of the matters at issue. The term "**Adverse Action**" as used in this Agreement means any negative action that could materially affect Practitioner, including but not limited to, the following:

(i) Any final actions or civil judgments in federal or state court related to the delivery of a health care item or service;

(ii) Any federal or state criminal final actions or convictions related to the delivery of a health care item or service;

(iii) Any actions by federal or state agencies responsible for the licensing and certification of medical care providers or suppliers, or any other board, institution, organization or professional society having any privilege or right to pass judgment upon the conduct of nurse practitioners or ancillary medical care providers or suppliers, including, but not limited to:

(1) formal or official actions, such as revocation, limitation, or suspension of a license (and the type of such limitation and/or the length of any such suspension), reprimand, censure or probation;

(2) any other temporary or final loss of license or the right to apply for, or renew, a license of the provider, supplier, or practitioner, whether by operation of law, voluntary surrender, non-renewability, or otherwise; or

(3) any other negative action or finding by such federal or state agency; and

(iv) Any complaint, arrest, indictment, subpoena, or audit related to the delivery of a health care item or service.

**15.** **Representations and Warranties of Company.** Company hereby makes the following representations warranties to Practitioner, each of which is material and is being relied upon by Practitioner, and each of which shall be true as of the date hereof and shall continue to be true throughout the term of this Agreement.

(a) Company's Status. At all times relevant hereto, Company shall be duly organized and validly existing under the laws of the [State of Delaware].

(b) Authorization. The execution, delivery and performance of this Agreement has and will be duly authorized by the Company's Board of Directors and this Agreement is the legal, valid and binding obligation of Company, enforceable against Company in accordance with its terms.

(c) Negative Covenants. Notwithstanding any other provision of this Agreement, Company shall not directly or indirectly, refer any patients, items, or services to Practitioner.

**16.** **Injunctive Relief.** Each party acknowledges that a violation of any of the provisions of this Agreement will cause the other party irreparable injury. Accordingly, each party may enforce such provisions by seeking injunctive or other equitable relief or specific performance in addition to any other remedies available at law or in equity. In the event a court

of competent jurisdiction declares any of the provisions of this Agreement to be too broad to be specifically enforced, such provisions shall be enforced to the maximum extent permitted by law.

**17. Limitation of Liability; Indemnification**

(a) DISCLAIMER OF CONSEQUENTIAL DAMAGES. NOTWITHSTANDING ANY OTHER PROVISION IN THE AGREEMENT, EXCEPT FOR (A) PRACTITIONER'S BREACH OF SECTION 2 (ACCESS TO PLATFORM), OR SECTION 14 (REPRESENTATIONS AND WARRANTIES OF PRACTITIONER) ABOVE AND (B) EITHER PARTY'S BREACH OF SECTION 12 (CONFIDENTIAL INFORMATION) ABOVE, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY SPECIAL, INDIRECT, RELIANCE, INCIDENTAL OR CONSEQUENTIAL DAMAGES OF ANY KIND, LOST OR DAMAGED DATA, LOST PROFITS OR LOST REVENUE, WHETHER ARISING IN CONTRACT, TORT (INCLUDING NEGLIGENCE), OR OTHERWISE, EVEN IF A PARTY HAS BEEN NOTIFIED OF THE POSSIBILITY THEREOF.

(b) GENERAL CAP ON LIABILITY. NOTWITHSTANDING ANY OTHER PROVISION OF THE AGREEMENT, EXCEPT FOR (A) PRACTITIONER'S BREACH OF SECTION 2 (ACCESS TO PLATFORM) OR SECTION 14 (REPRESENTATIONS AND WARRANTIES OF PRACTITIONER) ABOVE OR (B) EITHER PARTY'S BREACH OF SECTION 12 (CONFIDENTIAL INFORMATION) ABOVE, UNDER NO CIRCUMSTANCES WILL EITHER PARTY'S LIABILITY FOR ALL CLAIMS ARISING UNDER OR RELATING TO THE AGREEMENT (INCLUDING BUT NOT LIMITED TO WARRANTY CLAIMS), REGARDLESS OF THE FORUM AND REGARDLESS OF WHETHER ANY ACTION OR CLAIM IS BASED ON CONTRACT, TORT, OR OTHERWISE, EXCEED THE AGGREGATE FEES PAID BY PRACTITIONER TO COMPANY UNDER THE AGREEMENT DURING THE TWELVE (12) MONTH PERIOD PRECEDING THE EVENT OR CIRCUMSTANCES GIVING RISE TO SUCH LIABILITY. THIS LIMITATION OF LIABILITY IS CUMULATIVE AND NOT PER INCIDENT.

(c) Indemnification by Company. Company will indemnify, defend and hold Practitioner and the officers, directors, agents, and employees of Practitioner ("Practitioner Indemnified Parties") harmless from settlement amounts and damages, liabilities, penalties, costs and expenses ("Liabilities") that are payable to any third party or incurred by the Practitioner Indemnified Parties (including reasonable attorneys' fees) arising from, directly or indirectly, any claim, demand or allegation by a third party that arises out of any copyright infringement claim that involves, relates to or concerns the Company Platform (except for claims for which Company is entitled to indemnification under Section 17(d), in which case Company will have no indemnification obligations with respect to such claim). Company will have no liability or obligation under this Section 17 with respect to any Liability if such Liability is caused in whole or in part by (x) modification of the Company Platform by any party other than Company without Company's express consent; (y) the combination, operation, or use of the Company Platform with other product(s), data or services where the Company Platform would not by itself be infringing; or (z) unauthorized or improper use of the Company Platform. If the use of the Company Platform by Practitioner has become, or in Company's opinion is likely to

become, the subject of any claim of infringement, Company may at its option and expense (a) procure for Practitioner the right to continue using the Company Platform as set forth hereunder; (b) replace or modify the Company Platform to make it non-infringing so long as the Company Platform has at least equivalent functionality; (c) substitute an equivalent for the Company Platform or (d) if options (a)-(c) are not reasonably practicable, terminate the Agreement. This Section 17(c) states Company's entire obligation and Practitioner's sole remedies in connection with any claim regarding the intellectual property rights of any third party.

(d) Indemnification by Practitioner. Practitioner will indemnify, defend and hold Company and the officers, directors, agents, and employees of Company ("Company Indemnified Parties") harmless from Liabilities that are payable to any third party or incurred by the Company Indemnified Parties (including reasonable attorneys' fees) arising from, directly or indirectly, any claim, demand or allegation by a third party (a) arising from or related to any use or disclosure by Practitioner of the Company Platform or any portion thereof in violation of the Agreement, (b) a breach or alleged breach by Practitioner of Section 12 or 14, or (c) that arises out of or relates to any claim for medical malpractice.

(e) Indemnification Procedure. If a Practitioner Indemnified Party or a Company Indemnified Party (each, an "Indemnified Party") becomes aware of any matter it believes it should be indemnified under Section 17(c) or Section 17(d), as applicable, involving any claim, action, suit, investigation, arbitration or other proceeding against the Indemnified Party by any third party (each an "Action"), the Indemnified Party will give the other party (the "Indemnifying Party") prompt written notice of such Action. The Indemnified Party will cooperate, at the expense of the Indemnifying Party, with the Indemnifying Party and its counsel in the defense and the Indemnified Party will have the right to participate fully, at its own expense, in the defense of such Action with counsel of its own choosing. Any compromise or settlement of an Action will require the prior written consent of both Parties hereunder, such consent not to be unreasonably withheld or delayed.

**18. Right to Subcontract**. Company is hereby expressly authorized to subcontract with any other persons or entities for all or any portion of the services Company is required to provide or furnish to Practitioner pursuant to this Agreement; provided, however, that Company shall remain responsible for all services performed by such other persons or entities. Company may disclose any term of this Agreement to any subcontractor of Company who performs services for Practitioner on behalf of Company.

**19. No Act Contrary To Law.** Nothing herein shall be construed so as to require the commission of any act contrary to law, and wherever there is any applicable statute, law, ordinance or regulation which is inconsistent with this Agreement, such statute, law, ordinance or regulation shall prevail, and, in such event, the provision herein in conflict automatically shall be curtailed, limited, or eliminated to the extent necessary to bring it within legal limitations.

**20. Changes in Law and Regulations.** Notwithstanding anything herein to the contrary, if during the term hereof any Change of Law results in an Adverse Consequence (as such terms are hereinafter defined), the parties agree to cooperate in making reasonable revisions to this Agreement in order to avoid such Adverse Consequence. If the parties through good faith negotiations fail to agree to such revisions after thirty (30) days following written notice by any party to the other parties requesting renegotiation, then the matter shall be submitted to binding

arbitration in accordance with this Section. As used herein, "**Change of Law**" shall mean: (i) any new legislation enacted by the federal or any state or local government; (ii) any new third party payer or governmental agency law, rule, regulation or guideline; (iii) any judicial or administrative order, decree or decision; or (iv) any interpretation of (i), (ii), or (iii) above by a court of competent jurisdiction or by a formal written opinion issued by legal counsel to Company or Practitioner. As used herein, "**Adverse Consequence**" shall mean a Change of Law that prohibits, restricts, limits or otherwise affects any party's rights or obligations hereunder in a material manner or otherwise makes it desirable for the parties to restructure the relationship established hereunder because of material legal or financial consequences expected to result from such Change of Law.

**21.** **Governing Law and Choice of Forum.** The construction, interpretation and performance of this Agreement and all transactions under this Agreement shall be governed and enforced pursuant to the laws of the [State of Texas], without giving effect to its conflicts of laws provisions, except to the extent [Texas law] is preempted by any provision of federal law. The parties agree that all disputes arising out of or relating to this Agreement will be subject to mandatory binding arbitration under the rules of Judicial Administration and Arbitration Services ("**JAMS**") in effect at the time of submission, as modified by this Section 21. The arbitration will be heard and determined by a single arbitrator selected by mutual agreement of the parties, or, failing agreement within thirty (30) days following the date of receipt by the respondent of the claim, by JAMS. Such arbitration will take place in [Los Angeles, CA]. The arbitration award so given will be a final and binding determination of the dispute, and will be fully enforceable in any court of competent jurisdiction. Except in a proceeding to enforce the results of the arbitration or as otherwise required by law, neither party nor any arbitrator may disclose the existence, content or results of any arbitration hereunder without the prior written agreement of both parties.

**22.** **Notices.** Any and all notices and other correspondence required or permitted to be given in connection with, or pursuant to, this Agreement shall be in writing and delivered by hand, by recognized national overnight courier or by deposit in the United States mail, registered or certified mail, return receipt requested, with full postage prepaid and addressed to the recipient's place business residence or such other addresses as the parties may, from time-to-time, designate by written notice to each other in the foregoing manner. Notices given by mail shall be deemed effectively given on the earlier of the date shown on the proof of receipt of such mail or, unless the recipient proves that the notice was received later or not received, three (3) days after the date of mailing thereof. Other notices shall be deemed effectively given on the date of receipt.

**23.** **No Assignment.** Neither this Agreement nor any of the rights or obligations of the parties hereunder may be assigned by Practitioner, in whole or in part, without the express, prior written consent of Company, which consent shall not be unreasonably withheld. Company may assign such rights or obligations as it deems appropriate, including, but not limited to its affiliates and its lenders at the Company's sole and exclusive discretion.

**24.** **No Obligation to Third Parties.** None of the obligations and duties of the parties under this Agreement shall in any way or manner be deemed or construed to create any obligation of either party to, or any rights in, any person or entity not a party to this Agreement, except as this Agreement may expressly state otherwise.

**25. No Oral Modifications or Amendments.** This Agreement may not be modified, altered, amended, changed, waived or terminated, except pursuant to a writing signed by both parties hereto.

**26. No Waiver.** The failure by either party hereto to object to or take affirmative action with respect to any conduct of the other party which constitutes a breach or other violation of this Agreement shall not constitute, nor be construed as, a waiver thereof, or of any future breach, violation, or subsequent wrongful conduct.

**27. Severability and Reformation.** In the event that any one or more provisions of this Agreement shall be declared invalid or unenforceable in any court of competent jurisdiction or otherwise conflict with applicable law, such provisions shall, to the extent possible, be reformed in such a fashion as to not be invalid, unenforceable or otherwise in conflict with applicable law, and if such reformation is not possible, then and in that event such provisions shall be deemed deleted herefrom and the remaining provisions, terms and conditions hereof shall be and continue to be in full force and effect.

**28. Entire Agreement.** This writing and any exhibits or schedules hereto contains the entire agreement and understanding of the parties hereto with respect to the subject matter set forth herein or necessarily implied, and supersedes all prior agreements by and between the parties hereto with respect to the same subject matter (other than those agreements dated even date herewith that have been executed in connection with this Agreement). No agreements, promises, covenants, representations, warranties or indemnities have been made or relied upon by either of the parties hereto, other than those that are expressly herein set forth.

**29. Counterparts.** This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original hereof, but all of which shall constitute one and the same instrument.

(*The remainder of this page is intentionally blank. Signature page follows*.)

IN WITNESS WHEREOF, the parties hereto have executed this Agreement effective as of the date first hereinabove written.

**Okay Health**

DocuSigned by:

By: Anh Tran

6A8E8A948F40444...

Name: Anh Tran

Title: CEO

[______________________]

DocuSigned by:

Nwamaka Emeruem

A27D72ACDA19441...

Name: Nwamaka Emeruem

## Exhibit A

## BUSINESS ASSOCIATE AGREEMENT

THIS BUSINESS ASSOCIATE AGREEMENT (this *"Agreement"*), effective as of 4/9/2020 ___________ 2020 (the "*Effective Date*") is by and between [Nwamaka Emeruem] a health practitioner licensed in [State] (*"Covered Entity"*), and **OKAY HEALTH,** a [Delaware Corporation] (*"Business Associate"*).

### RECITALS:

WHEREAS, Business Associate has entered into an agreement with Covered Entity for the purposes of performing certain services for Covered Entity (the terms and conditions of such agreement between the parties hereinafter referred to as the *"Services Agreement"*);

WHEREAS, pursuant to the Administrative Simplification provisions of the Health Insurance Portability and Accountability Act of 1996 (the "*Act*""), add 42 CFR Part 2, and the "Health Information Technology for Economic and Clinical Health Act," part of the "American Recovery and Reinvestment Act of 2009" ("*HITECH Act*"), the Department of Health and Human Services ("*HHS*") has promulgated regulations at 45 C.F.R. Parts 160-64, including regulations implementing certain privacy requirements (the *"Privacy Rule"*), certain security requirements regarding electronic media ("*Security Rule*") and certain breach notification requirements (*"Breach Notification Rule"*), each as amended from time to time (the Act, HITECH Act, the Privacy Rule, the Security Rule and the Breach Notification Rule referred to collectively herein as "*HIPAA*");

WHEREAS, Business Associate may receive, maintain, retain, record, store, transmit, hold, use and/or disclose Protected Health Information (as defined below) in conjunction with the services being provided under the Services Agreement, thus necessitating a written agreement that meets applicable requirements of the Privacy Rule and the Security Rule, and making advisable certain additional agreements regarding HIPAA; and

WHEREAS, Business Associate and Covered Entity desire to satisfy the foregoing Privacy Rule and Security Rule requirements through this Agreement, and otherwise to address related matters regarding HIPAA on the terms and conditions set forth herein.

NOW THEREFORE, in consideration of the mutual agreements and undertakings of the parties, and for other good and valuable consideration the sufficiency of which is hereby acknowledged, the parties, intending to be legally bound, hereby agree as follows:

**1. Definitions:**

The following terms shall have the following meaning when used in this Agreement:

a. *"Breach"* shall have the same meaning as the term "breach" in 45 C.F.R. § 164.402.

b. *"Designated Record Set"* shall have the same meaning as the term "designated record set" in 45 C.F.R. § 164.501.

c. *"Electronic Protected Health Information"* shall mean Protected Health Information that is "electronic protected health information" as defined in 45 C.F.R. § 160.103.

d. *"Individual"* shall have the same meaning as the term "individual" in 45 C.F.R. §160.103 and shall include a person who qualifies as a personal representative in accordance with 45 C.F.R. §164.502(g).

e. *"Protected Health Information"* shall have the same meaning as the term "protected health information" in 45 C.F.R. § 160.103, except limited to the information received from Covered Entity, or created, maintained or received on behalf of Covered Entity.

f. *"Unsecured Protected Health Information"* shall mean Protected Health Information that is "unsecured protected health information" as defined in 45 C.F.R. § 164.402.

g. *"Required By Law"* shall have the same meaning as the term "required by law" in 45 C.F.R. § 164.103.

h. *"Secretary"* shall mean the Secretary of HHS or the designee of the Secretary of HHS.

i. *"Subcontractor"* shall have the same meaning as the term "subcontractor" in 45 C.F.R. §160.103, except limited to any such individual or entity who creates, receives, maintains, or transmits Protected Health Information on behalf of Business Associate.

Any capitalized term not specifically defined herein shall have the same meaning as is set forth in 45 C.F.R. Parts 160 and 164, where applicable. The terms "use," "disclose" and "discovery," or derivations thereof, although not capitalized, shall also have the same meanings set forth in HIPAA.

**2. <u>Obligations and Activities of Business Associate</u>:**

a. Business Associate agrees to not use or disclose Protected Health Information other than as permitted or required by this Agreement or as Required By Law.

b. Business Associate agrees use appropriate safeguards and comply, where applicable, with Subpart C of 45 C.F.R. Part 164 with respect to Electronic Protected Health Information, to prevent use or disclosure of the Protected Health Information other than as provided for by this Agreement.

c. Business Associate agrees to report to the Covered Entity any use or disclosure of Protected Health Information not provided for by this Agreement, including, without limitation, Breaches of Unsecured Protected Health Information as required at 45 C.F.R. 164.410, and any Security Incident of which it becomes aware. The parties acknowledge and agree that this Section 2(c) constitutes notice by Business Associate to Covered Entity of the ongoing existence and occurrence of attempted but unsuccessful Security Incidents for which no additional notice to Covered Entity shall be required. Unsuccessful Security Incidents shall include, but not be limited to, pings and other broadcast attacks on Business Associate's firewall, port scans, unsuccessful log-on attempts, denials of service and any combination of the above, so long as such incidents do not result, to the extent Business Associate is aware, in unauthorized access, use or disclosure of Electronic Protected Health Information.

d. In accordance with 45 C.F.R. 164.502(e)(1)(ii) and 164.308(b)(2), if applicable, Business Associate agrees to ensure that any Subcontractors that create, receive, maintain, or transmit Protected Health Information on behalf of Business Associate agree in writing to the same restrictions, conditions, and requirements that apply to Business Associate under this Agreement with respect to such Protected Health Information.

e. Business Associate agrees to make available Protected Health Information in a Designated Record Set to Covered Entity as necessary to satisfy Covered Entity's obligations under 45 C.F.R. § 164.524.

f. Business Associate agrees to make any amendment(s) to Protected Health Information in a Designated Record Set as directed or agreed to by the Covered Entity pursuant to 45 C.F.R. § 164.526, or take other measures as necessary to satisfy Covered Entity's obligations under 45 C.F.R. § 164.526.

g. Business Associate agrees to maintain and make available the information required to provide an accounting of disclosures to Covered Entity as necessary to satisfy Covered Entity's obligations under 45 C.F.R. § 164.528.

h. To the extent that Business Associate is to carry out one or more of Covered Entity's obligations under Subpart E of 45 C.F.R. Part 164, Business Associate agrees to comply with the requirements of Subpart E that apply to Covered Entity in the performance of such obligations.

i. Business Associate agrees to make its internal practices, books, and records available to the Secretary for purposes of determining compliance with HIPAA.

j. Business associate that acknowledges that, to the extent Covered Entity is subject to 42 C.F.R. Part 2, in receiving, storing, processing, or otherwise dealing with any patient records from the Covered Entity, Business Associate is fully bound by the regulations of 42 C.F.R. Part 2 and, if necessary, at Covered Entity's cost, will resist in judicial proceedings any efforts to obtain access to patient identifying

information related to substance use disorder diagnosis, treatment, or referral for treatment except as permitted by 42 C.F.R. Part 2.

**3. Permitted Uses and Disclosures by Business Associate:**

a. Business Associate may only use or disclose Protected Health Information as necessary to perform the Services Agreement. In addition, Business Associate is authorized to use Protected Health Information to de-identify the Protected Health Information in accordance with 45 C.F.R. 164.514(a)-(c).

b. Business Associate may use or disclose Protected Health Information as Required By Law.

c. Business Associate agrees to make uses and disclosures and requests for Protected Health Information consistent with Covered Entity's minimum necessary policies and procedures.

d. Business Associate may not use or disclose Protected Health Information in a manner that would violate Subpart E of 45 C.F.R. Part 164 if done by Covered Entity, except for the specific uses and disclosures set forth in subsections (e), (f) and (g), below.

e. Business Associate may use Protected Health Information for the proper management and administration of the Business Associate or to carry out the legal responsibilities of the Business Associate.

f. Business Associate may disclose Protected Health Information for the proper management and administration of the Business Associate or to carry out the legal responsibilities of the Business Associate, provided the disclosures are Required By Law, or Business Associate obtains reasonable assurances from the person to whom the information is disclosed that the information will remain confidential and used or further disclosed only as Required By Law or for the purposes for which it was disclosed to the person, and the person notified Business Associate of any instances of which it is aware in which the confidentiality of the information has been breached.

g. Business Associate may provide Data Aggregation services relating to the Health Care Operations of Covered Entity.

**4. Obligations of Covered Entity:**

a. Covered Entity shall notify Business Associate of any limitation(s) in the notice of privacy practices of Covered Entity under 45 C.F.R. 164.520, to the extent that such limitation may affect Business Associate's use or disclosure of Protected Health Information.

b. Covered Entity shall notify Business Associate of any changes in, or revocation of, the permission by an Individual to use or disclose his or her Protected Health

Information, to the extent that such changes may affect Business Associate's use or disclosure of Protected Health Information.

c. Covered Entity shall notify Business Associate of any restriction on the use or disclosure of Protected Health Information that Covered Entity has agreed to or is required to abide by under 45 C.F.R. 164.522, to the extent that such restriction may affect Business Associate's use or disclosure of Protected Health Information.

d. Except with respect to uses and disclosures by Business Associate of Protected Health Information under Sections 3(e), 3(f) and 3(g), above, Covered Entity shall not request Business Associate to use or disclose Protected Health Information in any manner that would not be permissible under Subpart E of 45 C.F.R. Part 164 if done by Covered Entity

**5. Term and Termination:**

a. Term. The Term of this Agreement shall commence as of the Effective Date and shall terminate upon the termination of the Services Agreement or on the date Covered Entity terminates this Agreement for cause as authorized in subsection (b) of this Section 5, whichever is sooner.

b. Termination for Cause. Business Associate authorizes termination of this Agreement by Covered Entity upon written notice to Business Associate if Covered Entity determines Business Associate has violated a material term of this Agreement and Business Associate has not cured the breach or ended the violation within thirty (30) days of Covered Entity providing written notice thereof to Business Associate.

c. Obligations of Business Associate Upon Termination. Upon termination of this Agreement for any reason, Business Associate shall:

   i. Retain only that Protected Health Information which is necessary for Business Associate to continue its proper management and administration or to carry out its legal responsibilities;

   ii. Return to Covered Entity or Covered Entity's designee (to the extent permitted by HIPAA), or, if agreed to by Covered Entity, destroy the remaining Protected Health Information that the Business Associate still maintains in any form;

   iii. Continue to use appropriate safeguards and comply with Subpart C of 45 C.F.R. Part 164 with respect to Electronic Protected Health Information to prevent use or disclosure of the Protected Health Information, other than as provided for in this Section, for as long as Business Associate retains Protected Health Information;

   iv. Not use or disclose Protected Health Information retained by Business Associate other than for the purposes for which such Protected Health

Information was retained and subject to the same conditions set out at Section 3 (e) and (f), above, which applied prior to termination; and

v. Return to Covered Entity, or, if agreed to by Covered Entity, destroy Protected Health Information retained by Business Associate when it is no longer needed by Business Associate for its proper management and administration or to carry out its legal responsibilities.

d. Survival. The obligations of Business Associate under this Section 5 shall survive the termination of this Agreement.

**6. Miscellaneous:**

a. Indemnity and Expenses. Business Associate shall indemnify Covered Entity from and against any and all claims, losses and liabilities arising out of or resulting from this Agreement (including, without limitation, enforcement of this Agreement), except claims, losses or liabilities resulting solely from Business Associate's willful misconduct, gross negligence or violation of any law.

b. Regulatory References. A reference in this Agreement to a section in the Privacy Rule, the Security Rule, or to another provision of HIPAA means the provision as in effect or as amended.

c. Amendment. The parties agree to take such action as is necessary to amend this Agreement from time to time as is necessary for the Covered Entity to comply with the requirements of the HIPAA and any other applicable law.

d. Interpretation. Any ambiguity in this Agreement shall be resolved to permit compliance with HIPAA.

e. Governing Law and Disputes. The construction, interpretation and performance of this Agreement and all transactions under this Agreement shall be governed and enforced pursuant to the laws of the State of Texas, without giving effect to its conflicts of laws provisions, except to the extent Texas law is preempted by any provision of federal law, including HIPAA. The parties agree that all disputes arising out of or relating to this Agreement will be subject to mandatory binding arbitration under the rules of Judicial Administration and Arbitration Services ("*JAMS*") in effect at the time of submission, as modified by this Section 6(e). The arbitration will be heard and determined by a single arbitrator selected by mutual agreement of the parties, or, failing agreement within thirty (30) days following the date of receipt by the respondent of the claim, by JAMS. Such arbitration will take place in San Francisco, CA. The arbitration award so given will be a final and binding determination of the dispute, and will be fully enforceable in any court of competent jurisdiction. Except in a proceeding to enforce the results of the arbitration or as otherwise required by law, neither party nor any arbitrator may disclose the existence, content or results of any arbitration hereunder without the prior written agreement of both parties.

f. No Third Party Beneficiary. Nothing express or implied in this Agreement is intended to confer, nor shall anything herein confer, upon any person other than the parties and the respective successors or assigns of the parties, any rights, remedies, obligations, or liabilities whatsoever.

g. Controlling Provisions. In the event that it is impossible to comply with both the Services Agreement and this Agreement, the provisions of this Agreement shall control with respect to those provisions of each agreement that expressly conflict. This Agreement shall supersede and replace any prior business associate agreements between the parties, with respect to any actions of Business Associate after the Effective Date.

h. Effect. This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors, assigns, heirs, executors, administrators and other legal representatives.

i. Severability. In the event any provision of this Agreement is rendered invalid or unenforceable under any new or existing law or regulation, or declared null and void by any court of competent jurisdiction, the remainder of the provisions of this Agreement shall remain in full force and effect if it reasonably can be given effect.

j. Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original.

k. Notices. Any notice, consent, request or other communication required or permitted under this Agreement shall be in writing and delivered personally by hand delivery or overnight delivery by a nationally recognized service. Notice that is sent by overnight courier shall be deemed given one (1) business day after it is dispatched, provided that receipt is acknowledged. All notices shall be addressed as follows:

If to the Covered Entity:

[________________]
[________________]
[________________]

If to Business Associate:

Okay Health
[Address 2]
Attention: ______________________

(*The remainder of this page is intentionally left blank; signatures on following page.*)

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement on the dates set forth below. The undersigned represent and warrant that they have the corporate authority to bind the respective parties under this Agreement.

**[______________]**

DocuSigned by:
Nwamaka Emeruem
A27D72ACDA10441...
Name: Nwamaka Emeruem
Date: 4/9/2020, 2020

**Okay Health**

DocuSigned by:
By: Anh Tran
8A8E8A946F40444...
Name: Anh Tran
Title: CEO
Date: 4/9/2020, 2020