Volume 8

Pages 1653 - 1798

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         )
                               )
   vs.                         )   NO. **3:24-cr-00329-CRB**
                               )
RUTHIA HE and DAVID BRODY,     )
                               )
            Defendants.        )
_____)

                         San Francisco, California
                         Thursday, October 9, 2025

                    <u>**TRANSCRIPT OF PROCEEDINGS**</u>

<u>**APPEARANCES**</u>:

For Plaintiff:
                         CRAIG H. MISSAKIAN
                         United States Attorney
                         Northern District of California
                         450 Golden Gate Avenue
                         San Francisco, California 94102
                    BY:  **KRISTINA GREEN**
                         **ASSISTANT UNITED STATES ATTORNEY**

                         U.S. DEPARTMENT OF JUSTICE
                         FRAUD SECTION
                         950 Pennsylvania Avenue NW
                         Washington, D.C. 20530
                    BY:  **JACOB N. FOSTER,**
                         **ACTING CHIEF, HEALTHCARE FRAUD UNIT**


            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
              Official Reporter, CSR No. 12219

**APPEARANCES**:   (CONTINUED)

                         U.S. DEPARTMENT OF JUSTICE
                         CRIMINAL DIVISION
                         1400 New York Avenue NW
                         Washington, D.C. 20001
                BY:  **EMILY GURSKIS, ASSISTANT CHIEF**

                         JOSEPH NOCELLA, JR.
                         United States Attorney
                         Eastern District of New York
                         271-A Cadman Plaza East
                         Brooklyn, New York 11201
                BY:  **ARUN BODAPATI, TRIAL ATTORNEY**

For Defendant He:
                         WILLKIE FARR & GALLAGHER LLP
                         2029 Century Park East - Suite 2900
                         Los Angeles, California 90067
                BY:  **KOREN L. BELL, ATTORNEY AT LAW**

                         WILLKIE FARR & GALLAGHER LLP
                         787 7th Avenue
                         New York, New York 10019
                BY:  **MICHAEL S. SCHACHTER, ATTORNEY AT LAW**
                         **STEVEN J. BALLEW, ATTORNEY AT LAW**


For Defendant Brody:
                         LAW OFFICE OF VALERY NECHAY
                         Law Chambers Building
                         345 Franklin Street
                         San Francisco, California 94102
                BY:  **VALERY NECHAY, ATTORNEY AT LAW**


**Also Present:   Thifany Braga**
                **Simon Hall**
                **Mackenzie Slater**
                **Andy Cepregi**
                **Casey Donnelly**
                **Ashley Moore**
                **Jeff Dinn, Mandarin Interpreter**
                **Barbara Hua Robinson, Mandarin Interpreter**

1

**I N D E X**

2  Thursday, October 9, 2025 - Volume 8

3  <u>**GOVERNMENT'S WITNESSES**</u>                              <u>PAGE</u>  <u>VOL.</u>

4  <u>**BOWEN, KRISTIN (RECALLED)**</u>
   (PREVIOUSLY SWORN)                                 1657   8
5  Cross-Examination by Mr. Schachter                 1657   8
   Redirect Examination by Ms. Green                  1712   8
6
   <u>**EMMERTH, MELISSA**</u>
7  (SWORN)                                            1741   8
   Direct Examination by Ms. Gurskis                  1741   8
8  Cross-Examination by Ms. Bell                      1754   8
   Cross-Examination by Ms. Nechay                    1779   8
9  Redirect Examination by Ms. Gurskis                1780   8

10

**E X H I B I T S**

11  **TRIAL EXHIBITS**                           <u>IDEN</u>   **EVID**   **VOL.**

12   389                                                1670   8

13   958                                                1730   8

14   3054 - Sections 4 and  5                           1732   8

15   6273                                               1667   8

16   6285                                               1658   8

17   6286                                               1664   8

18   6291                                               1672   8

19   6292                                               1673   8

20   6293                                               1676   8

21   6294                                               1676   8

22   6295                                               1677   8

23   6297                                               1687   8

24   6298                                               1685   8

25

<u>**I N D E X**</u>

<u>**E X H I B I T S**</u>

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 6300 | | 1710 | 8 |
| 6386 | | 1682 | 8 |
| 6397 | | 1679 | 8 |
| 6664 | | 1703 | 8 |
| 6667 | | 1700 | 8 |
| 6668 | | 1686 | 8 |
| 6705 | | 1765 | 8 |
| 6711 | | 1767 | 8 |
| 6718 | | 1689 | 8 |
| 9065 | 1756 | | 8 |

```
 1   Thursday - October 9, 2025                          9:18 a.m.

 2                      P R O C E E D I N G S

 3                          ---o0o---

 4    (Proceedings were heard out of the presence of the jury.)

 5          THE COURTROOM DEPUTY:  All rise.  Court is now in

 6   session.  The Honorable Charles R. Breyer presiding.

 7          THE COURT:  You all set?  Bring them in.

 8               (The jury enters the courtroom.)

 9     (Proceedings were heard in the presence of the jury.)

10          THE COURT:  Okay.  Let the record reflect all jurors

11   are present.  Parties are present.

12      You may be seated.

13      Good morning, ladies and gentlemen of the jury.  Thank you

14   for being so prompt.

15      At the end -- before noon today, I will tell you sort of

16   where we are on certain things so you can schedule accordingly.

17   Okay.  Because I think that's the least I could do.

18      Okay.  Go right ahead.

19                      KRISTIN BOWEN,

20   called as a witness for the Government, having been previously

21   duly sworn, testified further as follows:

22          MR. SCHACHTER:  Thank you, Your Honor.

23                   CROSS-EXAMINATION

24                   CROSS-EXAMINATION

25   \\\
```

1   BY MR. SCHACHTER:

2   Q.   Good morning, Ms. Bowen.

3        Ms. Bowen, when we left off yesterday, I had asked you a

4   question:  Both Ms. He and Dr. Brody continued to express

5   concerns to you about providers not spending enough time with

6   patients, and you answered (as read):

7            "You're suggesting that Ruthia and Dr. Brody

8        were concerned, like that was an ongoing concern of

9        theirs?"

10       And then you disagreed.  Do you recall that testimony?

11  A.   Yes, I do.

12  Q.   I'm going to show you --

13           MR. SCHACHTER:  Your Honor, we'll offer Exhibit 6285,

14  a communication with Ms. Bowen and Ms. He and Dr. Brody.

15           THE COURT:  Okay.  6285 admitted.

16       (Trial Exhibit 6285 received in evidence.)

17  BY MR. SCHACHTER:

18  Q.   And just so you can see, the first page that you're on

19  this communication --

20           MR. SCHACHTER:  I'm sorry, Mr. Cepregi.  Can we go

21  back?

22       Can you just blow up the participants.

23  BY MR. SCHACHTER:

24  Q.   Do you see you're on the communication?

25  A.   Yes.

BOWEN - CROSS / SCHACHTER

1  Q.   Okay.  And then if we can look at the second page.  Do you

2  see where Ms. He writes (as read):

3           "Received this" --

4       And this is July 7, 2021.  At this point you had been with

5  Done for about five months?

6  A.   Yes, about.

7  Q.   Okay.  And Ms. He writes (as read):

8           "Received this patient's e-mail to urgent at

9       inbox complaining about the appointment experience

10      was short and disappointing."

11      Do you see that?

12 A.   Yes.

13 Q.   And then she forwards to this group, including you and

14 Dr. Brody, the patient's review.

15      Do you see that?

16 A.   Yes.  I'm reading it.

17 Q.   She's reporting about an appointment that she had with a

18 nurse practitioner named Memphis Sandoval; is that right?

19 A.   Yes.

20 Q.   And then -- not to go through the whole communication, but

21 do you see in the middle, it's not highlighted, but there's

22 a -- right in the middle, it says also the appointment was

23 wrapped up in about 10 minutes.

24      Do you see that?

25           MR. SCHACHTER:  It's in the middle of that paragraph,

BOWEN - CROSS / SCHACHTER

 1    Mr. Cepregi.

 2        Okay.

 3    **BY MR. SCHACHTER:**

 4    **Q.**   And below that are Dr. Brody and Ms. He's comments with

 5    respect to this complaint.

 6        Do you see those?  Do you see their comments?

 7    **A.**   Yes.  I'm reading through them.

 8    **Q.**   Okay.  Dr. Brody did not say:  Who cares?  The faster the

 9    better.  We just want to deal drugs.

10        Did he?

11    **A.**   I need time to read it, please.

12    **Q.**   Oh, sure.

13    **A.**   Thank you.

14        (Witness examines document.)

15    **Q.**   Well, let me withdraw that question and we can just

16    proceed with what -- we can all read what he wrote.

17        Dr. Brody writes (as read):

18            "I've had a psychiatrist before.  She's" --

19        He's quoting from the complaint of the patient.

20        Do you see that?

21    **A.**   Yes.

22    **Q.**   He quotes (as read):

23            "I've had a psychiatrist before, and our initial

24        appointments have been far more in depth.  No offense

25        to any nurses out there, and with the proviso that

1      better to have a good NP rather than a bad

2      psychiatrist, of which there are plenty, but as y'all

3      know already I think we need more psychiatrists."

4      Do you see that?

5  A.   Yes.

6  Q.   Okay.  And then Dr. Brody inquires further, seeking

7  information about this patient's treatment.

8      Do you see that?

9  A.   Yeah.  Yes.

10  Q.   He writes (as read):

11          "I would be interested in knowing what

12      treatments, if any, she has already tried for ADHD

13      and what she is taking now, also her score on the

14      ADHD self-report scale."

15      And then Ms. He responds (as read):

16          "100 percent agree on we need to get more

17      psychiatrists (at least closely train the NPs to help

18      them improve and grow), but I believe even a

19      psychiatrist cannot have an in-depth conversion" --

20      "conversation for just 10 minutes.  This is not

21      following our platform rule for a 25-minute initial

22      appointment."

23      Do you see that?

24  A.   I do, yes.

25  Q.   And nowhere in this communication do you see Ms. He say:

1    Well, 10 minutes is great.  The shorter the better.  We just

2    want to get the drugs into the hands of the patients.

3         Do you see that in this communication?

4    **A.**    Not in this one.

5    **Q.**    Okay.  Well, let's look at another.  I'm now going to --

6         You indicated, by the way -- this is now July, and you

7    indicated to Ms. He that your team would follow up on this

8    issue.

9         Do you remember that?

10   **A.**   I remember saying that, and my team did follow up on the

11   issue.  So if we want to bring up all the Slack conversations,

12   we can, and it will demonstrate that.

13   **Q.**   I'm going to show you now what --

14            **MR. SCHACHTER:**  Your Honor, we'll offer Exhibit --

15            **THE COURT:**  Well, I'm a little concerned about this,

16   because there are literally hundreds of these conversations.

17   And you're cross-examining her -- your questioning is did she

18   ever say "the shorter the better."

19        So is it your intention to go through each conversation to

20   determine whether she said that, or is it your -- or are you

21   picking out some that she doesn't say it?

22        I don't understand that this is proper cross-examination.

23   That's what I'm saying.  By selecting some in which she doesn't

24   say it.  Or maybe she never says it.  I don't know.  I haven't

25   read these conversations.

1            MR. SCHACHTER:  Sure.  So --

2            THE COURT:  But if it's your point that she never said

3    it in any of her conversations, then you can ask that question

4    and you have your records.  You could produce them.

5            MR. SCHACHTER:  Sure.  If we had time, I would be

6    happy to show all of the communications.

7        But, Your Honor, Ms. Bowen on direct examination testified

8    that Ms. He wanted the appointments to be as short as possible

9    without -- just based on her memory, and now I am showing

10   communications that are in --

11           THE COURT:  That's not inconsistent.  It's not

12   inconsistent.  This is not inconsistent.  It's not inconsistent

13   that in one conversation, a conversation or maybe a series of

14   conversations, she reinforces her view that 25 minutes is

15   appropriate.  That's not inconsistent with what she is saying.

16       And to go through it I think is not proper impeachment, to

17   go through this type of approach.

18       That's my view.  And you can proceed.

19           MR. SCHACHTER:  Okay.  Thank you.

20   BY MR. SCHACHTER:

21   Q.   I'm going to show you --

22           MR. SCHACHTER:  Your Honor, we'll offer Exhibit 6286,

23   a communication with Ms. Bowen in which she's talking about

24   following up on this issue.

25           THE COURT:  I'm sorry.  Following up on what issue?

1    I've lost the track.

2        **MR. SCHACHTER:**  Ms. Bowen had testified that she had

3    followed up on the issue of trying to determine how long the

4    patients' appointments are, and in this communication, she is

5    talking about the difficulty in doing so.

6        **THE COURT:**  Okay.  You may proceed.

7        **MR. SCHACHTER:**  Thank you.

8      Is it admitted, Your Honor?

9        **THE COURT:**  Oh.  Yes.  6286.

10      (Trial Exhibit 6286 received in evidence.)

11    **BY MR. SCHACHTER:**

12    **Q.**  Okay.  This is July 7.  This is the same day as the

13    communication we just saw a moment ago regarding the patient --

14    the nurse practitioner Memphis Sandoval?

15    **A.**  I believe so.  I don't know what happened between the

16    previous conversation and this one, but it appears to be

17    germane, yes.

18    **Q.**  Okay.  And you write (as read):

19        "Not as much as we would like to be doing this,

20        but the provider support team has been understaffed

21        for a few months."

22      And then you go on towards the middle of the paragraph to

23    say (as read):

24        "If providers are ending appointments earlier,

25        then why are they doing this?  Do they not have

1      enough time to chart and fill prescriptions between

2      consults and so they have to open up more time by

3      ending appointments early?  Do most patients seem to

4      want to have shorter appointments and so providers

5      are trying to deliver what the patients want?

6           "I was surprised to learn that one of our

7      providers that tends to have high patient

8      satisfaction rates seems to rarely have a consult

9      last longer than 10 minutes."

10     Do you see that?

11  **A.**   Yes.

12  **Q.**   Okay.  Is this a reference to Erin Kim?

13  **A.**   Yes.

14  **Q.**   And at this point in time in July, you're saying that you

15  were surprised to learn that she rarely has consults longer

16  than 10 minutes; correct?

17  **A.**   Yes.

18  **Q.**   That's -- because that's something that you had just

19  learned?

20  **A.**   Yeah, at the time of a conversation we previously

21  reviewed.

22  **Q.**   Okay.  And then you write (as read):

23           "Unfortunately, we don't have an easy way to

24      monitor the video call log, at least not in any kind

25      of scalable way.  We would have to get a provider's

1           login credentials for Doxy and go through the call

2           log to see the length of each call that was made.  We

3           can do this in a spot-check manner to evaluate an

4           individual patient complaint, but we cannot easily

5           monitor call duration in a proactive manner across

6           all our providers with our current video conferencing

7           platform, Doxy."

8           All right.  And then you continued to tell Ms. He --

9                MR. SCHACHTER:  You can take that down.

10   BY MR. SCHACHTER:

11   Q.   -- that doing outreach to the providers to follow up on

12   this issue was difficult because of the -- you needed more

13   people working for you; is that right?

14   A.   Yes.  We were not given the support we needed to comply

15   with the directions that we were given by leadership.  I didn't

16   have the staffing.  I didn't have the tools.

17   Q.   Okay.  I'm going to show you a communication on that.

18                MR. SCHACHTER:  Your Honor, we'll offer Exhibit 6273.

19        Is it admitted, Your Honor?

20                THE COURT:  Well, again, I'm trying to figure out if

21   she said she agreed with you, now you want to introduce a

22   document that is in agreement with the witness's testimony.

23                MR. SCHACHTER:  She is communicating to Ms. He --

24                THE COURT:  I just don't understand -- I mean, I'm

25   sitting here trying to figure out what, then, is the purpose.

1    **MR. SCHACHTER:**  Sure.  Your Honor, in this

2    communication, Ms. He is communicating that she understands

3    that Ms. Bowen is following up on this issue and will

4    continue --

5    **THE COURT:**  Okay.  Go ahead, because our colloquy is

6    actually longer than it would take for you to ask the question.

7    **MR. SCHACHTER:**  Thank you, Your Honor.

8    Is it admitted?

9    **THE COURT:**  And, yes, it's admitted.

10   (Trial Exhibit 6273 received in evidence.)

11   **MR. SCHACHTER:**  Thank you.

12   **THE COURT:**  And, again, ladies and gentlemen, please

13   don't take anything I say as indicating what I think the

14   evidence should be.  That's going to be your task, and it's

15   going to be your task solely, not the Court's task.

16   Go ahead.

17   **BY MR. SCHACHTER:**

18   **Q.**  You write (as read):

19        "I wanted to clarify that provider support is

20        reaching out to providers, but that we are only

21        sufficiently staffed to do outreach in the

22        higher-priority cases."

23        Do you see that?

24   **A.**  Yes.

25   **Q.**  And Ms. He responds (as read):

BOWEN - CROSS / SCHACHTER

```
 1              "Sounds good.  And please keep monitoring flag
 2        issues like this, and I'll see how I can help."
 3        See that?
 4   A.   Yes.
 5   Q.   And this is the same day as the conversations we looked at
 6   a moment ago; correct?
 7   A.   Yes.
 8              MR. SCHACHTER:  All right.  We can take that down.
 9   Let's move to a different topic.
10   BY MR. SCHACHTER:
11   Q.   Ms. Green asked you about the auto-renewal process.
12        Do you recall that?
13   A.   Yes.
14   Q.   I am going to show you -- and I'm not sure it's offered
15   yet -- Exhibit 320, which is the announcement of the
16   auto-renewal policy?
17   A.   Auto-refill?
18   Q.   Auto-refill?  Well, okay.
19              MS. GREEN:  I believe it was admitted.  It should have
20   been, I think.
21              THE COURT:  320 admitted.
22              MR. SCHACHTER:  Thank you.
23              THE COURTROOM DEPUTY:  It was admitted.
24   BY MR. SCHACHTER:
25   Q.   Okay.  And I just want to spend a moment talking about
```

1    what the auto-renewal process was.

2         You recognize this to be the announcement of the

3    auto-renewal process?

4    A.   Yes.

5    Q.   Okay.  And it communicated (as read):

6              "If you need adjustments to your treatment plan,

7         have a complex treatment plan, plan to travel often,

8         or if your provider changes, the auto-renewal program

9         would not be a good fit.  Either way, you can always

10        conveniently manage your care or message your

11        provider through the patient portal at any time."

12   It goes on to say (as read):

13             "If you are interested in opting in to our new

14        auto-renewal program, please fill out this short

15        form.  We'll have your provider evaluate and will

16        reach out to let you know if your provider approves

17        your auto-renewal request."

18   Do you see that?

19   A.   Yes.

20   Q.   And then it goes on to provide certain prompts to the

21   patient.

22        Do you see that?

23   A.   Yes.

24   Q.   Okay.  All right.

25             MR. SCHACHTER:  And now I'm going to offer, if it's

 1   not already offered, Exhibit 389, which is the communication to

 2   the providers about this -- about the auto-renewal process.

 3          THE COURT:  389 admitted.

 4      (Trial Exhibit 389 received in evidence.)

 5   BY MR. SCHACHTER:

 6   Q.   Do you recognize this to be a communication to the

 7   providers that bcc's Dr. Brody?

 8   A.   Yes.

 9   Q.   Okay.

10          MR. SCHACHTER:  And if we can look at the next page,

11   please.

12   BY MR. SCHACHTER:

13   Q.   This is informing providers about a number of new

14   features.  One is the "no diagnosis or complex patient

15   discharge" feature, which states (as read):

16          "There are circumstances that may come up where

17      you do not feel that the patient meets the criteria

18      for an ADHD diagnosis or you do not feel comfortable

19      treating the patient."

20      And it goes on to explain what they should do.

21      And then focusing on the prescription auto-renewal

22   process, it states (as read):

23          "ADHD can impact a patient's ability to

24      anticipate when a medication is going to run out and

25      plan ahead by requesting the refill with ample time

1          for the provider to review and complete the request

2          before the prescription runs out."

3     Goes on to talk about the auto-renewals feature.  And it

4     says (as read):

5              "How it works."

6     It says (as read):

7              "The feature is off by default.  Patients can

8          turn on the setting to have a prescription renewal

9          request automatically sent to their provider 25 days

10         after the last prescription was approved by the

11         provider in the EHR."

12    And that provides -- it shows the provider what the

13    patients see in terms of their prompt.

14    Then if we can go to the next page, it says "What

15    clinicians see."

16         **MR. SCHACHTER:**  Can you -- thank you.

17    BY MR. SCHACHTER:

18    **Q.**   (as read):

19             "How to access existing prescription renewals

20         tab in a patient's chart.  Requests are shown just

21         like previous requests, but with auto-renewal stated

22         in the note column."

23    Do you see that?

24    **A.**   Yes.

25    **Q.**   And then there is a tab for the provider to hit "approve."

BOWEN - CROSS / SCHACHTER

1          Do you see that?

2  **A.**   Yes.

3  **Q.**   Okay.  Now, you recall, do you not, that Dr. Brindala

4  specifically approved the auto-refill process and delegated to

5  you to implement it?

6          Do you recall that?

7  **A.**   I do not recall that, no.

8          **MR. SCHACHTER:**  Your Honor, we'll offer Defense

9  Exhibit -- I'm sorry -- Exhibit 6291.

10          **THE COURT:**  6291 admitted.

11         (Trial Exhibit 6291 received in evidence.)

12 **BY MR. SCHACHTER:**

13 **Q.**   This is a communication with you and Dr. Brindala and

14 others.

15         Do you see that?

16 **A.**   Yes.

17 **Q.**   Okay.

18         **MR. SCHACHTER:**  And if we can turn to the next page,

19 Mr. Cepregi.

20 **BY MR. SCHACHTER:**

21 **Q.**   Dr. Brindala writes (as read):

22             "Kristin and Michell, the two of you will co-own

23         the launch of new refill process.  Ruthia and I

24         agreed on the approach below."

25         Do you see that?

1   **A.**   Yes.

2   **Q.**   Okay.  And this is March 12, 2021.  Without going back, do

3   you recall that the announcement of the auto-refill process was

4   March 31, 2021, a couple weeks after this?

5   **A.**   Okay.

6   **Q.**   Okay.  And then -- you then assigned to the care team the

7   work that Dr. Brindala had asked you to put in place for the

8   auto-renewal process.

9       Do you recall that?

10  **A.**   I'm sorry.  Could you repeat the question?  I was reading

11  the message.

12  **Q.**   Sure.  Do you recall that Dr. Brindala then -- I'm

13  sorry -- that you then assigned to the care team to implement

14  the auto-referral [sic] process that Dr. Brindala had approved?

15  **A.**   I told the care team?

16          **MR. SCHACHTER:**  I'll just offer it.

17      Your Honor, we'll offer Exhibit 6292, a communication with

18  a task assigned with Ms. Bowen.

19          **THE COURT:**  6292 admitted.

20      (Trial Exhibit 6292 received in evidence.)

21          **MR. SCHACHTER:**  If we could actually look at the very

22  top of the first page.  There we go.  Okay.

23  BY MR. SCHACHTER:

24  **Q.**   Do you see this is an Asana task from you to Niki Mercado?

25  **A.**   No, it's not.

1    Q.    Okay.  Do you see where it says "Assigned to you,

2    coordinate care team work for new refill process"?

3    A.    It's assigned to Niki Mercado.

4    Q.    Okay.  Do you see where it says "Kristin Oliver assigned a

5    task to you"?

6    A.    But who is it assigned to?  That I assigned it to Niki?

7    Q.    Well, I'm asking.  Is that true?

8            THE COURT:  Well, wait a minute.  Wait a minute.

9        I don't understand.  I mean, I'm trying to follow this

10   too.

11       The witness sends an e-mail to Niki Mercado in which it

12   says "Assigned to you.  You coordinate."

13       And her testimony is I assigned it to Niki Mercado, as I

14   understand her testimony to be.

15           THE WITNESS:  Yeah.  I think it's just through Asana.

16   It's not like an official -- like because if a task gets -- you

17   could reassign it to the person, but it's not like -- because

18   Niki wasn't under me.  Like I can't assign her tasks.

19           MR. SCHACHTER:  Fair enough.  I'm attempting,

20   Your Honor.

21   BY MR. SCHACHTER:

22   Q.    Ms. Bowen -- by the way, in your testimony with Ms. Green,

23   you were very critical of this auto-renewal process; correct?

24   A.    Yes.  I think we all were.

25   Q.    Okay.  And so after Dr. Brindala approved and asked you to

1  handle this, you then -- there was an Asana task which, at

2  least according to this document, states that you assigned a

3  task to the care team?

4  **A.**   No.  I just fixed it in Asana.

5  **Q.**   Okay.  Either way, it says (as read):

6          "The task is coordinate care team work for new

7      refill process."

8      Do you see that?

9  **A.**   Yes.

10         **MR. SCHACHTER:**  And then if we can go just a little

11  bit further up.

12  **BY MR. SCHACHTER:**

13  **Q.**   Okay.  And this -- you recognize this -- in this Asana

14  task to be the communication from Dr. Brindala that says

15  "Ruthia and I agreed on the approach below."

16     That's the language that Dr. Brindala communicated to you

17  in that communication we saw just a moment ago; correct?

18  **A.**   Yes.

19  **Q.**   Okay.  All right.

20     And then Dr. Brindala -- I'm sorry.

21     And then you told others that it was Dr. Brindala who

22  assigned this task to you; is that correct?

23  **A.**   Well, I told others that?

24         **MR. SCHACHTER:**  Your Honor, we'll offer Exhibit 6293.

25         **THE COURT:**  6293 admitted.

1            (Trial Exhibit 6293 received in evidence.)

2                MR. SCHACHTER:  We can turn to the next page.

3    BY MR. SCHACHTER:

4    Q.    Do you see in this communication, Ms. Bowen, you wrote to

5    Michell Huynh -- what was her title?

6    A.    I don't think she had a title.  She was kind of a

7    generalist.  I think special projects was her title.

8    Q.    Okay.  And you wrote (as read):

9                "I put some time on your calendar to discuss the

10           new refill process that Jayaram assigned to us on

11           Friday afternoon."

12           Do you see that?

13   A.    Yes.

14   Q.    Okay.  And then Dr. Brindala then communicated to you that

15   he was reviewing the final plan for the refill process.

16           Do you recall that?

17   A.    Yes, I believe so.

18   Q.    Okay.  I'm going to show you Exhibit 6294, which is the

19   Asana task.

20                MR. SCHACHTER:  We'll offer it, Your Honor.

21                THE COURT:  Admitted.

22           (Trial Exhibit 6294 received in evidence.)

23   BY MR. SCHACHTER:

24   Q.    And the task is (as read):

25                "Review final plan and provider communications

 1              for new refill process."

 2        And it generates Jayaram Brindala completed this task.

 3   That's a way to signify something in Asana?

 4   A.    Yes.

 5   Q.    Okay.  And then last one on this topic --

 6              MR. SCHACHTER:  Your Honor, we'll offer 6295 --

 7   BY MR. SCHACHTER:

 8   Q.    Well, let me ask you:  Do you recall that Dr. Brindala was

 9   excited to hear about this refill plan being put in place?

10   A.    Dr. Brindala didn't get excited about much.  He was pretty

11   levelheaded.

12              MR. SCHACHTER:  Okay.  Your Honor, we'll offer 6295,

13   our last communication on this topic.

14              THE COURT:  6295 admitted.

15        (Trial Exhibit 6295 received in evidence.)

16              MR. SCHACHTER:  If we can turn to the second page,

17   Mr. Cepregi.

18   BY MR. SCHACHTER:

19   Q.    And do you see that what is completed in this -- what is

20   included in this communication is the "Auto-renewal is here"

21   announcement?

22   A.    Yes.

23   Q.    Okay.  And then if we could just look at Dr. Brindala's

24   response at the bottom of the page (as read):

25              "This plan sounds great.  That was very quick

BOWEN - CROSS / SCHACHTER

```
 1          development."
 2          Do you see that?
 3   A.     Yeah, I do.  Sorry.  Yes.
 4   Q.     Okay.  Next topic.  Let's turn to bridge refills.
 5          You testified about bridge refills at Done.
 6          Do you recall that?
 7   A.     Yes.
 8   Q.     And a -- an idea of -- a bridge refill is also called an
 9          urgent refill; is that correct?
10   A.     An urgent refill?  No.  Those would be different things,
11   yes.
12   Q.     Okay.  A bridge refill is -- I believe you described is
13   where the patient is about to run out of medication, but the
14   provider is unavailable to do a follow-up or the provider has
15   left the platform or there's some other reason that the patient
16   and the provider are unable to connect; is that correct?
17   A.     A bridge refill is when we know that they have another
18   provider coming on, so we have an end date.  We know that they
19   will be seen by a provider in two weeks, but they will run out
20   in one week, for example.
21   Q.     Okay.  You testified that you were concerned about
22   Dr. Brody's bridge refills.
23          Do you remember that testimony?
24   A.     That I was concerned about the refills that he was making,
25   the excessive new refills, bridge or otherwise.
```

1    **Q.**   Yes.

2    **A.**   I gave you my answer.

3    **Q.**   Okay.

4         However, you told providers to send bridge refills to

5    Dr. Brody, did you not?

6    **A.**   I told providers to send bridge refills?

7    **Q.**   To Dr. Brody.

8    **A.**   If that's what Ruthia asked me to do, I did it.

9    **Q.**   Okay.  I'm going to show you 6397, a communication where

10   that's occurring.

11             **MR. SCHACHTER:**  Your Honor, we'll offer it.

12             **THE COURT:**  6397 admitted.

13        (Trial Exhibit 6397 received in evidence.)

14   **BY MR. SCHACHTER:**

15   **Q.**   Okay.  In this communication -- this is a communication

16   with Sussan Nwogwugwu?

17        I'm not sure I'm pronouncing that correctly.

18   **A.**   Nwogwugwu.

19   **Q.**   And she was a nurse practitioner; is that correct?

20   **A.**   Yes.

21   **Q.**   She went on to be a member of clinical leadership at some

22   point; is that correct?  Or was that after you left?

23   **A.**   It was not clinical leadership.  We just hired her on.

24   She saw patients for the majority of her time.

25        But, yes, we hired her on as an actual employee versus a

BOWEN - CROSS / SCHACHTER

 1   contractor.

 2   **Q.**   Okay.  And if she became a member of clinical leadership,

 3   that would have been after you had left?

 4   **A.**   I believe so.

 5        (Reporter interruption for clarity of the record.)

 6   **BY MR. SCHACHTER:**

 7   **Q.**   Okay.  So in this communication, Sussan -- I'll just call

 8   her Sussan -- asks about an ability to refill prescriptions if

 9   she has not yet seen a patient whose appointment is pending.

10   Do you see that?

11        Let me direct you to a certain portion on the second page.

12        Oh, I'm sorry.  At the bottom of the first page, Sussan

13   writes (as read):

14            "I'm not complaining about my schedule.  I am

15        only updating you on my communication with the

16        patient to ensure it's in line with the company's

17        policy and conversations with Dr. Lucchese."

18        Do you see that?

19   **A.**   Yes.

20   **Q.**   Okay.  And if we can turn to the second page.

21        Sussan writes (as read):

22            "I think my question is can we continue to

23        provide refills while appointments are pending, even

24        it's past three months?  I don't think any changes

25        need to be done with my schedule.  I want to be sure

1          that I'm in line with the practice."

2          And this is in June.  You've been there for about

3    four months at this point?

4    **A.**   Yes.

5    **Q.**   Okay.  You write (as read):

6              "Oh, I see.  As far as Done policy is concerned,

7          we very much support our providers issuing bridge

8          refills when a patient is going to run out of

9          medication before a refill unless there is any reason

10         why a bridge refill would not be appropriate, such as

11         strong indicators that the patient may be abusing or

12         diverting their medication.  Does that answer your

13         question?

14             "If Dr. Lucchese does not want to issue a bridge

15         refill, please let us know and our clinical

16         president, Dr. David Brody, may be able to issue the

17         refills if he feels that it is appropriate to do so.

18         He is a psychiatrist, so he may feel a little more

19         comfortable doing a bridge refill if Dr. Lucchese

20         does not feel comfortable."

21   **Q.**   Do you see that?

22   **A.**   I do.

23   **Q.**   And you recall Dr. Lucchese was not a psychiatrist?

24         Do you recall that?

25   **A.**   No, he's a surgeon.

1  Q.   Okay.  All right.

2       Now, you asked providers to do -- for them themselves to

3  do bridge refills when their patients missed appointments; is

4  that correct?

5  A.   I did everything I was directed to do by Ruthia, yes.

6  Q.   You did that?

7  A.   Yes.

8  Q.   Okay.  And, in fact, you talked a little bit about

9  Dr. Brody writing prescriptions to patients who were out of

10 state.

11      Do you recall that?

12 A.   Yes.

13 Q.   And you believed at the time that it was completely

14 appropriate for Dr. Brody to write prescriptions, bridge

15 prescriptions, for patients who were out of state; is that

16 correct?

17 A.   That I felt it was completely appropriate?

18 Q.   Yes.

19 A.   I don't -- no, I did not.

20          MR. SCHACHTER:  Your Honor, we'll offer 6368.

21          THE WITNESS:  What I feel and what I wrote were not

22 always congruent.  As a matter of fact, most of the time they

23 were not congruent.

24          THE COURT:  6368 admitted.

25      (Trial Exhibit 6386 received in evidence.)

1            MR. SCHACHTER:  Thank you.

2     BY MR. SCHACHTER:

3     Q.   This is a communication that you have --

4            MR. SCHACHTER:  If we can just move a little bit

5     further up so we can see that Dr. Brody is involved in this

6     communication.  I'm sorry.  Down, then.  Thank you.

7     BY MR. SCHACHTER:

8     Q.   Okay.  You write (as read):

9              "I am not sure what is happening, but we are

10            experiencing multiple issues across several states

11            with pharmacies not accepting our providers'

12            prescriptions.  David Brody, this likely means that

13            your OOS list is going to be filling up.  Persevere."

14            The OOS list is the out-of-state list; is that correct?

15    A.   I would assume so, just based on the context.

16    Q.   Okay.  And you're telling him that there is going to be a

17    longer list of prescriptions for him to write for out-of-state

18    patients; is that right?

19    A.   Right.

20    Q.   Okay.  And then if we can just turn to the middle of the

21    page, you write (as read):

22             "I have sent the legal language that states that

23            even under normal, non-pandemic Florida law" --

24            I guess this -- just the context of this is a --

25            Well, withdrawn.

BOWEN - CROSS / SCHACHTER

1      You write (as read):

2          "I have sent the legal language that states that

3      even under normal, non-pandemic Florida law,

4      telemedicine providers can write C2 scripts for

5      patients being treated for a psychiatric disorder.

6      Even then, it is up to the pharmacist's discretion,

7      and I don't know that they will care too much about a

8      care team member in the Philippines trying to send

9      them legal verbiage."

10     Do you see that?

11  A.  Yes.

12  Q.  And then you go on a little bit further in your

13  conversation to say (as read):

14         "At least one and maybe more Kentucky pharmacies

15     are refusing to fill Erin's scripts, claiming that

16     she isn't licensed in Kentucky."

17     Do you see that?

18  A.  Yes.

19  Q.  You write that (as read):

20         "I've sent the care team documentation of Erin's

21     credentials for them to share with the pharmacies

22     there, but I also don't know if that will resolve the

23     issue.  If not, some scripts may need to be

24     transferred to Dr. Brody's OOS list, and I will need

25     to turn her off in Kentucky."

BOWEN - CROSS / SCHACHTER

1        Do you see that?

2   **A.**   Yes.  This is all consistent with what I've said before.

3   **Q.**   Okay.  And now I'm going to show you a further discussion

4   about Dr. Brody's refill list, which is Exhibit 6298.

5           **MR. SCHACHTER:**  Your Honor, we'll offer it.

6           **THE COURT:**  6298, admitted.

7        (Trial Exhibit 6298 received in evidence.)

8   **BY MR. SCHACHTER:**

9   **Q.**   This is an Asana task?

10  **A.**   Yes, it would appear so.

11  **Q.**   Okay.  And it says that you've added a comment; is that

12  right?

13  **A.**   Yes.

14  **Q.**   Okay.  And the task is (as read):

15          "Provider urgent task list.  Keep refills by

16      Dr. Brody at 0 per day.  His role is for bridge

17      refills."

18       Do you see that?

19  **A.**   Yes.

20  **Q.**   Okay And you write -- and by the way, this is July of

21  2021, so at this point in time, you've been there for about

22  five months?

23  **A.**   Yes.

24  **Q.**   Okay.  And you write (as read):

25          "We do not have control over which refills the

```
 1        care team adds to Dr. Brody's list, though the
 2        majority of his refills are out-of-state refills,
 3        which" -- you write -- "is part of his role."
 4        Do you see that?
 5   A.   Yes.  That's what I was told.
 6   Q.   And you encouraged providers to send out-of-state
 7   prescriptions to Dr. Brody; is that correct?
 8   A.   Yes.  That's what I was instructed to do.
 9   Q.   I'm going to --
10            MR. SCHACHTER:  Your Honor, we'll offer 6668.
11            THE COURT:  6668 admitted.
12        (Trial Exhibit 6668 received in evidence.)
13   BY MR. SCHACHTER:
14   Q.   This is a communication between you and a nurse
15   practitioner named Yina Cruz.
16        Do you see that?
17   A.   Yes.
18   Q.   And just focusing at the bottom, you write (as read):
19            "Okay.  You can also ask Dr. Brody.  Direct
20        message him in Slack if he can fill it.  He should be
21        able to prescribe across state lines."
22        Do you see that?
23   A.   Yes.  This is what we were told.
24   Q.   Okay.  And -- but it -- I just want to be clear on your
25   testimony.  It's your testimony that you did not -- you did not
```

BOWEN - CROSS / SCHACHTER

1  believe that he should be able to prescribe across state lines?

2  **A.**   I mean, the pharmacies accepted his prescriptions.  But

3  was it legal?  No.

4  **Q.**   Okay.  So when you wrote, "He should be able to prescribe

5  across state lines," you did not believe that he should be able

6  to prescribe across state lines?

7  **A.**   No, no.  He is able to.  The pharmacies accepted his

8  prescriptions.  Like he's physically able to do it.

9  **Q.**   I see.  And let me ask you:  When a pharmacy receives a

10  prescription, it identifies the physician who is writing the

11  prescription; is that correct?

12  **A.**   Yes, it has their NPI number on it and the DEA number, if

13  it's a controlled substance.

14  **Q.**   Okay.  Thank you.

15      Last one on this topic and then we'll move off bridge

16  refills.

17          **MR. SCHACHTER:**  Your Honor, we'll offer 6297.

18          **THE COURT:**  6297 admitted.

19      (Trial Exhibit 6297 received in evidence.)

20  **BY MR. SCHACHTER:**

21  **Q.**   This is a communication from you to all providers, and

22  copied on this communication is Dr. Brindala; is that correct?

23  **A.**   Yes.

24  **Q.**   Okay.  And if we can just turn to the second page.  There

25  is a section on refills more than one week.

1    Do you see that?

2    A.   Yes.

3    Q.   And you write (as read):

4         "All refill requests that are over one week old

5    are reviewed by our clinical president, Dr. Brody.

6    He will review the patients' charts and issues bridge

7    refills as needed.  If you have a patient whose

8    refill request is more than one week old, it must be

9    addressed by Dr. Brody.  This patient will be

10   deducted from your panel pay for that month."

11   Do you see that?

12   A.   Yes.  Ruthia was pretty insistent that they not be paid if

13   Dr. Brody had to do the refill.

14   Q.   Okay.

15        MR. SCHACHTER:  You can take that down.

16   BY MR. SCHACHTER:

17   Q.   One more question about your understanding of legal --

18   legal principles relating to prescriptions.

19        You testified that in Texas, you understood that the

20   collaborative physician must actually see the patient.

21        Do you recall that testimony?

22   A.   That was the guidance that was issued by Texas medical

23   board that I found.

24        MR. SCHACHTER:  Okay.  Your Honor, we'll offer

25   Exhibit 6718, a communication from Ms. Bowen on this subject.

```
 1                THE COURT:  6?

 2                MR. SCHACHTER:  718.

 3                THE COURT:  Okay.  Admitted.

 4           (Trial Exhibit 6718 received in evidence.)

 5   BY MR. SCHACHTER:

 6   Q.   Do you recognize this to be a communication between you

 7   and a pharmacy in Texas called Express Scripts?

 8   A.   Oh, yes.

 9   Q.   Okay.  And there is a discussion here about the role of a

10   collaborative physician versus a nurse practitioner with

11   respect to the prescription of controlled substances in Texas.

12        Do you recognize that to be the general subject matter?

13   A.   Sorry.  I'm reading it.

14                MR. SCHACHTER:  If we could just highlight the

15   first -- Ms. Bowen's e-mail at the top.

16   BY MR. SCHACHTER:

17   Q.   Okay.  You wrote (as read):

18               "This is helpful, and from my limited Internet

19           research, it seems that an NP e-prescribing a C II

20           med that is processed under the MD's name might be

21           the tech equivalent of an NP signing the paper

22           prescription with the MD's name, which has more clear

23           guidance as not being permissible.  It's all a bit

24           gray when it comes to e-prescribing.  When I was an

25           oncology nurse, I must have written about 15 to 20
```

1    C II prescriptions every day and just stacked them up

2    in front of my desk for my doctor to go through and

3    sign.  It seems like we might need to find the

4    e-prescribing version of this practice."

5    You write (as read):

6         "The guidance does seem to say that it's fine

7    for the nurse practitioner to evaluate, diagnose, and

8    recommend the C II prescription but that the MD needs

9    to ultimately be the one that prescribes the

10   medication"

11   Do you see that?

12   **A.**   Yes.  This was in May.  I later found guidance that

13   contradicted this.

14   **Q.**   Okay.  You didn't write that down anywhere, did you,

15   Ms. Bowen, in any of your communications?

16   **A.**   It's -- this is in May.  I said I later found it.

17   **Q.**   Okay.  In any event, in this communication in May, you

18   wrote your understanding that in Texas, it is not necessary for

19   the collaborative physician to see the patient; correct?

20   **A.**   I said the guidance does not seem to say.  It's very

21   ambiguous language.  There's nothing of certainty that's

22   communicated there.

23   **Q.**   Okay.  You're speaking -- do you recall that in this

24   e-mail communication, you're speaking to the person in charge

25   of regulatory affairs at this pharmacy?

1          Do you recall that?

2    **A.**    It was a person who worked at this pharmacy.

3    **Q.**    Do you remember that it was a person in charge of

4    regulatory affairs?

5    **A.**    I do not --

6              **MS. GREEN:**  Objection.  Asked and answered.

7    **BY MR. SCHACHTER:**

8    **Q.**    Okay.  And do you recall -- again, I don't really want to

9    spend time going through this communication, but do you recall

10   the person from this pharmacy speaking to you about their view

11   that the collaborative physician does not need to see --

12             **THE COURT:**  Well, Counsel, she says in this e-mail

13   that she's done some limited research and it seems to say

14   something.

15             **MR. SCHACHTER:**  Fair enough.

16             **THE COURT:**  So let's move on.

17             **MR. SCHACHTER:**  We'll move on.

18   **BY MR. SCHACHTER:**

19   **Q.**    Okay.  Let's speak briefly about discharges.

20         You testified that patients who providers wanted to

21   discharge would just get transferred.

22         Do you recall that?

23   **A.**    Sorry.  Can you repeat the question?

24   **Q.**    Sure.  Was it your testimony that patients who a provider

25   wanted to discharge instead would just be transferred to a

1  different provider?

2  **A.**   I mean, in some occasions, yes, they would be transferred.

3  If there was another provider in the state.  I -- obviously, in

4  some circumstances, especially if it was a pretty egregious

5  reason, we'd try to block that.

6  **Q.**   Okay.  All right.  So to try to save time and just to

7  clarify, there was circumstances where a provider was going to

8  discharge a patient and it was transferred to another provider

9  for a second opinion; is that correct?

10  **A.**   There were some circumstances, yes, where that happened.

11  **Q.**   And do you recall that before that happened, it was

12  reviewed by clinical leadership?

13      Do you recall that?

14  **A.**   No, I don't recall that.

15  **Q.**   Okay.  To try to cut through it, you're not suggesting

16  that any time -- that any time a provider wanted to discharge a

17  patient that it was transferred to another provider?  You're

18  not suggesting that that happened in every occasion?

19  **A.**   Well, it was not possible, because often we didn't have

20  another provider in the state.

21  **Q.**   Okay.  Do you recall putting in place a process where

22  there was a complex patient button that was put in place, and

23  there were multiple reasons where the provider would specify

24  the reasons why the patient was being discharged?

25  **A.**   I think that sounds familiar.

BOWEN - CROSS / SCHACHTER

1  Q.   Okay.  And you also recall that there were circumstances

2  where patients were -- after a provider said they could not

3  reach a diagnosis that you were informed by Ms. Mercado that

4  what would happen is if the patient -- if the provider said,

5  can't reach a diagnosis, the care team would refund the money

6  to the patient?

7       Do you recall that?

8  A.   I think I recall it, but I don't recall that process being

9  in place very long.

10 Q.   Okay.  Let's try to move through this.

11      Next topic.  Medication fulfillment rate.

12      Do you recall Ms. Green asked you about a metric called

13 "medication fulfillment rate"?

14 A.   Yes.  There was a -- we were supposed to look at the

15 number of, I think, prescriptions that were filled.

16 Q.   Okay.  Sort of let me explore that.  Okay?

17      The medication fulfillment rate was not a list of the

18 number of prescriptions issued by providers; correct?

19 A.   We -- there was -- that was part of the report was the

20 number of prescriptions that were issued by providers.

21      Do you have the report?

22 Q.   Let's talk about what the medication fulfillment rate is.

23 I would like to get you out of here.

24      The medication fulfillment rate, am I correct, was a

25 metric that examined what percentage of patients who were

1  prescribed already by a provider then ultimately had their

2  prescription called in and were able to pick up their

3  prescriptions?

4  **A.**    Oh, we would have no way of knowing that.  We wouldn't

5  know if they were able to pick them up.

6  **Q.**    Your testimony is that that was not the medication

7  fulfillment rate?

8  **A.**    Yes.  My testimony is that that is not the medication

9  fulfillment rate because there was no way to know if they

10  picked it up from the pharmacy unless we call the pharmacy.

11  **Q.**    Okay.  You are unfamiliar with the care team contacting

12  patients to say, We see that you were prescribed a medication.

13  Have you -- has it been called in and have you been able to

14  pick it up -- through a contact with the patient?

15       If you don't know, you can just say you don't know.

16  **A.**    They're extremely -- remember, there was hundreds of

17  appointments happening every single day, so in extremely

18  limited circumstances, like when -- the example I gave earlier

19  where a patient would be like, Oh, I switched my pharmacy; Oh,

20  actually, I can't make it to this pharmacy, so we'd get called

21  and like three or four different --

22       (Reporter interruption for clarity of the record.)

23          **THE WITNESS:**  Sorry.

24       So they'd get called in to three or four -- I'm trying to

25  get in before he interrupts me -- four different pharmacies.

BOWEN - CROSS / SCHACHTER

1    Then what would happen is they -- the provider would ask them,

2    Can you call to try to see if this is what was happening, did

3    the patient pick it up, you know, before they send it to

4    another pharmacy.

5    **BY MR. SCHACHTER:**

6    **Q.**    Okay.  You're unfamiliar with any process put in place by

7    the care team that would effectively survey the patients after

8    they were prescribed to see if their prescription had been

9    called in and if they had been able to pick it up successfully?

10        You're unaware of that?

11            **MS. GREEN:**  Objection.  Beyond the scope --

12        (Reporter interruption for clarity of the record.)

13            **MS. GREEN:**  Sorry.

14        Objection.  This is beyond the scope of direct.

15            **THE COURT:**  Go ahead.  Answer the question.  Slowly.

16            **THE WITNESS:**  That would have been impossible with the

17    volume.

18    **BY MR. SCHACHTER:**

19    **Q.**    Okay.

20    **A.**    And the pharmacies wouldn't have allowed it.

21    **Q.**    Okay.  In any event, you didn't work on the care team and

22    you didn't manage the care team; correct?

23    **A.**    No.  That's been established.

24    **Q.**    Okay.  All right.  Next topic.

25        Let's talk about the subject of reviews.

1          Ms. Green showed you what is in evidence as Exhibit 355.

2              MR. SCHACHTER:  And, Your Honor, may we display that?

3              THE COURT:  Yes.

4     BY MR. SCHACHTER:

5     Q.    Okay.  Do you remember Ms. Green showed you this?

6     A.    Yes.

7     Q.    Okay.  And in this communication, Dr. Brindala expressed a

8     view that patients may give bad reviews to providers because

9     the provider had not prescribed a stimulant.

10         Do you recall that?

11    A.    Yes.

12    Q.    All right.

13         And you were asked by Ms. Green (as read):

14              "What was Defendant He's response to these

15         concerns laid out by Dr. Brindala?"

16         And you responded, "Dismissive."

17         Do you recall that testimony?

18    A.    Yes.

19    Q.    All right.  But Ms. Green did not actually show you -- she

20    showed you Dr. Brindala's comments, but she actually didn't

21    show you any of Ms. He's responses, did she?

22    A.    No.

23    Q.    Okay.  Let's look at this communication.

24         So at the very top, you write (as read):

25              "I went through and looked at all our providers'

1    patient ratings.  The following providers have below

2    90 percent five-star reviews."

3    Do you see that?

4 **A.**    Yes.

5 **Q.**    Okay.  And what you're describing is you had actually

6    undertaken a project to review the reviews that had been

7    submitted by patients; is that correct?

8 **A.**    That's correct.

9 **Q.**    And, in fact, there really weren't -- platform-wide, there

10    aren't many one-star reviews?

11 **A.**    Define "many."

12 **Q.**    Fair enough.

13    The vast majority of reviews that were received were

14    five-star reviews?

15 **A.**    The vast majority were not one-star reviews, but I think

16    it spanned across the different ratings.

17 **Q.**    Okay.  You identified only five providers that you found

18    to have below 90 percent of five-star reviews?

19 **A.**    Yes.

20 **Q.**    Okay.  Meaning that aside from these five providers, the

21    providers had received more than 90 percent five-star reviews?

22 **A.**    Yes.

23 **Q.**    Okay.  And of these five, only five that you had

24    identified that had less than 90 percent five-star reviews --

25    of these five, one of them had 89 percent five-star reviews;

1    correct?

2    **A.**    Yes.

3    **Q.**    One of them, Resheda House, who is discussed further in

4    this communication, had 88 percent five-star reviews?

5    **A.**    Yes.

6    **Q.**    Okay.  And a third had 86 percent five-star reviews?

7    **A.**    Yes.

8    **Q.**    Okay.  So a vast majority of reviews on the platform were

9    five-star reviews?

10    **A.**    Yeah, I guess from this, I would say that.

11    **Q.**    Okay.  That's what your work revealed.

12            Now, just going through this communication, Dr. Brindala

13    writes (as read):

14                "Resheda might represent a good example of a

15            provider with lower ratings as a function of

16            judiciousness with stimulant prescriptions."

17            Do you see that?

18    **A.**    Yes.

19    **Q.**    All right.  And he writes (as read):

20                "If we plotted provider ratings versus rates of

21            stimulant prescriptions, we would likely observe a

22            correlation.  The providers on the points not on that

23            curve would be the ones most likely to have bedside

24            manner issues, consumer experience issues."

25            You ask if there's any way to capture whether or not a

 1  patient received a stimulant; right?

 2  A.   Yes, to easily capture that data point.

 3  Q.   Right.

 4       And then I just -- let's look at Ms. He's response.  She

 5  writes (as read):

 6            "Cannot speak for newer providers, but I do

 7       remember Resheda had previously received complaints

 8       due to bedside manner.  Told the patient is

 9       overweight, not listening to patients."

10  And then Dr. Brindala responds (as read):

11            "We investigated those and could not identify

12       bad bedside manner complaints separate from

13       stimulants not being prescribed.  This might be an

14       even better provider example than I initially

15       thought."

16  Do you see that?

17  A.   Yes.

18  Q.   And then Ms. He responds (as read):

19            "How did you investigate?  I have previously

20       communicated with patients and also talked to Resheda

21       and paused her from receiving new patients for a week

22       after" -- you can't see it here, but -- "reviews were

23       improved for a while."

24  And then Dr. Brindala says (as read):

25            "Sharing weight status and related risks with a

1    patient is completely medically appropriate but needs

2    to be delivered in a sensitive manner."

3    Do you see that?

4    A.    Yes.

5    Q.    Okay.  So Dr. Brindala says (as read):

6          "We investigated Ms. He's communication --

7    Ms. He's reviews and could not identify bad bedside

8    manner complaints."

9    Do you see that?

10   A.    Yes.

11   Q.    Okay.  And you said that you looked at all the provider

12   ratings, so included in that was the negative rating of

13   Resheda House that Ms. He is mentioning in this communication;

14   correct?

15   A.    I did the analysis later, but I'm assuming Resheda was in

16   it.

17   Q.    Okay.  Let's look at that review Ms. House received.

18          MR. SCHACHTER:  Your Honor, we'll offer 6667.

19          THE COURT:  6667.

20          THE COURTROOM DEPUTY:  Admitted?

21          THE COURT:  Admitted.

22   (Trial Exhibit 6667 received in evidence.)

23          THE COURTROOM DEPUTY:  Thank you.

24   BY MR. SCHACHTER:

25   Q.    Okay.  And this is from a patient who writes (as read):

BOWEN - CROSS / SCHACHTER

"Ms. House, I very clearly acknowledged the relevance of an individual's weight in proper medication dosing in my e-mail to you below.  You are correct that you have not seen me in person.  However, you did not ask me to provide my height and weight as clinical indicators to guide your medical decision-making; rather, solely based on a video call, you described me as 'not skinny' and 'on the heavier side of things,' neither of which is clinically appropriate terminology or reflective of a clinical assessment.

"My issue has nothing to do with whether my weight should be considered in medication dosage determinations.  It absolutely should be.  My issue is with the terminology you used.  Had you asked my height and weight and then explained that based on my height and weight, BMI, or the fact that I am overweight or obese, you may need to adjust my dosage, this would be a nonissue, but that's not what you said.  So to say that you were only making a clinical assessment is an inaccurate portrayal of what happened.

"As noted in my initial correspondence, as a medical professional and mental health provider, your language is important.  I hope that you consider that

1          fact going forward."

2          Do you see that?

3    **A.**   Yes, I do.

4    **Q.**   Okay.  And in the course of your investigation, you became

5    aware that, in fact, Ms. House had been -- I'm sorry -- this

6    patient, Ms. Lusardi, had been prescribed stimulant medication

7    on multiple occasions by Resheda House.

8          Do you recall that?

9    **A.**   You're asking me if I knew that?

10   **Q.**   Well, let me just show you.

11            **MR. SCHACHTER:**  Your Honor, we're offering

12   Exhibit 6664, which are the prescription records of this

13   patient, Arielle Lusardi.

14            **THE COURT:**  I'm trying to figure out the relevance of

15   this.

16            **MR. SCHACHTER:**  Your Honor, the relevance is that

17   Dr. Brindala said that the complaint that Resheda House

18   received about a patient being overweight is a good example of

19   someone who is simply giving bad reviews because of stimulant

20   medications.  In fact, as Ms. He is saying, that is not the

21   case at all.  It had nothing to do with stimulant medication;

22   it is a bedside manner issue.

23          I'm suggesting that Ms. He is not being dismissive, as the

24   witness suggested, but rather was trying to understand why

25   patients are making complaints.

```
 1              THE COURT:  Okay.  Admitted.

 2         (Trial Exhibit 6664 received in evidence.)

 3              MR. SCHACHTER:  And if we can show rows -- row 4418 of

 4    these prescription records.

 5    BY MR. SCHACHTER:

 6    Q.    Do you see a reference to Arielle Lusardi, Resheda House

 7    prescribed Adderall?

 8    A.    Yes.

 9    Q.    If we can look at row 6687.

10    A.    Can I ask what the date was of the e-mail was from the

11    patient?

12    Q.    Sure.

13    A.    In the previous one?

14    Q.    It was September 1st, 2020, months after she had been

15    receiving her Adderall prescriptions.

16    A.    Okay.

17    Q.    Thank you.

18    A.    That's kind of a weird timing, though, because why would

19    she ask about weight like that much later unless she was

20    changing the medication.

21    Q.    Okay.  Well, let's look at it.

22    A.    So I'm guessing that she changed her to a non-stimulant.

23    Q.    Well, we're going to find out.

24    A.    Okay.

25    Q.    Let's look at row 6687.  Do you see a prescription dated
```

1    July 7, 2020, Arielle Lusardi, Adderall, now 10 milligrams,

2    increased from 5 milligrams that we saw moments ago?

3    **A.**   What is -- what is this spreadsheet?

4         **MS. GREEN:**   Yeah, I have a foundation objection as

5    well, Your Honor.

6         **THE WITNESS:**   Are these the ones that Dr. Brody was

7    filling?

8         **MR. SCHACHTER:**   No.   These are -- we've provided this

9    to the Government in advance.   These are Done's prescription

10   records.

11        **MS. GREEN:**   Can we establish if the witness has ever

12   seen this document before, before we continue these questions?

13        **THE WITNESS:**   I have not, no.

14   **BY MR. SCHACHTER:**

15   **Q.**   So in this discussion that you were having with

16   Dr. Brindala about whether -- whether negative reviews had been

17   motivated by patients who simply were upset that they didn't

18   receive a stimulant medication, you never looked to see whether

19   or not, in fact, those patients with negative reviews had or

20   had not received a stimulant?

21   **A.**   I did, but we're talking about statistics here.   One out

22   of 500 does not mean it's 500 out of 500.

23   **Q.**   In this communication specifically, Dr. Brindala has

24   identified that it's -- that Resheda House may be a good

25   example and that this complaint regarding her talking about a

1   patient's weight may be motivated by the fact that the patient

2   did not get a stimulant medication.  This is the topic of this

3   communication that we just saw --

4   **A.**   No, Ruthia gave several examples.  The weight was one of

5   the examples, but there were other appointments I think she was

6   referencing as well.

7        But I can't -- I have to actually see it and match it up.

8            **MR. SCHACHTER:**  Okay.  Your Honor, if I can just show

9   one more row --

10           **THE COURT:**  Actually, I think this is all collateral,

11  so I think we've finished this examination on this subject.

12           **MR. SCHACHTER:**  Your Honor --

13           **THE COURT:**  It's all collateral.

14           **MR. SCHACHTER:**  I'm nearly done.

15           **THE COURT:**  It's all collateral.

16           **MR. SCHACHTER:**  I'm nearly done.

17           **THE COURT:**  Well, okay, but we're finished on this

18  subject.

19           **MR. SCHACHTER:**  Yes, Your Honor.

20           **THE COURT:**  Okay.  Next subject.

21           **MR. SCHACHTER:**  Okay.

22  **BY MR. SCHACHTER:**

23  **Q.**   Now, you testified about -- this is the last topic we're

24  going to cover.

25       You testified about the -- Ms. He's focus on conversion

1    rate.

2        Do you remember that?

3    **A.**    Yes.

4    **Q.**    All right.  Now, the conversion rate was a metric that

5    examined what percentage of patients who were diagnosed with

6    ADHD in their initial appointment then signed up as members?

7    **A.**    No.

8    **Q.**    Do you recall that?

9    **A.**    No.  That's not the metric.

10   **Q.**    That's not your memory?

11   **A.**    That's not the metric.

12   **Q.**    Fair enough.

13       You talked about how -- you talked about the way that

14   providers on the platform were compensated.

15       Do you recall that?

16   **A.**    Yes.

17   **Q.**    Okay.  And you testified that panel pay incentivized

18   providers to have patients who were diagnosed stay as members;

19   correct?

20   **A.**    No, I did not say that.

21   **Q.**    Okay.  Is it correct that the panel pay system which paid

22   the providers based on the number of patients in their panel --

23   that's one of the incentives it created, was to have patients

24   sign up as members at Done?

25   **A.**    Yes.

1    Q.    Okay.   Now, there are many ways that a provider could help

2    cause a patient to sign up to be a member; fair to say?

3    A.    Yes.

4    Q.    And one of those ways is by providing warm, kind,

5    compassionate care; fair to say?

6    A.    Yes.

7    Q.    Okay.   Now, you talked about -- I believe you talked about

8    that the payment model at Done was intended to incentivize

9    providers to convert patients into members.

10        Do you recall giving that testimony?

11   A.    Yes.

12   Q.    Now, you are familiar in healthcare with the idea of fee

13   for service?

14   A.    Yes.

15   Q.    A surgeon is incentivized financially to perform a surgery

16   because he's going to get paid for the surgery?

17        MS. GREEN:   Objection, relevance.

18        MR. SCHACHTER:   I'm getting there.

19        THE WITNESS:   Can you repeat the question?

20   BY MR. SCHACHTER:

21   Q.    Sure.   A surgeon who gets paid for a surgery is

22   financially incentivized to say that a patient needs a surgery

23   because they'll make more money.

24        That would be an incentive, correct?

25   A.    And yes, the insurance company has a checks and balance on

1  that, so if it's not clinically validated -- because they

2  review the records -- they will not pay.

3  Q.   There's more than just the insurance companies that are

4  the check on that; correct?

5  A.   Yes.  We have JCAHO.  We have Department of Health.  There

6  are a lot of other systems that are doing checks and balances

7  to make sure there's not overutilization.

8  Q.   There's another.  All medical professionals have an

9  obligation to their patients only to recommend procedures that

10 are, in their view, medically necessary; correct?

11 A.   Yes, and when the institution controls the purse strings,

12 they do the best that they can.

13 Q.   Well, you are a licensed nurse; is that correct?

14 A.   I am a board register -- board-certified psychiatric nurse

15 practitioner.

16 Q.   And you have ethical rules that you are familiar with, are

17 you not?

18 A.   Yes.

19 Q.   And those ethical rules make very clear to you that you

20 are never allowed to put a financial incentive of any kind over

21 your professional obligations to your patient; correct?

22 A.   In theory, yes.

23 Q.   And you would never do that?  You would never place a

24 financial incentive over a -- you wouldn't let it influence

25 what care you provide to a patient; correct?

1    **A.**    That's not true.

2    **Q.**    Okay.

3    **A.**    There's always those considerations.  The world we live

4    in, we do have to consider finance and cost.  Like I have

5    patients that I would love to keep longer, but if insurance

6    starts denying, we unfortunately have to discharge them.

7    **Q.**    You are prohibited from recommending to your patient that

8    they need treatment that you don't think they need simply

9    because you're going to make money; right?

10         **MS. GREEN:**  Objection, relevance.  She wasn't treating

11   patients at Done.

12         **THE COURT:**  Sustained.

13         **MR. SCHACHTER:**  All right.

14   **BY MR. SCHACHTER:**

15   **Q.**    Now, last question on panel pay.

16         I believe that you testified that panel pay incentivized

17   providers not to do follow-ups.

18         Do you recall that?

19   **A.**    Yes.

20   **Q.**    However, you explained to medical providers just the

21   opposite, that your panel pay was intended to cover your

22   follow-ups?

23         **THE COURT:**  Well, I don't know that's the opposite.

24         **MR. SCHACHTER:**  Your Honor, I just --

25         **THE COURT:**  I mean, it's not the opposite at all.

1          MR. SCHACHTER:  I'll offer Exhibit 6300.

2          THE COURT:  Well --

3          MR. SCHACHTER:  A communication that Ms. Bowen has

4    with a provider on the subject of how panel pay is intended to

5    cover their follow-up examinations.

6          MS. GREEN:  Objection --

7          THE COURT:  Well, I don't -- what's argumentative

8    about it is the term "incentivize."

9          MR. SCHACHTER:  I'll withdraw the question, Your

10   Honor, and I'll just offer the exhibit, and the jury can see it

11   themselves.

12         THE COURT:  What is the exhibit?

13         MR. SCHACHTER:  6300, a communication between

14   Ms. Bowen and a medical provider on the subject of panel pay

15   and follow-up appointments.

16         THE COURT:  So this exhibit is offered to show that

17   the panel -- that there was a system in place for paying the

18   provider.

19         MR. SCHACHTER:  Correct, that was intended to cover

20   their follow-up appointments.

21         THE COURT:  Okay.  It's admitted for that purpose.

22      (Trial Exhibit 6300 received in evidence.)

23         MR. SCHACHTER:  Thank you, Your Honor.

24         THE COURT:  6300.  Anything further?

25         MR. SCHACHTER:  Once we go through this, that's the

BOWEN - CROSS / SCHACHTER

1  end of my questioning.

2          **THE COURT:**  Oh, okay.

3          **MR. SCHACHTER:**  Thank you.

4  **BY MR. SCHACHTER:**

5  **Q.**   Do you see, Ms. Bowen, that you wrote -- and this is the

6  end of July.  This is now you've been there for nearly

7  six months?

8  **A.**   Yes.

9  **Q.**   You wrote (as read):

10          "Thank you for sharing this with us.  I do want

11          to clarify that you are paid for follow-up

12          appointments as part of your panel pay.

13          "So, for example, you were paid $800 for your

14          patient panel last month, which comes out to eight

15          hours of work.  You had 16 follow-up appointments in

16          June, which comes out to be four hours.  So you were

17          paid for the four hours of followups you did in June

18          plus an additional four hours for messaging/refills."

19          **MR. SCHACHTER:**  I have no further questions.

20  Thank you very much, Ms. Bowen.

21          **THE COURT:**  Okay.  Thank you.  Counsel?

22          **MS. NECHAY:**  I'll consider it over a break if

23  Your Honor is inclined to take a short recess.

24          **THE COURT:**  No, I'm asking -- no.  You go forward if

25  you want to go forward now.

1    Do you want to ask questions?

2        MS. NECHAY:  Let me take one moment, please, Your

3    Honor.

4            (Defense counsel conferring.)

5        MS. NECHAY:  I think we've had a thorough examination

6    of this witness.  No further questions, Your Honor.

7        THE COURT:  No questions, okay.

8    Redirect.

9            <u>REDIRECT EXAMINATION</u>

10       THE COURT:  Ladies and gentlemen, do you want to stand

11   up, just take a little break in place, please do so.

12       MS. GREEN:  The translator just asked that I slow -- I

13   ask my questions slowly and for you to answer your questions

14   slowly as well, so we will do our best.

15   BY MS. GREEN:

16   Q.  I'll just start where Mr. Schachter had ended.  I don't

17   think I need to put the exhibit back up, but he was showing you

18   a communication about panel pay, I believe, and he just showed

19   it to you.  I don't believe he asked you any questions on it.

20       To the extent you were communicating anything about the

21   payment model in that e-mail, were you communicating your

22   beliefs about the payment system or what someone else was

23   instructing you to convey about the payment system?

24       It's okay.  Take a moment.  You can have some water.

25   A.  I am -- I feel a tremendous amount of guilt.  As you can

1    see, it's not long before I left.

2         You know, I was having so many like moral -- like ethical

3    dilemmas about having to tell the providers -- I mean, I can be

4    very persuasive, and I was using these skills of persuasion to

5    talk them out of like what were valid ethical concerns.  And

6    I -- it's part of what became too much is like I knew I was

7    lying to them.  I knew I was saying these things, but I was

8    getting calls at like 8:00 a.m. on a Sunday, you know, from

9    Ruthia.  Like:  Why haven't we hired enough providers?  Like

10   why is this happening?  I saw this review.

11        You know, it's -- and so I was just in this place where I

12   justified it because I was scared of losing my home.  I was

13   scared of losing my job.  And that -- but I put other people's

14   jobs and lives at risk, and so I'm sorry.  I just feel very

15   guilty about that.

16             **THE COURT:**  Let's take a recess now.

17        Ladies and gentlemen, we'll be in recess until a quarter

18   of.

19        Remember the admonition given to you:  Don't discuss the

20   case, allow anyone to discuss it with you, form or express any

21   opinion.

22                  (The jury leaves the courtroom.)

23       (Proceedings were heard out of the presence of the jury.)

24                  (Recess taken at 10:27 a.m.)

25                (Proceedings resumed at 10:43 a.m.)

 1    (Proceedings were heard out of the presence of the jury.)

 2         **THE COURTROOM DEPUTY:**  Court is now in session.

 3         **THE COURT:**  Is everybody here?

 4    Okay.

 5              (The jury enters the courtroom.)

 6    (Proceedings were heard in the presence of the jury.)

 7         **THE COURT:**  Okay.  Please be seated.

 8    Let the record reflect all jurors are present.  Parties

 9    are present.

10    You may continue.

11         **MS. GREEN:**  Thank you, Your Honor.

12    **BY MS. GREEN:**

13    **Q.**   Thank you, Ms. Bowen.

14    **A.**   Thank you.

15    **Q.**   You were asked a lot of questions on cross about e-mails

16    and messages you wrote about the auto-refill policy, bridge

17    refills, communications to providers and potential providers,

18    just to name some examples.

19         Who directed you what to write in those e-mails?

20    **A.**   It was primarily Ruthia.

21    **Q.**   And who did you report to?

22    **A.**   Ruthia.

23    **Q.**   You testified on cross-examination that "what I feel and

24    what I wrote is not congruent."

25         What did you mean by that?

A.   I mean, kind of what I was saying earlier is that there
was so much pressure to perform well on the job, to, you know,
do what Ruthia was saying.  And I wanted to also -- I wanted to
do is a good job.

And it was kind of like the example like, you know, the
frog getting slowly boiled.  You know, at first, you know, you
don't realize like how much you're going against your ethical
standards.  You know, you're like:  Okay, it's what my boss
tells me to do.  I'm going to do it.  I'm going to tell them
this.

And okay, like we just -- and more and more of what I was
telling the providers, because in the beginning I didn't
realize just how untrue it was.  And more and more I started to
realize, you know, that it is, and it was becoming like more of
instead of bending the truth, more and more like an outright
lie.

But, you know, you had to hide all that because, you know,
you're trying to do a good job.  You're trying not to get
fired.  Like there's so much job insecurity there, you know,
that it was -- I felt like --

And even then, like, I was -- I felt like I was going to
get in trouble for voicing my concerns as much as I was.  And
then -- and when Jayaram kind of stepped out of the picture and
left, Dr. Brindala, you know, he was like the one person in
leadership who was really kind of protecting us and, you know,

 1  making sure that our concerns about safety, you know, were --

 2  were -- he was echoing them as well.

 3      But then he -- there was some big fight between him and

 4  Ruthia that happened, and he just kind of said, okay, I'm

 5  stepping back, and we didn't ever really see him again.  And

 6  then that's kind of when, you know, we had to be very careful

 7  about like what we said or how we voiced our concerns to

 8  Ruthia.

 9  Q.   What were you worried about in terms of being careful when

10  you voiced your concerns to Ruthia?

11  A.   Oh, that we'd get fired.

12  Q.   Did you have another source of income at the time you were

13  working at Done?

14  A.   No, I did not.

15  Q.   Did you have a partner supporting you?

16  A.   No.  My partner -- my current husband now and I were

17  starting to talk again, and I think that I kind of -- when I

18  left Done, that accelerated things because then I was like, oh,

19  I don't know how I'm going to support myself.  So...

20  Q.   You talked about Dr. Brody's refills with Mr. Schachter,

21  and I believe at the start of that conversation, he asked you

22  to describe what a bridge refill is in usual standard practice,

23  and you explained that to the jury.

24      Can you explain how the refills Dr. Brody was writing were

25  different from what standard bridge refills are in normal

1 practice?

2 **A.**   I mean, a bridge refill is not something that's done that

3 common- -- you know, much less regularly done.

4      You know, so, for example, if I discharge one of my

5 patients from the hospital and they can't get in to see -- I

6 mean, we give them a month's worth.  That's our bridge refill

7 to them when they discharge to get to their provider.

8      But there are certain doctors -- like you can schedule an

9 appointment, a bridge appointment, if you can't see what's

10 going to be your regular psychiatrist -- because there's long

11 waiting times, like for two or three months but then doctors

12 will accept the case as a bridge patient where they will see

13 them.  But they will review all their records.  You know, they

14 actually see the patient themselves, so they'll schedule an

15 appointment and then they'll issue the refill.

16 **Q.**   And how was that different to what Dr. Brody was doing?

17 **A.**   So Dr. Brody wasn't familiar with these patients.  He

18 wasn't familiar with their history.  He wasn't familiar -- we

19 didn't even review the records in the platform, and there

20 wasn't even -- you look at the spreadsheet.  There was no like

21 reason column for why it was even put on the spreadsheet.

22      So he was just taking it at face value.  I mean, I guess

23 he trusted the care team that there was a valid reason, but,

24 you know, the care team -- they didn't know what they were

25 doing.  They were just being instructed that if there was an

BOWEN - REDIRECT / GREEN

1   issue, like Ruthia wanted it solved, and which involved putting

2   it on his list and having him refill it.

3       And that only became a problem when he became upset about

4   the volume and how much of his time it was taking.

5   **Q.**   And that's when you did your review?

6   **A.**   Yes.

7   **Q.**   Fair to say in the context of what was happening at Done,

8   these were more like blind refills as opposed to bridge

9   refills?

10  **A.**   Yes.

11  **Q.**   And when you did notice that there were valid concerns --

12  valid concerns, valid reasons why some of these prescriptions

13  should not have been written, these ones that were making it

14  onto Dr. Brody's list, did he change his practices as far as

15  you were aware in terms of saying he wasn't going to be

16  refilling all these scripts that he was being sent?

17  **A.**   I mean, he expressed concerns that those were being put on

18  his list, and his primary concern was the list was so long and

19  that, you know, he didn't feel like it was a good use of his

20  time.

21      But there -- I mean, there wasn't -- we didn't have like a

22  way to like systematically identify those, so they just kept

23  getting put on his list and he just kept refilling them.

24      But, you know, I did identify, hey, there are these

25  circumstances where, you know -- but it took too much time to

1  investigate each and every one.  I think I must have worked on

2  that investigation, that list, like for 12 hours a day for like

3  three days straight, you know, with that, and then,

4  unfortunately, had to neglect all my other duties to do it.

5      But to go through all of these things and read through all

6  the notes and try to figure out why it was put on his list --

7  because most of it was just coming from a patient complaint, so

8  a patient telling the care team:  Hey, like, I'm upset this

9  hasn't been filled.

10  Q.   And ultimately, he kept refilling them?

11  A.   Yes.

12  Q.   You brought up patient complaints, and you spent some time

13  on that with Mr. Schachter and this issue of negative reviews.

14      But Mr. Schachter also spent time with you showing you

15  some documents and talking with you about how much Defendant He

16  cared about providers spending short amounts of time with

17  patients, and he showed you two examples.  And I can pull them

18  up if you need them.

19      I believe he showed you the Erin Kim examples and the

20  example from someone called Memphis Sandoval, I believe.

21  A.   Yeah.

22  Q.   Now, both of those examples that Mr. Schachter showed you

23  where Defendant He was supposedly expressing concern about

24  these short appointments -- were they both in the context of a

25  negative patient complaint?

1  A.    Yes.

2  Q.    Did Mr. Schachter show you any examples of Ms. He,

3  Defendant He, supposedly being concerned about short initial

4  appointment?

5          MS. NECHAY:  Objection, burden shifting.

6          THE COURT:  I'm sorry?

7          MS. NECHAY:  Objection, burden shifting.

8          THE COURT:  Has nothing to do with burden.

9      Go ahead.

10  BY MS. GREEN:

11  Q.    Did Mr. Schachter show you any examples of Defendant He

12  expressing concerns about a short appointment time not in the

13  context of a patient complaint?

14  A.    No.

15  Q.    You had many interactions with Defendant He; correct?

16  A.    Yes, many.

17  Q.    Are you aware of her expressing concerns about short

18  appointment times not in the context of negative patient

19  complaints?

20  A.    No, never.

21  Q.    And, in fact, I believe you mentioned this yesterday.

22  When you suggested a system control -- I think it was some kind

23  of tech improvement that could help control for and ensure

24  providers were spending the scheduled amount of time with

25  patients -- what was Defendant He's response to that?

1    **A.**    No, she didn't want to do anything that cost any money,

2    which was really confusing for us, because we're constantly

3    being told how much money the company was making.  It was a

4    very, very tiny like monthly fee for a platform that would give

5    us this data so we could actually surveil this, you know, what

6    the average appointment times were, you know, because sometimes

7    the data was also corrupted by was it a no-show, like the

8    provider showed up, you know, was there for a little bit.

9        But it would tell us that, like if, you know, a person

10   didn't join, so we could just do that, you know,

11   instantaneously.  But we were constantly told no.

12   **Q.**    Okay.  And let's just focus on that initial appointment

13   time.

14       Let's assume the provider was spending 25 minutes.  Were

15   providers expressing concerns that even the 25 minutes was an

16   insufficient amount of time to make an accurate diagnosis?

17           **MR. SCHACHTER:**  Objection, asked and answered.

18           **THE COURT:**  Sustained.

19   BY MS. GREEN:

20   **Q.**    Looking at Exhibit 355, which Mr. Schachter showed you.

21           **MS. GREEN:**  And we can just go to page 1 just very

22   briefly, and let's look at the bottom two comments.

23   BY MS. GREEN:

24   **Q.**    He had focused on this concern -- this issue with one

25   provider that, actually, Dr. Brindala had been discussing with

BOWEN - REDIRECT / GREEN

1    Defendant He.

2        And looking at Defendant He's response, she talks about "I

3    have previously communicated with patients."

4        How appropriate was it, in your view, for Defendant He to

5    be having direct communications with patients about clinical

6    care?

7    **A.**    It was completely inappropriate.

8    **Q.**    Why?

9    **A.**    I mean, she wasn't a clinician, and she was supposed to be

10   on the business side of the house, making business decisions.

11       I think the patients even themselves were a little

12   surprised.  I think they believed that there was some level of

13   privacy to their data as well.

14   **Q.**    And she talks about "paused her from receiving new

15   patients."

16       So had Defendant He imposed negative consequences on

17   providers as a result of negative reviews?

18   **A.**    Yes.  It had a huge impact on her pay.  And if you'll

19   notice, it was new patients, not follow-ups, so...

20   **Q.**    And this overarching concern that Dr. Brindala and you had

21   raised in this communication about weighting providers' success

22   based on negative reviews, and you testified that -- I'm not

23   sure of your exact words, but essentially that Defendant He

24   dismissed those concerns from you and Dr. Brindala.

25       Did Defendant He change the way she was measuring

BOWEN - REDIRECT / GREEN

1    providers' success after you raised these concerns?

2    **A.**    No.

3    **Q.**    Mr. Schachter talked to you about the auto-refill policy,

4    and I just want to look at a couple of things.

5        So first of all, he showed you Exhibit 320, which we can

6    display very quickly, which was the communication that went out

7    to the patients.

8        Do you -- correct?

9    **A.**    And I actually -- I don't know that this actually went out

10   to the patients.  It's just a -- it's e-mail to herself.  I

11   don't know if this is something that actually went out.

12   **Q.**    Well, do you remember he also showed you another

13   document -- so this is dated March 31st.  He showed you another

14   document that said it went live by April 1st.

15       Do you remember that?

16   **A.**    Yes.

17   **Q.**    Okay.  And then he also showed you a document,

18   Exhibit 389, which was when it was communicated to the

19   providers, this auto-refill policy.

20       Do you remember this?

21   **A.**    Yes.

22   **Q.**    Okay.  And let's see the date of that.

23       Do you see the date July 9, 2021?

24   **A.**    Yes.

25           **THE COURT:**    389?

1          **MS. GREEN:**  Yeah.  And that was already admitted by --

2          **THE COURT:**  Thank you.

3    **BY MS. GREEN:**

4    Q.   So this auto-refill policy went out to members, went live,

5    and that was months before the actual Done providers were told

6    about this policy; is that correct?

7    A.   Yes.  They were furious because they were having patients

8    saying:  Why do I have to see you?  It's on auto-renewal.

9         And they had no idea what it was.

10   Q.   How -- and whose decision was it to institute this policy

11   at the time you were there?

12   A.   It was Ruthia.

13   Q.   And how was that, in your view, accommodating of providers

14   being allowed to execute their independent clinical judgment

15   when they're told months after a new policy gets rolled out to

16   their patients about this policy?

17   A.   The providers were kind of seen as these, you know,

18   factory workers.  And, you know, I would say it was probably

19   intentional to roll it out to the system before the providers

20   because the providers would have, as they did, object to it.

21          **THE COURT:**  One moment.

22                    (Pause in proceedings.)

23   **BY MS. GREEN:**

24   Q.   Mr. Schachter spent a while talking with you yesterday

25   about the intake screening questionnaires, the GAD-7, the

1    PHQ-9, if they were or weren't made mandatory again.

2        Even assuming that those screening questionnaires that

3    Defendant He took out came back in at some point, would that

4    change your view as to whether it was appropriate for

5    Defendant He to be deciding which clinical screening

6    questionnaires are in, which are out?

7    A.    Yes, it was inappropriate for her to take them out and

8    been making those decisions.

9    Q.    Did that -- did these screening questionnaires change any

10   of the fundamental concerns you had about whether prescriptions

11   were being prescribed inappropriately on the Done platform?

12   A.    No.

13   Q.    Did it have any impact on the concern about not paying for

14   follow-up appointments?

15   A.    No.

16   Q.    Or not increasing the initial appointment time?

17   A.    No.

18   Q.    Or this refill policy that we've just been discussing?

19   A.    No.

20   Q.    And were those all concerns that -- well, what did all

21   those concerns lead you to believe about Done?

22   A.    I mean, that the -- it reinforced the idea that they were

23   primarily concerned about revenue and not about patient safety

24   or, you know, the clinicians' requests for just the support

25   they needed to be able to follow up on their patients to be

1  able to treat them appropriately.

2  Q.   And would it -- the screening questionnaires have changed

3  anything that Dr. Brindala wrote in his May 2021 Slack that we

4  looked at, his concerns or his risk mitigation report about

5  legal consequences if Done didn't change its practices?

6  A.   No.

7  Q.   Did the screening questionnaires even feature in his

8  communication there?

9  A.   No.

10  Q.   Even from May until August 2021, when you left, was there

11  ever a point in time when you did not have providers expressing

12  concern that they were prescribing inappropriately?

13  A.   No.  It was a consistent concern.

14  Q.   And even if information from these screening

15  questionnaires was included and these patients were on the

16  platform, was there any accommodation made to ensure that more

17  complex patients such as people with depression or anxiety were

18  treated in a different way or with higher safeguards in place?

19  A.   No.

20  Q.   Not longer initial appointments?

21  A.   No.

22  Q.   No requirements of follow-ups?

23  A.   No.

24  Q.   Mr. Schachter asked you questions about this yesterday,

25  and he showed you a document that was in Chinese from

1    Defendant He to someone in China where it's -- he suggested

2    that that was where Defendant He was asking for these to be

3    mandatory again.

4         Do you remember that?

5    A.   Yes.

6    Q.   And you weren't on that communication; right?

7    A.   No, I was not.

8         MS. GREEN:   And can we just look at that, please.

9    It's Exhibit 6275.  I think, Ms. Braga, you have it.  And I

10   think if we could just look on page 2.  The penultimate

11   paragraph.

12        Page 2, please Ms. Braga.

13   BY MS. GREEN:

14   Q.   And let's just scroll.  Look at the bottom two -- the

15   bottom two sections that Defendant He wrote.

16        So in this communication, which is the translated version,

17   Defendant He wrote (as read):

18             "Otherwise, the provider team might all quit."

19        So even within this communication, what was Defendant He

20   expressing as her reason for why she was supposedly giving this

21   directive?

22   A.   She was concerned that all the providers might leave the

23   platform and quit, since there was so much anger and objection

24   to them being taken out.

25   Q.   And what would happen if all the providers left her

1  platform?

2  **A.**   Well, a huge loss of revenue.

3  **Q.**   And in your experience to that date, was it typical for

4  all providers to have to threaten to quit a platform in order

5  to get a clinical change that they needed put in place?

6  **A.**   I've never seen that except for when nurses go on strike.

7  **Q.**   Okay.  And this was in the May 2021 time frame, but -- and

8  we can pull up Exhibit 359.

9       Is it correct that providers had been raising concerns

10  about not having these screening questionnaires for months

11  prior to May 2021?

12  **A.**   Yes.

13  **Q.**   For example, if we look at page 3, please.

14       Ms. Ellis's communication was four months ago, prior to

15  the May 2021 time frame, in January 2021, approximately; is

16  that right?

17  **A.**   Yes, I believe so.

18       **MS. GREEN:**  I'd like to admit Exhibit 958, please, to

19  just to corroborate that date.

20       **THE COURT:**  958 admitted.

21       **MR. SCHACHTER:**  Objection, Your Honor, foundation.

22  The witness is not on this and has never seen it.  This is

23  before she started workers at Done.

24       **MS. GREEN:**  I can explain, Mr. Schachter.

25       So page 3 of Exhibit 359 is a copy of this communication,

```
 1   and this is the original from which it was copied.

 2            MR. SCHACHTER:  Objection, foundation.

 3            MS. GREEN:  Happy to lay a foundation.

 4   BY MS. GREEN:

 5   Q.   When you were preparing a meeting in May 2021 on this

 6   topic, did you and others gather previous communications and

 7   Slacks where providers had been raising concerns about the

 8   screening questionnaires to put in the meeting invite?

 9   A.   Yes.

10   Q.   And those were from before May 2021; correct?

11   A.   Yes, because we could search.  I could search in the past

12   Slack messages.

13            MS. GREEN:  Move to admit.

14            THE COURT:  You have to ask her:  Is this one of them?

15   BY MS. GREEN:

16   Q.   Okay.  So let's look at this.  Let's go to page 3.  And we

17   can do a comparison if you need to, because I'm not sure if you

18   looked.

19        But do you see Ms. Ellis's concern, looking at the bottom

20   three sections (as read):

21            "Just because they have been diagnosed doesn't

22        mean they have a diagnosis.  If a patient says they

23        have don't have anxiety and depression, do they not

24        have to fill out PHQ-9?"

25        Do you see that?
```

BOWEN - REDIRECT / GREEN

1   A.    Yes.  This is the same language --

2   Q.    The same language --

3   A.    -- the same message.

4   Q.    -- as Exhibit 359?

5          **THE COURT:**  Admitted.

6          (Trial Exhibit 958 received in evidence.)

7          **MS. GREEN:**  Thank you, Your Honor.

8   **BY MS. GREEN:**

9   Q.    So fair to say these concerns had been being raised

10  for months before May 2021?

11  A.    Yes.

12  Q.    And your testimony was you did not recall these

13  questionnaires being made mandatory again before you left;

14  correct?

15  A.    We -- we continued to get complaints from providers that

16  they were not in the platform.  I don't know if this is because

17  patients had already booked the appointment and it was only for

18  future-looking patients, but either way, we continued to get

19  complaints for months.

20  Q.    Okay.  And let's look at that.

21        When you were at Done, did you review patient records?

22  A.    Yes.

23  Q.    So you're familiar with what Done patients records look

24  like?

25  A.    Yes.

1   Q.   Are you familiar with the information that's included on

2   them?

3   A.   Yes.

4        MS. GREEN:   The Government moves to admit

5   Exhibit 3054, which is just two examples of Done patient

6   records.

7        MR. SCHACHTER:   Objection, foundation.   This patient

8   was seen after the witness's departure, and this witness has no

9   foundation for the document.

10       MS. GREEN:   We're not asking patient-specific

11  questions here.   This is a Done business record.   I'm only

12  going to ask if the information from the GAD-7 and the PHQ-9,

13  which were initial appointments during the time that she was

14  there, if that information is included.

15       And given that Mr. Schachter spent a fair amount of time

16  here trying to undermine this witness's credibility --

17       THE COURT:   Without characterizing it, what exhibits

18  are you asking --

19       MS. GREEN:   Just Exhibit 3054.

20       MR. SCHACHTER:   Your Honor --

21       THE COURT:   Wait a minute.   3054.

22       And your objection is that it's --

23       MR. SCHACHTER:   It's --

24       THE COURT:   Pardon me?

25       MR. SCHACHTER:   Apologize.   It's a document that's

1  created long after the witness's departure and that she has

2  never seen before, and so it lacks foundation.  The Government

3  objected multiple times --

4          THE COURT:  No, wait.  It lacks foundation.  Thank

5  you.

6      Now, 3054, let me look at it.

7          THE COURTROOM DEPUTY:  Did he say admitted?

8          MS. GREEN:  No, he just wanted to look at it.

9      And, Your Honor, I can point you to the only part that I

10  will be asking about on this record, which is in Section 4 on

11  page 1, you see the initial appointment time is August 11th,

12  2021.  That is when she is there.

13     And right below that, Section 5 is whether there is data

14  for the PHQ-9 or GAD-7 included.

15          THE COURT:  That portion of the exhibit will be

16  admitted.

17          MR. SCHACHTER:  The witness has never seen this

18  exhibit.

19          THE COURT:  It doesn't make any difference as to that.

20          MS. GREEN:  Thank you, Your Honor.

21     (Trial Exhibit 3054 - Sections 4 and 5 received in

22  evidence.)

23          THE COURTROOM DEPUTY:  What page is it?

24          MS. GREEN:  So page 1 of Exhibit 3054, and it's the

25  bottom portion.

1          THE COURT:  The Section 4 and Section 5 may be shown

2     to the jury.

3          MS. GREEN:  Thank you, Your Honor.

4     BY MS. GREEN:

5     Q.   So this is an excerpt of just one patient record.  You can

6     see the date here of the initial appointment is August 11th,

7     2021; is that correct?

8     A.   Yes.

9     Q.   So after May?

10    A.   Yes.

11    Q.   And just focusing on the data below that, it says (as

12    read):

13               "PHQ-9 evaluation, GAD-7 evaluation, no data on

14          file for this assessment."

15         Had this patient completed a mandatory -- well, let me ask

16    you a different question.

17         What does that tell you?

18         THE COURT:  The question is:  What does that mean?

19    BY MS. GREEN:

20    Q.   Yeah.  What does that mean?

21         MS. GREEN:  Thank you, Your Honor.

22         THE WITNESS:  So this is the next part of the

23    patient's medical record, and it shows that the patient did not

24    complete the PHQ-9 or the GAD-7.

25    \\\

BY MS. GREEN:

Q.   Thank you.

     Yesterday on cross --

          MS. GREEN:  And we can take that down.  Thank you,

Ms. Braga.

BY MS. GREEN:

Q.   Mr. Schachter showed you Exhibit 1418, which is the

clinician quick start guide.

          MS. GREEN:  And we can pull that up, just page 5.

BY MS. GREEN:

Q.   And he focused on that language at the bottom (as read):

          "If they don't fully meet the criteria for ADHD,

     patient may still benefit from a medication trial."

     And that was also very similar --

          MS. GREEN:  And we can pull this back up.  This is

already admitted --

BY MS. GREEN:

Q.   -- to Exhibit 1468, which had very similar language as

well on page 4.

     While Ms. Braga is pulling that up --

          MS. GREEN:  Yeah, on the right side.

BY MS. GREEN:

Q.   Do either of these provider guidance documents say it's

okay to give a medication trial when a patient has unspecified

ADHD?

BOWEN - REDIRECT / GREEN

1    **A.**   It does not.  And unspecified ADHD is temporary diagnosis.

2    It's just used --

3          **MR. SCHACHTER:**  Objection.

4          **THE WITNESS:**  -- when you haven't --

5          **MR. SCHACHTER:**  Objection to the opinion testimony.

6          **THE COURT:**  I think you asked her a question.

7          **MS. GREEN:**  Yeah, I've been asking questions.

8    **BY MS. GREEN:**

9    **Q.**   So Mr. Schachter then showed you the DSM-5 manual for

10   ADHD, Exhibit 6028.

11         **MS. GREEN:**  So we can bring that up.

12   **BY MS. GREEN:**

13   **Q.**   First of all, is ADHD unspecified a type of ADHD included

14   within this DSM-5 manual?

15   **A.**   No.  I mean, it's included in there, but I'll explain why.

16   **Q.**   Okay.  Are there certain criteria you have to meet to even

17   have an ADHD unspecified diagnosis?

18   **A.**   No, not specific.

19   **Q.**   Well, let's look at that.

20         What's -- could you please explain what you understand

21   about ADHD unspecified?

22   **A.**   So -- so to be specified, you're either type inattentive,

23   type hyperactive, or type combined.  So in order to be

24   inattentive, you must have six criteria from inattention

25   criteria.  In order to be hyperactive, you must have six from

BOWEN - REDIRECT / GREEN

1    the hyperactive.  To be combined, you must have six from each.

2          So a lot of times in the initial appointment, you can't

3    get all the information you need to make that specific

4    diagnosis.  You need to collect questionnaires, like if it's a

5    child, from the school, because you need to demonstrate it in

6    more than one setting --

7          I'm sorry.  I'll slow down.

8          You need to get collateral.  You need to demonstrate that

9    the symptoms were present before the age of 12, so sometimes

10   you reach out to family and friends, obviously with the

11   patient's permission.

12         So a lot of that can't be done in one visit.  But in order

13   to get insurance reimbursement, you have to have some kind of

14   diagnosis on there, so you put "unspecified" on there.  And you

15   can do that until you have enough information to make a final

16   diagnosis which is specified as inattentive, hyperactive, or

17   combined type.

18         And, actually, if you keep that unspecified diagnosis on

19   there throughout too many visits, insurance will start denying

20   you, because they say it's not a final diagnosis.

21   Q.   Okay.  You mention the symptom count, but just looking at

22   page 3 of this, which I think is the part that you were just

23   discussing in page 4, talks about the -- yeah, inattentive or

24   the combined presentation, inattentive, or hyperactive.

25         Beneath the symptom counts in A1 and A2, are there also

1  certain other criteria, like symptoms have to be present before

2  the age of 12, and several inattentive or hyperactive impulsive

3  symptoms are present in two or more settings, and diagnosis not

4  explained by another mental disorder?

5  **A.**    Yes, and that's the key one.  That's why the full

6  psychiatric evaluation is critical, so that you can rule out

7  bipolar, you can rule out personality disorders that might have

8  diagnostic overlap, and better explain the symptoms.

9  **Q.**    Okay.  And focusing on the diagnostic features of ADHD

10  generally, regardless of the type, so page 5, and just looking

11  at that top sentence (as read):

12         "The essential feature of ADHD is a persistent

13      pattern of inattention or hyperactivity and

14      impulsivity that interferes with functioning or

15      development."

16      Next paragraph talks about the prior to age 12 requirement

17  and manifestations must be more than one setting.

18      Does it say anywhere in DSM-5 whether you have combined

19  type, unspecified, that you can give a medication trial just to

20  make a patient feel better?

21  **A.**    No.

22  **Q.**    Is that a relevant diagnostic criteria, according to this

23  manual?

24  **A.**    No.

25  **Q.**    Were you concerned during your time at Done that given

1  Done's practices, Done members were getting stimulant

2  prescriptions who did not meet the diagnosis for ADHD?

3         **MR. SCHACHTER:**  Objection, asked and answered.

4         **THE COURT:**  Overruled.

5         **THE WITNESS:**  Yes, I was very concerned.

6  **BY MS. GREEN:**

7  **Q.**   And I believe you've testified that you raised your

8  concerns about the specific language that we looked at, the

9  medication trial language if you don't meet criteria, with

10 Defendant He; correct?

11 **A.**   Yes.

12 **Q.**   And at any point, did Ms. He tell you:  Your concerns are

13 unfounded, Ms. Bowen; I'm referring to the ADHD unspecified

14 type within the DSM-5?

15 **A.**   No.

16         **MS. GREEN:**  Just one moment, Your Honor, I'm seeing if

17 I might skip some of these things.

18                 (Pause in proceedings.)

19 **BY MS. GREEN:**

20 **Q.**   Mr. Schachter asked you a number of questions about

21 Dr. Lucchese and collaborating physicians.

22         Do you remember that?

23 **A.**   Yes, I do.

24 **Q.**   And let's look at Exhibit 6264, which was admitted by

25 Mr. Schachter, and we're just going to ask you about one

1    comment in here on page 3.

2        So this was not a sentence that Mr. Schachter discussed

3    with you, but it's Dr. Brindala wrote --

4            **MS. GREEN:**  And it's three paragraphs up from the

5    bottom, if we can expand that.  Nope.  Yeah, there we go.

6        Thank you, Ms. Braga.

7    **BY MS. GREEN:**

8    **Q.**  (as read):

9            "Ruthia He:  Most legitimate psychiatrists will

10           not provide the collaborating physician functions the

11           platform requires, irrespective of how much

12           compensation is given."

13       What did you understand Dr. Brindala to mean here?

14   **A.**  So the -- that our platform, the collaborating physician

15   functions the platform requires is to essentially sign off on

16   this -- the practices that are taking place.  So the --

17   you know, no legitimate psychiatrist would sign off and say

18   that you were able to provide a thorough psychiatric evaluation

19   in 25 minutes, which was typically less, because five minutes

20   in between patients is not enough to chart and prep for your

21   next patient, so that's, I think, part of the reason why they

22   were also shorter.

23       They would also not sign off on the large, extremely large

24   volume of stimulant prescriptions that were being sent.

25       And then also just the lack of access, like to the

BOWEN - REDIRECT / GREEN

 1  platform, to the records, how our information was collected.

 2  There were no safeguards in place.  I mean, any other

 3  healthcare institution, there would be so many other patient

 4  safeguards in place that we didn't have.

 5  **Q.**   So from your perspective and observations, was Done acting

 6  outside normal practice with respect to how collaborating

 7  physicians were used on the platform?

 8  **A.**   Yes, very far outside.

 9  **Q.**   You spent a lot of time with Mr. Schachter on Dr. Tsang's

10  clinical screening questions.  Ultimately, he showed them to

11  you and read some of them out to you.

12      Why were you concerned about Dr. Tsang's screening

13  questions?

14  **A.**   Because none of them addressed -- you know, presented --

15  because one of things that if we were a legitimate company that

16  was concerned about abuse and diversion, it would show in our

17  questions.  We'd be asking our providers:  How are you going

18  to, you know, evaluate patients for risk of abuse and

19  diversion?

20      That would be one of the scenarios.  None of scenarios

21  presented that.  None of them were looking for that signal in

22  the candidate, and it was glaringly obvious.

23          **MS. GREEN:**  One moment, Your Honor.

24      Thank you, Your Honor.

25          **THE COURT:**  Okay.  Any recross?

1      MR. SCHACHTER:  No, thank you, Your Honor.

2      MS. NECHAY:  No, thank you.

3      THE COURT:  Thank you very much for coming.  You are

4   excused.

5                  (Witness excused.)

6      THE COURT:  Would you call your next witness, please.

7      MS. GURSKIS:  United States calls Melissa Emmerth.

8                  **MELISSA  EMMERTH**,

9   called as a witness for the Government, having been duly sworn,

10  testified as follows:

11     THE WITNESS:  Yes, I do.

12     THE COURTROOM DEPUTY:  Thank you.  You may be seated.

13  Please state your full name for the record and spell your last

14  name.

15     THE WITNESS:  Melissa Anne Emmerth, E-M-M-E-R-T-H.

16                  **DIRECT EXAMINATION**

17  BY MS. GURSKIS:

18  Q.   Good morning.

19  A.   Good morning.

20  Q.   What do you do for a living, Ms. Emmerth?

21  A.   I'm a licensed clinical social worker.  I provide

22  psychotherapy in a private practice setting.

23  Q.   Where do you live?

24  A.   I live in Austin, Texas.

25  Q.   Are you familiar with a company called Done?

EMMERTH - DIRECT / GURSKIS

```
 1   A.   Yes, I am.

 2   Q.   How are you familiar with Done?

 3   A.   I used them about three years ago to see if I had ADHD,

 4   and they prescribed me medication.

 5   Q.   Any chance you remember when that visit took place?

 6   A.   Yes.  It was February 22nd, 2022.

 7   Q.   Good memory.  How do you remember that date so clearly?

 8   A.   2/22/22.  It was just 2-2-2-2-2.

 9   Q.   What symptoms were you having that made you schedule that

10   appointment with Done?

11   A.   I had recently moved from a pretty busy career working 40

12   to 60 hours per week to working in a private practice setting

13   where I sat for a number of hours listening to people talk

14   about, you know, issues that they were having.  And so I

15   noticed myself kind of going off on bunny trails in my mind,

16   some forgetfulness, distractibility.  And so I decided I wanted

17   to see if I possibly had an ADHD diagnosis.

18        Additionally, my son had been diagnosed with ADHD about a

19   year before that.

20   Q.   And in terms of that job shift, what were you doing before

21   where you were busy and on the ground before you were in the

22   more office setting?

23   A.   Sure.  I worked for Child Protective Services.  I was a

24   supervisor over a program where children who have been removed

25   from their primary parents go to live with family members.  And
```

EMMERTH - DIRECT / GURSKIS

1  so I supervised a team of 12 caseworkers that went and worked

2  with these families.

3  Q.  So turning back to 2/2/2222, at the end of that

4  appointment, you said you got a prescription?

5  A.  I did.

6  Q.  What was the prescription for?

7  A.  It was for Adderall.

8  Q.  How many minutes was that appointment?

9  A.  It was less than five minutes.

10 Q.  Five minutes?

11 A.  Yes.

12 Q.  And you said that after those five minutes the

13 practitioner diagnosed you with something?

14 A.  Yes.  The practitioner said:  Sounds like you have ADHD.

15 I'm going to go ahead and send in a prescription for Adderall.

16 Q.  Did you have health insurance at the time?

17 A.  I did.

18 Q.  Was that through United Healthcare?

19 A.  I believe so.

20 Q.  And how many prescriptions from Done did you get after

21 that, if you recall?

22 A.  Three.

23 Q.  How many other appointments did you have after that?

24 A.  I had no other appointments.

25 Q.  Have you ever been diagnosed with ADHD aside from that

**EMMERTH - DIRECT / GURSKIS**

1  encounter with a Done provider?

2  **A.**   No, I have not.

3  **Q.**   Let's talk about what you have been diagnosed with.

4  **A.**   Yes.

5  **Q.**   So since February of 2022, have you learned what was

6  causing that distractibility that led you to the Done website?

7  **A.**   Yes.  So about -- from this time about nine years ago, I

8  had ovarian cancer, and the treatment for that was

9  chemotherapy, a pretty intense type of chemotherapy, and then a

10  radical hysterectomy and oophorectomy, so they removed my

11  ovaries, which in turn put me into medical menopause.

12      And so since then, I've learned that a lot of the symptoms

13  that I was seeing were caused by menopause.

14  **Q.**   What were some of those symptoms from the chemical or

15  medical menopause that you're describing?

16  **A.**   Distractibility, forgetfulness, difficulty sleeping

17  sometimes at night, hot flashes -- but that's obviously not an

18  ADHD symptom.

19      And so a lot of that.  Some irritability, going off on

20  bunny trails in my mind when I was talking to someone,

21  forgetting words sometimes.

22  **Q.**   Are you being treated for that now?

23  **A.**   I am.

24  **Q.**   How are you being treated?

25  **A.**   I have a hormone replacement patch that I use.  I also try

EMMERTH - DIRECT / GURSKIS

1  to maintain really good sleep hygiene, so going to sleep at the

2  same time, waking up at the same time, and then eating healthy

3  and exercising.

4  Q.   Is that helping?

5  A.   Yes.

6  Q.   And while you were undergoing chemotherapy, were you

7  taking any other medication?

8  A.   Yes.  I was taking sertraline, which is also known as

9  Zoloft, for -- I initially started taking it when I had my son;

10  he's 11 now -- so for postpartum depression.  And then shortly

11  after he was about two years old -- actually, right after his

12  second birthday was when I was diagnosed with ovarian cancer,

13  so my oncologist felt like it would be a good idea to keep me

14  on that medication, and I'm still on it for depression.

15  Q.   I want to turn back to your appointment with Done,

16  Ms. Emmerth.

17       Do you recall the practitioner's name?

18  A.   Yes.  Her name is Erin Kim.

19  Q.   And do you remember anything about the intake process

20  before that five-ish-minute appointment with Ms. Kim?

21  A.   Yes.  I went onto their website, completed -- you know,

22  put in some information, and then they said these are the

23  appointments that are available.  I ended up not scheduling

24  right away and then got some e-mails that said:  Hey, we

25  noticed you on our website.  If you have ADHD symptoms, go

1  ahead and schedule this.

2      And so I got a few of those, and I finally said, okay, I'm

3  going to go ahead and schedule something.  And then I got an

4  e-mail that said, like, please complete this information.

5      The first one was to list like what medications you're on.

6  It asks, you know, what symptoms you might be having.  And then

7  I got two assessments:  The PHQ-9, which is the patient health

8  questionnaire 9, which assesses for like depression and

9  suicide, and then the GAD, which is for generalized anxiety

10  disorder, and that just you answer -- it's like, I think, nine

11  questions and you circle one, two, three, four, or five if

12  you're experiencing symptoms.

13  **Q.**   How long did it take you to fill out those forms?

14  **A.**   Less than a few minutes.

15  **Q.**   So you filled out the forms, and did you end up scheduling

16  an appointment?

17  **A.**   I did end up scheduling an appointment.

18  **Q.**   What happened on the -- on February 22nd, the day of that

19  appointment?

20  **A.**   Sure.  I -- I was in my office.  I got, you know, myself

21  situated.  I logged on a little bit early so that I would be on

22  time for my appointment, probably about 15 minutes early.  And

23  the provider popped on, Ms. Kim, and said:  Oh, you're not

24  so-and-so.

25      And I said:  No, I'm Melissa Emmerth.  I have an

EMMERTH - DIRECT / GURSKIS

1    appointment with you.

2         And she goes:  Well, this isn't your appointment time.  Go

3    ahead and log off.  I'm meeting with somebody else.

4         I said:  Oh, okay.

5         So I logged off and I waited until like right before my

6    appointment time and then logged back on.

7    Q.   Were you surprised that that was her interaction with you

8    during that --

9    A.   Yes, I was.

10   Q.   Why were you surprised?

11   A.   Well, it was the first time meeting me as a patient, and I

12   felt like you would maybe say:  Oh, hey, I have another person.

13   Go ahead and go back in my waiting room.

14   Q.   So she does sign online at the appointment time?

15   A.   Yes, ma'am.

16   Q.   Can you describe that interaction for the jury?

17   A.   Yeah.  She signs back on.  She checks in with my name.

18   Then she -- she lists symptoms of ADHD and says:  Are you

19   experiencing these?

20        And I said, You know, yeah.  It sounds like there are some

21   of them that I am having right now.

22        And she said:  Okay.  Sounds like you have ADHD, and I'm

23   going to go ahead and send in the prescription for Adderall.

24        And I said:  Okay.  Well, in my experience, just for -- as

25   a mom of a child that has ADHD, we would check in with the

EMMERTH - DIRECT / GURSKIS

1    doctor pretty regularly about one to two weeks in to let them

2    know how the medication was going.

3        And so I said:  Should I check in with you in, you know,

4    the next week or two and let you know how it's going, if I need

5    an increase or a decrease?

6        And she said:  Melissa, I have so many thousand patients,

7    I do not have time for you to be checking in with me on this.

8    In 30 days when it's time for your refill, you can go ahead and

9    let me know how it's going.

10   Q.   So she said you couldn't contact her for 30 days?

11   A.   She said that she didn't have time for me do that, so it

12   would be almost pointless for me to send something in.

13   Q.   And in 30 days, you could meet her for a follow-up?

14   A.   No.  In 30 days I would complete a little kind of form

15   e-mail and it would be sent to her or her care team, and then

16   a -- she would increase or decrease the prescription.

17   Q.   Okay.  We'll come back to that form e-mail in one second.

18   I just want to talk a little bit more about your interaction

19   with Ms. Kim over that -- that appointment.

20       Did she ask you anything about symptoms before the age of

21   12 during that --

22   A.   No, she did not.

23   Q.   Did she ask you about your history with cancer?

24   A.   No, she did not.

25   Q.   Did it come up at all?

**EMMERTH - DIRECT / GURSKIS**

1  A.    No, it did not.

2  Q.    Did she ask you if you had had any chemotherapy

3  treatments?

4  A.    No.

5  Q.    Did that come up?

6  A.    No, it did not.

7  Q.    Did she ask you anything about your medical history?

8  A.    No, she did not.

9  Q.    Did she ask you anything about other symptoms you were

10 experiencing?

11 A.    No, she did not.

12 Q.    Nothing about the hot flashes?

13 A.    No.

14 Q.    Nothing about difficulty sleeping?

15 A.    No.

16 Q.    Anything about the environmental changes going on in your

17 life?

18 A.    No.

19 Q.    New job didn't come up?

20 A.    No.

21 Q.    Did she ask if you were on any other medications, like the

22 antidepressant you were talking about?

23 A.    No, she did not ask about it.

24 Q.    What was your reaction after that interaction with

25 Ms. Kim?

1  A.   I felt like it was very quick, and I felt like it was kind

2  of like a cattle call.  Like, okay, now we're on to the next

3  person.  Like you wanted to find out if you have ADHD, I

4  prescribed you a prescription, and I'm going to log off and

5  move on to the next patient.

6       I did not feel valued.  I did not feel like she got to

7  know who I was, and I questioned whether it was an accurate

8  diagnosis.

9  Q.   So you didn't feel very confident in that diagnosis after

10 the visit?

11 A.   No, I did not.

12 Q.   Did Ms. Kim seem to be concerned about the accuracy of the

13 diagnosis?

14 A.   No.

15 Q.   What was your impression of Ms. Kim as a provider?

16 A.   That she was there to see people to prescribe them

17 medication for ADHD.

18 Q.   And what was the prescription that you got?

19 A.   Adderall.

20 Q.   Did she seem to be concerned about whether Adderall would

21 be the right treatment for you?

22 A.   No.

23 Q.   Did she talk about other options that could have worked in

24 your situation, other treatment options?

25 A.   No.  There were never any other options provided or

EMMERTH - DIRECT / GURSKIS

1   suggested.

2   **Q.**   Did you end up trying the Adderall anyway?

3   **A.**   I did.

4   **Q.**   And after the 30 days, did you reach back out to Ms. Kim?

5   **A.**   I did.  I reached out through the form e-mail.

6   **Q.**   Okay.  And can you describe for the jury what that form

7   looked like?

8   **A.**   Mm-hmm.

9        It was kind of a fill-in-the-blank type questionnaire.

10  Like how effective do you feel like the medication is, one,

11  two, three, four, or five.

12       Or how long is it lasting, you know, all day, half day,

13  none of the time, and so you just kind of like put your number

14  in.

15       And then it asked, you know, do you feel like you need a

16  higher strength, and then I believe if -- it also asks if you

17  wanted the immediate release or extended release.

18  **Q.**   Did you request the higher strength?

19  **A.**   Yes, I did.

20  **Q.**   And was that the result of an audiovisual appointment with

21  Ms. Kim?

22  **A.**   No.

23  **Q.**   Just the message?

24  **A.**   Yes.

25  **Q.**   Did you have to do anything else with Ms. Kim to obtain

1  that prescription?

2  **A.**   No, nothing else.

3  **Q.**   And did you contact her again after another interval of

4  time?

5  **A.**   Yes.  30 days later, when it was time for another refill,

6  I contacted her.

7  **Q.**   Did you request another prescription?

8  **A.**   I requested a different prescription.  I did not feel like

9  Adderall was working.  It didn't seem to be making a

10  difference.  And so I asked for a different prescription for

11  Vyvanse, which is another ADHD medication.  It's a stimulant.

12  **Q.**   Did you get the prescription for Vyvanse?

13  **A.**   I did.

14  **Q.**   Did you have any kind of audiovisual appointment with

15  Ms. Kim in connection with that prescription for Vyvanse?

16  **A.**   No, I did not.

17  **Q.**   Did she ask you any questions about how things were going,

18  how you were feeling?

19  **A.**   No.

20  **Q.**   Questions about side effects?

21  **A.**   No.

22  **Q.**   And did you have any further interaction with Ms. Kim

23  after that?

24  **A.**   30 days later, I did send another e-mail stating that I

25  didn't feel like this dose was working, and now, obviously,

1  because I do not believe I had ADHD.

2      And so I sent it, the form e-mail, again, and then I

3  didn't receive a refill on it.  They had said, Oh, you know --

4  or the e-mail said Okay, we'll send in a refill.

5      I didn't get the refill.  My pharmacy didn't receive the

6  refill.  So I sent a follow-up e-mail.  The care team said,

7  We'll check in with your provider and get back to you.

8      So I waited about, you know, a few days didn't hear

9  anything, checked with the pharmacy, didn't get anything, sent

10  another e-mail.  Still did not receive anything.

11      And so at that point, I was like, Okay, obviously I've

12  been abandoned as a patient, and I went ahead and canceled my

13  Done membership and never got any additional medication.

14  **Q.**   How did this experience with Done make you feel?

15  **A.**   I did not feel valued.  I felt like I was a number and

16  that, you know -- I have providers that I've worked with for

17  years that I've built the relationships with, and I did not

18  feel like I had a relationship with this provider at all.  They

19  didn't know who I was.  They didn't really care about me.  They

20  didn't care about the medication they were prescribing me or if

21  my symptoms were actually, you know, going to be relieved by

22  this.

23  **Q.**   So it's now been about three years since your Done

24  encounter?

25  **A.**   Yes.

EMMERTH - CROSS / BELL

1  Q.   Have you ever been on a stimulant before Done?

2  A.   No.

3  Q.   Have you taken a stimulant since?

4  A.   No, I have not.

5  Q.   What medications are you on right now?

6  A.   I'm on the sertraline, 100 milligrams, extended release.

7  I also use an estradiol patch, which is the hormone replacement

8  for the menopause from cancer.  And then I have hypothyroidism,

9  so I take Synthroid for that.

10  Q.   And what did this experience with Done lead you to

11  conclude about whether you have ADHD?

12  A.   I do not believe I have ADHD.  It allowed me to seek out

13  more answers through my primary care physician, but it also

14  made me, you know, kind of sad and a little bit embarrassed

15  that I sought this out with who I thought was a psychiatric

16  health practitioner and didn't receive either an accurate

17  diagnosis or the time for them to make an accurate diagnosis.

18         MS. GURSKIS:  Nothing further.  Thank you.

19     Pass the witness.

20         THE COURT:  Okay.

21         MS. BELL:  Good morning, everyone.

22                   CROSS-EXAMINATION

23  BY MS. BELL:

24  Q.   Good morning.

25  A.   Good morning.

1  Q.   Ms. Emmerth, you actually found Done after you saw an

2  advertisement online; is that right?

3  A.   I believe I did a search for psychiatric providers for

4  ADHD and found Done through that.

5  Q.   And you remember that the ad said that Done was a

6  subscription service that included 24/7 access to a mental

7  health specialist to get evaluated for ADHD and then to have

8  them manage the medication afterwards; right?

9  A.   I don't remember exactly what it said.

10 Q.   Do you recall telling the Government that on one of the

11 various occasions that you interviewed with them?

12 A.   That -- that exact information?

13 Q.   Yes.

14 A.   I do remember that I sought out Done through the Internet.

15 I looked for an ADHD provider, and -- but I don't remember

16 anything about the 24/7 access, no, ma'am.

17 Q.   Do you recall that your understanding was you were going

18 to have an evaluation and if diagnosed, this was really for

19 medication management?  Do you recall telling them that?

20 A.   I don't recall that.

21         MS. BELL:  Your Honor, if we could pull up --

22         THE COURT:  Go ahead.  Go ahead.  She doesn't recall

23 it.  You can show her a document.

24         MS. BELL:  Very well.  If we could pull up 9065,

25 page 2, paragraph 4, just for the witness and the Court.

```
 1              THE COURT:  For identification.
 2          MS. BELL:  And also the Government, of course.
 3          MS. GURSKIS:  What's the date on that?
 4          MS. BELL:  Let's see.  9065.
 5      (Trial Exhibit 9065 marked for identification)
 6  BY MS. BELL:
 7  Q.   Ms. Emmerth, could you review that and let us know if that
 8  refreshes your recollection about whether this was something
 9  you discussed with the Government?
10  A.   Sure.  Where would that be?
11  Q.   Oh, I'm sorry.  This should be on your screen.
12       Do you see that?
13  A.   No, ma'am.
14          THE COURTROOM DEPUTY:  It should come on now.
15          THE WITNESS:  Okay.
16  BY MS. BELL:
17  Q.   Do you see that now?
18  A.   I do see that.
19  Q.   Okay.  Does that refresh your recollection that you told
20  the Government that this was your understanding of the service?
21  A.   I mean, it looks like this is what they've said.  I don't
22  remember exactly what I told them, so -- you're saying
23  word-for-word, and I don't remember exactly word-for-word.
24  Q.   Completely fair.  It's been a long time.
25  A.   Yes, ma'am, it has.
```

EMMERTH - CROSS / BELL

1    Q.    Okay.  But in any event, when you -- after you saw the

2    advertisement --

3    A.    Yes, ma'am.

4    Q.    -- you actually went to -- went to the platform; right?

5    A.    Yes, I did.

6    Q.    Okay.  And what you were looking for is to see if maybe

7    you had ADHD; right?

8    A.    Yes.

9    Q.    And as you mentioned, there were some symptoms that had

10   come up for you that you were recognizing might be similar to

11   symptoms you had seen in your son; is that -- that's what I

12   understood you to testify to on direct; right?

13   A.    Yes.

14   Q.    Okay.  And your son is on stimulant medication; is that

15   right?

16   A.    Yes, he is.

17   Q.    Okay.  He had taken Adderall at one point in time and

18   I believe now is on Vyvanse?

19   A.    No, he is not on Vyvanse.

20   Q.    Okay.  Is it Adderall, then?

21   A.    No, ma'am, it's not.

22   Q.    Okay.  It's a stimulant medication?

23   A.    Yes, ma'am.

24   Q.    Okay.  But your symptoms -- you did experience symptoms

25   back in childhood as well?

1    **A.**    No, ma'am, I did not.

2    **Q.**    Do you recall when you were filling out the background and

3    intake forms reporting to ultimately Psychiatric Mental Health

4    Nurse Practitioner Kim that you did experience symptoms back in

5    childhood?

6    **A.**    No, I do not recall that.

7    **Q.**    You don't recall.  Okay.

8         **MS. BELL:**  Maybe we could pull up, for the witness and

9    the Government and the Court only, 6711 at page 2.

10         **MS. GURSKIS:**  Your Honor, objection.  This has not

11    been provided to the Government.  Rule 16.

12         **MS. BELL:**  Your Honor, this is an export data that the

13    Government has at Government Exhibit 1771 and 1772.

14         **THE COURT:**  Yes, and we have ruled that you're

15    supposed to -- if you're going to use the document, you're

16    supposed to give it to the Government before.  Accordingly, I'm

17    not going to permit questions with respect to the document.

18    Okay?  Moving ahead.

19         **MS. BELL:**  Okay.

20    BY MS. BELL:

21    **Q.**    So this -- when these symptoms come up, they did not feel

22    familiar to you based on things you had experienced earlier in

23    your life?

24    **A.**    No, ma'am.

25    **Q.**    Okay.  So you were feeling them about -- if you don't mind

EMMERTH - CROSS / BELL

1   my asking, about how old were you when you first went to Done?

2   A.   How old was I --

3   Q.   Yeah, back in 2022, when you felt the symptoms first

4   present.

5   A.   I was 41.

6   Q.   Okay.

7   A.   I have to count backwards.

8   Q.   Okay.  And when you saw this online advertisement, you

9   actually liked the idea of Done so much you were considering

10  referring your patients to the service if it worked out?

11  A.   Yes.

12  Q.   Okay.  And what was it that you liked so much about Done?

13  A.   I felt like in my area, sometimes it can be difficult to

14  get an appointment with a psychiatrist, and also, some

15  psychiatrists don't take insurance.  And so it -- I like the

16  fact that you could get in fairly quickly.

17  Q.   Okay.  And in addition, there was the convenience of it

18  being online; right?

19  A.   Yes.

20  Q.   And then, of course, for you, since you're actually in the

21  medical field, it gave you some privacy because you know a lot

22  of the providers right in your area physically; right?

23  A.   Yes, ma'am.

24  Q.   Okay.  Now, so after you went to the site, you scheduled

25  your initial appointment, and do you recall that the dose that

EMMERTH - CROSS / BELL

1  was prescribed by Psychiatric Mental Health Nurse Practitioner

2  Kim was 10 -- 10 milligrams?  Do you recall that?

3  **A.**  Yes.

4  **Q.**  And do you know, are you aware that that is half the

5  recommended starting dose for adults?

6  **A.**  No, I am not aware of that.

7  **Q.**  Okay.  Did you understand it was a low starting dose in

8  the context of when you asked for somewhat of a higher dose?

9  **A.**  I'm aware that when prescribing Adderall, most

10  practitioners prescribe the lower dose.

11  **Q.**  Okay.  And you -- as you said, you ultimately stayed on

12  the platform through June.  Do you recall that?

13  **A.**  I believe so.

14  **Q.**  Okay.

15  **A.**  Yes.

16  **Q.**  And in that period, you felt that this dose, as you

17  explained, was not adequately addressing your symptoms; right?

18  **A.**  Yes, ma'am.

19  **Q.**  And that was when you had asked for an increase in the

20  dose initially; right?

21  **A.**  Yes, ma'am.

22  **Q.**  And then ultimately a change in the medication to Vyvanse?

23  **A.**  Yes, ma'am.

24  **Q.**  Okay.  And then, as you said, you left the platform

25  because you felt abandoned.  Nobody actually ever responded at

1    the time you needed your Vyvanse; right?

2    **A.**    I did get an initial response, but then they did not

3    actually send in the refill, and then nobody was responding to

4    those requests of what was happening with that refill.

5    **Q.**    Mm-hmm.  And you sought the refill at that point because

6    you did feel ultimately, at least at that point in time, that

7    you were getting some benefit from the Vyvanse; is that

8    correct?

9    **A.**    I don't recall the exact information I filled in for that

10   one, but I do believe I requested an increase because I wasn't

11   seeing what I thought should be the symptoms improving enough.

12   **Q.**    Okay.  So at the time -- we'll get to that in a moment,

13   but just to clarify.

14        When you sought the refill for Vyvanse, you were asking

15   for a refill at the same dose you had previously; correct?

16   **A.**    I don't recall that.

17   **Q.**    Okay.  We'll get to it in a moment.

18   **A.**    Sure.  Okay.

19   **Q.**    This is a very long time ago.

20   **A.**    Yes, it was.

21   **Q.**    I'm impressed, even though 2/22/22 is memorable, even that

22   is impressive.

23        So today you testified that your feeling about Psychiatric

24   Mental Health Nurse Practitioner Kim she was just there to

25   prescribe medication and was kind of pushing you through the

1    process very quickly; right?

2    **A.**    Yes, ma'am.

3    **Q.**    And that was certainly one of your concerns back at the

4    time, but you also felt that she was too cautious about

5    prescribing.

6        Do you recall that?

7    **A.**    I do recall her making a comment that said:  Make sure you

8    take this on the days that you need it, not every time.

9        And then in every -- what looked like a form e-mail

10    interaction, there was something, I believe, that said, you

11    know, don't abuse this medication.

12    **Q.**    Okay.  And do you remember that you actually wrote a

13    review after your initial appointment explaining that the

14    appointment was not a good experience, but also that you felt

15    like she thought that your taking the medication made you

16    drug-seeking?

17    **A.**    The comments that she stated were that -- did make me feel

18    like, oh, this could be a drug-seeking process.

19    **Q.**    And you also wrote in the review that you, you know, felt

20    that you had simply reached out and e-mailed about how the meds

21    were working and needing a dosage change and that that, from

22    your perspective, was very standard practice among doctors when

23    starting meds, and she had actually told you wait for a refill.

24        Do you recall that?

25    **A.**    I'm sorry.  Can you repeat it again?

EMMERTH - CROSS / BELL

1   Q.   I'm sorry.  That was a long question.

2   A.   Yes.

3   Q.   Let me take that in bite-sized pieces.

4        So a part of what led you to feel like she was treating

5   you as a drug-seeking patient was that when you e-mailed to

6   request a dose change, which, from your perspective, was very

7   standard, her response was "Wait until your next refill"?

8        Do you recall that?

9   A.   I do not recall that it was -- that that was the drug --

10  that it would make me seem like a drug-seeking person.  That

11  made me feel like she did not have time for me, not that I was

12  a drug-seeking individual.

13  Q.   I see.  Okay.  But do you remember saying, "I e-mailed

14  about how the meds are working and needing a dosage change,

15  which is standard practice among doctors when starting meds,

16  and she told me to wait till next refill"?

17       Do you recall writing that in the review?

18  A.   Yes.

19  Q.   Okay.  And you also said (as read):

20            "I read these great reviews about clinicians

21       being supportive and nonjudgmental, but I didn't

22       experience that."

23       Do you remember that?

24  A.   Yes, ma'am.

25  Q.   So you recognized that there were other clinicians and

1  other patients who may have had different experiences; right?

2  **A.**   Oh, yes.

3  **Q.**   But from your perspective, you rated Psychiatric Mental

4  Health Nurse Practitioner Kim a 2 out of 5.

5     Do you remember that?

6  **A.**   I don't remember the exact rating, but that does sound

7  familiar.

8  **Q.**   Okay.  And in the end, you said that you -- or that

9  Done -- based on this experience, you gave Done a 3 out of 10

10 in terms of whether you would recommend Done?

11 **A.**   Right.  I would not recommend them.

12 **Q.**   Okay.  And so ultimately, what made you feel like she was

13 treating you like a drug-seeking patient wasn't so much wait

14 until the next refill but was the fact that she had pressed

15 heavily on ADHD medication being addictive and not to take it

16 daily?

17 **A.**   I wouldn't say "pressed heavily," but she did make that

18 comment, yes.

19 **Q.**   Do you remember writing in your review that (as read):

20        "She pressed heavily on ADHD medication being

21     addictive and not to take it daily"?

22 **A.**   I don't recall what I wrote in the review.  I have not

23 seen that review in probably three and a half years.

24 **Q.**   You're completely right.  In fact, again, I'm impressed

25 you remembered this much.

 1          MS. BELL:  We can pull it up, and then we've moving

 2    on, Your Honor, from this.

 3          But this is 6705.  It's a redacted version, and the

 4    Government has it.

 5          MS. GURSKIS:  Same objection, Your Honor.

 6          MS. BELL:  This is a --

 7          THE COURT:  I'll allow it.

 8          THE COURTROOM DEPUTY:  Admitted?

 9          THE COURT:  Admitted.

10     (Trial Exhibit 6705 received in evidence.)

11    BY MS. BELL:

12    Q.   Okay.  All right.  So do you see the first line?  That is

13    where you say that (as read):

14          "The clinician read from a screen about ADHD

15          symptoms, didn't ask me but maybe two questions, and

16          then pressed heavily on ADHD medication being

17          addictive and not to take it daily."

18    A.   Yes, I do see that.

19          And I also see the next line (as read):

20          "I felt like she thought taking the meds made me

21          drug-seeking."

22          Mm-hmm.

23    Q.   Okay.  Great.  And you also say right at the bottom there,

24    you reference what you testified to on direct, which is that

25    you felt that she just didn't have time for you?

EMMERTH - CROSS / BELL

1  A.    Yes, that she had over 3,000 patients, that she can't keep

2  up with that, yes.

3  Q.    And all of that contributed to your feeling that,

4  you know, you were kind of processed through the system?

5  A.    Yes, ma'am.  Mm-hmm.

6  Q.    Okay.  So let's talk a little bit about what the

7  pre-appointment intake process was like, what you actually had

8  to fill out.

9        So you -- you testified, I believe, that there -- that you

10  didn't have an option to list medications you were taking?

11  A.    No, I did not testify to that.

12  Q.    Okay.  Do you recall filling out forms where you listed

13  your medications?

14  A.    Yes, I believe so.

15  Q.    Okay.  And then you talked about that you recall filling

16  out two background screening tests.  The PHQ-9; right?

17  A.    Yes, ma'am.

18  Q.    Which is the nine-question screening test used to assess

19  depression -- symptoms of depression; right?

20  A.    Yes.

21  Q.    And also the GAD-7, you recalled, which is a screening

22  test used to assess symptoms of anxiety; right?

23  A.    Yes.

24  Q.    And the 9 and the 7 refer to the number of questions; do

25  you know that?

1   **A.**    Yes.

2   **Q.**    Okay.  Do you remember that you also filled out what's

3   called the ASRS, which is a screening tool to screen for ADHD

4   symptoms?

5   **A.**    I don't recall that.

6   **Q.**    Okay.  Do you -- do you know that the ASRS is based on the

7   DSM criteria for ADHD?  Do you know anything about it?

8   **A.**    I don't ever use that, so I don't really know about it.

9   **Q.**    Okay.  So you don't remember answering questions about how

10  often you felt certain symptoms related to inattention, and

11  impulsivity, hyperactivity?

12  **A.**    No, I do not recall.

13  **Q.**    Okay.  Let me ask you a few more specific questions on

14  that.  So --

15          **MS. BELL:**  And, Your Honor, I would actually go back.

16  The Government certainly has this document.  I think it would

17  be easier if we could display the responses to the

18  questionnaire, and I'd move to admit those.

19          **THE COURT:**  I'll allow it.

20          **MS. BELL:**  Thank you, Your Honor.

21      So if we could, this is 6711, I believe, at five to six

22  the responses to the ASRS.

23      (Trial Exhibit 6711 received in evidence.)

24  **BY MS. BELL:**

25  **Q.**    Okay.  So do you see that this has a date of January 13th,

1    2022?

2    **A.**    Yes, I do.

3    **Q.**    Okay.  And do you see at the top there's a score of 4?

4    **A.**    Yes, I do.

5    **Q.**    Okay.  And then -- and do you recall scoring likely to

6    have ADHD?  Does that ring any bells, after filling out this

7    screening?

8    **A.**    Is this my screening?

9    **Q.**    Yes, this is yours.  We'll go through it in a moment.

10   **A.**    Okay.  It doesn't have my name on it or anything like

11   that.

12   **Q.**    Okay.  We can certainly go back in a moment.  Let's go

13   through the questions --

14   **A.**    Okay.

15   **Q.**    -- then we can go back and double-check that.

16   **A.**    Okay.

17   **Q.**    We're not going to read them all, but there are certain

18   ones that you responded "often" to, others you responded

19   "sometimes" to, and others you responded "rarely" to, so we'll

20   just pick out a few.

21        But the first one here (as read):

22            "How often do you have trouble wrapping up the

23        final details of a project once the challenging parts

24        have been done?"

25        You have an "often" there.  Do you see that?

EMMERTH - CROSS / BELL

1   **A.**    Yes, ma'am.

2   **Q.**    Okay.  And then the next one (as read):

3           "How often do you have problems remembering

4       appointments or obligations?"

5       There, we see a "sometimes."

6       And what about (as read):

7           "When you have a task that requires a lot of

8       thought, how often do you avoid or delay getting

9       started?"

10      Do we see that?

11  **A.**    Okay.

12  **Q.**    Okay.  "Often."

13      Okay.  And then there's -- there's a part B of this test.

14  There's a part A and a part B, and part B here (as read):

15          "How often do you have difficulty keeping your

16      attention when you are doing boring or repetitive

17      work?"

18      We've got a "very often" there, and a few more "oftens" on

19  the screen there for these other questions.

20      And maybe we can just scroll down and see that in total

21  there were -- I think -- I counted them up.  I think there were

22  about 19 or so questions there.  Do you see -- we don't need an

23  exact number, but there are a number of questions on this ASRS.

24      Do you see that?

25  **A.**    Yes, I do see that.

1          MS. GURSKIS:  Your Honor, can we establish that -- a

2    foundation?  Her name is nowhere on this document.

3          MS. BELL:  Yes.  Let's go back.

4       And maybe we could show that, if we could.

5          MR. BODAPATI:  Can I also have a copy, Kori?

6          MS. BELL:  Yes, absolutely.

7    BY MS. BELL:

8    Q.   So I think we should see here your name and your age and

9    all of that, and I believe we also have the updated license,

10   the screenshot.

11         MS. BELL:  If you go down a little bit in this

12   document, there was --

13   BY MS. BELL:

14   Q.   Do you recall having to actually upload a copy of your

15   license?

16         MS. BELL:  If we can go down a little bit on the

17   document, you'll be able to see that.  There we go.

18   BY MS. BELL:

19   Q.   Okay.  Do you see that?

20   A.   Yes.

21   Q.   Okay.  All right.  We can move on now.

22       So you also answered some questions -- you mentioned the

23   PHQ-9, and that was the --

24         MS. BELL:  I'm sorry.  This is all being displayed for

25   the jury.  Is that -- okay.  Great.

1          THE COURT:  Well, I'm just trying to move quickly

2     through it.

3          MS. BELL:  Yes, we'll move quickly, Your Honor.

4     BY MS. BELL:

5     Q.   Okay.  So on the PHQ-9, those were the questions regarding

6     depression, and we can see you answered various questions here,

7     but in particular you wrote -- the only question where you

8     answered more than half the days here was the question about

9     trouble concentrating on things such as reading the newspaper

10    or watching television.

11         Do you see that?

12    A.   I do see that.

13    Q.   Okay.  We can move on there.

14         And the GAD-7, we will not spend much time on, but if we

15    can go there.  That should be page 10.

16         Okay.  And so you see there your answers to the GAD-7

17    regarding anxiety symptoms were -- were "not at all"?

18    A.   Correct.

19    Q.   Okay.  Can we go to the additional information portion now

20    of the intake which related to the childhood responses.  That

21    should be page 2, additional information.

22         Okay.  So do you see there the questions which ask about

23    (as read):

24              "Before I was 12 years old, my teacher or coach

25         noted my poor focus, impulsivity, and/or

EMMERTH - CROSS / BELL

1      hyperactivity"?

2  A.  Are you asking me if I can see it?

3  Q.  Yes.  Yes, ma'am.

4  A.  Yes, ma'am, I can see it.

5  Q.  Do you see a "yes" there?

6  A.  I do see that.

7  Q.  On the right-hand side, the question about (as read):

8          "Before I was 12 years old, my

9      mother/father/guardian complained about my poor

10     focus, impulsivity, and hyperactivity."

11     And you see a "yes" there?

12  A.  I do see that.

13  Q.  Okay.  And then do you also see here (as read):

14          "Do you have any experience with ADHD

15     medication?"

16     And you mentioned, "My son takes Adderall for ADHD"?

17  A.  Yes, I do see that.

18  Q.  Okay.  All right.  Let's see.

19     So you mentioned how short the appointment was from --

20  with Psychiatric Mental Health Nurse Practitioner Kim I think

21  you said "less than five minutes today."

22     Do you recall previously telling the Government it was

23  less than 15 minutes, maybe 10 minutes Does that ring a bell?

24  A.  I mean, I don't recall exactly what I said.  It was a very

25  short appointment.

EMMERTH - CROSS / BELL

1  Q.   It felt --

2  A.   But I believe it was five minutes or less.  Yes, ma'am.

3  Q.   Now, you don't know if that was contrary to Done policy or

4  not?  You have no idea; right?

5  A.   I'm not aware of Done policy, but I do know that most

6  doctors meet with you for a longer period of time to give you a

7  new diagnosis.

8  Q.   Understood.  Okay.  Now, do you recall --

9          MS. BELL:  Actually, before we move off that document,

10 let's just go to page 16 regarding medical history.

11     And if we could just blow up the page 2 on medical

12 history.

13 BY MS. BELL:

14 Q.   Okay.  Do you see there (as read):

15          "Denies any medical problems.  No history of

16     cardiac problems"?

17     Do you see that?

18 A.   Yes, I see what you're pointing out.  Yes, ma'am.

19 Q.   Okay.  All right.  Now, you mentioned that after the

20 appointment when you got the 10 milligrams, you felt like there

21 was really no opportunity for a follow-up because Psychiatric

22 Mental Health Nurse Practitioner Kim had basically said

23 don't -- you know, I'm very busy.  Don't contact me; right?

24 A.   Yes.

25 Q.   Okay.  And you didn't happen to reach out to customer

1  service and say, Listen, I need a transfer to a different

2  provider, or ask, you know, to see if you could get on the

3  schedule; is that right?

4  **A.**   No, I did not reach out to anyone else.

5  **Q.**   Okay.  Let's --

6       Do you recall that after your -- actually, the day of your

7  appointment, she wrote to you, Psychiatric Mental Health Nurse

8  Practitioner -- wrote to you -- Kim wrote to you and said (as

9  read):

10          "It was very nice meeting you today.  It's my

11      best hope that your ADHD symptoms are well managed.

12      Your prescription will be ready for you tomorrow.

13      Don't forget to message me with medication refill

14      requests in about 30 days and let me know how you're

15      doing.  You can also message me any time through

16      donefirst.com if you have any questions or concerns.

17      I try my best to take care of all your concerns,

18      questions, and medication refill requests in a timely

19      manner through messaging via Done website."

20  And then she goes on to say (as read):

21          "Please take medication as prescribed.  Message

22      me if you have any adverse symptoms or side effects.

23      Please note that it is illegal to share, sale" -- I

24      think that's supposed to be "sell" -- "or buy

25      prescription controlled medication."

1          Do you see that?

2    **A.**    Yes, I see what you have read.

3    **Q.**    Okay.  And then at the very bottom there, you see she says

4    (as read):

5              "Stimulants have risk of dependency and

6          addiction.  People can develop tolerance

7          necessitating increases in doses.  I strongly

8          recommend you take the medication only on days in

9          which it is needed, such as your work or school days

10         Do you see that?

11   **A.**    Yes, I see that.

12   **Q.**    Okay.  And I think we talked about that in the context of

13   your review that was part of what made you feel like she was

14   treating you -- maybe like you were drug-seeking as opposed to

15   really trying to figure out what was going on with you; right?

16   **A.**    It made me feel like that, yes.

17   **Q.**    Yeah, completely understood.

18         Okay.  So -- so let's go to the -- your three -- your

19   March 3rd message, which was actually two weeks later, when you

20   reported in to Psychiatric Mental Health Nurse Practitioner Kim

21   about how the medication was working.

22         **MS. BELL:**  Could we go to that, please.

23   **BY MS. BELL:**

24   **Q.**    So you report here that you --

25         **MS. BELL:**  Maybe we can blow that up a little bit.

1    It's a little bit small.

2    **BY MS. BELL:**

3    **Q.**    But you reported here you were seeing -- you gave your

4    medication a 5 out of 10, so you say (as read):

5             "I'm seeing only about half the symptoms

6         improve.  Usually about 3:00 to 4:00 p.m. there's no

7         effectiveness."

8    And you say that you are experiencing (as read):

9             "A bit more focus in the morning and not

10         following bunny trails in my thoughts when I should

11         be listening."

12    Do you see that?

13    **A.**    I do.

14    **Q.**    But then you say (as read):

15             "About halfway through the day, I find I'm not

16         able to focus as well and get distracted very

17         easily."

18    And so then we can go down.  And you were explaining that

19    you have worked demands that are eight to ten hours a day and

20    that that is an issue.

21    And then can we see how Psychiatric Mental Health Nurse

22    Practitioner Kim responds to your message here.

23    So she says (as read):

24             "Your next refill date is March 22nd."

25    And here you were at March 3rd; right?

1          "Ask for dosage increase then, please."

2      Do you see that?

3  **A.**   I do see that.

4  **Q.**   Okay.  And so then let's go to March 23rd.  You did indeed

5  follow up with a similar message.  We'll just look at that very

6  quickly.

7      And this -- here at the top, you're now giving it a 4, and

8  you, at the very bottom of the message, ask if it's possible to

9  switch to a different brand.

10     Do you see that?

11 **A.**   Mm-hmm.  Yes, ma'am.

12 **Q.**   Okay.  And then on -- but at that point, Psychiatric

13 Mental Health Nurse Practitioner Kim does not switch you to a

14 new brand.  She --

15         **MS. BELL:**  Let's go to page 18.

16 **BY MS. BELL:**

17 **Q.**   She increases your dose of Adderall from 10 to

18 20 milligrams.

19     Do you recall that?

20 **A.**   I do recall that, yes.

21 **Q.**   Okay.  And there we see that.  And you gave that a try,

22 but that still didn't fully resolve your symptoms, so then if

23 we go to page 29, that was when you report --

24         **MS. BELL:**  Let's go to the top.

25 \\\

1  BY MS. BELL:

2  Q.   You say (as read):

3        "I would like to change to Vyvanse.  I have read

4       that the medication lasts longer, and I need that

5       during the days I'm working because I am not able to

6       focus well during the last part of the day at all.  I

7       get distracted easily."

8       You see that?

9  A.   Yes, I see what you're reading.

10 Q.   And then you give it a 5 again for how it's working for

11 you.

12      And then down at the bottom, you also report that your

13 work demands are even longer.  You're having longer days and

14 that's part of the issue; right?

15 A.   Yes, ma'am.

16 Q.   Okay.  And do you know one way or another -- are you aware

17 whether 20 milligrams of Vyvanse is, you know, below or within

18 the recommended FDA dose?  Do you know anything about that?

19 A.   I do not, no.

20 Q.   Okay.  All right.  And then as we discussed, it was after

21 this that you -- you left the platform by June; right?

22 A.   Yes, ma'am.  I did not feel like I was getting adequate

23 care.

24 Q.   I understand, completely understand.

25      Okay.  So you testified that today -- it sounds like

EMMERTH - CROSS / NECHAY

1    you're doing well --

2    **A.**    Yes, ma'am.

3    **Q.**    -- which is wonderful to hear.

4        And you feel that you don't have ADHD, is your current

5    feeling?  Is that -- did I understand your testimony right --

6    correctly?

7    **A.**    Yes, ma'am.  I do not feel like I have ADHD.

8    **Q.**    Okay.  But just to be clear, you never sought another

9    evaluation from a different medical professional; is that

10   right?

11   **A.**    I spoke with my primary care physician about it, but I did

12   not seek out another psychiatric mental health evaluation for

13   ADHD medication.

14           **MS. BELL:**  Understood.

15       Thank you so much for your time.

16           **THE WITNESS:**  Yes, ma'am.

17           **MS. BELL:**  No further questions.

18           **MS. NECHAY:**  Only one very brief question.

19                      <u>**CROSS-EXAMINATION**</u>

20   **BY MS. NECHAY:**

21   **Q.**    Good morning, Ms. Emmerth.  Or good afternoon, I should

22   say now.

23   **A.**    Good afternoon.

24   **Q.**    Just two quick questions.

25   **A.**    Yes, ma'am.

EMMERTH - REDIRECT / GURSKIS

1   Q.   You have never interacted with Dr. Brody, who is sitting

2   over here; correct?

3   A.   Correct.

4   Q.   And he was never listed on any of your refills or any

5   other medications you received through Done?

6   A.   Actually, I do believe that he was listed on my

7   prescription bottle.

8   Q.   Okay.  And you don't happen to have a copy of that with

9   you today?

10  A.   No, ma'am, I don't.

11          MS. NECHAY:  Okay.  Thank you very much.

12                  <u>REDIRECT EXAMINATION</u>

13  BY MS. GURSKIS:

14  Q.   Very briefly, Ms. Emmerth.

15  A.   No problem.

16  Q.   You were asked a lot of questions about drug-seeking by

17  one of the defense attorneys.  Do you recall that?

18  A.   Yes, ma'am.

19  Q.   Do you feel like Done made it hard or easy to get a

20  prescription for Adderall?

21  A.   It was extremely easy to get a prescription for Adderall.

22  Q.   So if someone were drug-seeking, do you think it would be

23  hard or easy for --

24          MS. BELL:  Objection, Your Honor.  Calls for --

25          THE COURT:  Sustained.

1    **MS. GURSKIS:**  No further questions.

2    **THE COURT:**  Okay.

3    Ladies and gentlemen, we're going to take our recess.

4    Remember the admonition given to you:  Don't discuss the

5    case, allow anyone to discuss it with you, form or express any

6    opinion.

7    We are not meeting on Monday.  It is a holiday.  We will

8    be meeting Tuesday through Friday.

9    You can step down.

10                    (Witness excused.)

11   **THE COURT:**  As I said, I think I can give you a better

12   idea of the schedule.  The only thing I can tell you about the

13   schedule as of today is that we will not be meeting from the

14   afternoon of the 22nd through the rest of that week.  As to the

15   following week, I won't have an answer to that question --

16   **MR. FOSTER:**  Your Honor, I believe you meant the

17   afternoon of the 10th -- or the 20th.  Sorry.

18   **THE COURT:**  Afternoon of the 20th.  Tough to keep all

19   the dates in my mind.  Afternoon of the 20th.  Monday is the

20   20th.  We will be meeting in the morning of the 20th, not in

21   the afternoon of the 20th, not the remainder of that week.

22   The question is what will happen the following week, and I

23   may not be able to tell you that until October 17th.  It's a

24   function of the governmental shutdown, which has a consequence

25   that you don't have to consider, but I do because it's in terms

1    of whether a meeting is to take place.

2        Anyway, remember the admonition.  Thank you very much.

3    I'll see you next week.

4                    (The jury leaves the courtroom.)

5        (Proceedings were heard out of the presence of the jury.)

6        **THE COURT:**  Okay.  Let the record reflect the jury has

7    left.

8        So I am concerned about timing, the jury's time, how far

9    the case is going, and I need to get some update.  I know it's

10   going slowly, and I thought that it might move a bit faster.  I

11   think we all did.  But let's talk about where we're going from

12   here.

13       My only suggestion in that regard is that we don't ask

14   questions that contain within it statements like the other side

15   didn't show you this or the other side didn't show you that.

16       That's argument.  That's argument.  We know that.  Okay.

17       However, eliminating that isn't going to save a lot of

18   time.

19       Okay.  So where are we?

20       **MR. FOSTER:**  Well, Your Honor, we're moving slowly.

21   The Government had three out-of-state witnesses who were here

22   pretty much all week who we sent back.  I believe we've had

23   seven witnesses perhaps in six days.  My belief, the Government

24   has been very efficient with the time that it's presented its

25   case in and will continue to be, but we're obviously behind

1    where the Government anticipated we would be in terms of the

2    witnesses.

3            **MR. SCHACHTER:**  We're just trying to get closer.

4            **THE COURT:**  Ms. Bell.

5            **MS. BELL:**  Hi.  Well, we feel that we've also been as

6    efficient as we can be, and we appreciate Your Honor's comments

7    yesterday that part of presenting our case is through

8    cross-examination, and obviously we will be looking to expedite

9    and, you know, trim as appropriate.  Where we think we can make

10    our points earlier on, all the better.

11            But, you know, I'm sure as Your Honor understands, there

12    really are two sides to this story.  I think you see how

13    passionately we feel that our client is wrongly accused and

14    Dr. Brody is wrongly accused, and we are trying to do our jobs

15    as best we can in the context of a case where there are

16    millions and millions of documents.  And, of course, we

17    understand.  The Government gets up.  They show a fraction of

18    the documents.

19            And frankly, a lot of the testimony elicited on direct has

20    been in the vein of:  Ms. He controls a hundred percent of the

21    Company.  Ms. He knew everything was illegal.

22            And so part of deconstructing that, how do you prove

23    that's not the case?  You've got to kind of methodically go

24    through the policies and show, well, but Dr. Brody was doing

25    this, or Dr. Brindala was doing this, or here's how things

PROCEEDINGS

1    worked.

2        And, unfortunately --

3            **THE COURT:**  Well, you see --

4            **MS. BELL:**  -- it's time-consuming.

5            **THE COURT:**  Time-consuming.  Well, let's analyze that.

6        Number 1, when witnesses are saying that Ms. He

7    conducted -- had a hundred percent of the company, it -- it is

8    in the context, as the witnesses have made clear, that she is

9    the final say.  They didn't say she didn't do anything in the

10   company.  The documents are replete with her involvement in

11   many aspects of the company.

12       The question is did she exercise control over the company.

13   That's the question, whether she exercised control, not whether

14   she did everything in the company.

15       So it's -- so to show that she did other things in the

16   company, where Dr. Brody did other things in the company, then

17   it's not argued that he controlled the company, is -- has to be

18   put in the context of what is meant by control.  That's

19   Number 1.

20       Number 2, while there are a million documents, I do not

21   believe that the Defense is entitled to cross-examine witnesses

22   on the various documents that exist in the company unless

23   there's a good-faith belief that -- that a foundation for those

24   documents can be laid.  Foundation with the witness.

25       It's, as we know, with any number of documents and any

1    number of questions that were propounded, the witness had no

2    understanding.  No, didn't view the documents, didn't create

3    the documents.  They simply existed as company documents.

4        That's not the same thing as saying that they're

5    irrelevant, and it's not the same thing as saying you can't

6    present them.  It's simply saying to keep a witness on the

7    stand and using them as a vehicle to get the document before

8    the jury is improper.  And I've said that repeatedly.  And a

9    number of questions over the last couple of days and the

10   substantially causing extra time to be used was in that vein.

11       And, Ms. Bell, you know better than anybody, because,

12   actually, you're the only lawyer who has done that, in my view,

13   and I think that that's a practice that has to stop, because it

14   prolongs a witness's testimony -- prolongs a witness's

15   appearance and not her testimony, because at the end of these

16   lengthy questions showing documents and so forth, she then

17   says:  I've never seen that before and I was unaware of it.

18       So that's a -- a change in perhaps the manner in which

19   examination is going to go forward.

20       That doesn't curtail the Defense in presenting documents;

21   it simply curtails the Defense in asking witnesses questions

22   about a document in which they have -- you cannot establish

23   foundation of this witness to ask those questions.

24       But putting all that aside, but cautioning the counsel

25   that I am going to -- what I'm going to do is if, in fact,

1  those types of questions are asked absent a good-faith belief

2  that this witness can testify as to that thing, I'm going to

3  end the examination.  So it's not without consequences.  It's

4  that there's no reason to continue examinations if the

5  examination is simply going to be a parade of questions for

6  which there is no foundation.

7      Now, I don't -- the one thing I don't want to do is

8  unfairly limit cross-examination.  That's not to say that I

9  can't limit cross-examination.  I can't do it unfairly.  So I'm

10 putting you on notice now as to what I consider fair or not.

11     Now, you may disagree with me, and that's fine.  And you

12 can make your record.  That's fine.  But the way to make your

13 record, I think, is outside the presence of the jury.  At the

14 end of the day, you want to make a record as to that you were

15 unfairly curtailed or limited in your cross-examination, you're

16 certainly free to do so.  I would encourage you to do so, since

17 I think records are important.

18     But that's the path I want to take because of jury

19 consumption of time.

20     So everybody says they're moving slowly but efficiently.

21     Now I need to know a bit more about where we're going from

22 here in very concrete terms.  I'm not asking the Defense very

23 concrete terms how long -- what do you now anticipate, looking

24 at this, what your schedule is going to be?

25         MR. FOSTER:  In terms of the number of days, Your

1   Honor?

2           THE COURT:  Well, I think that's probably right.

3           MR. FOSTER:  You know, I'd have to go back and look at

4   it.  We initially estimated 15 to 20 days We'll do --

5   court days for the Government.  We'll do our best to try and, I

6   mean, we're six days in -- to stay within the 20, you know, and

7   we're going to try and speed this up as fast as possible based

8   on the evidence as it comes in.  We'll eliminate witnesses if

9   they'll be cumulative.  I think the issue so far has been the

10  crosses are almost double the length of the directs.  And we'll

11  keep it moving on our end.

12          THE COURT:  Okay.  Well, I don't know -- I haven't

13  done a comparison, but the advantage of a lengthy cross, I

14  suppose, is that it eliminates the necessity of calling extra

15  witnesses, so it's a two-edged sword.

16      Please look at it and make some determination if you can

17  so you can advise the Court on that Tuesday.  Monday is a

18  holiday.

19          MR. FOSTER:  Yes, Your Honor.

20          THE COURT:  The person who really needs a holiday is

21  our court reporter.

22          MR. FOSTER:  Yes, she does.

23          THE COURT:  I don't know whether everybody in this

24  case has some type of disorder, but I've never seen such rapid

25  questions and answers, so it's not like it's taking a long time

 1   to ask the question or get the response.

 2       Okay.  What else do you want to address?

 3       MS. BELL:  Your Honor, if I can just respond very

 4   briefly.  I certainly understand the Court's comments.  I do

 5   want to respond to --

 6       On the point about Ms. Cooke, I will tell the Court

 7   I believe -- maybe I need to lay more foundation, but I

 8   believed I had a good-faith basis for asking her did you know

 9   these things.  She testified on direct very extensively and in

10   her Government witness interview memoranda about her personal

11   knowledge, constant communication with her daughter, going to

12   medical appointments with her daughter, her daughter, you know,

13   telling her everything, and so when I asked those questions, it

14   was with that in mind.

15       That said, I completely understand Your Honor's comments.

16   We will do everything we can to focus our questions.

17       I do want to tell Your Honor that when we ask about --

18   we're not trying to impeach the notion that our client

19   controlled the company.  She was the owner.  That is not our

20   point.

21       Our point is the legal standard, as the Court knows, our

22   position is they must prove beyond a reasonable doubt that she

23   had the intent to run a drug dealing operation, and we have a

24   dispute about exactly what that means, but in our view, it

25   means that she intended for these licensed medical specialists

1    to issue prescriptions without a legitimate medical purpose and

2    outside the usual course of practice.

3        When we ask these questions, what we are trying to do is

4    to demonstrate that she was not acting with the requisite

5    intent, and because that goes to -- the Government has put at

6    issue a handful of policies and has said by implementing these

7    policies, that demonstrates her intent, we believe we need to

8    show through the witnesses -- well, no, that was actually --

9    first of all, she was not the one that single-handedly

10   implemented these policies, and there were medical doctors that

11   either wrote or approved these policies.

12       So that is much of what we're doing, in addition to

13   refuting the narrative that she was hiring or recruiting,

14   you know, drug dealers across the country to implement her

15   operation.

16       And then secondly, I would say part of the other thing

17   that we're doing in cross-examination is sometime the witnesses

18   are testifying contrary to documents, and so bias is always an

19   issue, and that's, you know, another aspect of what we're

20   trying to do.

21       But we will certainly take Your Honor's comments to heart

22   and be very efficient.  I just wanted the Court to understand

23   from our perspective, we are not trying to challenge, writ

24   large, the concept that she ran this company, controlled the

25   company.  We don't think that's what's at issue.  Our questions

PROCEEDINGS

1  are meant to be targeted at those two purposes.

2        THE COURT:  Well, then, I'm a little confused, or

3  maybe more than a little confused.

4     If you're not arguing that she controlled the company and

5  made the final decisions on these things, then I don't

6  understand why all the questions were directed in that area.

7  That's Number 1.

8     Number 2, indeed -- indeed, you will be free to -- to

9  explore her state of mind and -- and put in documents that go

10 to her state of mind under certain circumstances.  I'm not

11 saying a blanket everything comes in, but I'm -- my focus was

12 really not on the questioning of --

13       MR. FOSTER:  Ms. Emmerth.

14       THE COURT:  Yeah, it wasn't really on that.  It was --

15 other witnesses have been asked repeatedly about documents

16 that -- who were employees of the company who there was no

17 basis to suggest that they foundationally knew of the existence

18 of these particular documents.  That was what my observation

19 was.

20    However, I don't want to dwell on it, because the record

21 is the record, and I'm just -- I really don't want to say

22 anything in front of the jury about these questions for the

23 obvious reasons.  I'm not naive in that regard.  But I think

24 that that means that the policing of what questions to be asked

25 rests with the lawyers, one; and two, it's useful for the

1    lawyers to know what my approach to it is because while they

2    may think it's right or wrong, that is my approach.

3        And then if they think that they've been unfairly

4    circumscribed or limited in their cross, they can make a record

5    in that regard.

6        But I really do want to move on.  I mean, I've told these

7    jurors in no uncertain terms that this is going to end before

8    Christmas and end hopefully before Thanksgiving.  That was the

9    impression that was given.

10        Now, it's going to be consistent with the defendants being

11   permitted to present their defense.  That's axiomatic.

12        Okay.  However, I do want to give that cautionary -- I do

13   want to say what I said, so please be guided accordingly.

14        And also, I think it's much more effective.

15        Oh, well, look.  I'm not trying the case.  You see how

16   it -- it sits with the jury.  I can us only tell you how it

17   sits with me, and it sits with me that a lot of questions are

18   asked for which there is no basis to ask these witnesses those

19   questions.

20        I don't know whether the jury has the same impression I

21   have, but as we all know, it goes to lawyers' credibility.  You

22   have to get up and convince them that you're right.  There is

23   something called argument.  It's very helpful to have a lot of

24   credibility when you do that and not to appear that you don't

25   have credibility.

1        Nevertheless, that's up to you.  You decide -- try the

2    case the way you want to try it.

3        **MS. BELL:**  Thank you, Your Honor.  We certainly

4    appreciate Your Honor has seen more lawyers in this courtroom

5    than anyone else, probably, in the building, and so we

6    certainly appreciate the Court's feedback.

7        The only other thing I would say -- and we will be very

8    much taking your comments to heart -- but sometimes when we do

9    that, we try to admit an exhibit with an -- with a witness.  I

10   think we largely are doing it when they're on the document, but

11   sometimes rather than waiting until later in our case-in-chief

12   weeks down the road, there's something that relates directly

13   to --

14       **THE COURT:**  It may relate.

15       It may relate.  But unfortunately, I can't in the -- if

16   this were, you know, a 20- or 30- or 40-document case, I guess

17   we could have sat down at the beginning and had an agreement

18   that they're all coming in.  We actually did, in the Michael

19   Lynch case, have essentially an agreement as to what came in,

20   what didn't come in.

21       So there was none of this.  In a much longer case, there

22   was none of this, because we had agreed on documents.  There

23   isn't an agreement on documents in this case.

24       Now, if, in fact, you want to sit down and try to go

25   through all the documents, what you're going to use and so

**PROCEEDINGS**

 1  forth, I don't know.  If you're able to have an agreement,

 2  you're able to have an agreement, but if you're not, you're

 3  not.

 4       And so I don't think the argument is that, well, we showed

 5  it to this witness.  We know she can't testify as to it, but

 6  we're going to use it later so we're trying to save time.

 7  That's just not going to work because of the objections that

 8  have been raised.  And also, it's not the witness on the

 9  subject, you know.

10       It may be a -- it may be part and parcel of what you

11  believe the reality to have been at the time that the document

12  was created and so forth.  Not disagreeing with you on that.

13  And therefore, it may very well be admissible.  Not disagreeing

14  with you on that.

15       It's just to ask a witness about something that he or she

16  doesn't know isn't going to be productive.

17       Okay.  Anything else?

18            **MR. FOSTER:**  Yes, Your Honor.

19       On the exhibit point, the Government did provide a

20  stipulation on exhibits to the Defense before -- at or around

21  the time the trial started.  We followed up on multiple

22  occasions.  We likely will be filing a motion to admit,

23  pursuant to Rule 902(11), things like bank records that we got

24  from third parties and all those types of things, because we

25  haven't been able to get to an agreement yet, but we're

PROCEEDINGS

1    obviously amenable to those things.

2        **MR. SCHACHTER:**  Your Honor, we have not raised any

3    authenticity issues, and the Court made very clear that they

4    should not be raised and we don't think that they should be

5    raised.  It's a waste of time.

6        We got a list from the Government of hundreds and hundreds

7    of exhibits.  I need to lay eyes on them.  It takes a little

8    bit of time.  And what we've said is, Just tell us a few days

9    before you're going to introduce them, and we'll let you know

10   if we have any issues; and that's what we have been doing.

11       **THE COURT:**  Okay.

12       **MR. SCHACHTER:**  Now, I will say that with respect to

13   the list, now that we have the long break, we will be providing

14   to the Government many of our exhibits to make sure there is no

15   authenticity issue, and we'll have no trouble, given that we

16   have more time, to review the same with respect to authenticity

17   issues.

18       But there's many of things that came from the company that

19   were produced in discovery, and we'll be asking for the same

20   stipulation.  I'm sure we'll work that out.

21       **THE COURT:**  Good.

22       **MR. FOSTER:**  The second thing, Your Honor.  This

23   document -- I'll hand it up.  This was the document used with

24   the last witness, and Your Honor initially sustained an

25   objection under Rule 16.  Counsel came back to it and said -- I

PROCEEDINGS

1  don't have the transcript -- something along the lines of,

2  "I believe the Government has this."

3          THE COURTROOM DEPUTY:  What's the exhibit number?

4          MR. FOSTER:  I believe 6711.  Is that right, Your

5  Honor?  There's a stamp on it.

6          THE COURT:  6711.

7          MR. FOSTER:  Okay.  Thank you.

8      If you look at it, there is no Done health Bates number on

9  that document.  The Done Health Bates numbers indicate

10  something that was produced in response to the Government's

11  subpoena.

12      So at this point, being in court, my concern is that this

13  is something that wasn't produced in response to the subpoena.

14  It was something that wasn't given in regards to Rule 16.  Your

15  Honor previously ordered that if they're using documents for

16  the witnesses, to provide them.  And we're still not getting

17  them until the question is asked.

18          MR. SCHACHTER:  Your Honor, while Ms. Bell is walking

19  back, I believe that Mr. Foster is incorrect that the

20  Government did not produce documents -- I'm sorry.

21      There are documents that the Government produced that do

22  not bear a Bates number, so it is a -- it is a misstatement --

23          THE COURT:  Why don't you look at 6711, and if there

24  is a motion to strike, make your motion to strike, and you have

25  to give a brief on it, and then I'll rule on it.  Okay?

1          **MR. FOSTER:**  Thank you.

2          **MR. SCHACHTER:**  I'm sorry.  One last issue.

3      With respect to -- we have an issue with witnesses

4   testifying about what the law requires.  We raised an objection

5   with respect to Ms. Bowen.

6      For example, Ms. Bowen testified that the collaborative

7   physician must see the patient.

8          **THE COURT:**  She said that was her understanding of the

9   law based upon limited Internet research, and I think that --

10  and she has clearly indicated in her testimony that she thought

11  that what the -- a number of things done by Done were illegal.

12  That's what she said.

13     Now, she's not a lawyer, but she is entitled to give her

14  state of mind and attribute it to whatever was the basis for

15  her state of mind.  That's all.

16         **MR. SCHACHTER:**  The confusion, Your Honor, I just want

17  to note this, that the Government filed a charging instrument,

18  I believe the Court is aware, against Dr. Lucchese.  In that

19  charging instrument at paragraph 24, the Government lays out

20  what exactly a collaborative physician needs to do and what

21  they should not do, and it makes clear -- the Government is

22  well aware that the collaborative physician does not need to

23  see the patients.

24     I'm just -- our concern is that to have a Government

25  witness testify regarding issues of law that the Government

 1   knows is inaccurate causes confusion with the jury.

 2          **THE COURT:**  First of all, when you say the

 3   Government --

 4          **MR. SCHACHTER:**  And it's improper.

 5          **THE COURT:**  Well, improper.

 6          **MR. SCHACHTER:**  For the Government to elicit testimony

 7   from a witness about an issue of law that they know to be

 8   inaccurate --

 9          **THE COURT:**  No, it's not --

10          **MR. SCHACHTER:**  -- is an issue --

11          **THE COURT:**  It's not improper.  And the reason it's

12   not improper is that they are not -- is that they are eliciting

13   testimony -- if they were the ones to have done it, they're

14   eliciting testimony as to what she believed the law to be.

15      With -- and I give a cautionary -- and I have given the

16   cautionary instruction that it goes to her state of mind and

17   not as to the accuracy of the law.

18      The Government calls all sorts of witnesses every day who

19   misstate all sorts of things.  It's not their obligation to say

20   this witness is wrong or that witness is wrong.  They don't

21   have that obligation, because it is addressed by the Court's

22   instruction as to what they can consider and so forth.

23      And the problem is, as you well know, that -- that's

24   actually accurate testimony.  That is to say -- or it may be,

25   if she's to be believed, that may have influenced her state of

PROCEEDINGS

 1   mind.  That may be the truth; that is, she thought X.  That may

 2   be truthful.  It may be that she was mistaken, but she

 3   thought X.  Okay.

 4        So I don't think -- I don't think it's misleading.  I

 5   think you are entitled to an instruction at the time the

 6   testimony is given that it will reflect simply her state of

 7   mind and not a comment on what the law is actually in reality,

 8   because the Court instructs the jury as to what the law is.

 9        Anything else?

10            **MR. SCHACHTER:**  No, Your Honor.  Thank you.

11            **THE COURT:**  See you on Tuesday.

12        **MR. FOSTER:**  Thank you.

13            (Proceedings adjourned at 12:34 p.m.)

14                        ---o0o---

15                **CERTIFICATE OF REPORTER**

16        I certify that the foregoing is a correct transcript

17   from the record of proceedings in the above-entitled matter.

18

19   DATE:   Friday, October 10, 2025

20

21

22

23   _____
          Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG, CSR No. 12219
                  Official Reporter, U.S. District Court

24

25