1  WILLKIE FARR & GALLAGHER LLP
   Koren Bell (SBN 268614)
2    kbell@willkie.com
   2029 Century Park East
3  Los Angeles, CA 90067
4  T: 310-855-3016
   F: 310-855-3099
5
   Michael S. Schachter (*Pro Hac Vice*)
6  Steven J. Ballew (*Pro Hac Vice*)
     mschachter@willkie.com
7    sballew@willkie.com
8  787 Seventh Avenue
   New York, NY 10019-6099
9  T: 212-728-8102
   F: 212-728-9102
10
11 Attorneys for Defendant
   RUTHIA HE
12
                   UNITED STATES DISTRICT COURT
13                 NORTHERN DISTRICT OF CALIFORNIA
                     SAN FRANCISCO DIVISION
14

15 | UNITED STATES OF AMERICA, | CASE NO. 3:24-cr-00329-CRB |
16 |          Plaintiff, | **DEFENDANT RUTHIA HE'S TRIAL BRIEF CONCERNING THE ADMISSION** |
17 |         v. | **OF CERTAIN COMMUNICATION CASE IN CHIEF EXHIBITS.** |
18 | RUTHIA HE, A/K/A RUJIA HE, and | |
19 | DAVID BRODY, | |
20 |          Defendants. | |

21

22

23

24

25

26

27

28

The Government has objected to "any attempt by Defendants to improperly admit their own statements" because, according to the Government, those statements constitute self-serving "hearsay." ECF No. 319 at 4 (citing Fed. R. Evid. 801(d)(2)). Not so. No statement is *inherently* hearsay. Whether or not a statement is hearsay depends upon what use the offeror intends the fact-finder to make of it. Where the proponent of the evidence is *not* offering the statement to prove "the truth of the matter asserted," it is not hearsay under Federal Rule 801, which limits excludable hearsay to those out of court statements being offered to prove "the truth of the matter asserted." *See* FRE 801.

Ms. He intends to offer the below communications Exhibits (*e.g.*, emails, text messages, and Slack messages) into evidence during her case in chief.[1] As detailed below, given the purpose for which Ms. He is offering these Exhibits, each is admissible under the Federal Rules of Evidence. Should the Court have any concerns about the jury misunderstanding the purpose for which an Exhibit has been offered, Ms. He believes that an instruction explaining, where applicable, the limited purpose for which the Exhibit is being admitted would adequately cure any purported confusion.

**A. Evidence Offered for the Purpose of Demonstrating Effect on Defendant**.

It is well settled that "statements from one person to another, offered not for the truth of the matter, but to show their effect on the listener, are not hearsay." *See* 5 Weinstein's Federal Evidence § 801.11 (2025). The "relevant inquiry is whether the evidence supports reasonable inferences about how the statements influenced the listener's state of mind, decisions, or actions in a way that is pertinent to the case." *Id.; see also United States v. Lopez*, 913 F.3d 807, 826 (9th Cir. 2019) (explaining that the out-of-court statement of a declarant is admissible non-hearsay when offered "for the purpose of establishing what effect it had on the listener.").

---

[1] Ms. He will also file, separately, additional briefing which provides an offer of proof explaining why additional non-communication exhibits that she intends to offer in her case-in-chief are admissible. Ms. He believes that, if her exhibits are admitted into evidence without any need to lay a further foundation, she will be in a position to rest her case by the lunch break on Thursday or shortly thereafter.

DEFENDANT RUTHIA HE'S TRIAL BRIEF CONCERNING THE ADMISSION OF
CERTAIN COMMUNICATION CASE IN CHIEF EXHIBITS
Case No. 3:24-cr-00329-CRB

1    The below exhibits are being offered to demonstrate that certain information was conveyed

2    to Ms. He (regardless of its factual "truth") and thus affected her understanding and knowledge.

3    *See* McCormick on Evidence § 249 (2d ed. 1972) ("A statement that D made a statement to X is

4    not subject to attack as hearsay when its purpose is to establish the state of mind thereby induced

5    in X, such as receiving notice or having knowledge or motive, or to show the information which

6    X had as bearing on the reasonableness, good faith, or voluntariness of subsequent conduct, or on

7    the anxiety produced."). Given that the charges in this case depend on the jury's ability to

8    determine if Ms. He possessed the applicable *mens rea*, Ms. He respectfully contends that the jury

9    must be permitted to consider the below exhibits.

10    • **TX 310**: This is a March 9, 2021 text message communication exchanged between
11      Ms. He and Dr. Brody in which Dr. Brody explains that "prescribing stimulants for
        someone who does not strictly meet the requirement for DSM 5 ADHD is fine if it
12      [c]an be justified on clinical grounds that are firm and the benefits clearly outweigh
        the risks." This statement is not being offered for its truth, but for the effect it had on
13      the listener, Ms. He, and her understanding that it was clinically appropriate to
        prescribe controlled stimulants to patients who did not strictly meet the DSM 5
14      diagnostic criteria.

15    • **TX 5001 and 5001 A**: This is a February 26, 2020 communication exchanged via
        Facebook Messenger between Ms. He and a friend named Jarred Sumner. This
16      communication occurred during the founding stages of Done. Mr. Sumner, who suffers
        from ADHD, recounts to Ms. He information about the ADHD treatment and medical
17      care he receives from his psychiatrist at Kaiser Permanente. Mr. Sumner informs Ms.
        He that he has had only one appointment with his Kaiser psychiatrist, which lasted 30
18      minutes, two years earlier, and that he receives his medication refills by clicking a
        "button" on his phone which sends the refill request through a Kaiser health portal. Mr.
19      Sumner sends Ms. He a video of how the one-click refill process at Kaiser works. This
        communication is not hearsay because it is offered to show the effect on the listener,
20      Ms. He, and is relevant because the information Ms. He receives from Mr. Sumner
        informs Ms. He's understanding regarding typical standards for initial appointment
21      times and follow up cadence when evaluating and treating ADHD.

22

23    • **TX 5017:** This is a July 15, 2020 text message exchange between Ms. He and Dr. Les
        Tsang, a board-certified psychiatrist and graduate of UCLA Medical School who was
24      employed as Done's Medical Director. Dr. Tsang informs Ms. He that he does not
        "want my patients to have to endure the useless exercise of the video questions in order
25      to get their medications refilled. It gives me no clinically useful info, is impersonal, and
        an obstruction my patients need to overcome to access a basic service from our
26      platform. I've been advising them that we're trying to make patient experience easier
        and more user friendly so you don't need an appointment before each refill and you can
27

28                                          2

just send a message or click a button to request a refill." Dr. Tsang's statements are not offered to prove the truth of his statements, but for the effect they had upon the listener, Ms. He, and their contribution to her understanding of clinically appropriate follow up policy.

- **TX 5135**:  This is a September 14, 2020 Slack communication on which Ms. He is copied as a recipient.  In the communication, a nurse practitioner practicing on Done's online platform asks whether she needs to schedule an appointment with a patient in order to prescribe an increased dosage of ADHD stimulant medication to the patient.  Done's Medical Director, Dr. Les Tsang, informs the provider "If you think it's clinically appropriate, [you] can issue the prescription and make a note in her chart without an appointment."  This communication is not being offered for its truth, but for the effect it had on the listener, Ms. He, and her understanding that it is not clinically necessary to schedule a follow up appointment before a provider adjusts a patient's medication.

- **TX 5154**:  This is a January 26, 2021 text message exchange between Dr. Brody and Ms. He in which Dr. Brody explains that, in his experience, "it is OK to go a long time, in some cases even up to a year, without a follow up."  This statement is not offered for its truth, but for the effect on the listener, Ms. He, and her understanding that it was clinically appropriate for patients not to be seen for follow ups for extended periods of time.

- **TX 5162**:  This is a June 18, 2021 text message communication in which Dr. Brody informs Ms. He, "I am working on my 'What is ADHD?' Seminar and I'm feeling it will demolish anyone who says that people need to fit strictly the diagnostic criteria for ADHD before they are prescribed treatment."  This statement is not being offered to establish the truth of Dr. Brody's statements but for the effect on the listener, Ms. He, and her understanding that it was clinically appropriate to prescribe controlled stimulants to patients who did not strictly meet the DSM 5 criteria.

- **TX 5166**:  This is a December 22, 2021 text message communication in which Dr. Brody informs Ms. He that it is clinically appropriate to have a shorter appointment in circumstances where a patient has been previously diagnosed by a different medical provider, prescribed ADHD medication, and is now stable on their medication.  The statements are not offered for their truth, but for their effect on the listener, Ms. He, and her understanding of the propriety of Done's appointment times and transfer appointment policies.

- **TX 5169**:  This is a March 19, 2022 text message communication in which Dr. Brody informs Ms. He that the practice of "trying out stimulants for people who don't quite make the DSM-V diagnosis" is one that "scientists and researchers will understand and probably agree with" and that those who disagree with that practice are wrong.  The statements are not offered for their truth, but for their effect on the listener, Ms. He, and her understanding that it is clinically appropriate to permit medication trials even when patients don't quite satisfy the DSM 5 criteria.

DEFENDANT RUTHIA HE'S TRIAL BRIEF CONCERNING THE ADMISSION OF
CERTAIN COMMUNICATION CASE IN CHIEF EXHIBITS
Case No. 3:24-cr-00329-CRB

- **TX 6403**:  This is a March 12, 2021 communication in which Done's Chief Medical Officer, the triple board certified and UPenn and Stanford-trained medical doctor, Dr. Jayaram Brindala, informs Ms. He that there are "[n]o regulatory concerns" about Done's proposed automatic refill policy.  Dr. Brindala's statements are not offered to prove the truth of his statements, but for their effect on the listener, Ms. He, and her understanding of the propriety of Done's automatic refill policy.

- **TX 6405**: This is a January 20, 2021 email communication in which Dr. Jayaram Brindala (described above, in connection with TX 6403), Done's Chief Medical Officer, describes to Ms. He a "standard appointment process" and provides a template for how clinicians should allocate their time during Done's 25-minute initial evaluations.  This communication is not offered for its truth, but to show the effect on Ms. He's state of mind and her understanding that the length of initial evaluations at Done were medically reasonable.

- **TX 6407**:  This is a February 19, 2021 Slack communication about Done's intake questionnaire in which Dr. Jayaram Brindala states that "[t]he forms should be updated and shortened."  Ms. He is copied on the communication.  This communication is not offered for the truth, but for the fact that it was uttered and to show the effect on Ms. He's state of mind and her understanding that shortened intake forms were clinically appropriate.

### B.  Evidence Offered as Circumstantial Evidence of Defendant's State of Mind.

When a defendant makes a statement that tends to demonstrate her state of mind, it is admissible as non-hearsay, regardless of whether the statement is "true."  As Weinstein's Federal Evidence explains, "words or conduct offered as circumstantial evidence of an actor's beliefs or thoughts do not constitute statements under the rule against hearsay. **Thus, the rule against hearsay does not bar evidence introduced to show a party's viewpoint or attitudes, or the basis for his or her conclusions."** *See* 5 Weinstein's Federal Evidence § 801.11 (2025) (emphasis added).

Judge Chen of this District explained this principle in *United States v. Yagi* when he admitted, over the Government's objection, a number of emails authored by the defendant in which he expressed his belief that he was being "discriminated against" and that county personnel had engaged in "misconduct."  2013 U.S. Dist. LEXIS 189642, *6-14 (N.D. Cal. Oct. 7, 2013).  As Judge Chen explained, the emails would not be admitted to prove the "truth" of what the defendant was expressing—*i.e.*, that, as a factual matter, the defendant was being discriminated against or

DEFENDANT RUTHIA HE'S TRIAL BRIEF CONCERNING THE ADMISSION OF
CERTAIN COMMUNICATION CASE IN CHIEF EXHIBITS
Case No. 3:24-cr-00329-CRB

1    that county officials had engaged in misconduct—but *were* admissible for the non hearsay purpose

2    of demonstrating the defendant's *belief* that he was being discriminated against. *Id*. Because such

3    a belief would "offer an alternative explanation" to the jury as to why the defendant acted as he

4    did, as compared to the Government's arguments about the defendant's motive for acting, the

5    evidence was relevant and, because not barred by the rule against hearsay, admissible. *Id*.

6          Given that the charges in this case depend on the jury's ability to determine if Ms. He

7    possessed the applicable *mens rea*, Ms. He respectfully contends that the jury must be permitted

8    to consider the below exhibits, which tend to show her "beliefs and thoughts," *see* Weinstein, at §

9    801.11, regarding key factual points that the Government has put at issue.

10   - **TX 5211.0017-0018**: This is a February 5, 2020 Slack message between Ms. He and
11     the co-founder of Done, Anh Tran. Mr. Tran sends Ms. He a map demonstrating the
     lack of psychiatrists across the United States. Ms. He responds, "Yeah Make
12     psychiatrists more accessible is def a problem we can solve." The Exhibit is not
     offered for its truth, but as circumstantial evidence of Ms. He's then-existing state of
13     mind and motivations for founding Done.

14   - **TX 5123**: This is a February 21, 2020 exchange over Facebook Messenger between
     Ms. He and a friend named Julie Zhou. Ms. He explains her belief that there is a large
15     "underground market" for ADHD medication and that even those legitimately suffering
     from ADHD sometimes obtain medication "illegally" because of factors such as stigma
16     and lack of access to adequate care. During its case in chief, the Government admitted
     certain other communications in which Ms. He describes the "target market" of Done
17     as those who use ADHD medication "illegally" (*see e.g.*, TX 19). Accordingly, Ms.
     He seeks to offer TX 5123, a contemporaneous communication from the same time
18     period, as circumstantial evidence that when she referred to individuals who use ADHD
     medication "illegally," she believed she was speaking about those who legitimately
19     need the medication but cannot obtain it due to barriers to accessing traditional medical
     settings —as opposed to drug addicts and those who seek to abuse the medication.
20

21   - **TX 5146.0003**: This is a January 14, 2021 text message between Dr. Brody and Ms.
22     He, in which Ms. He recommends responding to a question from a nurse practitioner
     about Done's follow up practices, as follows: "We can give them an official answer
23     when they ask this type [of] question[]. For example, we can say we encourage
     [them] to do a follow up visit the first month and after that the provider can follow up
24     sync or async based on their judgment. However, they will have to do a follow up at
     least every 24 months (regulation requirement, need to see if every state has this).
25     For complex patients they need to consult with the physicians." This statement is not
     offered for its truth but for the fact that Ms. He recommended giving this answer in
26     response to the nurse practitioner's question. Ms. He's statement that "they will have
     to do a follow up at least every 24 months (regulation requirement, need to see if
27

28

5

DEFENDANT RUTHIA HE'S TRIAL BRIEF CONCERNING THE ADMISSION OF
CERTAIN COMMUNICATION CASE IN CHIEF EXHIBITS
Case No. 3:24-cr-00329-CRB

every state has this)" is offered as circumstantial evidence of Ms. He's understanding that the minimum legal required frequency for follow up appointments was two years.

- **TX 5173**: This is an April 14, 2022 email exchange amongst Ms. He, Dr. Brody, and certain public relations professionals retained by Done. In the exchange, Ms. He and Dr. Brody express a desire to defend Done's clinical practices to the media. The response of the public relations consultant is "I'm concerned about your approach to our current media situation, and want to ensure that we are all on the same page. We have intentionally positioned Done as a membership platform and not as a medical provider." The exhibit is relevant to circumstantially demonstrate that Ms. He and Dr. Brody did not believe there was anything improper with Done's clinical practices and undermines the Government's allegations that they intentionally misled the media because they understood that Done's prescription practices were unlawful.

- **TX 5176**: This is a May 18, 2022 email exchange amongst Dr. Brody, Ms. He, an executive in the Finance Department, MJ Chey, and marketing employee, Joanne Dai, in which Dr. Brody complains that a public relations entity retained by Done had sought to dissuade him from publishing an article he was writing regarding his approach to treating ADHD. Dr. Brody's statements are not being offered for their truth, but for the fact that Dr. Brody raised this complaint, which is circumstantial evidence of his state of mind and his belief that his approach to treating ADHD was clinically appropriate.

- **TX 5229.0004**: This is a March 9, 2020 Slack communication between Ms. He and Done's co-founder, Anh Tran, in which Ms. He states, "I was thinking that we really need to think about how to ask questions to make people tell us the truth." Mr. Tran responds, "Yeah good point. Maybe asking about their desired duration of treatment. Because if someone just wants a fun stash of drugs, then they want a high dosage and just 1 bottle. Whereas you probably don't want 10mg of Adderall for 6 months. That's a lot of ineffective Adderall." These statements are not offered for their truth, but as circumstantial evidence demonstrating Ms. He's state of mind, namely that she and her co-founder intended and wished for Done to be used by people who suffered from ADHD, rather than by recreational drug seekers and those who sought to abuse Adderall.

- **TX 5260**: This is an April 2, 2020 Slack communication between Ms. He and Done's co-founder, Anh Tran, in which they discuss a patient who they believe may be a drug addict. Ms. He suggests that Done either cancel the patient's appointment or inform the patient (in advance of the appointment) that he will not be prescribed a stimulant. Ms. He's statements are not offered for their truth, but for the fact that they were said, and they are circumstantial evidence of Ms. He's lack of intent to distribute controlled substances for no legitimate medical purpose and outside the usual course of professional practice.

- **TX 5272**: This is an April 10, 2020 Slack communication between Ms. He and Done's co-founder, Anh Tran. Ms. He and Mr. Tran discuss how to screen out patients who are too complex to be effectively treated via telehealth from accessing

6

DEFENDANT RUTHIA HE'S TRIAL BRIEF CONCERNING THE ADMISSION OF
CERTAIN COMMUNICATION CASE IN CHIEF EXHIBITS
Case No. 3:24-cr-00329-CRB

Done's platform.  Ms. He ultimately suggests language for Done's intake questionnaire to screen out complex patients.  These statements are not offered for their truth, but for the fact that they were said and as circumstantial evidence of Ms. He's lack of intent to distribute controlled substances for no legitimate medical purpose and outside the usual course of professional practice.

- **TX 5308**:  This is a November 3, 2020 Slack message exchange which took place over Done's "Medical Team" channel and on which Ms. He was copied.  During the exchange, a nurse practitioner explains that she is uncomfortable prescribing stimulants to a particular patient.  Dr. Brody agrees with the nurse practitioner's assessment and states as follows: "[Y]ou and/or Done are not obligated to give the patient what she is demanding."  Ms. He voices no objection or disagreement with Dr. Brody's direction.  Dr. Brody's statement is not offered for its truth, but as circumstantial evidence of his state of mind and for the fact that he uttered those words to a clinician practicing on Done's platform.  His statement and Ms. He's implied agreement and consent is relevant to disproving the Government's argument that Ms. He and Dr. Brody pressured clinicians to prescribe inappropriately.  Further the Exhibit serves as circumstantial evidence of their lack of intent to distribute controlled substances for no legitimate medical purpose and outside the usual course of professional practice.

- **TX 5196:**  This is a draft response to media inquiries in which Dr. Brody and Ms. He propose certain answers justifying Done's clinical practices.  Other documents that Ms. He seeks to offer as exhibits (*see e.g.*, TX 5173, 5176) will demonstrate that a public relations firm advised Ms. He and Dr. Brody to portray Done differently to the media.  This exhibit is not being offered for the truth of any statements made therein, but for the fact that Ms. He and Dr. Brody drafted these responses, which were later changed after consultation with the public relations firm.  The exhibit is relevant to circumstantially showing that Ms. He and Dr. Brody did not believe there was anything improper about Done's practices and undermines the Government's allegations that Defendants intentionally misled the media because they understood that Done's prescription practices were unlawful.

- **TX 5835**: This is a text message exchange from July 19, 2021, in which Done's former Chief Medical Officer, Dr. Jayaram Brindala, informs Ms. He that he thinks that he can find an acquirer for Done for $100-$130 million. This communication is not offered for the truth, but for the effect on the listener, Ms. He, and her reasonable expectation that Dr. Brindala would not risk his own credibility and reputation pitching Done to investors unless he believed that Company's practices were lawful and appropriate.  The message also impeaches a hearsay declarant, Dr. Brindala, who wrote a Risk Mitigation Report purportedly raising concerns about Done's prescribing practices, which the Government has used to suggest that Dr. Brindala left Done out of concern about the propriety of its clinical policies.

- **TX 5836**: These are March 7, 2022 text message exchanges in which Done's former medical director, Dr. Jayaram Brindala, discusses his efforts to find a buyer for Done

DEFENDANT RUTHIA HE'S TRIAL BRIEF CONCERNING THE ADMISSION OF
CERTAIN COMMUNICATION CASE IN CHIEF EXHIBITS
Case No. 3:24-cr-00329-CRB

and asks Ms. He if he might return to Done as a full-time employee.  The communication is not offered for the truth of any statement asserted, but for the fact that it was uttered and for the effect on the listener, Ms. He, and her reasonable expectation that Dr. Brindala would not seek to return to employment at Done if he believed the Company was engaged in illegal practices.  The message also impeaches a hearsay declarant, Dr. Brindala, who wrote a Risk Mitigation Report purportedly raising concerns about Done's prescribing practices, which the Government has used to suggest that Dr. Brindala left Done out of concern about the propriety of its clinical policies.

**C. Statements of Defendant's Then-Existing State of Mind or Emotional Condition Are Admissible, Even If Offered for Truth, Under Rule 803(3).**

In certain instances, a declarant's statements do not just "circumstantially" demonstrate her state of mind, but instead constitute express declarations as to her state of mind or emotional condition.  These statements are often, although not always, in the form of "I believe [X]" or "I am [upset, worried, grateful, etc.]."  Under Federal Rule of Evidence 803(3), the rule against hearsay does not exclude statements of a "declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)," although the Rule does not permit the introduction (for truth) of "a statement of memory or belief" in order to "prove the fact remembered or believed."

Three factors bear on admissibility under Rule 803(3): "contemporaneousness, chance for reflection, and relevance," meaning that a court should consider whether the timing of the declarant's statement gives rise to an inference that the "state of mind expressed in the [email]" is fabricated.  *Yagi*, 2013 U.S. Dist. LEXIS 189642, at *10-14 (admitting defendant's statements regarding his state of mind when they were temporally close to the actions that gave rise to his emotional feeling); *United States v. Miller*, 874 F.2d 1255, 1264 (9th Cir. 1989) (describing admissibility requirements under Rule 803(3)).

Ms. He intends to offer the following exhibit for admission under Rule 803(3), should the Court disagree that it is admissible as non-hearsay statements offered to circumstantially prove Ms. He's state of mind.  *Supra* at Section B; *see also* 2 McCormick on Evid. § 274 (7th ed.) (noting that the Rule 803(3) exception exists because there is often "no better way to prove a relevant

DEFENDANT RUTHIA HE'S TRIAL BRIEF CONCERNING THE ADMISSION OF
CERTAIN COMMUNICATION CASE IN CHIEF EXHIBITS
Case No. 3:24-cr-00329-CRB

1    mental or physical condition than through the statements of the individual whose condition is at

2    issue" and explaining that while courts "have tended to lump together arguably hearsay statements

3    asserting the declarant's state of mind with those arguably nonhearsay statements that tend to prove

4    state of mind circumstantially, applying a general exception to the hearsay rule," in fact, "many of

5    these statements could be treated as nonhearsay.").

6        • **TX 5275**:  This is a March 4, 2020 Slack message exchange between Ms. He and
          Done's co-founder, Anh Tran, discussing Done's pre-appointment screening process.
7         At the conclusion of the conversation, Mr. Tran suggests that should inappropriate
          patients slip through Done's screening process, Done "can either just let them go
8         through and charge them $200 for the consultation or we can maximize opportunity to
          convert to long term membership."  Ms. He responds, "Then we will be truly a platform
9         only prescribing stimulants—I think the goal should be get the patients properly
          treated."  Ms. He's statement of her then-existing goal, the contemporaneous nature of
10        her statement (when Done was in its infancy), and the lack of an opportunity for
          reflection and fabrication before making the statement, render it admissible under Rule
11        803(3).

12

13   **D. Instructions, Directives, Warnings, Questions, and Other Statements That Are
        Significant Because They Were Made, Without Regard to Their "Truth," Are Not
14      Hearsay Statements and Thus Are Not Excluded by the Rule Against Hearsay.**

15        It is well settled that where "the significance of an offered statement lies solely in the fact

16   that it was made, no issue is raised as to the truth of anything asserted."  5 Weinstein's Federal

17   Evidence § 801.11.  Additionally, directions and commands are admissible if relevant, even if

18   asserted by the defendant, because they are not statements capable of being "true or false."  *See* 4

19   Federal Rules of Evidence Manual § 801.02 (2025) ("A statement that is a direction or command

20   is ordinarily not hearsay, for two reasons: 1. It is not something that could be true or false; and 2.

21   It is not an assertion, because the declarant giving a direction or order it not intending to assert a

22   fact but is rather intending for an act to happen."); *see also United States v. Garza*, 2024 WL

23   4216952, at *18-19 (E.D. Cal. Sept. 17, 2024) ("questions are not hearsay" and a "command is

24   not hearsay because it is not an assertion of fact") (internal citations omitted).  Warnings and

25   questions fall into this same category, for this same reason.  *United States v. Garcia-Villanueva*,

26

27

28                                              9

1   1988 U.S. App. LEXIS 22262, at *9 (9th Cir. Aug. 10, 1988) (warnings are not hearsay

2   statements and thus are not excluded by the rule against hearsay).

3        Ms. He will seek to offer the following exhibits on the basis that they constitute non-

4   hearsay under this rule:

- **TX 458.0002**: This is a November 3, 2022 Signal message between Ms. He and an individual named Nick Chang. In this communication, Ms. He asks, with respect to complying with a grand jury subpoena whether "[f]rom your experience, do we need to collect all the historical versions of procedures? It's really hard to collect all the previous iterations. And what would happen if we miss some documents or history versions?" Mr. Chang replies "Just do your best. They may/will ask to see procedures. If we don't have all versions that's okay. Do your best. Hard for any company to keep everything." Ms. He's questions are not hearsay because they are not capable of being "true or false," and Mr. Chang's response bears on her state of mind and is relevant with respect to demonstrating Ms. He's lack of intent to obstruct the grand jury investigation into Done.

- **TX 5014**: This is an email, dated April 5, 2023, in which Done's customer support informed a Done patient that they could not refund her because her appointment was canceled due to a missing intake form. This statement is not offered for its truth, but for the fact that it was sent to a Done patient, demonstrating that Done took the intake process seriously.

- **TX 5015**: This is an email dated July 10, 2020, in which Done's customer support cancels a patient's appointment due to the patient's failure to complete an intake form. The statement is not offered for its truth, but for the fact that it was sent to a Done patient, demonstrating that Done took the intake process seriously.

- **TX 5128**: This is an email, dated June 21, 2020, in which Ms. He sends Done's then medical director, Dr. Les Tsang (described above), an invitation to edit a document entitled "Medication Renewal Best Practices." The statement is not offered for its truth, but for the fact that Ms. He sent this email to Dr. Tsang, which serves as circumstantial evidence of her desire to elicit the advice of medical professionals on medical subjects and issues.

- **TX 5163**: This is a July 13, 2021 email sent by Done to patients, informing them of resources, beyond Done itself, that they could use to manage their ADHD, including a 10% discount that was being made available to Done patients so that they could access and utilize an online therapy service called Better Help. The Exhibit is not being offered for the truth of any statement asserted therein, but for the fact that it was sent. It is relevant to demonstrating that Done's purpose was to treat patients with ADHD and offered patients more than just easy access to drugs, which contradicts the Government's argument that Ms. He intended for the site to serve as a prescriber of 40 million "unauthorized" pills of ADHD medication.

10

DEFENDANT RUTHIA HE'S TRIAL BRIEF CONCERNING THE ADMISSION OF
CERTAIN COMMUNICATION CASE IN CHIEF EXHIBITS
Case No. 3:24-cr-00329-CRB

- **TX 5167**: This is a March 8, 2022 email sent by Done to patients in Montana, informing them that Done could no longer treat patients in that state via telehealth, due to changes in Montana's telehealth laws.  The email is offered not for the truth of any statement asserted therein, but for the fact that it was sent. The document is relevant to demonstrate Done's efforts to comply with state telehealth regulations concerning the online prescription of controlled substances, which contradicts the Government's argument that Ms. He intended for the site to serve as a prescriber of 40 million "unauthorized" pills of ADHD medication.

- **TX 5179**:  This is a Signal message in which Ms. He asks Done employees, in the period *before* Done received a grand jury subpoena, to speak on an encrypted messaging application to discuss public relations issues. The statements are not offered for their truth but (1) because they occurred before Done was notified of a grand jury investigation and (2) because Ms. He asks for communications to occur on the encrypted application for PR reasons, both of which are relevant to undermining allegations that Ms. He used encrypted devices in an effort to obstruct a grand jury investigation.

- **TX 5254**: This is a Slack communication between Ms. He and her Done co-founder Anh Tran dated March 28, 2020.  Ms. He and Mr. Tran discuss a patient who they suspect is drug seeking.  Ms. He instructs Mr. Tran to "make sure he won't sign up and freak out our providers," and to "monitor if he signed up—or just email him we don't support illegal activities." Ms. He's statements are instructions that are incapable of being true or false and are circumstantial evidence that she lacked an intent to distribute controlled substances for no legitimate medical purpose and outside the usual course of professional practice.

- **TX 5334 through 5353**:  Ms. He seeks to offer these communications in which Done provider, Erin Kim, whom the Government has alleged knowingly or intentionally prescribed Done patients for no legitimate medical purpose and outside the usual course of professional practice, requested that patients be discharged from the platform.  The communications are not offered for the truth of any assertion therein, but for the fact that Kim made the statements.  The communications are relevant because the fact that Kim requested that patients who were inappropriate for stimulant care be discharged from the platform put Done on notice that she was acting as a responsible provider and effectively concealed from Ms. He and Done that she would knowingly or intentionally prescribe a controlled substance for an unlawful purpose.

- **TX 5834**: This is a Slack exchange from a Done employee named Peiro Zhang asking why her salary was paid by wire from Makebelieve Asia Consultancy.  Zhang is asking a question, which is incapable of being true or false, and is this not hearsay. The exhibit is relevant to impeaching the testimony of Special Agent Guzman, who suggested during his testimony that Makebelieve Asia Consultancy was just a shell entity that performed no legitimate business function. Additionally, the communication is admissible under Federal Rule of Evidence 807, because (1) the statement is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made; and (2) it is more probative on the point for

11

which it is offered than any other evidence that the proponent can obtain through reasonable efforts.

- **TX 6395**: This is a Slack exchange dated November 28, 2021, in which a Done nurse practitioner named Myron Faulkner messages a member of Done's care team, instructing them that Done patient Cheryl Cooke—one of the patients whose medical care was described by Government expert Dr. Goodman as outside the usual course of professional practice and without a legitimate medical purpose—must be scheduled for an appointment. This communication is an instruction that is not capable of being true or false and thus is not barred by the rule against hearsay.

- **TX 7649, 7690D, and 7669**: These Exhibits involve communications from March 2022 between Ms. He and public relations professionals retained by Done, which demonstrate that Ms. He removed language—that the Government now contends was false—from a "draft response" to certain media inquiries. This evidence is not offered for the truth of any statement asserted therein, but to show the fact that Ms. He removed the language at issue from the draft responses and that the public relations firm added the language back in. [2]

### E. Evidence Offered for the Nonhearsay Purpose of Circumstantially Demonstrating the Lack of a Criminal Conspiracy

As described above, when evidence is not offered to prove the "truth" of the statements asserted but rather to demonstrate, circumstantially, some other relevant evidentiary point, it is not barred by the rule against hearsay. Thus, statements and communications which demonstrate "the context within which [the] parties had been acting," *see* Weinstein's at § 801.11, or which are arguably inconsistent with how co-conspirators, joined together in a joint criminal venture, would likely communicate, are relevant and admissible when offered in support of that argument. As always, it is up to the fact-finder to interpret the evidence, including whether to accept or reject the argument that an admitted communication is inconsistent with how persons engaged together in a joint criminal venture would communicate.

- **TX 5132, 5133, 5134**: This is a text message communication from September 8, 2022 in which Ms. He forwards a message from a woman named Ann Marie Wiley to Dr. Brody. Ms. Wiley complains in her message that she has ADHD, but has "encountered judgmental pharmacists" who refuse to prescribe her ADHD medication "because of people who choose to abuse ADHD meds." Ms. Wiley also complains that her primary

---

[2] Ms. He is prepared to call a witness who can testify to the fact that she removed the language from the draft response to Wall Street Journal and lay further foundation for these documents. She will not need to call that witness if the documents are admitted.

DEFENDANT RUTHIA HE'S TRIAL BRIEF CONCERNING THE ADMISSION OF
CERTAIN COMMUNICATION CASE IN CHIEF EXHIBITS
Case No. 3:24-cr-00329-CRB

care physician requires her to drive 45 minutes to medical appointments every 4 weeks for prescription refills of her medication.  Ms. He and Dr. Brody discuss among themselves their belief that it is the experiences of patients like Ms. Wiley why Done's services are needed and that "someone should not go to a specialty mental health provider and find their policies are exactly the same as their PCP."  These communications are not offered for the truth, but for fact that Ms. He and Dr. Brody uttered them to each other in response to Ms. Wiley's message, as evidence circumstantial to establishing their states of mind, and as evidence to undermine the existence of a conspiracy to act for no legitimate medical purpose and in the usual course of professional practice.

- **<u>TX 5140</u>**:  This is a text message exchange from November 21, 2022 in which Ms. He tells Dr. Brody "I think they may have questions about controlled substances. For me I see it as not much different from other medications—just you cannot refill for unlimited time for sell etc. For medications as long as the goal is to treat patients, I don't see the criteria of prescribing controlled substances should be different—as long as it's for proper medical reason and have pdmp checked."  This statement is not offered for the truth, but for the fact that Ms. He said it to her alleged co-conspirator, which undermines the allegation that she entered into a criminal agreement with Dr. Brody to distribute controlled substances for no legitimate medical purpose and outside the usual course of professional practice, as opposed to having the goal of treating patients for "proper medical reason[s]."

- **<u>TX 5144</u>:** This is a text message exchange from December 23, 2020 between Ms. He and Dr. Brody in which they agree that a nurse practitioner should not prescribe a controlled substance to a patient who the nurse practitioner had never seen and who canceled a transfer appointment.  Ms. He and Dr. Brody's statements are not offered for the truth, but for the fact that they were communicated to each other, which is relevant to disproving that both defendants entered into a criminal conspiracy to distribute controlled substances for no legitimate medical purpose and outside the usual course of professional practice.

- **<u>TX 5145</u>:** This is a text message exchange from January 9, 2021 in which Ms. He tells Dr. Brody that the reason she built Done was to solve the problem of under supply of psychiatrists and to use technology to help psychiatrists see more patients. The statement is not being offered for the truth, but for the fact that Ms. He made the statement to her alleged co-conspirator, which undermines the allegation that she entered into a criminal agreement with Dr. Brody to distribute controlled substances for no legitimate medical purpose and outside the usual course of professional practice.

- **<u>TX 5151</u>:** This is a text message exchange from January 21, 2021 between Dr. Brody and Ms. He, in which they discuss the frequency of follow up appointments. Both Ms. He and Dr. Brody agree that nurse practitioners should have flexibility to exercise their discretion and check in with their patients, and Ms. He says "if they have time, I'd rather they can check-in every day."  These statements are not offered for the truth but

DEFENDANT RUTHIA HE'S TRIAL BRIEF CONCERNING THE ADMISSION OF
CERTAIN COMMUNICATION CASE IN CHIEF EXHIBITS
Case No. 3:24-cr-00329-CRB

for the fact that Dr. Brody and Ms. He made them to one another, which undermines the allegation that they conspired to restrict the clinical autonomy of Done's providers.

- **TX 5164:** This is a text message exchange from November 29, 2021 between Dr. Brody and Ms. He in which they discuss their shared goal of eliminating symptoms of ADHD in Done's patients. The statements are not offered for the truth but for the fact that Ms. He and Dr. Brody communicated such a goal to each other, which undermines the allegation that they agreed with one another to distribute controlled substances for no legitimate medical purpose and outside the usual course of professional practice.

- **TX 5165**: This is a text message exchange between Dr. Brody and Ms. He from December 14, 2021 in which they discuss the importance of Done, as a healthcare platform, offering good clinical quality.  These statements are offered not for the truth, but for the fact that Ms. He and Dr. Brody made such communications to each other, which undermines the allegation that they conspired with one another to distribute controlled substances for no legitimate medical purpose and outside the usual course of professional practice.

- **TX 5170**: This is a text message exchange between Dr. Brody and Ms. He from March 20, 2022 discussing potential responses to press inquiries.  Their reaction is to defend Done's practices to the media.  The statements are not offered for the truth, but for the fact that Dr. Brody and Ms. He discussed among themselves defending (as opposed to obfuscating) the very practices that the Government alleges were unlawful, to the press.  The fact that Ms. He and Dr. Brody engage in this discussion also undermines the Government's allegations that Defendants sought to misrepresent Done's practices to the media.

- **TX 5171**:  This is a text message exchange between Dr. Brody and Ms. He from March 26, 2022 discussing, in private, their shared goal of treating and raising awareness of ADHD in light of media reports critical of Done.  The statements are not offered for the truth, but for the fact that the defendants discussed these goals with one another, which undermines the allegation that they agreed with one another to distribute controlled substances for no legitimate medical purpose and outside the usual course of professional practice.

- **TX 6800**:  This is an email exchange between Elizabeth Shapard and a lead nurse practitioner for Done, Jillian Zimmerman, dated August 26, 2024.  This email exchange occurs after Ms. He and Dr. Brody were indicted.  In the exchange, Ms. Shapard expressed that she was "extremely upset and offended by the accusations from DEA/DOJ as my experience is not that of someone running a 'pill mill.'"  During Ms. Shapard's examination, Ms. He sought to introduce this communication as a prior inconsistent statement of the witness, thus impeaching her trial testimony that she understood that what she was doing was unlawful, but the Court denied the admission of the statement at that time.  (Tr. at 2414:1- 2424:12.).  Ms. He seeks to re-offer that statement here as a prior inconsistent statement as well as for the non-hearsay purpose

DEFENDANT RUTHIA HE'S TRIAL BRIEF CONCERNING THE ADMISSION OF
CERTAIN COMMUNICATION CASE IN CHIEF EXHIBITS
Case No. 3:24-cr-00329-CRB

of circumstantially establishing that, at the time she made the statement, Ms. Shapard did not believe she had engaged in a criminal conspiracy.

It is impossible for the jury to properly assess and evaluate the Government's allegations and the weight of its evidence unless the defense is permitted to offer alternative and contradictory evidence, as expressly permitted by the Federal Rules of Evidence and the Ninth Circuit's precedents. For these reasons, Ms. He respectfully submits that the Court should admit the aforementioned case in chief Exhibits.


Dated:  November 8, 2025                       WILLKIE FARR & GALLAGHER LLP


                                    By:    */s/ Koren Bell*
                                           Koren Bell
                                           Michael S. Schachter
                                           Steven J. Ballew

                                           *Attorneys for Defendant*
                                           RUTHIA HE

15

DEFENDANT RUTHIA HE'S TRIAL BRIEF CONCERNING THE ADMISSION OF
CERTAIN COMMUNICATION CASE IN CHIEF EXHIBITS
Case No. 3:24-cr-00329-CRB