UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. 3:24-cr-00329-CRB |
| | ) | |
| RUTHIA HE and DAVID BRODY, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

San Francisco, California
Wednesday, October 29, 2025

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:

                CRAIG H. MISSAKIAN
                United States Attorney
                Northern District of California
                450 Golden Gate Avenue
                San Francisco, California 94102
       **BY:  KRISTINA GREEN**
           **ASSISTANT UNITED STATES ATTORNEY**

                U.S. DEPARTMENT OF JUSTICE
                FRAUD SECTION
                950 Pennsylvania Avenue NW
                Washington, D.C. 20530
       **BY:  JACOB N. FOSTER,**
           **ACTING CHIEF, HEALTHCARE FRAUD UNIT**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By: Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
          Official Reporter, CSR No. 12219

**APPEARANCES**:  (CONTINUED)

                        U.S. DEPARTMENT OF JUSTICE
                        CRIMINAL DIVISION
                        1400 New York Avenue NW
                        Washington, D.C. 20001
              BY:  **EMILY GURSKIS, ASSISTANT CHIEF**

                        JOSEPH NOCELLA, JR.
                        United States Attorney
                        Eastern District of New York
                        271-A Cadman Plaza East
                        Brooklyn, New York 11201
              BY:  **ARUN BODAPATI, TRIAL ATTORNEY**

For Defendant He:
                        WILLKIE FARR & GALLAGHER LLP
                        2029 Century Park East - Suite 2900
                        Los Angeles, California 90067
              BY:  **KOREN L. BELL, ATTORNEY AT LAW**

                        WILLKIE FARR & GALLAGHER LLP
                        787 7th Avenue
                        New York, New York 10019
              BY:  **MICHAEL S. SCHACHTER, ATTORNEY AT LAW**
                   **STEVEN J. BALLEW, ATTORNEY AT LAW**

For Defendant Brody:
                        LAW OFFICE OF VALERY NECHAY
                        Law Chambers Building
                        345 Franklin Street
                        San Francisco, California 94102
              BY:  **VALERY NECHAY, ATTORNEY AT LAW**

Also Present:  **Thifany Braga**
               **Simon Hall**
               **Mackenzie Slater**
               **Andy Cepregi**
               **Ashley Moore**
               **Barbara Hua Robinson, Mandarin Interpreter**
               **Jeff Dinn, Mandarin Interpreter**
               **Yang Shao, Mandarin Interpreter**

**I N D E X**

Wednesday, October 29, 2025 - Volume 15

| GOVERNMENT'S WITNESSES | PAGE | VOL. |
|---|---|---|

**LEVY, RILEY (RECALLED)**

| | PAGE | VOL. |
|---|---|---|
| (PREVIOUSLY SWORN) | 3150 | 15 |
| Cross-Examination by Mr. Schachter | 3150 | 15 |
| Cross-Examination by Ms. Nechay | 3319 | 15 |
| Redirect Examination by Mr. Foster | 3345 | 15 |
| Recross-Examination by Mr. Schachter | 3386 | 15 |
| Recross-Examination by Ms. Nechay | 3386 | 15 |

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 475 | | 3158 | 15 |
| 540 | | 3170 | 15 |
| 549 | | 3229 | 15 |
| 582 | | 3249 | 15 |
| 585 | | 3256 | 15 |
| 612 | | 3366 | 15 |
| 635 | | 3287 | 15 |
| 714 | | 3358 | 15 |
| 1009 | | 3383 | 15 |
| 1016 | | 3370 | 15 |
| 1038 | | 3368 | 15 |
| 1062 | | 3368 | 15 |
| 1063 | | 3368 | 15 |
| 1494 | | 3353 | 15 |
| 5195 | | 3285 | 15 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 7117 | | 3194 | 15 |
| 7118 | | 3197 | 15 |
| 7119 | | 3208 | 15 |
| 7123 | | 3154 | 15 |
| 7126 | | 3172 | 15 |
| 7127 | | 3172 | 15 |
| 7133 | | 3169 | 15 |
| 7135 | | 3195 | 15 |
| 7136 | | 3176 | 15 |
| 7138 | | 3180 | 15 |
| 7140 | | 3200 | 15 |
| 7141 | | 3202 | 15 |
| 7147 | | 3154 | 15 |
| 7148 | | 3154 | 15 |
| 7151 | | 3151 | 15 |
| 7152 | | 3151 | 15 |
| 7153 | | 3151 | 15 |
| 7154 | | 3289 | 15 |
| 7155 | | 3289 | 15 |
| 7162 | | 3291 | 15 |
| 7163 | | 3291 | 15 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 7169 | | 3264 | 15 |
| 7201 | | 3280 | 15 |
| 7216 | | 3213 | 15 |
| 7217 | | 3210 | 15 |
| 7222 | | 3247 | 15 |
| 7224 | | 3219 | 15 |
| 7225 | | 3219 | 15 |
| 7243 | | 3318 | 15 |
| 7244 | | 3315 | 15 |
| 7249 | | 3241 | 15 |
| 7468 | | 3222 | 15 |
| 7475 | | 3239 | 15 |
| 7502 | | 3303 | 15 |
| 7507 | | 3303 | 15 |
| 7508 | | 3303 | 15 |
| 7509 | | 3303 | 15 |
| 7509 | | 3303 | 15 |
| 7513 | | 3308 | 15 |
| 7527B | | 3236 | 15 |
| 7527C | | 3237 | 15 |
| 7528C | | 3243 | 15 |

**<u>I N D E X</u>**

**<u>E X H I B I T S</u>**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 7535 | | 3297 | 15 |
| 7554 | | 3286 | 15 |
| 7601 | | 3311 | 15 |

1   <u>Wednesday - October 29, 2025</u>                    <u>9:19 a.m.</u>

2                    P R O C E E D I N G S

3                         ---o0o---

4   (Proceedings were heard out of the presence of the jury.)

5            **THE COURTROOM DEPUTY:**  All rise.  Court is now in

6   session.  The Honorable Charles R. Breyer presiding.

7            **THE COURT:**  Okay.  Bring in the jury.

8        (Riley Levy steps forward to be sworn.)

9                          **<u>RILEY LEVY</u>**,

10  called as a witness for the Government, having been previously

11  duly sworn, testified further as follows:

12           **THE COURT:**  Okay.  Please be seated.  Let the record

13  reflect, all jurors are present, parties are present.

14      You may proceed.

15           **MR. SCHACHTER:**  Thank you, Your Honor.

16                    <u>CROSS-EXAMINATION</u>

17  BY MR. SCHACHTER:

18  **Q.**   Good morning, Mr. Levy.

19  **A.**   Good morning.

20  **Q.**   Good morning.

21      All right.  Mr. Levy, I want to start on the subject of

22  discharge of patients.

23  **A.**   Okay.

24  **Q.**   Mr. Foster had asked you if providers were free to

25  discharge patients and you responded, no, because Ruthia and

1    Dr. Brody blocked them.

2        Do you recall that testimony?

3    **A.**   I do, yes.

4    **Q.**   Okay.  You did, however, have discussions -- I mean,

5    Ruthia had discussions with you about the process of

6    discharging patients, did she not?

7    **A.**   We had discussions, yes.

8            **MR. SCHACHTER:**  Your Honor, we move to admit 7151 and

9    its attachments, 7152 and 7153, a discussion between Mr. Levy

10   and Ms. He about discharges.

11           **THE COURT:**  7151?

12           **MR. SCHACHTER:**  One, 7152, and 7153, which are just

13   attachments.

14           **THE COURT:**  Yeah.  Admitted.

15       (Trial Exhibits 7151, 7152, 7153 received in evidence.)

16   **BY MR. SCHACHTER:**

17   **Q.**   All right.  In this communication, Ms. Mercado says to you

18   that (as read):

19           "A patient said he received this text message

20           from us.  We'd like to verify if we did send this."

21       And you can see the -- it's pretty visible here.  The

22   message is (as read):

23           "Congratulations.  Your provider suggests that

24           you do not need a treatment plan, therefore you won't

25           be enrolled in our membership subscription."

1      And so that would be -- you understood that to be a

2   communication that Done would send out to people who had been

3   through an evaluation who were then told by their provider:  We

4   don't think you have ADHD, and so you're being discharged?

5   **A.**   I don't know all the context prior to that.  I do know

6   that it was a message sent for a discharge for whatever reason.

7   **Q.**   Okay.  And then you responded (as read):

8          "If it is, we definitely need to turn that off."

9      Do you see that?

10  **A.**   Yes, I do.  And I was referring particularly to the

11  "congratulations" because that seemed very out of place.

12  **Q.**   Right.  We're going to get to that.

13     You wrote -- and then if we can go further down, Ms. He

14  says (as read):

15          "I think" --

16     Well, you said (as read):

17          "Ruthia He, we need to get this text message

18          turned off ASAP."

19     And's that's a reference to the "congratulations" part?

20  **A.**   It is, yes.

21  **Q.**   Okay.  And then Ms. He responds -- and you wrote that to

22  Ruthia and she responds (as read):

23          "I think the logic is, if the patient is

24          discharged, then we'll send this."

25     And she writes (as read):

1          "We need to notify the patients that they will

2      no longer be a member and won't be paying the fee.

3      If you have any other proposals that can help clarify

4      it without upsetting the patient, we review and

5      change the text message

6      She says (as read):

7          "We've been sending it for a year.  If this is

8      the first time we hear complaint, then maybe it's not

9      bothering most people."

10     And then if we can go to Mr. Levy's response.  You say, as

11 you discussed (as read):

12         "I would recommend something.  We appreciate

13     that you gave that a try."

14     So you're just talking about the different --

15        (Reporter interruption for clarity of the record.)

16 **BY MR. SCHACHTER:**

17 **Q.**   You're suggesting just changing the language that goes out

18 to patients that are being discharged?

19 **A.**   Yes.

20 **Q.**   Okay.  And then Ms. He writes (as read):

21         "Looks good.  For referral, we typically suggest

22     mental health websites."

23     You see that as well?

24 **A.**   Yes.

25 **Q.**   Okay.

1    MR. SCHACHTER:  All right.  You can take that down.

2    BY MR. SCHACHTER:

3    Q.   Now, you knew that clinical leadership would sometimes

4    review the charts of patients who providers wanted to

5    discharge; is that correct?

6    A.   Yes.

7    Q.   And you knew that those -- that process of clinical

8    leaders reviewing the charts would often then be used by

9    clinical leadership to educate the providers on how best to

10   evaluate and treat ADHD; is that correct?

11   A.   It was used as a way to identify providers to educate them

12   on Done's preferred practices.

13   Q.   Okay.  Well, let's look at a couple.

14        MR. SCHACHTER:  Your Honor, we move to admit

15   Exhibit 7148, 7147, and 7123.

16        THE COURT:  Admitted.

17        (Trial Exhibits 7123, 7147, 7148 received in evidence.)

18   BY MR. SCHACHTER:

19   Q.   Starting with 7148, here Sussan Nwogwugwu writes -- and

20   you're on this -- you see you're on this clinical, the clinical

21   management channel?

22   A.   Yes.

23   Q.   And Dr. Brody is on it as well?

24   A.   Yes.

25   Q.   Okay.  And Sussan writes (as read):

1    "I also shared this research article for a

2    provider who was concerned about prescribing ADHD

3    medications for a patient with a history of chronic

4    pain and on pain medication.  I understand there are

5    concerns but ADHD treatment is not contraindicated in

6    such patient population."

7    And then Dr. Martinez responds (as read):

8    "I am also wondering if we might want to find a

9    way to share this information with patients as I have

10   found from some of my chart reviews that one of the

11   big problems that some of the providers have is about

12   feeling that a patient was lying or hiding

13   information from them and not just the other meds

14   themselves.

15   "For example" -- Dr. Martinez writes -- "I find

16   that Suboxone patients, once they are stable, are

17   very reliable and are typically getting drug tested

18   at least periodically by their Suboxone provider."

19   Do you see that?

20   **A.**   I do.

21   **Q.**   Okay.  And so would you agree that this is an example of

22   clinical leaders using the process of reviewing the charts for

23   patients that a provider wanted to discharge as an opportunity

24   to educate providers about how, in their view, in the views of

25   clinical leadership, ADHD should be evaluated and treated?

1    **A.**    Yes, there -- and there were other views that came to play

2    in this as well, but, yes.

3    **Q.**    We'll look at that in a moment.

4        But I want to focus also on Dr. Martinez's view about

5    treating both -- treating patients who are on Suboxone for ADHD

6    as well.

7        Do you see that?

8    **A.**    Yes.

9    **Q.**    Okay.  And Suboxone, that is a medication that is given to

10    people who have suffered from substance use disorder; is that

11    correct?

12    **A.**    For opioids, yes.

13    **Q.**    For opioids in particular?

14    **A.**    Yes.

15    **Q.**    What Dr. Martinez is saying is that even though someone is

16    on treatment for having an opioid addiction, that once that

17    patient is stable, in her view, it is still appropriate to

18    treat that patient's ADHD as well?

19    **A.**    Yes.

20    **Q.**    Okay.  Let's turn to 7147.

21        Here, on the clinical management Slack channel,

22    Dr. Nwogwugwu writes (as read):

23        "I got a request to review a chart for a patient

24        recommended for discharge by one of our providers.

25        Provider was concerned.  Patient is currently being

1       treated for bipolar disorder.  As we plan to" --

2           MR. SCHACHTER:  I'm sorry.  Mr. Cepregi, can you just

3   move that up on the screen a little bit thank you so much.

4   BY MR. SCHACHTER:

5   Q.   (As read):

6           "-- concerned about being treated for bipolar

7           disorder.  As we plan to provide services to patients

8           with comorbidities, education is centered on coaching

9           providers to think about other treatment approaches

10          that could benefit the patients and possibly allow us

11          to take over patient's overall psychiatric needs.  I

12          shared this article with the provider to enlighten

13          about treatment of ADHD symptoms in patients

14          diagnosed with bipolar."

15      And then let's just look at the last one, 7123.  This

16  also, in the clinical management Slack channel that you were a

17  member of, Dr. Nwogwugwu writes -- I'm sorry.  Sussan

18  Nwogwugwu, a nurse practitioner, writes (as read):

19          "I shared this article with a provider who was

20          concerned about treating patients with sleep apnea

21          and cardiac issues with a stimulant."

22      And Dr. Brody writes (as read):

23          "Thank you, Sussan.  This is exactly what I want

24          to do when a provider is concerned or even thinking

25          that they should not treat a patient because of

1    comorbidities, whether physical or psychiatric.

2         "Please keep doing this and if you get any more

3    articles that help with such a project, send them my

4    way."

5    Okay.

6         MR. SCHACHTER:  You can take that down, Mr. Cepregi.

7    BY MR. SCHACHTER:

8    Q.   Now, one of charts that you were aware was reviewed was

9    the chart of a patient named Cheryle; is that correct?

10   A.   I don't recall that specific patient.

11   Q.   Okay.  Well, do you recall that Cheryle Cooke's mother had

12   contacted Done to say that her adult daughter had been

13   hospitalized, and to complain about the prescription for

14   Adderall that had been prescribed to her?  Does that ring any

15   bells?

16   A.   I recall receiving -- that Done received some of those

17   complaints.  I can't remember specifically Ms. Cooke's

18   situation.

19   Q.   Okay.

20   A.   Well, let me show you --

21        MR. SCHACHTER:  I'm not sure what the Government has

22   marked as Exhibit 475, is that in evidence?

23   We'll move to admit Exhibit 475.

24        THE COURT:  475 admitted.

25   (Trial Exhibit 475 received in evidence.)

1    BY MR. SCHACHTER:

2    Q.    Okay.  And if you can take a moment to look at that.  If

3    we can -- yeah.

4         Do you see that this is a communication between you and

5    somebody named Anas Albal- -- Albaghdadi?

6    A.    Albaghdadi.

7    Q.    Albaghdadi.  Thank you.

8         Do you see that?

9    A.    I do, yes.

10   Q.    Okay.  And Anas writes (as read):

11              "Regarding Cassidy Abbot" --

12        And do you remember that there was a provider named

13   Cassidy Abbot Orr?

14   A.    I don't recall that -- ever working with that provider.  I

15   recall being told about her being removed from the platform at

16   some point in time prior to my arrival.

17   Q.    Exactly.  Exactly.

18        In fact, there was -- so you do recall that there was a

19   nurse practitioner named Cassidy Abbot Orr and Done had removed

20   that provider at some point?

21   A.    Yes.  I don't recall if it was the provider who removed

22   herself or if Done had removed her.  I don't recall the whole

23   situation for her, but I knew she had left the practice.

24   Q.    Okay.  Let's see if this helps you remember.

25        So Anas writes to you (as read):

1    "Regarding Cassidy Abbot, Dr. Brody said that he

2    sent you a 'fairly' long message regarding her

3    practice and said that you will be looking that it.

4    We received a claim from a patient's mother regarding

5    'irrational prescribing,' the patient was with

6    Cassidy before she transferred to Myron Faulkner.

7    You said (as read):

8    "Yup.  That's what sparked the whole 'review.'"

9    Do you see that?

10   A.   Yes.

11   Q.   Okay.  And then Anas writes -- if we can go to the next

12   page -- you wrote (as read):

13   "It's a good news/bad news situation.  The good

14   news is that I did not find anything specifically

15   wrong with her prescriptions."

16   You go on to describe multiple problems with the

17   electronic health record for this patient.

18   A.   That was not mine.  I was copying and pasting Dr. Brody's

19   message.

20   Q.   Oh, I see.  Okay.  Okay.  Oh, that's helpful.  Thank you.

21   So, in other words, Dr. Brody wrote to you that he had

22   reviewed the chart of this patient, and just to see if it helps

23   you remember, do you see in there it says -- it says, different

24   providers (as read):

25   "There are at least three different providers

1      mentioned for Ms. Cooke."

2      Do you see that?

3  A.   Yes, I do.

4  Q.   All right.  And now, does that help you remember that you

5  were -- you had actually become -- well, does that help you

6  remember that there was a patient named Cheryle Cooke who's an

7  adult whose mother had contacted Done?

8  A.   I don't recall ever seeing the complaint.  I can

9  acknowledge that it was looked into based on these messages

10 here.

11 Q.   Okay.  All right.

12     Well, anyway, Dr. Brody, you understood from this message,

13 reviewed Cheryle Cooke's chart and did not find anything wrong

14 with the prescriptions; is that correct?

15 A.   Based on this message, yes.

16 Q.   Okay.  And then you go on to say -- Anas asked "any

17 additional notes from your part."  And you say you're working

18 on an investigation of this.

19     Does that help --

20         MR. FOSTER:  Objection, Your Honor --

21 BY MR. SCHACHTER:

22 Q.   -- you remember --

23         MR. FOSTER:  Objection, Your Honor.  This gets to an

24 issue we discussed yesterday --

25         MR. SCHACHTER:  I'm coming nowhere near that issue.

1          MR. FOSTER:  On the screen.

2          MR. SCHACHTER:  Okay.

3   BY MR. SCHACHTER:

4   Q.   Does that help you remember that you reviewed this chart?

5   A.   I don't recall if I reviewed it.  I know that I was

6   working with Done's internal counsel on reviewing it.

7   Q.   You can -- that's okay.

8          MR. SCHACHTER:  You can take that down, Mr. Cepregi.

9   BY MR. SCHACHTER:

10  Q.   Now, do you recall that you personally actually reviewed

11  Cheryle Cooke's chart and then communicated to Ruthia that you

12  did not think that Cheryle Cooke's provider had been reckless

13  in prescribing to Cheryle Cooke?

14  A.   I don't recall that communication.

15  Q.   Okay.  Let me show you something to see if it refreshes

16  your recollection.

17         MR. SCHACHTER:  I'm going to show -- I'm going to show

18  you -- let's try to do it this -- first just for the witness.

19      I'm going to show you what we've marked as 7164.  Just for

20  the witness, Court, and counsel, please.

21      No, 7164R, please, Mr. Cepregi.

22      Your Honor, may I approach the witness?

23         THE COURT:  Sure.

24              (Counsel approaches witness.)

25         MR. FOSTER:  I'm going to object, Your Honor.

1          **THE COURT:**  Sustained.

2          **MR. SCHACHTER:**  Okay.  I was just asking -- can I just

3     refresh -- see if it refreshes his recollection?  That's the

4     only purpose I'm using it for.

5          **THE COURT:**  I'm sustaining the objection.

6     BY MR. SCHACHTER:

7     Q.   Okay.  You can put that to the side.

8          Do you recall ever telling Ms. He that while the FDA's

9     recommended maximum dose of Adderall XR is 60s milligrams, do

10    you recall telling Ms. He in any context that it is safe to go

11    up to 90 milligrams daily depending on the patient's tolerance?

12    Do you recall telling that to Ms. He?

13    A.   I do not.

14    Q.   Okay.  It's consistent with your view; correct?

15         It was your view at the time that while the FDA's maximum

16    recommended dose of Adderall XR is 60-milligram, it is safe to

17    up to, in your view, 90 milligrams depending on the patient's

18    tolerance; is that correct?

19    A.   That is not consistent with my view.  I had been taught as

20    a pharmacy technician that we were not even to type up a

21    prescription in the system if it was over 60 milligrams per day

22    for Adderall specifically.

23    Q.   Do you recall thinking at the time that you don't think

24    it's reckless to prescribe 90 milligrams because while it's FDA

25    approved up to 60 milligrams of Adderall XR, you can actually

1    safely go up to 90 milligrams depending on patient tolerance?

2         Do you remember having that view around November of 2021?

3    **A.**    I do not.

4         **MR. SCHACHTER:**  Your Honor, may I show it just to

5    refresh his recollection?

6         **THE COURT:**  Show him what?

7         **MR. SCHACHTER:**  This 7164R just to see if it refreshes

8    his recollection.  He says he did not recall having that view

9    in November of 2021.  I wish to show him this document.

10        **THE COURT:**  I was given this -- okay.  Let me see.

11   Let me take a look.

12        **MR. SCHACHTER:**  Thank you, Your Honor.

13                    (Pause in proceedings.)

14        **THE COURT:**  I'm going to allow it.

15        **MR. FOSTER:**  Your Honor, I direct your attention to

16   the subject matter on --

17        **THE COURT:**  Well, the subject matter -- the subject

18   matter --

19        **MR. FOSTER:**  And we don't have a copy of the

20   unredacted versions.

21        **THE COURT:**  I think that should be redacted.

22        **MR. FOSTER:**  Well, we don't --

23        **MR. SCHACHTER:**  We'll redact it.

24        **THE COURT:**  Well, go ahead, Counsel.

25        **MR. FOSTER:**  Yes.  It goes to the issue that they

1    withdrew -- this is -- the subject matter relates to the

2    channel of discussion that's occurring.  And the Government

3    doesn't have access to these documents, including whatever was

4    redacted here.  And I believe what is redacted, as the witness

5    said --

6              THE COURT:  I see.  In other words -- in other words

7    the Government hasn't been given an unredacted copy it.

8              MR. SCHACHTER:  Your Honor --

9              THE COURT:  Fine.  Okay.  Sustained.  There's no

10   way -- there's no way that you can show a document to a witness

11   in which the Government, in order to determine context and in

12   order to determine what it is, it's been redacted.  You

13   redacted it.  Not you personally, but the Defense redacted it.

14   So that's the end of that.

15             MR. SCHACHTER:  Okay, Your Honor.

16             THE COURT:  Okay?  We're not going to have that type

17   of examination.  It's unfair to the Government.

18             MR. SCHACHTER:  Okay.  I was just focusing on what

19   the --

20             THE COURT:  I understand, but it's simply --

21             MR. SCHACHTER:  -- witness said --

22             THE COURT:  I got it.  But the problem is, to allow

23   both sides the opportunity to examine and if it's redacted, if

24   it's a truncated version of actually what was said, it's then

25   unfair to the Government.  Or the any side that introduces it.

1    It would be unfair to you if the Government did it.

2         MR. SCHACHTER:  Understood.

3         THE COURT:  Okay.

4         MR. SCHACHTER:  Understood.

5    BY MR. SCHACHTER:

6    Q.    Do you recall, Mr. Levy, having the view at the time that

7    1 milligram of Vyvanse equals .238 milligrams of Adderall so

8    that you need a significant amount of Vyvanse to be close to

9    the recommended maximum dose of Adderall.

10        Do you remember having that view at the time?

11   A.    It wasn't a personal view.  I was referencing if -- if

12   anything, I was referencing a conversion chart of that that was

13   available, you know, online to the public.

14   Q.    Do you remember having that view at the time?

15   A.    It was not a -- it was not a view.  It was --

16   Q.    An understanding?

17   A.    -- something I had reviewed.

18   Q.    Sorry.  Do you recall having that --

19        (Reporter interrupts for clarity of the record.)

20        THE WITNESS:  Something I reviewed.

21   BY MR. SCHACHTER:

22   Q.    Okay.  And last question on this:  Do you have any

23   recollection of reviewing the note from -- that had come to Don

24   from Cheryle Cooke's mother and noting that it was inaccurate

25   about what she had been prescribed?

1   A.   I don't recall reviewing that specific note or responding

2   to the family.

3   Q.   Okay.  All right.

4        And speaking of -- so at some point you understood that

5   after the nurse practitioner, Cassidy Abbot Orr, had either

6   been removed or left the platform, that the patient had been

7   transferred to a Myron Falkner.

8        Do you remember that?

9        Or let me ask a different question.  Sorry.

10       Do you recall that there was a provider named Myron

11  Falkner?

12  A.   I do, yes.

13  Q.   Okay.  And do you recall having the view at the time

14  that -- that Myron Falkner, in your view, incorrectly treated

15  patients as -- as drug seekers and drug abusers?  Do you recall

16  having a concern about Myron Falkner at the time?

17  A.   Yes.  There -- I had many concerns that were informed by

18  other clinicians about Myron Falkner and I absolutely -- a

19  better way to say that, would air dirty laundry related to that

20  and said things I am not proud of related to Myron, yes.

21  Q.   Okay.  Okay.

22       But, in other words, your view was that he would approach

23  his interactions with patients not as if they had legitimate

24  ADHD symptoms, but rather he would approach the patients

25  with -- sort of too harshly, as if they were here to seek

1    drugs?

2    **A.**    That was one of the complaints that we had received, yes.

3    **Q.**    All right.  Thank you.  All right.  Let me switch topics.

4    You understood that the time that was set aside for the

5    initial evaluation at Done was 30 minutes?

6    **A.**    Well, it was 25 minutes with a 5-minute documentation

7    period to follow the visit, or -- you know, yeah.

8    **Q.**    All right.  And I am correct, am I not, that you were in

9    favor of that appointment time being set aside because it

10   enabled medical providers to see more patients and therefore

11   expand mental health care to more people?

12   **A.**    When I shared that view, I had -- I had shared that view

13   because I was under an understanding that I gained from Ruthia

14   that the intake was sufficient to allow for that.  And as my

15   time went on and I spoke with many providers, including

16   clinical leadership team members, it -- I came to the view that

17   that was not a sufficient amount of time.

18   **Q.**    Okay.  Thank you.

19   Even six months into your tenure at Done, you were saying

20   to people that you thought it would be a bad idea to lengthen

21   the initial evaluation time; is that correct?

22   **A.**    Possibly.  And if I had, I was parroting the party line

23   outside of -- and maintaining the narrative outside of

24   conversations with Ruthia.

25   **Q.**    You shared that view six months into your tenure; correct?

1    **A.**    Possibly.

2          **MR. SCHACHTER:**  Your Honor, we move to admit 7133, a

3    communication between Mr. Levy and Sara Faber on the topic of

4    providing longer appointment times.

5          **MR. FOSTER:**  I don't think it's impeaching, Your

6    Honor, 403.  I think he just said he said it.

7          **THE COURT:**  Okay.  Admitted.

8          (Trial Exhibit 7133 received in evidence.)

9    **BY MR. SCHACHTER:**

10   **Q.**    Okay.  Do you see this communication between you and Sara

11   Faber?

12   **A.**    I do.

13   **Q.**    Okay.  And it says -- in this Ms. Faber informs you that

14   (as read):

15          "Clinical leadership would like to look into

16          implementing providing hour-long appointments for

17          complex patients."

18          Do you see that?

19   **A.**    Yes.

20   **Q.**    All right.  And if we can go to the next page, please.

21          And I think this is a communication from Sara Faber at the

22   top which says (as read):

23          "Yeah, so you answer yes to 'are you on

24          Suboxone?' the patient isn't eliminated from the

25          platform, but they pay for an hour appointment with a

1    provider comfortable treating complex patients."

2    And your response is (as read):

3        "I think that's beyond our scope.  We already

4    have a problem of not being able to offer same-day

5    appointments.  Not a problem but certainly a goal we

6    want to obtain at some point this year.  Adding in

7    this hour-long appointment type thing is beyond the

8    means to providing care to as many people as

9    possible.  While that sounds contradictory, since

10   we'd have to remove or deny service to one person in

11   that time block, we get two more or four follow-ups."

12   Do you see that?

13   **A.**   I do.

14   **Q.**   Okay.  And then I would also like to show you what I think

15   is in evidence.  It's what the Government marked as

16   Exhibit 540, a communication between you and Sarah Barker on

17   this topic.

18        **MR. FOSTER:**  We had not admitted that.

19        **MR. SCHACHTER:**  Your Honor, we move to admit what the

20   Government marked as 540.

21        **THE COURT:**  540 admitted.

22   (Trial Exhibit 540 received in evidence.)

23   **BY MR. SCHACHTER:**

24   **Q.**   And you see this communication between you and Sarah

25   Barker.  She writes (as read):

1      "One thing we could do that would be a huge

2      arguing point to say we are better than Cerebral is

3      that we hire all PMHNPs and even though you don't

4      want to, we could increase appointment times on

5      initials to prove that we take more time to properly

6      assess and get to know our patients."

7      Do you see that?

8  **A.**  I do.  I don't know if she was -- you don't want to -- it

9  was the business that she was referring to.  Done didn't want

10 to, and this was in preparation for a communication with Ruthia

11 regarding the topic.

12 **Q.**  I see.

13 **A.**  I recall this conversation.

14 **Q.**  I see.

15     Did Sarah Barker typically, when she wanted to refer --

16 when -- she referred to you as "Done" all the time?

17 **A.**  Not all the time --

18     **MR. FOSTER:**  Objection.  Argumentative.

19     **MR. SCHACHTER:**  I'll withdraw.

20 **BY MR. SCHACHTER:**

21 **Q.**  And by the way, here Sarah Barker says that even though

22 the initial evaluation time set aside is 30 minutes, she says

23 that she oftentimes continues to see patients for 45 to

24 60 minutes; is that correct?

25 **A.**  Yes.  She had a unique scheduling system that she used.

1  Q.   Okay.

2        MR. SCHACHTER:  You could take that down.

3  BY MR. SCHACHTER:

4  Q.   Now, you were also in discussions with Dr. Brody about

5  how, given the information from the questionnaires, that the

6  30-minute appointment time that was set aside is actually

7  pretty similar to what happens in private practice.

8        Do you recall that?

9  A.   I recall that being an ill-informed opinion of mine at the

10 time and something that Ruthia and I had discussed ad nauseam

11 and it was something that worked its way into the narrative

12 that was published externally as well.

13 Q.   Okay.  My question is:  Do you recall in as late as July

14 of 2022 participating in a discussion with Dr. Brody about how

15 the 30-minute evaluation time at Done was similar to what

16 occurred in private practice?

17 A.   Possibly.  I recall a discussion related to that,

18 maintaining the party line of the company wanting to grow.

19 Q.   Okay.  Last top- --

20       MR. SCHACHTER:  Your Honor, we move to admit 7126 and

21 7127, the last document on this topic.

22       THE COURT:  Admitted.

23       (Trial Exhibits 7126 and 7127 received in evidence.)

24 BY MR. SCHACHTER:

25 Q.   Okay.  Do you see in this communication, Ms. Chey says (as

1    read):

2           "Can we find evidence that in most private

3      practices, appointment time is spent on collecting

4      the information, survey results that in Done's case

5      are collected pre-appointment.

6           "This will be a most strong argument to back up

7      our efficiency driven by asynchronous care for both

8      initial and follow-up appointments."

9      And then if we can look at 7127, which is a continuation

10   of the same discussion, Dr. Brody writes (as read):

11          "I would say information that could have been

12     obtained from a rating scale or prefilled

13     questionnaire might often have taken from a quarter

14     to a half of the initial appointment, but since I

15     always had at least 60 minutes, and sometimes as much

16     as 90 minutes, and never below 45 minutes, that was

17     okay."

18     And Ms. Chey says (as read):

19          "This means the info intake is about 20 to

20     30 minutes of the appointment and the actual

21     consultation it about 30 minutes, in line with our

22     practice."

23     Do you see that?

24   **A.**   I do.

25          **MR. SCHACHTER:**  Okay.  You can take that down,

1    Mr. Cepregi.

2    **BY MR. SCHACHTER:**

3    **Q.**   Let's change topics.  Let's talk about follow-ups.

4        When you started at Done, you believed that follow-ups

5    should take place for patients on controlled substances every

6    one to two years; is that correct?

7    **A.**   I was speaking from personal experience as an ADHD patient

8    where my provider saw me once per year, but that was after a

9    two-and-a-half-hour initial appointment.  So I was one data

10   point, and I had only my own experience to speak about in that

11   conversation.

12   **Q.**   Okay.  When you started at Done, you thought that

13   follow-ups for patients on controlled substances should take

14   place every one to two years; is that correct?

15   **A.**   Based on my own personal experience, yes.

16   **Q.**   Okay.  But the policy at Done that was put in place that

17   you described with Mr. Foster was that follow-ups -- providers

18   should do follow-ups every six months; is that correct?

19   **A.**   That was a policy that we put in place in -- I want to say

20   in July of 2022.

21   **Q.**   Right.

22       Mr. Foster showed you -- and I'll place it on the screen;

23   it's already in evidence -- Exhibit 6816.

24       Okay.  Do you remember discussing this document with

25   Mr. Foster?

1    **A.**    Yes.

2    **Q.**    Okay.  And this is the document that says -- that talks

3    about the need -- that providers should have follow-ups

4    every --

5            **THE COURTROOM DEPUTY:**  I'm sorry.  It's not in

6    evidence.

7            **MR. SCHACHTER:**  It's not admitted?

8            **MR. FOSTER:**  Yes, it -- it was admitted before the

9    break, Lashanda.

10           **THE COURTROOM DEPUTY:**  Okay.  Thank you.

11           **MR. SCHACHTER:**  Should we clarify the record just to

12    make sure?  6186, Your Honor.

13           **THE COURTROOM DEPUTY:**  I'm double-checking.

14           **THE COURT:**  Okay.  Admitted.

15           **MR. SCHACHTER:**  Thank you.

16           **THE COURTROOM DEPUTY:**  Yes, it's been admitted.  Thank

17    you.

18           **MR. SCHACHTER:**  Thank you.

19    BY MR. SCHACHTER:

20    **Q.**    You described this, the first bullet point, as (as read):

21           "We have addressed in a previous e-mail the lack

22       of consistent follow-up requirements.  and in

23       response, a minimum six-month follow-up cadence has

24       been implemented."

25       Do you see that?

1    **A.**    Yes, I didn't write this e-mail, but --

2    **Q.**    Okay.

3    **A.**    -- yes, I do see that one.

4    **Q.**    Well, I think that you testified that you and others had

5    to get this e-mail out in the -- I think you used the words

6    "dark of night."

7         Do you remember that?

8    **A.**    Yes.

9    **Q.**    Okay.  But, in fact, prior to this going out, it was

10   discussed on the clinical leadership Slack channel with Ms. He,

11   not in the dark of night; isn't that correct?

12   **A.**    Yes, and we had a call after that to discuss that it

13   shouldn't go into place.

14   **Q.**    Okay.

15        **MR. SCHACHTER:**  Your Honor, we move to admit 7136.

16        **THE COURT:**  7136 admitted.

17   (Trial Exhibit 7136 received in evidence.)

18   **BY MR. SCHACHTER:**

19   **Q.**    Okay.  You see this is a communication from July 18th of

20   2022.  That's a few days before that e-mail went out?

21   **A.**    Yes.

22   **Q.**    Okay.

23        **MR. SCHACHTER:**  And if we can zoom back out just to

24   show that Ms. He is on this communication.

25   \\\

1    BY MR. SCHACHTER:

2    Q.   See your name?

3    A.   Are you asking me?  I do see my name, yes.

4    Q.   And Ms. He's as well?

5    A.   Yes.

6         MR. SCHACHTER:  Okay.  If we can go back to where we

7    were, Mr. Cepregi.

8    BY MR. SCHACHTER:

9    Q.   Okay.  And this -- this is a communication.  (as read):

10        "This will be the official e-mail language.

11   Patients are required to have a video follow-up with

12   their provider at least every six months."

13   Do you see that?

14   A.   Yes.

15   Q.   And Sarah Barker -- and then if we can go down a little

16   bit further (as read):

17        "We will add this verbiage to the e-mail going

18   out to providers about limiting visit hours on the

19   platform."

20   And then if we can go a little further down, Ms. Barker

21   says (as read):

22        "Can we make verbiage say at least every

23   six months because there are some states and some

24   providers" -- by the way, she says:  "There are some

25   states, New Jersey."

1      Do you see that?

2  **A.**   Yes.

3  **Q.**   Okay.  We'll get into this but you understood that New

4  Jersey was the only state in the country that required any

5  particular time for follow-up appointments for patients on

6  controlled substances.

7      You recall that; correct?

8  **A.**   I recall it being one of them.  I don't recall it being

9  only.  But I also don't recall any other states that I was

10 aware of at the time that had specific requirements for time

11 frame restrictions.

12 **Q.**   Okay.  That's very helpful.

13     The only state that you can recall that actually had a

14 requirement for follow-ups for patients on controlled

15 substances was New Jersey.  That's the only one you remember?

16 **A.**   Sitting -- yes.  Yeah.  Absolutely.

17 **Q.**   Okay.  And do you recall, actually, that what New Jersey

18 had put in place was a three-month follow-up requirement?

19 **A.**   Yeah, it was 90 -- yeah, a 90-day, three-month for an

20 in-person follow-up, yes.

21 **Q.**   Okay.  Great.

22     And so Sarah Barker says (as read):

23         "Because there are some states, New Jersey, and

24     some providers who will still probably choose closer

25     follow-up and that's fine.  That's up to them."

1    Do you see that?

2    **A.**   Yes.

3    **Q.**   Okay.  And what Ms. Barker means by "that's up to them" is

4    that medical providers, every medical provider has a duty to

5    their patient to do what they think is medically necessary;

6    correct?

7    **A.**   I -- I can -- I can understand that logic, yes.

8    **Q.**   Okay.  All right.  Very good.

9         **MR. SCHACHTER:**  You can take that down.

10   **BY MR. SCHACHTER:**

11   **Q.**   And, by the way, you also understood that the DEA had said

12   that patients prescribing controlled substances should be

13   followed up with every two years; correct?

14   **A.**   That was something that I was informed by Ruthia when I

15   started at Done.

16   **Q.**   Okay.  That the DEA had stated that patients on controlled

17   substances should be followed up with at least every two years?

18   **A.**   Yes, that was what I was informed.

19   **Q.**   Okay.  And you told providers that they needed to have a

20   video visit with patients every two years; correct?

21   **A.**   I don't recall if I personally sent out communication

22   related to that.

23   **Q.**   Okay.

24        **MR. SCHACHTER:**  Your Honor, we move to admit

25   Exhibit 7138.

1          **THE COURT:**  7138 admitted.

2      (Trial Exhibit 7138 received in evidence.)

3  **BY MR. SCHACHTER:**

4  **Q.**    Okay.  Do you see this communication that you're on from

5  July 22nd of 2022?

6  **A.**    Yes.

7  **Q.**    Okay.  And July now, you had been working there for --

8  what would that be? -- about nine or ten months, end of July?

9  **A.**    Give or take, yes.

10  **Q.**    Okay.  And then, if we can go a little bit further down,

11  you write (as read):

12          "At the two-year mark, they will need to see an

13      in-person provider but doesn't hurt to get them

14      scheduled now, especially over one year."

15      Do you see that?

16  **A.**    Yes.  This speaks to patients that had been established on

17  telehealth and had to be switched to in person in New Jersey.

18  And we had received guidance related to that from counsel.

19  **Q.**    Okay.  We don't want to get into that.

20      But this gets to what you were saying about there was a

21  point in time where New Jersey required face-to-face or was --

22  there was the possibility that New Jersey would put in place a

23  face-to-face requirement every three months; correct?

24  **A.**    Yes, and I believe by this time they had started to

25  require that for new patients.  It was my understanding based

1    on what we had been told.

2    **Q.**   Okay.  And then you say -- it's in response to that that

3    you say "At the two-year mark, they're going to need to see an

4    in-person provider but doesn't hurt to get them scheduled now";

5    correct?

6    **A.**   Correct.

7    **Q.**   Okay.  All right.

8         All right.  Let's switch topics.  Let's talk about the

9    method by which the providers at Done were compensated.  Okay?

10   **A.**   Okay.

11   **Q.**   You understood that at some point there had been a change

12   in the manner in which the medical providers were compensated

13   for seeing their patients at Done prior to your arrival; is

14   that correct?

15   **A.**   Yes.  There was a -- Ruthia and I had a conversation, I

16   think, on day three or four related to this -- to this.

17   **Q.**   Right.  And I think that Mr. Foster showed you that

18   communication.  I'm going to show it to you as well in just a

19   moment.

20   **A.**   Okay.

21   **Q.**   You understood that there were a number of nurse

22   practitioners that wanted to get paid hourly for their time

23   with patients and were insisting on seeing patients, even

24   stable patients, have them show up every month as a condition

25   of them writing a refill prescription.

1      Do you have that understanding?

2   **A.**   I personally never saw any of those communications.  That

3   was, to my recollection, what was communicated to me by Ruthia

4   on -- when we discussed why hourly pay wasn't being used.

5   **Q.**   Okay.  And then you recall that after that, there was a

6   switch and nurse practitioners were paid hourly for their

7   initial evaluation, and then they were paid based on the number

8   of patients in their care or on their panel; is that right?

9   **A.**   Yes.

10  **Q.**   Okay.  Now, I'm going to show you what is in evidence as

11  Exhibit 454.  Mr. Foster asked you about portions of it and I'm

12  going to ask you about some different portions.

13      Okay.  First -- I think, actually, Mr. Foster pointed you

14  to this.  Ms. He says to you (as read):

15          "Maybe we just compensate the PMHNPs too much.

16      The ones who work 40 hours with us can quickly get

17      compensated for 250- to $300,000."

18      You said (as read):

19          "Wow.  That's way too much.  150,000 max per

20      year."

21      **MR. SCHACHTER:**  And then if we can go just a little

22  bit further down, Mr. Cepregi.  Just on that same page.  Can we

23  go back to that?

24      Oh, no, this is it.  Great.

25  \\\

BY MR. SCHACHTER:

Q.   And then she writes here -- Ms. He forwards to you the provider payroll.  Do you see that?

A.   Yes.

Q.   Okay.  Fair to say that Ms. He was not trying to hide from you how much the nurse practitioners were getting paid at Done; correct?

A.   Yes.

Q.   And you then, if we can look at your communication, the bottom of page 6 into 7, well, Ms. He says (as read):

        "I think the highest one gets -- is paid at
        $432,000 per year and they still complain about the
        pay."

        Then if we can go to the next portion.  You say (as read):

        "I want to explore a flat hourly rate.  Could we
        build in time tracking?"

        And Ms. He says -- so you proposed paying hourly and then

Ms. He says to you (as read):

        "So previously we paid hourly.  The problem is
        the provider would try their best to spend more time
        with patients even if the patients don't want to,
        like request them to book follow-up appointments
        every month.  And it's already hard for ADHD patients
        to remember to book or attend appointments."

        Do you see that?

1  **A.**   I do.

2  **Q.**   Okay.  And is this -- you understand this to be the issue

3  that Ms. He discussed with you, that nurse practitioners

4  were -- when they're getting paid hourly, were insisting on

5  seeing even stable patients and have them show up every 30 days

6  in order to get a refill on their prescription because that's

7  how they were getting paid.

8      Do you recall that?  That was -- that was a discussion

9  that you had with Ms. He?

10 **A.**   Yes.  I had no bearing on how many providers or anything

11 related to that, if it was one or multiple that had this issue.

12 But this was the problem as it was explained to me.

13 **Q.**   Understood.  Because that occurred before you arrived at

14 Done?

15 **A.**   Correct.

16 **Q.**   All right.  And then, if we can go a little bit further

17 down, your response.

18     So she just said that, and then you respond (as read):

19         "Ah, yeah.  That sounds like a solvable problem,

20     though.  We should have very clear guidelines for

21     when a patient needs to follow up."

22     And you say (as read):

23         "I understand they are all their own providers

24     but we can still say this is the Done way."

25     Let me pause on that for a moment.

1      When you say "They are all their own providers," what you

2  mean is they were independent contractors; is that correct?

3  **A.**    That's what I understood at the time.  And from my

4  understanding, there was only some that gained, like, W-2

5  employment with Done.  But I did not understand how the

6  entities were established and all that fun stuff yet.

7  **Q.**    Sure.  But you understood that the providers' contract

8  with Done Health was that they were independent contractors; is

9  that correct?

10  **A.**    Yes.

11  **Q.**    Okay.  And as such, you understood that they could not --

12  Done could not tell a medical provider:  You need to diagnose

13  that patient as having a particular disorder.

14      You understood that; correct?

15  **A.**    Yeah, I understood that they, yeah, could not force them

16  to say that.

17  **Q.**    You understood that Done could not say to any licensed

18  medical provider:  We are telling you, prescribe medication to

19  that patient.

20      Correct?

21  **A.**    Correct.  There were other ways used to control the habits

22  of the providers that were deployed instead of using the direct

23  language that you're referring to.

24  **Q.**    Sure.

25      Done controlled the compensation system; yes?

1    A.    Yes.

2    Q.    They controlled the evaluation time?

3    A.    It did, yes.

4    Q.    They arranged for the appointments?

5    A.    Yes.

6    Q.    But the process of evaluating the patient, that was

7    between the medical provider and the patient; correct?

8    A.    Yes.

9    Q.    And the process of prescribing medication, that was

10   between the medical provider and the patient?

11   A.    Yes.  For the -- I would say for the initial consultation.

12   I think when we discuss refills, that's a different scenario.

13   Q.    Well, you understood that even the auto-refill process,

14   which we'll talk about in a little bit, required a provider to

15   say, yes, this patient is appropriate for auto-refills?

16   A.    I actually did not understand that of the system.  I

17   believed that the patient could deem themselves stable by

18   toggling like an iPhone-appearing switch on their dashboard.

19   Q.    You're not aware that the provider needed to check --

20   needed to check a box in the EHR in which they affirmatively

21   stated:  Yes, this patient is appropriate for auto-refill?

22   A.    I actually was not.

23   Q.    Okay.  Fair enough.

24         Let's go -- return to this document.

25         And then Ms. He says (as read):

1          "I agree but it was really hard to enforce them

2      to do things in certain ways previously."

3      Then if we could go a little bit further down (as read):

4          "Now, even Dr. David and Dr. Zoe don't just tell

5      NPs what to do, but say based on their clinical

6      judgment."

7      Do you see that?

8  A.  Yes.

9  Q.  Okay.

10 A.  My understanding of that was that was what Dr. Brody and

11 Dr. Martinez said back to Ruthia, and that they need to

12 practice their own clinical judgment.

13 Q.  Right.

14     Dr. Brody and Dr. Martinez said -- let me ask you.

15     Did they say in conversations that you were a party to as

16 well that, look, these are all licensed medical providers; we

17 can provide them with guidance and education, but ultimately

18 what they do is up to their clinical judgment?

19 A.  Yes.  I had conversations with them related to that.

20 Q.  Okay.  And so Ms. He says (as read):

21         "And we use the comp structure to disencourage

22     them to do follow-ups."

23     You see that?

24 A.  I do.

25 Q.  And that is the portion of this communication that

1   Mr. Foster -- he focused you on this -- that language; correct?

2   **A.**   I believe so.  I thought we talked more about the

3   conversation as well, just as you and I are.

4   **Q.**   Okay.  But what -- what has happened just in the minutes

5   before this language is Ms. He saying that there was a problem

6   where nurse practitioners were requiring patients to show up

7   every single month as a condition of getting their refill?

8           **THE COURT:**  I think this is now just argument.

9           **MR. SCHACHTER:**  I'll move on, Your Honor.  Thank you.

10  BY MR. SCHACHTER:

11  **Q.**   Okay.  Okay.

12      Let me just focus you on one other portion.

13          **MR. SCHACHTER:**  At 4 -- can we turn to it -- the very

14  bottom of page 10 at 4:01 p.m.  Actually, a little bit before

15  that.

16      Great.  Okay.

17  BY MR. SCHACHTER:

18  **Q.**   Ms. He says (as read):

19          "That's true and we do put a lot of efforts

20          around safety, which I don't think providers are

21          aware of."

22      And you say (as read):

23          "We don't necessarily need to say 'prescribe

24          this.'"

25      But you say (as read):

1            "But we can certainly can dictate appointment

2       cadence, scheduling times, et cetera."

3       Do you see that?

4  A.   Yes.  This was an instance of me trying to make a business

5  case for us getting our policies and providers and guidelines

6  together from day three.

7  Q.   Okay.  These are your words to Ruthia; is that correct?

8  A.   Yes.

9  Q.   Okay.  And then, at 4:01 --

10      MR. SCHACHTER:  If we can go a little further down.

11      Oh, actually, a little bit further up.  Thanks.

12 BY MR. SCHACHTER:

13 Q.   Okay.  Ms. He says (as read):

14           "Typically, when they start a new medication,

15      they'll want to check in a month to see if there is

16      any side effect, however, we automatically send a

17      survey three days after the appointment and inform

18      the providers if the patient reports any side

19      effect/meds adjustment request."

20      Do you see that?

21 A.   I do, yes.

22 Q.   Okay.

23      MR. SCHACHTER:  Then if we can look at the bottom of

24 page 12 to the top of 14, there's a communication from

25 Mr. Levy.

1    There we go.  Can we put that up towards the top of the

2 screen so everyone could see it.

3 BY MR. SCHACHTER:

4 Q.    You say (as read):

5         "In the asynch telemedicine world, we would call

6     a survey a follow-up, which counted as a visit, and

7     our providers were more than comfortable with that."

8     You say (as read):

9         "I think the DEA component has a lot of people

10     scared and I get it."

11     Do you see that?

12 A.    Yes.

13 Q.    Okay.  So what you're --

14     MR. SCHACHTER:  Can we go back?  Thank you.

15 BY MR. SCHACHTER:

16 Q.    What you're saying there, when -- first of all, when

17 you're talking about in the asynch telemedicine world, what

18 you're talking about is a -- asynchronous means following up

19 with the patient without a face-to-face visit by video but

20 rather by messaging?

21 A.    Yes.  Or, in my experience, it was usually photos of their

22 condition changing and evolving with dermatology.

23 Q.    Right.  You had this experience where there was

24 asynchronous consultation with dermatologists and what -- I'm

25 just asking, what that means is messaging?

1   A.   And photos, yes.

2   Q.   And photos.  Okay.

3        And you say (as read):

4            "We would call a survey a follow-up."

5        Right?

6   A.   Yes.  When we would discuss engineering, the follow-up

7   visits with the engineering and product teams, it was termed a

8   survey.  But it was built by -- well, it was built by engineers

9   but crafted by medical professionals.

10  Q.   All right.  And you say (as read):

11           "I think the DEA component has a lot of people

12           scared and I get it."

13       Right?

14  A.   Yes.

15  Q.   Okay.  And what you mean there is that medical providers

16  may want to do things that aren't necessarily required from a

17  medical perspective because they are scared of the DEA;

18  correct?

19  A.   I don't know if I would characterize it that way.  I think

20  that the DEA component referenced here, it is -- I said it as

21  it is a lot of people were fearful of prescribing controlled

22  substances period and they wanted to take extra steps to make

23  sure that they were doing it the right way.

24  Q.   Or the right way in the eyes of the DEA.  That's what

25  you're referring to?

1          **MR. FOSTER:**  Objection.  Asked and answered.

2    Argumentative.

3          **THE COURT:**  Sustained.

4          **MR. SCHACHTER:**  Okay.

5    **BY MR. SCHACHTER:**

6    **Q.**  Okay.  And then last bit on this communication.

7          Okay.  You talk about enforcing a survey when requesting a

8    refill.  And Ms. He talks about it being one click.

9          And then Ms. He says (as read):

10              "But we did that last year.  Every time they

11         request a refill, they will fill out a brief survey

12         and some providers are thinking it's not enough so we

13         ask patients to record a one-minute video."

14          **MR. SCHACHTER:**  Sorry.  Next page is what I was

15    looking for.

16          There we are.  Okay.  Thank you.

17    **BY MR. SCHACHTER:**

18    **Q.**  Ms. He says that (as read):

19              "A few PMHNPs at Ahead" --

20          You understood that to be another telehealth platform?

21    **A.**  Yes, that treated ADHD, yes.

22    **Q.**  Okay.  (as read):

23              " -- wanted to join us last year and they said

24         they also having a hard time not having providers

25         request for follow-up every month."

1      You write (as read):

2          "Interesting.  It's so old school.  That reminds

3      me of high school 15 years ago when I had to go to a

4      10-minute appointment just to pick up the paper

5      because --"

6      And then Ms. He says (as read):

7          "Because that's how they can get paid."

8      And you say (as read):

9          "True, true."

10     Do you see that?

11  **A.**   I do.  And that was based on my own experience with a

12  provider that -- where I had a two-and-a-half-hour initial

13  consultation, and then for some time, a quick pop in to grab

14  the paper prescription.  And then after that, I didn't see her

15  for a year.

16  **Q.**   Okay.  But your experience was not that the provider

17  required you, stable on your medication, to show up every

18  30 days as a condition of getting your refill because that's

19  how your provider can get paid?  That wasn't your experience?

20  **A.**   Sorry.  Can you ask that again?

21  **Q.**   Sure.  It was not --

22  **A.**   I didn't follow the question.

23          **THE COURT:**  I'm not sure why his experience is

24  relevant to this inquiry at this point.

25          **MR. SCHACHTER:**  Okay.  All right.

1    THE COURT:  A certain amount of experience is

2 relevant, but I think we've gone over that.  I'd like to move

3 ahead perhaps to a new topic.

4    MR. SCHACHTER:  Yes, Your Honor, will do.

5 BY MR. SCHACHTER:

6 Q.   Okay.  Now, on this -- well, on this subject, in fact, you

7 told -- you suggested to Ruthia that Done should find ways to

8 pay providers to have even more patients in their panel; isn't

9 that correct?

10 A.   I don't recall that communication or the context around

11 it.

12 Q.   Sure.

13    MR. SCHACHTER:  Your Honor, you move to admit 7117.

14    THE COURT:  Okay.  71 --

15    MR. SCHACHTER:  7117, a communication between Ms. He

16 and Mr. Levy.

17    THE COURT:  Admitted.

18    (Trial Exhibit 7117 received in evidence.)

19 BY MR. SCHACHTER:

20 Q.   You wrote to Ms. He (as read):

21       "What do you think about an incentive for

22       providers to take more patients?  Once you get to

23       1,500 consistent patients on your panel month after

24       month, we will adjust the hourly calculation from 14

25       patients as one hour to 12 patients is one hour."

1      Do you see that?

2  A.   Yes.

3  Q.   Okay.  And Ms. He's response is (as read):

4          "Why increase the incentive?  I would worry it

5      will lower the quality.  Especially right now we are

6      not short of provider supply."

7      Do you see that?

8  A.   I do.

9  Q.   Okay.  Now --

10       MR. SCHACHTER:  You can take that down.

11  BY MR. SCHACHTER:

12  Q.   And also, it is correct, is it not, that you told Ms. He

13  that you wanted to reduce the number of follow-up visits that

14  each provider requires; correct?

15  A.   I -- I don't recall.  I know there were several times

16  where I said the opposite to Ruthia in video calls, and that

17  after meeting with providers, my view had changed.  So I

18  possibly said that early on in my time at Done.

19  Q.   Okay.

20       MR. SCHACHTER:  And, Your Honor, we move to admit

21  7135.

22       THE COURT:  Admitted.

23       (Trial Exhibit 7135 received in evidence.)

24  BY MR. SCHACHTER:

25  Q.   You see here, Mr. Levy, where you wrote to Ruthia (as

 1    read):

 2               "I want to ultimately reduce the number of

 3         follow-up visits each provider requires.  We should

 4         honestly aim for one per year.  This is a metric that

 5         can help us regulate our clinical guidelines and

 6         enforce them."

 7         Do you see that?

 8    **A.**    I do.  And the context around the one year, again, goes

 9    back to my personal experience as a patient.  And so it was one

10    data point and I had been on board for about 30 days at this

11    point.

12    **Q.**    Okay.  Okay.

13         Well, December 10th, that's about two months, a little bit

14    less than two months?

15               **THE COURT:**  Are we --

16               **MR. SCHACHTER:**  Good enough.

17               **THE COURT:**  He said early.

18               **MR. SCHACHTER:**  All right.

19               **THE COURT:**  So where do you want to draw the line?

20               **MR. SCHACHTER:**  Okay.  Very good.

21    **BY MR. SCHACHTER:**

22    **Q.**    Okay.  And, in fact, I am correct, am I not, that at the

23    time that you worked there, months into working there, you

24    believed that there was no clinical evidence saying that

25    follow-up for stable patients yielded better care?

1   A.   I recall a discussion around, like, actual medical

2   literature regarding that topic and that it was very

3   challenging to find something.  But I came to the understanding

4   after communicating with clinicians that it was often referred

5   to as the standard of care and something that we had to follow.

6          MR. SCHACHTER:  Okay.  Your Honor, we move to admit

7   7118, a communication between Mr. Levy and Sarah Barker.

8          THE COURT:  Admitted.

9      (Trial Exhibit 7118 received in evidence.)

10         MR. SCHACHTER:  If we can move that a little bit

11  higher on the -- is it possible to move that -- thank you.

12  BY MR. SCHACHTER:

13  Q.   All right.  You and Sarah Barker are discussing the number

14  of patients on a particular provider's panel.

15     Do you see that?

16  A.   Yes, I do.

17  Q.   Okay.  And then Sarah Barker says (as read):

18          "Yes, I can see how the pay structure would make

19      more sense that way."

20     And then if we can go to the next page.

21     You write to Sarah Barker (as read):

22          "It's hard to justify follow-ups without

23      clinical evidence to support them.  I've asked

24      numerous times for the doctors to provide actual

25      evidence to suggest that follow-ups yield better care

1          for a stable patient."

2          Do you see that?

3  A.    I did say that and I believe after that she actually said

4  she was going to find some to share with the team.

5  Q.    Okay.  But what you're saying there is that you have

6  spoken to, plural, the doctors numerous times about whether

7  there's any evidence that follow-ups yield better care and

8  you've seen no evidence as of this point in time; is that

9  correct?

10  A.    Yes.  I had spoken to Dr. Brody and Dr. Martinez, who were

11  endorsing more follow-ups.  And I had asked for additional

12  evidence or clinical evidence from them so that I could go to

13  Ruthia with a better or stronger business case to implement

14  that.

15  Q.    I see.

16          Okay.  So let's be clear on that.

17          So Dr. Brody had been advocating, you recall, for more

18  frequent follow-ups; correct?

19  A.    Yes.  Him and Dr. Martinez, yes.

20  Q.    And then you pressed him:  Well, is there any actual

21  evidence that suggests that that provides better care?

22          Correct?

23  A.    Yes, because I understood that that was what I would need

24  to actually try and work with Ruthia to get it through and

25  built into the platform.

1   Q.   Okay.  Great.  Okay.

2        And then --

3           MR. SCHACHTER:  You could take that down.

4   BY MR. SCHACHTER:

5   Q.   The Government showed you an exhibit, 1013, which is in

6   evidence.

7        Do you recall Mr. Foster showing you this yesterday?

8   A.   Yes, I do.

9   Q.   And this is an Asana task; is that correct?

10  A.   Yes, it is.

11  Q.   And you state a number of ideas in the Asana task about

12  ways to -- ways -- what you're talking about is how to deal

13  with the problem that patients are missing follow-up

14  appointments; is that correct?

15  A.   Can you give me a minute to reread it?

16  Q.   Sure.

17  A.   Thank you.

18       (Witness examines document.)

19       Thank you for that.  I've reread it.  Can you reask your

20  question?

21  Q.   Sure.

22       What you're talking about is the problem that patients are

23  not showing up for their follow-up appointments and the issue

24  about what should be done about that?

25  A.   Yes.

1    Q.    Right.

2         And the discussion that you're having is we can text the

3    patient to remind them to schedule a follow-up.

4         Do you see that?

5    A.    Yes.  And if they didn't show up, that we should stop --

6    or that they would not get their medication.

7    Q.    Okay.  If we can -- before this happens, can --

8         MR. SCHACHTER:  Your Honor, we move to admit 7140, a

9    communication between Mr. Levy and Ms. He on this topic --

10        THE COURT:  Admitted.

11        (Trial Exhibit 7140 received in evidence.)

12   BY MR. SCHACHTER:

13   Q.    You write --

14        MR. FOSTER:  Excuse me.  Do you have a copy?

15   BY MR. SCHACHTER:

16   Q.    Okay.  Ms. He writes (as read):

17            "I see we have providers stop supporting

18        patients if they no-show to follow-ups."

19        Do you see that?

20   A.    Yes.

21   Q.    Okay.  That's a little bit of broken English but you

22   understood her to be saying that there are providers that

23   are -- that are not issuing refills because the patients have

24   no-showed to their follow-up appointments; is that correct?

25   A.    Yes.  I don't have the context for this, but, yes --

1    Q.    Okay.

2    A.    -- I understand that the --

3    Q.    And Ms. --

4    A.    -- that's the issue.

5    Q.    Sorry.  And Ms. He says (as read):

6          "If we do change our standard operating

7          procedure or have special cases like this, the team

8          should send it to you to review and approve."

9          Do you see that?

10   A.    I do, yes.

11   Q.    Okay.  And that's to you in your capacity as lead of

12   operations and strategy; correct?

13   A.    It's to me, yes.  In my role, yes.

14   Q.    Okay.  And to be clear, Ms. He is still in China at this

15   point in time; correct?

16   A.    Yes.  But we had employees all over the world.  We were a

17   completely remote company, so everything was online and I mean,

18   it was not abnormal for all of us to be spread out.

19   Q.    Right.  You had employees everywhere.  You had employees

20   in China; correct?

21   A.    Yes.

22   Q.    Okay.  Now -- and then you say (as read):

23          "If the provider isn't willing to refill because

24          the patient no-shows multiple times, we're going to

25          get more negative press."

1    And then you say (as read):

2        "We can consistently remind patients until they

3    confirm."

4    And then if we can go a little bit further down, you write

5    that your dentist sends you 30 texts before you confirmed.

6    Okay.  And then if we can go to the next page to Ms. He's

7    response.

8    Ms. He says (as read):

9        "These are all good ideas.  Please add them to

10    Asana."

11    Do you see that?

12  **A.**   I do, yes.

13  **Q.**   Okay.  And then I just want to show you the continuation

14  of that communication, which is 7141, which we'll move to

15  admit.

16        **MR. SCHACHTER:**  Your Honor, we move to admit 7141

17  which is a continuation of this --

18        **THE COURT:**  Admitted.

19    (Trial Exhibit 7141 received in evidence.)

20  **BY MR. SCHACHTER:**

21  **Q.**   And you wrote as part of the same communication (as read):

22        "On the ops end, we will work to develop an SOP

23    that if the patient misses the first follow-up, then

24    the providers will ask to send a bridge refill until

25    a scheduled follow-up appointment."

1    Do you see that?

2  **A.**   I do.  And the intent behind that was if the patient did

3  miss their follow-up and had scheduled another one, then they

4  would be able to get a refill up until, you know, whether it be

5  six days, 12 days, whatever the time period was in between

6  their next scheduled appointment.

7  **Q.**   Okay.  And that gets us to the next topic --

8        **MR. SCHACHTER:**  You can take that down.

9  **BY MR. SCHACHTER:**

10 **Q.**   -- which is bridge refills.  I want to speak to you about

11 that very briefly.

12    You testified at some point there was a prescription

13 backlog in the thousands.

14    Do you recall telling that to Mr. Foster?

15 **A.**   Yes, in July.

16 **Q.**   Okay.  Can -- there was -- in July of 2022; is that right?

17 **A.**   Yes.

18 **Q.**   Okay.  I want to focus on that time period and I'd like

19 you to explain to the jury what happened.

20    Am I correct that there was a time when Done switched its

21 prescription platform from something called Ayva -- A-Y-V-A --

22 to RXNT?

23 **A.**   Yeah.  We were forced to because Ayva actually kicked us

24 off the platform.

25 **Q.**   Okay.  Can you just, again, try very briefly, if you can,

1    to explain why that switch required, in that limited time

2    period, a big influx of the need for refills?

3    **A.**    Yes.

4         So Ayva gave us, to my recollection, a 72-hour notice that

5    they were removing Done from its services, so we were no longer

6    able to send prescriptions through their platform.  And RXNT --

7    the new platform required us anywhere between three to

8    seven days to get set up.

9         There was additional hurdles because RXNT utilized

10   physical devices to validate the prescriber that had to be

11   shipped out to all of the providers.  And so because of that

12   delay of the timing of those, a lot of providers didn't get

13   access to the electronic prescribing platform.

14        And a secondary difficulty was we had a large challenge

15   importing the records from Ayva into RXNT.  So, ultimately,

16   half of them had to be a manual process of someone going in and

17   entering the record into RXNT so that the prescriber could go

18   in and send the refill.

19   **Q.**    This created a big operational mess, for lack of a better

20   word?

21   **A.**    Yeah.  It was a very stressful time and I had to have a

22   conversation with Ruthia about it every single day.

23   **Q.**    And you were very clear, you told both Ms. Chey and Ruthia

24   to send -- that they should stop answering crap related to

25   refills and that you told them to send everything to you

1  because you were going to take care of this?

2  **A.**   Yes.  I was managing the refill.  And it was a very

3  stressful time.  I believe we actually called the team like the

4  refill destruction team because the backlog was so significant.

5  **Q.**   Okay.  Thank you.

6        **THE COURT:**  Let's take a recess now.

7        Ladies and gentlemen, we'll be in recess until a quarter

8  of.

9        Remember the admonition given to you:  Don't discuss the

10 case, allow anyone to discuss it with you, form or express any

11 opinion.

12              (The jury leaves the courtroom.)

13      (Proceedings were heard out of the presence of the jury.)

14              (Recess taken at 10:31 a.m.)

15              (Proceedings resumed at 10:49 a.m.)

16      (Proceedings were heard out of the presence of the jury.)

17        **THE COURTROOM DEPUTY:**  Come to order.  Court is now in

18 session.

19        **THE COURT:**  Okay.  Bring in the jury.

20        **THE COURTROOM DEPUTY:**  Okay.

21              (The jury enters the courtroom.)

22      (Proceedings were heard in the presence of the jury.)

23        **THE COURT:**  Okay.  Please be seated.  Let the record

24 reflect all jurors are present, all parties are present.

25        You may continue.

1          MR. SCHACHTER:  Thank you, Your Honor.

2     BY MR. SCHACHTER:

3     Q.   All right.  Mr. Levy, brief, new topic.

4          Given that Done was a telehealth platform, taking EKGs or

5     vital signs was not a standard part of the initial evaluation;

6     is that correct?

7     A.   That's correct.

8     Q.   And you agree that that made sense; correct?

9     A.   For a telehealth platform, yes, that -- that made sense.

10    And I recall that some providers would send a patient back to

11    their primary care or other sources to get them when they

12    suspected that there might be an issue.

13    Q.   Okay.

14         MR. SCHACHTER:  Your Honor, I'm just going to display

15    what's in evidence as 7118, the end of that document.  Thank

16    you.

17    BY MR. SCHACHTER:

18    Q.   Okay.  Do you see where Ms. Barker says (as read):

19             "Can we reach out to the psychiatrists we have

20         hired and ask them if they took vitals in their

21         in-person practices?"

22         And Ms. Barker said (as read):

23             "Because, to my knowledge, I have never seen a

24         psychiatrist office take vitals and they are

25         prescribing ADHD meds."

1    You say (as read):

2         "Definitely.  We could also ask Dr. Martinez as

3    well."

4    You say (as read):

5         "I've known it," all caps, "NOT to be standards

6    of care for adult patients."

7    Do you see that?

8    A.   Yes.

9    Q.   Okay.

10        MR. SCHACHTER:  You can take that down.

11   BY MR. SCHACHTER:

12   Q.   And, in fact, also Dr. Brody had told you specifically

13   that he did not think it was necessary for providers to request

14   urine drug screens, and you told him that you agreed.

15   Do you recall that?

16        MR. FOSTER:  Objection.  Hearsay.

17        MR. SCHACHTER:  Goes to the existence of a conspiracy.

18   State of mind.

19        THE COURT:  I'll allow it.

20        THE WITNESS:  Sorry.  Can you -- was that UAs and --

21   BY MR. SCHACHTER:

22   Q.   Sure.  Why don't I just --

23        (Reporter interruption for clarity of the record.)

24        MR. SCHACHTER:  Your Honor, we move to admit 7119.

25        THE COURT:  Okay.  Admitted.

1      (Trial Exhibit 7119 received in evidence.)

2  BY MR. SCHACHTER:

3  Q.   Do you see this communication with you and Dr. Brody and

4  Dr. Martinez?

5  A.   In the medical team group chat, yes.

6  Q.   Okay.  And Dr. Brody says (as read):

7           "I'm thinking it might be a good idea to send

8       him my little article about urine drug screens and

9       their limited usefulness in psychiatry first.  I will

10      look for it."

11      And then you respond (as read):

12          "I do believe that there is a clear distinction

13      that also has to be established.  While, yes, every

14      provider has a limited range of freedom to practice

15      as they see fit, they don't, however, get to use

16      terms of 'we are an online platform so we want to be

17      extra careful.'"

18      Do you see that?

19  A.   I do, yes.

20  Q.   Okay.  And what you're saying is that providers, they, of

21  course, have freedom to practice and have an obligation to

22  practice pursuant to their clinical judgment; right?

23  A.   Yes.  I am acknowledging that, yes.

24  Q.   Okay.  But what you're saying is that they shouldn't be

25  able to say:  Look, we're online and so we are going to require

1    things that are not medically necessary.

2        That's effectively what you're communicating to Dr. Brody?

3    A.    Yes.  I don't have the full context here.  I also -- I

4    also elaborate and highlight that the individual provider

5    shouldn't be telling our care team exactly how Done's practices

6    should be.  That could be coming from clinic leadership.

7    Q.    Okay.  Great.

8        MR. SCHACHTER:  You could take that down, Mr. Cepregi.

9    BY MR. SCHACHTER:

10   Q.    Very briefly on one other topic that Mr. Foster hit on

11   with you.  You were asked if Dr. Brody was writing

12   prescriptions in states that he was not licensed in.

13       Do you remember Mr. Foster asking you that?

14   A.    Yes.

15   Q.    Okay.  And you were -- that was one of the things that you

16   were working on was getting Dr. Brody licensed in various

17   states?

18   A.    Yes, it was.

19   Q.    In fact, there was a point in time where you actually went

20   to Dr. Brody's house and spent four hours helping him organize

21   the applications for licensing in various states?

22   A.    Yes.

23   Q.    Okay.  Thanks.

24       Okay.  Let's switch topics.

25       You testified about media inquiries that Done received.

1          Do you recall that?

2    **A.**    Yes.

3    **Q.**    And the fact is -- would you agree with me -- that you are

4    the one who was really -- took responsibility on yourself for

5    handling those media inquiries; is that right?

6    **A.**    That's not accurate.

7    **Q.**    Okay.  Well, you received an inquiry in January of 2022

8    from a news outlet called CNET; is that correct?

9    **A.**    I don't recall that one.

10   **Q.**    Okay.

11          **MR. SCHACHTER:**  Your Honor, we move to admit 7217.

12          **MR. FOSTER:**  Is there a question, Your Honor?

13          **THE COURT:**  Sorry?

14          **MR. FOSTER:**  Is there a question?

15          **THE COURT:**  There might be.

16          **MR. SCHACHTER:**  Your Honor, this document goes to my

17   question, which was:  You spearheaded the response to the

18   media?

19          **THE COURT:**  Admitted.

20      (Trial Exhibit 7217 received in evidence.)

21   **BY MR. SCHACHTER:**

22   **Q.**    Okay.  Do you see where you wrote to Ms. He (as read):

23          "I received this question from a news outlet."

24   **A.**    Yes, I -- it would not have been sent directly to me.  It

25   would have likely gone to your customer service e-mail and then

1  forwarded on and I shared it with Ruthia.

2  **Q.**   Okay.  What you're telling Ms. He is:  I received this

3  question from a news outlet; correct?

4  **A.**   It was forwarded to me.  And my words on the page are that

5  I did receive it, though.

6  **Q.**   Okay.  And you draft a response to the media outlet and

7  you include it in your communication to Ms. He; is that

8  correct?

9  **A.**   Yes.

10  **Q.**   Okay.  And then if you can go a little bit further down,

11  you wrote (as read):

12        "Finalized by MJ, myself and Joanne."

13      Do you see that?

14  **A.**   Yes.  I worked with others to do this, yes.

15  **Q.**   Okay.  So what you're telling -- but not with Ms. He?

16  **A.**   I seeked her approval to -- before sending it out.  And I

17  don't -- it's hard to recall if we had to do that because there

18  was a deadline and timing with China and different time zones

19  and things like that.  So that might be why this team assembled

20  to respond.

21  **Q.**   Right.  You got the -- you received an inquiry from a

22  media outlet.  You worked with these two other people to draft

23  a response.  You send it to Ms. He, and 16 seconds later she

24  says (as read):

25        "This looks good."

1  A.   Yes.

2  Q.   Okay.  And then further down, you see where Ms. He asks if

3  it needs to be reviewed by Dr. Brody?

4  A.   Yes.

5  Q.   And you wrote (as read):

6        "He's working on it right now."

7  A.   Yes.  I recall sending him a Word document.

8  Q.   Right.  Before you even sent it to -- the response to the

9  media to Ms. He, you first sent it to Dr. Brody for his review;

10 correct?

11 A.   Yes.

12 Q.   Okay.  And then Ms. He just says (as read):

13       "Let me know if there is anything I can help

14    with."

15    MR. SCHACHTER:  Do you have that?

16    That's okay.  It's not necessary.

17    Okay.  You could take that down, Mr. Cepregi.

18 BY MR. SCHACHTER:

19 Q.   Now, you now testified that -- when Mr. Foster was asking

20 you questions that you had told Ruthia that you had great

21 concerns about Done's advertising.

22    Do you remember that?

23 A.   Yes.

24 Q.   You -- but the fact is that you specifically told Ms. He

25 that you did not think that Done's advertising was misleading.

1          Do you remember that?

2     **A.**     There may have been in reference to one ad or a group of

3     ads, but generally, I did raise concerns frequently, alongside

4     clinical leadership, actually, to Ruthia's attention.

5     **Q.**     You said that in your testimony but do you recall

6     Mr. Foster didn't show you any communications where you were,

7     in writing, expressing that view?

8     **A.**     Yes, I did not see anything in writing.

9     **Q.**     Okay.  I am going to show you something in writing.

10          **MR. SCHACHTER:**  Your Honor, we move to admit 7216, a

11     communication between Mr. Levy and Ms. He on the subject of

12     Done's advertising.

13          **THE COURT:**  Admitted.

14          (Trial Exhibit 7216 received in evidence.)

15     **BY MR. SCHACHTER:**

16     **Q.**     Okay.  Do you see where Ms. He forwards a news article

17     entitled "Instagram and TikTok Pull Ads from Startup Cerebral

18     Linking ADHD to Obesity," and she writes that the article had

19     mentioned us.

20     **A.**     Yes, she does.

21     **Q.**     And then she asks (as read):

22          "Can we get a full list of ads that are running

23          on Facebook and TikTok and have it reviewed?"

24     **A.**     She does ask that, yes.

25          **MR. SCHACHTER:**  We can go a little bit further down to

1    Ms. --

2    **BY MR. SCHACHTER:**

3    **Q.**   Ms. He then says (as read):

4         "I think we should pull out all the suspicious

5         ads and social media posts ASAP.  Prepare medically

6         reviewed responses like Cerebral does."

7         Joanne Dai, she was an employee focused on advertising or

8    marketing; is that correct?

9    **A.**   Yes, she was.

10   **Q.**   All right.  She responds.

11        And then we can go a little further down.  That the top

12   communication is from -- I think, that's from Ms. Chey (as

13   read):

14        "The ads were describing general feedback from

15        our patients, but we acknowledge that it could be

16        misleading information to a general audience.  We

17        pulled down the misleading ads and will have a

18        medical board double-check and approve all ads before

19        publishing."

20        Do you see that?

21   **A.**   I do.

22   **Q.**   Okay.  And then I just want to show your response to that

23   below that.

24        You wrote (as read):

25        "I would disagree that our ads are misleading

1          but rather only 'part of the condition.'"

2          Do you see that?

3    **A.**   I do.

4    **Q.**   Okay.  I just want to explore what you meant by that.

5          What you're saying is that the question is that in

6    these -- there were short ads on TikTok that would talk about

7    signs that somebody may need to be evaluated for ADHD; is that

8    right?

9    **A.**   That was some of them, yes, that were out there.

10   **Q.**   Okay.  And what you're saying is:  Look, we're not saying

11   that these are all of the diagnostic criteria for ADHD.  Your

12   ads are simply describing part of condition.

13         That's what you mean there?

14   **A.**   Yes, referring to those specific ads, yes.

15   **Q.**   Okay.  And you write (as read):

16            "I would disagree that our ads are misleading."

17         Correct?

18   **A.**   Yes.  I do write that.

19   **Q.**   Okay.

20         Okay.  And then actually further down in that

21   communication, you write --

22            **MR. SCHACHTER:**  Can we go to where Mr. Levy says:  "I

23   have another time-sensitive response"?

24         So something -- where Mr. Levy says (as read):

25            "I have another time-sensitive response I need

1    to get out as well for CNET."

2    Right.  Okay.  If you can just blow up from there to the

3    bottom.

4    **BY MR. SCHACHTER:**

5    **Q.**    Okay.  So, again, here you say (as read):

6        "I have another time-sensitive response I need

7        to get out."

8    That's, again, you spearheading the response to the -- to

9    this media outlet; is that correct?

10   **A.**    To CNET specifically, I was gathering all the information,

11   yes.

12   **Q.**    Right.  And then you circulated a draft response; correct?

13   **A.**    Yes, our draft response.

14   **Q.**    Okay.

15       **MR. SCHACHTER:**  You can take that down, Mr. Cepregi.

16   **BY MR. SCHACHTER:**

17   **Q.**    Now, you -- when Mr. Foster was asking you questions, you

18   testified that you told Ruthia that we should stop advertising

19   that contained pills or pill bottles.

20       Do you remember testifying to that with Mr. Foster?

21   **A.**    I do.

22   **Q.**    However, at the time that you worked there, you told

23   Ruthia the exact opposite; isn't that correct?

24   **A.**    In reference to the ads that were in question here, I

25   answered differently.  But in regards to ads regarding pill

1    bottles and pills, I had many conversations, we had a weekly

2    meet on Monday that was mostly led by the growth team and I

3    shared that concern several times, as did Sarah Barker and

4    other leadership members.

5    **Q.**   Okay.  Well, I'd like to show you what you actually said

6    in writing to Ms. He.

7        **MR. SCHACHTER:**  Your Honor, we move to admit

8    Exhibit 7216.

9        **THE COURT:**  You did already.

10       **THE COURTROOM DEPUTY:**  Yes.

11       **MR. SCHACHTER:**  I'm sorry.  It's in there already?

12   Oh, great.  Thank you.

13   **BY MR. SCHACHTER:**

14   **Q.**   Do you see where Ms. He says (as read):

15       "We only have six plus Facebook ads running as

16       of now.  These have some pill images but it is not

17       related to the issue in the article."

18   And you respond (as read):

19       "I think these are fine.  They're nondescript

20       pill images.  Not exactly a visual representation of

21       our medications offered."

22   Do you see that?

23   **A.**   I do, yes.

24   **Q.**   Ms. Dai forwards to you a different ad and you say (as

25   read):

1          "I think that one is okay."

2      Do you see that?

3  A.  Yes, I do.

4  Q.  On different ads you say (as read):

5          "This one is questionable and hard to defend."

6      And then you say (as read):

7          "A wine glass to take psych medication is," and

8      you're confused?

9  A.  That's an emoji, yes.

10 Q.  Okay.  And I guess in one of these ads there was a glass?

11 A.  Yeah.  It was a stemmed wine glass.

12 Q.  All right.  And Ms. Chey says (as read):

13          "Isn't it just a water?"

14     And then your response (as read):

15          "It is, but some NBC intern is going to be like

16     'wine'."

17     Do you see that?

18 A.  I do, yes.

19 Q.  Okay.  All right.

20        MR. SCHACHTER:  You could take that down.

21 BY MR. SCHACHTER:

22 Q.  Now, what happened after this is that the company created

23 a channel on Slack for the medical team to review

24 advertisements; is that correct?

25 A.  That is correct.

1    Q.   And I'll just show you the Slack channel creation so we

2    can pinpoint the timing.

3         MR. SCHACHTER:  Your Honor, we move to admit to 7224.

4         THE COURT:  Admitted.

5    (Trial Exhibit 7224 received in evidence.)

6    BY MR. SCHACHTER:

7    Q.   And Dr. Brody was part of that process; correct?

8    A.   I believe so.  I believe he was added to the channel, yes.

9    Q.   And fair to say that it was your experience that Dr. Brody

10   was no "yes man" when it calm to his review of Done's

11   advertisement?

12   A.   I believe he was critical of some of the ads, yes.

13   Q.   I'm going to show you one.

14        MR. SCHACHTER:  Your Honor, we move to admit 7225.

15        THE COURT:  Admitted.

16   (Trial Exhibit 7225 received in evidence.)

17        MR. SCHACHTER:  Can you just lift it up on the screen

18   so it's easier to see.  Thank you.

19   BY MR. SCHACHTER:

20   Q.   This is -- in the Slack channel "Marketing Medical

21   Review," Joanne Dai has raised a question regarding a term

22   used -- to be used in one of the ads.

23        Do you see that?

24   A.   Yes.

25   Q.   And Dr. Brody pushes back and suggests that the

1 advertising should not be -- he disagrees with the advertising;

2 correct?

3 A.   Yes.

4 Q.   Okay.

5        MR. SCHACHTER:  All right.  You can take that down.

6 BY MR. SCHACHTER:

7 Q.   And I guess without --

8        MR. SCHACHTER:  You can take that down, Mr. Cepregi.

9 BY MR. SCHACHTER:

10 Q.   Without showing you a document, you recall that there were

11 then -- there was a regular process where ads were placed on

12 this medical review -- medical review marketing slack channel

13 and posted every Friday morning?

14     Do you recall that?

15 A.   I didn't recall the -- how often they went up, but I

16 recall that that was the process, that they got sent for

17 review.

18 Q.   Okay.  Thank you.

19     All right.  Let's talk about the Wall Street Journal.

20     You testified about an inquiry that came from the Wall

21 Street Journal in March of 2022; is that correct?

22 A.   Yes.  I believe we possibly received two from them that

23 month.

24 Q.   Okay.  And you managed how Done responded to the Wall

25 Street Journal; is that correct?

1    **A.**    I did not.  The PR firm managed that and we had an entire

2    crisis room onboarding with them where myself, Ruthia, others

3    from the company joined and provided the narrative to the PR

4    firm.

5    **Q.**    Okay.  Thank you.  That's helpful.

6         Would you describe yourself as the main point of contact

7    for the PR firm?

8    **A.**    I was for some time.  Not -- not forever, though.

9    **Q.**    Okay.  That PR firm was a firm call Forbes Tate; is that

10   correct?

11   **A.**    That's correct.

12   **Q.**    Okay.  And Done did not find Forbes Tate on its own?

13   **A.**    No.  If my recollection is correct, I believe Craft

14   Ventures actually sourced the contact at Forbes Tate.

15   **Q.**    Right.  One of the investors for Done suggested, look,

16   given these inquiries, this is going to be a good, experienced

17   public relations firm that you should be utilizing?

18   **A.**    Yes.

19   **Q.**    Okay.  And by the way, you had -- this Wall Street Journal

20   reporter that ultimately wrote an article about Done, you had

21   direct personal interactions with him; correct?

22   **A.**    I had one -- one in-person meeting with him, yes.

23   **Q.**    Just you and him?

24   **A.**    Yes.

25   **Q.**    It was over dinner?  Lunch?  Drinks?

1    **A.**    It was just -- he had dinner.  I just sat there.

2    **Q.**    Okay.  All right.  Okay.

3         But Ruthia wasn't there?  That was just you and the Wall

4    Street Journal reporter?

5    **A.**    Correct.  She was in China.

6    **Q.**    She was in China.  Okay.

7         All right.  So when the inquiry comes in, I'm going to

8    show you what I'm not sure is in evidence.

9              **MR. SCHACHTER:**  The Government marked it as 541.  And

10   we'll move to admit if it's not already in evidence.

11             **THE COURT:**  It's in evidence.

12             **MR. SCHACHTER:**  It's in evidence.  Thank you, Your

13   Honor.  I apologize.

14   **BY MR. SCHACHTER:**

15   **Q.**    And so the inquiry comes to Ruthia and she forwards that

16   to you, just to you and two people at this PR firm, Forbes

17   Tate; correct?

18   **A.**    Yes, those were the partners there.

19   **Q.**    Okay.  And then I want to talk a little bit about your

20   involvement in the response.

21             **MR. SCHACHTER:**  We'll move to admit 7468.

22             **THE COURT:**  Admitted.

23        (Trial Exhibit 7468 received in evidence.)

24   **BY MR. SCHACHTER:**

25   **Q.**    Okay.  And in this communication between you and Ms. He,

1  Ms. He asks (as read):

2      "Please send me after you have a draft of

3  response by today.  And for anything clinical I can

4  also talk to David, Jayaram for their input."

5  You say (as read):

6      "I will try my best.  They are reviewing the

7  questions."

8  Do you see that?

9  A.  I do, referring to Forbes Tate reviewing the questions.

10  Q.  I see.  Okay.

11  You write (as read):

12      "We likely won't need to respond to all of

13  them."

14  But Ms. He says (as read):

15      "Yes, but it's the only opportunity for us to

16  defense for inaccurate facts and share our

17  perspectives."

18  And you assure her that Forbes Tate will do that.

19  A.  Yes, based on the information we provided.

20  Q.  Okay.  Ms. He said (as read):

21      "Let's try to get a first draft by today," and

22  goes on.  Okay.

23  And then if we can go a little bit further down, you say

24  what's going to happen.  You write (as read):

25      "Okay.  Here's what we're going to do on the

1          Done side.  I'm breaking the questions up by the

2          departments/team.  Each team will write the basic,

3          yes, no, or as bare-bones answer as possible.  Will

4          send to FTP and they'll spice it up."

5          Do you see that?

6    A.    Yes.

7    Q.    Okay.  So what you're saying there is that you are laying

8    out to Ruthia the plan for responding to the media inquiry?

9    A.    Yes.  After I spoke with Andres as Forbes Tate, he -- this

10   was his suggestion of how to handle this.

11   Q.    I see.

12         Inquiry comes in, there's a deadline on Sunday, you speak

13   to Forbes Tate?

14   A.    Yeah.  After Ruthia forwarded that over, we got all on a

15   call, and then Andres made that recommendation on that call.

16   Q.    Okay.  And then, I guess what you're parroting here is

17   what you've heard from Forbes Tate as to what they are saying

18   is the plan for responding to the Wall Street Journal?

19   A.    Correct.

20         **MR. SCHACHTER:**  All right.  If we can go a little bit

21   further down.  Okay.  If we can go a little bit further down

22   than that.

23   BY MR. SCHACHTER:

24   Q.    You say that (as read):

25              "It's important that we have the team leads

1          involved.  And please send the clinical one out as

2          there's more issues with David."

3          Meaning for David Brody to respond to?

4     A.   Yes.  I don't have the context of what issues were at hand

5     at the time.  But, yes.

6     Q.   Okay.  And I'm going to show you what the Government

7     showed you as Exhibit 1371 in evidence.

8          Or I'm sorry.  They didn't -- they didn't show this to

9     you.  This was --

10              MR. SCHACHTER:  Your Honor, this was admitted during

11    Mr. Levy's direct but I don't believe that they showed it to

12    you.

13              THE COURT:  Well, it's in evidence.

14              MR. SCHACHTER:  It's in evidence.  Okay.

15         And so if we can blow up the middle, the response to the

16    question.  There we are.  Thank you.

17    BY MR. SCHACHTER:

18    Q.   Okay.  So it says -- what was happening was in drafting

19    the internal responses that were going to be provided to Forbes

20    Tate, do you recall that you created a Google doc with

21    questions and then different people were responsible for

22    providing different answers?

23    A.   Yes, that is correct.

24    Q.   Okay.  And this one was a question that came in from the

25    Wall Street Journal that says (as read):

1          "Our reporting indicates that your employee

2      handbook in 2020 stated that even for patients who

3      don't meet DSM-5 criteria for ADHD, it may still be

4      worth putting them on a medication trial, and that

5      such trials involve low doses of Adderall.  Is that

6      accurate?  What is the medical other basis for such

7      trials?"

8      Do you see that?

9  A.   I do, yes.

10 Q.   Okay.  And then do you see the draft response on the

11 right?

12 A.   Yes.

13 Q.   Okay.  And do you recall -- I can show you documents if

14 you don't -- that this is language that was drafted by

15 Dr. Brody?

16 A.   I recall it's -- I think this might be organized in what

17 his additions to the responses were by the parentheses, but I

18 do see his response in there.

19 Q.   Okay.  Well, do you recall -- and, again, I can show you

20 something if helpful, but do you recall that what Dr. Brody

21 wrote is (as read):

22          "The DSM-5 criteria are essentially a list of

23      symptoms.  I will point out that in psychiatry,

24      things do not have very strict definitions.  As soon

25      as it becomes strict or cut and dried, and some

1    things you only need numbers to define, it is no

2    longer psychiatry.  Any diagnosis in medicine, and

3    particularly in psychiatry, is made by drawing

4    somewhat arbitrary lines on a bell-shaped curve,

5    plotting symptomatology against number of patients

6    exhibiting that symptomatology.

7          "Because where these lines are drawn is

8    arbitrary, the decision on whether to treat someone

9    who falls just outside of one of those lines needs to

10   be based on how much the person is suffering, an

11   assessment and decision that can only be made by the

12   clinician that knows the patient.  Then the negative

13   effects of the treatment need to be balanced against

14   the possible positive effects to decide whether to

15   proceed with it even though the person does not quite

16   meet the diagnostic criteria."

17   Do you see that?

18   A.   Yes.

19   Q.   Okay.  Now, in this document that the -- that the

20   Government introduced, I want to focus you on who wrote this.

21        You recall that this is Dr. Brody's language; is that

22   correct?

23   A.   Yes, I do.

24   Q.   Okay.  I want to -- because I want to just make sure

25   that's clear in this document, if we can zoom back out, you see

1    on this line the only people that are listed are you, Ruthia,

2    and Sol Ross.

3        Do you see that?

4    A.    I do.

5    Q.    Okay.  But -- so that is why I want to be very clear.

6    There was a separate document called press questions clinical

7    which -- do you recall that document that was created?

8    A.    I don't.  But earlier you showed me that there were links

9    to documents.

10   Q.    Okay.  In any event, not withstanding what this document

11   shows, you recall this is Dr. Brody's language?

12   A.    Yes, I do.

13   Q.    Okay.

14        MR. SCHACHTER:  Your Honor, then we would just like to

15   offer -- just to introduce, we don't need to go through with

16   the witness -- 7524B.

17        THE COURT:  Well, wait a minute.

18        MR. SCHACHTER:  75- --

19        THE COURT:  7524 what?  B?

20        MR. SCHACHTER:  B, 7524C, 7524D, and 7524E.

21        THE COURT:  Objection.  Foundation.  Hearsay.  The

22   witness said he didn't see that.

23        MR. SCHACHTER:  Yeah, I'll withdraw it.  We don't need

24   it, Your Honor.

25        THE COURT:  All right.  So not admitted.

1      **MR. SCHACHTER:**  Okay.  All right.

2          And I think it's -- 549, I think, is in evidence.  And if

3  not, we move to admit 549.

4          **THE COURT:**  I'm sorry.  Which exhibit?

5          **MR. SCHACHTER:**  We move to admit what the Government

6  identified as 549.

7          **THE COURT:**  Okay.  One moment, please.

8                    (Pause in proceedings.)

9          **THE COURT:**  Okay.  549 admitted.

10     (Trial Exhibit 549 received in evidence.)

11  **BY MR. SCHACHTER:**

12  **Q.**  Okay.  And Mr. Levy, this is -- in this time period

13  between Friday and Sunday, the reporter's deadline, you recall

14  you actually -- and just to situate us.

15         One of questions that we just saw was asked by the

16  reporter was:  We understand there's something about a

17  medication trial that's in some handbook?

18  **A.**  Yes.

19  **Q.**  Okay.  And what you do is you forward to Forbes Tate the

20  actual provider playbook?

21  **A.**  Yeah.  I see the attachment there, yes.  I don't have a

22  copy of that document.

23  **Q.**  Okay.  Well -- if we can look at the attachment, I

24  think -- which is 540 --

25         **MR. SCHACHTER:**  Is there another page to this

1  document?

2          MR. FOSTER:  There is.

3          MR. SCHACHTER:  Okay.  Great.

4  BY MR. SCHACHTER:

5  Q.  Okay.  Do you recall this is what you shared with Forbes

6  Tate?

7  A.  I don't recall this --

8          THE COURT:  Let's move ahead.  Okay.

9  BY MR. SCHACHTER:

10  Q.  Okay.  And if you can just turn to the last page.  And

11  just the bottom half -- not that -- right.

12      And you're forwarding to -- when you forward to Forbes

13  Tate what the document actually says, what it says is (as

14  read):

15          "If they don't fully meet the criteria for ADHD,

16      use your clinical judgment to determine if the

17      patient may still benefit from a medication trial.

18          "Redirect to the clinical leadership if the

19      situation is complex."

20      Do you see that?

21  A.  I do.

22  Q.  Okay.  And when you are sending this to Forbes Tate and

23  you're saying this is what it actually says, what you're

24  communicating is it doesn't say that they should -- that

25  providers should do a medical trial; that's what you're trying

1    to communicate to him?

2    **A.**    I don't believe so.  I believe that there was a concern

3    that I raised with Ruthia as well that we shouldn't deny the

4    language because it did exist, but we can acknowledge the

5    existence of it and say we're removing that from service and it

6    is no longer something that providers will receive.

7    **Q.**    Okay.  We're going to get to that communication, which

8    Mr. Foster showed you, in just a moment.

9        But to be clear, when you forward this document, you say

10   (as read):

11           "Here's what it," all caps, "actually says."

12       Do you remember that?

13   **A.**    Yes.

14   **Q.**    Okay.  And what you're telling him it actually says is not

15   "you should do a medication trial"; correct?

16   **A.**    I'm not trying to tell him anything aside from what's in

17   the document.

18   **Q.**    Okay.  And what the document says is:  Use your clinical

19   judgment to determine if the patient may still benefit from a

20   medication trial?

21           **MR. FOSTER:**  Objection.  Asked and answered.

22   Argumentative.

23           **THE COURT:**  Well, it says what it says.

24           **MR. SCHACHTER:**  Withdrawn.

25           **THE COURT:**  Is this document the 2020 handbook?  What

1  is this document?

2          **MR. SCHACHTER:**  This is the document that Mr. Levy

3  forwards to --

4          **THE COURT:**  I understand that, but is this the

5  document that was referred to in the Wall Street Journal piece?

6          **MR. FOSTER:**  Yes, Your Honor.

7          **MR. SCHACHTER:**  We're going to --

8          **THE COURT:**  Well, it was or wasn't.  It was or wasn't.

9          **MR. SCHACHTER:**  I guess, Your Honor, we don't -- I

10  don't know.

11          **THE COURT:**  You don't know?

12          **MR. SCHACHTER:**  I don't know what the Wall Street

13  Journal was referring to.  This is what -- in responding to the

14  Wall Street Journal, this is what Mr. Levy forwards to the PR

15  firm.  Okay?

16  **BY MR. SCHACHTER:**

17  **Q.**   All right.  And then you were raising your communication

18  with Ms. He back and forth, and I want to show that to you,

19  what's in evidence as Exhibit 551.

20          This is what you were referring to a moment ago; is that

21  correct, Mr. Levy?

22  **A.**   Yes, it is.

23  **Q.**   Right.  You said (as read):

24          "I see one thing that I want to change.  Our

25          handbook does not state that providers should

1    consider" --

2    Well, you say (as read):

3        "I think we need to change this.  Our handbook

4    does not state that providers should consider placing

5    patients who don't meet the criteria for ADHD to be

6    placed on medication trials because," you say, "our

7    handbook from 2020/2021 does say this, actually, and

8    I believe I found the one they got.  I don't know

9    from who yet."

10   You say (as read):

11       "I'll figure that out after.  And it does state

12   that if clinically indicated and safe, providers

13   should consider a stimulant medication even if the

14   patient doesn't meet the DSM-5 criteria explicitly."

15   Okay?

16   And then I just want to look at your back-and-forth with

17   Ms. He.  Ms. He responds and she says (as read):

18       "But it doesn't say we should do it."

19   Do you see that?

20   **A.**   Yes.

21   **Q.**   And that is correct.  It doesn't say you should do it;

22   correct?

23       **MR. FOSTER:**  Objection, Your Honor.  The document says

24   what it says.

25       **MR. SCHACHTER:**  The document speaks for itself.

1   That's fine, Your Honor.

2   **BY MR. SCHACHTER:**

3   **Q.**   And then Ms. He says (as read):

4           "Do you want me to disable this public link?"

5       Right?

6   **A.**   She does.

7   **Q.**   Okay.  And you respond, I think -- yes, can we just -- you

8   say at the bottom (as read):

9           "Let's go ahead and disable it."

10      Do you see that?

11  **A.**   Yes.

12  **Q.**   Okay.  And that's because -- you are saying that it should

13  be disabled because now this is a document that the Wall Street

14  Journal has focused on and is being scrutinized and so you

15  think it's a good idea that it shouldn't be publicly available;

16  is that correct?  As a policy of Done?

17  **A.**   I also felt that that policy was actually pretty bad.  And

18  that it shouldn't be available to providers or something that

19  the company endorses at all.  And so as I was moving towards

20  trying to get us to be compliant with a lot of things.

21  **Q.**   Right.  And so Ms. He asked you, okay, should we disable

22  the document?  You say yes?

23  **A.**   I agree with her, yes.

24  **Q.**   Okay.  Great.

25          All right.  Now --

1              MR. SCHACHTER:  You can take that down.

2    BY MR. SCHACHTER:

3    Q.   I'm just going to show you briefly what's in evidence as

4    Exhibit 544.

5         You wrote to Forbes Tate.  You forwarded them to a link to

6    a Google document; is that right?

7    A.   Yes.

8    Q.   You created a Google document, as we talked about, to

9    review the response -- to work on the response to the Wall

10   Street Journal?

11   A.   Yeah, a collaborative -- yeah, a collaborative tool, yes.

12   Q.   All right.  And I want to show you a document that was --

13   do you recall a document that you shared with Dr. Brody and

14   Ruthia called "Wall Street Journal Inquiry Responses"?

15   A.   I don't recall that specific document, but --

16   Q.   Okay.  I'm going to show you -- let's try to do this more

17   briefly.

18        I'm going to show you what we've marked as --

19             MR. SCHACHTER:  Your Honor, we move to admit 7527B,

20   which is a document Mr. Levy shared with Ruthia and Dr. Brody.

21             THE COURT:  7527?

22             MR. SCHACHTER:  B.

23             THE COURT:  B?

24             MR. FOSTER:  I'm going to object to this, Your Honor.

25   It gets back to the subpoena issue and productions.  Doesn't

1    seem to have a Done Health Bates stamp on it.  I don't know

2    where it came from.

3            MR. SCHACHTER:  Your Honor, this is a document created

4    by the witness.  He can authenticate it.

5            THE COURT:  Well, he said it wasn't produced.

6            MR. SCHACHTER:  Well, I don't -- I can't control that.

7    I don't know what was produced.  I don't know what was asked

8    for and I was not involved.  But this is a witness who can

9    authenticate a document that is relevant.

10           THE COURT:  Okay.  Well, go ahead and it'll come in

11   subject to a motion to strike.  Thank you.

12           MR. SCHACHTER:  Thank you.

13           THE COURTROOM DEPUTY:  Admitted?

14           THE COURT:  Yes, admitted subject to a motion to

15   strike.

16           THE COURTROOM DEPUTY:  Thank you.

17      (Trial Exhibit 7527B received in evidence.)

18   BY MR. SCHACHTER:

19   Q.   Okay.  You created this Wall Street Journal inquiry

20   responses doc and shared that with Dr. Brody and with Ruthia;

21   is that correct?

22   A.   I actually did not.  Ruthia is the owner and the owner of

23   the document is the creator.  And they are the only ones with

24   the ability to share the document.

25   Q.   I see.  Okay.  That's helpful.

1      You had access to the document and you commented on it?

2  **A.**   I'm -- I had access to it and I'm sure I added comments.

3  **Q.**   Okay.  And you were able to see the comments that were

4  added by others?

5  **A.**   Yes, as a commenter, you can.

6  **Q.**   Okay.  And I'm going to show you --

7          **MR. SCHACHTER:**  Your Honor, we move to admit 7527C,

8  language written by Dr. Brody on this document that Mr. Levy

9  had access to.

10         **MR. FOSTER:**  Same objection, Your Honor.

11         **THE COURT:**  Admitted subject to a motion to strike.

12     (Trial Exhibit 7527C received in evidence.)

13             (Pause in proceedings.)

14 **BY MR. SCHACHTER:**

15 **Q.**   Okay.  What Dr. Brody wrote is (as read):

16         "The question demonstrates an assumption that

17     Done's motivation is to, open quote, get ADHD

18     patients only and run them through a quick and easy

19     assessment and treatment system to maximize revenue.

20     And that patients who somehow slip in are an

21     impediment, an inconvenience to our system.  Such a

22     system obviously would be unethical, and it is also

23     obvious that the reporter is probing to find some

24     evidence of unethical practice.  However, Done will

25     disappoint this reporter by providing evidence that

1          we actually care about the patient whether they have

2          ADHD or not."

3          See that?

4     A.    I do.

5     Q.    Okay.

6          **MR. SCHACHTER:**  You can take that down, Mr. Cepregi.

7     **BY MR. SCHACHTER:**

8     Q.    I am correct that you thought that this -- that the Wall

9     Street Journal's reporting on Done was unfair?

10    A.    For the first article -- or first set of questions and

11    inquiry, I certainly did, up until I had a chance to meet with

12    him.

13    Q.    You told Ruthia that, in your view, Done was in compliance

14    and did nothing to encourage clinicians to overprescribe

15    medication; correct?

16    A.    I did.  And I was, again, parroting back everything that

17    we had already discussed previously and that we were working

18    towards all those compliance goals and -- at the time, and so I

19    was bought all in on Done and discrediting anything that said

20    something to the alternative.

21    Q.    Okay.  All those other words you did not say to Ruthia?

22         **MR. FOSTER:**  Objection.  Argumentative.

23         **MR. SCHACHTER:**  Withdrawn.

24         Your Honor, we move to admit 7475, communication between

25    Mr. Levy and Ms. He.

 1          THE COURT:  Admitted.

 2      (Trial Exhibit 7475 received in evidence.)

 3          MR. SCHACHTER:  Why don't we just move to the last

 4   portion.  The part between Mr. -- Ms. He and Mr. Levy at the

 5   end.  Okay.  There we are.

 6      You can just blow up the bottom half of the page.  Thank

 7   you.

 8   BY MR. SCHACHTER:

 9   Q.  Ms. He says (as read):

10              Responding to something (as read):

11              "Yes, if they didn't write things like 'we're

12      not in compliance.  We encourage clinician to

13      overprescribe meds for profit, et cetera.'"

14      And your response is (as read):

15              "But we are, and we don't."

16      Do you see that?

17   A.  I do.

18          MR. SCHACHTER:  You can take that down.

19   BY MR. SCHACHTER:

20   Q.  You had told -- and by the way, without getting into the

21   documents, let's see if we can do it this way.

22      You actually had Sarah Barker write a set of answers to go

23   to the Wall Street Journal as well; is that correct?

24   A.  I think possibly that occurred.  I don't recall the

25   document specifically.  I know that there was one article that

1  I couldn't get in touch with Dr. Brody, and so I sent it to

2  Sarah and -- but I don't know -- I don't recall if it was this

3  one or an alternative one.

4  **Q.**  Okay.  Do you have a recollection of sending to Forbes

5  Tate answers that were drafted by Sarah Barker?

6  **A.**  I don't.  If I did, it was an alternative perspective --

7  **Q.**  Okay.

8  **A.**  -- for them to review.

9  **Q.**  Okay.  That's fine.  All right.

10  Let me ask you a different portion of this question about

11  this -- this -- a different subject.

12  So I'm going to show you --

13  **MR. SCHACHTER:**  May I just have a moment, Your Honor?

14  (Pause in proceedings.)

15  **BY MR. SCHACHTER:**

16  **Q.**  Okay.  The Government showed you as what's in evidence as

17  554 and directed your attention to a question on the risk

18  mitigation report.

19  Do you remember that?

20  **A.**  I see that, yes.

21  **Q.**  Okay.  Just the bottom of the page, there's a question

22  that came in that Mr. Foster asked you about, I think, what was

23  the purpose of the risk mitigation report.

24  Do you see that?

25  **A.**  I do.

1  **Q.**  Okay.  I am correct that you wrote that language, did you

2  not?

3  **A.**  I did not.

4  **Q.**  All right.  I'm going to show you --

5       **MR. SCHACHTER:**  We'll move to admit 7482.

6  You can take that down.

7  No, actually, we don't need that one.  Let's more -- sort

8  of get right to -- I'm going to show you a series of documents.

9       Your Honor, we move to admit 7- -- well, let's see if we

10  can do this without it.

11  **BY MR. SCHACHTER:**

12  **Q.**  Do you recall that you -- that on Google Docs, you wrote

13  things called compliance -- that was compliance team and you

14  were the author of that?

15  **A.**  I don't recall -- I mean, we didn't have a compliance

16  team.

17  **Q.**  All right.

18       **MR. SCHACHTER:**  Your Honor, we move to admit 7249.

19       **MR. FOSTER:**  Same objection, Your Honor, as before the

20  documents.

21       **MR. SCHACHTER:**  Subject to the motion to strike, Your

22  Honor.

23       **THE COURT:**  Admitted subject to a motion to strike.

24  (Trial Exhibit 7249 received in evidence.)

25  \\\

1  BY MR. SCHACHTER:

2  Q.   Okay.  Do you see this thing, it says "Compliance team,"

3  and it's got the contact details as Riley@donefirst?

4  A.   Yes.  I think this e-mail address, the

5  compliance@donefirst, it got -- I must have inherited it when

6  Michelle left the company.

7  Q.   Okay.  And so do you recall then that -- that -- well,

8  we're going to look at a couple, but do you recall that when

9  you would edit something in a Google document that the edit

10  would show up as "compliance team"?

11 A.   I suppose it could have.  Because I -- if I had that

12 alias, I suppose.  But I don't recall that it did regularly.

13 Q.   Okay.

14      MR. SCHACHTER:  We will move to admit 7528C.

15      MR. FOSTER:  Objection.  Foundation.

16      MR. SCHACHTER:  Well, I'll -- I'll show it to the

17 witness then.

18      THE COURT:  All right.

19      MR. SCHACHTER:  Just for the witness, Court, and

20 counsel.

21      MR. FOSTER:  Same objection as before as well.

22      THE COURTROOM DEPUTY:  Microphone.

23      MR. FOSTER:  And same objection as before.

24      THE COURT:  Admitted subject to a motion to strike and

25 lay a foundation.

1      (Trial Exhibit 7528C received in evidence.)

2          **MR. SCHACHTER:**  Yes.

3  **BY MR. SCHACHTER:**

4  **Q.**   Okay.  Mr. Levy, you recognize -- well, I'm showing you a

5  document which is entitled "Questions received March 20, 2022.

6  Response due by end of day tomorrow."

7      Do you see that?

8  **A.**   I do.

9  **Q.**   And you see that on the right side of the document, there

10 are various authors -- it contains version history which shows

11 who wrote what at various points in time; is that correct?

12 **A.**   Yes.

13 **Q.**   And do you see that there is one that's listed as

14 March 21, 2022, and it lists as "compliance team" and Andres

15 Ramirez?

16 **A.**   Yes, I do see that.

17 **Q.**   Andres Ramirez is from Forbes Tate?

18 **A.**   Yes.

19 **Q.**   He's somebody who also had access to this document?

20 **A.**   He is, yes.

21 **Q.**   Okay.  And there's colors next to the names; is that

22 right?

23 **A.**   There are.

24 **Q.**   And that will show you who wrote in a Google doc various

25 portions of the document?

1    A.    Yes.  Or edited or whatever they did to the document.

2    Q.    Okay.  And so you recognize this as something that you,

3    although it showed up as compliance team, may have added to

4    this document?

5    A.    Yes.

6    Q.    Okay.

7             MR. SCHACHTER:  Your Honor, we move to admit 7528C.

8             MR. FOSTER:  Objection.  Foundation.

9             THE COURT:  Admitted subject to a motion to strike.

10   BY MR. SCHACHTER:

11   Q.    Okay.  If we can zoom out and look at the -- what you see

12   when you click on the version history, you're able to see what

13   change is made by a par- -- at a particular time by a

14   particular person; is that correct?

15   A.    Yes.

16   Q.    Okay.  All right.  Okay.  Good enough.  Let's move on.

17             Now, you actually, at the conclusion -- when the Wall

18   Street Journal reporter -- when the Wall Street Journal article

19   came out, it was your reaction that the article really was not

20   too bad?

21   A.    It was.  And I was surprised.  After my conversation with

22   him, I thought it would be a lot more scathing.

23   Q.    Okay.  But you thought it wasn't?

24   A.    It was certainly lesser than what I anticipated.

25   Q.    And you took credit for that?

1    A.    In a private conversation with someone, I did, yes.

2    Q.    Okay.  That someone is Sarah Barker -- well, withdrawn.

3          MR. SCHACHTER:  Your Honor, we move to admit --

4          THE COURT:  What -- this is -- he said, yes, he did.

5    Okay.  Yeah, he took credit for it.  So let's move on.

6    Otherwise we're going to be here for a very long time if you

7    simply show him documents which he already agreed to.

8          MR. SCHACHTER:  Okay.  Understood, Your Honor.

9    BY MR. SCHACHTER:

10   Q.    You felt that -- in addition to taking credit for it, you

11   thought that what the Wall Street Journal should have been

12   focused on was how insurance companies charge too much for ADHD

13   medication?

14   A.    That was one of the topics that we discussed, and there

15   was a lot of -- there was a lot of negativity around Adderall

16   specifically.  And the justification that we put ourselves

17   together on was that insurance companies covered Adderall

18   because it was cheaper than the other medications.

19   Q.    All right.  And you felt that any comparison between

20   Adderall and opioids was ridiculous?

21   A.    I don't know if it was any comparison, but I -- I would

22   agree -- I mean, based on my experience with opioids in the

23   field, they were much more deadly, and I felt that.

24   Q.    Okay.  And you felt that the Wall Street Journal was

25   acting as a catalyst of a crisis by falsely reporting data;

1  correct?

2  **A.**   I don't recall that statement.

3  **Q.**   Okay.  Well, whether you recall making the statement, you

4  will agree that your view at the time was the Wall Street

5  Journal had become the catalyst of a crisis by falsely

6  reporting data; correct?

7  **A.**   That may have been the view that I shared internally, yes.

8  **Q.**   Okay.  Very good.

9       Now, you testified that Ruthia was focused on silencing

10  whoever was leaking information to the media.

11       Do you remember you said that to Mr. Foster?

12  **A.**   I do.

13  **Q.**   However, you were the one who was focused on finding out

14  who leaked information, and you were the one who wanted to fire

15  providers who spoke to the press; correct?

16  **A.**   I was.  After a conversation with Ruthia on Zoom, her and

17  I had that same discussion of if providers are speaking to the

18  press, that we should let them go.  And I later repeated that

19  conversation and shared the same views with Sarah Barker.

20  **Q.**   Okay.  Well, isn't it a fact that what actually happened

21  is you told Ruthia that you thought providers should be fired,

22  and she responded that that seems unfair?

23       Isn't that true?

24  **A.**   It depends on -- on which provider and the context

25  surrounding that individual.

1      MR. SCHACHTER:  Your Honor, we move to admit 7222.

2      THE COURT:  Admitted.

3      (Trial Exhibit 7222 received in evidence.)

4  BY MR. SCHACHTER:

5  Q.   You wrote (as read):

6         "We will need to make a decision on what to do

7      with the providers that did speak to the press.  It's

8      clear in their contracts.  If we don't terminate the

9      contracts this time, we won't be able to exercise it

10     in the future for press matters because if we were

11     ever claimed of wrongful termination, the Courts

12     would ask us for records of other providers

13     terminated or not terminated for the same thing."

14     Ms. He says (as read):

15        "I can see the point.  I think after our e-mail

16     is out, we need to be very strict.  But before that,

17     some of them just may not know about it and if they

18     didn't know, we probably cannot blame too much."

19     Do you see that?

20  A.   I do.

21  Q.   She says (as read):

22        "We actually built in a feature to renew, update

23     the contract."

24     Do you see that?

25  A.   Yes.

1   Q.   And what she's saying is it's really not fair to hold the

2   providers accountable for the language in the contracts because

3   we just have them kind of click a button to renew their

4   contracts.

5        You understood that; correct?

6   A.   That's not how I understood the contracts to work.  It was

7   DocuSign, and they could review every page of it.  I don't -- I

8   don't recall the reference to a feature to renew or update --

9   Q.   Sure.

10  A.   -- the contract.

11  Q.   But you understood that what Ms. He is saying, "Look,

12  you're right, Mr. Levy, the contract may say that they're not

13  supposed to speak about these matters like they did to the

14  press, but it's not really fair to hold them accountable

15  because all they do in DocuSign the contract."

16       You understood that's what she's saying there?

17  A.   Yes.

18  Q.   Okay.  All right.

19       There was another press inquiry --

20       MR. SCHACHTER:  You can take that down, Mr. Cepregi.

21  BY MR. SCHACHTER:

22  Q.   -- which Mr. Foster asked you about, which has to do with

23  a three-strikes policy.

24       Do you remember Mr. Foster asking you about that?

25  A.   I do.

Q.   Okay.  And what happened in is April of 2022, Bloomberg

sent some additional questions to Done?

A.   Yes.

Q.   Okay.

A.   I believe that was the Bloomberg article.

Q.   All right.  And one of those was regarding the existence

of a three-strikes policy?

A.   Yes.

Q.   Okay.

        MR. SCHACHTER:  We move to admit what the Government

has marked as Exhibit 582.

        THE COURT:  Sorry.  What is it?

        MR. SCHACHTER:  582.

        THE COURT:  Admitted.

    (Trial Exhibit 582 received in evidence.)

BY MR. SCHACHTER:

Q.   Okay.  Now, first is Ms. He's response.  The first part is

the questions that have come in from the media; right?

A.   I believe so.

Q.   Ms. He says (as read):

        "We never had this policy in the past, a

        three-strikes policy."

    And then let's look at Dr. Brody's response.

    Oh, I'm sorry.  This is -- that's on reviews.

    If we can look at the first page.  Dr. Brody then layers

1    in after Ms. He says "we never had this policy in the past,"

2    Dr. Brody says (as read):

3         "To start with, I'm assuming this is all totally

4         confidential within the company."

5    And then he says (as read):

6         "In the same initial response, I gave my

7         thoughts why such a policy might actually be a good

8         thing.  If there were not good aspects to it, I don't

9         think we would have had it.

10        "The concept of making patient evaluations of a

11        clinician an integral part of that clinician's

12        evaluation is a radical one, which is one of the

13        minor reasons I like it.  The major reason I like it

14        is I think it is the right thing to do, as

15        clinician's only true purpose is to serve the

16        patient.  Of course, keeping the ultimate welfare of

17        the patient in mind (not just giving what they want

18        simply for them to feel good)."

19   Now, this -- these answers went to Forbes Tate; is that

20   correct?

21   A.   I didn't see the top of this page.

22        MR. SCHACHTER:  Can we zoom back out, Mr. Cepregi?

23        THE WITNESS:  Yes.

24   BY MR. SCHACHTER:

25   Q.   Okay.  And then you had a communication with Ruthia and

1    Dr. Brody in which you said that (as read):

2         "Forbes Tate's recommended approach is that we

3         should limit as little information to Bloomberg as

4         possible.  This was successful in the Wall Street

5         Journal article."

6    Do you recall that?

7    **A.**   I recall them wanting to pare down the answers.  I don't

8    remember that exact wording, but I recall them wanting to pare

9    the answers down.

10   **Q.**   Okay.  Well, do you recall that their recommendation was

11   the way to handle this is provide as little information as

12   possible?

13   **A.**   That would go hand in hand with paring the answers down,

14   yes.

15   **Q.**   Okay.  Now, I want to show you the documents which the

16   Government introduced, but I'm not sure showed you on this

17   supposed policy that's being discussed here.

18        First, I'm going to show you what is this evidence as

19   1334.  Okay.  This is --

20        **MR. SCHACHTER:**  By the way, if we can pull back out.

21   **BY MR. SCHACHTER:**

22   **Q.**   Do you see where it says at the bottom "Riley Levy search

23   warrant."

24        Is this one of the documents that you had obtained for the

25   Government?

1  **A.**   I guess "SW" does stand for search warrant; and, yes, this

2  was something that I obtained for the Government.

3  **Q.**   Okay.  So you went into Done's computer systems and you

4  found this, and you then shared that with the Government; is

5  that correct?

6  **A.**   Yes, the Government asked me to find specific things under

7  specific topics.

8  **Q.**   Okay.  I guess, were you asked to look in particular for

9  something which looks like a three-strikes policy?

10 **A.**   No.  I was not asked to look for -- it was just much more

11 generalized terms; right?  So it would be something bigger than

12 that.

13 **Q.**   Okay.  In any event, this is one of the documents you

14 shared with the Government?

15 **A.**   Yes.

16 **Q.**   Let's look at what that is.

17       **MR. SCHACHTER:**  Can we blow up the middle part?

18 **BY MR. SCHACHTER:**

19 **Q.**   So this document which you shared says these words (as

20 read):

21       "1st week - conversion, below 3 star -

22    terminate."

23       **MR. SCHACHTER:**  Actually, can you zoom back out.  I

24 just want to get the date.

25 \\\

1  BY MR. SCHACHTER:

2  Q.   So this -- this document --

3       MR. SCHACHTER:  No, no.  Further down.

4  BY MR. SCHACHTER:

5  Q.   This one that we're looking at, remember how this -- you

6  described how if you click on the portion of the version

7  history, it tells you what version you're looking at?

8  A.   Yes.

9  Q.   Okay.  So this version that we're looking at of these

10 words on this screen was written in -- on August 9 of 2020.

11      Do you see that?

12 A.   I do.

13 Q.   Okay.  That's long before this inquiry which came in in

14 April of 2022, which is a little bit less than two years after

15 the creation of this document; correct?

16 A.   Yes.

17 Q.   Okay.  So, to be clear, when Ms. He is saying we never had

18 such a policy, you then found a document from August 9 of 2020

19 which you shared with the Government?

20 A.   It -- yes.  I found this document and shared it with the

21 Government, yes.

22 Q.   Thank you.  And let's just look at what the document is

23 that was shared.  It says (as read):

24          "1st week - conversion, below 3 star -

25      terminate.  Afterwards - every 1 star review - talk

1      to them and find out why."

2      You would agree that this looks like a draft from August

3   of 2020; is that correct?

4   A.   Yes.

5   Q.   Okay.  The Government also introduced another document,

6   which is now in evidence as 1334.

7      Oh, that was 1334.  I'm sorry.  I apologize.  I'm sorry.

8   What's in evidence as 1335.

9      This is another document.  You can see --

10        **MR. SCHACHTER:**  Don't blow it up, please.

11  **BY MR. SCHACHTER:**

12  Q.   It's also from August 10 of 2020?

13  A.   Yes.

14  Q.   Okay.  And now, this says "Platform Provider Guidance."

15  [sic]

16        **MR. SCHACHTER:**  If we can blow that up.

17  **BY MR. SCHACHTER:**

18  Q.   And this version says (as read):

19        "New provider probation period.  1st week -

20        conversion, first below 3 star - terminate if it's a

21        solid feedback."

22      Do you see that?

23  A.   I do.

24  Q.   All right.  And to be clear, these were not policies as of

25  October of 2021, when you started; correct?

1  **A.**  To my knowledge, I don't believe these were in the

2  provider handbook in the CODA document, but I can't say with a

3  hundred percent certainty.

4  **Q.**  Okay.  Now, this -- whatever you call this, this policy,

5  it doesn't say "Terminate if the provider doesn't give

6  stimulants," does it?

7       **MR. FOSTER:**  Objection.  Argumentative.

8       **THE COURT:**  Sustained.

9       **MR. SCHACHTER:**  Okay.

10  **BY MR. SCHACHTER:**

11  **Q.**  All right.  In your role at Done, did you have the

12  opportunity to see reviews that came in from patients?

13  **A.**  I did.

14  **Q.**  There were reviews that were one-star reviews because the

15  provider hadn't shown up for the appointment?

16  **A.**  There were.

17  **Q.**  There were reviews that were one-stars because the

18  provider had shown up very late to the appointment?

19  **A.**  Yes.

20  **Q.**  There were reviews where they were negative because the

21  patient -- because the provider had ended the appointment

22  early?

23  **A.**  Yes.

24  **Q.**  There were reviews about providers who the patient felt

25  had made inappropriate comments about them?

1    **A.**    Possibly.  I don't recall a specific situation.  I know

2    that if a patient had a disagreement with their provider, it

3    often resulted in a negative review, and sometimes that meant

4    because they weren't getting their medication prescribed.

5    **Q.**    Okay.  There were reviews about -- well, withdrawn.  Okay.

6          Now, I'd like to show you what I think is in evidence.

7    And if not, we move to admit what the Government marked as

8    Exhibit 585.

9              **MR. SCHACHTER:**  Your Honor, is that admitted?

10             **THE COURT:**  585 admitted.

11         (Trial Exhibit 585 received in evidence.)

12   **BY MR. SCHACHTER:**

13   **Q.**    And in this response, it contains responses from both

14   Ruthia and Dr. Brody.

15         Do you see that?

16   **A.**    I do.

17   **Q.**    And this is what gets forwarded to Forbes Tate?

18   **A.**    I believe it was sent by Dr. Brody to them, yes.

19   **Q.**    Ruthia writes (as read):

20          "Also I did a search on the policy and this is

21         closest to the policy on reporter's e-mail:  Pause

22         taking new patient for a week if got three solid

23         one-star reviews (solid meaning after the

24         investigation if the fault is on the clinicians)."

25         Do you see that?

1    **A.**    I do.

2    **Q.**    Okay.  And then Dr. Brody writes (as read):

3          "Yes, that is what I remember.  I never meant

4          that we had a rigid policy or that it was anything

5          like three strikes and you're out.  Anyone who

6          thought a healthcare platform would have rigid

7          policies like that without trying to investigate why

8          the clinicians were getting bad reviews in the first

9          place is simply trying to make us look bad."

10         **MR. SCHACHTER:**  Okay.  You can take that down.

11   **BY MR. SCHACHTER:**

12   **Q.**    One of the things that Mr. Foster asked you about was an

13   inquiry that came in about a patient named Harlan Band.

14         Do you remember that?

15   **A.**    I do.

16   **Q.**    Okay.  Harlan Band was a patient who had passed away; is

17   that right?

18   **A.**    That's my understanding, yes.

19   **Q.**    He had been a patient before you joined Done; is that

20   correct?

21   **A.**    Yes.

22   **Q.**    And you didn't know anything about Harlan Band before this

23   inquiry had come in from the reporter?

24   **A.**    Correct.

25   **Q.**    You noted in your responses to Mr. Foster that one of the

1  things that you saw when you looked at the medical records was

2  that it showed that the patient was a practitioner named

3  Shannon Wozniak, but other records showed that he had been

4  treated by Shabnam Rahimi; is that correct?

5  **A.**  That is correct.

6  **Q.**  You were not at Done at the time of a migration of data

7  from what was called the Version 1 to Version 2; correct?

8  **A.**  I was not.

9  **Q.**  And you were not aware of issues that occurred that caused

10  the misidentification of providers during that migration?  You

11  were not aware of that?

12  **A.**  I was not, but when I -- also I inquired and I was not

13  made aware of that.

14  **Q.**  Nobody told you that?

15  **A.**  Correct.

16  **Q.**  Okay.  Well, isn't it true that Ms. He told you that?

17  **A.**  She told me that there was version issues and that it got

18  imported, but that was the only information I had.  I was not

19  provided information on errors or anything technical.

20  **Q.**  Okay.  Very good.

21      All right.  And by the way, you reviewed Harlan Band's

22  records with Sarah Barker; correct?

23  **A.**  Yes.

24  **Q.**  And you recall that you and Sarah Barker were not

25  concerned about the Wall Street Journal writing a story about

1  Harlan Band; is that correct?

2  **A.**   We were concerned about the story, but I believe we

3  weren't concerned that the cause of death was specifically the

4  prescription written by Shabnam Rahimi.

5        **MR. SCHACHTER:**  Your Honor, we move to admit 7122.

6     I'm sorry.  Can we go to next page.

7        **THE COURT:**  I'm sorry.  Why is this -- the witness

8  said:  We weren't concerned that the cause of death was

9  specifically the prescription written by Shabnam Rahimi.

10  That's what the witness said.

11        **MR. SCHACHTER:**  Okay.  That's fine.

12        **THE COURT:**  Now, is this -- this doesn't say anything

13  about that.

14        **MR. SCHACHTER:**  You're right, Your Honor.  I'll move

15  on.

16        **THE COURT:**  Okay.  Let's -- it's now noon.  I want to

17  conclude before the recess.   Okay?

18        **MR. SCHACHTER:**  Yes, Your Honor.

19     Before the lunch recess?

20        **THE COURT:**  Well, you indicated that you would --

21  conclude --

22        **MR. SCHACHTER:**  I am --

23        **THE COURT:**  -- this morning.

24        **MR. SCHACHTER:**  I am close, but I think it will take a

25  little bit after the lunch recess, but not much.

1      THE COURT:  Well, all right.  So let's take our noon

2  recess.

3      Ladies and gentlemen, we will be in recess until 12:45.

4      Remember the admonition given to you:  Don't discuss the

5  case, allow anyone to discuss it with you, form, or express any

6  opinion.

7                (The jury leaves the courtroom.)

8                (Recess taken at 12:01 p.m.)

9                (Proceedings resumed at 12:51 p.m.)

10     (Proceedings were heard out of the presence of the jury.)

11     THE COURTROOM DEPUTY:  Come to order.  Court is now in

12  session.

13     THE COURT:  Bring in the jury.

14                (The jury enters the courtroom.)

15     (Proceedings were heard in the presence of the jury.)

16     THE COURT:  Okay.  Please be seated.

17     Let the record reflect all jurors are present.  Parties

18  are present.

19     You may proceed.

20     MR. SCHACHTER:  Thank you, Your Honor.

21  BY MR. SCHACHTER:

22  Q.   Good afternoon, Mr. Levy.  There was another set of media

23  inquiries that came in in May of 2022; is that correct?

24  A.   I don't remember the exact timelines.  I do know there was

25  some later, yes.

1    **Q.**   Okay. Do you recall that when press inquiries came in,

2    you communicated to Ms. He that you're all over the press

3    inquiries, you're working with Forbes Tate on it, and you have

4    a statement almost ready to go before -- before you had any

5    discussions with her?

6    **A.**   At times, yes, depending on if it was one question or

7    several. I did reach out to Forbes Tate and start preparing a

8    statement, as that's what we hired them for.

9    **Q.**   And you tried to communicate with Ms. He that you were all

10    over it?

11    **A.**   I was -- yes. I established that there was a sense of

12    urgency in the response. Usually the reporters would say, you

13    know, we need it back by -- in 8 minutes or -- you know, that's

14    an exaggeration, but very quickly.

15    **Q.**   Okay. And you drafted a statement to give to the Wall

16    Street Journal in May; is that correct?

17    **A.**   I don't recall.

18        **MR. SCHACHTER:** Your Honor, we move to admit 7168.

19        **THE COURT:** Admitted.

20    **BY MR. SCHACHTER:**

21    **Q.**   Okay. And here you're forwarding to Ms. He a draft of the

22    statement that you have prepared?

23    **A.**   I don't know if I prepared this or if this was something

24    that was prepared by Forbes Tate or with Forbes Tate on -- on a

25    Zoom call.

1    There were many -- most of the responses were prepared in

2    live calls with the Forbes Tate team.

3    **Q.**   And one of things that you were communicating to the Wall

4    Street Journal was about how PDMPs are searched and screened

5    amongst 20 different items before being passed to a provider

6    for review; is that correct?

7    **A.**   I did -- or my response here, the draft does include that,

8    yes.

9    **Q.**   And I'm just going to show you your discussion with Ms. He

10   about that.

11        **MR. SCHACHTER:**   If we can look at the bottom of page 9

12   through -- page 9 through the bottom of page 10.  Starting at

13   501.  I'm sorry.  A little bit further up.  If we look at 501.

14   Yeah.  Okay.  Yeah.  And go back to where you were.  That would

15   be great, Mr. Cepregi.  That's right.

16   **BY MR. SCHACHTER:**

17   **Q.**   You see how you wrote there's 20 different screening

18   points?

19   **A.**   Yes.

20   **Q.**   Okay.  And what you're telling Ms. He is there were 20

21   different things that you had instructed the care team -- well,

22   withdrawn.

23        You had given direction to the care team for 20 different

24   things they should look at when reviewing a prescription drug

25   monitoring program document; correct?

1  **A.**  It was a document, actually, that was provided to the care

2  team.

3      And as I mentioned earlier, it -- I exaggerated that they

4  were trained on using that document, they had not been trained

5  on using that document.  And -- but the document existed.  It

6  had 20 categories, and then the subitems would have made it --

7  made it 29.

8  **Q.**  Okay.  You prepared this document to give to the care team

9  to instruct them how to look at a PDMP?

10 **A.**  Yes.  Based off of actually an old document that I had

11 from Target.

12 **Q.**  Okay.  And you were telling that to the Wall Street

13 Journal?

14 **A.**  That was ultimately what the response from the company

15 was, yes.

16 **Q.**  Okay.  And you wrote (as read):

17      "There's 20 different screening points."

18      And Ms. He says (as read):

19      "Got it.  Just think about it as I was reading

20      it as 20 different times.  I trust you have better

21      understanding on PDMP than me."

22      And what you told her is (as read):

23      "It's our own internal screening tool, and it

24      has 20 checkboxes.  There're actually 29 checkboxes,

25      but let's stick to 20."

1      And Ms. He says, (as read):

2          "That's amazing.  Let's send it out."

3  A.   Yes.

4  Q.   Okay.  Right.  And then after this, you actually -- you

5  then reminded the providers that it was their responsibility to

6  check the PDMP?

7  A.   I'm -- at some point after this, I likely did, yes.

8          MR. SCHACHTER:  Okay.  You can take that down,

9  Mr.~Cepregi.

10 BY MR. SCHACHTER:

11 Q.   But do you remember that in May of 2022, you sent out a

12 reminder to the providers that just because the care team

13 reviews the PDMP is insufficient.  You also have an obligation

14 to review the PDMP.

15     Do you remember that?

16 A.   I don't recall if I personally sent that out or if another

17 team member did.  I do recall there being discussions of

18 something being sent out to the providers to remind them to do

19 so.

20 Q.   Okay.

21         MR. SCHACHTER:  Your Honor, I move to admit 7169.

22         THE COURT:  Admitted.

23     (Trial Exhibit 7169 received in evidence.)

24 BY MR. SCHACHTER:

25 Q.   Do you see this communication which says (as read):

1    "As a reminder, PDMP screening is done as a

2    courtesy to identify potential areas of concerns for

3    patients, and you as the provider are required to

4    screen the PDMP as well, which is why it's uploaded

5    to the patient chart."

6    You see that?

7    **A.**   Yes, I see that provider support and success sent this

8    e-mail out to select providers.

9    **Q.**   Okay.

10    **MR. SCHACHTER:**  You can take that down.  Let's change

11    topics.

12    **BY MR. SCHACHTER:**

13    **Q.**   All right.  Mr. Foster asked you about communications that

14    you had with various pharmacies.  Do you recall those

15    questions?

16    **A.**   I do.

17    **Q.**   All right.  Walmart reached out to you in March of 2022;

18    is that correct?

19    **A.**   That is correct.

20    **Q.**   Now, Done, at that point in time, had been operating for

21    about two years; is that correct?

22    **A.**   I believe so.

23    **Q.**   And it was not until after there had been press reports

24    that Walmart reached out?

25    **A.**   I think Walmart actually reached out prior to press for

1    the first inquiry from them.  From my recollection, it was like

2    the first or second week of March and we didn't start getting

3    press until the end of March.

4    Q.    Okay.  You recall that it's within like a day or two of

5    the Wall Street Journal making an inquiry to you is when

6    Walmart reached out to you?

7    A.    I thought it was different timeline.

8    Q.    Okay.  And there had already been some articles in January

9    that we looked at about advertising?

10   A.    There had been, yes.

11   Q.    Okay.  And you prepared a response to Walmart with Sarah

12   Barker's assistance; is that correct?

13   A.    With Sarah Barker's assistance, with Ruthia's assistance,

14   and pulling information that was available on the internal CODA

15   document that the providers had access to.

16   Q.    Okay.  Well, I'm going to show you what is in evidence as

17   Exhibit 540.  This is a communication between you and Sarah

18   Barker.

19        Do you see that?

20   A.    I do.

21   Q.    And Ms. He is not on this communication; is that correct?

22   A.    No.  This was a personal channel of communication with

23   Sarah Barker.

24   Q.    Okay.  And in this communication, you spoke to Ms. Barker

25   about how to respond to Walmart; correct?

1      Let me point you to a specific portion.

2          MR. SCHACHTER:  Can we go to the page -- from page 5

3  to the middle of page 6 where Ms. Barker says "one thing."

4      Okay.  We looked at this part.  Okay.

5      Let's go to the next part where Mr. Levy says "Walmart

6  specifically asked."  There we go.

7  BY MR. SCHACHTER:

8  Q.   You said (as read):

9          "Walmart specifically asked just now how

10         prescribers avoid prescribing to patients with

11         cardiac disease."

12     Do you see that?

13 A.   I do.

14 Q.   And this is you asking Ms. Barker about a question that

15 has been posed by Walmart and you're trying to craft a

16 response?

17 A.   Yes.

18 Q.   Right.  And Ms. Barker says (as read):

19         "So we screen for any previous cardiac

20         conditions in the pre-appointment questionnaire, then

21         take a full medical history in session.  If a patient

22         has a history of hypertension, we ask for clearance

23         from a medical doctor and most recent blood pressure

24         and recommend they have capabilities for home

25         monitoring.  And then for every refill request, the

1          patient has to attest to not having any side

2          effects."

3          Do you see that?

4     A.    I do.

5     Q.    Okay.  And that is in information that you then passed on

6     to Walmart in your -- the document that you prepared; is that

7     right?

8     A.    Yes.  I don't recall if it was specifically that

9     information.  There was something related to the screening of

10    cardiac information in the questionnaire.

11    Q.    Okay.  And so here we're looking at a communication with

12    Ms. Barker about how to respond to Walmart, but am I correct

13    that Mr. Foster did not show you any documents where you're

14    communicating with Ms. He about how to respond to Walmart?

15    A.    That's correct.  I did communicate with her about it, but

16    I did not see a document from anybody on that.

17    Q.    I understand.

18          You say you communicated with her, but it, I guess, must

19    not have been a writing?

20    A.    It might have been, but I specifically didn't actually

21    fully understand the intake at the time, so I needed Ruthia's

22    help to craft that section specifically.

23    Q.    Okay.  But there are -- you're unaware of any documents

24    which show Ms. He having any input whatsoever on the

25    information that was shared with Walmart; correct?

1  A.   I haven't been shown any.  I'm not -- I'm not -- I can't

2  speak with certainty that there aren't any.

3  Q.   Okay.  Now, that's Walmart.  You also -- well, you took

4  the lead on communications with CVS as well; correct?

5  A.   I did.  That was the instruction I received.  It was the

6  directive I received to communicate with pharmacies by Ruthia.

7  Q.   Okay.  You, with CVS, had a call with them; is that right?

8  A.   Yes.

9  Q.   And also attending that call with CVS was Sara Faber?

10 A.   I -- I -- the only person that I remember off the top of

11 my head is Sarah Barker was there and Sarina Pattar.  Outside

12 of that, I do not recall anyone else from Done off the top of

13 my head.

14 Q.   Okay.  Ms. He was not on that call?

15 A.   Correct, she was not.

16 Q.   And you also -- in addition to that group call, you also

17 coordinated calls between CVS and various Done prescribers; is

18 that right?

19 A.   At their request, yes.  At CVS's request, I did.

20 Q.   You made available to them -- do you recall five different

21 providers?

22 A.   I honestly would not, no.

23 Q.   Good enough.

24      One of the providers that CVS spoke to and that you had

25 assisted in facilitating that was Erin Kim; is that right?

1   A.   She was one of the providers, yes.

2   Q.   You participated in CVS's interview of Erin Kim?

3   A.   I was present, yes.

4   Q.   And in that interview, do you recall that you told CVS

5   that Erin Kim had 2,700 patients in her panel?

6   A.   I recall -- I don't recall the exact number.  I do recall

7   correcting Erin in her statement to them which was a

8   significantly lower number than that, and I ensured that the

9   truth was provided to them.

10  Q.   Exactly.  Your goal in going into these communications was

11  to tell the truth?

12  A.   It was to correct Erin Kim in that, yes.

13  Q.   Okay.  You thought she was inaccurate in the size of the

14  panel that she described.  You told CVS that she had 2,700

15  patients?

16  A.   Yes.

17  Q.   Okay.

18  A.   Or a number greater than the one she provided.  I do not

19  recall the exact number I told them.

20  Q.   You didn't try to hide it?

21  A.   Correct.

22  Q.   You recall Erin Kim told CVS that she did not do urine

23  drug screens?

24  A.   I honestly do not recall.  I know that she said:  I'm an

25  experienced provider and I've been doing this a long time.  And

1    that was in -- a common response of hers.

2    Q.   Right.  They had asked her how she identifies drug-seeking

3    behavior and she explained?

4    A.   I don't recall.

5    Q.   Okay.  She told CVS that she communicated with patients by

6    messaging over the platform.

7        Do you recall that?

8    A.   The only thing I do recall from that call was correcting

9    the patient numbers.  Otherwise, I don't recall the majority of

10   the substance of that call.

11   Q.   Okay.  All right.

12       After these discussions, both CVS and Walmart blocked

13   Done; is that correct?

14   A.   I believe that's correct, yes.

15   Q.   And you felt that those blocks had been unfair?

16   A.   I had felt that any critics of Done were unfair and I was

17   particularly harsh on the pharmacies because I probably wasn't

18   ready to -- well, I wasn't ready to give up the fight on making

19   Done better and being a great place, so I defended Done

20   furiously.

21   Q.   Okay.  Okay.

22       Mr. Foster asked you a number of questions about what

23   providers had told you about Done's practices.

24       Do you remember those questions?

25   A.   I don't -- I remember the topic.  I don't remember the

1    specific questions I was asked.

2    Q.   All right.  Providers also told you -- providers that

3    worked on the platform told you that they thought there was no

4    basis for pharmacies to have blocked Done's providers?

5    A.   I recall some select providers that had large patient

6    panels that shared that with me, yes.

7    Q.   One of those providers was Elizabeth Shapard?

8    A.   Yes, I recall that.

9         MR. SCHACHTER:  Your Honor, we move to admit 6861,

10   discussion between Mr. Levy and Elizabeth Shapard.

11        MR. FOSTER:  Not impeaching.  Consumption of time.

12        THE COURT:  Sustained.  He said that.

13        MR. SCHACHTER:  Well, Your Honor, to be clear --

14        THE COURT:  What's clear.  Okay.  To be clear, yes --

15        MR. SCHACHTER:  Impeaches the hearsay declarant --

16        THE COURT:  Pardon?

17        MR. SCHACHTER:  It impeaches the hearsay declarant,

18   Ms. Shapard.

19        THE COURT:  Fine.  Objection sustained.

20        MR. SCHACHTER:  Okay.

21   BY MR. SCHACHTER:

22   Q.   All right.  The Government showed you an exhibit,

23   Exhibit 546, which is in evidence, which we'll display.

24        MR. SCHACHTER:  If we can turn to the second page of

25   this.

1  BY MR. SCHACHTER:

2  Q.  Do you remember the -- do you remember this document?

3  A.  I do.

4  Q.  All right.  And Sara Faber had communicated that one thing

5  that made her nervous -- she's talking about a different

6  provider, and that provider had told her that one thing that

7  made her nervous was that Dr. Brody had said she should be

8  prescribing medication to patients no matter what and not worry

9  about going to jail.

10  Do you recall that?

11  A.  Yes.  A point of clarification.  Sara Faber was not a

12  provider.  She was relaying this concern.  You said that she

13  was another provider.  She was not.

14  Q.  I was trying to say she was relaying the concerns of

15  another provider?

16  A.  Yes.

17  Q.  Of a provider?

18  A.  Of a provider, yes.

19  Q.  Thank you.

20  Now, this is -- this is something you had heard from

21  Dr. Brody more than once; is that correct?

22  A.  I heard variations of this.  This was the first time that

23  I heard the specific line, "not worry about going to jail."

24  Q.  Okay.  And you understood that what Dr. Brody meant when

25  he communicated that was that medical providers, when

1  evaluating and treating patients, should think about only that,

2  evaluating and treating patients; correct?

3      **MR. FOSTER:**  Objection.

4      **THE COURT:**  Well, is that what you thought?

5  Do you mean "should not be concerned about going to jail,"

6  all they should care about is their medical purpose?

7      **MR. SCHACHTER:**  Correct.  That's my question.

8      **THE COURT:**  So if -- if there was a totally illegal

9  drug, they shouldn't be concerned about that; they should

10  prescribe it?  Is that the type of question you're asking him?

11      **MR. SCHACHTER:**  I'm trying to explore the witness's

12  understanding.

13      **THE COURT:**  Well, wait a minute -- yeah.  But you

14  can't -- you can ask him whether Dr. Brody communicated that to

15  him.

16      **MR. SCHACHTER:**  Fair enough.  I'll ask it just that

17  way.

18      **THE COURT:**  All right.  Yeah.

19  BY MR. SCHACHTER:

20  **Q.**  Did Dr. Brody communicate his view that providers should

21  be treating patients, not worried about their -- the

22  consequences to them, but only about what is in the best

23  interest of the patient?

24      **THE COURT:**  I'm sorry.  "The consequences to them," I

25  don't understand what that means.

1      MR. SCHACHTER:  I'll rephrase.

2   BY MR. SCHACHTER:

3   Q.   Did Dr. Brody communicate to you that he believed that

4   medical providers should treat patients solely based on what is

5   in the best interest of the patient without also thinking about

6   an impact of what could happen to them individually?

7      Did he communicate to that to you?

8      THE COURT:  What would happen to them individually as

9   a matter of law?  Is that -- when you say "what happened to

10   them individually," I don't know what you mean by that.

11      MR. SCHACHTER:  Sure.

12   BY MR. SCHACHTER:

13   Q.   Did Dr. Brody communicate to you that when treating

14   patients, the sole concern that a medical provider should have

15   is what is in the best interest of the patient?  Did he

16   communicate that to you?

17   A.   Yes, with several qualifying criteria for that, yes.

18   Q.   Did Dr. -- sorry.

19      Did Dr. Brody also communicate to you that he did not

20   believe it was appropriate for medical providers, when acting

21   in the best interest of the patients, should refrain from doing

22   so because they're worried about what the DEA thinks?

23   A.   I'm sorry.  I do not understand the question.

24   Q.   All right.  I'll move on.

25      MR. SCHACHTER:  If we can go to the first page of this

1  document.  Page 1, please, Mr. Cepregi.  If we can just look at

2  Mr. Levy's --

3  **BY MR. SCHACHTER:**

4  Q.  You forward a communication from Dr. Martinez.  Do you see

5  that?

6  A.  I do.

7  Q.  And you also wrote --

8      **MR. SCHACHTER:**  If you can lift that a little bit

9  further.

10  **BY MR. SCHACHTER:**

11  Q.  Then your words are below Dr. Martinez's?

12  A.  Sorry.  Which words?

13  Q.  The words that are highlighted, those are yours?

14  A.  I'm sorry.  Give me a moment to read this entire

15  paragraph, please.

16  Q.  Sure.

17  A.  (Witness examines document.)

18      I can't say with certainty that those are my words.  I see

19  the quotations at the end of Dr. Martinez's statement.  And --

20  but I don't see that I've added my 2 cents, as she says.

21  Q.  Okay.  But you see there's a close-quote after

22  Dr. Martinez's comments which you had forwarded to this group?

23  A.  I do, yes.

24  Q.  Okay.  And then the following words are (as read):

25      "I explained that the philosophy for treatment

1    is to help as many people as possible through a

2    standardized diagnosis protocol such as the ASRS with

3    a small number of variables that help reach maximum

4    outcome through treatment.  The above are things that

5    Ruthia and I have both said related to sustainable

6    treatment models.  We cannot save the world but we

7    can help as many people as possible with a

8    standardized approach that is enjoyable for both the

9    patient and provider while maintaining efficacious

10    clinical outcomes."

11         **MR. FOSTER:**  Can we show who the e-mail is from, Your

12    Honor?

13         **MR. SCHACHTER:**  Sure.  Can we zoom back out?

14    **BY MR. SCHACHTER:**

15    **Q.**   Okay.  You write to Ms. He and to the head of HR, and you

16    wrote (as read):

17         "Adding in this e-mail from Dr. Martinez."

18    Then you have open-quote and close-quote.  Do you see

19    that?

20    **A.**   I do, yes.

21    **Q.**   And then there are some words after the close-quote?

22    **A.**   Yes.  The first paragraph, I -- the highlighted text I do

23    not believe is me.  I never once agreed that the ASRS was a

24    diagnosis protocol.

25    **Q.**   Okay.  How about the second paragraph; yours?

1  A.   The second would be something along the lines I would say,

2  yes.

3  Q.   Okay.

4       MR. SCHACHTER:  You can take that down.

5  BY MR. SCHACHTER:

6  Q.   Now, you testified that -- well, you were asked by

7  Mr. Foster the following question and gave the following

8  answer.

9       "QUESTION:  How frequently and how quickly were employees

10      fired?

11      "ANSWER:  If concerns were raised, they most of the time

12      were removed immediately."

13      Do you recall giving that testimony?

14 A.   Yes.

15 Q.   Okay.  Now, Mr. Foster also showed you Exhibit 651 in

16 evidence, which I'll put on the screen.

17      Okay.  Do you recall this is a communication from Sarah

18 Barker to a group of people, including -- including Ms. He?

19 A.   Yes, prior to her sending this, she actually sent it to me

20 and said "Prepare for me to get fired," is what her words to me

21 were.

22      And I said "I will do my best to protect you," or

23 something along these lines before she posted this.

24 Q.   Okay.  Ms. Barker lays out a number of -- well, she writes

25 it as a devil's advocate and she is raising things that if

1    someone were to criticize the platform, they could focus on; is

2    that right?

3    A.    I'm sorry.  I didn't hear the last part of that question.

4    Q.    Sure.

5          Ms. Barker, in this communication, identifies areas of --

6    if someone wanted to criticize Done, she's identifying these

7    are things that they could criticize?

8    A.    Yes.  This was in, I believe, response to MJ and others

9    working to seek external validation from another psychiatrist

10   down in San Diego.  I cannot remember his name off the top of

11   my head.

12   Q.    Right.  Dr. Stahl?

13   A.    Dr. Stahl, yeah.

14   Q.    Right.

15         In advance of Dr. Stahl this outside psychiatrist coming

16   in, there was an effort to develop, okay, what are the

17   potential areas of concern for the platform; correct?

18   A.    No.

19   Q.    How would you put it?

20   A.    There was an effort to paint as rosy of a picture of the

21   platform and the practices at Done as possible to get external

22   validation for the platform to try and back off some of the

23   heat from the press, and to also further assist in Done's

24   lobbying efforts.

25   Q.    Okay.  And Ms. Barker adds to this discussion with a list

1  of concerns; correct?

2  **A.**  Yes.

3  **Q.**  Okay.  Now, to be clear, Ms. Barker was not fired, was

4  she?

5  **A.**  No, she was not.

6  **Q.**  She, I think, resigns -- resigns on her own in November;

7  is that correct?

8  **A.**  That's -- I believe that's correct.  I know she resigned

9  on her own.

10  **Q.**  Okay.  And I just want to show -- so she raises these

11  concerns, which Mr. Foster spoke to you about, and then I want

12  to show you some of the responses, first from Dr. Brody.

13          **MR. SCHACHTER:**  Your Honor, we move to admit 7201.

14          **THE COURT:**  7201 admitted.

15      (Trial Exhibit 7201 received in evidence.)

16  **BY MR. SCHACHTER:**

17  **Q.**  Dr. Brody responds --

18          **MR. FOSTER:**  I think it's the same thing as 656, which

19  was admitted yesterday.

20          **THE COURT:**  It's the same as 656?

21          **MR. FOSTER:**  I believe so.  We went through this

22  yesterday.

23          **THE COURT:**  Okay.  Well, be that as it may, it's in.

24  Okay?

25          **MR. SCHACHTER:**  Okay.

BY MR. SCHACHTER:

Q.   And Dr. Brody says (as read):

     "I would like to also weigh in on some of the

excellent points that Sarah has made."

And then he goes on to say (as read):

     "Number 5 ('no clinical guidelines'):  The fact

that it seems this way must be evidence of a

disconnect in our mechanism for propagating

information as I am the proud author of a document

that I called clinical guidelines and that was

supposedly disseminated, admittedly a long time ago."

And he is talking about -- and then he provides the --

describes the brief version of his guidelines.

Do you see that?

A.   Down below, yes, I do.

Q.   Okay.  And then if we can just turn to page 2.

He writes (as read):

     "I know the documents above are not very formal,

however, I believe they address most of the truly

important treatment dilemmas a clinician with some

prior experience in treating ADHD will encounter."

Also goes on to say -- if we look at the next -- okay.

Then he goes on (as read):

     "I may be on a roll, so I will continue on to

Sarah's point.  Way back in ancient" -- "(no set

1   follow-up standards).  Way back in ancient history I

2   created the following document about that topic.

3   Again, I admit it is not very formal, more of a

4   guideline than a policy or standard, but it is an

5   honest statement of my approach to the issue of

6   intervals between follow-ups."

7   And then he recounts (as read):

8       "Treatment guidelines:  Frequency of follow-up

9   visits."

10  And then page 3 he says (as read):

11      "I will close for tonight with some thoughts

12  about Number 9.  Patients over FDA stimulant dose

13  limits.  The FDA is obviously not God, and

14  intimidating though they may possibly be, I will take

15  the risk of saying that their promulgations sometimes

16  simply don't make sense.

17      "Here is the maximum dose part of a table I

18  created on stimulants.  Because I know that not all

19  authorities agreed with the FDA, I have columns for

20  max dose recommendations from the Carlat report,

21  UpToDate, and the Canadian ADHD Alliance.  You can

22  see that often the other authorities have higher

23  maximums than the FDA.  You can also see some notes

24  about how, at times, the FDA is inconsistent, won't

25  commit itself, or, as I said above, simply does not

1    make sense."

2    He goes on to say, (as read):

3        "Why is the FDA like that?  In my opinion, it is

4    because they are a political body.  They are beholden

5    to forces in addition to those of sober, rational,

6    evidence-based science.  My idealistic hope is to be

7    guided by science, not politics.  That is why I am

8    not an advocate of following the FDA guidelines

9    slavishly."

10   Now, I'm going to quickly show you what is in evidence as

11   6350.

12   Do you recognize these to be the short version of the

13   guidelines that Dr. Brody was referencing in response to Sarah

14   Barker?

15   **A.**   I don't recall this document.  If I could compare the

16   Slack message that copied and pasted of this, maybe.

17   **Q.**   We don't need to take time to do that.

18   I'm now going to show you what's in evidence as 6351.

19   Did you see this before, Dr. Brody's treatment guidelines

20   for adult ADHD?

21   **A.**   I don't recall this document.  I know that Dr. Brody did

22   send along some documents and those documents, with the

23   addition of ones by Sussan and Dr. Martinez and Sarah Barker,

24   were sent along to be basically put together in the policies

25   and procedures manual that we were hoping to publish.

1  Q.   Okay.  And then Dr. Brody referenced in his communication

2  a guide -- "Treatment Guidelines:  Frequency of Follow-Up

3  Visits."

4      Do you remember that?

5  A.   I -- I recall the subject line from the Slack message, but

6  I don't recall the document.

7  Q.   Okay.

8      MR. SCHACHTER:  Your Honor, we'll move to admit 5195,

9  which are Dr. Brody's "Treatment Guidelines:  Frequency of

10 Follow-Up Visits."

11     THE COURT:  Admitted.

12     MR. FOSTER:  Can you lay a foundation?  I think he

13 said he saw the Slack.

14     MR. SCHACHTER:  It is what was excerpted in

15 Dr. Brody's Slack communication.

16     THE COURT:  Don't ask me.

17 BY MR. SCHACHTER:

18 Q.   Do you see, Dr. Brody had referenced that he had

19 circulated "Treatment Guidelines:  Frequency of Follow-Up

20 Visits"?

21 A.   He did reference that in his Slack message, yes.

22 Q.   Okay.  Do you recognize these to be Dr. Brody's "Treatment

23 Guidelines:  Frequency of Follow-Up Visits," which he said that

24 he had circulated?

25 A.   I recognize the first one, two -- up to Number 4, that's

1    what I recognize from the Slack message.

2         MR. SCHACHTER:  Okay.  Your Honor, we move to admit

3    it.

4         THE COURT:  Admitted.

5         (Trial Exhibit 5195 received in evidence.)

6    BY MR. SCHACHTER:

7    Q.   Okay.  This document from Dr. Brody entitled "Treatment

8    Guidelines:  Frequency of Follow-Up Visits," he states that (as

9    read):

10        "Done's guidelines regarding frequency of

11        follow-up visits are based on flexibility."

12   Describes what should determine session frequency, and

13   then he goes on to define the field, examples of the possible

14   extremes, (as read):

15        "Short:  If the clinician feels that the initial

16        evaluation has not provided sufficient information

17        for accurate assessment and effective treatment plan.

18        Long:  If the patient has ADHD uncomplicated by

19        additional psychiatric or medical issues, and is

20        employed, in stable relationships and has no

21        significant risk of substance misuse, twice yearly or

22        even less frequent follow-up is acceptable."

23   It goes on to say at the bottom (as read):

24        "There is no doubt that Done's 'average patient'

25        is more stable than the population served by

1    community mental health clinics.  The Typical 'Done

2    patient' is much less likely to have psychotic

3    symptoms, more likely to be financially stable, and

4    is significantly younger than the community mental

5    health center client."

6    Goes on to say the default frequency is only that?

7         **MR. SCHACHTER:**  Okay.  We can take that down.

8    **BY MR. SCHACHTER:**

9    **Q.**   Now, it wasn't just Dr. Brody that responded to Sarah

10   Barker.  We saw one of those responses, which I'll just put on

11   the screen briefly, and that was Exhibit 931 in evidence.

12   You went through this with Mr. Foster.  Do you recall

13   that?

14   **A.**   Yes.

15   **Q.**   Okay.  And I'll show you one other response that she made,

16   which is Exhibit 7554.

17        **MR. SCHACHTER:**  Which we'll move to admit.

18        **THE COURT:**  Admitted.

19   (Trial Exhibit 7554 received in evidence.)

20   **BY MR. SCHACHTER:**

21   **Q.**   Okay.

22        **MR. SCHACHTER:**  We can take that down.

23   **BY MR. SCHACHTER:**

24   **Q.**   Now, Ms. Barker wrote that devil's advocate Slack on

25   June the 29th of 2022; is that correct?

1  **A.**    I believe that was the date, yes.

2  **Q.**    All right.  Now, two weeks before that, you and Sarah

3  Barker had a communication about what percentage of -- well,

4  withdrawn.

5       You and Sarah Barker just shortly before that had tried to

6  figure out what percentage of controlled substances versus

7  other kinds of medications had been prescribed by certain

8  providers on the platform; is that right?

9  **A.**    I believe we actually looked at all providers.  It wasn't

10  just certain providers.

11  **Q.**    Okay.  Great.

12       And that impacted what she wrote to be those concerns in

13  the devil's advocate communication; is that right?

14  **A.**    I believe so, yes.

15  **Q.**    Okay.

16       **MR. SCHACHTER:**  Your Honor, we'll move to admit what

17  the Government marked as Exhibit 635.

18       **THE COURT:**  Admitted.

19       (Trial Exhibit 635 received in evidence.)

20  **BY MR. SCHACHTER:**

21  **Q.**    Okay.  Now, if we can look at the bottom.  So this is

22  just -- just about two weeks before that devil's advocate

23  communication; right?

24       And Sarah Barker has written to you about what she has

25  seen in her review now in June of 2022 about percentages of

1   stimulants versus non-stimulants, as well as she looked at who

2   had prescribed at higher dosages of the providers that she was

3   examining; is that right?

4   A.    Well, this looked at controlled versus noncontrolled, and

5   then non-Adderall versus Adderall.

6   Q.    Okay.

7   A.    And it looked at all providers.  She -- her message

8   highlighted those that were outliers or outside the norm.

9   Q.    Okay.  Great.

10       And this happened -- in June of 2022, you had not looked

11  at any data on this prior to receiving this communication from

12  Sarah Barker on June 16; correct?

13  A.    No, I adjusted the communications of other team members --

14  Q.    Okay.

15  A.    -- regarding this data prior.

16  Q.    Okay.  Great.

17       Now, if we can -- so this gets communicated?

18       MR. SCHACHTER:  Could we zoom back out.

19  BY MR. SCHACHTER:

20  Q.    Now, within minutes, you then turn to a different topic of

21  a broken shampoo bottle; is that correct?

22       MR. FOSTER:  Objection, Your Honor.  Relevance.

23  Consumption of time.

24       THE COURT:  Move on.

25       MR. SCHACHTER:  Okay.  Withdrawn.  You can take that

1  down.

2  BY MR. SCHACHTER:

3  Q.  Now, it is after Ms. Barker had identified -- it is after

4  this communication that -- well, withdrawn.

5      It is two months after that that there begins a process to

6  develop a provider metrics Slack channel that is going to

7  perform an audit of each of the providers; is that right?

8  A.  I don't recall.  I recall someone by the name of Ahkshay

9  leading those effort but I don't know the timeline.  And at

10 times I had provided an opinion on certain metrics that were

11 suggested to be in there that I felt were not appropriate.

12 Q.  Okay.  So let's just -- just to set the timing of this.

13      MR. SCHACHTER:  Your Honor, we'll move to admit 7154

14 and 7155.

15      THE COURT:  Admitted.

16      (Trial Exhibits 7154 and 7155 received in evidence.)

17      MR. FOSTER:  Do you have a copy?

18      MR. SCHACHTER:  I sent them to you a couple days of

19 ago.  But we'll figure out something.

20 BY MR. SCHACHTER:

21 Q.  Okay.  So this is now August of 2022, there is a new

22 channel that's set up called the provider metrics Slack

23 channel; is that correct?

24 A.  That's the name of the channel, yes.

25 Q.  Okay.  And Ruthia is on that channel?

1  A.   She is.

2  Q.   All right.  So what's happened is you and Ms. Barker have

3  this communication about statistics in June.  In August now

4  there is an effort to look more closely at the prescription

5  practices of the providers; correct?

6  A.   Yes.  There was even -- in July we actually looked at all

7  of the July prescriptions as well.  It became an ongoing effort

8  where she would share that update with the team.

9  Q.   Great.

10      And then what happens is, then there is a more formalized

11  effort, like we are going to develop an audit scorecard that

12  takes a close look at the prescription practices of the

13  providers; correct?

14  A.   Yes.  I don't recall if it was just prescription practices

15  or several things.

16  Q.   Okay.  And then if we can look at 7155.  There is a

17  discussion about what kind of metrics -- in order to closely

18  look at the prescription practices, there's a discussion of

19  what are the metrics that we should add to this audit; is that

20  correct?

21  A.   Yes.

22  Q.   Sussan Nwogwugwu says (as read):

23       "I will add percentage of nonstimulant versus

24       stimulant use."

25       Right?

1   **A.**   Yes.  I believe that Dr. Martinez suggested that a few

2   messages above.

3   **Q.**   Okay.  And then, by the way, at no time did Ms. He halt

4   this process; correct?

5   **A.**   Not to my knowledge.  I don't -- but I also don't know

6   that these ever got sent out to providers.  I don't have

7   knowledge of that.

8   **Q.**   Okay.  Okay.  Well, you mentioned this person Akhshay

9   Karkar I'm going to show you --

10          **MR. SCHACHTER:**  Your Honor, we move to admit 7162 and

11   7163.

12          **THE COURT:**  Admitted.

13      (Trial Exhibits 7162 and 7163 received in evidence.)

14   **BY MR. SCHACHTER:**

15   **Q.**   Okay.  So now this is November of 2022 and this person who

16   you mentioned, Mr. Karkar is now sending the first set of

17   provider scorecards for the month of October.

18      Do you see that?

19   **A.**   I do.

20   **Q.**   All right.  And so that's November of 2022.  And then if

21   we can look quickly at 7163.

22          **MR. SCHACHTER:**  Can we zoom back out?

23   **BY MR. SCHACHTER:**

24   **Q.**   All right.  This is sent out to all providers, and

25   indicates that each provider will receive a monthly report to

1  help identify and track areas of clinical care and patient

2  experience.

3      Do you see that?

4  A.   I do.

5  Q.   All right.

6          MR. SCHACHTER:  You can take that down.

7  BY MR. SCHACHTER:

8  Q.   Okay.  You recall that Ms. Barker spoke to each of the

9  providers that had been flagged in this audit with what you and

10 she thought were high prescription numbers; is that correct?

11 A.   It was -- well, based on her clinical experience, what she

12 determined to be the high prescription numbers, yes.

13 Q.   And those conversations she reported to you were well

14 received with one exception?

15 A.   I don't recall the one exception, but I recall that it was

16 reported that they were well received.

17 Q.   Okay.  So she gets the data, she speaks to the providers,

18 tells you that those communications seem to have gone well?

19 A.   Yes.

20 Q.   All right.  Okay.  Now, let's switch topics.

21     Erin Kim.  You recall Mr. Foster said:  Was Defendant He

22 made aware that there were prescribers like Erin Kim who

23 weren't seeing their patients?

24     Do you recall that?

25 A.   Yes.

1  Q.  Okay.  Now, if Erin Kim was not seeing her patients, it

2  wasn't because she wasn't getting paid for the time she spent

3  on follow-ups; is that correct?

4  A.  I'm sorry can you say the question again.

5  Q.  Sure.  Let me rephrase.

6     Erin Kim was paid her hourly rate for the follow-ups that

7  she had on complex patients; is that correct?

8  A.  I -- I don't remember which appointments she was being

9  paid for.  I know that she had somehow found a way to schedule

10  more frequent 30-minute visits than a human could do.

11  Q.  Okay.  Let me explore that.

12     So you found there were a number of ways where Erin Kim

13  was sort of gaming the system; is that correct?

14  A.  Yes.

15  Q.  One of the ways was that there was a time when providers

16  were paid their hourly rate for follow-ups that they were doing

17  with transfer patients that they were accepting from providers

18  who had left the platform?

19  A.  Yes, there was a time where that occurred.

20  Q.  Okay.  And what you found was that providers were just

21  transferring patients back and forth and billing for that time?

22  A.  Yes, I don't know -- I don't recall if Erin Kim was part

23  of that, but I recall that occurring with some of the Texas

24  providers.

25  Q.  Okay.  Let's drill down on that just for a moment.

1    You recall that after there was an announcement that

2 providers would get paid their hourly rate for seeing transfer

3 patients, that providers started transferring patients back and

4 forth and billing for those times?

5 A.    Yes.

6 Q.    All right.  Now, on Erin Kim, do you recall that she had

7 asked to do 25 -- to be paid for 25-minute follow-ups with

8 complex patients for which she would be paid?

9 A.    I don't recall the request from Erin Kim.

10 Q.    Well, do you remember that she was?

11    Do you remember telling the Government that Erin Kim asked

12 the care team for 25-minute follow-ups with complex patients

13 for which she would be paid?

14 A.    I -- I don't.

15 Q.    Good enough.

16    Do you also recall that another thing that Erin Kim did is

17 she left her Zoom session open for 16 hours and patients would

18 just go in and out of those Zoom meetings so it would be very

19 difficult to track if she was not spending enough time with

20 patients?

21 A.    I don't recall if that's how it worked.  I thought we

22 could see time stamps of when the other participant joined and

23 left and that's how we identified that certain patients were

24 only being seen for seconds, minutes at a time.

25    Yeah, I don't remember if it only tracked when the meeting

1  started and stopped or if it was, you know, when an attendee

2  came in and left.

3  Q.   Okay.  Do you remember that she left her Zoom open for

4  16 hours so that her session would not appear to begin or end

5  at any period of time?

6  A.   I do.

7  Q.   Okay.  And after -- do you recall a point in time where

8  when Ms. He became aware -- when Ms. He was informed that Erin

9  Kim had been gaming the system, that she cut Erin Kim's pay?

10  A.   I -- my recollection is that it was actually part of the

11  total November payroll cancellation for any provider that was

12  being paid for 25-minute follow-ups.

13  Q.   Including Erin Kim?

14  A.   She was in that group, yes.

15  Q.   Okay.  All right.  Let's switch topics.

16      The Government asked you about a -- and he showed you an

17  Exhibit 1392.

18      **MR. SCHACHTER:**  If we can just -- it's in evidence.

19  Why don't you put that up briefly.

20  **BY MR. SCHACHTER:**

21  Q.   And do you recall they showed you this document?

22  A.   I do.

23  Q.   And you identified a change which Ms. He had made to this

24  document on October the 4th of 2022?

25  A.   Yes.

1  **Q.**  Okay.  And Mr. Foster had noted that that was after the
2  grand jury subpoena had come in?
3  **A.**  Yes.  The change isn't on the screen right now, but it was
4  this document.
5      **MR. SCHACHTER:**  Yeah, just to help the jury remember,
6  can you turn -- do you -- it's okay.
7  **BY MR. SCHACHTER:**
8  **Q.**  You remember that there was this line?
9  **A.**  There was a line at the bottom of the page regarding
10  medication trials.
11  **Q.**  Okay.  Now, you are also aware that Ms. He had removed
12  identical language from a different document months before the
13  grand jury subpoena back in May of 2022; is that correct?
14  **A.**  My recollection is that these are the exact same
15  documents.  She took the document out of service, did not
16  modify it at the time that she took it out of service back
17  then, and this was the document that was requested in the
18  subpoena and it was produced modified.
19  **Q.**  Okay.  You had access to a document called "Clinician
20  Support Guide"; is that correct?
21  **A.**  I don't recall that document.
22  **Q.**  All right.
23      **MR. SCHACHTER:**  Let me just show just for the witness,
24  Court, and counsel, Exhibit 7535.
25  \\\

1  BY MR. SCHACHTER:

2  Q.   Take a look at that to yourself, please.

3  A.   (Witness examines document.)

4  Q.   Are you looking at a document -- do you see your name by

5  the version history on the right side?

6  A.   Yes.

7  Q.   Okay.  And you see the date of this document is May of

8  2022?

9  A.   Yes.

10 Q.   And you see a change which Ms. He had made to this

11 document, according to the version history, on May 25, 2022?

12 A.   Yes.

13       MR. SCHACHTER:  We'll move to admit Exhibit 7535, Your

14 Honor.

15       MR. FOSTER:  Same objection about the Done Health

16 Bates number, Your Honor, so subject to a motion to strike.

17       THE COURT:  Okay.  It may be admitted subject to a

18 motion to strike.

19    (Trial Exhibit 7535 received in evidence.)

20 BY MR. SCHACHTER:

21 Q.   Okay.  So do you see that -- you see on the version

22 history it reflects Ms. He making a change on May 25, 2022?

23 A.   Yes.

24       MR. SCHACHTER:  If you can zoom back out, please,

25 Mr. Cepregi.

1   BY MR. SCHACHTER:

2   Q.   And that is -- and what she is doing is deleting this same

3   language -- the same language about "if they don't fully meet

4   the criteria for ADHD, still might be worth doing a medication

5   trial"?

6   A.   It's very similar language.  It's not identical.

7   Q.   Okay.  And so she had made this change back in May of

8   2022.  That is months before Done received a grand jury

9   subpoena in September; is that correct?

10  A.   Yes.

11  Q.   All right.  And May is around the time that you and she

12  had spoken about -- can't remember what the word was -- should

13  we --

14  A.   Deprecate.

15  Q.   I don't -- I'm not -- deprecate the document?

16  A.   Just remove it from service.

17  Q.   Remove it from service.  Okay.

18       It was around this time?

19  A.   Yes.

20  Q.   Okay.  All right.

21          MR. SCHACHTER:  You can take that down.

22  BY MR. SCHACHTER:

23  Q.   Do you recall that you also in August of 2022 had edited

24  this same language?

25  A.   I -- I don't recall.  I know that I had produced this

1  document to Done's counsel in August at a request of theirs.

2  Q.   Okay.

3  A.   I don't recall if I edited it to match what Ruthia had

4  edited or not back then.

5  Q.   Okay.

6        **MR. SCHACHTER:**  Your Honor, I will show just to the

7  witness, Court, and counsel what we've marked as Exhibit 7480A.

8        **MR. FOSTER:**  Objection, Your Honor.

9        **THE COURT:**  Well, I -- the objection being?

10       **MR. FOSTER:**  Objection being, one, there's no Done

11  Health Bates number so I don't know that this was ever produced

12  to the Government.

13     Two, he just said it was --

14       **THE COURT:**  Well, was it produced to the Government?

15       **MR. SCHACHTER:**  I had nothing to do with that

16  production.

17       **THE COURT:**  No, wait a minute.  Wait.  You said

18  nothing to do with it.  The Defense under law is -- under the

19  rules is required to produce certain documents.  Certain

20  documents.  It's called reciprocal discovery.

21     Now, my question is:  Did the Defense produce that

22  document?

23     It's not whether you had anything to do with it or not.

24  Maybe you have to talk to the people who produced it or didn't,

25  but I think that's an appropriate thing to discuss outside the

1    presence of the jury, so let's move on --

2            MR. SCHACHTER:  Yes, Your Honor.

3            THE COURT:  -- and we'll discuss it.

4            MR. SCHACHTER:  Okay.  Okay.

5    BY MR. SCHACHTER:

6    Q.   Well, then, let me just ask you this question:  Do you

7    recall removing the word "trial" -- do you recall in August of

8    2022 you yourself going into the document to remove the word

9    "trial"?

10   A.   I do not.  And what I'm seeing doesn't show my edits.

11   Q.   I understand.  I have another document.  I'm just asking,

12   putting aside the document, do you have a memory in August of

13   2022, going in and editing this medication trial language?

14   A.   I do not.

15   Q.   Okay.

16       Do you recall changing it from "use your clinical judgment

17   to determine if the patient may still benefit from a medication

18   trial," and changing it to "may benefit from alternative

19   medication"?

20       Does that ring a bell?

21   A.   I don't, but that would not -- that would indicate

22   prescribing something that wasn't a stimulant, if I did write

23   that, but I don't recall.

24   Q.   Okay.  In any event, you certainly had no intention in

25   change -- to say you changed language in this document in

1  August of 2022, you were not doing so with any intent to

2  obstruct justice; correct?

3          **MR. FOSTER:**  Objection.  Foundation.

4          **MR. SCHACHTER:**  Fair enough.  I'll move on.

5          **THE COURT:**  Okay.

6  BY MR. SCHACHTER:

7  **Q.**   Okay.  And by the way, this same language about a

8  medication trial, that is an attachment to dozens of provider

9  contracts which you know were produced to the Government;

10 correct?

11 **A.**   What was an attachment?

12 **Q.**   Sure.  Sorry.  I'm going to show you what is in evidence

13 as 1308.  If we can just turn quickly to page 18 of that

14 compendium.

15     You know that in the provider contracts, dozens of which

16 were provided to the Government, there was a Schedule C?

17 **A.**   I can recognize that on the page.  I don't remember what

18 my memory was of these contracts at the time.

19 **Q.**   Okay.  And did you -- you were working there at the time

20 of the production of documents, do you know that Done produced

21 dozens of these contracts to the Government?

22 **A.**   I believe so.

23 **Q.**   Okay.  All right.  Now, next topic.

24     The Government asked you about a WhatsApp communication

25 with Ms. He.

1     **MR. SCHACHTER:**  Can we put that up on the screen.

2     It's Exhibit 603 in evidence.

3     **BY MR. SCHACHTER:**

4     Q.   And you wrote on WhatsApp in May of 2022 (as read):

5          "We should try to refrain from talking about the

6     articles and how it relates to us on company

7     platforms."

8     You go on to say (as read):

9          "Only because if they wanted to, they could

10    subpoena our Slack messages."

11    And Ms. He says (as read):

12         "I'll delete the Slack messages."

13    Is that correct?

14    A.   Yes.

15    Q.   Okay.  And then Mr. Foster asked you this question, you

16    gave this answer (as read):

17    **"QUESTION:**  "What Slack messages did you understand her to

18    go delete after this?

19    **"ANSWER:**  We were discussing how the Cerebral

20    investigation could relate to us and the articles that

21    related to that and those were the messages that were

22    deleted."

23    Do you remember being asked that question and giving that

24    answer.

25    A.   I do.

1   Q.   Okay.  The fact of the matter is that Ms. He did not

2   delete any Slacks; isn't that correct?

3   A.   I don't know that to be true.

4   Q.   You don't know one way or the other?

5   A.   My recollection is that she did -- we -- I also deleted

6   those messages.  We deleted the messages related to that

7   conversation --

8   Q.   Okay.

9   A.   -- in Slack.

10  Q.   I'm going to show you --

11       MR. SCHACHTER:  Your Honor, we move to admit

12  Exhibits 7502, 7507, 7508, 7509, and 7510, Slack messages on

13  the subject of how the Cerebral investigation could relate to

14  us and the articles that related to that.

15       THE COURT:  Admitted.

16       (Trial Exhibits 7502, 7507, 7508, 7509, and 7510 received

17  in evidence.)

18       MR. FOSTER:  Do you have copies?

19       MR. SCHACHTER:  Okay.  Looking first at 7502.

20  Can you go back?

21  BY MR. SCHACHTER:

22  Q.   Okay.  First of all, your communication with Ms. He, "I'll

23  delete the Slack messages," was May 5th of 2022; is that

24  correct?

25  A.   Yes, and there were only a subset or a select few of

1    messages that were removed on the 5th following that message.

2         Nothing prior to that time to my knowledge we had removed.

3    So this is before that time.

4    **Q.**   Okay.  So when Ms. He says on May 5th, 2022, "I'll delete

5    the Slack messages," let's look at what exists and what was

6    produced to the Government.

7         On May 3rd, 2022, you wrote (as read):

8              "Cerebral got blocked by Truepill yesterday."

9         **MR. SCHACHTER:**  Can we go down.

10   **BY MR. SCHACHTER:**

11   **Q.**   (as read):

12             "Truepill will let them back, but they need to

13             likely do an audit of internal processes because some

14             of the podcasts mentioned that companies like

15             Cerebral and Done are doing ADHD prescriptions

16             without even a consultation."

17        Okay.  Let's look at 7507.

18        This is a Slack thread from the same day, May 5th, 2022.

19   It's a communication, a Slack communication between you and

20   Ruthia and MJ Chey and Sarina Pattar and Sol Ross.

21        Do you see that?

22   **A.**   I do.

23   **Q.**   It's entitled "Regulatory Affairs"?

24   **A.**   Yes.

25   **Q.**   And the -- in this discussion, Mr. Ross writes (as read):

1          "Cerebral, by ceasing stimulant prescribing and

2     cooperating with DEA, puts us in the position of

3     being the industry leader."

4          MR. SCHACHTER:  If we can go a little further down.

5     Okay.  That's great.

6     BY MR. SCHACHTER:

7     Q.  Now, let's look at 7508.

8          MR. SCHACHTER:  Can we back up so we can see the

9     document?

10    BY MR. SCHACHTER:

11    Q.  Okay.  This again, same day, May 5, 2022, do you see a

12    Slack communication that you have just with Ruthia?  Do you see

13    that?

14    A.  Yes.

15    Q.  Okay.  And you write (as read):

16          "Check your e-mail.  Bloomberg published."

17    And then there's -- if we could just scan down, there's a

18    discussion of responses to the press.

19    Great.  Let's look at 7509.

20    This is May 7, 2022.  It is a Slack between you and

21    Ms. He, two days after the May 5th communication we looked at.

22    And there is a communication about checking on subpoenas and a

23    Wall Street Journal article, "Cerebral Receives Subpoenas from

24    Federal Prosecutors."

25          Ms. He asks (as read):

1          "Did we reply to Rolfe but they said no

2     regulatory or law enforcement authority has accused

3     it of violating the any law."

4          Let's look at 7510.  Slack communication, May 17.  If we

5     can look at page 3 at the top, you are communicating regarding

6     Wall Street Journal article, "Cerebral Board Members Agree to

7     Replace CEO Amid Federal Probe into Prescription Practices."

8          Okay.  All right.

9               **MR. SCHACHTER:**  You can take that down.

10    **BY MR. SCHACHTER:**

11    **Q.**   Now, I am correct that if one wanted to show that Slack

12    messages were deleted, one could request the deletion history

13    from Slack and a history of what was deleted could be obtained

14    via a JSON file; is that correct?

15               **MR. FOSTER:**  Objection.

16               **THE COURT:**  Lay a foundation.

17    **BY MR. SCHACHTER:**

18    **Q.**   Well, did you in 2023 tell the Government that deletion

19    history from Slack and a history of what was deleted could be

20    obtained via a JSON file, which was JavaScript?

21    **A.**   I recall answering questions related to the platforms and

22    how to access version history.  And that, from my

23    understanding, it was a possibility to request that from Slack.

24    Depending on what type of customer you were and if you

25    essentially had the highest tier contract with Slack, then they

1    could produce that at the request, yes.

2    **Q.**   Do you recall you told the Government about how to do that

3    in March of 2023?

4    **A.**   I recall speaking to them about it.  I believe it was

5    during the search warrant period of time.  I don't know if I

6    gave them, like, explicit steps to follow.

7    **Q.**   Okay.  Let's switch topics.

8         You testified that Google accounts had been requested to

9    be deleted, I believe?

10   **A.**   Yes.

11   **Q.**   All right.  And, now, I am correct, am I not, that you

12   understood that there had been deletions of unused Google

13   accounts of former employees to reduce costs; correct?

14   **A.**   That was the request, yes.

15   **Q.**   Okay.  You -- there was an effort to return Done to

16   profitability and deleting the former employee accounts would

17   reduce the cost of paying for inactive Google accounts;

18   correct?

19   **A.**   Yes.

20   **Q.**   And you got involved and made sure that those Google

21   accounts were preserved; correct?

22   **A.**   I did.

23   **Q.**   Okay.  There was also a vendor called Consilio that was

24   preserving data to produce to the Government.  You understood

25   that, did you not?

1  **A.**   I actually didn't know that Consilio ever came on board

2  or -- I don't recall.  I do recall substantial number of days

3  of -- I wouldn't say argument, but disagreements because we

4  were being advised to retain them as quickly as possible and it

5  was very delayed.

6  **Q.**   All right.  And you do not recall Consilio coming in with

7  access to Done's computer systems?  You just don't recall that?

8  **A.**   I do not, no.

9  **Q.**   Okay.

10      Now -- well.  Okay.  I'm going to show --

11          **MR. SCHACHTER:**  Well, we'll move to admit

12  Exhibit 7513.

13          **MR. FOSTER:**  Objection, Your Honor.  I don't know

14  where this is from.

15          **MR. SCHACHTER:**  This is from a communication that --

16  Mr. Levy gave you this communication.

17          **MR. FOSTER:**  Is there a Bates Number here?

18          **MR. SCHACHTER:**  Yeah.  It's Bates-stamped

19  DONE-DOJ-7513641.

20      We move to admit 7513.

21          **THE COURT:**  Admitted.

22      (Trial Exhibit 7513 received in evidence.)

23  **BY MR. SCHACHTER:**

24  **Q.**   This is a text exchange you had with Ruthia on

25  November 21, 2022.  You say (as read):

1          "Did Consilio back up Google?"

2      And Ms. He says (as read):

3          "I'm not sure."

4      And then she says (as read):

5          "I see perhaps the investigation tool already

6      stored the information."

7      Do you see that?

8  A.   I do.

9  Q.   Okay.  And those are -- it's -- you write (as read):

10         "It's to aid MJ in her request to delete Google

11     users.  We can't do it until we have a complete

12     backup of their accounts."

13     Do you see that?

14 A.   Yes.

15 Q.   And that's the deletion of the Google users that you're

16 talking about?

17 A.   Yes.

18 Q.   Okay.  Thank you.

19         MR. SCHACHTER:  You can take that down.

20 BY MR. SCHACHTER:

21 Q.   All right.  Now, specifically, do you recall the

22 Government asking you (as read):

23         "When the federal grand jury served its subpoena

24     for documents on Done, did Defendant He want to

25     produce the risk mitigation reports to the

1      Government?"

2      And you answered (as read):

3           "To my recollection, no, because the narrative

4      had already been published that they didn't exist."

5      Do you remember that question and that answer?

6  **A.**   Yes.

7           **MR. SCHACHTER:**  Your Honor, we move to admit the

8  produced version of this exhibit, 7601, the risk mitigation

9  report that was produced to the Government.

10          **MR. FOSTER:**  Objection.  Foundation.

11          **THE COURT:**  I'm sorry.  The question, if I understand

12  the chain, you asked the witness or the witness testified that

13  the defendant did not -- told him that she didn't want this

14  document produced.

15          **MR. SCHACHTER:**  Correct.  And here is the produced

16  document.

17          **THE COURT:**  Okay.

18          **MR. SCHACHTER:**  We move to admit --

19          **THE COURT:**  I don't know that that's impeachment.

20  That's not impeachment.  She either said it or she didn't say

21  it, but the fact that the document was produced, I don't know.

22  I mean, I think we're getting into issues of how documents were

23  produced.

24      But the question is what did she express?

25          **MR. SCHACHTER:**  Your Honor, the Government, through

1  their question and the answer, suggested that the risk

2  mitigation report was not produced to the Government.  It was

3  produced to the Government.  We wish to present that evidence.

4          **THE COURT:**  All right.

5      You can proceed.

6          **MR. SCHACHTER:**  It's admitted?

7          **THE COURT:**  Admitted.  7601 admitted.

8      (Trial Exhibit 7601 received in evidence.)

9  **BY MR. SCHACHTER:**

10 **Q.**  Do you see this document entitled "Monthly Risk Mitigation

11 Report"?

12 **A.**  I do.

13         **MR. SCHACHTER:**  And if we can just go -- zoom out.

14 **BY MR. SCHACHTER:**

15 **Q.**  Do you see a Bates stamp at the bottom which says -- and

16 over to the left it says -- it says Done Health and DONE-DOJ.

17     Do you see that?

18 **A.**  I do.

19 **Q.**  And over to the left, do you see where it says (as read):

20         "FOIA confidential treatment requested by Done

21     Health."

22     Do you see that?

23 **A.**  I do.

24 **Q.**  Okay.

25         **MR. SCHACHTER:**  You can take that down.

BY MR. SCHACHTER:

Q.   All right.  Let's talk about Signal briefly.  You testified that after receiving the grand jury subpoena, Ruthia instructed you and other Done employees to communicate via Signal.

Do you recall that?

A.   I do.

Q.   Okay.  The fact of the matter is that you used Signal months before the grand jury subpoena back in May of 2022 to communicate with the Wall Street Journal reporter; is that correct?

A.   Yes.  That was how he instructed people to communicate with him through his e-mails.

Q.   And you did?

A.   Yes.

Q.   You didn't think there was anything wrong with it?

A.   With communicating with the reporter, no, I did not.

Q.   Okay.  And, in fact, Done's PR firm communicated with you and Ruthia over Signal; correct?

A.   For some time, yes.

Q.   Done's lawyers communicated with you and Ruthia over Slack?

MR. FOSTER:  Objection, Your Honor.

MR. SCHACHTER:  It's not advice.

THE COURT:  Let's leave it out.  Go ahead.  Next.

1          **MR. SCHACHTER:**  Okay.

2    **BY MR. SCHACHTER:**

3    **Q.**   All right.  Now, Mr. Foster asked you about the

4    disappearing message feature on Signal; is that correct?

5    **A.**   Yes.

6    **Q.**   The fact is that you turned on disappearing messages in

7    your Signal chat with Ruthia; is that correct?

8    **A.**   I might have.  I don't recall.

9    **Q.**   Okay.  Mr. Foster asked you (as read):

10          "Where did Defendant He move operations to and

11          how did that relate to making evidence harder for the

12          grand jury to obtain?"

13          You answered (as read):

14          "Shortly after this, we had an influx of

15          employees joining the company that were out of China.

16          It would have significantly impaired the ability to

17          retrieve documents and patient charts and other

18          things that were responsive to the subpoena."

19          Do you remember that question and answer?

20   **A.**   I do.

21   **Q.**   Okay.  But to be clear, there were employees of Done

22   working in engineering in China back in -- right when you

23   started in 2021; is that correct?

24   **A.**   Yes.  And I was concerned that patient charts were on

25   servers in China and not in the U.S. --

1    **Q.**   Sure.

2    **A.**   -- back then too.

3    **Q.**   But to be clear, those employees were working in China

4    more than a year before, and maybe longer, any grand jury

5    subpoena was served; correct?

6    **A.**   Those engineers were, yes.

7    **Q.**   Okay.  Now, last couple of questions.

8        You testified a lot about your concerns about working at

9    Done.  Do you recall that?

10   **A.**   Yes.

11   **Q.**   And about how you felt that Ms. He was too focused on

12   growth; is that correct?

13   **A.**   I don't know if I said too focused on growth but it was

14   the Number 1 priority.

15   **Q.**   The fact of the matter is that you, in May of 2022, were

16   offered a significantly higher-paying job; correct?

17   **A.**   Yes.

18   **Q.**   You turned that down?

19   **A.**   I did.

20   **Q.**   To stay at Done?

21   **A.**   Yes.  After many conversations with Craft and F7, the

22   venture capital firms, and -- yes, I did.

23   **Q.**   And in communicating to Ms. He how you were turning down

24   that job because you wanted to stay at Done, you laid out your

25   accomplishments; correct?

1    A.    I did, yes.

2          MR. SCHACHTER:  Your Honor, we move to admit 7244.

3          THE COURT:  Admitted.

4    (Trial Exhibit 7244 received in evidence.)

5    BY MR. SCHACHTER:

6    Q.    And in touting your accomplishments to Ms. He, you talked

7    about how membership had increased on your watch?

8    A.    Yes.  I had to use language that resonated with Ruthia if

9    I had any hopes of receiving compensation increase for myself.

10   Q.    You talked about how there were more providers that had

11   been recruited; correct?

12   A.    Yes.

13   Q.    You talked about how provider ratings had increased;

14   correct?

15   A.    Yes.

16         To be clear, those provider ratings were after we had

17   started to -- oh, wait.  I'm thinking of different provider

18   ratings.  Yes.  Never mind.

19   Q.    And you talked about how the company had returned to

20   profitability?

21   A.    Yes.

22   Q.    Okay.

23         MR. SCHACHTER:  You could take that down.

24   BY MR. SCHACHTER:

25   Q.    You were asked these questions and gave these answers (as

1    read):

2         "Who was the person on paper with the power to

3         change things and put in place all the clinical

4         practices?

5         "ANSWER:  Dr. Brody was.

6         "In reality, did the actual perspectives and

7         opinions of clinicians control whether clinical

8         practices were implemented at Done?

9         "ANSWER:  They did not.

10        "QUESTION:  Who controlled it?

11        "ANSWER:  That was Ruthia."

12    Do you recall giving that testimony yesterday?

13   A.   I do.

14   Q.   While you worked at Done, you were very clear in speaking

15   to Ms. He that she was not making clinical decisions; correct?

16   A.   I don't recall.  I know that there were many conversations

17   over Zoom, over other live communication tools, that that

18   concern was expressed to her multiple times.

19   Q.   You told her in discussing the angle that you thought the

20   reporter was trying to take, that (as read):

21        "The angle this reporter is trying to take with

22        all of this is that you, the CEO of Done, are

23        directing clinical practice and that we have no

24        doctors leading clinical decisions.  It reminds me a

25        lot of the Nurx situation where they actually found

1          the CEO was making clinical decisions and he wasn't a

2          clinician.  But" -- you told Ms. He -- "this is very

3          different as you are not making clinical decisions."

4          Didn't you say that?

5     A.    I may have.  And I was, again, all in on saving the

6     company, working tirelessly, and I would have -- all of my

7     efforts would have ceased to exist if I told her anything

8     different in writing.

9     Q.    What you told her is, in your view, the decisions that she

10    was making were not clinical; correct?

11    A.    In that message, there were countless other conversations

12    that were Huddles, Zooms and other conversations in real-time

13    where I expressed that concern and shared the concern that

14    others were raising.

15    Q.    But at that time you communicated to her she was not

16    making decisions that were clinical?

17    A.    Correct.

18          MR. FOSTER:  Objection.  Asked and answered.

19    Consumption of time.

20          THE COURT:  Sustained.

21          MR. SCHACHTER:  All right.

22    BY MR. SCHACHTER:

23    Q.    The fact of the matter is that back when you worked there,

24    you believed that Ruthia had just trusted the wrong people to

25    help her put proper processes in place; correct?

PROCEEDINGS

1    A.    I recall a conversation related to that, yes.

2          MR. SCHACHTER:  Last document, Your Honor.  We move to

3    admit Exhibit 7243.

4          THE COURT:  Okay.  7243 admitted.

5          (Trial Exhibit 7243 received in evidence.)

6    BY MR. SCHACHTER:

7    Q.    This is a communication between you and Sarah Barker.  If

8    we can focus on page 3.  Ms. Barker writes (as read):

9              "It's just a shame because if she would have had

10         good people at the beginning and had proper processes

11         in place, this wouldn't be happening."

12         You write, (as read):

13             "Agreed.  She absolutely trusted the wrong

14         people."

15         MR. SCHACHTER:  I have no further questions.

16         Thank you, Mr. Levy.

17         THE COURT:  Okay.  Ladies and gentlemen, let's --

18         MS. NECHAY:  Your Honor, I apologize for the

19    interruption.

20         THE COURT:  Oh.  Sorry.

21         MS. NECHAY:  I was going to suggest to the Court that,

22    if I may, I'd like to just ask the witness just one or two

23    questions --

24         THE COURT:  Oh, go ahead.

25         MS. NECHAY:  -- because it might lead to --

1    THE COURT:  Please go ahead.

2    MS. NECHAY:  Thank you.

3                CROSS-EXAMINATION

4  BY MS. NECHAY:

5  Q.    Good afternoon, Mr. Levy.

6  A.    Good afternoon.

7  Q.    You testified yesterday about having your differences with

8  Dr. Brody; correct?

9  A.    Yes.

10  Q.    Do you specifically recall the details of a meeting that

11  took place on March 10th, 2022?

12  A.    I do, yes.

13  Q.    Okay.  You recall that this was a credentialing meeting

14  that was led by Dr. Brody?

15  A.    It was a credentialing meeting.  It was our first one,

16  actually, trying to establish a credentialing policy and

17  procedure and board, so we had lot of agenda items to get

18  through on that meeting.  And Dr. Brody, being the clinical

19  president, was one of the leaders in that meeting, yes.

20  Q.    You recall making a chopping gesture as such (indicating)

21  to Dr. Brody in order to get him to stop speaking to the other

22  clinical leadership members?

23  A.    He was actually screaming at me when I made that gesture

24  because I was trying to get the meeting back on track.

25        All we needed at the time was a vote of if that

1    clinician -- by the clinical leadership, if they were going to

2    approve or deny his credentialing application.  And had he

3    denied it, that was an opportunity for clinical leadership to

4    step in and say:  We're not bringing that provider on board.

5        Or had they approved it, that was an opportunity for them

6    to say:  We endorse this provider.  They can come on board.

7        It did not matter to me either way which way that vote

8    went.  We had spent about 40 minutes discussing that provider,

9    so all I was asking for was a vote.  And he started screaming

10   at me, to which I made that gesture and asked him to stop and

11   said it was very disrespectful to be screaming at me.

12   Q.   You were not invited to that meeting; correct?

13   A.   I don't recall if I was or I wasn't.  I know that there

14   was another one later on that I was not invited to.  I believe

15   that Michelle Huynh, who was developing the credentialing

16   process with our external vendor, had reached out to me and

17   asked if I was going to be available at that time, and then

18   I believe someone asked me to join the meeting.

19   Q.   You stated you don't recall.  Would it refresh your

20   recollection to review documentation regarding that meeting?

21   A.   Possibly.  I know that there's official agenda items and

22   it is treated like a committee meeting where those in

23   attendance that have voting powers are shown up on those

24   documents.

25        MS. NECHAY:  With that, Your Honor, I would like to

1  refresh the witness's recollection.  But it's a several-page

2  document, so if the Court would permit me --

3        THE COURT:  Well, show him anything you want to show

4  him.

5        MS. NECHAY:  I was just saying, my suggestion is

6  perhaps, respectfully --

7        THE COURT:  No.  Just show it to him.  Let's get

8  going.

9        MS. NECHAY:  It's a lengthy document --

10        THE COURT:  Just show it to him.

11        MS. NECHAY:  Okay.  It's not a document, however, that

12  he --

13        THE COURT:  Just show it to him.

14        MS. NECHAY:  Okay.

15        THE COURT:  So the question is, looking at the

16  documents, does that refresh your recollection as to whether or

17  not you were invited to that meeting?  That's the question.

18        THE WITNESS:  I don't recall if I was invited or not.

19        THE COURT:  Okay.  That's the answer.

20  BY MS. NECHAY:

21  Q.   Okay.  The only other --

22        MS. NECHAY:  And, Your Honor, I'm happy to pick up my

23  questioning after the break or I can continue.

24        THE COURT:  No.  Just ask him questions so we can move

25  ahead.

BY MS. NECHAY:

Q.   So specifically at that meeting, you were the only person that was not on the clinical leadership team; is that true?

A.   That is not true.

Q.   Who else was there that was not on the clinical leadership team?

A.   I believe Sara Faber was there.  Michelle Huynh was there. I believe Sarina Pattar was there.  I don't recall if Sarina -- Sarina started either a day before that or something along those lines, so I don't know if she joined or not.

Q.   And they had administrative roles; correct?

A.   What was that?

Q.   They had administrative roles; correct?

A.   Yes.

Q.   To assist clinical leadership?

A.   They had their own respective roles and responsibilities, and one of them was to assist clinical leadership in establishing this credentialing committee.

Q.   You had only been working at Done for about a month before this meeting took place; correct?

A.   No.  I had -- I started as Done in October.

Q.   In October?

A.   And this meeting is in March.

Q.   Okay.  Thank you for clarifying.

     With respect to the meeting that you don't recall whether

1    you were invited or not invited to, Dr. Brody was spearheading

2    that meeting; correct?

3    A.    Again, I'm actually pretty sure Michelle Huynh was

4    spearheading that meeting because she was the one that was

5    working with the external vendor to establish the credentialing

6    committee, and she was seeking the -- the conversations were

7    around the credentialing packets of providers that were

8    presented to all clinical leadership a week or so before that

9    time, and it was an official committee meeting to seek votes on

10   if those providers were to be permitted to practice at Done or

11   they were not to be.  The floor was open for discussion on any

12   of those providers, but ultimately the goal was to get through

13   the agenda of providers because we owed those providers a

14   response as well.

15   Q.    Michelle Huynh did start the meeting and she created the

16   Zoom link and shared it with other individuals; correct?

17   A.    She also, I believe, hosted her screen the entire time.

18   I believe she also marshaled through the requirements because

19   she was given explicit requirements by the vendor Verifiable on

20   how to run a credentialing meeting and elicit the votes of the

21   providers present.

22   Q.    Okay.  I'm going to ask you some yes-or-no questions.

23        Dr. Brody did, in fact, elicit information and his

24   advocacy to remove a Dr. Alan Tran; yes or no?

25   A.    There was -- I don't -- I know that there was a lot of

1    discussion around -- and, actually, with that provider,

2    I believe it was a malpractice claim related to epiglottitis

3    and that provider had overarching other concerns because a

4    malpractice claim had been lost in his -- against him, so

5    resolved in the favor of the patient.  And Dr. Brody did

6    express concern related to that.  And there was other clinical

7    team members offering plenty of discussion related to that as

8    well.

9    **Q.**   Thank you.

10    And Dr. Tran actually discovered that his malpractice

11    record showed that there was a preventable death due to the

12    condition that you just described; correct?

13    **A.**   That Tran did or Dr. Brody did?

14    **Q.**   I believe it was Dr. Tran that reviewed -- excuse me -- it

15    was Dr. Brody discovered that there was this malpractice issue

16    with Dr. Tran; correct?

17    **A.**   Yes.  It was highlighted in the credentialing packet and

18    he brought it up to -- for discussion with the team.

19    **Q.**   And he expressed his concerns that keeping a provider that

20    had a malpractice record on the Done platform would expose your

21    company to liability; correct?

22    **A.**   Yes.  And, again, it went on for a very long discussion.

23    And Dr. Martinez even tried to reel it in and say:  I

24    understand the concern.  This is a credentialing meeting; we do

25    not need to bring this provider on board.

1    So the other physician in the room was also sponsoring

2  action on this application.

3  **Q.**   But Dr. Brody fiercely advocated for removing this

4  Dr. Alan Tran from the Done platform; correct?

5  **A.**   I don't know if he was even practicing with Done yet, but

6  I recall Dr. Brody not wanting that provider on board, yes.

7  **Q.**   You don't recall Dr. Brody --

8    **THE COURT:**  Well, I think that that was covered.

9  Okay.  So he said yes.  He said yes.

10    **MS. NECHAY:**  Stating that he would -- Your Honor --

11    **THE COURT:**  I think we've -- I actually think we've

12  established that so let's move on to another subject.

13  **BY MS. NECHAY:**

14  **Q.**   You, however, sharply disagreed with Dr. Brody on this

15  subject?

16  **A.**   I did not.  I wanted an action on the application and I

17  wanted the meeting to move forward.  I implored the providers

18  to call a vote and move the agenda forward.  If the provider --

19  if the providers, as a uniform body for a credentialing

20  committee, agreed not to bring this provider on board, I

21  endorsed that decision.  If they agreed to bring him on board

22  with supervision or other criteria, I endorsed that decision as

23  well.  It was -- it did not matter to me what happened with

24  that provider coming on board or not because it was not my

25  decision to make.  All I was trying to do was move the meeting

1  forward.

2  Q.   Dr. Brody was using this as an example that -- as an

3  example of a discussion point for overall Done policies when

4  you decided to move it along; correct?

5           THE COURT:  Counsel, he's agreed.

6           MS. NECHAY:  I'm asking him.

7           THE COURT:  He said that Dr. Brody opposed this person

8  being credentialed -- being allowed on the platform.

9           MS. NECHAY:  And I --

10          THE COURT:  This witness has not disagreed with that.

11  He said, yes, he did.  So did somebody else.  And what he said

12  was let's have a vote, because it had gone on for some period

13  of time, according to this witness.

14      So I don't think -- I think it is -- I think it's covered

15  and I think we should move to a new subject if you have one.

16          MS. NECHAY:  I apologize, Your Honor.  I'm asking a

17  different question regarding this being an opportunity for

18  policy discussion rather than just about this individual

19  patient.

20          THE COURT:  Okay.

21  BY MS. NECHAY:

22  Q.   When you asked Dr. Brody to stop talking as the clinical

23  president, he was trying to use the example of this physician

24  in the context of changing Done policies; isn't that correct?

25  A.   I do not -- I don't recall that.  Again, I recall this

1 being a meeting on voting on if clinicians needed to come on

2 board or not and if they were going to be permitted or not

3 permitted to join the platform.

4     I don't -- if Dr. Brody ever wanted to have a conversation

5 with me regarding adjusting and making policies and procedures

6 better, and I offered that and I offered plenty of assistance

7 to develop projects for Dr. Brody, break them down into bullet

8 points and data points on things that I've seen in other

9 organizations, pulled other policy and procedure manuals from

10 other organizations and gave him as much leeway and endorsement

11 as I possibly could.

12     I even worked with Ruthia to hire a law firm to review

13 those policies and procedures had they been produced to me in

14 enough time.

15     So we very much -- I respected Dr. Brody's clinical

16 experience and years as a clinician.  I was very frustrated

17 that we couldn't have administrative or basic meetings in a

18 professional setting with basic human decorum.

19 **Q.**    Okay.  Thank you.

20     I'd like to move on to the attachments and what has

21 already been admitted into evidence, Exhibit 656.

22     Thank you very much.

23     And you recall yesterday the Government bringing up page 3

24 of this exhibit and eliciting testimony about Dr. Brody's lack

25 of formality regarding e-mails.

1      Do you recall that?

2  **A.**  I don't know that it -- to be about formality regarding

3  e-mails, but he did say -- these are not very formal, and

4  copied-and-pasted previous documents into Slack.

5  **Q.**  Okay.  Right in the middle there, there was some

6  testimony, "PS" -- beginning with "PS."

7      The Government asked you a question about that and

8  Government also asked you about a section where Dr. Brody

9  stated (as read):

10         "This was not intended for use to satisfy

11      regulatory and fourth estate."

12      Do you recall some statement like this?

13  **A.**  Yes, I do.

14  **Q.**  And out of this six-page document, the Government did not

15  ask you any other questions --

16         **THE COURT:**  Well, whatever the Government did or

17  didn't do, that's argument.

18      You could ask the question, if you think the Government

19  didn't say something, ask the question; say the Government said

20  something, ask the question, but don't characterize what the

21  Government did.

22         **MS. NECHAY:**  Understood, Your Honor.

23  **BY MS. NECHAY:**

24  **Q.**  I'd like to bring your attention to page 2 of this

25  exhibit.

1      Mr. Schachter already went over some additional portions

2  here with you, but I'd like to bring your attention to the

3  first -- to Number 5, where it states, in the middle of the

4  paragraph (as read):

5          "I know our rapid growth rate is used as an

6          explanation for almost any shortcoming and the reason

7          this document is not well-known is not important.

8          What is important is to get the document out there,

9          so hopefully here it is."

10     Do you recall Dr. Brody imploring you in that way to

11  please distribute his clinical guidelines to the providers?

12  **A.**   This isn't a direct imploring of me or my duties.  I

13  rare -- I interfaced one-on-one with some providers, but I

14  rarely sent out communication to all of them at any given time.

15     And, in addition, we had a structured format for the way

16  in which we were going to be distributing these things and

17  his -- the documents that were later shown to me by the other

18  defense counsel were sent off to the law firm in a way to get

19  them analyzed for compliance so that they could be distributed

20  and we could have a training manual led by compliant --

21  compliance attorneys-approved training manuals so that we could

22  have this out to all of our providers.

23     We were -- I endorsed this and I did a lot of work to try

24  and get those out.

25  **Q.**   He continued (as read):

1          "BTW" -- Which do you understand that to mean

2      "by the way"?

3  A.    Yes.

4  Q.    (as read):

5          " -- I still feel we should just e-mail these to

6      all clinicians as I'm about to do to y'all."

7      So as the chief operating officer, you did not feel it was

8  incumbent upon you to assist in the distribution of important

9  clinical materials that your clinical president produced?

10 A.    We all equally had access to those e-mails.  It would have

11 been sufficiently stronger to have him himself e-mail every

12 clinician one-on-one, or send it out in a mass e-mail to all

13 the providers.  It would have meant a lot more coming from a

14 clinician than it would have been from me.

15     And the plan for the training was to have it with an

16 attorney and clinicians in a live session so that those could

17 occur --

18          **MR. FOSTER:**  Objection, Your Honor.

19          **THE WITNESS:**  -- consistently.

20          **MS. NECHAY:**  I'll move on.

21 **BY MS. NECHAY:**

22 Q.    I'd like to go to the following page, and right at 8:25 --

23 withdrawn.

24     With respect to -- where it begins at "obviously."

25 A.    I -- there's nothing visible on my screen.

1  **Q.**  Oh, I apologize.

2      If we can go back to 656 at page 3.  And the second to

3  last paragraph starting with "obviously."

4      You recall that Mr. Schachter was just asking you some

5  questions about the paragraph right above that, examples about

6  the -- that Dr. Brody provided.

7      Do you recall that?

8  **A.**  I believe he showed me this whole thing and asked me

9  questions about it, yes.

10  **Q.**  Okay.  And so you specifically recall that Dr. Brody on

11  the very last paragraph stated (as read):

12          "There's no doubt that Done's average patient is

13      more stable than the population served by community

14      mental health clinics.  The typical Done patient is

15      less likely to have psychotic symptoms, more likely

16      to be financially stable, and is significantly

17      younger than the community mental health center

18      clients.  Because of these differences, a default

19      visit frequency is a reasonable balance," and he

20      continued on.

21      Do you recall reviewing that?

22  **A.**  I do.

23          **THE COURTROOM DEPUTY:**  One moment.

24                  (Pause in proceedings.)

25  \\\

1  **BY MS. NECHAY:**

2  **Q.**   So you can see here that Dr. Brody was trying very

3  carefully to analyze how the different --

4       **THE COURT:**   This is just argument.  You're just making

5  an argument.  You're marking an argument.  You're saying what

6  you think.  And you can make arguments, but you can't make an

7  argument with a witness.

8       You can't use these documents to -- and a witness sitting

9  there so you can make an argument.  Make your argument when the

10  time comes to make the argument.  It's not today with this

11  witness.

12       Now, if you have a question, a specific question about

13  what this document is, fine.  But you can't argue what it is.

14  **BY MS. NECHAY:**

15  **Q.**   Didn't Dr. Brody on a variety of instances carefully

16  analyze and weigh considerations about what care was

17  appropriate for Done patients?

18  **A.**   I don't know it to be true that he analyzed.  I know that

19  he did some chart reviews.

20       Analytics to me means a very large sample size where that

21  occurred.  So I don't know that to be true.  But I know he

22  provided opinions on his beliefs of what the practice should be

23  at the company.

24  **Q.**   Well, you just reviewed, Mr. Levy, this paragraph, for

25  example.  Isn't that Dr. Brody carefully weighing the model --

1    **THE COURT:**  How does he know what he's carefully

2  weighing?

3    There's a document from Dr. Brody.  He said what he said.

4  Whether he carefully did it, evaluated everything, came to a

5  considered opinion, this witness doesn't know.

6    **MS. NECHAY:**  We can move on, Your Honor.

7    **THE COURT:**  He doesn't know.  But you can argue it,

8  Counsel.  You can argue it.  Examination is not a time for

9  argument.  Okay.

10    **MS. NECHAY:**  I can move on.

11    **THE COURT:**  Thank you.

12  **BY MS. NECHAY:**

13  **Q.**  I'd like to bring your attention to Exhibit 494 already in

14  evidence.

15    **MS. NECHAY:**  If we could just blow that up, please.

16  **BY MS. NECHAY:**

17  **Q.**  Do you recall seeing this document yesterday and being

18  asked some questions about it?

19  **A.**  I do.

20  **Q.**  Okay.  Dr. Brody, in his letter to you dated January 4th,

21  2022, on the very first line -- I'll just go through it

22  quickly -- he makes some mentions of salutations, talks about

23  the holidays; correct?

24  **A.**  Yes.

25  **Q.**  Then he states clearly (as read):

1          "This missive is related to a conversation

2     between Ruthia and I that occurred a little before

3     you arrived in the crucial role of head of

4     operations."

5          Do you see that?

6  **A.**   Yes.

7  **Q.**   Okay.  And I'll just give you a second to review the next

8  paragraph.

9          Here Dr. Brody states (as read):

10         "As you may know, I started with Done as

11    clinical president in approximately August of 2020.

12    I did this on a part-time basis until July 2021.  My

13    earnings while part-time were highly variable,

14    commensurate with my variable hours per week."

15         Do you see that?

16 **A.**   I do.

17 **Q.**   And then he discusses a request for his salary to be

18 increased; correct?

19 **A.**   Yes.

20 **Q.**   He continues on (as read):

21         "Feeling averse to even a slightly prolonged

22    discussion of remuneration at that point, I accepted

23    the offer without expressing my thoughts."

24         Did you take that to mean that Dr. Brody was incredibly

25 uncomfortable with a thorough discussion regarding finances in

1  person?

2  **A.**    I understand that many people have challenges discussing

3  wages and earnings with employers.  I -- I don't know that I

4  took this to understand him having that conversation with me in

5  person.  I think this is a conversation that he was concerned

6  having with Ruthia at the time when he joined.  I'm not sure.

7  **Q.**    I'll move on.

8      In a paragraph down below -- sorry.  On the same

9  exhibit -- Dr. Brody states (as read):

10         "I've said many times, both in training

11         providers and in other contexts, that my goal is to

12         make the patient-first philosophy of Done an everyday

13         reality as opposed to a mere slogan.  In order to

14         achieve this, it's necessary to have a physician

15         leader who is willing to take some risks.  My opinion

16         is that those risks are not great."

17      Do you interpret Dr. Brody's statement about taking risks

18  here to mean that he was willing to be on the edge of

19  innovation and think outside the box?

20  **A.**    No.  I took this to understand that he understood that

21  there's risks, as did I, with working on a platform that

22  prescribed controlled substances and treating a condition

23  that's primarily treated, from my understanding, with

24  controlled substances.

25  **Q.**    He continues on (as read):

1          "However, the vast majority of clinicians

2      perceive the risks as significant enough to not take

3      them, resulting in actions and omissions antithetical

4      to a patient-first philosophy.  Done has already

5      experienced the impact of risk aversion among

6      physicians affiliated with the company.  Early on

7      Dr. Brindala played the role of advocating for

8      practicing defensive medicine in all circumstances,

9      which caused damage before he left."

10     I'll just move on to the very last couple of lines where

11 Dr. Brody stated to you (as read):

12         "PS, initially, I planned to send this e-mail to

13     you and CC to Ruthia.  However, on consideration, I

14     was concerned that there were one or two passages

15     that she might construe as derogatory.  I might be

16     being overly diplomatic and if you think I should, I

17     will gladly share it with her in edited form, or not,

18     as you recommend.  You know I am a big fan of Ruthia

19     and that is actually why I'm being careful."

20     He finishes by saying (as read):

21         "Also for me, it's still unclear who does what

22     in terms of you and Ruthia.  Such is life in the fast

23     lane of startups."

24     There was, in fact, disarray among who was doing what;

25 correct?

1  **A.**   Yes, to the extent that startups are what I would

2  oftentimes refer to as organized chaos.

3  **Q.**   Okay.

4       **MS. NECHAY:**  And, Your Honor, I'd like to move on to

5  another exhibit.  I could move on with the remainder of my

6  examination, if we have a break, in quite rapid speed if I can

7  just have a few moments.

8       **THE COURT:**  Certainly.

9       All right.  Ladies and gentlemen, we're going to take

10  recess now.  We'll be in recess until 10 to 3:00.

11       Remember the admonition given to you:  Don't discuss the

12  case, don't form or express any opinion.  Thank you.

13                 (The jury leaves the courtroom.)

14    (Proceedings were heard out of the presence of the jury.)

15       **THE COURT:**  Let the record reflect the jurors have

16  left.  Could I take a look at 6861?  That's the document, the

17  Shapard document which you said you were introducing it for

18  impeachment of her.

19       Is it -- it was only clear after you said that to me that

20  that's what you were doing, so I want to look at it to see

21  whether or not it would be proper to come in.  It may or may

22  not.

23       Yes, Counsel?

24       **MR. FOSTER:**  It doesn't impeach her testimony.

25       **THE COURT:**  I have no idea what it does.  I haven't

1  seen it.  I know one thing, it -- it's odd that this witness

2  wasn't -- I mean, she was on the stand.

3       MR. FOSTER:  Yes.

4       THE COURT:  Did you use it with her on the stand?  No,

5  you wanted to wait for this dramatic moment.  Well, you got the

6  dramatic moment, but I want to take a look at the document.

7       All right.  And I may have misunderstood you.  I thought

8  when you asked the question, you said "I have one or two

9  questions."

10       MS. NECHAY:  Oh.  I apologize if I wasn't clear, Your

11  Honor.  I thought that this witness -- I was certain this

12  witness wouldn't understand or remember every single detail of

13  that meeting that I first went into.

14       THE COURT:  Well, that's all right, but you --

15       MS. NECHAY:  So I apologize.  So I simply thought that

16  I was giving -- I might have given him an opportunity to

17  refresh during the break.  That was only -- my only intention.

18       THE COURT:  No.  When you first rose to ask questions,

19  you said you had one or two questions.  That's what I recall

20  you saying.  So that's why I thought.

21       Now we're onto maybe the third or fourth topic.  I'm not

22  saying you can't address these topics.  It's that when you tell

23  me one thing, that's what I gear the jury's sitting there

24  and -- I don't want to cut you short.  I think you're entitled

25  to have full cross-examination.  But if you tell me one thing

1    and then you start to do something else, I don't understand it.

2        Maybe I misunderstood you.  Thank you anyway.

3            **MS. NECHAY:**  I think it was my fault.

4            **THE COURT:**  We're in recess --

5            **MS. NECHAY:**  Thank you.

6            **THE COURT:**  -- so we don't lose our court reporter.

7                    (Recess taken at 2:39 p.m.)

8                    (Proceedings resumed at 2:54 p.m.)

9        (Proceedings were heard out of the presence of the jury.)

10            **THE COURTROOM DEPUTY:**  Come to order.  Court is now in

11    session.

12            **THE COURT:**  Okay.  Bring in the jury.

13        I'm not admitting 6861.  Okay.

14                    (The jury enters the courtroom.)

15        (Proceedings were heard in the presence of the jury.)

16            **THE COURT:**  Oh, please be seated.  Sorry.  Yeah.

17            **MS. NECHAY:**  Thank you.

18            **THE COURT:**  Let the record reflect all witnesses --

19    all jurors are present, parties are present.

20        You may proceed.

21            **MS. NECHAY:**  Thank you very much.

22    **BY MS. NECHAY:**

23    **Q.**    Hello again, Mr. Levy.

24    **A.**    Hello.

25    **Q.**    I'd like to pull up, already in evidence, Exhibit 495.

1    **THE COURT:** 495?

2    **MS. NECHAY:** Yes. Already in evidence.

3    **BY MS. NECHAY:**

4    **Q.** And I'd like to turn to 9:09:48.

5    Do you recall testifying, Mr. Levy, about your exchange

6    with Ruthia concerning Dr. Brody in this Slack message?

7    **A.** I don't recall testifying about this message specifically

8    that's highlighted on the screen.

9    **Q.** Okay. But you do recall yesterday testifying about a

10   Slack message with Ruthia concerning Dr. Brody and how to

11   leverage his skill set; correct?

12   **A.** It sounds familiar, yes.

13   **Q.** Okay. Well, let's take a look at 9:09:48. States right

14   there (as read):

15       "I think" --

16   Ruthia states to you (as read):

17       "I think that's the end goal, but as we have him

18       right now, we can also leverage his skill set. Also

19       before we get there, we will need to check in with

20       providers, even with the provider team to give them

21       performance feedback."

22   Do you recall that?

23   **A.** I -- I see the message, yes.

24   **Q.** Okay. You don't dispute that you wrote this message?

25   **A.** I read this message. This is --

1           THE COURT:  Well, I don't know that he wrote this

2     message.

3           MS. NECHAY:  Oh, excuse me.

4     BY MS. NECHAY:

5     Q.   You don't dispute that this was an accurate exchange --

6           THE COURT:  No one's disputing it.  Okay?  They

7     haven't disputed a single e-mail that's been shown.  So let's

8     move on.

9           MS. NECHAY:  Perfect.

10    BY MS. NECHAY:

11    Q.   Then I'd like to go down to 9:15:41.  And here you were

12    speaking and you state (as read):

13              "I think he might feel like he's not being

14         helpful or useful right now so he reaches out to you

15         to complain."

16         And you were speaking about Ruthia; correct?  That

17    Dr. Brody was complaining to Ruthia?

18    A.   Yes.

19    Q.   Okay.  I'd like to go down to 9:17:51.

20         You specifically -- Ruthia specifically states to you (as

21    read):

22              "Happy to kick off a weekly meeting to get the

23         team aligned.  When Michelle was working with him, he

24         did do more."

25         Then moving right along to 9:20:26 -- and just to clarify,

1  the speaker was Ruthia He.  She stated (as read):

2        "At their clinics" -- "at their clinics that

3        they'll have the admin to work on scheduling."

4  And you recall that this was a conversation in this

5  snippet regarding Dr. Brody's complaints that he had to do his

6  owned admin work; correct?

7  **A.**    Yes.  And if I recall, it actually related to why we had

8  to hire Anas.  And I did not fully understand or align,

9  especially because in clinics, a clinician seeing patients, my

10  understanding was that Dr. Brody was not seeing patients at

11  Done, so it didn't make sense to me.

12  **Q.**    Okay.  And here at 9:21:08, you stated (as read):

13        "I think the more we say typical clinics do

14        this," in quotes, "the worse off our patients are --

15        we are.  Dr. Martinez used to say that we needed to

16        give clinicians a week to respond to a refill request

17        because that's how they did it in clinics, et cetera.

18        We have to change the way people work in medicine."

19  And moving on to 10:46:45.  You stated (as read):

20        "She can start on Monday and take pressure off

21        provider success people who can also keep focusing on

22        provider performance revamp.  It will also allow us

23        to get all the credentialing cleaned up, which is a

24        prerequisite to us enrolling into insurance

25        companies."

1    And then it goes on.

2        **MS. NECHAY:**  Then just a couple more, Your Honor.

3    I'd like to go to 1:48:45.

4  **BY MS. NECHAY:**

5  **Q.**  Ruthia He states (as read):

6        "And that's why I had consider Zocdoc model more

7    than setting up our own clinics."

8    Do you recall this being a discussion with Ruthia

9  considering the many platforms that you both were weighing as

10 to what to borrow ideas from; correct?

11 **A.**  We certainly shared in the entrepreneurial spirit of

12 looking at ideas from other platforms, whether it be clinical

13 or not.

14 **Q.**  Okay.  Moving on to 1:49:59.

15    You stated (as read):

16        "Like One Medical or Forward."

17    What are those companies?

18 **A.**  They are -- well, Forward doesn't exist any longer, but

19 One Medical is a concierge primary care service.

20 **Q.**  And here right beneath that at 1:50:40, you state (as

21 read):

22        "One Medical charges a small membership fee,

23    copays, and bills your insurance for every visit."

24    And right beneath that you state at 1:51:48 (as read):

25        "I'm thinking the path is all three models."

1        And right beneath that you state (as read):

2            "Number 2 is probably the most cost effective."

3        And right beneath that, Ruthia responds at 1:52:45 (as

4   read):

5            "Yes, we cannot completely rely on the

6            insurance.  Can we still charge the monthly

7            membership fee when we take insurance?"

8        Finally on 1:56:04, you state (as read):

9            "I'm bringing up the patient ownership concern

10           because it was brought up constantly with clinics and

11           providers at Nurx and Hims & Hers."

12       What is Nurx?

13  **A.**    Nurx is a former employer of mine.  It's a telehealth

14  company.

15  **Q.**    Thank you.  And what about Hims & Hers?

16  **A.**    Hims & Hers is also a telehealth company at --

17  technically, a former employer.  I -- after Apostrophe was

18  acquired by them.

19  **Q.**    You testified finally that -- yesterday -- you were trying

20  to become CEO of the company.  And isn't that why you decided

21  to throw Ruthia He and Dr. David Brody under the bus, to

22  advance your own interests?

23  **A.**    No.  I understood that I would temporarily have to step

24  into that role had the investors had the ability to remove

25  Ruthia.  I did not seek that role.  I didn't want to inherit

1    someone else's company.

2        And I absolutely said in a Slack message:  I guess I have

3    to be prepared to take over a company while I'm on vacation in

4    Europe.

5        But that's the only time.

6            **MS. NECHAY:**  No further questions.  Thank you.

7            **THE COURT:**  Redirect?

8            **MR. FOSTER:**  Thank you, Your Honor.

9                    <u>**REDIRECT EXAMINATION**</u>

10   **BY MR. FOSTER:**

11   **Q.**    Now, Mr. Levy, you were just asked questions for about

12   eight or so hours; is that fair?

13   **A.**    I think so, yes.

14   **Q.**    Did anything you were asked about or anything you ever

15   said or did at Done change the fact that Defendant He told you

16   that she paid money to enforce prescribers to do things?

17   **A.**    No.

18   **Q.**    Did anything you said or did change the fact that

19   Defendant He told you that it would be necessary to break the

20   law for Done to be successful?

21   **A.**    No.

22   **Q.**    Did anything you said or did change the fact that it was

23   Defendant He who gave Defendant Brody a raise after he said he

24   was willing to take risks the vast majority of clinicians would

25   not take?

1    A.    No.

2    Q.    Did any of the statements you made change the fact that it

3    was Defendant He at the end of the day who controlled the

4    clinical practices as Done?

5    A.    I'm sorry.  The screen lit up.  Can you please reask the

6    question?

7    Q.    Sure.  Did anything you say change who was in control of

8    the clinical practices at Done?

9    A.    No.

10   Q.    Who was in control of them?

11   A.    It was Ruthia.

12   Q.    You were asked a lot of questions about your background in

13   telehealth companies and the -- and statements you made in

14   October, November, January, February, early months after you

15   started at Done; correct?

16   A.    Yes.

17   Q.    Did your perspective change over your time at Done?

18   A.    It did.

19   Q.    And what did you conclude about whether Done was organized

20   chaos, like a regular startup, or an illegal operation?

21   A.    As I kept getting blocked on making things compliant, I

22   concluded that we simply weren't compliant and it was an

23   illegal operation that was producing prescriptions left and

24   right.

25   Q.    Can you explain to the jury how different the experience

1    at Done was from all the other telehealth companies you worked

2    at?

3    A.    Yeah.   So at all the other telehealth companies, at least

4    in the last -- in the last years of my experience leading up to

5    Done, I had been brought in to kind of help the company figure

6    out how to grow and scale while facing all these compliance

7    challenges and the challenges that were present as it happens

8    when you're growing a company really quickly.

9         But I had a CMO partner, so a chief medical officer

10   partner.   I had resources and enablement for whatever needed to

11   be done to make sure that we could effectuate the changes that

12   we were trying to put in place, where at Done I was blocked

13   90 percent of the time on doing that.   So we really couldn't

14   become compliant.

15   Q.    And who blocked you 90 percent of the time from becoming

16   legally compliant?

17   A.    Ruthia did.

18        MR. FOSTER:   Ms. Braga, can we bring up 546 at 2.   And

19   can we zoom in on the message from Sara Faber in the middle of

20   the page.

21   BY MR. FOSTER:

22   Q.    Now, when Defendant Brody stated that the clinician should

23   be prescribing medications to patients no matter what, even if

24   they're on other medicines, and not worry about going to jail,

25   how inappropriate did you think that was?

**A.**    I found it -- I mean, first and foremost, the last part,
"not worry about going to jail," was extremely inappropriate.
And I at times provided opinions on how I felt about
prescribing medication to others -- or to people who had other
medications, which wasn't my place to do so.

     But I know that "not worry about going to jail" was very
surprising to me.  And I later learned this to actually be a
question related to patients who were on other controlled
substances.  So it was a concern from that provider related to
prescribing Adderall to patients who were on Suboxone or
admitted to using marijuana or things like that.

**Q.**    And was Defendant Brody like any doctor you had ever met?

**A.**    No.

**Q.**    Had you ever heard anyone say something like think, "keep
prescribing, don't worry about going to jail"?

**A.**    No.

**Q.**    Did Defendant Brody appear to be a reliable source of
medical information?

          **MS. NECHAY:**  Objection.  Calls for expert opinion.

          **MR. FOSTER:**  Appears to him, Your Honor.

          **THE COURT:**  Well, you're asking whether he believed --

          **MR. FOSTER:**  Right.

          **THE COURT:**  -- Dr. Brody was a reliable -- giving
reliable medical information.  You can answer that question.

          **MR. FOSTER:**  Yes.

1    **THE WITNESS:**  No, I did not find him to be a reliable

2  source of medical information.

3  **BY MR. FOSTER:**

4  **Q.**   And can you tell the jury how obvious that was to you?

5  **A.**   I mean, when we were receiving complaints like this, or

6  other complaints from other clinicians, sometimes calling me or

7  otherwise, it became very apparent that there was some issues

8  going on that made it unreliable.

9  **Q.**   And when Elle Monus, the head of HR, advocated for him to

10  get fired because of this remark, who did Defendant He fire?

11  **A.**   Elle Monus.

12    **MR. FOSTER:**  Can we pull up 656 at page 2, Ms. Braga.

13  **BY MR. FOSTER:**

14  **Q.**   Now, you were asked a lot of questions about what

15  Defendant Brody wrote.  And was this the same thing, what he

16  wrote in these guidelines, which he says are informal and not

17  well known, was that what you wanted to put in place in terms

18  of mandatory follow-ups and longer appointment times and

19  guardrails around abuse and diversion?

20  **A.**   We might have shared some similar ideas but it was not the

21  same of what we were trying to implement.

22  **Q.**   And before seeing this in this Slack in July 2022, had

23  Defendant He ever provided this to you?

24  **A.**   No.

25  **Q.**   Had it ever been distributed, what Defendant Brody was

1   saying to clinicians as far as you were aware?

2   A.   No.

3   Q.   And if we can go to page 3 of 656.

4        Now, in this, did Defendant Brody say that he believed

5   that the default frequency for follow-ups should be

6   three months?

7        MR. FOSTER:   At the bottom of page, Ms. Braga, the

8   second to last paragraph.

9        THE WITNESS:   Your question was did he say that?

10  BY MR. FOSTER:

11  Q.   Yes.

12  A.   He advised it was a reasonable balance.

13  Q.   Yes.   And when you got to Done, were patients being seen

14  every three months?

15  A.   No.

16  Q.   And when you left Done, were they being seen every

17  three months?

18       MS. NECHAY:   Objection.   Misstates evidence as below

19  paragraph indicates.

20       THE COURT:   Overruled.

21  BY MR. FOSTER:

22  Q.   When you left Done, were they being seen every

23  three months?

24  A.   No, they were not.

25  Q.   And if we can look at 656 at page 5.

1      Was the reason, as Nurse Barker made clear, because --

2  they weren't being seen because the prescribers weren't getting

3  paid to see them?

4  **A.**   Yes.  That was a very common reason providers told us they

5  weren't doing follow-ups.

6  **Q.**   And did -- who was the one who blocked a compensation

7  change that would have caused them to do follow-ups?

8  **A.**   Ruthia did.

9  **Q.**   And you were asked a lot of questions about Sarah Barker

10  and whether she stayed in the job and when she left and all

11  those things.

12      **MR. FOSTER:**  Can we pull up 666, which was previously

13  admitted.  And can we go to the next page, Ms. Braga.  And the

14  next page.

15  **BY MR. FOSTER:**

16  **Q.**   After Sarah Barker sent her list of all the practices at

17  Done that went against legitimate literature, what did she do

18  when they were blocked from there being any changes?

19  **A.**   To my recollection, she either said she was going to be

20  leaving or stepping back from those communications.  And I do

21  recall this conversation with MJ to try and change her scope of

22  work and she felt like she wasn't being heard.

23  **Q.**   And did you write, in regards to Sarah Barker (as read):

24          "She feels like no one is listening to her and

25      that changes are not happening and she does not want

1    her name associated with clinical leadership or that

2    she approves of our practices company-wide to limit

3    individual risk.  The doctors or" -- "are horrific."

4  **A.**   Yes, that was what I wrote.

5  **Q.**   And who was she referring to when she said the doctors are

6  horrific?

7  **A.**   Both Dr. Brody and Dr. Martinez.

8  **Q.**   And did you go on to say (as read):

9       "She felt super defeated by Ruthia just denying

10       implementation of a template that all clinical

11       leadership approved"?

12  **A.**   Yes.

13  **Q.**   And so was clinical leadership at Done able to make

14  decisions?

15  **A.**   They could make decisions, but they couldn't implement

16  anything.

17  **Q.**   Why not?

18  **A.**   It -- they were blocked at every avenue.  When I sponsored

19  things that they approved, or anyone else, Ruthia would block

20  it if it meant that it made the process even a minute longer.

21  **Q.**   Now, you talk about the template that all clinical

22  leadership approved.  Was that template to use the DSM-5 in

23  notes?

24  **A.**   That was part of the template, yes.

25  **Q.**   And was that after Nurse Barker conducted chart reviews?

1   **A.**   It was.

2   **Q.**   And so did it matter whether chart reviews were occurring

3   or not occurring if the results of them were never implemented?

4   **A.**   It didn't.  It didn't effectuate change so it didn't

5   matter.

6          **MR. FOSTER:**  Your Honor, we'd like to admit

7   Exhibit 1494, which is an Excel that the witness is a custodian

8   of.

9          **THE COURT:**  1494 admitted.

10         (Trial Exhibit 1494 received in evidence.)

11  **BY MR. FOSTER:**

12  **Q.**   And on this topic of metrics provided --

13         **MR. FOSTER:**  If we can bring up 1494, Ms. Braga.

14  **BY MR. FOSTER:**

15  **Q.**   In terms of Defendant He and the metrics at Done, was she

16  primarily interested in metrics that measured how often and how

17  quickly and how reliably providers provided stimulants to Done

18  customers?

19  **A.**   It was tracked and monitored, yes.

20  **Q.**   And was Nurse Barker and others upset because they felt

21  that clinical quality should be the metrics to be followed?

22  **A.**   Yes.

23  **Q.**   And looking at this document that captures provider

24  metrics --

25         **MR. FOSTER:**  And if we can go to the January coaching

1    tab at 1494.

2    **BY MR. FOSTER:**

3    **Q.**    Is this a list of providers whose metrics were low enough

4    in January 2023 -- sorry -- to qualify them for coaching?

5    **A.**    It was, yes.

6    **Q.**    And do you see the types of metrics that were used for

7    coaching at Done in columns L, N, and M, being no-shows,

8    outstanding notes, and outstanding refills?

9    **A.**    Yes.

10   **Q.**    And were those the three metrics that contributed to

11   coaching at Done?

12   **A.**    It wasn't the only three.

13   **Q.**    Okay.  Well, let's -- are those the only three metrics

14   shown here?

15   **A.**    Yes.

16   **Q.**    And if we can look at Exhibit 1494, "Performance Score

17   Card by Lead NP" tab.  And can we go to Row 23, Elizabeth

18   Shapard.

19        So is this a list of metrics that Done actually had for

20   providers for the month of January?

21   **A.**    It is.

22   **Q.**    And when we look at Shapard's metrics, does it show that

23   she has a stimulant percentage of 94.69 percent?

24   **A.**    It does.

25   **Q.**    Does it show in column Q an audit score of 2?

1    A.    Yes.

2    Q.    Does it show in cell H a panel size --

3          MR. FOSTER:  If we can go to cell H, Ms. Braga.

4    BY MR. FOSTER:

5    Q.    -- a panel size of 2,008 patients?

6    A.    It does.

7          MR. FOSTER:  If we can go to cell AB23.

8    BY MR. FOSTER:

9    Q.    Does it show overdue patients, 801 patients who are out of

10   compliance with follow-ups?

11   A.    Can you go up one cell just so I can see the title,

12   please.

13   Q.    Yeah.

14   A.    With your mouse.

15         MR. FOSTER:  Ms. Braga, can you click on row 4,

16   column AB or the witness.  And can you go click on that.

17         THE WITNESS:  Okay.

18         MR. FOSTER:  And show what comes up when you click on

19   it to the right in the box, Ms. Braga.  The message there.

20       Can you click on that and expand it.

21         THE WITNESS:  Can you ask the question again --

22   BY MR. FOSTER:

23   Q.    Sure.  Yes.

24   A.    -- and see if I have the context.

25   Q.    Did you understand that there were 801 overdue patients

1  who had been over six months since they had had a follow-up for

2  Elizabeth Shapard?

3  **A.**   Yes, I do understand that that was the metric, yes.

4  **Q.**   Okay.  And did Ms. Shapard appear on the January coaching

5  list that we saw?

6  **A.**   I don't believe so.

7  **Q.**   And is the same true for other high-volume prescribers

8  like Jonathan Decker and Erin Kim, where they had huge panel

9  sizes, high stimulant percentages, low chart audit scores, huge

10 overdue patient counts, and they were not on the counseling

11 list?

12 **A.**   Correct.

13      **MR. FOSTER:**  And if we can go to Exhibit 1494,

14 "Performance Scorecard by Lead NP" tab, column AB.  And can we

15 sum that column, Ms. Braga.

16 **BY MR. FOSTER:**

17 **Q.**   And does it reflect that there are 10,558 overdue

18 patients?

19 **A.**   It does.

20 **Q.**   And is it fair to say that there was clinical leadership

21 like Sarah Barker who wanted to change these policies and

22 Defendant He blocked that?

23 **A.**   It is.

24 **Q.**   So on this topic of chart reviews, you were asked a lot of

25 questions about chart reviews at Done, so let me be direct.

1        You were asked a lot of questions about early 2022

2    messages.  And when Defendant He was sending these messages,

3    did Done actually have any sort of systematic chart review

4    process in place?

5    **A.**    No.  The only time a chart was reviewed, to my

6    recollection, at that time was when the patient left a review

7    less than five stars and one of the review options that was

8    common was:  Didn't get the medication prescribed that I

9    wanted.

10   **Q.**    And so was -- when Ms. He talked about chart reviews, was

11   she talking about in that -- that in the context of second

12   opinions for patient discharges?

13   **A.**    That was part of that context, yes.

14   **Q.**    And in September 2022, years after the company was

15   created, did Nurse Barker say we haven't gotten a chance to

16   start a formalized chart-auditing process?

17   **A.**    She did.

18   **Q.**    And you were asked about Exhibit 556.

19        **MR. FOSTER:**  Can we pull that up, Ms. Braga.

20   **BY MR. FOSTER:**

21   **Q.**    You were asked about her question on cross-examination,

22   (as read):

23        "Are we still doing routine chart reviews?"

24        Is that right?

25   **A.**    Yes.

1  Q.  Were you asked about your answer, which was (as read):

2        "This is one of the precise reasons I have been

3        pushing for new clinical protocols, though.  They are

4        not robust to defend anything"?

5  A.  I was asked, yes.

6        **MR. FOSTER:**  And, Your Honor, we'd move to admit 714.

7        **THE COURT:**  Admitted.

8        **MR. FOSTER:**  You guys have it.  It was disclosed

9  pretrial.

10      (Trial Exhibit 714 received in evidence.)

11  **BY MR. FOSTER:**

12  Q.  And so in this message from Zoe Martinez, does she tell

13  Defendant He, Defendant Brody, and others (as read):

14        "If someone were to ever review these charts, it

15        would look very bad.  Our charts can't indicate that

16        all is well when it is not"?

17  A.  Yes, Dr. Martinez does say that.

18  Q.  And --

19        **MR. FOSTER:**  Ms. Braga, can you pull up what was

20  previously admitted as Exhibit 724.  And can we go to page 3,

21  please.

22  **BY MR. FOSTER:**

23  Q.  Now, did --

24        **MR. FOSTER:**  And can we go to page 4, actually.

25  \\\

1 **BY MR. FOSTER:**

2 **Q.** Did Sarah Barker tell Defendant He that the -- any sort of

3 chart reviews or provider counseling needed to be enforced,

4 which means the providers would need to get paid?

5 **A.** Yes.

6 **Q.** And did Defendant He want to pay for that type of work?

7 **A.** No.

8 **Q.** And what does that tell you about the priority that

9 Defendant He placed on legitimate chart reviews versus growth

10 and revenue?

11 **A.** There -- there was not a priority placed on legitimate

12 chart reviews and the money going out the door was to be spent

13 on growth.

14 **Q.** And when you and Defendant He talked to external partners

15 like investors and pharmacies and the media, did you lie about

16 the chart reviews?

17 **A.** Yes.

18 **Q.** And can you tell the jury what the lie was?

19 **A.** That -- well, there were probably a few, and some being

20 that they were occurring on a regular basis or that clinical

21 leadership was reviewing charts at a certain percentage.  I

22 don't recall specifically, but that, essentially, they were --

23 they were occurring but there was nothing to back them up.

24 **Q.** And in terms --

25     **MR. FOSTER:**  And can we go to page -- or Exhibit 725,

1  which was previously admitted.  And can we go to page 2,

2  please.

3  **BY MR. FOSTER:**

4  **Q.**  And did Sarah Barker tell Defendant He, Defendant Brody,

5  and otherwise -- and others that (as read):

6      "Each clinical note should show whether the

7      patient has met or has not met DSM-5 criteria.  I can

8      confidently say we are not meeting the standard as

9      far as our clinical documentation and we are way off

10     from the follow-up standards."

11 **A.**  Yes.

12 **Q.**  And so did doing chart reviews do anything to make Done

13 more compliant?

14 **A.**  It did not.

15 **Q.**  Did doing chart reviews or checking on the PDMP make it

16 any less illegal for prescribers to write controlled substances

17 prescriptions without seeing patients?

18 **A.**  No, it did not.

19 **Q.**  You were asked a lot of questions about Defendant Brody

20 and Defendant Brody's chart reviews, in particular in regards

21 to a patient Cheryle Cooke.

22      **MR. FOSTER:**  And can we bring up Exhibit 475, please.

23 And can we go to page 2.

24 **BY MR. FOSTER:**

25 **Q.**  Do you recall being asked about this message that you

1    copied and pasted?

2    **A.**    I do, yes.

3    **Q.**    Okay.  And were you asked about the bottom of page 2 where

4    Anas asked (as read):

5              "Did Dr. Brody review the substance of these

6         charts?"

7    **A.**    What was your question?  I'm sorry.

8    **Q.**    Were you asked that by Anas?

9    **A.**    I was asked that by Anas, yes.

10            **MR. FOSTER:**  And can we go to page 3.

11   **BY MR. FOSTER:**

12   **Q.**    And did you respond, (as read):

13              "I don't think so"?

14   **A.**    I did.

15   **Q.**    Yeah.

16        Now, was another occasion when Defendant He asked about

17   chart reviews when she needed to respond to negative publicity?

18   **A.**    Yes.

19   **Q.**    And after the Good Morning America episode was aired, did

20   you and Defendant He discuss watching it?

21   **A.**    Yes, we did.

22   **Q.**    And did Defendant He also tell you that you asked

23   Defendant Brody to review the Good Morning America episode and

24   conduct a chart review?

25            **MR. SCHACHTER:**  Objection.  Beyond the scope.

1         (Reporter interruption for clarity of the record.)

2              **MR. SCHACHTER:**  Objection.  Scope.

3              **MR. FOSTER:**  It goes directly to the chart review

4    question, Your Honor.

5              **THE COURT:**  Overruled.

6    BY MR. FOSTER:

7    Q.    And do you also -- well, do you remember that, that

8    Defendant He also asked Defendant Brody to review the Good

9    Morning America episode and conduct a chart review?

10   A.    Yes.

11   Q.    And after conducting the chart review did Defendant He,

12   Defendant Brody, and yourself prepare a PR statement saying

13   Good Morning America was wrong?

14   A.    Yes.  I recall that something was published.

15   Q.    Do you also recall being asked a lot of questions about

16   whether you were in the room in meet -- for any meetings

17   between patients and providers?

18   A.    I do recall.

19   Q.    And you were asked questions about who was responsible for

20   the prescriptions in the room with patients and prescribers?

21              **MS. NECHAY:**  Objection.  Relevance, 352.

22              **THE COURT:**  Overruled.

23   BY MR. FOSTER:

24   Q.    Do you recall being asked who was responsible for

25   prescriptions in the room with patients and prescribers?

1          **MS. NECHAY:**  Same objection, Your Honor.

2          **THE COURT:**  Overruled.

3      (Reporter interruption for clarity of the record.)

4          **THE WITNESS:**  I do remember.

5   **BY MR. FOSTER:**

6   **Q.**   And was one occasion where you saw the connection between

7   Done's policies and what occurred in the room between patients

8   and providers when you saw the Good Morning America episode?

9          **MR. SCHACHTER:**  Objection.  Scope.

10         **MR. FOSTER:**  Laying the foundation, Your Honor.

11         **THE COURT:**  Well, I'm trying to -- I'm going to allow

12  it and I'm going to allow you to redirect on it -- recross on

13  it.

14     Go ahead.

15  **BY MR. FOSTER:**

16  **Q.**   Was one occasion when you saw the connection between

17  Done's policies and what occurred in the room between patients

18  and providers when you saw the Good Morning America episode?

19  **A.**   Yes.

20  **Q.**   And you were also asked questions about whether the

21  medication trial policy stopped before you got there?

22  **A.**   I was.

23  **Q.**   And did your viewing of the Good Morning America episode

24  also inform that in your discussions with the defendants?

25  **A.**   It did.

1          **MR. FOSTER:**  Your Honor, we'd move to admit

2    Exhibit 2858.

3          **MR. SCHACHTER:**  Same objection.

4          **THE COURT:**  Okay.  I'm not going to admit it at this

5    point.  This is the video?

6          **MR. FOSTER:**  This is the video, Your Honor.

7          **THE COURT:**  Yeah.  Okay.  Objection sustained.

8    BY MR. FOSTER:

9    **Q.**   Based upon your watching of the video and your

10   conversations with Defendant He and Brody, what did you

11   discover about whether clinicians were still giving medication

12   trials?

13   **A.**   We discovered that -- after watching that that the

14   clinician was sharing a list of medications available to the

15   patient and that they offered the patient a -- or something

16   along the lines of:  Do you want me to diagnosis you with ADHD

17   so you can get the medication?

18         And they offered that to the patient.

19   **Q.**   And did it matter that the patient didn't have ADHD?

20   **A.**   No.  I believe that they actually -- the provider actually

21   said:  You don't meet ADHD criteria.

22   **Q.**   Turning the question of follow-ups, there were questions

23   you were asked about DEA guidance on follow-ups.

24         Where did you get your information about that topic from?

25   **A.**   From counsel at -- well, from Ruthia that said it was from

1    counsel.

2    **Q.**    Did you ever -- did she ever show you any proof?

3    **A.**    No.

4    **Q.**    Did you later learn that she was lying about the length of

5    time patients could legally go without follow-ups?

6            **MR. SCHACHTER:**  Objection.  Objection.  And this is a

7    *Napue* issue, Your Honor, and he knows it.

8            **MR. FOSTER:**  I don't even know what he means.

9            **THE COURT:**  Objection sustained.

10   BY MR. FOSTER:

11   **Q.**    Not based on any discussions that you ever had with

12   counsel, did clinician after clinician tell Defendant He that

13   it was not legal and not safe to prescribe without following up

14   with patients?

15   **A.**    Yes.

16   **Q.**    And let me be direct:  Was there any DEA guidance you ever

17   saw that would permit prescribing to, as we just saw, 10,000

18   patients who hadn't been seen in six months?

19   **A.**    No.

20           **MR. FOSTER:**  Now, Your Honor, we'd move to admit

21   Exhibit 612.

22           **MR. SCHACHTER:**  Do you have that?

23           **MR. FOSTER:**  That's also a document disclosed

24   pretrial.

25           **MR. SCHACHTER:**  But not for this witness.

1          THE COURT:  Okay.

2          MR. SCHACHTER:  I just would like a copy.

3          THE COURT:  Sorry?

4          MR. SCHACHTER:  I'm just asking for a copy.

5          THE COURT:  Yes, fine.  Yeah, wait.  Let's wait a

6     moment until counsel gets a copy.

7          MR. FOSTER:  You should have an electronic one as

8     well.

9          THE COURT:  Any objection?

10          MR. SCHACHTER:  Thank you, Your Honor.

11          THE COURT:  Okay.  Admitted.

12     (Trial Exhibit 612 received in evidence.)

13          MR. FOSTER:  And can we go to page 2, Ms. Braga.

14     BY MR. FOSTER:

15     Q.   And did you write (as read):

16          "I don't have the patience to explain that the

17          standard of care for controlled substances is

18          six month follow-ups"?

19     A.   I did.

20     Q.   And did Sarah Barker respond to Ruthia?

21     A.   Yes.

22     Q.   And did you say (as read):

23          "Yeah."

24     A.   Yes.

25     Q.   And did you say (as read):

1    "Can we find anything anywhere that says

2    standard of care is to follow-up QX time frame"?

3  **A.**    Yes.  And QX means Q -- every -- Q means every.  Every X

4  time frame.

5  **Q.**    And did she respond (as read):

6    "Yes, I have plenty"?

7  **A.**    Yes.

8  **Q.**    And is that consistent with conversations with

9  Defendant He that you had where you told her repeatedly that

10  the standard of care was following up between three and

11  six months?

12  **A.**    Yes.

13  **Q.**    Did clinicians also repeatedly tell her that?

14  **A.**    Yes.

15       **MR. FOSTER:**  And, Your Honor, we'd also move in

16  Exhibit 1000 -- or no, Exhibit 1038 a communication involving

17  this witness and both defendants.

18       **THE COURT:**  Which one are you --

19       **MR. FOSTER:**  1038.

20       **THE COURT:**  Okay.  1038 admitted.

21       **MR. SCHACHTER:**  Your Honor, if I may have just a

22  moment?

23       **THE COURT:**  One moment.

24            (Pause in proceedings.)

25       **MR. SCHACHTER:**  Okay.  No objection, Your Honor.

1   Thank you.

2          THE COURT:  Admitted.

3      (Trial Exhibit 1038 received in evidence.)

4   BY MR. FOSTER:

5   Q.   And on September 1st, 2022, did a member of clinical

6   leadership report to both defendants that one of the NPs

7   reported that she called the DEA and was told patients on

8   Schedule II medications or other controlled substances require

9   at least follow-up appointments every three months?

10  A.   Yes.

11  Q.   And did Defendant He or Defendant Brody change the policy

12  to enforce follow-ups after that point?

13  A.   No.

14  Q.   Now, you were asked about the six-month follow-up policy

15  that went into place in July, 2022.  And do you recall

16  testifying that Defendant He got mad at you about it going out?

17  A.   Yes.

18         MR. FOSTER:  And, Your Honor, we'd move to admit 1062

19  and 1063 which were communications related to that.

20         THE COURT:  1062 and 1063 admitted.

21     (Trial Exhibits 1062 and 1063 received in evidence.)

22  BY MR. FOSTER:

23  Q.   And looking at 1062, do you say (as read):

24         "Ruthia had be going off at like 11:00 p.m."?

25  A.   Yes.

1    **Q.**    And looking at 1063, do you see (as read):

2              "I told Ruthia to leave me alone.  Might get

3        fired"?

4    **A.**    Yes.

5    **Q.**    Can you tell the jury --

6              **MR. FOSTER:**  Oh, sorry.  I don't think it's up for the

7    jury, Lashanda.

8              **THE COURTROOM DEPUTY:**  Okay.  Thank you.

9    **BY MR. FOSTER:**

10   **Q.**    How angry was Defendant He that the six-month follow-up

11   policy went out?

12   **A.**    Pretty upset.  I got a call pretty much immediately

13   following it and was scolded and asked why -- or told that

14   anything moving forward I wasn't allowed to do and needed to

15   seek approval from her on.

16   **Q.**    And then, when you wanted to put in engineering -- put

17   engineering changes in place to make sure the patients couldn't

18   get prescriptions without a six-month follow-up, who blocked

19   it?

20   **A.**    Ruthia did.

21   **Q.**    And when you wanted to put in compensation payments to

22   make sure clinicians got paid, who reversed it?

23   **A.**    Ruthia did.

24   **Q.**    And did clinicians tell both defendants that that was

25   unethical, unsafe, and did they quit Done because of it?

1    **A.**    They did.

2           **MR. FOSTER:**  And, Your Honor, we'd move to admit

3    Exhibit 1016.

4           **THE COURT:**  Admitted.

5        (Trial Exhibit 1016 received in evidence.)

6    BY MR. FOSTER:

7    **Q.**    And can we -- and so is this a communication from a

8    clinician after the payment for transfers was reversed where

9    she wrote to both defendants and said (as read):

10            "I quit.  This is unacceptable to not be paid.

11        My hourly wage I negotiated April 2019.  When I see

12        patients, I want to be paid for that time.  New

13        patients, old patients, follow-ups, it doesn't matter

14        and want an organization that values this.  Whoever

15        financial advisor came up with this way of paying

16        medical professionals needs to reevaluate their

17        values, goals because they are at the expense of a

18        wonderful provider, myself and others."

19   **A.**    Yes.

20   **Q.**    Now, you were asked questions about the response to the

21   media.  Do you recall being asked questions about that?

22   **A.**    I do.

23   **Q.**    And you were asked questions about the response to

24   Bloomberg on the three-strikes policy.

25           Do you recall that?

1    A.    I do.

2        MR. FOSTER:  And can we pull up what was previously

3    admitted as Exhibit 1416.

4    BY MR. FOSTER:

5    Q.    So when the questions initially came in, did

6    Defendant Brody respond internally that Done had had the policy

7    and it was a good thing because Done was a company built around

8    a customer-first philosophy?

9    A.    I recall the second part.  I just am looking for the rest

10   of the context myself.

11   Q.    Sure.

12   A.    Dr. Brody does acknowledge that it, in and of itself, is a

13   good policy in reference to the patient-first philosophy.

14       MR. FOSTER:  And if we can go to the initial -- the

15   responses to Bloomberg, 584 at 2.

16   BY MR. FOSTER:

17   Q.    Were -- was a response sent on April 15th, 2022?

18   A.    It was.

19   Q.    And if we can go to page 3, is that where Defendant He and

20   Defendant Brody both said (as read):

21       "Done does not have such a policy for our

22       providers"?

23   A.    Yes.

24   Q.    Now --

25   A.    That's actually marked as Ruthia's responses.

1    Q.    Sure.

2    A.    And they're -- I recall Dr. Brody also saying no on his

3    responses.

4          MR. FOSTER:    Sure.    Can we look at page 5 Ms. Braga?

5    BY MR. FOSTER:

6    Q.    Is that the same response from Defendant Brody?

7    A.    It is, yes.

8          MR. FOSTER:    And then can we go to page 1 of

9    Exhibit 584.    And if we can look at the e-mail at the bottom,

10   on April 18th.

11   BY MR. FOSTER:

12   Q.    Did the Bloomberg journalist respond with a follow-up

13   where he said (as read):

14        "You say you do not currently have a

15        three-strike policy.    Are you saying you never had a

16        three-strike policy?    We were told by former

17        providers that such a policy existed"?

18   A.    Yes.    There was a follow-up question for that.

19   Q.    Okay.

20         MR. FOSTER:    And then can we go to what was admitted

21   as Exhibit 582.

22   BY MR. FOSTER:

23   Q.    And this was what was shown to you on cross-examination.

24        After that follow-up where the journalist followed up

25   again and said "Clinicians are telling us you had this policy,"

1    did Defendant Brody write again (as read):

2            "When I wrote to the PR team that we used to

3        have a policy, I said that because it is true"?

4    A.   Yes.

5            MR. FOSTER:  And if we can go to Exhibit 585, which

6    was previously admitted, and go to page 2.

7    BY MR. FOSTER:

8    Q.   Did --

9            MR. FOSTER:  And the one at the bottom, from page 2 to

10   3.

11   BY MR. FOSTER:

12   Q.   On April 19th, did Defendant He respond, going to

13   page 3 -- (as read):

14           "David still cannot recall when we had this

15       policy"?

16   A.   Yes.

17           MR. FOSTER:  And if we can go back to page 2 of 585.

18   BY MR. FOSTER:

19   Q.   Did Andres Ramirez, the PR firm, respond (as read):

20           "I understand" -- "Ruthia, I understand you do

21       not recall having this policy in place.  Even if you

22       had a policy slightly different in place, I would

23       recommend against stating anything that could be

24       proven untruthful"?

25   A.   Yes, he did.

1  Q.   And can you tell the jury whether the PR firm became

2  concerned that Defendant He was lying to them and the media?

3  A.   They did.  Often after the calls concluded with all of us

4  on, they would call and say:  We're concerned about the honesty

5  and the truthfulness that we are receiving from Ruthia.

6  Q.   Did Defendant He continue to insist on making false

7  statements?

8  A.   Yes.

9  Q.   And you were shown a best practices example from a

10  contract, Exhibit 1308 at 75.

11      Do you see this, "Schedule C, Best practices for Done

12  platform use"?

13  A.   Yes.

14  Q.   And that's the medication trial language, "If the patient

15  does not meet DSM-5 criteria"?

16  A.   Yes, it does.

17      MR. FOSTER:  And, Ms. Braga, can you pull up

18  Exhibit 554 at page 6.

19  BY MR. FOSTER:

20  Q.   Did Defendant He tell the media, "Done does not provide a

21  list of best practices to providers," when they asked about

22  that?

23  A.   Yes.

24  Q.   What was your understanding of why Defendant He kept lying

25  about what Done's prescription practices were?

1    **A.**   Well, we were concerned that the truth getting out would

2    have pharmacies stop filling medications and other issues at

3    hand that ultimately would impact the revenue and growth of the

4    business.

5    **Q.**   And were you also concerned that the Government would

6    investigate and you might be held responsible?

7    **A.**   Yes.

8         **MR. FOSTER:**   Can we pull up Exhibit 1371.  And can we

9    zoom in on the middle box there with the green highlighting,

10   Ms. Braga.

11   **BY MR. FOSTER:**

12   **Q.**   So is this what Defendant Brody was saying internally,

13   "Don't follow the DSM-5"?

14   **A.**   Yes, I had heard that prior to this.

15   **Q.**   Okay.  But externally, if we go to Exhibit 553 at 8, did

16   the defendants lie to the media and say that they didn't have

17   such a policy of not following the DSM-5?

18   **A.**   Yes.

19   **Q.**   And when they were asked what is the medical or other

20   basis for such trials, did they even try to defend not

21   following the DSM-5?

22   **A.**   No.

23   **Q.**   And why wasn't what Defendant Brody said internally and to

24   clinicians, "don't follow the DSM-5," admitted externally?

25   **A.**   Well, because that wouldn't be evidence-based medicine or

1  anything that established a standard of care that was

2  appropriate for people to be prescribed Adderall.

3  Q.   Now, you were asked a lot of questions about who was

4  responsible for these answers.  Who signed off on these

5  answers?

6  A.   Ruthia did.  There was one time where I sent one answer

7  out to a question and she immediately called me and said:  You

8  can't do that.  I need to approve them all.

9  Q.   And after it was denied that this policy of not following

10  the DSM-5 existed, did Defendant Brody and Ruthia He continue

11  to tell prescribers not to follow it?

12  A.   Yes.

13  Q.   Now, turning to the federal investigation.  After the

14  federal investigation began, did you and Defendant He obstruct

15  it by not making incriminating statements on Slack channels?

16  A.   Yes.  Us and the majority of the company.

17  Q.   And you were asked about this -- some of these Slack

18  messages that still existed.  Is that what you were referring

19  to when Defendant He said "I'll delete the Slack messages"?

20  A.   No.  I was referring to an immediate conversation that her

21  and I had had related directly to that article coming out and

22  it was -- it was actually a conversation of Ruthia reassuring

23  me that everything was going to be okay and that we're good.

24  Cerebral is different than us.

25      And we had had a conversation externally that we shouldn't

1    talk about Cerebral.  And I took that a step further and said,

2    well, let's just not talk about it on company platforms.  But

3    those were the messages that were deleted.

4         MR. FOSTER:  And if we can pull up what was admitted

5    as Exhibit 7535.  I can pull it up with the ELMO.

6    BY MR. FOSTER:

7    Q.   So is this -- you were shown this on cross-examination.

8         Do you recall that?

9    A.   Yes.

10   Q.   And what's the date on this edit?

11   A.   On this edit, it's May 25th, 2022.

12   Q.   And is that after when you and Defendant He discussed

13   deleting messages?

14   A.   Yes.

15   Q.   And did she go into this document, it appears, and delete

16   the language about the medication trial policy?

17   A.   It does, yes.  The red highlight indicates deletion.

18   Q.   Now, you were also asked about the Google and Slack

19   accounts belonging to former employees.  And did you tell

20   Defendant He, "We can't do it until we have a complete backup

21   of their accounts"?

22   A.   I did.

23   Q.   And did Defendant He delete those accounts anyway without

24   a complete backup?

25   A.   They were deleted and, to my knowledge, no backup was made

1    available to me.

2    **Q.**    And you mentioned that these were deleted accounts

3    belonging to former employees; is that right?

4    **A.**    Yes.

5    **Q.**    And so if there were employees or contractors who had quit

6    because Done's practices were unsafe or illegal, would their

7    communications have been retained after this?

8    **A.**    No, they would not have been.

9    **Q.**    And how clear did you take it to Defendant He that she

10   should not allow these deletions?

11   **A.**    Very clear.

12   **Q.**    And you were asked -- did she say it was about cost?

13         Do you remember being asked about that?

14   **A.**    Yes.

15   **Q.**    Now, cost for these e-mail and Slack accounts, can you

16   tell the jury how many millions of dollars Done was spending on

17   advertisements every month?

18   **A.**    The most I saw was 5 million in a month.

19   **Q.**    And so did you feel that cost was a legitimate reason to

20   delete records needed by the grand jury?

21   **A.**    I didn't feel that cost was a legitimate reason to delete

22   anything.  And truthfully, regardless of the grand jury or not.

23   **Q.**    And after the grand jury investigation started, would

24   Defendant He propagate the compliance message when she

25   communicated on Slack?

1  A.    I'm not entirely sure what you're referring to.

2  Q.    Sure.  Do you remember when Mr. Sanfratello referred to

3  gaslighting by Defendant He?

4  A.    Yes.

5  Q.    And do you recall the message that Defendant He sent you,

6  that you and her should redirect the attention from

7  overprescribing?

8  A.    Yes, I do.

9  Q.    And so after the subpoena was served, would she post false

10  statements about compliance and wanting reviews and things like

11  that on Slack?

12  A.    Yes, she would.

13  Q.    What encrypted platforms was she actually using to run the

14  company?

15  A.    From my recollection, mostly Signal.

16  Q.    And was it your impression that Defendant He was saying

17  one thing on public channels and other things on privates ones?

18        MR. SCHACHTER:  Objection.  Leading.

19        MR. FOSTER:  I'll rephrase.

20  BY MR. FOSTER:

21  Q.    What was your impression about what Defendant He was doing

22  in her communications?

23  A.    I think there was even a time where I said that it felt

24  like she was grandstanding on the Slack platforms, boasting

25  about the company and our compliance, and also comparing us to

1    others like, "Oh, well, Kaiser always get investigated and

2    otherwise," while on Slack, it was -- or on Signal it was

3    everything that was going on day-to-day.

4    Q.    You were also asked a lot of questions about -- about

5    wanting to enforce NDAs and silence employees from talking to

6    the press.

7    A.    I was.

8    Q.    And were you and Defendant He concerned that employees

9    would tell the truth to the media?

10   A.    We were.

11   Q.    And prior to the Wall Street Journal article publication,

12   did you discuss firing clinicians who leaked information to the

13   media?

14   A.    Yes.  And it wasn't necessarily just the media, it was

15   information to competitors and other things like that, too.

16   Q.    And --

17         MR. FOSTER:  Can we pull up Exhibit 2861 at page 9 to

18   10, Ms. Braga, and zoom in on the bottom.

19   BY MR. FOSTER:

20   Q.    When the Wall Street Journal article was published, was

21   the current clinician who spoke to the media a clinician called

22   Yina Cruz-Harris?

23   A.    Yes.

24   Q.    And did Cruz-Harris say she managed 2,300 patients for

25   Done?

**A.**    Yes.

**Q.**    And going to page 10, did she say she was clicking and
doing two renewals a minute?

**A.**    She did.

**Q.**    And so can you tell the jury how that influenced
Defendant He's desire to fire people who talked to the media?

**A.**    Well, we ultimately didn't end up firing Yina, but there
was concern that because the truth was out there, that
providers didn't actually have to do much to send a refill out,
and there weren't as many safeguards as we were touting in our
responses to the media, and that there was a grave concern that
the providers were going to be telling the reality of the
situation to the media.

**Q.**    And how did Defendant He's reluctance to fire
Nurse Cruz-Harris relate to the number of patients she had?

**A.**    I don't recall.  I do believe that some -- that Yina had
her panel cut down, but I don't recall -- well, before that,
there was discussions of:  How are we going to rehome all these
patients?

    And there was no good way to do that, because she was in a
underserved provider area for us.  And so there was actually
concern related to:  How are we going to keep these patients
and make -- you know, keep the memberships active for these
patients?

    And then later, slowly, we started to taper off the number

1  of patients Yina had to try and remove her.

2  **Q.**  And when you say "we," do you mean you and your team?

3  **A.**  Yes.

4  **Q.**  Okay.  Who wanted to keep Yina Cruz even though she was

5  signing two refills a minute?

6  **A.**  Ruthia did.

7  **Q.**  Now, you were also asked a lot of questions about whether

8  you were doing things without Defendant He's knowledge.

9      Do you recall those questions?

10 **A.**  Yes.

11 **Q.**  And you were asked a lot of questions about whether you

12 were able to do things without her knowing it.  Do you recall

13 that?

14 **A.**  Yes.

15 **Q.**  Can you tell the jury how much Defendant He micromanaged

16 the operations of Done?

17 **A.**  I --

18      **MS. NECHAY:**  Objection.  Asked and answered.  352.

19      **THE COURT:**  Sustained.

20 BY MR. FOSTER:

21 **Q.**  Now, were you the one who was able to make decisions about

22 the model, the fundamental model at Done without Defendant He's

23 approval?

24 **A.**  I was not.

25      **MS. NECHAY:**  Same objection, Your Honor.

1        **THE COURT:**  Overruled.

2        **MR. FOSTER:**  Your Honor, we'd move to admit

3   Exhibit 1009.

4        **THE COURT:**  Admitted.

5      (Trial Exhibit 1009 received in evidence.)

6        **MR. FOSTER:**  And can we go to page 4.

7   BY MR. FOSTER:

8   Q.  Did you write in this message to Mr. Sanfratello --

9   A.  Can you just show me one page before this so I can see

10  if --

11  Q.  Yeah.  We can go to page 1.

12  A.  Thank you.

13  Q.  Yeah.

14      Now, did you write on page 4 (as read):

15          "The gatekeeper ultimately is Ruthia.  The

16      mindset has been established" --

17        **MR. FOSTER:**  It's at the top, Ms. Braga.  The sixth

18  line, I believe.

19  BY MR. FOSTER:

20  Q.  (as read):

21          "The gatekeeper is ultimately Ruthia.  The

22      mindset has been established.  We've been doing it

23      this way for years.  Why change it?  And anything

24      that isn't significantly broken won't be changed or

25      adjusted with excessive pushing or persuasion.

1          "I know the above is super upsetting but it's

2      the truth.  We are hired as industry-leading experts,

3      some living the telehealth industry from the day it

4      became legal to those who have gone through

5      investigations with government bodies in an active

6      company, yet advice, decisions, and other steps

7      aren't yielded to and it is exhausting, upsetting,

8      and frustrating."

9  A.    Yes.

10 Q.    Can you explain to the jury what you meant?

11 A.    Sorry.  That one frustrated me all over again.

12     There were so many of us that were hired for -- sourced

13 by -- I believe Joe also as sourced from Craft Ventures because

14 they had concerns about the company being compliant and moving

15 forward and they -- they wanted their investment to succeed, of

16 course.  They're an investment capital firm.

17     And we were all recruited with this promise from them that

18 we were going to have some level of autonomy and some ability

19 to make change and make this successful.  But the reality was

20 is every day was an excruciating fight, whether it be to try

21 and just keep the company moving and change things.

22     You know, I referred to it sometimes as:  You don't air

23 the dirty laundry of a divorce before the divorce is public.

24     And so we were trying to fix things at home but we

25 couldn't.  The home and -- we were also kicked out to the yard

1   by the time we went to fix things a lot of the time.  And it

2   was exhausting.

3        So a lot of us were brought in with experience from the

4   industries in telehealth to solve the problems that Done was

5   facing and we were completely ignored.

6   **Q.**  Now, when that happened, did you and Defendant He lie to

7   pharmacies and others to keep the business going?

8   **A.**  We did, and -- yeah.

9   **Q.**  And did you actually think Done was compliant when you

10  were lying to them?

11  **A.**  No.  I was hoping to get us there.

12  **Q.**  And if you had thought Done was compliant, would you have

13  needed to tell Defendant He not to talk on company platforms?

14  **A.**  No.

15  **Q.**  And if you believed everything was compliant, would you

16  have offered to cooperate after becoming concerned about fake

17  evidence being provided to the grand jury?

18  **A.**  I might have.  I don't recall.

19  **Q.**  And would there have been any need for you to participate

20  in chats on encrypted apps if everything was compliant?

21  **A.**  There would not.

22       **MR. FOSTER:**  No further questions, Your Honor.

23       **MR. SCHACHTER:**  Your Honor, three questions.

24       **THE COURT:**  Go ahead.  Yes, go ahead.

25  \\\

1            **RECROSS-EXAMINATION**

2   **BY MR. SCHACHTER:**

3   **Q.**   Mr. Levy, you were asked if your perspective at some point

4   changed about Done over time from organized chaos to illegal

5   operations.

6         Do you remember that question?

7   **A.**   I do.

8   **Q.**   You have a sister-in-law named Evelyn Weston; is that

9   right?

10  **A.**   I do.

11  **Q.**   You recruited your sister-in-law, Ms. Weston, to work at

12  Done months after you had started; correct?

13  **A.**   I did.

14  **Q.**   And Ms. Weston continued to work at Done until September

15  of 2023, more than a year after Done had received a grand jury

16  subpoena; isn't that correct?

17  **A.**   Yes, she did.

18            **MR. SCHACHTER:**  I have no further questions.

19            **THE COURT:**  Okay.  Anything?

20            **MS. NECHAY:**  Just one.

21            **THE COURT:**  Sure.

22            **RECROSS-EXAMINATION**

23  **BY MS. NECHAY:**

24  **Q.**   Mr. Levy, you just spoke quite a bit about autonomy;

25  correct?

1    **A.**    Yes.

2    **Q.**    Were you autonomous when you made the decision to lie

3    about your credentials?

4    **A.**    I was, and I shouldn't have.

5    **Q.**    And did you lie only to Dr. David Brody and Ruthia He

6    about your credential, or did you lie to all your other

7    previous employers as well?

8    **A.**    I did not lie to my previous employers.

9    **MS. NECHAY:**  Okay.  Thank you.  No further questions,

10   Your Honor.  I apologize.

11   **THE COURT:**  Thank you.  You're excused.

12   **THE WITNESS:**  Thank you.

13   (Witness excused.)

14   **THE COURT:**  Okay.  Ladies and gentlemen, we're taking

15   our recess.

16   Remember the admonition given to you:  Don't discuss the

17   case, allow anyone to discuss it with you, form or express any

18   opinion.

19   See you tomorrow, 9:15.

20   Sometime Friday I think I can give you some further

21   information as to how we're doing.  Okay?  Thank you.

22   (The jury leaves the courtroom.)

23   (Proceedings were heard out of the presence of the jury.)

24   **THE COURT:**  The jury has retired.  So tomorrow we have

25   some witnesses, I assume.

1          **MR. FOSTER:**  Well, yeah.  We're going to have to go

2     back -- because obviously we're moving slower than we

3     anticipated -- and see who's available, but we previously

4     disclosed the potential witnesses.

5          **THE COURT:**  Okay.  Well, let them know.

6          **MR. FOSTER:**  Yeah, of course, Your Honor.

7          **THE COURT:**  Yeah.  Okay.  See you tomorrow.

8               (Proceedings adjourned at 3:59 p.m.)

9                         ---o0o---

10

11                    <u>**CERTIFICATE OF REPORTER**</u>

12          I certify that the foregoing is a correct transcript

13     from the record of proceedings in the above-entitled matter.

14

15     DATE:   Wednesday, October 29, 2025

16

17

18

19

20     _____
          Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG, CSR No. 12219
                   Official Reporter, U.S. District Court

21

22

23

24

25