UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) NO. 3:24-cr-00329-CRB |
| | ) |
| RUTHIA HE and DAVID BRODY, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

San Francisco, California
Thursday, October 30, 2025

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:

CRAIG H. MISSAKIAN
United States Attorney
Northern District of California
450 Golden Gate Avenue
San Francisco, California 94102
BY: **KRISTINA GREEN**
**ASSISTANT UNITED STATES ATTORNEY**

U.S. DEPARTMENT OF JUSTICE
FRAUD SECTION
950 Pennsylvania Avenue NW
Washington, D.C. 20530
BY: **JACOB N. FOSTER,**
**ACTING CHIEF, HEALTHCARE FRAUD UNIT**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By: Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
Official Reporter, CSR No. 12219

                        U.S. DEPARTMENT OF JUSTICE
                        CRIMINAL DIVISION
                        1400 New York Avenue NW
                        Washington, D.C. 20001
                   BY:  **EMILY GURSKIS, ASSISTANT CHIEF**

                        JOSEPH NOCELLA, JR.
                        United States Attorney
                        Eastern District of New York
                        271-A Cadman Plaza East
                        Brooklyn, New York 11201
                   BY:  **ARUN BODAPATI, TRIAL ATTORNEY**

For Defendant He:
                        WILLKIE FARR & GALLAGHER LLP
                        2029 Century Park East - Suite 2900
                        Los Angeles, California 90067
                   BY:  **KOREN L. BELL, ATTORNEY AT LAW**

                        WILLKIE FARR & GALLAGHER LLP
                        787 7th Avenue
                        New York, New York 10019
                   BY:  **MICHAEL S. SCHACHTER, ATTORNEY AT LAW**
                        **STEVEN J. BALLEW, ATTORNEY AT LAW**

For Defendant Brody:
                        LAW OFFICE OF VALERY NECHAY
                        Law Chambers Building
                        345 Franklin Street
                        San Francisco, California 94102
                   BY:  **VALERY NECHAY, ATTORNEY AT LAW**

Also Present:   **Thifany Braga**
                **Simon Hall**
                **Mackenzie Slater**
                **Andy Cepregi**
                **Ashley Moore**
                **Barbara Hua Robinson, Mandarin Interpreter**
                **Jeff Dinn, Mandarin Interpreter**

**I N D E X**

Thursday, October 30, 2025 - Volume 16

**GOVERNMENT'S WITNESSES**                                    **PAGE**   **VOL.**

**HILL-ALVAREZ, CHRISTINA**
(SWORN)                                                       3395   16
Direct Examination by Ms. Gurskis                            3396   16
Cross-Examination by Ms. Bell                                3472   16
Cross-Examination by Ms. Nechay                              3608   16

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 309 | | 3406 | 16 |
| 336 | | 3406 | 16 |
| 381 | | 3434 | 16 |
| 396 | | 3424 | 16 |
| 398 | | 3424 | 16 |
| 464 | | displaying | 16 |
| 864 | | 3448 | 16 |
| 883 | | 3462 | 16 |
| 1122 | | 3468 | 16 |
| 2869 as redacted | | 3450 | 16 |
| 5437 | | 3501 | 16 |
| 6057 | | 3556 | 16 |
| 6191 | | 3539 | 16 |
| 6575 | | 3602 | 16 |
| 7387 | | 3517 | 16 |
| 7389 | | 3546 | 16 |

<u>**I N D E X**</u>

<u>**E X H I B I T S**</u>

| <u>**TRIAL EXHIBITS**</u> | <u>**IDEN**</u> | <u>**EVID**</u> | <u>**VOL.**</u> |
|---|---|---|---|
| 7402 | | 3519 | 16 |
| 7404 | | 3533 | 16 |
| 7405 | | 3534 | 16 |
| 7408 | | 3586 | 16 |
| 7409 portion | | 3582 | 16 |
| 7416 | | 3515 | 16 |
| 7425 | | 3544 | 16 |
| 7432 | | 3597 | 16 |
| 7433 | | 3598 | 16 |
| 7434A | | 3599 | 16 |
| 7434B | | 3599 | 16 |
| 7434C | | 3599 | 16 |
| 7434D | | 3599 | 16 |
| 7438 | | 3604 | 16 |
| 7439 | | 3604 | 16 |
| 7440 | | 3604 | 16 |
| 7441 | | 3521 | 16 |
| 7442 | | 3527 | 16 |
| 7443 | | 3527 | 16 |
| 7448 | | 3478 | 16 |
| 7504 | | 3533 | 16 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 7533 | | 3566 | 16 |
| 7540 | | 3535 | 16 |
| 7548 | | 3527 | 16 |
| 7550A | | 3523 | 16 |
| 7551 | | 3523 | 16 |
| 7558 | | 3594 | 16 |
| 7559 | | 3592 | 16 |
| 7560 | | 3593 | 16 |
| 7568 | | 3525 | 16 |
| 7569 | | 3528 | 16 |
| 7577 | | 3547 | 16 |
| 7578 | | 3554 | 16 |
| 7580A | | 3492 | 16 |
| 7580 | | 3493 | 16 |
| 7595 | | 3581 | 16 |

1    <u>Thursday - October 30, 2025</u>                        <u>9:17 a.m.</u>

2                        P R O C E E D I N G S

3                            ---o0o---

4      (Proceedings were heard out of the presence of the jury.)

5            **THE COURTROOM DEPUTY:**  All rise.  Court is now in

6    session.  The Honorable Charles Breyer is presiding.

7        We don't have Dr. Brody yet.

8            **THE COURT:**  Oh.  Well, be seated.

9        So what is the story with Dr. Brody?

10           **MS. NECHAY:**  Dr. Brody is having some medical issues.

11   He's in the restroom.

12       There he is.

13           **THE COURT:**  Okay.  Are we all set?  Is everybody here?

14           **MR. FOSTER:**  Yes, Your Honor.

15       We do have some agreed-upon business records, so we could

16   potentially read those in outside of the presence of the jury.

17           **THE COURT:**  Yeah.  What are they?

18           **MR. FOSTER:**  They're business records that the

19   Government is going to introduce that are agreed upon for

20   admission.

21           **THE COURT:**  I think there's some sort of rule that

22   requires evidence to be heard in the presence of the jury, but

23   I don't know that it can't be we simply have a stipulation and

24   enter the stipulation with this attached to it so you don't

25   have to read 28 numbers 150 numbers.  But I think it has to be

# PROCEEDINGS

1  done before the jury.

2          **MR. FOSTER:**  Okay.  I'm --

3          **THE COURT:**  Not outside the presence.

4          **MR. FOSTER:**  I'll discuss the stipulation.  That's

5  sufficient.

6          **THE COURT:**  Okay.  That's fine.  That's fine.  Okay.

7  Bring in the jury.

8          **THE COURTROOM DEPUTY:**  Okay.

9      (Christina Hill-Alvarez steps forward to be sworn.)

10          **THE COURTROOM DEPUTY:**  Please rise for the jury.

11              (The jury enters the courtroom.)

12      (Proceedings were heard in the presence of the jury.)

13          **THE COURT:**  Okay.  Please be seated.

14      Let the record reflect all jurors are present.  Parties

15  are present.

16      You may proceed.  Call your next witness.

17          **MS. GURSKIS:**  Thank you, Your Honor.  The Government

18  calls Christina Hill-Alvarez.

19          **THE COURTROOM DEPUTY:**  Good morning.  Please stand up

20  to be sworn.  Please raise your right hand.

21              <u>**CHRISTINA HILL-ALVAREZ**</u>,

22  called as a witness for the Government, having been duly sworn,

23  testified as follows:

24          **THE WITNESS:**  Yes.

25          **THE COURTROOM DEPUTY:**  Thank you so much.  Please be

1    seated.  Please state your full name for the record and spell

2    your last name.

3              THE WITNESS:  Christina Simone Hill-Alvarez.

4    A-L-V-A-R-E-Z.

5                        DIRECT EXAMINATION

6    BY MS. GURSKIS:

7    Q.   Good morning, Ms. Hill-Alvarez.

8         Where are you from?

9    A.   McAllen, Texas.

10   Q.   What is your educational background?

11   A.   I have a bachelor's degree in philosophy and English and a

12   master's degree in education and psychology with an emphasis on

13   the spirit-mind-body dynamic.

14   Q.   What do you do for a living?

15   A.   Currently I am a makeup artist.

16   Q.   In what other industries have you worked?

17   A.   I've worked in education for five years.  I was a teacher.

18   And then I moved into tech for two years.

19   Q.   Have you ever heard of a company called Done?

20   A.   Yes.

21   Q.   Did you ever work at a company called Done?

22   A.   Yes.

23   Q.   How did you come to work there?

24   A.   It was 2021 during the pandemic.  I was looking for a

25   remote job.  I used a website called AngelList, and Done had a

1  job posting that I applied for.

2  **Q.**  What position was that?

3  **A.**  I do not recall the name of the position.

4  **Q.**  What position did you come to have at Done?

5  **A.**  Executive assistant to the CEO.

6  **Q.**  Who was the CEO?

7  **A.**  Ruthia.

8  **Q.**  Ruthia He?

9  **A.**  Yes.

10  **Q.**  What about working at Done appealed to you?

11  **A.**  The pandemic was a very challenging time for all of us.

12  At the time, telehealth was relatively new.  I had had a cousin

13  who committed suicide, and it seemed like this company could

14  really help people during this time because everyone was

15  really, really struggling.  And I love the idea of having

16  affordable, accessible healthcare for people at the reach of

17  their fingertips, and it seemed like, yeah, this is great,

18  people need help right now.  Let's go ahead and try to build a

19  lighthouse in the world, because at the time we were all

20  trapped in our homes.  It was a very different time.

21  **Q.**  What about working with Ruthia He appealed to you?

22  **A.**  As a fellow woman of color, I was really excited.  She was

23  pioneering an industry in tech, and I wanted to see her win.

24  **Q.**  What was your first impression of Defendant He?

25  **A.**  Very intelligent, very bright, had an ability to balance

1    nuance and ambiguity.

2    **Q.**    Did your first impression of Defendant He end up being

3    correct or incorrect?

4    **A.**    This is season five of my experience with Done.  I would

5    say during season one I had a different perspective of her, and

6    through time, I grew another perspective.

7    **Q.**    Can you elaborate a little bit more on that perspective?

8    **A.**    It seemed to me that who I met is not the person she ended

9    up being.

10   **Q.**    You said you had a few seasons at Done?

11   **A.**    Yes.

12   **Q.**    Or a couple of seasons at Done.

13        Do you recall the time periods when you were employed at

14   Done?

15   **A.**    March 2021 to March 2022, and then again, I believe, in

16   early October of 2023 to June of 2024.

17   **Q.**    Let's talk about that first segment at Done for a minute.

18        When you started at Done in March of 2021, how many

19   employees were there at the company?

20   **A.**    I believe I was the 10th or the 11th hire.  And the care

21   team, which is a customer service team based in the

22   Philippines, was not that large.  It was just starting.

23   **Q.**    When you say "not that large," did that size eventually

24   expand?

25   **A.**    Yes.

1   Q.   Okay.  We'll come back to the care team in a minute.

2       Speaking about your experience as Defendant He's executive

3   assistant, how often were you interacting with her?

4   A.   I would say constantly, 24/7.

5   Q.   Can you elaborate for the jury on the different formats in

6   which you would be constantly in contact with Defendant He?

7   A.   Certainly.  So we primarily communicated through a

8   software called Slack.  It's a little bit like Facebook where

9   you see people's photos.  You have messages.  And Slack was our

10  primary way of communicating.

11      Other than that, it was phone call or Zoom or Google

12  Meets, which are all videoconferencing softwares.

13  Q.   In those various formats, did Defendant He ever speak

14  about her goals for the company?

15  A.   Through time, yes.

16  Q.   What would she say?

17  A.   At some point -- I don't recall the exact time frame.

18  Maybe three months into me working there, four months, it

19  became clear that she wanted Done to be similar to Uber or

20  Airbnb in a marketplace share, meaning that people might

21  eventually have clinicians come to their home, and that was

22  something she was really passionate about.

23  Q.   So is it fair to say that Defendant He was interested in

24  growth?

25  A.   Yes.

1  Q.  Do you recall any specific things she would say or

2  comments she would make about her visions for growth for Done?

3  A.  At the time, Done was not operating in all the states.  I

4  think it operates currently.  I want to say maybe 13 states at

5  the time.  She wanted it to be a national company.

6      She also mentioned that we had really active growth goals

7  so we needed to meet a really ambitious growth goals and that

8  we needed to be a lean team as we scaled.

9  Q.  When you say ambitious growth goals, what -- are there any

10 specific examples of that that come to mind as an ambitious

11 growth goal?

12 A.  Specifically with marketing and recruiting.  With

13 recruiting, I recall on the clinician side, she wanted to hire

14 about 20 clinicians a month, which is pretty ambitious to do.

15 And then on the marketing side, she was really passionate about

16 organic marketing, which basically means when you scroll on

17 your phone and you see "sponsored," not having that "sponsored"

18 logo come up and people finding the website naturally.

19 Q.  Let's break that apart a little bit.

20     So in terms of the pace of the growth, you mentioned

21 Defendant He's wishes of hiring at least 20 clinicians a month.

22 Were there other ways that she described or referenced the pace

23 of the growth?

24 A.  Hypergrowth.  The term "unicorn" was mentioned.  That's

25 what I can recall.

1    Q.    What do you mean the term "unicorn" was mentioned?

2    A.    This concept that's similar to the company WeWork, which

3    is where you can go in and rent an office or meet with

4    colleagues, they had a really unique story and that their

5    company blew up, so to speak.  And so she really wanted Done to

6    be a unicorn in that way.

7    Q.    What kinds of things would she say about Done, wanting

8    Done to be a unicorn?

9    A.    At the time that it was mentioned, it seemed like

10   protecting the unicorn and making sure that it got to the

11   trajectory of growth that she was wanting.

12   Q.    In terms of growth relative to employee performance, did

13   Defendant He ever evaluate employee performance based on who

14   was advancing her goals of growth?

15   A.    Yes.

16   Q.    How?

17   A.    There were quarterly goals that were shared team-wide, and

18   everyone knew each other's goals publicly, and if you did not

19   meet your goals, it was then articulated that perhaps you were

20   not a culture fit for the team.

21   Q.    When you say "it was then articulated," who was

22   articulating that?

23   A.    At the time, Ruthia.

24   Q.    Were employees at Done generally receptive to

25   Defendant He's growth priorities or did people have concerns?

1    A.    People had concerns.

2    Q.    Can you explain?

3    A.    Building a company is similar to baking a very large cake,

4    and it seemed at the time that Ruthia wanted to put all the

5    ingredients together and just make a cake and not really think

6    about the structure that goes into that, such as needing to let

7    it cool off, put on the icing in a certain way, source

8    high-quality ingredients.

9         And so the world was a very different place in the

10   pandemic.  It was very slow, and at that time, the team was

11   really passionate about making sure that once the world went

12   back to normal that the company was still able to operate

13   because at the time, it did not seem it was so.  It seemed that

14   it was able to operate because of the pandemic.  And so these

15   concerns were raised.

16   Q.    Who do you recall raising concerns?

17   A.    Kristin Neland, Rick Menesini, Denis Lam, Dr. Brindala,

18   Dr. Brody, and several other employees from different parts of

19   the company.

20   Q.    When you say several employees from different parts of the

21   company, can you just give the jury a high level view of the

22   different departments or units at the company that were

23   expressing concerns to Defendant He?

24   A.    Certainly.

25        So we operated in a flat structure at the time, which

1   means no one has hierarchy over another individual.  However,

2   we each had our own lane, and so there were some people focused

3   on engineering, some people on product, some people on

4   marketing, some on the healthcare aspect, and myself was more

5   on the people administrative aspect.

6   Q.    You mentioned Defendant Brody?

7   A.    Yes.

8   Q.    Did you interact with Defendant Brody when you were

9   employed at Done?

10  A.    Yes.

11  Q.    Was Defendant Brody in clinical leadership?

12  A.    At the time, no.  He was a contractor, I believe.

13  Q.    About how long were you at the company when his role

14  shifted from being a contractor?

15  A.    From what I recall, about seven -- six, seven months into

16  my first year there.

17  Q.    Okay.  And was it after that six- or seven-month period

18  that Dr. Brody advanced to clinical leadership?

19  A.    From what I can recall, yes.

20  Q.    Was Defendant Brody in clinical leadership at the same

21  time as Dr. Brindala?

22  A.    No.

23  Q.    And you mentioned that you heard Defendant Brody raising

24  concerns?

25  A.    Yes.

1    Q.    What type of concerns did Defendant Brody raise?

2    A.    The appointment times were not long enough.  I recall him

3    offering to give patients the option to choose if they wanted

4    to be seen in 30 minutes, an hour, an hour and a half, because

5    he felt that that 30-minute time slot was not enough for all

6    patients and that some people needed more time with their

7    clinician.

8    Q.    How did Defendant He respond to that suggestion from

9    Defendant Brody about needing -- clinicians needing more time

10   with their patients?

11   A.    The suggestion was seen as not being in alignment with the

12   company growth and being too nuanced to scale, so that it was,

13   in other words, easier to scale in the 30-minute-increment

14   structure that was already in place, and it was placated into

15   being something that would come later, once there was more

16   funding, once the company had gotten bigger.

17   Q.    When you say it was placated, who was doing the placating?

18   A.    Ruthia.

19   Q.    We'll come back to some more of the concerns in a moment.

20   But how would you describe in terms of Defendant He's goals

21   whether money played into that?

22   A.    That's a very layered question.  Let me think about it.

23                    (Pause in proceedings.)

24   A.    Over time it became clear that profit was the biggest

25   factor in her decision-making.  But in the beginning, it did

1   not seem that way.

2   Q.   That was something that became clear to you over time?

3   A.   Yes.

4   Q.   And in terms of Defendant He's priorities, would you say

5   she cared more about growth and profit or about patient care?

6   A.   Growth and profit.

7   Q.   Did Defendant He care more about scaling or patient care?

8   A.   Scaling.

9   Q.   In your work with Defendant He, did she communicate about

10  negative reviews from patients?

11  A.   Yes.

12  Q.   Could you tell whether Defendant He was concerned about

13  negative patient reviews?

14  A.   I would say she was very vigilant about anything negative

15  that was said about the company, and it was something that was

16  a top priority for her.

17  Q.   How could you tell that Defendant He was vigilant about

18  it?

19  A.   At the time, there seemed -- I believe I learned this

20  about a month into my role -- to be some kind of process that

21  if a negative review was posted, somehow the care team, which

22  is the customer service team, would be able to contact the

23  patient and get them to change their review by solving the

24  issue.

25  Q.   Who ran the care team?

1    A.    Niki Mercado -- or Nikita Mercado.

2    Q.    Okay.  And in terms of the format that Done received

3    reviews in, can you describe for the jury when Defendant He was

4    being vigilant about reviews, what forums or formats those

5    reviews were in?

6    A.    From what I can recall, the website Trustpilot, which is

7    something a lot of people look at when they're reviewing a

8    product or a company, but I do remember there was another way

9    patients gave reviews, but I don't remember the name of it.

10   Q.    Okay.  What was the process?

11   A.    It seemed that these reviews were able to be seen by the

12   care team, and somehow they knew the patient e-mails and could

13   reach out to them.

14        **MS. GURSKIS:**  Your Honor, at this time, the Government

15   would like to move in Exhibits 309 and 336.

16        **THE COURT:**  Admitted.

17       (Trial Exhibits 309 and 336 received in evidence.)

18        **MS. GURSKIS:**  Ms. Braga, if you could pull up

19   Exhibit 309.  If you could zoom in on that.

20   **BY MS. GURSKIS:**

21   Q.    Is this a screenshot of a message from Defendant He that

22   you took, Ms. Alvarez?

23   A.    Yes.

24   Q.    Can you read what Ms. He wrote here?

25   A.    (as read):

1      "We should try our best to take down all the

2      negative reviews.  Even if it's really our fault, we

3      can take it down and compensate patients in other

4      ways."

5  **Q.**   Do you know what Defendant He meant by "compensate

6  patients in other ways"?

7  **A.**   I'm not sure.  I started, I believe, March 21st, 2021, so

8  this was a little bit before my time.  But what I assume is

9  that they would somehow be able to see a different clinician.

10     **MS. BELL:**  Objection, Your Honor, calls for

11 speculation, foundation.  I move to strike.

12     **THE COURT:**  Sustained.

13 **BY MS. GURSKIS:**

14 **Q.**   Let's talk about the care team and what you were aware of

15 and their role in negative reviews.

16     So you mentioned the care team was run by someone named

17 Nikita Mercado?

18 **A.**   Yes.

19 **Q.**   Do you know if that was a separate company or was it part

20 of Done?

21 **A.**   It seemed that it was a company that she was starting at

22 the time.

23 **Q.**   Okay.  And in terms of the process for taking down

24 negative reviews, was that something that you observed

25 Ms. Mercado and Defendant He working on?

1   A.   From the periphery, yes.

2   Q.   Can you describe to the jury what you saw in terms of that

3   process?

4   A.   They would have a list, essentially, of the negative

5   reviews.  I believe Nikita would contact the patient and try to

6   fix whatever was stated in the review and then ask them to

7   write a new review.

8   Q.   Do you ever recall a particular event surrounding reviews

9   between Defendant He and the care team?

10  A.   An event is coming to mind, but I'm not sure if it was a

11  public review.

12  Q.   In terms of the -- the event that is coming to mind, did

13  that -- let me ask the question a different way.

14       When Defendant He and Ms. Mercado were dealing with the

15  negative reviews, would the lower-level care team employees

16  also be involved?

17  A.   Yes.

18  Q.   Was there a time you saw a change in negative reviews to

19  positive reviews after an interaction between Defendant He and

20  Ms. Mercado?

21  A.   Yes.

22  Q.   Can you describe that event for the jury?

23  A.   There seemed to be a lot of negative reviews both from

24  patients and past employees, and it seemed like overnight the

25  discussion had -- was had between them.  I recall seeing a

1  calendar event, and then it seemed that the next day and

2  proceeding days there was a flood of positive reviews on

3  Trustpilot.

4  **Q.**  How closely would Defendant He manage employees like you

5  and Ms. Mercado?

6  **A.**  She was a micromanager.  She was constantly looking at

7  what we were doing and when we were online, so she would be

8  able to tell on Slack -- it's similar to Facebook where you

9  have the photo and a little circle that's green or not if a

10  person is accessible.  She was very vigilant about how often we

11  were working.

12  **Q.**  A moment ago -- shifting gears for a moment -- you

13  referenced Dr. Brindala.  Is that Jayaram Brindala?

14  **A.**  Yes.

15  **Q.**  And Dr. Brindala is someone who flagged concerns about

16  Defendant He's approach to growth?

17  **A.**  Yes.

18  **Q.**  Did he ever voice concerns about Done's clinical practices

19  to Defendant He?

20  **A.**  Yes.

21  **Q.**  Are there any specific concerns he had that come to mind?

22  **A.**  Yes.  When a patient came to Done, his primary concern was

23  that the clinician who saw the patient should be trusted with

24  the decision they made about the patient, and Ruthia disagreed

25  with this, and she preferred that the patient be transferred to

1   a different clinician for a second opinion.

2   Q.   When would that come up, the second opinion?

3   A.   In terms of -- can you clarify?

4   Q.   Sure.  So you mentioned that Dr. Brindala voiced concerns

5   to Defendant He about a transfer between a provider who had

6   made a certain decision about a patient to a different

7   provider.

8        Are you aware of what the decision was by the first

9   provider that would have led to such a transfer?

10  A.   Usually the provider felt that the patient was not a fit

11  for the platform, either because they had too many

12  comorbidities, they might need to see someone in person, or

13  that they felt that they were possibly drug seeking at times.

14  Q.   Do you recall any other concerns from Dr. Brindala with

15  regard to appointment length, similar to the concerns voiced by

16  Dr. Brody?

17  A.   I would say in the founding team.  Many of the founding

18  team members had that concern.

19  Q.   What about outside tests?  Was that something that you

20  ever heard Dr. Brindala talk about?

21  A.   Yes.  I recall him mentioning that he believed there

22  should be a way for patients to -- and forgive me; I don't know

23  the medical terminology -- but get their heart tested, urine

24  test, things like that, that there should be a way to do that.

25  Q.   In terms of the appointment length, the urine and heart

1   tests, and this transfer protocol, was Dr. Brindala ever able

2   to change those policies while he was at Done?

3   **A.**   No.

4   **Q.**   Did Defendant He, to your knowledge, have any kind of

5   medical training or experience?

6   **A.**   No.

7   **Q.**   But she didn't defer to Dr. Brindala on that?

8   **A.**   No.

9   **Q.**   You mentioned earlier that you interacted with

10  Defendant He personally quite a bit.  How often would you see

11  Defendant He interact with other employees such as through

12  meetings and things like that?

13  **A.**   Fairly often.  I attended most meetings she attended.

14  **Q.**   Was that when you observed Dr. Brindala voicing these

15  concerns?

16  **A.**   Yes.

17  **Q.**   And in those meetings, was anyone other than Dr. Brindala

18  voicing concerns?

19  **A.**   Yes, many people.

20  **Q.**   Who were those many people?

21  **A.**   Rick Menesini, Kristin Oliver, Jacob Korth, Michael Poon,

22  Dr. Brody, Denis Lam, Matthew Ward, Yanshen Zhou, Jiatao Chang.

23  That's what I can recall.

24  **Q.**   Other than the length of time that providers were able to

25  spend with patients, were there other types of concerns that

1   you heard all of these employees voicing?

2   **A.**   Yes, and they were very layered.

3   **Q.**   Can you give the jury an example of some of the concerns

4   you heard?

5   **A.**   Rick Menesini was a businessperson, and so he was really

6   concerned about document-keeping in regard to finances.  And

7   so, for example, to pay the clinicians, he would have to use an

8   Excel spreadsheet to mathematically calculate based on hours,

9   plus I'm not -- he explained it to me once, but I don't

10  remember the formula he used, but he had to use a really

11  complex process through an Excel spreadsheet to be able to pay

12  providers.  That was one issue he raised.

13       Another issue was that he felt that there needed to be --

14  I believe he used the term "white glove accountants" because

15  the company was starting to generate a lot of revenue, and I

16  got the sense it was a lot for him to deal with.

17       **MS. NECHAY:**  Your Honor, I'm sorry for the

18  interruption.  May I confer for a moment with Government

19  counsel?

20       **THE COURT:**  I'm sorry?

21       **MS. BELL:**  I'm sorry for the interruption, but may I

22  confer with Government counsel?

23       **THE COURT:**  Absolutely.

24              (Pause in proceedings.)

25       **MS. NECHAY:**  Your Honor, if we could take a brief

1   recess?

2       Your Honor, could we take a brief recess?

3           THE COURT:  All right.  Ladies and gentlemen, we'll be

4   in recess until 10:00.

5       Remember the admonition given to you:  Don't discuss the

6   case, allow anyone to discuss it with you, form or express any

7   opinion.

8                   (The jury leaves the courtroom.)

9       (Proceedings were heard out of the presence of the jury.)

10          THE COURT:  Please be seated.  The jury has retired.

11  What do you want to do?

12          MS. GURSKIS:  I think Ms. Bell had a concern she

13  wanted to raise.  I don't know, Ms. Bell, if you think the

14  witness should be excused or not?

15          MS. BELL:  Yes, Your Honor.  We received a -- about

16  10 -- there have been 10 separate meetings with the

17  Government --

18          THE COURT:  I'm sorry.  What?

19          MS. BELL:  There have been 10 separate meetings or

20  communications between the witness and the Government.  Much of

21  the content of the testimony thus far is not memorialized in

22  any of those memos in terms of really what we're hearing now,

23  and so certainly we're going to need a break between the --

24          THE COURT:  Why don't we wait until she's finished?

25          MS. BELL:  Yes, we may need do that --

 1          THE COURT:  I sent out the jury because --

 2          MS. BELL:  So that --

 3          THE COURT:  You may get the break.  I just need to --

 4     I don't know -- how much longer is the witness going to be?

 5          MS. GURSKIS:  Maybe about an hour or so, Your Honor.

 6          THE COURT:  Okay.  Then we'll take it up then.

 7          MS. BELL:  Because there are substantial --

 8          THE COURT:  I'm not going to rule on that right now.

 9          MS. BELL:  Understood, Your Honor.  Thank you.

10          THE COURT:  Okay.  We'll resume at 10:00.

11          MS. GURSKIS:  Okay.  Thank you, Your Honor.

12                    (Recess taken at 9:50 a.m.)

13                  (Proceedings resumed at 9:59 a.m.)

14       (Proceedings were heard out of the presence of the jury.)

15          THE COURTROOM DEPUTY:  Come to order.  Court is now in

16     session.

17          THE COURT:  So the parties are present.  Why don't you

18     hand it up to the Court, so I can read it during her testimony,

19     the interviews.  As I understand it, you're concerned --

20     counsel is concerned that she didn't have notice that this

21     witness will be testifying in the manner in which the witness

22     is testifying because it wasn't in any of the 302s or whatever

23     they are, witness interviews.  So I can read it during her

24     testimony and try to figure out whether I agree or disagree

25     with that.

1      MS. BELL:  And, Your Honor, just to be clear, there

2  are a large number and they're voluminous, so we are not asking

3  that the witness be precluded from testifying as Government

4  counsel is eliciting --

5      THE COURT:  What are you asking for?

6      MS. BELL:  I may need a break between -- we will see

7  how it comes out --

8      THE COURT:  Why?

9      MS. BELL:  Because there are certain things that are

10 coming up that we need to now respond to.

11     THE COURT:  Wait a minute.  Were they in the 302s?

12     MS. GURSKIS:  Your Honor, during the break I flagged

13 --

14     THE COURT:  No, I'm not giving any breaks.  We're

15 trying to try this case as quickly as possible.  We took a

16 recess, which was totally unnecessary as -- is my view.  So if

17 it's in the 302, you should be prepared to proceed.

18     MS. GURSKIS:  It is, Your Honor.

19     THE COURT:  If it's not in the 302, I'll give you

20 time.

21     MS. BELL:  Thank you, Your Honor.  And I think what

22 Government counsel just said is that she was surprised by a

23 certain answer and wasn't expecting it herself, so there --

24     THE COURT:  Witnesses surprise people all the time.

25 That's why you have trials rather than just simply submitting

1    on some statement.

2        Okay.  If it's -- listen.  If it's a big shocker,

3    you know, a smoking gun or something, of course I'd give you

4    time.  But if it's, oh, now they said this when I didn't think

5    they were going to say this or that -- come on.  You're a trial

6    lawyer.  Suck it up.  That's the way it works.  Okay?

7            MS. BELL:  Yes, Your Honor.  We understand.

8            THE COURT:  You're a good trial lawyer on top of it --

9            MS. BELL:  Thank you, Your Honor.

10            THE COURT:  -- so you've had a lot of experience of

11    being surprised.  There are surprises and surprises.

12        Okay.  Bring in the jury.  Let's get going.  The surprise

13    I don't want is to go over Christmas.  That's a surprise I'm

14    not going to put up with.

15            MS. BELL:  We understand.

16                    (The jury enters the courtroom.)

17        (Proceedings were heard in the presence of the jury.)

18            THE COURT:  Please be seated.  Let the record reflect

19    all jurors are present.  The parties are present.  The witness

20    is on the stand.

21        You may proceed.

22            MS. GURSKIS:  Thank you, Your Honor.

23    BY MS. GURSKIS:

24    Q.  Ms. Hill-Alvarez, when we stopped for the break, you were

25    talking about some employees who voiced concerns at Done.

1    Do you recall that?

2  **A.**   Yes.

3  **Q.**   In terms of the way that the concerns were conveyed in

4  those meetings with Defendant He, were they framed more as

5  recommendations or more as an urgent need or an emergency?

6  **A.**   Concerns were voiced repeatedly.  In the beginning, it was

7  a recommendation, and then it became an urgency.

8  **Q.**   Can you elaborate on that?

9  **A.**   I think in any professional context, you approach a

10  colleague and you say, hey, I think we need to fix this.  I

11  think something is going on.  You expect them to want to build

12  a bridge with you and to address it or to ease your concerns.

13    Those concerns were placated as not being high priority,

14  and then the issues that had been voiced started to really ramp

15  up and needed to be addressed.

16  **Q.**   When you say "the concerns are placated as not being high

17  priority," who was the person saying that or conveying that to

18  the other employees?

19  **A.**   Ruthia.

20  **Q.**   So was Defendant He receptive to feedback?

21  **A.**   No.

22  **Q.**   How would she describe people who criticized Done

23  policies?

24  **A.**   There were several words.  One of them was "junior," that

25  the person was too junior to comprehend either the structure of

1  the company or her experience when it came to the trajectory of

2  growth.

3  Q.   Did you ever hear Defendant He use the term

4  "patient-first"?

5  A.   Yes.

6  Q.   What did your understanding of patient-first come to be at

7  Done?

8  A.   Whatever the patient wanted.

9  Q.   Did you ever hear Defendant He describe somebody as "not

10 being a culture fit"?

11 A.   Yes.

12 Q.   What did your understanding of "not being a culture fit"

13 come to be when you were at Done?

14 A.   The way that term began to float around the company was

15 really a veiled term that we saw over time as a team, that it

16 meant whoever pushed back.

17 Q.   Earlier you were describing your initial impressions of

18 Defendant He.  In terms of Defendant He's temperament or

19 reactions when people were pushing back, would you observe a

20 change in her demeanor?

21 A.   Yes.

22 Q.   Can you describe for the jury what that felt like?

23 A.   What that felt like?

24 Q.   Yes.

25 A.   In some ways it made you doubt your own reality, and it

1    made you feel incompetent.

2    Q.    How did Defendant He's reactions in those situations

3    affect people's feelings about job security?

4              MS. BELL:  Objection, Your Honor, leading.

5              THE COURT:  Overruled.

6              THE WITNESS:  May I answer the question?

7    BY MS. GURSKIS:

8    Q.    You may.

9    A.    Everyone was afraid to lose their job.  No one felt that

10   they had job security.

11   Q.    And did you have anything to add on that,

12   Ms. Hill-Alvarez?

13   A.    It became a very odd culture where if you had something

14   personal in your life going on, you didn't want her to know

15   about it.  And it was -- you never knew what was going to

16   happen that day, is what I'll say.

17   Q.    And shifting back to the types of concerns that would --

18   that people would raise that might lead them to be in that

19   position where they felt concerned about their jobs, I think

20   you said one of them was appointment length?

21   A.    Yes.

22   Q.    What do you recall Defendant He's response to be in

23   particular with regard to recommendations about the length of

24   time clinicians could spend with patients?

25             MS. BELL:  Objection, asked and answered, Your Honor.

1          **THE COURT:**  Overruled.

2          **THE WITNESS:**  I recall she mentioned that therapy was

3   ineffective because it could not be measured numerically, and

4   so by allowing more time with the patients, she felt that it

5   was not in relationship to company growth goals and that the

6   current structure was what was needed so that the company could

7   grow really quickly.

8   BY MS. GURSKIS:

9   Q.   So the CEO of a mental health platform was saying therapy

10  is not effective?

11  A.   Correct.  She had an impression that you could not rate

12  the effectiveness of a therapist.

13  Q.   Did that strike you as unusual coming from somebody who

14  was running a mental health company?

15  A.   Very unusual, and I think my colleagues and I who were

16  drawn to this company, especially in the pandemic, we either

17  ourselves had mental health issues or we loved someone with

18  mental health issues, and so hearing this was challenging.  But

19  we were the type -- I will say with the people I interacted

20  with -- to give benefit of the doubt, rather than assume the

21  worst.

22  Q.   And even though Defendant He expressed a disregard or --

23  for therapists, were there certain providers that she actually

24  did hold out on a pedestal?

25  A.   Elizabeth Shapard was always the pony show clinician.  She

1   was always brought out for photos, interviews, things like

2   that.

3   Q.   Did you have any understanding as to why Defendant He felt

4   that she wanted to display Elizabeth Shapard in that way?

5   A.   In the beginning, I believed it was because she had high

6   patient ratings, meaning the patients really liked her.  And

7   then over time, it seemed she had a very large patient panel is

8   what I came to learn.

9   Q.   Were there any other clinicians who you observed

10  Defendant He praising who also had high patient panels?

11  A.   She's the one who sticks out to me.

12  Q.   And in terms of the organization of the company at this

13  point -- so Defendant Brody, I think you said about six months

14  in, had ascended to clinical leadership at Done?

15  A.   That's correct.

16  Q.   And other than the -- his voicing concerns about

17  appointment length, were there other recommendations that you

18  heard him suggesting in those meetings?

19  A.   He wanted to do ADHD coaching for people who maybe didn't

20  have the means to pay what the company was asking and to also

21  receive guidance in a group setting.  That was something he

22  recommended and was passionate about.

23      But outside of that, my workflow and his did not interact

24  too much in that regard.

25  Q.   What about a 5150 protocol or a suicide protocol?

1          **MS. BELL:**  Objection, leading, Your Honor.

2          **THE COURT:**  Overruled.

3          **THE WITNESS:**  I recall there had been an issue with a

4   patient.  I recall the patient was transgender and was

5   experiencing suicidal ideation, reached out to Done.

6          And when it came to my attention, at this point it was a

7   fire already.  All of that had already occurred.

8          And I recall Ruthia saying that a protocol like that was

9   not important because it would not happen often enough to

10  warrant a protocol.

11         I do recall Dr. Brody wanting the protocol at the time.

12  but it was challenging in that situation because at the end of

13  the day, Ruthia always had the final word.

14  BY MS. GURSKIS:

15  **Q.**  So if at the end of the day, Defendant He always had the

16  final word, how would you describe Defendant Brody's

17  leadership?

18  **A.**  There is an intergenerational difference there.  I think

19  it's important for the jury to understand.  Most of my

20  colleagues, we were around the same age.  And Dr. Brody had a

21  very idealistic view of the world and what people could be and

22  how we could be better, and he was passionate about wanting to

23  help people.

24         And as a younger person, meeting an older person with so

25  much hope and belief in the -- in others was very refreshing,

1    and I would say he was someone who the team might have

2    perceived as a grandfather in the sense that he had a

3    technological gap when it came to softwares in meetings, and so

4    there was some grace there with the team.

5         But outside of him making these suggestions, I did not see

6    his suggestions go anywhere.

7    Q.   Do you remember Defendant He ever accepting a suggestion

8    from any clinician when it came to patient care policies?

9    A.   Not that I can recall.

10   Q.   So who made the decisions about how long providers were

11   spending with patients?

12   A.   Ruthia.

13   Q.   Who made the decisions about how frequently providers saw

14   the patients?

15   A.   Ruthia.

16   Q.   And were you aware of how many companies there were at

17   Done?

18   A.   When I started at Done, the company was called Okay

19   Health, and that changed to Done Global, I believe.  And then

20   another company name popped up which was Done Health.  But at

21   the time, I had been an educator.  I didn't know the back-end

22   contractual meaning of all this, but I came to learn that it

23   was underneath Done Global, and so there was the tech company,

24   which is Done Global, and the healthcare company, which was

25   Done Health.

1  Q.   So I saw you doing some air quotes.  Did it feel like

2  there were two companies?

3  A.   No, it felt like there were one.

4  Q.   One run by whom?

5  A.   Ruthia.

6  Q.   Shifting gears for a moment.

7       MS. GURSKIS:  Your Honor, at this time, we would move

8  to admit Exhibits 396 and 398.

9       THE COURT:  Admitted.

10      (Trial Exhibits 396 and 398 received in evidence.)

11      MS. GURSKIS:  Ms. Braga, if you could pull up

12  Exhibit 398.

13  BY MS. GURSKIS:

14  Q.   Ms. Hill-Alvarez, is this a Slack thread between you,

15  Defendant He, and Defendant Brody?

16  A.   This is an Asana thread.

17  Q.   An Asana thread.  Thank you.

18       And this is July of 2021?

19  A.   Correct.

20  Q.   Would you say this was still in season one of your views

21  on Done as a company?

22  A.   Yes.

23  Q.   So here you're saying that (as read):

24          "This is a private board between me, you, and

25       Ruthia, so we can openly discuss gaps with a growth

1          mindset and problem-solve."

2          And then do you write that (as read):

3              "Done is falling short of the goal to hire 20

4          providers a month"?

5     A.   That's correct.

6     Q.   And then you write (as read):

7              "There are some other issues with one-star

8          provider ratings as well where the rationale is

9          lumped into a patient is seeking drugs//sees company

10         as a pill mill versus using patient-first mindset and

11         seeing what the issue is."

12         And "patient-first mindset," that was one of the terms we

13    were just discussing a moment ago; right?

14    A.   Yes.

15         MS. GURSKIS:  And if you could just zoom out for one

16    moment, Ms. Braga.

17    BY MS. GURSKIS:

18    Q.   The subject line of this is called "Culture damage"?

19    A.   Correct.

20    Q.   Is that in the same vein of that culture fit description

21    in terms of being aligned with Defendant He's views that you

22    were describing before?

23    A.   This was a complicated situation.  I would say it was the

24    beginning of what that term would come to mean.

25         MS. GURSKIS:  If you could turn to page 3, Ms. Braga.

1   BY MS. GURSKIS:

2   Q.   And Defendant Brody writes (as read):

3        "Kristina, to make sure I understand your

4        response, in the last part you were saying that a

5        one-star review was essentially 'rationalized' by

6        Kristin as a poor review because the patient did not

7        get the medication they wanted, presumably a

8        stimulant, and one thing that would make them

9        drug-seeking."

10   The Kristin being referred to here is Ms. Neland or

11   sometimes Ms. Oliver, as she was then?

12   A.   Yes.

13        MS. GURSKIS:  If you could turn to page 5, Ms. Braga.

14   It's a continuation of the sentence.

15   BY MS. GURSKIS:

16   Q.   And when you say (as read):

17        "'Sees the company as a pill mill,' you mean

18        that Kristin believed the patient looks at us as

19        that.  In other words, another way of saying that

20        they are drug-seeking."

21   Had you ever heard the term "pill mill" before?

22   A.   Not until Kristin began to say it.

23   Q.   Okay.  And can you --

24        MS. GURSKIS:  Actually, if you could take that down,

25   Ms. Braga.  We'll come to that -- return to that in one moment.

1        If you could turn to page seven.  And if you can blow up

2   Defendant Brody's comment.

3   **BY MS. GURSKIS:**

4   **Q.**   And is this generally referencing a discussion between

5   Defendant Brody and Ms. Neland where he expressed that

6   providers fear losing licenses was enough to get in the way of

7   patient care?

8   **A.**   I'm not sure what the question is.

9   **Q.**   I was just -- rather than reading through all of this, I

10  was just -- if you want to take a second and look at it.

11  **A.**   Okay.

12  **Q.**   And just see if my summary was consistent with what was

13  written there.

14  **A.**   (Witness examines document.)

15       Yes.

16  **Q.**   So Defendant Brody is referencing that discussion with

17  Ms. Neland about providers' fear of losing their licenses?

18  **A.**   It seems so.

19  **Q.**   Okay.  And then Defendant Brody relayed that (as read):

20       "Kristin essentially defended providers as

21       having the right to do whatever they feel will

22       protect their license, whether it makes sense or

23       not."

24       **MS. GURSKIS:**  And if you could turn to page 9,

25  Ms. Braga.

1   BY MS. GURSKIS:

2   Q.   And here Defendant He is responding (as read):

3        "Anecdotally also heard complaints that she

4        didn't get paid enough."

5        Is that consistent with your recollection?

6   A.   Yes.

7        MS. GURSKIS:   And then finally turning to page 11,

8   Ms. Braga.

9   BY MS. GURSKIS:

10  Q.   And here you write that Ms. Neland (as read):

11       "Didn't want her face tied to something should

12       the DEA do an investigation, as she believes we are

13       close to being in breach of the law//a pill mill, and

14       it's only a matter of time before the authorities are

15       involved."

16       Do you see that, Ms. Hill-Alvarez?

17  A.   Yes.

18  Q.   So this is saying -- talking about video interview

19  questions?

20  A.   That's correct.

21  Q.   Does that ring a bell for you, these video interview

22  questions?

23  A.   Kristin had been tasked with recording videos asking

24  questions.  It was a new software where if you were applying

25  for a job, you could watch the video and either record a

1    response or write your response.

2        I recall waking up one morning and Ruthia was very upset

3    that this had not been done.  Apparently it had been tasked to

4    her for some time.  And so I offered to do it to just get it

5    off her plate.  I thought:  Reading questions?  What's the big

6    deal.

7        And this is when this came up.

8    Q.   So did you proceed to start to do the video?

9    A.   I did, but I did not ask the questions they gave me.

10   Q.   Was that because of a conversation you had with

11   Ms. Neland?

12   A.   In part, but also just the logistics of it.  The questions

13   were very long.  I was in my kitchen with a ring light.  It

14   didn't make sense to read them.

15   Q.   And in terms of the conversation you had with Ms. Neland

16   when -- a moment ago you were describing the term "pill mill."

17   Can you just relay for the jury briefly what that interaction

18   was about the video and the reference to a pill mill?

19   A.   She reached out to me when she learned that I was going to

20   do the videos, and we had a pretty heated discussion.  It was

21   not a professional discussion, but to paraphrase, she stated

22   that she did not want her face in the videos and that she did

23   not want my face in the videos because she felt that the

24   company was a pill mill.

25       And at the time, this was the very first time I'm hearing

1  "pill mill" from Kristin in my life, and she was very emotional

2  and unprofessional, and I did not internalize that interaction

3  as her trying to warn me, but I can see in hindsight she was

4  trying to be somewhat of a big sister, in a sense, but it came

5  across as abrasive, and there were other instances of things

6  that occurred at that time in the team.

7  Q.   So in terms of the term "pill mill," since you hadn't

8  heard it before, did you ask Ms. Neland what it meant?

9  A.   Yes.

10  Q.   Did you ask her what it meant in the context of Done?

11  A.   No.

12  Q.   Okay.  What did she say a pill mill meant?

13  A.   Basically just giving away medication without there being

14  a need for the medication.

15  Q.   And in the context of a company giving away medication

16  without there being a need for the medication, did she make any

17  other comments about Done to you?

18  A.   She made many comments.  I'm not sure if there's a

19  specific category or just in this realm of the pill mill part

20  you're curious about.

21  Q.   In terms of -- well, you mentioned before that Ms. Neland

22  was somebody who voiced concerns a lot about the company.

23  A.   Correct.

24  Q.   In that conversation where she was expressing her concerns

25  about the video and the DEA, were -- was that call another

1  moment where you heard Ms. Neland echoing concerns about the

2  company?

3  A.    That's correct.

4  Q.    And aside from the -- the messages we were just looking at

5  here, did you have a separate conversation over the phone with

6  Defendant He and Defendant Brody about these communications?

7  A.    Yes.  Dr. Brody had a technological gap in understanding

8  Asana, and so we chatted on the phone, from what I can recall.

9  Q.    And was the phone call generally mirroring what was said

10  across these messages?

11  A.    Yes.

12  Q.    Were there any comments or discussion about how to address

13  the flags raised by Ms. Neland in that conversation?

14  A.    There had been several instances with Ms. Neland where

15  these eruptions had taken place over various topics not related

16  to this, and so at the time it seemed that her raising this

17  concern seemed a bit more vindictive than based in reality.

18      So I would say no.  There was no solution around the pill

19  mill because the -- what I was told is that it was not, so that

20  it was not true.

21  Q.    So you said what you were told was that it was not.  Was

22  that in the phone call with Defendant He and Defendant Brody?

23  A.    Yes.

24  Q.    And when you said that you had the impression that

25  Ms. Neland's raising concerns about the company was vindictive,

1   was that based on communications like this and conversations

2   with Defendant He and Defendant Brody about culture fit and

3   cultural damage and patient-first mentality?

4   **A.**     This is a little challenging, as she'd had some separate

5   issues with other colleagues not related to this.

6         And so what I mentioned before about how the term

7   "culture" came out and then it came to mean something else,

8   this was seen more as an abrasive, unprofessional person.

9         But in hindsight, from where I stand now, I see that she

10  was incredibly frustrated.  She was seeing things that --

11  because in a remote setting it's a bit hard.  You don't see

12  other people.  She was seeing things that other teammates were

13  not, and this frustration, I think, led her to react in ways

14  that she did.

15        And in reflection, this was the first gunshot in my mind

16  that I can remember that something is -- something is off, but

17  at the time it -- there was so much involved with this

18  particular ex-colleague of mine that I didn't isolate it right

19  away.

20        **MS. GURSKIS:**  You can take that down, Ms. Braga.

21  Thank you.

22  **BY MS. GURSKIS:**

23  **Q.**     As Done was growing, how concerned was Defendant He with

24  following the law?

25  **A.**     During the pandemic, the team was concerned with being

1    able to operate once things went back to normal, and I recall

2    there being a conversation about how the company needed to be

3    structured in a way for the return of normalcy.

4         And Defendant He had a particular view of the law, where

5    the law was an arbitrary line, and it mattered how well you

6    argued on that line.  And she said this in a meeting with the

7    founding team.

8         Someone said:  I don't have the same view of the law as

9    you do.

10        And then that is when she made the joke "the first person

11   to get arrested gets a Tesla."

12        And at the time, it's the team -- from what I remember,

13   went quiet, because we didn't know like if it was a culture

14   barrier or why that joke was said.  But it also felt like, upon

15   reflection, when somebody crosses a line or a boundary to sort

16   of test you.

17        And I think in my mind I wrote it off as a bad joke, but

18   her view of the law was that and that the government would

19   continue to extend the Ryan Haight Act lifting and that the

20   company would be able to keep running the way that it was.

21   **Q.**   And when you said Defendant He would make a comment about

22   the law being arbitrary, were there any other specific comments

23   that you recall her saying, like reflecting the arbitrariness

24   of the law?

25   **A.**   I think that's about a general summary.

1  Q.   Okay.  Was Defendant He receptive to employees who raised

2  concerns about the law?

3  A.   It was seen as not being needed right now because it

4  wasn't important and that it was better to focus on scaling and

5  growth.

6  Q.   And shifting gears to your -- you said you had some

7  interactions with Defendant Brody, but primarily your

8  interactions were with Defendant He?

9  A.   Yes.

10      MS. GURSKIS:  If you could pull up Exhibit 464, which

11  is an instance of interactions with Defendant Brody.

12      And, Your Honor, the Government would move in at this time

13  Exhibits 381 and 464.

14      THE COURT:  Admitted.

15  BY MS. GURSKIS:

16  Q.   Ms. Hill-Alvarez, is this a Slack between you,

17  Defendant He, Defendant Brody, and some other employees?

18  A.   I believe so.

19  Q.   What is the date on this message, if you can tell?

20  A.   The 8th of November 2021.

21  Q.   Okay.

22      MS. GURSKIS:  You can zoom out, Ms. Braga.

23  BY MS. GURSKIS:

24  Q.   If you would just take a look at the first page for a

25  moment, Ms. Hill-Alvarez.

1    A.    Yes.   (Witness examines document.)

2          Okay.

3    Q.    Is this generally discussing the screening process at

4    Done?

5    A.    I believe Dr. Brody, as he had just become clinical

6    president, and MJ Chey -- I believe she had just joined the

7    company in a formal manner -- were curious about data that

8    Dr. Brindala and Rick Menesini had gathered.

9          And Dr. Brindala was no longer at the company at this

10   time, and so I was trying to explain the data to them.

11   Q.    At some point, did you take the screening test for Done?

12   A.    Yes, I did.   I think all of us did to understand the --

13   the flow of it.

14   Q.    Do you recall how long it took you?

15   A.    Maybe 10 minutes, 15 minutes.

16   Q.    Do you recall the results you got?

17   A.    I got the three plus, you might be a fit.

18   Q.    Have you ever had an ADHD diagnosis, Ms. Hill-Alvarez?

19   A.    No.

20          MS. GURSKIS:   Ms. Braga, if you could turn to page 2

21   of Exhibit 464 and zoom in on the top message.

22   BY MS. GURSKIS:

23   BY MS. GURSKIS:

24   Q.    And this is more on the -- a continued conversation,

25   Ms. Hill-Alvarez, on the screening at Done.

1       Do you see that?

2  A.   Yes.

3  Q.   And do you see that Dr. Brody writes --

4       MS. BELL:  Objection, leading.

5  BY MS. GURSKIS:

6  Q.   Do you see that Dr. Brody writes (as read):

7            "We need to be aware that the ASRS is a

8       screening tool that does not use the official

9       (meaning DSM-5) criteria for ADHD.  What we would

10      need to do to attain that coveted validation (wink)

11      is a diagnostic interview after they are admitted to

12      the platform using the DSM-5 criteria, ideally by

13      interviewers specially trained in those diagnostic

14      criteria and not the same clinicians who will be

15      treating the patient on the platform."

16      Do you know if this process with multiple interviewers

17 ever got implemented at Done?

18 A.   Not to my knowledge.

19      MS. GURSKIS:  You can take that down, Ms. Braga.

20 BY MS. GURSKIS:

21 Q.   In your role as Defendant He's executive assistant, did

22 you assist her in collecting information for investors for a

23 brief period of time?

24 A.   Yes.

25 Q.   Did that involve collecting data and other information

1  from other members of the Done team?

2  **A.**   Yes.  Ruthia would send me a master list of questions and

3  direct me to go to different colleagues and get answers for

4  those questions and compile them into a document.

5       **MS. GURSKIS:**  Ms. Braga, if you could pull up the

6  first page of Exhibit 1359, which I believe has already been

7  admitted.

8  **BY MS. GURSKIS:**

9  **Q.**   Is this a document that you helped Defendant He put

10  together, Ms. Hill-Alvarez?

11  **A.**   Yes.

12  **Q.**   And in terms of the materials that you collected for this

13  document, did that include the rate of stimulant prescriptions

14  for Done?

15  **A.**   I recall there being a question on that, but I'm not

16  sure...

17  **Q.**   Let me rephrase, Ms. Hill-Alvarez.

18       So you said the -- in terms of this collection process and

19  the steps that it involved, was one step that the investors

20  submitted questions to Done that they wanted answers to?

21  **A.**   Yes.

22  **Q.**   And then in your role in assisting Defendant He, did you

23  collect data and other information to potentially use in

24  answering those questions?

25  **A.**   Yes.

1  Q.  Was one category of information that you collected the

2  rate of stimulants that were prescribed by Done providers to

3  Done patients?

4  A.  From what I can recall, yes.

5  Q.  Okay.  And do you recall putting together a chart or graph

6  or any other materials relating to that?

7  A.  I believe my colleague Calvin gave one to me, as he was

8  the one who pulled the data.  And from what I recall, there was

9  this document and then a Google Excel sheet, Google

10  spreadsheet, where there were different tabs with the different

11  photos of either data or items that the investors had asked

12  for.

13  Q.  Okay.  And do you remember anything in particular about

14  the rate that you saw on that document put together by

15  Mr. Hyunh?

16  A.  I recall it was a pie graph, and there was 94 percent and

17  it was cited that 94 percent was the stimulant rate of

18  prescription and I believe it was 6 percent that was other

19  meds.  And that was in the Excel sheet.

20  Q.  Did that graph showing the 94 percent stimulant rate end

21  up in this document that was put together?

22  A.  At the time, I recall Ruthia deleting it and saying that

23  the EHR, which is the software that, to my knowledge, the

24  Chinese team made -- it's the electronic health records

25  software where all of the data for patients and clinicians is

1   stored -- I recall her saying something along the lines that it

2   was not robust enough and so that that pie graph was likely

3   inaccurate and that it did not need to be shared.

4   Q.   Were you aware of investors continuing to request that

5   information about the rate of stimulant prescription at Done?

6   A.   I did see it a few times, but chatting with investors,

7   from what I can recall, was maybe a month of my workflow.

8        MS. GURSKIS:   If you could turn to page 10, Ms. Braga,

9   and zoom in on the text, please.

10  BY MS. GURSKIS:

11  Q.   Do you see the reference to something called "Greylock,"

12  Ms. Hill-Alvarez?  Or just that it says "Greylock" in bold

13  right above bullet one?

14  A.   Yes.

15  Q.   Was that one of the investors, if you can recall?

16  A.   I don't recall that name.

17  Q.   Okay.  And looking at point B, where it says (as read):

18       "Done clinicians offer careful assessment and

19       management with longitudinal care with the same

20       clinician to ensure accurate diagnosis and

21       appropriate treatment."

22       Was that an accurate description of how patients were

23  paired with providers at Done?

24  A.   Over time I would come to see this as inaccurate.  At the

25  time I think I was two, three months into my job, and I was not

1    really aware of how the clinical side functioned.  But over

2    time I would come to see that that was inaccurate.

3         MS. GURSKIS:  And turning to page 12, Ms. Braga,

4    towards the bottom.

5    BY MS. GURSKIS:

6    Q.   Where it says (as read):

7              "Clinicians can always request more information

8         and more time to evaluate."

9         Were providers complaining about not having enough time to

10   evaluate patients from a reset?

11   A.   I recall hearing mentions of it in team meetings. which is

12   why my ex-colleagues would bring it up as a pain point.

13        MS. GURSKIS:  You can take that down.  Thank you,

14   Ms. Braga.

15   BY MS. GURSKIS:

16   Q.   You mentioned earlier that employees were concerned about

17   maintaining their jobs at Done.

18        Did you observe employee turnover when you were at the

19   company?

20   A.   There was a lot of turnover at the company.

21   Q.   Did you see any connections between Defendant He's

22   reactions to feedback and employee departures?

23   A.   Over time, yes.

24   Q.   And would you say that was a few employees, more employees

25   than a few?

1   A.   I would say that it was most people who pushed back too

2   hard.

3   Q.   What was your reaction when these employees started to

4   depart?

5   A.   In the sense of?

6   Q.   How did it feel when -- you know, I think you said earlier

7   you were the tenth employee at Done.  Of that core group, how

8   many people were -- were still there a few months or six or

9   eight months into your time at the company?

10  A.   It was an odd experience, because if you've ever worked in

11  a small team, you're the tenth, eleventh hire and you're told

12  this company is going to be really big, you kind of think it's

13  job marketing, not really going to happen?

14       And then when it starts to happen and you go through

15  hypergrowth -- I think in my first year there, the company grew

16  six times its size.  And so that can be a really

17  psychologically draining experience to be working all the time.

18       And this was also combined with people getting the

19  vaccines, traveling again, going outside, and so it started

20  to -- from where I was sitting, I started to feel like there

21  were things happening behind closed doors that -- it was an

22  intuition that there was something going on.  And it began to

23  be overwhelming with the amount of people who would come and

24  go.

25  Q.   And in terms of people coming and going, did that

1    sometimes add to your workload?

2    A.    Yes.

3    Q.    Was one such situation after the departure of Rick

4    Menesini?

5    A.    Yes.

6    Q.    Did you take on some work with the EHR at that time?

7    A.    Yes.  Rick Menesini had been working on what was called

8    "the in-person project," and in his departure, I took on that

9    workflow, which, to put it in simple terms, meant getting the

10   company from no longer being fully online to being in-person.

11   Q.    And as part of that job, did you log in to the EHR and see

12   provider-patient information?

13   A.    That's correct.  From what I can recall, this was the

14   first time I had access to the EHR working at Done.  And on my

15   end, it's software literacy.  You want to understand what it

16   is.

17        I recall logging in and looking at all the clinician

18   names, sealing what states they were licensed in, and then

19   seeing a number which was their patient load.  And I recall

20   seeing two names that stood out to me:  Dr. Les Tsang, which

21   I'd never met him.  He and I never overlapped at the company.

22        And then I recall seeing Dr. Brody's name, and they both

23   had very high numbers, somewhere around 20,000.

24        And my immediate thought was because I knew the software

25   was homegrown, so to speak, was made by the team, that there

1   has to be some kind of bug.  There has to be some kind of data

2   discrepancy.  And I thought I need to let them know because

3   this is really important.

4        As my role was focused on trying to get all these patients

5   in different ZIP codes and correlate where the doctors live in

6   different states into a building that was somehow in the center

7   of all of them where they could see each other in person, and

8   the data discrepancy was making that task very hard for me, and

9   so I raised that concern.

10  Q.   Did you raise that concern with somebody named

11  Ms. Stanfill, Ruthie Stanfill?

12  A.   Yes Ruthie Stanfill.

13  Q.   What was Ms. Stanfill's role at the company?

14  A.   She -- I'm not too sure.  I don't remember, but I recall

15  she was working on pediatrics at the time.

16  Q.   Okay.  And did you log back in to the EHR after your

17  conversation with Ms. Stanfill?

18  A.   Yes, and the numbers changed.

19  Q.   Did that concern you?

20  A.   Yes, because my conversation with Ms. Stanfill -- she told

21  me that I was being negative and not assuming the benefit of

22  the doubt, and there had been some conversation she'd had with

23  Niki where Niki said those patients needed to be put there for

24  some reason.  And when I logged back in the very next day to

25  look at them, they were all -- all gone.  I would say the ones

1    for -- under Dr.Les Tsang were all gone, and my first thought

2    was that's a large number of patients.  If they needed to be

3    there, then where did they go and why?

4    Q.   And you said you felt concerned.  Did you raise that --

5    concerns with some -- people in management at the company?

6    A.   I recall this experience is what led to my exit the first

7    time from the company.

8         So between seeing this, I would say there was about

9    three weeks that passed, if I can recall, correctly, between my

10   exit.

11        I do recall telling Dr. Brody I think something weird is

12   going on.  And at the time, Ruthie Stanfill was my manager, and

13   because the company had grown so much, I was no longer

14   interacting with Ruthia.  I believe Ruthie and Riley were more

15   so in the org chart line of who was above me.

16   Q.   Okay.  And you said you raised the concern with

17   Defendant Brody?

18   A.   Not in a formal way.  Just in a "hey, I think something's

19   going on."

20   Q.   What was his reaction when you said that to him?

21   A.   From what I can recall, he was his usual, at the time,

22   jovial self in the sense that it probably wasn't a big deal

23   what was going on.

24   Q.   But you felt concerned about it?

25   A.   Yes, because it was too strange.

1    Q.   And so you ultimately left Done, I think you said,

2    three weeks after that?

3    A.   That's correct.

4    Q.   And that was in part due to concerns about how the company

5    was being operated?

6    A.   I saw behind the curtain a little bit, so to speak, and at

7    the time it seemed like a mirage.

8         But when you're in that kind of situation, you don't want

9    to believe you're in that kind of situation, and so I think

10   that was a part of it for me?

11        But, yes, that was a part of why I left.

12   Q.   Okay.  And did you sign an NDA, or a nondisclosure

13   agreement, when you left?

14   A.   Yes.  I had actually resigned, and then I was given a

15   severance agreement by Riley and Ruthia, which I did sign.

16   Q.   Okay.  And after being given that agreement to sign, did

17   you ever hear from Defendant He after that departure from the

18   company the first time?

19   A.   Yes.  She called me on the phone.

20   Q.   What did she say when she called you on the phone?

21   A.   Her first question was to see if I was feeling okay, and

22   then she told me not to talk to any reporters if they called,

23   and she told me to please speak well of the company.  And

24   that's what I can recall from that chat.

25        But in a way, it felt like a veiled threat, and she told

1   me to remember my contract.

2   **Q.**   And not long after that conversation, did the DEA come to

3   you and ask questions about Done?

4   **A.**   I departed in March 2022, and I believe the DEA came the

5   fall, winter of that year, from what I can remember.

6   **Q.**   And by the fall and winter of that year, were you aware

7   that Done was under investigation?

8   **A.**   I had seen an article come out in the Wall Street Journal,

9   I think about two weeks after my departure at the time.

10  **Q.**   And did you ultimately return to Done in 2023?

11  **A.**   Yes.

12  **Q.**   Why did you return to Done if things were so bad when you

13  left?

14  **A.**   This is a little embarrassing or vulnerable to admit, but

15  I was in a domestically abusive relationship, and I was looking

16  at having to go to a women's shelter and let go of my pets or

17  to get a job and figure it out.

18       So from what I can recall, my abuser got arrested.  I had

19  a sprained hand, a chest wall contusion, and I just started

20  reaching out to everyone I knew everywhere I had ever worked to

21  see if I could have a job back, and Done answered.

22  **Q.**   Do you need a minute?  Are you okay?

23  **A.**   Yeah, I'm okay.

24  **Q.**   Did you return to Done as Defendant He's executive

25  assistant or in another position?

1    A.    During my interview process, I interviewed with Haley Zhu

2    and I was told I would be a project manager on the marketing

3    and growth team and that Ruthia was no longer running the

4    company.

5    Q.    Who did you understand from that conversation was running

6    the company?

7    A.    I understood it as Haley was running the company.

8    Q.    At some point after you started, did you understand that

9    it wasn't Haley or Haley Zhu who was running the company?

10   A.    Yes.

11   Q.    Who did you understand it to be?

12   A.    Ruthia.

13   Q.    How did you know that if you weren't her executive

14   assistant anymore?

15   A.    She began to message me and ask me to do certain things.

16   And I recall bringing it up with Haley, because I was under the

17   impression Haley was my manager.  And Ruthia had a note on

18   Slack that said "innovating," so I assumed she was working -- I

19   think her company, other company, was called Olivia.  And so I

20   didn't really know why she was reaching out to me.

21        And I would say about two to three weeks in, Haley kind of

22   dropped, I would say, the charade and let it be known that she

23   would meet with Ruthia He about everything regarding the

24   company and Ruthia would give her directions and guidance.

25   Q.    And in terms of the atmosphere of the company in 2023

1   compared to when you left in 2022, was it the same?  Was it

2   different?

3   A.   No.  When I was first there, it was a really collaborative

4   open space.  That slowly changed, and when I returned it was --

5   it felt like a ghost ship.

6   Q.   When you say "ghost ship," were there fewer people?

7   A.   There were names there, but you got the impression you

8   were there alone.  Nobody really talked.

9          MS. GURSKIS:  Your Honor, we would move to admit

10   Exhibit 864.

11          THE COURT:  854 admitted.

12          MS. GURSKIS:  864, Your Honor.

13          THE COURT:  Pardon?

14          MS. GURSKIS:  864.

15          THE COURT:  864 admitted.

16      (Trial Exhibit 864 received in evidence.)

17          MS. GURSKIS:  Thank you.

18   BY MS. GURSKIS:

19   Q.   Is this a message --

20          MS. GURSKIS:  If you could just wait one moment to

21   zoom in.  Thanks, Ms. Braga.  Sorry.

22   BY MS. GURSKIS:

23   Q.   Is this a message between you and Ms. He in February of

24   2023 after you returned to the company?

25   A.   2024.

1   Q.   2024.   I'm sorry.

2   A.   Yes.

3        MS. GURSKIS:   And, Ms. Braga, if you could zoom in to

4   that bottom portion again.   Thank you.

5   BY MS. GURSKIS:

6   Q.   And here Defendant He is referring to a reorg and someone

7   named Yue Wang?

8   A.   That's correct.

9   Q.   Do you have an understanding of who Yue Wang was?

10  A.   When I came back to the company, it seemed that there was

11  a very large team in China, which was called the APAC team, and

12  that he was the leader of that team?

13       MS. GURSKIS:   You can take that down.   Thank you,

14  Ms. Braga.

15      Your Honor, move to admit Exhibit 2869.

16       THE COURT:   Admitted.

17       MS. BELL:   I'm sorry.   I have an objection to this one

18  based on hearsay notes that are on the front of the exhibit.

19      If I can confer with Government counsel for a minute.

20       THE COURT:   2859 or 69?

21       MS. GURSKIS:   2869, Your Honor.

22                     (Counsel conferring.)

23       MS. GURSKIS:   If you could pull up Exhibit 2869.

24  Thank you, Ms. Braga.

25       THE COURTROOM DEPUTY:   Is it admitted, Your Honor?

1          THE COURT:  I'm sorry.  I have 2869.  Is there a 2858?

2          MS. GURSKIS:  No.  It is 2869, Your Honor.  I'm sorry.

3    I wasn't speaking clearly.

4          THE COURT:  Okay.  And what's the objection?

5          MS. BELL:  Oh, Your Honor, these notes, I believe, at

6    the bottom are not part of the business record.  These are the

7    witness's notes.  So I just discussed with Government counsel

8    that they would be redacting those.

9          THE COURT:  Okay.  So it's admitted as redacted.

10         (Trial Exhibit 2869 as redacted received in evidence.)

11         MS. BELL:  Thank you, Your Honor.

12   BY MS. GURSKIS:

13   Q.   Is this a blown-up version of what we were just looking

14   at?

15   A.   Yes.

16   Q.   And you were describing the APAC team, Ms. Hill-Alvarez?

17   A.   That's correct.

18   Q.   What are the stars on this document?

19   A.   Those, to my knowledge, were the contractors or employees

20   in China.

21   Q.   And what about the purple circles?

22   A.   These are contractors or employees from the Philippines.

23   Q.   When you say contractors or employees from the

24   Philippines, are you referring to the care team or a different

25   part of the company?

1   A.   The care team.

2   Q.   And looking at the top of the chart, do you know what the

3   general management office was?

4   A.   It was understood that Niki and Joanne, who both took over

5   Haley Zhu's role, were essentially the interim CEO.

6   Q.   And you mentioned that Ms. Zhu, when she was on paper

7   directing the company, was interacting regularly with

8   Defendant He.  Were you aware of frequent interactions between

9   Defendant He and Ms. Mercado during this time period?

10  A.   Yes, but it was not as frequent as it was with Haley.

11  Q.   Okay.  And in terms of your return to the company and the

12  original 10 or so people who were there when you first started,

13  had many of them gone by this point in 2024?

14  A.   I would say most of them.

15  Q.   But not Ms. Mercado?

16  A.   Not Ms. Mercado or Bianca Rohr.

17  Q.   Did you get a sense of why Ms. Mercado stayed at Done even

18  while all of these other employees were leaving?

19  A.   I came to learn that she had family members in the care

20  team or the team from the Philippines and that she didn't want

21  to leave them there.

22  Q.   How would you describe the dynamic between Defendant He

23  and Ms. Mercado?

24  A.   I think on the surface it was very pleasant.

25  Q.   On the surface?

1    **A.**    Yes.   Niki often voiced to me that she wanted to learn to

2    say no to Ruthia but that it was hard for her, coming from her

3    culture, to not be pleasant.

4    **Q.**    You mentioned earlier today that in your experience,

5    Defendant He was micromanaging employees.   Was Ms. Mercado one

6    of those employees who --

7         **MS. BELL:**   I'm sorry.   Objection, foundation,

8    speculation, calls for hearsay.

9         **THE COURT:**   Lay a foundation.

10        **MS. GURSKIS:**   Sure.

11   **BY MS. GURSKIS:**

12   **Q.**    You worked as Ms. He's executive assistant; right?

13   **A.**    Yes.

14   **Q.**    And as Defendant He's executive assistant, I think you

15   said you were interacting with her on an almost constant basis?

16   **A.**    Yes.

17   **Q.**    And when you were interacting with Defendant He on an

18   almost constant basis, did you observe her also regularly in

19   contact with Nikita Mercado?

20   **A.**    Not as much as with Haley Zhu, but it was pretty frequent.

21   **Q.**    Okay.   And when you say it was pretty frequent and you

22   were observing those interactions, what did you observe about

23   the dynamic between Defendant He and Ms. Mercado?

24        **MS. BELL:**   Objection as to time frame.

25        **MS. GURSKIS:**   I can clarify.

1  BY MS. GURSKIS:

2  Q.   So let's first think about the earlier time period when

3  you were at the company, Ms. Hill-Alvarez, and you had regular

4  interactions with Defendant He as her executive assistant.

5      What did you observe at that time in terms of the dynamic

6  between Ms. Mercado and Defendant He, thinking back to your

7  first time at the company?

8  A.   Ruthia really cared about Niki, really favored her, and I

9  recall I think she was Ruthia's first hire.

10 Q.   When you spoke about employees as a general matter who

11 Defendant He micromanaged, would you say Ms. Mercado, in that

12 first time period, was one of those employees?

13 A.   From where I stood, yes.

14 Q.   And when you say that Ms. Mercado had difficulty saying no

15 to Defendant He, were your observations about that only from

16 the time period in 2022 to 2023, or did that continue when you

17 returned to the company in 2023 and 2024?

18 A.   It continued.

19 Q.   Turning back to this document and the geographic location

20 of the employees, was this an accurate representation of how

21 many employees were actually based in China at the time?

22 A.   No.

23 Q.   Can you explain?

24 A.   It seemed to me, based on the amount of people both that I

25 interacted with and then also whose e-mails I saw, that the

1  China team was very, very large, somewhere around a hundred,

2  maybe 150 people.

3  **Q.**   And when you say based on your observations, did the

4  language used in meetings and in documents change at some point

5  upon your return to the company?

6  **A.**   Yes.  It was common for meetings to suddenly shift to

7  being in Chinese or conversations to be in Chinese and there to

8  be notes in Chinese.

9  **Q.**   Do you speak Chinese?

10 **A.**   No.

11 **Q.**   So what would you do during those meetings when the

12 language would change?

13 **A.**   I would try to clarify after the meeting whatever it was

14 that I had missed, and I would trust what I was told.

15 **Q.**   What about when it came to documents?

16 **A.**   In terms of documents, they were not ones that I directly

17 interacted with in my workflow.  I recall seeing them in the

18 marketing team specifically.

19      **MS. GURSKIS:**  You can take that down.  Thank you

20 Ms. Braga.

21 **BY MS. GURSKIS:**

22 **Q.**   And during the time when you returned to the company, I

23 think you said were you a project manager?  Is that right?

24 **A.**   That's correct.

25 **Q.**   Did providers occasionally reach out to you with concerns

1  in that role?

2  **A.**  There was a time when about seven providers e-mailed me

3  regarding a concerning contract they saw when they logged in to

4  the EHR.  And for some of them, they copy-pasted the contract

5  text.  I believe one of them took a photo with their cell

6  phone.

7       But essentially, they were prevented from logging in to

8  the platform to see their patients for that day unless they

9  signed the contract, which was something to do with working for

10  a company called Mindful Mental Wellness.

11  **Q.**  Prior to those concerned providers reaching out to you,

12  had you ever heard of a company called Mindful Mental Wellness?

13  **A.**  No.

14  **Q.**  Do you recall approximately when this was that these

15  providers are suddenly getting the Mindful Mental Wellness

16  contract?

17  **A.**  I want to say it was the spring of 2024, so around

18  February, March, I would say.

19  **Q.**  Did you speak to anybody at Done about what Mindful Mental

20  Wellness was?

21  **A.**  Yes.  I asked Joanne and Niki, and there were other people

22  in this Slack group, but nobody answered me.

23  **Q.**  Did you ever speak to someone named Shelby Leal about

24  Mindful Mental Wellness?  L-E-A-L?

25  **A.**  Yes.  She, Shelby, had been tasked with getting tax

1   documents set up in different states for a new HR software

2   called Gusto that she was pioneering transitioning to.

3       And I asked her what it was, and she said she'd seen it

4   start to pop up in documents.

5   Q.   Did Ms. Legal say who directed her to put together those

6   tax documents for Mindful Mental Wellness?

7   A.   Which task documents?

8   Q.   Tax.  Didn't you say it was tax?

9   A.   Yes.  That was directed by Ruthia, and in that channel was

10  also Niki and Joanne, I believe.

11  Q.   And at this point upon your return, did you have any

12  concerns about whether Done was under investigation?

13  A.   When I had interviewed with Haley, I asked her if the

14  investigation was still going on.  She told me that it was

15  over, nearing over, and that the government was calculating a

16  fine.

17  Q.   Did that end up being true?

18  A.   No.

19  Q.   So by this time, with Mindful Mental Wellness, were you

20  aware that the investigation was going on?

21  A.   Yes, I was.

22  Q.   Did you become aware at some point upon your return to the

23  company that the ongoing investigation into the company

24  involved interviewing witnesses?

25  A.   Yes.

1  Q.   And did you also become aware that witnesses were -- who

2  the witnesses were speaking to law enforcement included current

3  and former employees of Done?

4  A.   Yes.

5  Q.   Did Defendant He actually reach out to you about legal

6  bills pertaining to these employees?

7  A.   Yes.

8  Q.   In that capacity, did Defendant He eventually ask you to

9  scrutinize legal bills for certain information for those

10 employees?

11 A.   It was cited as overbilling.  She perceived the law firms

12 were overbilling her, so I was asked to scrutinize them to see

13 essentially where there was rationale to ask to remove items

14 from what it is they were charging, or a discount, in other

15 words.

16 Q.   At some point, did she ask you to look for information

17 about whether employees were speaking to the Government for

18 certain periods of time?

19 A.   It became clear that, as she mentioned in a call, that she

20 felt that certain employees were talking to the Government for

21 too long and were likely making her or the company not look

22 good.

23      THE COURT:  Do you want to take a recess, Court

24 Reporter?

25           (Pause in proceedings.)

1    **MS. GURSKIS:**  I'm almost done, Your Honor, I don't

2    have too much more.

3          **THE COURT:**  Go ahead.

4    **BY MS. GURSKIS:**

5    **Q.**   Did she -- do you remember the names of any employees

6    where Defendant He expressed that she didn't want to pay the

7    legal bills for those employees?

8    **A.**   Dr. Brody, Riley Levy, Jiatao Chang, Michelle Huynh.

9    **Q.**   And upon your return to the company, did Defendant He give

10   you any directives about day-to-day communications and how

11   those should be conducted?

12   **A.**   She asked me about, I believe, two weeks in my return to

13   not type things, and if I were to speak to her, to speak to her

14   in the presence of a lawyer, specifically Rumi and Xena, who

15   were colleagues on the APAC team.

16   **Q.**   And when you say "not type things," did you understand

17   that to mean not to put things in writing?

18   **A.**   That's correct.

19   **Q.**   Did she give you instructions about a phrase to use or a

20   channel to use when you felt that you did need to put things in

21   writing?

22   **A.**   Privileged and confidential.

23   **Q.**   Did Defendant He explain what privilege and confidential

24   meant to you?

25   **A.**   No, but I looked it up.

1  Q.   And what did you learn when you looked it up?

2  A.   To my understanding, it seemed that anything said in the

3  presence of a lawyer is privileged and confidential and cannot

4  be used, in simple terms.

5  Q.   Are you a lawyer?

6  A.   No.

7  Q.   What was your reaction to getting that instruction from

8  Defendant He?

9  A.   It became clear to me that the investigation was probably

10  still going on, and I had not yet received confirmation of that

11  working there.  It also seemed very strange.  Just seemed very

12  strange.

13  Q.   And you mentioned Defendant He wanting to speak with you

14  only when Rumi Ge and Xena Zhao were present?

15  A.   That's correct, or Mike Feldman.

16  Q.   Do you know if Rumi Ge and Xena Zhao were actually

17  lawyers?

18  A.   I was told that they were lawyers, and then I learned

19  after the arrest that they were not.

20       MS. BELL:  Objection, Your Honor, to the extent that

21  calls for hearsay.  Move to strike.

22       MS. GURSKIS:  801(d)(2)(d), Your Honor.

23       THE COURT:  Sustained.  That will be stricken.

24       MS. GURSKIS:  I can lay a foundation for it.

25       THE COURT:  Okay.

1  BY MS. GURSKIS:

2  Q.  So at the time that you learned that Ms. Zhao and Ms. Ge

3  were not lawyers, were you an employee of Done?

4  A.  Yes.

5  Q.  Did you learn from another employee at Done that Ms. Zhao

6  and Ms. Ge were not lawyers?

7           MS. BELL:  Objection, Your Honor.  Same objection.

8           THE COURT:  Well, I'll discuss it outside the presence

9  of the jury.

10          MS. GURSKIS:  Okay.

11          THE COURT:  Do you have anything further?

12          MS. GURSKIS:  On this topic?  I have other questions

13  for her, yes, Your Honor.

14          THE COURT:  Then ask your other questions.

15 BY MS. GURSKIS:

16 Q.  Did Defendant He give you any other instructions or

17 directives about documents that she wanted you to sign or put

18 your name on?

19 A.  There was an instance where a law firm that had not been

20 paid wanted to go to arbitration, and she wanted me to sign

21 that document, which I was not comfortable doing, as I'm not a

22 lawyer.

23      And she mentioned me possibly going to arbitrate, which I

24 was not comfortable doing, and I said no.

25      And then another instance, there were some insurance

1   documents.  I don't recall exactly what that insurance portion

2   of the company was for, but it was suggested that I sign, and

3   they were asking for an executive signature, which was not me.

4   **Q.**  And with regard to the arbitration, did you even know what

5   an arbitration was?

6   **A.**  No.  I had to look up what that meant.

7   **Q.**  What was your reaction when you were being asked to sign

8   all these documents as Done's representative?

9   **A.**  It's a very complex reaction.  The facet of it was it felt

10   like scapegoating, in a sense.  And another facet of it was

11   when you're being told nothing is going to happen, everything's

12   fine, you're overreacting, where I just trusted my feeling

13   about it.  But what was around me was this is not a big deal;

14   just do it.

15   **Q.**  And in terms of comparing the time when you were at the

16   company in 2022 to when you returned in 2023 and 2024, did you

17   make any observations about documents that you worked with in

18   2022 when you returned to the company?

19   **A.**  As I was a founding team member, I took a lot of notes as

20   the assistant, and I recall logging in to my Google drive.

21   I believe Shelby had asked me for something that Ruthia asked

22   her to do, and I said, oh, I remember I made something like

23   that a long time ago.  Let me find it for you in my Google

24   drive.

25      It was not accessible to me, and that's when I realized a

1  lot of things that I had taken notes on or presentations I had

2  created were not accessible to me.

3  **Q.**  Could you tell who had removed the documents or made them

4  not accessible?

5  **A.**  No.  I just knew that I could not access them.  But there

6  is a feature in Google Sheets or Google where you can change

7  the owner, make someone else an owner and remove somebody else

8  from having access on the document.

9  **Q.**  Did you see any documents that were -- or documents that

10  you recalled working with that were just not available at all?

11  **A.**  I recall there was one that I had made an onboarding

12  presentation just to kind of give a high-level overview of

13  these are the softwares we use.  As there was so much turnover

14  in the team, it was easier for me to share this presentation

15  than to try to explain to people who had questions at that

16  time.

17  **Q.**  And if you could --

18       **MS. GURSKIS:**  Your Honor, we move to admit

19  Exhibit 883.

20       **THE COURT:**  Admitted.

21  (Trial Exhibit 883 received in evidence.)

22       **MS. GURSKIS:**  Ms. Braga, if you could pull up

23  Exhibit 883.

24  **BY MS. GURSKIS:**

25  **Q.**  Do you recognize this, Ms. Hill-Alvarez?

1    A.    Yes.

2    Q.    Can you just explain for the jury what's going on here?

3    A.    Whenever you need help from a company, you usually send an

4    e-mail that says something like "customer support @ company

5    name.com" or "customer service @ company name.com."

6         When I had returned to Done, I was asked to send e-mails

7    to different groups in the team, such as sometimes just the

8    team in China needed to know something.  Sometimes just the

9    care team needed to know something.  Same thing for clinicians

10   or for core employees.

11        None of these groups had been created, and if they'd been

12   created, they had not been maintained.  And so Shelby and I

13   went through.  We created a master list of all the e-mails of

14   everyone in those different departments, and we cleaned up the

15   e-mail group, meaning whoever is in contractors@donefirst.com,

16   there can be about 20 e-mails there corresponding to those

17   contractors that need whatever it was that needed to be sent

18   out.

19        This was a major project Shelby and I worked on.  It was a

20   big cleanup.  I would say it took about a month and a half

21   because there were a lot of gaps that needed to be filled.  And

22   on June 12th, I started to get alerts that the e-mail groups

23   were not working, which is -- it had been a big pain point for

24   us and we had done a lot of work to clean it up.  I was raising

25   it as a concern because they'd been working fine.

1    And it came to light that these had been deleted.

2    Q.   What was your reaction when you saw that these had all --

3    these channels had all been deleted?

4    A.   I was pretty upset.  I had worked really hard to clean it

5    up, and I thought it was odd because to delete them, you would

6    have to click them, and so for them all to be gone, it was --

7    at that time, it was very odd and it seemed strange.

8    Q.   So you said at that time.  This is June 12th, 2024?

9    A.   Correct.

10   Q.   And when you say "to delete them, you would have to click

11   them," is that somewhat labor intensive to do that?

12   A.   It's similar to going through your phone and deleting

13   photos.  You have to go and select them.  So the person who

14   deleted them on accident, quote/unquote, would have --

15   accident -- would have had to select seven to 10 things.

16   Q.   When you say "accident, quote/unquote," does that suggest

17   you didn't think it was an accident?

18   A.   Well, the next day the arrests happened, and nobody could

19   e-mail us.

20   Q.   When you say the arrests happened, you mean the arrest of

21   the defendants?

22   A.   That's correct.

23   Q.   Was anything else unusual going on at this time in terms

24   of documentation or other things at the company?

25   A.   There were several things.

1  Q.   Let's start with the China team.  Anything in particular

2  with regard to the China team that you recall?

3  A.   The care team told me that the China team had started to

4  remove their access to the EHR and that Redash, which is a

5  software basically that just monitors data, that the numbers

6  began to change and that they were not able to do their job in

7  the way that they were used to.

8  Q.   And as you're -- the access to this information or as

9  these materials are being deleted, did you speak to anybody at

10  the company about your concerns?

11  A.   Joanne Dai resigned, and so who was left in charge was

12  Nikita Mercado, Marc Arias, and Yue Wang.  I reached out to

13  Niki and Marc about it.

14  Q.   What was Ms. Mercado's reaction when you reached out to

15  her about it?

16  A.   She was having a panic attack, and she said she felt that

17  Ruthia set her up.

18  Q.   And what was Mark Arias's role at Done?

19  A.   I'm not sure his formal title.  I know he managed finance.

20  Q.   And in terms of the timing of Defendant He's arrest

21  relative to payday, was that pretty close in time?

22  A.   Yes.

23  Q.   You said Marc Arias was in finance, but who -- was he the

24  person who controlled the pay for Done employees?

25  A.   No.  So Ruthia and Shelby both controlled the pay.  Shelby

1  would collect all invoices, et cetera, and then Ruthia would

2  approve payment.

3      The intricacies of that, I'm not sure.  Shelby's mother

4  had died -- I'm not sure when, but very soon before this.  And

5  so Joanne had chosen someone from the care team named Audrey to

6  take over Shelby's place, and it was a pain point because this

7  was a learning curve for her -- "her" being Audrey -- and there

8  was a situation where just people had not been paid at that

9  point.

10 **Q.**   So in terms of -- did -- when you say Audrey, is that

11 Audrey Guinto?

12 **A.**   Yes.

13 **Q.**   Did Ms. Guinto and Mr. Arias work to take some measures to

14 make sure employees were getting paid at that time?

15 **A.**   That's correct.

16 **Q.**   Did you help them?

17 **A.**   I helped them in the sense of communicating with the

18 employees to let them know, hey, your check may be late,

19 et cetera.

20 **Q.**   And in terms of pay, did that include potential severance

21 or bonuses, or was it limited to just the next pay period, if

22 you can recall?

23 **A.**   These events happened very close together, and so part of

24 it was the pay period, and then when the arrests occurred,

25 there had been an e-mail that went out months ago that Joanne

1  Dai had asked to send out regarding giving company bonuses.

2  And to my knowledge, Nikita Mercado and Marc Arias had decided

3  to issue those bonused with the understanding that they were

4  also severance.

5      And so all of this was occurring somewhat simultaneously.

6  **Q.**   Okay.  And were you able to receive some payment from Done

7  at that time?

8  **A.**   Yes.

9  **Q.**   How scary of a time was this for you?

10 **A.**   It's like when you get on an airplane and you're by the

11 exit door.  You don't ever think you're going to be the one

12 responsible; right?

13     And you're kind of in free fall.  There's turbulence.

14 There's people having very human emotions.  I think all of us

15 at that point in time were crying, and there was this sense of

16 you saw the depth of things that previously you couldn't see.

17 And people felt set up.  They felt lied to.

18     I do want to say people felt possibly Dr. Brody had been

19 set up because he had been removed from Slack.  And it was a

20 very raw emotional time.  There was no one in leadership

21 stepping in, and I think we were all waiting for an investor to

22 step in, for somebody to step in.  And it kind of felt like

23 you're walking around trying to help people put on masks,

24 trying to help them to feel okay, and, you know, you're worried

25 about the patients because doctors, clinicians are resigning.

1    They have thousands of patients under them.  Sometimes they're

2    the only ones who are licensed in that state, and so all of a

3    sudden you have people who don't have access to care and

4    people -- you know, it's like everyone's jumping ship.

5        And you want to do the right thing.  You want to help the

6    patients.  You want to make sure that they have the right

7    documentation.  They need to continue their care.

8            MS. GURSKIS:  Ms. Braga, if you could pull up

9    Exhibit 1122, which, Your Honor, we'd move to admit.

10           THE COURT:  Admitted.

11       (Trial Exhibit 1122 received in evidence.)

12           MS. BELL:  I would object on hearsay grounds to this,

13   Your Honor.

14           MS. GURSKIS:  It's a --

15           THE COURT:  Overruled.

16   BY MS. GURSKIS:

17   Q.   Do you recognize this Instagram post from the Done

18   account, Ms. Hill-Alvarez?

19   A.   Yes.

20   Q.   And it says (as read):

21           "Alert emoji.  Important update for our

22           patients.  Alert emoji."

23       Did you screenshot this while you were at Done?

24   A.   Yes.

25   Q.   And approximately when did this Instagram post occur

1  relative to the arrest and the other events that we were just

2  talking about?

3  **A.**  I would say about a week after.

4  **Q.**  Can you read the bullets in black that are written on this

5  post?

6  **A.**  (as read):

7         "Providers are leaving.  Patients are being

8      displaced.  The management team from China has taken

9      over operations and disabled the U.S. core team

10     accounts with little to no communication or

11     transparency.  stop booking appointments and request

12     refunds."

13 **Q.**  Did you help create this post?

14 **A.**  I did not help.

15 **Q.**  Okay.  What involvement did you have in or awareness did

16 you have in terms of the creation of the post?

17 **A.**  I was aware of who posted it.

18 **Q.**  Was that Wednesday Almero?

19 **A.**  Yes.

20 **Q.**  And did Ms. Almero speak to you about why she felt the

21 need to put this post up?

22 **A.**  A lot of my ex-colleagues actually have ADHD.  Wednesday

23 is one of them.  And so I think this experience for her and for

24 others is --

25         **MS. BELL:**  Objection, Your Honor, calls for hearsay.

1          THE COURT:  Sustained.

2     BY MS. GURSKIS:

3     Q.   In terms of your -- well, Ms. Almero --

4          MS. GURSKIS:  Can I lay the foundation, Your Honor,

5     for a hearsay exception?

6          THE COURT:  Well, it's hearsay.

7          MR. BODAPATI:  Ms. Almero was another employee at

8     Done, and they were putting up this post together while

9     employees at Done.

10         THE COURT:  But now you're asking her for somebody

11    else's sentiments, how they felt.

12         MS. GURSKIS:  I can rephrase, Your Honor.

13         THE COURT:  Okay.

14    BY MS. GURSKIS:

15    Q.   So in terms of the climate at the company when this post

16    was being put up, I think you mentioned you felt, from your

17    observations, that other employees felt scared?

18    A.   Yes.

19    Q.   Based on your interactions and observations of Ms. Almero,

20    was she someone who fell into that category of an employee

21    being scared or concerned?

22    A.   Yes.

23    Q.   And subsequent to those observations, did you see her put

24    this post up on the Done Instagram page?

25    A.   She informed me she did.

1    Q.    Okay.  And --

2              MS. GURSKIS:  You can take that down.  Thank you

3    Ms. Braga.

4    BY MS. GURSKIS:

5    Q.    And in terms of the -- so you mentioned that Ms. Almero

6    and some of your other colleagues had ADHD?

7    A.    That's correct.

8    Q.    How important to you was that mission that you described

9    earlier of the mental health focus of the company?

10   A.    I think the times we're in, things can't be said very

11   casually, but I would say since the pandemic, people are really

12   struggling, and I was excited to be a part of something that

13   could make people's lives better.

14        And the mission of the company, for me, while I don't

15   think it's a bad thing to dream of a better world, I think the

16   world can use more hope, and it was a heartbreaking experience,

17   to say the least.

18   Q.    When you say it was a heartbreaking experience, did it not

19   fulfill what you expected or saw the mission as when you joined

20   the company?

21   A.    There was a time in the beginning where there was this

22   synergy of momentum, where the team felt like magic, like we

23   were really changing things, and to slowly see people fall

24   away, it became clear that the company was about profit?

25        And it's ambiguous because I'm aware this platform helped

1  people, but I'm also aware it harmed people, and I do think

2  that harm could have been mitigated, prevented and lessened.

3          MS. GURSKIS:  I pass the witness, Your Honor.  Thank

4  you.

5          THE COURT:  Okay.  Well, ladies and gentlemen, let's

6  take our noon recess at this point.  And we will --

7      Well, maybe we could have 15 minutes of -- let's not take

8  it quite yet.  We'll take it in 15 minutes.

9      Go ahead.  Cross.

10         MS. BELL:  Thank you, Your Honor.

11                     <u>CROSS-EXAMINATION</u>

12         THE COURT:  If you want to stand up, stand up.

13                     (Pause in proceedings.)

14         THE COURT:  Okay.  You may proceed.

15         MS. BELL:  Thank you, Your Honor.

16  BY MS. BELL:

17  Q.   Good morning.  So you testified that you first worked at

18  Done for this one-year period between March of 2021 and March

19  of 2022; right?

20  A.   That's correct.

21  Q.   And then you came back for your second time at Done, and

22  that was October 2023 to June; right?

23  A.   It may have been late September, but it was September,

24  October.

25  Q.   Okay.  So about a nine -- eight- to nine-month period?

1   **A.**   That's correct.

2   **Q.**   And June was the month that Ruthia and Dr. Brody were

3   arrested and charged in this case; right?

4   **A.**   That's correct.

5   **Q.**   Now, when you went back to work at Done the second time,

6   you were paid a salary of about $5,400 per month; right?

7   **A.**   Sometimes.

8   **Q.**   You were paid between 5- and $6,000 per month; right?

9   **A.**   It depended on the amount of hours I worked.

10  **Q.**   You were paid more than $5,400 a month?

11  **A.**   There was about, from what I can recall, two or three

12  months where I worked overtime and was paid more.

13  **Q.**   Okay.  So for overtime?

14  **A.**   Correct.

15  **Q.**   Okay.

16          But it was somewhere in that range; right?

17  **A.**   Usually.

18  **Q.**   Okay.  So Ruthia was arrested on June 13th; right?

19  **A.**   That's correct.

20  **Q.**   And five days later, on June 18th, you wrote to the

21  company to tell them that you were resigning that day; right?

22  **A.**   I don't recall the day specifically.

23          **MS. BELL:**  Can we go to Exhibit 7448, just for the

24  witness.

25  \\\

BY MS. BELL:

Q.   Let's see if this refreshes you.

     Do you see that?

A.   Yes.

Q.   Okay.  So on June 18th, you write to the company and you say (as read):

          "I resign effective immediately."

     Right?

A.   Yes.

Q.   Now, the day before you left, you received six different wire transfers from Done's bank accounts; right?

A.   I don't recall the amount.

Q.   Let's go through them.

     You received a transfer for $19,000 on June 17th, the day before you wrote that e-mail; right?

A.   I do recall receiving the money.  Not sure of the day.

Q.   Would it refresh your memory to go to the Bill.com record of the transfer from Done's accounts to yours?

A.   Yes.

     MS. BELL:  Could we put that up just for the witness, the Court, and the Government.  This is Exhibit 7567.

     Okay.  So if we could blow that up.

BY MS. BELL:

Q.   Okay.  So you see you received first one transfer in the amount of $19,000.  Confirmation -- last four of the

1  confirmation 1974; correct?

2  A.   That's what's on the screen.

3  Q.   You remember receiving that money; right?

4  A.   Yes.

5  Q.   You received a second transfer the same day for $19,000,

6  last four of the confirmation number 2034; right?

7  A.   Correct.

8  Q.   You received another transfer for $5,400 also the same

9  date, June 17th, confirmation number 8483; right?

10  A.   Correct.

11  Q.   You received another transfer the same day, June 17th, for

12  $10,400, last four confirmation numbers 8863; right?

13  A.   I don't think that one is accurate, but I would need to

14  check with bank records to double-check.

15  Q.   Okay.  Well, from what you see right here, you see that

16  transaction; right?

17  A.   Yes.

18  Q.   Okay.  And then you received another transaction for

19  $5,400, confirmation number last four 8787; right?

20  A.   That's what's on the screen.

21  Q.   Also on June 17th; right?

22       Right?

23  A.   Yes.

24  Q.   And then the last transfer was for $20,703, also on

25  June 17th, confirmation number 2046; right?

1   **A.**   That's correct.

2   **Q.**   So that's a total of nearly $80,000; right?

3   **A.**   About that amount.

4   **Q.**   $79,903, to be exact; right?

5   **A.**   I can't confirm that.  I would need to check my bank

6   records.

7   **Q.**   Okay.  But based on what we see here, nearly $80,000;

8   right?

9   **A.**   Somewhere in that range.

10  **Q.**   And so that's 14 times $5,400, a little more; right?

11  **A.**   I don't know the math there.

12  **Q.**   Okay.  It's a lot more than $5,400, your typical monthly

13  salary; right?

14  **A.**   Correct.

15  **Q.**   And the fact is you arranged with Ms. Mercado and

16  Mr. Arias to pay yourselves large sums of money the day before

17  you walked out the door; isn't that true?

18  **A.**   That's not true.

19  **Q.**   The fact is you used this money to pay off substantial

20  debts you had; right?

21  **A.**   I did pay off debt.

22  **Q.**   Okay.  And the fact is you do know that it is a crime to

23  take money that you're not entitled to; right?

24  **A.**   This money was promised to us.  I did not calculate the

25  bonuses.  I was not the only individual to receive a bonus.  I

1   did not issue the payments.

2       And in my view, this is severance, and that is what it was

3   told to me for living through a situation that devastates a

4   career.

5   **Q.**   And you say today that you received the severance the day

6   before you gave notice that you were actually leaving?  Is that

7   your testimony?

8   **A.**   That is not my testimony, no.

9   **Q.**   Okay.  You don't dispute you got the money on June 17th;

10  right?

11  **A.**   I would have to check my bank records.

12  **Q.**   Okay.  But based on what you're looking at here on the

13  screen, that's the day the transfers were sent; correct?

14  **A.**   Transfers were sent to many employees.  Some employees had

15  not been paid for two months.  There were vendors that had not

16  been paid, so many transfers were sent out at this time.

17  **Q.**   I'm asking about the transfers of $80,000 to you.  Those

18  were sent on June 17th; right?

19  **A.**   I'm not sure.  I did not issue the transfers.  But that is

20  the date that is on the document.

21  **Q.**   Okay.  And June 18th, you told the company that you were

22  leaving that day; right?

23  **A.**   I would need to see the e-mail again to verify.

24      **MS. BELL:**  Let's go back to 7448.

25      And I'd just offer that, Your Honor.

1          **MS. GURSKIS:**  Objection, hearsay.

2          **MS. BELL:**  It's her resignation letter, Your Honor.

3          **THE COURT:**  Admitted.

4      (Trial Exhibit 7448 received in evidence.)

5          **MS. BELL:**  Could we display that for the jury.

6  BY MS. BELL:

7  **Q.**   Okay.  So do you see the date, June 18th; right?

8  **A.**   Yes, at 1:00 p.m.

9  **Q.**   Okay.  So you testified about the shift in your views over

10 time on direct; right?

11 **A.**   Correct.

12 **Q.**   And you either met or spoke with the Government 10 times

13 before you testified today; right?

14 **A.**   I don't recall the amount of times, but that seems pretty

15 high.

16 **Q.**   Okay.  Well, we'll go through them.

17     So you first met with the Government on September 22nd,

18 2022.  Do you recall that?

19 **A.**   Yes.

20 **Q.**   Okay.  And that was before you got all of this money;

21 right?

22 **A.**   That was before I received the severance, yes.

23 **Q.**   Then you went on to meet with the Government on

24 December 9th, 2024.

25     Do you remember that?

1   A.   No.

2        MS. BELL:  Okay.  Could we pull up just for the

3   witness --

4        THE COURT:  No, we're not going to.  It's not a memory

5   test.  Just go ahead.

6        MS. BELL:  Okay.

7     Go on?

8        THE COURT:  Well, you could say did you tell the

9   Government X, did you tell the Government Y, whatever it is,

10  but we're not --

11       MS. BELL:  We'll get into that, Your Honor, but I want

12  to establish the -- the timeline --

13       THE COURT:  I don't know that she, sitting here, can

14  remember the particular dates in which she met the Government.

15       MS. BELL:  Completely fair.  I was going to refresh

16  her just with the date of the interview memos, but we could do

17  it this way.

18  BY MS. BELL:

19  Q.   You met with the Government a number of times just this

20  month in October.  You remember that?

21  A.   Yes.

22  Q.   Okay.  You've met with them or spoken with them four times

23  just this month.  Do you remember that?

24  A.   I don't think it was that amount.  There was a lot of

25  scheduling conflicts.  I'm not sure.

1    Q.    Okay.  So we can --

2          MS. BELL:  Your Honor, I'll just pull up to refresh on

3    the dates, but it's important to get a sequence here.  If I

4    may.

5          THE COURT:  We're going to take our recess.

6          Ladies and gentlemen, we're going to go into recess until

7    a quarter of 1:00.

8          Remember the admonition given to you:  Don't discuss the

9    case, allow anyone to discuss it with you, form or express any

10   opinion.

11               (The jury leaves the courtroom.)

12      (Proceedings were heard out of the presence of the jury.)

13         THE COURT:  Okay.  The jury has left.

14      You can step down.  You're excused.  You can come back.

15                   (Witness steps down).

16         THE COURT:  Let's address the issue, the lawyer issue.

17         MS. BELL:  The lawyer issue?

18         THE COURT:  The question was asked of the witness

19   "So-and-so are actually lawyers."

20         MS. BELL:  Ah, yes.  Yes, thank you.

21         THE COURT:  You objected to that.

22         MS. BELL:  I did, Your Honor, yes.

23         THE COURT:  Okay.  Well, go ahead.

24         MS. GURSKIS:  The two individuals are not lawyers, and

25   so it's --

1      **THE COURT:**  I understand that.  Now, that's not --

2 that's your testimony.

3      **MS. GURSKIS:**  Sorry, Your Honor.

4   In terms of the foundation?  Is that what you're asking?

5      **THE COURT:**  Yeah, unless you're prepared to testify.

6 I mean, how are you going to get it in?

7      **MS. GURSKIS:**  She learned it from another employee,

8 and under 801(d)(2)(d), this was a discussion about things

9 going on at the company.  She learned that she was directed by

10 the defendant to write things in a -- to include these two

11 individuals who were not lawyers so that it was not reachable,

12 you know, by --

13      **THE COURT:**  No, I understand that.  I'm just asking

14 the question.

15   So it comes in as an exception to the hearsay rule because

16 of?

17      **MS. GURSKIS:**  Because the other employee who she

18 learned it from was an employee of Done.  It was a conversation

19 between the two employees in the scope of their employment at

20 Done about the fact that this other person was not a lawyer

21 hired by Done.

22      **THE COURT:**  Okay.  That seems right.

23      **MS. BELL:**  Well, Your Honor, I guess we would just

24 preserve our objection.  We --

25      **THE COURT:**  Fine.  Okay.

1    **MS. BELL:** -- had a brief on this, and I think there

2  are 403 issues particularly when we get into --

3    **THE COURT:** No, they're not 403 issues. They're not

4  403 issues. I mean, somebody who's -- the company says this is

5  a lawyer, talk to a lawyer because we want the speech

6  protected, and then it turns out the person is not a lawyer but

7  the person is having a conversation -- who's having the

8  conversation with these individuals believes it's a lawyer,

9  that's -- that's relevant. That's relevant.

10    Anyway, I'll allow it in if it comes in on redirect.

11    Okay. That's -- you're not going to ask her -- there are

12  a lot of ways -- if there are 10 conversations, you start with

13  whatever -- however you're going to do it chronologically and

14  so forth. Well, shortly after June, did you meet with the

15  lawyer -- with the Government? Yes, she'll say. Even if she

16  doesn't know. Okay.

17    At a meeting with the Government, did you say X or did you

18  not say X?

19    I don't remember, or yes, or no, and then you have to show

20  her the document to refresh her recollection if she says "I

21  don't remember." Otherwise, we're going to be here for hours.

22  And I've watched this witness and you have too. She's very

23  deliberate, very thoughtful, and it takes her forever to answer

24  a question. Okay?

25    **MS. BELL:** Yes, Your Honor.

1    THE COURT:  So you have an hour.  Pull it all together

2  and figure out how you're going to get through this, because

3  you want testimony to come out.

4    MS. BELL:  Understood, Your Honor.

5    THE COURT:  You don't want to drive everyone nuts on

6  the jury waiting for it to come out.

7    MS. BELL:  This was not a substantive -- we're not

8  going into the substance of each of these conversations --

9    THE COURT:  You can.  I'm not foreclosing you from

10  that.  I'm just saying do it.

11    MS. BELL:  Understood, Your Honor.  It will be

12  efficient.  It is planned to be efficient.  Thank you.

13    THE COURT:   See you at 1:00, quarter to 1:00.

14    (Proceedings resumed at 12:53 p.m.)

15   (Proceedings were heard out of the presence of the jury.)

16    THE COURTROOM DEPUTY:  Come to order.  Court is now in

17  session.

18    THE COURT:  Bring in the jury.

19    Please be seated.  Let the record reflect all parties are

20  present.

21    You may proceed.

22    MS. BELL:  Thank you.

23  BY MS. BELL:

24  Q.   Good afternoon.  So before the break, we were talking

25  about your testimony about the shift in your views over time.

1    Do you recall that?

2  **A.**    Yes.

3  **Q.**    Okay.  And you said that you do remember that your first

4  meeting with the Government back in 2022 was before you got the

5  $80,000 the day before you resigned; right?

6  **A.**    Not the day before I resigned.  As I mentioned, I would

7  need to look at the dates and my bank documents and also

8  confirmed the amount of money.

9    But yes, I did speak to them in 2022.

10 **Q.**    Okay.  My question is you spoke to them in 2022, and that

11 was before you got the $80,000; right?

12 **A.**    That's correct.

13 **Q.**    Okay.  And then you went over -- you went on to meet with

14 the Government many more times; right?

15 **A.**    Not many.  I would say a few.

16 **Q.**    You went on to meet with the Government for many more

17 hours.  That, you remember; right?

18 **A.**    Many hours, yes.

19 **Q.**    So well over 15 hours; right?

20 **A.**    Somewhere around that range, yes.

21 **Q.**    Okay.  And you do recall that you had multiple different

22 either conversations by Zoom or in-person meetings; right?

23 **A.**    Yes.

24 **Q.**    Including a number of meetings just this month; right?

25 **A.**    There were a lot of scheduling conflicts, so I'm not sure

1 how many meetings there were.

2   **MS. BELL:** And, Your Honor, at this point I'd just ask

3 the Government to stipulate, to move this along, that there

4 were, in fact, the 10 total meetings or conversations with this

5 witness.

6   **THE COURT:** Okay.

7   **MS. GURSKIS:** Do you want to give me the dates?

8   **MS. BELL:** Sure. So the first meeting, as we said,

9 was September 22, 2022.

10   **MS. GURSKIS:** Yes, we'll stipulate to that meeting.

11   **MS. BELL:** December 9th, 2024.

12   **MS. GURSKIS:** We'll stipulate to that.

13   **MS. BELL:** January 13th, 2025.

14   **MS. GURSKIS:** Yes.

15   **MS. BELL:** April 26, 2025, a phone call.

16   **MS. GURSKIS:** That was not really -- I mean, that

17 wasn't a -- that was a brief -- I'm not sure that falls under

18 the category of a meeting, but...

19   **MS. BELL:** The question was met with or spoke with, so

20 that was a contact.

21   **MS. GURSKIS:** Sure, there was a contact.

22   **MS. BELL:** Okay. Also on July 19, 2025,

23 Ms. Hill-Alvarez again contacted the DEA agent.

24   **MS. GURSKIS:** Yes.

25   **MS. BELL:** Then August 13th, 2025, an in-person and

1    virtual meeting.

2         MS. GURSKIS:  Yes.  And then three October meetings?

3         MS. BELL:  Four October meetings.  October 5th, 23rd,

4    27th, and 28th.

5         MS. GURSKIS:  Yeah, confirmed.

6         MS. BELL:  Okay.  Okay.  So a total of 10 either

7    meetings or conversations?

8         MS. GURSKIS:  I -- there were 10 interactions with the

9    Government, yes.

10        MS. BELL:  Okay.

11   BY MS. BELL:

12   Q.   However, you did not tell the Government until the end of

13   this month, October, that you received $80,000 in transfers,

14   did you?

15   A.   Again, I need to confirm the amount.  And the way the

16   question is phrases is a little peculiar.

17   Q.   Can you answer the question or do you need me to rephrase?

18   A.   Rephrase, please.

19   Q.   Okay.  You do not tell the Government until the end of

20   this month that you personally had received tens of thousands

21   of dollars from Done in June of 2023?

22   A.   I did not tell them.  It came up.

23   Q.   Okay.  You -- they asked you?

24   A.   It was brought up around what it was that I did in the

25   week of the arrest, so that's in the manner it came up.

1   Q.   Understood.  So in terms of when that came up, that -- you

2   were asked about that and you told them about it --

3   A.   Yes.

4   Q.   -- in response to those questions --

5        Sorry.

6   A.   Yes.

7   Q.   For the first time at the end of this month, October,

8   2025; right?

9   A.   I had mentioned previously that there was severance and

10  bonuses and back-paid payments that had gone out.

11  Q.   But you told them for the first time at the end of this

12  month, October 2025, that you personally had received over --

13  what you now say was over $60,000?

14  A.   Again, I need to confirm the amount.

15  Q.   Understood.  I'm asking you now about the timing.

16       The first time you talked about that with the Government

17  was the end of this month, October 2025; right?

18       **THE COURT:**  You see, that's an inexact question.  She

19  said that prior to the conversations in October, she had

20  discussed -- she had mentioned -- and that's up to the jury to

21  determine -- that she had received severance.

22       You're asking her the amount of the severance and the

23  amount of the payments.

24       And so it's just a disconnect.  She said the subject of

25  severance came up before; the amount came up later.  That's

1    what she said.  That's her testimony.

2           MS. BELL:  Understood, Your Honor.  Let me clarify.

3    BY MS. BELL:

4    Q.    So prior to this month, what you told the Government was

5    that you had been asked to send bonuses or severance to the

6    team; right?

7    A.    No, I was not asked to send payments.  I did not issue

8    payments.

9    Q.    Okay.  But my question is:  You did not talk about

10   payments to yourself until this month; isn't that right?

11          MS. GURSKIS:  Objection, asked and answered, Your

12   Honor.

13          THE COURT:  Yeah.  Overruled.

14          THE WITNESS:  I had mentioned that I had received

15   severance and bonuses.

16   BY MS. BELL:

17   Q.    That's your testimony, that you told the Government that

18   you received severance and bonuses?

19   A.    It came up.  There were many hours of discussion.  It did

20   come up.  It came um in a more granular way more recently.

21   Q.    Okay.  So you -- what you do remember is the first time

22   you had a specific discussion about what you now say was over

23   $60,000 in transfers to you personally was this month; right?

24   A.    Again, the amount, I would need to clarify with my bank.

25   Q.    Okay.  But that's what you told the Government on

1    October 23rd; right?

2    **A.**    I estimated that it was that amount.

3    **Q.**    Okay --

4    **A.**    And on the date, I'm not sure.

5    **Q.**    Okay.  Well -- and you recall that was in the last week

6    that you had that conversation, last week or so?

7    **A.**    This experience is really traumatic and it's very blurred,

8    and it went on for many years.  And in terms of my memory about

9    specific dates, I feel I mentioned it earlier, and I recall

10   talking about it more recently.

11   **Q.**    Okay.  So you do recall talking about it recently; right?

12   **A.**    Yes.

13   **Q.**    Okay.  And, in fact, the same day that you talked about

14   it, which was October 23rd, you asked for written

15   conversation -- confirmation that you would not be arrested

16   when you came to testify today; right?

17   **A.**    The nature of the letter that I sent -- I currently live

18   in Mexico -- was a trauma response, because at the time that

19   the team leadership decided to issue severance, bonuses, and

20   payment to many employees, it was seen as something we were all

21   really grateful for, for living through this, because after you

22   go through something like this, you don't know if you're going

23   to have a job again.  This is a black stain on your résumé.

24       And --

25           **MS. BELL:**  Your Honor, let me redirect the witness.  I

1  had a very specific question and I'd just like to get an answer

2  to that so we can move forward.  If I may?

3      Okay.

4  BY MS. BELL:

5  Q.  Ms. Hill-Alvarez, my question is quite specific.  If you

6  could please answer yes or no.

7      The same day that you remember discussing the fact that

8  you received over $60,000 in payments from Done, you asked for

9  written confirmation that you would not be arrested when you

10 came to testify; yes or no?

11 A.  The letter was very long.  I would need to see it again.

12 I sent a body text and an attachment.

13 Q.  Let's go ahead and do that.

14     MS. BELL:  Just for the witness and the Government and

15 the Court, 7580, please, if we could pull that up.  There's

16 7580 and the attachment at 7580A.

17 BY MS. BELL:

18 Q.  Okay.  Ms. Hill-Alvarez, do you see the date at the top of

19 your e-mail?

20     MS. BELL:  If we could blow that up so it's a little

21 bit easier.  Okay.

22 BY MS. BELL:

23 Q.  Do you see that, October 23rd?

24 A.  Yes.

25 Q.  Okay.  And do you see that it says "urgent"?

1    A.    Yes.  I read the e-mail.

2    Q.    Okay.  And you -- at the top, the subject is "Notice of

3    inability to travel pending written assurances."

4          Do you see that?

5    A.    Yes.

6    Q.    Okay.  And you wrote that -- if we can go to --

7          Does that refresh your memory?

8    A.    Yes.

9          MS. BELL:  Okay.  And let's go to 7580A.

10         If we could blow that up.

11         THE WITNESS:  I would like to go back to the other

12   document really quickly.

13   BY MS. BELL:

14   Q.    Okay.  We'll -- let me get through this.  You'll have a

15   chance to go back.

16         So you wrote that you've been fully cooperative with their

17   office; right?

18   A.    Yes.

19   Q.    Okay.  And that you had already participated in more than

20   15 hours of interviews and discussions; right?

21   A.    That's what's there, yes.  That's what I wrote.

22   Q.    Okay.  And then you asked for written confirmation of

23   three different things; right?

24         THE COURT:  The document is being admitted.  What

25   document is it?

1          MS. BELL:  It's 7580A, Your Honor.

2          THE COURT:  7580 admitted.

3      (Trial Exhibit 7580A received in evidence.)

4  BY MS. BELL:

5  Q.   And do you see --

6          MS. BELL:  If we could just focus on the three bullet

7  points.

8  BY MS. BELL:

9  Q.   Do you see that you wrote for the -- you wrote to request

10 those three assurances; right?

11 A.   That's correct.

12 Q.   That you were being called solely as a witness and that

13 you are not a target or subject of any criminal investigation;

14 right?

15 A.   That's correct.

16 Q.   That you will not be arrested, detained, or otherwise

17 restricted during your time in the United States; right?

18 A.   Correct.

19 Q.   And that you will be permitted to safely return to Mexico

20 immediately after completing your testimony; right?

21 A.   Yes.

22 Q.   Okay.  And you asked for --

23          MS. BELL:  You can take that down.

24 BY MS. BELL:

25 Q.   You asked for those things because once the Government

1  confirmed that you would be required to testify in this trial,

2  you knew that you could be forced to admit under oath that you

3  had received all of that money; right?

4  **A.**   If we could go back to the first document, the body of the

5  text, please.

6  **Q.**   I'd just like to get an answer to my question.  You'll

7  have another opportunity --

8       **MR. BODAPATI:**  Objection, Your Honor.  She's trying to

9  answer the question.

10      **THE COURT:**  Show her the first document.

11      **MS. BELL:**  I believe that is 7580.

12      **THE COURT:**  Okay.  Admitted.

13    (Trial Exhibit 7580 received in evidence.)

14      **THE WITNESS:**  There's a sentence here where I write

15  (as read):

16        "I have endured significant abuse in my life,

17     and after our discussion today, I foresee potential

18     mistreatment, false allegations, or unfair scrutiny.

19     ,None of which I deserve.  I don't deserve that."

20  **BY MS. BELL:**

21  **Q.**   Okay.  Well, my question is:  You knew that you could,

22  indeed, face scrutiny under oath for the money that you

23  received; right?

24  **A.**   The framing of that question insinuates that I did things

25  I did not do, and the unfair scrutiny is that at the time,

1   leadership made a choice to issue these severances and those

2   bonuses as a way to take care of employees for living through

3   what is known as one of first cases of its kind.  It was a way

4   to make sure that everyone was safe.

5   **Q.**   And your reference there to "after our discussion today"

6   is a reference to the discussion you had that very same day

7   with the prosecution team about the over $60,000 you had

8   gotten; right?

9   **A.**   From what I recall, that discussion was about three hours

10  long, give or take.  And that was something that came up in the

11  discussion.

12      However, this more so is a nervous system response.  When

13  you live through trauma, it doesn't matter what you logically

14  know.  You're still afraid, especially after learning the

15  caliber of character of certain individuals.

16      **MS. BELL:**  Okay.  We can take that down.

17  BY MS. BELL:

18  **Q.**   So you told them that you could not come to the United

19  States from Mexico to testify without these assurances; right?

20  **A.**   I did not phrase it in that way.  And that is not my

21  intention of what I meant.

22      I more so needed logical assurance that I was just going

23  to be okay.

24  **Q.**   You entitled your letter "Notice of inability to travel

25  pending written assurances"; right?

1    **A.**    I believe so.

2    **Q.**    And then the Government wrote back, and they assured you

3    that you could return home after your testimony; right?

4    **A.**    Yes.

5    **Q.**    Okay.  So let's move on to talk about the shift in your

6    views a little more.

7         So today you talked about Ruthia prioritizing profit over

8    people; right?

9    **A.**    That was a topic that came up.

10   **Q.**    Okay.  But when you first met with law enforcement, before

11   you got the $80,000 in 2022, you said that Done's main goal was

12   to help patients; right?

13   **A.**    Again, on the $80,000, as I mentioned several times, I

14   need to confirm that.

15        And in regard to that first discussion in 2022, that was

16   three years ago now.  I don't know -- I don't remember what I

17   said.

18   **Q.**    You have trouble remembering what happened back then; is

19   that right?

20   **A.**    I remember a general gist of it, but not exactly, not per

21   verbatim.

22   **Q.**    Okay.

23        **MS. BELL:**  Let's pull up 920 -- 9120, page 3,

24   paragraph 10, just for the witness, the Government, and

25   the Court.  Okay.

1    BY MS. BELL:

2    Q.    Do you see that there?

3    A.    Yes.

4    Q.    Does that refresh your memory that you told the Government

5    back in 2022 before you got the money that the main goal was to

6    help their patients?

7            MR. BODAPATI:  Objection.  I think this is taken out

8    of context, because it follows another paragraph on a related

9    topic.

10           THE COURT:  Well, the question was:  Did you tell them

11   this before you got the money?

12   BY MS. BELL:

13   Q.    Did you tell them this in 2022?

14           THE COURT:  Well, but you said "before you got the

15   money."

16           MS. BELL:  Yes, Your Honor.

17           THE COURT:  She got the money before she told them

18   this.

19           MS. BELL:  She got the money after she told them this.

20   This is September 2022.

21           THE COURT:  This is September.

22           MS. BELL:  Yes, September 2022.

23       We can go up and show you the date.

24   BY MS. BELL:

25   Q.    So we're just focused on your first meeting with the

1  Government, the only meeting you had before you got the money.

2  Okay?

3      Do you see it was prepared on 9/30, and I can tell you

4  that the meeting itself was on 9/22/22.  Okay?

5      So if you could please look at paragraph -- yeah.  You see

6  the top, it says on September 22nd, 2022, okay?

7  **A.**   I've never seen this document before, so I would just like

8  to be able to have a little bit of time to look at it.

9  **Q.**   Sure.  If we could go back to paragraph 10, which is the

10 question I'm asking.

11 **A.**   That is what me and the founding team believed, yes.

12 **Q.**   Okay.  That the main goal was to help patients; right?

13 **A.**   That's correct.

14 **Q.**   Okay.  And --

15      **MS. BELL:**  We can take that down.

16 **BY MS. BELL:**

17 **Q.**   And today you testified that Ruthia was in charge of Done

18 and that she made the decisions; right?

19 **A.**   Yes.

20 **Q.**   But back in 2022, before you got the money, you told the

21 Government that Done's main investor was unhappy with Ruthia as

22 the CEO and had implanted a man named Riley Levy, who you

23 thought may take over the company.

24      Do you remember that?

25 **A.**   Yes.

1    Q.   Okay.  You also told the Government that Mr. Levy had

2    hired a lot of people -- a lot of his own people and people he

3    knew personally from December 2021 onward.

4         Do you remember that?

5    A.   I think so, yes.

6    Q.   And that he had changed some internal documents when he

7    joined; right?

8    A.   I don't remember that.

9    Q.   Okay.  You don't remember telling the Government that

10   Mr. Levy had changed some internal documents when he joined

11   Done?

12   A.   This conversation was many years ago and from what I

13   recall, it was a few hours.  I don't remember the specifics.

14   Q.   Okay.  That's completely fair.  It was a long time ago.

15   So let's see if this will -- we'll pull up the same memo again,

16   page 9, paragraph 17.

17        Do you see that?

18   A.   Yes.  Give me a second to read it, please.

19        (Witness reviews document.)

20        Yes.

21             MS. BELL:  Okay.  Take that down.

22   BY MS. BELL:

23   Q.   So you recall telling them that Mr. Levy changed some

24   internal documents when he joined Done?

25   A.   Yes.

1    Q.    Okay.  And today you also testified about the movement of

2    Done's operations to China in 2023?

3    A.    I'm not sure of the background on that.  It's just when I

4    came back, there was a very strong and large team in China.

5    Q.    Okay.  And, in fact, back in September 2022, before you

6    got the money, you told the Government that Done had large

7    numbers of employees overseas in many places; right?

8    A.    I recall there being the Philippines, several other

9    countries, and at the time I think operations in China had just

10   started, from what I can remember.

11   Q.    Right.  So there were 60 to 80 people in the Philippines;

12   right?

13   A.    I don't remember the number.

14   Q.    Okay.  Do you remember telling the Government that back in

15   September of 2022?

16   A.    I don't know if I shared a number.  It was a while ago,

17   but --

18   Q.    Okay.

19   A.    But it probably came up.  If you have a note on it,

20   because I don't remember what was said.

21   Q.    We can look back at the same document, page 3,

22   paragraph 9.

23        Do you see that?

24   A.    I see.

25   Q.    Okay.  So does that refresh your memory about 60 to 80

1   people in the Philippines is what you said back then?

2   A.   It's just a little challenging, because when I came back,

3   I think the team was around 300, so I'll trust this document,

4   but I don't remember saying that number.

5   Q.   Okay.  And you also talked about the employees in China

6   and in Canada and Pakistan; right?

7   A.   I briefly remember mentioning some of their names.

8   Q.   Okay.  And you knew that when you were hired,

9   approximately half of Done's team was actually located in

10  China; right?  Back in March of 2021?

11  A.   That's not true.

12        MS. BELL:   Let's go and look at 9122, page 2,

13  paragraph 4.   Okay.

14  BY MS. BELL:

15  Q.   Do you see that you -- what you told the Government back

16  then?

17  A.   I see.

18  Q.   So does this refresh your memory back when you started, it

19  was a small team.   You were employee Number 11; right?

20        And at that time four to five people, so approximately

21  half of the team, were working from China; right?

22  A.   There's a discrepancy here.

23  Q.   Okay.  But you do see that's what you told the Government;

24  right?

25  A.   Yes.

1   **Q.**   Okay.

2          **MS. BELL:**  We can take that down.

3   **BY MS. BELL:**

4   **Q.**   So you testified that you believed that Done was really

5   pioneering in this space; right?

6   **A.**   Yes.

7   **Q.**   And you believed in Done's mission so much that you wrote

8   blog posts for the website; right?

9   **A.**   I wrote one blog post.

10  **Q.**   Okay.  And you suggested topics for blogs; right?

11  **A.**   I recall when Calvin left and a young woman named Maria

12  was hired, there was a period where I was working with the blog

13  a little bit more, which is around when I wrote the article.

14  **Q.**   Great.  Let's take a look at that.

15         **MS. BELL:**  We'd offer 5437, Your Honor.

16         **THE COURTROOM DEPUTY:**  What's the number again?

17         **MS. BELL:**  It's 5437.

18         **THE COURT:**  Admitted.

19  (Trial Exhibit 5437 received in evidence.)

20  **BY MS. BELL:**

21  **Q.**   Okay.  Do you recognize this as the blog that you wrote?

22  **A.**   From what I can tell at a first glance, yes.

23  **Q.**   Okay.  Do you see your name up at the top?

24  **A.**   Yes.

25  **Q.**   Okay.  So "ADHD:  Why are women underdiagnosed" was the

1  topic; right?

2         MS. BELL:  And if we could just scroll down and look

3  at -- if we could blow up the bottom text.

4  BY MS. BELL:

5  Q.   Okay.  Do you see that?

6  A.   Yes.

7  Q.   And so can you tell us, does this refresh your memory

8  about the topic of this blog?

9  A.   Yes.

10 Q.   Okay.  And so the topic was the disparity between women

11 and men, right, and diagnosis?

12 A.   Correct.

13        MS. BELL:  And if we could go to page 2.

14 BY MS. BELL:

15 Q.   Can you read to us what you write at the --

16        MS. BELL:  I'm sorry.  Could we go to page 2.  The

17 bottom of the page, "Being a bad woman."  If we could just blow

18 that up.

19 BY MS. BELL:

20 Q.   Okay.  And could you read to us starting with "ADHD's

21 symptoms in women" if -- what you wrote.

22 A.   (as read):

23        "ADHD symptoms in women are difficult to accept

24     and ask for help with, as to do so would be

25     admittance that you are not a good woman in society.

1          Good women, according to social conditioning, pay

2          attention, listen, are clean and organized, do not

3          disrupt, are polite, and can be calm, kind, and

4          cordial no matter the circumstance.  Let's analyze

5          these qualities in relationship to the

6          neurobiological impacts of ADHD."

7     Q.   Okay.

8          MS. BELL:  And then let's go to page 4 if we could.

9     And this paragraph -- if we can blow up the top.  I'm sorry.

10    The bottom paragraph, but the -- just the bottom.  We'll blow

11    up the full paragraph.  Okay.

12    BY MS. BELL:

13    Q.   So you go on to discuss here why many women do not

14    discover that they've lived with ADHD until they approach their

15    late twenties and early thirties.

16         Do you see that?

17    A.   Yes.

18         MS. BELL:  Let's go to page 5, where you talk about

19    telehealth solutions.  Could we just blow up the bottom, the

20    whole bottom part.  Okay.

21    BY MS. BELL:

22    Q.   So do you see you write (as read):

23          "Mental health in general carries with it

24          various layers of stigma.  ADHD in particular

25          contains a special breed of stigma given that one of

1      primary methods of treatment is to be prescribed a

2      controlled substance."

3      Do you see that?

4  A.   Yes.

5  Q.   What did you mean by "a special breed of stigma given that

6  one of the primary methods of treatment is to be prescribed a

7  controlled substance"?

8  A.   I reference the book that I read in the beginning of the

9  article.  Would you be willing to share that on the screen?

10 Q.   Sure.  I believe we'd have to go about to page -- page 3

11 under "Being a bad woman."  I think that's what you're

12 referring to.

13          MS. BELL:  If we could just --

14          THE WITNESS:  It would be likely in the introduction.

15 Yes, that one.  In her book.  (as read):

16          "A Radical Guide for Women with ADHD" --

17      (Reporter interrupts for clarity of the record.)

18          MS. BELL:  Sorry.

19 BY MS. BELL:

20 Q.   So page 3, "Being a bad woman."  If we can look at the top

21 sentence.  I think that's what you're looking for?

22 A.   Yes.  This is a really excellent book.  I think any woman

23 who has ADHD should read it.

24      But this was a concept that this author explored where she

25 noticed her life was, in simple terms, not together, and she

1  talks about how there is a stigma, because I think we've all

2  lived through the opioid epidemic and then the stigma around

3  Adderall.  It can be challenging when you have a disorder and

4  you need this specific type of medication to get through it.

5       And so a lot of people who have ADHD may not want to seek

6  out a diagnosis because of the stigma that's associated if they

7  are prescribed a stimulant.

8  Q.   Okay.  Thank you.

9        MS. BELL:  If we could just go back to page 5.  Then

10 we will move beyond this document.  The bottom of the paragraph

11 under "Telehealth Solutions."  Nope, the bottom paragraph.

12 There we go.  Okay.

13 BY MS. BELL:

14 Q.   So there you write (as read):

15       "At Done, over 60 percent of our patients are

16       women.  This is not a coincidence when we take into

17       consideration societal factors that might otherwise

18       prevent our patients from seeking help in their

19       direct communities.  Telehealth provides a solution

20       to various layers of social stigma that are present

21       within doctors' offices."

22       And then you go on to discuss that.  And particularly, you

23 discuss how it can give access to women who might be in an

24 environment that doesn't support their wellness.

25       Do you see that?

1   A.   Yes.

2          MS. BELL:   Okay.   We can take that down.

3   BY MS. BELL:

4   Q.   So as part of your work on blogs at that point in time,

5   you also know that Dr. Brody wrote blog posts that were posted

6   on the same date alongside yours; right?

7   A.   That was a really long time ago.   I know he wrote blogs.

8   If it was posted the same day or not, I'm not sure.

9          MS. BELL:   Your Honor, we would offer 5370, 5364,

10  5365, 5367, and 5369.

11         MR. BODAPATI:   Objection, hearsay and foundation.

12         THE COURT:   Sustained.

13         MS. BELL:   Your Honor, not for the truth.

14         THE COURT:   What are they for?

15         MS. BELL:   They're to show that they were actually

16  published on the website to educate --

17         THE COURT:   She doesn't deny it.

18         MS. BELL:   Well, I can certainly lay a foundation.

19         THE COURT:   No found -- ask her.

20         MS. BELL:   Okay.   Sure.

21  BY MS. BELL:

22  Q.   So what was your purpose in writing --

23         THE COURT:   No.   Did she -- if you're going to pursue

24  this questioning --

25         MS. BELL:   Yes.

1      **THE COURT:** -- you have to pursue it.

2      **MS. BELL:** Okay.

3  BY MS. BELL:

4  **Q.** So you understood that one of the reasons why Done had

5  these articles written and posted on the website was to educate

6  the public, right, about ADHD?

7  **A.** I wouldn't say that. There's another very popular website

8  called Attitude Magazine which is ADD, and they provide

9  community. And so I perceived it more as providing community

10 to people who do have this diagnosis and are stigmatized.

11 **Q.** And also advertising how Done could help; right?

12 **A.** "Advertising" is a -- not a word I would use. It was just

13 an observation.

14 **Q.** And your blog post was one among various others; right?

15 **A.** I only wrote this one. I did help edit another one that I

16 can recall, but outside of this, other blog posts were there.

17 As to who wrote them, I'm not sure.

18 **Q.** And these blog posts were under a tab that the public

19 could go to on the website with a drop-down menu with different

20 topics; right?

21 **A.** The layout of the website changed many times over

22 the years, so intuitively, that sounds right, but -- yes.

23 **Q.** Okay.

24     **MS. BELL:** So, Your Honor, I would move to admit these

25 blogs, which were --

1          THE COURT:  No.

2          MS. BELL:  -- dated the same date as hers.

3          THE COURT:  What difference does that make?  I mean,

4    you have to lay a foundation.  She read them, she considered

5    them, she believed they were inadequate or adequate or whatever

6    it is.

7       There's no nexus between her testimony and these

8    documents.

9          MS. BELL:  Okay.

10   BY MS. BELL:

11   Q.   I believe you testified that you knew that Dr. Brody wrote

12   blogs?

13   A.   When I first started in 2021, he was really passionate

14   about the blags and enjoyed writing them, yes.

15          MS. BELL:  Okay.  Perhaps we could just show them to

16   the witness and she can see --

17          THE COURT:  No.  Let's move honor to another topic.

18          MS. BELL:  Okay.

19   BY MS. BELL:

20   Q.   All right.  So let's go to an exhibit the Government

21   showed you, which is 398?

22          MS. BELL:  And if we could go to 398 at 1.

23       So this was -- if we could blow that up.

24       Okay.

25   \\\

1    BY MS. BELL:

2    Q.    So do you recall your testimony about Kristin Neland on

3    direct?

4    A.    Yes.

5    Q.    Okay.  And so you actually raised this to Dr. Brody's

6    attention; right?  This issue with Kristin Neland?

7    A.    Both -- raising which issue?

8    Q.    Well, that's a good point.  So she -- there were two

9    different issues.  What you focus on here is that you say that

10   (as read):

11              "Kristin Neland had raised issues with one-star

12         provider ratings where the rationale is lumped into

13         patient is seeking drugs/sees company as pill mill

14         versus using patient-first mindset and seeing what

15         the issue is."

16         Right?

17   A.    That had come up in company meetings, yes.

18   Q.    Okay.  And so you raised this to Dr. Brody's attention;

19   right?

20   A.    It's not so much that I raised it.  I was asked to create

21   this board and to document a summary of things that were going

22   on.

23   Q.    Okay.  And then Dr. Brody responds.

24         MS. BELL:  So let's go and look at his response, which

25   is 396 at 2.  Okay.  So we can blow up Dr. Brody.  This should

 1    be 1730 at 8:19:33 p.m.

 2    **BY MS. BELL:**

 3    **Q.**    Okay.  So we see Dr. Brody, and he says (as read):

 4          "When you say 'sees the company as a pill mill,'

 5       you mean Kristin believes the patient looks at us as

 6       that; in other words, another way of saying they are

 7       drug-seeking."

 8       Right?

 9    **A.**    That's what's there, yes.

10    **Q.**    Okay.  And do we see the part also on there where

11    Dr. Brody says (as read):

12          "Christina, to make sure I understand your

13       response?"

14          **MS. BELL:**  This should be 396 at 1 to 2.

15    **BY MS. BELL:**

16    **Q.**    (as read):

17          "Christina, to make sure I understand your

18       response" --

19          **MS. BELL:**  May I have a moment, Your Honor?

20                  (Pause in proceedings.)

21          **THE COURT:**  Is 392 admitted?

22          **MS. BELL:**  Yes, it is, Your Honor.  The Government

23    admitted this.

24       I'm sorry.  It's 396.  I misspoke.  396.

25          **THE COURT:**  396 admitted.

1          **MS. BELL:**  So what we're looking at --

2      Okay.  There we go.  So we should start there.

3  **BY MS. BELL:**

4  **Q.**   So (as read):

5          "Kristina, to make sure I understand your

6      response, in the last part you were saying that a

7      one-star review was essentially rationalized by

8      Kristin as a poor review because the patient did not

9      get the medication they wanted, presumably a

10      stimulant, and one thing -- that would make them

11      drug-seeking."

12      And then he goes on to say (as read):

13          "And when you say 'sees the company as a pill

14      mill,' you mean that Kristin believes the patient

15      looks at us like that; in other words, another way of

16      saying they are drug-seeking."

17      And then now let's look at how you respond.

18          **MS. BELL:**  If we could go to page 2 at 8:29:13.

19      Okay.

20  **BY MS. BELL:**

21  **Q.**   And you say (as read):

22          "Hi, David."

23      And you write (as read):

24          "This is the feedback we have heard from her in

25      team meetings.  It can be a culture issue in my

1      perspective, as it can absolve some providers of the

2      task of due diligence in making the patients feel

3      seen, cared, and heard for."

4      Do you see that?

5  A.   Yes.

6  Q.   Okay.  So those were your words back at the time where you

7  said in your perspective, it could be a culture issue; right?

8  A.   That's what I wrote, yes.

9  Q.   Okay.  And then there was a second issue which you

10  testified about on direct that Kristin raised, and this was

11  with a recruiting video that had -- there were certain

12  questions that had been recommended by Done's former medical

13  director, Dr. Tsang; right?

14  A.   That's what I recall, yes.

15  Q.   Okay.

16      **MS. BELL:**  So let's go to 398 at 11.  Okay.

17  BY MS. BELL:

18  Q.   So you testified about this on direct as well, and here

19  you say (as read):

20      "When I did the video interview questions for

21      providers, she refused to do them herself.  She told

22      me after the fact that she didn't want her face tied

23      to something should the DEA do an investigation, as

24      she believes we are close to being in breach of the

25      law/a pill mill and that it's only a matter of time

1    before the authorities are involved.

2        "I think all of this should have been said to

3    the team, not hid from and pushed aside to cover her

4    own reputation.  Point-blank, we do not know what she

5    says to providers about the company behind closed

6    doors."

7    Do you see that?

8  A.  Yes.

9  Q.  And then Dr. Brody goes on to express his views about the

10   term "pill mill."

11       MS. BELL:  So let's look at page 4, 396 at 4.

12   BY MS. BELL:

13  Q.  And he says (as read):

14       "By the way, I'm starting to conceptualize a

15   blog post or even an article or a book about

16   denigrating stereotyping within the medical

17   profession.  'Pill mill' would be one of many

18   examples.  Other healthcare professionals use it to

19   denigrate an institution that makes it easy to get

20   appropriate treatment, even though that is what

21   healthcare is supposed to do.  As we have all seen

22   many times, the subliminal message is to do the

23   opposite, especially if you are dealing with mental

24   health, so-called addictive substances or care for

25   minorities or economically underprivileged or

1      females.  Stigmatization, of course, is closely

2      related to those denigrating terms that are used

3      within the healthcare -- within the healthcare.

4          "The Republican idea that healthcare is a

5      privilege, not a right, is another way to keep

6      healthcare away from these, quote/unquote,

7      undeserving elements."

8      Do you see that?

9  A.   Mm-hmm.

10 Q.   And you testified that you understood that Dr. Brody is an

11 idealist; right?

12 A.   Yes.

13 Q.   Someone who came from the sixties or seventies who dreamt

14 of a better humanity and being more forward-thinking; right?

15 A.   Yes.

16 Q.   And at the time, you knew exactly what Dr. Brody meant by

17 this, didn't you?  Right?

18     Let me be more specific.

19     You understood that his mindset was that if patients

20 taking medication is seen as a pill mill, then that person

21 probably should not be working at Done, meaning Ms. Neland;

22 right?

23 A.   Yes.

24 Q.   And that makes sense because, as you recognized in your

25 blog, stimulants are a primary treatment, in fact, the primary

1  treatment for ADHD; right?

2  A.   Yes.

3  Q.   Now --

4       MS. BELL:  We can take that down.

5  BY MS. BELL:

6  Q.   You actually raised Ms. Neland's concerns about

7  Dr. Tsang's recruiting questions directly to Ruthia; right?

8  A.   I think so.

9  Q.   Okay.

10 A.   It's been a long time.

11      MS. BELL:  Your Honor, we'd offer 7416.

12      THE COURT:  7416.

13      (Trial Exhibit 7416 received in evidence.)

14 BY MS. BELL:

15 Q.   Okay.  So you see here you say to Ruthia (as read):

16       "Kristin says some of these questions have legal

17      implications.  She said she'll call you about it."

18      And Ruthia says (as read):

19       "The interview questions?"

20      And you say (as read):

21       "Les -- Les questions."

22      Meaning that's Dr. Tsang; right?

23 A.   Correct.

24 Q.   (as read):

25       "She said DEA will investigate if those

1    questions were documented."

2    And then Ruthia says (as read):

3        "I have no idea, but it's fine to exclude it for

4    now.  The key is to get the basic questions right."

5    Do you see that?

6  A.   Yes.

7  Q.   That's what she told you; right?

8  A.   Yes.

9  Q.   Okay.

10        MS. BELL:  We can take that down.

11  BY MS. BELL:

12  Q.   Okay.  So you -- as we talked about, you started in March

13  of 2021, and you testified that you were Ruthia's executive

14  assistant; right?

15  A.   Correct.

16  Q.   But you were only her executive assistant from March to

17  July, so a period of about four or so months; right?

18  A.   My formal title never changed at the company.  Ruthia

19  often would change my title internally depending on the needs.

20  However, I still maintained my role as executive assistant.

21  Q.   Well, in fact, you were promoted to team lead in July of

22  2021; right?

23  A.   Yes.

24  Q.   Okay.

25        MS. BELL:  And actually, let's just put up your

1   résumé.

2       7387, if we could offer that, please, Your Honor.

3           **THE COURT:**  Admitted.

4       (Trial Exhibit 7387 received in evidence.)

5           **MS. BELL:**  And if we could go to your -- if we can

6   just go to the second page, actually.  Okay.

7   **BY MS. BELL:**

8   **Q.**   So you see you write on your résumé "Executive assistant,

9   March 2021 to July 2021."

10      Do you see that?

11  **A.**   Yes.

12  **Q.**   Okay.  And then let's go to your next role there if we

13  could.

14      Do you see "People operations team lead, July 2021 to

15  January of 2022"?

16  **A.**   Yes.

17          **MR. FOSTER:**  Ms. Bell, I don't think they can see it.

18          **MS. BELL:**  My apologies.  Sorry.

19                  (Pause in proceedings.)

20          **MS. BELL:**  So maybe we can just scroll -- sorry.  Oh,

21  okay.  Maybe we can scroll down and start with the executive

22  assistant part of the résumé.

23  **BY MS. BELL:**

24  **Q.**   Okay.  So "Executive assistant March 2021 to July 2021";

25  right?

1  **A.**   Yes.

2  **Q.**   And then let's go up to your next position, "People

3  operations team lead culture, July 2021 to January of 2022";

4  right?

5       And then about in January of 2022, you transitioned to yet

6  another role in operations, team lead, and you were in that

7  position through March of 2022.

8       Do you see that?

9  **A.**   Yes.

10 **Q.**   Okay.  So you testified about how Ruthia made you and

11 others feel and that you had concerns for your jobs.

12      Do you remember that testimony?

13 **A.**   Yes.

14 **Q.**   Okay.  So I want to walk through a few more of your

15 communication with Ruthia during this time frame.

16      **MS. BELL:**  Let's -- your Honor, I'm going to offer a

17 set of exhibits, and we'll move through them quickly.

18      7402, 7441, 7549, 7550 and 7550A, 7551, 7569, 7568, 7442,

19 7443, and 7401.

20      **THE COURT:**  Admitted.

21      **MS. GURSKIS:**  Your Honor, objection, foundation.

22      **THE COURT:**  Lay a foundation.

23      **MS. BELL:**  Okay.  Let's start with 7402.  If we could

24 pull that up.

25 \\\

BY MS. BELL:

Q.   Okay.  So this is a conversation between you and Ruthia the month that you resigned; right?

A.   Yes.

Q.   Okay.

        MS. BELL:  I'd offer this, Your Honor.

        THE COURT:  Admitted.

     (Trial Exhibit 7402 received in evidence.)

BY MS. BELL:

Q.   And you see you say (as read):

        "I've come to the egotistical realization that I
     am probably one of the smarter, more hardworking and
     best people on the team.  Another thing I realized is
     that this is something you always tried to tell me.
     Thank you for that.  I see it now."

     And Ruthia writes (as read):

        "Hi, Christina.  You certainly are.  It could
     help if you can lay out the expected outcome that
     would make you feel better.  Sometimes it's just
     extremely hard for people to understand each other's
     needs, and communications can help bridge the gap.
     At the end we're all human.  We make mistakes -- we
     made mistakes and we learn and grow from them."

     And then you say (as read):

        "Let me know when you can huddle."

1      And Ruthia says (as read):

2          "Your happiness is most important."

3      Do you see that?

4  A.   Yes.

5  Q.   Okay.  Let's go to 7441.

6      This is a communication from July of 2021, so we're moving

7  backwards, essentially, in your first tenure.

8      Do you recognize this --

9          MS. BELL:  If we could go up to the top.

10  BY MS. BELL:

11  Q.   This is a message that Ruthia sends to a group of people,

12  including you.

13      Do you see that?

14          MS. GURSKIS:  Where is her name?

15          MS. BELL:  I'm sorry?

16          MS. GURSKIS:  I don't think her name is on it.

17          MS. BELL:  It's at the very end.

18          MS. GURSKIS:  Oh, okay.

19  BY MS. BELL:

20  Q.   Do you see that?

21  A.   This was the Slack channel?

22  Q.   Yes.  Leadership core.

23      Do you see that?

24  A.   Yes.

25  Q.   Okay.

1          MS. BELL:  So, Your Honor, we'd offer this.

2          THE COURT:  Sorry?

3          MS. BELL:  We would offer this exhibit.

4          THE COURT:  Admitted.

5      (Trial Exhibit 7441 received in evidence.)

6          MS. BELL:  Thank you.

7   BY MS. BELL:

8   Q.   So -- okay.  So you see Ruthia says (as read):

9          "I know we've had some issues lately, but please

10      rest assured we'll make it through these obstacles

11      together."

12      Do you see that?

13  A.   Yes.

14  Q.   And then at the -- towards the bottom, she says (as read):

15          "As a mental health company, it's important that

16      we all remember that each and every one of us is a

17      complex human being.  We will all have off days at

18      some point or we will make mistakes.  Please have the

19      self-awareness and need to know when you need to take

20      a rest.  I am not a mind reader, and reading between

21      the lines isn't for me.  Communicate these needs

22      directly to me."

23      And then you write (as read):

24          "Thank you for this message" --

25          MS. BELL:  If we could scroll down.

BY MS. BELL:

Q.   (as read):

        -- "and for your leadership.  I have really been
    struggling to stay positive, and this is what my
    heart needed to hear and what my mind needed to be
    reminded of."

        MS. BELL:  Okay.  We can take that down.

BY MS. BELL:

Q.   The next month, in August of 2021 --

A.   I would like to go back to that document, that message
Ruthia wrote.  I actually wrote it, and it was copy/pasted to
her to send to the team because of how bad the team was
feeling.  And I was trying to help create bridges between
people, so it was me that wrote that message, not Ruthia.  She
just copy/pasted it and sent it.

Q.   Okay.  And then you responded -- you did write your
response; right?

A.   That's correct.  In support.

Q.   Okay.

A.   Because I wanted her to have a good relationship with my
colleagues.

Q.   Okay.  So 7549.  Actually, we can -- do you remember
sending Ms. -- sending Ruthia a birthday card on her birthday
on August 19th, 2021?

A.   I sent everyone in the company birthday cards, flowers,

1    and Edible Arrangements.  So yes, I likely did.

2            **MS. BELL:**  Okay.  Let's go to 7550A, if we could, at

3    page 3, which is your note on the birthday card.  Page 3.

4        And, Your Honor, I'd offer this if it's not already

5    admitted.

6            **THE COURT:**  Admitted.

7            **MS. BELL:**  Thank you.

8        (Trial Exhibit 7550A received in evidence.)

9    **BY MS. BELL:**

10   **Q.**   So you tell her (as read):

11           "You've pioneered this amazing company from

12       scratch and are innovating the future.  Thanks for

13       caring about all of us and pushing us to be our

14       best."

15       Do you see that?

16   **A.**   Yes.

17   **Q.**   Okay.  And then you also wrote her a personal card

18   separate from this group card.

19           **MS. BELL:**  That's 7551.  Can we go to that.

20   **BY MS. BELL:**

21   **Q.**   Do you see that?

22           **MS. BELL:**  We'd offer this as well, Your Honor.

23           **THE COURT:**  Admitted.

24       (Trial Exhibit 7551 received in evidence.)

25   \\\

1  BY MS. BELL:

2  Q.   (as read):

3       "Thank you for being our fearless leader and for

4       caring about all of us even though we can be a little

5       crazy sometimes."

6       And then you tell her (as read):

7       "Know that you are deeply loved.  You're making

8       history and defying all of the odds.  Please know how

9       much we appreciate you."

10      Do you see that?

11 A.   Yes.

12 Q.   Okay.

13      MS. BELL:  Let's go to 7569, bottom of page 4.

14 BY MS. BELL:

15 Q.   Okay.  Starting with (as read):

16      "You're doing great, Christina Starstruck."

17      MS. GURSKIS:  Your Honor, we have an objection to this

18 exhibit because there is a reference to information that's been

19 excluded from this case.

20      THE COURT:  Okay.

21      MS. BELL:  May we confer for a moment?

22      THE COURT:  Yes.

23              (Counsel conferring.)

24      MS. BELL:  So, Your Honor, we'll only admit the one

25 page we're actually using.  Okay.

1    BY MS. BELL:

2    Q.   So do you see where you say -- Ruthia tells you (as read):

3         "You're doing great, Christina And then she says

4         (as read):

5         "I'm a bit down.  Please remind me about

6         praising you because I'm a bit down recently due to

7         my mom is sick."

8         Do you see that?

9    A.   Yes.

10   Q.   And then you say (as read):

11        "Please focus on your mental health and your

12        mom.  I know that is a hard place to be disappointed

13        and emotionally, especially with managing the

14        company.  Let me know how I can support you.  You're

15        not alone."

16        (as read):

17        "Thank you, Christina.  I'm already feeling very

18        supported because of you."

19        Do you see that?

20   A.   Yes.

21        MS. BELL:  Okay.  And then let's go to 7568, which

22   we'd offer.

23        THE COURT:  Admitted.

24        (Trial Exhibit 7568 received in evidence.)

25   \\\

```
 1   BY MS. BELL:
 2   Q.   End of page 4 to page 5.
 3        And there you say (as read):
 4            "Let me know if you need anything while you are
 5        traveling.  I know your mom being sick is very hard."
 6        So do you recall --
 7        Do you recall that Ruthia's mom was sick in September of
 8   2021, and she actually went to China?
 9            MR. BODAPATI:  Objection, Your Honor.  403, relevance.
10            THE COURT:  Overruled.
11            THE WITNESS:  Yes, I do recall this.
12   BY MS. BELL:
13   Q.   Okay.  And she was in China until -- for a very long time;
14   right?  Until after your -- until September of 2022.
15        Do you recall that?
16   A.   I don't know how long she was in China for.
17   Q.   Okay.  But she was -- you do recall she was there for a
18   while; right?
19   A.   Yes.
20   Q.   Okay.  This was September of 2021.  Okay.
21            MS. BELL:  Let's go to 7442.
22   BY MS. BELL:
23   Q.   This is December of 2021, and you tell her (as read):
24            "I'm just grateful to be here learning and
25        growing for however long I'm good for the company.  I
```

1          like the adventure."

2          And then she says (as read):

3               "Thank you, Christina, for being here, and we

4          cannot grow to this size without you."

5          Do you see that?

6   **A.**    Yes.

7   **Q.**    Okay.  Let's go to --

8               **MS. BELL:**  And sorry, Your Honor.  I would offer this

9   as well, 7442.

10              **THE COURT:**  Admitted.

11         (Trial Exhibit 7442 received in evidence.)

12              **MS. BELL:**  And I'm not sure if I actually formally

13  offered 7548, which was the preceding one.

14              **THE COURT:**  Admitted.

15         (Trial Exhibit 7548 received in evidence.)

16              **MS. BELL:**  And then 7443 --

17              **THE COURT:**  Admitted.

18              **MS. BELL:**  -- is the next one.

19         If we could go to that.

20         (Trial Exhibit 7443 received in evidence.)

21              **MS. GURSKIS:**  Ms. Bell, if you could just move a

22  little bit slower so we can look at the document before you

23  move to admit it.

24              **MS. BELL:**  Oh, sorry.

25         Okay.  So for this one, if we could go to page 1.

BY MS. BELL:

Q.   Here, you tell Ruthia in December of 2021 (as read):

          "Thank you for having the brain baby that is

     Done and for inviting us all to be part of this

     adventure.  You are such a visionary, and you are

     always ready and fueled to push us to the next

     level."

     Do you see that?

A.   Yes.

Q.   Okay.  And let's go to the last one, which is another

message the month you told her you were leaving.

          MS. BELL:  7401.  And we'd offer that.

          THE COURTROOM DEPUTY:  That's already admitted.

          THE COURT:  Isn't it already in?

          THE COURTROOM DEPUTY:  Yes.  What about 7569?

          MS. BELL:  7569.  We would offer that as well.  We

went over that one already.

          THE COURT:  Admitted.

     (Trial Exhibit 7569 received in evidence.)

          MS. BELL:  Thank you.

          THE COURTROOM DEPUTY:  7550.  We did -50A but not -50.

          MS. BELL:  We can stick with what we went over.  7550A

is fine.

          THE COURTROOM DEPUTY:  What about 7549?  Sorry.

          MS. BELL:  No, my fault.  So we don't need to do the

1  ones we didn't look at.  I'm not sure -- I don't think we

2  looked at that one.

3          THE COURTROOM DEPUTY:  Thank you.

4  BY MS. BELL:

5  Q.  So here -- this is the same month you left, and you tell

6  Ruthia (as read):

7          "Thank you for the time we spent working

8      together.  I know sometimes we got into heated talks

9      and changes and obstacles we faced, but thank you for

10     always seeing me as a complex person.  I want you to

11     know that even though there were obstacles, a reason

12     why I stood by you and the team is because at the end

13     of the day, it was all about work and nothing

14     personal."

15  And you say (as read):

16     "My decision is to continue with my resignation

17     as planned."

18  And then Ruthia said (as read):

19     "I'm on a long call now, but I do want to fully

20  support you to make the best decision for yourself.

21  Please be sure to know that I really enjoy working

22  with you and you have contributed a lot to a very

23  positive team culture.  Please do prioritize for your

24  happiness and spend more time with your family."

25  Do you see that?  And then she -- yes?

1    A.    Yes.

2    Q.    Okay.  And she says (as read):

3              "We will always welcome you to come back, so

4          don't hesitate to reach out to me."

5          Do you see that?

6    A.    Yes.

7    Q.    Okay.  And so you testified a bit about Mr. Menesini and

8    ultimately your decision to leave having to do with the person

9    who was supervising you at the time; right?

10   A.    In part.

11   Q.    Okay.  And here, this was Ruthia's reaction to the news

12   that you would, in fact, be leaving; right?

13   A.    Part of it, yes.

14   Q.    Okay.  So in terms of --

15             MS. BELL:  You can take this down.

16   BY MS. BELL:

17   Q.    But you talked about "heated talks about changes and

18   obstacles we faced" in that exchange; right?

19   A.    Yes.

20   Q.    And when you first met Ruthia, you thought she was

21   somewhat socially illiterate and may be overcoming Chinese

22   generational trauma?

23             MR. BODAPATI:  Objection, relevance.

24             THE COURT:  Overruled.

25             THE WITNESS:  Yes.  My heart went out to her, and I

1   wanted to see her win and succeed.  And reading these messages

2   is -- it's challenging because I cared about her.

3   **BY MS. BELL:**

4   **Q.**   And you initially thought that she had some sort of

5   language barrier; right?

6   **A.**   That was the benefit of the doubt I gave her, yes.

7   **Q.**   And you thought -- both you and others thought that she

8   needed an executive coach to help her talk to people; right?

9   **A.**   After the meeting where she made the joke about the Tesla

10  car, yes, the team really felt she needed to be coached,

11  because the CEO cannot be saying those kinds of jokes.

12  **Q.**   And, in fact, she provided a document that gave

13  instructions about how to better interact with her; right?

14  **A.**   I recall she posted that, yes.

15          **MS. BELL:**  Your Honor, we'd offer 7581.

16          **MS. GURSKIS:**  Objection, hearsay.

17          **MS. BELL:**  It's not for the truth, Your Honor.

18          **THE COURT:**  I'm sorry.  What is this document, 7581?

19          **MS. BELL:**  These are the instructions --

20          **MS. GURSKIS:**  This was excluded yesterday, Your Honor,

21  as well.

22          **MS. BELL:**  Your Honor, the witness -- I can --

23          **THE COURT:**  I can't hear.

24          **MS. BELL:**  I can explain, Your Honor.

25          So the witness testified that --

1      THE COURT:  Well, let's -- we'll deal with this during

2   a recess.

3      MS. BELL:  Okay.

4      THE COURT:  So it's not admitted.

5   BY MS. BELL:

6   Q.   Okay.  All right.  So notwithstanding these challenges of

7   communicating with Ruthia, you decided to return to Done for a

8   second time in September of 2023, as you testified; right?

9   A.   I was under the impression Ruthia was no longer at the

10  company.

11  Q.   Okay.  And you decided to come back; right?

12  A.   I needed a job.

13  Q.   Right.

14      And you certainly didn't think you were joining a criminal

15  organization when you returned; right?

16  A.   Correct.

17  Q.   And you came back in the role of project manager, so

18  another operations position; right?

19  A.   At the time it was articulated to me it would be more in

20  the marketing team, but it -- it was a varied role.

21  Q.   Okay.  Let's look at what you said when you were offered

22  the job.

23      MS. BELL:  7404, Your Honor, I'd offer, and 7540.

24      THE COURT:  75 what?

25      MS. BELL:  7504.

1          **THE COURT:**  Admitted.

2       (Trial Exhibit 7504 received in evidence.)

3          **MS. BELL:**  Okay.

4          **THE COURTROOM DEPUTY:**  Is it 7404 or 7504?

5          **MS. BELL:**  I had offered several, but we'll start with

6    7404.

7          **THE COURT:**  7404.

8          **MS. BELL:**  Yes, 7404.

9          **THE COURT:**  Admitted.

10      (Trial Exhibit 7404 received in evidence.)

11   **BY MS. BELL:**

12   **Q.**  So do you see here at the bottom September 13th,

13   1:02 p.m.?

14          **MS. BELL:**  If we can scroll down.

15   **BY MS. BELL:**

16   **Q.**  Okay.  And you can see that Hayley Zhu writes to you and

17   says (as read):

18          "I would be happy to offer you the

19      opportunity --"

20      (Reporter interruption for clarity of the record.)

21          **MS. BELL:**  Sorry.

22   **BY MS. BELL:**

23   **Q.**  So here we are in September of 2023; right?

24   **A.**  Yes.

25   **Q.**  And Hayley offers you the opportunity to come back as a

1  project manager; right?

2  **A.**   Yes.

3        **MS. BELL:**  And then if we can scroll to the top.

4  **BY MS. BELL:**

5  **Q.**   You say (as read):

6        "Yay.  I'm excited."  And you say, "I'm eager to

7     get started."

8     Right?

9  **A.**   That's what I wrote.

10       **MS. BELL:**  If we could go to 7405.  And I'd offer

11  that, Your Honor.

12       **MS. GURSKIS:**  Could we get a copy of that?  That

13  wasn't provided.

14       **THE COURT:**  Admitted.

15     (Trial Exhibit 7405 received in evidence.)

16  **BY MS. BELL:**

17  **Q.**   And there, again, in September of 2023, you write (as

18  read):

19        "Hi, Hayley.  Thank you so much again for this

20     amazing opportunity.  I'm excited to get started."

21     Right?

22  **A.**   Yes.

23       **MS. BELL:**  And then last one, 7540, which I would

24  offer.  And this is at the end of --

25       **THE COURT:**  Admitted.

1        (Trial Exhibit 7540 received in evidence.)

2           **MS. BELL:**  -- September.

3    **BY MS. BELL:**

4    **Q.**   Looks like you had started; right?

5        Do you see that?

6    **A.**   Yes.  I'm reading it.  If you would give me a moment.

7    **Q.**   I'm sorry.  Take your time.

8    **A.**   Yes.

9    **Q.**   Okay.  And you -- Ms. Mercado says (as read):

10           "Yay, girl.  Welcome back.  So excited to have

11       you back."

12       And you say (as read):

13           "I'm so emotional to be back.  I really loved

14       our team."

15       Do you see that?

16   **A.**   Yes.

17   **Q.**   Now, you were not on the clinical team?

18           **MS. BELL:**  We can take that down.

19   **BY MS. GREEN:**

20   **Q.**   Right?

21   **A.**   I'm sorry.  I don't understand.

22   **Q.**   You were not on the clinical team?  You were on the

23       operations side; right?

24   **A.**   Sometimes the role would overlap, but I was not on the

25       clinician side.  I did interact with clinicians, specifically

1   my second time back, and then also during the in-person

2   project.

3   Q.   Okay.  And you testified about Dr. Brody and Dr. Brindala

4   and views you said you heard them express; right?

5   A.   That is correct.

6   Q.   We didn't see any documents with those views; right?

7   During your direct testimony?

8        THE COURT:  That's not -- it's not a proper question.

9        MS. BELL:  Okay.

10  BY MS. BELL:

11  Q.   Are you aware that multiple members of clinical leadership

12  approved of the 30-minute standard initial appointment time?

13       MS. GURSKIS:  Objection, misstates the evidence.

14       THE COURT:  Does she know this fact?  Does she know

15  this to be the case?

16  BY MS. BELL:

17  Q.   Do you know that?

18  A.   No.  As far as I know, it seemed like that was not what

19  they wanted.

20  Q.   Are you aware that Dr. Brindala told Ruthia in person that

21  this was a clinically appropriate appointment time?

22  A.   There's no way --

23       THE COURT:  I'm trying to figure out this line of

24  questioning.

25       MS. BELL:  Yes, Your Honor.

1          **THE COURT:**  She's not a clinician.  She's on the

2    operational side.  And now you're going to ask her about

3    whether she was aware of certain things that were discussed.

4          **MS. BELL:**  Yes, Your Honor.

5          **THE COURT:**  You're asking her whether she had any

6    discussions on this or was told this?

7          **MS. BELL:**  Let me lay a better foundation.

8    BY MS. BELL:

9    **Q.**   So you testified on direct about certain views you say you

10   heard -- let's start with Dr. Brody -- Dr. Brody express about

11   initial appointment times.

12         Do you recall that testimony?

13   **A.**   Yes.

14   **Q.**   Okay.  But are you aware that Dr. Brody told Ms. He in

15   writing that a 30-minute initial appointment time is clinically

16   appropriate and sufficient in most circumstances?

17         Are you aware of that?

18   **A.**   There was a lot on Slack.  There was a lot of

19   communication.  It's been multiple years.

20         And to my knowledge.  I always remember he pushed back a

21   little bit on the appointment time.  So it's -- sorry.  My

22   memory...

23   **Q.**   It was a long time ago.  That's completely understandable.

24         Dr. Brindala.  Are you aware that he actually wrote a

25   template advising how clinicians practicing on Done's platform

1  should spend their time during the 25-minute initial

2  appointment slot?

3      Are you aware of that?

4  **A.**   Dr. Brindala worked there, I think, during my first three

5  months there, so maybe.

6  **Q.**   Okay.  And, of course, Dr. Tsang.  Dr. Les Tsang, he

7  preceded your tenure; right?

8  **A.**   Correct.

9  **Q.**   So you don't know one way or another what his views about

10  the 30-minute initial appointment time were; right?

11  **A.**   Correct.

12  **Q.**   Okay.  Now, you also testified about Dr. Brindala's views

13  on EKGs.

14      Do you recall that?

15  **A.**   I recall him mentioning it in a meeting, yes.

16  **Q.**   Okay.  Are you aware that Dr. Brindala actually rejected

17  practitioners for the platform where they required EKGs?

18  **A.**   That was not my line of work, so no.

19  **Q.**   Understand.

20      Okay.  We'll move on to a new topic.

21      So you testified about certain employees who left the

22  company after they had raised concerns.

23      Do you remember that?

24  **A.**   Yes.

25  **Q.**   Okay.  And I want to focus on Mr. Menesini and Mr. Neland

1    [sic] in particular.  Okay?

2    **A.**    Okay.

3            **MS. BELL:**  So we would offer, Your Honor, 6191.

4            **THE COURT:**  6191 admitted.

5        (Trial Exhibit 6191 received in evidence.)

6    BY MS. BELL:

7    **Q.**    Okay.  So this is what you told Ruthia at the time about

8    Mr. Menesini and Mr. Neland -- I'm sorry.  Ms. Neland.  You say

9    (as read):

10            "This might be hard to read, but I need to say

11        it.  If you look at" --

12        I'll just skip (as read):

13            "If you look at lack of communication, it's all

14        the same team members that are culture fit issues,

15        don't execute tasks, and who undermine you passive

16        aggressively or just straight-up aggressively, push

17        you into a triangulation or a manipulative dialogue.

18        This isn't about lost adults.  This is about people

19        who are just waiting until the company is making more

20        money and have plans for how they want the company to

21        go, who they want it to be" -- "who they want to be

22        in it, and what they will do when that happens.  It's

23        a waiting game, and all everyone sees is dollar

24        signs.

25            "However, there's really no point in doing all

1  this culture work since we are just keeping people

2  who have been problems for months.  Rick" --

3  That's Mr. Menesini; right?

4  A.  Yes.

5  Q.  (as read):

6     -- "who has managed to rope in almost every new

7  hire into the idea that you can't run the company.

8  This impacted TJ's performance and commitment."

9  TJ is TJ Williams; is that right?

10  A.  Correct.

11  Q.  He was replaced effectively by Mr. Levy?

12  A.  From what I can recall, yes.

13  Q.  (as read):

14     "Kristin" --

15  That's Kristin Neland?

16  A.  Yes.

17  Q.  (as read):

18     -- "whose colossal failure we still haven't

19  recovered from in the growth department."

20  And then you go on to say more things about others.

21  (as read):

22     "It ultimately doesn't matter the strategies we

23  do if we are just going to let people run rampant,

24  pay them six-figure salaries, and let them

25  manipulatively stage meetings, et cetera, in order to

1    triangulate their way into whatever agenda they have

2    in this large plan of theirs that may or may not

3    include you.

4        "I get it.  These people are Ivy League, have

5    nice backgrounds, et cetera.  They're shiny.  There

6    is that old saying that not everything that shines is

7    gold, which I feel to be true about certain members

8    on the team."

9    And then Ruthia responds (as read):

10        "Hi, Christina.  Thanks for sharing me your

11    observations.  I think it's good that you can see it

12    from an outsider perspective, because I sometimes get

13    too busy in works and meetings.  I do see that TJ

14    initially had too many meetings to keep me busy."

15    And then she is goes on (as read):

16        "I do like this article from the Wiki doc about

17    team growth.  Nobody wakes up and tries to do a bad

18    job.  95 percent of the time, you can resolve your

19    feelings by running a respectful clearing session.

20    If they're not a fit, then we should let them go, but

21    they probably don't have bad intention or just want

22    to keep their job.  Ideally, we can make decision

23    like this more quickly without influencing our

24    emotions much.  It's tough for every team."

25    Do you see that?

1    **A.**    I only saw -- okay.  Now I see the second part.

2    **Q.**    Oh, I'm sorry.

3          Okay.  Do you see that?  The end of Ruthia's response

4    there?

5    **A.**    Yes.

6    **Q.**    Okay.

7          **MS. BELL:**  We can take that down.

8    **BY MS. BELL:**

9    **Q.**    So in particular, Ms. Neland, in your view, was a

10   nightmare for the company; right?

11   **A.**    May I see the document again?

12   **Q.**    This is a different document, but you want to go back to

13   that one?

14   **A.**    I would like to point out it was written at

15   three-something a.m.

16   **Q.**    Okay.

17   **A.**    Which is very in the middle of the night, which was usual

18   to have conversations with Ruthia at all times of the day.

19          And that message was written on my part in frustration to

20   my boss.

21   **Q.**    Okay.  This was October of 2021, and Ruthia is in China;

22   right?

23   **A.**    I don't remember when she went to China.

24   **Q.**    Do you recall the messages we saw back when her mom was

25   sick?

1    A.    Yes.

2    Q.    That was --

3    A.    But I don't remember the time.

4    Q.    Okay.  You don't remember that was September of 2021?

5    A.    I don't remember the month that she was in China in 2021,

6    no.

7    Q.    But in China, she's on a different time zone than you all;

8    right?

9    A.    That's correct.  However, it's been my experience working

10   in international companies, you usually honor the time zone of

11   your other colleagues.

12   Q.    Okay.  Let's talk about --

13         So Kristin Neland, in your view, was a nightmare?

14   A.    In the beginning, yes.

15   Q.    She was a nightmare when she left; right?

16   A.    It's hard to talk about that when so much time has passed,

17   and just like a series on television, you have season one,

18   season five.  Things come to light and things change.

19   Q.    Right.  Including all the meetings with the Government;

20   right?

21         MS. GURSKIS:  Objection, argumentative.

22         MS. BELL:  We'll move on, Your Honor.

23         THE COURT:  Sustained.

24   BY MS. BELL:

25   Q.    So what you said in the communication we just looked at is

1    (as read):

2         "Kristin, whose colossal failure we still

3    haven't recovered from in the growth department."

4    So at the time you wrote that, Kristin was already gone;

5    right?

6    A.   Maybe.

7    Q.   Okay.  Let's put it back up.  You can see.

8    You see where you write (as read):

9         "Kristin, whose colossal failure we still

10   haven't recovered from in the growth department."

11   Right?

12   A.   Yes.

13        MS. BELL:  Okay.  Now let's go to 7425, which I'd

14   offer, Your Honor, also about Kristin.

15        THE COURT:  Admitted.

16   (Trial Exhibit 7425 received in evidence.)

17   BY MS. BELL:

18   Q.   Okay.  So page 2, eighth message.

19   So you see Mr. Levy reaches out to you and says (as read):

20        "Who previously managed provider success?"

21   And then you say (as read):

22        "Kristin LOL.  She was a nightmare."

23   Do you see that?

24   A.   Yes.

25   Q.   Okay.

1    **MS. BELL:**  We can take that down.

2    **BY MS. BELL:**

3    **Q.**   So in addition to telling Ruthia that people like

4    Mr. Menesini and Ms. Neland were bad for her and bad for the

5    company, you took credit for an increase in employee morale

6    after their departures; right?

7    **A.**   No.  That's very layered.

8    **Q.**   Do you remember the ENPS?

9    **A.**   That took over many months of time.  The ENPS score

10   started at a negative 15, which an ENPS score is essentially an

11   HR rating that employees can give a company, and negative 15 is

12   very, very bad?

13        And Rick was there as I was doing these interviews with

14   people trying to see what we could change and do better.  So he

15   had not departed.  And Kristin, I don't remember when she

16   departed at that time.

17        But there were other instances where I think Kristin's

18   frustration led her to act in certain ways, as I previously

19   mentioned, that it was not until I saw behind the curtains more

20   why she was acting that way.  But in the beginning, I think

21   anybody who comes across as abrasive or angry or volatile and

22   you don't see a reason for it, it can seem that way, like a

23   nightmare.  And she had issues with people on the team, but she

24   was also really liked.

25   **Q.**   Okay.  So you felt proud of the -- what you called a

1    "remarkable 346 improvement in employee net promoter score

2    rating," indicating a high employee satisfaction and

3    engagement; right?

4    **A.**    "Proud" is a strong word.  It's a resume.  You're looking

5    for a job.  It was something I did do, which took a lot of work

6    to do, and I wanted to show that I knew how to do that.

7         **MS. BELL:**  Let's go to 7389, an exchange with Mr. Levy

8    on this.

9         **THE COURT:**  7389 admitted.

10       (Trial Exhibit 7389 received in evidence.)

11       **MS. BELL:**  Thank you.

12   **BY MS. BELL:**

13   **Q.**    So Mr. Levy asks you about the ENPS, and you describe the

14   large increase over five months; right?

15   **A.**    Yes.

16   **Q.**    And he praises you for that; right?

17   **A.**    Yes.

18   **Q.**    And that increase was after some key departures, like

19   Mr. Menesini and Ms. Neland; right?

20   **A.**    There were many departures from the company and new hires

21   at the time, so the way the question is phrased makes it seem a

22   certain way that I don't agree with the narrative of, but yes.

23   **Q.**    Okay.  Let's move on to a new topic.

24       So today you talked about Ruthia's emphasis on growth at

25   all costs.

1      Do you recall that?

2  **A.**    Can you repeat the question?

3  **Q.**    That you testified about Ruthia's emphasis on growth above

4  everything else; right?

5  **A.**    Yes.

6  **Q.**    Okay.

7          **MS. BELL:**  So let's go to 7577.  I'd offer that, Your

8  Honor.

9          **THE COURT:**  Admitted.

10     (Trial Exhibit 7577 received in evidence.)

11 **BY MS. BELL:**

12 **Q.**    Okay.  And if we --

13         **MS. BELL:**  Let's start at the top of the document so

14 we can see what this is first.

15 **BY MS. BELL:**

16 **Q.**    Okay.  So we see that this is a another Slack conversation

17 with the leadership core.  Okay.

18     Do you see that?

19 **A.**    Yes.

20 **Q.**    And Ruthia writes (as read):

21         "Sharing some thoughts around the quality/growth

22         discussion from Monday.  This is going to be a

23         problem for every hypergrowth startup."

24     And then she goes on (as read):

25         "As a mental health service, the core of our

1          service is the clinician interaction with the

2          patients.  Our service quality and the patient

3          experience are the key for our brand and for someone

4          who would pay to use our platform, stay around for

5          long, and refer their friends to join the platform.

6          Improving clinical quality, it's a joint team effort.

7          How can we do better?  It would be great to hear your

8          thoughts."

9          Do you see that?

10   A.    Yes.

11   Q.    Okay.  And so you go on to contribute, and you talk

12   about -- at the top, you say (as read):

13          "I'm still really passionate about offering ADHD

14          coaching to our patients."

15          Do you see that?  As optional?

16          And that was one of things that was discussed as a goal to

17   be able to offer eventually; right?

18   A.    It was brought up multiple times.  The first time I can

19   recall was at the company off-site and it was brought up

20   several times, but it was always placated down, so it was never

21   formally stated or planned as to when that would be offered.

22   Q.    Okay.  And then you say (as read):

23          "I know that David Brody has also expressed --

24          has also expressed hosting training sessions with

25          clinicians where he can mentor them and ask them

1    questions."

2    Do you see that?

3 A.  Yes.

4 Q.  And then you go on to say (as read):

5        "If the leadership teams approaches clinicians

6    with the mindset of how can I add value to your life,

7    then this will trickle for the most part into how

8    providers interact with patients, our brand,

9    relationship, style if you will."

10   And then you say (as read):

11       "Times are difficult for a lot of people."

12   And then you go on to say (as read):

13       "This speaks to something important about human

14   nature, our deep need to be seen and cared for

15   despite our status or title or reputation.  Whether

16   or not this fits into a reproducible model or not,

17   I'm not sure, but I think that as a mental health

18   company, there is an unsaid expectation from our

19   patients that we will meet, see, and help people on

20   this deep level, and in these times, we also have an

21   additional responsibility to not fail people like

22   other companies are."

23   We can go down.  And then you say (as read):

24       "This is why TikTok is becoming the best place

25   to advertise, because people can comment their views

1       and it's harder to be sold something that is not of

2       genuine value, and if they buy it, that's because

3       they connect to and like the person who's selling

4       it."

5       Do you see that?

6  A.   Yes.

7  Q.   And I think you testified on direct that that was actually

8  important to Ruthia to have that authenticity in the

9  advertising; right?

10 A.   I don't know if I mentioned that, but I mentioned organic

11 growth, which is not a sponsored ad, so it's paying to sponsor

12 an ad so it goes into someone's feed versus someone finding it

13 of their own volition.

14 Q.   Okay.  And then you say (as read):

15      "If we can get some of David's ideas off the

16      ground in terms of mentoring and providing that human

17      connection and mentorship to providers, it is going

18      to go a long way."

19      Do you see that?

20 A.   Yes.

21 Q.   And then let's go to page 2 and see Dr. Brody's response.

22      He says (as read):

23      "Ruthia, thank you for responding to my serious

24      concerns about quality and growth.  I would like it

25      not to be quality versus growth, and your opening

1        this dialogue is a step towards avoiding that

2        pitfall."

3        And then Ruthia responds (as read):

4            "Yes.  Quality and growth are not always in

5        conflict.  They actually often come together.  If we

6        don't focus on quality, it will damage our growth.

7        If we can achieve high-quality service, it will

8        accelerate our growth."

9        Dr. Brody says (as read):

10            "I said I would come back with more concrete

11        ideas on how to actualize providers giving care that

12        will make patients feel they are truly getting care

13        in the broad sense of the word."

14        And then we can skip down, and we see that on page 3,

15   Sara Faber jumps in.  He says -- okay.

16        And do you recall Sara Faber's role?

17   **A.**   I don't remember her role exactly.  I think she worked

18   with clinicians in some capacity, but I don't remember.

19   **Q.**   Okay.  And she says (as read):

20            "I am loving the thoughtful sharing of hopes for

21        a better future at Done and ultimately the space

22        where we share with so many humans.  I spoke with

23        Sussan today."

24        Sussan is -- saying is -- Sussan was the -- one of the --

25            **THE COURT:**  Excuse me.  Why are we reading this?

1    MS. BELL:  Your Honor, this goes to the testimony on

2    direct about growth at all costs, and here we see a discussion

3    about growth and quality --

4         THE COURT:  So somebody disagrees with it.  But what

5    does this witness have to do with this particular view

6    expressed by one of her colleagues?

7         MS. BELL:  Well, she -- we can move on, but --

8         THE COURT:  Fine.  Then let's move on.  Then let's

9    move on.

10        MS. BELL:  Okay.  Let's move on.  All right.

11   BY MS. BELL:

12   Q.   So the last point is just that -- all I wanted to say was

13   that Sussan was the lead -- one of the lead nurse practitioners

14   at the time?

15   A.   I'm not sure her title, but she was a nurse.

16   Q.   Okay.  So in any event, the end of that --

17        MS. BELL:  I'm going to move on, Your Honor.  Last

18   point on that. if we can just put it up.

19   BY MS. BELL:

20   Q.   With Sara Faber saying "I spoke so Sussan," and then she

21   says (as read):

22        "I have wanted to bring a provider into

23        the onboarding process in two steps."

24        And they proceed to discuss that; right?

25   A.   If you could just give me a second to read it.  It's been

1    a few years.

2        (Witness examines document.)

3        Yes.

4    Q.    Okay.  Let's move on to a new topic.  Okay.  But a related

5    topic.

6        So you talked about disagreements between Dr. Brindala and

7    Ruthia, what you perceived to be disagreements; right?

8    A.    There were disagreements.

9    Q.    Okay.  But Dr. Brindala, in fact, wanted to hire providers

10   at a rapid rate; right?

11   A.    I recall that being in a meeting where I was with both of

12   them and Kristin Neland as well where they gave an ambitious

13   number, yes.

14   Q.    Okay.  And you also knew that the recruiting checklist

15   required providers to meet a high standard; right?

16   A.    I don't remember a recruiting checklist.

17   Q.    Okay.

18        MS. BELL:  Can we put up -- well, let me see if this

19   refreshes you.

20   BY MS. BELL:

21   Q.    Do you recall that the requirements included either a

22   psychiatrist or a psychiatric mental health nurse practitioner?

23   A.    Yes.

24   Q.    Okay.  And that the providers had to meet regulatory

25   requirements like have the DEA licensing, state licensing,

1    et cetera; right?

2    **A.**    Yes.

3    **Q.**    Okay.

4          **MS. BELL:**  And if we could look at 7578, which is an

5    exchange you had on this topic.

6          I'd offer that, Your Honor.

7              **THE COURT:**  Admitted.

8          (Trial Exhibit 7578 received in evidence.)

9    **BY MS. BELL:**

10   **Q.**    Okay.  And so here you are asking Sydney Jiminez, who was

11   a recruiter; right?

12   **A.**    This was about a month into me working there, and I think

13   she was a coordinator for recruiters, I'm not sure if she did

14   actual interviews.  I don't remember.

15   **Q.**    Okay.  But here you're asking about the requirements, and

16   you say (as read):

17          "Would we accept someone who was just missing

18          their final exam?  They're already working as a PMHNP

19          in California."

20          And Sidney [sic] responds (as read):

21          "Unfortunately, they have to have the

22          certification.  They also have to have a DEA

23          certification."

24          Do you see that?

25   **A.**    Yes.

1          MS. BELL:  Okay.  We can take that down.

2    BY MS. BELL:

3    Q.   Okay.  You also testified on direct about reviews.

4         Do you recall that?

5    A.   Yes.

6    Q.   And that Ruthia was hyperfocused on reviews and wanted

7    them to be taken down; right?

8    A.   Yes.

9    Q.   But you also wanted bad reviews taken down; right?

10   A.   I don't agree with the way the question is phrased.  I

11   wanted patients to be helped, whatever the issue was, and I

12   wanted to make sure that we were meeting those needs as a

13   company in the pandemic.  It was a really challenging time for

14   everyone.

15   Q.   And that's not inconsistent with wanting bad reviews not

16   to be there; right?

17   A.   There's a nuance between not wanting bad reviews not to be

18   there and fixing the systemic issues that cause bad reviews.

19   Q.   Right.

20          MS. BELL:  Let's look at 336 at 4, the bottom, to the

21   top of 5.

22          THE COURT:  I'm sorry.  What number is it?

23          MS. BELL:  This is 336, Government exhibit.

24          THE COURT:  Okay.  Thank you.

25          MS. BELL:  And I'd offer that.  I don't think this

1    is --

2         **THE COURT:**  336 admitted.

3    **BY MS. BELL:**

4    **Q.**   Okay.  And so you see here is an example of you're

5    informed that there are some negative public reviews, and you

6    say (as read):

7              "Yikes.  Can we get it taken down or no?"

8         Do you see that?

9    **A.**   Yes.

10   **Q.**   Okay.

11        **MS. BELL:**  We can take that down.

12   **BY MS. BELL:**

13   **Q.**   You also testified about the -- Dr. Brindala disagreeing

14   with Ruthia about patients being transferred.

15        Do you recall that?

16   **A.**   Yes.

17        **MS. BELL:**  Let's look at 6057, and I'd offer that,

18   Your Honor.

19        **THE COURT:**  I'm sorry.  What number?

20        **MS. BELL:**  6057.

21        **THE COURT:**  Admitted.

22      (Trial Exhibit 6057 received in evidence.)

23        **MS. BELL:**  Thank you.

24   **BY MS. BELL:**

25   **Q.**   Okay.  So we see Dr. Brindala says (as read):

1          "Thanks for the discussion today.  I definitely

2     represent the conservative end of the physician

3     spectrum, particularly with my specializations in

4     preventative medicine and addiction medicine.  I

5     certainly can be biased in favor of the provider as

6     well.  I apologize if I appear dismissive of any

7     other opinions expressed.  I clearly have strong and

8     loud opinions.  I think my conservative physician

9     bias in favor of the provider can be appropriately

10    balanced by biases in favor of the patient.  The

11    truth likely lies somewhere in between those.  a

12    diversity of opinions incorporated and considered

13    will shape the most effective results."

14    Do you see that?

15 A.    Yes.

16 Q.    And then you go on to say (as read):

17         "I think it was a great discussion.  It's great

18    to see everyone's views.  I think as we build a

19    bridge forward as a team that the composite value of

20    those views will make us successful."

21    Do you see that?

22 A.    Yes.

23 Q.    Okay.  And then we won't go over the rest of it, but you

24 can see that others, like Rick Menesini and Kristin Neland,

25 also share their views on the topic of patient transfers when

1    they complain.

2         Do you see that?

3    **A.**   On this document here?  As a former nurse?

4    **Q.**   Yes.

5    **A.**   Just give me a second to read it.

6         (Witness reviews document.)

7         Who wrote the first paragraph?

8    **Q.**   Oh, this is Kristin Neland.

9    **A.**   Okay.

10   **Q.**   We can go up a little bit and -- you just see that there's

11   more to this conversation where other people weigh in?  That's

12   my question.

13   **A.**   I mean, it was dialogue had over many meetings and Slack

14   messages, yes.

15        **MS. BELL:**  Okay.  We can take that down.

16        All right.  Let's move to the topic of screening.  So --

17        **THE COURT:**  Maybe we'll take a recess.

18        **MS. BELL:**  Yes, Your Honor.

19        **THE COURT:**  Okay.  Ladies and gentlemen, remember the

20   admonition given to you:  Don't discuss the case, allow anyone

21   to discuss it with you, form or express any opinion.

22             (The jury leaves the courtroom.)

23     (Proceedings were heard out of the presence of the jury.)

24        **THE COURT:**  About -- Ms. Bell.  Where are you

25   Ms. Bell?

1      **MS. BELL:**  Sorry, Your Honor.

2        I believe Mr. Schachter wanted to address something with

3  you.  Sorry about that.

4          **THE COURT:**  That's fine.  But I just was curious as to

5  how much longer you'll be.

6          **MS. BELL:**  Well, I will certainly finish today.  And

7  I'm just looking at the topics, but we're moving along very

8  well, so maybe within the hour?

9          **THE COURT:**  Okay.  All right.  I mean, this is

10  essentially your case.

11        **MS. BELL:**  Yes, Your Honor.

12        **THE COURT:**  This witness is testifying as your

13  witness, essentially.

14        **MS. BELL:**  It will make our case-in-chief very

15  efficient.

16        **THE COURT:**  I think so.  So just remember this:  When

17  I get to your case and you say, I want to call this witness and

18  that witness, if there was a witness up here who -- as this

19  witness is, who basically was laying out your case for you,

20  that's a presentation of your case.  Doesn't make any

21  difference whether it comes in under direct or cross, and I'll

22  tell the jury that.

23        **MS. BELL:**  Yes, Your Honor.

24        **THE COURT:**  If you want, I'll tell them they have to

25  consider both the direct and the cross in looking at the entire

1    case.  It's not a formalistic issue.

2         **MS. BELL:**  Yes --

3         **THE COURT:**  It is for certain things, obviously, a

4    Rule 29 and so forth.  I understand that.  But I'm just telling

5    you, you know, and I -- you're pretty free rein for all of

6    these documents and so forth.

7         So, you know, it's obvious to me that this is basically

8    your -- a part of your case.  I'm not saying it's your whole

9    case, but it's a part of your case.  Okay.

10        **MS. BELL:**  Yes.

11        **THE COURT:**  Mr. Schachter, you'd like to --

12        You've spoken so much today that I'll give you another

13   five minutes.

14        **MR. SCHACHTER:**  Thank you, Your Honor.

15        Just addressing --

16        **THE COURT:**  Oh, yes.  I want to address this.  Thank

17   you very much.  Everybody can sit down.  You don't have to

18   stand up.

19        **MR. SCHACHTER:**  May I explain a little bit more about

20   why --

21        **THE COURT:**  This is 7581.  Working with Ruthia.

22        **MR. SCHACHTER:**  And I would just like to explain the

23   non-hearsay purpose, Your Honor.

24        **THE COURT:**  Somebody tell me, first of all, who wrote

25   this.

1        **MR. SCHACHTER:**  Ms. He.

2        **THE COURT:**  Okay.  The defendant wrote this.  Go

3  ahead.

4        **MR. SCHACHTER:**  So there's been a lot of testimony

5  about how Ms. He would not accept feedback, would shoot people

6  down, was very difficult to work with.  The part -- and it is

7  our fault, because reading from the top, it certainly can be

8  seen as why it would be offered for the truth, and what we

9  would propose is redacting it to only the instructions.

10 Obviously, an instruction, a direction has no capability of

11 being true or false, and so the portion that we would focus on,

12 Your Honor, are the instructions at the bottom of the page.

13       The rest of it is useful context, but we don't need it.

14 It's not the purpose.  And we are fine, of course, with a

15 limiting instruction saying nothing here is being offered for

16 the truth.  But if you look down to start at Number 4, these

17 are directions that she is giving to the team which she posts

18 on CODA for all to see.  This is her reacting to the feedback

19 that she is getting that you shoot people down and you don't

20 listen to feedback.

21       **THE COURT:**  My first question is, given -- is it that

22 the witness saw this document?

23       **MR. SCHACHTER:**  Correct.  Correct.  That the witness,

24 both this witness as well as Mr. Levy, have identified an

25 internal document in which Ms. He gave instructions as to how

1  best to work with her.  We would like to redact everything from

2  the words "working with Ruthia" through Number 3.

3       And then if Your Honor just reviews Number 4 through the

4  next page, I think Your Honor will see none of this is -- none

5  of this is capable of being true or false.  These are

6  instructions and directions, which, of course, are non-hearsay.

7       **MR. FOSTER:**  Your Honor excluded it yesterday, and

8  Your Honor was correct to do so.  There's no exception to the

9  hearsay rule for instructions given by a CEO to their

10 subordinates.  Otherwise, everything a CEO said would come in,

11 and that's not the law.

12      And I think one of the reasons this trial is taking so

13 long, Your Honor, is that there's not impeachment.  There's not

14 foundation.  There's just reading into the record without

15 questions of things people say, obviously being offered for the

16 truth.  And --

17      **THE COURT:**  It seems to me -- it's obvious that it's

18 being offered for the truth.

19      For example, "My English pronunciation, choice of words,

20 and grammar are not great."

21      I don't know.  Maybe they're not.  But she says they are.

22 She says they are.  And in large part -- in part, not large

23 part -- in some part, that's her defense.  That is to say I

24 didn't understand this or I didn't understand that.

25      **MR. SCHACHTER:**  It is the part that is "I welcome

1   corrections."  It is context, but it's the part "I welcome

2   corrections when we're having a one-on-one conversation" and

3   then focusing, Your Honor --

4        THE COURT:  So a witness testifies that you couldn't

5   criticize her.  Let's say she was above criticism.  You

6   criticized her and she got mad.  And you want to bring in a

7   statement, un-cross-examined, in which she said, "I welcome

8   criticism."

9        I think that's hearsay, and I think it's -- otherwise, any

10  statement of a defendant would come in.  It would come in, and

11  I think that's not the law.

12       MR. SCHACHTER:  Well, Your Honor --

13       THE COURT:  But I'll let you brief it.  Okay?  It's

14  out.  You can brief it, and I'll take a look at your brief.

15       MR. SCHACHTER:  Yes, Your Honor.  Thank you.

16            (Recess taken at 2:31 p.m.)

17            (Proceedings resumed at 2:47 p.m.)

18    (Proceedings were heard out of the presence of the jury.)

19       THE COURTROOM DEPUTY:  Come to order.  Court is now in

20  session.

21       THE COURT:  Bring in the jury.

22            (The jury enters the courtroom.)

23     (Proceedings were heard in the presence of the jury.)

24       THE COURT:  Okay.  Please be seated.  Let the record

25  reflect all parties are present, jury is present.

1    You may proceed.

2         **MS. BELL:**  Thank you, Your Honor.

3    **BY MS. BELL:**

4    **Q.**   Ms. Hill-Alvarez, before the break, we had turned to the

5    topic of screening procedures.  Do you recall on direct that

6    the Government asked you about Done's screening process and you

7    looked at an Exhibit?

8         Do you remember that testimony?

9    **A.**   I don't remember the exhibit.  It's been a long day.

10   **Q.**   It certainly has.  So we will go back to the exhibit but I

11   have a few questions for you first.

12        So you understood that Dr. Brindala created the online

13   intake process; right?

14   **A.**   Do you mean the questionnaire patients took on the

15   website?

16   **Q.**   Yes.  The ASRS.

17   **A.**   That was my understanding, yes.

18   **Q.**   Okay.  And you also understood that if a patient indicated

19   on the intake questionnaire that they had a complex health

20   history such as like if they had been hospitalized for a mental

21   health condition they would not be allowed onto the platform;

22   right?

23   **A.**   That was my understanding.

24   **Q.**   Okay.  And you understood that patients with severe

25   comorbidities or suicidal ideations were removed from the

1  platform; right?

2  **A.**    Suicidal ideations, that one evolved over time.  But

3  people who had essentially had a psychiatric stay, that was my

4  understanding, or they had severe mental health issues.

5  **Q.**    Okay.  And you understood -- sorry.  Did you have

6  something else to add?

7  **A.**    No.

8  **Q.**    Okay.  And you understood that Ruthia believed the intake

9  questionnaires were weeding out patients who were inappropriate

10  for the platform; right?

11       **MS. GURSKIS:**  Objection.  Foundation.

12       **THE COURT:**  She's asking whether she had the

13  understanding.

14  **BY MS. BELL:**

15  **Q.**    Did you have the understanding that Ruthia felt that

16  these -- the intake process would weed out people that needed

17  in-person appointments?

18  **A.**    I think that's fair.

19  **Q.**    Okay.  So now let's go to the Government Exhibit 464 which

20  was the one that the prosecutor showed you.

21       Okay.  And so this message begins with your saying (as

22  read):

23            "Through screening, our ASRS helps us to

24       diagnose more effectively, meaning 99 percent of

25       patients that are admitted to the platform do have

1      ADHD."

2      Do you see that?

3   A.   Yes.

4   Q.   Okay.  And do you recall what the ASRS is?  I know it's

5   been a while.

6   A.   What I recall from this conversation is they were asking

7   about the data that was in a PowerPoint Dr. Brindala and Rick

8   Menesini had put together.  And I was relaying what had been

9   shared in that meeting.

10     And the ASRS, I think it was an ADHD questionnaire that's

11  used formally in offices, in in-person clinicians' offices.

12  Q.   Yes, that's -- that's exactly right on the context.

13          MS. BELL:  If we can go to page 4 of this document.

14  BY MS. BELL:

15  Q.   Do you see there that there is a link to a PowerPoint and

16  now let's look at 7533 if we could.

17          MS. BELL:  We'd offer that, Your Honor.

18          THE COURT:  Admitted.

19     (Trial Exhibit 7533 received in evidence.)

20  BY MS. BELL:

21  Q.   Okay.  And let's go to the first page if we could.  Okay.

22     So this is the presentation that you were sharing to the

23  Slack channel.  Do you see that?

24  A.   This is the presentation I mentioned that Dr. Brindala and

25  Rick Menesini had put together.  And if you go to the first

1    page I think it says May 3rd, so that was about a month and a

2    half into my job --

3    Q.    Okay.

4    A.    -- at the time and that was what was shared around the

5    company.

6    Q.    Okay.

7          And you see that it says here that the ASRS Part A asked

8    at intake and at follow-ups, and then you see the scores there?

9    A.    Okay.

10   Q.    Okay.  And then --

11              MS. BELL:  Can we zoom out for a moment.

12   BY MS. BELL:

13   Q.    Okay.  So it's discussing Part A and Part B.  And with

14   Part A it says (as read):

15              "Scores of 4-plus are highly consistent with

16         ADHD in adults, and further investigation is

17         warranted."

18         Do you see that?

19   A.    Yes.

20   Q.    Okay.  And then if we go to Slide 3, this shows here that

21   99 percent of the patients being treated with medication on

22   Done's platform scored 4 or more on the ASRS during their

23   initial intake.

24         Do you see that at the second bullet point?

25   A.    99 percent of these patients from this group that they

1  chose, yes.  I wouldn't say all of the patients from the Done

2  platform.

3  Q.   Okay.  Right.  Exactly.  This data that Dr. Brindala and

4  Mr. Menesini were looking at here.  Okay.

5       And then that -- what that means is that the 99 percent of

6  the patients screened within this sample size were told before

7  they actually got to the initial appointment that they were

8  likely to have ADHD.

9       Do you recall that?

10 A.   The phrase was "likely a fit for the platform," not ADHD.

11 Q.   Okay.  And this was before they committed to paying the

12 money for the initial appointment; right?

13 A.   I don't know the product flow of that process for the

14 patients, so I'm not sure if they would take the screen and

15 then pay.  I'm not too familiar.

16 Q.   Okay.

17      And then here it also says under follow-ups that there

18 were -- 56 percent of patients who took the ASRS during their

19 follow-up within the sample size scored 4 or more.

20      Do you see that?

21 A.   Yes.

22 Q.   Okay.  Now, let's go back to your message, 464, which was

23 the Government's exhibit.  Okay.

24      So you start with the 99 percent and that was a reference

25 to the data we just looked at; right?

1    A.    Yes.

2    Q.    And then if we could go to page 2, you explain there

3    that -- let's see the part where MJ Chey says (as read):

4              "Thanks, Christina.  Just so I understand, why

5         is the score lower for follow-ups?"

6         Do you see that?

7    A.    I don't see that on my screen.

8         MS. BELL:  It should be at 12:17:43.  If we could blow

9    up MJ Chey, please, "And Christina."

10        So MJ Chey --

11        MS. BELL:  Could I have a moment, Your Honor?

12        THE COURT:  Yes.

13                  (Pause in proceedings.)

14        MS. BELL:  Okay.  Thank you, Your Honor.

15   BY MS. BELL:

16   Q.    Okay.  So MJ Chey says (as read):

17             "Just so I understand, why is the score lower

18        for follow-ups.  Because of the medication?"

19        Then you respond (as read):

20             "Yes, it means the medication is helping to

21        manage the symptoms to where the patients" --

22        And I think we need to go to the next page.

23        (as read):

24             "-- are feeling more functional and not

25        displaying intense symptoms of ADHD."

1    Do you see that?

2  A.  Yes.

3  Q.  Okay.  And so at this time was it your understanding that

4  the ASRS was being administered a second time to patients at

5  the follow-up stage to measure how the medication was working?

6  A.  My understanding of this data was that it was an isolated

7  sample size as you said.  So I'm not sure if that was like a

8  company-wide practice.  I can't speak to that.

9    But I think at the time for, I don't know who, needed to

10  measure improvement in the patients who had been diagnosed with

11  ADHD, which is why the patient panel seemed to be around 2,000

12  or so.

13  Q.  Okay.  And what you explained to MJ Chey was that the

14  change in score from the 99 percent to the 56 percent was --

15  means that the medication is helping to manage the symptoms;

16  right?

17  A.  I was relaying to them what had been said in the company

18  meeting by Dr. Brindala as I was not -- they were not there,

19  so...

20    I'm not sure if I was saying that about the percentage

21  exactly, but I believe the PowerPoint, if you could go back to

22  it, please.

23  Q.  Sure.

24      MS. BELL:  Could we go back to the PowerPoint, 7533.

25      THE WITNESS:  The next page, please, where it has the

1   patient number around 2,000.  Thank you.

2       So the intake would be the first, to my understanding of

3   what was relayed in the meeting many years ago, would have been

4   the first ASRS questionnaire they took they got a 4 or higher,

5   which meant that they were really struggling with symptoms of

6   ADHD.  That was the score 5.2 out of a scale of 0 to 6.  And

7   the follow-ups were the same patient panel.  And to my

8   understanding what that means is 56 percent of the original

9   99 percent saw improvement.  So, yes.

10      MS. BELL:  Okay.  And if we could just go back to 464

11  at page 2, and look at Dr. Brody's response, 1:29:16 a.m.

12  BY MS. BELL:

13  Q.   Okay.  And you see he says (as read):

14      "It is good that we don't waste time with people

15      who are unlikely to have ADHD."

16      Do you see that?

17  A.   Yes.

18  Q.   Okay.  And now, the Government asked you about the next

19  part of the discussion where he talks about his views on the

20  DSM.

21      Do you remember that?

22  A.   Vaguely, yes.

23  Q.   Okay.  Do you recall what the DSM is?

24  A.   Yes, it's the diagnostic manual that clinicians use to

25  diagnose individuals with mental illness and mental disorders.

Q.    He says (as read):

          "If we want to validate your procedures among

      the portion of the psychiatric community that is

      based in science, we need to be aware that the ASRS

      is a screening tool that doesn't use the official" --

      meaning DSM-5, " -- criteria for ADHD.

      Do you see that?

A.    Yes.

Q.    And then if we can go down, there's a reference there he

says (as read):

          "What we would need to do to obtain that coveted

      validation," wink, "is a diagnostic interview using

      the DSM-5 criteria" -- this the Government reviewed

      with you.  " -- ideally by interviewers specially

      trained in those diagnostic criteria, and not the

      same clinicians who will be treating the patient on

      the platform.  This will tell us what percentage of

      the screened patients really have ADHD.

          "It would also make sense when doing the

      follow-up evaluations to only rate the patients who

      are confirmed to have ADHD by the above procedures so

      we're not studying the effects of treatment on

      problems other than ADHD."

      And then he goes down to expound on his views of the DSM

further.

1          **MS. BELL:**  If we could go to page 2 to 3.

2     **BY MS. BELL:**

3     **Q.**  And so he says here (as read):

4              "I want to be clear that when I say 'really have

5          ADHD' I do not mean that I believe the DSM-5 has any

6          magical ability to ferret out the truth.  As I have

7          said many times before, truth is a very relative

8          thing especially about the human psyche.  But the

9          reality is that the DSM-5 contains the most commonly

10         used criteria for making the diagnosis, and thus, if

11         we wish to make any comparisons with the conclusion

12         of other clinicians and researchers about the

13         so-called diagnosis of ADHD, it should actually be

14         called attention deficit hyperactivity syndrome,

15         using the DSM-5 will make such a task less complex.

16         It will also buy us some respect among the, quote, we

17         suspect that ADHD may be an excuse to get high, and

18         even more so if they use loosey goosey emoji criteria

19         like the ASKS, unquote."

20         Do you see that?

21    **A.**  Yes.

22    **Q.**  And earlier you testified about Dr. Brody being an

23    idealist.  You understood that Dr. Brody had a liberal approach

24    to practicing medicine; right?

25    **A.**  That's correct.

1   Q.   And that Dr. Brindala was kind of on the other end of the

2   spectrum.  He was very by the book; right?

3   A.   I would say they both offered a -- they're both -- they

4   have an amazing résumé, both of them.  They had amazing

5   careers.  And they both offered their perspectives, yes.

6        I would say Dr. Brindala was more procedural in the way

7   that I would see him speak in team meetings.  And Dr. Brody

8   offered the humanity, the heart.  That was my understanding.

9   Q.   Okay.  And Dr. Brody in particular was of the mentality

10  that sometimes providers get it wrong and that bias could view

11  how providers see patients; right?

12  A.   Yes.

13  Q.   Okay.  So you knew that Dr. Brody prepared a seminar about

14  his approach to diagnosing and treating ADHD; right?

15  A.   I don't think I do.

16  Q.   Okay.

17       MS. BELL:  Let's -- I'd offer Government Exhibit 381,

18  Your Honor.

19       THE COURT:  Admitted.

20  BY MS. BELL:

21  Q.   And this is a conversation with a group that includes you.

22       Do you see that?

23  A.   Yes.

24  Q.   At the top -- okay.

25       And if we can scroll down, we see that Dr. Brody says --

1  he's sending his notes for what is ADHD seminar.

2     Do you see that?

3  **A.**  Yes.

4  **Q.**  And he goes on to describe the DSM-5; right?

5     Do you see that?

6  **A.**  Yes.

7  **Q.**  And we won't walk through the whole thing here, but he's

8  essentially -- if we can scroll to the next page -- giving an

9  overview of his notes for a seminar.

10    Do you see that at the top?

11    We can blow that up.

12    Okay.

13    And do you see he continues to discuss these -- at the

14 top.  Sorry.  At the top.

15    Do you see that he continues to give an overview of these

16 notes for his what is ADHD seminar?

17 **A.**  Yes.  I'm just reading them.  It's been a while.

18    (Witness examines document.)

19    Okay.

20 **Q.**  Okay.  And he says, for example, in the middle of that he

21 says (as read):

22        "To summarize, there is convincing evidence that

23    ADHD results from complex genetic differences in the

24    way in which the neurotransmitters" -- which I won't

25    even pronounce that, but dopamine and -- I won't

1      pronounce that.

2      But in any event he's talking about how these

3 neurotransmitters function in the brain; right?

4 **A.**   It seems so.

5 **Q.**   Okay.  And he -- and he ends here with a citation to a

6 scientific article.  Do you see that?

7 **A.**   Yes.

8 **Q.**   Okay.  And then Ruthia comments a little bit further down.

9 If we scroll down a bit.  And she says, (as read):

10         "Wow.  We have a lot of good content here ready.

11         Just need to organize the structure and make it -- to

12         make it digestible for everyone.  For example, for

13         the first section, as someone who do not have medical

14         background, we may start with explaining what is the

15         definition in DSM-5, or even what is DSM-5, and

16         extend to new ideas that are different from the

17         traditional views"

18      And then Dr. Brody responds.  And he says --

19         **MS. GURSKIS:**  Your Honor, I'm going to object that

20 this back-and-forth reading of the defendant's statements,

21 undue consumption of time, hearsay.

22         **THE COURT:**  What is the question?  I think you should

23 ask a question first before you read the document.

24         **MS. BELL:**  Okay.  Yes, Your Honor.

25 \\\

1    BY MS. BELL:

2    Q.    So we were talking about Dr. Brody's views on the DSM-5 as

3    set forth in the Government exhibit about the screening tests,

4    which was 464.

5         And now we're looking at another exhibit where he expounds

6    further on his views of the DSM-5.

7              THE COURT:  And did she see this?

8              MS. BELL:  She's on this communication.

9    BY MS. BELL:

10   Q.    So if we could --

11             THE COURT:  Go ahead.

12   BY MS. BELL:

13   Q.    -- scroll down to the end.  We're almost done, so let's

14   just look at Dr. Brody's response at the bottom.  Okay.

15        And so he says (as read):

16             "That would be superb."

17        He also says (as read):

18             "I feel it would be great to use this as a blog

19        post to help me have more mechanisms for feedback

20        from the audience."

21        And then he says (as read):

22             "I'm hoping to avoid the echo chamber."

23        And last sentence (as read):

24             "The feedback people at Done give me is

25        wonderful but they're not exactly the laypeople that

1    are the intended audience."

2        And then let's go down to the bottom part.  And here he

3    responds to Ruthia's (as read):

4            "Yes, this is just an outline for me to talk and

5            as I go along I can explain things like DSM-5.  I

6            didn't go into all the nitty-gritty detail of the

7            DSM-5 criteria on purpose.  The reason is I don't

8            believe in them myself."

9        Face with hand over mouth, astonished.  And then he says

10   (as read):

11           "Plus, they're long-winded, and boring sleeping,

12           and our audience would stop listening."

13       Do you see that?

14   **A.**    Yes.

15   **Q.**    Okay.  And you understood -- you -- did you see the

16   reference there to "the laypeople that are the intended

17   audience"?

18       Did you see that?

19       We can go up again.  It was just in Dr. Brody's response.

20           **THE COURT:**  What's the question?

21   **BY MS. BELL:**

22   **Q.**    Yes.  The question is:  Do you recall that the intended

23   audience were laypeople, essentially members of the public?

24           **THE COURT:**  Did she have a recollection of this

25   conversation?

1     MS. BELL:  Yeah.

2  BY MS. BELL:

3  Q.   Do you have a recollection of either the conversation or

4  the seminar itself?  And I can show you another --

5          THE COURT:  Well, ask her if she does.

6          MS. BELL:  Okay.

7          THE COURT:  You don't have to show her anything.

8          MS. GURSKIS:  I think she already testified she didn't

9  recall the seminar.

10         THE COURT:  Pardon me?

11         MS. GURSKIS:  She already testified she didn't recall

12  the seminar.

13         THE COURT:  Oh.

14  BY MS. BELL:

15  Q.   Let me show you 6358 and see if that refreshes you --

16  which is an invitation to the seminar.  Okay.

17      Do you recall getting this?  You're line 2.

18         THE COURT:  Do you have a recollection of actually

19  receiving this document; yes or no?  As you sit here today, do

20  you recall having received it or not?

21         THE WITNESS:  Yes.

22         THE COURT:  You recall having received it.

23         THE WITNESS:  I recall seeing it in my inbox.

24         THE COURT:  Okay.  And did you view the event that it

25  refers to?

```
 1              THE WITNESS:  No.

 2              THE COURT:  Okay.  Then let's move on.

 3              MS. BELL:  Okay.

 4    BY MS. BELL:

 5    Q.   There was --

 6              THE COURT:  Any testimony about the event is stricken.

 7    The jury is instructed to disregard it.

 8              MS. BELL:  Thank you, Your Honor.  We have not gotten

 9    into the event yet, but I will not ask about the event.

10              THE COURT:  Okay.

11    BY MS. BELL:

12    Q.   Do you recall that Dr. Brody also hosted a different

13    webinar about myths surrounding ADHD, and that one you drafted

14    a recap for?

15    A.   Maybe.  I was in a lot of -- I was the executive

16    assistant.  I was in almost -- I was in a lot of Slack

17    channels.  I would say over a hundred.  Maybe, but it's not

18    standing out to me.

19              MS. BELL:  Okay.  Could we go to 7595, and I'd offer

20    that.

21              THE COURT:  Okay.

22    BY MS. BELL:

23    Q.   So do you see there you are --

24              THE COURT:  Admitted.

25              MS. BELL:  Thank you.
```

1      (Trial Exhibit 7595 received in evidence.)

2  BY MS. BELL:

3  Q.   And you write (as read):

4           "This month we held our first ADHD seminar

5       hosted by Dr. Brody on ADHD.  We had a stellar

6       turnout and our patients enjoyed dismantling stigma

7       with our clinical president."

8       Do you see that?

9           MS. BELL:  Maybe we can zoom out.  Could we zoom out

10 for a moment to see the document?  Okay.

11 BY MS. BELL:

12 Q.   Let's see.  So am I right that that's your update at the

13 top?  Let me just make sure I'm getting that right.

14      Do you recall writing that this month we --

15 A.   To my understanding, and it's been a long time, the

16 monthly update was the monthly newsletter that would go out.

17 And I would collect any updates so the subject line that says,

18 "Can add easy value," that was around the time we made the

19 company values, and I don't remember if I wrote that or if I

20 just copy-pasted it into the monthly update at the time.

21 Q.   Okay.  Do you recall attending and viewing that seminar

22 that is summarized here, the "ADHD Myths and Q and A"?

23      Do you recall that?

24 A.   No, I do not.

25 Q.   Okay.  Let's look at a different exhibit.

1    So do you recall that Dr. Brody also wrote about his

2  treatment philosophies in articles and newsletters?

3  **A.**   I recall he really loved writing the blog.

4  **Q.**   Okay.  Let's go to 7409 which is the last document we'll

5  look at on this topic.  Okay.

6    And so do you see you are copied there at the bottom of

7  the group there?

8    **MS. GURSKIS:**  Your Honor, we're going to object to

9  this document.  This is a compilation of over a hundred

10 e-mails, half of which she's not on.  So I'm not sure there's

11 an appropriate foundation for this exhibit with this witness.

12   **MS. BELL:**  We're only looking at the part we'll go

13 over with this witness, which is a response from this witness

14 so we'll not admit the rest of the pages.

15   **THE COURT:**  Okay a portion is admitted.

16   (Trial Exhibit 7409 portion received in evidence.)

17 **BY MS. BELL:**

18 **Q.**   Okay.  So do you see here, right before -- you see there's

19 Zoe Martinez.  She was also a member of clinical leadership;

20 right?  Do you see she's copied as well?

21 **A.**   So this is a Slack channel; right, provider one-on-ones?

22 **Q.**   Yes.

23 **A.**   I don't -- I know Zoe was a contractor.  I don't know when

24 she became a leader, so I can't speak to that.  But I do see my

25 name and her name there.

**Q.** Okay. So let's go down and see what Dr. Brody writes here.

Okay. So he is sending a draft of the provider newsletter. And he says (as read):

> "Hello, fabulous providers. There have been some amazing changes" -- and then he lists the changes, " -- which include a better credentialing system, to ensure we're always in full compliance; new staffing, including more provider support."

And he mentions there (as read):

> "The transition of our clinical president from part-time to full-time."

That's a reference to himself; right?

**A.** I would assume so, yes.

**Q.** Okay. And then he talks -- in Number 4 he says (as read):

> "Continuation of our patient webinar series links are as follows: ADHD Myths and What is ADHD."

Those are the two webinars we just looked at; right?

**MS. GURSKIS:** Objection, Your Honor. Ms. Alvarez doesn't even respond on this chain. This is just more undue consumption of time. I'm not even sure there's a question here.

**MS. BELL:** She does respond. We'll just go down to that in a moment. I'm just setting up the response. She responds exactly to this point, to this issue.

1   BY MS. BELL:

2   Q.   Okay.  So do you see the reference to the -- the other

3   updates, Number 4, those are the webinars we just looked at;

4   right?

5   A.   I understand this is a draft he wrote, and I've glanced

6   over it briefly.

7   Q.   Okay.  And he says (as read):

8          "As we grow, we want to ensure that our clinical

9          standards are actually met and exceeded."

10         Right?  Do you see that?

11  A.   In part two, yes.

12  Q.   Okay.  Now, let's scroll down a little bit further and

13  you'll see he adds a case study on the next page at the top,

14  and we're getting to your response.

15         So do you see he adds a case study there; right?

16         And we won't go through that, but let's scroll down to

17  what you and Ruthia say.

18         Okay.  So Ruthia says (as read):

19          "This is amazing work."

20         She says she (as read):

21          "... would like to hear feedback from Sussan

22          about the case studies since it tackles a

23          controversial topic and may be different than what

24          textbooks says."

25         Then let's see what you say in response.  Okay.  You say

1   (as read):

2           "I love this, as well as the concept of

3       collecting vignettes or other case studies to share

4       with learnings via our patient-first philosophy.

5       This may help mentor some of our providers.  Awesome

6       work, David Brody."

7       Do you see that?

8   A.   Yes.

9   Q.   Okay.  And we can move -- just -- if we can just scroll

10  down.  We're done with the document, but you can see -- if we

11  could scroll down a little further that there are additional

12  people, including Sussan, who weighs in.

13      Okay.  Maybe we don't have it as part of this, so we'll

14  just move on.

15      All right.  So moving to a new topic, you were asked about

16  or you testified about Dr. Brody's panel size and Dr. Tsang's

17  panel size.  Do you remember that?

18  A.   Yes.

19  Q.   Okay.  And you testified that you had logged into the EHR

20  when you were assigned to this new project and then you felt

21  like the numbers had actually changed when you logged back on.

22      Do you remember that?

23  A.   I didn't feel they changed; they did change.

24  Q.   Okay.  They did change.  All right.

25      So let's look about -- at what you learned at the time

1   about the reason for that change, if we could.

2          **MS. BELL:**  Exhibit 7408.  We offer that, Your Honor.

3          **THE COURT:**  7408 admitted.

4      (Trial Exhibit 7408 received in evidence.)

5   **BY MS. BELL:**

6   **Q.**  Okay.  So do you see that you write here, and you ask (as

7   read):

8          "I'm hoping to have more context around the

9          active patient panels for" -- and then you -- if we

10         can scroll down -- "Dr. Tsang and Dr. Brody."

11         Do you see that?

12  **A.**  Yes.

13  **Q.**  And then Dr. Brody responds and Niki Mercado -- so Niki

14  clarifies and she says (as read):

15         "Just a context on this.  When a provider

16         offboards from our platform, we gradually transfer

17         them to another provider so the new provider is not

18         overwhelmed with patient inquiries, refills, and

19         messages.  So we add them to Dr. Brody's panel until

20         we completely transfer, triggered by a refill request

21         or an EHR message, them to another provider.

22         "We are in the process of transferring these

23         patients to another provider but these patients will

24         remain under Dr. Brody's panel until the transfer is

25         complete, schedule appointment to another provider,

1        refilled."

2        Do you see that?

3    A.   Yes.

4    Q.   And you say gotcha?

5    A.   I don't see what I say in this document.

6    Q.   Oh.  Sorry.

7        I think it's at the top.  Gotcha.

8        Do you see that?

9    A.   My curiosity, yes.

10   Q.   Okay.  So now let's turn to the topic of investors.

11       So the Government showed you a document.  Let's go to

12   3559, if we could.

13            MS. GURSKIS:  You might mean 1359.

14            MS. BELL:  I'm sorry.  Yes, 1359.

15   BY MS. BELL:

16   Q.   So this is the document that you reviewed with the

17   Government.

18            MS. BELL:  And let's just go over to the right-hand

19   side, if we could, and blow that up a bit.

20   BY MS. BELL:

21   Q.   Okay.  So can you see there that we -- this Government

22   exhibit is a version dated May 6th, 2021?

23   A.   Yes.

24   Q.   And you can see that you both, you and Ruthia, are listed

25   as editors of the document?

1  A.   Yes.

2  Q.   Okay.  And then -- but there's subsequent versions; do you

3  see that on June -- well, there's a subsequent version on two

4  different time stamps.  Do you see that?

5  A.   Yes.

6  Q.   Okay.  But what we see here is not the June version but

7  the May version; right?

8  A.   I'm not sure.

9       MS. BELL:  Okay.  Let's zoom back out so we can see.

10  BY MS. BELL:

11  Q.   Do you see how it's highlighted as the May version on the

12  right?

13  A.   Yes.

14  Q.   Okay.  And so this was a draft document; right?

15  A.   Correct.

16  Q.   And I think the Government showed you page 11.  And if we

17  could just scroll through, you can see, such as on page 11, if

18  we could go there for a moment that there's text in all

19  different colors; right?

20       Do you see that?

21  A.   Yes.

22  Q.   There's black and -- so essentially there was -- there

23  were -- there was preexisting content in this document, and

24  then you and Ruthia were making edits on top of it; right?

25  A.   From what I can recall, I had copy-pasted all the

1   questions she sent me, and then copy-pasted the answers that I

2   had received from other teammates she directed me to get the

3   answers from.

4   **Q.**   Okay.  So it was, at this point in time, a work in

5   progress document; right?

6   **A.**   Yes.

7   **Q.**   And we don't know what information ultimately went to

8   investors from this document; right?

9   **A.**   I do not know.

10  **Q.**   Okay.  And we can look at a few things.

11          **MS. BELL:**  Let's see 1359 fifth paragraph down.  Sorry

12  at one, page 1, pharmacist paragraph down.

13      Okay.

14      And so I am looking for --

15      May I just confer for a moment, Your Honor, to make this a

16  bit more smooth?

17                  (Counsel conferring.)

18          **MS. BELL:**  Okay.  So can you blow up so that we can

19  see the part where it says "we create large patient panels."

20  Okay.

21  **BY MS. BELL:**

22  **Q.**   Do you see where it says, "we retain," and "by" and then

23  it says (as read):

24          "...creating large patient panels.  Note this

25      creates substantial monthly comp for asynchronous

1    work."

2       Do you see that?

3    **A.**   Yes.

4          **MS. BELL:**  Okay.  And then if we could go to another

5    bullet at page 2 last bullet.

6       (Reporter interruption for clarity of the record.)

7    **BY MS. BELL:**

8    **Q.**   Do you see that bullet?  It says (as read):

9             "We have all the patient records on the system."

10      And then the next sentence (as read):

11            "Since the ongoing care is mostly asynchronous

12      medication management, it won't interrupt patient

13      care very much."

14      Do you see that?

15   **A.**   Yes.

16   **Q.**   Okay.  And that's one of the edits that -- if we can zoom

17   out -- okay.

18      We can see this is one of the edits to the draft at this

19   stage; right?

20   **A.**   Okay.

21          **MS. BELL:**  Okay.  And then one last example, 1359 at

22   5.  Okay.  And if we can see the -- it's the bottom of the page

23   "out of a sample of 9,708 patients."  That's what I'm looking

24   for.

25   \\\

BY MS. BELL:

Q.   "48 were not diagnosed."

     Do you see that?

A.   Yes.

Q.   Okay.  Okay.  So let's move on to a new topic.

     The Government asked you about the organization chart.

     Do you remember that?

A.   Yes.

Q.   Okay.  That organization chart was not the complete chart of the company; right?

A.   Another one did not exist to my knowledge.

Q.   Okay.  But -- and we can put it back up to just to refresh us.

     That was 2869.  And this was I don't know if you can see it well enough across the top.  But my question is, this did not include the clinical side of the team; right?

A.   I asked for one and one was never made.  So, to my knowledge, one did not exist.

Q.   Okay.  So this was essentially the tech side of the team; right?

A.   It does not encompass everyone on the tech side, but, yes.

Q.   And the clinical side of the team continued to remain in the United States; right?

A.   I can't really speak to that; to my knowledge, yes.

Q.   Okay.  And you had mentioned during this time that Ruthia

1    was working on a new vertical called Olivia.

2        Do you recall that testimony?

3    A.   Yes.

4    Q.   And you -- what do you recall about Olivia?

5    A.   Olivia was an AI therapist.

6    Q.   Okay.  And so there were some AI verticals that Ruthia was

7    working on with other team members at this point in time when

8    you came back to the company?

9    A.   When I was rehired I was told Ruthia was not working there

10   and that she was working at a new company.

11       As for AI verticals, I never really heard that phrase

12   until around when Annie Zheng, I believe her name was, was

13   hired, which would have been sometime in the spring of 2024.

14   Q.   Okay.  Let's look at 7559.

15       **MS. BELL:**  I'd offer that.

16       **THE COURT:**  Admitted.

17   (Trial Exhibit 7559 received in evidence.)

18       **MS. BELL:**  Okay.  Okay.  Can we pull this out, zoom

19   out for a moment.  Okay.  Because I believe Ms. Hill-Alvarez is

20   on this at the top.

21   **BY MS. BELL:**

22   Q.   Okay.  Do you see you're cc'd here?

23   A.   Yes.

24   Q.   And it says "Update on status of project agreement for

25   Olivia."

1      Okay.  And below you see there's someone named Nick

2 Vander Woude who's writing and he says (as read):

3          "I'm reaching out to you in regards to the

4          recent plans for me to collaborate with Done on a

5          project basis to finish work on the Olivia AI presale

6          AI chatbot."

7      Do you see that?

8 A.   Yes.

9 Q.   Let's go to 7560.

10         MS. BELL:  We'd offer that.

11         THE COURT:  Admitted.

12     (Trial Exhibit 7560 received in evidence.)

13 BY MS. BELL:

14 Q.   And then we see here you're copied there as well at the

15 top.  And someone named Wednesday Almero.  Who was Wednesday

16 Almero?

17 A.   She was a growth marketer.

18 Q.   She says (as read):

19         "Thank you so much for the e-mail and the

20         official recognition of my new role.  I'm thrilled

21         about this opportunity and eager to continue learning

22         and leveraging my skills to contribute more

23         significantly to our projects, especially as I

24         transition to the new verticals or AI/innovation

25         team."

1    Do you see that?

2  **A.**    This is consistent with my recollection where I said I did

3  not hear about it until the spring.  This is April 8th, 2024.

4    And me being cc'd on an e-mail -- I was cc'd on plenty of

5  e-mails, but I do see that I'm cc'd here.

6  **Q.**    Okay.  Do you also remember a weight loss vertical that

7  was in development?

8  **A.**    I recall around this time that -- hearing that, but I

9  never really heard much about it.

10  **Q.**    Okay.  Let's look at 7558.

11    **MS. BELL:**  I'd offer that, Your Honor.

12    **THE COURT:**  Admitted.

13    (Trial Exhibit 7558 received in evidence.)

14  **BY MS. BELL:**

15  **Q.**    And, again, in spring of 2024, do you see Shelby Leal

16  talking about "Adding our weight loss platform here too.  It's

17  super new and came out this week."

18    So you see that?

19  **A.**    Yes.  This is May 23rd, 2024, so it's around the time I

20  heard about it.  It seems like we were creating an onboarding

21  document, and Shelby is letting me know.

22  **Q.**    Okay.

23    **MS. BELL:**  We can take that down.

24  **BY MS. BELL:**

25  **Q.**    So you testified about the -- a name change -- do you

1  recall that testimony -- to Mindful Mental Wellness?

2  **A.**   I recall the clinicians asking me what that company was.

3  **Q.**   Okay.  And you don't know because you were not involved in

4  the decision to change the name; right?

5  **A.**   I had never heard about it.  I had never received an

6  update about it.  I do recall seeing it when Shelby asked for

7  some help understanding some documents.

8  **Q.**   Okay.  You also testified about Ruthia instructing you to

9  label certain documents privileged and confidential.

10      Do you remember that testimony?

11 **A.**   That was part of what I said in my testimony, yes.

12 **Q.**   Okay.  And you mentioned Rumi and Xena.  Do you remember

13 that?

14 **A.**   Yes.

15 **Q.**   And you understood they were employees of Done; right?

16 **A.**   I understood they were lawyers.

17 **Q.**   Okay.  And you really don't know one way or another

18 whether they were lawyers, U.S. lawyers, China lawyers, or not

19 lawyers; right?

20 **A.**   I was told by Ruthia that Xena was a lawyer.  And I was

21 told by Xena herself, the week of the arrest, that she was not

22 a lawyer in the United States.

23      As to whether or not they're certified in China, I'm not

24 sure.

25 **Q.**   So you don't know whether she is a lawyer in China?

1    **A.**    Correct.

2    **Q.**    But Mike Feldman you do know that he is a lawyer; right?

3    **A.**    Yes.

4    **Q.**    Okay.  Ruthia -- you testified that Ruthia wanted Mike

5    Feldman to be included on company communications that were

6    marked privileged and confidential; right?

7    **A.**    The way that question is framed doesn't honor the context,

8    but it's factually correct.

9    **Q.**    Okay.  Let's talk about documents.

10    So you mentioned that you -- when you came back, there

11    were documents that you -- that either went missing or you felt

12    like you no longer had access to; right?

13    **A.**    Yes.

14    **Q.**    Okay.  And also the Government showed you this exhibit,

15    883?  We can just put it back up to refresh you.

16    This is 883.  Okay.

17    Do you remember seeing this document on direct?

18    **A.**    Yes.

19    **Q.**    Okay.  And so here there was an issue about a

20    payroll@donefirst e-mail address was not found.

21    Do you see that?

22    **A.**    There were many more e-mails.  These were the first two

23    that sounded the alarm that something was wrong.

24    **Q.**    And, in fact, you raised this issue to Ruthia's attention;

25    right?

1   **A.**   I don't recall.  I think it says there Ruthia, Audrey,

2   Joanne, and Marc.

3   **Q.**   Okay.  Let's look at 7432.

4       **MS. BELL:**  I'd offer that, Your Honor.

5       **THE COURT:**  Admitted.

6       (Trial Exhibit 7432 received in evidence.)

7       **MS. BELL:**  Okay.  And then if we could just zoom out.

8   Okay.

9   **BY MS. BELL:**

10  **Q.**   So you can see you are writing at the top, and now it's a

11  little hard to -- thank you.  That's good.

12      So you say (as read):

13          "And when you have time, could you please look

14      into" -- and then you list certain e-mails that are

15      seem to be missing.

16      Do you see that?

17  **A.**   It's not so much that the e-mails were missing.  I would

18  say it was the groups.  So there were employee e-mail addresses

19  tied underneath.  So, for example, legal would be sent to the

20  inbox of everyone underneath that, and all that had been

21  deleted.

22  **Q.**   Okay.  And, in fact, if we scroll down a little bit

23  further, we see that Ruthia says -- makes just that point, if

24  we go up -- right there.

25      She says (as read):

1          "It should be a group not an actual e-mail

2     account."

3     Do you see that?

4  **A.**  That's correct, which they were.

5  **Q.**  Okay.  And then you asked Ann if she could look into that?

6  **A.**  Ann is Audrey.  Yes.

7  **Q.**  Okay.  Audrey Guinto.  Okay.

8     And let's go to 7433 to see the result of Ann's

9  investigation.

10          **MS. BELL:**  And I'd offer that, Your Honor.

11          **THE COURT:**  Admitted.

12     (Trial Exhibit 7433 received in evidence.)

13  **BY MS. BELL:**

14  **Q.**  Okay.  And if we see page 2, please.  Okay.

15     So you see at the top you say (as read):

16          "In regards to the accidental deletion of the

17     e-mail users groups, please see the rationale below.

18     Ann will provide more context."

19     Do you see that?

20  **A.**  Yes.

21  **Q.**  You used air quotes in your direct testimony when you

22  referenced "accidental."

23     Do you remember that?

24  **A.**  Yes.

25  **Q.**  Okay.  But let's zoom out and see what the rationale is

1    that Ann provides, and the screenshots.

2         **MS. BELL:**  If we can blow that up.  Okay.

3    **BY MS. BELL:**

4    **Q.**   So Ann says here (as read):

5         "Hi, team.  This is the documentation of the

6    accidental deletion of the groups.  33 user groups

7    were deleted.  The user groups cannot be recovered.

8    And this is the data extracted from the Google admin

9    console security."

10   And so now let's look at each of these screenshots.

11        **MS. BELL:**  Let's go to 34 -- 7434A, B, C and D, which

12   are just blowups of these embedded images.

13        And I'd offer these, Your Honor.

14        **THE COURT:**  Admitted.

15        (Trial Exhibits 7434A, B, C, and D received in evidence.)

16   **BY MS. BELL:**

17   **Q.**   Okay.  So we see that someone named Charo@donefirst is

18   the -- is the actor who deleted all of these groups.

19        Do you see that?

20   **A.**   Yes.

21   **Q.**   Okay.  And if we could go to their -- each of the

22   screenshots, so that's the first of the screen shots Audrey

23   attaches.

24        **MS. BELL:**  Let's go to B.  7435B, please.  It's up.

25   This is up.  Okay.

1    BY MS. BELL:

2    Q.   And so this is the second screenshot Audrey attached.  You

3    see, again, it's Charo who is the actor who deleted the group.

4         Do you see that?

5    A.   Yes.

6    Q.   Okay.  Let's go to 7436C.

7         Again, we see Charo, on Audrey's third screenshot, is the

8    one who deleted the group; right?

9         THE COURTROOM DEPUTY:  You said 7436.  Do you mean

10   7434?

11        MS. BELL:  Yes, I apologize.  I'm wrong.  Thank you

12   for correcting me.

13   BY MS. BELL:

14   Q.   So let me correct myself.

15        The first exhibit, the first screenshot we looked at was

16   7434A.  The second one should be 7435B.

17        THE COURTROOM DEPUTY:  That wasn't admitted, though.

18        MS. BELL:  That was because I got the number wrong.

19        Sorry, Your Honor.  We already looked at 7435B.  Now we're

20   on 7436C which is the third screenshot.

21   BY MS. BELL:

22   Q.   And, again, we see Charo here as the actor who deleted the

23   group; right?

24   A.   Okay.

25   Q.   And last 7437D --

1        **MS. BELL:**  I'd offer that, Your Honor.

2   **BY MS. BELL:**

3   **Q.**    And this is the final embedded image that Audrey passed

4   along to you and the group and it says (as read):

5            "Audrey.  Hi, Charo Mae Sunga."

6        Do you see that?

7        I'm sorry.  Just says Mae Sunga.

8        Do you know Mae Sunga was actually Charo Mae Sunga; right.

9   **A.**    No, I did not.  That's something I spoke to earlier where

10  people's names, legal names, their Slack names, and their

11  e-mails did not match across platforms.

12  **Q.**    Okay.  We'll get back to that in a moment.

13       Audrey says (as read):

14           "Mae Sunga, may I ask who instructed you to

15       delete the user groups we have?"

16       And he responds (as read):

17           "I actually did not intentionally delete them,

18       and nobody instructed me to delete those.  I'm not

19       really sure what happened.  I was just trying to add

20       a provider to a group and I was trying to change it

21       and then I see there was a delete option, and then it

22       automatically deleted everything.  I notified Shelby

23       about it and asked if there's anyone I can ask

24       assistance to help retrieve them possibly."

25       Okay.  Do you see that?

1  A.    Yes.

2  Q.    And there was actually an official incident report

3  prepared after the fact, wasn't there?

4  A.    Yes.  I was very concerned and I reached out to Niki and

5  I believe she created an incident report.

6          MS. BELL:  Your Honor, we offer 6575.

7          THE COURT:  Admitted.

8       (Trial Exhibit 6575 received in evidence.)

9  BY MS. BELL:

10 Q.    Okay.  And you see at the top, this is from -- now we see

11 that Charo is -- Mae Sunga is Charo Mae Sunga?

12         MS. GURSKIS:  Objection.  Foundation.  She's not on

13 this document.

14         THE COURT:  Overruled.  Go ahead.

15 BY MS. BELL:

16 Q.    Do you see that?

17 A.    I do see it.

18 Q.    And Charo writes to Niki and says (as read):

19         "I'm writing to explain the circumstances

20         surrounding the accidental deletion of user groups in

21         our Google account that occurred yesterday.  While

22         attempting to create an e-mail for a provider and add

23         her to a user group, I made an error.  I accessed the

24         groups tab, and when selecting from the top-down list

25         I chose the wrong group.  In an attempt to correct

1     this, I clicked on the manage group tab and selected

2     delete, mistakenly believing this would allow me to

3     modify the group selection.  It was only after this

4     action that I noticed the dropdown list was now

5     empty, indicating that I had inadvertently deleted

6     the entire group."

7     And then he goes on to explain why or -- you know, the

8     steps he did take.  And he says (as read):

9          "I apologize for the confusion and inconvenience

10     this has caused.  I acknowledge that my lack of

11     training on properly adding and deleting groups

12     contributed to this mistake."

13     And he says (as read):

14          "I'm ready to assist in any way necessary to

15     restore the deleted group and mitigate any impact

16     that may have caused.:

17     Do you see that?

18     **A.**   Yes.

19     **Q.**   Okay.

20          **MS. BELL:**  Let's take that down.

21     BY MS. BELL:

22     **Q.**   So you then went onto work with Charo Mae Sunga to

23     recreate the groups that he had accidentally deleted?

24     **A.**   She had deleted.  And to my knowledge, I believe it was

25     Audrey and I.  But that week -- a lot happened that week

1    because that was the night before the arrest, and I don't

2    remember the timeline of events.  But I remember the next day

3    really scrambling to try to get the e-mail groups back together

4    because nobody could contact anybody.

5         MS. BELL:  Okay.  And we'll admit Your Honor -- or

6    we'd offer 7438, 7439, and 7440, if we could.

7         THE COURT:  Admitted.

8         (Trial Exhibit 7438, 7439, 7440 received in evidence.)

9         MS. BELL:  And we'll just pull up one of these as an

10   example.

11   BY MS. BELL:

12   Q.   But do you see that you write (as read):

13            "Hi, team.  An accident occurred on the back-end

14        and all of our e-mail user groups were deleted.  We

15        are aware this impacts organizational processes and

16        we are working to get them up and running ASAP.  Ann

17        Charo Mae Sunga and I are owning this urgent cleanup.

18        Please inform us who should belong to the following

19        user groups as recipients," and then you list one of

20        the groups

21        Do you see that?

22   A.   Okay.

23   Q.   Let's look -- just so the jury can see it -- the next two

24   examples, and then we'll move off this topic.

25        Do you see this is another e-mail on the same topic?

1  A.  I think this is a Slack message.  I'm not sure.

2  Q.  We can scroll out.  But you're again saying an accident

3  occurred on the back-end and you're owning the urgent clean up;

4  right?

5  A.  Letting the team know because they're not going to be able

6  to receive e-mails if they're one of those groups, which is

7  really important.

8  Q.  Okay.  All right.

9       So let's talk about the onboarding deck.

10      So do you recall your testimony that there were certain

11  documents you had access to during your first tenure at Done.

12  And then you came back and you testified that you thought

13  certain permissions were changed but you didn't have access

14  when you came back in September 2023 to the documents you had

15  access to in March 2022 when you left; right?

16  A.  I recall that, yes.

17  Q.  Okay.  And in particular you talked about an onboarding

18  presentation that you created; right?

19  A.  Yes.

20  Q.  And you said you couldn't access it when you came back in

21  2023; right?

22  A.  I believe I found it or a version of it on Slack, but I do

23  not recall it being in my Google drive.

24  Q.  Okay.  So let's go ahead and -- so to be clear, you're not

25  sure if it was deleted.  You think maybe it wasn't; right?

1   A.    I'm not saying that things were deleted.

2         Similar to how you showed on the side me and Ruthia

3   editing a document, if you go up in any document created in

4   Google, Google Drive, there's the ability to make the document

5   shareable with others.  You can make it shareable with specific

6   people, but if you're the creator of it you're usually the

7   owner of it and -- unless you transfer ownership to another

8   individual.

9         So items that I had created that were in my Google Drive,

10  if I were to open my Google Drive and look through everything

11  I'd ever created -- which is any Google sheet, any Google Excel

12  sheet, Google presentation -- I know a lot of them were not

13  there.  And it seemed that specifically with the onboarding

14  presentation, it still existed, however I had been removed as

15  the owner of that document.

16  Q.    Okay.  I want to just bring up the onboarding

17  presentation.

18        MS. BELL:  If we could bring up 7627 and 76 -- well,

19  we'll look at this one first.

20  BY MS. BELL:

21  Q.    Okay.  So if --

22        MS. GURSKIS:  Your Honor, objection.  This was not

23  disclosed to the Government.  We've never seen this before.

24        THE COURT:  Well, I'm trying to figure out all -- this

25  witness has simply testified that when she searched for it in

1  Google she could not have access to it.  So what -- where are

2  you going with this?  You're going to show that somebody else

3  could have access to it?  Or it wasn't there?

4  　　　　MS. BELL:  Sorry.  No, Your Honor.  We were going to

5  confirm that this is, in fact, the document she's talking about

6  and that it still exists.  If there's no --

7  　　　　THE COURT:  She doesn't say it doesn't exist.

8  　　　　MS. BELL:  Okay.

9  　　　　THE COURT:  She didn't say it doesn't exist.  She just

10  said she didn't have access to it.

11  　　　　MS. BELL:  Understood, Your Honor.

12  　　　　THE COURT:  Do you want to contest that?  She did have

13  access to this?

14  　　　　MS. BELL:  We can move on and conclude, Your Honor.

15  　　　　THE COURT:  Okay.  Then move on because --

16  　　　　MS. BELL:  Yes, yes, Your Honor.  We will move on.

17  BY MS. BELL:

18  Q.　 Okay.  So you did eventually find the presentation, to be

19  clear; right?

20  A.　 Yes.  I believe I found it through a Slack search.

21  Q.　 Okay.  And you left the company in March 2022; right?

22  A.　 The first time, yes.

23  Q.　 Okay.  And you didn't return for months later; right?

24  A.　 I would say over a year.

25  Q.　 Okay.  And what you're telling us is that you -- your

1    permissions changed in the interim; right?

2    **A.**    It's different than what I knew to be the procedure in

3    place when I worked there, which is where you wanted to allow

4    everyone's inboxes to remain intact in case you needed to go

5    and find something, which is why it was unusual to me.  But,

6    yes, it was different when I returned.

7    **Q.**    Okay.  Thank you very much.

8            **MS. BELL:**  No further questions.

9            **THE COURT:**  Do you have any questions?

10           **MS. NECHAY:**  Yes, I do.  One moment, Your Honor,

11   please.

12                    (Pause in proceedings.)

13                    <u>**CROSS-EXAMINATION**</u>

14   **BY MS. BELL:**

15   **Q.**    Good afternoon.

16   **A.**    Good afternoon.

17   **Q.**    My name is Valery Nechay and I'm Dr. David Brody's

18   attorney.

19        You had such heartfelt testimony about Dr. Brody, and I

20   want to ask you a few questions about your time working with

21   him.

22        Dr. Brody was respectful towards you; correct?

23   **A.**    Very.

24   **Q.**    And he was considerate of your points of view?

25   **A.**    Yes.

1  **Q.**  And you developed a working friendship with him through

2  your working relationship; correct?

3  **A.**  Yes.

4  **Q.**  And, in fact -- and I'm sorry to have to bring this up

5  again.  Earlier you very vulnerably testified about a domestic

6  violence situation that you were experiencing.  And you, in

7  fact, talked about that with Dr. Brody; correct?

8          **MS. GURSKIS:**  Objection.  Relevance.

9          **THE COURT:**  Overruled.  Go ahead.

10          **MS. NECHAY:**  Thank you.

11          **THE WITNESS:**  Yes, I did.

12  **BY MS. NECHAY:**

13  **Q.**  And, in fact, he also even shared personal details about

14  his life, about his daughter and about his wife?

15  **A.**  Yes.

16          **MS. GURSKIS:**  Objection.

17          **THE COURT:**  Sustained.  Sustained.  Okay.  We're not

18  going to get into that.

19  **BY MS. NECHAY:**

20  **Q.**  Dr. Brody also treated other individuals that worked for

21  Done with respect?

22  **A.**  Correct.

23  **Q.**  You never heard Dr. Brody yelling or screaming at anybody?

24  **A.**  He can be a little boisterous about certain things, but

25  never in a disrespectful manner.

1  Q.   Sure.  And he clearly had very -- he was vocal about his

2  views at Done; correct?

3  A.   Yes.

4  Q.   And he spoke on cross-examination with Ms. Bell about his

5  career and his credentials; do you recall?

6  A.   Yes.

7  Q.   And he -- those vocal views that he had were -- they

8  appeared based in science, rooted in medicine?

9        THE COURT:  She doesn't know that.  How could she

10  testify to that?

11        MS. NECHAY:  As to his state of mind, Your Honor.

12        THE COURT:  She cannot testify as to his state of

13  mind.  She cannot testify to -- as to his state of mind.

14        MS. NECHAY:  To her --

15        THE COURT:  She doesn't have his state of mind.  You

16  can't testify to another person's state of mind.  You can

17  testify as to your own state of mind.  You can't testify to

18  somebody else's state of mind unless you're a fortune teller or

19  a clairvoyant.

20        MS. NECHAY:  I apologize.  I was trying to ask about

21  her state of mind.  The appearance that the -- those --

22        THE COURT:  You asked her what his state of mind --

23  what he based it on.  Okay.  Please move on.

24  BY MS. NECHAY:

25  Q.   Dr. Brody appeared to you to be well researched in his --

1    the views that he was espousing to employees?

2    A.    Yes.

3    Q.    Were there -- there were times, certainly, that he weighed

4    different models and ways of doing things carefully?

5         MS. GURSKIS:  Objection.  I'm not even sure what that

6    was asking.

7         MS. NECHAY:  I can clarify.

8    BY MS. NECHAY:

9    Q.    For example, Dr. Brody had advocated, in fact, that he

10   wanted board-certified nurses?

11        MS. GURSKIS:  Objection.  Foundation.

12        THE COURT:  Well, I think she's asking the witness:

13   Did he say that to you?

14        THE WITNESS:  I don't remember.

15   BY MS. NECHAY:

16   Q.    Okay.  With respect to Riley Levy, you recall testifying

17   about that individual?

18   A.    Yes.

19   Q.    Do you recall one specific event that Dr. Brody had shared

20   with you regarding a meeting that took place?

21        MS. GURSKIS:  Objection.  Hearsay.

22        THE COURT:  Sustained.

23        MS. NECHAY:  It's impeachment, Your Honor.

24        THE COURT:  What?

25        MS. NECHAY:  Impeachment.

1    THE COURT:  Impeachment of who?

2    MS. NECHAY:  Riley Levy.

3    THE COURT:  Do you mean she had a conversation with

4  Riley Levy?  Did she have a conversation with Riley Levy?

5    MS. NECHAY:  She had a conversation perhaps, but she

6  had a con- --

7    THE COURT:  Perhaps -- not perhaps.  You're asking a

8  question.  Did she -- you say it's for impeachment.

9    You can certainly impeach Riley Levy, but you can't ask

10 her what Dr. Brody told about the incident to her.  You

11 understand that?

12   That's hearsay.  That's hearsay because you're introducing

13 it for the truth of the matter.  You're introducing Dr. Brody's

14 version of events through this witness.

15   Okay.  So you can't do that.  You know that.

16   So -- because that would be hearsay.  So if it's a

17 conversation with Mr. Riley, yes, you can.  If it's a

18 conversation with Dr. Brody, no, you can't.

19   MS. NECHAY:  Thank you, Your Honor.

20 BY MS. NECHAY:

21 Q.  Let me ask you a few questions about Riley Levy.

22   He appeared to you to be a very self-interested

23 individual; correct?

24   MS. GURSKIS:  Objection.  Relevance.

25   THE COURT:  Well, I don't even understand what a

1    self-interested individual is.  I think a lot of people are --

2    I mean, what does that mean?  He was interested in himself?

3        It's just so imprecise.  It doesn't mean anything.

4        **MS. NECHAY:**  I'll clarify, Your Honor.

5        **THE COURT:**  And I don't know that she can give a

6    character assessment of another witness.  I don't think that's

7    impeachment.  I just think that that's not -- not proper.

8        **MS. NECHAY:**  Okay.  Your Honor, the witness did

9    testify on direct about Riley Levy, and so I'm foundationally

10    asking some questions about different roles and --

11        **THE COURT:**  Go ahead.  Ask your question.

12        **MS. NECHAY:**  Thank you.

13    BY MS. NECHAY:

14    **Q.**  At some point you testified that it was your impression

15    that Riley Levy wanted to take over Done and become CEO;

16    correct?

17    **A.**  I'm not sure if I used those words, but, yes.

18    **Q.**  Well, I don't want to put words in your mouth.  How would

19    you describe it?

20    **A.**  It seemed with -- over time that he may be the person put

21    in charge of Done that -- at least that I recall that he

22    said -- through the investors.

23    **Q.**  He did, in fact, create an organizational chart that

24    directly placed Dr. Brody under -- as reporting to him;

25    correct?

1  **A.**   I remember mention of that, but I don't recall the chart.

2  **Q.**   Do you recall Dr. Brody and Riley Levy having a

3  contentious relationship?

4  **A.**   I think around the first year, around the time that I

5  left, that had started to emerge.

6  **Q.**   Can you give me an example that comes to mind of a -- that

7  high tension in that working relationship between the clinical

8  president Dr. Brody and Riley Levy the new COO at the time?

9  **A.**   I believe in the leadership Slack channel -- and this

10  happened many years ago; I'm sorry -- there had been some back

11  and forth about practicing at Done.  And I recall it being

12  pretty lengthy.  I don't remember the time frame around that

13  and I'm not sure I read through the entire thread at the time.

14  **Q.**   Would it refresh your recollection to take a look at some

15  notes from around that time?

16  **A.**   Sure.

17       **MS. NECHAY:**  Your Honor, may I approach?

18       **THE COURT:**  Sure.

19       **MS. NECHAY:**  I just want you to know, for the record,

20  that I only have some highlights in here, but I don't have any

21  writing on these documents.

22       **THE COURT:**  I don't know what you're showing her.

23       **MS. NECHAY:**  I'm showing the witness an e-mail that

24  Dr. Brody wrote just as to the time frame and the subject

25  matter, whether this refreshes this witness's recollection of

1    these events.

2            THE COURT:  Okay.  Go ahead.

3        Do you have a copy for the Government?

4            MS. NECHAY:  I have provided already a copy for the

5    Government yesterday.  And I just want to note that it looks

6    like a lot of pages, but the font is just very big and I have

7    it flagged.

8            MS. GURSKIS:  May I have a copy?

9            MS. NECHAY:  I gave it to you yesterday.  Just a

10   second.  Let me see if I have another copy.  Just a second.

11           THE WITNESS:  Would you like me to read the whole --

12           THE COURT:  I think the question is, if you look at

13   it, does it refresh your recollection of an event that you saw

14   or witnessed or read between Dr. Brody and the other

15   individual.

16           THE WITNESS:  Your Honor, this seems to be an e-mail

17   from Dr. Brody to Ruthia and it's dated, I think around the

18   first time I left the company.

19           THE COURT:  Okay.  Fine.  It doesn't refresh her

20   recollection.  Next.  Go to another subject or if there's

21   another question.

22   BY MS. NECHAY:

23   Q.  Okay.  No problem.  I'll just go ahead and grab that paper

24   from you.  Thank you so much.

25        You had stated in your testimony that it appeared to you

1   and other members that Dr. Brody was set up.  That was the

2   impression that you and other employees had; correct?

3   A.   Yes.

4   Q.   And, in fact, his access, his ability to communicate with

5   the employees in the company had been rescinded; correct?

6   A.   When I returned to the company for the second time,

7   I believe that occurred within the first week of my return, and

8   it was because he was advocating for Ruthia to pay all of the

9   legal fees that had not been paid.

10  Q.   But you don't have any personal knowledge who actually

11  removed the access?

12  A.   I can't say who.  It must have been an admin of one of the

13  platforms.  It was not me.

14  Q.   Sure.  And, in fact, you had also testified that there

15  were some technological shortcomings, let's just say, that

16  Dr. Brody had in terms of accessing the various platforms;

17  correct?

18  A.   Interacting with Dr. Brody was a lot -- it reminded me a

19  lot of teaching my grandpa to use a cell phone, back when we

20  used T9 keyboards.

21  Q.   Fair enough.  And certainly your communications heavily

22  relied on those -- those technological channels; correct?

23  A.   That's correct.  And it's my view, for him to lose access

24  for the amount of time he did was a very long time.  That was

25  not morally right, in my opinion.

Q.   You also would agree that Dr. Brody was not provided with

the same amount of respect by individuals like Riley Levy as he

afforded to, say, other clinicians like Dr. Brindala?

A.   To my recollection, Riley Levy never interacted with

Dr. Brindala.  That was before his time.  And I did see some of

the contention towards my end of the first year there.  But I

will say it seemed that Dr. Brody was treated like a

figurehead.

Q.   You did testify, however, that Dr. Brody participated in

onboarding sessions with new providers; correct?

A.   I don't recall that.

Q.   Or perhaps -- let me ask it a different way.

     You didn't testify about that, but he did, in fact,

participate in onboarding with new providers?

          THE COURT:  She said she didn't recall.

          MS. NECHAY:  I apologize.  I thought she said she

didn't recall testifying.

          THE COURT:  Okay.

          THE WITNESS:  I don't recall either.  I recall mention

of it, but his work was often in my periphery, so I don't know.

BY MS. NECHAY:

Q.   He was essentially like the thought leader, correct?  He

came up with the policies, or some policies, and as an example

we just saw the webinars; correct?

A.   In regards to the policies, I -- I'm not sure.

1      He was really passionate about educating and having

2  community, as I mentioned.  I think someone -- I forget who at

3  this point in the day -- showed a screenshot where he said he

4  doesn't want the blog to be an echo chamber.  So he really

5  wanted to interact with the patients.  That was really

6  important to him.

7  **Q.**   He did not have a personal assistant except the occasions

8  that you would assist him; right?

9  **A.**   I would assist him in terms of what -- from what I can

10 recall, technological literacy such as maneuvering platforms

11 like Slack and Zoom.  And I believe -- and I'm -- this is

12 what's difficult about having worked in a flat structure,

13 I believe Michell and a gentleman named Anas might have

14 assisted him, but I'm not sure in what capacity.

15 **Q.**   But he didn't have like a single, dedicated person to your

16 knowledge, at any point, that was routinely, you know,

17 assisting him in daily tasks?

18 **A.**   That's correct.

19 **Q.**   Okay.  And your understanding of the way traditional

20 clinics, for example, work is that physicians that are treating

21 patients do have front-line staff in their clinics like

22 administrative assistants that pick up the phones and schedule

23 with patients; correct?

24      **MS. GURSKIS:**  Objection.  Foundation.

25      **THE COURT:**  I'll allow it.

1          **THE WITNESS:**  I have been to a doctor's office and I

2    know that's how it's run.

3    **BY MS. NECHAY:**

4    **Q.**   I want to talk a little bit about an individual -- or

5    withdrawn.

6          You were speaking about the time period where it was right

7    before the arrest, or perhaps right after, when there was a lot

8    of chaos, confusion, and, you know, real human emotion that you

9    saw.  Remember?

10   **A.**   Yes.

11   **Q.**   And one of the individuals you spoke about was Wednesday;

12   correct.

13   **A.**   That's correct.

14   **Q.**   In fact, you had testified that she herself had suffered

15   from ADHD?

16   **A.**   Correct.

17   **Q.**   And isn't it true that one of the reasons there was a lot

18   of confusion or a lot of fear is that individuals -- there was

19   fear that there would be patient abandonment, that patients

20   would not be able to obtain their medication during this

21   uncertain time?

22   **A.**   That's a superficial way -- yes -- to say it.  But the

23   problems behind it were very large given the amount of people

24   who left the company in that week.

25   **Q.**   Well, do you -- I'm happy to allow you to provide some

1    color to my superficial comment if that helps for the jury to

2    understand that issue.

3         THE COURT:  So explain your answer, what you mean

4    by --

5         THE WITNESS:  There was just simply not enough

6    manpower from the people who stayed -- because a lot of people

7    left the day of the arrest -- to even know the gaps of what to

8    do in that situation.

9         But it did seem that there were -- at least one state that

10   no longer had a clinician.  So all of those patients, then,

11   were going to fall through the cracks.

12        And that has a lot of different mechanisms behind it,

13   behind ensuring that the patient is, one, possibly refunded for

14   that month because they can't get care, ensuring that they have

15   their patient notes so that they can continue their care, and

16   depending on what kind of medication they're on, if you've

17   taken medication in your life and you need it, any kind of

18   medication disrupting for a week or two or a month can be

19   devastating, so there are several layers to this.

20   BY MS. NECHAY:

21   Q.   Absolutely.  And that actually leads me to my next

22   questions for you which is with respect to the urgent refills

23   that Dr. Brody did.

24        It was your understanding that those patients that were on

25   that panel of his for the urgent refills, those were not really

1   his patients in the traditional sense, that was not the

2   understanding anybody had, that that was the purpose of that;

3   correct?

4   **A.**   Can you elaborate on that?

5   **Q.**   Sure.  Meaning these were patients that had -- he was

6   relying -- withdrawn.

7        Dr. Brody was relying on the independent diagnosis of

8   other clinicians and he was just simply providing the bridge --

9        **MS. GURSKIS:**  Objection as to the characterization of

10  Dr. Brody relying.

11       **THE COURT:**  Well, I don't know.  I mean, I think,

12  first you have to lay a foundation that she knows what

13  Dr. Brody was -- the reason for whatever Dr. Brody did.

14       **MS. NECHAY:**  Absolutely, Your Honor.  I'm sorry.  I'm

15  being a little hasty.

16  **BY MS. NECHAY:**

17  **Q.**   You are familiar with the urgent refill policy at Done;

18  correct?

19  **A.**   In the beginning, the team was very small, we had a

20  15-minute standup every day, and there was a spreadsheet shared

21  of different things we were working on.

22       I recall that being called the out-of-state -- I want to

23  say -- prescription issue, which to my understanding was, let's

24  say, a doctor is going out of town, can't work that week, there

25  are 17 patients that need a refill filled, to my understanding

1  that would go to Dr. Brody.

2  **Q.**  Okay.  And, again, back to your concern of patient

3  abandonment or gaps in their medicine, the idea behind it was

4  that it was to prevent immediate and urgent harm; correct?

5          **MS. GURSKIS:**  Objection.

6          **THE COURT:**  I'll allow it.  Go ahead.

7          **THE WITNESS:**  You know, I'm not too sure.  But I know

8  Dr. Brody's heart, I would say, from working with him as a

9  colleague.  And, of course, no one -- if you're on medication,

10  whatever medication it was -- because I didn't learn much until

11  articles came out.  So I'm trying to share what I only know --

12  **BY MS. NECHAY:**

13  **Q.**  Absolutely.  Please share.

14  **A.**  -- living the experience.

15      Whatever medication they were on, of course, when you have

16  mental health issues, you want them to be stable and enjoy

17  their life.

18  **Q.**  Is it fair -- well, let's go back to the size of that

19  panel.

20      It's obviously not feasible that Dr. Brody would have been

21  able to personally see all of the patients in those urgent

22  refills; correct?

23  **A.**  The panel are you referring to -- can you clarify which

24  panel?

25  **Q.**  Sure.  So first of all, let me go back and just clarify.

1     To your knowledge, for the most part, Dr. Brody was not

2  like personally interacting with Done patients; right?

3  **A.**   That was my understanding.

4  **Q.**   Okay.  And so, again, this urgent refill policy, it was to

5  cover instances where a provider was on vacation as you just

6  stated; correct?

7  **A.**   That's what it seemed to me.

8  **Q.**   Or perhaps there was a -- they were switching provider and

9  needed to prevent the gap in their care; right?

10        **MS. GURSKIS:**  Objection.  Foundation.

11        **THE COURT:**  I'll allow it.

12        **THE WITNESS:**  That was my understanding.

13  BY MS. NECHAY:

14  **Q.**   Okay.  And also, through all of your time, as you stated,

15  speaking about Dr. Brody and his character, it's your

16  understanding that he never had nefarious --

17        **THE COURT:**  I don't think she's here to give character

18  testimony.

19     Character testimony is very special.  It's very -- it's

20  defined by the code.  This is not a proper inquiry.  Okay?

21  She's not here as a character witness.

22        **MS. NECHAY:**  Your Honor --

23        **THE COURT:**  Not here as a character witness.  So I

24  wouldn't ask her questions about Dr. Brody's character.  Okay?

25        **MS. NECHAY:**  Okay.  I would like to discuss that off

PROCEEDINGS

```
 1   the record.
 2        THE COURT:  Finish everything else and then we'll
 3   discuss it.
 4        MS. NECHAY:  Your Honor, I probably have only about
 5   15 minutes left.  I can go a lot quicker perhaps if we could
 6   discuss this issue and I could just --
 7        THE COURT:  Okay.  Ladies and gentlemen, we're going
 8   to take our recess for the evening.
 9      Remember the admonition given to you:  Don't discuss the
10   case, allow anyone to discuss it with you, form or express any
11   opinion.
12      We'll resume tomorrow at 9:15.
13      And you're excused.
14                     (Witness excused.)
15             (The jury leaves the courtroom.)
16    (Proceedings were heard out of the presence of the jury.)
17        THE COURT:  The jury has retired.
18      If you can give me a code section that suggests that you
19   can ask the witness about his character.  I'll certainly take a
20   look at it.  That's my -- not my understanding of character
21   evidence.
22        MS. NECHAY:  Your Honor, the Government has opened the
23   door --
24        THE COURT:  No.  Wait a minute.  Wait, wait, wait.
25      Let's -- the rules of evidence are the rules of evidence.
```

1  It's not that it's not relevant.  Or it's not that it won't be

2  considered.  Maybe it will.  Maybe it won't.  Maybe it's

3  relevant.  Maybe it's not.

4      There's a procedure in the evidence code that says what

5  you can do for character evidence.  And this type of question

6  to this witness is not within the code.  Okay.

7          **MS. NECHAY:**  Your Honor, may I just request to brief

8  the issue --

9          **THE COURT:**  Yes, of course, you can.  Yes, of course,

10  you can.

11          **MS. NECHAY:**  Thank you very much.

12          **THE COURT:**  So you've got 15 minutes?  10 minutes?

13  What do you have?

14          **MS. NECHAY:**  Yes.  I will do my absolute best.  I had

15  a lot of cross-section with Ms. Bell, and so I will cross off

16  and be as judicious as possible, but I won't take more than

17  20 minutes.

18          **THE COURT:**  We'll finish with this witness and we'll

19  move on; right?

20          **MR. FOSTER:**  We'll move on, Your Honor.

21      And I would just observe that, you know, Mr. Levy was on

22  direct for about two and a half hours.  I think the cross was

23  about eight.  And what we've seen again today is that a large

24  consumption of time is reading hearsay into the record.  Just

25  because there's foundation that a witness is on an e-mail does

1  not mean that the hearsay is admissible.

2         **THE COURT:**  Right.  Thank you.  Okay.

3         **MR. FOSTER:**  You're welcome.

4         **THE COURT:**  See you tomorrow.

5             (Proceedings adjourned at 4:14 p.m.)

6                    ---o0o---

7

8               <u>**CERTIFICATE OF REPORTER**</u>

9         I certify that the foregoing is a correct transcript

10  from the record of proceedings in the above-entitled matter.

11

12  DATE:   Thursday, October 30, 2025

13

14

15

16

17  _____
     Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG, CSR No. 12219

18             Official Reporter, U.S. District Court

19

20

21

22

23

24

25