Volume 19

Pages 4077 - 4317

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

UNITED STATES OF AMERICA,      )
                               )
          Plaintiff,           )
                               )
    vs.                        )   NO. 3:24-cr-00329-CRB
                               )
RUTHIA HE and DAVID BRODY,     )
                               )
          Defendants.          )
_____)

                          San Francisco, California
                          Tuesday, November 4, 2025

                   **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
                          CRAIG H. MISSAKIAN
                          United States Attorney
                          Northern District of California
                          450 Golden Gate Avenue
                          San Francisco, California 94102
                     BY:  **KRISTINA GREEN**
                          **ASSISTANT UNITED STATES ATTORNEY**

                          U.S. DEPARTMENT OF JUSTICE
                          FRAUD SECTION
                          950 Pennsylvania Avenue NW
                          Washington, D.C. 20530
                     BY:  **JACOB N. FOSTER,**
                          **ACTING CHIEF, HEALTHCARE FRAUD UNIT**


              **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
              Official Reporter, CSR No. 12219

**APPEARANCES**:  (CONTINUED)

                        U.S. DEPARTMENT OF JUSTICE
                        CRIMINAL DIVISION
                        1400 New York Avenue NW
                        Washington, D.C. 20001
              BY:  **EMILY GURSKIS, ASSISTANT CHIEF**

                        JOSEPH NOCELLA, JR.
                        United States Attorney
                        Eastern District of New York
                        271-A Cadman Plaza East
                        Brooklyn, New York 11201
              BY:  **ARUN BODAPATI, TRIAL ATTORNEY**

For Defendant He:
                        WILLKIE FARR & GALLAGHER LLP
                        2029 Century Park East - Suite 2900
                        Los Angeles, California 90067
              BY:  **KOREN L. BELL, ATTORNEY AT LAW**

                        WILLKIE FARR & GALLAGHER LLP
                        787 7th Avenue
                        New York, New York 10019
              BY:  **MICHAEL S. SCHACHTER, ATTORNEY AT LAW**
                   **STEVEN J. BALLEW, ATTORNEY AT LAW**


For Defendant Brody:
                        LAW OFFICE OF VALERY NECHAY
                        Law Chambers Building
                        345 Franklin Street
                        San Francisco, California 94102
              BY:  **VALERY NECHAY, ATTORNEY AT LAW**


**Also Present:**  **Thifany Braga**
                   **Simon Hall**
                   **Mackenzie Slater**
                   **Andy Cepregi**
                   **Ashley Moore**
                   **Barbara Hua Robinson, Mandarin Interpreter**
                   **Jeff Dinn, Mandarin Interpreter**

**I N D E X**

Tuesday, November 4, 2025 - Volume 19

<u>GOVERNMENT'S WITNESSES</u>                                    <u>PAGE</u>  <u>VOL.</u>

<u>GOODMAN, DAVID (RECALLED)</u>
(PREVIOUSLY SWORN)                                          4080   19
Cross-Examination by Mr. Schachter                          4080   19

**E X H I B I T S**

<u>TRIAL EXHIBITS</u>                                  <u>IDEN</u>  <u>EVID</u>  <u>VOL.</u>

 1806                                               4258   19

 1806A                                              4258   19

 2612                                               4253   19

 5382                                               4234   19

 6028                                               4089   19

 6192                                               4257   19

 7386A                                              4210   19

 7464                                               4280   19

 7466                                               4292   19

 7605                                        4125          19

```
 1   Tuesday - November 4, 2025                          9:18 a.m.

 2                        P R O C E E D I N G S

 3                             ---o0o---

 4     (Proceedings were heard out of the presence of the jury.)

 5          THE COURTROOM DEPUTY:  All rise.  Court is now in

 6   session.  The Honorable Charles R. Breyer presiding.

 7       Okay.  Yeah, bring in the jury.

 8                   (The jury enters the courtroom.)

 9      (Proceedings were heard in the presence of the jury.)

10      (David Goodman steps forward to resume the stand.)

11          THE COURT:  Okay.  Please be seated.

12       Let the record reflect all parties are present, jury's

13   present.

14       Mr. Schachter, you may proceed.

15          MR. SCHACHTER:  Thank you.

16                        DAVID GOODMAN,

17   called as a witness for the Government, having been previously

18   duly sworn, testified further as follows:

19          MR. SCHACHTER:  Good morning.  Good morning.  Good

20   morning, Dr. Goodman.

21          THE WITNESS:  Good morning.

22                       CROSS-EXAMINATION

23   BY MR. SCHACHTER:

24   Q.   We left off, we were talking about the length of

25   interviews that medical providers do with patients during the
```

1   course of the initial evaluation.  Okay?  Just to situate us.

2       You conducted a survey of primary care physicians that

3   were treating ADHD.  And you found that only 20 percent of

4   primary care physicians conducted a, quote, extended interview

5   to ascertain patients' history in order to evaluate for ADHD;

6   isn't that correct?

7   **A.**   If you can show me the publication and the year.

8   **Q.**   Sure.  It's in your binder under 6207.  It's your

9   assessment of physician practices in adult ADHD, a survey you

10  conducted in 2012.

11          **THE COURT:**  This is the 2012 publication?

12          **MR. SCHACHTER:**  Correct.

13          **THE WITNESS:**  Okay.  The number again?

14  **BY MR. SCHACHTER:**

15  **Q.**   6207.

16  **A.**   Yes.  Okay.  I've got it.

17  **Q.**   Okay.  So am I correct that you conducted a survey of

18  primary care physicians that were treating ADHD, and you found

19  that only 20 percent of primary care physicians conducted an

20  extended interview to ascertain patients' history to evaluate

21  for ADHD?

22  **A.**   So there are five coauthors on this paper.  We all

23  conducted the interview.  And, yes, that was the finding.  The

24  publication I would highlight is 2012, so you're referencing

25  something that is now 13, 14 years old.

1          At 10 -- 10, 11 years -- you have to take into

2     consideration the publication occurred in 2014.  The manuscript

3     was probably written in 2013.  The survey dates are probably in

4     here, in fact, 2010, so you're talking about 15 years ago.

5     **Q.**    Sure.  Today is 2025 --

6     **A.**    Mm-hmm.

7     **Q.**    -- do you understand that the events that this trial is

8     about occurred in 2020 to 2022, 2023?

9     **A.**    So the survey would have been 10 years prior to 2021,

10    2022.

11    **Q.**    Sure.  Your publication, you said in 2014?

12    **A.**    Yeah.  And the survey was conducted in 2010.

13    **Q.**    Okay.  In any event, this is the only survey that you

14    yourself have conducted to determine the length of time that

15    primary care physicians were spending with patients before

16    diagnosing them with ADHD; correct?

17    **A.**    So I'll agree with that except for "the only."  I can't

18    recall the survey -- all the surveys I've done.  I don't want

19    to stipulate that this is the only survey I've done.  But I'll

20    agree this was a survey that I was part of.

21    **Q.**    Okay.  Sitting here today, you don't actually recall doing

22    any other surveys of primary care physicians to determine the

23    length of time they were spending with patients?

24    **A.**    I don't, and I don't recall every single one of my

25    publications either.

GOODMAN - CROSS / SCHACHTER

1  Q.    Okay.  Very good.

2        In any event, that was the finding, that approximately --

3  of your survey of primary care physicians that were evaluating

4  patients for ADHD, you found that only 20 percent did an

5  extended interview with their patients?

6  A.    In 2011, yes.

7  Q.    Okay.

8  A.    Or 2010.

9  Q.    And, in fact, in your survey, you found that only

10 35 percent of psychiatrists conducted an extended interview to

11 ascertain a patient's history?

12 A.    Yes.

13 Q.    Now, I want to spend just a couple minutes talking about

14 the ASRS.

15       What does that stand for?

16 A.    ASRS is a -- well, there's two.  So there's two versions.

17 One is the ASRS screener.  It's six questions from the symptoms

18 of the DSM-5.

19       And then there's a more extensive screener -- symptom

20 profile, which is all 18 symptoms out of the DSM-5 scored by

21 the patient on a frequency basis.

22 Q.    Okay.  So the full ASRS is 18 questions; is that right?

23 A.    Correct.

24 Q.    Six make up the ASRS A, and then 12 make up the ASRS B; is

25 that correct?

1    A.    Correct.

2    Q.    All right.  You are -- and these are -- it's very commonly

3    used?

4    A.    Yes.  I hope.

5    Q.    Okay.

6    A.    It ought to be.

7    Q.    I'm sorry?

8    A.    It ought to be.

9    Q.    Why is that?

10   A.    Because it is a way of assessing symptoms by the patient's

11   subjective report relatively quickly.  I use it as a matter of

12   routine, and it helps identify specific symptoms that the

13   patient considers are occurring at a frequent basis.

14   Q.    Okay.

15   A.    Remember, the symptoms are only a portion of the five

16   criteria, so it's -- what the screeners don't assess is the

17   level of impairment, which is a critical criteria in the

18   diagnosis of ADHD.

19   Q.    Thank you.  And we're going to talk about impairment in

20   just a moment.

21        On that subject of the shorter ASRS A, the six-question

22   one versus the ASRS B, the 12 additional questions, I am

23   correct, am I not, that the six questions in Part A are the

24   most predictive of the disorder and are best for use in a

25   screening instrument; isn't that correct?

1   A.   No.

2   Q.   You're familiar with Dr. Leonard Adler; is that correct?

3   A.   Yes.

4   Q.   He is a very well-known luminary in the field of ADHD?

5   A.   And a friend and colleague.

6   Q.   Okay.  You're aware that -- withdrawn.  Hold on one

7   second.

8        And Dr. Ronald Kessler, also a well-known figure in the

9   study of ADHD?

10  A.   Yes.

11  Q.   Okay.  And you've coauthored articles with Dr. Kessler; is

12  that correct?

13  A.   I can't remember.  Likely.  I can't remember all the

14  coauthors I've written 40 papers with.

15  Q.   Okay.  And you're familiar with Dr. Kessler's article "The

16  World Health Organization adult ADHD self-report scale," in

17  which he concluded that the six-question ASRS screener in

18  comparison seems to hold more promise than the full ASRS for

19  clinical screening purposes?

20  A.   I'm familiar with the article, and he probably did write

21  that.

22  Q.   Okay.  All right.

23  A.   That -- excuse me.  That publication year was what year?

24  Q.   2005.

25  A.   Right.  So 20 years ago.

1    Q.    Okay.   Nonetheless, that was Dr. Kessler's conclusion --

2    and how long has this ASRS scale been available?

3    A.    I don't know the specific date.  He wrote the article in

4    2005.  It was in development for several years before that.

5    Q.    Okay.

6             THE COURT:  Moving ahead?

7             MR. SCHACHTER:  Yes.

8    BY MR. SCHACHTER:

9    Q.    Okay.  Now, the DSM-5 criteria that you have been speaking

10   about and that Ms. Green asked you about, you were asked if it

11   is in the usual course of professional practice to write

12   prescriptions for patients who do not meet the DSM criteria for

13   ADHD, and you said no.

14       Do you recall giving that testimony?

15   A.    I do.

16   Q.    Okay.  The DSM, this -- remind me again, Dia- --

17   A.    Diagnostic and Statistical Manual Version 5.

18   Q.    Now, prescribing medication is form of treatment; is that

19   right?

20            THE COURT:  There are two versions of 5, aren't there?

21            THE WITNESS:  There are, so -- good pickup,

22   Your Honor.

23       There's a DSM-5 and then there's a DSM-TR, revised text.

24   The revised text, though, doesn't have any clinically

25   significant changes under the category of ADHD.

GOODMAN - CROSS / SCHACHTER

1                THE COURT:  Okay.

2    BY MR. SCHACHTER:

3    Q.    So prescribing medication is a form of treatment; is that

4    right?

5    A.    Yes.

6    Q.    And you agree with me, do you not, that the DSM is not a

7    guideline for the treatment of ADHD?

8    A.    Correct.  It's the basis of the treatment.

9    Q.    Well, what it is is a classification system; correct?

10   A.    It's a diagnostic system.

11   Q.    Okay.  It provides, at least according to the DSM, it is a

12   tool for defining and diagnosing mental disorders; is that

13   correct?

14   A.    Correct.

15   Q.    It, according to the DSM says, (as read):

16          "It provides a common language for healthcare

17       professionals who diagnose mental illness."

18       Correct?

19   A.    Sure.

20   Q.    So when a clinician says that a patient they are seeing

21   has bipolar disorder or schizophrenia, there is a common

22   language and other mental health professionals may know what

23   they mean?

24   A.    Yes.  And while the English language is used in the DSM,

25   the clinical implications of the vernacular are specific to

1    mental health.

2    **Q.**    Okay.  To be clear the, DSM specifically states that it,

3    in all caps, "does not include information about treatments."

4    **A.**    Correct.

5    **Q.**    Now, the DSM has certain criteria that it lays out as the

6    definition of what is ADHD; correct?

7    **A.**    Correct.  Well, let me clarify.  It doesn't state what

8    ADHD is.  That would go to the etiology of ADHD.  It states a

9    five-criteria requisite for the diagnosis of ADHD.

10   **Q.**    Okay.  And we're going to look at that.

11        The core symptoms are inattentiveness,

12   hyperactivity/impulsivity; is that correct?

13   **A.**    Yes.

14   **Q.**    Okay.

15            **MR. SCHACHTER:**  Your Honor, we would like to offer the

16   DSM chapter on ADHD.  It's -- we've marked it as 6028.  We move

17   to admit it.

18            **THE COURT:**  Okay.

19            **MS. GREEN:**  Objection, Your Honor.  Hearsay.

20            **THE COURT:**  Pardon?

21            **MS. GREEN:**  Objection.  Hearsay.

22            **THE COURT:**  Well, I don't know what hearsay means.  I

23   mean -- okay.  What number is it?

24            **MR. SCHACHTER:**  6028.

25            **THE COURT:**  Okay.  So it's overruled on the basis of

1    hearsay.  60?

2              **MR. SCHACHTER:**  28.

3              **THE COURT:**  6028.  Admitted.

4         (Trial Exhibit 6028 received in evidence.)

5                        (Pause in proceedings.)

6              **THE COURT:**  Okay.  So it's clear for the record, as I

7    understand it, 6028, the portion that you are admitting -- or

8    the portion that is being offered goes from page 59 -- and I'm

9    now going -- maybe I should use the TX number.  Maybe that's a

10   better number to use rather than the page.  Number 0003 -- oh,

11   pardon me.  No, no.  It's 0001 through 0010, so it includes the

12   attention-deficit/hyperactivity disorder, the diagnostic

13   criteria, along with other specified

14   attention-deficit/hyperactivity disorder, as well as

15   unspecified attention-deficit/hyperactivity disorder.

16        So as I understand it, there are three sets of diagnostic

17   criteria.  And maybe that's not the way to look at it, and the

18   doctor can explain how to look at it, but they each three have

19   their own insurance code -- which I call an insurance code; I

20   don't know what anybody else calls it.

21        But there is the disorder, the unspecified, and the

22   nonspecified; is that it?

23        There is the other specified and the unspecified.  So you

24   have to take a look at it as three diagnostic criteria?

25        Well, that's my question to you, so you have to answer

1    mine.

2          THE WITNESS:  I have to answer -- I have to answer

3    yours first.

4          THE COURT:  Yeah, answer mine first.

5          THE WITNESS:  So let me be clear on that, then.  While

6    there are codes for the diagnostic billing, all of these ADHD

7    diagnosis, whether it's attention deficit hyperactivity

8    disorder, whether it is ADHD other specified or ADHD

9    unspecified, all fall under the category of ADHD, which is why

10   the first code designation is F90, and then gets qualified by

11   .0, which is inattention; .1, .2, .8, which is specified --

12   ADHD specified; and F90.9, which is unspecified.

13      So let's keep the diagnostic codes separate from the

14   diagnostic categories.  Is that clear?

15         THE COURT:  Yeah.  And I think it might be useful --

16   and maybe counsel is going to go there, so I should let him go

17   there on his own terms, but sometime in the course of the

18   testimony, I think it would be useful to explain the difference

19   between -- for whatever purpose, the difference between

20   attention deficit hyperactivity disorder as well -- between the

21   difference with that -- the difference between that and other

22   specified attention deficit disorder and unspecified deficit

23   disorder because they all three have an explanation to them as

24   to what they are.

25         THE WITNESS:  Correct.

```
 1              THE COURT:  And at some point, I'll let -- you're
 2   going to go through that; is that right?
 3              MR. SCHACHTER:  For sure.
 4              THE COURT:  Okay.  Then you go ahead and conduct your
 5   examination.
 6              MR. SCHACHTER:  Thank you, Your Honor.  That was very
 7   helpful.
 8        So may we display it for the jurors?
 9              THE COURT:  Yes, of course.
10   BY MR. SCHACHTER:
11   Q.   Okay.  So we're looking first at just --
12              THE COURTROOM DEPUTY:  One moment.
13              MR. SCHACHTER:  Sorry.  Okay.  Great.
14   BY MR. SCHACHTER:
15   Q.   So we're looking at the title of the book.  And then if we
16   can turn to page 3.  So just as the Court was saying, so we
17   have a chapter called "Attention deficit hyperactivity
18   disorder"; is that correct?
19   A.   Yes.
20   Q.   And then underneath that, we have diagnostic criteria.
21   A.   Yes.
22   Q.   We're going to go through this, but I just want to show
23   the pages to the jurors so that they can see.
24        So we have the -- on this page, we have the inattention
25   symptoms?
```

GOODMAN - CROSS / SCHACHTER

1   A.    Yes.

2   Q.    And then on the next page, we have the hyperactivity and

3   impulsivity symptoms.  People don't need to read it quickly.

4   We're going to go through it in a little bit more detail.  I

5   just want to provide the overview.

6         And then, as the Court was saying, if we turn to page 9,

7   we get to other specified attention deficit hyperactivity

8   disorder.

9         And you were referring, and the Court was referring to

10  what the Court referred to as insurance codes or diagnostic

11  codes, and we see here F90.8.

12        Do you see that?

13  A.    Yes.

14  Q.    And just to define that, so what that means is when a

15  healthcare professional submits a bill to an insurance company,

16  they will generally write down both a diagnosis code and a

17  procedure code; is that correct?

18  A.    Yes.

19  Q.    All right.  Very general terms?

20  A.    Yes.

21  Q.    So the diagnosis code is telling the insurance company:

22  Okay, this is what I'm treating.

23        And the procedure code is telling them, out of a long code

24  book:  Here, insurance company, is what I am doing so that I

25  can be paid for it.

GOODMAN - CROSS / SCHACHTER

1    A.    Correct.

2    Q.    Okay.  So -- and there is an overall diagnosis code for

3    ADHD, which is F90; right?  That's what you were saying?

4    A.    Correct.

5    Q.    And then you were saying that for -- I'm sorry.

6          MR. SCHACHTER:  Can we go back to 4, page 4 of this,

7    Mr. Cepregi.  Sorry.

8          A little further up, please.

9          No, no, other way.  Other up.  There we go.  Okay.

10   BY MR. SCHACHTER:

11   Q.    So if somebody writes down a diagnosis code F90.2, that

12   means this person -- the code that -- tell the insurance

13   company is this person has both inattentiveness and

14   hyperactivity/impulsivity.  If they write down F90.0, that

15   means they're predominantly inattentive.  If F90.1, it's

16   predominately hyperactive or impulsive.  And then if they write

17   down F90.8 -- which is back on page 9 -- then that means other

18   specified attention-deficit/hyperactivity disorder And if they

19   write down -- if we can look at the next page -- F90.9, that

20   means unspecified attention-deficit/hyperactivity disorder; is

21   that correct?

22   A.    Correct.

23   Q.    Okay.  Great.  We're going to talk about those criteria in

24   a moment.

25         But if we can go first to -- if we can turn to page 3.

1  Okay.  Great.

2      All right.  Now, you will agree with me that the diagnosis

3  of ADHD by a mental health professional is a subjective

4  exercise; is that correct?

5  **A.**  No.

6  **Q.**  Okay.  You are familiar, are you not, with an article

7  prepared for the Department of Health and Human Services in

8  January of this year called "Barriers to Attention Deficit

9  Hyperactivity Disorder Diagnosis in Adults:  Findings from a

10  Qualitative Study"?

11  **A.**  I recall the article.  Do you -- can you place that

12  article in front of me here?

13  **Q.**  Sure.  It's 7346.

14      **THE COURT:**  That would be in the other volume.

15  Volume 2.

16      **THE WITNESS:**  Thank you, Your Honor.

17      Okay.  Can I have the number again, please.

18  **BY MR. SCHACHTER:**

19  **Q.**  7346.

20  **A.**  73 --

21      **THE COURT:**  And what page?

22      **MR. SCHACHTER:**  Page 11.  The -- I guess the

23  second-to-last paragraph.

24      **THE WITNESS:**  I'm sorry.  Give me the page number

25  again.

1    BY MR. SCHACHTER:

2    Q.    Page 11.

3    A.    Let me take a moment just to review some information about

4    the article and how it was constructed.

5    Q.    Thank you.

6    A.    (Witness examines document.)

7                        (Pause in proceedings.)

8    A.    Okay.  I'm ready.

9    Q.    Okay.  Great.  Okay.

10        Do you see the authors of this article prepared for the

11   Department of Health and Human Services wrote (as read):

12            "Complicating this issue is the fact that ADHD

13        occurs on a continuum and the threshold for diagnosis

14        and treatment are subjective.

15        You see where that's written there?

16   A.    I see where that's written.

17   Q.    Okay.  You disagree with that?

18   A.    I do.  On several conceptual bases.

19   Q.    Okay.  But, as happens, sometimes experts in mental health

20   will disagree; is that correct?

21   A.    Yes.

22   Q.    And, I guess, you will acknowledge that at least the

23   authors of this article concluded that the -- the -- (as read):

24            "ADHD occurs on a continuum and the threshold

25        for diagnosis and treatment are subjective."

1     You will agree with that?

2  **A.**    So I -- I acknowledge -- I acknowledge that the authors

3  wrote this.  I'm unfamiliar with the authors.  I don't know if

4  any one of them are clinicians.  I don't know -- it doesn't

5  list what their training is, whether they're Ph.D.s, MDs, MAs,

6  MS, what the credentials are.

7     And so what's very interesting, then, in the world of

8  ADHD, as everyone becomes more aware of this, the difficulty is

9  without formal training, conceptualizations becomes diffuse,

10 inaccurate, and ultimately misleading.  I take issue with this

11 statement on several conceptual basis.  And I'm happy to

12 explore my disagreement with them.

13 **Q.**    Well, I think -- why don't we do this.  We're going to

14 talk about the criteria, and we can talk about your --

15         **THE COURT:**  Well, I think he can explain why he --

16         **MR. SCHACHTER:**  Oh, sure.

17         **THE COURT:**  -- disagrees with it.

18     Go ahead.

19 **BY MR. SCHACHTER:**

20 **Q.**    Sure.

21 **A.**    So the one conceptual inaccuracy in this statement is ADHD

22 occurs on a continuum.  ADHD does not occur on a continuum.

23 The symptoms of ADHD, which are normal human variants like

24 distractibility, inattention, impulsivity, fidgetiness, all

25 occur on a continuum.  It's part of normal human experience.

1    Those experiences occur on a continuum.  Some people are

2    laser-focused, some people are easily distracted.  I get a

3    little distracted when there's an objection, the judge has to

4    answer, I come back to you and I've forgotten the question.

5    That's not ADHD.  Those are symptoms over the course of a

6    continuum that are part of human variation.

7        ADHD is a very specifically defined psychiatric disorder

8    by the DSM-5 after decades of research refining the diagnostic

9    criteria.

10       So if we say that ADHD is on a continuum, I can easily say

11   everyone in this courtroom has a little ADHD.  And if they have

12   a little ADHD, why don't we just give everyone in this

13   courtroom a stimulant medication.  Tomorrow they'll come back,

14   they'll say they feel much better, and ah-ha, everybody in this

15   courtroom has ADHD, everybody gets a stimulant medication.

16   That's a disservice to you and it's a disservice to the

17   industry and it's in disregard for the DEA's emphasis on the

18   usual course of professional practice.

19       That's the first conceptual distinction here.

20       As to whether the diagnosis and treatment is subjective,

21   that's also not true, there are clear standards of care in the

22   diagnosis and treatment of ADHD.

23       You don't get to make up what the treatment ought to be

24   because you think and feel the patient has ADHD.

25       The patient needs to fulfill the diagnostic criteria.

1    There's evidence-based treatment that is utilized.  And the

2    usual course of professional practice, as you know, is a

3    statement that comes out of the Federal Controlled Substances

4    Act.  It's very specific to the prescription of C II drugs.

5         So let's make sure in this cross-examination that we

6    remain consistent to the conceptualization of ADHD diagnosis,

7    treatment, patient concern, and patient safety.  And that's why

8    I disagree with this statement.

9         Professionals will conceptually disagree on a variety of

10   things, which is the basis of scientific exploration.  We are

11   better now defining ADHD than we were 10 years ago or 20 years

12   ago.  Thank God more people are getting accurately diagnosed

13   and treated.  As you mentioned negative consequences are

14   mitigated by appropriate treatment.

15        So I will stop there.  You can see my passion in getting

16   information accurately both in the public and in this

17   courtroom.

18   Q.   Thank you.  That's great.  And we're going to explore the

19   criteria, and you can explain its clarity in just a moment, but

20   that was very helpful.

21        You mentioned that the definition of, I guess, the

22   diagnostic criteria for ADHD was different 20 years ago and

23   10 years ago; correct?

24   A.   Well, DSM-5 was published in 2013, it was a revision of

25   DSM-4, so there's been iterations over the course of 40 years.

1  It started off as minimal brain dysfunction.

2  Q.    I don't mean to put words in your mouth.  You said that

3  something was very different -- or was different 20 years ago

4  and was different 10 years ago.  What was the thing that you

5  said was different 20 years ago or 10 years ago?  Maybe it was

6  how the training --

7  A.    The awareness -- the awareness of ADHD amongst clinicians

8  and the general public.

9  Q.    Different 20 years ago?

10 A.    Yes.

11 Q.    Different 10 years ago?

12 A.    Yes.

13 Q.    Different five years ago?

14 A.    Evolving.

15 Q.    Okay.  All right.

16       There are other statements in this report that I'll just

17 ask if you agree with then or disagree with.  If you could

18 please turn to page 35.

19        THE COURT:  Sorry.  The exhibit again?

20        MR. SCHACHTER:  7346, Your Honor.

21        THE COURT:  Have you established that the witness is

22 familiar with this publication?

23        MR. SCHACHTER:  I think he said at the beginning that

24 he is familiar with the article.

25        THE COURT:  Okay.

GOODMAN - CROSS / SCHACHTER

1           THE WITNESS:  Not having read it.  Familiarity is

2    different than having read it and digested it.

3    BY MR. SCHACHTER:

4    Q.   Okay.  Just asking -- I'm just going to -- if you can just

5    tell us if you agree or disagree with this statement (as read):

6              "Since ADHD exists on a continuum, we really

7         have an arbitrary cut point for how severe someone's

8         symptoms have to be in order to give a diagnosis.

9         And our rule of thumb, based on the definition of a

10        mental disorder that has been encoded and enshrined

11        in the DSM for decades, is that if the person

12        experiences impairment, then that should be the point

13        at which we attribute their symptoms to being

14        sufficiently severe to give the diagnosis, and

15        therefore the treatment.  But the complicating factor

16        about that is it's gotten pretty subjective whether

17        someone's impaired enough or not."

18   Do you agree with that statement that seems to focus on

19   the fact that the idea of how much impairment is enough

20   impairment is a subjective exercise?

21   A.   I don't agree with the statement at all.  It's a poorly

22   written editorial comment without scientific basis.

23   Q.   Okay.  How about this statement?  (as read):

24             "If you fought your ADHD-like symptoms for a

25        long time and therefore it hasn't caused you any

**PROCEEDINGS**

```
1          impairment, there's a clinician out there who's going

2          to say you don't deserve a diagnosis and there's

3          another clinician out there who's going to say, yes,

4          you do."

5      Do you agree with that assessment in the article, that

6  clinicians may differ widely in whether or not they are going

7  to diagnosis a particular patient with ADHD?

8          MS. GREEN:  Objection.  Foundation.  And asked and

9  answered.

10         THE COURT:  We're going to have to take a five-minute

11 recess.  I've got to deal with this issue.  So would the jury

12 be excused for until 10:00.

13                  (The jury leaves the courtroom.)

14    (Proceedings were heard out of the presence of the jury.)

15         THE COURT:  Okay.  The jury has retired.

16     The question that I -- that, I guess, there's an -- the

17 objection entails is whether or not you can cross-examine a

18 witness based upon some other article of an expert.  And

19 that's -- that's the issue.

20         MR. SCHACHTER:  Your Honor, may we excuse the witness

21 just for a moment?

22         THE COURT:  Yes, of course.

23     Okay.  You get to go.

24         THE WITNESS:  I'll step outside?

25         THE COURT:  Yeah, that would be great.  Yeah.  Thanks.
```

PROCEEDINGS

1          (Witness steps down.)

2          **MR. SCHACHTER:**  Dr. Goodman has left.

3          **THE COURT:**  Okay.  So I'm looking at 705.  I'm trying

4   to figure out -- it's been a while since I've looked at this --

5   what's your understanding, if a person says -- what foundation

6   do you have to lay -- because the objection is -- is to the

7   foundation.

8       What foundation do you have to lay in order to

9   cross-examine an expert witness on an article that is not in

10  evidence, written by somebody else?  Obviously, if it's written

11  by him, that's a different story.

12      What is the code section?  What am I looking at?  The

13  evidence rule is what?  Is it 705?

14          **MS. GREEN:**  705 is -- I don't --

15          **THE COURT:**  You have to stand up at the microphone.

16  Let's try to realize, after a month and a half of trial, that

17  there's a way to do it.

18          **MS. GREEN:**  I believe 705 is -- relates to disclosing

19  facts underlying the expert's opinion, so that wouldn't cover

20  this.

21          **THE COURT:**  Okay.  So what evidence code section do we

22  look at?  I mean, if you know the answer, you can give it.

23          **MR. SCHACHTER:**  I do.  So I believe it to be in 803.

24          **THE COURT:**  803.  Okay.  Thank you very much.  803.

25          **MR. SCHACHTER:**  Which are going to be two different

1    topics.  So there's 803, there's a section on learned treatises

2    and, I think, periodicals.  I'm doing this a little bit from

3    memory.  And so I think there's two different issues.

4        One is where I am simply asking -- there's one with

5    respect to peer review --

6            THE COURT:  I don't think it's 803.  Okay.  I mean,

7    803 is if you want to introduce the document itself.

8        Good.  Everybody's got out their evidence book.  What is

9    it?

10            MR. SCHACHTER:  Right.  Exactly.  Exactly.  That would

11    be with the admissibility of the treatise, which you're right,

12    I'm not -- is not what we're doing here.

13            THE COURT:  No.

14            MR. SCHACHTER:  I believe, that I can -- because I'm

15    not --

16            THE COURT:  Give me the code section.  The evidence

17    code section -- it's somewhere.  I mean, maybe we have to take

18    a recess and go do research, but it's somewhere there to say

19    you can or you cannot ask an expert about documents, treatises,

20    articles --

21            MR. SCHACHTER:  803(18).

22        THE COURT:  803?

23        MR. SCHACHTER:  18.

24        THE COURT:  Okay.  Thank you.

25                    (Pause in proceedings.)

1          **THE COURT:**  Okay.  "A statement contained in a

2     treatise," et cetera, if -- this is under 18 -- this is under

3     exceptions to the hearsay rule.

4          This is exceptions -- I mean, it's hearsay.  I mean --

5     wait.  It's -- it has to be an exception to the hearsay rule

6     because it's introduced for the truth of the statement

7     somewhere.

8          **MR. SCHACHTER:**  So that, I think, is the distinction.

9          **THE COURT:**  Oh.

10         **MR. SCHACHTER:**  I think that if I am -- if I am

11     introducing the statement for its truth as opposed to asking a

12     witness:  Here is a statement; do you agree with it or disagree

13     with it?

14         That is something different.  If I wish to admit it for

15     its truth, which is what 803(18) is suggesting, then -- and

16     that is fair game with respect to the peer-reviewed journals

17     that I am -- that I have been utilizing.  This is not one.

18         For the other stuff, I can say --

19         **THE COURT:**  Okay.

20         **MR. SCHACHTER:**  -- Here's a statement; do you agree

21     with it or disagree with it?

22         He says agree, disagree, that's it.

23         **THE COURT:**  But you're asking -- fine.  The problem

24     is, that's not what you're doing, in my judgment.  What you're

25     doing is actually introducing the statement.  You see, if you

 1    were to say -- and he has said I dis- -- if you say, Well -- he

 2    says, I believe it's not on a continuum, or I believe it's

 3    objective, or I believe X, or I believe Y, that's what he says.

 4         Now, you say -- okay.  So he disagrees with what your

 5    treatise says.  That's the end of the inquiry unless the

 6    treatise comes in under an independent basis, and 18 of 803

 7    provides an independent basis.  But you have to lay that

 8    foundation.

 9         And what triggered it, from my way of thinking, is that

10    this document that you are referring to, I think, was -- was

11    prepared by a company called Mathematica, and it's got five

12    authors -- pardon me -- six he's never heard of and there's

13    no -- there's no way of knowing who it is.

14         I mean, maybe there is if I read the article -- which I

15    haven't read yet, Mr. Schachter, but -- and it's being shown to

16    the jury and it's being read to the jury.  That's all improper

17    and I'm not -- there's no -- I'm just talking about the

18    evidence.  You're not doing anything that isn't entirely

19    proper, but it can't be read to the jury.

20         Now, I don't know whether the Government is asleep at the

21    table.  They're not arguing this so, I mean, maybe I just sit

22    down and listen to it all come in because they haven't

23    highlighted this is a problem.  So, you know, but I am

24    concerned about consumption of time and talking about evidence

25    or information that is not properly admitted.

PROCEEDINGS

```
 1        So that's my way of saying, Mr. Schachter, if -- if you're

 2   going to introduce these, you better lay a foundation that they

 3   are admissible.

 4        MR. SCHACHTER:  Understood, Your Honor.  And what I

 5   was attempting to do, and maybe inartfully or simply

 6   incorrectly --

 7        THE COURT:  Yeah.

 8        MR. SCHACHTER:  -- was drawing a distinction between

 9   for the most part what I've been utilizing are peer-reviewed

10   journals that the witness -- they're peer-reviewed, they're

11   authoritative, they fall within the learned treatise exception.

12        This one does not.  This one does not.  I asked him if he

13   was familiar with it and I was attempting to -- again, maybe

14   incorrectly -- simply ask him if he agrees or disagrees with

15   statements, but I -- I don't believe that I have anything else

16   that falls within this category.  And I understand the Court's

17   ruling and I will carefully --

18        THE COURT:  Okay.  All right.  It's clear.

19        MR. SCHACHTER:  I think everything else is a -- is a

20   peer-reviewed --

21        THE COURT:  Well, I hope now that the Government will

22   be awake and when it appears that it's not the proper -- and by

23   the way, the Government can decide, for tactical reasons, let

24   it all in.  They don't care.  That's fine.  I mean, that's a

25   trial decision, that's not my decision.  But I'm sitting here
```

PROCEEDINGS

1  listening to something and things are being shown to the jury

2  that -- that otherwise wouldn't come in.

3          MR. SCHACHTER:  Understood.  And --

4          THE COURT:  And then I listen -- okay.

5          MR. SCHACHTER:  I think everything else that I have is

6  a peer-reviewed journal, but I'll make sure to be careful.

7          THE COURT:  Okay.  So let's bring the witness back.

8          MS. GREEN:  Your Honor, can I just make one point on

9  that, since we're talking about the basis of admissibility.

10 803(18), for that admission, requires that the publication is

11 established as a reliable authority by the expert's admission

12 or testimony or by another expert's testimony.

13     So I think that's also an important point.  If you're

14 going to be laying a foundation here, he specifically very

15 clearly did not agree or, you know, view it as a reliable

16 authority, so I just want to make sure we're all clear on that

17 because I will be objecting.

18         THE COURT:  Fine.  Well, I'm going to give a

19 curative -- I don't know what's been -- I see my screen and I

20 have a sense that the jury is being shown the same -- they're

21 not?

22         THE COURTROOM DEPUTY:  No.

23         MR. SCHACHTER:  No, no.

24         THE COURT:  Okay.  Okay.

25         MR. SCHACHTER:  No, no.  I am intentionally not --

1          THE COURT:  Okay.  All right.

2          MR. SCHACHTER:  -- displaying it for the jurors at

3   all.

4          THE COURT:  I can deal with it.  I know how I'm going

5   to deal with it.

6       Okay.  So bring the --

7          MR. SCHACHTER:  Your Honor, just to be clear on this

8   point, everything else we have used is a peer-reviewed journal

9   that Dr. Goodman himself has cited, so I don't think there's

10  any issue about the expert finding it --

11         THE COURT:  That's fine.

12         MR. SCHACHTER:  -- to be authoritative.

13         THE COURT:  That's fine.  Okay.

14      Okay.  Bring in the jury, bring in the -- have the witness

15  resume --

16         MR. SCHACHTER:  But, so then it would fall within the

17  hearsay exception, so I want to make sure that the Court's

18  statement does not cover much of the statements that I was

19  dealing with.

20               (The jury enters the courtroom.)

21      (Proceedings were heard in the presence of the jury.)

22         THE COURT:  Okay.  Let the record reflect that the

23  jurors are present.  The parties are present.

24      Ladies and gentlemen, there have been a series of

25  questions just recently about an article that was -- I think it

1   was identified as an article written by six individuals,

2   published and dated January 10th, 2025.  It was -- it's

3   Exhibit Number -- let me just cite to it.

4            MR. SCHACHTER:  7346.

5            THE COURT:  Yeah.  7346.  And the -- the statements

6   made -- first of all, the statements made in the article are

7   not admissible in evidence at this point.  That's Number 1.

8        And Number 2, to the extent they were presented as being

9   written by these authors or findings by these authors in this

10  article, that's stricken and you're instructed to disregard it.

11  You certainly can consider that this witness's opinion may be

12  different from somebody else's opinion.  As counsel has pointed

13  out, this is -- this is frequently the case.

14       But you cannot consider -- give any weight to any of the

15  purported opinions of some author who -- or authors who are not

16  subject to cross-examination in our process.

17       Okay.  That we just -- that's a very technical point, but

18  we need to just clarify that going forward.

19       Go ahead, Mr. Schachter.

20           MR. SCHACHTER:  Thank you, Your Honor.

21  BY MR. SCHACHTER:

22  Q.   Okay.  So what I'd like to do now is spend a little time

23  looking at the DSM diagnostic criteria.  And we can talk about

24  its subjectivity or lack of subjectivity.

25           MR. SCHACHTER:  If we can put back on the screen 6028.

GOODMAN - CROSS / SCHACHTER

1    BY MR. SCHACHTER:

2    Q.    So these things -- these are the symptoms of inattention;

3    is that right?

4    A.    Yes.

5    Q.    Okay.  And it lays out -- there's nine symptoms that are

6    laid out here?

7    A.    Yes.

8    Q.    And if you're a child or adolescent, you need six of these

9    things; right?

10   A.    Give me a moment just to pull this up in front of me.

11   62 --

12   Q.    6028.

13   A.    Okay.  Very good.

14   Q.    Okay.

15   A.    Okay.

16   Q.    And so these criteria that you say are not subjective, I

17   just want to be clear, so this -- if you're -- according to

18   this -- by the way, the same definition here, the same

19   symptoms, a clinician is supposed to use them whether it's a

20   six-year-old or whether it's an adult; is that correct?

21   A.    No.

22   Q.    Is there a different definition in the DSM for childhood

23   ADHD versus -- let me reword that.

24         Is there a different chapter of the DSM which contains

25   different symptoms or criteria if you are diagnosing a child

GOODMAN - CROSS / SCHACHTER

1    than an adult?

2    A.    There are not.  Let me clarify my remark.

3    Q.    Mm-hmm.

4    A.    The original DSM ADHD symptom checklist was written for

5    children and young adults.  It has since been revised.  The

6    language and choice of words have been revised to better

7    reflect the continuation of symptoms into adults.

8        For a specific example, I would not ask my adult patient:

9    Do you have difficulty sitting still in the classroom and do

10   you run around a lot in the classroom?

11       Irrelevant.  You have to ask the question within the

12   context of the person's life and their psychological experience

13   at the age they are.  So that's the modification.

14   Q.    Sure.  But just to be clear, just to focus, if you can, on

15   my question, the DSM definition of ADHD is the same words that

16   a -- the ones on the page are the same words a clinician is

17   supposed to look at whether they're diagnosing a six-year-old

18   or an adult?

19   A.    I've given my answer to that, and I'll stipulate, yes,

20   given what you're trying to demonstrate.

21   Q.    Okay.  And so -- but if -- according to the DSM, if you're

22   looking at a kid, you got to find six of these things; correct?

23   A.    That's the symptom count threshold.

24   Q.    Right.  And if you're looking at an adult, you need only

25   five?

1    **A.**    That's the symptom count threshold in inattention and/or

2    hyperactivity and then the combination or the absence

3    determines the subtype presentation.

4    **Q.**    Okay.  All right.

5        Now, on the subject of its subjectivity, let's look at B.

6    (as read):

7            "A clinician in assessing ADHD is supposed to

8        determine whether or not the patient often has

9        difficulty sustaining attention in tasks or play

10       activities."

11       Correct?

12   **A.**    Yes.

13   **Q.**    Okay.  It does not tell you what tasks; correct?

14   **A.**    Correct.

15   **Q.**    It doesn't say:  Does this mean difficulty sustaining

16   attention while raking leaves, while shoveling snow, while

17   creating an Excel spreadsheet.

18       It doesn't provide any definition of what kind of tasks

19   the particular clinician is supposed to be examining; correct?

20   **A.**    Correct.  If we were to write it with all of the

21   stipulations and circumstances, I'd have a volume the size of

22   this binder.

23       So remember that these are written for clinicians who

24   understand that these are examples.  As you note, it says e.g.,

25   as an example, difficulty remaining focused during lectures,

GOODMAN - CROSS / SCHACHTER

1  conversations, or lengthy readings.

2      Those are examples not all inclusive of all the possible

3  tasks you could be involved with.

4      The other aspect of this, as you dial down on each and

5  every one of these symptoms, is the level of impairment.  And

6  I'm sure you're going to get to the level of impairment, but

7  that's part of the diagnostic criteria.

8  Q.  All right.  I'm just -- all I'm trying to do -- and I

9  don't -- I certainly do not want to spar with you, you're

10  answers are what matters.

11      But it is left up to the individual clinician who's

12  examining the individual patient to determine whether or not

13  they think this person often has difficulty sustaining

14  attention in tasks or play activities; is that correct?

15  A.  A trained clinician who understands what these words mean.

16  If I ask each juror to make the determination of this

17  psychological experience, they wouldn't understand how to do

18  this because they're not a trained clinician.

19  Q.  Okay.  But, again, you use the word "trained clinician"

20  and we agree, do we not, that you have said that most

21  clinicians that are seeing patients and evaluating them for

22  ADHD have not been trained; correct?

23  A.  They have been trained --

24          MS. GREEN:  Objection.  Misstates testimony.

25          THE WITNESS:  I'll wait for the objection.

1          THE COURT:  Go ahead.

2          THE WITNESS:  I'm sorry.  Again, I get distracted.

3      Tell me the question again, please.

4  BY MR. SCHACHTER:

5  Q.    Sure.

6      Your average family practice physician who is sitting down

7  with a patient may be evaluating them for ADHD without training

8  on how to conduct, as you said, a comprehensive psychiatric

9  evaluation; correct?

10  A.    When I refer to clinicians, I'm referring to people who

11  have been trained on doing a mental health evaluation.  Whether

12  they're specifically trained for ADHD is secondary to the fact

13  that they are trained to conduct a mental health evaluation.

14  Q.    I see.  Okay.  Okay.

15      Well, that's helpful.  But as we've talked about, there

16  are a lot of people who are engaged in professional practice

17  who are evaluating people for ADHD that do not have that

18  training that you just described; correct?

19          THE COURT:  Well, what training?  I'm sorry, the

20  question's inexact.

21      Do you mean who do not have the training of conducting a

22  mental health examination or do not have training in ADHD --

23  which of the two?  Is that the question?

24          MR. SCHACHTER:  I'd actually like both.

25  \\\

1  BY MR. SCHACHTER:

2  Q.   And I think we've covered this ground, but there are a lot

3  of people who are engaged in the professional practice of

4  figuring out whether a patient they're seeing has ADHD and they

5  don't have training in mental health as the Court said; is that

6  correct?

7  A.   Part of medical training includes at least an

8  understanding of how to conduct a mental status exam.

9       If someone in primary care sees a patient who complains of

10 anxiety that mental health -- that professional, whether

11 they're a mental health professional or an MD in family

12 practice, has been trained on how to conduct a mental health

13 evaluation.

14      They can evaluate for anxiety.  They can evaluate for

15 depression.  They can evaluate for PTSD and bipolar disorder.

16 And ADHD had not been part of training, but is now part of the

17 rubric of a mental health evaluation.

18 Q.   Okay.  I really -- I want to move on, but I just -- you

19 used two different words, and I just want to make sure I'm

20 understanding.

21      You say that primary care physicians, they get training in

22 a -- I think you used the word "mental status examination"?

23 A.   Mental health evaluation.

24 Q.   Are those the same thing?

25 A.   Well, I'll stipulate that both are the same, if you'd

1    like.

2    Q.    Fair enough.  I was trying to understand your terms.

3         And those are different than a comprehensive psychiatric

4    evaluation; correct?

5    A.    Yes.

6    Q.    Fair enough.  Okay.  Great.

7         Now -- and I just want your views.  So you think it is not

8    a subjective exercise when a doctor or nurse sits down and

9    tries to figure out whether or not a particular patient --

10   often has difficulty sustaining attention in tasks or play

11   activities?

12        Just yes or no, because I want to move along.

13   A.    I can't answer yes or no.  You have to define -- you have

14   to operationally define "subjective" for me.

15   Q.    Okay.  Well, let me try to make that clear.  When I say

16   "subjective," I mean that a particular physician or nurse may

17   look at a patient and, one, may conclude that this person often

18   has difficulty sustaining attention in tasks or play

19   activities, and a different nurse or doctor, may say, "I don't

20   think this person does often have difficulty sustaining

21   attention and tasks and play activities"?

22   A.    So the question assumes that each has conducted the mental

23   health evaluation in exactly the same way.

24   Q.    I'm not assuming anything.  I'm saying -- I'm just asking

25   you a simple question.

**GOODMAN - CROSS / SCHACHTER**

1   **A.**    It's not a simple question.

2   **Q.**    I shouldn't characterize it as such.  And if you can't

3   answer it, just say "I can't answer it," we'll move on.

4   **A.**    I'm very willing to answer it, but you're curtailing and

5   restricting the interpretation here.

6        To define this as this juror can decide whether or not the

7   patient has inattention and this woman here says, No, he's not.

8   Do you want to call me ADHD because every time there's an

9   objection, I can't remember your question?  That is a

10  reductionistic, simplistic idea of what these symptoms mean.

11       In order to evaluate this symptom, there are a series of

12  questions that get asked in order to determine whether the

13  symptom rises to a clinically significant level.

14  **Q.**    Okay.  Thank you.

15       Each of these criteria contains the word "often" before

16  it.

17       Do you see that?

18  **A.**    Yes.

19  **Q.**    Often fails it give it close attention.  Often has

20  difficulty sustaining attention and tasks.

21       Each one has often; correct?

22  **A.**    Yes.  It reflects a frequency.

23  **Q.**    Okay.  Is often once a week?  Three times a week?  12

24  times a week?  Or 20 times a week?

25  **A.**    No idea how to quantify that.

GOODMAN - CROSS / SCHACHTER

1  Q.   You will agree with me, will you not, that one clinician

2  may conclude that the person is experiencing these symptoms

3  often and another clinician may conclude they are not often

4  enough.

5       Would you agree with that?

6  A.   I would agree the clinician can come to different

7  impressions.  And one clinician can be accurate and one

8  clinician can be inaccurate.

9  Q.   Sure.  There are clinicians that probably are diagnosing

10  people with ADHD and you, Dr. Goodman, may reach a different

11  conclusion; correct?

12  A.   There are people diagnosing ADHD with inadequate

13  restricted evaluations, reaching diagnoses without fulfilling

14  diagnostic criteria because an exam has not been completed in

15  its entirety.

16  Q.   There may be lots of reasons, but would you agree with me

17  that there are clinicians who may look at these criteria and

18  conclude that somebody does not have ADHD but you may think

19  that they do?

20  A.   And that's --

21       MS. GREEN:   Objection asked and answered.  403.

22       THE COURT:   Overruled.

23  Go ahead.

24       THE WITNESS:   And that's the basis of poor treatment.

25  \\\

GOODMAN - CROSS / SCHACHTER

1   BY MR. SCHACHTER:

2   Q.   Okay.  In your view?

3   A.   No.  As a matter of usual course of professional practice

4   in prescribing controlled drugs under the Controlled Substances

5   Act.

6   Q.   Okay.  All right.  Okay.

7        Let's turn to hyperactivity.  There's --

8            MR. SCHACHTER:  If you can turn to the next page.

9   Okay.  Great.

10  BY MR. SCHACHTER:

11  Q.   And, again, we have these criteria that you say are not

12  subjective; is that correct?

13  A.   Observ- -- I would use the word observational rather than

14  subjective.

15  Q.   Okay.  And, again, by subjective -- let me define the

16  term -- what I mean is one clinician, one well-meaning

17  clinician acting in good faith may conclude that these criteria

18  have been met and another clinician acting in good faith may

19  conclude that they have not been met?

20  A.   Yes.  Since -- I'd like to bring this questioning to some

21  conclusion here, but I'll say, yes.

22  Q.   Okay.  Nobody would more than the ladies and gentlemen of

23  the jury, I'm sure.

24       Okay.  Now, and to be -- okay.  All right.

25       So, okay.

GOODMAN - CROSS / SCHACHTER

1          Focusing on the same page, the definition of ADHD also

2   contains a section on partial remission.

3          Do you see that?

4   A.   Yes.

5   Q.   Okay.  And it says that (as read):

6               "In diagnosing somebody with ADHD, you should

7          specify when the full criteria were previously met:

8          Fewer than the full criteria have been met for the

9          past six months" --

10         I'm sorry.  I put the wrong emphasis.  Let me start over.

11         The definition of ADHD, so somebody can have ADHD if they

12  are in partial remission; correct?

13  A.   Yes.

14  Q.   Okay.  And so what that means is, if a clinician is

15  looking at somebody who the full criteria may have been

16  previously met, but right now, when they're sitting in their

17  office with the patient, fewer than the full criteria have been

18  met for the past six months, but the person is still suffering

19  from impairment in social, academic, or occupational

20  functioning, those people have ADHD; right?

21  A.   Yes, if the other criteria have been fulfilled.

22  Q.   Well, okay.  Let's just --

23  A.   Partial remission means they had ADHD by full criteria and

24  now the symptoms no longer fulfill the criteria.

25  Q.   Right.  So that is an assessment that's being made by a

1   clinician that this person may have met the criteria in the

2   past, but for the past six months they haven't met the

3   criteria.  But if they have impairment, they fall within this

4   definition of ADHD; correct?

5   **A.**   Correct.

6   **Q.**   Okay.  Now, I am correct, am I not, that mental health

7   professionals can conclude that someone has ADHD based on

8   symptoms that are mentioned nowhere in the DSM?

9   **A.**   I need you to repeat that question to make sure I heard

10  it.

11  **Q.**   Sure.  I want you to hear it, please.

12      Mental health professionals can conclude that someone has

13  ADHD based on symptoms that are mentioned nowhere in the DSM;

14  is that correct?

15  **A.**   I suppose they can make any diagnosis they want, but it

16  wouldn't fulfill any diagnostic criteria here.

17  **Q.**   Well, you yourself would conclude -- I guess you have

18  concluded that someone's got ADHD based on criteria that are

19  mentioned nowhere in the DSM; correct?

20  **A.**   If you're about to quote, cite me for something, please

21  raise that so I can address it specifically.

22  **Q.**   Sure.  I am.

23      You wrote an article in September -- you are a coauthor on

24  an article in September of this year, just a couple of months

25  ago; is that correct?

1  **A.**  Tell me the title of the article and where it was

2  published, please.

3  **Q.**  You are prolific.  I understand it can be hard to keep

4  track.  If you can look at 7605.

5          **THE COURT:**  Volume 2.

6          **THE WITNESS:**  Oh, we're going to go here.  Okay.

7  **BY MR. SCHACHTER:**

8  **Q.**  Okay.  You are --

9  **A.**  What -- I'm sorry.  Give me the number again.

10  **Q.**  7605.

11          **THE COURT:**  It has the advantage of being the last

12  exhibit in the --

13          **THE WITNESS:**  Oh, okay.

14          **THE COURT:**  -- binder.

15          **THE WITNESS:**  Yes.

16  **BY MR. SCHACHTER:**

17  **Q.**  Okay.

18  **A.**  Okay.

19  **Q.**  Yes, we are going here.  An article that you published in

20  October of this year.

21  **A.**  I, along with my coauthors.

22  **Q.**  With your coauthors.

23          I take it you -- I mean, when you put your name on an

24  article, you stand by what you wrote; right?

25  **A.**  Yes.

GOODMAN - CROSS / SCHACHTER

1   Q.   Very good.

2        Okay.  I'd like you to turn to --

3   A.   So a clarification here.

4   Q.   Okay.

5   A.   Just so the jury understands how an academic article gets

6   constructed.  There are several coauthors on this paper, as you

7   noticed.  When we're invited to participate in this process,

8   each of the authors writes a section of that article.

9        This is a 20,000-word article with hundreds of references.

10  And I was asked to write two particular sections in this

11  article.  One is called ADHD simplex, which is basically ADHD

12  in adults with no comorbidity.  And the second section was on

13  ADHD in older adults.

14       So those are the portions of the article that I will

15  stipulate I'm responsible for.

16  Q.   Okay.  You are a coauthor on an article with people who

17  you respect; is that correct?

18  A.   Correct.

19  Q.   People like Margaret Sibley, we talked about her article

20  about diagnostic criteria varies widely.  She's somebody who

21  you respect?

22  A.   Yes.

23  Q.   Okay.  In any event, let's talk about what is written in

24  this article.

25           MR. SCHACHTER:  If we can turn to page 2, start of the

1    last paragraph.

2    **BY MR. SCHACHTER:**

3    **Q.**    You and your coauthors --

4            **MS. GREEN:**    Objection, Your Honor.    He just specified

5    which portions he wrote, so same objection as before our break.

6            **THE COURT:**    Okay.    Well, first of all, it would be

7    helpful if he identified whether he wrote that particular part.

8    But secondly, it may be admissible under -- under the exception

9    to the hearsay rule.

10           **MR. SCHACHTER:**    Sure.    I mean, I believe he -- the

11   witness believes that an author he -- an article that he

12   coauthored is authoritative.

13           **THE COURT:**    Well, there are 20 people who wrote this,

14   so -- as explained.    But, I mean, I don't -- I think -- I think

15   it's admissible, so that's the bottom line.    Okay.

16       But I think it also would be useful for the witness and

17   the jury to -- when you're asking the question, is it a portion

18   that this -- that the witness wrote or 19 other people wrote

19   that's just useful because it then can be considered by the

20   jury in the context of what it was.

21           **MR. SCHACHTER:**    Sure.    Your Honor, maybe it would be

22   helpful, may I display for the jury the title and the authors

23   so that the jurors can see that?

24           **THE COURT:**    Sure.

25           **MR. SCHACHTER:**    So, Your Honor, we move to admit 7605.

 1          MS. GREEN:  Objection.

 2          THE COURT:  Okay.  I'll rule on its admissibility

 3   later but it's marked for identification and you can show that

 4   portion to the jury.

 5          MR. SCHACHTER:  Okay.  Thank you.

 6      (Trial Exhibit 7605 marked for identification)

 7   BY MR. SCHACHTER:

 8   Q.   Okay.  This is an article that you and your coauthors

 9   published in *World Psychiatry* in October of 2025; correct?

10   A.   Correct.

11   Q.   And we can see your name.  You're the one, two, three,

12   four -- fifth named author; is that correct?

13   A.   Correct.

14   Q.   Okay.  And then if we can turn to -- the article is

15   entitled "Attention Deficit Hyperactivity Disorder in Adults;

16   Evidence Base, Uncertainties and Controversies"; is that

17   correct?

18   A.   Yes.

19   Q.   All right.  Now I'd like to get to the portion I wanted to

20   ask you about.

21      Do you see the portion which says (as read):

22          "Core ADHD symptoms may manifest differently in

23      adults"?

24   A.   I see that.

25   Q.   (as read):

1           "Thus, hyperactivity in adults" --

2           **MR. SCHACHTER:**  Oh, I'm sorry.  No, I'm sorry.  The

3    jurors can't see it.  I apologize, Your Honor.

4           **THE COURTROOM DEPUTY:**  The judge said only the title.

5           **MR. SCHACHTER:**  Oh, I'm sorry.  Your Honor, can I --

6    we move to admit, or at least to display for this time as --

7           **THE COURT:**  Well, actually, the evidence code, as I

8    understand it, provides that the statements can be read into

9    evidence but are not received as exhibits.

10          **MR. SCHACHTER:**  Very good.

11          **THE COURT:**  So it can't be an exhibit but you can read

12   the statement you wish to cite to.  Okay?

13          **MR. SCHACHTER:**  Got it.  Thank you very much,

14   Your Honor.

15   **BY MR. SCHACHTER:**

16   **Q.**   The article you coauthored states (as read):

17           "Core ADHD symptoms may manifest differently in

18       adults.  Thus, hyperactivity" --

19          **MR. SCHACHTER:**  Actually, you know what, Your Honor,

20   may we display as we go through this 6208 at page 4, the

21   hyperactivity -- oh, no.  I'm sorry.

22       I'm sorry.  Let's leave this.  Leave it alone.  I'm sorry.

23   Let's leave it.  Sorry.

24          **THE COURT:**  Have we established whether the statement

25   you're about to read is a statement that this -- that the

 1  witness wrote or somebody else wrote?  Have we established

 2  that?

 3          MR. SCHACHTER:  Well, I think the witness stands by

 4  everything that's in the article, he stated.

 5          THE COURT:  No, no.

 6          MR. SCHACHTER:  I will not --

 7          THE COURT:  We're not going to do it that way.  We're

 8  not going to do it that way.  And we're not doing it that way

 9  because if you have a statement that is offered to contradict

10  the witness's testimony, it is significant whether or not the

11  witness actually said that statement or somebody else said that

12  statement.  So that's the way we're going to proceed when we

13  cross-examine on learned treatises in which the witness is also

14  listed as one of a number of authors.  Okay?  That's the

15  rule --

16          MR. SCHACHTER:  Okay.

17          THE COURT:  -- going forward.

18          MR. SCHACHTER:  Okay.

19          THE COURT:  Okay.

20  BY MR. SCHACHTER:

21  Q.    Did you write this paragraph that starts --

22          MR. SCHACHTER:  May I read it to the witness?  I

23  believe that I can.

24          THE COURT:  Yes, you may.

25          MR. SCHACHTER:  Yeah, sure.  Okay.

1  BY MR. SCHACHTER:

2  Q.    So there is a paragraph, and then I will ask you if you

3  wrote it or one of your coauthors wrote it.

4        At the bottom of page 2, it states (as read):

5            "Core ADHD symptoms may manifest differently in

6        adults.  Thus, hyperactivity in adults often

7        manifests as inner restlessness, over-scheduling, or

8        not being able to relax properly.  Impulsive behavior

9        may manifest as acting without thinking or blurting

10       things out, spending too much money or spending it

11       too quickly, carrying out plans immediately,

12       resigning from jobs in a flurry, starting

13       relationships quickly, and not being able to postpone

14       need gratification."

15       Do you see that?

16 A.    I do.

17 Q.    Okay.  First, did you write that or was that one of your

18 coauthors?

19 A.    I did not write that.  That was one of my coauthors.

20 Q.    Okay.  These symptoms of ADHD that are described right

21 here, we'll take them one by one.

22       Over-scheduling --

23           MR. SCHACHTER:  You can take that down, Mr. Cepregi.

24 And can we go back to 6028, page 4.

25 \\\

1    BY MR. SCHACHTER:

2    Q.    Okay.  What we're looking at here are the DSM criteria for

3    hyperactivity and impulsivity.  Do you see that?

4    A.    Yes.

5    Q.    Okay.  Do you see anywhere where it talks about

6    over-scheduling?

7    A.    No.

8    Q.    Do you see anywhere where it talks about not being able to

9    relax properly?

10   A.    No.

11   Q.    Does it say anything about spending too much money?

12   A.    No.

13   Q.    Or spending money too quickly?

14   A.    No.

15   Q.    Or carrying out plans immediately?

16   A.    No.

17   Q.    Or resigning from jobs in a flurry?

18   A.    No.

19   Q.    Starting relationships quickly?

20   A.    No.

21   Q.    Okay.  So you will agree with -- and by the way, you do

22   not disagree that those are appropriate things for a clinician

23   to inquire about when determining whether or not someone has

24   the hyperactivity and impulsivity criteria of ADHD?

25   A.    Correct.

1   Q.   Okay.  So you will agree with me that a clinician can look

2   to things that are not mentioned in the DSM to determine

3   whether or not somebody has ADHD?

4   A.   As I testified earlier, if we include every circumstance

5   that would be an example of how people's symptoms and

6   impairments are mentioned and experienced, I would have two

7   sets of large binders.

8        So to take examples out of one paper and say that they're

9   not in the DSM-5 is a mischaracterization of the clinical

10  impression made in the solicitation of psychological symptoms.

11  Q.   I'm just trying to ask a very simple question.

12  A.   I know, but your question is not simple, and I'm not going

13  to be corralled into the distinction between the examples in

14  the DSM-5 and the examples that are set forth in this paper.

15  Q.   I'm really -- I'm not trying to corral you, but I would

16  like you to try your best, if you can, to answer my question.

17       THE COURT:  Well, I think -- okay.  Go ahead.  Next

18  question.

19  BY MR. SCHACHTER:

20  Q.   Over-scheduling is a relevant factor in determining

21  whether or not a patient is displaying hyperactivity or

22  impulsivity; correct?

23  A.   It's a relevant experience for a person with ADHD, a

24  person with anxiety, a person who's overextended, a person

25  who's unable to say no for a request.  So it's what we call

1  transdiagnostic.  No simple symptom is ever a sine qua non for

2  a diagnosis.

3      And each of these symptoms, with the examples of how they

4  manifest in this person's life, become the way in which we

5  decide does the overextension and procrastination become part

6  of ADHD, become part of depression, become part of generalized

7  anxiety disorder.

8  Q.  And a clinician can look at things that aren't

9  specifically enumerated in the DSM in making that evaluation;

10  fair to say?

11  A.  As I've said before, if you're going to cite individual

12  examples in order to hair-split diagnostic qualifications, it

13  misrepresents the entire diagnostic process and the diagnostic

14  criteria here that trained clinicians understand how to

15  evaluate.

16  Q.  Okay.  Good enough.

17      Let's see.  Now, you will also agree, will you not, that

18  ADHD patients often suffer from emotional dysregulation, which

19  means, I believe, someone who has difficulty managing their

20  mood?

21  A.  Yes.

22  Q.  That is not -- that concept of emotional dysregulation,

23  which can be a sign of ADHD, that's not in the DSM?

24  A.  Correct.

25  Q.  And part of this is because the DSM-5's criteria were

GOODMAN - CROSS / SCHACHTER

1  developed from pediatric studies and -- and samples of children

2  and adolescents; is that correct?

3  **A.**   Not entirely.

4  **Q.**   Okay.  Well, there is, under hyperactivity (as read):

5          "Runs about or climbs in situations where it is

6      inappropriate."

7      Do you see that?

8  **A.**   Correct.

9  **Q.**   Okay.  That -- you will agree with me that that criteria

10  does not appear to have been drafted with adults in mind?

11  **A.**   Correct.

12  **Q.**   Okay.  There are -- although it's called attention deficit

13  disorder, you will agree with me that what happens with many

14  ADHD patients is they can overconcentrate or hyperfocus, for

15  example, when they're playing video games?

16  **A.**   Correct.  When the task is salient, that is engageable,

17  what you find is your dopamine levels go up.  So the prototypic

18  example of this is the mom says, "My kid can't possibly have

19  ADHD; he plays video games for three hours," so the situational

20  attention has to be judged on the basis of the salience of the

21  task itself.

22      And so ADHD individuals are vulnerable to losing their

23  focus and attention when the task is repetitive and boring,

24  which is an example in the DSM-5 criteria.

25  **Q.**   Well, that is what one would also call when the -- the

**GOODMAN - CROSS / SCHACHTER**

1  hyperfocus on a particular task is what is called attention

2  dysregulation; correct?

3  **A.**    I'm not familiar with that term.

4  **Q.**    Okay.  In any event, if we can look at page 3 under the

5  "inattentiveness."

6      Does it say anything in the DSM about this criteria of

7  ADHD where people focus -- where they overconcentrate or

8  hyperfocus.  Is that described in the DSM?

9  **A.**    No.

10  **Q.**    I'm sorry?

11  **A.**    No.  The answer is no.

12  **Q.**    Okay.  All right.

13      So that would be another example of a kind of criteria

14  of -- that a clinician may conclude somebody has ADHD but it's

15  not included in the DSM?

16  **A.**    No.  Because that's not part of the symptom criteria.

17  Hyperfocus is not part of the 18 symptoms in the symptom count

18  criteria.

19          **THE COURT:**  So let's take a recess now.

20      We will be in recess until 10 to 11:00.

21      Remember the admonition given to you:  Don't discuss the

22  case, allow anyone to discuss it with you, form or express any

23  opinion.

24              (The jury leaves the courtroom.)

25   (Proceedings were heard out of the presence of the jury.) # #

```
 1                    (Recess taken at 10:36 a.m.)

 2                 (Proceedings resumed at 10:57 a.m.)

 3        (Proceedings were heard out of the presence of the jury.)

 4             THE COURTROOM DEPUTY:  Come to order.  Court is in

 5   session.

 6             THE COURT:  Okay.  Bring in the jury.

 7                    (The jury enters the courtroom.)

 8         (Proceedings were heard in the presence of the jury.)

 9             THE COURT:  Okay.  Please be seated.

10        Let the record reflect all parties are present, jurors are

11   present.

12        You may proceed.

13             MR. SCHACHTER:  Thank you, Your Honor.

14   BY MR. SCHACHTER:

15   Q.   Okay.  So you talked about five -- the five criteria or

16   areas of ADHD.  I want to move to a different one.

17             MR. SCHACHTER:  If we can put on the screen, please,

18   what's in evidence as 6028, page 4.  Paragraph B, if we can.

19             THE WITNESS:  I'm sorry.  What --

20   BY MR. SCHACHTER:

21   Q.   It's 6028, which is the DSM --

22   A.   I got it.

23   Q.   -- page 4.

24        Tell me when you're there.

25   A.   I'm ready.  Thank you.
```

GOODMAN - CROSS / SCHACHTER

1    Q.    Okay.  Great.  Okay.

2         So the -- you talked about this on direct as one of the

3    five things I think you said of ADHD.

4    A.    Correct.

5    Q.    Okay.  You may have used a more precise word than

6    "things," but --

7    A.    Criteria.  There are five criteria.

8    Q.    Criteria.  All right.

9         And this is one of them, (as read):

10             "Several inattentive or hyperactive impulsive

11        symptoms were present prior to age 12."

12        Correct?

13   A.    Correct.

14   Q.    The paper that you coauthored last month said (as read):

15             "Clinicians should be cautious when excluding

16        ADHD only based on onset of symptoms after 12 years

17        of age."

18        Correct?

19   A.    That may be in the article.  I didn't write that, did I?

20   Q.    Well, let's look at it.

21   A.    What section is it in, and I'll tell you if I wrote it.

22   Q.    Sure.  Sure.

23        Well, why don't you just take a look at it.

24   A.    Okay.

25   Q.    7605 at page 5.

GOODMAN - CROSS / SCHACHTER

1   **A.**   The last one.

2   **Q.**   It's in the middle of the left column.

3   **A.**   That's on page 5?

4   **Q.**   Yeah.

5   **A.**   Okay.

6   **Q.**   Okay.  You see where it says in the middle of the left

7   column (as read):

8           "ADHD symptoms in childhood are frequently found

9       in referred adult cases, however, clinicians should

10      be cautious when excluding ADHD only based on onset

11      of symptoms after 12 years of age."

12      Do you see that?

13  **A.**   I do.

14  **Q.**   Let's start there.  Did you write it?

15  **A.**   No.

16  **Q.**   You didn't -- did you read it?  Did you read the article?

17  **A.**   I'm not sure I read the entirety of the article.  The way

18  this is set up is each author coauthors a particular section.

19      The senior editor, which I believe was Dr. Cortese, then

20  reviews all of the sections.  He reviews them.  He sends them

21  back to the authors of those particular sections with comments

22  and edits.  The authors of the sections then edit accordingly.

23  Either they agree with the comment, they disagree with the

24  comment as to why.  And then the manuscript gets finalized by

25  the senior author and gets submitted for publication.

1          So this is a 20,000-plus word article, and I may not have

2    read it in its entirety in great detail.

3    Q.   Dr. Cortese is someone you respect?

4    A.   Dr. Cortese is the second-most frequently cited researcher

5    on ADHD in the world.

6    Q.   Excellent.

7          And so this statement (as read):

8               "Clinicians should" -- this statement in the

9          article that you coauthored, reviewed by the

10         second-most-cited expert in the world on ADHD states

11         (as read):

12              "Clinicians should be cautious when excluding

13         ADHD only based on symptoms after 12 years of age."

14         Agree or disagree?

15   A.   Oh, I agree.  And the caveat here is "cautious in

16   excluding ADHD."  But the diagnostic criteria allow for the

17   diagnosis of ADHD even if the age criteria is not met.

18   Q.   Okay.

19              MR. SCHACHTER:  Okay.  Let's just put back on the

20   screen 6028 at page 4 of the DSM.  I'm sorry.  B, please.

21   Great.

22   BY MR. SCHACHTER:

23   Q.   It says (as read):

24              "Several inattentive or hyperactive impulse

25         symptoms were present prior to age 12 years."

1      Correct?

2   **A.**    Correct.

3   **Q.**    You agree clinicians should be cautious when excluding

4   ADHD only based on symptoms -- on the onset of symptoms which

5   occurred after 12 years of age; correct?

6        Oh, I'm sorry.  The jurors -- thank you.

7        **MR. SCHACHTER:**  Your Honor, the jurors can't see.  It

8   is in evidence.

9        **THE COURT:**  Okay.  It is in evidence.

10        **MR. SCHACHTER:**  Okay.  Just to take a step back, then.

11  **BY MR. SCHACHTER:**

12  **Q.**    DSM says that a requirement, according to the DSM, is

13  several inattentive or hyperactive impulse symptoms were

14  present prior to age 12 years.

15        That's a requirement according to the DSM?

16  **A.**    That's a criteria for the DSM diagnosis.

17  **Q.**    You agree that clinicians should be cautious before

18  excluding ADHD only because symptoms onset didn't occur until

19  after 12 years; correct?

20  **A.**    Correct.

21  **Q.**    There's reasons for that.  That's because some patients

22  may have trouble remembering what happened before they were 12;

23  correct?

24  **A.**    Correct.

25  **Q.**    And others may have not exhibited the symptoms of ADHD

1   when they were younger because they happened to be in a less

2   stressful environment or they had a better support system;

3   correct?

4   **A.**   The observation of their symptoms as children may not have

5   been evident.  Let me state it that way.

6   **Q.**   Okay.  Great.

7   **A.**   May not have been -- right.

8        But, again, for children -- so here's the contrast between

9   adults and children.  For children, we're not relying so

10  much -- and I'm not a child psychiatrist, so that's my

11  disclaimer.

12       But for children, you're very much relying on collateral

13  information.  The teachers' reports, the parents' report,

14  et cetera.

15       In adults, we don't have teachers and often parents to

16  corroborate.  We use other collateral information.

17       So there's a difference between a child's evaluation and

18  the source of information and the evaluation of an adult and

19  its source of information.

20  **Q.**   Okay.  Let's turn to another requirement, according to the

21  DSM.  It says, the next one (as read):

22            "Several inattentive or hyperactive impulsive

23            symptoms are present in two or more settings."

24       Do you see that?

25  **A.**   Yes.

1    Q.    You gave an example.  You said that it absolutely has to

2    be in more than one setting.  For example, if you just don't

3    listen to your spouse, that doesn't mean you have ADHD;

4    correct?

5    A.    Correct.

6    Q.    Okay.  Now --

7    A.    Doesn't mean you don't have ADHD, but that itself would

8    not be an example of somebody who has ADHD.

9    Q.    Okay.  You will agree that some individuals who display

10   impairment in just one setting at one point in time may show

11   impairment in multiple settings at a later point; correct?

12   A.    Correct.

13   Q.    All right.  Let's turn to the next section.

14         And a requirement in the DSM is that there is clear

15   evidence that the symptoms interfere with or reduce the quality

16   of social, academic, or occupational functioning.

17         Do you see that?

18   A.    Yes.

19   Q.    Okay.  The DSM doesn't explain what it means to interfere

20   with social, academic or occupational functioning, does it?

21   A.    Not in this text.

22   Q.    Nor does the DMS explain how much interference is the

23   right amount of interference for somebody to be given a

24   diagnosis of ADHD, does it?

25   A.    No.

1    **Q.**   And you --

2    **A.**   It does not; right.  Correct.

3    **Q.**   Okay.  And you will agree that what matters most to

4    patients is not how many symptoms they have, but how the

5    disorder impacts their ability to successfully lead their

6    lives?

7    **A.**   So now you've introduced two variables.  One is what the

8    patient observes and wants and what the clinician observes and

9    wants.

10        So help me understand where we're going.

11   **Q.**   Well, I guess -- well, withdrawn.  Let me just move on.

12        Clinicians may meet -- or let me clarify, rather.

13        Clinicians may meet an adult with mild ADHD symptoms who

14   shows negligible impairment but reports internal distress,

15   reduced self-esteem, and self-blame as a consequence of their

16   symptoms; is that correct?

17   **A.**   Yes.

18   **Q.**   And when that happens, you believe that the correct

19   diagnosis is the last part of the ADHD chapter, unspecified or

20   otherwise specified ADHD, that may be the appropriate

21   diagnosis; correct?

22   **A.**   Sure.

23   **Q.**   Okay.  And there is -- as we talked about at the beginning

24   of today, there's a section of the DSM ADHD definition that

25   covers this and I'd like to turn to that.

1              MR. SCHACHTER:  Let's turn to page 10 of the ADHD

2    chapter.

3    BY MR. SCHACHTER:

4    Q.   And this is -- there's a section on unspecified attention

5    deficit hyperactivity disorder; correct?

6    A.   Correct.

7    Q.   And what it says is (as read):

8              "This category applies to presentations in which

9         symptoms characteristic of attention deficit

10        hyperactivity disorder that cause clinically

11        significant distress or impairment in social,

12        occupational, or other important areas of functioning

13        predominate but do not meet the full criteria for

14        attention deficit hyperactivity disorder or any of

15        the disorders in the neurodevelopmental disorders

16        diagnostic class.  The unspecified attention deficit

17        hyperactivity disorder category is used in situations

18        in which the clinician chooses not to specify the

19        reason that the criteria are not met for attention

20        deficit hyperactivity disorder or for a specific

21        neurodevelopment disorder and includes presentations

22        in which there is insufficient information to make a

23        more specific diagnosis."

24        And if you are seeing a patient like this, who may have

25    mild ADHD symptoms, who show negligible impairment but report

GOODMAN - CROSS / SCHACHTER

1   internal distress, reduced self-esteem, and self-blame as a

2   consequence of their symptom, a clinician may note their

3   diagnosis as F90.9; correct?

4   **A.**    No.

5   **Q.**    Okay.

6           **THE COURT:**  Do you want to explain your answer?

7   What -- why not?

8           **THE WITNESS:**  Okay.  So let's read this again.  (as

9   read):

10          "This category applies to presentations in which

11      symptoms characteristic of ADHD that cause clinically

12      significant distress and impairment in social,

13      occupational, and other important functions

14      predominate but do not meet the full criteria for

15      ADHD disorder or any other disorders,

16      neurodevelopmental disorders, diagnostic class."

17      You've tried to make the connection between ADHD mild and

18  unspecified ADHD.  ADHD mild means that they have fulfilled

19  criteria except the symptoms are mild and the impairments are

20  relatively mild.

21      That is different than what we are talking about here in

22  which clinically significant distress or impairment across the

23  domains predominates and that this category exists when the

24  clinician has chosen not to specify the specific reason the

25  ADHD diagnosis doesn't fall into the three subtype categories.

BY MR. SCHACHTER:

Q.   Okay.  You said a number of things and I want to break them down because I think they were each very important.

First, you talked about ADHD mild; right?

A.   Yes.

Q.   Okay.  I'd like to turn to that --

A.   I didn't talk about it except in my last testimony.  You have raised the issue of mild ADHD and I'm trying to address that.

Q.   Right.  You used the words "mild ADHD."

A.   Following your question.

Q.   Good enough.

Let's -- I want to turn to that and then we're going to come back to this unspecified ADHD.  Let's jump to mild and what that means.

MR. SCHACHTER:  If we can turn to 6028 at page 4.

BY MR. SCHACHTER:

Q.   So you have ADHD -- I'm sorry.  If you have ADHD mild, you have ADHD; correct?

A.   Correct, based on the diagnostic criteria.

Q.   Right.  And let's look at how the DSM defines mild.

You have mild ADHD if (as read):

"Few, if any, symptoms in excess of those required to make the diagnosis are present, and symptoms result in no more than minor impairments in

GOODMAN - CROSS / SCHACHTER

1        social or occupational functioning."

2        See that?

3   A.   Yes.

4   Q.   The words "few, if any" may mean none; correct?

5   A.   I suppose.

6   Q.   Okay.  So that is mild ADHD that a patient can suffer

7   from.  Let's turn back to unspecified.

8   A.   Let's pick up on mild.  The category of mild in ADHD is

9   subsumed under the diagnostic criteria, which means that the

10  patient who is ADHD mild has fulfilled age criteria and has

11  ruled out other psychiatric or medical conditions that would

12  explain their symptoms.

13       It is not a cross-sectional evaluation of presenting

14  cognitive symptoms.

15  Q.   That is a very helpful explanation, Dr. Goodman, that you

16  have just provided to us and that we just heard from you.

17       However, you will agree that every clinician in the

18  country is not talking to you and having you elaborate on what

19  these words in the DSM mean; correct?

20           MS. GREEN:  Objection.  Argumentative.

21           THE COURT:  Sustained.

22  BY MR. SCHACHTER:

23  Q.   You will agree with me, will you not, that what you just

24  said, that's not contained in the definition of mild that a

25  clinician may read should they open up the DSM?

```
 1    A.    Mild, moderate, and severe are listed under the ADHD.
 2    They are not listed under the unspecified category or the
 3    specified category, which means they are subsumed on the
 4    diagnostic criteria of ADHD.
 5    Q.    Understood.
 6          And what you've explained is it's vitally important that
 7    clinicians be looking at the words of the DSM before they say
 8    anybody has ADHD; correct?
 9    A.    The clinician's looking at the words of the DSM if they've
10    been trained in mental health.  They are not construing this
11    with the rigidity of a legal parameter.
12    Q.    Okay.  Well, there are people that are diagnosing people
13    with ADHD that are not trained in mental health; correct?
14          MS. GREEN:  Objection.
15          THE COURT:  Well, when you say trained in mental
16    health --
17          MS. GREEN:  Right.
18          THE COURT:  -- are you referring to that they don't
19    know how to conduct a mental health examination or that they
20    don't -- specifically are trained in mental health evaluation
21    from the point of view of the diagnostic manual?
22          A question -- when you say trained in mental health,
23    that's -- the problem -- I mean, I don't know if it's a
24    problem.
25          The doctor has testified that a doctor or a psychiatric
```

1  nurse practitioner has received, in his opinion -- could be

2  rejected by the jury -- has received training in conducting a

3  mental health evaluation.  That is, when the patient comes in,

4  they can -- and, in the doctor's opinion, should -- evaluate

5  the person from a mental health point of view, as well as a

6  physical health point of view.

7       That's what he said.  People who have a medical degree or

8  psychiatric nurse degree or whatever it is, a family doctor,

9  whatever it is, that's basic training to that -- to that

10 individual.  So when you use the word "mental health," you have

11 to distinguish what it is in particular that you are assuming

12 so you communicate the same words back and forth.

13          MR. SCHACHTER:  Okay.

14          THE COURT:  The same meaning by using the same words.

15          MR. SCHACHTER:  Sure.

16          THE COURT:  Okay.

17          MR. SCHACHTER:  Let me be more clear.

18 BY MR. SCHACHTER:

19 Q.   As I think you've said, in your view, most doctors and

20 nurses have not -- they didn't get a focus in their residency

21 or their training on ADHD; correct?

22 A.   On ADHD specifically, perhaps not.

23 Q.   Okay.  And so if they pop open the DSM and they're trying

24 to read it, they may see these words that define when somebody

25 has mild ADHD, "these words" being (as read):

1            "Somebody who has few, if any, symptoms in

2        excess of those required to make the diagnosis are

3        present and symptoms result in no more than minor

4        impairments or in social or occupational function."

5        You would agree with me they may see these words; correct?

6   **A.**    If you haven't been trained in mental health, you don't

7   understand the context of the diagnostic criteria and its

8   application to patient evaluations any more than I couldn't

9   perform an appendectomy by reading a surgical textbook even

10  though I'm a trained physician.

11  **Q.**    Okay.    Okay.

12       Okay.    Let's turn back to -- away from these words, which

13  explain what mild ADHD is to the reader of the DSM, and let's

14  turn to unspecified attention deficit disorder on page 10.

15       So, I think you may have disagreed -- I'm not sure -- are

16  you disagreeing with the concept that clinicians may meet

17  adults with mild ADHD symptoms who show negligible impairment

18  but report internal distress, reduced self-esteem, and

19  self-blame as a consequence of their symptoms, do you disagree

20  with the statement (as read):

21            "When this happens, unspecified or otherwise

22        specified ADHD may be an appropriate alternative

23        diagnosis in these cases"?

24            **MS. GREEN:**    Objection.    Compound and confusing.

25            **MR. SCHACHTER:**    Let me try --

GOODMAN - CROSS / SCHACHTER

```
 1              THE COURT:  Overruled.
 2       Go ahead.
 3              THE WITNESS:  I apologize.  I need you to repeat it.
 4  BY MR. SCHACHTER:
 5  Q.   Why don't I cut to the chase.
 6  A.   Every time there's an objection, I just get distracted.
 7  Q.   Why don't I cut to the chase.
 8       Can you turn to your article, the one that you coauthored
 9  7605 at page 5.
10  A.   Mm-hmm.
11  Q.   On page 5, can you turn to the right column, the middle to
12  the end of the first full paragraph.
13              MR. SCHACHTER:  Can we go a little bit further up.
14       Ah, there we are.  Okay.  Right.
15  BY MR. SCHACHTER:
16  Q.   In this article that you coauthored, does it say (as
17  read):
18              "Clinicians may meet adults with mild ADHD
19       symptoms who show negligible impairment but report
20       internal distress, reduced self-esteem, and
21       self-blame as a sequence of their symptoms.
22       Presently, the DSM-5 classification suggests that
23       ADHD cannot be diagnosed in this scenario, but
24       unspecified or otherwise specified ADHD may be an
25       appropriate alternative diagnosis in these cases."
```

GOODMAN - CROSS / SCHACHTER

```
 1         Is that what the article that you coauthored last month
 2   says?
 3              MS. GREEN:  Objection.  Can we lay foundation as to
 4   authorship?
 5              THE COURT:  Sustained.  This portion.  Did he write
 6   this portion?
 7              MR. SCHACHTER:  I'll break it down.
 8   BY MR. SCHACHTER:
 9   Q.   Did you write that (as read):
10             "When clinicians meet an adult with a mild ADHD
11        symptom who shows negligible impairment but they
12        report internal distress, reduced self-esteem, and
13        self-blame as a consequence, that unspecified or
14        otherwise specified ADHD may be an appropriate
15        diagnosis."
16        Did you write those words?
17   A.   No.
18   Q.   Okay.  Let's ask you then, in this -- do you disagree with
19   the words that were reviewed by Dr. Cortese in this article
20   that you coauthored?
21   A.   I would -- if I were reviewing this as a peer -- a
22   prepublication peer-reviewer, I would make some very strong
23   comments on the inaccuracy and misleading nature of these
24   things.
25   Q.   Okay.  But just to be very clear, do you disagree with the
```

1  statement in the article that you coauthored that says these

2  words?  I don't need to read them again.

3  **A.**  I disagree with the wording of this text which I did not

4  author.

5  **Q.**  Very good.  Thank you.  Okay.

6     Now --

7  **A.**  Would you like to know why?

8  **Q.**  Ms. Green can ask you if she wishes.  She'll have a

9  chance.  I would like move things along, if I can.

10    Now, on the DSM subject, as we talked about, I think, you

11 are familiar with Dr. Russell Barkley?

12 **A.**  Yes.

13 **Q.**  He is one of nations's foremost experts in ADHD?

14 **A.**  And a friend and colleague.

15 **Q.**  You are familiar -- and you're familiar with the

16 publication *Additude*, A-d-d-i-t-u-d-e?

17 **A.**  *Additude* is a magazine published for people wanting to

18 know information about ADHD.

19 **Q.**  You are on the medical advisory board of *Additude*?

20 **A.**  Am I?  Good to hear.  Thank you.

21 **Q.**  Well, you listed it on your CV as being on the medical

22 advisory board; is that correct?

23 **A.**  Then so be it.  I'm on the medical advisory board.

24 **Q.**  Okay.  In any event, in 2023, Dr. Barkley wrote an article

25 published in this magazine, it was entitled "How the DSM-5

1  fails people with ADHD and a better way to diagnose."

2      You're familiar with that publication, are you not?

3  **A.**   No.  So you can show it to me, but I do have a response to

4  your question when it -- when you get to it.

5  **Q.**   Well, so far my only question was if you're familiar with

6  the article?

7  **A.**   I have not read the article.

8  **Q.**   Okay.  Well, let me show it to you.  Exhibit 7291.

9          **MS. GREEN:**  We're going to object on foundation and

10 403.

11         **THE COURT:**  Overruled.

12     It's Volume 2.

13         **THE WITNESS:**  Yeah.  7293.

14 **BY MR. SCHACHTER:**

15 **Q.**   I'm sorry.  7291.

16 **A.**   Got it.  Okay.  Thank you.  I got it.

17 **Q.**   Okay.  And to be clear, part of the job of the medical

18 advisory board of *Additude* magazine is to ensure the accuracy

19 and medical integrity of the articles that are published in it;

20 is that correct?

21 **A.**   I assume that's correct.  I haven't been asked to review

22 this article.

23 **Q.**   Okay.  All right.

24     In any event, you consider Dr. Barkley to be an authority

25 in the field?

1    A.    Yes.

2    Q.    Okay.  And in this article "How the DSM-5 fails people

3    with ADHD and a better way to diagnose," Dr. Barkley

4    recommends -- and this is at page 3, Recommendation Number 5.

5    Dr. Barkley recommends (as read):

6             "Don't adhere too rigidly to diagnostic

7         thresholds when there are clear signs of impairment."

8         Does he not?

9    A.    That's what I see written here.

10   Q.    And what that means is that there are people with ADHD who

11   don't fall within the DSM's defined criteria, but Dr. Barkley

12   believes that practitioners should ignore some of those

13   symptoms and focus on the impairment that the patient is

14   suffering; is that correct?

15   A.    That's what he wrote here, and I believe that that's what

16   he believes.

17       I will clarify, though, you're citing an article that is

18   not in a scientific journal, has not been peer-reviewed, and

19   this is an editorialism by him on the state of ADHD as he sees

20   it.

21   Q.    Okay.

22            THE COURT:  Well, so, therefore, I think the objection

23   is sustained.  It's not a learned treatise, it's not -- does

24   not fall within the exception to the hearsay rule.

25            MR. SCHACHTER:  Well, I believe Dr. Goodman has very

```
 1    correctly identified Dr. Barkley as an authority in the field
 2    which makes his periodicals -- it does not -- it's not limited
 3    to learned treatises, but also periodicals written by
 4    authoritative figures.  And once Dr. Goodman says correctly --
 5    which I think everybody agrees -- Dr. Barkley is one of the
 6    foremost experts in the field, then that falls within the
 7    definition and I am entitled to ask him questions about the
 8    article.
 9            MS. GREEN:  Your Honor, we object to how Mr. Schachter
10    just clarified the -- defined the exception.  It does not say
11    just written by an authority in the field.
12            THE COURT:  Well --
13            MS. GREEN:  It has -- it's part E -- part B of
14    803(18).
15                      (Pause in proceedings.)
16            THE COURT:  (as read):
17             "However, the statement contained in a treatise
18        periodical -- it's a periodical -- "if the statement
19        is called to the attention of an expert witness on
20        cross-examination or relied on by the expert in
21        direct examination, it's been called to his
22        attention, and the publication is established as a
23        reliable authority by the expert's admission or
24        testimony by another expert's admission or testimony
25        or by judicial notice."
```

1          So the Government has raised an objection on B, it's

2     not -- it doesn't fall within it.  It doesn't fall within it.

3     It is not a periodical --

4                         (Phone rings.)

5               **THE COURT:**  If that's for me, I'm busy.

6          It does not fall within it, and so the objection is

7     sustained.

8               **MR. SCHACHTER:**  Okay.

9               **THE COURT:**  Okay.  Next.

10              **MR. SCHACHTER:**  Next.

11    **BY MR. SCHACHTER:**

12    **Q.**   Okay.  Now, let's talk about how one evaluates ADHD a

13    little bit further.

14         You have said that the diagnosis should be based on the

15    patient's report of their experience of ADHD symptoms; is that

16    correct?

17    **A.**   Yes.  But not solely necessarily.

18    **Q.**   Okay.  Now, I am correct, am I not, that when patients

19    self report, they do not tend to exaggerate their symptoms,

20    rather they tend to underestimate both the number and the

21    severity of their symptoms; is that correct?

22    **A.**   No.

23    **Q.**   Okay.  You will agree with me that *The Lancet* is one of

24    the foremost peer-reviewed journals in medicine?

25    **A.**   Yes.

1   Q.   And as we've talked about, Margaret Sibley, a respected

2   colleague of yours; correct?

3   A.   Yes.  A friend and colleague.

4   Q.   I am going to show you an article that she wrote.  It's

5   behind 7287.  This is Margaret Sibley's article in *The Lancet*

6   entitled "Method of adult diagnosis influences estimated

7   persistence of childhood ADHD:  A systemic [sic] review of

8   longitudinal studies."

9        Do you see that?

10  A.   Yes.

11  Q.   I'd like to direct your attention to page 6.

12           THE COURTROOM DEPUTY:  What number is this?

13           MR. SCHACHTER:  This is 7287.  But it's not being

14  admitted.

15           THE COURT:  And where on the page?

16           MR. SCHACHTER:  At page 6, it's in the highlighted

17  section, Your Honor.  It's on the screen.  There it is.  At the

18  top of the page.

19  BY MR. SCHACHTER:

20  Q.   Okay.  Do you see where Dr. Sibley writes (as read):

21           "Adults with ADHD have been shown to underreport

22       their symptoms."

23       Do you see that?

24  A.   Yes.

25  Q.   Okay.

1             MR. SCHACHTER:  You can take that down.

2    BY MR. SCHACHTER:

3    Q.   Now, I want to ask you about a question that Ms. Green

4    asked you on direct.

5         She asked you (as read):

6              "Is drug-seeking a particularly relevant concern

7         when prescribing a stimulant such as Adderall?"

8         And you answered:  (as read):

9              "It's particularly relevant in prescribing C II

10        drugs and stimulants specifically.  A clinician's

11        worry is that the person sitting in front of them may

12        be giving them a story that is reflecting that they

13        have ADHD when, in fact, they don't because of

14        drug-seeking behavior"

15        Do you remember that question and answer?

16   A.   I do.

17   Q.   In fact, the Canadian guidelines, which you relied on in

18   your report, disagree with that statement?

19   A.   What year?

20   Q.   Well, you cited them in your report.  It's the report that

21   you cited.

22        I'll direct your attention.  It's 6200.  We've looked at

23   it before.

24             THE COURT:  Wait.  6200?

25             MR. SCHACHTER:  Yeah.

1    BY MR. SCHACHTER:

2    Q.   Specifically, I'd like to direct your attention to

3    page 15.  Tell me when you're with me.

4    A.   Oh, I'm with you.  What's the -- what's the exhibit?

5    Q.   6200?

6    A.   62...

7         620...

8              THE COURT:  Page 50.

9              THE WITNESS:  Page 50?

10             MR. SCHACHTER:  15, 1-5.

11             THE COURT:  Top of page 42 of the --

12             THE WITNESS:  Oh, 42 on the TX?

13             THE COURT:  No.  50 on the TX.

14             MR. SCHACHTER:  15.  It's page 1-5 on the TX number at

15    the very bottom of the page.

16             THE WITNESS:  Got it.  Okay.

17             THE COURT:  You're all ahead of me.

18    BY MR. SCHACHTER:

19    Q.   Okay.  Tell me when you're there.

20    A.   I think I'm ready.  It's TX page 15?

21    Q.   Yeah.

22    A.   Okay.

23             THE COURT:  Page 7 of the --

24             THE WITNESS:  Page 7.  Got it.  Very good.  Okay.  I'm

25    good.

GOODMAN - CROSS / SCHACHTER

1    **BY MR. SCHACHTER:**

2    **Q.**    Okay.  And these are the Canadian guidelines that you cite

3    and rely on in your report; correct?

4    **A.**    Yes.

5    **Q.**    Okay.  The Canadian guidelines, I am correct, specifically

6    warn medical providers that quote (as read):

7            "Some clinicians may be wary of an individual

8        self-referring with a possible ADHD diagnosis.  They

9        may suspect that the person is looking for drugs,

10       accommodations, or an explanation/excuse for other

11       problems.  Clinical experience indicates this is an

12       infrequent occurrence."

13       Do you see that?

14   **A.**    I do.  And I disagree.

15   **Q.**    Fair enough.

16       Let me also --

17   **A.**    You wouldn't like to know why?

18   **Q.**    I'm going to show you one --

19           **THE COURT:**  Go ahead.  Go ahead so we don't have to go

20   back to this.  Go ahead.

21           **THE WITNESS:**  So the reason I disagree is severalfold.

22   One is, this is a publication that relies on published

23   scientific research.  As a result, those patients are

24   homogeneous in the sense that they're all very specifically and

25   completely evaluated in order to participate in ADHD research.

1          That is one population.  You cannot extend that assumption

2     from that population to a population of people who are actively

3     seeking treatment and/or drugs on a platform that facilitates

4     and allows that.

5          And, in fact, to drive that home, there was a recent

6     publication that showed that substance use disorder development

7     occurs more often in telehealth platforms than it occurs in

8     face-to-face evaluations.

9          So let's put this into context so the jury and the court

10    understands the methodology upon which the statement was

11    written.

12    **BY MR. SCHACHTER:**

13    **Q.**    Okay.  Well, we're going to talk a little bit more about

14    this in a moment, but I want to be clear before we talk about

15    the platform that we're talking about.

16         First of all, you understand -- you examined the files of

17    16 Done patients; is that correct?

18    **A.**    Yes.

19    **Q.**    You understand, do you not, that there were 137,000 Done

20    patients; correct?

21    **A.**    I was informed there were over a hundred thousand.

22    **Q.**    Okay.  And you have no idea how many patient files the

23    prosecutors needed to pore through before they found the 16

24    that they asked you to look at; correct?

25    **A.**    Correct.

GOODMAN - CROSS / SCHACHTER

1   Q.   You are familiar -- I think you used the term

2   statistically significant when I was asking you about the

3   percentage of -- of primary care physicians versus

4   psychiatrists that see ADHD patients; do you remember that?

5   A.   Yes, and that's a moving target because those numbers have

6   changed over the last 10 years.

7   Q.   Fair enough.  We're not going back there.

8        You used the term statistically significant; correct?

9   A.   Correct.

10  Q.   You will agree with me, will you not, that 16 out of

11  137,000 is not a statistically significant sample?  Yes or no.

12  A.   The answer is, yes; however, the patterns identified in 16

13  patients, if extended to the hundred-plus-thousand patients,

14  given the policies that restricted care, the evaluation times,

15  the follow-ups, and the template text, I can assume that the

16  pattern I saw from the policies and the provision of care, if

17  applied to other providers in this platform, would have

18  extended to all hundred-thousand-plus patients.

19  Q.   Sure.

20       If you were to assume that the things that you saw in the

21  16 files out of 137,000 that the prosecutors found and handed

22  to you occurred in all the other ones, you may be able to draw

23  certain conclusions; correct?

24  A.   The diversity --

25       MS. GREEN:  Objection.  Asked and answered.

1          THE COURT:  Overruled.  Go ahead.

2          THE WITNESS:  The diversity of the 16 patients extends

3    to 15 different practitioners who did the initial evaluations

4    and 36 different prescribers.  So when you say 16 cases, I'm

5    also looking at 15 initial evaluators and 38 other prescribers.

6        So call that what you want.

7    BY MR. SCHACHTER:

8    Q.    Okay.  But what I'd like to call it or not call it,

9    because you're the one that answers the questions, is the words

10   "statistically significant" because I think you misspoke.

11       When I just asked you if 16 -- a sample of 16 out of

12   137,000 is a statistically significant sample, I'm very sure

13   that you said yes.  I don't think that's what you meant.

14       Is a sample of 16 out of 137,000 --

15   A.    I will agree with you.  You are correct in regards to the

16   fraction of 16 over 100,000.

17   Q.    It is not statistically significant?

18   A.    I don't know if it's statistically significant because

19   a -- the statistical model has to be run on that.  But let's

20   assume -- I'll agree to the premise of your question.

21   Q.    Thank you.  Let's move on.

22       And by the way, just to return to the clinical guidelines,

23   you said a lot of things about the homogeneity of the -- of

24   something.  But to be clear, the Canadian guidelines say

25   clinical experience indicates that it is an infrequent

1    occurrence that a patient self-refers and a clinician suspects

2    that the person is looking for drugs.  That is according to the

3    Canadian guidelines that you cite an infrequent occurrence --

4              MS. GREEN:  Objection.

5    BY MR. SCHACHTER:

6    Q.    -- and according to clinical experience; correct?

7              MS. GREEN:  Objection.  Asked and answered and 403.

8              THE COURT:  Wait, sorry.  Sorry.

9                        (Pause in proceedings.)

10             THE COURT:  If what are you saying -- asking him, is

11   that the statement you read, is that in the document --

12             MR. SCHACHTER:  That's a much better way of asking the

13   question.

14             THE COURT:  Well, no.  I mean, it -- clearly it's in

15   the document.  You're not making things up.  It's in the

16   document.

17        Now, he has explained why he disagrees with it so I think

18   we've actually covered that subject.

19             MR. SCHACHTER:  Agreed, Your Honor.

20             THE COURT:  Okay.

21             MR. SCHACHTER:  I'll move on to a different part of

22   this Canadian guidelines.

23             THE COURT:  Go ahead.

24   BY MR. SCHACHTER:

25   Q.    If you can turn to page 11, please.

1           THE COURT:  You're talking about the TX number or

2      the --

3           MR. SCHACHTER:  Yes, the TX number.  I will generally

4      always be referring to that.  And it's 6200 Exhibit at 11.

5           THE COURT:  Okay.

6           THE WITNESS:  Okay.

7      BY MR. SCHACHTER:

8      Q.   Okay.  Do you see the paragraph that starts --

9           MR. SCHACHTER:  Mr. Cepregi, can you just blow it up

10     for the witness, the one that starts "There is a common public

11     misconception."

12     BY MR. SCHACHTER:

13     Q.   The Canadian guidelines that you cite and rely on in your

14     report state (as read):

15              "There is a common public misconception

16          reinforced by much of the media that ADHD is

17          overdiagnosed."

18          Do you see that?

19     A.   I do see that.

20     Q.   I'll ask you if you agree.

21          Is this another statement in this guidelines that you cite

22     that you disagree with or do you agree with it?

23     A.   I don't know how to measure public misperception, but if

24     you want me to concede this point, I'm happy to say, yes, ADHD,

25     here -- it doesn't specify whether it's children, adolescents,

 1    or adults.  This is a guideline out of Canada that addresses

 2    ADHD across the life spectrum, so this sentence doesn't specify

 3    the age that they're referring to.

 4         So there are several clarifications in here that are

 5    important rather than taking this as a single sentence.

 6    Q.   Okay.  Thank you, Doctor.

 7         Okay.  Let's switch topics.

 8         Now, you testified that it is outside the usual course of

 9    professional practice to write prescriptions for controlled

10    substances for patients who do not meet the DSM-5 criteria;

11    correct?

12    A.   Correct.

13    Q.   All right.  Now, just --

14    A.   Let me -- let me clarify that.

15    Q.   Mm-hmm.

16    A.   Correct, as it relates specifically to ADHD; correct.

17    Q.   Okay.  But to be clear, again, the DSM-5 says nothing

18    about what medications should be prescribed to someone who

19    suffers from ADHD inattentive?

20    A.   Because the DSM-5 doesn't stipulate treatment --

21    Q.   Exactly.

22    A.   -- recommendations.

23    Q.   Exactly.  It says nothing about what kind of medication

24    should be prescribed to anybody who suffers from any of the

25    different definitions of ADHD that are found in the DSM;

1    correct?

2    **A.**    Correct.

3    **Q.**    All right.  Now, let's talk about how doctors prescribe

4    medication.

5        Now, medication has to be approved by the FDA; is that

6    correct?

7    **A.**    No.

8    **Q.**    Okay.  Are there certain kinds of medication that need to

9    be approved by the FDA?

10   **A.**    The FDA approves medications when registration trials are

11   submitted, efficacy is demonstrated for a particular disease

12   state.  Physicians have the latitude to use medications

13   off-label if there is substantial scientific evidence to do so

14   despite the fact the FDA hasn't approved those medications.

15       The absence of approval does not mean the medicine doesn't

16   work.  It means that registration trials haven't been submitted

17   and that is often dictated by commercial interests as to

18   whether or not it's commercially viable to submit research and

19   seek an approval.  Many generic medications never get a formal

20   approval because they don't submit that and they're entered

21   into an FDA approval because of the original research.

22   **Q.**    Thank you.  That's exactly what I was going to ask you

23   about.

24       So a drug company develops a medication.  They do clinical

25   trials.  They submit the application to the FDA.  And they, in

 1   their initial application, will identify particular what are

 2   called indicated uses of that medication; is that right?

 3   A.   Correct.

 4   Q.   All right.  And then the FDA may approve the medication as

 5   being safe and effective?

 6   A.   Correct.

 7   Q.   Those are the two criteria they look at; right?

 8   A.   Yes.

 9   Q.   Safety, which doesn't mean that there aren't side effects?

10   A.   Correct.

11   Q.   It means that it is safe enough.  Withdrawn.

12        And then they say -- they go to the FDA and say, okay,

13   look, this is safe for these uses and these are -- and it's

14   efficacious, meaning it helps people with these particular

15   diseases; right?

16   A.   Correct.

17   Q.   Okay.  Then the FDA says we approve this medication, if

18   they do?

19   A.   So I'm not involved with the FDA or the regulatory.  I

20   don't know whether to answer yes or no or whatever, so --

21   Q.   Fair enough.  I don't really want to go beyond what you

22   just talked about.

23   A.   Okay.

24   Q.   This is the area that I want to cover.

25        Okay.  According to the FDA, from the FDA perspective,

1 once the FDA approves a drug, health care providers generally

2 may prescribe the drug for an unapproved use when they judge

3 that it is medically appropriate for their patient; correct?

4 **A.**   Yes.  As it relates to noncontrolled drugs.

5 **Q.**   Okay.  Well, we're going to get to that in a minute

6 because there are loads of off-label uses for even drugs that

7 are also controlled.  You will agree with me, will you not?

8 **A.**   They're used off-label.  Whether it's for a legitimate

9 medical purpose or not is by the dictate of the clinician

10 writing the prescription.

11 **Q.**   Bingo.

12     It's by the dictate of the clinician writing the

13 prescription?

14 **A.**   It's by the dictate of an independent clinician writing a

15 prescription.

16 **Q.**   Sure.

17     It is by the dictate of the independent clinician writing

18 the prescription.

19     Now, this is what's called an off-label prescription --

20 let me fix that question.

21         **MS. GREEN:**  Can we object on relevance?

22         **MR. SCHACHTER:**  Oh, it is --

23         **THE COURT:**  Overruled.

24 BY MR. SCHACHTER:

25 **Q.**   Okay.  A -- you used the term "off-label."  What that

1    means is the FDA approves it for a particular purpose.  For

2    example, Adderall is -- its approved uses are ADHD and

3    narcolepsy; is that correct?

4    **A.**    ADHD in what age range?

5    **Q.**    Well -- I think any, but well -- let's come back to that

6    in a minute.

7         Adderall IR is approved for ADHD and narcolepsy; correct?

8    **A.**    For what age group?

9    **Q.**    For any age group.

10   **A.**    Incorrect.

11   **Q.**    I'm sorry.  Up to age 65 or something like that.  There's

12   an age cutoff.

13   **A.**    Incorrect.

14   **Q.**    Okay.  For what age is Adderall IR approved?

15   **A.**    Adderall immediate-release is not FDA approved for use

16   over the age of 18.

17   **Q.**    Okay.  Okay.  Great.

18        And you understand, then, that it would be off-label to

19   prescribe Adderall IR to somebody over the age of 18; correct?

20   **A.**    Technically true.

21   **Q.**    Okay.  You prescribe Adderall IR to people over the age of

22   18, do you not?

23   **A.**    Yes.

24   **Q.**    And lots of practitioners prescribe Adderall IR off-label

25   to people over the age of 18?

1    A.    Correct.

2    Q.    Okay.  And the idea of an off-label prescription is that

3    the medical provider is using a clinical judgment to weigh the

4    benefits of the medication to that particular patient against

5    the side effects and then they, together with the patient, make

6    a decision as to whether or not the off-label use of that

7    medication is in the patient's interest; is that right?

8    A.    Yes.  Considering all of the clinical factors

9    individualized for that patient.

10   Q.    Okay.  Great.

11         So Vyvanse is approved for ADHD and binge eating disorder;

12   is that correct?

13   A.    Correct.  Across the age.

14   Q.    Okay.  Now, you have said that if a person does not

15   qualify for an ADHD diagnosis, if they have attentional

16   problems, they will still benefit from a stimulant; correct?

17   A.    Most of the time, yes.

18   Q.    But you say that what is important is that you are -- even

19   if they would benefit, you cannot use it to enhance

20   performance.

21         That would be an inappropriate use of a stimulant?

22   A.    It would be a -- it would not be a legitimate medical

23   purpose.

24   Q.    Right.

25   A.    In the usual course of professional practice.

1  **Q.**  Right.  Right.

2  **A.**  Per the Controlled Substances Act.

3  **Q.**  Great.  Okay.

4  **A.**  And the DEA.

5  **Q.**  Okay.  Now, I am correct that of psychiatric drugs,

6  stimulants are prescribed off-label more than any other?

7  **A.**  I don't know that.

8  **Q.**  Okay.  Well, what if I told you you cited an article that

9  cited an article that said just that?

10  Okay.  Never mind.  I'm just kidding.  Let's move on.

11  Now, ADHD medications, those that are approved for ADHD,

12  are used to treat a variety of conditions; is that correct?

13  **A.**  I'm sorry.  Say it again.

14  **Q.**  Sure.  You talked about off-label use of medications?

15  **A.**  Off-label use of Adderall?

16  **Q.**  Let's talk about that.  There are off-label uses of

17  Adderall; correct?

18  **A.**  Yes.

19  **Q.**  Clinicians use it for depression?

20  **A.**  Yes.  Although the literature on that is controversial.

21  **Q.**  Sure.  It may be controversial, but a medical provider in

22  their independent judgment can be meeting with a patient

23  suffering from depression and they can decide that an off-label

24  use of Adderall may help that patient and prescribe it to them?

25  **A.**  Yes, in their independent judgment.

GOODMAN - CROSS / SCHACHTER

1  Q.   Adderall is prescribed for people with post-traumatic

2  stress disorder?

3  A.   I don't specialize in PTSD, so I don't know whether it is

4  or is not written for PTSD.

5  Q.   Okay.  Do you know that Adderall is prescribed to people

6  with traumatic brain injury?

7  A.   Yes.

8  Q.   And that's an off-label use?

9  A.   Yes, it would be.  There's no FDA approval for it.

10  Q.   Right.  But an independent medical provider can look at a

11  patient and say, "You know what?  I think this person would be

12  helped by this and the benefit, in my judgment, will outweigh

13  the side effects"; correct?

14  A.   Yes.  And we assume that that clinician writing an

15  off-label use understands what a certain body of literature

16  exists in order to support that off-label use.

17      An off-label use is simply a willy-nilly decision to use

18  megadoses of vitamin C to treat ADHD.

19  Q.   Right.  No practitioner anywhere should be making

20  willy-nilly decisions about prescribing medication; correct?

21  A.   Correct.

22  Q.   They should -- all medical providers have an independent

23  ethical and professional obligation to their patient to only

24  prescribe medication that they believe is in the patient's best

25  interests and the benefits are going to outweigh the side

GOODMAN - CROSS / SCHACHTER

1    effects.

2         That's every doctor and nurses' obligation to their

3    patients.  You agree with that?

4    **A.**    And since we're talking about stimulants, the regulations

5    for prescribing stimulants, then, fall under the Controlled

6    Substances Act.  So anyone writing a C II drug needs to write

7    for a legitimate medical treatment, for a legitimate medical

8    reason, and not for the purpose of abuse, diversion, or profit.

9    **Q.**    Let's -- I want to -- I want to ask you about a word that

10   you just used you.

11        Just you said "legitimate medical reason," did you not?

12   **A.**    I did.

13   **Q.**    But the actual language that we're talking about is the

14   word "purpose"; right?

15   **A.**    Okay.

16   **Q.**    And those are two different words, the words "purpose" and

17   "reason" are two different words, are they not?

18        **MS. GREEN:**  Objection.  Argument.  And 403.

19        **THE COURT:**  Overruled.  They are two different words.

20   I don't see what -- what counsel's point is.  Okay.  They're

21   two different words.

22        **THE WITNESS:**  They are two different words, and I use

23   the words in the English vernacular.  If there's a legal

24   definition of both words, then I have misspoken.

25   \\\

GOODMAN - CROSS / SCHACHTER

1    BY MR. SCHACHTER:

2    Q.   As I'm trying to -- as I tried to tell you, we here try to

3    use English just like everybody else does, as best we can.

4         The word "purpose" means the intent, the reason why

5    someone -- some individual -- well, withdrawn.

6         It is the intent behind why someone is doing something --

7              THE COURT:  Counsel --

8              MS. GREEN:  Objection.

9              THE COURT:  -- I understand exactly what you're trying

10   to say.

11             MR. SCHACHTER:  I'm going to return to this.

12             THE COURT:  For example -- for example, it may be the

13   purpose of a doctor or a practitioner to help a patient, which

14   is what you're talking about, its purpose.

15        The reason may be that he doesn't -- he or she doesn't

16   follow the DSM, that he or she disagrees with it, says, "I

17   don't think the DSM is appropriate at all.  I don't think the

18   Controlled Substances Act is appropriate at all.  I think

19   they're inappropriate."

20        Now -- so the reason is one thing.  The purpose is another

21   thing.  And I think what the witness testified to is that you

22   look at -- you can look at both.  Certainly it is the purpose

23   to help somebody, but the reason can't be that he or she simply

24   disagrees with the DSM or simply disagrees with the Controlled

25   Substances Act because that invites -- that invites -- that has

1    consequences.

2         Okay.  Go ahead.

3         So use those words carefully when you question the witness

4    because there's some confusion as to the two.

5              **THE WITNESS:**  Thank you, Your Honor.

6              **MR. SCHACHTER:**  Your Honor, the Court couldn't have

7    said it better than -- the Court said it better than ever I

8    could, ever.  Let's -- let's move on then.

9    **BY MR. SCHACHTER:**

10   **Q.**   Now, ADHD medications, which are controlled substances --

11   as we've talked about, even though they're controlled

12   substances, clinicians may say, "My purpose in prescribing this

13   medication is to treat depression"?

14   **A.**   Yes.

15   **Q.**   That's a legitimate medical purpose?

16   **A.**   Yes.

17   **Q.**   This -- you don't know about PTSD, but they may -- you

18   know, by the way, that one common off-label stimulant use is to

19   treat fatigue or excess daytime sleepiness?

20   **A.**   Yes.  Under a -- under a diagnosis of narcolepsy and sleep

21   apnea and circadian rhythm sleep disorders.

22   **Q.**   Okay.

23   **A.**   They're not treating -- the FDA has indicated those

24   medications for specific medical orders.  It is not indicated

25   for the treatment of fatigue.  It is not indicated for a

GOODMAN - CROSS / SCHACHTER

1    symptom.

2    **Q.**    Right.  Exactly.

3        It is only indicated for ADHD and for narcolepsy, at least

4    Adderall IR?

5    **A.**    Okay.

6    **Q.**    However, you understand that there are practitioners that

7    prescribe it off-label to treat someone's fatigue or excess

8    daytime sleepiness.

9        That happens, doesn't it?

10   **A.**    So I'm not an expert -- this is not my area of expertise,

11   and it's beyond the scope of my expert opinion today.

12   **Q.**    Very good.  You don't know one way or the other?

13           **MS. GREEN:**  Objection.  Asked and answered.

14           **THE COURT:**  He's not here to give that expert opinion.

15   Okay.

16           **MR. SCHACHTER:**  Very good.  Okay.

17       Now, we're going to move to a different topic, Your Honor.

18   I don't know if this is -- if Your Honor wishes me to continue

19   or not?

20           **THE COURT:**  Sure.  Ladies and gentlemen, we'll take

21   our noon recess.  We'll be in recess until a quarter of 1:00.

22       Remember the admonition given to you:  Don't discuss the

23   case, allow anyone to discuss it with you, form or express any

24   opinion.

25                   (The jury leaves the courtroom.)

```
 1        (Proceedings were heard out of the presence of the jury.)

 2            THE COURT:  Okay.  Let the record reflect jurors have

 3    left.

 4        Mr. Schachter, approximately how much longer do you have?

 5            MR. SCHACHTER:  I'll just wait until the --

 6            THE COURT:  You want to keep it a secret from the

 7    witness?

 8            MR. SCHACHTER:  I don't want him to know.  I want it

 9    to be a surprise.

10        This is going much slower.  I did not anticipate lengthy

11    discussions about what is on the page and what isn't on the

12    page, and so it's taken a lot longer.  I am -- I am certainly

13    going to go through the afternoon recess, and I will do

14    everything I can to finish by the end of day.

15        Let me also say, Your Honor, I have conferred with

16    Dr. Brody's counsel on everything that I am covering, and we

17    have discussed this cross-examination.  I don't -- I don't know

18    that she'll be in a position to say with certainty until I'm

19    done, but I don't know, based on my discussions, whether

20    Dr. Brody's counsel will have any questions or whether I will

21    have covered everything for both.

22            MS. NECHAY:  I just want to confirm that for the

23    record, on behalf of Dr. Brody, and -- I anticipate passing

24    questions on this witness.

25            THE COURT:  You can't give an opinion on those things
```

```
 1   you haven't heard yet, so...
 2           MS. NECHAY:  Sure.
 3           MR. SCHACHTER:  It's obviously a very important
 4   witness for us.
 5        Thank you. Your Honor.
 6           THE COURT:  You think?
 7                    (Recess taken at 12:00 p.m.)
 8                  (Proceedings resumed at 12:50 p.m.)
 9      (Proceedings were heard out of the presence of the jury.)
10           THE COURTROOM DEPUTY:  Come to order.  Court is now in
11   session.
12           THE COURT:  Okay.  Bring in the jury.
13                    (The jury enters the courtroom.)
14       (Proceedings were heard in the presence of the jury.)
15           THE COURT:  Please be seated.  Let the record reflect
16   all parties are present.
17        You my proceed.
18           MR. SCHACHTER:  Thank you, Your Honor.
19           THE COURT:  Jury is present.
20           MR. SCHACHTER:  Good afternoon.
21   BY MR. SCHACHTER:
22   Q.   Good afternoon.
23   A.   Hello.
24   Q.   Doctor, you testified that it is outside the usual course
25   of professional practice to have a policy that says even if a
```

1  patient does not meet the full criteria, it still might be

2  worth doing a medication trial.

3       Do you recall that testimony?

4  **A.**   I said it might be worth doing?

5  **Q.**   No, no, no.  I'm sorry.  I'll repeat.

6       I think you said that it was outside -- in your opinion,

7  it was outside the usual course of professional practice to

8  have a policy that says even if a patient does not meet the

9  full criteria, it still might be worth doing a medication

10 trial?

11 **A.**   Correct.

12 **Q.**   Okay.  The fact of the matter is, doctors all the time

13 recommend patients do a trial to see if a stimulant may help.

14 Agree or disagree?

15 **A.**   I don't know what other clinicians do.  As I said

16 earlier --

17           **THE COURT:**  Could you move the microphone?

18           **THE WITNESS:**  Oh, I'm sorry.  Sorry.  Sorry.

19      I don't know what other clinicians do.  I'm not in their

20 office.  As I said earlier, if I gave everyone in this room a

21 stimulant medication, they said that they would -- their mood

22 would be better, their energy would be better, and the

23 cognition is better.  That doesn't justify the ongoing

24 prescription of a stimulant medication.  So without a formal

25 diagnosis of ADHD, writing these medications for that needs to

1    be done for a legitimate medical reason in the usual course of

2    professional practice.

3    **BY MR. SCHACHTER:**

4    Q.    Okay.  Thank you.

5          You are familiar with the peer-reviewed journal called

6    *Neurology*?

7    A.    I am only by name.  Not being a neurologist, it's not a

8    publication I read.

9    Q.    Well, you cited to an article in *Neurology* in your report,

10   did you not?

11   A.    Well, let's go back to my report.

12   Q.    Well, let me try to refresh your recollection.

13         You cited an article that you wrote in the peer-reviewed

14   journal *Neurology*.  Does that help you remember?

15   A.    I wrote an article for the *Journal of Neurology*?

16   Q.    Yeah.  Well, you can't --

17   A.    I do not recall that.  I don't recall that.

18   Q.    Okay.  If you can look at your --

19   A.    I mean, I may, but --

20   Q.    Sure.

21         If you can just look --

22   A.    Am I an author or the paper?

23   Q.    Yeah.

24         You do remem- --

25             **THE COURT:**  Let's look at it rather than spending

1    10 minutes --

2            **MR. SCHACHTER:**  Sure.

3            **THE COURT:**  Where is it?

4            **MR. SCHACHTER:**  I believe it's Note 34.

5            **THE COURT:**  Pardon?  It's Exhibit Number 4321; right?

6    I mean, it's not in evidence but it's the expert report?

7            **MR. SCHACHTER:**  I think it's 7318.

8            **THE COURT:**  7318?

9            **MR. SCHACHTER:**  Yeah.

10           **MS. GREEN:**  Can we show the expert report to the

11   witness, Mr. Schachter, where you said it was cited?

12           **MR. SCHACHTER:**  Yeah.  I'll do both.

13       Well, withdrawn.  Hold on.  Hold on.  I can show him --

14           **THE COURT:**  7318.

15           **MR. SCHACHTER:**  I'm sorry.

16   **BY MR. SCHACHTER:**

17   **Q.**   You have cited to *Neurology* magazine.  *Neurology*, the

18   peer-reviewed journal.

19   **A.**   Well, I'm looking at what I'm looking at on the screen but

20   I want to pull this up --

21           **MS. GREEN:**  Sorry.  Can we clarify?  Are you saying

22   you have cited in his expert report?

23           **MR. SCHACHTER:**  No.  I'm saying that -- I'm sorry.  I

24   misspoke.

25   \\\

1  BY MR. SCHACHTER:

2  Q.    Dr. Goodman, you have cited to the *Journal of Neurology*

3  before; correct?

4             MS. GREEN:  Objection.  Vague.

5        Can we --

6             THE COURT:  Why don't you just -- why don't you just

7  show him -- if you believe he has, just show him the citation.

8  Okay?

9             MR. SCHACHTER:  Sure.

10            THE COURT:  What exhibit number is it?

11            MR. SCHACHTER:  7318 is an article that Dr. Goodman

12  wrote.  It's a cite to *Neurology*.

13            THE COURT:  Okay.  Yes.

14            THE WITNESS:  I see it.  Just so I'm clear on what

15  you're asking me.  I wrote an article an ADHD in older adults

16  and I did cite an article from *Neurology* on vascular dementia.

17  BY MR. SCHACHTER:

18  Q.    Right.

19  A.    So the answer is yes.

20  Q.    Okay.  Great.

21        And *Neurology* is a peer-reviewed journal put out by the

22  American Academy of Neurology; correct?

23  A.    True.

24  Q.    ADHD is a neurodevelopmental disorder; correct?

25  A.    True.

1  Q.    Okay.   It has been published in a peer-reviewed article in

2  *Neurology* that adults diagnosed with ADHD or those for whom

3  there is a high suspicion of ADHD can significantly benefit

4  from a trial of stimulant medications.

5       Are you aware of that?

6  A.    So I'm not sure what you're citing.   Are you citing

7  something I wrote in my article or you're citing something

8  someone else wrote in another article?

9  Q.    Sure.   Well, let me just show you.   I'm going to show you

10 what is in your binder as Exhibit 6029.

11         THE COURT:   Okay.   Wait a minute.   6019 is in

12 Volume 1.

13         MR. SCHACHTER:   I'm sorry.   6029.

14         THE COURT:   6029.

15         THE WITNESS:   Okay.   Got it.

16         THE COURT:   And what -- okay.   Oh.   Go ahead.

17 BY MR. SCHACHTER:

18 Q.    Do you see the article entitled "Do I Have ADHD?

19 Diagnosis of ADHD in Adulthood and Its Mimics in the Neurology

20 Clinic"?

21 A.    Yes.

22 Q.    Do you see the author is Dr. Mierau from Harvard?

23 A.    Yes.

24 Q.    And if we look at the bottom of that page.

25         MS. GREEN:   Objection on 803(18), not learned

 1   treatise.

 2           **MR. SCHACHTER:**  I have not yet asked the question,

 3   Your Honor.

 4           **MS. GREEN:**  Okay.

 5   **BY MR. SCHACHTER:**

 6   **Q.**   Do you see the author's qualifications with the Division

 7   of Cognitive and Behavioral Neurology at Brigham and Women's

 8   Hospital, Boston, the Lurie Center for Autism, Massachusetts

 9   General Hospital, and Harvard Medical School?

10   **A.**   Yes.

11           **MR. SCHACHTER:**  And if we can turn to the last page of

12   the article, Mr. Cepregi, publication history.

13           I'm sorry.  Page 11.  No, no.  I'm sorry.  Are we looking

14   at the wrong -- 6029.

15   **BY MR. SCHACHTER:**

16   **Q.**   Okay.  You see where it says (as read):

17                "Publication history, Received by *Neurology:*

18           *Clinical Practice* October 17, 2023.  Accepted in

19           final form, submitted and externally peer-reviewed."

20           Do you see that?

21   **A.**   Yes.

22   **Q.**   Okay.  And what does it mean to be a peer-reviewed article

23   in a journal?

24   **A.**   So the manuscript is submitted to the journal.  The

25   journal then sends the manuscript out to usually two, if not

1  three expert reviewers.  They go through the document, they

2  critique the introduction, whether the appropriate references

3  are there.  They critique the methodology, as to whether the

4  methodology is sound or not.

5       Then they review the statistical analysis.  They review

6  the reported results.  They review the conclusion, and they

7  make comments on whether the methodology is solid or not solid.

8  Whether the results are solid or not solid.  Whether the

9  statistics done are appropriate, and when whether the

10  conclusion is written in a way that accurately portrays the

11  results.

12 **Q.**  Thank you.

13      I would like to now direct your attention to page 8 of

14 this article.  Under the section "Treatment and Diagnostic

15 Trial with Stimulant Medications," section on "Rationale."

16      Do you see that?

17 **A.**  Yes.

18 **Q.**  Okay.  Do you see where the article states (as read):

19          "Adults diagnosed with ADHD or those for whom

20      there is a high suspicion for ADHD can significantly

21      benefit from a trial of stimulant medications."

22      Do you see that?

23 **A.**  I do.

24 **Q.**  Do see where the author goes on to say (as read):

25          "A trial is relatively low-risk as even the

1          long-acting medications typically wear off within 8

2          to 12 hours."

3          Do you see that?

4     A.    I do.

5          Point of clarification.  Highly -- where does it say? --

6     high suspicion of ADHD means the evaluator has done a

7     comprehensive psychiatric evaluation, that most of the

8     diagnostic criteria are fulfilled, and therefore, that's what

9     this author cites.  It's a single author who's responsible for

10    what she writes.

11         Saying the trial is relatively low-risk doesn't clearly

12    clarify the risks involved, in part because perhaps the author

13    is referencing patients who only have ADHD and hasn't qualified

14    her statement by including comorbid psychiatric or comorbid

15    medical illnesses.

16         So I think this statement, as it stands by itself, is

17    unlikely and un- -- and inaccurate given that 70 to 80 percent

18    of ADHD adults have another psychiatric comorbidity, 50 percent

19    have two or more.  This statement is a reductionistic statement

20    of people who simply have ADHD, which is 20 percent of the ADHD

21    adult population.

22    Q.    Okay.  Thank you.

23         With respect to the author's statement that a trial is

24    relatively low-risk as the long-acting medications typically

25    wear off within 8 to 12 hours, you have said that the -- that

1    children are more sensitive to side effects from stimulants

2    than adults; is that correct?

3    **A.**    Did I say that in testimony or I've said that in a written

4    article?  Because I don't recall saying it in testimony.  And

5    because I don't treat children, it's unlikely I would make a

6    clinical comment about the treatment of ADHD in children.

7    **Q.**    Okay.  Well, do you remember saying to NPR that (as read):

8            "Children are more sensitive to certain side

9         effects from stimulants than adults.  We know that

10        from comparative studies looking at side effects from

11        the medications"?

12    **A.**    If you're citing a quote, I will concede that I said that.

13    **Q.**    Okay.  All right.

14        Now --

15    **A.**    Let me ask, though, was what you just read in an interview

16    that had a preamble of a question about children?

17        Was I responding to a question about children?

18    **Q.**    Okay.  Dr. Goodman, these are all good questions, but

19    I'm -- and Ms. Green can ask you about that.  I just want to --

20            **THE COURT:**  Well, no, I think that that's in

21    fairness --

22            **MR. SCHACHTER:**  Sure.  Okay.  Sure.

23    BY MR. SCHACHTER:

24    **Q.**    Yes.  Okay.

25        Can you, please, if you wish to, look at what's in your

```
 1   binder as Exhibit 7274T, which is a -- I believe to be a
 2   transcript of an interview that you gave.  If you look at -- I
 3   mean --
 4           MR. SCHACHTER:  Or, Your Honor, I can just withdraw
 5   the question and move on.
 6           THE COURT:  No, no.  It's --
 7           MR. SCHACHTER:  All right.  I'm just trying to be
 8   efficient.
 9           THE COURT:  What page?
10           MR. SCHACHTER:  Okay.
11   BY MR. SCHACHTER:
12   Q.   Okay.  It's on -- if you look at page 31 -- I'm sorry.
13   I guess the question is on page 30 of the interviewer.
14           THE COURT:  Starts on line 6.
15           MR. SCHACHTER:  Correct.  Then 31.
16           THE WITNESS:  So what exhibit is this, then?
17           THE COURT:  Ms. Fisher.  Do you see that?  Line 6, you
18   first go to page 30 --
19           THE WITNESS:  Okay.
20           THE COURT:  -- of 7274.
21           THE WITNESS:  Mm-hmm.
22   BY MR. SCHACHTER:
23   Q.   I'll give the full question and answer, if that's helpful.
24   A.   Okay.
25   Q.   You are asked by the interviewer on NPR (as read):
```

1            "Here's an interesting e-mail from Clark.  He

2       says, 'I have a friend who was diagnosed with ADHD as

3       a child.  He is now in his early 30s, living in his

4       mom's basement.  He has two young children with

5       state-minimum shared custody and he is unable to

6       maintain a full-time job.  He knows he has ADHD but

7       refuses to address the problem.  What are some of the

8       ways I can encourage him to seek help?  He had bad

9       experiences with medication as a child and is adamant

10      to not take medication.

11           "'That's an interesting question, someone who

12      maybe wasn't treated properly as a child, now

13      paranoid, or maybe that's not the right word, but

14      skittish about treating it as an adult.'"

15      You respond (as read):

16           "Right.  That's a great example of what can

17      happen when the child is given medication and

18      develops side effects.  It doesn't necessarily mean

19      the child was mistreated.  The children are more

20      sensitive to certain side effects from stimulants

21      than adults.  We know that from comparative studies

22      looking at side effects of the medications."

23      Do you see that?

24  A.  I do.

25  Q.  Okay.  So the question is about an adult and you are

1    responding about how, just because the person suffered side

2    effects from stimulants as a child doesn't mean that they'll

3    have side effects as an adult; correct?

4    **A.**    There's too many variables in that question.  Can you make

5    it easier -- let me describe -- let's see if I can answer your

6    question this way.

7            My response was -- my response was in direct response to

8    the example of the case provided, which included children, a

9    patient who had been treated as a child, didn't like the

10   effect, now had the attitude:  I don't want to be on

11   medication.

12           My response is to explain that to the person asking the

13   question, and that response is very reasonable and appropriate.

14   **Q.**    Agreed.  It's accurate; right?  The side effects that

15   adults have from stimulant medication are not as severe as

16   those that children may receive; is that correct?

17   **A.**    That's correct.  And I would appreciate it if you're going

18   to cite transcripts and interviews that I provided that you

19   give me the preamble to that quote and not simply extract it

20   out and make an example that I am misstating, misquoting, or

21   denying what I said.

22   **Q.**    Dr. Goodman, I'm in no way suggesting that you are.  I

23   simply asked the question that -- do the side effects that an

24   adult feels from stimulant medication, are they less than those

25   that children receive and then -- anyway, let's move on.

1          Let's move on.

2          There was a time when you believed that teaching doctors

3    to give stimulant medications a try when they suspect ADHD was

4    completely appropriate?

5    **A.**    The word "suspect" is predicated on the fact that a

6    complete comprehensive psychiatric evaluation was done and the

7    predominance of symptoms dictate a suspicion.  It is not some:

8    Inattention.  Distractibility.  Let's see what happens if I

9    give you a stimulant medication.

10   **Q.**    I'd like to explore that.

11          You oversaw a medical education course called "Unmasking

12   ADHD in Adults," did you not?

13   **A.**    Yes.

14   **Q.**    It was published on the website "Medscape," which is used

15   to educate physicians; is that correct?

16   **A.**    Correct.

17   **Q.**    There was an instructional video in that course that you

18   oversaw to teach doctors; correct?

19   **A.**    I believe so, but I do not recall the specifics.

20   **Q.**    In the video, a primary care physician is meeting with a

21   college professor.

22          Do you recall that?

23   **A.**    I don't.

24   **Q.**    Do you recall that they talk about work-related sleep

25   issues?

1    **A.**    I don't recall the video at all.

2    **Q.**    Do you recall that after three minutes, the patient

3    describes attention issues he had as a child?

4              **MS. GREEN:**    Objection.    The witness said he doesn't

5    recall the video at all, so foundation.

6              **THE COURT:**    Overruled.

7         Go ahead.

8    **BY MR. SCHACHTER:**

9    **Q.**    After about three minutes, the patient describes attention

10   issues that he had as a child.

11        Do you recall that?

12   **A.**    I do not.

13   **Q.**    The person playing the patient says that his son was found

14   to have ADHD and is doing well in college on his medication.

15        Ring any bells?

16   **A.**    No.    Back up for a moment.    You mentioned the person

17   playing the patient.    This was a video, then, constructed for

18   educational purposes?

19   **Q.**    Correct.

20   **A.**    Right.

21   **Q.**    Now it's coming back?

22   **A.**    No, it's not coming back except that the format is such

23   that I would not have participated in the production of that,

24   so I'm not sure how the video relates to me.

25   **Q.**    Well, I'm going to ask you one more question about the

1  video and then we'll talk about how you can remember it.

2      Do you recall that six minutes into the video, the doctor

3  in the course that you oversaw said (as read):

4          "If you have ADHD, which I believe you do,

5      family members often respond well to similar

6      medications.  Would you consider giving that a try?"

7      Do you remember that?

8  A.   Are you quoting me in this video?

9  Q.   I am quoting a video that you prepared in a course that

10  you oversaw for Medscape called "Unmasking ADHD in adults."

11      Do you recall that?

12          MR. BODAPATI:  Objection.  Foundation.  "You

13  prepared"?

14  BY MR. SCHACHTER:

15  Q.   Let me help you.  Do you recall being interviewed by *The*

16  *New York Times* about this case -- this course -- this training

17  for physicians course that you oversaw?

18  A.   I do not.

19  Q.   Do you recall that?

20  A.   I don't recall *New York Times* interviewing me specifically

21  about this course.

22  Q.   Okay.  I'm going to ask you to turn to -- your attention

23  to see if it helps bring back your recollection.  It's -- *The*

24  *New York Times* article is marked as Exhibit 7295.

25  A.   I will reassure you that after this trial, I won't be

 1   talking to anyone.

 2                        (Laughter.)

 3            **THE WITNESS:**  So goes my teaching career.

 4                        (Laughter.)

 5   **BY MR. SCHACHTER:**

 6   **Q.**   I'd like to direct your attention to pages 21 and 22 of

 7   the exhibit.

 8   **A.**   Yes.

 9   **Q.**   Okay.  Why don't you take a look at this to yourself for a

10   moment.  The bottom of 21, paragraph starting, "A recent course

11   unmasking ADHD in adults."

12   **A.**   Yes.  Yes.

13   **Q.**   If you could, please read through the top of page 22.

14   Again, just to yourself and then I'll pose a question.

15   **A.**   Okay.  Let me...

16         Ah, yes.  Okay.

17         So where would you like me to start?

18   **Q.**   I just want you to read it and let me know when you're

19   done.

20   **A.**   From the top?

21   **Q.**   No, no.  Pages 21 and 22 of *The New York Times* article

22   that you were quoted in, and just read that to yourself and let

23   me know when you're done and then I'll pose a question to you.

24   **A.**   Oh, I'm done because I remember this interview with Alan

25   Schwarz.

1    **Q.**    Great.    Okay.

2              **MR. SCHACHTER:**    You could take that down, Mr. Cepregi.

3    **BY MR. SCHACHTER:**

4    **Q.**    Does that refresh your recollection about the course

5    "Unmasking ADHD in adults"?

6    **A.**    No.

7    **Q.**    Okay.

8    **A.**    I'm not denying that I oversaw the course.    I'm not

9    denying that the course occurred.    I'm not denying that I was

10   involved in the course.    I didn't prepare the video.    That was

11   prepared by Medscape.    It was an encapsulation of an example of

12   how to look at a patient, listen to what they say, and

13   interview.

14        If you're offering that video up as an example of how one

15   does a psychiatric interview, you're misrepresenting the video

16   itself and the coursework that was involved.    You're extracting

17   a video from two or three hours' worth of -- or an hour of

18   educational material.

19        Now, if you want to ask me about Alan Schwarz and *The*

20   *New York Times*, feel free.

21   **Q.**    Sure.    What I want to ask you is:    As part of a course

22   that you oversaw, there was an instructional video provided to

23   the physicians, and six minutes into the visit, the doctor in

24   the course that you oversaw said (as read):

25              "If you have ADHD, which I believe you do,

```
 1              family members often respond well to similar
 2              medications.  Would you consider giving that a try?"
 3         That was contained six minutes into the visit shown in the
 4    instructional video in the course that you oversaw; correct?
 5              MS. GREEN:  Objection.  Asked and answered.
 6              THE COURT:  No.  Overruled.  However, you should read
 7    the next paragraph, what the witness says.  He says (as read):
 8                  "That was not an acceptable way to evaluate and
 9              conclude that the patient had ADHD."
10         So, in other words, he saw the video, he saw exactly what
11    you said.  And then in the same article that brings it to his
12    attention, he says to the reporter, "That was not" -- "what you
13    saw, that's not acceptable."  That's what he said.  So
14    that's -- that is that bit of testimony.  Now let's move to
15    another bit of testimony because I don't think you can explore
16    that testimony -- I mean, you can.  If you want to ask him any
17    questions about what did he mean by "not acceptable, what was
18    wrong with it, what was right about it," go right ahead.
19    BY MR. SCHACHTER:
20    Q.   I guess my question, Dr. Goodman, is:  You did not deny to
21    The New York Times that you had anything to do with this
22    instructional video where after six minutes, the doctor in the
23    video says, "Would you consider giving stimulants a try?"
24              MS. GREEN:  Same --
25              THE COURT:  He's not denying it.  He's saying he said
```

1  something about it.  And what he said about it was it wasn't

2  acceptable.

3          **MR. SCHACHTER:**  After --

4          **THE COURT:**  Okay.  That -- you can explore why did you

5  wait?  You want to ask him questions about it, go right ahead

6  but you have to put exactly what he said there.

7      Now, if you want to ask him questions about why was the

8  video shown when he disagreed with -- with the manner in which

9  the doctor conducted the examination, go right ahead, ask him.

10 **BY MR. SCHACHTER:**

11 **Q.**   Okay.  After this course provided to educate physicians

12 that you oversaw, after that -- which contained this

13 instructional video, you then got a call from *The New York*

14 *Times*; correct?

15 **A.**   I don't know what the time sequence was.  Evidently I

16 gave -- I participated in the course, and Alan Schwarz called

17 me at some point later.

18 **Q.**   Okay.  But there's no question that you oversaw a course

19 in which there was a six-minute long instructional video

20 provided to physicians; correct?

21 **A.**   Correct.  And as His Honor has cited, if you read further

22 down, I'm not endorsing that video as an example of doing an

23 evaluation.  I'm clearly quoted (as read):

24          "That was not an acceptable way to evaluate and

25      conclude that the patient has ADHD.  It was a video

1              brief in order to encapsulate some of the language

2              that is used for the audience to understand and what

3              elements contained in the interview."

4          So I'm not sure what point you're trying to make, but

5     you're not tying my credibility and indicting it based on my

6     endorsement of a six-minute video that says you have ADHD.

7     **Q.**   Dr. Goodman, nobody's trying to indict your credibility.

8     That's not the point.

9          The question is, there came a point in time where you put

10    on an instructional course for physicians and in that course,

11    you presented an instructional video in which after

12    six minutes, the family care physician --

13    **A.**   The answer --

14    **Q.**   Can I just finish --

15    **A.**   The answer to your question, sir, is yes.

16    **Q.**   After six minutes, the family care physician says to the

17    patient in this educational video --

18              **MS. GREEN:**  Objection.  Undue consumption of time.

19              **THE COURT:**  Let him finish his question.  You can't

20    interrupt his question.

21          Go ahead, Mr. Schachter.

22    **BY MR. SCHACHTER:**

23    **Q.**   After six minutes, the doctor in the course that you

24    oversaw says to the patient, "If you have ADHD, which I believe

25    you do, family members often respond well to similar

1  medications.  Would you consider giving it a try?"

2      That was contained in the video in the course that you

3  oversaw; just yes or no?

4  **A.**    Correct.

5  **Q.**    Afterwards you got a call from *The New York Times* about

6  it; right?

7  **A.**    Sometime afterwards, yes.

8  **Q.**    And you didn't deny involvement in the course; correct?

9  **A.**    Correct.

10  **Q.**    What you said was, "Looking back on it, I don't think that

11  was an appropriate way to evaluate ADHD"?

12  **A.**    I'm sorry.  You've mischaracterized looking back on it.

13  This was not a retrospective position on my part.  I discussed

14  with Medscape that this video was abbreviated, and we all

15  agreed that this was simply an encapsulation to demonstrate in

16  a video format what an interview might look like for a brief

17  period of time, but was not in any way considered to be a

18  psychiatric evaluation for the conclusion or of an accurate

19  diagnosis of ADHD.

20  **Q.**    Understood.

21      Okay.  Thank you.

22      Now, you were asked about follow-up frequency.  Do you

23  recall that testimony?

24  **A.**    Yes.

25  **Q.**    And you were asked what is the usual course of

**GOODMAN - CROSS / SCHACHTER**

1  professional practice for follow-ups.  Do you recall that?

2  **A.**    I do.

3  **Q.**    And I noted your answer.  What you said was (as read):

4         "Usually, we have them come back in two to

5    four weeks to evaluate their response to medication."

6    Do you recall giving that answer?

7  **A.**    I don't recall the specifics, but I will stipulate, I

8  agree that you've written it down accurately.

9  **Q.**    All right.  What you did not say is that the usual course

10  of professional practice is to follow up in two to four weeks?

11  **A.**    Okay.  I missed that.  The usual course of professional

12  practice after initiating stimulant medications ought to be

13  within one month.

14  **Q.**    Okay.  Now -- and then I think you said that if you are

15  not increasing dosage, then you have them come back in a month

16  two?

17  **A.**    Yes, I did.

18  **Q.**    And then you testified that once stable, four to

19  six months is the usual cadence for follow-up?

20  **A.**    Depending on clinical circumstances of the patient.  If

21  the patient has a cardiac issue, I see them more often.  If the

22  patient has a substance abuse history or ongoing issues, I see

23  them more frequently.  So depending on the circumstance.

24      It also depends on the duration of my relationship with

25  the patient.  If I've only seen the patient for six months,

1    then I'm probably seeing them more frequently.  If I've seen

2    the patient for 20, 25, 30 years, I know this patient well and

3    it may be less frequent at four to six months.

4    Q.   Okay.  In your report, you said (as read):

5              "It is recommended that the minimal frequency of

6         the patient is seen every six months."

7         Do you recall that?

8    A.   I do.

9    Q.   Okay.  Now, you're not --

10   A.   Minimal frequency; right?  Minimal --

11   Q.   That's what you said.

12   A.   Yeah.

13   Q.   Okay.  Now, you conducted a survey of primary care

14   physicians treating patients with ADHD, as we've discussed?

15   A.   Yes.

16   Q.   And your survey showed that only about one out of every

17   four primary care physicians follow up with their patients

18   within 30 days of initiating treatment; is that correct?

19   A.   Yes.  I recall that -- that's data from 2010, 2011.  We've

20   actually since published more recent data on quality measures,

21   looking at the clinical practices of patients.  So a quality

22   measure would be a clinical behavior.  Like measuring blood

23   pressure, how often do you do that?  Or measuring something

24   else, how do you do that?  Informing the patient of side

25   effects, how often do you do that?

GOODMAN - CROSS / SCHACHTER

1         And we've -- we've published on that and we've published

2    on what changes we've seen occur over 10 years and there's been

3    a doubling in the rate of the utility of clinical practice

4    measures.

5         So to cite 2010 data misrepresents the current atmosphere

6    and clinical practice.

7    Q.   I wasn't asking about any representations.  Simply asking:

8    You did a survey before the events of 2020 that are relevant

9    here and that survey showed that about only one out of every

10   four primary care physicians follow up with their patients

11   within 30 days of initiating treatment; correct?

12   A.   Yes.

13   Q.   Okay.  Okay.

14        Now, I want to talk to you about guidance that was issued

15   to psychiatrists by the American Psychiatric Association on the

16   frequency of follow-ups to patients prescribed with controlled

17   substances.  Okay?

18   A.   Okay.

19   Q.   There is something called the Ryan Haight Act, which is a

20   law that was enacted in 2008 to regulate online controlled

21   substances prescriptions; correct?

22   A.   I believe so.  I'm not -- I know the name, I know the

23   general flavor of the law, but I don't know the specifics.

24   Q.   Okay.  And that's fine.  If you don't know, please just

25   tell me you don't know.

1    A.    Mm-hmm.

2    Q.    Do you know that one of the things that this law required

3    was an inpatient visit by a medical professional prior to

4    prescribing a controlled substance?

5              MS. GREEN:    Objection.  Beyond the scope of direct.

6              THE COURT:    Overruled.  Go ahead.

7              THE WITNESS:    So I'm not familiar with this, and if

8    you ask me questions about what the Ryan Haight Act says, I'm

9    going to render an answer "I don't know."

10         I don't know.  And I'm not going to sit here and speculate

11   on an area of expertise I have very little in.

12   BY MR. SCHACHTER:

13   Q.    Dr. Goodman, nobody is asking you to speculate.  You can

14   just say, "yes," "no," "I don't know."  That's fine.

15         If you don't know, please just let us know.

16   A.    Okay.

17   Q.    And just one last question on that:  Are you aware of any

18   kind of exemption that was put in place by the DEA where the

19   in-person requirement before prescribing controlled substances

20   was removed and it could be via telehealth?

21         Do you know anything about that?

22   A.    I do.  That was suspended during COVID, I understand.

23   Q.    Okay.  And you know that that suspension that allows a

24   prescription by telehealth, that is still in place today?

25   A.    Yes.

1    Q.    Okay.  Now, I want to -- in 2021, early in the events

2    here, you're aware that the American Psychiatric Association

3    issued guidance to mental health professionals that -- saying

4    that a conservative recommendation is that any medical provider

5    prescribing a controlled substance should conduct an in-person

6    exam every two years.

7         Do you recall that?

8    A.    I do not.  I'm completely unaware of that and I would very

9    much like to review that document.

10   Q.    Great.

11        I would like you to.  I'm going to show you 6179, if you

12   could turn to that in your binder.

13   A.    61...

14        MS. GREEN:  We're going to object on foundation and

15   outside the scope.

16        THE COURT:  Well, it is outside the scope.  I'm trying

17   to figure out its relevance.

18        MR. SCHACHTER:  Sure.  Your Honor it's -- there were a

19   lot of questions about the recommended frequency of follow-up

20   visits and I will direct the Court's attention -- well, let me

21   just...

22   BY MR. SCHACHTER:

23   Q.    Do you see on page 3 -- well, you are a member of the

24   American Psychiatric Association; correct?

25   A.    True.

GOODMAN - CROSS / SCHACHTER

1  Q.   And the American Psychiatric Association, it puts out

2  guidance for mental health professionals as to how they should

3  practice mental health care; correct?

4  A.   Correct.

5        THE COURT:  I'm sorry.  What's the exhibit number?

6        MR. SCHACHTER:  6179, Your Honor.

7        THE COURT:  6179.

8        MR. SCHACHTER:  I'm showing the witness what was

9  posted by the American Psychiatric Association on October 26,

10 2021.

11       THE COURT:  Okay.

12       MS. GREEN:  Objection.  Hearsay.  Not a learned

13 treatise.

14       THE COURT:  Overruled.

15    Go ahead.

16 BY MR. SCHACHTER:

17 Q.   Do you see where it says (as read):

18       "The Act requires any practitioner issuing a

19       prescription for a controlled substance to conduct an

20       in-person medical evaluation with certain specified

21       exemptions.  A conservative recommendation to support

22       compliance with the Act is to conduct an in-person

23       exam at least once every 24 months."

24    Do you see that?

25 A.   I do.

 1          MR. SCHACHTER:  Your Honor, we move to admit 6179, the

 2   guidance to psychiatrists presented by the APA.

 3          MS. GREEN:  Objection.

 4          THE WITNESS:  I might add that -- I might add that

 5   this statement by the APA flies in the face of at least five

 6   international clinical practice guidelines.  And why do I know

 7   how the APA's involved?  That I've been asked to review the

 8   current, most recent policy on the description of ADHD for the

 9   American Professional Association.

10          MR. SCHACHTER:  Understood.

11          MS. GREEN:  Your Honor, we're objecting.  This article

12   isn't even about ADHD specifically, it's --

13          MR. SCHACHTER:  It's about --

14          THE COURT:  -- a post about the Ryan Haight Act and

15   controlled substances.

16          MR. SCHACHTER:  Right.  It's about the recommendation

17   of the American psychiatry association as to how often patients

18   prescribed controlled substances should have follow-ups with

19   their medical providers.

20          THE COURT:  Okay.

21          MR. SCHACHTER:  We move to admit it.

22          MS. GREEN:  We're objecting, Your Honor.  This is not

23   admissible under 803(18).

24          THE COURT:  It is -- I'm sorry.  It's what?

25          MS. GREEN:  Not admissible under 803(18).  It can be

 1  read into evidence if Your Honor disagrees, but we certainly

 2  disagree with the admission of this exhibit.

 3           THE COURT:  Okay.  I will review its admissibility

 4  during a recess but you're free to ask him questions about it.

 5           MR. SCHACHTER:  Okay.  Your Honor, may we display it

 6  to the jury?

 7           THE COURT:  Well, why don't you ask questions about

 8  it.

 9           MR. SCHACHTER:  Okay.  Well, I think I've asked the

10  question.

11  BY MR. SCHACHTER:

12  Q.   Are you aware that the National Association of the Boards

13  of Pharmacy also said that the law requires practitioners to

14  conduct a video communication with their patients at a minimum

15  of once every two years?  Are you aware of that?

16  A.   I am not aware of that.  What I am aware of is the DEA's

17  emphasis on follow-ups report that frequent follow-ups ought to

18  occur in high-risk situations, including substance use disorder

19  and telehealth.

20  Q.   Okay.  I'm going to ask you now to look at Exhibit 7371 in

21  your binder.

22           THE COURT:  Okay.  73...

23           THE WITNESS:  Okay.

24           MR. SCHACHTER:  Your Honor, this is guidance from the

25  National Association of the Boards of Pharmacy on the future of

1    telehealth and the Ryan Haight Act post-pandemic, published

2    April 22, 2021.

3    **BY MR. SCHACHTER:**

4    **Q.**    Dr. Goodman, do you see where the National Association of

5    Boards of Pharmacy states (as read):

6            "The Ryan Haight Act requires practitioners

7        issuing a prescription for a controlled substance to

8        conduct an in-person medical evaluation or conduct a

9        video/audio communication in a DEA-registered

10       facility at a minimum of once every 24 months."

11       Do you see that?

12   **A.**    I do.  I'm not aware, though, that pharmacists have direct

13   responsibility for the clinical care of patients.

14   **Q.**    No.  But pharmacists do, you understand, have an

15   obligation with respect to the issuing of prescriptions for

16   controlled substances.

17       Are you aware of that?

18   **A.**    That's true.

19       **THE COURT:**  The issuance of prescription or the

20   distribution of the drug?

21       **MR. SCHACHTER:**  Thank you, Your Honor.  You're, of

22   course, correct.

23   **BY MR. SCHACHTER:**

24   **Q.**    The distribution of the controlled substance?

25   **A.**    Right.  So they simply execute that which the prescriber

1    has requested.  They are not involved in the direct clinical

2    care, evaluation, or decision-making concerning the patient's

3    care, so I'm not sure what the weight of the statement is to

4    import.

5    Q.    Okay.  Two points.  I wasn't asking you about the weight.

6         Second, you're not aware that, in fact, pharmacists do

7    have a legal obligation to make sure that the medications that

8    they are distributing pursuant to prescriptions were issued in

9    the usual course of professional practice and for a legitimate

10   medical purpose?

11        You're just not aware one way or the other or are you

12   disagreeing with that statement?

13        **MS. GREEN:**  Okay.  Beyond scope of direct.  Undue

14   consumption of time.

15        **THE COURT:**  I don't know that the issue of the

16   propriety of a pharmacy is at issue in this case.

17        So I'm going to exclude it on 403 grounds.

18        **MR. SCHACHTER:**  Yes, Your Honor.

19        **THE COURT:**  Okay.

20   BY MR. SCHACHTER:

21   Q.    Okay.  Now, let's change topics.  I want to very briefly

22   ask you about dosage of medications.

23        The FDA has recommended maximum dosages for stimulant

24   medications; is that correct?

25   A.    Some, not all.

```
 1   Q.    Okay.  I want to show you a slide that you prepared.

 2   It's --

 3            MR. SCHACHTER:  And we'll move to admit.  It's 7386A.

 4   It's a slide that Dr. Goodman prepared and used in a 2020

 5   lecture called "FDA approved medications for adults with ADHD."

 6            MS. GREEN:  Objection.  Outside scope of direct.

 7            THE COURT:  73 --

 8            MR. SCHACHTER:  -- 86.

 9            THE COURT:  -- 86.  What page?

10            MR. SCHACHTER:  I'm sorry.  It is 7386.  We marked it

11   separately as A, but it's page 57 in the full document.  But

12   we're only seeking to admit this one chart that Dr. Goodman

13   prepared.

14            THE COURT:  Okay.  57; right?

15       Do you have it?

16            THE WITNESS:  I'm familiar with the slide, Your Honor.

17            THE COURT:  Pardon?

18            THE WITNESS:  I'm familiar with the slide.

19            THE COURT:  Show it.  Put it up.

20            MR. SCHACHTER:  Okay.  Your Honor, it's admitted?

21            MS. GREEN:  Objection, Your Honor.

22            THE COURT:  It's in subject to a motion to strike.

23       Go ahead.

24       (Trial Exhibit 7386A received in evidence.)

25            MR. SCHACHTER:  And may we display it to the jurors?
```

GOODMAN - CROSS / SCHACHTER

1    BY MR. SCHACHTER:

2    Q.    Okay.  So in one of your lectures -- or in some of your

3    lectures you talk about the FDA recommended maximum dosages for

4    certain stimulants; is that correct?

5    A.    Yes.

6    Q.    And we're going to come back to this, but you noted, among

7    other things, the dosages for mixed amphetamine salts XR.

8          That's just another word for Adderall extended-release?

9    A.    Correct.

10   Q.    And you wrote the adult dosing is 20 milligrams and the

11   max is none; correct?

12   A.    Correct.

13   Q.    All right.  Now, in -- you would -- the FDA recommended

14   maximum dose is not -- well, let me put it this way.

15         You think that in a standard clinical practice, you would

16   estimate that about 20 percent of the prescription that a

17   competent experienced medical provider should issue should be

18   20 percent -- you would estimate 20 percent are going to exceed

19   the FDA maximum dose; correct?

20   A.    I'm not sure where you're coming up with 20 percent.

21   Q.    Okay.  Well, I don't want to put words in your mouth.  If

22   you can just turn in your binder, then, to 7267T.

23         Do you recall in an interview being asked --

24   A.    Hang on.  Hang on.  Hang on.

25   Q.    Sure.  7267.  This is --

1    **A.**    7267?

2    **Q.**    Yeah.

3    **A.**    I don't have 7267.

4    **Q.**    It may be in the other binder.

5            **THE COURT:**  It's in the other binder.  Okay.

6            **THE WITNESS:**  Ah, okay.  7267.

7    BY MR. SCHACHTER:

8    **Q.**    All right.

9    **A.**    Okay.

10   **Q.**    Do you recall giving a lecture in 2023 to the NEI Congress

11   called "A rousing discussion differentiating stimulant

12   medications for ADHD"?

13   **A.**    Yes.

14   **Q.**    Okay.  And if you turn to page 3.  Again, I want you to

15   have the full context.

16   **A.**    Okay.

17   **Q.**    Do you see where you were asked (as read):

18            "In your experience, how often do adults and

19        kids need to go above the FDA max of stimulants for a

20        significant reduction of symptoms?"

21        And you answered (as read):

22            "So if I pulled a number, it would be from

23        the -- I'm going to use the brand-name -- Concerta

24        adult titration study, which is about 30 percent."

25        You say that you run a specialty clinic (as read):

1            "People who see me are looking for a certain

2       level of expertise so I'm going to be the people who

3       are refractory or not optimally responding, and I

4       have more patients who are going to be on higher

5       doses."

6       And then you say (as read):

7            "In a clinical practice, I would probably

8       guesstimate maybe 20 percent of your patients need to

9       go beyond the FDA max."

10  A.   Yes.

11  Q.   Okay.  Do you agree with that?

12  A.   I agree that I said it.

13  Q.   Okay.  And --

14       **THE COURT:**  Well, again, he goes on to explain what he

15  means by the 20 percent, so you have to read the rest of it.

16       Go ahead.  Line 16.

17       **THE WITNESS:**  (as read):

18            "But again, not cavalierly.  It's because

19       they've gotten a benefit.  As you move up, there's no

20       tolerance developing and so you're going to go higher

21       and higher, monitoring vital signs to ensure that as

22       you go up, you're not going to run into hemodynamic

23       problems which is another issue with people who have

24       comorbid ADHD and hypertension and cardiac issues,

25       which is a conversation and presentation for another

1              time."

2          So the caveat here is, yes, I said that patients could be

3      prescribed medications beyond the FDA max, and there's a

4      certain level of vigilance necessary when you exceed those

5      doses.

6      BY MR. SCHACHTER:

7      Q.   Right.  Okay.

8          And, in fact, you have -- you agree with this statement

9      that if you get to the FDA max, and the patient says "I'm kind

10     of better, but I'm not all the way there," if you stop, you

11     have not optimized the patient.

12     A.   No.  I disagree with what you just said.

13     Q.   Okay.

14     A.   I'll tell you specifically what I disagree with.

15     Q.   I'm just going to ask you to take a look at your words.

16             MS. GREEN:  May the witness be allowed to finish his

17     answer?

18             THE COURT:  Yes.

19         Go ahead.

20             THE WITNESS:  You said "the patient says."  My

21     decisions to change dose and any clinician's decision to change

22     dose is based on clinical assessment and clinical judgment.

23     Patients will often say, "I'm not doing as well as I hoped.

24     Can we go up on the dose?"

25         And I say, "You have executive disfunction issues in

1  addition to ADHD and executive disfunction issues won't respond

2  to higher doses of medication."

3  **BY MR. SCHACHTER:**

4  **Q.**   Okay.  Can you just quickly look at Exhibit 7280T, the

5  transcript of your presentation at the 2022 NEI synapse in

6  which you gave a lecture at ADHD treatment options and decision

7  tree.

8      If you can look at page 3, at the bottom, to page 4.

9  **A.**   Okay.  Can you give me --

10          **MS. GREEN:**  Your Honor, we're going to object again on

11  403.  This witness did not give opinions as to dosage levels on

12  direct, so I'm --

13          **MR. SCHACHTER:**  It's going to be relevant, Your Honor.

14          **THE COURT:**  I'm going to allow it.

15      Go ahead.

16          **THE WITNESS:**  Okay.  Give me the document again.

17          **MR. SCHACHTER:**  7280.

18          **THE COURT:**  What line do you want him to start?

19          **MR. SCHACHTER:**  From line 322 --

20          **THE COURT:**  No.

21          **MR. SCHACHTER:**  Page 3, line 22 to page 4, line21.

22          **THE WITNESS:**  Okay.

23          **THE COURT:**  Page 3, line 22.

24          **THE WITNESS:**  Page 3, line 22.  Okay.

25          **MR. SCHACHTER:**  Right.

1             THE COURT:  Through the conclusion on page 4.

2             MR. SCHACHTER:  Right.

3    BY MR. SCHACHTER:

4    Q.   Did you see (as read):

5             "I won't spend too much time on this except to

6        highlight to you that if you look at this list of

7        ADHD medications for adults, specifically because the

8        adult trials were run, you'll notice that in each and

9        every one of them, the daily max dose in the package

10       insert is less than the max dose that was used in the

11       clinical trials.

12            "So do not think that the max dose in a PI is

13       based on safety issues.  It's based on the clinical

14       protocol that was submitted to the FDA, and it

15       doesn't answer the question if the patient failed to

16       respond to 72 milligrams of OROS methylphenidate" --

17       Is that Concerta?

18   A.   Yes.

19   Q.   (as read):

20            " -- would they respond to 90 or 108?

21            "The other supporting evidence to this is we ran

22       a trial with OROS methylphenidate in a

23       dose-optimizing fashion up to 108 milligrams.

24       One-third of the adults -- one-third of the adults

25       were over 72 milligrams.  One-third of the adults

1    were over 72 milligrams.  That means if you get up to

2    72" -- which is the FDA recommended max; is that

3    right?

4  A.   Yes.

5  Q.   (as read):

6        "So if you get up to the FDA recommended max and

7    the patient says, quote, 'I'm kind of better, but I'm

8    not all the way there,' if you stop, you've not

9    optimized the patient.  There are off-label uses,

10   off-label medications, and on-label.

11   Do you see that?

12 A.   I do.

13 Q.   Okay.  Let's change topics.

14   You testified about treating patients who also have a

15 substance use disorder; is that correct?

16 A.   Yes.

17 Q.   You told *The Wall Street Journal* that, quote, (as read):

18        "Drug addicts properly diagnosed with ADHD can

19   benefit from treatment with stimulants, but they must

20   be closely managed."

21   Is that correct?

22 A.   Yes.

23 Q.   And the Canadian guidelines, which you cited, they

24 recommend treating ADHD and substance abuse at the same time;

25 is that right?

1    A.    Yes.

2    Q.    Okay.  And that is because research has shown that ADHD

3    and substance use disorder related craving share

4    neurobiological similarities and the treatment of ADHD may

5    reduce craving for substances and subsequently reduce the

6    relapse to substance abusers; is that correct?

7    A.    Yes.  Research within the last three years.

8    Q.    Okay.  And, in fact, you have --

9    A.    So heretofore, if we go back 10 years ago, the diagnostic

10   prioritization was you treat the substance abuse first and

11   then, after the patient's in recovery, solidly in recovery,

12   then you can go on to treat the ADHD with a controlled drug.

13   Q.    Okay.

14   A.    But there's a difference between the opinion currently and

15   the opinion 5 years ago, 10 years ago.  This is an evolving

16   science.  Is the usual course of practice currently to treat

17   substance abuse and ADHD, currently?  The answer is no.

18   Q.    Okay.  Did the Canadian guidelines that you cited say (as

19   read):

20              "In most cases ADHD and substance use disorder

21         need to be treated concurrently and independently

22         when comorbid."

23   A.    Did I say that or the Canadians said that?

24   Q.    Well, why don't you look at 6200 at page 29.

25   A.    6209?

1    Q.    6200.  6200 is the Canadian guidelines that you cited.

2         And if you turn to page 29.

3    A.    Okay.

4    Q.    Okay.  Do you agree that the Canadian guidelines that you

5    cited say (as read):

6              "In most cases, ADHD and substance use disorder

7         need to be treated concurrently and independently

8         when comorbid"?

9    A.    I agree that that's what it says.

10   Q.    Okay.  But you disagree with the guidelines that you cited

11   in that regard?

12         **MS. GREEN:**  Objection.  Argument.

13         **THE COURT:**  Overruled.

14         **THE WITNESS:**  These guidelines are written for mental

15   health professionals treating ADHD.  Would this statement stand

16   as a recommendation for the usual course of professional

17   practice for a pediatrician treating a 19-year-old with ADHD

18   and substance abuse?  No.

19         Would this stand for a family medicine doctor treating

20   ADHD and substance disorder, no.  Why?  They don't have the

21   expertise in order to sort out the differences, monitor the

22   patient, and understand what needs to be prescribed and how it

23   gets monitored.

24         This becomes a problem if you take this sentence and

25   extend it to people who are not specialists in the field.

1    **BY MR. SCHACHTER:**

2    **Q.**    Okay.  But to be clear, what we're looking at here are

3    practice guidelines that are issued to medical practitioners so

4    that they can figure out what to do.

5        Do you agree with that?

6    **A.**    It's issued in Canada.

7    **Q.**    Okay.  We used to like Canada.

8                            (Laughter.)

9            **THE WITNESS:**  I still like Canada.

10   **BY MR. SCHACHTER:**

11   **Q.**    In Canada, the professional guidance that is issued to

12   medical practitioners, was it, in most cases, ADHD and

13   substance use disorder need to be treated concurrently.

14       Do you agree with that?

15   **A.**    Well, since we're citing international guidelines, we can

16   talk about the World Federation of ADHD.  We can talk about the

17   United -- the United Kingdom's clinical practice guidelines.

18   We can talk about the consensus guideline for Europeans.  We

19   can talk about South Africa.  So if you want to select a set of

20   guidelines that are international here, let's look at the

21   predominance of what the recommendation is across all of these

22   clinical practice guidelines.

23   **Q.**    Dr. Goodman, you know, I didn't select it, you did.  You

24   cited -- am I correct that you cited these guidelines and

25   relied on it in the conclusions that you wrote in your report?

GOODMAN - CROSS / SCHACHTER

1        I'm correct about that; right?

2    **A.**    I did.  I apologize.  I did not go through it with a

3    fine-tooth comb understanding what the legal implications were

4    of citing this research.

5    **Q.**    Dr. Goodman, nobody is asking you for an apology.  I'm

6    just trying to ask a very simple question.

7        The Canadian guidelines say that in most cases, ADHD and

8    substance use disorder need to be treated concurrently?

9    **A.**    Yes.  And because it's a Canadian guideline, that's why

10   APSARD has undertaken the development of diagnosis and

11   treatment of adult ADHD in the United States.

12   **Q.**    Okay.  And you also understand that U.S. practitioners

13   that are trying to figure out what to do, they can look on the

14   Internet for these practice guidelines; correct?

15   **A.**    They can look on the Internet for these practice

16   guidelines.  The likelihood that they're reading Canadian

17   guidelines, I have my questions as to how many of them are

18   reading that.

19   **Q.**    Fair enough.  Okay.

20       Now, let's put aside the Canadian guidelines and let's

21   talk about the guidance that you have provided to medical

22   practitioners on this subject.  And in particular I want to ask

23   you about the guidance that you issued in 2023, which is within

24   the time period that we are talking about in this trial.

25       In 2023, you lectured medical professionals and you said

1    (as read):

2            "The idea that prescribing stimulant medications

3        for somebody who has ADHD in recovery is going to

4        provoke a relapse?  There's very little evidence."

5        Do you recall saying that in 2023?

6    **A.**   I don't, but it sounds like -- I don't, but it sounds like

7    something I would have said.

8    **Q.**   Okay.  And, in fact, you are aware of studies

9    demonstrating that when substance users treat their ADHD with

10   stimulants, they were five times less likely to relapse back

11   into addiction than addicts who did not treat their ADHD?

12   **A.**   You want to cite the publication?

13   **Q.**   Well, I'd like to cite you.

14       Do you recall in that lecture in 2023 where you presented

15   with a Dr. Sabrina Segal that you said (as read):

16           "For those then who go into substance abuse

17       recovery" --

18       And if you want to follow along, it's Exhibit 6201 T would

19   be the transcript.

20   **A.**   I'm familiar with the reference.

21   **Q.**   Okay.  Great.

22       Then you know that in 2023, a time period that's relevant

23   here, you said --

24           **THE COURT:**  What page?

25           **MR. SCHACHTER:**  Page 9, Your Honor, lines 6 through

 1    13.

 2                THE COURT:  Okay.  Thank you.

 3    BY MR. SCHACHTER:

 4    Q.    And what you said in 2023 was (as read):

 5                "For those then who go into substance abuse

 6          recovery, there was a study published about a year or

 7          two ago" --

 8          And that would be in 2020, 2021?  Okay.  (as read):

 9                "There was a study published about a year or two

10          ago looking at those with ADHD and substance abuse

11          with ADHD with without ADHD medication.  If you were

12          in substance abuse, had ADHD and you weren't treated

13          for your ADHD, you had a fivefold higher risk in

14          three months of relapsing versus those who had their

15          ADHD with medication who are in recovery."

16          That's what you said; correct?

17    A.    I did say that.

18    Q.    Okay.

19    A.    Based on a study by Kast -- K-A-S-T -- done in about a

20    hundred patients.  And when you cite these studies, when you

21    cite that they had ADHD and substance abuse, it is very

22    important, in fact, critical to understand that the patients

23    were diagnosed accurately through a comprehensive psychiatric

24    evaluation and a structured interview.

25          Let's not extrapolate the outcome of these studies to

1    other practice platforms whose diagnosis is held in question.

2    **Q.**    Okay.  But to be clear, I didn't cite the study,

3    Dr. Goodman.  You, in lecturing medical professionals, cited

4    the study, did you not?

5    **A.**    I did and it's a single study upon which we would not

6    change clinical practice.  This is evolving research and it

7    suggests that we should not treat substance abuse and ADHD in

8    sequence.  We might want to consider treating them

9    concomitantly given specific circumstances and clinical

10    features.

11    **Q.**    Dr. Goodman, I'm just asking what you were teaching

12    medical professionals back in 2023.

13    **A.**    And I'm answering it within the context of my lecture.

14    **Q.**    Okay.  Okay.  All right.

15        Let's change topics.

16        You were asked about people learning about ADHD on TikTok.

17    Do you remember those questions up on the screen?

18    **A.**    I do.

19    **Q.**    And you testified, and I'm quoting you (as read):

20            "There was a scientific publication looking at

21        the top 10 TikTok videos, and of those, 52 percent

22        were deemed to be misinformation, inaccurate

23        information."

24        Do you remember giving that testimony?

25    **A.**    I do.

1   Q.   You said something very similar in your report.  You wrote

2   (as read):

3            "A recent review of the 10 most-viewed TikTok

4       ADHD videos concluded that 52 percent were misleading

5       and only 24 percent were useful."

6       Recall that?

7   A.   Correct.

8   Q.   Okay.  Can you explain how one gets 52 percent of 10

9   videos?

10  A.   I don't even know how to answer that question.  Pull the

11  reference, look at the graph, that's what it shows.

12  Q.   Okay.  I pulled the reference.

13       In fact, there's no way to have 52 percent of 10 videos

14  and I think you were citing the wrong study.  I think what you

15  meant to cite was something that's not cited in your report,

16  because I looked and I found it.

17       There is a different study that is different than the one

18  that you cited.

19       By the way, you cite -- just to be clear, you cited an

20  article which is -- to the extent you care, it's Exhibit 7289

21  in your binder.

22            THE COURT:  7289?

23            MR. SCHACHTER:  Correct.

24            THE COURT:  And what page?

25            MR. SCHACHTER:  Well, it's nowhere.  Dr. Goodman cites

1    this report -- cites this article as support for his statement

2    in his report (as read):

3            "A recent review of the 10 most-viewed TikTok

4        ADHD videos concluded that 52 percent were misleading

5        and only 24 percent were useful."

6    **BY MR. SCHACHTER:**

7    **Q.**    If you wish, Doctor, you can look at your report, which is

8    in front of you, and you can see that you cite this article

9    called "Misinformation mayhem: the effects of TikTok content on

10   ADHD knowledge, stigma, and treatment-seeking intentions."

11   **A.**    Okay.

12   **Q.**    Do you recall that this is the article that you cited in

13   your report for this proposition about 52 percent of 10 videos

14   having misinformation?

15           **THE COURT:**  So you're referring to 7290 --

16           **THE WITNESS:**  Mm-hmm.

17           **THE COURT:**  -- as the correct citation?

18           **MR. SCHACHTER:**  I'm going to get to it in a moment,

19   Your Honor, yes.

20   **BY MR. SCHACHTER:**

21   **Q.**    So if you look at your report, Dr. Goodman, on page 3 you

22   make this statement about (as read):

23           "A recent review of the 10 most-viewed TikTok

24        ADHD videos concluded that 52 percent were misleading

25        and only 24 percent were useful."

1          Do you see that?

2    **A.**    I do.

3    **Q.**    You cite -- you have a footnote, Footnote 2, and you can

4    see that you cite this article that we're looking at right now,

5    "Misinformation mayhem."

6          You see that?

7    **A.**    Correct.

8    **Q.**    Okay.  I can tell you, you can -- you will not find in

9    that article the answer to the question how one gets 52 percent

10   of 10 videos because it doesn't exist.

11   **A.**    Correct.  So perhaps I miscited.

12   **Q.**    You made a mistake in your notes.  That happens.

13   **A.**    I'd have to review this article then in detail but you're

14   correct.

15   **Q.**    Okay.  I'm correct.  There's nothing in there about that.

16         I think what you meant to cite, because I looked, is an

17   article -- there's another study -- because I tried to find

18   something about 52 percent of 10 videos unsuccessful, but I did

19   find an article citing 52 percent of a hundred videos

20   containing misinformation.

21         Is that perhaps what you were referring to?

22   **A.**    It might have been but I have to now go back --

23              **THE COURT:**  Look at 7290.

24              **THE WITNESS:**  I've got 70 -- right.  You are correct.

25   \\\

1  BY MR. SCHACHTER:

2  **Q.**    Okay.  Okay.

3  **A.**    I cited the wrong reference.

4  **Q.**    You made a mistake in your notes and in your report.

5  Happens.

6  **A.**    Mm-hmm.

7  **Q.**    Okay.  This report, however, I just want to be clear, none

8  of the videos that are being discussed in this report were

9  issued by Done; correct?

10  **A.**    I don't know what videos were reviewed.

11  **Q.**    Well, okay.  In the article that you, I think, meant to

12  cite, none of the videos were actually on TikTok.

13      Do you recall that?

14  **A.**    I don't.

15  **Q.**    Okay.  Do you recall that the study that I think you meant

16  to cite identified a -- the study created their own videos and

17  showed them to college students.  Ring any bells?

18  **A.**    No.

19  **Q.**    Okay.

20      So, I'm sorry.  Before your testimony about how 52 percent

21  of the top 10 videos contained misinformation, you didn't --

22  you don't recall doing anything to confirm the accuracy of the

23  statement that you gave to the jury or in your report?

24  **A.**    I will admit that I made a reference error in creating my

25  expert report.  The 52 percent remains accurate because

1    52 percent in this other citation is the number of videos out

2    of 100 that was misleading.  So the 52 percent in my testimony

3    is accurate.  The reference, I admit, I made an error.

4    **Q.**    Okay.  But the 52 percent, I just want to be clear, none

5    of those videos in the study were actually on TikTok.

6        Do you recall that?

7    **A.**    I have no idea.

8    **Q.**    Okay.  Well, do you recall that none of the videos were

9    uploaded by corporations or health organizations or for-profit

10    entities or nonprofit entities.

11        Do you recall that?

12    **A.**    I would have no way of knowing.

13    **Q.**    Do you recall that none of them were advertisements?

14    **A.**    Of the 100 that we're talking?  Or of any marketing

15    material at all?

16    **Q.**    Sure.  I'm talking -- well, so there's two things.

17        The 10-video study that you cited, they're all just

18    prepared for a study, they're not actually on TikTok.  Okay?

19    **A.**    The 100.

20    **Q.**    The 10.  You cite an article talking about 10 videos.

21    **A.**    Yes, but I also acknowledge that that citation was in

22    error.  It should have been 100, and not 10.

23    **Q.**    Right.

24    **A.**    So I missed a 0.

25    **Q.**    Okay.  And in the article that I think you meant to refer

1    to, are you aware that none of the videos were uploaded by

2    corporations, health organizations, for-profit entities, or

3    nonprofit entities?

4    **A.**    I'm not aware and would have no knowledge of that.

5    **Q.**    Did you understand that they were -- what they were

6    looking at is just, for lack of a better word, random people

7    saying stuff on TikTok?

8    **A.**    They were the top 100 videos that got views on TikTok.

9    **Q.**    Right.  And I'm asking --

10   **A.**    And they were reviewed by psychiatrists or psychologists

11   with an expertise in ADHD.  So when you come up with the

12   52 percent, it's because those specialists with PhDs and MDs

13   judged 52 percent of 100 videos to be misinformation.

14   **Q.**    Right.  Exactly.

15        But I'm asking about what videos we're talking about.  Do

16   you remember that this is a study of information put on TikTok

17   by kind of random, unaffiliated people and the study concluded

18   that the -- 52 percent of the information put out by kind of

19   random individuals on TikTok happened to be misinformation?

20            **MS. GREEN:**  Objection.

21   BY MR. SCHACHTER:

22   **Q.**   Do you remember that?

23            **MS. GREEN:**  Argument and vague.

24            **THE COURT:**  Overruled.

25   \\\

BY MR. SCHACHTER:

Q.   Do you remember that that was the subject of the study was information just put out by random individuals not affiliated with any corporation, health organization, or other entity?

Do you remember?

A.   I don't know how to answer that question.

Q.   Okay.  Well, why don't I just direct you -- I'll just direct you --

A.   These are 100 most-viewed videos on TikTok in reference to ADHD.  That's the basis of the study.  They were reviewed by a specialist in ADHD, either psychologist or psychiatrist, and 52 percent were judged to be misinformation.  This constitutes why information on the Internet, in order to help patients decide whether they have ADHD, is misleading.

Q.   Okay.

THE COURT:   I think the disconnect here, because you're asking -- he's asking one question, you're answering another one.  It -- your point is that upon review of 100 videos, it was found that 52 percent of them -- I guess 52 videos, that's about the level of my math -- 52 videos were found to be misleading.

The question that counsel is asking is there is no evidence in this report, at least there's no citation to evidence that healthcare providers looked at those videos.  That's -- and healthcare and a few other people and so forth.

1          So, in other words, your testimony is, look, you go on the

2     web and look at TikTok, look at all the misleading information

3     there is on videos and they are the most widely downloaded

4     videos or observed videos.

5          And counsel's point is, I'm not -- that he's not

6     disagreeing with that.  Hey simple says in that study, it

7     didn't show that healthcare provider, that who else -- I don't

8     know -- any -- your whole collection of people actually saw the

9     video.

10         Is that it?

11              MR. SCHACHTER:  Not exactly, Your Honor.

12              THE COURT:  Go ahead.

13              MR. SCHACHTER:  If I could just put on the screen 7290

14    at page 3.

15              THE COURT:  Okay.

16              MR. SCHACHTER:  Just want to focus on the information

17    that is part of this study.

18              THE COURT:  Page 3.  Where is it?

19              MR. SCHACHTER:  And it's on the screen, Your Honor.

20              THE COURT:  I know, but where do you what -- oh, it's

21    on the screen.  Okay.

22    BY MR. SCHACHTER:

23    Q.   My question, Doc- --

24              THE COURT:  Well, that's what I'm saying.  There's no

25    evidence as to -- as to healthcare professionals -- I'll go

1    on -- corporations, for-profit entities, or nonprofit entities

2    actually uploaded these.  Okay.

3              **MR. SCHACHTER:**  Yeah.

4              **THE COURT:**  Fine.  Let's move on.  I think this is --

5    I think you've taken his testimony and put it in the context

6    and it's now explained.

7              **MR. SCHACHTER:**  Right.  Clear that it --

8              **THE COURT:**  Move on right now.

9              **MR. SCHACHTER:**  Clear that it's not information put

10   out by companies like Done.

11             **THE COURT:**  Well, I don't know whether it is or not

12   but just move on.

13             **MR. SCHACHTER:**  Okay.  I'll move on.

14   **BY MR. SCHACHTER:**

15   **Q.**   Now, are you aware that Done put out information on its

16   website which cited to the same article and which cautioned

17   people about misinformation about ADHD on TikTok and social

18   media?

19   **A.**   I'm not aware.  I'm not on TikTok.

20             **MR. SCHACHTER:**  Your Honor, we'd like to show the

21   witness Exhibit 5382, Done's posting on ADHD misinformation and

22   social media, and I'd like to know if the witness agrees with

23   the information that Done put out.

24        Your Honor, we move to admit 5382.

25             **MS. GREEN:**  Objection.  Hearsay.

1          MR. SCHACHTER:  And, Your Honor, to be clear, we are

2     not offering this for truth.  We are offering it for the fact

3     that it was said by Done to the public cautioning them about

4     information available on TikTok and social media.

5          THE COURT:  Okay.  I'll allow it.

6          THE COURTROOM DEPUTY:  Admitted?

7          THE COURT:  Admitted.  Yes.  Okay.

8          (Trial Exhibit 5382 received in evidence.)

9          MS. GREEN:  Objection on foundation grounds too.

10         THE COURT:  Fine.  Proceed.

11    BY MR. SCHACHTER:

12    Q.   Okay.  I want to ask you about whether you agree with

13    portions of this.

14         Do you see this posting by Done on May 6, 2022, called

15    "ADHD misinformation and social media"?

16    A.   Yes.

17    Q.   And I just want to direct you to page 3.

18         Do you see where Done cautioned people (as read):

19              "When individuals rather than board-certified

20         ADHD clinicians give their opinions and advice

21         online, there's a greater possibility that false or

22         misleading content can be shared."

23         You agree with that statement, do you not?

24    A.   Sure.

25    Q.   Okay.  I'd like to show you another portion on page 4 in

1    which Done cautioned people that (as read):

2            "When social media users view incorrect content,

3        it can affect whether they seek the help they need.

4        Simplifying the symptoms of ADHD without providing

5        context for other possible causes of those symptoms

6        is a recurring issue in many of these social media

7        posts."

8        You agree with that statement?

9    A.    Sure.

10   Q.    And then I just want to direct your attention to the last

11   page of that article where Done points people to where they can

12   get reliable information.

13           MR. SCHACHTER:  I'm sorry.  The page before that.

14   Before that.  Okay.

15   BY MR. SCHACHTER:

16   Q.    Do you see where then Done --

17           MR. SCHACHTER:  If you can blow that up.  Oh, no, no.

18   I'm sorry.  The whole thing at the bottom, please, sources.

19   Okay.

20   BY MR. SCHACHTER:

21   Q.    And do you see where Done then points people in the

22   direction of certain sources of information?

23        Do you see that?

24   A.    I do.

25   Q.    Okay.  And I just want to ask you.  So CHADD, when Done is

1    sending people to CHADD what is that?

2    **A.**    CHADD is the Children and Adults -- Children and Adults

3    with ADHD Association.  It's a national association, grassroots

4    with a scientific board that has support -- or support groups

5    around the country.

6    **Q.**    So, and that's a source of reliable information about ADHD

7    that Done is pointing people to?

8    **A.**    It's a source of reasonably reliable information.

9    **Q.**    *Attitude* magazine, that's a source of reliable information

10    for people that are interested in knowing more about ADHD?

11    **A.**    I would disagree with that.

12    **Q.**    Okay.  Psychiatrist.com, is that a source of reliable

13    information?

14    **A.**    Yes.

15    **Q.**    Okay.  Okay.

16    **A.**    You don't want to know why I disapprove of *Additude*

17    magazine?  No?  Not relevant?

18    **Q.**    Let's move on.  Okay.

19    **A.**    That's fine.

20    **Q.**    All right.  Let's change topics.

21         **MR. SCHACHTER:**  And, Your Honor, I'm going to move to

22    specific patients now.  I don't know if this is a good time or

23    if you -- would you like me to press on?

24         **THE COURT:**  Let's keep on going.

25         **MR. SCHACHTER:**  Very good.

1    BY MR. SCHACHTER:

2    Q.   Okay.  Now, the prosecutors asked you about 16 -- they

3    asked you whether you reviewed the files of 16 patients; is

4    that correct?

5    A.   Correct.

6    Q.   All right.  And you were asked the following question, you

7    gave a the following answer.  You were asked (as read):

8            "Based on your review of the 16 Done members,

9        did any of them meet the diagnostic criteria for

10       ADHD?"

11       And your answer was (as read):

12           "Not a single one."

13       Is that correct?

14   A.   Correct.

15   Q.   Okay.  Now, to be clear, you have not examined or spoken

16   with a single one of those 16 patients; is that correct?

17   A.   Correct.

18   Q.   I'm sorry?

19   A.   Correct.

20   Q.   Okay.  So sitting here today, you do not actually know

21   whether any of the 16 patients, in fact, meet the diagnostic

22   criteria for ADHD; correct?

23   A.   Based on what I reviewed from the medical records and the

24   medical documentation, there was insufficient information to

25   qualify any of them for the diagnostic criteria of ADHD.

1   Q.   Okay.  But if you can try to focus in on my question.

2        Sitting here today, because you have not spoken to or

3   examined any of the patients, you are unable to say whether

4   they, in fact, meet the diagnostic criteria for ADHD; correct?

5   A.   Correct, because my role as an expert witness was not to

6   interview the patients.

7   Q.   Okay.  In any event, you didn't and you don't know;

8   correct?

9   A.   I think I've answered the question, unless you want a yes

10  or no.

11  Q.   Very good.  Let's move on.

12       Okay.  Now, of the 16 patients whose files you did review,

13  you are aware that 10 of the 16 have been diagnosed with ADHD

14  and prescribed stimulants by independent medical providers who

15  have nothing to do with Done?

16       You're aware of that, are you not?

17  A.   I haven't added up that number but I'll take it as a -- as

18  an accurate.

19  Q.   Okay.  You certainly did review some medical records

20  provided to you by the Government of other examinations that

21  were Done of those patients in which they were diagnosed with

22  ADHD and prescribed stimulants; correct?

23  A.   In the past or the present?

24  Q.   Either.

25  A.   Yes.

GOODMAN - CROSS / SCHACHTER

Q.   Okay.  Now, let's talk about those 16 patients that the prosecutors asked you to review.

As we talked about, the FDA maximum dosage for Adderall IR is 40 milligrams per day; is that correct?

A.   Not that I know of.  I don't think there's a maximum dose for adults in Adderall IR because it's not FDA-approved for adults.

Q.   Okay.  So there's -- how about for Adderall -- and there's no FDA maximum for adults for Adderall XR?

A.   Correct.  There is a considered max dose by insurance companies of 60 milligrams a day.  That was established on the basis of a registration trial that was submitted, for which I was a principal investigator.

Q.   Okay.  So the insurance-set maximum for Adderall XR for adults is 60 milligrams per day?

A.   Generally.

Q.   Okay.  Great.

You are aware, are you not, that six of the 16 were prescribed 10 milligrams of Adderall per day, so one-sixth of the maximum?

A.   I will assume that your number is accurate and they were prescribed for no legitimate medical purpose.

Q.   Just asking about the dosage.

10 milligrams of -- that six of the 16 were prescribed, that's the same dosage that you would give a six-year-old; is

 1    that correct?

 2    **A.**    No.  So now you're going to equate the -- and I'm --

 3    apologize to the jury because I have to talk about neuroscience

 4    and neuroscience dictates statistics and pharmacokinetics.

 5    There's no way of looking at a person and determining what dose

 6    is optimal.  It's all dependent on metabolism.

 7        I can have a 20-year-old man who is on 10 milligrams of

 8    Adderall who's 200 pounds.  I could have a 30-year-old woman

 9    who's 100 pounds on 60 milligrams of Adderall XR.

10        So to tell me that the dosing for children is in some way

11    linearly related to adults because of weight, I don't know how

12    to answer your question, sir.

13    **Q.**    Okay.  I'm just going to show you what's in evidence as

14    7386, page 57.

15    **A.**    7386.

16    **Q.**    It's on the screen.

17    **A.**    Okay.  Okay.  Very good.

18    **Q.**    Okay.  Do you see in this slide that you prepared, it says

19    "Adderall XR"?

20    **A.**    Yes.

21    **Q.**    It says "child dosing" and "adolescent dosing" --

22    **A.**    Yes.

23    **Q.**    -- and "adult dosing"?

24    **A.**    Yes.

25    **Q.**    Okay.  And you see where you -- you -- and you prepared

GOODMAN - CROSS / SCHACHTER

1    this slide; right?

2    **A.**    I did.

3    **Q.**    Okay.  And you see where it says -- for child dosing, it

4    says "10 milligrams, max 30 milligrams."

5        Do you see that?

6    **A.**    Uh-huh.

7    **Q.**    And you're aware that 6 out of the 16 patients that the

8    Government asked you to review received a dosage of

9    10 milligrams of Adderall per day.

10        Do you recall that?

11    **A.**    I don't recall the number six, but I'll accept the

12    accuracy of your statement.

13    **Q.**    Okay.  Are you aware that the recommended -- well, let me

14    ask you, am I correct that the recommended -- according to the

15    manufacturer -- starting dose for adults with ADHD is

16    20 milligrams?

17    **A.**    That's the max -- that's the recommended starting dose.

18    And infrequently, we start at 20 -- we infrequently start at

19    20.  We often start at 10 and titrate up by 10 milligrams.

20    **Q.**    Okay.  Are you aware that -- so -- so, in other words, 6

21    out of the 16 patients that the government asked you to look at

22    were given half of the recommended starting dose; is that

23    correct?

24    **A.**    For an illegitimate medical purpose.

25        **MS. GREEN:**  Objection, Your Honor.  Also, undue

GOODMAN - CROSS / SCHACHTER

1  consumption of time.  Again, this witness didn't opine as to

2  dosage levels on direct.

3          **MR. SCHACHTER:**  Your Honor, it is directly relevant --

4          **THE COURT:**  I'm going to allow it.

5      Go ahead.

6  BY MR. SCHACHTER:

7  Q.    Okay.  So 6 out of the 16 patients the Government asked

8  you to look at were given dosage of half of the recommended

9  starting dose; correct?

10  A.    Yes.

11  Q.    Okay.  Are you aware that 1 out of the 16 was given a

12  prescription at the recommended starting dose?

13  A.    I don't know that number, but I'll assume the accuracy of

14  your statement.

15  Q.    Do you recall that a Ms. DePrimo was prescribed

16  10 milligrams twice a day?

17  A.    Yes.  I recall Ms. DePrimo had an evaluation of

18  six-and-a-half minutes.

19  Q.    Okay.  Three of those patients were prescribed between

20  25 -- 3 out of the 16 were prescribed between 25 and

21  30 milligrams?

22  A.    Okay.

23  Q.    Okay.  All right.

24      Now, are you aware that of the 16 patients that the

25  prosecutors asked you to examine, 4 of them were treated by a

1  nurse practitioner named Elizabeth Shapard?

2  A.    Yes.

3  Q.    That's four.

4       Are you aware that 3 of the 16 that the prosecutors asked

5  you to look at were treated by a nurse practitioner named Erin

6  Kim?

7  A.    Yes.  These patients you're citing were also prescribed

8  medication by other prescribers as well.

9  Q.    Three were prescribed by Erin Kim?

10 A.    Yes.

11 Q.    Three were treated by a nurse practitioner named Cassidy

12 Abbott-Orr?

13 A.    Yes, I assume.  I'm going to -- Counsel, I'm going to

14 assume the accuracy.  I have no way of doing this spreadsheet

15 in my head.

16 Q.    If you don't know, please just say I don't know.

17 A.    Okay.  That's what I'll say then.

18 Q.    Okay.  Do you know that two of the 16 were treated by a

19 nurse practitioner named Shabnam Rahimi?

20 A.    I don't know.

21 Q.    Okay.  All right.

22      Let's talk about -- we're not going to go through all 16,

23 but I want to talk about some of the patients that the

24 prosecutor asked you about.

25      I'd like to start by asking you about Harlan Band.

1    MR. SCHACHTER:  And, Your Honor, before we embark on

2    this, I just want to check with the Court whether or not this

3    is an appropriate time for an afternoon break?

4         THE COURT:  Let's take a 10-minute break.  We'll

5    resume at 2:30.

6         MR. SCHACHTER:  Thank you, Your Honor.

7         THE COURT:  Remember the admonition given to you.

8                   (The jury leaves the courtroom.)

9      (Proceedings were heard out of the presence of the jury.)

10                 (Recess taken at 2:18 p.m.)

11                (Proceedings resumed at 2:32 p.m.)

12        THE COURTROOM DEPUTY:  Come to order.  Court is now in

13   session.

14     (Proceedings were heard out of the presence of the jury.)

15        MR. SCHACHTER:  These are replacements.  They cover a

16   lot of the same things that might get used, but they have

17   medical records.

18        THE COURT:  They have what?

19        MR. SCHACHTER:  We're talking about the patients now.

20        THE COURT:  I know.  That's it.

21        MR. SCHACHTER:  That's it.

22        THE COURTROOM DEPUTY:  Judge, you have new binders.

23        THE COURT:  What?  Oh, new -- oh, my God.

24        MR. SCHACHTER:  They're replacements.  We can get rid

25   of the other ones.

1           THE COURT:  Oh, get rid of the others.  Okay.  With

2      pleasure.

3           MR. SCHACHTER:  They contain -- just so Your Honor's

4      clear, they contain -- to the extent that there would be any

5      reason to go back to those --

6           THE COURT:  I'm not going to look at them, but are

7      they in evidence or not.

8           MR. SCHACHTER:  The medical records, some I need to

9      move subject to a motion to strike, but the medical records

10     will all come into evidence.

11          THE COURT:  Yeah.  Okay.  Bring in the jury.

12               (The jury enters the courtroom.)

13        (Proceedings were heard in the presence of the jury.)

14          THE COURT:  Please be seated.

15      Let the record reflect all jurors are present, parties are

16     present.

17      You may proceed.

18          MR. SCHACHTER:  Thank you, Your Honor.

19     BY MR. SCHACHTER:

20     Q.   Doctor, I'd like to turn to the patients that you

21     discussed with the prosecutor.

22      You remember questions about the evaluation and treatment

23     of a patient name Harlan Band?

24     A.   Yes.

25     Q.   Okay.  And are you aware, I think the prosecutor said it,

 1    that Ms. Ruthia He is charged with a specific crime for one of

 2    prescriptions that was issued to this gentleman, Harlan Band.

 3        Are you aware of that?

 4    A.    I'm not aware of the specific charges.

 5    Q.    Okay.  Very good.

 6        In any event, Mr. Band was treated by a medical provider

 7    named Shabnam Rahimi; is that correct?

 8    A.    Yes.

 9    Q.    She diagnosed Mr. Band with ADHD and prescribed him

10    20 milligrams of Adderall XR.

11        Do you recall that?

12    A.    Correct.  In 13 minutes.

13    Q.    Okay.  And you testified that her prescription was not for

14    a legitimate medical purpose and in the usual course of

15    professional practice; correct?

16    A.    Correct.

17    Q.    You have never spoken with Ms. Rahimi; is that correct?

18    A.    Correct.

19    Q.    You do not, then, actually know what her purpose was when

20    she chose to prescribe medication to Mr. Band.

21        You would agree with that; correct?

22    A.    Well, she put a diagnosis of ADHD, so the presumption was

23    that was the purpose of the medical prescription.

24    Q.    Okay.  Now, you testified that Mr. Band did not meet the

25    criteria for the diagnosis of ADHD; is that correct?

 1   **A.**    Correct.

 2   **Q.**    You recall that Mr. Band had been diagnosed with ADHD as a

 3   child by a doctor who had no ties to Done.

 4        Do you recall that?

 5   **A.**    Let me look at my report.

 6        Yes.

 7   **Q.**    Okay.

 8            **MR. SCHACHTER:**  And just to short-circuit, Your Honor,

 9   we move to admit -- I'm sorry.  This is already in evidence,

10   1820.  We'd like to display 1820 in evidence specifically at

11   page 32.

12            **THE COURT:**  You're saying it's already in evidence?

13            **MR. SCHACHTER:**  Yes, Your Honor.

14            **THE WITNESS:**  Okay.  If you're going to put it on the

15   screen -- 1820.

16            **THE COURT:**  Okay.

17            **THE WITNESS:**  Do I have a copy of what you're showing?

18   **BY MR. SCHACHTER:**

19   **Q.**    You should, but if you wish it's -- we're going to move to

20   certain portions of the medical records.  You can look at it in

21   the binder or not.  They're available to you.

22            **THE COURT:**  Would it be useful to have the doctor's --

23   the doctor's report -- the witness's report has his analysis of

24   the treatment -- of his -- his analysis of the case in which

25   you cited.  I don't know his name.  What is name?  Harlan

```
 1  something.  Harlan Band.
 2          MR. SCHACHTER:  You have 1820.
 3          THE COURT:  It's an exhibit, should it be admitted
 4  into evidence, or are you offering it or not?
 5          MR. SCHACHTER:  1820, the medical records are in
 6  evidence.  That's what I wish to ask him about.
 7          THE COURT:  Okay.  You want the records but not the
 8  report?
 9          MR. SCHACHTER:  Correct.
10          THE WITNESS:  I've got it.
11  BY MR. SCHACHTER:
12  Q.   Very good.  All right.
13       So -- and you reviewed these records; correct?
14  A.   Correct.
15  Q.   All right.  So you saw that Harlan Band, according to
16  Nurse Rahimi's notes, was diagnosed at age 12 and started on
17  Concerta.
18       That's a stimulant?
19  A.   Yes.
20  Q.   (as read):
21          "This was stopped at the beginning of high
22       school because parents divorced and mom did not want
23       him to be on medications.  He did poorly in high
24       school 2/2 this --"
25       That's medical lingo for due to this; is that correct?
```

GOODMAN - CROSS / SCHACHTER

1    **A.**    I'm not familiar what that abbreviation.

2    **Q.**    Oh.

3    **A.**    Which one are we talking about?

4    **Q.**    2/2.

5    **A.**    I'm not familiar with that abbreviation.

6    **Q.**    Okay.  I'm going to show you the Veteran's Administration

7    medical abbreviations cheat sheet, which is 7254 in your

8    binder.

9    **A.**    I don't work for the Veteran's Administration, so what am

10   I supposed to do with this document?

11   **Q.**    Withdrawn.  Let's move on.

12       You don't --

13           **MR. SCHACHTER:**  No, no.  I'm sorry.  You can go.

14   BY MR. SCHACHTER:

15   **Q.**    You don't know that 2/2 is a medical abbreviation --

16           **THE COURT:**  What difference does it make?  Move on.

17   BY MR. SCHACHTER:

18   **Q.**    Okay.  See where she wrote (as read):

19           "Did poorly in high school 2/2 this, resulting

20       in his dropping out"?

21   **A.**    Yes.

22   **Q.**    So you would agree that it appears that Mr. Band appears

23   to have told Nurse Rahimi that he had suffered impairment as a

24   result of his ADHD.

25       Do you agree with that?

GOODMAN - CROSS / SCHACHTER

1    A.    An impairment --

2    Q.    Yes.

3    A.    -- without qualification of the basis of his diagnosis at

4    age 12?

5    Q.    Right.

6        He said that he -- that he and Nurse Rahimi, according to

7    the notes, discussed the fact that had been prescribed a

8    stimulant and Wellbutrin to help him with his ADHD symptoms; is

9    that correct?

10    A.    What stimulant are we talking about?

11    Q.    Okay.  Well, you see where it says (as read):

12            "Later got his GED.  He is in school majoring in

13            premed.  On armodafinil 150 milligrams but feels that

14            it does not help."

15        Do you see that?

16    A.    I do.

17    Q.    Armodafinil is a stimulant, the brand-name is Nuvigil; is

18    that correct?

19    A.    Correct.

20    Q.    And, I'm sorry, that is a stimulant?

21    A.    It is a stimulant but in this case, it was not prescribed

22    for ADHD.

23    Q.    Well, I guess -- we're going to talk about other records,

24    but here you see where, according to these notes, Harlan Band

25    said that he had been prescribed this stimulant but feels that

1    it does not help?

2    **A.**    Right.  This is an example of a stimulant that was

3    prescribed for circadian sleep disorder, not for ADHD.  And how

4    would he know if he feels better if he thinks armodafinil is

5    going to help his ADHD when, in fact, it was prescribed for an

6    entirely different medical disorder?

7    **Q.**    Okay.  I'm just asking you, the notes reflect a

8    conversation in which he said that he had been prescribed this

9    stimulant but feels that it does not help; correct?

10   **A.**    I'm all in favor of describing what we see on the screen.

11   I'm putting it in context of the other medical records, so

12   let's just be full in the context of what you're asking me.

13   **Q.**    Okay.  We're going to talk about those other medical

14   records in a minute.  I promise.  Okay.

15        So he also says that he -- he was also on Wellbutrin.  Do

16   you see that?

17   **A.**    Correct.

18   **Q.**    Okay.  And Wellbutrin is a well-known antidepressant; is

19   that correct?

20   **A.**    Correct.

21   **Q.**    And it is often prescribed to people who suffer from both

22   depression and ADHD; is that correct?

23   **A.**    Yes.

24   **Q.**    And then -- okay.

25        And by the way, armodafinil is a controlled substance; is

1   that correct?

2   **A.**    It's a Class IV, not a Class II.

3   **Q.**    Okay.  And you agree that armodafinil, or Nuvigil, is

4   sometimes prescribed off-label to treat ADHD symptoms?

5   **A.**    Yes, but there are no randomized control trials justifying

6   its use.

7   **Q.**    Okay.  But in your report you described it as an alerting

8   agent which is prescribed off-label for ADHD; correct?

9   **A.**    Correct.

10  **Q.**    Okay.  Now, Ms. Green asked you if you were provided

11  medical records from Mr. Band's prior psychiatrist, a person

12  named Dr. Javaherian who had treated Mr. Band.

13       Do you remember that?

14  **A.**    Yes.

15  **Q.**    And she asked you how, if at all, they changed your

16  opinion and you said they did not; is that correct?

17  **A.**    Correct.

18  **Q.**    Dr. Javaherian's practice was called Java Psychiatry.

19       Do you recall that?

20  **A.**    I don't know.

21  **Q.**    Okay.  Well, let's take a look at him.

22       **MR. SCHACHTER:**  Your Honor, we -- to the extent

23  they're not in, they were included to the Government's

24  stipulation, Exhibit 2612, we move to admit them if they're not

25  already in.

1          THE COURT:  Admitted.

2          (Trial Exhibit 2612 received in evidence.)

3          MR. SCHACHTER:  And if we can go, please, Mr. Cepregi,

4     to page 76.

5     BY MR. SCHACHTER:

6     Q.   Okay.  Do you see the notes from Java Psychiatry on

7     August 14, 2020?

8     A.   August 14, 2020.

9     Q.   Right.  And that would be two months to the day before

10    Mr. Band sees Nurse Practitioner Rahimi; correct?

11    A.   Correct.

12    Q.   All right.  Now, I want to direct your attention to the

13    line in these notes that say, (as read):

14          "Soon to start school and wants to resume

15          Provigil."

16          Do you see that?

17    A.   Yes.

18    Q.   Provigil, what that is is a stimulant similar to Nuvigil,

19    which is used off-label for ADHD; is that correct?

20    A.    It is used off-label for ADHD, but it has a negative

21    randomized control trial which I was involved with which never

22    was published.

23    Q.   Okay.  In any event, it's a stimulant used off-label for

24    ADHD; correct?

25    A.   Can be.

GOODMAN - CROSS / SCHACHTER

1  Q.    Okay.  If we continue to look at the notes --

2  A.    Interesting, though, you say it's about ADHD, but there's

3  no diagnosis of ADHD in Dr. J's report.

4  Q.    I was just asking to look at the notes.  Why don't we

5  proceed.

6        Do you see where it then goes on to say that the

7  recommendations from Java Psychiatry is to presume Provigil

8  100 milligrams.

9        Do you see that?

10 A.    I do.

11 Q.    Okay.  So looking at these notes, would you agree that it

12 appears that Mr. Band told Java Psychiatry that he was starting

13 school and wanted to resume the stimulant medication?

14 A.    Well, that's what he requested.  But there's no formal

15 diagnosis of ADHD or any indication of the symptoms that are

16 being treated by Provigil.

17 Q.    Exactly.

18       So you do not see in here any reference to a comprehensive

19 psychiatric evaluation of Mr. Band, do you?

20 A.    I don't see any reference as to why Provigil was

21 prescribed.

22 Q.    Okay.  But, in any event, you did see the reference to, he

23 said (as read):

24           "Soon to start school and wants to resume

25       Provigil."

1          The stimulant; correct?

2  A.    Yes.

3  Q.    And now we see that Java Psychiatry is doing what he

4  requested and resuming Provigil 100 milligrams.

5          Do you see that?

6  A.    Dr. J made a clinical decision and started the Provigil.

7  Q.    Right.  Okay.

8          Now, I just want to be clear.  If we can just go to 2612

9  at 78, because it will matter in a minute.  These notes are

10  written by a Dr. Nicole Desiderati at Java Psychiatry.

11          Do you see that?

12  A.    I see what you're showing me on the screen, yes.

13  Q.    Okay.  Now let's go to the notes of Java Psychiatry a

14  month later, so just a month before Mr. Band's visit with Nurse

15  Rahimi.

16          MR. SCHACHTER:  If we can go to 2612 at 79.

17  BY MR. SCHACHTER:

18  Q.    Okay.  So Mr. Band, 27 days later, after he had said he's

19  soon to start school and wants to resume that stimulant, it

20  says at Java Psychiatry (as read):

21          "States went back on Provigil.  States the

22          dosage has been too low."

23          Do you see that?

24  A.    I do.

25  Q.    Okay.  And then after Mr. Band, according to these notes,

1    told Java Psychiatry that his stimulant dosage was too low, do

2    you recall that Dr. Javaherian doubled it?

3    **A.**    I don't recall because I haven't seen these notes, so

4    you're showing me those notes.

5    **Q.**    Well, actually, Ms. Green specifically asked you if you

6    had reviewed these notes and whether they changed your opinion.

7         Do you recall that?

8    **A.**    I do.  And I thought I was referencing the first.  So if I

9    have seen them, I misspoke and I have forgotten, so we can go

10   through your questions.

11   **Q.**   Okay.  Okay.

12        All right.  Now, you are aware, are you not, that Nurse

13   Rahimi checked Harlan Band's CURES report before prescribing

14   him Adderall?

15   **A.**    And I would know that because?

16   **Q.**    Well, let's do this -- well, do you recall checking to

17   see, when you were analyzing Nurse Rahimi's evaluation of

18   Harlan Band, did you attempt to determine whether she had

19   checked his CURES report as part of her process before

20   prescribing him Adderall?

21   **A.**    So you'd have to refresh my memory by showing me the

22   medical note of her evaluation that would indicate that the

23   CURES was checked.

24   **Q.**    Okay.  Well, let me -- I'm going to show you this.

25        **MR. SCHACHTER:**  Your Honor, we move to admit the CURES

1  audit report, which is Exhibit 6192, which shows what medical

2  professional checks the CURES report.

3         **THE COURT:**  Admitted.

4      (Trial Exhibit 6192 received in evidence.)

5         **MS. GREEN:**  Objection.  Foundation.

6         **THE COURT:**  Well, I'll deal with it later.

7         **MR. SCHACHTER:**  There's a business record

8  certification associated with this.  It's in page 1 of the

9  exhibit.

10  **BY MR. SCHACHTER:**

11  **Q.**   Okay.  Do you see where it says that Nurse Rahimi on

12  October 14, 2020, the day of her visit with Harlan Band,

13  "Checked the patient's CURES report"?

14  **A.**   Yes.

15  **Q.**   Okay.  Do you see where it reflects that she -- we don't

16  even need to highlight it, but do you see that she also checked

17  it again on November 11, 2020?

18  **A.**   Yes.

19  **Q.**   Okay.  And you agree that's an appropriate thing for a

20  medical provider to do, to check the PDMP or CURES report

21  before prescribing a controlled substance; right?

22  **A.**   Yes.

23  **Q.**   Okay.  Now, if we look at that CURES report, Mr. Band's

24  CURES report, which is 18 --

25         **MR. SCHACHTER:**  Your Honor, we offer Mr. Band's CURES

1    report, which is 1806, as well as 1806A, which is just a more

2    readable version of his CURES report.

3            **THE COURT:**  Admitted.

4        (Trial Exhibits 1806 and 1806A received in evidence.)

5    **BY MR. SCHACHTER:**

6    **Q.**    Okay.  If we can look at Item 446, which is the entry for

7    September 11, we see that prescription by Dr. Javaherian on

8    September 11th for 200 milligrams of modafinil, which is that

9    Provigil stimulant medication; is that correct?

10   **A.**    Correct.

11   **Q.**    All right.  And you can see just above it, you see that --

12   I had asked you if you recall that Java Psychiatry had doubled

13   Mr. Band's prescription after he had requested it be doubled --

14   or increased, and now you see that that's what happened, that

15   his -- that Java Psychiatry doubled his stimulant prescription?

16   **A.**    Correct.

17   **Q.**    Okay.  Now I'd like to go to the notes of Mr. Band's

18   October 7 appointment with Java Psychiatry.  That's 2612 at 81.

19        The notes here reflect that -- how he appears.  And this

20   is one week before Harlan Band's appointment with Nurse Rahimi.

21        Do you see that?

22   **A.**    Yes.

23   **Q.**    Okay.  Now, I want to look just at the top line.  You see

24   it's -- these notes are taken by a physician assistant.

25        Do you see that?

1    **A.**    Yes.

2    **Q.**    Okay.  And if you look a little further down, you see

3    where it says that Provigil will be switched to Nuvigil?

4    **A.**    Yes.

5    **Q.**    Okay.  Both are stimulants and controlled substances?

6    **A.**    Yes.

7    **Q.**    Okay.  So Harlan Band had reported to this physicians

8    assistant -- or, I guess, she noted that he had appeared

9    fatigued, and she changes him from Provigil to Nuvigil.

10        Am I correct that Nuvigil is a somewhat more potent

11    stimulant than Provigil?

12    **A.**    I'm not sure I would go there.  I would say that

13    they're -- Nuvigil is actually an offshoot of Provigil.  That's

14    as far as I'll go.

15        I will make note, while you're focused on this, he

16    complains of insomnia and daytime sleepiness, so it still is

17    not clear, in the course of the notes that you've shown me,

18    that either of these medicines are being prescribed for ADHD.

19    **Q.**    Okay.  Great.

20        But what they do show is prescribed a stimulant and

21    doubled.  And that information is in the CURES report that was

22    available to Nurse Rahimi when she sees Harlan Band; is that

23    correct?

24    **A.**    Correct.

25    **Q.**    Okay.  Now, looking back at that CURES report --

1          MR. SCHACHTER:  If we can go back to 1806A.

2    BY MR. SCHACHTER:

3    Q.   Okay.  And if we can look -- we see the stimulant

4    prescriptions that Nurse Rahimi would have seen in August and

5    September and October.  And then she also would have seen, if

6    we look at -- right.  Thank you -- that on April 2020, Mr. Band

7    was also prescribed Nalaxone [sic] by the same doctor who had

8    later prescribed him the stimulant.

9         Do you see that?

10   A.   Correct.

11   Q.   Okay.  So in April of 2020, Mr. Band is prescribed

12   Naxalone -- Nalaxone?

13   A.   Naloxone.

14   Q.   Naloxone.  Thank you.

15        And that is a prescription for somebody who is

16   suffering -- who is in recovery for opioid addiction; is that

17   correct?

18   A.   Correct.

19   Q.   Okay.  So Nurse Rahimi would have seen that the same

20   psychiatrist that had prescribed naloxone for opioid recovery

21   to Mr. Band in April subsequently made a series of

22   prescriptions for a stimulant.

23        That would have been available to her when she looked at a

24   CURES report; is that right?

25   A.   Correct.

1  Q.   Okay.  Now, let's look at -- and by the way, you would

2  agree with me, would you not, that one conclusion that a

3  medical provider may have -- well, let me ask you this:  One

4  conclusion that Ms. Rahimi may have reached when she looked at

5  the CURES report was that Harlan Band was sufficiently along in

6  his recovery for another psychiatrist to have prescribed him a

7  stimulant?

8          MS. GREEN:  Objection.  Calls for speculation.

9          MR. SCHACHTER:  Well, he's opining on Nurse

10  Rahimi's --

11          THE COURT:  Well, are you asking, is it a possible

12  conclusion that the person may have drawn?  Or are you asking

13  is it the likely conclusion that a person would draw?  Are you

14  asking is it a reasonable conclusion that the person drew?

15      I don't know.  If you say what's possible -- everything is

16  possible.  In other words, the objection is sustained but you

17  can re-ask the question.

18          MR. SCHACHTER:  Okay.

19          THE COURT:  Does it seem reasonable that she believed

20  that it was such and such?  You can simply ask that.

21  BY MR. SCHACHTER:

22  Q.   Why don't I ask it this way:  So when Nurse Rahimi saw

23  Harlan Band's CURES report on her first visit with Harlan Band,

24  she would have seen that back in April, he had been prescribed

25  medication associated with recovery for his opioid addiction

1    and then subsequently, she would have seen that the same doctor

2    prescribed stimulants; correct?

3    **A.**    Yes.  But she would not have known for what reason the

4    stimulant was prescribed nor did she speak to Dr. J or get

5    records from Dr. J to clarify the reason for the modafinil.

6    Let's not say that the fact the modafinil was prescribed meant

7    that this patient who had a history of narcotic abuse would be

8    a legitimate candidate for modafinil.  In addition, modafinil

9    is a C IV drug not a C II drug.

10   **BY MR. SCHACHTER:**

11   **Q.**    Dr. Goodman, please, if you can try just to focus on my

12   questions.

13           **THE COURT:**  Excuse me.  Don't lecture the witness.

14           **MR. SCHACHTER:**  Okay.

15           **THE COURT:**  Just ask questions.

16           **MR. SCHACHTER:**  Okay.

17   **BY MR. SCHACHTER:**

18   **Q.**    Let's now look at what Harlan Band told Nurse Rahimi at

19   this visit, according to her notes.

20           If we can turn to Exhibit 1820 at page 26.

21           Do you see where, according to the notes, he says, no, he

22   has not taken any recreational drugs in the past year?

23   **A.**    Yes, I see that.

24   **Q.**    Okay.  And then if we can look at page 34.

25           Do you see where, according to the notes, Nurse Rahimi had

1  written that the patient is not an active substance abuser.

2      Do you see that?

3  A.   Yes.

4  Q.   Okay.  Now, we talked a little bit about whether or not it

5  is appropriate to prescribe stimulant medications for somebody

6  who has ADHD and is in recovery for some kind of addiction.

7      Do you recall that?

8  A.   Yes.

9  Q.   Okay.  And I just want to be clear.  In 2023, one of the

10 things that you said is when you -- when you were talking about

11 the fact that -- the idea that prescribing stimulant

12 medications for somebody who has ADHD in recovery is going to

13 provoke a relapse, there's very little evidence to support

14 that.  You said that, right, in 2023?

15 A.   I said that.

16 Q.   Okay.  And you also said, (as read):

17          "And for those people, if they have ADHD and

18      they've never been treated, I would go ahead and

19      treat their ADHD with the usual medications and just

20      monitor their recovery program."

21     That's the guidance that you were providing to medical

22 professionals back in 2023; is that correct?

23 A.   That is correct.  With the clarification that when I say

24 ADHD, it's someone who's been diagnosed with a comprehensive

25 psychiatric evaluation, and you cannot convince me that

**GOODMAN - CROSS / SCHACHTER**

1   Mr. Band was diagnosed accurately with a comprehensive

2   psychiatric evaluation in 13 minutes.

3   **Q.**   Dr. Goodman, I'm not here to convince you of anything.

4   I'm simply trying to ask you questions which I would like you

5   to answer.

6   **A.**   And that's fine.  I'm happy to do that within the context

7   of the entirety of the patient you're discussing.

8   **Q.**   Thank you.

9        Without further context, what you said to medical

10  professionals in 2023, is (as read):

11            "For those people who are in recovery, if they

12        have ADHD and they've never been treated, I would go

13        ahead and treat their ADHD" --

14       **THE COURT:**  Counsel, I think we're just going over

15  this.  His answer is, as he gave the last time, he said if the

16  person has ADHD and he -- and you know he's had it because he's

17  had a comprehensive medical exam, then X, then Y, then Z,

18  whatever it is.

19       So every time you ask him about a piece, well, you could

20  treat a person this way, you could treat a person that way, you

21  can do this, you can do that.  Yeah, I'm sure in all of --

22  wherever those binders are -- ask his mother -- he has -- he

23  has -- said that.

24       But the question is he has -- you may not like it or you

25  may disagree with it or the jury may conclude it's wrong.

1    Okay?  All of that's out there.  But the fact of the matter is

2    this witness's testimony is based on a -- on a premise, and the

3    premise is -- which you may disagree with, but the premise is

4    that that individual has had a comprehensive psychiatric

5    evaluation medical examination according to the DSM which

6    establishes that he has a disease -- or disorder.  Sorry.  I

7    don't know what it is.

8        Anyway -- maybe we're all suffering today.

9        But the point is -- the point is that that's what he has

10    been saying now.  And to go over piece by piece by piece and

11    for the witness then to have to say, "Yes, but that assumes

12    that he's X, done this," and then you say, "Well, just answer

13    the question," the question is based upon an assumption -- his

14    answer is based on an assumption -- not the question.  The

15    answer is based on an assumption.

16        So have at it.  I mean, you can ask questions about the

17    diagnosis and so forth, but try to realize that his response is

18    what he has given in the past repeatedly --

19          **MR. SCHACHTER:**  I understand.

20          **THE COURT:**  -- and maybe we can move on a bit.

21          **MR. SCHACHTER:**  I understand, Your Honor.  My

22    questions were about the words he used when he was providing

23    guidance to medical professionals.  My question was very clear,

24    I was simply asking him about the words he used when he

25    provided guidance to medical professionals in 2023.  I

1  understand, I think we all understand, Dr. Goodman's position.

2  I was inquiring about the words he used.

3          THE COURT:  But he is saying -- the words he used were

4  a function of the basic premises of his argument.  In other

5  words, I say X because I believe Y to be true.

6          So you could ask him about X, X, X, but if, in fact, the

7  answer always is, "Yes, but it is in the context of my

8  believing Y is the case," then it's -- it's not a useful

9  exercise.  It's enormously time-consuming because his answer --

10  he's not denying that he said those things.

11          MR. SCHACHTER:  That was all I was asking.

12          THE COURT:  Okay.  Go ahead.

13  BY MR. SCHACHTER:

14  Q.   Okay.  Now -- so we talked about Nurse Rahimi's initial

15  visit with Harlan Band.  In terms of monitoring Harlan Band

16  after he had provided the information that we looked at, you

17  recall that Nurse Rahimi required a follow-up less than

18  four weeks later; is that correct?

19  A.   So I'm not going to be able -- if you're going to ask me

20  about follow-up dates, I'm not going to be able to remember

21  that.  If you want to bring up the Excel spreadsheets showing

22  the appointments, then I can -- I can respond accordingly.

23  Q.   Sure.  You can just say -- that's okay.  If you can --

24  A.   I don't know.

25  Q.   -- say "I don't remember" or "I don't know," those are

1  fine answers.  Just say "I don't remember," I'll show you

2  something.

3  **A.**    Okay.

4  **Q.**    Okay.  I'm going to show you something.  I'm going to show

5  you 1820 at page 35.

6  **A.**    1820.

7            **THE COURT:**  Is it in evidence?

8            **MR. SCHACHTER:**  I'm sorry?

9            **THE COURT:**  In evidence?

10           **MR. SCHACHTER:**  Yes, Your Honor, 1820 is in evidence.

11           **THE COURT:**  Show it on the screen.

12           **MR. SCHACHTER:**  Yes.

13           **THE COURT:**  It's on the screen, Doctor.

14 **BY MR. SCHACHTER:**

15 **Q.**    Do you see where Nurse Rahimi wrote (as read):

16           "We will need to schedule a follow-up assessment

17      to evaluate the effects of medications and handle

18      refills."

19      Do you see that?

20 **A.**    Yes, I do.

21 **Q.**    And then if we can turn to page 22.  You see where there

22 is an appointment date of November 11, 2020; is that right?

23 **A.**    Yes.

24 **Q.**    That's a little less than a month after her initial

25 appointment with Mr. Band.

1          Do you see that?

2    A.    Yes.

3    Q.    Okay.  Now, you feel that Nurse Rahimi did not do an

4    appropriate evaluation of Mr. Band; correct?

5    A.    I can't think of a single psychiatrist I know who would

6    have said 13 minutes was an adequate time for a comprehensive

7    psychiatric evaluation.

8    Q.    Understood.

9          That's -- that's at least part of the reason, there may be

10   other reasons is because you looked at it and you said it's

11   13 minutes and that's too short; correct?

12   A.    Correct.

13   Q.    All right.  Now, are you aware that at Done, providers

14   were supposed to take 25 minutes for their appointments?

15   A.    I understand the appointments were scheduled for

16   25 minutes.

17   Q.    Okay.  And Nurse Rahimi only took half that time?

18   A.    Correct.

19   Q.    You don't know why?

20   A.    Huh?

21   Q.    You don't know why?

22   A.    No, I don't know why.

23   Q.    It might be that Mr. Band, a 29-year-man, had reported

24   that he had already been diagnosed with ADHD and because his

25   PDMP had confirmed that he had been prescribed stimulants

1    before, that may be a reason why she only spent 13 minutes.

2        Fair to say.

3            **MS. GREEN:**  Objection.  Calls for speculation.

4            **THE COURT:**  Sustained.

5    **BY MR. SCHACHTER:**

6    **Q.**    Okay.  You for sure would have taken longer than Nurse

7    Rahimi did with Harlan Band; correct?

8    **A.**    Yes.

9    **Q.**    You were shown no evidence that a woman named Ruthia He

10   knew anything about how long Nurse Rahimi had taken in her

11   initial evaluation of Harlan Band; correct?

12   **A.**    Correct.

13   **Q.**    You certainly never saw any evidence that a woman named

14   Ruthia He told Nurse Rahimi to diagnose Harlan Band with ADHD;

15   correct?

16   **A.**    Correct.

17   **Q.**    Okay.  And let's talk about what Ms. Rahimi prescribed for

18   Harlan Band.

19            **MR. SCHACHTER:**  If we can look at 1820 at 34.

20        Okay.  This is in evidence.

21   **BY MR. SCHACHTER:**

22   **Q.**    Okay.  Do you see where she started him on Adderall,

23   20 milligrams XR?

24   **A.**    XR -- Adderall XR is extended-release.  PO means by mouth.

25   PRN means as-needed daily.

1  **Q.**   Okay.  And 20-milligrams is the recommended starting dose,

2  according to your chart, for Adderall XR?

3  **A.**   The chart is a derivative of the package insert, so it is

4  the starting dose in the package insert of Adderall XR.

5  **Q.**   Okay.  And as we talked about, Adderall IR has a much

6  greater opportunity for abuse; correct?

7  **A.**   Correct.

8  **Q.**   But he was prescribed XR; is that right?

9  **A.**   Yes, he was, on an as-needed basis.

10 **Q.**   Okay.  Now, if -- will you agree with me that if

11 Ms. Rahimi's purpose was to help Mr. Band abuse drugs, she

12 could have prescribed him immediate-release; correct?

13        **MS. GREEN:**  Objection.  Calls for speculation and

14 argument.

15        **THE COURT:**  Sustained.

16        **MR. SCHACHTER:**  Okay.

17 **BY MR. SCHACHTER:**

18 **Q.**   Now -- well, immediate release is more easily abused, you

19 said; correct?

20 **A.**   Yes.

21 **Q.**   All right.  Now, the second prescription written by Nurse

22 Rahimi, do you recall whether it was for 5 milligrams of

23 Adderall IR?

24 **A.**   I don't recall.

25 **Q.**   I'm going to show you 1820, in evidence, at page 22.

1      And do you see that after the first appointment, she

2   prescribed him the starting dose for Adderall XR and also

3   5-milligram of IR in the afternoon.

4      Do you see that?

5   A.   Correct.

6   Q.   Okay.  And we talked about that, but that is common

7   sometimes for mental health professionals to prescribe a small

8   dosage IR for the afternoon; is that correct?

9   A.   Correct.  Because the Adderall XR would have worn off and

10  so people might take what's called a booster dose in the

11  afternoon to get them into the early evening.

12  Q.   Okay.  And I'd like to just show you the reason for this.

13  I can show you, in evidence, 1820 at page 38.

14      Do you see where Mr. Band writes (as read):

15          "Hello, Dr. Rahimi.  The medication has been

16      working great.  No jitters or anxiety, just clean and

17      clear.  One small issue I've run into is within the

18      last week or two, I have started to notice I crash

19      and become extremely lethargic for an hour or two in

20      the afternoon.  I take the 20 milligram XR capsule

21      when I wake up around 7:30.  As I stated to the

22      support team, I will be running out towards the end

23      of the week, so we can talk about it then, however,

24      if you have any suggestions in the meantime as it

25      takes a big chunk out of the otherwise extremely

1          productive day."

2          And then if we can look at Ms. Rahimi, she writes (as

3    read):

4               "Hello, Harlan.  Sorry to hear that.  Are you

5          able to schedule an appointment soon?"

6          Do you see that?

7    **A.**   I do.

8    **Q.**   Would you agree with me that it appears that her purpose

9    in seeking to schedule an appointment with Harlan Band was a

10   medical purpose?

11             **MS. GREEN:**  Objection.  Calls for speculation.

12             **THE COURT:**  Sustained.

13             **MR. SCHACHTER:**  Your Honor, I would just note that the

14   witness throughout his direct testified about Nurse Rahimi's

15   purpose and I am now asking about the witness --

16             **THE COURT:**  I'll allow it.  I mean, I don't know --

17             **MS. GREEN:**  That's not correct, Your Honor.

18             **THE COURT:**  I don't know how he can -- how he can

19   testify as to what her purpose was.  That's the problem.

20             **MR. SCHACHTER:**  Exactly.  That is the problem.

21             **THE COURT:**  Okay.  Well, I'm glad I made that point.

22   Anyway --

23             **MR. SCHACHTER:**  Thank you.

24             **THE COURT:**  -- he can't give testimony.  I don't know

25   what her purpose was.

1          MR. SCHACHTER:  We stipulate to that, Your Honor.

2   BY MR. SCHACHTER:

3   Q.   Okay.  So, by the way, in this message, Ms. Rahimi does

4   not say that her purpose is to facilitate drug abuse, does she?

5          MS. GREEN:  Objection.  Argumentative.

6          THE COURT:  I'll allow it.

7          THE WITNESS:  She does not say it.  And any clinician

8   who would write that in a medical record is an idiot.

9   BY MR. SCHACHTER:

10  Q.   Sure.

11         And Mr. Band did not say, according to the notes, that he

12  wanted Adderall so that he could engage in drug abuse.  Did he

13  say that?

14         MS. GREEN:  Same objection, Your Honor.

15         THE COURT:  Well, he's asking did he say it, is it in

16  the notes anywhere.  That's all.

17         THE WITNESS:  Say the question again.

18  BY MR. SCHACHTER:

19  Q.   Sure.

20         Did -- according to these notes, at any time during his

21  medical appointment with Nurse Rahimi, did Harlan Band say,

22  "I'd like this Adderall so that I can abuse drugs"?

23         He didn't, did he?

24  A.   No, he didn't.  I don't -- no, he didn't.

25  Q.   Thank you.  Okay.

1          And, in fact, there was a follow-up on November 11th.

2              MR. SCHACHTER:  If we could look at 1820 at 22.

3    BY MR. SCHACHTER:

4    Q.   Okay.  And when you -- you reviewed the notes of the --

5    well, I'll just show it to you.

6              MR. SCHACHTER:  Can we look at 1820 at 47.

7    BY MR. SCHACHTER:

8    Q.   These are Nurse Rahimi's notes of the follow-up which

9    occurs a little bit less than a month after her first

10   appointment.

11         And she writes (as read):

12             "Today, November 11, 2020, in school for premed.

13         Feels that the medication wears off around 2:00 to

14         3:00 p.m.  Currently on Adderall XR 20 milligrams.

15         He says works out two to three hours per day, no

16         substance uses."

17         Do you see that?

18   A.   I do.

19   Q.   So does it appear from that reference that Nurse Rahimi

20   had explored with Harlan Band how he was doing in recovery for

21   his substance abuse problem for which he had been prescribed

22   naloxone back in April, about six months earlier?

23   A.   "No substance uses" as reported by the patient was

24   gathered by Ms. Rahimi.

25   Q.   Okay.  And in response to this information about the

1    medication wearing off, as we saw, she prescribes him the

2    additional 5 milligrams.

3          And, by the way, to be clear --

4          MR. SCHACHTER:  If we can just look at that.  1820 at

5    page 22.  Okay.

6    BY MR. SCHACHTER:

7    Q.   To be clear, 5 milligrams of Adderall IR, that is the

8    smallest dose of Adderall IR that is available in the United

9    States; is that correct?

10   A.   Well, I guess you've checked that.  Is there not a 2.5?

11   Q.   I've checked it.  There's not a 2.5.

12   A.   Fine.

13   Q.   Okay.  Fair to say that if one wanted to facilitate

14   somebody's drug abuse, you could prescribe a much higher dosage

15   than the smallest dosage available on the market?

16         MS. GREEN:  Objection.  Argumentative and calls for

17   speculation.

18         THE COURT:  Sustained.

19         MR. SCHACHTER:  Okay.

20   BY MR. SCHACHTER:

21   Q.   All right.  So this is one of the 16 patients that the

22   Government asked you to consider, Harlan Band; correct?

23   A.   Yes.

24   Q.   And I'm sorry, you did or did not know that this -- the

25   treatment of Harlan Band by Nurse Rahimi is one of the crimes

1    for which Ruthia He is charged.  Are you aware of that or no?

2         **MS. GREEN:**  Objection.  Asked and answered.

3         **MR. SCHACHTER:**  I'll withdraw it.  I'll move on.

4    **BY MR. SCHACHTER:**

5    **Q.**   Let's turn to another patient.

6         One of the patients that the Government asked you to look

7    at was a patient named Patricia Li, L-I.  Do you recall that?

8    **A.**   Yes.

9    **Q.**   Right.  And I think that Ms. Green asked you about

10   Patricia Li.  Do you recall that?

11   **A.**   During direct?

12   **Q.**   Yes.

13   **A.**   Okay.

14   **Q.**   Okay.  I -- just to refresh you, I believe that you

15   testified that the treatment of Ms. Li was an example of the

16   lack of follow-up that you saw.

17        Do you remember that?

18   **A.**   Yes.

19   **Q.**   Okay.  Let's talk a little bit about Patricia Li.

20        Do you recall that she saw a nurse practitioner named

21   Harman Randhawa in August of 2020?

22   **A.**   Yes.

23   **Q.**   Okay.  Do you recall that the appointment time of that

24   initial evaluation was 31 minutes?

25   **A.**   Yes.  It was the longest of all of the 16 patients.

GOODMAN - CROSS / SCHACHTER

1    Q.    Okay.  And you have never spoken to Ms. Li; correct?

2    A.    Correct.

3    Q.    You have never spoken to the Nurse Practitioner Harman

4    Randhawa; correct?

5    A.    Correct.

6    Q.    All right.  Now, you reviewed the clinical notes; right?

7    A.    Correct.

8    Q.    And you concluded --

9    A.    Let me clarify a question.

10   Q.    Mm-hmm.

11   A.    Clinical notes includes what?

12   Q.    Well, I don't know.  Let me ask you about your report.

13         You said that the evaluation, whatever you were looking

14   at, quote (as read):

15              "Contained a reasonable amount of specifically

16         solicited information concerning Ms. Li's possible

17         ADHD symptoms and impairments."

18         Do you recall that?

19   A.    Yes.

20   Q.    Okay.  Whatever notes you were looking at, that was your

21   conclusion?

22   A.    Yes.

23   Q.    Okay.  And from the clinical notes, you also agree, as you

24   put in your report, that Ms. Li appeared to have had, quote (as

25   read):

1              "Academic difficulties in college and evidence

2          of some impairment from ADHD symptoms."

3          Is that correct?

4     A.    Yes.

5     Q.    You also agree that Nurse Randhawa asked questions about

6     depression and anxiety and obsessive compulsive disorder

7     symptoms and inquired into other comorbid psychiatric

8     disorders; is that correct?

9     A.    That's what she documented.

10    Q.    Right.

11         According to her notes, that is reflected?

12    A.    Well, here's an issue:  In the course of 16 patients, it's

13    unclear as to what is written in the evaluation as having been

14    solicited to the patient because of template notes that are

15    used in the evaluation.

16         So you're going to pull out one patient and I'm going to

17    tell you, of the 16 patients, it was very difficult to rely on

18    the accuracy and the credibility of the information in the

19    initial evaluation because some evaluations were done for

20    10 minutes and the transcript of the evaluation would have

21    reflected that they spent 25 or 30 or 40 minutes.

22         So when you tell me a prescriber documented, they asked

23    that, I'm not sure whether or not it was done based on my

24    review of the 16 patients and the accuracy of the information

25    in the medical records.

1    Q.    Okay.  I'm just asking about your report.

2        Do you recall reporting that Nurse Randhawa had asked

3    questions about depression, anxiety, and OCD symptoms, and

4    inquired into other comorbid psychiatric disorders?

5    A.    That's what she documented in her evaluation.

6    Q.    Okay.  You also agreed in your report that appropriate

7    medical history was documented as denied, as well as family

8    psychiatry history; is that correct?

9    A.    That's what was documented.

10   Q.    Okay.  Now, having obtained all of that information, or at

11   least as reflected in her notes, Nurse Randhawa prescribed

12   Ms. Li Adderall XR 10 milligrams; is that correct?

13   A.    Correct.

14   Q.    That would be half of the recommended starting dosage for

15   Adderall XR for an adult; is that correct?

16   A.    Yes.

17   Q.    Okay.

18       Well -- okay.

19       Now, and, in fact, the dosage prescribed to Ms. Li by

20   Nurse Randhawa is what you wrote in your chart as being the

21   starting dosage for a child; correct?

22   A.    I'm not going to engage in child dosing or adult dosing or

23   the relativity of whether a dose is low or high or et cetera.

24   The dose is the dose.  I'll stipulate, I agree that the dose

25   was started as she prescribed it.

1          MR. SCHACHTER:  Okay.  If we can -- if we'd just

2    please put up 7386A in evidence.

3    BY MR. SCHACHTER:

4    Q.  Okay.  I was just asking you about your chart.

5          Dr. Goodman, the dosage that Nurse Randhawa wrote for

6    Ms. Li of 10 milligrams, that's the same dosage that, according

7    to your chart, is the starting dosage for a child; correct?

8    A.  Yes.

9    Q.  Okay.  Now, fair to say that if Nurse Randhawa was

10   prescribing not because of the patient's health but because she

11   wanted to serve as a drug dealer, she could have prescribed a

12   dose a lot stronger than that which is the recommended starting

13   dose for a child?

14         MS. GREEN:  Objection.  Calls for speculation.

15   Argumentative.

16         THE COURT:  Sustained.

17         MR. SCHACHTER:  Okay.

18   BY MR. SCHACHTER:

19   Q.  Ms. Randhawa had a follow-up appointment with Ms. Li one

20   month after the initial evaluation on September 20 -- well, why

21   don't I just show it to you.

22         MR. SCHACHTER:  We will move to admit 7464, which are

23   Ms. Li's medical records at -- and we'll focus on page 13.

24         THE COURT:  Admitted.

25         (Trial Exhibit 7464 received in evidence.)

1          MS. GREEN:  Is this one of the ones we discussed?

2          MR. SCHACHTER:  Yeah.

3          MS. GREEN:  For the record, Your Honor, we would --

4    we're okay with him using these, but we would like them subject

5    to a later motion to strike because they weren't produced.

6          THE COURT:  Go ahead.

7          MR. SCHACHTER:  In this form?

8          MS. GREEN:  In --

9          MR. SCHACHTER:  In this form?

10         MS. GREEN:  Correct.

11         MR. SCHACHTER:  Okay.  All right.

12     If we can turn to page 13.

13   BY MR. SCHACHTER:

14   Q.   Okay.  Do you see that it says that Nurse Randhawa did a

15   follow-up visit one month after the initial evaluation?

16   A.   Yes.

17   Q.   Okay.  And that -- that sequence seems fine to you?

18   Having a follow-up one month after the initial evaluation for a

19   patient prescribed 10 milligrams of Adderall, that's a fine

20   cadence, you would think?

21   A.   Yes.

22   Q.   Okay.  And at that appointment, you see Ms. Randhawa --

23         MR. SCHACHTER:  If we can -- I'm sorry -- look at --

24   we're on page 13.  Very good.  Okay.

25   \\\

1    BY MR. SCHACHTER:

2    Q.    At that appointment, Nurse Randhawa decides to give Ms. Li

3    a slightly higher dose to 15 milligrams of Adderall.

4         Do you see that?

5    A.    Yes.

6    Q.    All right.

7         And that is still -- 15 milligrams is still less than the

8    FDA recommended starting dose for adults of 20, according to

9    your chart?

10   A.    My chart is referenced from the package insert of each and

11   every medication on that.  So if you refer to it as my chart,

12   the information is derived from the package inserts of each one

13   of those medications.

14   Q.    Okay.  And then, do you recall that two months after that,

15   there was a third appointment by the nurse with Ms. Li?

16        You know, I don't need to test your memory.  Let me show

17   you 7464 in evidence at page 14.

18   A.    I'm looking at my report, I have that.

19   Q.    Okay.  Great.

20        So then there was a third evaluation on November 18, 2020.

21        Do you see that?

22   A.    Correct.

23   Q.    Okay.  Okay.

24        Now, you testified that Ms. Li then went a long time, I

25   think you said 31 months, without a follow-up appointment; is

1    that correct?

2  **A.**    Yes.

3  **Q.**    Okay.  Now, to be clear, you understand that Ms. Li kept

4    being scheduled for appointments which she missed.

5         Do you recall that?

6  **A.**    I do not.

7  **Q.**    Okay.  Let me show you 7464 at 19, in evidence.

8         Okay.  This is a message by the nurse to Ms. Li (as read):

9             "Hi, Patricia.  Hope you're doing well.  I

10        refilled your medication for this month this time.

11        Please schedule a follow-up in the next month to

12        continue to obtain refills.  Our last check-in was in

13        2020, my policy is to follow up every four to

14        six months."

15        Do you see that?

16  **A.**    I do.

17  **Q.**    Okay.  Then if we can look at -- this is, by the way,

18    June 9th of 2021.  Let's look at August 8th, so about two

19    months later.  This is at page 20.

20        The nurse, again, follows up (as read):

21            "Hi.  Hope you're doing well.  I refilled your

22        medication this time.  You are due for a follow-up.

23        Please make an appointment at my earliest

24        availability, September/October, I can only continue

25        to refill stimulants with regular follow-ups every

1          four to six months.  Thank you."

2          Do you see that?

3     A.   I do.

4     Q.   Okay.  And then a little bit more than a month later, I'm

5     going to show you another message from Nurse Randhawa to

6     Ms. Li, which is at page 21.

7          Okay.  And she writes (as read):

8              "Hi, Patricia.  I'm refilling your medication

9          this time only.  Next time you will need a follow-up

10         appointment to continue treatment.  Thank you."

11         Do you see that?

12    A.   I do.

13    Q.   Okay.  Now, you recall that Ms. Li ultimately does have a

14    follow-up appointment is that correct?

15    A.   On what date?

16    Q.   Okay.  Long after.  It's at -- if we can look at 7464 at

17    page 34.

18         Do you see a follow-up appointment on June 22, 2023?

19    A.   Correct.

20    Q.   Okay.  And the patient reports at that time that she's

21    doing well, no side effects?

22    A.   Correct.

23    Q.   According to the notes?

24    A.   Right.  Let's put this in context as well.  This follow-up

25    appointment was prompted after a pharmacist called to verify

1   the legitimacy of the prescription after no follow-up

2   appointments for 31 months despite the provider saying

3   periodically "I need to see you every four to six months," and

4   yet the prescriptions were never stopped.

5   Q.   Understood.

6        You will agree with me, will you not, that when Nurse

7   Randhawa was prescribing medication to Ms. Li, it is possible

8   that her purpose was to treat what she believed was her

9   illness?

10           MS. GREEN:   Objection.  Calls for speculation.

11           THE COURT:   Sustained.

12           MR. SCHACHTER:   Okay.

13   BY MR. SCHACHTER:

14   Q.   Are you aware that for years afterwards, Ms. Li took ADHD

15   medication, Vyvanse, prescribed by a board-certified adult

16   psychiatrist who had nothing to do with Done?

17           MS. GREEN:   Objection.  Foundation.  Beyond the scope

18   of direct and his opinion.

19           THE COURT:   Sustained.

20           MR. SCHACHTER:   Okay.  Just -- we'd like to move to

21   admit the records from Dr. Maria Ella Aguilar Donis whose

22   treatment of -- her treatment of Ms. Li that occurs to the

23   present day.

24           MS. GREEN:   Objection.  Foundation.  This witness has

25   never seen these records.

1          THE COURT:  I'll deal with it outside the presence of

2     the jury.  Thank you.

3          MR. SCHACHTER:  Yes, Your Honor.  Okay.

4     BY MR. SCHACHTER:

5     Q.   Now, let's turn to another patient.

6          One of the patient that you testified about was a patient

7     named Brenda Hill; is that correct?

8     A.   Yes.

9     Q.   By the way, that patient that we just saw, I just want to

10    be clear, the treatment of Patricia Li, that's one of the 16

11    patients that the Government found and asked you to review; is

12    that correct?

13    A.   It is.

14    Q.   All right.  Let's now turn to a third of the 16 patients

15    that the Government asked you to look at.

16         That was a woman named Brenda Hill.  Do you recall that?

17    A.   I do.

18    Q.   All right.  You testified that Ms. Hill was on

19    prescription opioids; is that correct?

20    A.   Let me pull up my report.

21    Q.   Sure.  Thank you.

22    A.   Okay.

23    Q.   Okay.  All right.

24         You were asked the following question by Ms. Green and you

25    gave the following answer.

GOODMAN - CROSS / SCHACHTER

1          (as read):

2              "In December of 2022, did Ms. Ejim's

3      collaborating physician at the time, Mr. Shalomov,

4      decline to approve the Adderall prescription

5      request?"

6      And you answered "He did"?

7    A.    He did.

8    Q.    Okay.  And then -- okay.

9      And she also asked you if Ms. Hill's Done PMHNP, Ms. Ejim,

10   had a collaborative physician who had to approve her

11   prescriptions.

12     Do you recall that?

13   A.    I do.

14   Q.    And your report repeatedly said that Ms. Hill was treated

15   by a nurse practitioner named C. Ejim; isn't that correct?

16   A.    Yes.

17   Q.    Any idea where you got that from?

18   A.    If I got it, it was from the -- either the PDF medical

19   record or the Excel spreadsheet.

20   Q.    Okay.  Well, I'm going to show you what the Government

21   marked as Exhibit 1403.

22          MR. SCHACHTER:  If it's not in evidence, which it may

23   be, we move to admit 1403, which is Ms. Hill's medical records?

24          THE COURT:  Admitted.

25          THE COURTROOM DEPUTY:  It's already been admitted.

1        MR. SCHACHTER:   Okay.   Thank you.

2   BY MR. SCHACHTER:

3   Q.   Okay.   Do you see where it states that her provider was a

4   woman named Callista Chika, C-H-I-K-A?

5   A.   I do.

6   Q.   Okay.   I take it you got no idea where this -- why you

7   said that the provider's name was Ejim, do you?

8   A.   So let me state up front, I may have made a mistake,

9   however, this is the PDF medical record, let's put up the Excel

10  spreadsheet that shows the name of the initial evaluator on the

11  Excel spreadsheet.   And the reason I say that is because

12  sometimes there's a record of one provider when, in fact,

13  another provider.

14       This comes up with prescriptions, where you have -- on the

15  medical record, you have one prescriber; on the Excel

16  spreadsheet, you have three prescribers.   And so this is a

17  level of inaccuracy and if I made a mistake, then I'll admit

18  it.   But I'd like to see the Excel spreadsheet, if you have

19  that, to verify that this PDF is, in fact, accurate.

20  Q.   Okay.   Well, this is the PDF that the Government

21  introduced in this case that we're looking at.

22       And if you made a mistake with Ejim, that happens.   People

23  make mistakes in their notes and reports, it happens.

24  A.   I won't admit to a mistake until I see the Excel

25  spreadsheet that indicates the provider on that spreadsheet is

1  the same as the provider on the PDF.

2  Q.   To be clear, this is a record that the Government provided

3  to you?

4         THE COURT:   Well, be that as it -- let's not get into

5  an argument.   Do you have the Excel spreadsheet?

6         MR. SCHACHTER:   Not handy and, unfortunately, we'll

7  have more time to do it, so we'll come back to it.

8         THE WITNESS:   If you say this is -- if this you say is

9  the Government record of the medical records, then I will point

10  out to you that if you look down on these PDFs and you look at

11  prescribers, there are some areas where the prescription has no

12  provider on it.   Do not tell me that the PDF of this medical

13  record is an accurate depiction of the medical records, as I've

14  gone through extensive records and can document inconsistency

15  across the patient medical records.

16  BY MR. SCHACHTER:

17  Q.   Dr. Goodman, I'm not here to tell you anything.   I'm just

18  asking questions.

19         You see that in this Government Exhibit 1403, it says the

20  provider's name is Callista Chika?

21  A.   Yes, I agree.

22  Q.   Now, Ms. Hill was -- you recall she was 61 years old when

23  she sought treatment at Done?

24  A.   I don't recall the age, because I didn't write it down.

25  Q.   Do you recall her day-to-day job was to act as a caregiver

1    to her 90-year-old father?

2    A.    I do not.

3    Q.    You do not.

4          MR. SCHACHTER:    Let's go to page 7.

5    BY MR. SCHACHTER:

6    Q.    Does that help you remember what she said she did?

7    A.    Yes.    This is the clinician's note.

8    Q.    Okay.    Now, the Government also possessed, just like they

9    had Dr. Javaherian's medical records showing Mr. Band's prior

10   treatment, they also had the records of a Dr. Mann, who had

11   been diagnosing this patient with ADHD and treating him

12   for years before this.

13         MR. SCHACHTER:    And we'd like to admit those, Your

14   Honor.

15         MS. GREEN:    Objection.

16         MR. SCHACHTER:    It's 1856.

17         MS. GREEN:    Objection.    Foundation.    This expert

18   hasn't seen these records.

19         THE COURT:    I'm sorry.    Are these records that were

20   created prior to the prescription?

21         MR. SCHACHTER:    Absolutely, yes.

22         MS. GREEN:    The date on this is actually from

23   December 2023.

24         MR. SCHACHTER:    It's --

25         MS. GREEN:    After.

GOODMAN - CROSS / SCHACHTER

 1          THE COURT:  Yeah, I'll deal with this -- I'll deal

 2    with this, again, outside the presence of the jury.

 3          MR. SCHACHTER:  Okay.  Okay.  Yes, Your Honor.  We'll

 4    move on to a different patient, then.  We'll return to Brenda

 5    Hill, unfortunately, tomorrow.

 6    BY MR. SCHACHTER:

 7    Q.   Okay.  Let's turn to a patient named Shenila Farooq?

 8          THE WITNESS:  Am I going to be here tomorrow?

 9          THE COURT:  Well, let's see where we are.

10          THE WITNESS:  Because if you're insinuating that, I

11    have a presentation in Colorado Springs on Thursday to 2,000

12    people.  If I'm here tomorrow, I'm not going to make my

13    presentation, for the record.

14          THE COURT:  Okay.  Let's just ask the questions.

15    BY MR. SCHACHTER:

16    Q.   Okay.  Another one of the 16 patients that -- that they

17    the Government asked you to review was a patient name Shenila

18    Farooq.

19         Do you recall that?

20    A.   I do.

21          MR. SCHACHTER:  Your Honor, we will offer -- we move

22    to admit 7466, which are the medical records of Shenila Farooq.

23          MS. GREEN:  Same find with -- subject to later motion

24    to strike.

25          THE COURT:  Okay.  This is what I'm going to do.  I'm

1    allowing it in subject to a motion to strike.  Okay?  And we

2    can go back to the other ones.  I'll allow in subject to a

3    motion to strike so we can move along here.

4            **MR. SCHACHTER:**  Yes, thank you.

5            **THE COURT:**  Okay.

6            **MR. SCHACHTER:**  Okay.

7        (Trial Exhibit 7466 received in evidence.)

8    **BY MR. SCHACHTER:**

9    **Q.**    Looking at page 2, do you see where Ms. -- these are the

10   clinical notes from -- of the patient that the Government asked

11   you to look at.  She writes -- in response to the question:

12   Have you ever been treated for any behavioral health condition

13   such as ADHD?  She writes (as read):

14            "My dad thought I was depressed and pressed that

15        concept on my doctor every visit.  I was even told

16        once it was possibly anxiety because of how

17        outrageous my behavior got during puberty.

18            "As I got older and the responsibilities of

19        adult life started to feel more and more impossible,

20        I wondered why I was unable to stick to simple

21        routine or sit down and focus on schoolwork or work

22        in general when I know all the problems making me

23        feel depressed would be fixed if I could just grow up

24        and get things done.

25            "Between talking to a therapist and failing

GOODMAN - CROSS / SCHACHTER

1    again and again, hating myself more after each

2    failure, I started trying to think what would I do if

3    a friend was having the same issues?  I wouldn't call

4    them stupid, lazy, and irresponsible like I do to

5    myself.  I'd tell them that after all this effort,

6    there must be something going on deeper.  After some

7    research, I realized a lot of women diagnosed with

8    ADHD in adulthood were describing the story of my

9    life.  I have no prior ADHD treatment."

10    Do you see that?

11  **A.**   I do.

12  **Q.**   Now, I am correct, Dr. Goodman, that you have had a lot of

13  ADHD patients over the years who have come in and told you

14  similar stories; is that correct?

15  **A.**   Correct.

16  **Q.**   They will report to you that they think they have a

17  personality problem and that they are stupid or lazy or

18  irresponsible; correct?

19  **A.**   Correct.

20  **Q.**   They feel depressed and anxious because they can't get

21  anything done and they have no idea why?

22  **A.**   So I'm going to interrupt for a moment.  When a patient

23  comes to see me for an evaluation and they say, "I think I have

24  X, Y, and Z," I don't know what they have.  I start with a

25  blank slate, I do a comprehensive psychiatric evaluation.  At

1    the conclusion of that, I then make a decision as to what they

2    have.

3        A patient self-report like this is very helpful, but in no

4    way definitive as to what's going on.

5    Q.   I was just asking you if you have patients --

6        THE COURT:  He said -- actually, when you read it to

7    him, he said yes and then you started going through all the

8    pieces.  He said yes.  So what's the next question?

9    BY MR. SCHACHTER:

10   Q.   Okay.  Now, when asked if she's taking medications, if we

11   can go further down a page 2, she says -- see where it says (as

12   read):

13        "No.  Only talk therapy"?

14       No, it's not there.  Okay.

15       Anyway, now, you know from your review of the clinical

16   notes that Ms. Farooq and her nurse practitioner, who was a

17   woman named Marie Rabel.

18       Do you recall that?

19   A.   Yes.

20   Q.   Okay.  You recall that she -- they discussed how she had

21   been assessed for depression; is that correct?

22       Let me show you.

23       MR. SCHACHTER:  If we can turn to page 9.

24       Oh, here we are.  Okay.  Great.

25   \\\

GOODMAN - CROSS / SCHACHTER

 1   BY MR. SCHACHTER:

 2   Q.   You see where it says (as read):

 3            "Do you have any experience with ADHD

 4        medication?"

 5        And she says (as read):

 6            "I do not, unfortunately.  This will be the

 7        first step in my journey of figuring out what the

 8        heck is wrong with my brain."

 9        Do you see that?

10   A.   I do.

11   Q.   Okay.  And then, when she's asked (as read):

12            "Do you have any experience with medications

13        used to treat other behavioral health conditions?"

14        She says (as read):

15            "No, only talk therapy for anxiety, which I

16        later realized was only frustration in my own

17        abilities and performance and that I was on the brink

18        of giving up on myself."

19        Do you see that?

20   A.   I do.

21   Q.   Okay.  And then if we can go on a little bit further to

22   the clinical notes.

23        See where she says that (as read):

24            "According to the notes, patient reports that

25        she's been having trouble since her youngest and her

 1              father took her to see doctor to be evaluated for

 2              depression.  Patient reports that she feels

 3              frustrated and extremely disturbed with where she is

 4              in life" --

 5         And let me just pause for a second.

 6         What we looked at the first time, that was the information

 7    that this patient that the Government asked you to examine,

 8    that was the information she put in her intake information.

 9         Do you recall that?

10    A.   Give me the question again.

11    Q.   Sure.

12         We looked at a narrative that the patient had provided.

13    That was in the intake information provided to Nurse Rabel

14    before the appointment.

15         Do you recall that?

16         **MS. GREEN:**  Objection.  Foundation.

17         **MR. SCHACHTER:**  He's reviewed the medical records and

18    offered an opinion that this was for no legitimate medical

19    purpose.

20         **THE COURT:**  Okay.  Go ahead.

21         **MS. GREEN:**  No --

22         **MR. SCHACHTER:**  Okay.

23         **THE WITNESS:**  I'm getting confused.

24    BY MR. SCHACHTER:

25    Q.   Sure.

1  **A.**    So I apologize if I have to ask you to repeat the

2  question, but this back and forth just -- this is not my

3  bailiwick so I don't know where my attention needs to be, so I

4  apologize.

5  **Q.**    I would only ask that you focus your attention on my

6  question.

7        These are clinical notes, which you understood to be the

8  notes that Nurse Rabel is taking during the course of her

9  session with this patient that the Government asked you to

10 examine; correct?

11 **A.**    You talk about clinical notes.  Let's talk about the

12 clinical notes of this patient.

13 **Q.**    Okay.

14 **A.**    I know.  It's upsetting when I point out things that are

15 not being raised.

16      This patient filled out the GAD-7 and Ms. Rabel mis-scored

17 it on the evaluation.

18      This patient filled out the PHQ-9 indicating severe

19 depression and yet it's not noted in Ms. Rabel's note.

20      The other thing most remarkable about her evaluation,

21 there is two sentences about having problems with erectile

22 dysfunction in a female patient.

23      So when I said earlier I have credibility issues with the

24 accuracy of the information in these medical notes and the

25 evaluation, this is a case that represents that inconsistency.

GOODMAN - CROSS / SCHACHTER

1    Q.    Thank you.

2          These are the notes -- what we're looking at here are the

3    notes that Nurse Rabel took when she was meeting with the

4    patient; correct?

5    A.    Yes.

6    Q.    She writes that (as read):

7               "The patient reports that she has been having

8          trouble since her youngest and her father took her to

9          see her doctor to be evaluated for depression.

10         Patient reports that she feels frustrated and

11         extremely disturbed where -- with where she is in

12         life.  She endorses a long history of concentration

13         issues, poor attention span, difficulty following

14         conversations, interrupting others, difficulty

15         starting or completing tasks, jumping from one task

16         to another.

17              "According to the notes, they discuss how she

18         has not worked in two years because of these

19         difficulties.  She kept quitting jobs and dropped out

20         of school.  The notes also reflect that they

21         discussed how these symptoms have been causing issues

22         that are troublesome for at least the past since

23         middle school.  Her grades started dropping in high

24         school and she developed behavioral issues."

25         Do you see that?

1    A.    I do.

2    Q.    Okay.  Now, it is -- so what she has described here you

3    would characterize as a description of an impairment; is that

4    correct?

5    A.    Yes.  I don't know why, but, yes.

6    Q.    Okay.  Now, you agree, do you not, that often people

7    develop anxiety or depression as a result of their ADHD because

8    it can be so debilitating?

9    A.    Yes.  And it's incumbent upon the clinical interviewer to

10   decide whether this is secondary to ADHD or primary anxiety

11   disorder or primary clinical depression.

12   Q.    Okay.  You agree that ADHD individuals can have anxiety?

13   They're often worried about performance issues, that is can I

14   get to work on time?  Can I finish the project on time?  Can I

15   do this spreadsheet without making mistakes?  Can I pick up my

16   kid on time?

17        And you have said that anxiety usually diminishes while we

18   decrease the ADHD symptoms.  That's something that you've said;

19   correct?

20   A.    Yes.  In a patient who's been comprehensively diagnosed in

21   the evaluation, which took 18 minutes in this case.

22   Q.    Okay.  You also said (as read):

23            "Because if you decrease the inattention,

24        distractibility, and disorganization, then

25        productivity rises and your anxiety diminishes."

1          Is that correct?

2    **A.**    Correct.

3    **Q.**    Okay.  Now, let's talk about how Ms. Rabel decides to

4    treat Ms. Farooq.

5              **MR. SCHACHTER:**  If we can turn to 7466 at page 11 in

6    evidence.

7    **BY MR. SCHACHTER:**

8    **Q.**    What did Nurse Rabel prescribe to Ms. Farooq?

9    **A.**    Adderall 5 milligrams, that's a tablet, by mouth twice a

10   day.

11   **Q.**    And that, as we've discussed, is less than the starting

12   childhood dosage, according to your chart?

13   **A.**    That was the dose that Ms. Rabel decided to start the

14   patient on.

15   **Q.**    Okay.  If we can look at page 11, she also tells her to

16   monitor her blood pressure and heart rate.

17         Do you see that?

18   **A.**    Yes.

19   **Q.**    She says to follow up in one month or sooner if needed.

20   **A.**    Yes.

21   **Q.**    And she also says to start CBT for general anxiety

22   disorder.  Do you see that?

23   **A.**    Yes.

24   **Q.**    That is her recommending cognitive behavioral therapy for

25   her anxiety; is that correct?

1    **A.**    Yes.

2    **Q.**    You would agree that Nurse Rabel wasn't ignoring

3    Ms. Farooq's other issues.  She prescribes a tiny dose of ADHD

4    medication, coupled with cognitive behavioral therapy; is that

5    correct?

6    **A.**    She prescribes an appropriate starting dose of medication

7    per her judgment and recommends a psychotherapy approach to the

8    generalized anxiety disorder.

9    **Q.**    She also says that the patient should stop the drugs if

10   her blood pressure is greater than 140 over 90 or her resting

11   heart rate is greater than 90; is that correct?

12   **A.**    That's true.

13   **Q.**    Tells her to follow up in a month?

14   **A.**    Correct.

15   **Q.**    And I just want to show you the message that Ms. Farooq

16   then sends to Ms. Rabel 10 days after her first appointment.

17          **MR. SCHACHTER:**  If we can look at 7466 at page 22 in

18   evidence.

19   **BY MR. SCHACHTER:**

20   **Q.**    Okay.  Ten days after her initial appointment, Ms. Farooq

21   writes (as read):

22          "On a scale of" -- "she says may we up the dose

23          a little, please?"

24          Do you see that?

25   **A.**    I do.

GOODMAN - CROSS / SCHACHTER

1   Q.   She says (as read):

2            "I feel like I'm a 5 with this dosage.  I'm

3        absolutely less irritable and more engaged in social

4        interactions.  Focusing on work or daily tasks is

5        still a bit challenging.  I still find myself

6        switching focus to other thing or conversations

7        around me.  I also feel the medicine wears off too

8        quickly."

9        Do you see that?

10  A.   I do.

11  Q.   She talks about how long the medication lasts, she says

12  it's two to three hours after taking a pill.  Above that, she

13  talks about the symptoms that have not adequately improved,

14  which she describes as squirrel brain.

15       You see that?

16  A.   I do.

17  Q.   Okay.  She also says, at the bottom (as read):

18           "I would prefer twice daily dosing just for a

19       affordability.  The medication has been helping me

20       with my confidence, though, and I was finally able to

21       apply for jobs with a calm demeanor."

22       Do you see that?

23  A.   I do.

24  Q.   She says (as read):

25           "Not an emergency, but I would prefer to have an

1          update by the time my next refill is."

2          Okay.  And let's look at how Nurse Rabel responds, which

3     is at 16.  We see here that Nurse Rabel then increases the dose

4     slightly from the smallest dose commercially available in the

5     United States to 10 milligrams.

6          Do you see that?

7     **A.**   I do.

8     **Q.**   Okay.  So even after Ms. Farooq asks for additional

9     medication, Nurse Rabel only increases it from the child dose

10    to the 10 milligrams that we saw; correct?

11    **A.**   Yeah.  I know you insist on saying child dose to make the

12    impression that the dose is low, but the fact here is that all

13    of notes you just read marking improvement could occur with

14    anyone I give stimulant medications in this office.  So to

15    confirm that the diagnosis is ADHD based on the response to the

16    medication is a -- is a mischaracterization of what's happened

17    since there was never a comprehensive psychiatric evaluation.

18    **Q.**   Okay.  Dr. Goodman, you understand this is not a medical

19    malpractice case.  You understand that, don't you?

20    **A.**   I understand that this is -- I'm here as an expert to

21    offer up my opinion on the usual course of professional

22    practice, legitimate medical need under -- under the controlled

23    substance prescription practices among clinicians.

24         If we do not have a valid diagnosis, the prescription of

25    an addiction controlled drug is not for a legitimate medical

1  purpose in the usual course of professional practice.

2  Q.   You used a word that I think maybe you made a mistake.

3  You talked about legitimate medical need a moment ago, but you

4  understand that really what you're here to testify about is

5  purpose.

6      You used that term repeatedly during the course of your

7  direct examination; is that correct?

8          THE COURT:  Wait a minute.  Number 1, he explained

9  what he was retained to do.

10     I think we should move on.

11         MR. SCHACHTER:  Okay.

12  BY MR. SCHACHTER:

13  Q.   Nothing -- you will agree with me that nothing that you

14  saw in the medical records for Ms. Farooq suggests that she was

15  a drug abuser looking to get high.

16     You agree with that, do you not?

17         MS. GREEN:  Objection.  Argumentative.

18         THE COURT:  I'll allow it.

19         THE WITNESS:  Correct.

20  BY MR. SCHACHTER:

21  Q.   And nothing in the medical records that you reviewed

22  suggested that Ms. Farooq had any purpose -- I'm sorry.  That

23  Ms. Rabel the nurse practitioner, had any purpose in

24  prescribing medication to Ms. Farooq other than to treat the

25  symptoms that she had described?

1              MS. GREEN:  Objection.  Calls for speculation.

2              THE COURT:  Sustained.

3              MR. SCHACHTER:  Okay.

4    BY MR. SCHACHTER:

5    Q.    Let's move to a new patient.

6          You recall a patient named Danielle Johnson, do you not?

7    A.    Yes.

8    Q.    This is the one who had a video visit with a nurse

9    practitioner named LaTesha Reed.

10         Do you recall that?

11   A.    I do.

12   Q.    The Government showed you just a tiny snippet of

13   Ms. Reed's visit with Ms. Johnson.

14         Do you recall that?

15   A.    Yes, I recall that.  No, it was a small little snippet.

16   Q.    Okay.

17              MR. SCHACHTER:  Your Honor, we'd like to show the jury

18   for context some more of nurse practitioner LaTesha Reed's

19   visit with Danielle Johnson.  It is -- it was marked by the

20   Government as 1348.  We would like to show just 11 1/2 minutes

21   for the time period 3:22 to 14:40 and then 16:35 to 17:17.

22              THE COURT:  Okay.  And then we'll take recess.

23              MR. SCHACHTER:  Yes, Your Honor.

24         I think the jurors are not able to see it on the screen.

25   Okay.

1          (Video played but not reported.)

2          MR. SCHACHTER:  Then just 45 seconds, 16:45 to 17:17.

3          (Video played but not reported.)

4          THE COURT:  Okay.  Ladies and gentlemen, we're going

5  to take our recess for today.  Let me just make the observation

6  that today there was a discussion amongst -- between counsel

7  and the Court, the Court obviously summarized in some manner

8  witness's testimony and so forth.

9          I want you to understand that you are the individuals

10  who -- who consider the testimony and whatever it means to you.

11  That is that you're the trier of fact.  That I may characterize

12  something as one way or the other isn't to be taken by you as

13  an opinion as to what the -- what you should conclude in terms

14  of what the testimony is.  What you should conclude in terms of

15  what the testimony is is whatever you think it is.  That's

16  entirely up to you.

17          And you should not be influenced by the Court's

18  characterization of the testimony.  Being the presiding judge,

19  I want to make sure things move along, and I want to try to

20  establish clarity if I think there's some ambiguity and to make

21  sure that testimony's not repeated or unnecessary.

22          In that process, it's -- sometimes the Court has to engage

23  in colloquy with counsel without discharging the jury because

24  you'd running back and forth and back and forth.  So you just

25  simply have to understand, it's your opinion that counts, not

 1   anything that you consider my opinion.

 2        With that, see you tomorrow, 9:15.  Thank you so much.

 3                    (The jury leaves the courtroom.)

 4     (Proceedings were heard out of the presence of the jury.)

 5        **THE COURT:**  Okay.  The jury has retired.

 6     Doctor, what is your commitment now for Thursday?

 7        **THE WITNESS:**  Yeah.  A lecture in Colorado Springs on

 8   Thursday.

 9        **THE COURT:**  Thursday at what time?

10        **THE WITNESS:**  That, I'm going to have to check.

11        **MR. FOSTER:**  Your Honor, just for the record, based

12   upon the colloquy yesterday where you said that you wanted the

13   cross-examination to be done by lunch and Mr. Schachter's

14   indication that he would try his best but it would be done by

15   the afternoon break, I think, Your Honor would be well within

16   your discretion under 611(a) to impose a limitation on this

17   cross so we can get him out of here early tomorrow.

18        **THE COURT:**  Let's get the facts first.

19        **MR. FOSTER:**  Because we told him that he would be done

20   today based upon that change.

21        **THE WITNESS:**  Your Honor, I'm just going to have to

22   look at.

23        **THE COURT:**  Take your time, Doctor.

24                    (Discussion held off the record.)

25        **THE COURT:**  You're excused for the day.

 1          **THE WITNESS:**  Thank you.

 2          **THE COURT:**  Now I want to talk to counsel on the

 3     record.

 4                         (Witness steps down.)

 5          **THE COURT:**  Okay.  There is a flight that leaves at

 6     3:00, 2 -- 49 p.m., it goes to Denver.

 7          San Francisco, Denver, Colorado Springs, tomorrow

 8     afternoon.  Okay.  At 3:00.

 9          Now, let me ask a couple of questions.

10          I'm trying to figure out because -- in my mind, because I

11     think a number of documents are awaiting some decision, some

12     medical records and so forth, the relevance of the fact that

13     the person may have a deficit disorder.  That is, does it make

14     any difference to the case that patient A, B, C, D, E was

15     ultimately diagnosed -- and, I mean, subsequently diagnosed

16     with the deficit disorder before -- and everything that -- that

17     the prescriber or -- was told is relevant.  Now we're talking

18     about things that they weren't told.  As I understand it, there

19     were documents that are being sought to be introduced that

20     weren't told.  I would guess, otherwise why would you bother,

21     that it's going to establish -- or tend to establish that

22     person actually does have attention-deficit disorder.

23          Okay.  To which I say so what?

24          You know, the Controlled Substances Act is not a slot

25     machine.  You don't just put money into it and if you get three

 1  cherries, it was a good investment and if you don't, it wasn't.

 2  You're gambling.  That's the point.  The prohibition is against

 3  the gambling not against the result.

 4      It's -- it is clear that there were a number of -- that

 5  there were, here, 16 diagnoses, where the person was diagnosed

 6  by the -- by Done providers with having the deficit disorder.

 7  And this witness is testified in his opinion, his opinion, you

 8  could not have come to that conclusion given the information

 9  the provider had.  That's as simple as I can make it out to be.

10      Now, that can be wrong, but it could be right.  But what

11  makes it wrong or right aren't events subsequent to the -- to

12  the prescription of the drug for the reason that I've stated.

13      It's not all right to gamble if you win.  It's not

14  all right to do any of these you happen to be right.  It's not

15  roulette.  Enough with the gambling.

16      Again, I've got a witness -- and, Mr. Schachter, I'm not

17  being critical, but I think the Government is right, that we're

18  taking a great deal of time on cross-examination, which you

19  should do given the gravity of the witness's testimony and how

20  it addresses a key issue, not the only issue, but certainly a

21  key issue in the case, that is was the -- were these

22  prescriptions done without a legitimate medical purpose and

23  outside the course of -- the usual course of psychiatric

24  practice.

25      So nobody says:  Oh, by the way, this is surplusage or not

1    necessary to have a thorough cross-examination.

2        Also, I'm mindful that it is a constitutional right to

3    have thorough cross-examinations.  That's a fundamental right

4    in any trial, the defendant entitled to it.

5        So that isn't the same thing as saying a witness can be on

6    the stand for three days because that's what I choose to do or

7    I want to get into all of X, Y, or Z.

8        Now, I think that, just to sum up, and it came up in the

9    context of all of these other medical records, it's not a

10    question of the authenticity of the document and it's not a

11    question, I don't think, pretty much of whether it can be --

12    well, as I said just, authentication or an exception to the

13    hearsay rule, they are.  The question is are they relevant, are

14    they relevant to the issue to be tried in this case.  That's

15    where I'm having a problem.

16        Now, you can respond to it or not -- I mean, that's why

17    I'm including it all, but I'll allow you the opportunity to

18    change my mind on that if you can give me some information that

19    will change my mind.

20        **MR. SCHACHTER:**  Sure.  So the witness has testified --

21    let's start this way.  There is an evaluation between a nurse

22    practitioner and a patient.  The Government has decided to call

23    neither.  They don't wish to call the nurse practitioner who

24    did the evaluation and they are not call the patient who was

25    involved in the meeting.

 1          Instead they call Dr. Goodman, and Dr. Goodman says, "I
 2     looked at some notes, and here are my conclusions.  The purpose
 3     here, not a legitimate medical purpose.  This is outside the
 4     usual course of practice."

 5          But, of course, Dr. Goodman does not know what actually
 6     transpired in this meeting between patient and provider.  He
 7     looks at notes.

 8          So the crime is not taking poor notes, of course, it's a
 9     drug trafficking offense.  And so what evidence exists which
10     sheds light on what may have occurred in the meeting between
11     patient and provider --

12          **THE COURT:**  That's where you lost me.  You got me just
13     to that sentence.  And you lost me because the -- if you had
14     information that by call the provider, by calling the patient,
15     by calling X, Y, or Z who says, "Oh, in this meeting, in these
16     examinations, I said X."

17          "I'm sorry.  They're not in the notes."

18          "But I said X or I said Y or I said Z," then, of course,
19     that's highly relevant, it's relevant and it would be -- it
20     would be admissible.

21          But what was said afterwards, the diagnoses that occurred
22     subsequent to the prescription is not on that subject, it's on
23     the subject of, "Oh, the person really did have
24     attention-deficit disorder."  That's what you want to show.

25          And that's -- that's what -- I'm not going to let you show

1    it that way.  There are ways that maybe you could show it.  You

2    could show it -- and I don't want to suggest the ways, but

3    there may be ways you can show it.  And if you want to show it

4    those ways, in the sense that the prescriber knew that the

5    person had the deficit disorder, then I would permit it or

6    least consider it.

7          Unfortunately I can't get into a lengthy conversation

8    because I have to be somewhere, but I'm willing to come in

9    tomorrow at 8:30 and have a further discussion on this if you

10   wish.  But I wanted to lay it out because, Number 1, you do

11   follow my instructions and, Number 2, I want this witness out

12   by noon, I mean, there's just no justification for keeping the

13   witness later than noon tomorrow.  I want this witness to be

14   able to get on that plane, assuming my computer's right.

15         So do you want to think about it or what do you want to

16   do?

17               **MR. SCHACHTER:**  I would like to just say one more

18   word.

19               **THE COURT:**  Go right ahead.

20               **MR. SCHACHTER:**  There's two kinds of records that we

21   attempted to introduce.  One are records of the patient's

22   interactions after the Done meeting.  I understand the Court's

23   view on that.  I will say that it is, I think, just to make the

24   record, 401 relevant that a different provider sat down close

25   in time to the same patient and reached the conclusion.

 1    I believe, it is probative of what occurred between the Done

 2    provider and the patient.  That's --

 3            THE COURT:  Only if you can show they were told the

 4    same things.

 5            MR. SCHACHTER:  Nobody knows what occurred in the

 6    meeting.

 7            THE COURT:  Well, then, I'm sorry, that's the whole

 8    problem.  Maybe the person had a relapse, maybe the person

 9    inherited $12 million and the job concerns were over.  Maybe X,

10    maybe Y, maybe Z, and that's what counsel is saying, it's

11    highly speculative.  So you made your record, that's out.

12        Now, is there another set of records?

13            MR. SCHACHTER:  Sure.  So prior to the Done

14    appointment, for example, with respect to Harlan Band, the

15    Government showed Dr. Goodman records of his prior treatment

16    with Java Psychiatry, Your Honor will recall, the Government

17    elicited from Dr. Goodman, "Did you review those records of his

18    prior treatment?"

19        "Yes.  What effect did it have in my opinion, none."

20        Okay.  We wish to do the same, show him records of prior

21    treatment, which is exactly what the Government did.  That, I

22    think, falls in a different -- those are two different

23    subjects.  I think both are --

24            THE COURT:  I don't understand.  Records that -- are

25    you saying records the witness didn't see or records that the

PROCEEDINGS

1  provider saw but aren't part of the documents that were given

2  to him?

3         **MR. SCHACHTER:**  I think it's probably the latter.  The

4  Government showed the witness Java Psychiatry records for

5  Harlan Band, we have similar, the Government has them as well,

6  similar records which, just like Java Psychiatry of his prior

7  treatment, some they chose to share with him, some they chose

8  not with respect to --

9         **THE COURT:**  You are entitled to cross-examine him on

10  records that he was not shown if those records demonstrate that

11  the provider -- the subscriber -- I use the wrong word all the

12  time.  That the subscriber had access.  If Doctor X reviewed

13  it -- if Dr. X -- Practitioner X and so forth -- no.  Pardon

14  me.  If the -- Dr. Number 1 came to the conclusion the person

15  had the deficit disorder.  Okay?  And did an exhaustive medical

16  examination, didn't reflect it in those notes that were shown

17  to the -- that were shown to this witness, but they were shown

18  to the provider, the subscriber, then obviously that's --

19  that's relevant.  In other words, he came to the conclusion

20  saying I looked at what this prescriber looked at in terms

21  of -- wait.  I'll finish it -- in terms of recording in her --

22  his or her -- her, I guess, her notes what she saw.  I don't

23  know that you can bring in things that even existed at that

24  time which weren't reflected in what she saw because unless you

25  can establish she saw it, then that would be -- that would be

1    fine -- then it doesn't come in.

2        Putting it another way, you call a provider, you can call

3    these providers and they say, "Oh, by the way, I saw X, I saw

4    Y."

5        "It's not in your notes."

6        I know it's not my notes but this is what I saw, and based

7    upon that, it contributed to my decision to prescribe the

8    medication."

9        That's fine.  Because you're right -- you're right, this

10   isn't a trial of notes, but this is a trial of what did the

11   person -- what was the justification for the person giving the

12   prescription.  And -- and the answer to that -- the short

13   answer to that is we will look at the body of information that

14   was given to the provider upon which she decided that she

15   should prescribe.

16       Now, the witness says, "With what I saw, there's not

17   enough.  There's not enough here."

18       Okay.  I -- I've laid it out.  Think about what you want

19   to do, but I'm not -- on that issue, I'm not -- I mean, on

20   these issues, I'm not going to change my mind unless you

21   establish -- and I'll be here at 8:30.  If you want to go over

22   this subject, I'll go over it with you.  It's important.

23       I'm not -- Mr. Schachter, I want to make sure both sides

24   get a fair trial here.  I -- and I want to make sure that the

25   evidence comes in that should come in and the evidence that

1    shouldn't come in doesn't come in.

2        **MR. SCHACHTER:**  I would just like to provide the Court

3    one fact so the Court can think about it.  And I would like to

4    come back at 8:30.  And that is with respect to Harlan Band,

5    the Government showed the witness records from a different

6    provider that the nurse had never seen.  They made the decision

7    that it was important to Dr. Goodman's opinion to show him the

8    records of Java Psychiatry.  There is no issue.  Those records

9    were not provided to the treating Done provider.  Nonetheless,

10   they made the decision to share those with the medical -- with

11   Dr. Goodman and then asked him what affect did that have on the

12   opinion.  I just want to do exactly the same thing that the

13   Government did.

14       **THE COURT:**  Oh, no, no, it doesn't work that way.

15   That they may have made a mistake or not a mistake, they simply

16   culled the material that they thought was appropriate to have

17   to give to their witness.  That's all the subject of

18   cross-examination.

19       I mean, that -- you can demonstrate that by way of

20   cross-examination, but it doesn't mean that you can do the same

21   thing.  I mean, it doesn't mean that you can introduce some

22   things that were not given to the provider but you think might

23   bear on his opinion.  In other words, you're not going to ask

24   him the opinion does the person have a deficit disorder.

25       Now, given all these factor, does this person suffer from

PROCEEDINGS

1  a deficit disorder?  That's not why he's here.

2       Anyway, let's talk about it tomorrow morning.  You can

3  give any explanation tomorrow morning you want to.  It's all

4  teed up.

5       Good night, everybody.

6       I've got to go to a homeowners meeting which, by the way,

7  will be more difficult than this one.

8            (Proceedings adjourned at 4:23 p.m.)

9                      ---o0o---

10

11            **CERTIFICATE OF REPORTER**

12       I certify that the foregoing is a correct transcript

13  from the record of proceedings in the above-entitled matter.

14

15  DATE:   Tuesday, November 4, 2025

16

17

18

19

20  _____
        Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG, CSR No. 12219
               Official Reporter, U.S. District Court

21

22

23

24

25