Volume 21

Pages 4602 - 4885

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

UNITED STATES OF AMERICA,       )
                                )
            Plaintiff,           )
                                )
    vs.                          )   NO. 3:24-cr-00329-CRB
                                )
RUTHIA HE and DAVID BRODY,       )
                                )
            Defendants.          )
_____  )

                        San Francisco, California
                        Thursday, November 6, 2025

                **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
                        CRAIG H. MISSAKIAN
                        United States Attorney
                        Northern District of California
                        450 Golden Gate Avenue
                        San Francisco, California 94102
                BY:  **KRISTINA GREEN**
                     **ASSISTANT UNITED STATES ATTORNEY**

                        U.S. DEPARTMENT OF JUSTICE
                        FRAUD SECTION
                        950 Pennsylvania Avenue NW
                        Washington, D.C. 20530
                BY:  **JACOB N. FOSTER,**
                     **ACTING CHIEF, HEALTHCARE FRAUD UNIT**


            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
              Official Reporter, CSR No. 12219

**<u>APPEARANCES</u>:    (CONTINUED)**

                         U.S. DEPARTMENT OF JUSTICE
                         CRIMINAL DIVISION
                         1400 New York Avenue NW
                         Washington, D.C. 20001
                    BY:  **EMILY GURSKIS, ASSISTANT CHIEF**

                         JOSEPH NOCELLA, JR.
                         United States Attorney
                         Eastern District of New York
                         271-A Cadman Plaza East
                         Brooklyn, New York 11201
                    BY:  **ARUN BODAPATI, TRIAL ATTORNEY**

For Defendant He:

                         WILLKIE FARR & GALLAGHER LLP
                         2029 Century Park East - Suite 2900
                         Los Angeles, California 90067
                    BY:  **KOREN L. BELL, ATTORNEY AT LAW**

                         WILLKIE FARR & GALLAGHER LLP
                         787 7th Avenue
                         New York, New York 10019
                    BY:  **MICHAEL S. SCHACHTER, ATTORNEY AT LAW**
                         **STEVEN J. BALLEW, ATTORNEY AT LAW**

For Defendant Brody:

                         LAW OFFICE OF VALERY NECHAY
                         Law Chambers Building
                         345 Franklin Street
                         San Francisco, California 94102
                    BY:  **VALERY NECHAY, ATTORNEY AT LAW**

**Also Present:  Thifany Braga**
                **Simon Hall**
                **Mackenzie Slater**
                **Andy Cepregi**
                **Ashley Moore**
                **Barbara Hua Robinson, Mandarin Interpreter**
                **Jeff Dinn, Mandarin Interpreter**

<u>**I N D E X**</u>

Thursday, November 6, 2025 - Volume 21

<u>**GOVERNMENT'S WITNESSES**</u>                          **PAGE**  **VOL.**

<u>**PRASAD, AAKASH (RECALLED)**</u>
(PREVIOUSLY SWORN)                                4612    21
Cross-Examination by Ms. Bell                     4612    21
Cross-Examination by Ms. Nechay                   4685    21
Redirect Examination by Ms. Green                 4687    21

<u>**GRANGER, TREVOR**</u>
(SWORN)                                           4699    21
Direct Examination by Ms. Gurk                    4699    21
Cross-Examination by Mr. Ballew                   4772    21
Redirect Examination by Ms. Green                 4801    21

<u>**GUZMAN, ANTHONY**</u>
(SWORN)                                           4805    21
Direct Examination by Mr. Bodapati               4810    21

<u>**E X H I B I T S**</u>

| <u>**TRIAL EXHIBITS**</u> | <u>**IDEN**</u> | **EVID** | **VOL.** |
|---|---|---|---|
| 2 | | 4810 | 21 |
| 4 | | 4810 | 21 |
| 11 | | 4810 | 21 |
| 17 | | 4810 | 21 |
| 18 | | 4810 | 21 |
| 19 | | 4810 | 21 |
| 22 | | 4810 | 21 |
| 32 | | 4810 | 21 |
| 48 | | 4810 | 21 |
| 51 | | 4810 | 21 |
| 53 | | 4810 | 21 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 57 | | 4810 | 21 |
| 59 | | 4810 | 21 |
| 84 | | 4810 | 21 |
| 85 | | 4810 | 21 |
| 87 | | 4810 | 21 |
| 109 | | 4810 | 21 |
| 115 | | 4810 | 21 |
| 132 | | 4810 | 21 |
| 145 | | 4810 | 21 |
| 164 | | 4810 | 21 |
| 172 | | 4810 | 21 |
| 187 | | 4810 | 21 |
| 191 | | 4813 | 21 |
| 198 | | 4810 | 21 |
| 206 | | 4810 | 21 |
| 207 | | 4810 | 21 |
| 208 | | 4810 | 21 |
| 213 | | 4810 | 21 |
| 218 | | 4810 | 21 |
| 229 | | 4810 | 21 |
| 238 | | 4810 | 21 |

1                       **I N D E X**

2                  **E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 252 | | 4810 | 21 |
| 278 | | 4810 | 21 |
| 291 | | 4833 | 21 |
| 310 | | 4810 | 21 |
| 314 | | 4810 | 21 |
| 315 | | 4810 | 21 |
| 322 | | 4810 | 21 |
| 324 | | 4810 | 21 |
| 326 | | 4810 | 21 |
| 330 | | 4810 | 21 |
| 337 | | 4810 | 21 |
| 352 | | 4810 | 21 |
| 362 | | 4810 | 21 |
| 380 | | 4810 | 21 |
| 382 | | 4821 | 21 |
| 422 | | 4810 | 21 |
| 445 | | 4810 | 21 |
| 456 | | 4810 | 21 |
| 466 | | 4810 | 21 |
| 483 | | 4810 | 21 |
| 489 | | 4810 | 21 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 496 | | 4850 | 21 |
| 504 | | 4810 | 21 |
| 535 | | 4810 | 21 |
| 545 | | 4810 | 21 |
| 574 | | 4815 | 21 |
| 577 | | 4843 | 21 |
| 597 | | 4810 | 21 |
| 599 | | 4810 | 21 |
| 628 | | 4745 | 21 |
| 690 | | 4820 | 21 |
| 731 | | 4836 | 21 |
| 739 | | 4850 | 21 |
| 748 | | 4836 | 21 |
| 749 | | 4836 | 21 |
| 754 | | 4820 | 21 |
| 768 | | 4848 | 21 |
| 769 | | 4848 | 21 |
| 772 | | 4834 | 21 |
| 787 | | 4717 | 21 |
| 791 | | 4837 | 21 |
| 794 | | 4850 | 21 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 795 | | 4850 | 21 |
| 796 | | 4850 | 21 |
| 797 | | 4850 | 21 |
| 798 | | 4850 | 21 |
| 804 | | 4862 | 21 |
| 807 | | 4838 | 21 |
| 818 | | 4739 | 21 |
| 818 | | 4769 | 21 |
| 820 | | 4721 | 21 |
| 836 | | 4753 | 21 |
| 837 | | 4759 | 21 |
| 840 | | 4763 | 21 |
| 843 | | 4841 | 21 |
| 844 | | 4841 | 21 |
| 845 | | 4810 | 21 |
| 846 | | 4810 | 21 |
| 851 | | 4841 | 21 |
| 859 | | 4841 | 21 |
| 867 | | 4810 | 21 |
| 868 | | 4810 | 21 |
| 871 | | 4810 | 21 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 872 | | 4810 | 21 |
| 894 | | 4821 | 21 |
| 895 | | 4821 | 21 |
| 898 | | 4810 | 21 |
| 901 | | 4821 | 21 |
| 904 | | 4810 | 21 |
| 934 | | 4820 | 21 |
| 937 | | 4848 | 21 |
| 941 | | 4735 | 21 |
| 948 | | 4735 | 21 |
| 961 | | 4810 | 21 |
| 1064 | | 4814 | 21 |
| 1068 | | 4691 | 21 |
| 1071 | | 4846 | 21 |
| 1363 | | 4810 | 21 |
| 1400 | | 4855 | 21 |
| 1401 | | 4855 | 21 |
| 1475 | | 4810 | 21 |
| 1501 | | 4851 | 21 |
| 1732 | | 4810 | 21 |
| 2354 | | 4823 | 21 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 2372 | | 4859 | 21 |
| 2375 | | 4859 | 21 |
| 2383 | | 4852 | 21 |
| 2471 | | 4815 | 21 |
| 2472 | | 4815 | 21 |
| 2473 | | 4815 | 21 |
| 2490 | | 4825 | 21 |
| 2545 | | 4817 | 21 |
| 2555 | | 4736 | 21 |
| 2609 | | 4816 | 21 |
| 2610 | | 4816 | 21 |
| 2611 | | 4816 | 21 |
| 2646 | | 4861 | 21 |
| 2655 | | 4853 | 21 |
| 2824 | | 4810 | 21 |
| 2825 | | 4810 | 21 |
| 2826 | | 4810 | 21 |
| 2827 | | 4810 | 21 |
| 2883 | | 4810 | 21 |
| 2903 | | 4822 | 21 |
| 2990 | | 4810 | 21 |

## I N D E X

### E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 2991 | | 4810 | 21 |
| 2992 | | 4810 | 21 |
| 2995 | | 4810 | 21 |
| 3004 | | 4810 | 21 |
| 3043 | | 4810 | 21 |
| 3044 | | 4751 | 21 |
| 3092 | | 4810 | 21 |
| 3096 | | 4707 | 21 |
| 7608 | | 4643 | 21 |
| 7609 | | 4695 | 21 |
| 7612 | | 4621 | 21 |
| 7714 | | 4787 | 21 |

```
 1   Thursday - November 6, 2025                        9:19 a.m.

 2                     P R O C E E D I N G S

 3                          ---oOo---

 4    (Proceedings were heard out of the presence of the jury.)

 5         THE COURTROOM DEPUTY:  All rise.  Court is now in

 6   session.  The Honorable Charles R. Breyer presiding.

 7         THE COURT:  Okay.  Bring in the jury.

 8      (Aakash Prasad steps forward to resume the stand.

 9                      AAKASH PRASAD,

10   called as a witness for the Government, having been previously

11   duly sworn, testified further as follows:

12         THE COURT:  Okay.  Please be seated.  Let the record

13   reflect all parties are present.  Jury is present.

14      You may continue.

15         MS. GREEN:  Thank you, Your Honor.

16      Good morning, Mr. Prasad.  And good morning, members of

17   the jury.

18      The Government has no further questions on direct.

19         THE COURT:  Pardon me?

20         MS. GREEN:  We have no further questions for direct.

21         THE COURT:  Okay.

22                    CROSS-EXAMINATION

23   BY MS. BELL:

24   Q.  Good morning.  Good morning.

25   A.  Good morning.
```

1    Q.    So, Mr. Prasad, I'd like to talk about -- start by talking

2    about your vantage point, respecting your work at Done.

3         You worked there for a consult -- as a consultant for a

4    handful of weeks in the November 2022 to December 2022 period;

5    right?

6    A.    Correct.

7    Q.    And your job during that handful of weeks was to find

8    candidates for executive leadership positions; right?

9    A.    Correct.

10   Q.    And so you only had limited interactions with people at

11   Done during those few weeks; right?

12   A.    I had -- my main interactions were with Ruthia.  Not --

13   and a recruiter.

14   Q.    And yesterday you testified that you didn't have any

15   special insight into the healthcare side of the business.

16        Do you remember that?

17   A.    Yes.  I was not working on the healthcare or operations

18   side of the business.

19   Q.    And so you don't know, after the negative press came out,

20   what, if any, changes were made on the clinical side of the

21   business; right?

22   A.    I do not know besides just Ruthia's response to my

23   questions.

24   Q.    And if we could go -- well, let me just ask you this.

25        On the day that you actually decided to terminate your

```
 1    relationship with Done, you told Ruthia, "I don't know the

 2    internals of the company."

 3         Do you remember that?

 4    A.   Yes, I didn't know all the details; correct.

 5    Q.   And when you were subpoenaed in connection with this

 6    matter you, again, said, "I have nothing to do with Done."

 7         Do you remember that?

 8    A.   Yes.

 9    Q.   Okay.  And do you also remember discussing legal fees in

10    connection with the subpoena and ultimately your testimony to

11    this day?

12              MS. GREEN:  Objection.  Beyond scope of direct.

13              THE COURT:  Overruled.

14              THE WITNESS:  Does that mean I answer?

15              THE COURT:  Yeah, that means you should answer.

16              THE WITNESS:  Oh.  Yes, I did, yeah.

17    BY MS. BELL:

18    Q.   Okay.

19    A.   Yeah.

20    Q.   And you asked Done to pay your legal fees; right?

21    A.   To respond to the subpoena; correct.

22    Q.   And to this day, Done is paying your legal fees; right?

23    A.   Correct.

24    Q.   And they didn't cut that off when you learned you were

25    going to be a witness in this case; right, for the Government?
```

PRASAD - CROSS / BELL

1  A.   Correct.

2  Q.   Okay.  So yesterday you testified that Ruthia's stated

3  goal was to build a billion-dollar company.

4       Do you remember that?

5  A.   Yes.

6  Q.   Okay.  But she also told you that building a successful

7  company was not her only goal; right?

8  A.   Was there a specific message you were referring to?

9  Q.   Yes.

10       MS. BELL:  Why don't we put up just for the witness,

11  if we could, and we can hand the Government a copy of this.

12  This is 7631.

13       I don't know if it's up on the screen for the witness yet.

14       THE WITNESS:  Not yet.

15       MS. BELL:  Okay.

16       MS. GREEN:  Objection.  December 2019.

17       MS. BELL:  Okay.

18       THE COURT:  I didn't hear anything that you said.

19       MS. GREEN:  Objection.  Relevance based on date.

20       THE COURT:  First of all, she's showing it for -- to

21  refresh the witness's -- she's showing it to refresh the

22  witness's recollection who said -- he asked is there something

23  that would refresh my recollection on the subject that counsel

24  just asked.

25       MS. BELL:  Yes, Your Honor.  Sorry.  I can explain.

 1    This is a 2019 document, so this is before Done had even

 2    started.  And so Ms. Bell was asking about the stated goal with

 3    respect to Done and this is before Done is even started.

 4            THE COURT:  Yes.  I mean, that's fine.  But that's --

 5    that could be part of cross-examination or redirect examination

 6    that this statement, this is 2019 --

 7            MS. BELL:  And we can --

 8            THE COURT:  That's what it is.  I -- that's what it

 9    is.

10            MS. BELL:  This is a statement from December 2019 --

11    and, in fact, we could put up the unredacted version for the

12    witness.  I've redacted some personal information that

13    Mr. Prasad exchanged and vice versa with our client to focus on

14    the relevant portion, but it's fine to also put up the -- the

15    unredacted version for Mr. Prasad.  If we admit it, it would

16    be --

17            THE COURT:  Well, let's -- I think we're, again,

18    spending a lot of time on this --

19            MS. BELL:  Okay.  Let me proceed.

20            THE COURT:  -- and the issue is did -- I don't have

21    the exact words but --

22            MS. BELL:  Yes.

23            THE COURT:  What was expressed as a goal of the

24    defendant.

25            MS. BELL:  Yes.

BY MS. BELL:

Q.    So Ruthia said to you (as read):

            "I've been thinking about if doing startups is
       what I truly want.  I think making money and
       competing with other people have been rewarding to me
       but I can never do it too well because they are not
       the things that will make me smile when waking up
       every day.  What attracts me is always the creative
       part.  I like to create things that are" --

            MS. GREEN:  Objection.

BY MS. BELL:

Q.    (as read):

            -- "valuable to people, create solutions" --

            MS. GREEN:  Can I object?  Hearsay and non-impeaching.
I thought we were just showing this to the witness to refresh.
This is not impeaching.

            THE COURT:  I did too.

            MS. GREEN:  Yes.

            MS. BELL:  The question --

            THE COURT:  I did too.

            MS. BELL:  Okay.

            THE COURT:  I did too.  You can't read it.  The jury
is instructed to disregard it.

       Now, the witness reads it and then sees whether or not he
has a recollection that she said -- that she had other goals.

PRASAD - CROSS / BELL

1  Goals other than making money.  Okay?

2  **BY MS. BELL:**

3  **Q.**  Does this refresh your recollection, Mr. Prasad, about

4  your conversation in 2019?

5  **A.**  Yes.

6  **Q.**  Okay.  And do you recall that Ruthia told you that she had

7  goals besides, for example, making money; right?

8  **A.**  Yes.

9  **Q.**  And what she said was that what attracts her about

10  startups is always the creativity part; right?

11          **MS. GREEN:**  Same objection.

12          **THE COURT:**  Sustained.

13  **BY MS. BELL:**

14  **Q.**  Okay.  But you understood that her stated goals beyond

15  building a successful company was creating a solution that can

16  solve problems; right?  You had that understanding?

17  **A.**  She wanted to use her creativity and build things;

18  correct.

19  **Q.**  Okay.  And, in fact, you testified yesterday that before

20  Done, she had founded another startup focused on music; right?

21  **A.**  Correct.

22  **Q.**  And that was connecting musicians and fans; right?

23  **A.**  Correct.

24  **Q.**  Okay.  Let's go to another example.  Let me ask you about

25  this.

1          Do you recall Ruthia also telling you later in 2022 that,

2    "My problem is I wanted to change the world"?

3    A.    Is there a message or...

4          MS. BELL:  Yes.  Let's go to 7611 at page 2.  And we

5    can read backwards to page 1.  And if we could put this up just

6    for the witness, the Government, and the Court, please.

7    BY MS. BELL:

8    Q.    Okay.  Take a moment.

9    A.    Yes.

10   Q.    Okay.  So does this refresh your recollection that

11   several years later she told you that -- her stated goal is

12   that she wanted to change the world?  That was another stated

13   goal; right?

14   A.    Yes.

15   Q.    And that she rarely sees startups that can really change

16   the world; right?

17   A.    Yes.

18   Q.    But she wanted to make history by pushing the human being

19   forward?

20          MS. GREEN:  Same objection.

21          THE COURT:  Okay.  Proceed.

22   BY MS. BELL:

23   Q.    Do you recall that?

24   A.    Yes.

25   Q.    Okay.  All right.  So yesterday --

1          MS. BELL:  We can take that down.

2    BY MS. BELL:

3    Q.    -- the prosecutor showed you some communications in early

4    2020 where Ruthia was talking about Done as a drug startup.

5          Do you remember those questions?

6    A.    Yes.

7    Q.    But you understood in 2020 that she did not mean that Done

8    was an illegal drug-trafficking operation when she said that;

9    right?

10          MS. GREEN:  Objection.  Calls for speculation.

11    Foundation.

12          THE COURT:  Well, you're asking this witness as to

13    what he understood her to mean when she said a drug -- she

14    wants to start a drug business or --

15          THE WITNESS:  Yes.

16          THE COURT:  What did you understand her to mean?

17          THE WITNESS:  Yes.  She referred to it in the messages

18    as a drug business.

19    BY MS. BELL:

20    Q.    Right, and you did not understand her to mean in 2020 that

21    Done was an illegal drug-trafficking operation; right?

22    A.    I did not know it was illegal.

23    Q.    You didn't understand that that's what she meant --

24    right? -- when she said that?

25          MS. GREEN:  Objection.  Asked and answered.

1           THE COURT:  Overruled.

2           THE WITNESS:  I did not look at it that way at the

3    time.

4    BY MS. BELL:

5    Q.   Okay.  In fact, you went on to work there two years later;

6    right?  For the period of weeks we talked about; right?

7    A.   Yes.

8    Q.   Okay.  So let's look at another communication from that

9    time frame.  This is a portion, a different portion of the same

10   set of messages the Government showed you yesterday.  So I put

11   up 7612, an August 19 -- an August 9th, 2020, message.

12          MS. BELL:  And I'd move to admit that, Your Honor.

13          THE COURT:  I'm sorry.  What --

14          MS. BELL:  This is 7612, and I'd offer that as an

15   exhibit, please.

16          THE COURT:  7612.  So it's a different exhibit?

17          MS. BELL:  It is because we've taken other sections of

18   the same 7,000-page message exchange that the Government

19   excerpted in its Exhibit 862.

20          THE COURT:  Okay.  7612, admitted.

21      (Trial Exhibit 7612 received in evidence.)

22          MS. BELL:  If we can scroll down to the bottom.  Okay.

23   And can we see the date here August 9th, 2020?  Can you go down

24   to see the date of the communication, please.

25      Okay.  Can you blow that up, please.

PRASAD - CROSS / BELL

1    BY MS. BELL:

2    Q.    Okay.  Great.

3         So do you see this is a communication from August 9, 2020?

4    A.    Yes.

5    Q.    Okay.  And here Ruthia tells you that Done is an ADHD

6    platform; right?

7         She tells you that Done started with one woman wanting to

8    help a close friend she really cares about.

9         She's talking about herself there; right?

10   A.    Correct.

11   Q.    (as read):

12            "That friend suffers from ADHD symptoms but

13        could not afford to see a psychiatrist to get help.

14        There are 28,000 psychiatrists in the United States,

15        and 10 million adult ADHD patients.  Due to the

16        national shortage in most of the counties in the

17        United States, psychiatrists were rare resources just

18        for rich people.  Her research on ADHD" --

19        Again, she's talking about herself there; right?

20   A.    Mm-hmm.

21   Q.    (as read):

22            "-- and its social impact leading to economic

23        loss propelled her to take action to make effective

24        psychiatric care accessible to everyone by building

25        innovative technology to increase the care efficiency

 1          for both providers and patients.  Everyone can use

 2          Done to get instant access to high quality

 3          psychiatric care at half the cost.

 4              "Today Done works with over a dozen providers to

 5          bring professional psychiatric care to thousands of

 6          people who wouldn't otherwise be able to access it or

 7          afford it.  Our vision is to build a world where

 8          everyone's potential could be reached."

 9          Do you see that?

10  A.    Yes.

11  Q.    Okay.  Now, let's go to another communication from the

12  2020 time frame.

13          MS. BELL:  I'd offer 7614, Your Honor.  It's another

14  section of the same set of communications.

15          MS. GREEN:  Objection.  Hearsay.  And non-impeaching.

16          THE COURT:  Well, let me look at.

17          MS. BELL:  Well, Your Honor, the witness was shown a

18  series of communications from the 2020 time frame referring to

19  the business as a drug business.  And, in fact, it was quite

20  clear that our client was discussing the treatment platform as

21  an ADHD treatment platform, which was the question and the

22  testimony the Government elicited.  The Government asked you --

23  "Ruthia, didn't refer to it as a company providing ADHD mental

24  health care" when, in fact, during that exact time frame, she

25  was doing just that.

1          THE COURT:  So these statements that are coming in now

2    are not coming in for the truth of the matter, that is that the

3    person who -- the defendant, in this case, believed what she

4    was saying.  It's simply evidence that at the time that she had

5    these conversations with the witness, this is what she told

6    him.

7          MS. BELL:  Okay.

8          THE COURT:  So it's not -- it's not hearsay.  It's not

9    being admitted for the truth of the matter.

10          MS. BELL:  Correct, Your Honor.

11          THE COURT:  And it's not being admitted for the -- not

12    only is it not being admitted for the truth of the matter, it's

13    not being admitted as evidence of the defendant's state of

14    mind.  It's simply being admitted as to what this witness heard

15    her say and as it affected this witness's state of mind.

16          MS. BELL:  Okay.

17          THE COURT:  So with those limitations, I'm allowing in

18    the evidence.

19    BY MS. BELL:

20    Q.    So, Mr. Prasad, do you see here you tell Ruthia in April

21    of 2020 (as read):

22          "When I saw your ad, I thought of Alex."

23          The ad you're referring to is for Done; right?

24    A.    Yes.

25    Q.    And you say (as read):

1           "I was like that was definitely what inspired

2       you.  Because you didn't say Alex had ADD, so you

3       made the online ADD app.  That's what it looks like

4       to me, you made this for Alex, LOL, or you were

5       inspired by him."

6       And Ruthia says (as read):

7           "But we ended.  I think he could feel it and

8       wanted to change, just ended up giving up.  Yeah, I

9       was inspired by him and tried to do things for him.

10      That's what love means to me."

11      Do you see that?

12  A.  Yes.

13  Q.  Alex was a person Ruthia was dating at the time, you knew?

14  A.  Yes.

15  Q.  Okay.  And so Ruthia not only told you --

16      (Reporter interrupts for clarity of the record.)

17  BY MS. BELL:

18  Q.  And you believed that Alex, who you understood to have

19  ADHD, had inspired her idea for Done; right?

20  A.  Yes.

21  Q.  Okay.

22          MS. BELL:  And then let's go to 7620.

23      I'd offer that, Your Honor.  At page 3, please.

24  BY MS. BELL:

25  Q.  You also discussed Ruthia's own mental health challenges;

1  right?

2  **A.**    Yes.

3  **Q.**    And she told you here in March of 2020, (as read):

4           "I do have a mental issue" --

5          **MS. GREEN:**  Objection.  Relevance.

6          **THE COURTROOM DEPUTY:**  Are we still on 7614?

7          **MS. BELL:**  This is 7620.

8          **THE COURT:**  Okay.  Ladies and gentlemen, sorry, but

9  we're going to have to have a conference, so we'll take a

10  ten-minute recess and resume.

11         Remember the admonition.

12                 (The jury leaves the courtroom.)

13      (Proceedings were heard out of the presence of the jury.)

14         **THE COURT:**  Okay.  The jury has retired since there

15  seemed to be more than a few of these, and I would anticipate

16  maybe more to come.  I thought we ought to get the ground rules

17  down.

18         The objection for all of these documents is essentially

19  that they are -- that they are hearsay.  The response to that,

20  I think, is they're not being introduced for the truth of the

21  matter, so they're not hearsay.

22         The exception so -- to jump ahead is, of course, there

23  were statements of Ms. He -- He -- pardon me -- and the witness

24  that come out of these -- come out of these statements, so how

25  do they come in?

1    And the answer is they come in as admissions.  In other

2  words, if a defendant says, "I'm running a drug business," that

3  comes in as an admission.  That's -- that is actually an

4  exception to the hearsay rule and so it can be considered by

5  the jury as the defendant admitting something.

6    If it comes in and says -- if she says "I'm very concerned

7  about other people," that doesn't come in because that's not an

8  admission, it's simply hearsay, and it's not -- and it doesn't

9  reflect her state of mind.  Arguably you could say that was her

10 state of mind, but that's not the way the evidence code works,

11 as I understand it.

12    So, you know, I mean, whenever these statements come in,

13 the Government is entitled and at some point -- by the way, at

14 some point, it doesn't -- it doesn't even justify a question

15 because the -- the witness's state of mind isn't at -- isn't at

16 issue in these statements.  It's not what did you think she

17 meant.

18    I mean, sometimes it's important, sometimes it's not, but

19 it can't -- you can't use it as a platform to introduce many,

20 many hearsay statements that otherwise wouldn't come in.  And

21 that's what I see occurring here, and that's why I called a

22 recess rather than having to jump in after every single

23 statement because of Mr. Schachter's deep concern that I should

24 stay uninvolved in this in terms of a commentary.

25    So I thought I would explain it outside the presence of

 1   the jury and give you, Mr. Schachter, or, Ms. Bell, the

 2   opportunity to respond.

 3           MS. BELL:  Well, maybe I'll start.

 4       So two reasons why I believe this is proper, Your Honor.

 5   First of all, it's certainly impeachment of the evidence that

 6   was proffered through this witness in the sense that we have a

 7   set of communications from 2020.  As Your Honor knows, it's

 8   actually a 7,000-page exhibit.  The Government has picked out

 9   certain sections selectively, and we're completing the picture

10   which is actually impeachment by contradiction to the extent

11   that the evidence proffered was a series of about ten or more

12   communications where she's referring to this as a drug biz

13   wherein the same period of time, she makes it perfectly clear

14   this is an ADHD platform.

15       That's one reason why it's permissible.

16       But a second --

17           THE COURT:  Well, let me think about that for a

18   minute.

19           MS. BELL:  Okay.

20       He has not said -- you have not asked him the question:

21   Did you believe, in your conversation -- and I'm -- that it was

22   simply a platform for issuing drugs as distinct from a

23   treatment platform.  That would have been the proper question.

24   And then -- that would then entitle you to impeach by showing

25   on 25 occasions she talked about it being a platform.

 1        So you've got the horse -- definitely have the -- have it

 2   reversed.  In other words, you haven't laid a foundation that

 3   would justify these questions.  That's Number 1.

 4        So on that basis, on that argument, denied.  I'm not going

 5   to let you do it.

 6        I will let you lay a foundation but, of course, to me it's

 7   obvious.  I'm sitting here thinking:  If he thought it was a

 8   drug platform, why did he go work there?

 9        If he -- if, in fact, his impression was, "Oh, yeah, this

10   is just a drug mill, why am I going to go work there," then

11   that would be interesting.

12        But I think -- I don't think anybody is going to come -- I

13   don't think anyone is going to have the impression -- any

14   reasonable person is going to have the impression that you're

15   afraid has been created --

16            MS. BELL:  Yes, Your Honor.

17            THE COURT:  -- on that issue.

18            MS. BELL:  I will -- I will move on to my second

19   point, although, I will say that's exactly where I started with

20   him.  I asked Your Honor's question and then I asked -- you

21   testified that Ruthia didn't refer to it as a company providing

22   ADHD mental health care and now I'm impeaching him by showing

23   she did.

24        But we can move on from that because there's a second

25   point --

PROCEEDINGS

1          **THE COURT:**  He said I -- that -- maybe I didn't hear

2    it.

3          **MS. BELL:**  Yes, Your Honor, and I asked --

4          **THE COURT:**  He said I never heard her refer to it an

5    ADHD platform --

6          **MS. BELL:**  Yes.

7          **THE COURT:**  -- that was his testimony?

8       Just wait.  Slow down.  Slow down.  Slow down for a

9    variety of reasons.  The court reporter can't get it.  And I

10   can't understand it.  So if this effort of calling -- of saying

11   a trial is a process of communication, I think it's important

12   to use it as such.

13      Okay.  I don't remember it.  If you want to show it to me,

14   that's fine.  You could certainly show it to me, and I can -- I

15   can change my ruling in that regard.

16      Okay.  So it's out on that basis.

17      Next.

18          **MS. BELL:**  This separate issue, Your Honor, is on the

19   hearsay point.

20      So the state of mind issue, testimony can be proffered, as

21   Your Honor knows, for the purpose of showing state of mind not

22   as an exception to the hearsay rule, which would still be for

23   the truth of the matter, but to show state of mind.  It's not

24   true or false, it's what her state of mind was at the time,

25   it's what she is saying -- it's the fact she's saying it.  And

PROCEEDINGS

```
 1   one reasonable interpretation of that is that she's saying it
 2   because it was her state of mind.  The Government's point --
 3            THE COURT:  By the way, as to that, one reasonable
 4   interpretation is the state of mind, that means you're
 5   introducing it for the truth of the matter.  So you see that's
 6   where you've run into your buzz saw of words because if it
 7   is -- if it's a reasonable inference that she means what she
 8   said -- and by the way, it's un-cross-examined -- then it's
 9   introduced for the truth as "I want to run a platform," that's
10   my state of mind.  "I want to help people," that's my state of
11   mind.
12       And the reason it's not admissible is because it's
13   un-cross-examined and being introduced for the truth of the
14   matter.  That is for -- he's saying that is what I'm thinking.
15   And you can't cross-examine it.  So that's out.
16            MR. SCHACHTER:  Your Honor, may I just --
17            THE COURT:  Mr. Schachter --
18            MR. SCHACHTER:  -- if the Court will indulge me for
19   just a --
20            THE COURT:  -- go ahead.
21            MR. SCHACHTER:  -- for just a moment.
22       First of all, there are two issues.  One is it is a
23   hearsay exception, or at least portions of it may be.
24       Under 803(3), a statement...
25            MS. GREEN:  But that's not the defendant.
```

PROCEEDINGS

```
 1            THE COURT:  Whatever happened to Weinstein -- it's
 2   803 --
 3            MR. SCHACHTER:  803(3).
 4            THE COURT:  803(3).  Got it.
 5            MR. SCHACHTER:  (as read):
 6             "A statement of the declarant's then-existing
 7        state of mind (such as motive, intent, or plan)..."
 8        So if we're using it to show the defendant's intent or her
 9   plan, then it is non-hearsay.  Or it is an exception to the
10   hearsay rule and it is admitted.
11            Including, by the way, as relevant to the document that
12   was -- that Ms. Bell was just trying to admit, a statement of
13   the defendant's mental feeling, pain, or bodily health is also
14   an exception to the hearsay rule and is admissible.
15        So there is -- there is that.
16            MS. GREEN:  Your Honor, what --
17            THE COURT:  That's not that.  That's okay.  But that's
18   not that.  That's not -- oh, yes, that's that.  I mean, oh,
19   yes, that's exactly what it says, but that doesn't mean that --
20   it's not used in the context, and the cases have made clear
21   it's not used in the context -- somebody has a smoking gun and
22   he says, "I'm not going to kill you," or "I am going to kill
23   you," or "I'm not going to kill you.  I don't want to hurt
24   you," bang-bang, that's not evidence of his state of mind,
25   un-cross-examined.
```

**PROCEEDINGS**

1    I mean, that's not evidence of his state of mind.  That's

2    evidence that he stated it.

3         **MR. SCHACHTER:**  Well --

4         **THE COURT:**  Anyway, you know what?  You made your

5    point.  It's not coming in under that.  Next.

6         **MR. SCHACHTER:**  Okay.  And, Your Honor, just --

7    because at the -- towards the end of the day -- I mean, just

8    one more moment on this.

9         **THE COURT:**  Sure.

10        **MR. SCHACHTER:**  If I may.  Which is, I mean,

11   obviously, a hearsay statement is a statement that is offered

12   for the truth of the matter asserted.  If we are not offering

13   it to prove the fact that is made in the statement, but rather

14   it -- either it is the witness's belief or the declarant's

15   belief, or it is information which informs the statement -- the

16   declarant's belief and we don't care if it is true or false.

17        In other words, if there is a statement to Ms. He that you

18   can diagnose ADHD -- a medical professional says to her, you

19   can diagnose ADHD in five minutes, we don't care whether that's

20   true or false.  It is not being offered to prove the truth of

21   the matter asserted, that you can diagnose ADHD in

22   five minutes.  Rather it is being used to show -- to inform her

23   state of mind, and that means it's being offered for a

24   non-hearsay purpose and is, therefore, admissible.

25        The Court can certainly instruct the jury that the

1  statement is not being offered for the truth of the matter

2  asserted.

3          **THE COURT:**  But it is.

4          **MS. GREEN:**  Right.

5          **THE COURT:**  That's exactly what it is.  If she got

6  a -- let's say they had a statement which said -- let's say

7  there was a statement that "I think people could be examined in

8  five minutes."

9      Five minutes.  Okay.

10      And you want to -- the Government wants to introduce it.

11  Why does it come in if the Government introduces it?  Because

12  it's an admission.

13      Why doesn't it come in if you want to introduce it?

14  Because it's -- it's -- well, maybe that's not a good example.

15  Maybe I have to use the example of, "Oh, I think every" -- some

16  other example.  I'm not -- not doing it well.

17      But it -- it is actually being introduced for the truth of

18  the matter.  That's what you want to do.

19      The statement "I want to run a drug platform," "I want to

20  help humanity," "I want to cure deficit disorder," "I want to

21  do good works," "I want this to be above" -- let's say she

22  says, "I don't want to violate the law," "I certainly don't

23  want to violate the law," does that come in?

24      You say, yes, it does because it shows her state of mind.

25  It's not being introduced for the truth of the matter, it's

being introduced because it shows her state of mind.

But the answer to that is no.  No, no, no.  It's no because it is actually being introduced for the truth of the matter and it's un-cross-examined.  It's un- -- they cannot cross-examine what she said.  She's not testifying.

MR. SCHACHTER:  And Your Honor --

THE COURT:  She is the declarant and she's not testifying.

MR. SCHACHTER:  I understand, Your Honor, but that -- so if it is a statement --

THE COURT:  It's a one-sided -- you see, the problem is, which you won't accept but I do, is that actually, 803 -- 803(3) is essentially a one-sided example because, in fact, there's an exception to it and the exception -- or maybe it's the exception.  It's the exception if it is used in the sense of an admission.

Now, there may be some other ways of getting it in, for example, excited utterance, spontaneous declaration, all of that, which none of this qualifies for, may be exceptions to the hearsay.

But it's not an exception to the hearsay rule to simply let her give an exculpatory statement and argue that it's not being introduced for the truth of the matter.  Because if it isn't, what is it?

If she didn't believe it, why is it relevant?  If she made

1    it up, why do -- why should it be in evidence?

2        MR. SCHACHTER:  Your Honor -- Your Honor, if -- if I

3    may, and I'd just ask the Court -- we don't need to take up too

4    much time right now.  Maybe we can return to it at the end of

5    the day.  But to be clear, Rule 803, statements like excited

6    utterance or a statement of the declarant's --

7        (Reporter interrupts for clarity of the record.)

8        MR. SCHACHTER:  I'm sorry.

9        Just like an excited utterance, just a present-sense

10    impression, and just like a statement of the declarant's

11    then-existing state of mind, such as motive, intent, or plan,

12    may be offered for truth.

13        The following are not excluded by the rule against hearsay

14    regardless of whether the declarant is available as a witness.

15    This does not require it to be an admission.  It doesn't

16    even -- it doesn't require it to be non-hearsay.

17        There's two issues.  One is if it is a statement that is

18    not being offered for the truth of the matter asserted --

19        THE COURT:  Do you have a case?

20        MR. SCHACHTER:  We will certainly brief this.  I'm

21    just --

22        THE COURT:  Fine.  Okay.  You'll brief it, but I'm not

23    going to allow it in.

24        MS. GREEN:  Your Honor, I would just note, 803(3) on

25    its face says that it does not include statements of memory or

PROCEEDINGS

 1  belief unless it relates to the terms or validity of a

 2  declarant's will.

 3      And here we're obviously talking about a defendant's

 4  statement, which is very different than a -- you know, a

 5  third-party declarant.  So on its face it says it does not

 6  allow it for statements of belief to prove that belief.

 7          **MR. SCHACHTER:**  Right.  And we -- I think it would be

 8  very helpful if we would brief this.  That --

 9          **THE COURT:**  Fine.  Brief it.  I'm not going to allow

10  it.

11          **MR. FOSTER:**  And I'll just note, Your Honor, this was

12  briefed during the motion in limine process --

13          **THE COURT:**  I thought it was.

14          **MR. FOSTER:**  -- as well -- yes.

15          **THE COURT:**  So just dust off the briefs and I'll take

16  a look at it.

17          **MR. SCHACHTER:**  Thank you, Your Honor.

18          **MS. BELL:**  Your Honor, should we return to -- I can

19  show Your Honor the portion of the transcript, although I did

20  ask the witness and he agreed that that's how he testified.

21          **THE COURT:**  Where -- where -- I --

22          **MR. SCHACHTER:**  That's the rough.

23          **MS. BELL:**  So this is 185 at pages 24 to 25.

24      I'm sorry?  The rough.

25      Oh, that's the rough.  But if I may -- that was the rough

PROCEEDINGS

```
 1   citation.
 2              THE COURT:  But why don't you read it to me.
 3              MS. BELL:  The statement was that Ruthia --
 4         (Reporter interrupts for clarity of the record.)
 5              MS. BELL:  May we have a moment to find the citation?
 6              MS. GREEN:  Your Honor, while she's finding it, I can
 7   just give you the context for that.  I had shown him --
 8              MS. BELL:  Actually, I wasn't done.  I wanted to
 9   address that, if I could.
10         May I?
11         So I just -- at least for the record.  I understand
12   Your Honor has ruled, but on your point about why is it
13   relevant if it's not for the truth.  Okay, why would it be
14   relevant?
15         Well, the Government has elicited a whole series of
16   snippets from the exact same time frame out of a 7,000-page
17   communication where our client is referring to this as a drug
18   biz startup.
19         They did go on to ask:  Did she ever refer to it as a
20   company providing ADHD mental health care, to which he said no,
21   but we'll find that.
22         But putting that aside, completing the picture and showing
23   that in that exact same time frame, she was also referring to
24   it as an ADHD --
25              THE COURT:  As I said, if, in fact -- if, in fact, he
```

PROCEEDINGS

1    said that, you're entitled to take a -- any portion of the

2    7,000 pages and quote.  I think the -- 2019 where she talks

3    about what she wants to create can be viewed in some context as

4    impeaching.  Okay?  That's fine.  You can impeach.

5              MS. BELL:  Thank you, Your Honor.  And --

6              THE COURT:  I'm not saying you can't impeach.

7              MS. BELL:  And that is, I think, regardless of the

8    truth or the falsity or the hearsay issues.  The point is, that

9    was not the only thing she was saying.  If the fact is she was

10   talking about it as a drug biz, she was also talking about as

11   an ADHD treatment platform.  And that fact is irrespective of

12   truth or falsity.  Those are the facts of her words and it's

13   circumstantial evidence of what was the -- it's evidence of the

14   conversations at the time.

15             MS. GREEN:  I would just note, Your Honor, I'm going

16   off my memory, but my recollection of his testimony was not:

17   Did she ever say X?

18       I was asking him about one specific message.  So I

19   understand, Your Honor, about impeachment, but I think we just

20   need to look very carefully at what we're impeaching and what

21   he actually said.

22             THE COURT:  I mean, I'd like to look at the context of

23   what was said.

24             MS. GREEN:  Right.

25             THE COURT:  I doubt whether the Government got up and

 1  said:  Did she ever tell you, in your relationship with her

 2  over X years, that she was not creating a platform?

 3      After all, she created the platform.  She did exactly what

 4  she said she was going to do.

 5      I don't think the witness would say, no, she didn't.

 6          MS. GREEN:  And I didn't ask that question.  You're

 7  correct, I didn't -- that was not said.

 8          THE COURT:  Okay.  Moving ahead.  I'm not going to

 9  allow this kind of examination for the reasons I've stated.

10  The witness -- if I change my mind, the witness can be brought

11  back.  Okay?

12          MR. SCHACHTER:  Thank you, Your Honor.

13          THE COURT:  All right.  Let's move on to a different

14  subject or a different manner in which the examination is going

15  to occur.

16      You can bring in the jury.

17              (The jury enters the courtroom.)

18      (Proceedings were heard in the presence of the jury.)

19

20          THE COURT:  Okay.  Let the record show all parties are

21  present, jury is present.

22      You may continue.

23          MS. BELL:  Thank you.

24  BY MS. BELL:

25  Q.   So, Mr. Prasad, Ms. -- Ruthia actually asked you to help

PRASAD - CROSS / BELL

 1  her find psychiatrists to join Done in that same time frame,

 2  2020; right?

 3  **A.**    I do not recall.  Do you have the messages?

 4         **MS. BELL:**  Your Honor, we would offer 7620, please.

 5  I'm sorry.  7608.

 6         **THE COURT:**  To refresh his recollection?

 7         **MS. BELL:**  We'd offer it.  Again, it's not for the

 8  truth of the matter.

 9         **THE COURT:**  No, you can show it to him to refresh his

10  recollection.  He says he didn't recall.

11  **BY MS. BELL:**

12  **Q.**    Okay.  Mr. Prasad, can you take a look at this e-mail

13  between you and Ruthia from 2020?

14  **A.**    Yes.  Yes.

15  **Q.**    Okay.  Does this refresh your recollection that in 2020

16  Ruthia asked you to help find connections to psychiatrists in

17  the field?

18  **A.**    Yes.

19  **Q.**    Okay.  And in doing so, she sent you an intro for you to

20  share with people you thought might be a fit; right?

21  **A.**    Yes.

22  **Q.**    And as part of that intro, she told you (as read):

23         "We aim to be the Number 1 mental health" --

24         **MS. GREEN:**  Same objection.

25  \\\

PRASAD - CROSS / BELL

1    BY MS. BELL:

2    **Q.**   (as read):

3            " --medication management platform starting with

4        a focus on providing accessible and affordable ADHD

5        treatment."

6        Right?

7    **A.**   Yes.

8    **Q.**   Okay.

9            **THE COURT:**  That statement is stricken.  The jury is

10   instructed to disregard it.

11           **MS. BELL:**  Your Honor, may we address the Court at

12   sidebar on the issue?  We now have the portion of the

13   transcript we are addressing through this line of questioning.

14           **THE COURT:**  I don't know.  What is it?  You want me to

15   see something?

16           **MS. BELL:**  Yes, Your Honor.

17           **MR. SCHACHTER:**  Just for the record, it's page 4506 of

18   the transcript.

19                    (Pause in proceedings.)

20           **THE COURT:**  You may introduce it.

21           **MS. BELL:**  Thank you, Your Honor.

22           **THE COURT:**  Ms. Scott.  Mr. Schachter is bereft of

23   mechanical devices.

24           **MS. BELL:**  Thank goodness for modern technology.

25           **THE COURT:**  Yes, admitted.

1          (Trial Exhibit 7608 received in evidence.)

2              MS. BELL:  Okay.  If we could display this for the

3     jury, please.

4     BY MS. BELL:

5     Q.   Okay.  So we were discussing this message that Ruthia sent

6     you in 2020; right?

7     A.   Yes.

8     Q.   And she shared with you this intro, which she says,

9     you know, please share it with folks you may -- you think may

10    be a fit; right?

11    A.   Yes.

12    Q.   And she says (as read):

13             "Done is a nationwide telehealth platform

14         providing high-quality psychiatric care to patients

15         of all ages, serving nine statements [sic] in the

16         United States with anticipated expansion in 2020.

17         Our mission is to empower everyone to reach their

18         full potential.  We aim to be the Number 1 mental

19         health medication management platform, starting with

20         a focus on providing accessible and affordable ADHD

21         treatment.  So far we have achieved 2,000-plus

22         patient visits every month, a team of 10 healthcare

23         providers from Kaiser, UCS -- UC -- USC -- SF, UPMC,

24         et cetera.  Medical director Les Tsang, 12-plus years

25         of experience and was previously a director at

1            Kaiser, a strong team of 20 from Facebook, Harvard,

2            Oxford, Berkeley.  We are looking for experienced

3            psychiatrists to serve as collaborating physicians,

4            be on our medical advisory board, and head our

5            clinics in multiple states."

6            Do you see that?

7    A.    Yes.

8    Q.    And did you indeed assist her in trying to find

9    psychiatrists or other mental health specialists to work with

10   the platform?

11   A.    I do not recall.  I don't believe I knew any.

12   Q.    Okay.

13            MS. BELL:  We can take that down.

14   BY MS. BELL:

15   Q.    And you also understood from these communications that the

16   focus on medication management was because stimulants were the

17   first-line treatment for ADHD; right?

18   A.    That would not be my area of expertise.

19   Q.    Okay.  Let's look at 7617 at page 3 -- 6, please.

20            MS. BELL:  Your Honor, we would offer this.  It's

21   another portion of the communication the Government --

22            MS. GREEN:  Same objection.  Not impeaching.

23            THE COURT:  Let me take a look at it.

24            MS. BELL:  Can we scroll down, actually, a little bit,

25   please.

1           Okay.  We can leave it there.

2                THE COURT:  Where do you want me to look?

3                MS. BELL:  So, Your Honor, we -- it's -- starting with

4      the first paragraph here, which says "first" and then we could

5      scroll up.

6                THE COURT:  Okay.

7                          (Pause in proceedings.)

8                THE COURT:  Objection sustained.

9                MS. BELL:  Okay.  May I inquire whether he recalls?

10               THE COURT:  Well, he said -- his answer was -- his

11     answer was, "That's not my field of expertise."

12               MS. BELL:  Okay.

13               THE COURT:  Or I think he said --

14               THE WITNESS:  Not my area of expertise.

15               THE COURT:  Pardon?

16               THE WITNESS:  I said it was not my area of expertise.

17               THE COURT:  Not his area of expertise.

18               MS. BELL:  Okay.

19               THE COURT:  His statement does not impeach that.  And

20     so you have to move on to something else.

21               MS. BELL:  Okay.  Let me -- may I inquire further

22     about their conversations on this topic?

23               THE COURT:  It depends on what you --

24               MS. BELL:  Okay.  Let me --

25               THE COURT:  If you're going to ask, well, did Ms. He

 1    tell you things about the platform or the this or the that, the

 2    answer is no, you can't move on to that for the reasons that we

 3    stated.  It's not his area of expertise, period.  He said that.

 4         MS. BELL:  Okay.  So it's precisely for that --

 5         THE COURT:  You can certainly inquire as to what he

 6    did.

 7         MS. BELL:  Yes.

 8    BY MS. BELL:

 9    Q.    So precisely because it's not your area of expertise, in

10    September 2020, which was before you made the decision to work

11    there, you inquired as to why stimulants; right?  Do you

12    remember having those discussions?

13    A.    Yes.

14    Q.    Okay.

15         MS. BELL:  Your Honor, I would go back to the

16    document, if we could, at this point.

17         THE COURT:  What is it that you want to read?

18         MS. BELL:  I want to specifically -- well, we --

19    should we put it back up so I can point you -- the first

20    paragraph -- this goes back to the medication management focus

21    and why.

22         THE COURT:  Objection sustained.

23         MS. BELL:  Okay.

24    BY MS. BELL:

25    Q.    Did you learn before you decided to go work there that

1  Done actually referred patients who would benefit from therapy

2  treatment to partners who work with therapists and focused just

3  on medication management because stimulants are the first-line

4  treatment?

5       Did you learn that before deciding to go work there?

6            MS. GREEN:  Objection.  Foundation.  He said not his

7  area of expertise already.

8            THE COURT:  Sustained.

9  BY MS. BELL:

10 Q.   Okay.  So I think you testified, just before we move on,

11 that you do recall discussing these topics with Ruthia before

12 you made a decision to work there in November of 2022; right?

13 A.   Yes.

14 Q.   Okay.  And you yourself also tested out the -- the

15 platform, didn't you?

16 A.   All I did was I filled out the -- the sign-up form.

17 That's it.  I never used the platform.

18            MS. BELL:  Your Honor, I would offer 7613 at 3, page 3

19 to page 1.

20            THE COURT:  7613.  Okay.

21            MS. BELL:  We can go -- scroll backwards -- scroll up,

22 please.

23            THE COURT:  Where do you want me to look?

24            MS. BELL:  Could we look at -- it's page 3 to page 1.

25            THE COURT:  Page --

 1          **MS. BELL:**  But, yes, this is the relevant portion

 2    that's on the screen now.

 3                    (Pause in proceedings.)

 4          **MS. GREEN:**  Same objection.  Not impeaching.

 5          **MS. BELL:**  And if we could scroll up.  This relates to

 6    Mr. Prasad's assessment.

 7          **THE WITNESS:**  Am I supposed to see something on my

 8    screen?

 9          **THE COURT:**  I'm trying to figure out what the question

10    was.

11        The question was -- he said he filled out something.

12          **MS. BELL:**  Yes, Your Honor.

13          **THE COURT:**  Okay.  And -- and this is what he filled

14    out, I guess?

15          **MS. BELL:**  This relates to exactly what he did.  It

16    was a long time ago, so...

17          **MS. GREEN:**  Not impeaching.

18          **THE COURT:**  Why is it relevant?

19          **MS. BELL:**  Well, it's relevant because it shows that

20    Mr. Prasad understood how the platform worked, that there was a

21    screening component --

22          **THE COURT:**  Well, I don't know -- I don't know that a

23    person would -- you take a test, I don't know that you would

24    understand how the test works.  You can say what the questions

25    are.

 1              MS. BELL:  Okay.

 2              THE COURT:  And by the way, that's not relevant.  It's

 3    simply not relevant.

 4              MS. BELL:  Let me --

 5              THE COURT:  That he understood or didn't understand

 6    the way the platform worked.  So let's move on to a relevant

 7    question.

 8              MS. BELL:  Okay.  Let me just --

 9              THE COURT:  So I'm sustaining the objection.

10    BY MS. BELL:

11    Q.   Okay.  But just to clarify your answer on this before we

12    move on, when you said you filled out some forms, do you -- do

13    you remember that you took the -- an initial screening test for

14    ADHD because you thought you might have ADHD; right?

15    A.   I did not think I had ADHD.  I just did it out of

16    entertainment.  I filled out the form and I believe it said I

17    did not have ADHD.

18    Q.   Right.

19         And do you recall Ruthia said, "Ha Ha, it's good.  You do

20    not have it."

21         Do you recall that was her reaction?

22              MS. GREEN:  Objection.

23              THE COURT:  It's irrelevant.

24              MS. BELL:  Well, Your Honor, I think it is relevant

25    based on the testimony elicited on direct.

1          THE COURT:  It's not relevant.  The jury is admonished

2     to disregard it.

3          MS. BELL:  Okay.

4     BY MS. BELL:

5     Q.   All right.  So you did not -- you got that answer before

6     you paid any money to sign up; right?  You did not -- it was

7     not likely that you had ADHD; right?

8     A.   Yes.

9          THE COURT:  I don't think there's any evidence that he

10    was going to pay money to sign up.

11         THE WITNESS:  Yeah, I was not planning to.

12         THE COURT:  I mean, we -- we --

13         THE WITNESS:  I was not planning to.  I was just doing

14    the test for entertainment.

15         MS. BELL:  I understand, Your Honor.  I'm going

16    through the information he had before he made a decision to go

17    work there in 2020.  I believe it's relevant.

18         THE COURT:  I don't think it --

19         MS. BELL:  Okay.

20         THE COURT:  Okay.  But let's move on.

21         MS. BELL:  Okay.

22    BY MS. BELL:

23    Q.   You also nominated Ruthia for an award for Done, right,

24    also before you went to work there.

25         Do you recall that?

1    **A.**    I do not recall that.

2    **Q.**    Okay.

3    **A.**    If you can refresh my memory.

4         **MS. BELL:**  Could we go to 7609.  And I'd offer that,

5    Your Honor.

6         **THE COURT:**  No.  I think you have to -- it's for --

7    it's to refresh the recollection of the witness.  He says he

8    doesn't --

9         **MS. BELL:**  Okay.

10        **THE COURT:**  -- recall it.  So now you're showing him a

11   document, which is not in evidence.

12   And please look at the document and see does that refresh

13   your recollection that you nominated her for an award.

14        **MS. BELL:**  And maybe we could scroll to the back, the

15   back page, because I think that has your nominator's name.

16   **BY MS. BELL:**

17   **Q.**    Do you see that?

18   **A.**    Yes.

19   **Q.**    Does this refresh your memory that you nominated her for

20   an award in January of 2020?

21   **A.**    Yes.

22   **Q.**    Okay.  And if -- does it refresh your memory -- if we

23   could go back to the first page -- that you said that (as

24   read):

25             "Ruthia's main contribution is to make high

1    quality mental health care more affordable via

2    telepsychiatry."

3    Do you recall that?

4  A.  Yes.

5  Q.  And that she had teamed up with medical experts from

6  Stanford and the American Psychiatric Association (as read):

7    "To empower traditional ADHD care with

8    technology."

9    Do you recall that?

10 A.  Yes.

11 Q.  (as read):

12    "Significantly increase the adherence rate by

13    four times and reduce the cost by over 50 percent and

14    time needed for ongoing care by over 90 percent."

15    Do you recall writing that?

16 A.  Yes.

17 Q.  And then you wrote (as read):

18    "The platform has helped tens of thousands of

19    patients with over 40 million annual potential

20    revenue.  The team is also working on pushing

21    healthcare reform with a former congressman."

22    Do you recall writing that?

23 A.  Yes.

24 Q.  All right.  So?

25    MS. BELL:  We can take that down.

1    BY MS. BELL:

2    Q.    So do you recall the Government showing you a

3    communication, it was part of the long set of communications

4    between you and Ruthia about moving the team to the Philippines

5    and China.

6          Do you recall that?

7    A.    Yes.

8    Q.    In 2022?

9    A.    Yes.

10   Q.    Okay.  And you knew that Done had always had large numbers

11   of employees overseas; right?

12         MS. GREEN:  Objection.  Foundation.  Calls for

13   speculation.

14         THE COURT:  Did you know?  Were you aware?

15         THE WITNESS:  I was aware.

16         MS. BELL:  Okay.

17         THE COURT:  Pardon?

18         THE WITNESS:  Yes, I was aware.

19   BY MS. BELL:

20   Q.    And you also were aware that Done was losing money in the

21   second quarter of 2022; right?

22   A.    For a brief period, I vaguely recall, yes.

23   Q.    Okay.  And you believed that may have motivated Ruthia to

24   hire more employees overseas; right?

25         MS. GREEN:  Objection.  Calls for speculation.

 1   Foundation.

 2            **THE COURT:**  Sustained.

 3   **BY MS. BELL:**

 4   **Q.**   Well, do you recall telling the Government that when you

 5   met with them in one of your meetings?

 6   **A.**   Yes.

 7   **Q.**   Okay.  And this included, at one point, a lawyer in China

 8   she hired; right?

 9            **MS. GREEN:**  Objection.  Calls for speculation.

10            **THE COURT:**  If he knows.

11            **THE WITNESS:**  Yes.

12   **BY MS. BELL:**

13   **Q.**   Okay.  And, in fact, you are familiar with hiring

14   employees overseas to reduce costs; right?

15   **A.**   Yes.

16   **Q.**   And you actually recommended to Ruthia that she do that in

17   2020, in the early days of the company; right?

18   **A.**   I do not recall that.

19   **Q.**   Okay.

20            **MS. BELL:**  Could we put up 7619 at page 3, please.

21   **BY MS. BELL:**

22   **Q.**   Okay.  If you could take a moment to review this.  I think

23   we need to scroll backwards to page 1.

24        Do you see the top part?

25   **A.**   Yes.

PRASAD - CROSS / BELL

1    Q.    Okay.

2            MS. BELL:  And we can scroll up a little bit further.

3            THE COURTROOM DEPUTY:  Is there a copy for the judge?

4    BY MS. BELL:

5    Q.    Okay.  Do you see that?

6    A.    Yes.

7    Q.    Okay.  Does that refresh your memory that in 2020, you

8    suggested to her that hiring people, for example, overseas in

9    India, which is what you were doing, works very well?

10   A.    Yes.

11   Q.    And do you recall that she said that's a great idea;

12   right?

13   A.    Yes.

14   Q.    And you said this could be a good cost efficient strategy;

15   right?

16   A.    Yes.

17   Q.    Okay.  We can take that down.  Okay.

18        I want to ask you about Dr. Brody.  So the Government

19   asked you yesterday about something that you said that Ruthia

20   had relayed to you about Dr. Brody.

21        Do you recall that?

22   A.    Yes.

23   Q.    Okay.  But you had personal experience with Dr. Brody's

24   treatment of someone close to you; right?

25   A.    Yes.

PRASAD - CROSS / BELL

1  Q.    And, in fact, Ruthia had recommended Dr. Brody to you and

2  this person who was your girlfriend at the time; right?

3  A.    Yes.

4  Q.    And she was having serious mental health struggles at the

5  time; right?

6  A.    Yes.

7          MS. GREEN:  Objection.  Relevance.

8          THE COURT:  Sustained.

9  BY MS. BELL:

10 Q.    You knew from that experience, your personal experience --

11         THE COURT:  I don't know that that's appropriate

12 testimony.

13         MS. BELL:  Well, Your Honor, again, may we be heard on

14 sidebar given the testimony elicited on direct?

15         THE COURT:  No.  The testimony elicited on direct was

16 what Ruthia He allegedly told him about Dr. Brody.  What his

17 own experiences about -- about Dr. Brody aren't relevant.  It's

18 not -- it's not relevant, and I'm not going to permit inquiry.

19     I'll listen to it in offer of proof outside the presence

20 of the jury on this issue.

21     You may go on to another subject.

22         MS. BELL:  Thank you, Your Honor.  I will do so and we

23 can return to this at sidebar.

24 BY MS. BELL:

25 Q.    Okay.  So Uber and Lyft.  So the Government showed you --

1      **MS. BELL:**  We could actually just go to this, 897 at

2  172.

3  BY MS. BELL:

4  Q.    Okay.  So do you recall the Government showing you this

5  communication about Uber and Lyft yesterday?

6  A.    Yes.

7  Q.    Okay.  And you see here where Ruthia says (as read):

8          "Honestly, I don't care about these things at

9          early stage.  Like Uber and Lyft were all illegal but

10         still need to be careful."

11         Do you see that?

12  A.    Yes.

13  Q.    Okay.  And, again, this is before you make the decision to

14  go to work at Done; right?  This is back in 2020, at the early

15  days; right?

16  A.    Yes.

17  Q.    And you see here that there's a discussion about the

18  corporate structure; right?

19  A.    Yes.

20  Q.    Okay.  And then -- and there's no mention here of anything

21  to do with federal criminal drug laws; right?

22         **MS. GREEN:**  Objection.  Argumentative.

23         **THE COURT:**  Sustained.

24  BY MS. BELL:

25  Q.    Okay.  Let's go back to your communication about Uber once

1    you were at the company.

2         **MS. BELL:**  So let's go to 897 at 44.

3    **BY MS. BELL:**

4    **Q.**   Okay.  And I believe you may have seen a portion of this

5    on your direct, but do you see -- so 2020, December, this is

6    during the couple week period you were actually working at the

7    company; right?

8    **A.**   Yes.

9    **Q.**   Okay.  And so you go on to have a conversation about

10   companies like Uber and Airbnb, and Ruthia says (as read):

11        "Companies like Uber and Airbnb were also

12        running with regulatory risk."

13        And here's how you respond, you say (as read):

14        "So I think they invested lot in legal

15        communication and lobbying, et cetera.  It was a big

16        part of their initial years.  To retain the best

17        lawyers, lobbyists, litigators, et cetera, but

18        without that, they would not have succeeded.

19        "So the question is, if with the backing of

20        someone who knows how to manage the regulatory risk,

21        can the company fight back and mitigate the

22        regulation risk, which is what Uber, Airbnb did with

23        deep pockets and big backing in the early years."

24        Do you see that?

25   **A.**   Yes.

 1   **Q.**   Okay.  We can take that down.

 2       Okay.  So you testified that it was your opinion that

 3   Ruthia was not taking the press or the investigation seriously;

 4   right?

 5   **A.**   That's how I -- that was how I felt, yes.

 6   **Q.**   Okay.  And it was your view that she was in denial; right?

 7   **A.**   Yes.

 8   **Q.**   And that she -- she felt that the negative press was

 9   really a personal attack; right?

10   **A.**   Yes.

11           **MS. BELL:**  Okay.  I'd like to offer 7632, Your Honor.

12           **THE COURT:**  I'm sorry.  May I see it?

13           **MS. BELL:**  Yes, Your Honor.

14           **THE CLERK:**  And what do you want me to look at?

15           **MS. BELL:**  This exchange here, Your Honor, which

16   relates to the press and Ms. He's response.

17           **THE COURT:**  Where do I look?  I've got four pages.

18           **MS. BELL:**  It should be up on the screen, I hope.  Is

19   this up on the screen for the Judge?

20           **THE COURT:**  Oh, okay.  Let me look at it.

21           **MS. GREEN:**  We're going to object, Your Honor.

22           **THE COURT:**  Pardon?

23           **MS. GREEN:**  We're objecting to this, Your Honor.

24           **THE COURT:**  You do or you do not?

25           **MS. GREEN:**  We do object.  Not impeaching and hearsay.

```
 1              THE COURT:  Sustained.

 2              MS. BELL:  Well, let me set it --

 3              THE COURT:  I'll discuss it at sidebar.  I'll discuss

 4   during the recess.

 5              MS. BELL:  I could ask a further question to maybe set

 6   the foundation.

 7              THE COURT:  You may certainly --

 8              MS. BELL:  Okay.

 9   BY MS. BELL:

10   Q.   So you understood, though, that Ruthia actually -- she

11   initially thought it was a personal attack and then she -- she

12   changed her view; right?

13              MS. GREEN:  Objection to foundation.  Vague.  And

14   calls for speculation.

15              THE COURT:  Sustained.

16              MS. BELL:  Okay.

17   BY MS. BELL:

18   Q.   And your reaction at the time was that you did not want

19   her to get demotivated by the press; right?

20   A.   That was --

21              THE COURT:  I'm sorry.  What --

22              MS. BELL:  Demotivated by the press.

23              THE COURT:  Demotivated.

24   BY MS. BELL:

25   Q.   Demotivated by the press; right?
```

1    **A.**    That was an early initial reaction, but I did not have

2    much information at the time.

3    **Q.**    Okay.  This is before you were actually working at the

4    company for those few weeks; right?

5    **A.**    Earlier that year, I believe.

6    **Q.**    Right.  And you felt that Ruthia had real determination

7    and put her life and blood and sweat into the company and you

8    felt angry about the press; right.

9    **A.**    That was my initial reaction.

10   **BY MS. BELL:**

11   **Q.**    Okay.  You felt that she was humble and grounded and

12   worked hard; right?

13          **MS. GREEN:**  Objection.

14          **THE COURT:**  I'll allow it.

15          **THE WITNESS:**  I -- I -- at the time, yes.

16   **BY MS. BELL:**

17   **Q.**    Okay.  And that she was determined and most people were

18   not like that; right?

19   **A.**    Yes.

20   **Q.**    And you said to her, "I hope you don't get demotivated and

21   lose that," when the press article came out; right?

22   **A.**    Yes.

23   **Q.**    And you said (as read):

24          "I've never met anyone like you.  You're a

25          unique person.  The worst thing in the world would be

1           if you lose that because of some article."

2           Right?

3    A.    That was my initial response, yes.

4    Q.    Okay.  So let's take that down.

5           Let's go to 897 at 13, which is part of what the --

6    I believe, the Government showed you this message yesterday.

7               MS. BELL:  So I think we can put it up for the jury.

8           Can everyone see it?  No?  897 at 13.  Yes?  Okay.

9    BY MS. BELL:

10   Q.    So you say (as read):

11              "Maybe you're hoping the investigation will just

12          go away.  If they find one shred of negligence, it

13          can screw up your life, not just the company and

14          revenue."

15          Do you see that?

16   A.    Yes.

17   Q.    Okay.  And you also testified yesterday that you were

18   worried about Ruthia going to jail; right?

19   A.    Yes.

20   Q.    And you explained to us that you're not a lawyer and you

21   don't know what legal standard applies in a federal criminal

22   case before someone can be exposed to jail; right?

23              MS. GREEN:  Objection.  Foundation.

24              THE COURT:  Overruled.

25              THE WITNESS:  Yes.

1  BY MS. BELL:

2  Q.   Okay.  So now let's go to 897 at 69.

3          MS. BELL:  And I'd offer that, Your Honor.  It's

4  another portion of this.

5          THE COURTROOM DEPUTY:  The entire exhibit is in.

6          MS. BELL:  Oh, the entire exhibit's in.  Okay.  So 897

7  at 69.

8  BY MS. BELL:

9  Q.   And what you told Ruthia at the time -- this is

10  December 5th, 2022; right?

11  A.   Yes.

12  Q.   And so you're in your period of few weeks actually working

13  at the company now; right?

14  A.   Yes.

15  Q.   You said (as read):

16          "I don't think you have bad intentions, but I

17      think you've gotten yourself into a difficult

18      situation and need to see the reality."

19      Right?

20  A.   Yes.

21  Q.   Okay.  And let's go to 897 at 13.

22      Okay.  And you also tell her later, December 15th (as

23  read):

24          "I know you don't think this is likely, but if

25      the investigators find any shred of negligence and

1    press charges against you and Brody, your best bet is

2    to be in China so they don't extradite you."

3        **MS. BELL:**  And if we could go up a bit.  Oh, I'm

4    sorry.  If we could go down a bit.

5    **BY MS. BELL:**

6    **Q.**  You also said at that -- (as read):

7        "At that point I'd be wondering if it's safer to

8    be in China if they can extradite you from China or

9    not since you're a Chinese citizen."

10   Do you see that?

11   **A.**  Yes.

12   **Q.**  Okay.  And that's what you were telling her on

13   December 15th, 2022; right?

14   **A.**  Yes.

15   **Q.**  Which is actually the day you ultimately end your

16   engagement with the company; right?

17   **A.**  I believe so.

18   **Q.**  Okay.  So I want to go backwards to a communication the

19   Government showed you at page 95, which is from September 2nd,

20   2022.  And do you see there, it's at 6:41 p.m.  This was where

21   she says (as read):

22       "Hmm, I got to wait at the custom inspection.

23   Hope they won't arrest me," with a face.

24   Do you see that?

25   **A.**  Yes.

PRASAD - CROSS / BELL

```
 1   Q.   Okay.  So that was going backwards from December to
 2   September of 2022.  Do you see that?
 3   A.   Yes.
 4   Q.   And you testified in connection with this exhibit that at
 5   this point in time in the public sphere there were articles
 6   about risks and issues that Done might be facing.
 7        Do you remember that?
 8   A.   Yes.
 9   Q.   Okay.  And you know, though, that despite that, Ruthia
10   decided to return to the United States from China on
11   September 2022; right?
12            MS. GREEN:  Objection.  Argument.
13            THE COURT:  Overruled.
14            THE WITNESS:  Yes.
15   BY MS. BELL:
16   Q.   Okay.  And you also know that she had actually been in
17   China for the year with her mom; right?
18   A.   Yes.
19   Q.   Okay.  Because her mom had gotten sick, she had gone and
20   she was coming back; right?
21            MS. GREEN:  Objection.  Strike.
22            THE COURT:  Sustained.
23            MS. BELL:  Okay.
24   BY MS. BELL:
25   Q.   You also know that days after you advised her, moving
```

1  forward -- back to December, that the best bet was for her to

2  be in China so they don't extradite you, she actually went to

3  Asia for a one-week trip for the holidays and came back.  You

4  know that; right?

5  **A.**   I was not communicating with her at the time, but I did

6  learn about that later.

7  **Q.**   Okay.  And you actually saw her in January after she

8  returned to the country; right?

9  **A.**   Very briefly, yes.

10  **Q.**   Okay.  And that was despite your advice in December that

11  she go to Asia and stay there; right?

12          **MS. GREEN:**  Objection.  Misstates the testimony.

13          **THE COURT:**  You may answer -- okay.

14      Well, was it your advice that she go to China and stay

15  there?

16          **THE WITNESS:**  I was not directing her to do that.  I

17  was simply trying to -- I was simply trying to get her to take

18  the situation seriously and alert her that, you know, she --

19  that she is in a -- she is at legal risk.

20  **BY MS. BELL:**

21  **Q.**   And then she came back in January of 2023 and you saw her

22  in the United States; right?

23  **A.**   Yes.

24  **Q.**   Okay.  Okay.

25          So let's go to Government Exhibit --

1          MS. BELL:  Let me just confer.

2                       (Conferring.)

3   BY MS. BELL:

4   Q.   But the Government asked you about your departure from the

5   company; right?

6   A.   Yes.

7   Q.   Okay.  So let's go to 897 at 39 in the middle.  I just

8   want to set up the context here.

9        So this is December 14th, which is the day before you

10  ultimately end your engagement with the company; right?

11  A.   Yes.

12  Q.   Okay.  So in the middle of the page here at 11:33 p.m.,

13  Ruthia says to you (as read):

14           "We need ops leader help ASAP.  It's insane or

15      I'll need to do it myself."

16      Do you see that?

17  A.   Yes.

18  Q.   Okay.  And she was telling you this because you were --

19  had been brought on as a contractor to recruit executive

20  leadership; right?

21  A.   Yes.

22  Q.   Okay.  So now let's fast-forward to 897 at page 8, the

23  top.

24      Okay.  So this is --

25          MS. BELL:  If we could blow this up.

BY MS. BELL:

Q.    This is your departure note, but I think we need to see the date, if we could.

        MS. BELL:  Scroll up a little further.

BY MS. BELL:

Q.    Okay.  So do you see this is December 15th, 11:33 p.m.; right?

A.    Yes.

Q.    So literally 24 hours after the message we just looked at; right?

A.    Yes.

Q.    Okay.  And in the span of a 24-hour period, you sent Ruthia over 30 pages of messages, one after another.

      Do you remember that?

A.    Yes.

Q.    And maybe we could just scroll backwards a bit so -- just to get a flavor here, but -- so --

        MS. BELL:  Sorry.  The other way.  So let's go all the way from -- this is page 39 -- I'm sorry.  This is page 8, and let's scroll backwards to 39, which is where we started.  Go ahead.

BY MS. BELL:

Q.    So this is all -- pretty much all you; right?

A.    Yes.

Q.    And we're going to look -- do you recall Ruthia responds

1  only twice in this whole 24-hour period.

2      Do you remember that?

3  **A.**   Yes, there were minimal responses, yes.

4  **Q.**   Okay.

5          **MS. BELL:**  So let's go -- continue scrolling through

6  all the way back to page 39, which is where we started.  We can

7  move quickly.  I just want to get a flavor here to set the

8  context.  Go ahead.  All the way to page 39.

9  **BY MS. BELL:**

10 **Q.**   Okay.  So this is pretty much all you.  It's like a

11 one-sided conversation; right?

12 **A.**   Yes.

13 **Q.**   Okay.  And we can -- we can go to -- let's look at one of

14 her two responses.  Page 897 at 12, in the middle.

15      Okay.  Do you see where she says (as read):

16          "It was your job at" --

17      December 15th she says (as read):

18          "It was your job to find this candidate and

19      we've been working on it for a month with limited

20      progress.  Our recruiter is stepping in to assist.

21      It's not acceptable to harass someone personally

22      because of challenges with a task."

23      Do you see that?

24 **A.**   Yes.

25 **Q.**   Okay.  And at this point you had already sent a number of

PRASAD - CROSS / BELL

1  messages; right?

2  A.   Yes.

3  Q.   Okay.  Let's go to, then, her second response in that

4  30-page period.  December 15th, when you decided to leave.

5         MS. BELL:  And this is 897 at 9.  Bottom of the page.

6  Okay.  If we could blow that up, the highlighted portion.

7  BY MS. BELL:

8  Q.   So she writes, after all of your messages (as read):

9         "To summarize, you attempted to recruit three or

10      four individuals for the position but were

11      unsuccessful in convincing them to join the team.

12      Now we are considering hiring an executive recruiting

13      firm for the search, which would cost $135,000

14      without a guarantee of success.  You believe this is

15      the only way to show strategic thinking, but I

16      disagree.  I think it would be most effective to

17      continue seeking referrals as the best candidates

18      often come from personal experience.  As you

19      mentioned, we can only hire top candidates, and they

20      are unlikely -- they are unlikely not to find a job

21      through a firm like this but more often through

22      referrals."

23      Do you see that?

24  A.   Yes.

25  Q.   Okay.  And you write, if we can just go to the top of your

PRASAD - CROSS / BELL

1    next message when you end the engagement (as read):

2            "We are not on the same page as far as what

3        strategy makes sense so I think it's best to end the

4        engagement here.  It's been one month anyways and,

5        sure, if you want to tell yourself it's because

6        you're not happy with my performance instead of I'm

7        trying to help you feel -- fix the real issues, you

8        can tell yourself that."

9        Right?

10   A.   Yes.

11   Q.   And then again at the bottom of your message, we can just

12   scroll down.  You say -- if we could go all the way down to "I

13   don't think I can help you because we are not on the same

14   page."

15   A.   Yes.

16   Q.   Right there.  Okay (as read):

17           "I don't think I can help you because we are not

18       on the same page as far as strategy and what should

19       be done and how it should be done."

20       Right?

21   A.   Yes.

22   Q.   And so suffice it to say, you sharply disagreed on this

23   issue; right?

24   A.   Yes.

25   Q.   And you found Ruthia to be stubborn; right?

PRASAD - CROSS / BELL

1    A.    Sure.

2    Q.    And she did not have good interpersonal skills, in your

3    assessment; right?

4              MS. GREEN:  Objection.  Relevance.

5              THE COURT:  I'll allow it.

6              THE WITNESS:  Yes.

7    BY MS. BELL:

8    Q.    And you also thought she was not an effective leader;

9    right?

10   A.    Yes.

11   Q.    Okay.  And so you left after a few weeks?

12   A.    Yes.

13   Q.    You also said yesterday that you felt frustrated and you

14   imagined that Dr. Brindala may have shared that feeling and

15   quit for the same reason.

16        Do you remember that?

17   A.    Yes.

18   Q.    You didn't talk directly to Dr. Brindala; right?

19   A.    No.

20   Q.    Okay.  But, in fact, you knew that Dr. Brindala continued

21   to work as a consultant with Done for months meeting with

22   investors; right?  You knew that?

23             MS. GREEN:  Objection.  Foundation.  Calls for

24   speculation.

25             THE COURT:  Sustained.

1    BY MS. BELL:

2    Q.    Okay.  You knew that Dr. Brindala wanted to sell Done to a

3    hospital system?

4    A.    Ruthia had shared that with me.

5    Q.    Okay.  And you knew he was working to that end; right?

6            MS. GREEN:  Objection.  Foundation.

7            THE COURT:  Well, do you know?  Do you have a

8    foundation?  Did you observe it?  Were you told it?

9            THE WITNESS:  I was -- I had never spoken to

10   Dr. Brindala.  It was all just information Ruthia had shared

11   with me over time.

12           THE COURT:  Okay.  Objection sustained.

13           MS. BELL:  Okay.

14           THE COURT:  And the jury is instructed to disregard

15   it.  Okay.

16           MS. BELL:  Okay.  Your Honor, maybe we can take up the

17   matter?  I just want the Court --

18           THE COURT:  Are you finished with all the other

19   matters?

20           MS. BELL:  I have, like, three more questions.

21           THE COURT:  Well, then, ask the three --

22           MS. BELL:  Okay.

23           the ocu:  -- and then we'll do it.

24   BY MS. BELL:

25   Q.    So I want to talk to you about the time frame you -- after

PRASAD - CROSS / BELL

1   you left Done.

2         You founded a nonprofit called Karma?

3   A.   Yes.

4   Q.   Okay.  What is Karma?

5         MR. BODAPATI:  Objection.  Relevance.

6         THE COURT:  I'll allow it.

7         THE WITNESS:  It was an initiative to encourage

8   startup founders to donate more money.

9   BY MS. BELL:

10  Q.   Okay.  And, in fact, in March of 2023, after you left the

11  company, you asked Ruthia to donate shares of Done to your

12  nonprofit; right?

13        MS. GREEN:  Objection.  Relevance.

14        THE COURT:  I'll allow it.

15        THE WITNESS:  Not specifically to my nonprofit.  This

16  initiative was to encourage startup founders to pledge or

17  donate their shares to nonprofit causes in general.

18  BY MS. BELL:

19  Q.   You actually sent her an invitation where you said (as

20  read):

21        "You undoubtedly built a remarkable company and

22        created significant value."

23  Q.   Do you remember that?

24  A.   Yes.

25  Q.   Okay.  That was March of 2023; right?

PROCEEDINGS

1  A.    Yes.

2  Q.    You also referred your sister to apply for a job at Done

3  after you left; right?

4  A.    My sister was looking for a job.  She had applied to many

5  places.  She asked me if I have any friends who were hiring and

6  she might have applied there, yes.

7  Q.    Okay.  You gave her -- you suggested she try to apply at

8  Done; right?

9  A.    I believe so.

10  Q.    Okay.  And in April 2023, also months after your

11  departure, you referred a woman named Helen Mann to work with

12  Ruthia at Done; right?

13  A.    Yes.  She was looking for a job.

14  Q.    Okay.  And she was a woman you hoped would become your

15  girlfriend, someone somewhat close to you; right?

16  A.    Yes.

17  Q.    Yes.  Okay.

18          MS. BELL:  Your Honor, maybe we could address this

19  issue --

20          THE COURT:  Okay.  Ladies and gentlemen, we can take

21  recess.  We'll be in recess until 11:00.

22      Remember the admonition given to you:  Don't discuss the

23  case, allow anyone to discuss it with you, form or express any

24  opinion.

25                  (The jury leaves the courtroom.)

```
 1        (Proceedings were heard out of the presence of the jury.)

 2              THE COURT:  Okay.  The jury has left.

 3              MS. BELL:  Thank you, Your Honor.

 4              THE COURT:  Okay.  Any order that you want to take

 5   these up?

 6              MS. BELL:  Thank you, Your Honor.

 7        So on the issue of Dr. Brody --

 8              THE COURT:  Yes.

 9              MS. BELL:  -- the testimony that was elicited was a

10   statement by -- well, it was a statement in their exchange

11   where Mr. Prasad is saying to Ruthia, (as read):

12              "Dr. Brody is crazy.  He's saying things like he

13         will prescribe Adderall even if the Government

14         executes him."

15        And we can get the transcript but my recollection is --

16              THE COURT:  I'm sorry.  I'm sorry.  I'm sorry.  I

17   better look at the transcript.

18              MS. BELL:  Okay.  Let's do that.

19              THE COURT:  You're saying that the witness is saying

20   to the defendant Dr. Brody is crazy?

21              MS. BELL:  Yes.  It was actually a written message

22   that the Government had the witness read in, so it's one of

23   these messages that we've been looking at.

24              THE COURT:  Can I see it, please?

25              MR. SCHACHTER:  It's -- just for the record, it's
```

1    4576.

2             MS. BELL:  I'm just refreshing myself.

3        Okay.  And you will see that Your Honor interjects and

4    asks a question, to which the witness gave a very damaging

5    response for our case, which is what I'm trying to now address.

6             THE COURT:  What did I say?

7             MS. BELL:  Okay.  Let's pass it up for -- okay.  We

8    can pass -- wait.

9             MR. FOSTER:  You asked where he got the information

10   and said Ruthia told it to him.

11            THE COURT:  Yeah.  That's right.

12            MS. BELL:  Okay.  Let me pass it up so Your Honor can

13   see it.

14            THE COURT:  No, I believe that.

15            MS. BELL:  Okay.  So let --

16            THE COURT:  That's enough.

17            MS. BELL:  Let me --

18            THE COURT:  In other words, he says -- his statement,

19   "Dr. Brody is crazy," is not his opinion.  It's -- it's what

20   she said to him.  That's right.  Okay.  Got it?

21            MS. BELL:  Got it.

22            THE COURT:  I'm sorry it was damaging to your case.

23   Whether things are damaging to a person's case is actually not

24   the test.  If nothing is introduced damaging to your case, I'll

25   grant a Rule 29 and you'll be out of here.  Okay?  That's not

1    the test.  And you shouldn't even suggest it's the test.

2        And the fact of the matter is, this is not the witness --

3    it is the witness speaking, I understand that, but the source

4    of the witness's statement is not his and it was clarified for

5    the jury.

6        Now, in that context, you tell me why it's important to

7    ask the witness what he thought of Dr. Brody, because that's

8    what you were asking.  You were asking about his relationship

9    with Dr. Brody, his girlfriend's relationship with Dr. Brody,

10    or somebody else's interaction with Dr. Brody.  You tell me why

11    it's important, why it's admissible.

12        **MS. BELL:**  Yes, Your Honor.  Because Ruthia -- where I

13    started was Ruthia recommended Dr. Brody.  What matters is,

14    okay, does she think this is a crazy guy who she just got to be

15    a fig leaf for her company or does she think that he is a

16    serious medical doctor who provides good care?

17        She recommends Dr. Brody to Mr. Prasad, which I did elicit

18    and he -- and he agreed with, but to complete the picture, the

19    point is his reaction was not only was Dr. Brody an excellent

20    doctor for his girlfriend, but -- but he was extremely caring

21    and he called back when --

22        **THE COURT:**  That's your offer?

23        **MS. BELL:**  Yes.

24        **THE COURT:**  Yeah, okay, fine.  I'm sustaining the

25    objection.

 1       What's next?

 2       It's clear it's out.  It's clear it's out.  He's not being

 3  called as a character reference or a quality reference for

 4  Dr. Brody.  What you said at the end shows -- demonstrates it's

 5  clearly inadmissible.  Whether he had a great contact with

 6  Dr. Brody, whether Dr. Brody should get the Nobel Prize for

 7  medicine, that's wonderful but it's not admissible.  It's --

 8  his opinion is not admissible.  There's no foundation.  He's

 9  not called as a character witness, which, by the way, is sort

10  of interesting on the issues of what are the characteristics

11  that are appropriate character -- character evidence, but

12  that's not it.

13       And it's not like it explains something he did vis-a-vis

14  Dr. Brody.  That's not what it is.  It's simply that he is

15  saying she said -- you can -- you can -- you can impeach it,

16  but she said that he's crazy.

17           MR. SCHACHTER:  I guess, Your Honor, if I may, just

18  one thought.  So the witness is saying that he recalls Ruthia

19  saying this.

20           THE COURT:  Yes.

21           MR. SCHACHTER:  So what we could explore, we think, is

22  what was meant by that and what the witness understood was

23  meant by that, or whether it was said at all; right?  We don't

24  need to accept that the witness said -- that the witness is --

25           THE COURT:  Of course that's true.

1          MR. SCHACHTER:  -- correct, that that was, in fact,

2     what was said.

3          THE COURT:  Okay.

4          MR. SCHACHTER:  And so other experiences that the

5     witness has with Ruthia about Dr. Brody may contradict --

6          THE COURT:  It may be -- it -- there is -- you're

7     right, there is a set of circumstances in which, if, for

8     example, she were to say to him, "You know, I think Dr. Brody

9     is a terrible diagnostician.  I think Dr. Brody is a person who

10    has no idea what ADHD is.  I think that Dr. Brody is not

11    somebody who could adequately practice medicine."  Any of those

12    statements, none of which were said, it would be entirely

13    appropriate for the -- to introduce -- arguably, to introduce

14    evidence that notwithstanding that, he then went to Dr. Brody

15    or sent somebody to Dr. Brody, because that would suggest that

16    he either made it up, discounted it, or -- well, basically,

17    discounted it.  In other words, that he -- notwithstanding

18    being told that Dr. Brody is a bad doctor, he went and took a

19    close friend of his and sent that person to him.

20         Now, arguably, there are limits to that because it's

21    entirely collateral to the case.  In that -- in that respect,

22    it's collateral to the case.  But that's not the factual

23    record.  The factual record is that Ruthia He said Dr. Brody is

24    crazy.  You can be crazy in a lot of different ways, you know.

25    Whatever that word means, by the way.

 1          You can be -- you can be a brilliant doctor and not be

 2     grounded in the law.  You can be a brilliant doctor who decides

 3     X, Y, and Z.  That doesn't -- they're not at odds.  And what

 4     you're really doing is not impeaching this witness, what you're

 5     doing is trying to qualify what Ruthia He meant, if it's to be

 6     believed, when she said he's crazy.  And you can't do it

 7     through this witness because this witness is acting on his own

 8     opinion.  He's not acting on Ruthia He's opinion.

 9          So for that reason, for those reasons, and also I think it

10     is an undue consumption of time, I'm not going to allow that

11     line of questioning.

12          What is your next item?

13              MS. BELL:  I think that's our only item.

14              THE COURT:  Great.  Then we're talking a recess.

15              MS. BELL:  And I understand the Court's ruling.  Can I

16     just complete the record?  I'm not asking --

17              THE COURT:  Of course you can.

18              MS. BELL:  Thank you, Your Honor, I appreciate that.

19          The only thing I would add is that the statement does not

20     end with Dr. Brody is crazy.  It goes on, he's saying things

21     like he will prescribe Adderall even if the Government executes

22     him.  And the -- the connection now has been made that that is

23     what -- you know, that's now attributed to our client; right?

24     And the fact that our client recommended him as a good doctor

25     and a caring doctor and -- and that Mr. Prasad found -- the

 1   reason why Mr. Prasad finding it to be the case is relevant is

 2   obviously if she recommended him and Mr. Prasad found that he

 3   was just passing out pills without regard to patient care that

 4   would be relevant.  The converse is also true.  That's the

 5   argument.

 6         THE COURT:  Okay.  You've made your record.  Thank

 7   you.

 8         MS. BELL:  Thank you, Your Honor.

 9         MS. NECHAY:  Your Honor, I did want to make a brief

10   record as well.  Sorry to disappoint you.

11         THE COURT:  Number 1, you're not disappointing me.

12   You go ahead.  Right ahead.

13         MS. NECHAY:  I was going to explore this as well.  But

14   actually, from my vantage point, this really touched on

15   Dr. Brody's judgment.  There was a statement, there was a text

16   message, something to the effect of you don't have any grownups

17   around you, you don't have any -- there was an inference that

18   there was not solid clinical leadership around him; i.e.,

19   Dr. Brody.

20       And so in conjunction with that statement, as well as the

21   statement, I think it's probative of asking this witness what

22   is the basis of his opinion that Dr. Brody does not have good

23   judgment, and certainly exploring his work, his personal

24   knowledge of his work as a physician in the context of being at

25   Done, I think is -- is relevant --

PROCEEDINGS

 1        **THE COURT:**  I'm not sure you can't ask questions on

 2   cross-examination as to what was the witness's -- what did the

 3   witness base his opinion on that there weren't grownups around?

 4   If that's what you want to do -- he says I don't think that

 5   there were -- you need to have grownups -- and I'm paraphrasing

 6   it in a very crude way.  But he had a whole litany of

 7   excuses -- it goes on for pages, litany of reasons why he

 8   thought this company was in jeopardy.  I think that's the right

 9   way to say it.  In jeopardy.

10        If, in fact, you have questions to -- and you want to

11   explore those reasons, you're entitled to do it under cross.

12   He gave his opinion that -- and tells her, "I think the company

13   is in jeopardy," and he has six -- he has pages of reasons.

14   Pick it out.  You can cross him on that.

15        Thank you.

16        **MS. BELL:**  Thank you, Your Honor.

17        **MS. NECHAY:**  Thank you.

18        **THE COURTROOM DEPUTY:**  How long is the break, Judge.

19        **THE COURT:**  What about 5 after 11:00.

20             (Recess taken at 10:48 a.m.)

21             (Proceedings resumed at 11:03 a.m.)

22   (Proceedings were heard out of the presence of the jury.)

23        **THE COURTROOM DEPUTY:**  Come to order.  Court is in

24   session.

25        **MR. SCHACHTER:**  We have a --

PROCEEDINGS

1          THE COURT:  A matter to take up.

2          MR. SCHACHTER:  -- a matter to -- the Court knows

3    everything.

4          THE COURT:  Pardon me?

5          MR. SCHACHTER:  The Court knows everything.

6          THE COURT:  Hardly.

7          MR. SCHACHTER:  It is with respect to the next

8    witness.  Two issues with respect to, I think it's Agent

9    Guzman --

10          MS. GURSKIS:  He's not the next witness.

11          MR. SCHACHTER:  He's not the next witness?

12          MS. GURSKIS:  No.  It's Trevor Granger.

13          MR. SCHACHTER:  Never mind.

14          THE COURT:  Do you have any questions?

15          MS. NECHAY:  Just a few.

16          THE COURT:  Pardon?

17          MS. NECHAY:  Just a few.

18          THE COURT:  Okay.  That's fine.  Bring in the jury.

19    Bring up the witness.

20              (The jury enters the courtroom.)

21     (Proceedings were heard in the presence of the jury.)s #

22          THE COURT:  Please be seated.

23      Let the record reflect all jurors are present, the parties

24    are present.

25          MS. BELL:  Thank you, Your Honor.  I have no further

1   questions for this witness.

2        Thank you, Mr. Prasad.

3            **THE COURT:**  Thank you.

4            **MS. NECHAY:**  Thank you very much.

5                        <u>**CROSS-EXAMINATION**</u>

6   BY MS. NECHAY:

7   **Q.**   Good morning, Mr. Prasad.  My name is Valery Nechay, and

8   I'm Dr. Brody's counsel.

9   **A.**   Good morning.

10  **Q.**   During your time at Done, you had the opportunity to have

11  some conversations with Dr. Brody; correct?

12  **A.**   I had conversations with him on a separate topic to do

13  with my ex-girlfriend's treatment, but not to do with Done or

14  the engagement at Done.

15  **Q.**   And at that time, you had actually formed the opinion that

16  Dr. Brody, in fact, was a good doctor?

17           **MS. GREEN:**  Objection.

18           **THE COURT:**  I'll allow it.

19       Go ahead.

20           **MS. GREEN:**  Can we clarify at that time, then, timing.

21           **THE WITNESS:**  He had treated my ex-girlfriend, and she

22  was satisfied with the treatment and had -- yes.

23  BY MS. NECHAY:

24  **Q.**   You, in fact, had even stated that Dr. Brody had worked

25  magic on her?

PRASAD - CROSS / NECHAY

1   A.    I do not recall the specific message, but she was

2   satisfied with the treatment.

3   Q.    And in any of your conversations, you did not specifically

4   discuss with Dr. Brody his clinical guidelines that he had

5   authored for Done?

6   A.    No.  We had no conversations about Done.

7   Q.    And you never viewed his blog posts; correct?

8   A.    I had seen his blog posts on the website in response to

9   the press.

10  Q.    Okay.  You never reviewed his educational materials

11  specifically, though, titled "What is ADHD," perhaps you recall

12  there was webinars online.

13        You never reviewed those?

14  A.    No.

15  Q.    Okay.  And you've never reviewed his discharge protocols

16  for patients that were not suitable to the Done platform?

17  A.    No.

18  Q.    And you never discussed with him his evidence-based views?

19        MS. GREEN:  Objection at this point.  He said he

20  didn't have any discussions with Dr. Brody.

21        THE COURT:  Sustained.

22  BY MS. NECHAY:

23  Q.    And all of those -- yesterday there was a series of text

24  messages that were provided.  You went through a litany of kind

25  of -- you cautioned Ms. He about the landscape of the company,

1    correct?  Do you recall some questions about that?

2    **A.**    Yes.

3    **Q.**    And you never specifically went and raised your concerns

4    to Dr. Brody; correct?

5    **A.**    No.

6    **Q.**    Okay.

7         **MS. NECHAY:**  Thank you.  No further questions.

8         **THE COURT:**  Okay.  Redirect.

9                    <u>REDIRECT EXAMINATION</u>

10   **BY MS. GREEN:**

11   **Q.**    Good morning, again, Mr. Prasad.

12   **A.**    Good morning.

13   **Q.**    You were asked on cross-examination with Ms. Bell about

14   what you thought when you came to work at Done, you know, in

15   late 2022.

16        Did you come to work at Done because you were

17   Defendant He's friend?

18   **A.**    Yes.

19   **Q.**    And that was even though you had concerns about the

20   company; correct?

21   **A.**    Yes.

22   **Q.**    You were asked on cross about some messages where

23   Defendant He sort of raised issues with you fulfilling your

24   obligations with respect to recruiting.

25        Do you remember that?

PRASAD - REDIRECT / GREEN

1    A.    Yes.

2    Q.    And were you fulfilling your obligations as a recruiter or

3    was the concern that you were discussing with Defendant He

4    serious concerns with respect to the legal landscape at Done

5    and risks they were faceable?

6    A.    They were broader than just recruiting.

7    Q.    And can you explain to the jury?

8    A.    The concerns I was raising were more about the bigger

9    picture, legal and compliance concerns about the company.

10   Q.    And how clear were you making it to Defendant He that she

11   was facing serious risks, including criminal consequences,

12   potentially?

13   A.    I believe very clear.

14   Q.    You were shown Exhibit 7608 which was -- and we can put it

15   back on the screen.  I believe it was admitted.  Which was this

16   blurb that Defendant He asked you to send out in 2022.

17        Do you remember that?

18   A.    Yes.

19   Q.    And Ms. Bell read you some statements in here about Done

20   that Defendant He wrote.  With respect to this -- the accuracy

21   of these statements that Defendant He wrote and asked you to

22   send out, do you know whether any of these statements were

23   accurate?

24   A.    I had not verified myself.

25   Q.    Okay.  You were asked about -- with Ms. Bell about

1  Defendant He's goals with respect to money, and Ms. Bell spoke

2  to you about a conversation you had with Defendant He back in

3  2019, December 2019.

4      Do you remember that?

5  A.  Yes.

6  Q.  And just to clarify, December 2019, that's before Done

7  started; correct?

8  A.  I believe so.

9  Q.  Okay.  And so let's look at the goals as stated during the

10  time of Done.  I'm going to show you a couple of examples.

11      MS. GREEN:  Can we look at Exhibit 897, page 143,

12  please?

13  BY MS. GREEN:

14  Q.  In June of 2021 -- so this is when Done was operating;

15  correct?

16  A.  Yes.

17  Q.  Did Defendant He write (as read):

18      "Right now I just want to be a billionaire"?

19  A.  Yes.

20  Q.  And let's look at page 80 -- actually -- yeah, let's look

21  at page 133 of the same exhibit.

22      MS. BELL:  Your Honor, this is just rehashing direct

23  at this point.

24      THE COURT:  Overruled.

25      MS. GREEN:  Zoom out, please.  I think it was above

PRASAD - REDIRECT / GREEN

 1   that.  This is the page above or behind it, please.

 2        Give me a second.  One moment.  Or we can try

 3   Exhibit 80 -- page 80.  We'll just use a different example.

 4   **BY MS. GREEN:**

 5   **Q.**  In 2022, Defendant He, when she was describing what she

 6   wanted for the company finance person, was it to continue to

 7   optimize her profit margin to be profitable and raise or sell

 8   at least 500 million?

 9   **A.**  Yes.

10   **Q.**  Okay.  We'll move on to a different topic.

11        Ms. Bell showed you on cross an Exhibit 7612, which

12   I believe was admitted.

13        So we can pull that up.

14        And it was this -- I'll wait for it to be on your screen.

15   Oh, do you have --

16        **MS. GREEN:**  I'm so sorry.  We weren't given an

17   electronic version of this exhibit, so if I could just ask --

18                    (Pause in proceedings.)

19        **MS. GREEN:**  Thank you.

20   **BY MS. GREEN:**

21   **Q.**  So you will recall --

22        **MS. GREEN:**  And if we could zoom in on that bottom

23   portion, the Defendant He?

24   **BY MS. GREEN:**

25   **Q.**  Do you recall when you were talking about goals again,

```
 1    I believe, with Defendant He, and about the company, Ms. Bell

 2    just read you this portion of this message from August 9, 2020.

 3        Do you remember that?

 4   A.   Yes.

 5   Q.   Let's look at the context for this message.

 6            MS. GREEN:  I would ask that we show Exhibit 1068,

 7    please.

 8            THE COURT:  Is it in evidence?

 9            MS. GREEN:  No.  I'm going to ask for it to be

10    admitted, please, Your Honor.

11            THE COURT:  1068 admitted.

12        (Trial Exhibit 1068 received in evidence.)

13   BY MS. GREEN:

14   Q.   Okay.  So we're going to see page 1 here was the page that

15    Ms. Bell showed you, which is this message from August 9, 2020,

16    but let's look at what happened right before that.

17        So if we look at page 3, please.

18        Did Defendant He --

19            MS. GREEN:  And we can zoom in on the top half of the

20    page, please.

21   BY MS. GREEN:

22   Q.   -- write to you on August 8th, 2020, just the day before

23    (as read):

24            "I still need to refine my story and probably

25        practice at least for once.  Next week going to talk
```

**PRASAD - REDIRECT / GREEN**

1          to Sequoia."

2          And you said (as read):

3                "Oh nice.  That will be amazing."

4          What is Sequoia?

5   A.   It's a well-known venture capital firm.

6   Q.   Okay.  And then there was some personal messages.

7          On page 2, please.

8          At the top of the page, did Defendant He then write to you

9   on August 9th (as read):

10               "Okay.  How about this?"

11         And then let's look at page 1, please.  Then we can zoom

12  in on the blurb.

13         Then she sends you this blurb that you discussed with

14  Ms. Bell about Done being -- you know, started with a woman

15  wanting to help a close friend, et cetera.

16         So this is the blurb that Defendant He wrote to practice

17  for her meeting with Sequoia; correct?

18  A.   It seems so.

19  Q.   So unlike the messages that you and I talked about

20  yesterday where you were the intended audience of

21  Defendant He's message, here the intended audience of this

22  message, to your understanding, was an investor; is that

23  correct?

24         **MS. BELL:**  Objection.  Argument, Your Honor.  And the

25  document speaks for itself.

```
 1              THE COURT:  Overruled.

 2              THE WITNESS:  Seems so, yeah.

 3   BY MS. GREEN:

 4   Q.   Fair to say you may not want to refer to your business as

 5   a drug business when talking to an investor?

 6              MS. BELL:  Objection, Your Honor.  Same -- same

 7   objection.

 8              THE COURT:  Sustained.

 9              MS. BELL:  And cumulative at this point.

10   BY MS. GREEN:

11   Q.   Okay.  Let's look at page -- Exhibit 7609, which was

12   admit -- I believe that was admitted.  It was an application

13   that Ms. Bell discussed with you.

14        Do you remember that?

15   A.   Yes.

16              THE COURTROOM DEPUTY:  It is marked.

17              MS. GREEN:  Oh, it is marked so let's just show for

18   the witness.

19   BY MS. GREEN:

20   Q.   So this was an application that Ms. Bell discussed with

21   you, and she discussed how you wrote these things about

22   Defendant He for this application.

23        Do you remember that?

24   A.   Yes.

25   Q.   Okay.  So let's look at who actually wrote this.  I'm
```

 1    going to show you -- so first of all I'm going to show you the

 2    date of this, January 9th, 2022; finalized on January 10th,

 3    2022.

 4         Do you see that?

 5    **A.**    Yes.

 6    **Q.**    Okay.  So let's look at Exhibit 1066, please, and we can

 7    start on page 14.

 8              **THE COURTROOM DEPUTY:**  Do you want that admitted?

 9              **MS. GREEN:**  Admitted, please.

10              **MS. BELL:**  Your Honor, the Court didn't admit the

11    exhibit I proffered so we'd object then.

12              **THE COURT:**  Okay.  Let me look at it.

13              **MS. GREEN:**  I'm happy to --

14              **MS. BELL:**  The Government objected to my exhibit.

15              **MS. GREEN:**  I'm happy to just refresh if you want.

16              **THE COURT:**  Well, I'm trying to figure out where we're

17    going from here.

18         The -- the questioning started at this phase with

19    Exhibit 7609, which I think defense counsel read into the

20    record.

21              **MS. GREEN:**  Mm-hmm.

22              **THE COURT:**  At least a large portion of it.  Okay.

23         Now you're referring to some other exhibit?

24              **MS. GREEN:**  Yeah, to show who actually wrote that --

25              **THE COURT:**  Why don't you ask him who wrote it.

1  BY MS. GREEN:

2  Q.   Do you recall --

3          MS. BELL:  Can I get a copy?

4          MS. GREEN:  Oh, sorry, Ms. Bell.

5          MS. BELL:  I'm sorry, Counsel.  I don't believe we

6  have a copy of that.

7          THE COURT:  If he knows.

8          MS. BELL:  Thank you.

9          THE COURT:  I mean, 7609 is admitted.  Okay.

10         (Trial Exhibit 7609 received in evidence.)

11 BY MS. GREEN:

12 Q.   Do you recall who --

13         THE COURT:  And it's admitted and show the portion

14 that was read to the jury.

15         MS. GREEN:  7609.

16         THE COURT:  Okay.

17         MS. GREEN:  We can show that.

18         THE COURT:  Page 1.

19         THE COURTROOM DEPUTY:  Okay.  Let me switch over to

20 defense.

21         MS. GREEN:  I don't have that copy yet.

22         MS. BELL:  We have it.

23         MS. GREEN:  Oh, okay.  You can show it.  Great.

24         THE COURTROOM DEPUTY:  One minute.

25 \\\

1  BY MS. GREEN:

2  Q.    So this was the application that Ms. Bell discussed with

3  you; correct?

4  A.    Yes.

5  Q.    Okay.

6          MS. GREEN:   And so I would then like to admit

7  Exhibit 10- --

8          THE COURT:   It's in now.

9          MS. GREEN:   Okay.  Great.

10 BY MS. GREEN:

11 Q.    So let's look at 1066.

12         THE COURT:   No.  No.  Don't do it that way.  Look at

13 the bottom of page 1 of this exhibit.  Okay?  Do you see it?

14         THE WITNESS:   Mm-hmm.

15         THE COURT:   Okay.  It starts out, "Her main

16 contribution is to make high quality mental health," et cetera,

17 et cetera, et cetera.  It's about five sentences.

18     You see that?

19         THE WITNESS:   Yes.

20         THE COURT:   Okay.  And that was something that you

21 submitted; is that correct?

22         THE WITNESS:   Correct.

23         THE COURT:   Were you the author of that?  That is, did

24 you create that paragraph?

25         THE WITNESS:   I do not believe so.

1              THE COURT:  Okay.  Now, go ahead.

2    BY MS. GREEN:

3    Q.    Who created that paragraph?

4    A.    I believe she had provided me with the content for the

5    nomination.

6    Q.    Okay.

7              MS. GREEN:  One moment, Your Honor.

8    BY MS. GREEN:

9    Q.    And did she also ask you to do the nomination?

10   A.    Yes.

11   Q.    So she asked you to do it and then provided you with the

12   content to write; correct?

13   A.    Yes.

14   Q.    And in 7609, the document that was just on the screen,

15   I'll just show you one portion from what Ms. Bell, I believe,

16   read to you.

17        It said here, for example, that Done had reduced the time

18   needed for ongoing care for over 90 -- for over 90 percent.

19        Did Defendant He ever explain to you how she had safely

20   reduced the time needed for ongoing care by 90 percent?

21   A.    No.

22   Q.    No.

23        You were asked --

24             MS. GREEN:  We can take that down.  Thank you.

25   \\\

 1    BY MS. GREEN:

 2    Q.    You were asked by Ms. Bell about your reaction to the

 3    press in March 2022.  And on cross when you were responding to

 4    her, you -- you know, she asked did you tell her not to get

 5    demotivated and -- do you remember that?  And did you tell her

 6    to --

 7    A.    Yes.

 8    Q.    I don't remember the exact words Ms. Bell used.

 9          And you kept responding, "Well, that was my early

10    reaction.  That was my early response."

11          Can you explain to the jury how that changed?

12    A.    Yes, and initially I -- I thought, you know, these were --

13    maybe kind of Ruthia had kind of shared something along the

14    lines of these allegations in the press are not accurate, and

15    so I thought, you know, kind of I -- I believe -- bought her

16    view of, you know, they're kind of attacks, and so that was my

17    initial view when the first articles came out.

18          But later, my view changed because I hadn't received

19    concrete answers to the actual allegations in terms of how

20    they -- how they were actually addressing the core issues

21    raised.  And so at that point my concern went from these are

22    attacks to, you know, are they being taken seriously.

23    Q.    Taken seriously by Defendant He?

24    A.    Yes.

25          MS. GREEN:  One moment, Your Honor.

 1          That's it.  Thank you, Your Honor.

 2              **THE COURT:**  Okay.  Anything further?

 3              **MS. BELL:**  Nothing, Your Honor.  Thank you.

 4              **THE COURT:**  Anything further?

 5              **MS. NECHAY:**  No, thank you.

 6              **THE COURT:**  Thank you very much.  You're excused.

 7                            (Witness excused.)

 8              **THE COURT:**  Okay.  Call your next witness.  If you

 9      want to stand up, ladies and gentlemen, and stretch, you may.

10              **MS. GURSKIS:**  The Government calls Trevor Granger.

11          (Trevor Granger steps forward to be sworn.)

12              **THE COURTROOM DEPUTY:**  Hello.  Please raise your right

13      hand to be sworn.

14                            **TREVOR GRANGER**,

15      called as a witness for the Government, having been duly sworn,

16      testified as follows:

17              **THE WITNESS:**  Yes.

18              **THE COURTROOM DEPUTY:**  Thank you.  You may be seated.

19              **MS. GURSKIS:**  Good morning, Mr. Granger.

20              **THE COURTROOM DEPUTY:**  Please state your name for the

21      record and spell your full name, please.

22              **THE WITNESS:**  Sure.  My name is Trevor Granger.

23      T-R-E-V-O-R, G-R-A-N-G-E-R.

24                          **DIRECT EXAMINATION**

25      \\\

GRANGER - DIRECT / GURSKIS

1    BY MS. GURSKIS:

2    Q.    Sorry about that.  Good morning, Mr. Granger.

3    A.    Good morning.

4    Q.    What do you do for a living?

5    A.    I'm a product manager, which means I oversee and guide the

6    development of software applications.  And I've been working in

7    the health and wellness technology sector for about 13 years.

8    Q.    What is your educational background?

9    A.    I have an undergraduate degree from Dartmouth College and

10   a master's degree in biology from Columbia University.

11   Q.    Have you ever worked as a company called Done?

12   A.    Yes.

13   Q.    Approximately when did you work at Done?

14   A.    Approximately nine months between 2022 and 2023?

15         Is this too loud?  Should I back up?  Okay.

16   Q.    What was your job title?

17   A.    Head of product.

18   Q.    Before starting at Done, what did you anticipate your

19   principal job duties would be as head of product?

20   A.    I expected to be responsible for the primary strategic

21   direction of the development of the core software application,

22   including responsibility for the experience of anyone using the

23   application, including users and patients, as well as our

24   providers who were using it as an electronic health record

25   system.

**GRANGER - DIRECT / GURSKIS**

1    Q.    Did that end up encapsulating your job duties while you

2    were there or did it change?

3    A.    It -- that -- that was always how I -- I interpreted my

4    responsibilities and I carried that out to the best of my

5    ability when I was there.

6    Q.    Were you excited about the opportunity at Done?

7    A.    I was initially, yes.  I saw it as an opportunity for more

8    responsibility in my career, as well as to apply my experience

9    at previous jobs to this opportunity and -- and I was excited

10   by it.

11   Q.    When you left the company in 2023, did you have the same

12   positive views of the company as when you started?

13   A.    No.  Unfortunately, quite the polar opposite.  I was

14   frustrated, disillusioned, and -- yeah.

15   Q.    When you say frustrated and disillusioned, can you be a

16   little more specific?

17   A.    Sure.  Sure.  Yeah.  Obviously what I had hoped when I had

18   joined the company was that this was a company that was

19   innovative and pioneering and that it was helping to provide

20   greater access of care to people that needed it.

21        Unfortunately, what I came to believe by the time I left

22   was that that was not the primary focus of those running the

23   company, and that it was actually doing as much or more harm

24   than any good.

25   Q.    And you said by the time you left the company.  Why did

1   you leave the company?

2   **A.**    I was fired.

3   **Q.**    Why do you think you were fired?

4   **A.**    I am quite certain that I was fired because I was not

5   going along with the direction that the leaders of the company

6   were or were trying to take the company in.

7        Frankly, for -- yeah.  I suppose you can say

8   insubordination, not carrying out -- basically pulling in a

9   very different direction than what I was being told to pull.

10  Yeah.

11  **Q.**    You said pulling in a different direction from what you

12  were being told to pull, going against the leaders of the

13  company.

14       Who were the leaders of the company when you left in 2023?

15  **A.**    Really, specifically, it was Ms. He.

16  **Q.**    Who did you report to?

17  **A.**    Her.

18  **Q.**    And as -- moving to your time at the company, as head of

19  product, can you tell the jury what departments you worked with

20  at Done?

21  **A.**    Yes.  I worked most closely with my own product team, as

22  well as the engineering team.  But the duties of a product

23  leader necessitate working with every department in some

24  respect, operations, care management, and clinical, especially.

25  **Q.**    Did you say clinical especially?

GRANGER - DIRECT / GURSKIS

1    A.    Especially, yeah.

2    Q.    Were the engineers at that time based both in the United

3    States and in China when you started?

4    A.    When I started, there were engineers both in the U.S. and

5    China.  Both teams grew while I was there, but there was a

6    distinct period in which the China team suddenly started

7    growing much more rapidly than the U.S. team in the last few

8    months that I was there.

9    Q.    And we'll come back to that expansion of the China team in

10    a minute.

11        But talking about the clinical operations for a moment,

12    who was in charge of the clinical operations on paper?

13    A.    On paper that would have been Dr. Brody.

14    Q.    In practice, in your experience, who had the final say

15    with clinical decisions?

16    A.    In practice, every decision at the company flowed to

17    Ruthia.

18    Q.    In practice, was Done operated as two separate companies?

19    A.    In practice, no.

20    Q.    Can you explain that for the jury?

21    A.    Sure.  The -- you know, the formal structure, as far as I

22    understood it, which is typical for a company like this, is

23    actually to be split into two different companies, one that is

24    overseeing clinical operations and in charge of the policies

25    and procedures that -- that govern the -- how the providers are

1    meant to work.

2        And then there is the parent or technology company that's

3    responsible for developing the technology and operational

4    support to work in tandem with the -- with the clinical side,

5    but there is meant to be a clear separation for important

6    ethical and legal reasons.

7        That was in practice not, in fact, the day-to-day case

8    that I observed.

9    Q.   Did you ever hear anyone from the clinical side express

10   concern about that lack of boundary between the two entities?

11   A.   Yeah, absolutely.  Pretty consistently from beginning to

12   end of my time period there, mm-hmm.

13   Q.   Do you recall individuals in particular who raised concern

14   about that?

15   A.   Yeah.  Most outspoken, I would say, you know, were

16   Dr. Denis, Dr. Luca, Sarah Barker.

17   Q.   And when you say most outspoken, were they raising

18   concerns to the level of Defendant He?

19   A.   Yes, of course.

20   Q.   And just to identify who those individuals are for the

21   jury.

22   A.   Yeah.

23   Q.   Who was Sarah Barker, briefly?

24   A.   She was -- we only overlapped for a few weeks, actually as

25   far as I can recall.  When I first joined, she had already been

1   there.  She was a provider on the platform with a medical

2   background and training and had a supervisor role.

3   Q.   And what about Dr. Luca, is that Dr. Catrina Luca?

4   A.   Yes.

5   Q.   Who is she?

6   A.   Similar.  She joined sometime later after -- after I

7   joined the company.  And, you know, I was impressed by her

8   experience and background, and she was also a supervising

9   provider.

10   Q.   Dr. Denis, is that Dr. Sandra Denis?

11   A.   Dr. Sandra Denis, yes.

12   Q.   Also a supervisory provider?

13   A.   Yes.

14   Q.   How clear were the concerns they raised about that lack of

15   separation between the entities?

16   A.   Very.

17   Q.   Can you elaborate?

18   A.   Sure.  Both of them in particular -- when they came in,

19   you know, particularly as outside observers with the experience

20   in the industry that they had as medical providers, they were

21   very clear, I think, in expressing their concerns to myself, to

22   Ruthia, and others about the policies and procedures that we

23   had in place and -- and that -- their ability to determine and

24   guide those policies and procedures.

25   Q.   And in terms of your interaction with the different

GRANGER - DIRECT / GURSKIS

1    departments, did your work with the software also involve an

2    interaction and understanding of the patient population at Done

3    at a high level?

4    **A.**    Yes.  Yeah.  Part of my responsibility was doing my best

5    to try to understand who our, you know, users and patients

6    were, what their motivations were, what kind of service and

7    care they were getting.

8    **Q.**    Do you know how patients were paying for services -- for

9    prescriptions they would get on the platform?

10    **A.**    Primarily it was out-of-pocket cash pay; but in many

11    cases, they would attempt to pay with their insurance through

12    out-of-pocket reimbursement -- out of network.  Excuse me.

13    **Q.**    And that reimbursement, was that something that, from

14    where you sat, Done helped facilitate?

15    **A.**    Yes, explicitly.

16    **Q.**    Can you explain what you mean?

17    **A.**    Sure.  Sure.

18        Yeah, it was -- it was an advertised part of the -- of

19    our -- of Done's service, primarily through the team, the care

20    team, customer support team, to assist patients with -- with

21    their insurance billing.

22        So, you know, for -- you know, they would go with

23    something like this if, you know, they were prescribed through

24    their provider on the platform and would go to pick up their

25    prescription and had to pay for it at the pharmacy, they could

GRANGER - DIRECT / GURSKIS

1   use -- they could -- the care team would actually intervene in

2   many case on behalf of the patient to try to help them use

3   their insurance information to bill out of network

4   reimbursement.

5   Q.   And was information about that reimbursement facilitation

6   available on the Done website?

7   A.   Yes, I believe it was.

8   Q.   Did that include through FAQs on the Done website?

9   A.   Yes.

10          MS. GURSKIS:  Your Honor, at this time, we would move

11   to admit Exhibit 3096.

12          THE COURT:  Admitted.

13      (Trial Exhibit 3096 received in evidence.)

14   BY MS. GURSKIS:

15   Q.   How much did you interact with the clinical team in your

16   role as a product manager?

17   A.   Very, very closely.  Interfacing daily, if not weekly --

18   weekly if not daily.

19   Q.   Were providers generally pleased with the Done policies or

20   were they raising concerns regarding clinical safety and

21   legality of the Done policies?

22   A.   There was a strong and consistent pattern of concerns

23   being raised, particularly, in my experience, through the

24   supervisors who I interfaced with most, but also directly from

25   our rendering providers as well.

1     And I also think that, frankly, it was reflected in the

2  fact that there were such high turnover among our rendering

3  providers as well.

4     You know, it's sometimes hard to criticize your employer

5  without fear of, you know, losing your job, and so I think many

6  of them simply left.

7  **Q.**   And when you say many of them left, these were people who

8  had been expressing concerns about the platform prior to

9  leaving?

10 **A.**   Yes.  To me, those are related phenomenon.

11 **Q.**   Okay.  Let's talk about some of those concerns that you

12 heard providers raising?

13 **A.**   Sure.

14 **Q.**   Was one of them related to the length of time that

15 providers could spend with patients through the platform?

16 **A.**   Yes, definitely.

17 **Q.**   And do you recall if those concerns about appointment

18 length made it to the level of Defendant He?

19 **A.**   Yes, of course, it was discussed with her on many

20 occasions.

21 **Q.**   What do you recall about that?

22 **A.**   Different conversations and meetings, written memos

23 from -- from clinical supervisors in particular, you know,

24 expressing a concern around the duration, pressure that was

25 being put on the -- on the providers to keep the -- to keep the

GRANGER - DIRECT / GURSKIS

1  sessions short, you know, within a -- within a confined window

2  that many of them didn't feel they were entirely comfortable

3  with, particularly given the nature of, you know, the

4  psychiatric evaluations that we were offering.

5       Many of them, particularly when you are tasked with

6  prescribing controlled substances, you know, need to be a

7  certain length.  And, yeah, they -- they, I think, consistently

8  expressed concern about that.

9  Q.   Do you also recall providers raising concern about the

10  size of the panels, the patient panels?

11  A.   Absolutely, yeah.

12  Q.   Do you recall those concerns about the panel size being

13  raised in front of Defendant He?

14  A.   Yes.  On several occasions.  She was aware and, you know,

15  commented on them in response to us.  I can recall, you know,

16  her saying things to the effect that, you know, we were -- it

17  was very important that we -- you know, the service that we

18  were providing, that we were putting the patients first, that

19  we were, you know -- it was important that we, you know,

20  didn't -- you know, wouldn't stop somebody's care just because,

21  you know, the provider was, you know, overwhelmed with their

22  loads and things like those loads would be, you know,

23  temporary, and we were working to -- but they -- to overcome

24  them, but they weren't really temporary.

25  Q.   Let's talk about those patient loads for a minute.  So, I

 1   guess, first you say that the loads weren't really temporary.

 2       Can you elaborate for the jury what you mean by that?

 3   A.   Sure.  So when I first joined, obviously I wasn't aware of

 4   the scope of those panel sizes.  Those weren't things that were

 5   shared with me explicitly.  In my conversations with clinical

 6   supervisors, there was some vague awareness of concern around

 7   that?

 8       But a few months into my work there, largely in response

 9   to concerns I was hearing from our clinical supervisors that --

10   that -- these -- you know, that we were not following the

11   appropriate practice and, for example, scheduling transfer

12   appointments for patients when they were meant to be

13   transferred, that it was leading to these large panel sizes.

14       And when I became aware of -- you know, I think I first --

15   well, I think it was maybe a few months in that it was kind of

16   brought to my attention that there were certain providers

17   with -- with, in some cases, thousands of -- of patients on

18   their panel -- sorry.  I lost the thread of the original

19   questions.

20   Q.   No.  No.  Let's break that down a little bit.

21   A.   Yeah, yeah.

22   Q.   So it sounds like you were talking about the transfer

23   policy in conjunction with the panel size, I think that was

24   what you were discussing --

25   A.   Yeah.  Those related phenomenon in my mind that -- yeah.

GRANGER - DIRECT / GURSKIS

1   Q.   So in terms of your -- the -- the patient transfer policy,

2   I believe you were testifying before that your role at Done

3   involved listening to provider concerns and considerations and

4   working on software improvements or software developments to

5   try to address those concerns.

6   A.   Yeah.

7   Q.   So in the course of that, were you working on a project

8   relating to an automatic feature for transfer appointments?

9   A.   Yes.  So just -- I mean, a little bit of explanation

10  around the transfer issue.  Right?

11       When -- this was a common scenario.  When a provider left

12  the platform, for example, as we just talked about, there was

13  high churn and turnover rate among the providers, so this was a

14  common problem.  For example, if a provider suddenly left and

15  they had, you know, a hundred patients on their panel, the

16  question of what to do with those patients who are in our

17  platform, Done's platform, you know, monthly paying

18  subscribers, that means, you know, potentially lost business

19  and lost revenue if you're suddenly going to lose all of those

20  patients?

21       So what do you do?  You know, medical guidelines and

22  practices, as far as I understand them from -- from my work

23  with our supervisors, is that the appropriate thing to do is to

24  transfer them to -- you know, offer a transfer to another

25  provider, which means scheduling an appointment with that new

1  provider so that they can establish a new connection,

2  transferring any medical records.  And if that's not possible,

3  referring out to another practice or provider network.

4      The latter was obviously deemed undesirable and

5  unacceptable because you're losing that patient's business.

6      What happened was many of those patients in Done's case

7  specifically were receiving prescriptions for ADHD medication

8  and when the patient would be transferred to another provider's

9  panel, what was happening, the common practice was to just have

10  that provider essentially rubber-stamping their prescription

11  refills, which -- which was the main source of concern for --

12  for the -- you know, of our providers.

13      So one thing I was work on was an attempt to try to

14  address that partially, so we envisioned the software working

15  to help aid in that transfer process by, in a more automated

16  way, looking for providers that had openings on their panels,

17  scheduling appointments for them automatically, and helping to

18  reduce the number that were just being dumped onto other

19  providers' panels.

20      That was not going to solve the problem that we already

21  had of, you know, some -- you know, existing patients that were

22  thousands deep on a -- any given provider's panel, but at least

23  would help kind of going forward in righting the ship because

24  the process was -- you know, it was -- imagine it's

25  logistically difficult to suddenly schedule a hundred transfer

1    appointments manually, you know, across the entire network and

2    that simply just wasn't being done.

3        So that was one thing I was working on.  Sorry, long

4    answer.

5    **Q.**    No.  So let's -- I want to follow up on a couple of things

6    that you said there.

7        So, from your perspective in working at other

8    healthcare -- in other healthcare spaces or platforms, when a

9    provider leaves, they go to another provider for a warm

10   handoff?

11   **A.**    Right.

12   **Q.**    Or if there's not a doctor there to -- or a nurse to have

13   that appointment, you say, "Hey, go to this other platform or

14   go to this other clinic down the street; we don't have the

15   capacity"?

16   **A.**    Right.  You have to -- the guidelines state that you have

17   to have make some -- as far as I understand them, a good faith

18   effort to try to, you know, refer out.

19   **Q.**    And I think you said, and maybe you used the passive

20   voice, saying it wasn't preferred or it wasn't desired, this

21   second option of referring out because of the impact it would

22   have on the bottom line.

23       Who --

24   **A.**    Yeah, that was just not a -- what was being done.

25   **Q.**    And who was driving that aspect of not referring people

GRANGER - DIRECT / GURSKIS

1  out for clinical care?

2  **A.**    That decision, you know, would have been directed by

3  Ruthia.

4  **Q.**    And then you were speaking about the -- the large groups

5  of people or panels that you saw assigned to providers.

6  **A.**    Yep.

7  **Q.**    And I think you used the word that they were "dumped on

8  providers"?

9  **A.**    Wasn't the official term but that's essentially -- yeah, I

10  mean, the providers, the receiving providers were aware.  In

11  fact, you know, the procedure at the time was to kind of

12  essentially ask for volunteers, say, "Hey, who wants to take on

13  a panel load of a hundred patients," and the care team would,

14  you know, manually divvy them up.

15  **Q.**    And were there some providers who were comfortable taking

16  on a large bulk transfer and other providers who voiced

17  concerns about having a large volume of patients suddenly

18  appear on their roster on panel?

19  **A.**    Yes, that's correct.  Some just outright, you know,

20  refused and -- but there was a pretty large handful that was

21  apparently comfortable doing that.

22  **Q.**    And when you say apparently comfortable doing that, are

23  you referring -- and you, I guess I'll say, used the term

24  "rubber-stamping" refill, are you referring to prescribers

25  issuing prescriptions for those patients they hadn't seen?

GRANGER - DIRECT / GURSKIS

1    **A.**    Yeah.  The term we used was bridge refill, which I think

2    was a euphemism because it implied bridging, you know, a care

3    gap and implying that it was a temporary situation.  But the

4    reality was that as far as I understood and saw, many of those

5    panels were -- were very oversized for the entire duration of

6    my time there at least.

7    **Q.**    And do you recall providers raising concerns to

8    Defendant He about the impact these bulk transfers had on their

9    pressures to prescribe stimulants without seeing patients?

10   **A.**    Yes.

11   **Q.**    What do you recall about that?

12   **A.**    I recall verbal and written communications being expressed

13   to Ms. He and Dr. Brody about those panel loads on more than

14   one occasion.

15   **Q.**    Did that include the more senior folks like Dr. Luca and

16   Dr. Denis, as well as the on-the-ground clinicians?

17   **A.**    Yes, both.  Primarily from the supervising physicians.

18   Again, I interfaced with them more.  They -- they had the most

19   experience and felt, I think, the most empowered to speak out

20   about these things and they were very verbal and direct, but

21   also our rendering providers who were, frankly, putting their

22   jobs at risk were also speaking out about it as well.

23   **Q.**    You said rendering providers putting their jobs at risk.

24   Was the feeling that they were putting their jobs at risk by

25   engaging in these practices, was that something that was raised

GRANGER - DIRECT / GURSKIS

1    to the defendants?

2    **A.**    Yes.

3    **Q.**    When you've worked at other healthcare startups, did you

4    ever see that quantity of patients assigned to a single

5    provider?

6    **A.**    Certainly not.  Would have not been allowed.

7    **Q.**    And in terms of the providers who, I believe you stated

8    that some providers were willing to accept larger transfers of

9    patients and other providers weren't.

10        So was it common that the transfers would be assigned to

11    particular providers, in other words?

12   **A.**    Yes.  Yes.  There -- it was -- it was evident that -- that

13   it was very asymmetric.  I would say most providers weren't

14   doing this, but there was a pretty big number that were, and a

15   few in particular that had really large numbers.

16   **Q.**    Any names stick out to you with those really large

17   numbers?

18   **A.**    I -- I came across a number of names.  I didn't know any

19   of them personally except for Dr. Brody, whose name, obviously,

20   who was at the top of that list.

21   **Q.**    And when you say really large numbers, can you give the

22   jury a sense of what the numbers were that you were seeing?

23   **A.**    Many thousands.

24   **Q.**    Many thousands?

25   **A.**    Yes.

1          MS. GURSKIS:  Ms. Braga, could you please pull -- and,

2    Your Honor, we would move to admit Exhibit 787.

3          THE COURT:  Admitted.

4      (Trial Exhibit 787 received in evidence.)

5    BY MS. GURSKIS:

6    Q.   Is this a clinical leadership Slack thread dated

7    December 21, 2022, Mr. Granger?

8    A.   Yes.

9    Q.   Do you see that you're on this thread, along with

10   Defendant He and Defendant Brody?

11   A.   Yes.

12         MS. GURSKIS:  Ms. Braga, if you could turn to page 2.

13   And if you could zoom in on Defendant Brody's message at the

14   bottom.

15   BY MS. GURSKIS:

16   Q.   So Defendant Brody writes -- and it looks like, just for

17   context for the jury, he's responding to a message at the very

18   end of the paragraph, "Thread Broadcast" (as read):

19          "Just a thought, are we shooting ourselves in

20      the foot allowing providers to take on as large a

21      panel and Erin Kim has?  EHR says she has 5,692

22      patients.  In the current climate, it is to be

23      expected there are going to be unavoidable delays in

24      response times.  In my opinion, there has to be a

25      balance of clinical quality, revenue, and an

1    understanding where the tipping point is."

2        And then Defendant Brody responds to that at the top (as

3    read):

4            "As Dr. Stahl has pointed out, we need to be

5        conscious of the 'visuals,' as well as the statistics

6        showing whether someone is having problems in their

7        quality of care.  Speaking as someone who has been

8        doing frontline patient care for a long time, 5,692

9        patients sounds like way too much.

10           "If someone from the outside reviews that

11       number, I believe it would give us problems even if

12       the provider has a perfect record, which, by the way,

13       Erin Kim does not, as I recall seeing several

14       previous issues with her."

15       And then at the bottom it looks like you're giving a

16   thumbs-up or a like to the message?

17   A.   Yeah.

18   Q.   Why did you thumbs-up or like that message?

19   A.   I'm intending to emphasize the importance of this issue

20   that was first raised by Mr. Jones there and Dr. Brody is

21   responding to, just emphasizing the importance of addressing

22   this problem.

23   Q.   Because it was concerning to you?

24   A.   Correct.

25           MS. GURSKIS:  You can take that down.  Thank you,

 1    Ms. Braga.

 2    **BY MS. GURSKIS:**

 3    **Q.**   Did you ever hear providers raise with Defendant He legal

 4    concerns about Done's practice model?

 5    **A.**   I'm sorry.  Can you repeat that?

 6    **Q.**   Sure.

 7    **A.**   Sorry.

 8    **Q.**   In your interactions with the clinicians --

 9    **A.**   Yeah.

10    **Q.**   -- did you hear them raise legal concerns about Done's

11    practice model to Defendant He?

12    **A.**   Yeah, yes, absolutely.  They were concerned about a number

13    of issues during -- including some that we just discussed,

14    panel sizes, transfer appointments, initial appointment

15    durations, proper document -- provider documentation, follow-up

16    frequency, to name a few.

17    **Q.**   How clear were their concerns about the legality and

18    ethical implications of the Done practice model with -- in

19    those interactions with Defendant He?

20    **A.**   As clear and forceful, I think, as you can make.

21    **Q.**   How would Defendant He respond when they were making these

22    clear and forceful remarks and concerns about the legality of

23    Done's model?

24    **A.**   Look, I -- she, I think, on some level realized that,

25    you know, she needed these people to run the company.  But I

**GRANGER - DIRECT / GURSKIS**

1  think -- her pattern was to, you know, listen and kind of,

2  you know, act concerned and act like she was going to take

3  action on these things, and then -- and then not do it and then

4  not follow through and find ways to kind of push back and push

5  around it that frustrated people.

6  **Q.**   And did those frustrations lead to some of the turnover

7  that you were describing earlier?

8  **A.**   Yeah, absolutely.  You know, I pretty -- pretty clear to

9  me that, you know, Sarah Barker was very frustrated with that

10  exact dynamic at the time that I was coming into the company.

11  I met with her fairly -- fairly early on and she, you know,

12  expressed a lot of her concerns and frustrations.

13       I, I think, naively when I was first hired tried, I think,

14  to actually console her and say, you know, look, with my

15  experience, I'm going to be able to kind of talk sense into

16  this and turn things around and kind of shift the direction of

17  how we were -- seriously we were taking these issues.  And, you

18  know, she ultimately left not that long after and I was

19  unfortunately proven quite wrong about my hopes there.

20  **Q.**   In those conversations with Ms. Barker, did you get the

21  sense she was renting to you as a colleague or that these were

22  concerns that she had been repeatedly raising to --

23  **A.**   No, it was very professional.  It was -- you know, I think

24  she was raising legitimate, specific concerns.  It wasn't a

25  personality thing.

1  Q.   And was she raising those to the defendants, if you're

2  aware?

3  A.   Yes.

4  Q.   And on the subject of turnover, were you aware of both

5  people being terminated and leaving the company because of

6  concerns and frustrations with the business model at Done?

7  A.   Yes.  Not just on the provider side, you know, in

8  Ms. Barker's case, but on the corporate side, there was,

9  you know, a disturbing pattern of firings and leavings.  And I

10  would include myself in that.

11       MS. GURSKIS:  Your Honor, at this time, we will move

12  to admit Exhibit 820.

13       THE COURT:  Admitted.

14       (Trial Exhibit 820 received in evidence.)

15       MS. GURSKIS:  Ms. Braga, if you could pull that up.

16  BY MS. GURSKIS:

17  Q.   Is this a Slack message with you, Lisandro Martino, Jiatao

18  Cheng, and Mike Xu dated April 3rd, 2023?

19  A.   Yes.

20  Q.   And just very briefly, can you just identify for the jury

21  what roles those other individuals had at Done?

22  A.   Sure.  Lisandro and Jiatao were other product managers on

23  my team.  And Mike Xu was the engineering lead for the U.S.

24  team.

25       MS. GURSKIS:  Thank you, Ms. Braga.  If you could turn

1   to the next page of Exhibit 820 and zoom in at the top.

2   BY MS. GURSKIS:

3   Q.   Mr. Martino, is sending you an astonished face emoji with

4   a photograph of, it looks like, Cory Jones in marketing and

5   growth.  It says "deactivated account."

6        Do you see that?

7   A.   Yes.

8           MS. GURSKIS:  And then if you could scroll to the

9   bottom of that message, Ms. Braga.

10  BY MS. GURSKIS:

11  Q.   And you say, (as read):

12           "Yeah, he was let go.  I found out on Friday.

13       Sean just confirmed I can share.  I don't have a lot

14       of detail.  Basically it came down to some kind of

15       disagreement with Ruthia."

16       Is this an example of that pattern of people voicing

17  disagreements with Ruthia and then leaving the company?

18  A.   Yes.

19  Q.   Isn't turnover common at start-ups?

20  A.   To a certain degree.  Start-ups can be hard places to

21  work, a lot of long hours and, you know, sometimes frustrating

22  conditions, but I -- you know, there's -- there's a spectrum of

23  what you would consider a start-up.  You know, even though this

24  was a young company, it was doing eight figures in annual

25  recurring revenue and growing.  That's a -- you know, that's

1    a -- not an opportunity that a lot of people are going to

2    readily walk away from.

3    Q.    And by this point, the -- we were just looking at messages

4    from April 2023, you'd been at the company maybe four or five

5    months?

6    A.    Something like that, yeah.

7    Q.    Okay.  And in terms of the opportunity that you saw that

8    people wouldn't readily walk away from --

9    A.    Yeah.

10    Q.    -- I guess can you elaborate on that point for the jury?

11    A.    Sure.  You know, if you're a member of a smallish team at

12    a company that's making lots of money, then, you know, that's

13    a -- that's an opportunity for your career.  But also, I think,

14    many of us, myself included, saw the inherent potential to do

15    good with a platform like this, to actually, you know, fulfill

16    that promise of providing better access to care for underserved

17    people.  And I think that many of us felt like that was

18    something that was worth sticking it out for.

19        I saw a path to legitimacy for the company.  I saw a path

20    to doing things the right way and still being very profitable

21    and still growing, and so I think I was motivated to continue

22    that effort.

23    Q.    You said you saw a path to legitimacy, but was another

24    path taken?

25    A.    Another path was definitely taken.

GRANGER - DIRECT / GURSKIS

1    Q.    And you mentioned the smaller structure at Done?

2    A.    Sure.

3    Q.    By that point -- by this point at the company, did you

4    have a sense of Defendant He's leadership style in leading the

5    company?

6    A.    Yeah.  Ms. He was, you know, as a founder of a company

7    very, very hands-on, detail oriented, you could say

8    micromanagement.  She had -- you know, it was clear the buck

9    stopped with her on every decision.  She helped -- she was the

10   one who set the quarterly, monthly goals for every department

11   and would frequently join cross functional meetings and give

12   direction.

13   Q.    Did that include directives on the clinical side?

14   A.    Yes.

15   Q.    And when people raised concerns and voiced recommendations

16   about changing policies and practices to improve Done's

17   business model, would Defendant He generally accept those

18   recommendations?

19   A.    Ms. He was laser focused on growth and on maintaining

20   revenue and maintaining, you know, our patient load to -- to

21   the, I think, imbalanced detriment to other important

22   priorities, including patient safety, compliance, and ethical,

23   medical guidelines.

24        THE COURT:  So let's take our recess here.

25        Ladies and gentlemen of the jury.  We'll be in recess

1    until quarter of 1.

2        Remember the admonition given to you:  Don't discuss the

3    case, allow anyone to discuss it with you, form or express any

4    opinion.

5                    (The jury leaves the courtroom.)

6        (Proceedings were heard out of the presence of the jury.)

7            **THE COURT:**  Okay.  Jury has retired.  About how much

8    longer do you have?

9            **MS. GURSKIS:**  Half an hour, 45 minutes.

10           **MR. SCHACHTER:**  Your Honor, with respect to the next

11   witness, Agent Guzman, we have two issues that we want to

12   raise.  I don't know if it's necessary to raise it now or

13   maybe -- or we should tee it up and then the Court can decide

14   whether the court wishes to hear more now or at the afternoon

15   recess.

16           **THE COURT:**  What are the issues?

17           **MR. SCHACHTER:**  Only two issues.  The first is there

18   is an undercover recording that the agent wishes to introduce

19   between a patient of Done's named Jobman and the undercover.

20   I believe it has -- the video will show or relate to Jobman

21   discussing the sale of Adderall.

22       He is not selling Done Adderall.  He had just received --

23   the CURES report shows he had just received Adderall the day or

24   two before from some other source.  It's not Done.

25       However, they -- also, during the course of discussion, he

1    is going to tell the agent that, "Well, Done's an easy place to

2    get Adderall."  This is an out-of-court hearsay statement, and

3    we believe both the sale of Adderall from some other source

4    is -- is prejudicial and irrelevant and his statement is an

5    out-of-court statement that we can't examine him on and

6    violates our confrontation clause rights.  That's one issue.

7    There's a second, but we can take --

8          MR. BODAPATI:  First, Your Honor, on the confrontation

9    cause issue, because this is an undercover recording --

10          THE COURT:  What?

11          MR. BODAPATI:  Because this was a recording performed

12    by a confidential source, the speaker did not know that he was

13    speaking to anyone affiliated with law enforcement, therefore,

14    it does not implicate the confrontation clause.  There's a lot

15    of settled law on that.

16          As to the hearsay issue, Your Honor, this is the audio of

17    the controlled buy, the transaction in which this Done member

18    actually sold his Adderall to the confidential source, acting

19    at the direction of law enforcement.  And so when we're

20    providing this audio, it's to provide context for the

21    transaction.

22          We actually don't believe that all of the statements made

23    by the speaker about Done are true.  In fact, we would concede

24    that at least one is false.  But it provides the context for

25    why this individual in Dallas who is conducting this operation

 1   thought it was relevant to the investigation and provided it to

 2   the investigative team.

 3        THE COURT:  I may need some further discussion.

 4   Okay.  What's the second point?

 5        MR. SCHACHTER:  The second issue is they intend to

 6   offer a bunch of documents through the agent, which we have no

 7   objection to.  One set of them are what, I guess, purport to be

 8   financial records of Done.  Our issue is not authenticity,

 9   I believe that we all have a shared agreement that nobody is

10   challenging authenticity with respect to materials received

11   from Done.  They're authentic.  Nobody thinks that we typed

12   them up in our office or that they typed them up in their

13   office.

14   The issue is just one of hearsay.  That they're -- they --

15   there is no business record certification, there is no witness

16   that will attest to their business record, and so the agent

17   can't say that he knows what they are or what they represent or

18   the truth of any information in there, and so it is on that

19   basis that we object as hearsay.

20        MR. BODAPATI:  Two thoughts on that, Your Honor.  And

21   these exhibits are available on the thumb drive.  I can give

22   the numbers to you if you would like to review them.

23        THE COURT:  What?

24        MR. BODAPATI:  I apologize.  Am I bit louder now?

25        THE COURT:  You are arguing authenticity.

PROCEEDINGS

1          MR. SCHACHTER:  No.  They are -- they are records that

2     came from the company.  What they are, what they represent, and

3     the truth of any information in there, that's our objection.

4     They are hearsay.

5          THE COURT:  There's a business records exception,

6     isn't there?

7          MR. SCHACHTER:  Sure.  But there is no business record

8     foundation, there is no witness or certification which attests

9     to the fact that they are records that are kept and maintained

10    in the ordinary course of business?

11         THE COURT:  I mean, there has to be.  I mean, I have

12    to assume that he's right.  That defense counsel's right.

13    Okay.

14         MR. BODAPATI:  Two thoughts on that, Your Honor.

15         THE COURT:  What?

16         MR. BODAPATI:  Two thoughts on that, Your Honor.

17    These documents were produced by defendant's own company and

18    they regard the company's business.  They're capitalization

19    tables, general ledgers, income sheets, and balance statements,

20    so we also believe that they can come in as statements --

21         THE COURT:  So they're self-authenticating?

22         MR. BODAPATI:  Yes.

23         THE COURT:  Okay.  I have to look at it.  Has anybody

24    done a brief on it?  I guess not.

25         MR. SCHACHTER:  No, Your Honor.

1          THE COURT:  You have another thought?  I mean, I'll go

2   look during the lunch hour about it.

3          MR. SCHACHTER:  I don't believe that they're

4   self-authenticating.  They would purport to be business

5   records, and if they -- government had a certification --

6          THE COURT:  I better look at the business records.

7          MR. FOSTER:  Your Honor, I have one other issue.

8          THE COURT:  What?

9      I'm surprised I don't have a brief from the Government on

10  this issue.

11         MR. FOSTER:  I don't think --

12         THE COURT:  I've got a brief from the Government on

13  3,000 issues.  I don't know why I don't have one that this

14  actually -- ought to be simple to do a brief.

15         MR. FOSTER:  Thank you.  An unrelated issue, Your

16  Honor.

17      As Your Honor commented, goose and gander, the parties'

18  reciprocal agreement was for the defense to disclose their

19  witness for Monday last night to the Government.  The only

20  witness they disclosed to the Government is Riley Levy who, you

21  may recall, already was cross-examined for over eight hours by

22  the Defense.  So we'd be asking that they furnish another

23  witness.

24         THE COURT:  We'll have a discussion about witnesses

25  who have been -- testified and they're being recalled.

 1           MR. SCHACHTER:  And it would be very helpful, Your

 2   Honor, if at the end of the day, we could talk about the -- we

 3   would like to talk about the Defense case.

 4           THE COURT:  Yeah.

 5           MR. FOSTER:  Thank you.

 6                    (Recess taken at 12:11 p.m.)

 7               (Proceedings resumed at 12:50 p.m.)

 8      (Proceedings were heard out of the presence of the jury.)

 9           THE COURTROOM DEPUTY:  Come to order.  Court is now in

10   session.

11           THE COURT:  Okay.  Bring in the jury.

12      Please be seated.  Let the record reflect the parties are

13   present, all jurors are present.

14      You may proceed.

15           MS. GURSKIS:  Thank you, Your Honor.

16   BY MS. GURSKIS:

17   Q.   Mr. Granger, when we left for the lunch break, you were

18   speaking about some concerns about practices at Done with

19   regard to rubber-stamping prescriptions and other things

20   related to patient care.

21      Do you recall that?

22   A.   Yes.

23   Q.   Was there a point where things sort of came to a head with

24   regard to the concerns you had at Done?

25   A.   Yeah.  There were, I would say, sort of an escalating

GRANGER - DIRECT / GURSKIS

1    trend of concern.  Probably starting out with, you know, when I

2    initially became aware of the investigation, that was my first,

3    you know, cause for concern.

4         But, later, I think, when -- you know, a particular

5    instance that stood out to me was when my colleague Shawna

6    Arroyo was kind of abruptly fired.  That was a real -- you

7    know, to put it bluntly, that's when I dusted off my resume.  I

8    knew I needed to go.

9    Q.    Do you recall a particular meeting with clinicians and

10   Defendant He where things came to a head for you with regard to

11   some of these concerns being raised by the providers?

12   A.    Yeah, yeah.  There's -- there's one meeting that stands

13   out to my memory in particular.  I think you're referring to

14   when I -- it was a meeting that I actually helped organize

15   to -- partly out of just my normal duties to solicit feedback

16   and gather concerns from the clinicians who were, you know,

17   using the software that I was in charge of.

18        But I also was aware of a lot of their complaints and

19   concerns and I felt it would be a good practice to set up a

20   meeting in which they could be heard directly, you know, by a

21   senior member of the corporate team and have their voices

22   heard.

23        So, during that meeting, it was sort of a -- set up as

24   this, you know, a feedback session, but it turned into, I

25   think, something -- it -- quite different in that many of the

1  providers started expressing a lot of really serious concerns

2  that, you know, was, even at the time, a little shocking to me

3  to kind of hear so directly.

4  Q.   Was this meeting in early June of 2023?

5  A.   Yeah.

6  Q.   Does that sound about right?

7  A.   Yep.

8  Q.   And you mentioned senior members of the corporate team.

9  Can you just tell the jury -- give the jury a sense of who was

10  actually at the meeting and the format of the meeting?

11  A.   Yes.  As far as -- I don't recall every individual that

12  was there but it was myself, members of the senior clinical

13  team, many of our kind of, so to speak, frontline rendering

14  providers and Ms. He.

15  Q.   And you mentioned during the meeting people were raising

16  concerns about practices at Done?

17  A.   Yes.

18  Q.   Was the tone calmer or can you relate to the jury the

19  sense of urgency and what was going on during the meeting with

20  those providers?

21  A.   Yeah, sure.  It started out, like I said, you know, my

22  main goal at the beginning was to kind of solicit feedback,

23  particularly on a few features that I was working on with

24  regard to how the system -- how the note-taking system was

25  functioning.

1    And it started out that way and I think it kind of quickly

2    got out of hand, so to speak.  A lot of the providers were

3    taking turns, you know, grabbing the proverbial mic and kind of

4    speaking their mind about a lot of concerns that they had, and

5    I let them talk.

6    Q.    Would you say things escalated during the meeting?

7    A.    Yeah, certainly.

8    Q.    When you say you let them talk, what kinds of concerns

9    were the providers sharing in that meeting with Defendant He

10    about the practices at Done?

11    A.    Many were concerned about the time that they had for their

12    appointments, that they were being allowed for their

13    appointments with the patients.  They felt concerned that they

14    didn't have enough time to -- to perform their duties and to

15    document the encounters properly, that they were being

16    pressured to cut things short.

17    Many of them expressed concern about, you know, patient

18    care quality and the frequency of follow-ups.  Some of them

19    expressed around about, you know, in particularly worried about

20    threats to their medical licenses.  And -- at least one cited

21    the example of another provider in the network that they had

22    heard had had their license challenged or removed in a state

23    and many people were worried about that.

24    Q.    How clear was it that these providers were deeply troubled

25    by the safety and legality of Done's practices based on that

GRANGER - DIRECT / GURSKIS

1  meeting?

2  **A.**   Very.

3  **Q.**   And by this point in June, had you already participated in

4  meetings and communications with Defendant He where some of

5  these concerns had been raised to her in a different format?

6  **A.**   Yeah, absolutely.  And, in fact, you know, one thing

7  really -- that really kind of struck out -- struck me during

8  that meet, that one line in particular when someone raised a

9  concern about, you know, a provider's license having been

10  pulled, or had been challenged, Ms. He said during that

11  meeting, "Oh, this is -- that sounds -- something to the effect

12  of that sounds concerning.  You know, we should look into

13  that."

14       And I did, like, a -- you know, kind of a double take

15  because I knew for a fact that she was aware of that and it had

16  been communicated to her before.  And so my interpretation was

17  that she was kind of, you know, lying, gaslighting about her --

18  about her knowledge of that and just being dismissive

19  generally.  And I didn't -- I don't know if I said anything at

20  that time, but it was troubling and I -- you know, I got the

21  general sense that -- that, you know, she was kind of trying to

22  make this go away.

23  **Q.**   How -- can give a sense to the jury of how many people

24  were participating in this Zoom meeting who were raising

25  concerns?

 1   **A.**    It was a fairly substantial number.  I don't recall

 2   exactly.  A dozen or more.

 3   **Q.**    And would you say they were uniformly raising concerns in

 4   that meeting?

 5   **A.**    The general thrust of the feedback was the same.

 6   **Q.**    After that meeting, do you recall Defendant He sending you

 7   a Slack message?

 8   **A.**    Yes, I do.

 9          **MR. BODAPATI:**  Your Honor, we move to admit

10   Exhibits 948 and 941.

11          **THE COURT:**  Admitted.

12      (Trial Exhibits 941 and 948 received in evidence.)

13          **MS. GURSKIS:**  Ms. Braga, if you could pull up

14   Exhibit 948.

15   **BY MS. GURSKIS:**

16   **Q.**    Is this the first part of that message, Mr. Granger?

17   **A.**    Yes.

18   **Q.**    And could you just let the jury know who Lauren Koester is

19   on this message?

20   **A.**    Lauren is the head of HR.

21   **Q.**    Okay.  And you start the message by thanking Ms. He for a

22   diagram.

23          **MS. GURSKIS:**  And, Your Honor, at this time we'd also

24   move to admit Exhibit 2555.

25          **THE COURT:**  Admitted.

1          (Trial Exhibit 2555 received in evidence.)

2          **MS. GURSKIS:**  If you could just briefly pull up that

3     diaphragm, Ms. Braga.

4     **BY MS. GURSKIS:**

5     **Q.**   Is this the message you're -- or the diagram you're

6     referring to?

7     **A.**   Yes.

8     **Q.**   Okay.

9          **MS. GURSKIS:**  Thanks, Ms. Braga.  If you could flip

10    back to the message.

11    **BY MS. GURSKIS:**

12    **Q.**   So Defendant He states (as read):

13          "It has become apparent during today's session

14      that a significant portion of the team lacks a clear

15      understanding of how our product works.  This has led

16      to the issues we discussed, including each team

17      attempting to develop policies based on their own

18      interpretations of our product and operations,

19      leading to disruptions and fires."

20      Is Defendant He's comment about providers not

21    understanding the product's functionality as described here, or

22    even the diagram we just looked at, an accurate representation

23    of what happened during that meeting?

24    **A.**   No.  I -- my first reaction to reading this was what a

25    bizarre response.  It had absolutely nothing to do with what

1    just occurred during that meeting.  There was no confusion over

2    how the product works.  All of the complaints were around the

3    policies, and concerns around those policies.

4        My interpretation of this message from Ruthia after the

5    meeting was to -- frankly, my only interpretation was to kind

6    of rewrite history, to put down in some kind of written record,

7    you know, kind of written gaslight form what she wanted people

8    that maybe weren't at the meeting to think what happened.

9        Also to kind of indirectly point a finger at me as head of

10   product; right?  She's implying here that I have failed in some

11   duty to help our providers understand how our product works and

12   that that's somehow the reason that they're upset.  That's not

13   what happened.

14       MS. GURSKIS:  And, Ms. Braga, if you could pull up

15   Exhibit 948, which was the other part of that message.  Or 941,

16   I'm sorry.

17   BY MS. GURSKIS:

18   Q.  And so here you're replying to her and saying (as read):

19           "I think it's important not to mistake the main

20       thrust of what clinical leadership was expressing

21       yesterday, which was a pretty clear disagreement and

22       frustration about some of our clinical policies.

23       They cited acute concerns over certain liabilities

24       incurred by our providers, noting several who

25       recently lost prescription-writing privileges, and

1          are at further risk of even losing their licenses and

2          facing our legal actions."

3     A.    Yes, that's right.  That's right.  I felt compelled,

4     you know, even though Ms. He was my boss, to kind of set the

5     record straight here on what had happened for posterity.

6     Q.    And Defendant He replies by saying that she's not directly

7     involved in day-to-day operations anymore?

8     A.    Yeah.

9     Q.    Was that accurate?

10    A.    A, that was not accurate.  She was involved.

11          And B, you know, I -- what a bizarre response to that.  I

12    mean, that's basically I -- I interpret this as her kind of,

13    you know, being called out and retreating a little bit,

14    knowing, oh, she stepped over the line here.  I should probably

15    remind whoever's going to read this that I'm not involved in

16    day-to-day operations, but she was.

17    Q.    And then she's referencing details -- requesting specific

18    details regarding the issue you mentioned about the clinical

19    losing prescription ability.  Is that --

20    A.    Yeah.

21    Q.    -- related to what you were just describing --

22    A.    Yeah.

23    Q.    -- regarding the clinician --

24    A.    Exactly.  She's saying here that she was not aware of that

25    and that was not the case.

 1          (Reporter interrupts for clarity of the record.)

 2    BY MS. GURSKIS:

 3    Q.    What was your reaction when you were getting these

 4    messages from Defendant He about this meeting?

 5    A.    My reaction was that this was a bad situation that was

 6    rapidly turning worse.

 7    Q.    Did you reach out to other colleagues because you were

 8    upset about what was happening at the company at this time?

 9    A.    I did.

10    Q.    Did that include Sean Arroyo?

11    A.    It did.

12    Q.    Was he chief operating officer at that time?

13    A.    That was my understanding, yes.

14          MS. GURSKIS:  Your Honor, at this time we move to

15    admit Exhibit 818.

16          THE COURT:  Admitted.

17       (Trial Exhibit 818 received in evidence.)

18          MS. GURSKIS:  And if you could pull up that exhibit,

19    Ms. Braga.

20    BY MS. GURSKIS:

21    Q.   And you write to Mr. Arroyo (as read):

22          "FYI, Ruthia's been on a real bender this week.

23       Getting that sense she's rounding up folks who

24       disagree with her on clinical policies.  I notice a

25       new pattern of her inviting herself into meetings,

1          dragging Lauren.  Someone probably told her she

2          should involve HR to fire people now.  She'll

3          announce at the beginning of the meeting that she's

4          taking a step back, et cetera, and then proceed to

5          lay into everyone for the rest of the meeting.

6              "Happened three times this week.  Clinical

7          leadership freaked out and so am I a bit.  Need to

8          book a meeting with you and clinical leaders first

9          thing when you're back."

10         Do you have that message, Mr. Arroyo [sic]?

11    **A.**    Yes.

12    **Q.**    And when you referenced Defendant He rounding up folks who

13    disagree with her clinical policies, were you referring just to

14    the meeting that we were just talking about with the clinicians

15    or other meetings as well?

16    **A.**    No, other meetings as well.  This was a pattern across

17    many different meetings at the time.

18    **Q.**    And when we came back from the break, you made a brief

19    reference to --

20         **MS. GURSKIS:**  You can take that down.  Thank you,

21    Ms. Braga.

22    **BY MS. GURSKIS:**

23    **Q.**    -- the federal investigation or the investigation into the

24    company.

25         Do you recall that?

**GRANGER - DIRECT / GURSKIS**

1   **A.**   Yes.

2   **Q.**   Do you recall learning about that investigation at some

3   point after you started at the company?

4   **A.**   Yeah, at some point after I started.  I don't recall

5   exactly when I learned about it, but I was obviously dismayed

6   when I did.

7   **Q.**   Did Defendant He present the investigation as something

8   serious or not really a big deal?

9   **A.**   To me she said, you know -- I don't remember exactly what

10  she said but it was to the gist of, you know, just so you know,

11  this is going on but don't really worry about it.  Yeah.

12  **Q.**   As far as you know, were -- was Done under investigation

13  for most or all of the time that you were at the company?

14  **A.**   As far as I know, yeah.

15  **Q.**   And in the course of your time at Done, were you

16  personally preserving records that you had access to from the

17  company?

18  **A.**   Yes.  To -- to a degree, that I was, you know, concerned

19  about records and posterior at the tea.

20  **Q.**   You were -- records and posterity, is that what you said?

21  **A.**   Yeah.

22  **Q.**   Did that have to do with concerns about the legality of

23  Done practices?  Is that what you're referring to?

24  **A.**   Yes.

25  **Q.**   And did you receive a grand jury subpoena from the

GRANGER - DIRECT / GURSKIS

1   Government where you produced those records --

2   **A.**   Yes, I did.

3   **Q.**   -- to the Government?

4   **A.**   And I did.

5   **Q.**   Okay.  And some of those are documents that we've gone

6   through today during your testimony?

7   **A.**   Yes.

8   **Q.**   And you also mentioned earlier this morning -- or the

9   expansion of the China side of the business.

10      Do you recall that?

11  **A.**   Yes.

12  **Q.**   Do you recall approximately when -- can you just give the

13  jury a sense of when you were at the company where you started

14  to notice that expansion of the China team?

15  **A.**   It was a few months in.  It was -- there was what appeared

16  to be from my point of view an increase in activity with regard

17  to the investigation.  I was actually pulled in at some point

18  to help with record gathering, and that's when I became a

19  little bit more aware of the scale and severity of it, frankly.

20  And that was my first kind of direct involvement.

21      Around that time, I would say sometime in the spring of

22  2023, I noticed, you know, a clear trend of an expansion in the

23  team in China.

24  **Q.**   How did you see that play out in practice?

25  **A.**   In practice, the -- you know, the troubling component of

1   it was that -- that folks on that -- on that team based in

2   China were increasingly making their presence known in the

3   day-to-day operations of the company, coming to meetings,

4   and -- and exerting more influence over decision-making.

5   **Q.**    Did you have a sense of who the Chinese engineers were

6   ultimately reporting to?

7   **A.**    It was quite clearly Ruthia, Ms. He.

8   **Q.**    When you say it was quite clearly Ruthia, Ms. He, can you

9   explain for the jury what you mean?

10  **A.**    Yeah.  I don't think it was any real secret at the company

11  that -- that at the same time she was purporting to take a step

12  back, she was still actively, you know, daily intimately

13  involved in managing the team that was in China who were then

14  in turn appearing in meetings and in the -- in the -- in the

15  U.S.-based team and, again, you know, exerting influence.

16  **Q.**    And when you say that they were exerting influence and

17  appearing in meetings, did that have ramifications for the

18  clinical product and the clinical care that --

19  **A.**    Yes.

20  **Q.**    -- Done was providing?

21  **A.**    In every dimension, clinical care, operations, product,

22  decision-making.

23  **Q.**    So is it fair to say that Defendant He was continuing to

24  control the engineering and design of the patient provider

25  experience through this arm of the China team at this point?

GRANGER - DIRECT / GURSKIS

1    **A.**    Yes.

2    **Q.**    And this is even after, you know, the message we just

3    looked at where she said that she had taken a step back from

4    day-to-day operations at Done?

5    **A.**    Yes.

6    **Q.**    Do you know if Defendant He continued to -- her control

7    over that team also included the hiring of individuals on the

8    China team?

9    **A.**    I believe so.

10    **Q.**    And did you see her also insert herself in hiring

11    decisions with regard to U.S.-based design and engineering?

12    **A.**    Yes.

13    **Q.**    How did you see that manifest?

14    **A.**    You know, a specific example of trying to hire a designer

15    my last few weeks there, where, you know, she directly

16    intervened and said that -- you know, alter the course of that

17    decision.

18    **Q.**    And in terms of the focus of work that the U.S.based

19    product and design engineers were working on versus the

20    China-based product and engineers, would you say they were

21    working in parallel or were there -- were the products

22    sometimes actually in contradiction with each other?

23    **A.**    Yeah.  You know, when I first joined, it's not unusual to

24    have part or all of your engineering team, you know, overseas.

25    That's kind of what I assumed the -- what the modus operandi of

 1  that team was going to be and for a while it was, but it

 2  shifted from them being support to them leading on -- the

 3  insight I had most clearly into were product decisions, so,

 4  yes, there were product decisions that were being designed not

 5  just in parallel but in direct conflict with product decisions

 6  that I was trying to develop.

 7          MS. GURSKIS:  Your Honor, at this time, we move to

 8  admit Exhibit 628.

 9          THE COURT:  Admitted.

10      (Trial Exhibit 628 received in evidence.)

11          MS. GURSKIS:  If you could pull that up, Ms. Braga.

12  BY MS. GURSKIS:

13  Q.   Was one situation of the contradiction involving an

14  engineer named Kai Zhang?

15  A.   Yes.

16  Q.   Okay.  You can take a look at the message here and just

17  explain to the jury generally what happened with the situation

18  with Mr. Zhang.

19  A.   Sure.  So we talked a little bit earlier about the issue

20  around transferring patients, and one of the features that I

21  was working on, in collaboration with and at the behest of our

22  clinical leadership, was this automated transfer of work flow

23  that would have helped the situation when -- when providers

24  leave the platform or request a transfer to automatically

25  schedule an appointment with a new provider as appropriate.

1    That was something that I had been working on for

2   many weeks.  And almost at the, you know, eleventh hour, it

3   was -- it was blocked.  And at the same time, I was made aware

4   from Kai, who was a product manager in the China team, that

5   they were, in fact, working on it completely separate,

6   quote/unquote, solution to this problem that I was not aware

7   until, you know, pretty late in the -- in the time line here.

8   Q.    So before we get to that completely separate solution --

9   A.    Mm-hmm.

10  Q.    -- on this screen, there is a reference to -- it says (as

11  read):

12        "My recollection was that she provided some

13        feedback and concern about the necessity for transfer

14        patients to book transfer appointments when switching

15        providers before those providers could write scripts

16        for C II drugs; but after conferring with senior

17        clinical leadership, we determined that was the

18        required policy."

19        Do you see that?

20  A.    Yes.

21  Q.    Who is the she who is addressing whether transfer

22  appointments are necessary?

23  A.    Ms. He.

24  Q.    And then in terms of the completely separate project from

25  the transfer appointment protocol that you were working on, can

1   you explain to the jury what that separate project was that you

2   learned about from Mr. Zhang?

3   **A.**    Quaker the alternative version which was being -- yeah,

4   which was being touted as a replacement for the -- the solution

5   that was going to automatically schedule appointments was a --

6   a simple video upload from a patient basically requiring them

7   to just upload a short video attesting that they were not

8   having negative side effects on their medications.

9          And that was -- that was viewed to be a stand in for a --

10   for a clinical appointment.

11   **Q.**    And that was what when you're referring senior clinical

12   leadership --

13   **A.**    Dr. Denis and Dr. Luca.

14   **Q.**    You saw Dr. Denis and Dr. Luca as wanting the transfer

15   appointment protocol that you were designing not this video

16   upload?

17   **A.**    That's right, they were very clear about what they wanted

18   and believed the policies should be and there was actually some

19   agreement.  At some point they believed that there was

20   agreement.

21          **MS. GURSKIS:**  Ms. Braga, if you could turn to the

22   second page of Exhibit 628.

23   **BY MS. GURSKIS:**

24   **Q.**    And so is that what Mr. Zhang is referring to here with

25   (as read):

1            "The conclusion is that we decide to publish the

2        asynch follow-up which means the patients will only

3        need to upload a three-minute video answering the

4        templated questions and that also works"?

5   **A.**   Yep.

6   **Q.**   Okay.  For transfer and follow-up too?

7   **A.**   Yeah, and the conclusion by the way, I don't have any

8   insight beyond this conversation with Mr. Zhang, but my

9   assumption --

10           **MR. BALLEW:**  Objection speculation.

11           **THE COURT:**  Sustained.

12  **BY MS. GURSKIS:**

13  **Q.**   So just focusing, Mr. Granger, on the message that is in

14  front of you here.

15  **A.**   Sure.

16  **Q.**   So you ask Mr. Zhang (as read):

17           "That policy is originating from Ruthia?

18        Dr. Brody?"

19        And Mr. Zhang replies (as read):

20           "From Ruthia and the board."

21        Do you see that?

22  **A.**   Yes, I do.

23  **Q.**   Had you ever heard of a board before until this moment?

24  **A.**   No.  I rather -- you know, the assumption, whenever that

25  term was used, was just a euphemism for Ms. He herself.

1  Q.   And were you troubled by this situation with Mr. Zhang?

2  A.   Deeply.

3  Q.   Did you reach out to other colleagues after this event

4  with Mr. Zhang?

5  A.   I did.

6  Q.   Was one of them Mr. Arroyo, who we were just discussing a

7  moment ago?

8  A.   Yes.

9        MS. GURSKIS:  Ms. Braga, if you could pull

10 Exhibit 818, which has already been admitted.  At page 3.

11 BY MS. GURSKIS:

12 Q.   I believe, and here you're sharing, actually, a screen

13 shot of what we were just looking at with the jury; is that

14 right?

15 A.   Yup, that's right.

16 Q.   Okay.  And then you write (as read):

17        "Feel your absence already.  She's about to axe

18        follow-ups entirely."

19 A.   Yep.

20 Q.   Is that your interpretation of the message from Mr. Zhang?

21 A.   Yeah.

22 Q.   And then what did you mean when you said, "I think I'm

23 circling the drain"?

24 A.   I meant I felt like I was likely to be fired soon.

25        MS. GURSKIS:  You can take that down.  Thank you,

 1   Ms. Braga.

 2   **BY MS. GURSKIS:**

 3   **Q.**   Were there other instances where you felt like

 4   Defendant He was using the Chinese engineers to block things

 5   related to safe and compliant clinical care?

 6   **A.**   This was the most prominent example, but it was

 7   certainly -- there was a time period we it felt like it was

 8   impossible to get actually anything meaningful done.

 9   **Q.**   In terms of your interactions with the U.S.-based

10   engineers and the Chinese-based engineers, did you feel like

11   the U.S.-based engineers were more willing than the

12   Chinese-based engineers to speak up about safety concerns and

13   issues?

14   **A.**   Yes, definitely.

15   **Q.**   And as -- during this time period when the China team is

16   expanding, can you explain for the jury what was going on in

17   terms of the language being used in the communications and

18   meetings at Done, from time to time?

19   **A.**   I only ever encountered English in my meetings, but I --

20   obviously the team in China was communicating in Chinese.

21          **MR. BALLEW:**  Objection.  Speculation.

22          **MS. GURSKIS:**  I can lay a foundation, Your Honor.

23   **BY MS. GURSKIS:**

24   **Q.**   Your interaction as head of product involved work with

25   both the China team and the American team; is that right?

1    A.    I primarily -- yes.

2    Q.    And I believe earlier this afternoon, you were testifying

3    to members of the Chinese team popping up in meetings or seeing

4    their communications relating to product and design and other

5    things going on at Done?

6    A.    Yes.

7    Q.    In those instances, what language would you see them use?

8    A.    Chinese, Mandarin.

9    Q.    And do you speak Chinese, Mr. Granger?

10    A.    I do not.

11          MS. GURSKIS:   Your Honor, at this time we'd move to

12    admit Exhibit 3044.

13          THE COURT:   Admitted.

14    (Trial Exhibit 3044 received in evidence.)

15          THE COURT:   How do you know it's Mandarin?

16          THE WITNESS:   How do I know that's Mandarin?   I'm not

17    completely certain.   I have an understanding that that's

18    primarily what is spoken in mainland China.

19          THE COURT:   Okay.

20    BY MS. GURSKIS:

21    Q.    Can you explain for the jury what we're looking at in

22    Exhibit 3044?   Is this a screenshot that you took?

23    A.    This is a screenshot that I took of a -- viewing Mr. Xu's

24    screen in which he is showing me what I believe are WeChat

25    communications with the China team.

1   Q.   And what was your -- or what was going on during this

2   meeting when Mr. Xu was sharing this with you?

3   A.   Basically, I was having a discussion with Mike and

4   Lisandro here about, you know, frustration around where,

5   you know, the -- I was getting pushback on development and how

6   these members of the China team were, you know, showing up and

7   making decisions, and I was pushing back.

8       I was saying -- because Mike was our head engineer.  And I

9   was saying, "You know, Mike, like, I don't" -- "you know, we're

10  not going to -- we're not going to do this.  We're going to --

11  we're not going to do the thing that they're saying.  We're

12  going to do the thing that we're saying."

13      And he's saying -- and he's basically responding, no --

14  you know, Mike is caught in the middle here.  And he's saying,

15  you know, I'm hearing from, you know, Ms. He and the team in

16  China that this is the direction.

17      And I said, "Well, you've got to show me that because,

18  you know, otherwise, I'm just kind of taking your word for it.

19  I'm out of the loop."

20      And so Mike is sharing his screen saying, "Here, take a

21  look."  He is -- sharing his screen because, you know, I think

22  he's a little bit afraid of getting caught in the middle and,

23  you know, isn't, like, copying and pasting and sending me

24  something, he's saying, "Here, take a look at" --

25          MR. BALLEW:  Objection.  Speculation as to what Mike

```
 1    Xu thought.
 2              THE COURT:  Sustained.
 3    BY MS. GURSKIS:
 4    Q.   Mr. Granger --
 5    A.   Yeah.
 6    Q.   -- in terms of your concerns at the company right now,
 7    would you say they were really starting to rise to the surface
 8    in terms of the -- what was going on with the Chinese
 9    operations?
10    A.   Yeah.  I felt like things were really headed in a -- in a
11    bad direction at this point.
12    Q.   And in addition to using communication like Slack and Zoom
13    to communicate with Mr. Xu and Mr. Martino, did you also use
14    WhatsApp?
15    A.   I did not use WhatsApp.
16    Q.   What other forms of communication did you use to -- was
17    it --
18    A.   Slack, e-mail.
19    Q.   -- Slack, chat?
20    A.   Video chat.
21    Q.   Okay.
22              MS. GURSKIS:  Your Honor, at this time we'd move to
23    admit Exhibit 836.
24              THE COURT:  Admitted.
25         (Trial Exhibit 836 received in evidence.)
```

 1              MS. GURSKIS:  If we could pull this up.

 2    BY MS. GURSKIS:

 3    Q.   Is this WhatsApp?  Or what is the interface we're looking

 4    at here, Mr. Granger?

 5    A.   This is WhatsApp.  I apologize.  So this is just a private

 6    channel, though.  This is not an official company channel.

 7    We're just using this to communicate like any other text

 8    messaging service.

 9    Q.   Okay.

10    A.   Yep.

11    Q.   And so you're writing here.  You write (as read):

12              "Sometimes I struggle to understand myself."

13         Lisandro says (as read):

14              "Anyway, everything is fine."

15         And you say (as read):

16              "Totally."

17         And then there's a -- looks to be a screenshot or a meme

18    of Steve Carell in *Anchorman* with "hahahahahaha"?

19    A.   Yeah.

20    Q.   Can you explain for the jury what you meant when you sent

21    that message?

22    A.   It was meant to be implying nervous sardonic laughter.

23    Q.   About what was going on at the company?

24    A.   This was in the immediate aftermath, I believe, of

25    Mr. Arroyo being fired and expressing, you know, deep concern

 1    about that.

 2    Q.   Okay.  And that's -- Sean is Mr. Arroyo's first name.  So

 3    in reference to --

 4    A.   Sean -- that's right.

 5    Q.   -- Mike Xu's comment (as read):

 6            "Before Sean is Riley"?

 7    A.   Yes.  "Before Sean" -- yes.

 8    Q.   And do you know who the Riley is he's referring to there?

 9    A.   Riley was an individual that I did not have a whole lot of

10    interaction with.  He was -- we had a brief overlap.  When I

11    first joined the company, he, I was told, was mainly handling

12    duties with regard to the investigation itself.  And he left at

13    some point through -- in my tenure.  That's all I know.

14    Q.   Okay.

15            MS. GURSKIS:  Ms. Braga, if you could move to page 2

16    of this message.

17    BY MS. GURSKIS:

18    Q.   And you write (as read):

19            "Yes, but last time she didn't have the

20            Department of Justice investigating her for federal

21            crimes.  She wouldn't fool them."

22            Who is the she you're referring to?

23    A.   Ms. He.

24    Q.   And then Lisandro sends a picture of a man in front of a

25    fire, it looks like.  And you say (as read):

1          "It may take them a year."

2      And Mr. Martino says (as read):

3          "Yeah, eventually the company is going to go

4      down with these actions."

5  **A.**   Yup.

6  **Q.**   And then you reply (as read):

7          "But the more disgruntled executives she fires,

8      the more she feeds the case against her."

9      And then you clarify.  It looks like you also meant

10  doctors, as well as executives; is that --

11  **A.**   Yes.

12  **Q.**   What did you mean here when you said "she won't fool them"

13  or won't fool the Department of Justice?

14  **A.**   I'm specifically referring to the actions and attention to

15  continue to direct the company through the Asia team.

16  **Q.**   And if you could flip to the next page, page 3 of

17  Exhibit 836.

18      Looks like you send a screenshot here of a news article,

19  Mr. Granger?

20  **A.**   Yeah.

21  **Q.**   Did that reference a competitor company of Done?

22  **A.**   That's right.

23  **Q.**   And then there's a purple highlighting.  Was that your

24  highlighting?

25  **A.**   Yes.

GRANGER - DIRECT / GURSKIS

1   Q.   And you're highlighting a part of -- about the Controlled

2   Substances Act?

3   A.   Yes.

4   Q.   Why did you share with Mr. Martino and Mr. Xu an article

5   about Done's competitor and potential violation?

6        MR. BALLEW:   Your Honor, objection on relevance

7   grounds.   Ms. He is not on this communication so these

8   correspondences are not relevant to any issue in this case and

9   it's hearsay.

10        THE COURT:   Overruled.

11        THE WITNESS:   I am pointing out to my colleagues,

12   you know, a corollary of the danger that we're in.

13   BY MS. GURSKIS:

14   Q.   Corollary comparison?

15   A.   Comparison of this, you know, very similar company doing a

16   very similar thing that got in very serious trouble.   And

17   they're clearly in agreement.

18   Q.   And around this time, was there some confusion as to who

19   was going to be on paper in leadership of the company?

20   A.   Yeah, I think that was one of the most concerning parts

21   here is that it felt like we didn't know who was -- you know,

22   if -- how we were going to navigate this going forward with

23   Sean gone.   And this team in China kind of, you know,

24   functionally taking over management of the company.

25        MS. GURSKIS:   And if you could zoom out, Ms. Braga.

1  BY MS. GURSKIS:

2  Q.   And Mr. Xu says (as read):

3        "Confirm that we will report to Yue in the

4       future"?

5  A.   Yes.

6  Q.   Who is Yue?

7  A.   Yue was somebody that I didn't know at all except as a

8  name on certain e-mail threads at the time.  He was a member of

9  the team in China.

10        MS. GURSKIS:  And if you could turn to page 4 of

11  Exhibit 836, Ms. Braga.

12  BY MS. GURSKIS:

13  Q.   And then it looks like Lisandro is saying (as read):

14        "Who?  Isn't he a project manager?"

15        MS. GURSKIS:  And then if you could turn to the next

16  page, or the bottom of the page, Ms. Braga.

17  BY MS. GURSKIS:

18  Q.   And you reply, (as read):

19        "He doesn't speak great English.  Nothing

20       against that per se, but it's kind of challenging to

21       run a U.S.-based company if you don't speak fluently.

22       Buckle up boys.  Going to be a wild ride.  Honestly

23       he couldn't do a worse job than Ruthia.  I'm sure

24       he's competent but tactically this makes negative

25       sense even if your goal is to install a puppet."

1    What did you mean by "even if your goal is to install a

2    puppet"?

3    **A.**    Clearly, my understanding was that this individual was

4    reporting directly to Ruthia and it was her intention to

5    continue to manage the company through him.  What I'm referring

6    to in terms of it making negative sense is that, you know, he's

7    an individual who doesn't speak English and how is that going

8    to actually work.

9    **Q.**    And was there -- did you have other communications about

10    the leadership of the company with Mr. Xu and Mr. Martino

11    around this time?

12    **A.**    Sorry.  The -- clarify?

13    **Q.**    Sure.  Did you continue to have communications with Mr. Xu

14    and Mr. Martino?

15    **A.**    Oh, yes.

16    **Q.**    -- about this issue at this time?

17    **A.**    Yes.

18         **MS. GURSKIS:**  And, Your Honor, we'd move to admit 837.

19         **THE COURT:**  Admitted.

20    (Trial Exhibit 837 received in evidence.)

21         **MS. GURSKIS:**  And, Ms. Braga, if you could pull up

22    page 1.

23         **MR. BALLEW:**  Objection on the same ground as relevance

24    and hearsay.  Ms. He is not on here.  It's unclear why this

25    is -- how this is relevant.

 1           THE COURT:  Okay.  It's admitted subject to a motion

 2    to strike.

 3           MS. GURSKIS:  Your Honor, these are all employees of

 4    the company under 801(d)(2) --

 5           THE COURT:  Pardon?

 6           MS. GURSKIS:  These are all employees of the company

 7    speaking about company operation, so it's admissible under

 8    801(d)(2)(d).

 9           THE COURT:  Okay.  You may continue.

10           MR. BALLEW:  Still we raise our objection.  And also

11    on relevance grounds.

12           THE COURT:  Okay.  Overruled.

13    BY MS. GURSKIS:

14    Q.   And here you're raising similar concerns about the

15    reporting structure?

16    A.   Yes.

17           MS. GURSKIS:  You could take that down, Ms. Braga.

18    And then pull up the next page, page 2.

19        Oh, I'm sorry.  It's the previous page, "Who will we

20    report to," page 1.  Yes, sorry.  It's the bottom half of

21    page 1.  My apologies, Your Honor.

22    BY MS. GURSKIS:

23    Q.   You reference missing Jiatao.  And then you say (as read):

24           "She is starting to form a decision pattern that

25        I can see: total control no matter the cost."

 1           Mr. Xu replies (as read):

 2                "This is new definition of stepping down."

 3           And then you write (as read):

 4                "Maybe she thinks she can trick the prosecutors

 5           by running everything through Hayley and Yue.  A dark

 6           thought."

 7           **MR. BALLEW:**  Also objection on foundation, personal

 8   knowledge of the hearsay declarant speaking about something he

 9   doesn't have any personal knowledge about.

10           **THE COURT:**  And the basis for admissibility?

11           **MS. GURSKIS:**  I can lay the foundation, Your Honor.

12   **BY MS. GURSKIS:**

13   **Q.**   Mr. Granger, who's Hayley, the Hayley being referenced

14   here?

15   **A.**   Hayley was an individual that was essentially Ms. He's

16   assistant.  She was relatively young and inexperienced.

17   **Q.**   And at some point did you learn that she was being -- or

18   was it conveyed to you that she was going to be at the helm of

19   Done?

20   **A.**   Yes.  There was an announcement, I believe by Ms. He

21   herself at some point, that Hayley would be interim general

22   manager of the company.

23   **Q.**   And despite that announcement from Ms. He about Ms. Zhu

24   being the general manager or in charge of the company in

25   practice, was that your impression of who was actually in

1  control?

2  **A.**    As I said, Hayley was a young assistant.  It was really

3  the only interpretation that one could walk away with.

4           **MR. BALLEW:**  I still have a foundation objection on

5  "maybe she could trick -- think she could trick the

6  prosecutors."

7           **THE COURT:**  Overruled.

8      Go ahead.

9  **BY MS. GURSKIS:**

10  **Q.**    So you felt that that didn't match -- a portrayal of

11  Ms. Xu as being in charge didn't match what was actually going

12  on internally?

13  **A.**    Yeah, not at all.

14  **Q.**    And in terms of the communications that you had with

15  Defendant He around this time, was she still in direct

16  correspondence with you?

17  **A.**    No, less so with me directly.

18  **Q.**    When you say less so with you directly, can you explain to

19  the jury what you mean by that?

20  **A.**    We didn't have any standing one-on-one meetings.  For

21  example, our only interaction was kind of up and to that point

22  when -- I think before the point where she fired Sean and made

23  the formal announcement to the company that she was stepping

24  back, that she was, you know, herself present in many meetings

25  after that period personally less so.

1   Q.   And were you interacting with Ms. Zhu more at this time?

2   A.   Yes.

3   Q.   And you testified a moment ago that you were under the

4   impression that Ms. Zhu was getting directives or instructions

5   from Defendant He.

6        Can you explain to the jury what led you to draw that

7   conclusion?

8   A.   Hayley herself told me that she was communicating with

9   Ms. He regularly.  And when I pushed Hayley on certain

10  decisions, she'd say, "Well, no, this is coming from Ms. He."

11          MS. GURSKIS:  Your Honor, at this time, we'd move to

12  admit Exhibit 840?

13          THE COURT:  Admitted.

14       (Trial Exhibit 840 received in evidence.)

15  BY MS. GURSKIS:

16  Q.   And then at the bottom, you're asking about clarity on

17  company structure.  And Mr. Martino says, "She just mentioned

18  the leaders are going to be MJ and Hayley and they're looking

19  for a GM."

20  A.   Mm-hmm.

21  Q.   Do you know what he's talking about there?

22  A.   I'm not sure exactly what announcement he's referring to.

23  Little mixed up on the timeline, but...

24  Q.   Okay.

25          MS. GURSKIS:  If you could flip to the next page,

1    Ms. Braga.

2    **BY MS. GURSKIS:**

3    **Q.**    And you see the date at the top that says June of 2023?

4    **A.**    Yeah.

5    **Q.**    And then Mr. Martino writes, (as read):

6          "Hayley is Ruthia LOL, but, yeah"?

7    **A.**    Right.

8    **Q.**    Is that --

9    **A.**    Mr. Martino has the same understanding that I do at this

10   point.

11          **MR. BALLEW:**  Objection.  Speculation.

12          **THE WITNESS:**  That's my assumption.

13          **THE COURT:**  Sustained.

14   **BY MS. GURSKIS:**

15   **Q.**    And did this issue of the leadership structure of the

16   company continue to be an issue for you?

17   **A.**    Yeah.  Not for much longer, though.

18   **Q.**    And if we could return to Exhibit 836 on page 8 just

19   briefly.

20          And you write in July of 2022, (as read):

21          "Tell me honestly, is Ruthia just running

22          everything through Hayley?  How much do they talk?

23          She's playing with fire.  Her making decisions on

24          product changes, like pushing auto transfers without

25          appointments, for example, is legal jeopardy.  Just

GRANGER - DIRECT / GURSKIS

1        FYI."

2        Do you see that?

3   A.   Yeah.

4   Q.   Who is the "she" you're referring to in this message?

5   A.   Ms. He.

6   Q.   And in terms of your interactions with Ms. He over the

7   course of your time at the company, how much could you -- did

8   you ever hear her talk about the concept of Friction?

9   A.   Yes.

10  Q.   Can you explain to the jury how that would come up?

11  A.   Sure.  Friction is a term used in any kind of software

12  development to refer to, I think, how easy it is to use your

13  platform.  You know, for example, if you're -- you've got a --

14  you know, you're Amazon and you're trying to sell sneakers, you

15  want to make it as easy as possible for the user to put in

16  their credit card and their address and send them on their way

17  so that they buy their sneakers.  That's friction.  And -- and,

18  yes.

19  Q.   And in what context would you hear Defendant He talk about

20  friction?

21  A.   Yes.  Specifically friction -- her -- her concerns around

22  friction centered around patients' access to the -- getting

23  through the system to get -- primarily to get their

24  prescriptions refills.

25  Q.   And so what we were just looking at on this screen, you

1    referred to product changes and transfer appointments, and

2    Defendant He making decisions as to those operations?

3    **A.**    Yeah.

4    **Q.**    Can you explain to the jury how that related to the

5    concept of friction at Done?

6    **A.**    Yeah.  Sure.  I mean, so in Ms. He's mind follow-up

7    appointments themselves were a form of friction to be avoided.

8    **Q.**    Did Defendant He, in your view, care more about reducing

9    friction or patient safety?

10           **MR. BALLEW:**  Objection.  Speculation.

11           **THE COURT:**  Lay a foundation.

12   **BY MS. GURSKIS:**

13   **Q.**    How often were you interacting with Defendant He when you

14   were working at Done?

15   **A.**    Quite frequently, especially at the beginning.

16   **Q.**    And in the frequent interactions with Defendant He, were

17   you able to do -- hear her speak about her goals and priorities

18   for the company?

19   **A.**    Yes.  On many occasions in a wide manner of meetings

20   through goals that she would set for my team and others through

21   company town halls, through leadership meetings, et cetera.

22   **Q.**    And how often in those meetings would you hear her talk

23   about reducing friction and growth?

24   **A.**    Consistently.  That was -- that was a major animating

25   force of her -- of her leadership.  Growth goals were baked

 1    into every monthly and quarterly LKR for every team, every

 2    goal.

 3        The nature of my position and the reason I was hired in

 4    the first place was because I brought experience with regard to

 5    insurance markets and insurance business.  And part of my -- my

 6    greatest mandate in my hiring was to help Done expand beyond a

 7    consumer out-of-pocket business and into the insurance

 8    business, which was itself a major growth goal, so it colored

 9    every interaction.

10    Q.   And so in terms of all those interactions with

11    Defendant He, were you able to reach a conclusion about whether

12    she was prioritizing reducing friction or patient safety?

13            MR. BALLEW:  Objection.  Speculation.

14    BY MS. GURSKIS:

15    Q.   Were you able to reach a conclusion about whether she

16    cared more about reducing friction or patient safety?

17            MR. BALLEW:  Objection.  Speculation.

18            THE COURT:  Lay a foundation.

19            MS. GURSKIS:  Your Honor, he just spoke about the

20    meetings he had with Defendant He where she was speaking at

21    great lengths about growth.

22            THE COURT:  Okay.  Overruled.

23            THE WITNESS:  Yes, her singular focus was growth.

24    BY MS. GURSKIS:

25    Q.   And we were just looking at the screen, a message on --

1    from July of 2022.

2        Were you fired shortly after that July exchange?

3    **A.**   I was indeed.

4    **Q.**   Who fired you?

5    **A.**   Ms. Zhu, Hayley.

6            **MS. GURSKIS:**  If we could pull up Exhibit 836 at

7    page 9.  I'm sorry.  Page 10, actually, Ms. Braga.

8    **BY MS. GURSKIS:**

9    **Q.**   And you say, "Pretty clear it came directly from Ruthia"?

10   **A.**   Yeah.

11   **Q.**   Can you explain what you mean by that?

12   **A.**   Sure.  As I say in the text, Hayley was almost in tears,

13   poor thing.  She clearly -- you know, it felt very much like

14   she was put up to it and didn't have any clear explanation for

15   me as to why I was being fired.

16   **Q.**   What -- did Ms. Zhu offer you an explanation?

17   **A.**   Only that it was the decision of the board that the head

18   of product position is no longer a position that's needed at

19   the company, to that effect.

20   **Q.**   No longer needed at the company?

21   **A.**   Yeah.  She seemed to imply that the position itself was

22   going away.

23   **Q.**   How busy were you prior to that -- prior to your

24   termination?

25   **A.**   Exceedingly busy.

1    Q.    Busy enough to think that your position wasn't at risk of

2    being eliminated?

3    A.    There was certainly a lot to do and -- both in terms of

4    compliance features that I was working on, but also in terms of

5    actual growth initiatives, including building out the insurance

6    business, you know, which remained an unfurnished task.

7    Q.    Did you feel that you were fired for performance issues or

8    for raising concerns?

9    A.    Raising concerns.

10          MS. GURSKIS:    Thank you, Ms. Braga.    If you could pull

11    up Exhibit 818, on page 8.

12          THE COURT:    Admitted.

13        (Trial Exhibit 818 received in evidence.)

14    BY MS. GURSKIS:

15    Q.    And you're sending a link to a *Wall Street Journal* article

16    to Mr. Arroyo?

17    A.    Yes.

18    Q.    And Mr. Arroyo responds with a DOJ press release?

19    A.    Yes.

20    Q.    Are those links related to the defendants in this case?

21    A.    Yes.    These are the announcements when I learned that they

22    were arrested.

23    Q.    And Mr. Arroyo writes (as read):

24          "She should have listened to us"?

25    A.    Yes.

GRANGER - DIRECT / GURSKIS

1  Q.   Who is the "us" -- or I guess, did you agree with

2  Mr. Arroyo's statement?

3  A.   Of course.

4  Q.   Who is the us --

5           MR. BALLEW:  Objection.  This is also hearsay because

6  they're no longer employees of the company.  And relevance.

7  What their views are of -- on the propriety of whether Ms. He

8  should have listened to them is irrelevant.

9           THE COURT:  Okay.  The question is what was this

10 witness's understanding as to the term "us"?

11          MS. GURSKIS:  Yes.

12          THE COURT:  Overruled.

13          THE WITNESS:  My understanding of "us" is -- includes

14 Mr. Arroyo, myself, and a large contingent of people at the

15 company, including clinical leadership, operational leaders,

16 and others who worked for an extended period of time to change

17 the direction of the company, a large contingent of people.

18 BY MS. GURSKIS:

19 Q.   How hard was it to get Defendant He to listen to

20 recommendations when you were working at Done?

21 A.   At times excruciating.  Things that felt that -- actually,

22 nothing to do with how you felt.  Things that just were table

23 stakes, safety features, experience features, compliance

24 features that should have been implemented on day one were,

25 you know, consistently challenged by Ms. He, along the lines

GRANGER - DIRECT / GURSKIS

1    of -- you know, she would challenge the necessity of

2    everything.  She would raise concerns about whether it would

3    slow down providers, reduce growth.

4    Q.    In your years in the start-up space and the healthcare

5    industry, do you feel like Done was similar or different to

6    other healthcare practices where you've worked?

7    A.    Superficially similar in many ways, but obviously there

8    were some key differences.

9    Q.    What were the key differences?

10   A.    The key differences were the tight integration between the

11   clinical side of the company and the operations and business

12   side of the company.  The fact that the directors -- the

13   director of the business side of the company was making

14   clinical and policy decisions for the clinical side was

15   obviously one the most, you know, concerning and key

16   differences that I experienced at other -- similar companies.

17   Q.    And you said when you started at Done, you were excited

18   about the opportunity?

19   A.    Yeah.

20   Q.    By the time you left Done, had your perception of the

21   company changed?

22   A.    Yes.  Unfortunately, completely.  I thought, you know,

23   what I initially thought were growing pains and naivete, I came

24   to strongly believe were motivated by --

25        MR. BALLEW:  Objection.  Speculation.

GRANGER - CROSS / BALLEW

```
 1           THE COURT:  Sustained.
 2    BY MS. GURSKIS:
 3    Q.   From your own personal perception, can you speak to
 4    what -- what you personally observed at that time?
 5    A.   What I personally observed was a pattern of resisting the
 6    strong recommendations and insistence on important policies and
 7    procedures from clinical leaders and other people that were
 8    experienced in the healthcare space to the -- of -- of
 9    unethical and illegal --
10           MR. BALLEW:  Objection.  Legal conclusion.
11           THE COURT:  Well, I think he's answered it.
12    BY MS. GURSKIS:
13    Q.   And who was -- well, you said -- used the passive voice,
14    who were you talking about in that instance?
15    A.   Ms. He.
16           MS. GURSKIS:  No further questions.  Your Honor.
17           THE COURT:  Okay.  Cross.
18                        CROSS-EXAMINATION
19    BY MR. BALLEW:
20    Q.   Good afternoon, Mr. Granger.
21    A.   Good afternoon.
22    Q.   My name is Steven Ballew.  I represent Ruthia.
23         You testified at the beginning of your testimony about
24    your educational and professional background.
25         Do you recall that?
```

GRANGER - CROSS / BALLEW

1    A.    Yes.

2    Q.    You -- I believe you said you have a master's in biology?

3    A.    Yes.

4    Q.    You don't have a medical degree; correct?

5    A.    Correct.

6    Q.    And you have no training as a psychiatrist?

7    A.    Correct.

8    Q.    You testified about your experience in start-ups before

9    Done.

10         Do you recall that?

11   A.    Yes.

12   Q.    I believe one of your experiences was that in 2018, you

13   founded a mental wellness start-up for college students; is

14   that correct?

15   A.    That's correct.

16   Q.    It was called Village?

17   A.    That's correct.

18   Q.    And this was before the pandemic?

19   A.    Yes.

20   Q.    Can you tell us a little bit about what Villager did?

21   A.    Sure.  Villager was a -- a software solution designed for

22   college campuses to help address the loneliness crisis, which

23   is a public health concern, regarding young people who were

24   spending too much time on social media, for example, and were

25   exhibiting antisocial behavior, and so this was a -- designed

1   to be sold to colleges and universities to help college

2   students spend more time in healthy face-to-face interactions.

3   Q.   Can you tell us some of the things that you needed to do

4   when founding a mental health start-up to get the project off

5   the ground?

6   A.   There's a lot to do.  Sure.

7        You -- you know, first of all, as to developing your

8   product feature, you have to interview users.  You have to

9   understand what problems you're trying to solve for them in the

10  marketplace, try to figure out how to monetize the solution.

11  Designing the software itself.  Hiring people to help with

12  engineering and design and -- et cetera, et cetera.

13  Q.   Can you explain what ended up happening to Villager?

14           MS. GURSKIS:  Objection.  Relevance.

15           THE COURT:  What happened to Villager?

16           MR. BALLEW:  Your Honor, it goes to his experience.

17  He talked a lot of his experience in mental health start-ups.

18           THE COURT:  I'll allow it.

19       Go ahead.

20           THE WITNESS:  Yeah.  We shut down operations in March

21  of 2020.  Largely because of the pandemic.

22  BY MR. BALLEW:

23  Q.   And was that a difficult thing to have to give up that

24  business that you put so much hard work into because of the

25  pandemic?

1              MS. GURSKIS:  Objection.  Relevance.

2              THE COURT:  I'll allow it.

3              THE WITNESS:  Yeah, certainly, of course.

4              MR. BALLEW:  Can we pull up Government Exhibit 1818 in

5    evidence, please.  I mean, 818, not 1818.  I'm.

6    BY MR. BALLEW:

7    Q.   So do you recall seeing this conversation on your direct

8    testimony?

9    A.   Yes.

10   Q.   And under this -- at this time period, you were having a

11   conversation with Sean Arroyo discussing pressure that Ruthia

12   was facing to take a step back from the company; is that

13   correct?

14   A.   Yes.

15   Q.   You understand that Ruthia had founded Done three years

16   before you had this conversation with Mr. Arroyo; correct?

17             MS. GURSKIS:  Objection.  Foundation.

18   BY MR. BALLEW:

19   Q.   Did you have that understanding?

20             MS. GURSKIS:  Objection.  Foundation.

21             THE COURT:  He's asking.

22   BY MR. BALLEW:

23   Q.   Did anybody tell you that she had founded this company

24   three years before you had this conversation with Mr. Arroyo?

25   A.   Am I answering that?

GRANGER - CROSS / BALLEW

1          **THE WITNESS:**  Judge, sorry.  Am I to answer that?

2          **THE COURT:**  Yeah.

3          **THE WITNESS:**  Okay.  I apologize.

4     Roughly -- I knew that she was the founder of the company.

5     I didn't know the exact timeline.

6     **BY MR. BALLEW:**

7     **Q.**   But you knew that she had put years of hard work into the

8     company?

9     **A.**   That was my understanding, yes.

10    **Q.**   And you understood that she was having a hard time

11    stepping back from this company that she had founded and worked

12    hard building for years?

13    **A.**   That certainly seemed to be the case.  She did seem to be

14    having a hard time stepping back.

15    **Q.**   Okay.  So after you stopped working at Villager, I believe

16    your next job in the mental health space was at a place called

17    Talkspace; is that correct?

18    **A.**   That's right.

19    **Q.**   And you began working there in 2020?

20    **A.**   Yes.

21    **Q.**   And at Talkspace, you worked as a senior product manager

22    on the insurance side of the business?

23    **A.**   Insurance, enterprise, EAP.  The B to B side, as we called

24    it, mm-hmm.

25    **Q.**   And I believe you testified that Done -- one of

GRANGER - CROSS / BALLEW

1    responsibilities you were brought on to do was to have Done be

2    able to become a business that was able to accept insurance at

3    some point?

4    A.    Yeah, that's right.  Talkspace had had great success

5    transitioning from an out-of-pocket to a company that was in

6    network with major payers, so I understood, you know, that

7    industry and that playbook, so to speak, on how to do that.

8    And I think that was one of the reasons that Ms. He hired me

9    was to help in that regard.

10   Q.    And to be clear, Done did not take any money from

11   insurance at the time you were with the company?

12   A.    Correct.

13   Q.    And you were interviewed by Ruthia, Mike Xu, and Jiatao

14   Cheng; is that correct?

15   A.    Yes.

16   Q.    And Mike Xu and Jiatao, they were engineers at Done; is

17   that correct?

18   A.    Jiatao was more of a project manager than an engineer,

19   yeah.

20   Q.    But they were on the tech side of the business?

21   A.    They were on the tech side of the business, yes.

22   Q.    And to be clear, you were not -- even though you

23   interacted with the medical team, you were not part of the

24   medical team; right?

25   A.    I interacted -- it was part of my responsibility and duty

1   in my role to -- to work very closely with them.  So I was not

2   a member of them, but it's my job to -- I'm building software

3   for the clinical team as much as I'm building software for

4   patients, so I found to understand their work flows and their

5   needs and their concerns.

6   **Q.**   So where you previously worked, Talkspace -- and you said

7   that -- you testified at the end of your testimony that Done

8   was different than a lot of other places that you would --

9   start-ups that you worked.

10      That would include Talkspace?

11  **A.**   Yeah, Talkspace would have been a clear contrast right

12  similar on the surface.

13  **Q.**   Well, Talkspace was founded in 2012, and is a much bigger

14  and more established company than Done; is that correct?

15  **A.**   That's correct.

16  **Q.**   Okay.  And it -- it is an online platform that connects

17  users with therapists and psychiatric providers, kind of like

18  Done; correct?  Well, psychiatric providers.

19  **A.**   Yeah.  Talkspace offers both psychotherapy, that was their

20  primary business, through a couple different modalities.  But,

21  you know, primarily it's video therapy and video psychiatry at

22  Talkspace Space.  Similar to how Done is video psychiatry.

23  **Q.**   And one of the, I guess, verticals of Talkspace is

24  medication management for ADHD?

25  **A.**   Yes.

GRANGER - CROSS / BALLEW

1  Q.   And you know that Talkspace has a website; correct?

2  A.   Yes.

3  Q.   And you know on its -- have you seen its website?

4  A.   I worked there for two years; yes, I saw their website.

5  Q.   So you're familiar with some of the features on its

6  website?

7  A.   Certainly.

8        MR. BALLEW:  Can we pull up for the witness and the

9  court and counsel only Exhibit 7706.  And if we can go down

10  and --

11       MS. GURSKIS:  Objection as to relevance and also

12  foundation.  I believe the screenshot of this was several years

13  after he left the company.

14 BY MR. BALLEW:

15 Q.   Well, are you familiar with how Talkspace advertises

16 its --

17       MR. BALLEW:  And we can -- we can take that down.

18       THE COURT:  Sustained.

19 BY MR. BALLEW:

20 Q.   Are you familiar with how Talkspace advertises its

21 service?

22       MS. GURSKIS:  Objection.  Relevance.  403.

23       THE COURT:  At what time?

24 BY MR. BALLEW:

25 Q.   Well, at the time that you were there, are you familiar

GRANGER - CROSS / BALLEW

1  with how it advertised its services?

2  **A.**   At the time, I was generally aware, yes.

3  **Q.**   And you know that it would say things like "Receive ADHD

4  treatment online in three easy steps."

5       Is that something that -- would -- you would understand

6  Talkspace to advertise on its website?

7  **A.**   I don't recall that specifically being advertised at the

8  time that I was there.

9  **Q.**   And you said that Talkspace providers prescribed

10  medication for ADHD; is that correct?

11  **A.**   My understanding during my time there, that they -- they

12  did offer diagnostic services for ADHD.  But explicitly, I also

13  know that they did not prescribe any controlled substances.

14  **Q.**   Correct.  They did not prescribe controlled substances but

15  they did prescribe medication; correct?

16           **MS. GURSKIS:**  Objection.  Relevance.

17           **THE COURT:**  It's not relevant.

18           **MR. BALLEW:**  Okay.

19           **THE COURT:**  The jury is instructed to disregard it.

20       Okay.  Next point.

21  **BY MR. BALLEW:**

22  **Q.**   Okay.  Okay.  Moving along.

23       You testified about some problems that clinical leadership

24  identified with some of Done's practices Do you recall that --

25  **A.**   Yes.

GRANGER - CROSS / BALLEW

1  Q.   -- testimony.

2       And you were speaking about specifically Dr. Luca and

3  Dr. Denis; correct?

4  A.   Specifically but not exclusively.

5  Q.   And one of things you mentioned was problems with an

6  initial appointment times.

7       Do you recall that?

8  A.   Yes.

9  Q.   And one of the things that you mentioned is that clinical

10 leadership, including Dr. Luca, had issues with 25-minute,

11 30-minute appointment times at Done?

12 A.   Yes.

13 Q.   You -- you're familiar with the technology at Done;

14 correct?

15 A.   Yes.

16 Q.   There wasn't a feature at Done, for example, where if an

17 appointment went over 25 minutes, they would basically cut the

18 mic of the provider?  That wasn't a feature of Done's

19 technology?

20 A.   No, that was not an explicit feature, but those policies

21 were set and directed to the -- to providers, and they were

22 often scheduled in such a way that they would not have had more

23 time before their next appointment.

24 Q.   You don't happen to know, do you, how often providers

25 would go over the 25 minute time if they felt it was necessary

GRANGER - CROSS / BALLEW

1   to make an appropriate diagnosis, do you?

2   **A.**   I don't have statistics on the frequency of that.

3   **Q.**   But it was something that they could have done if they

4   thought it was necessary in their clinical judgment?

5   **A.**   Functionally, I don't believe so because they were, again,

6   being pressured and directed not to.  And in many cases, their

7   appointment -- their schedule wouldn't allow it.

8        Were there instances of that happening?  Likely.

9   **Q.**   I want to turn now to your testimony about transfer

10  appointments?

11  **A.**   Sure.

12  **Q.**   You testified about some proposed changes to the processes

13  on transferring appointments while you were at Done.

14       Do you recall that testimony?

15  **A.**   Yeah.

16  **Q.**   And the problem that you identified was that sometimes

17  when a provider would leave the platform, there would be

18  hundreds of patients that would need to be transferred to

19  another provider.

20       Do you recall that?

21  **A.**   Yes.

22  **Q.**   And do you recall that as part of the solution, one of the

23  things that Dr. Luca and Dr. Denis proposed was to require

24  automatic transfer appointments for patients who would be

25  transferred onto the platform to another provider?

GRANGER - CROSS / BALLEW

1    **A.**    To another provider, yes.

2    **Q.**    But you recall that there was a possibility, because of

3    the supply of providers, that there would potentially be a

4    delay where a patient would run out of medication before they

5    would be able to have a transfer appointment with the new

6    provider; is that correct?

7    **A.**    Yes.    There was a concern that was expressed, although my

8    impression of how I understood this to be done, you know,

9    outside of Done, you know, the same risk that lies with any

10    medical practice and other medical practices would handle it

11    differently.

12    **Q.**    And do you recall that in order to alleviate that delay

13    and make sure that patients wouldn't unnecessarily run out of

14    medication before having a transfer appointment, one of the

15    things Dr. Luca and Dr. Denis proposed was that it would be

16    required for the off-going provider to give a bridge refill of

17    90 days to their patient before they were then transferred to

18    the new provider on the platform?

19    **A.**    Yes, I do recall that being one of the recommendations.

20    **Q.**    So Dr. Luca and Dr. Denis were okay with three-month

21    refills for transfer appointment -- transfer patients before

22    they would be able to have their new appointment?

23    **A.**    In my understanding, that was to them seen as an improved

24    compromise over the current practice, yes.

25    **Q.**    And you're also aware -- you testified about certain

1  providers like Dr. Brody and some others that you couldn't

2  recall their names that basically exclusively did bridge

3  refills for patients whose providers had left the platform or

4  were unavailable in some way.

5        Do you recall that?

6  A.    Yes.

7  Q.    And one of the things that Dr. Luca -- even though

8  Dr. Luca and Dr. Denis wanted these automatic transfer

9  appointments, one of the things that they also said was to keep

10 providers like that around for emergency or unusual situations

11 where a patient might need a refill and couldn't get those

12 follow-up appointments at a time that --

13 A.    I honestly don't recall that specifically.

14 Q.    Okay.  And you also -- another change you suggested, or

15 maybe that you heard from clinical leadership as appropriate

16 with respect to transfers was to allow patients to switch to a

17 new provider if their original provider declined to provide

18 care; is that correct?

19 A.    That's another scenario in which a transfer is -- occurs.

20 Q.    And that's something that was allowed at Talkspace, to

21 switch if there was a bad fit with the provider; correct?

22 A.    Correct.

23 Q.    And your understanding is that clinical leadership

24 actually agreed that this is an acceptable reason for a

25 transfer of care; is that correct?

1   **A.**   Yes, that's my understanding.

2   **Q.**   Okay.  Next I want to talk to you about panel sizes.

3          **MR. BALLEW:**  Can we pull up Government Exhibit 787 in

4   evidence.

5   **BY MR. BALLEW:**

6   **Q.**   Now, you recall --

7          **MR. BALLEW:**  Can we go back to the top of the page?

8   **BY MR. BALLEW:**

9   **Q.**   So this is the clinical leadership Slack channel from

10  December 21st, 2022.  And you recall talking with the

11  prosecutor about this --

12  **A.**   Yes.

13  **Q.**   -- document?

14        And you were part of the clinical leadership Slack

15  channel?

16  **A.**   There's a little bit of -- just for clarification, there's

17  a difference between a channel and a thread.  I don't know

18  which of these this actually is.  This could just be a thread,

19  like an e-mail thread, in which all these people are sort of

20  cc'd on that.

21  **Q.**   Okay.  Well, you can see it's clinical leadership,

22  December 21, 2022.  And if we can go to the text of this, you

23  could see that the first speaker is Kyle Jones, who talks about

24  Erin Kim's large panel size.

25        Do you see that?

GRANGER - CROSS / BALLEW

1   A.   Yes.

2   Q.   And Kyle Jones, he was a member of clinical leadership?

3   He was a lead nurse practitioner on the platform?

4   A.   Yes.  He was in a supervisor -- supervisory role.

5   Q.   And you can see on the third communication here, someone

6   named Helena Lee says (as read):

7            "She Sue's provider.  They work closely

8       together."

9   Do you see that?

10  A.   Yes.

11  Q.   And I want to show you the continuation of -- and in this

12  communication, Dr. Brody mentions that (as read):

13           "Speaking as someone who has been doing

14      frontline patient care for a long time, 5,692

15      patients sounds like way too much."

16  Do you see that?

17  A.   Yes.

18  Q.   And you testified that clinical leadership had the

19  position that patient panel sizes were too big and they should

20  be reduced.

21  Do you recall testifying along those lines?

22  A.   Yes.

23  Q.   And -- but that wasn't all of clinical leadership that

24  believed that, is it?

25  A.   I am not sure who you're referring to.  I can't think of

1  an individual who didn't think that was a concern.

2  Q.  Well, is it accurate to say that Sussan Nwogwugwu, she was

3  also a lead nurse practitioner on the platform; correct?

4  A.  Sussan, yes.

5  Q.  And isn't it accurate that her position that she told the

6  clinical leadership in responding to this Slack channel was

7  that the decision should be up to the providers to monitor the

8  size of their panels?

9  A.  I don't recall that, but --

10        MR. BALLEW:  I'd like to introduce into evidence

11  Government -- it's Trial Exhibit 7714.  And if we can go down

12  to the -- you'll see that this is from the same day in the

13  clinical leadership group.

14        THE COURT:  Admitted.

15     (Trial Exhibit 7714 received in evidence.)

16  BY MR. BALLEW:

17  Q.  And if we go down to the conversation, you could see that

18  Ruthia is on this Slack channel as well; correct?

19  A.  Yes.

20  Q.  And so when Sue, who is Sussan Nwogwugwu, when she makes

21  the statement, Ruthia is copied on -- on it; correct?

22  A.  Yes.  It appears that way.

23  Q.  And she responds to the concerns by saying, (as read):

24        "Kyle, the information displayed in the admin

25     EHR regarding panel size is not a true representation

1          of the actual number of patients on the provider's

2          panel.  I agree with Ruthia.  Providers should be

3          able to recognize their limitations and verbalize

4          when needed, especially now that we have more

5          providers in most states."

6          Do you see that?

7     A.   Yes.

8     Q.   And this is a member of clinical leadership making this

9     statement in a Slack channel where Ms. Ruthia is copied?

10    A.   There is a spectrum of seniority among clinical

11    leadership, I'll just say that.  I believe that this is a

12    minority opinion, but yes, I see that.

13    Q.   But it is an opinion of someone in clinical leadership?

14    A.   It is.

15    Q.   Okay.  Moving on, you spoke about -- and Ms. Gurskis

16    admitted it into evidence, about Done's FAQ policy.

17         Do you remember her admitting that exhibit during your

18    testimony?

19    A.   Yes.

20    Q.   You didn't actually look at that exhibit, though, during

21    your testimony, did you?

22    A.   I don't believe I did today.

23              MR. BALLEW:  I'd like to pull it up.  It's

24    Exhibit 3096.

25    \\\

1   BY MR. BALLEW:

2   Q.   And, now, Ms. Gurskis mentioned a -- a FAQ about prior

3   authorizations during your direct testimony.

4        Do you recall that?

5   A.   Apologize.  It's not on the screen but it's in evidence.

6        MR. BALLEW:  Yes, this is in evidence, Your Honor.

7   This was admitted into evidence.

8        THE WITNESS:  Yes.

9   BY MR. BALLEW:

10  Q.   But there are a lot, you could see here, of frequently

11  asked questions.  And this would appear on Done's website;

12  right?

13  A.   Yes.  Both on the website and on the -- yeah, on the

14  website.

15  Q.   All right.  So a patient who wanted to learn about Done's

16  platform before they ended up shelling over $200 for an initial

17  appointment, they could come to the website and learn different

18  things about how the platform operated; is that accurate?

19  A.   Yes.

20  Q.   Okay.  I'd like to go and take a look at Row 1, Column B.

21       And you could see, if we go to Row 2, it says (as read):

22            "Do you accept any alternative proof of

23       residence?"

24       That's the question that they would see on the website;

25  correct?

1  **A.**   Yes.

2  **Q.**   And now, if we go to Column N of Row 2, and we can -- it's

3  a little difficult to read but maybe we can take an attempt to

4  highlight what the response is.  It says (as read):

5          "At this time, we only accept a valid photo ID

6      that is not expired.  You may not receive a

7      prescription without proper identification, and most

8      pharmacies will not dispense ADHD medication without

9      an in-state photo ID."

10  Do you see that?

11  **A.**   Sure.

12  **Q.**   So someone who's interested in possibly using Done's

13  website, before shelling out $200, would be able to see on the

14  website that Done requires photo identification to ensure that

15  the patient is in a state where Done operates; is that

16  accurate?

17          **MS. GURSKIS:**  Objection.  Relevance, 403.

18          **THE COURT:**  Sustained.

19  BY MR. BALLEW:

20  **Q.**   If we go to (as read):

21          "FAQ, will I get a prescription?"

22      That is a frequently asked question that a patient would

23  be able to see --

24          **THE COURT:**  It's hard to see the relevance.

25          **MR. BALLEW:**  Your Honor, I think one of the things

1   that the Government has argued, that this is a website that

2   attracts drug seekers and is pushing out pills and this is what

3   they are informing patients who would be coming to the website

4   about what their practices are.

5           **THE COURT:**  This is informing patients who -- which

6   patients desire to ask these questions or go to this website.

7   That's what it does.  And there are hundreds of questions on

8   here, and hundreds of responses.  So I don't want to -- you

9   know, it's in evidence; right?

10          **MR. BALLEW:**  It's in evidence; correct.

11          **THE COURT:**  Fine.  And you can -- if you want us to

12  look at it, you can look at it, you can argue, you can argue

13  it, but we're not spending any more time on it on this

14  particular issue.  Thank you.

15          **MR. FOSTER:**  Okay.  Fair enough.

16          **THE COURT:**  And I think we'll take our recess now

17  until 2:30.

18      Remember the admonition given to you:  Don't discuss the

19  case, allow anyone to discuss it with you, form or express any

20  opinion.

21                  (The jury leaves the courtroom.)

22      (Proceedings were heard out of the presence of the jury.)

23          **THE COURT:**  About how much longer will your cross be?

24          **MR. BALLEW:**  Yes, Your Honor.

25          **THE COURT:**  Sorry.  How much longer will your cross

PROCEEDINGS

 1 | be?

 2 |     **MR. BALLEW:** Maybe about -- well, there's one issue,

 3 | and maybe the -- if the witness could step down.

 4 |     **THE COURT:** Yeah, you can step down.

 5 |     (Steps down).

 6 |     **MR. BALLEW:** So just based on this witness's testimony

 7 | about initial appointments saying that clinical leadership,

 8 | including Dr. Luca and the clinical leadership opposed the

 9 | initial appointment times and saw it problematic as 30 minutes,

10 | we'd actually like to offer to impeach the hearsay declarant a

11 | training video that Dr. Luca and clinical leadership gave

12 | called "Doing a thorough initial appointment in 25 to 30

13 | minutes" where at the end of the video -- Dr. Luca ends up

14 | going 34 minute, and then Dr. Luca says, "Well, I actually

15 | think you could have diagnosed him faster."

16 |     We think that that is actually relevant impeachment of a

17 | hearsay declarant to the -- the witness has testified, actually

18 | thought that 25, 30 minutes was too short.  And it's

19 | impeachment by contradiction.

20 |     **THE COURT:** I don't know whether it's impeachment.

21 | Has he seen this video?

22 |     **MR. BALLEW:** Well, we're going to attempt to lay a --

23 | lay a foundation on that.

24 |     **MS. BELL:** Your Honor, I think the -- the different

25 | argument that we would make is it's actually impeachment by

1   contradiction of his testimony.  So he proffered testimony, as

2   I understood it, that he was present in meetings where Dr. Luca

3   expressed the view that 30 minutes was insufficient for an

4   initial appointment.  We have an audio, it's a training audio

5   where Dr. Luca trains providers to do initial appointments in

6   30 minutes.  So it's impeachment by contradiction of this

7   witness's testimony.

8        We have a transcript prepared of the audio, and he can

9   authenticate that that is indeed Dr. Luca talking and Kyle, who

10  was the other member of clinical leadership who appeared in the

11  corresponds, so we believe it is proper through this witness to

12  authenticate the audio and to play it as a direct impeachment

13  by contradiction of his proffered testimony about Dr. Luca's

14  views on the initial appointment time.

15       **MS. GURSKIS:**  First of all, he is in engineering.

16  He's not on the clinical training video, first point.  Second

17  point is it's hearsay.  And the fact that there is a training

18  video where someone may or may not have made a comment after

19  25 minutes does not impeach the witness on repeated concerns

20  raised by different members of clinical leadership in meetings

21  with the defendant.  It's not appropriate impeachment.

22       **THE COURT:**  It's not impeachment.  It's not

23  impeachment.  He said a witness said X on a particular

24  occasion.  Now, you have evidence that on a different occasion,

25  the witness said Y.  Okay.  That's fine.  But you can't -- you

1    don't impeach the witness that way.

2              **MR. BALLEW:**  The hearsay declarant is Dr. Luca.  He

3    was describing testimony --

4              **THE COURT:**  Maybe you should call him I don't know.

5              **MS. BELL:**  Your Honor can we.

6              **THE COURT:**  You can't use this witness.

7              **MS. BELL:**  Can he present the present to Your Honor to

8    review.

9              **THE COURT:**  Of course you can do whatever you want to

10   do, but he's not going to be allowed to ask questions unless I

11   change my ruling.

12             **MS. BELL:**  We will pass the transcript up.

13             **THE COURT:**  Now my question is how much longer.

14             **MR. BALLEW:**  Maybe about half-hour, 40 minutes; not

15   terribly long.

16             **THE COURT:**  You want me to look at it I'll look at it.

17             **MS. BELL:**  Yes, Your Honor.  We'll pull out the

18   transcript for you.

19                     (Recess taken at 2:19 p.m.)

20                 (Proceedings resumed at 2:35 p.m.)

21      (Proceedings were heard out of the presence of the jury.)

22             **THE COURTROOM DEPUTY:**  Come to order.  Court is now in

23   session.

24             **THE COURT:**  Okay.  Bring in the jury.

25                   (The jury enters the courtroom.)

1           (Proceedings were heard in the presence of the jury.)

2           **THE COURT:**  Please be seated.

3      Let the record show all parties are present.

4      You may continue.

5           **MR. BALLEW:**  Okay.

6  BY MR. BALLEW:

7  **Q.**   Mr. Granger, you testified on direct about a meeting in

8  June 2023 that you attended with Ms. He and, I think you said

9  it was a whole host of providers on the platform about -- where

10 they complained that their licenses were in jeopardy for

11 following uncompliant Done practices.

12     Do you recall that testimony?

13 **A.**   Yes.

14 **Q.**   And I believe you testified that you actually set up the

15 meeting to talk about some tech issues, EHR -- was it EHR,

16 workflow process, things like that?

17 **A.**   Yes.  As far as I remember, I was one of the organizers of

18 the meeting and really had a few was purpose in my mind was 21

19 to specifically get feedback on some of the futures we were

20 building but also to allow the clinicians to have their voices

21 heard by a member of, you know, executive leadership given the

22 concerns that I'd been hearing more broadly.

23 **Q.**   And you testified, quote (as read):

24           "You'll the complaint were around the policies

25      and not how the tech worked

1      Do you recall giving that testimony earlier today?

2  A.   Yes.

3  Q.   But in fact the majority of the complaints at that meeting

4  were in -- how the tech worked, specifically the new EHR note

5  that was being rolled out; isn't that accurate?

6  A.   A portion of the discussion centered around concerns

7  regarding a new note.  But specifically those concerns were

8  around -- it was really characterized about them feeling like

9  they didn't have enough time in their allotted appointment

10  times to fill out this new, more comprehensive note that --

11  that I had built out in collaboration with clinical leadership.

12  Q.   So the complaints weren't about 25 minutes being an

13  inadequate amount of time to actually diagnose someone with

14  ADHD, it was a complaint about 25 minutes wasn't enough time to

15  do that, plus fill out whatever this new note that was being

16  rolled out were?

17  A.   My understanding was that those two are part of the

18  necessary actions of actually diagnosing and following through

19  on that.  So my understanding is those were part and parcel of

20  the same effort.

21  Q.   Well, isn't it true that the complaint that the providers

22  were raising were about this new note feature --

23      THE COURT:  He just answered the question.  He

24  answered the question.

25      MR. BALLEW:  Okay.

1           THE COURT:  And the way he answered the question was

2    the complaints about the note had to do with the amount of time

3    that they were given to fill out the information.

4           MR. BALLEW:  Okay.

5           THE COURT:  So it's been asked and answered.

6           MR. BALLEW:  Okay.

7           THE COURT:  Let's move on.

8           MR. BALLEW:  Moving on.

9    BY MR. BALLEW:

10   Q.   I think I have just a few more questions for you.

11        So you testified about Done's China team.

12        Do you recall that?

13   A.   Yes.

14   Q.   You understood that many of the engineers were located in

15   China?

16   A.   Yes.  When I joined, there were a number of engineers.

17   That team expanded to encompass other individuals as well,

18   project managers, product managers specifically.

19   Q.   And you understood that the China team was focused on

20   front-end marketing, consumer facing stuff on the website, the

21   application, and discount codes; is that accurate?

22   A.   That was my understanding early on.  But their scope and

23   role expanded towards the end of my tenure into clinical areas.

24   Q.   And to be clear, nobody in China was actually writing

25   prescriptions; right?  That wasn't one of the things that

PROCEEDINGS

1    was --

2    **A.**   No.

3    **Q.**   -- shipped out?

4        The Government showed you GX3044, that's the screenshot

5    you showed where there were conversations in Mandarin?

6    **A.**   Yes.

7    **Q.**   You joined Done in October of 2022; correct?

8    **A.**   Yes.

9    **Q.**   You don't know how early on in the company's operations,

10   Ms. He would speak to members of Done's China based team in

11   Mandarin, do you?

12   **A.**   No, I can't say for certain I do.

13   **Q.**   But you testified about -- that you learned about the DOJ

14   investigation into Done shortly after you began working at the

15   company?

16   **A.**   I don't recall exactly when, but it was after I initially

17   joined, yeah.

18   **Q.**   And during your direct, you testified about certain

19   communications that you had with employees at Done discussing

20   the investigation.

21       Do you recall seeing those?

22   **A.**   Yes.

23   **Q.**   Now, you haven't been accused of any crimes in that case,

24   like obstructing justice; correct?

25   **A.**   Correct.

PROCEEDINGS

1  Q.   And to be clear, you never took any actions during your

2  time at Done with an intent to obstruct a grand jury's

3  investigation; is that correct?

4  A.   Certainly not.

5  Q.   You never acted to hide any information from the grand

6  jury; is that right?

7  A.   I would -- why would I do such a thing?  No.

8           MR. BALLEW:  Can we pull up GX36.

9  BY MR. BALLEW:

10  Q.   And I believe during your testimony, you explained that

11  this -- you were having conversations with some of your

12  colleagues on WhatsApp.

13      Do you recall that?

14  A.   Yes.

15  Q.   And you can see here that it says (as read):

16          "Messages to this chat and calls are now secured

17      with end-to-end encryption."

18      Do you recall that?

19  A.   Yes.

20  Q.   You understand that WhatsApp is an encrypted messaging app

21  that provides added securities in conversations that you're

22  having with others; correct?

23  A.   Yes.  But, you know, as we can see now, obviously that's

24  not infallible.

25  Q.   And these conversations are between you and your

PROCEEDINGS

1  co-workers at Done; right?

2  A.   Yes.

3  Q.   And one of the topics of the conversation is about the DOJ

4  investigation into Done?

5  A.   Yes.  That's referenced, yeah.

6  Q.   And you're not having these on official Done channel like

7  Slack or e-mail; correct?

8  A.   No.  It's broadly understood that on a company Slack or

9  e-mail channel, that it can be read by any administrative so --

10  anyone with administrative privileges, so that would have

11  directly jeopardized our employment in that case.

12  Q.   So you didn't think there was anything illegal, to be

13  clear, about having such a conversation on WhatsApp?

14  A.   I did not.

15  Q.   Okay.  So just a couple more questions.  I think you --

16  I believe you testified that at some point you were involved in

17  retrieving data from Done for the production to the Government

18  in response to the subpoena in this case?

19  A.   Yes.

20       MS. GURSKIS:  Your Honor, I'm going to object because

21  this relates to an issue that it's not -- has been addressed by

22  motions in limine in this proceeding.

23       MR. BALLEW:  I don't understand.  He testified about

24  it.  I'm cross-examining about what he testified about.

25       THE COURT:  Go ahead.

GRANGER - REDIRECT / GREEN

1    BY MR. BALLEW:

2    Q.   And you carried out that function without altering or

3    deleting any information before providing it to the Government;

4    correct?

5            MS. GURSKIS:  Your Honor, if I can be -- we could be

6    heard on this issue.  This relates to counsel, interactions

7    with counsel.

8            MR. BALLEW:  I'm not bringing up any interactions with

9    counsel.

10            THE COURT:  Go ahead.

11   BY MR. BALLEW:

12   Q.   So is that correct?

13   A.   Of course, yeah, I just did what was asked of me.

14   Q.   And Ruthia never instructed you -- you did what was asked

15   of you.  Ruthia never instructed you to delete or destroy

16   documents before you collected them for production to the

17   Government; correct?

18   A.   No.

19            MR. BALLEW:  No further questions.

20            THE COURT:  Any redirect?

21            MS. NECHAY:  I'll pass on this witness, Your Honor.

22            THE COURT:  I'm so sorry.

23            MS. NECHAY:  That's okay.

24                          REDIRECT EXAMINATION

25   \\\

1    BY MS. GREEN:

2    Q.    Good afternoon, Mr. Granger.

3    A.    Hello.

4    Q.    Mr. Ballew asked you some questions about the -- about

5    your WhatsApp communications.

6          Do you recall that?

7    A.    Yes.

8    Q.    And you produced those to the Government in response to a

9    grand jury subpoena issued to you; is that right?

10   A.    Correct.

11   Q.    And there wasn't any kind of automatic deletion feature or

12   anything like that that was part of that chain, was there?

13   A.    No.

14   Q.    And in terms -- you also addressed with Mr. Ballew that on

15   that chain you were raising concerns that you had about the

16   company; right?

17   A.    Yes, that's right.

18   Q.    And those were not concerns that you kept to yourselves

19   among your colleagues.  Those were concerns that you raised to

20   people in leadership as well; right?

21   A.    Yes.  You know, in a more formal tone and under official

22   channels, but the subjects were the same.

23          MS. GREEN:  And, Ms. Braga, could you -- do you have

24   the ability to pull up Exhibit 7714?  No?

25   \\\

BY MS. GREEN:

Q.   Do you recall when Mr. Ballew asked you some questions --

          MS. GREEN:  If you could turn to the second page,
Ms. Braga.

BY MS. GREEN:

Q.   -- about this message from Sussan Nwogwugwu?

A.   Yes.

Q.   And included in this message is (as read):

          "Providers should be able to recognize their
     limitations and verbalize when needed."

A.   Mm-hmm.

Q.   Do you see that?

A.   Yes.

Q.   Do you feel like when providers verbalized their needs and
concerns at Done, it was addressed by Defendant He?

A.   Generally speaking, no.  And I think I gave many examples
of those.

Q.   And in terms of the concerns that you heard about at the
company, was the panel size just one piece of the puzzle of
things that were brought to your attention?

A.   Yes, that was just one out of the others that I mentioned.

Q.   And did that relate to the ability of patients to actually
have meaningful interactions with the clinicians?

A.   Yes, almost certainly.  I mean, a panel size of, you know,
6-, 7-, 8,000 -- you know, you can do the simple math.  If a

1    follow-up is required by, you know, statutes and guidelines to

2    be every 90 days in the case of a controlled substance and you

3    have 6,000 patients, there's not enough time physically --

4    right? -- in the year for that.  And I don't -- that's not a

5    medical opinion, that's just a mathematical observation.

6    **Q.**   You were also asked some questions about how you're not a

7    medical practitioner.  You're not a doctor or you're not a

8    nurse; right, Mr. Granger?

9    **A.**   Correct.

10   **Q.**   And despite not having a medical background, how clear

11   was it to you that the practices at Done were illegal and

12   problematic?

13   **A.**   It was quite clear.  I -- despite not having medical

14   training, it's my job to understand the needs and concerns of

15   the clinicians that I'm working very closely with and they were

16   verbalizing these concerns and they made perfect sense and they

17   were totally congruent with my years of experience.

18   **Q.**   And when they were verbalizing those concerns, they were

19   verbalizing those concerns to Defendant He?

20   **A.**   Yes.

21        **MS. GURSKIS:**  Nothing further, Your Honor.

22        **THE COURT:**  Anything further?

23        **MR. BALLEW:**  No, Your Honor.

24        **MS. NECHAY:**  No, thank you.

25        **THE COURT:**  Okay.  Thank you.  You're excused.

PROCEEDINGS

```
 1            THE WITNESS:  Thank you.

 2                         (Witness excused.)

 3            THE COURT:  Call your next witness.

 4            MR. BODAPATI:  Your Honor, the Government calls

 5  Special Agent Anthony Guzman.

 6            THE COURT:  Okay.

 7        (Anthony Guzman steps forward to be sworn.)

 8            THE COURTROOM DEPUTY:  Please raise your right hand.

 9                         ANTHONY GUZMAN,

10  called as a witness for the Government, having been duly sworn,

11  testified as follows:

12            THE WITNESS:  I do.

13            THE COURTROOM DEPUTY:  Thank you.  Please be seated.

14  Please state your full name for the record and spell your last

15  name.

16            THE WITNESS:  My name is Anthony Guzman.  Last name is

17  G-U-Z-M-A-N.

18            THE COURTROOM DEPUTY:  Thank you.

19            MR. BODAPATI:  And, Your Honor, before we proceed with

20  the witness, we have two limiting instructions.  If Your Honor

21  would prefer, I could read those in now.

22            THE COURT:  Has this been shown to the defense?

23            MS. NECHAY:  To myself, but I suppose you probably

24  should read it as well.

25            THE COURT:  I think you gave me --
```

1          **MR. BODAPATI:**  Yes, Your Honor, they're double-sided,

2     but...

3          **MS. NECHAY:**  If I could just have a moment to confer

4     with counsel?

5          **THE COURT:**  Yeah.

6                    (Counsel conferring.)

7          **THE COURT:**  Am I to read the handwritten portion as

8     well?

9          **MR. BODAPATI:**  Yes, Your Honor.  That was the one

10    change that counsel requested.

11         **THE COURT:**  Okay.  So ladies -- has the witness -- the

12    witness has been sworn?  Okay.

13         **THE COURTROOM DEPUTY:**  Yes.

14         **THE COURT:**  Ladies and gentlemen of the jury, you are

15    about to hear evidence about Defendant Brody's practice of

16    prescribing controlled substances other than stimulants to a

17    patient who is not a member of Done.

18      This evidence of other acts will be admitted only for

19    limited purposes.  You may consider this evidence only for the

20    limited purpose of deciding whether Defendant Brody had the

21    state of mind, knowledge, or intent necessary to commit the

22    crimes charged in the indictment, or did not commit the acts

23    for which the defendant is on trial by accident or mistake.

24      Do not consider this evidence for any other purpose.  Of

25    course, it is for you to determine whether you believe this

1   evidence, and if you do believe it, whether you accept it for

2   the purpose offered.

3        You may give it such weight as you feel it deserves, but

4   only for the limited purpose -- purposes that I described to

5   you.

6        Defendant Brody is not on trial for committing these other

7   acts.  You may not consider the evidence of these other acts as

8   a substitute for proof that Defendant Brody committed the

9   crimes charged.  You may not consider this evidence as proof

10  that Defendant Brody has a bad character or any propensity to

11  commit the crimes.  Specifically, you may not use this evidence

12  to conclude that because Defendant Brody may have committed the

13  other acts, he must have committed the acts charged in the

14  indictment.

15       Do you want me to read the financial motive as well?

16            **MR. BODAPATI:**  Yes, Your Honor.

17            **THE COURT:**  Okay.  Additionally, you are about to hear

18  evidence that Defendant Brody has unpaid debts to the Internal

19  Revenue Service and mortgage lenders prior to and during his

20  employment at Done.  This evidence will be admitted only for a

21  limited purpose.  You may consider this evidence only for the

22  purpose of deciding whether Defendant Brody had a motive or the

23  state of mind, knowledge, or intent necessary to commit the

24  crimes charged in the indictment.

25       Do not consider this evidence for any other purpose.  Of

1  course, it is for you to determine whether you believe this

2  evidence, and if you do believe it, whether you accept it for

3  the purpose offered.  You may give it such weight as you feel

4  it deserves but only for the limited purposes that I described

5  to you.

6     Defendant Brody is not on trial for any mortgage or tax

7  offenses.  You may not consider evidence of any unpaid debts by

8  Defendant Brody as a substitute for proof that Defendant Brody

9  committed the crimes charged.

10     You may not consider this evidence as proof that

11  Defendant Brody has a bad character.  Or any propensity to

12  commit the crimes.

13     Specifically, you may not use this evidence to conclude

14  that because Defendant Brody may have had outstanding financial

15  obligations to the IRS or to mortgage lenders, he must also

16  have committed the acts charged in the indictment.

17     Okay.  You may proceed.

18       **MR. BODAPATI:**  And one final matter, Your Honor.

19  There are several exhibits that the defendants do not object to

20  admitting.  To streamline the proceedings, I would offer them

21  upfront.

22       **THE COURT:**  You want to introduce them?

23       **MR. BODAPATI:**  Yes, Your Honor.

24       **THE COURT:**  And they are what?

25       **MR. BODAPATI:**  They are Exhibits 2, 4, 11, 17, 18, 19,

PROCEEDINGS

1    22, 32, 48, 51, 53, 57, 59, 84, 85, 87, 109, 115, 132, 145,

2    164, 172 --

3              THE COURT:  Okay.  Wait, wait.

4         MR. BODAPATI:  I'm sorry.  Yep.

5              THE COURT:  I thought I could keep up with you.

6         MR. BODAPATI:  Yep.

7              THE COURT:  132.  Then what's after that?

8         MR. BODAPATI:  145.

9              THE COURT:  Go ahead.

10         MR. BODAPATI:  164, 172, 187, 198, 206, 207, 208, 213,

11    218, 229, 238, 252, 278, 310, 314, 315, 322, 324, 326, 330,

12    337, 352, 362, 380, 422, 445, 456, 466 --

13         THE COURTROOM DEPUTY:  One moment.

14         THE COURT:  456?

15         MR. BODAPATI:  466.

16         THE COURT:  466.

17         MR. BODAPATI:  483, 489, 504, 535 --

18         THE COURT:  Five what?

19         MR. BODAPATI:  535.

20         THE COURT:  535.

21         MR. BODAPATI:  545, 597, 599, 845, 846, 867, 868, 871,

22    872, 898, 904, 961, 1363, 1475, 1731, 2824 through 2827, 2990

23    through 2992, 2883, 2995, 3004.

24         THE COURTROOM DEPUTY:  Slow down.

25         MR. BODAPATI:  3043 and 3092.

1        **THE COURT:**  All those exhibits are admitted.

2        (Trial Exhibits 2, 4, 11, 17, 18, 19, 22, 32, 48, 51, 53,

3    57, 59, 84, 85, 87, 109, 115, 132, 145, 164, 172, 187, 198,

4    206, 207, 208, 213, 218, 229, 238, 252, 278, 310, 314, 315,

5    322, 324, 326, 330, 337, 352, 362, 380, 422, 445, 456, 466,

6    483, 489, 504, 535, 545, 597, 599, 845, 846, 867, 868, 871,

7    872, 898, 904, 961, 1363, 1475, 1731, 2824, 2825, 2826, 2827,

8    2990, 2991, 2992, 2883, 2995, 3004, 3043, 3092 received in

9    evidence.)

10                       <u>**DIRECT EXAMINATION**</u>

11   **BY MR. BODAPATI:**

12   **Q.**   Who do you work for, sir?

13   **A.**   I work for the DEA.

14   **Q.**   And what's your title?

15   **A.**   I am a special agent.

16   **Q.**   How long have you worked as a special agent at the DEA?

17   **A.**   Approximately 20 years.

18   **Q.**   And do you work for the DEA here in San Francisco?

19   **A.**   I work in the San Francisco field division but my office

20   is in Oakland.  It's the Oakland resident office.

21   **Q.**   Okay.  What kind of cases do you investigate as a DEA

22   agent?

23   **A.**   We investigate violations of the Controlled Substances

24   Act.

25   **Q.**   Are you part of a specific squad or unit at the DEA?

GUZMAN - DIRECT / BODAPATI

1  A.    Yes.  I belong to a group called the tactical diversion

2  squad.

3  Q.    And what does the tactical diversion squad do?

4  A.    We investigate crimes that involve prescription drugs.  So

5  that could be anything from someone selling their prescription

6  drug on the street, all the way to a medical provider who's

7  prescribing outside the usual course of professional practice,

8  not for a legitimate purpose.

9  Q.    When did you become involved in this case?

10  A.    It was approximately September 2022.

11  Q.    And are you part of the investigative team?

12  A.    Yes.

13  Q.    Are all of the agents on the team from the DEA or do they

14  come from other agencies?

15  A.    There's various agencies in this investigation.  There's

16  agents from HHS, OIG, HSI, and IRS, CID.

17  Q.    And are all of those agents based out of this district?

18  A.    No.

19  Q.    Where are the majority of the other agents based?

20  A.    New York.

21  Q.    Was this investigation conducted in connection with a

22  grand jury proceeding in this district?

23  A.    Yes, it was.

24  Q.    And have you reviewed all of the evidence obtained by the

25  investigative team in this case?

1    A.    No.  No, I haven't.

2    Q.    Have you reviewed any of it?

3    A.    Yes.

4    Q.    Did the investigative team collect information through

5    grand jury subpoenas, including ones served on Done?

6    A.    Yes, they did.

7    Q.    And did the investigative team conduct judicially

8    authorized searches of electronic devices and accounts

9    belonging to the defendants?

10    A.    Yes.

11    Q.    Did those devices include a MacBook, iPhone 12, and iPhone

12    14 Pro Max belonging to Defendant He?

13    A.    It did.

14    Q.    And did they include a phone belonging to Defendant Brody?

15    A.    Yes, it did.

16    Q.    Did the accounts that were searched include Google and

17    Dropbox accounts for Defendant He?

18    A.    Yes.

19    Q.    And a personal e-mail account for Defendant Brody?

20    A.    Yes.

21    Q.    During the course of the investigation, did agents obtain

22    records from the companies that serviced Defendant Brody's home

23    mortgage?

24    A.    Yes.

25    Q.    And did those records include letters from Defendant Brody

1    to the mortgage servicers?

2    **A.**    It did.

3          **MR. BODAPATI:**  The Government offers Exhibit 191.

4          **THE COURT:**  191 admitted.

5          **MR. BODAPATI:**  Ms. Braga, can we pull that up.

6      (Trial Exhibit 191 received in evidence.)

7    BY MR. BODAPATI:

8    **Q.**    Special Agent Guzman, is this a November 9th, 2020, letter

9    from Defendant Brody to Select Portfolio Servicing?

10   **A.**    It is.

11   **Q.**    And just below the address, it says --

12          **MR. BODAPATI:**  Can we pull that up for the jury?

13   BY MR. BODAPATI:

14   **Q.**    Okay.  And just below the address, does it say "hardship

15   explanation"?

16   **A.**    It does.

17   **Q.**    And it's an attachment to a request for mortgage

18   assistance?

19   **A.**    That is correct.

20   **Q.**    Can you read the first two paragraphs of this letter?

21   **A.**    (as read):

22          "On March 16, 2020, due to the COVID-19

23      pandemic, I was let go from my job with Sonoma

24      County.  Losing not only my job but our health

25      insurance as well.  As a result, my wife's smaller

1    salary went almost entirely to pay for insurance.

2         I remained unemployed until July 1st, 2020, when

3    I  obtained temporary part-time employment for three

4    months.  On October 1st, 2020, my part-time hours

5    were further reduced."

6    Q.   Now, it says here that Defendant Brody remained unemployed

7    until July 1st, 2020.  After that date, did Defendant Brody

8    enter into an agreement to work for Done?

9    A.   Yes.

10   Q.   How long after July 1st, 2020, did he enter that

11   agreement?

12   A.   It was about a month.

13   Q.   And after Defendant Brody joined Done, did he ever discuss

14   his tax obligations with Defendant He?

15   A.   He did.

16        **MR. BODAPATI:**  Government offers Exhibit 1064.

17        **THE COURT:**  Admitted.

18        **MR. BODAPATI:**  And, Ms. Braga, can we pull that up?

19   (Trial Exhibit 1064 received in evidence.)

20   **BY MR. BODAPATI:**

21   Q.   Zooming in at the bottom of page 1, do you see where

22   Defendant He says (as read):

23        "You should definitely stay worry free?

24   A.   I do.

25        **MR. BODAPATI:**  Turning to page 2, can we zoom in on

1  the middle message?

2  **BY MR. BODAPATI:**

3  **Q.**  And do you see Defendant Brody's response, (as read):

4      "By the way, my reaction to the idea that I'm

5  worry free"?

6  **A.**  Yes.

7  **Q.**  Let's turn to page 3.  Zooming in on the second message,

8  what does Defendant Brody say here?

9  **A.**  He states (as read):

10      "I have three different jobs.  Still owe taxes

11  on all years from 2014 to the present.  Have seven

12  people living here.  It is a big house."

13  **Q.**  Did Defendant Brody continue to express worries about his

14  outstanding taxes in 2022?

15  **A.**  He did.

16      **MR. BODAPATI:**  Government moves to admit Exhibits 574.

17      **THE COURT:**  574 admitted.

18      **MS. GREEN:**  As well as 2471 through 2473.

19      **THE COURT:**  Admitted.

20      (Trial Exhibits 574. 2471, 2472, 2473 received in

21  evidence.)

22      **MR. BODAPATI:**  And 2609 through 2611.

23      **THE COURT:**  2609 through what?

24      **MR. BODAPATI:**  2611.

25      **THE COURT:**  Admitted.

1          (Trial Exhibits 2609, 2610, 2611 received in evidence.)

2          **MR. BODAPATI:**  Ms. Braga, can we pull up Exhibit 574.

3     And zoom in on the top message.

4     **BY MR. BODAPATI:**

5     **Q.**   What's the date of this message?

6     **A.**   It's April 14th, 2022.

7     **Q.**   And was Defendant Brody for Done at this time?

8     **A.**   Yes, he was.

9     **Q.**   Can you read the first message he sends?

10    **A.**   (as read):

11            "Thank you very much for filing the extension.

12         We are very worried about the amount the IRS claims

13         we owe for 2015 and 2018.  I sent you pictures of the

14         letters.  They claim we owe 77,000 for 2015 and

15         18,000 for 2018.

16            "We understand you are exceedingly busy now, but

17         we're hoping we can meet with you on the 18th or

18         19th or even on the weekend before about the 95,000

19         the IRS claims we owe as the deadline they gave us is

20         April 25.

21            "Thank you, as always, for all your help."

22    **Q.**   Shifting topics.  Did investigators obtain any records

23    from the medical board of California?

24    **A.**   Yes.

25    **Q.**   And did those records include a stipulated surrender of

1   license signed by Defendant Brody?

2   **A.**   It did.

3          **MR. BODAPATI:**   The Government moves to admit

4   Exhibit 2545.

5          **THE COURT:**   2545 admitted.

6       (Trial Exhibit 2545 received in evidence.)

7          **MR. BODAPATI:**   And, Ms. Braga, can we first zoom in on

8   the caption?

9   **BY MR. BODAPATI:**

10  **Q.**   And who's the respondent here?

11  **A.**   It's David Brody, MD.

12  **Q.**   And did -- just below that, does it say that there's an

13  attached stipulated surrender of license?

14  **A.**   Yes.

15         **MR. BODAPATI:**   Now, can we briefly turn to page 7.

16  **BY MR. BODAPATI:**

17  **Q.**   And looking at the top, is that Defendant Brody's

18  signature?

19  **A.**   It is.

20  **Q.**   Okay.

21         **MR. BODAPATI:**   Let's turn now to page 4.

22  **BY MR. BODAPATI:**

23  **Q.**   Zooming in on paragraph 9, what does the first sentence

24  here say?

25  **A.**   (as read):

1          "For the purpose of resolving the first amended

2     accusation without the dispense and uncertainty of

3     further proceedings respondent agrees that at a

4     hearing, complaint could establish a factual basis

5     for the charges in the first amended accusation and

6     that those charges constitute cause for discipline."

7  **Q.**   And was the first amended accusation attached to this

8  stipulated surrender of license?

9  **A.**   Yes.

10         **MR. BODAPATI:**  Can we turn now to page 15?  And can we

11  zoom in on the three paragraphs, 23, 24, and 25?

12  **BY MR. BODAPATI:**

13  **Q.**   Looking first at paragraph 23, does this indicate that

14  Defendant Brody prescribed controlled substances to someone who

15  was not a Done member between 2017 and 2022?

16  **A.**   It does.

17  **Q.**   Can you read the last sentence of paragraph 23?

18  **A.**   (as read):

19          "No documentation evidenced that respondent

20     completed an adequate psychiatric evaluation to

21     determine the indication for these psychiatric

22     medications or completed adequate psychiatric

23     evaluations at follow-up visits to determine whether

24     the medications were safe, effective, and continued

25     to be medically indicated."

1  Q.    Looking at paragraph 24, what conditions did this patient

2  have?

3  A.    The patient was diagnosed with severe recurrent major

4  depression with psychotic features, post-traumatic stress

5  disorder, seizure disorder, atypical dissociative disorder, and

6  a status post-multiple head traumas and memory loss.

7  Q.    And now looking at paragraph 25, what was the finding in

8  the last sentence?

9  A.    (as read):

10        "The decision to prescribe the controlled

11        substances while in private practice does not appear

12        to be based on an adequate history and examination to

13        establish an appropriate medical indication for their

14        use."

15  Q.    Let's shift topics.

16        Special Agent Guzman, are Medicare and Medicaid federal

17  healthcare programs?

18  A.    Yes.

19  Q.    And is the same true for Medicare and Medicaid drug plans

20  operated by private insurers?

21  A.    It is.

22  Q.    During the course of the investigation, did agents

23  identify communications in which Defendant Brody approved the

24  submission of prior authorizations in his name?

25  A.    Yes.

1          **MR. BODAPATI:**  The Government moves to admit Exhibits

2    690, 754, and 934.

3          **THE COURT REPORTER:**  Admitted.

4    (Trial Exhibits 690, 754, 934 received in evidence.)

5          **MR. BODAPATI:**  Ms. Braga, can we please pull up

6    Exhibit 754?

7    **BY MR. BODAPATI:**

8    **Q.**   Special Agent Guzman, could you please read the prior

9    authorization department's message at the bottom?

10   **A.**   (as read):

11            "Hi, Dr. Brody.  Good day.  May we request that

12       you please sign the attached PA form of patient Molly

13       Hanks.  We'll send the form to the plan once we

14       receive the signed form.  Thank you."

15   **Q.**   And in the reply up top, what does Defendant Brody say in

16   response?

17   **A.**   (as read):

18            "Of course I approve it, but I do not know how

19       to actually sign anything on this computer.  If I'm

20       supposed to sign electronically, I need clear

21       instruction on how.  And if I'm supposed to sign the

22       old-fashioned way, that's a problem, because I do not

23       have a printer.  Thanks for your patience."

24   **Q.**   Now, during the investigation, did agents also identify

25   communications in which Defendant He discussed or saw

```
 1    information about prior authorizations?

 2    A.   Yes.

 3              MR. BODAPATI:  Government moves to admit Exhibits 382,

 4    894, 895, and 901.

 5              THE COURT:  Knitted.

 6         (Trial Exhibits 382, 894, 895, 901 received in evidence.)

 7              MS. GURSKIS:  Ms. Braga, can we please pull up

 8    Exhibit 901?  And can we go to the first e-mail, which is on

 9    page 2.  Zooming in on that e-mail.

10    BY MR. BODAPATI:

11    Q.   Is this an e-mail from Defendant He to someone named

12    YiDing Yu?

13    A.   Yes.

14              MR. SCHACHTER:  Objection.  That's not -- sorry.

15    Sorry.

16    BY MR. BODAPATI:

17    Q.   And can you read the second line of Defendant He's e-mail?

18    A.   (as read):

19              "Here are a list of reasons why we're getting PA

20         denials."

21    Q.   And is there a list of reasons below?

22    A.   Yes.

23    Q.   What is Reason Number 3 in that list?

24    A.   (as read):

25              "The clinical information submitted by your
```

```
 1            provider does not meet the criteria for this

 2            medication."

 3    Q.   Now, moving briefly to the e-mail at the top of page 1.

 4            MR. BODAPATI:  Can we zoom in on that?

 5    BY MR. BODAPATI:

 6    Q.   Now, did Dr. Yu provide a phone number in response near

 7    the end of her e-mail?

 8    A.   Yes.

 9    Q.   Did agents find exchanges with that phone number on

10    Defendant He's iPhone 12?

11    A.   Yes.

12            MR. BODAPATI:  The Government moves to admit

13    Exhibit 2903, which is a collection of screenshots from the

14    iPhone 12.

15            THE COURT:  Admitted.

16        (Trial Exhibit 2903 received in evidence.)

17            MS. GURSKIS:  And, Ms. Braga, can we pull that exhibit

18    up to page 18.

19    BY THE COURT:

20    Q.   Looking up top, is this that same phone number we just

21    saw?

22    A.   It is.

23    Q.   And can you read the first sentence of this message?

24    A.   (as read):

25                "What I will say is based on your original
```

1              e-mail listing out the reasons you are having trouble

2              with PA, it seems like the main one is getting the

3              right documentation."

4    Q.    Now, during the investigation, did law enforcement agents

5    compile prior authorizations and letters of medical necessity

6    submitted in the name of Done providers?

7    A.    Yes.

8              MR. BODAPATI:  The Government moves to admit Exhibit

9    be 2354.

10             THE COURT:  Admitted.

11        (Trial Exhibit 2534 received in evidence.)

12   BY MR. BODAPATI:

13   Q.    Now, the next sentence here mentions CoverMyMeds.  Did

14   Defendant He receive e-mails from CoverMyMeds?

15   A.    Yes.

16             MR. BODAPATI:  Let's pull up Exhibit 894.

17   BY MR. BODAPATI:

18   Q.    Special Agent Guzman, what is this exhibit?

19   A.    It's an e-mail from CoverMyMeds to Ruthia He regarding

20   approved prior authorizations.

21   Q.    And is the exhibit one e-mail or more than one e-mail?

22   A.    There's more than one e-mail.

23   Q.    Okay.

24             MR. BODAPATI:  Ms. Braga, can we briefly scroll

25   through the first five pages.

1   BY MR. BODAPATI:

2   Q.   And it appears each page is a separate e-mail?

3   A.   Yes.

4   Q.   Special Agent Guzman, approximately how many e-mails did

5   Defendant He receive regarding prior authorizations?

6           MR. BALLEW:   Objection, Your Honor.   It's an e-mail to

7   Rdone -- r@done.com.   It's not an e-mail to Ruthia.

8           MR. BODAPATI:   I can lay a foundation.

9   BY MR. BODAPATI:

10  Q.   Special Agent Guzman, just focusing here, looking at the

11  top, who is this addressed to?

12  A.   It is addressed to Ruthia He.

13  Q.   And during the course of your investigation, did you learn

14  who used the e-mail address r@donefirst.com?

15  A.   Yes.

16  Q.   Who was that?

17  A.   It was Ruthia He.

18  Q.   Now, Special Agent Guzman, based on this exhibit, about

19  how many e-mails were sent to Ruthia He's e-mail address from

20  CoverMyMeds on the subject of prior authorizations?

21  A.   There were over 9,000.

22  Q.   Okay.   And let's briefly shift to Exhibit 895.

23       And, Special Agent Guzman, what does this exhibit show?

24  A.   These are more e-mails from CoverMyMeds to Ruthia He, but

25  these are for prior authorizations that were denied.

1    Q.    Okay.

2        MR. BODAPATI:    And, Ms. Braga, can we, again, briefly

3    scroll through the first five pages.

4    BY MR. BODAPATI:

5    Q.    And does it appear, again, that each e-mail is a separate

6    page?

7    A.    Yes.

8    Q.    Based on that, Special Agent Guzman, approximately how

9    many e-mails did CoverMyMeds send to Ruthia He's e-mail account

10   on the subject of prior authorization denials?

11   A.    There were over 10,000.

12   Q.    Okay.    Let's switch topics.

13       You mentioned earlier that Done produced documents in

14   response to grand jury subpoenas.

15       Did I remember that right?

16   A.    Yes.

17   Q.    On April 30th, 2024, did Done certify that it completed

18   its productions in response to the grand jury subpoenas?

19   A.    Yes, they did.

20       MR. BODAPATI:    Your Honor, the Government offers

21   Exhibit 2490, which is the certification of completion.

22       THE COURT:    Admitted.

23       (Trial Exhibit 2490 received in evidence.)

24   BY MR. BODAPATI:

25   Q.    And during the course of the investigation, did agents

1  obtain documents and communications that Done had not produced

2  prior to April 30th, 2024?

3  A.   Yes.

4      MR. BODAPATI:  Let's pull up Exhibit 2361, which is

5  one of the subpoenas in evidence.  And let's turn to page 8.

6      Ms. Braga can we zoom in on Request 11?

7  BY MR. BODAPATI:

8  Q.   Does this request call for communications between

9  employees regarding concerns or complaints related to medical

10 providers' work for Done Health, including, but not limited to,

11 prescribing practices?

12 A.   It does.

13 Q.   Do you see how the portion about concerns and complaints

14 to the end is highlighted?

15 A.   Yes.

16 Q.   Was this highlighting that the case team made or was it in

17 the original document seized from Defendant Brody's MacBook?

18 A.   It was in the original document seized from the MacBook.

19 Q.   Did investigators obtain unproduced communications in

20 which Done employees raised concerns related to their work?

21 A.   Yes.

22      MR. BODAPATI:  Let's pull up Exhibit 888 in evidence.

23 And can we zoom in on that, Ms. Braga.

24 BY MR. BODAPATI:

25 Q.   And these were messages from a provider named Hilary

 1    Ortega?

 2    A.    Yes.

 3    Q.    She mentioned to stop treating controlled medications like

 4    Lexapro refills?

 5    A.    Yes, she does.

 6    Q.    Is this a communication that Done produced before

 7    April 30th, 2024?

 8    A.    No, it is not.

 9    Q.    Where did agents find it?

10    A.    This came from Ruthia He's Dropbox.

11         MR. BODAPATI:    Let's turn to Exhibit 355 in evidence.

12    And can we turn to page 3?    And, Ms. Braga, can we zoom in on

13    the message?    There we go, yeah.

14    BY MR. BODAPATI:

15    Q.    This is a message where Dr. Brindala discusses his

16    concerns about Done's approach to prescribing stimulants?

17    A.    It is.

18    Q.    Did Done produce this conversation before certifying it

19    had completed its response to the subpoenas?

20    A.    No.

21    Q.    How did agents obtain this communication?

22    A.    We obtained this through a search warrant through Riley

23    Levy.

24    Q.    Okay.    And what was that search warrant of?

25    A.    I'm sorry.    What was that?

1    Q.    What was searched through that warrant?

2    A.    Computers on Done's platform.

3    Q.    All right.

4          MR. BODAPATI:  Let's pull up the subpoena again,

5    page 9.  And that's Exhibit 2361, Ms. Braga.  Can we zoom in on

6    Request 27.

7    BY MR. BODAPATI:

8    Q.    What did this request call for?

9    A.    (as read):

10          "Onboarding, training, guidance, or marketing

11          materials provided to medical providers, including

12          documents, video communication, and audio

13          communications."

14   Q.    During the course of the investigation, did agents obtain

15   training videos that Done had not produced before April 30th,

16   2024?

17   A.    Yes.

18   Q.    And did agents obtain those through a judicially

19   authorized search of Done's computer systems?

20   A.    Yes.

21          MR. BODAPATI:  Let's pull up Exhibit 3056, which is in

22   evidence.  And, Ms. Braga, can we zoom in on the first six or

23   so folders up top?

24   BY MR. BODAPATI:

25   Q.    What is this a picture of?

 1  **A.**    It's a Google drive folder.

 2  **Q.**    And was the name of the -- what is the name of the

 3  subfolder?

 4  **A.**    There's various subfolders, including "training video, do

 5  not share."

 6  **Q.**    Okay.  Did agents search that specific folder?

 7  **A.**    Yes.

 8  **Q.**    And did the folder include a video of an encounter between

 9  a Done provider and a patient named Danielle Johnson?

10  **A.**    It did.

11  **Q.**    Did Done produce that video before April 30th, 2024?

12  **A.**    No.

13  **Q.**    Okay.

14         **MR. BODAPATI:**  Let's pull up the subpoena,

15  Exhibit 2631 again, and go to page 9.  Can we zoom in now on

16  Request 23?

17  **BY MR. BODAPATI:**

18  **Q.**    Special Agent Guzman, what did this request call for?

19  **A.**    (as read):

20             "Documents regarding, reflecting, or referring

21         to queries of the prescription drug monitoring

22         programs in each state where controlled substance

23         prescriptions were issued."

24         **MR. BODAPATI:**  Now, let's pull up Exhibit 1805 in

25  evidence.

1  BY MR. BODAPATI:

2  Q.   And it says at the top this is a (as read):

3        "Controlled substance utilization review and

4        evaluation system report"?

5  A.   Yes.

6  Q.   And is that California's prescription drug monitoring

7  program?

8  A.   It is.

9  Q.   Okay.

10       MR. BODAPATI:  Can we zoom in on the top two rows

11  there?

12  BY MR. BODAPATI:

13  Q.   And is this a CURES report for a patient named Harlan

14  Band?

15  A.   It is.

16  Q.   And does Row 1 show that he had been prescribed

17  buprenorphine-naloxone --

18  A.   Yes.

19  Q.   -- on November 24th, 2020?

20  A.   Yes.

21  Q.   And is buprenorphine-naloxone sometimes known as Suboxone?

22  A.   It is.

23  Q.   Did Done produce this prescription drug monitoring program

24  report to the grand jury before April 2024?

25  A.   No.

1              MR. BODAPATI:  Let's pull up Exhibit 1830 in evidence.

2    BY MR. BODAPATI:

3    Q.   Is this a document that Done did produce to the

4    Government?

5    A.   Yes, it is.

6    Q.   And looking at the two boxes in the middle where it says

7    "patient information" and "patient address," it says this is

8    for Harlan Band?

9    A.   It does.

10   Q.   And just above the boxes, it says CURES was searched on

11   June 17th, 2022, for the period June 17th, 2021 to June 17th,

12   2022?

13   A.   Yes.

14   Q.   Now, just below the two boxes with Harlan Band's

15   information, what does it say?

16   A.   (as read):

17        "No records matching the above identified search

18        criteria were found."

19   Q.   Special Agent Guzman, did the time period that was queried

20   here cover the time that Mr. Band was on Suboxone?

21   A.   It did not.

22   Q.   Did the time period that was queried here cover the time

23   that Mr. Band was still alive?

24   A.   It did not.

25              MR. BODAPATI:  Let's go back to Exhibit 2661.  And now

 1    can we zoom in on request Number 7?  Yes.

 2    BY MR. BODAPATI:

 3    Q.   What does this request call for?

 4    A.   (as read):

 5              "Documents that constitute, reflect, or refer to

 6         data analysis of the prescription practices of

 7         medical providers who contract with Done Health."

 8              MR. BODAPATI:  And can we now pull up Exhibit 1454 in

 9    evidence.  And can we zoom in on, let's say, the top quarter?

10    BY MR. BODAPATI:

11    Q.   What does it say at the top here?

12    A.   (as read):

13              "Overdue patients count."

14    Q.   Did Done produce overdue patient counts like these in

15    response to the subpoena?

16    A.   No.

17    Q.   And just one more subpoena request.

18         Did the subpoena call for patient files?

19    A.   Yes.

20              MR. BODAPATI:  And can we pull up Exhibit 7456?

21         And can we just zoom in on the left there?

22    BY MR. BODAPATI:

23    Q.   And this appears to be a patient file for a patient named

24    Cheryle Cooke?

25    A.   That is correct.

1  Q.   Did Done produce patient files with this format to the

2  grand jury?

3  A.   No.

4        MR. BODAPATI:  We can take that down.

5  BY MR. BODAPATI:

6  Q.   During trial, do you recall hearing testimony regarding

7  the potential deletion of communications like Slack messages at

8  Done?

9  A.   I did.

10 Q.   And during the investigation, did agents learn that Done

11 used Facebook Workplace for company communications before it

12 switched to Slack?

13 A.   Yes.

14 Q.   And after Done transitioned to Slack, did Defendant He

15 receive a copy of Done's Facebook Workplace data?

16 A.   Yes.  She did.

17        MR. BODAPATI:  The Government moves to admit

18 Exhibit 291.

19        THE COURT:  291 admitted.

20     (Trial Exhibit 291 received in evidence.)

21        MR. BODAPATI:  And let's pull that up.  Can we zoom

22 in?

23 BY MR. BODAPATI:

24 Q.   And this is a February 15th, 2021, e-mail to Defendant He?

25 A.   It is.

1   Q.   And can you read the first line of this e-mail?

2   A.   (as read):

3         "You recently requested a copy of your Workplace

4   data.  It is now ready for you to download."

5   Q.   Did Done produce Facebook Workplace communications to the

6   Government before April 2024?

7   A.   No.

8   Q.   And did agents obtain Facebook Workplace messages between

9   Defendant He and Done clinicians by other means?

10  A.   Yes.

11  Q.   Let's pull up Exhibit 2892 in evidence.

12       Do you recall seeing this message during the testimony of

13  Nwamaka Emeruem?

14  A.   Yes.

15  Q.   Where did law enforcement agents find this message?

16  A.   On Defendant He's MacBook.

17  Q.   Okay.  Let's turn to the subject of deletion.

18       During the investigation, did agents identify any records

19  in Defendant He's personal Gmail account about the deletion of

20  information?

21  A.   Yes.

22       **MR. BODAPATI:**  The Government offers Exhibit 772.

23       **THE COURT:**  Admitted.

24       (Trial Exhibit 772 received in evidence.)

25  \\\

1    BY MR. BODAPATI:

2    Q.    What's the date of this e-mail, Special Agent Guzman?

3    A.    It's December 2nd, 2022.

4    Q.    And who is the e-mail to?

5    A.    Defendant He.

6    Q.    And who is the e-mail from?

7    A.    Quora.

8    Q.    What is Quora?

9    A.    It's like an online forum where people can ask various

10   questions and then users can write responses to those

11   questions.

12   Q.    Okay.  And what is the headline of this Quora e-mail to

13   Defendant He?

14   A.    "More related to 'If a Gmail account is deleted, can the

15   police check Google's history?'"

16   Q.    Special Agent Guzman, based on your understanding of

17   Quora, who entered the question in quotations?

18   A.    Defendant He.

19   Q.    Special Agent Guzman, did agents find communications made

20   via encrypted messaging platforms on Defendant He's phones?

21   A.    Yes.

22   Q.    Did those include Signal messages?

23   A.    Yes.

24   Q.    Before certifying that it had completed its response to

25   the subpoenas, did Done produce Signal messages to the grand

1    jury?

2    **A.**    No, they did not.

3    **Q.**    Did the investigative team identify instances where

4    Defendant He discussed company business or the government

5    investigation with others on Signal?

6    **A.**    Yes.

7         **MR. BODAPATI:**  The Government offers into evidence

8    Exhibits 731, 748, and 749.

9         **THE COURT:**  Admitted.

10    (Trial Exhibits 731, 748, 749 received in evidence.)

11         **MR. BODAPATI:**  And Ms. Braga, can we pull up

12    Exhibit 749.

13    **BY MR. BODAPATI:**

14    **Q.**    Zooming in a bit, what's the name of this Signal channel?

15    **A.**    "Done PR."

16    **Q.**    And who is sending the messages in blue?

17    **A.**    Defendant He.

18    **Q.**    Can you read the first three messages from Defendant He

19    here?

20    **A.**    (as read):

21         "I think we need to do a rehearsal before we can

22         invite media as Dr. Brody and Dr. Zoe are really not

23         politics heavy.  Dr. Brody always are biased about

24         politicians.  We don't want the media to cover him

25         saying 'regulations are all bullshit.'"

1    Q.    Did Defendant He discuss the government investigation via

2    another encrypted messaging app called WhatsApp?

3    A.    Yes.

4    Q.    And did Done produce WhatsApp messages to the grand jury

5    before April 30th, 2024?

6    A.    No.

7            MR. BODAPATI:  Government moves to admit Exhibit 791.

8            THE COURT:  Admitted.

9        (Trial Exhibit 791 received in evidence.)

10           MR. BODAPATI:  Ms. Braga, can we pull that up.

11    BY MR. BODAPATI:

12    Q.    First just zooming in on that box at the top.

13        Who are the participants here?

14    A.    The participants are Ruthia He and David Barrett.

15    Q.    And what's the date?

16    A.    The date is January 7th, 2023.

17           MR. BODAPATI:  Okay.  Let's turn to page 3.  And can

18    we zoom in on the two messages at the top.

19    BY MR. BODAPATI:

20    Q.    And are these two messages sent by Defendant He to David

21    Barrett?

22    A.    Yes.

23    Q.    Could you please read these two messages?

24    A.    (as read):

25            "I've been caring more about privacy as we're

 1          dealing with PR and government agency.

 2               "It's likely everyone got fired especially

 3          leadership role will be interviewed by government

 4          agency."

 5   Q.   Now, did Defendant Brody ever write to Defendant He about

 6   using personal e-mail instead of work e-mail for

 7   communications?

 8   A.   Yes, he did.

 9               MR. BODAPATI:  Government moves to admit Exhibit 807.

10               THE COURT:  Admitted.

11          (Trial Exhibit 807 received in evidence.)

12               MR. BODAPATI:  And let's pull that up.

13   BY MR. BODAPATI:

14   Q.   Special Agent Guzman, what's the date of this e-mail?

15   A.   It's February 17th, 2053.

16   Q.   Who are the participants?

17   A.   David Brody and Ruthia He.

18   Q.   What's the subject line of the e-mail?

19   A.   "Using private e-mail for certain things."

20   Q.   And could you read the body of the e-mail?

21   A.   (as read):

22               "Given the current climate, I feel more

23          comfortable discussing certain things on a private

24          setting that won't necessarily be scrutinized using

25          the mechanism of subpoena.  Please let me know if

1      you're up for communicating this way.  Thanks,

2      David."

3  Q.   Did Done produce personal e-mails to the grand jury before

4  certifying it had completed its productions?

5  A.   No.

6  Q.   How did the investigative team obtain these personal

7  e-mails?

8  A.   Search warrants.

9  Q.   Let's shift topics to two individuals named Yue Wang and

10  Hayley Zhu.

11      During the investigation, did agents obtain organizational

12  charts from any of Defendant He's devices?

13  A.   Yes.

14  Q.   And did that include charts from before the grand jury

15  subpoena to Done?

16  A.   It did.

17          MR. BODAPATI:  Let's pull up Exhibit 2368 in evidence

18  and zoom in on the very top.

19  BY MR. BODAPATI:

20  Q.   What is Defendant He's title in this chart?

21  A.   Chief everything officer.

22  Q.   Now, did agents obtain organizational charts for Done that

23  came after the grand jury subpoenas?

24  A.   Yes.

25          MR. BODAPATI:  Now let's pull up Exhibit 2654 in

1   evidence.

2   **BY MR. BODAPATI:**

3   Q.   This is a company all-hands deck from July 2023?

4   A.   It is.

5   Q.   And now we see what appears to be an org chart?

6   A.   Yes.

7          **MR. BODAPATI:**  Can we zoom in just below the board of

8   directors.

9   **BY MR. BODAPATI:**

10  Q.   Who is listed as the head of North America?

11  A.   Hayley Zhu.

12  Q.   And who's listed under APAC?

13  A.   Yue.

14  Q.   And just to be clear, Special Agent Guzman, in addition to

15  not producing before April 30th, 2024, did Done produce the

16  documents that we've discussed before the grand jury returned

17  its indictment?

18  A.   No.

19  Q.   Okay.  And briefly returning to 2368, which I mentioned

20  was the grand jury subpoena found on Defendant He's device, was

21  that produced before April 30th, 2024?

22  A.   No, it was not.

23  Q.   Was that produced before the grand jury returned its

24  indictment?

25  A.   No.

 1  Q.   Now, during the investigation, did the case team obtain

 2  communications to and from Hayley Zhu?

 3  A.   Yes.

 4  Q.   And were any of those communications with or about

 5  Defendant He?

 6  A.   Yes.

 7       MR. BODAPATI:  Government moves to admit Exhibits 843,

 8  844, 851, and 859.

 9       THE COURT:  Admitted.

10       (Trial Exhibits 843, 844, 851, 859 received in evidence.)

11       MR. BODAPATI:  Let's pull up Exhibit 859 as page 6.

12  BY MR. BODAPATI:

13  Q.   And is this a conversation between Hayley Zhu and another

14  Done employee named Joanne Dai?

15  A.   Yes.

16  Q.   What's the date of this communication?

17  A.   January 18 -- or actually, January 19th, 2024.

18  Q.   And in these two messages that are now zoomed in, what

19  does Hayley Zhu say?

20  A.   (as read):

21       "Actually, it's best if Ruthia does not appear

22       on this kind of Asana approval because she said to

23       the DOJ that she'll step down, so that Yue's approval

24       is R's approval."

25       And the next message (as read):

1          "So Yue signing equals R signing."

2          MR. BODAPATI:  Let's pull up Exhibit 844 now.

3  BY MR. BODAPATI:

4  Q.   And just staying on page for a moment this is a Slack

5  message between Hayley Zhu and a Done employee named Bianca

6  Rohr?

7  A.   Yes.

8  Q.   And the date here is July 19th, 2023?

9  A.   It is.

10         MR. BODAPATI:  Let's go to page 2.  And can we zoom in

11  on the messages from the top down to 12:50 a.m.

12  BY MR. BODAPATI:

13  Q.   Beginning with Hayley Zhu's first message, can you read

14  their exchange to the end.  (as read):

15         "Hey, can you edit on the approval channel and

16     remove everything that's mentioning Ruthia.

17         "Bianca Rohr:  Yeah.

18         "Hayley Zhu:  It would look like she's approving

19     LOL.

20         "Bianca Rohr:  LOL of course.

21         "Hayley Zhu:  Could edit all the messages where

22     Ruthia's name is on.

23         "Hayley Zhu again:  If not possible, just delete

24     the message and resend it.

25         "Bianca Rohr:  Done."

1  Q.   Let's turn now to Yue Wang, who is listed as the head of

2  Asia-Pacific in Exhibit 2654.

3       During the investigation, did agents obtain communications

4  between Defendant He and Yue Wang?

5  A.   Yes.

6            MR. BODAPATI:  Government moves to admit Exhibit 577.

7            THE COURT:  Admitted.

8       (Trial Exhibit 577 received in evidence.)

9            MR. BODAPATI:  Before we pull that up, Ms. Braga, can

10 we pull up Exhibit 962 in evidence.

11 BY MR. BODAPATI:

12 Q.   And this is an April 15th, 2022, message to Defendant He?

13 A.   Yes, it is.

14 Q.   And the subject line is "Bloomberg inquiry ads practice"?

15 A.   That's correct.

16 Q.   Okay.  And now let's turn to Exhibit 577.

17      Special Agent Guzman, where does this document come from?

18 A.   Ruthia He's phone.

19 Q.   What's the messaging platform being used?

20 A.   This appears to be WeChat.

21 Q.   Did Done produce WeChat messages before certifying that it

22 had completed its response to the grand jury subpoenas?

23 A.   No.

24 Q.   Who were the participants?

25 A.   This is between Yue Wang and Ruthia He.

GUZMAN - DIRECT / BODAPATI

1    Q.   And looking here, the date of these messages is

2    April 15th, 2022?

3    A.   That's correct.

4    Q.   And the same date as the e-mail we just saw?

5    A.   Yes.

6         MR. BODAPATI:  Let's turn to page 2, which is the

7    English translation.  And can we zoom in on the 10:47 p.m.

8    message.

9    BY MR. BODAPATI:

10   Q.   What did Defendant He say to Yue Wang here?

11   A.   (as read):

12        "Let's move the marketing team to China as soon

13        as possible.  Feel that we will be investigated for

14        the advertisement sooner or later."

15   Q.   Special Agent Guzman, are you familiar with Defendant He's

16   international travel?

17   A.   Yes.

18   Q.   And are you familiar generally with her immigration

19   status?

20   A.   Yes.

21   Q.   When Defendant He sent this message, was she in the United

22   States, China, or somewhere else?

23   A.   China.

24        MR. BODAPATI:  Let's pull up Exhibit 2346 in evidence.

25   \\\

BY MR. BODAPATI:

Q.    Are these U.S. Customs and Border Protection travel records?

A.    They are.

Q.    Can we look at the bottom row.

      According to this, when did Defendant He leave San Francisco?

A.    September 8th, 2021.

Q.    And now looking at the row just above that, when did she return to the United States next?

A.    September 2nd, 2022.

Q.    So just under a year later?

A.    Yes.

Q.    Special Agent Guzman, what would have happened to Defendant He's legal status or her immigration status if she had stayed outside of the country for more than a year?

A.    She would have lost her --

          MR. BALLEW:  Objection.  403.

          THE COURT:  Overruled.

BY MR. BODAPATI:

Q.    You can answer.

A.    She would have lost her visa.

Q.    Had Defendant He before this date ever applied for any relief that would allow her to stay outside of the country for over a year?

1    **A.**    Before this date, I believe so.

2    **Q.**    And was that granted?

3    **A.**    No.

4    **Q.**    After Defendant He returned to the United States on

5    September 2nd, 2022, did she apply for that relief again?

6    **A.**    She did.

7            **MR. BODAPATI:**  And can we pull up Exhibit 1071, which

8    the Government offers.

9            **THE COURT:**  1071 admitted.

10            (Trial Exhibit 1071 received in evidence.)

11            **MR. BODAPATI:**  And can we zoom in on the top here.

12    **BY MR. BODAPATI:**

13    **Q.**    Special Agent Guzman, it says here that this is an

14    application for travel document?

15    **A.**    That's correct.

16    **Q.**    And looking at the mailroom received date, when did

17    Defendant He submit the application for the travel document?

18    **A.**    September 9th, 2022.

19    **Q.**    How long after that was -- how long after she returned to

20    the U.S. did she submit this?

21    **A.**    It was about a week.

22    **Q.**    Now, let's go back to Exhibit 2346, which are the customs

23    and board patrol records.

24            After Defendant He returned to the United States on

25    September 2nd, 2022, how long did she stay in the country

GUZMAN - DIRECT / BODAPATI

1    before she left again?

2    **A.**   About three months.

3    **Q.**   And where did she travel outside the United States after

4    that?

5    **A.**   It looks like she went to the Philippines.

6    **Q.**   And where did she go after the Philippines?

7    **A.**   Singapore.

8    **Q.**   And after she went to Singapore, where did she go?

9    **A.**   Hong Kong.

10   **Q.**   And when did she return to the United States from Hong

11   Kong?

12        Or no, sorry.  I should say when did she return to the

13   United States from Singapore?  My apologies.

14   **A.**   Let's see.  It looks like -- oh, she returned on

15   January 3rd, 2023.

16   **Q.**   Now, let's briefly switch topics.

17        After the grand jury issued its subpoenas, did media

18   coverage of Done continue?

19   **A.**   Yes.

20   **Q.**   For example, did ABC do an investigative piece about Done

21   on an episode of *Good Morning America*?

22   **A.**   That's correct.

23   **Q.**   And did agents obtain communications where Defendant He

24   expressed her views about the *Good Morning America* video?

25   **A.**   Yes.

1          **MR. BODAPATI:**  The Government offers into evidence

2    Exhibit 768, 769 and 937.

3          **THE COURT:**  Admitted.

4      (Trial Exhibits 768, 769, 937 received in evidence.)

5          **MR. BODAPATI:**  Let's pull up Exhibit 768.  And can we

6    zoom in.

7    BY MR. BODAPATI:

8    Q.   So the date here is Saturday, November 26th?

9    A.   Yes.

10   Q.   And Special Agent Guzman, these appear to be more Signal

11   messages?

12   A.   That's correct.

13   Q.   Can you please read what Defendant He said in the second

14   message from the beginning through the end of .1?

15   A.   (as read):

16          "I'm happy to share my thoughts as references.

17      Considering the video makes us look really, really

18      bad and already causes issue to our operations

19      stability, and will cause continuous damage to our

20      brand.  Here are some approaches we should consider.

21      Best scenario, have *GMA* take down the video and issue

22      apology through e-mail the team and the journalist

23      directly."

24   Q.   Now, the day before Defendant He sent these messages, did

25   she also discuss other issues with medical records with Yue

1    Wang?

2    **A.**    Yes.

3         **MR. BODAPATI:**  Let's pull up Exhibit 769 and go to the

4    bottom of page 7.

5         And can we zoom in on the bottom message here.

6    **BY MR. BODAPATI:**

7    **Q.**    Special Agent Guzman, where did this come from?

8    **A.**    This looks to be coming from Ruthia He's phone.

9    **Q.**    And did Done produce this?

10   **A.**    No.

11   **Q.**    Who sent this green message?

12   **A.**    Ruthia He.

13   **Q.**    And what did Defendant He say in this message?

14   **A.**    (as read):

15            "If the Government checks on us and we have no

16        way of proving that the prescription has a medical

17        basis, the doctor may be subject to a 20-year

18        imprisonment."

19   **Q.**    Special Agent Guzman, did Defendant He discuss the

20   possibility of imprisonment or arrest with other individuals

21   including Yue Wang after this exchange?

22   **A.**    Yes.

23        **MR. BODAPATI:**  The Government moves to admit

24   Exhibits 739, 794, 795, 796, 797, 798, and 496.

25        **THE COURT:**  Admitted.

1          (Trial Exhibits 739, 794, 795, 796, 797, 798, and 496

2     received in evidence.)

3          **MR. BODAPATI:**  Let's pull up Exhibit 794 at 6.  And

4     can we zoom in on the messages from Defendant He.

5     **BY MR. BODAPATI:**

6     Q.   Now, the date of these messages is January 9th?

7     A.   Yes.

8     Q.   So just about a week after she had returned from

9     Singapore?

10    A.   Yes.

11    Q.   Can you please read the two messages from Defendant He in

12    green?

13    A.   (as read):

14              "Teacher, I think I need to think about the

15         future.  In April, if what they say is true, I will

16         be arrested or will be fined."

17         **MR. BODAPATI:**  And Ms. Braga, can we actually zoom out

18    and then zoom in on the two messages from Yue Wang in response.

19    **BY MR. BODAPATI:**

20    Q.   And in the first two messages, what does Yue Wang respond?

21    A.   (as read):

22              "If it's extreme situation, my recommendation is

23         to transfer a portion of the funds in advance to the

24         Caymans/Hong Kong.  Then you yourself return to the

25         country."

```
1    Q.    Now, after this exchange, did Done begin transferring

2    money to a bank account for a Hong Kong entity?

3    A.    Yes.

4    Q.    What was the name of that entity?

5    A.    Makebelieve.

6    Q.    Did the investigative team obtain corporate documentation

7    for Makebelieve?

8    A.    Yes.

9              MR. BODAPATI:  The Government offers Exhibit 1501.

10             THE COURT:  Admitted.

11        (Trial Exhibit 1501 received in evidence.)

12             MR. BODAPATI:  Let's pull that up.

13   BY MR. BODAPATI:

14   Q.    And Special Agent Guzman, is this an incorporation form

15   for Makebelieve?

16   A.    It is.

17   Q.    What's its registered address?

18   A.    It's Unit B, 13/F, Shing Lee Commercial Building, Number 8

19   Wing Kut Street Central, Hong Kong.

20   Q.    And turning to page 3, who is listed as the founder of

21   Makebelieve?

22   A.    Yiying Zhu.

23   Q.    During the course of the investigation, did agenting

24   determine whether Yiying Zhu goes by any other name?

25   A.    Yes.
```

 1   **Q.**   And what name is that?

 2   **A.**   Hayley Zhu.

 3   **Q.**   Now, on page 1 we saw a registered address for

 4   Makebelieve.  Did any agents visit that location?

 5   **A.**   Yes.

 6   **Q.**   And when they visited the location, did they take pictures

 7   of the site?

 8   **A.**   They did.

 9          **MR. BODAPATI:**  Government moves to admit Exhibit 2383.

10          **THE COURT:**  Admitted.

11      (Trial Exhibit 2383 received in evidence.)

12   **BY MR. BODAPATI:**

13   **Q.**   Special Agent Guzman, what does this first photograph

14   show?

15   **A.**   It shows the list of buildings -- or the list of offices

16   in the Shing Lee Commercial Building.

17   **Q.**   First, looking just at this directory on this page, is

18   there any entry for Makebelieve?

19   **A.**   No.

20   **Q.**   Let's go to Photograph Number 2.

21      What does this show?

22   **A.**   This is a marker on the 13th floor showing the different

23   offices on that floor.

24   **Q.**   And does this marker have any entry for Makebelieve?

25   **A.**   It does not.

1          MR. BODAPATI:  Let's go to page Number 3.

2    BY MR. BODAPATI:

3    Q.    And what does this show, Special Agent Guzman?

4    A.    This is the door where Makebelieve is supposed to be at.

5    Q.    And what is there instead?

6    A.    ECB Accounting Services Limited.

7    Q.    Now, before Makebelieve was incorporated, how often had

8    Done transferred money to ECB Accounting Services Limited?

9    A.    One time.

10   Q.    And how soon after that one transfer was Makebelieve

11   Incorporated?

12   A.    A few weeks after.

13   Q.    Okay.  Now, did investigating agents identify any images

14   relating to Makebelieve on Defendant He's MacBook?

15   A.    Yes.

16   Q.    And have you reviewed those images?

17   A.    I have.

18          MR. BODAPATI:  Government moves to admit Exhibit 2655.

19          THE COURT:  Admitted.

20        (Trial Exhibit 2655 received in evidence.)

21          MR. BODAPATI:  And, Ms. Braga, let's pull that up and

22   turn to page 4.

23   BY MR. BODAPATI:

24   Q.    Special Agent Guzman, what is the date up at the top here.

25   A.    August 12, 2023.

1    Q.    And what's the username that's logged in here?

2    A.    Yiying Zhu.

3    Q.    And I believe we've established Yiying Zhu also goes by

4    Hayley Zhu?

5    A.    That's correct.

6    Q.    And in the bottom left, what's the name of the company

7    business accounts?

8    A.    Both accounts are in the name of Makebelieve Asia

9    Consultancy Limited.

10    Q.    Special Agent Guzman, did agents obtain records from

11    Done's Mercury bank accounts?

12    A.    Yes.

13    Q.    And did Done transfer money from any of those accounts to

14    Makebelieve?

15    A.    Yes, they did.

16    Q.    And did Done transfer that money through a payment

17    processor called Ramp?

18    A.    That's correct.

19        MR. BODAPATI:  Let's pull up Exhibit 2787 in evidence.

20    BY MR. BODAPATI:

21    Q.    And Special Agent Guzman, these are international wire

22    transfer details for Done's Mercury bank accounts?

23    A.    That's correct.

24        MR. BODAPATI:  And, Ms. Braga, in Column R, can we

25    filter the counterparty name for Makebelieve?  And now let's go

1  over to Columns J and K.

2  BY MR. BODAPATI:

3  Q.  Before June of 2024, had Done ever wired more than

4  $200,000 to Makebelieve in a single month?

5  A.  No.

6  Q.  How much did Done wire to Makebelieve in the month of

7  June 2024?

8  A.  A little over 500,000.

9  Q.  And what month was Defendant He arrested?

10  A.  June 2024.

11  Q.  Now, shortly after Defendant He's arrest, did Done produce

12  invoices for those two transfers to Makebelieve in June 2024?

13  A.  Yes.

14      MR. BODAPATI:  Government moves to admit 1400 and

15  1401.

16      THE COURT:  Admitted.

17      (Trial Exhibits 1400 and 1401 received in evidence.)

18      MR. BODAPATI:  Let's pull up Exhibit 1400.

19  BY MR. BODAPATI:

20  Q.  Special Agent Guzman, have you ever reviewed invoices over

21  the course of your career?

22  A.  I have.

23  Q.  In your experiences, who typically prepares an invoice,

24  the company that provides the service or the company that pays

25  for the service?

1   A.   The company that provides the service.

2   Q.   And looking at the header at the top, who prepared this

3   invoice, Done or Makebelieve?

4   A.   This was prepared by Done.

5   Q.   And was Done the company providing the services or paying

6   for the services?

7   A.   They're the ones paying for the services.

8   Q.   What was the date that this invoice was submitted?

9   A.   June 18th, 2024.

10  Q.   And what was the due date for payment on this invoice?

11  A.   June 19th, 2024.

12  Q.   So the next day?

13  A.   Yes.

14  Q.   What is the invoice number here?

15  A.   The invoice number is 007.

16  Q.   And what is the project for this invoice?

17  A.   The project is listed as "others."

18  Q.   And what's the description of the service?

19  A.   Also "others."

20          MR. BODAPATI:  Let's pull up Exhibit 1401.

21  BY MR. BODAPATI:

22  Q.   Is this another invoice that Done produced?

23  A.   It is.

24  Q.   And what's the invoice number here?

25  A.   010.

1   Q.   And when was this invoice submitted?

2   A.   June 18th, 2024.

3   Q.   And when was this invoice's due date?

4   A.   June 19th, 2024.

5   Q.   So, again, the very next day?

6   A.   Yes.

7   Q.   What's the project for this invoice?

8   A.   It's also listed as "others."

9   Q.   And what's the description for this invoice?

10  A.   Also "others."

11  Q.   And how much was Done to pay Makebelieve for "others"?

12  A.   250,000.

13  Q.   And does that also hold true for the invoice that we just

14  saw before at Exhibit 1400?

15  A.   That's correct.

16  Q.   Now, what did Ramp do to Done's accounts after these two

17  transfers?

18  A.   The accounts were shut down.

19  Q.   And what did Mercury do to Done's bank accounts after

20  these transfers?

21  A.   They also shut down the bank accounts.

22          MR. BODAPATI:  Let's briefly return to Exhibit 794.

23  BY MR. BODAPATI:

24  Q.   This is the exchange between Defendant He and Yue Wang?

25  A.   Yes.

1          MR. BODAPATI:  And let's turn to page 9.  Can we zoom

2    in on the last three messages?  And, Ms. Braga, can we actually

3    also capture the note to the right of it?

4    BY MR. BODAPATI:

5    Q.   What does Defendant He say at 8:32 p.m.?

6    A.   (as read):

7               "Our situation is that right now the Government

8         may suspect us of cross border FD.  It's best to

9         avoid cross border entities."

10   Q.   And according to the note by the certified translator,

11   what is "FD" likely an abbreviation of?

12   A.   Fondue, meaning drug trafficking.

13   Q.   Turning to page 10.  Do you see where Yue Wang says (as

14   read):

15              "Or a Singaporean entity paired with a

16         Singaporean bank"?

17   A.   I do.

18   Q.   Had Defendant He just returned from Singapore about a week

19   earlier?

20   A.   Yes.

21   Q.   Now, what does Defendant He say in the next two messages?

22   A.   (as read):

23              "For Singapore, there's no need to go on-site,

24         but it seems that there's extradition clause."

25   Q.   What is an extradition clause?

1  **A.**   That's an agreement between two countries that if someone

2  is in another country and the other country has an arrest

3  warrant, they agree to help each other bring that person to the

4  country with the arrest warrant.

5  **Q.**   During the investigation, did agents identify any other

6  materials relating to extradition on Defendant He's devices?

7  **A.**   Yes, we did.

8         **MR. BODAPATI:**   Government moves to admit Exhibit 2372

9  and 2375, two screenshots from the MacBook.

10         **THE COURT:**   Admitted.

11         (Trial Exhibits 2372 and 2375 received in evidence.)

12         **MR. BODAPATI:**   Ms. Braga, let's pull up Exhibit 2375.

13  **BY MR. BODAPATI:**

14  **Q.**   Special Agent Guzman, what is this?

15  **A.**   It's a screenshot of a Google search for the search for

16  the search "non-extradition countries with U.S."

17  **Q.**   And, Special Agent Guzman, as part of the investigation,

18  did agents monitor the Defendant He's travel patterns?

19  **A.**   Yes.

20  **Q.**   After these messages in January of 2023, did Defendant He

21  make any international travel arrangements?

22  **A.**   Yes.

23         **MR. BODAPATI:**   Let's pull up Exhibit 2346 again.

24  **BY MR. BODAPATI:**

25  **Q.**   And according to this, what flight did Defendant He book

 1  for February 18th, 2023?

 2  **A.**    A flight to Hong Kong.

 3  **Q.**    When Defendant He headed to the airport for this flight,

 4  what did law enforcement agents do?

 5  **A.**    They obtained a search warrant for her phone and stopped

 6  her at the airport.

 7  **Q.**    And when agents stopped her at the airport, what did they

 8  tell her?

 9  **A.**    They told her not to leave the country or else she'll be

10  arrested.

11  **Q.**    Now, after service of the warrant, did you come to

12  understand that Defendant He surrendered her passport?

13  **A.**    Yes.

14  **Q.**    And when agents encountered her, was she on her way to the

15  airport?

16  **A.**    Yes.

17  **Q.**    Okay.  Now, after this encounter on February 18th, 2023,

18  did agents set up any alerts for future international travel by

19  Defendant He?

20  **A.**    Yes.

21  **Q.**    And did they continue to monitor her location?

22  **A.**    That's correct.

23  **Q.**    Now, after Defendant He surrendered her passport, did she

24  obtain another travel document.

25  **A.**    She did.

1    Q.    What was that?

2    A.    She obtained a Chinese travel document through the

3    consulate here in San Francisco.

4         MR. BODAPATI:  Government moves to admit Exhibit 2646.

5         THE COURT:  Admitted.

6    (Trial Exhibit 2646 received in evidence.)

7         MR. BODAPATI:  And let's pull that up.

8    BY MR. BODAPATI:

9    Q.    Turning to page 3, can you read entry Number 1?

10    A.    (as read):

11         "This travel document is an identity certificate

12         for travel purpose in lieu of a passport and is valid

13         for travel to all countries."

14         MR. BODAPATI:  Now, let's turn to page 18.  And,

15    Ms. Braga, is it possible to rotate this?

16    BY MR. BODAPATI:

17    Q.    What was the date of issue of this passport?

18    A.    June 21, 2023.

19    Q.    Did Defendant He disclose that she had obtained this

20    Chinese travel document to the investigative team?

21    A.    No.

22    Q.    When did agents find out about it, before or after her

23    arrest?

24    A.    After.

25    Q.    And did agents find this passport pursuant to a search?

1  A.   Yes.

2  Q.   Now, earlier you testified about a Quora search result

3  found during a search of Defendant He's personal Gmail account.

4      Do you recall that?

5  A.   I do.

6  Q.   Did you identify any other Quora e-mails in Defendant He's

7  personal account from the week before the planned flight to

8  Hong Kong?

9  A.   Yes.

10      MR. BODAPATI:  Government moves to admit Exhibit 804.

11      THE COURT:  Admitted.

12      (Trial Exhibit 804 received in evidence.)

13      MR. BODAPATI:  Let's pull that up.

14  BY MR. BODAPATI:

15  Q.   What's the date of this e-mail?

16  A.   February 13th, 2023.

17  Q.   So five days before the flight?

18  A.   That is correct.

19  Q.   And what's the subject line of this e-mail?

20  A.   The subject line is "How do I legally disappear and never

21  be found?"

22      MR. BODAPATI:  No further questions, Your Honor.

23      THE COURT:  Okay.  Ladies and gentlemen, we're going

24  to take our recess for the evening.  Remember the admonition

25  given to you:  Don't discuss the case, allow anyone to discuss

1    it with you, form or express any opinion.

2        I'll see you tomorrow at 9:15.  Thank you.

3                    (The jury leaves the courtroom.)

4        (Proceedings were heard out of the presence of the jury.)

5            **THE COURT:**  Let the record reflect jurors have left.

6        So when this witness is concluded, where is the Government

7    in its case.

8            **MR. FOSTER:**  We expect to rest tomorrow, Your Honor.

9            **THE COURT:**  Okay.  So I think our understanding is

10   that I will not require any witnesses tomorrow.

11           **MR. SCHACHTER:**  Your Honor, I -- can we just find out

12   who's testifying tomorrow?  Because that's --

13           **THE COURT:**  He said --

14           **MR. SCHACHTER:**  -- the number of witnesses, that would

15   be impossible.

16           **THE COURT:**  I thought you said you expect to rest

17   after this witness.

18           **MR. FOSTER:**  No, no.  We have two more potential

19   witnesses.

20           **THE COURT:**  Oh.

21           **MR. FOSTER:**  Yeah.

22           **THE COURT:**  I didn't hear you.  I'm so sorry.

23           **MR. FOSTER:**  Yes.  We expect to finish our case

24   tomorrow.  We have two more potential witnesses.

25           **MR. SCHACHTER:**  Can we just ask who that is?

PROCEEDINGS

1          **THE COURT:**  Yes.

2          **MR. FOSTER:**  Mr. Petron and Ms. Chieppa.

3          **THE COURT:**  Okay.  Those are the two witnesses.

4      All right.  So -- and I assume the Defense knows what

5  their subject matter is of their testimony?

6          **MR. FOSTER:**  They were disclosed, along with their

7  exhibits, many -- I think weeks ago, yeah.

8          **THE COURT:**  Okay.  All right.  So I think we're in a

9  position now to talk about the Defense case.

10          **MR. SCHACHTER:**  Your Honor, may I have just one moment

11  to confer with Ms. Bell?

12          **THE COURT:**  Yes.

13                          (Conferring.)

14          **MS. NECHAY:**  If it's helpful to the Court, perhaps I

15  can just make at least a brief comment.

16          **THE COURT:**  Go ahead.

17          **MS. NECHAY:**  I was prepared to discuss, I think the

18  Court had advised that at the conclusion of the Government's

19  case, Defense should be prepared to discuss our witnesses.  I

20  would like to take the evening to evaluate which witnesses I

21  am, in fact, moving forward with, so I'm happy to report back

22  in the morning to the Court, if that's acceptable.

23          **THE COURT:**  Well, I think that -- yeah.  That's fine.

24  That's fine.  No problem.  Tell me in the morning.

25      No, I -- no problem from you.  I don't know whether

 1   there's a problem from them.

 2          MR. SCHACHTER:  I'm sorry.  I'm sorry.

 3          THE COURT:  Yes, there we go.

 4          MR. SCHACHTER:  I was paying ill attention.  What was

 5   the issues?

 6          THE COURT:  Counsel was saying that she would be

 7   prepared tomorrow morning to indicate what witnesses she calls.

 8   The -- I would have expected the order to be that -- that

 9   Ms. He goes first and Dr. Brody goes second.  But again, I'm

10   not wedded to any particular order.  If there's a -- if the

11   Defense wants to change the order or do something different,

12   I'd certainly consider that.  It's not -- it's not written in

13   stone.

14      But assuming that you go first, who are you calling?

15          MR. SCHACHTER:  Yes.  So thank you.  This is going to

16   be very helpful because we need guidance from the Court as to

17   what we can and cannot do in our defense case.

18      So what I would like to do is I would like to step the

19   Court through what is effectively an outline of our defense

20   case so that I can understand if there are going to be any

21   issues because we certainly don't want to do something or have

22   something prepared that would be a waste of time for the Court

23   to then say we're not doing that.  So I'd like to just -- what

24   I would like to do is lay it out.

25      But before I get to that, one issue with respect to

PROCEEDINGS

 1   Ms. Chieppa tomorrow.  So the Court will recall that she was

 2   served with a subpoena and --

 3            MS. BELL:  We got the return.

 4                 (Defense counsel conferring.)

 5            MR. SCHACHTER:  Oh, okay.  Never mind.  Never mind.

 6   Forget that.  Then we can return to the defense case.

 7       Okay.  So I'd like to lay out for the Court what our plan

 8   is.

 9            THE COURT:  Okay.  I just was handed a witness list.

10            THE COURTROOM DEPUTY:  That's the one they submitted.

11            THE COURT:  So, I mean --

12            MS. BELL:  Thank you.

13            THE COURT:  -- I just want to tell you that now

14   there's a piece of paper in front of me and it has listed 33

15   witnesses.

16       Okay.  Go ahead.

17            MR. SCHACHTER:  Okay.  So what we intend to do is

18   we're going to play -- yeah, yeah, no.

19       Okay.  All right.  What we'd like to do is the Court --

20   we'd like to play the video that the Court found was not a

21   grand jury violation at transcript 877 to 880.  I can hand up

22   the transcript.  This is -- you'll recall this is the

23   onboarding video from Dr. Tsang that we sought to introduce at

24   the time of Ms. Ross' testimony very early on in the case.  And

25   I'll hand up the transcript for the Court.

PROCEEDINGS

```
 1            THE COURT:  How long is it?

 2            MR. SCHACHTER:  I think it's like 10 minutes, maybe

 3   less.

 4            THE COURT:  And what exhibit number is it?

 5            MR. SCHACHTER:  I believe it to be 5163.

 6            THE COURT:  Okay.

 7            MR. SCHACHTER:  5189.  I'm sorry.  518- -- I'm sorry.

 8   5186.

 9            THE COURT:  All right.  Okay.  Next.

10            MR. SCHACHTER:  Okay.

11            THE COURT:  I'll hear any objections, but I want to

12   get it all out.

13            MR. SCHACHTER:  Okay.

14            MR. FOSTER:  Understood.

15            MR. SCHACHTER:  Then Dr. Brody's onboarding videos,

16   which the Court ruled to be admissible at transcript page 899.

17   I have that -- I'm sorry, 855.  I can't read my own

18   handwriting.  But I have the Court's instructions on the --

19            THE COURT:  And that's exhibit number what?

20            MR. SCHACHTER:  That's two different exhibits,

21   I believe.  And I don't have that -- I don't have the exhibits

22   with me.

23            THE COURT:  Okay.  How long are these exhibits?

24            MR. SCHACHTER:  We only wish to play excerpts that we

25   had previously identified on the record.  My recollection is
```

PROCEEDINGS

 1  that it's about -- maybe about -- one is, I think, around 10 to

 2  15 minutes.  The other one is somewhere in the same range.

 3          THE COURT:  Okay.  Next.

 4      MR. FOSTER:  Do you have a copy?

 5      MR. SCHACHTER:  Yeah.

 6      And I'm just handing Mr. Foster --

 7      Okay.  You recall with respect to Dr. Brody's onboarding

 8  videos, as the Court will see in the transcript --

 9          THE COURT:  I'm not going to argue them now.  I just

10  want to get a list of what you're going to do.

11      MR. SCHACHTER:  Very good.  We would like to present

12  the video of Dr. Luca -- I'm sorry.  It's not a video.  It's an

13  audio of Dr. Luca training the medical providers on how a

14  30-minute evaluation time is appropriate and can be done,

15  obviously inconsistent with the Government's -- much of the

16  evidence in this case that clinical leadership was absolutely

17  opposed and objected to it.

18          THE COURT:  Okay.  Next.

19      MR. SCHACHTER:  We intend to present, along the same

20  lines as Dr. Brody acting as clinical leader, his guidance

21  which he had posted on the Done website, his articles,

22  educational articles talking about ADHD, as well as other posts

23  on the Done website which talk about the fact that there are

24  other ways to treat ADHD other than stimulants, which is

25  inconsistent with the theory that this was a -- a hell-bent

PROCEEDINGS

1    operation focused on the distribution of controlled substances.

2         And then we turn to Ms. He's communications, which brings

3    us back to our discussions earlier, as well as communications

4    between Ms. He and Dr. Brody.

5         And for that, Your Honor, the Court asked cases.  We will

6    submit something in writing, but just to give the Court

7    something to read as we are working on that brief, which we

8    hope to get to -- I don't want to promise but I believe we can

9    get something to the Court either this evening or before

10   tomorrow morning -- but I will provide -- I will hand up the

11   Ninth Circuit's decision in *United States versus Garcia*

12   *Villanueva*, which refers to conviction for --

13             **THE COURT:**  The cite?

14             **MR. SCHACHTER:**  I'm sorry.  May I hand it up?

15             **THE COURT:**  You can read it.

16             **MR. SCHACHTER:**  I seem to have a Lexis cite.  I

17   have -- I also have the --

18             **THE COURT:**  No, I can --

19             **MR. SCHACHTER:**  855 F.2d 863, as well as a District

20   Court's decision from Judge Chen.

21             **THE COURT:**  Oh, my goodness.  You're citing

22   Judge Chen?

23             **MR. SCHACHTER:**  Is that a mistake?  I'm an

24   out-of-towner.  Is that --

25             **THE COURT:**  No.  I mean, whatever he says, I'll

PROCEEDINGS

```
 1    just --
 2              MR. FOSTER:  He's right there.
 3              THE COURT:  I understand he's in Japan today.  I may
 4    catch him when he goes from Japan to Mexico.
 5         Yeah, go ahead.
 6              MR. SCHACHTER:  United States vs. Yagi, Y-A-G-I, 2012
 7    U.S. District Lexis 171326.
 8         We'll have a brief that describes these and other cases.
 9              THE COURT:  Okay.
10              MR. SCHACHTER:  I have -- I have -- of course.  Of
11    course.  Here you go.  That's Yagi.  This is --
12              THE COURT:  I mean, it's not exactly Blackstone, but
13    still, I think --
14              MR. SCHACHTER:  And, Your Honor, just -- I mean, in
15    brief, what it is talking about --
16              THE COURT:  You don't have to characterize it.  I'll
17    look at it.
18              MR. SCHACHTER:  Very good.
19         So consistent with that, we intend to introduce
20    communications between Dr. Brody and Ms. He which go to the
21    absence of the existence of a conspiracy.  We intend to show
22    communications to Ms. He which informed her state of mind and
23    her knowledge, which is critical to this case, as well as
24    statements both by her and to her, which are only offered for
25    her intent.
```

1          And just -- I want to be perfectly clear --

2          **THE COURT:**  Go ahead.

3      No, I'm just saying -- I'm just saying what I want you to

4  do is I want you to list the communications that you wish to

5  introduce.  Okay?  Because I don't like to deal with

6  abstractions.

7          **MR. SCHACHTER:**  Of course.

8          **THE COURT:**  Okay.  All right.

9          **MR. SCHACHTER:**  And that's exactly what the Court said

10  in ruling on -- in not ruling on the Government's motion in

11  limine, which said we should exclude all self-serving

12  statements of the defendant.  Of course, as I've heard many

13  courts say, all evidence is self-serving, that's not the point.

14  The point is, is it for a hearsay purpose.  In other words, is

15  it offered to prove the truth of the matter in the

16  communication, or is it simply offered to show what is in the

17  defendant's state of mind, those being two different things.

18          What the Court said at the time is, I need to see the

19  communications.

20          **THE COURT:**  Yeah, and I have to -- and it has to be a

21  context to show that it's not susceptible of a fabrication.  In

22  other words, there is something to the timing of it.  It's

23  usually that there's a coincidence of the event and the

24  statement.  And the reason that there is -- that the timing is

25  so crucial is because if faced with something, a person is less

1    likely to contrive a false statement about it.

2        But, and that's why there is a description in 803(3) that

3    says about a belief or a memory, it's -- it's not in.

4        But there's a -- but we can get into it -- I'm doing

5    exactly what I told you not to do, so I'm not going to do it.

6        Keep on going.  I just need to have a sense.  When you say

7    communications, are you talking about an hour of

8    communications?  Are you talking about, you know, a few?  What

9    are you talking about?  Because I'm trying to plan it out.

10        **MR. SCHACHTER:**  Yes.  So I would think that it would

11    be roughly -- the Court and the jury have heard a lot of

12    dramatic recitations from the prosecutors in this case, various

13    ones.  It's -- it's a meaningful volume.

14        **THE COURT:**  Please -- okay.  Please list the

15    communications that you wish to introduce.

16        Okay.  Next.

17        **MR. SCHACHTER:**  Okay.  And then one question for

18    the Court then will be how the Court wishes to -- and we can

19    return to this, as to how we can best be helpful to the Court

20    in assessing what the proponent of the evidence believes that

21    they -- the purpose of the communication.  I don't know if

22    the Court wishes document by document in writing or categories.

23    I don't know if the Court's going to want to hear argument on

24    them --

25        **THE COURT:**  I don't know either.  Tell me what they

PROCEEDINGS

1  are, and then I'll tell you what I need to do.  However, so far

2  we haven't gotten into a single witness.

3      **MR. SCHACHTER:**  Correct.  But this will take, you

4  know, some time just what I've described.

5      **THE COURT:**  Well, this may take weeks if I let it all

6  in.  I have no idea because I don't know how long your

7  communication is.

8      **MR. SCHACHTER:**  To be clear, I anticipate that it will

9  be equal or less than the Government's presentation of just

10 communication evidence.

11     **THE COURT:**  I don't know what that means.  Let's move

12 on rather than getting into an argument of who's taking longer

13 about what.

14     **MR. SCHACHTER:**  Very good.

15     **THE COURT:**  Do we have any names of people?

16     **MR. SCHACHTER:**  Yes.

17     **THE COURT:**  Like a person testifying?

18     **MR. SCHACHTER:**  Yes.  So I'm still going through some

19 documents, which I'm going to return to.

20     So if needed to authenticate documents, which we still

21 need to speak to the Government about, we will call an

22 engineering employee.  Likely --

23     **THE COURT:**  Okay.  Forget -- forget -- I'm not

24 interested in you telling me what witnesses we need for

25 authentication purposes.  Okay?

PROCEEDINGS

1        I'm interested in witnesses that you intend to call to

2   give substantive evidence other than authentication purposes.

3            **MR. SCHACHTER:**  Okay.  Again, mostly for one point,

4   one brief point, it would be Mr. Levy.

5            **THE COURT:**  Mr. Levy.  And Mr. Levy has testified;

6   right?

7            **MR. SCHACHTER:**  He has testified.

8            **THE COURT:**  Fine.  You have to make an offer of proof

9   as to Mr. Levy in writing.

10           **MR. SCHACHTER:**  Okay.

11           **THE COURT:**  Okay.  Next.

12           **MR. SCHACHTER:**  And if we cannot do this one piece of

13  testimony through Mr. Levy, then we would do it through Andres

14  Ramirez or Sol Ross, who are also identified as Government

15  witnesses.

16           **THE COURT:**  Ramirez and Ross?

17           **MR. SCHACHTER:**  Yes.

18           **THE COURT:**  And it is your view that this evidence --

19  I'm not interested in what it is -- will take approximately how

20  long?

21           **MR. SCHACHTER:**  10 minutes.

22           **THE COURT:**  Okay.

23           **MR. SCHACHTER:**  From one of the three, we do not need

24  all three.

25           **THE COURT:**  Okay.  Next.

PROCEEDINGS

```
 1              MR. SCHACHTER:  Okay.  That brings us to

 2    Dr. Saint Martin our expert.

 3              THE COURT:  And he's your expert?

 4              MR. SCHACHTER:  Correct.

 5              THE COURT:  How long do you expect his direct to be?

 6              MR. SCHACHTER:  Well, let me -- let me identify the

 7    issue that perhaps the Court can help us with but perhaps not.

 8         So whether or not we call Dr. Saint Martin is something

 9    that we are still considering.  It is heavily influenced --

10              THE COURT:  I've got to make sure I'm focused on the

11    right person.  Is -- because we've had a discussion on just --

12    I'm so sorry I don't have it in front of me.  I think you

13    proffered three experts.

14              MR. SCHACHTER:  Correct.

15              THE COURT:  And of the three, I said one could

16    testify.  I indicated one could testify.  Is this the person I

17    indicated could testify?

18              MR. SCHACHTER:  Yes.

19              THE COURT:  Go ahead.

20              MR. SCHACHTER:  Okay.  So with respect to

21    Dr. Saint Martin, it is a -- it is critical for us if

22    effectively the instruction, which the Government urged, which

23    we believe is effectively a malpractice instruction, that it is

24    a crime to issue a prescription outside the usual course of

25    professional practice.  If that is the determination that the
```

1    jury will make, then that makes it much more likely that we

2    call Dr. Saint Martin because that is effectively a negligent

3    standard.

4        If however --

5            **THE COURT:**  Wait a minute.  Wait a minute.  I'm sorry.

6    I had him for -- I apologize for interrupting you but when you

7    lose me, I'm lost.

8        Okay.  So you believe -- I'm not saying you're wrong.  You

9    believe that I have to articulate -- or that I should

10    articulate the standard that the Government must meet in terms

11    of a conviction, a criminal conviction, and once I articulate

12    that, you can make a decision as to whether or not Dr. Martin

13    will testify --

14            **MR. SCHACHTER:**  What I --

15            **THE COURT:**  -- is that correct.

16            **MR. SCHACHTER:**  What I'm saying is that our decision

17    whether that expert is necessary to be called is heavily

18    influenced by what decision the jury needs to make.

19        Now, if the Court's -- for example, if we knew that

20    the Court's instruction is going to lock like the Court's

21    instruction in *Napoli*, we're probably not going to call

22    Dr. Saint Martin.  However, if the Court's instruction is as

23    the Government has urged, that changes the calculus because the

24    Government's instruction --

25            **THE COURT:**  Fair enough.

PROCEEDINGS

1          **MR. SCHACHTER:**  Okay.

2          **THE COURT:**  I got the picture.

3          **MR. SCHACHTER:**  I'm just letting the Court know what

4    our thought process is.

5          **THE COURT:**  By the way, that sounds perfectly

6    reasonable.  I mean, you're going to call your witness

7    depending on what it appears to be the legal issue that the

8    jury has to decide.  That's fine.  There's nothing wrong with

9    that.  And you're telling me you're not in a position yet

10   because it's up to me to deal with it.  And I think you're

11   right.  I think you're right.  I mean, I never liked this thing

12   about, well, just try the case and I'll tell you at the end how

13   it goes.  I mean, it's so unfair to lawyers.  I mean, I'll tell

14   you what it is.  I can't write it in concrete that I won't

15   change my mind because if I become convinced I'm wrong, I have

16   to change my mind, but at least I can give you my best

17   indication.  Got it.  Let's put Dr. Martin aside.

18        But before we do, I want to ask you the question of how

19   long -- assuming that you hear from me what I believe the

20   standard to be and you then conclude that Dr. Martin is

21   necessary, how long will his direct be, approximately?

22        **MR. SCHACHTER:**  We would estimate three hours.

23        **THE COURT:**  Pardon?

24        **MR. SCHACHTER:**  Three hours direct.

25        **THE COURT:**  Okay.  Thank you very much.  Okay.

PROCEEDINGS

1          Now, next.

2          **MR. SCHACHTER:**  Okay.  With respect to the other two

3    experts which, to be clear, the Court said -- I think the Court

4    said provisionally they are not going to be called and that

5    we -- you the Court would address it during the course of the

6    trial.

7          With respect to one of the two, we are not calling

8    Dr. Lee, which the Court felt was basically duplicative of

9    Dr. Saint Martin, we're calling Dr. Lee, we can tell the court

10   that now.

11         With respect to the other expert, Chabbra, now that the

12   Court has heard the evidence in the case, we do believe that

13   his is relevant evidence.

14         **THE COURT:**  And I'll hear argument on that.

15         Next.

16         **MR. SCHACHTER:**  Okay.  Now, the next subject.

17   Patients, we have a number of patients that we have identified

18   for the Government.  Your Honor will recall that the Government

19   called a patient named Melissa Emmerth, and I will hand up

20   portions of her --

21         **THE COURT:**  You don't have to hand it up right now.  I

22   just need to know who you're intending to call.

23         **MR. SCHACHTER:**  Yes.  The Government called a witness

24   named Melissa Emmerth to talk about her experiences at Done and

25   how she felt it was quick and she didn't feel valued and her

1    experience.  We intend to call a number of patients well.  We

2    would estimate three to five patients.  We've identified them

3    for the Government already.

4         THE COURT:  And do I understand that the basic

5    testimony that they are going to give -- and I need to

6    understand this.  They're going to say they were very well

7    treated but Done, they liked everybody at Done, the Done

8    medication helped them enormously, and something to that

9    effect?

10         MR. SCHACHTER:  It will be the flip side of the

11    evidence that the Government presented through the testimony of

12    Melissa Emmerth.

13         THE COURT:  All right.  I will take a look at that.  I

14    will take a look at that.

15    And the identity of these people has been disclosed to the

16    Government.

17         MR. SCHACHTER:  Yes, Your Honor.

18         THE COURT:  Thank you very much.

19    What's next?

20         MR. SCHACHTER:  We identified 16 patients, however, we

21    selected from that group and starred for the Government the

22    ones that we currently intend to call.

23         THE COURT:  Okay.  What's next?

24         MR. SCHACHTER:  Providers.  And this brings us to the

25    issue that was -- we discussed with the Court yesterday.  We

 1    had identified, I believe, four medical providers who we have

 2    interviewed, we've prepared to testify, and we've identified

 3    them for the -- well, that's part of the problem.  We've

 4    identified them for the Government, and they are prepared to

 5    testify about how -- and they recounted to us that they felt

 6    that the policies in no way constrained their ability to

 7    practice medicine as they thought was appropriate; however,

 8    they have now been contacted by the Government.  And since

 9    those discussions, which discussed -- where the Government

10    discussed with them after this lengthy investigation, now they

11    should think about their exposure and their licensing.

12        In any event, we are awaiting hearing from their counsel

13    tomorrow, however, the indication is that all four will now

14    invoke their Fifth Amendment rights after hearing from the

15    Government.

16            THE COURT:  Okay.  Fine.  Thank you.

17        Now, who's next?

18            MR. SCHACHTER:  Walter Sujansky who is our data person

19    similar to Mr. Petron, who the Court will be hearing from

20    tomorrow.  And --

21            THE COURT:  And he is testifying as to?

22            MR. SCHACHTER:  Similar information to Mr. Petron.

23    I'll let Mr. Ballew talk about the subjects.

24            MR. BALLEW:  It's basically data, Your Honor,

25    statistics about prescribing trends and things of that nature.

1   Mr. Petron is going to be discussing that tomorrow.  It's

2   basically like statistics --

3           THE COURT:  Since I haven't heard that.  Okay.

4           MR. BALLEW:  Yes.

5           THE COURT:  Got it.  If it's rebuttal to that, I'll

6   assume you're entitled to do it.

7      Okay.  How long will Mr. Sujansky be?

8           MR. BALLEW:  Probably a half-hour, 45 minutes at most,

9   I would think.

10          MR. SCHACHTER:  And then the only other thing on the

11  table would be -- well, there's two other subjects.  One, of

12  course, is our client will need to make a decision as to --

13          THE COURT:  Pardon?

14          MR. SCHACHTER:  Our client will need to make a

15  decision as to whether she will testify.

16          THE COURT:  Exactly.

17          MR. SCHACHTER:  Which, of course, is always up to her.

18  And then the last subject is -- that I would like to revisit,

19  which is medical records of some number of the 16 patients.

20  And I want to --

21          THE COURT:  You can revisit it.

22     Okay.  Now, let me just tell you where I think we are and

23  you can disagree with me if you want.

24     We have three -- after tomorrow, we have three trial days

25  the following week:  Monday, Thursday, and Friday.  And let's

1    just assume for the moment that -- that your client doesn't

2    testify.  If he testifies, obviously, it's going to be

3    lengthier, but let's assume just for the sake of this

4    discussion.

5         And I haven't gotten to Dr. Brody's people, but I said I

6    won't until tomorrow.

7         It may be possible to conclude next week.  Maybe.  But

8    perhaps going the following week, depending on what I do on all

9    these other people.  All these other people.

10        That being the case, if it does conclude -- we have to

11   give some thought, if it does conclude, especially in the

12   middle of next week -- I mean, middle of the following week,

13   then the question is, what do we want to do.

14        I don't know.  You know what?  The smart thing is not to

15   discuss it until it becomes real.  I don't think you should --

16   don't plan the case to lengthen it or not lengthen it.  We'll

17   try to figure.  It's an odd set of circumstances.  We're taking

18   a week off and I'll hear from both sides what your views are as

19   to what we should do, because I already promised the jury a

20   promise that I will keep that they will have that week off.

21        Now, if we're in a position where --

22             **MR. FOSTER:**  Just -- Your Honor?

23             **THE COURT:**  Thanksgiving week.

24             **MR. FOSTER:**  We have another week before Thanksgiving

25   after next week.

PROCEEDINGS

```
 1              THE COURT:  No, I am thinking about next week.  Oh,

 2    oh, I see --

 3              MR. FOSTER:  After next -- after the three days,

 4    there's a whole another week.  Yes.

 5              THE COURT:  Okay.  Thank you very much.  We're in

 6    recess.

 7              MR. FOSTER:  Oh, Your Honor, one thing.

 8              THE COURT:  Yeah.

 9              MR. FOSTER:  On the standard, very fair.  Before you

10    reach a conclusion on it, can we file our brief by tomorrow

11    morning?

12              THE COURT:  Oh, please do.

13              MR. FOSTER:  Yeah.

14              THE COURT:  Please do.

15              MR. FOSTER:  We'll file it by tomorrow morning.

16              THE COURT:  Absolutely.

17              MS. BELL:  And we will file our response, Your Honor,

18    as well.

19              MR. FOSTER:  And the other thing, Your Honor, is on

20    the -- on the sauce for the gander and our preparation, we do

21    need to know the universe of witnesses potentially on Monday

22    and their exhibits.  That's our reciprocal agreement.

23              THE COURT:  They'll tell you.

24              MR. FOSTER:  Okay.  Thank you.

25              THE COURT:  They're very cooperative.
```

PROCEEDINGS

1          **MR. SCHACHTER:**  And, Your Honor, so I guess we'll --

2     we can talk tomorrow about some of the issues that are present

3     with respect to our witnesses.  For example, we would have

4     Mr. Charbray here on Monday, unless the Court's going to say no

5     to Mr. Charbray, and I don't know when the Court wishes to hear

6     that argument.  So I think there's two possibilities, I guess,

7     that I would ask the Court to consider.

8          Either we can take up at the conclusion of the day

9     tomorrow, some of these issues in greater detail, that might

10    make sense.  It might make sense for -- if the Court wishes on

11    Monday, we could take up Rule 29 and take up these issues.

12    Okay.  Very good.

13         **THE COURT:**  It really -- it really makes sense -- I

14    don't know your two extras.  I don't know how long they're

15    going to take.

16         **MR. FOSTER:**  Short.  Short.

17         **THE COURT:**  They're going to be pretty short?

18         **MR. FOSTER:**  Yeah.

19         **THE COURT:**  Now, what I might do tomorrow at the end

20    of noon or something like that, send the jury home and then we

21    can have a full discussion about where we go and so forth.

22         Okay.  I want to thank the parties on all sides.  I have a

23    tendency to be impatient, and I very much appreciate the

24    courtesy that I've been given.  Tremendous courtesy by the

25    lawyers on all sides, so I do appreciate it.  Thank you very

PROCEEDINGS

```
 1   much.
 2            MR. SCHACHTER:  Thank you so much, Your Honor.
 3            MR. FOSTER:  The pleasure is all ours, Your Honor.
 4            THE COURT:  Okay.
 5                 (Proceedings adjourned at 4:27 p.m.)
 6                          ---o0o---
 7
 8                   CERTIFICATE OF REPORTER
 9            I certify that the foregoing is a correct transcript
10   from the record of proceedings in the above-entitled matter.
11
12   DATE:   Thursday, November 6, 2025
13
14
15
16
     _____
17    Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG, CSR No. 12219
           Official Reporter, U.S. District Court
18
19
20
21
22
23
24
25
```