Volume 22

Pages 4886 - 5082

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

UNITED STATES OF AMERICA,        )
                                 )
            Plaintiff,           )
                                 )
    vs.                          )   NO. **3:24-cr-00329-CRB**
                                 )
RUTHIA HE and DAVID BRODY,       )
                                 )
            Defendants.          )
_____  )

San Francisco, California
Friday, November 7, 2025

### TRANSCRIPT OF PROCEEDINGS

**APPEARANCES**:

For Plaintiff:
                        CRAIG H. MISSAKIAN
                        United States Attorney
                        Northern District of California
                        450 Golden Gate Avenue
                        San Francisco, California 94102
                    BY: **KRISTINA GREEN**
                        **ASSISTANT UNITED STATES ATTORNEY**

                        U.S. DEPARTMENT OF JUSTICE
                        FRAUD SECTION
                        950 Pennsylvania Avenue NW
                        Washington, D.C. 20530
                    BY: **JACOB N. FOSTER,**
                        **ACTING CHIEF, HEALTHCARE FRAUD UNIT**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
              Official Reporter, CSR No. 12219

**APPEARANCES**:   (CONTINUED)

```
                        U.S. DEPARTMENT OF JUSTICE
                        CRIMINAL DIVISION
                        1400 New York Avenue NW
                        Washington, D.C. 20001
                   BY:  EMILY GURSKIS, ASSISTANT CHIEF

                        JOSEPH NOCELLA, JR.
                        United States Attorney
                        Eastern District of New York
                        271-A Cadman Plaza East
                        Brooklyn, New York 11201
                   BY:  ARUN BODAPATI, TRIAL ATTORNEY

For Defendant He:
                        WILLKIE FARR & GALLAGHER LLP
                        2029 Century Park East - Suite 2900
                        Los Angeles, California 90067
                   BY:  KOREN L. BELL, ATTORNEY AT LAW

                        WILLKIE FARR & GALLAGHER LLP
                        787 7th Avenue
                        New York, New York 10019
                   BY:  MICHAEL S. SCHACHTER, ATTORNEY AT LAW
                        STEVEN J. BALLEW, ATTORNEY AT LAW


For Defendant Brody:
                        LAW OFFICE OF VALERY NECHAY
                        Law Chambers Building
                        345 Franklin Street
                        San Francisco, California 94102
                   BY:  VALERY NECHAY, ATTORNEY AT LAW


Also Present:   Thifany Braga
                Simon Hall
                Mackenzie Slater
                Andy Cepregi
                Ashley Moore
                Barbara Hua Robinson, Mandarin Interpreter
                Jeff Dinn, Mandarin Interpreter
```

<pre>
 1                          I N D E X

 2   Friday, November 7, 2025 - Volume 22

 3                                               PAGE   VOL.

 4   Government Rests                            5072    22

 5   GOVERNMENT'S WITNESSES                      PAGE   VOL.

 6   GUZMAN, ANTHONY (RECALLED)
     (PREVIOUSLY SWORN)                          4922    22
 7   Cross-Examination by Mr. Ballew            4922    22
     Cross-Examination by Ms. Nechay            4932    22
 8   Redirect Examination by Mr. Bodapati       4949    22

 9   PETRON, MICHAEL
     (SWORN)                                     4958    22
10   Direct Examination by Mr. Foster           4958    22
     Cross-Examination by Mr. Ballew            5001    22
11   Cross-Examination by Ms. Nechay            5023    22
     Redirect Examination by Mr. Foster         5025    22
12
     CHIEPPA, KIMBERLY
13   (SWORN)                                     5030    22
     Direct Examination by Ms. Green            5030    22
14   Cross-Examination by Ms. Bell             5059    22
     Redirect Examination by Ms. Green          5067    22
15
                          E X H I B I T S
16
     TRIAL EXHIBITS                  IDEN   EVID   VOL.
17
      504                                   4949    22
18
     1072                                   5026    22
19
     1073                                   5072    22
20
     1074                                   5072    22
21
     1319                                   4966    22
22
     1321                                   4966    22
23
     1482                                   4966    22
24
     2828                                   4966    22
25
</pre>

<u>**I N D E X**</u>

<u>**E X H I B I T S**</u>

| <u>**TRIAL EXHIBITS**</u> | <u>IDEN</u> | <u>EVID</u> | <u>VOL.</u> |
|---|---|---|---|
| 2829 | | 4966 | 22 |
| 2830 | | 4966 | 22 |
| 2831 | | 4966 | 22 |
| 2832 | | 4966 | 22 |
| 2833 | | 4966 | 22 |
| 2834 | | 4966 | 22 |
| 2835 | | 4966 | 22 |
| 2847 | | 4966 | 22 |
| 2852 | | 4966 | 22 |
| 2853 | | 4966 | 22 |
| 2899 | | 4982 | 22 |
| 4000 page 9 | | 4966 | 22 |
| 4000 page 11 | | 4966 | 22 |
| 4000 page 12 | | 4966 | 22 |
| 4000 page 14 | | 4966 | 22 |
| 4000 page 17 | | 4966 | 22 |
| 4000 page 15 | | 4968 | 22 |
| 4000 page 16 | | 4968 | 22 |
| 4000 page 30 | | 4968 | 22 |
| 4000 page 44 | | 4968 | 22 |
| 4000 page 27 | | 4970 | 22 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 4000 page 28 | | 4970 | 22 |
| 4000 page 32 | | 4970 | 22 |
| 4000 page 23 | | 4973 | 22 |
| 4000 page 25 | | 4973 | 22 |
| 4000 page 26 | | 4973 | 22 |
| 4000 page 29 | | 4974 | 22 |
| 4000 page 58 | | 4974 | 22 |
| 4000 page 20 | | 4977 | 22 |
| 4000 page 21 | | 4977 | 22 |
| 4000 page 22 | | 4977 | 22 |
| 4000 page 36 | | 4977 | 22 |
| 4000 page 37 | | 4977 | 22 |
| 4000 page 45 | | 4977 | 22 |
| 4000 page 46 | | 4977 | 22 |
| 4000 page 47 | | 4977 | 22 |
| 4000 page 48 | | 4977 | 22 |
| 4000 page 49 | | 4977 | 22 |
| 4000 page 60 | | 4977 | 22 |
| 4000 page 62 | | 4977 | 22 |
| 4000 page 68 | | 4977 | 22 |
| 4000 page 69 | | 4977 | 22 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 4000 page 70 | | 4977 | 22 |
| 4000 page 52 | | 4979 | 22 |
| 4000 page 53 | | 4979 | 22 |
| 4000 page 54 | | 4979 | 22 |
| 4000 page 61 | | 4979 | 22 |
| 4000 page 67 | | 4979 | 22 |
| 4000 page 18 | | 4984 | 22 |
| 4000 page 19 | | 4984 | 22 |
| 4000 page 34 | | 4984 | 22 |
| 4000 page 35 | | 4984 | 22 |
| 4000 page 63 | | 4984 | 22 |
| 4000 page 65 | | 4984 | 22 |
| 4000 page 66 | | 4984 | 22 |
| 4000 page 59 | | 4989 | 22 |
| 4000 page 39 | | 4990 | 22 |
| 4000 page 42 | | 4990 | 22 |
| 4000 page 43 | | 4990 | 22 |
| 4000 page 57 | | 4990 | 22 |
| 4000 page 72 | | 4990 | 22 |
| 4000 page 73 | | 4990 | 22 |
| 4000 page 71 | | 4993 | 22 |

1

**I N D E X**

2

**E X H I B I T S**

3

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 4000 page 1 | | 4994 | 22 |
| 4000 page 2 | | 4994 | 22 |
| 4000 page 3 | | 4994 | 22 |
| 4000 page 4 | | 4994 | 22 |
| 4000 page 5 | | 4994 | 22 |
| 4000 page 6 | | 4994 | 22 |
| 4000 page 7 | | 4994 | 22 |
| 4000 page 8 | | 4994 | 22 |
| 4000 page 57 | | 4994 | 22 |
| 4000 page 41 | | 5009 | 22 |
| 4000 page 50 | | 5013 | 22 |
| 7724 | | 4927 | 22 |
| 7725 | | 4927 | 22 |

| | |
|---|---|
| 1 | <u>**Friday - November 7, 2025**</u>       <u>**9:13 a.m.**</u> |

2          <u>**P R O C E E D I N G S**</u>

3           ---o0o---

4   (Proceedings were heard out of the presence of the jury and

5            Ms. Nechay.)

6     **THE COURT:**  This is on the record.  We're just talking

7   about -- well, I better wait on that one.  Let me talk about

8   scheduling.

9     At least my tentative is as to -- as to the patients

10   who -- you proposed four or five patients, I don't believe I

11   would allow that, it seems to me that, Number 1, I don't know

12   that it is -- doesn't seem to be impeaching.

13     I think what you're -- what you're proposing this

14   testimony is that while the witness said, I think we were

15   devalued and not -- in the excerpt that you gave me, which is

16   1742 to 1754 of the transcript, yes, I mean, she certainly said

17   she was devalued.  But I don't think it's -- and this is -- so

18   this is not impeaching her on that.  It's impeaching her in the

19   sense, or offering evidence -- maybe not impeachment --

20   offering evidence that not everybody was devalued.  Or that

21   there were people who were highly valued and that's not it.

22   That's not an issue in the case, I don't believe.

23     And, I mean, if the Government were to argue, you know,

24   the way they -- nobody was valued -- or, I mean, take -- take

25   this evidence to the extreme and tries to characterize it as to

1    everybody there, then I think that that would be improper and

2    there would be an objection.  I might even open the case for

3    further evidence.

4        But this is not -- this is truly a collateral issue and I

5    think it's a 403 issue at the very least, and so I wouldn't

6    allow that.

7        As to providers, you have to give me an update as to -- as

8    to what they are.  And what the status is.

9        As to -- we'll get to Dr. Brody's table when his attorney

10   gets here, but as to -- I'm going through your sort of list of

11   things that you proposed to do.  The on-boarding video I would

12   allow.  I would allow Dr. Brody's video.

13       I don't know about Dr. Luca, whatever that person's name

14   is.  I have some concerns about that.  And I'm not, you know --

15   my inclination is not to allow it but I will hear argument

16   about it.

17       There are articles of Dr. Brody.  I have to figure out

18   what -- what you're talking about and what they are.  I think I

19   would allow -- is it Levy?  Levy [different pronunciation]?

20   What's his name?

21           **MR. FOSTER:**  Riley Levy.

22           **THE COURT:**  Yeah, to come back -- you say it's

23   10 minutes and I -- yeah, I would allow him to come back.

24       And then there's Mr. Sigorski [sic] or whoever the

25   gentleman is and I don't know yet what he is going to say.

1      So that's my understanding.  I haven't heard from

2  Dr. Brody's attorney yet as to who she would -- if anyone, she

3  would call.  But, these are the people, I think, that you would

4  call, and that's my tentative on that.

5           MR. SCHACHTER:  Your Honor, can --

6           MS. BELL:  Your Honor --

7           THE COURT:  Go ahead, whoever wants to address it.

8           MS. BELL:  So, Your Honor, I think we have also

9  Mr. Chandra, who's the expert, and Mr. Schachter can address

10  that when the Court is ready.

11           THE COURT:  Oh, really?  The expert.  I mean,

12  you know, your answer to the expert -- or your offer of the

13  expert, as I understood it, was contingent on what instruction

14  I'll give.

15           MS. BELL:  Your Honor --

16           THE COURT:  And I haven't decided what instruction.

17  The instruction you have before you is essentially the one I

18  gave in the *Napoli* case.  And if I give that, it was my

19  understanding you're not going to call an expert.  But if I

20  don't give that, you have -- you may or may not call an expert,

21  you have to see what the instruction is.

22           MS. BELL:  Yes, Your Honor.  So there are a few

23  different experts in play.  One we withdrew entirely, and then

24  we had our medical expert, Dr. Saint Martin.  And, yes, we --

25  that is absolutely correct.  If we get the instructions in

1    *Napoli*, our present intent is not to call Dr. Saint Martin, I

2    think subject to just --

3         **THE COURT:**  Okay.

4         **MS. BELL:**  -- some final discussion.

5         However, there's another expert, Mr. Chandra.

6         **THE COURT:**  Okay.  Go ahead.  Who is this?

7         **MS. BELL:**  And then I did also want to just address

8    the patients in whatever order Your Honor prefers.

9         **THE COURT:**  Well, let's talk about patients.

10        **MS. BELL:**  Thank you, Your Honor.  Let me make a

11   further offer of proof on --

12        **THE COURT:**  By the way --

13        **MS. BELL:**  Yes.

14        **THE COURT:**  -- you can certainly make an offer of

15   proof as to any of these people that I say I'm not going to

16   listen to.  I'm not going to allow in.  You can certainly make

17   a complete offer of proof if you have things you want to say.

18        **MR. SCHACHTER:**  Well, Your Honor, I guess, with

19   respect to the patients, I mean, I -- what I -- what I --

20   what's not clear to me -- I understand the Court's view that

21   perhaps patients aren't relevant.  But the problem is that the

22   Government introduced -- they called a patient to testify about

23   her experience and I don't understand how in -- how we cannot

24   counter that, do the exact flip side of what the Government

25   actually injected into the case.

PROCEEDINGS

1    That's the part that seems --

2        **THE COURT:**  Well, because it's easy.  There are

3    135,000 patients.  The Government calls one or two or three who

4    had adverse experiences.  They certainly can't argue that

5    because two or three have adverse experiences, or because --

6    the Government -- that the defense did not call a patient --

7    and, by the way, I won't -- I wouldn't allow them even to say

8    it.  It's not -- I can't exclude it, and then the Government

9    says, oh, where were they?  That can't happen.

10       So all it is is -- you get up and say, one patient, two

11   patients, three patients out of 135,000 does not make -- which

12   is .00000 percent of the population -- patient population

13   hardly establishes.  And there are a lot of e-mails in there in

14   the record saying, "Oh, thank you.  This is great."  I think I

15   listened to some yesterday.

16       So whether you can understand it or not, that's the way --

17   I don't want to spend time bringing in what I think are

18   essentially testimonials:  I took this drug and it was

19   wonderful.  I had this experience, it was terrific.

20       **MR. SCHACHTER:**  Yeah.

21       **MR. FOSTER:**  Your Honor, you also excluded at

22   pretrial, there was a motion in limine on the good conduct

23   grounds and you're -- so you're correct.

24       **THE COURT:**  Okay.  Well, I'm not going to go back to

25   what I said in the beginning because, as you know, I change my

PROCEEDINGS

 1    mind.

 2         **MS. BELL:**  There was just a further offer of proof and

 3    point I wanted to make.  And I'm happy to do it later if Your

 4    Honor wants to get started.

 5         **THE COURT:**  I can't get started --

 6         **MR. SCHACHTER:**  Let me just say -- go ahead.  Go

 7    ahead.

 8       (Reporter interrupts for clarification of the record.)

 9         **MS. BELL:**  So, Your Honor, I think that the --

10    obviously, the crux of the Government's case is that this was a

11    pill mill, meaning through and through these prescriptions were

12    issued without a legitimate medical purpose and outside the

13    usual course of practice.  These patients will talk about their

14    experience generally with being diagnosed and prescribed by

15    different petitioners throughout their life.  Some of them will

16    at least give that --

17         **THE COURT:**  If they make the argument that this

18    happened in -- that all these patients -- that none of these

19    patients received prescriptions in the -- according to the

20    standard, if they make that argument, I'll stop the case then

21    and there and I will allow you to rebut it.  Okay?

22         They're not going to do it.  I'll instruct them not to do

23    it.  And that's not going to be the argument.  And it isn't the

24    argument.  It just isn't.  We know it's not the argument.

25         And you can -- there's enough in the record that you can

 1   point to to say that there were people who were satisfied and

 2   not -- not dissatisfied because they were drug seeking.  But

 3   people -- people who actually over time, the records show that

 4   they got better and they were better -- they could function

 5   better.  There's enough in the record on that.  And I'm not

 6   going to belabor it.  And I'm not going to allow the Government

 7   to make the larger argument, which I don't believe they even

 8   intended to make.

 9          MS. BELL:  Well --

10          MR. SCHACHTER:  Your Honor, then I think that it would

11   be appropriate, if individual patients are irrelevant, which I

12   certainly understand, then -- then we ask that the Court strike

13   the testimony of Melissa Emmerth, and we would ask perhaps for

14   some instruction saying that there are happy patients and there

15   are sad patients or something along those lines, but at a

16   minimum we think it would be --

17          THE COURT:  Yeah.

18          MR. SCHACHTER:  -- that the testimony of Melissa

19   Emmerth should be stricken, the Government should not be

20   speaking about Melissa Emmerth in summation because to say "You

21   heard from a sample patient at Done, you heard from Melissa

22   Emmerth and she said that she was not valued, she felt it was a

23   cattle call," and to have us not be able to rebut that --

24          THE COURT:  I'll consider that.  I'll consider it.

25          MS. BELL:  Thank you, Your Honor.  And --

1      THE COURT:  So unimportant that if they're going to

2  spend time talking about it, I'll consider it.  I'll consider

3  it.

4      MS. BELL:  The one --

5      THE COURT:  I'll not consider striking it.  I'm

6  considering directing the Government not to make that argument.

7      MS. BELL:  Your Honor, the one other point I'd make

8  about these patients is some of them will be able to say, "I

9  have seen X number of other practitioners for this problem.

10  The experience I had at Done was comparable to these other

11  practitioners.  It was a medical appointment.  I was diagnosed

12  in 30 minutes.  I was treated in this fashion.  I had

13  follow-ups in this fashion."

14      Particularly if we are not going to be able to proffer our

15  provider witnesses due the Fifth Amendment issues, which I hope

16  that we can get past, it is critical testimony that goes

17  straight to the heart of the standard at issue in this case,

18  which is in part what is the objective measure of what is

19  usually done in the course of practice --

20      THE COURT:  How can three -- how can five witnesses

21  establish the pattern?

22      MS. BELL:  They can't --

23      THE COURT:  How -- the five witnesses that you call

24  out of 135,000 and they had a different experience, or

25  different from what the Government is -- characterizes it, and

PROCEEDINGS

 1  you say, well, that will establish that it was -- that in the

 2  usual course of -- and they'll talk about their 10

 3  experiences -- which, by the way, is -- you can't even begin to

 4  cross-examine them on that.

 5      How is that particularly probative?

 6      It may -- I'm not saying it's irrelevant.  I'm just saying

 7  I don't think it's -- I think under 403, I would exclude it,

 8  and that's the ruling of the Court.  And you can make a further

 9  offer of proof.

10      **MS. BELL:**  Thank you, Your Honor.  We will take that

11  up at a --

12      **THE COURT:**  Okay.

13      **MS. BELL:**  -- further time.

14      **THE COURT:**  Now -- sorry.

15      **MR. SCHACHTER:**  I have one other -- so there's an

16  issue -- two issues.  One is, so Dr. Chandra, I just want to

17  explain what his testimony is.

18      (Reporter interrupts for clarification of the record.)

19      **MR. SCHACHTER:**  I apologize.

20      I would like to explain who Dr. Chandra is, just to remind

21  the Court, and what that testimony is.

22      So Dr. Chandra is a healthcare economist.  One of the big

23  issues is that there is something completely inappropriate with

24  the panel pay.  The idea that although they -- providers were

25  paid hourly for the initial evaluation, they were paid per

1    patient after that time, which would include doing follow-ups

2    or whatever was medically appropriate in the provider's view.

3        Dr. Chandra will explain that that form of payment is

4    called capitation and it is very common in the healthcare

5    industry because both forms of payment, paying a medical

6    practitioner by the hour and paying them per patient both have

7    pros and cons.

8        Paying by the hour can incentivize unnecessary care.

9    Someone who's paid to do more surgeries may be inclined to do

10   more surgeries.

11       Paying per patient is a way of causing efficiency,

12   requiring medical practitioners to -- to act more efficiently.

13   It's not unusual.  It's not a crazy idea is really the thrust

14   of this testimony.  It is a common form of payment in the

15   medical industry.

16       It's very limited.  I do not think that this testimony

17   will last more than, you know, an hour max.  But we think it's

18   important.  And we think earlier in the -- before the trial,

19   the Court didn't understand -- had no way of knowing that a big

20   part of the Government's argument is that paying per patient

21   was -- was a -- basically, a part of the criminal enterprise.

22   We want to normalize that and explain that it is normal in the

23   healthcare industry.

24               THE COURT:  Well, I don't know whether it is or not.

25               MR. FOSTER:  Your Honor, you indicated pretrial that

1   you were inclined to exclude this witness.  The reason is

2   because this witness has nothing relevant or reliable to offer

3   the jury.  He's going to testify about insurance company

4   policies and give a high-level overview of the U.S. healthcare

5   system, completely divorced from the facts of the case.

6       The relevant issue in this case, which, of course, was

7   alleged in the indictment and is no surprise at trial, is

8   whether, in part, the defendants implemented this payment

9   structure with the knowledge and intent that it would

10  facilitate illegal prescribing.

11      Dr. Chandra hasn't examined anything related to this case

12  at all.  He would testify about capitation models for insurance

13  companies.  Done is not an insurance company.  He doesn't have

14  a reliable methodology applied to the facts of this case, and

15  that's why the Court indicated that it would not permit him to

16  testify.

17          **THE COURT:**  I think that's right.  And I think it's --

18  I think it is highly susceptible of confusion on the -- on the

19  issues that -- that are appropriate.  So I'm not going to

20  permit it.  But you made your offer of proof and it's part of

21  the record.

22      So, let's -- yes, Mr. Schachter?

23          **MR. SCHACHTER:**  Your Honor, I have a very short issue

24  with respect to Agent Guzman and I want to --

25          **THE COURT:**  I want to tell you all, although I didn't

 1  rule, I'm not going to allow the video because this was a --
 2  was there some video that he had of something?  I thought it
 3  was a video.  Maybe I -- wrong person, wrong case, wrong
 4  something.
 5          **MS. BELL:**  I think it's the Jobman video.
 6          **MR. SCHACHTER:**  Oh, the Jobman -- the Jobman video.
 7  Yeah, that's excluded.
 8          **THE COURT:**  Yeah.
 9          **MR. SCHACHTER:**  Okay.  Thank you, Your Honor.
10      With respect to -- so this is -- we want to make sure that
11  we are not coming anywhere close to any reliance and advice of
12  counsel issues.  However, there has been a suggestion,
13  effectively, that Ms. -- that Ms. He had involvement in not --
14  making sure that certain documents were not produced because
15  what the agent says is there was this production and -- and in
16  it was not this document that we got after the fact.
17      Okay.  However, and -- and the Government is free to argue
18  that that's because, you know, Ms. He individually stopped it.
19  But it is -- it is inaccurate to -- when -- when the Government
20  and the agent know that there was an e-discovery vendor that
21  was pulling electronic documents, and that there was a law firm
22  that is the one that actually made the production.
23      We're not relying on the advice of counsel, but I think it
24  gives a misimpression that Ms. He is the one who's gathering up
25  the documents and handing them over when in a massive

 1    e-discovery case, the fact that there is a document here or a

 2    document there is in every -- that is not produced is in every

 3    single case.  And that's really for the jury, but the jury

 4    should have the reality.

 5            THE COURT:  Isn't the reality this -- and I may be

 6    wrong because it may not be the reality.  But isn't the reality

 7    that the allegation is, based upon the agent's testimony, that

 8    the defendant removed or otherwise made unavailable to the

 9    lawyer a particular document?  That's what -- that was the way

10    I understood it to be.

11        Now, if you're saying to me, actually, it was available to

12    the lawyer and the lawyer chose not to produce it, if that's

13    what you're saying to me, then, of course, it would be

14    important that that fact be known to the jury because the

15    implication is, as I listen to this witness's testimony,

16    that -- that she did a -- some type of culling, encryption,

17    deletion, withholding effort, which, in fact -- which, in fact,

18    made it either difficult or impossible for the lawyer to comply

19    with the subpoenas.  That's -- that's what I took from it.

20            MR. FOSTER:  Exactly.

21            MR. SCHACHTER:  Yes.  And, Your Honor --

22            THE COURT:  Wait.  One at a time.

23            MR. FOSTER:  Yes.  And, Your Honor, you may recall

24    that about three weeks ago or so, I brought up this exact issue

25    and I raised the question:  If she was going to say that she

1    had provided any of this information to her lawyer, that would

2    be an advice of counsel defense.  We'd need to see the

3    communications.  The Government would need to be able to test

4    that.  And we were told on the record that they were not going

5    to go down that road.

6        **THE COURT:**  I'm actually asking a different question

7    and I think that counsel is raising a different question.

8        I'm -- it's not a question -- if the lawyer withheld the

9    document, then it's not on her -- on her head, unless he told

10   the lawyer to withhold it.

11       Now -- and you don't know whether he did or not.  I mean,

12   because you have not been able to explore that.

13       But if the argument is that she was engaged in an

14   enterprise, as I've described it, thereby the lawyer not having

15   either received it or receiving permission to -- I don't know

16   that you need permission -- received it and, therefore, it was

17   unavailable to the lawyer, that's a different -- that's a

18   different -- that is what I thought this witness said.

19       **MR. FOSTER:**  Yes.

20       **MR. SCHACHTER:**  Yes.

21       **MR. FOSTER:**  And I think it was narrowly tailored to

22   here's a document, here's where it is on her phone or her drive

23   or something under her control, we didn't get it.

24       Now, the interaction between here and her lawyers or an

25   e-discovery vendor, those are all facts that have never been

 1    provided to the Government --

 2              **THE COURT:**  No, there's --

 3              **MR. FOSTER:**  -- and there's been no showing that she

 4    provided --

 5              **THE COURT:**  I think the burden, in a sense, is on --

 6    the burden, I think, is on your -- on the defense side.  In

 7    other words -- and I'll explain what I mean by that, because

 8    very -- when you start talking about shifting burdens, it

 9    raises red flags.  I understand that.

10        But she was engaged in a business, in an enterprise, in a

11    practice of deleting files and of encrypting files, and there's

12    a fair amount of testimony that she's inquiring:  Can this file

13    be discovered?  Can this information be discovered?

14        So it's not a fancy -- fanciful exercise on the part of

15    the Government.

16        As a matter of fact, also, by the way, there's a charge of

17    obstruction of justice, so it's -- it's entirely germane.

18        Now, what the Government says is two things.  They say

19    she's engaged in this business and, by the way, we subpoenaed

20    the document and didn't get it.

21        So then they sit down because they don't have to do

22    anything more than that.  If -- and this is what I mean by

23    shifting -- you have access to the lawyers, if you want to come

24    in and bring in a lawyer to say, "I got the document and chose

25    not to produce it," or whatever the lawyer will say, then

1   that's -- that's -- that's a fair defense to the obstruction.

2       But I -- I mean, I would -- I'd be careful treading here

3   because if you're going to suggest that the -- that it was the

4   lawyer's decision not to produce the document, then I think

5   that does introduce the advice of counsel.

6       Now, I'm not quite sure how to balance it all fairly, but

7   I know that you do not want to invade the attorney/client

8   privilege.  That's a decision that you made and it's a

9   perfectly -- it's a perfectly acceptable decision.  But with it

10  goes the sequence, and the consequence may very well be that

11  then you can't rely on what the lawyer did.

12      However, I would entertain a discussion, if I have a -- if

13  I have a record, that it was the lawyer's decision not to

14  produce something.

15          MR. SCHACHTER:  Your Honor, it's not so much -- it's

16  not so much a decision not to produce something.  When -- when

17  a production is made of this size, there -- a lawyer conducts a

18  reasonable search.  It is not -- then there are always

19  materials that are ultimately not produced.

20          THE COURT:  Yes, of course.

21          MR. SCHACHTER:  And what the record the Court does

22  have is that Mr. Steskal has said, look, there are things that

23  weren't produced, nobody told me not to produce them.  They

24  weren't produced, and effectively what he says is, like, look,

25  this happens.  And he -- and he in no way points the blame at

 1    our client.

 2         And so the problem is that the impression that the Court

 3    had that the -- the witness's testimony suggests volitional

 4    activity with respect to these documents I think is an unfair

 5    one and the only thing that we wish to show -- we don't intend

 6    to say, like -- this is what we intend to show.  You understand

 7    that, given the volume of electronic documents, that there was

 8    an e-discovery vendor and that there was a law firm involved.

 9         That's it because the jury has a right to understand,

10    maybe based on --

11         **THE COURT:**  No, I think they have a right to

12    understand.  I don't know that they have a right to understand

13    that there was a vendor and there was a law firm, because that

14    suggests that those -- that the failure to produce the

15    documents was their decision.  Or their ineptitude, their

16    negligence, or the vastness of the task.

17         I think you can ask this witness, if he knows the answer,

18    a subpoena was issued; approximately how many documents were

19    produced?

20         I think you can give a magnitude of it and you can make

21    your argument from a magnitude of it, but that's as far as I

22    would let you go.  Since you're seeking guidance, there's the

23    guidance.

24         **MR. SCHACHTER:**  Thank you, Your Honor.

25         **THE COURT:**  Okay.

PROCEEDINGS

 1              **MS. BELL:**  Thank you, Your Honor.

 2              **THE COURT:**  Now, let's see.  Do we -- is -- we don't

 3    have Dr. Brody's.

 4              **DR. BRODY:**  Valerie said she informed the Court that

 5    it's a medical -- she's going to be --

 6              **THE COURT:**  No, no.  I understand that it's medical,

 7    and I did receive a communication that she would be here at

 8    9:30, but it's 9:40.  But -- and we can't start without her, so

 9    we'll just sit here and wait.  But we can talk about things.

10              **MR. FOSTER:**  Yes.

11              **THE COURT:**  What do you want to talk about?

12              **MR. FOSTER:**  So the videos, Your Honor.  You had

13    initially excluded them both because they were not impeaching

14    and because they were hearsay.  And, of course, if the Defense

15    wanted to lay an appropriate foundation by having a witness who

16    could testify that they heard them, that there was some number

17    of people that they -- that watched them, that they were

18    distributed in some form, that would be laying an appropriate

19    foundation.

20         But absent that, it's both hearsay, they're being offered

21    for the truth of the matter asserted, and they're incredibly

22    confusing to the jury because of the -- because there's no

23    witness testimony and no suggestion that they were actually

24    used.

25              **THE COURT:**  I think there's a lot of testimony in the

1  record that there was an on-boarding video and that Dr. Brody

2  did it.  And I -- I don't think it's hearsay in that I don't

3  think it's being admitted for the truth of whatever he said in

4  the video, it's being admitted because, in fact -- as I

5  indicated, if they want to put it on in their case.  I don't

6  think it impeached any of the witnesses, but I think that --

7  that I would allow it in.  I doubt if it's that confusing.  I

8  mean, it is what it is.

9        MR. FOSTER:  Well, I think we'd stipulate that a video

10 exists, but without a witness, we can't cross-examine anyone:

11 Was this given just on one occasion?  Were there three people

12 watching it or five or 50?

13     All of these facts go to the import and weight of the

14 contents, and if the only fact that needs to be established is

15 that Brody gave onboarding presentations, well, we'll stipulate

16 to it.

17     They want to admit the video not for the fact, but for the

18 contents.

19        THE COURT:  Well, I think that's -- that may be

20 acceptable.

21        MR. SCHACHTER:  I'm sorry, Your Honor.

22        THE COURT:  But I know you're not Dr. Brody's lawyer,

23 so I can't -- I shouldn't carry on a conversation at this point

24 on that issue.

25        MR. SCHACHTER:  No, but we do care about rebutting the

 1  Government's argument in opening that he was a clinical

 2  president on paper only.

 3       Now, with respect to Mr. Foster's argument that we don't

 4  know how often it was given or whether it was distributed, in

 5  fact, we do.  We attempted -- we used many times an e-mail in

 6  which Dr. Brody is distributing it.  There's also a calendar

 7  entry inviting the participants to see the video.  It is linked

 8  in both the e-mail, as well as in the calendar invite, and so

 9  we know precisely who it was shown to, and the Government can

10  argue, oh, it was only once, but it -- but that goes -- you

11  know, that's an argument issue as to the significance of these

12  videos.

13       The jury has a right to see Dr. Brody acting as a clinical

14  president and not as a on-paper-only.

15       THE COURT:  They have a right to see it if there's

16  a -- if there's a witness who can testify as to the frequency

17  that this video was shown to what group of people.

18       There's no way -- what they're saying is, yes, we'll

19  stipulate that he made a video, we'll stipulate that it -- I

20  mean, they may even stipulate to some of the content of it from

21  that point of view.  It's not the same thing, I understand.

22  But they're saying they can't -- they can't cross-examine a

23  video to determine whether or not it was -- how many providers

24  were there at Done?  I forget --

25       MR. FOSTER:  Hundreds.  I think over 400.

 1        **THE COURT:**  Okay.  So let's just say we get a

 2   stipulation there were approximately 400 providers.  What the

 3   question really is in a -- in part, is, is there any evidence

 4   as to the number of people who actually saw it.  Now, maybe

 5   your argument, no, there won't be that, but the fact of the

 6   matter, it was made available to anyone who was interested in

 7   seeing it.  If that's -- if that's the stipulation, then -- I'd

 8   like to see a stipulation on this, and I'd like the parties to

 9   sit down and see if they can stipulate to it.

10        **MR. SCHACHTER:**  And, Your Honor --

11        **THE COURT:**  Because the content just sitting out there

12   unexamined -- not that the content's unexamined, the

13   dissemination of the content is unexamined, becomes --

14   becomes -- carries with it undue weight.

15        Now, I think it is important that Dr. Brody be able to

16   establish that he did things other than -- or he did exercise

17   his duties as the head of the clinical aspects of it, and one

18   of them was to create a video for instructional purposes.  I

19   think that's important, and I think that ought to be stipulated

20   to.

21        **MR. FOSTER:**  We will stipulate to that.

22        **MR. SCHACHTER:**  Your Honor, we -- we proposed very

23   limited excerpts of these videos so as not to consume time.

24   Each one has about 10 minutes of content.  We ask that

25   the Court review the content before ruling that it is somehow

 1  excluded.  It is not hearsay.  We are not arguing and nobody

 2  cares whether or not Dr. Brody is accurate or inaccurate in his

 3  description of what is ADHD and in his description of what the

 4  clinical policies of Done are.  This is simply him -- as the

 5  Court said, this is evidence of him effectively punching a time

 6  clock, and the jury has a right to see him acting as this.

 7       Now, if there's any question, well, maybe the defense is

 8  going to overstate to whom these videos were shown, the e-mails

 9  and the calendar entries show precisely to whom they were shown

10  and the Government is, therefore, free to say, "Okay.  Fine.

11  He showed them on this one occasion that's laid out in the

12  e-mail."

13           THE COURT:  Your suggestion that I look at them is a

14  good suggestion.

15           MR. SCHACHTER:  Thank you, Your Honor.

16           MR. FOSTER:  And I'd note, Your Honor, that if the

17  defense doesn't care about the contents, why are they

18  excerpting certain portions?  The reason that they're

19  excerpting certain portions is because they want the jury to

20  take them for the truth, not for the facts that he made

21  the onboarding videos, which the Government will stipulate to.

22           MR. SCHACHTER:  The Court needs to --

23           THE COURT:  I will look at them.

24           MR. SCHACHTER:  Thank you.

25       Because the Court will see nothing in there is being

PROCEEDINGS

 1   offered for the truth of the matters that are asserted --

 2          THE COURT:  I don't think it's necessarily hearsay.  I

 3   don't think it's hearsay.  I think it's offered for a

 4   non-hearsay purpose.

 5          MR. SCHACHTER:  Exactly.  Thank you, Your Honor.

 6          THE COURT:  But that doesn't mean it's -- that doesn't

 7   mean that 403 simply lets it in.

 8          MR. SCHACHTER:  There is very little that we are

 9   trying to do in our defense case, and these 10 minute --

10   10 minutes of videos is a critical component, we think.

11          THE COURT:  We've spent hours on the defense case.

12   Let -- let -- don't -- don't denigrate your efforts in

13   cross-examination.  I mean, the cross-examination certainly was

14   part of the defense case.

15      Ms. Bell.

16          MS. BELL:  Thank you, Your Honor.  I believe -- I'm

17   just waiting for the Government.  We will have a proposed

18   limiting instruction before one of our later witnesses, but

19   we'll see if we can reach agreement first.

20          THE COURT:  Yes.

21          MS. BELL:  One further issue, we are eager and

22   grateful to the Court to have the opportunity to address the

23   jury instruction issue.  We do intend to file something in

24   response to what the Government has filed.  We'll file it

25   today.  We're just --

 1          THE COURT:  Fine.

 2          MS. BELL:  -- reviewing what they filed, but I wanted

 3     Your Honor to have the benefit of that as well.

 4          THE COURT:  So now I'm thinking -- let me talk about

 5     scheduling for a minute.  I don't know -- you know, we have to

 6     wait, but eventually -- I don't know what the cross -- how long

 7     the cross, if there is any cross of this witness.  Maybe

 8     there's some cross.

 9          MR. BALLEW:  It's very, very little.

10          THE COURT:  Then you go to two other witnesses.

11          MR. FOSTER:  Very short, both of them.

12          THE COURT:  Okay.  And we'll see.  And they're going

13     to cross, so we'll see where we are.  The only thing I'm

14     debating is whether to bring the jury back on Monday because

15     there's no court on Tuesday and no court on Wednesday.  And it

16     almost occurred to me, and I really have to be guided by you

17     people, if a day, like Monday, would be well spent -- assuming

18     we can conclude the testimony today of the Government's case,

19     if Monday would be well spent in discussing jury instructions.

20          I mean, it really is a question of how long your case will

21     be.  And, I guess, we don't know that until Monday in any

22     event; is that right?  Is that what you're saying?  So I better

23     bring them back on Monday.

24          MR. FOSTER:  I think so, Your Honor, because I've been

25     in a similar situation where the defense case appeared short

1   but then each defendant testified and it --

2          **THE COURT:**  Oh.

3          **MR. FOSTER:**  Right.  And then, you know -- I do want

4   to get -- I think we told the jury they'd get out of here

5   before Thanksgiving.

6          **THE COURT:**  Oh, don't worry.  Well, let me ask you, is

7   it your intention at the present time to call your client?

8          **MR. SCHACHTER:**  I think we need to confer with our

9   client.

10         **THE COURT:**  Well, I'd like to know that -- I mean, you

11  can certainly tell me you haven't decided yet.  It's perfectly

12  legitimate.  But how I bring the jury -- obviously if your

13  client is going to testify, then there's no question the jury

14  should come back on Monday and we should proceed with the order

15  in which you want the case to proceed.  If your client is not

16  going to testify, then I may give the jury Monday off, because

17  they're getting Tuesday and Wednesday off.  And we won't have

18  Monday off, we'll be here, and we'll hammer out all the

19  instructions.

20      And then on Thursday, depending on what you ultimately

21  decide to do, there may be some testimony.  And then on Friday,

22  we may have argument, but --

23         **MR. SCHACHTER:**  May we confer for just a moment?

24         **THE COURT:**  You have another idea, you have another

25  idea.  I don't know what to do about Dr. Brody's attorney.  Do

1    we have --

2                DR. BRODY:  She said 9:50.

3                MS. BELL:  She's on her way.  Dr. Brody is saying she

4    has now updated and she should be here by 9:50.

5                THE COURT:  Oh, okay.  All right.  That's fine.

6                        (Pause in proceedings.)

7                THE COURT:  See, you want to work out something, work

8    out something.  Let me know when she's back.

9                        (Recess taken at 9:48 a.m.)

10                   (Proceedings resumed at 9:52 a.m.)

11       (Proceedings were heard out of the presence of the jury.)

12                THE COURTROOM DEPUTY:  Come to order.

13                MR. SCHACHTER:  Your Honor, one other issue with

14    respect to --

15                THE COURT:  Yes.  Please be seated.

16          Yeah, go ahead.

17                MR. SCHACHTER:  With respect to Mr. Petron, who is the

18    witness who is next, there are a number of slides which the

19    Government produced to us which were based on the truth of

20    the -- of the hearsay financial records which the Court

21    excluded.

22          We have notified the Government that we object to those

23    slides which are based on those financial records which have

24    been excluded.

25                MR. FOSTER:  I don't think the Court excluded them.  I

1  think you said the Government's filed -- files lots of briefs,

2  will you file a brief?  So we filed a brief this morning.

3  These are the general ledgers of the defendant's company that

4  the defendant's company produced to us.

5          THE COURT:  I read it.  I read the briefs.  I'm

6  satisfied the Government can -- can introduce this, and so I'm

7  admitting it.

8      Let me ask Dr. Brody's lawyer, you were going to indicate

9  this morning about witnesses, and what is the response?

10         MS. NECHAY:  Yes, Your Honor.  Just give me one

11  moment, please.

12     So there are ostensibly two patient witnesses that I would

13  like to call.  Specifically these are two witnesses that --

14  first of all, these were patients of Dr. Brody's during his

15  time at Done, and they are also percipient witnesses to --

16  there's been -- first of all, a variety of statements made

17  characterizing Dr. Brody as being crazy, as being a provider

18  that doesn't have sound judgment and a variety of very

19  disparaging comments made just about the way he even speaks or

20  presents himself.

21     So these are -- these are patients -- long-term patients

22  of his that can put in context, for example, statements he's

23  made.  For example, I --

24         THE COURT:  This is what I'd like you to do.  As to

25  those two people or three or how many you have, give me a

PROCEEDINGS

 1   detailed offer of proof.  Okay?  Write out a detailed -- I mean

 2   you don't have to do it -- I'm not going to ask you to give it

 3   to me today --

 4          **MS. NECHAY:**  Certainly.

 5          **THE COURT:**  -- because you're not going to start the

 6   case today, but I want you to file a detailed offer of proof.

 7      You may be unaware, I've ruled the patients -- by and

 8   large, patients are not being -- I'm not allowing the defense

 9   to call.

10      Now, maybe this is -- this is a different case because,

11   after all, there isn't a claim that Ruthia He treated patients.

12   There is a claim that Dr. Brody did in some manner.  Anyway, I

13   want to see it in writing.

14          **MS. NECHAY:**  Absolutely.  And I'm happy to file that

15   over the weekend, Your Honor.

16          **THE COURT:**  Yes, that's fine.

17      Next, I need to know, for scheduling purposes, and I will

18   ask you, I guess this afternoon, whether it's your present

19   intention to have your client testify.  I understand you don't

20   have to finally make that election until just before you rest,

21   but I need to know for scheduling purposes what your present

22   intention is.  Okay?

23          **MS. NECHAY:**  And, Your Honor, as has been sort of

24   said, this is a little bit of a game time decision.  I'm not

25   trying to hide the ball here.  But when would the Court like

PROCEEDINGS

1   that information?

2        **THE COURT:**  I'd like to know -- well, I'd like to know

3   today what your present intention is.  Not right now.  I'll ask

4   at the end of the day.

5        The Government's going to rest today if they can, and then

6   it's a perfectly -- now then you know all of the evidence the

7   Government has in this case that has been produced.  It's a

8   fair question to ask.

9        **MS. NECHAY:**  Fair enough, Your Honor.  Thank you.

10       **THE COURT:**  And especially if what you're going to do

11  is call a couple of patients.  That's not going to change

12  Dr. Brody's decision whether to testify or not.  Now, maybe

13  other things might, I don't know.  But -- and I'm not asking it

14  from the point of view of -- that you're going to elect to

15  decide to do it at that point.  You can change your mind

16  until -- until you rest.  That's the way I view it.

17       **MS. NECHAY:**  Understood.  Thank you.

18       **THE COURT:**  Okay.  Let's bring in the jury.

19            (The jury enters the courtroom.)

20       (Proceedings were heard in the presence of the jury.)

21       **THE COURT:**  Okay.  Please be seated.

22       Let the record reflect all parties are present.  Jurors

23  are present.

24       Ladies and gentlemen, let me thank you, it's been, as you

25  see by the clock, 45 minutes delayed.

```
 1        So it's no mystery, what we are talking about is
 2   scheduling issues, which will directly affect you.  You know
 3   next week you are not meeting on Tuesday and Wednesday.  And at
 4   the end of today, I may be in a position to talk about Monday.
 5   But, you know, uppermost in my mind, and I know in your mind,
 6   is bringing the process to a conclusion as expeditiously as
 7   possible.  And the parties are working towards that.  So I
 8   can't give you any more information than that.
 9        I know by the end of today, I'll be able to tell you
10   whether to come in on Monday.  Obviously, you would come in on
11   Thursday and Friday of next week in any event.
12        Okay.  You may proceed.
13             MR. BALLEW:  Thank you, Your Honor.
14                        ANTHONY GUZMAN,
15   called as a witness for the Government, having been previously
16   duly sworn, testified further as follows:
17             THE COURT:  You may proceed.
18             MR. BALLEW:  Thank you, Your Honor.
19                       CROSS-EXAMINATION
20   BY MR. BALLEW:
21   Q.   Good morning, Agent Guzman.
22   A.   Good morning, sir.
23   Q.   Yesterday the Government asked you some questions
24   concerning e-mails that an account R@donefirst.com received
25   from CoverMyMeds regarding prior authorizations.
```

1          Do you recall that testimony?

2    A.   Yes, sir.

3             MR. BALLEW:  And can we pull up Trial Exhibit 894 in

4    evidence, please.

5    BY MR. BALLEW:

6    Q.   And this was one of the e-mails that you were asked about.

7          Do you recall that?

8    A.   There's nothing on my screen yet.

9             THE COURTROOM DEPUTY:  One moment.

10            THE WITNESS:  Okay.

11         I'm sorry.  What was the question?

12   BY MR. BALLEW:

13   Q.   So you recall that you testified about this particular

14   e-mail?

15   A.   Yes, sir.

16   Q.   And you testified that this was an e-mail to Ruthia He

17   regarding prior authorizations from CoverMyMeds.

18         Do you recall that testimony?

19   A.   Yes, sir.

20   Q.   But you know that you learned in the course of your

21   investigation that other people at Done responsible for

22   completing prior authorizations used this e-mail address to

23   complete prior authorizations for Done patients; isn't that

24   correct?

25   A.   I believe so.

GUZMAN - CROSS / BALLEW

1    Q.    Okay.  And just to show you one example in evidence

2    already, Government Exhibit 6600.

3        You see that at the bottom of this e-mail, it's

4    Bates-stamped DONE-DOJ; correct?

5    A.    Yes, sir.

6    Q.    And it's also Bates-stamped DONEHEALTH as well?

7    A.    Yes, sir.

8    Q.    And a DONEHEALTH Bates stamp indicates that it was a

9    document that the company produced to the Government, that Done

10   produced to the Government in response to the grand jury

11   subpoena?

12   A.    I believe so, yes.

13   Q.    Okay.  Moving along to the documents that Done produced in

14   response to the grand jury subpoena.  You recall you gave some

15   testimony about documents that the Government received by means

16   such as search warrants or from other parties aside from Done's

17   response to the grand jury subpoena.

18        Do you recall that testimony?

19   A.    Yes, sir.

20   Q.    And you spoke about a certificate of completion that the

21   company filed about its response to the grand jury subpoena.

22        Do you recall that?

23   A.    I do.

24        MR. BALLEW:  Can we pull that up?  It's

25   Trial Exhibit 2490.

1   BY MR. BALLEW:

2   Q.   And if -- and you could see that this is attested by a

3   gentleman named Mike Xu.

4        Do you see that?

5   A.   I do.

6   Q.   You say -- you see that he says that his title is software

7   engineer, and he signs this certificate saying that he is

8   familiar with how records were created, managed, stored, and

9   retrieved.

10       Do you see that?

11  A.   I do.

12          THE COURTROOM DEPUTY:  I don't believe that's

13  admitted, is it?

14          MR. BALLEW:  This was admitted.

15          MR. FOSTER:  Yes, it was.

16          MR. BALLEW:  Yes, it was.

17  BY MR. BALLEW:

18  Q.   And you see that he says that the records produced to the

19  Government were exported from the company systems in a manner

20  that was designed to ensure they are true duplicates of the

21  original records in the custody of the company.

22       Do you see that?

23  A.   I do.

24  Q.   And you know that the company in -- by whatever processes

25  Mike Xu or anybody who was assisting him retrieved the

**GUZMAN - CROSS / BALLEW**

1  documents, produced 3.8 million pages of documents in response

2  to the grand jury subpoena?

3  **A.**    I'm not sure on the exact number that was produced, but I

4  do know there were -- we received a lot of documents.

5          **MR. BALLEW:**  Can we go to page 3 of this document,

6  please.

7  **BY MR. BALLEW:**

8  **Q.**    If you look at the left-hand column, you'll see that

9  there's the Done Health Bates stamp that we talked about

10  earlier.

11      Do you see that?

12  **A.**    I do.

13  **Q.**    And you see that, the number 3,800,279 as the last number?

14      Do you see that?

15  **A.**    Yes.

16  **Q.**    That would mean that that is how many pages were produced

17  in response to the grand jury subpoena?

18  **A.**    I believe so.

19  **Q.**    Okay.  And you testified about some documents that you

20  received from other means.  For example, Trial Exhibit 355.

21          **MR. BALLEW:**  Can we pull that up?

22          **THE COURTROOM DEPUTY:**  The number again?

23          **MR. BALLEW:**  355.

24          **THE COURTROOM DEPUTY:**  Thank you.

25  \\\

1    BY MR. BALLEW:

2    Q.    Do you recall testifying that you obtained this document,

3    I believed -- I believe through Riley Levy instead of through

4    the company?

5    A.    Yes.

6    Q.    And to be clear, you know that the company did not delete

7    this document; correct?

8    A.    I mean, I'm not sure what -- if the company deleted it or

9    not.  I just know this was not produced to us.

10   Q.    It was not produced to you by April 30th, 2025 -- 2024; is

11   that correct?

12   A.    Correct, it was not produced.

13   Q.    But it was produced by the company eventually; isn't that

14   correct?

15   A.    I don't recall that.  I recall getting this through the

16   search warrant through Riley Levy.

17          MR. BALLEW:  Your Honor, we'd like to admit into

18   evidence document -- Exhibits 7724 and --

19          THE COURT:  I'm sorry.  Wait, wait, wait, wait, wait,

20   wait.

21      Okay.  What are the exhibit numbers?

22          MR. BALLEW:  7724 and 7725.

23          THE COURT:  Okay.  Admitted.

24      (Trial Exhibits 7724 and 7725 received in evidence.)

25          MR. BODAPATI:  Your Honor, I would object, actually.

 1    These documents were produced after the grand jury returned its

 2    indictment so they are not relevant.

 3            MR. BALLEW:  That wasn't --

 4            THE COURT:  Well, I think counsel's point is that they

 5    weren't destroyed.

 6            MR. BALLEW:  That is correct, Your Honor.

 7            THE COURT:  Okay.  Go ahead.

 8    BY MR. BALLEW:

 9    Q.    And so if we go down to the Bates number here at the

10    bottom of the first page, you could see that's the DONEHEALTH

11    Bates number; correct?

12    A.    Yes, sir.

13    Q.    And you could see here that the Bates number at this point

14    is 9,706,425.

15          Do you see that?

16    A.    I do.

17    Q.    So at this point, when this document was produced to the

18    Government by the company, there were at least 9,076,425 pages

19    worth of material that was produced to the Government by the

20    company; is that correct?

21    A.    I believe that's what it means.

22    Q.    Okay.  Now, another topic that you discussed was Ms. He's

23    travel.  Do you -- international travel.

24          Do you recall that?

25    A.    I do.

GUZMAN - CROSS / BALLEW

1  Q.    And so you testified yesterday about a document that was

2  admitted in evidence, 2346.

3          MR. BALLEW:  Can we pull that up, please.

4      Oh, yeah.  Your -- can we actually go back to the previous

5  document, please.  And can we go down to the actual text of the

6  message.

7  BY MR. BALLEW:

8  Q.    And you'll see that this is the same message that was --

9  that you testified about yesterday that was received through

10  the search warrant on Riley Levy.  We could pull up the 355

11  side by side if you want to take a look.

12  A.    Yeah, if you don't mind.  I believe it is but just so I

13  can verify.

14      Okay.

15  Q.    Okay.  Okay.  So moving along now to Ms. He's travel.

16      So you testified yesterday about Trial Exhibit 2346.  And

17  you testified that these are customs and border travel records;

18  correct?

19  A.    Yes, sir.

20  Q.    And you looked at the bottom rows of this chart and

21  testified that Ms. He left the United States in September 2021

22  and returned in September 2022; do you recall that?

23  A.    I do.

24  Q.    And when she returned in September of 2022, that was

25  within weeks before Done ended up receiving the grand jury

1    subpoena; is that correct?

2    **A.**    Yes.

3    **Q.**    Okay.  Then, three months after she became aware of the

4    grand jury subpoena, she traveled internationally again;

5    correct?

6    **A.**    Yes.

7    **Q.**    And you see on December 24th, 2022, she went to the

8    Philippines; right?

9    **A.**    Yes.

10    **Q.**    Then she went to Singapore; right?

11    **A.**    Yes.

12    **Q.**    And I believe you testified yesterday about some Quora

13    e-mail that she received mentioning about Google, if Google

14    account is deleted, can police find the history, something

15    along those lines.

16        Do you recall that?

17    **A.**    I do.

18    **Q.**    And she received that Quora -- e-mail from Quora before

19    she ended up traveling abroad; is that correct?

20    **A.**    I believe so, yes.

21    **Q.**    Okay.  And so she traveled in these countries when she

22    knew Done was under federal investigation for illegal drug

23    distribution; correct?

24    **A.**    The December and --

25    **Q.**    The December travel?

GUZMAN - CROSS / NECHAY

1  **A.**   Yes.

2  **Q.**   And at this time, you know she was still a native of

3  China; right?

4  **A.**   Yes.

5  **Q.**   You know she had family in China?

6  **A.**   Yes.

7  **Q.**   You know her parents live there?

8  **A.**   Yes.

9  **Q.**   You know that China does not have an extradition treaty

10 with the United States?

11 **A.**   That's correct.

12 **Q.**   And so at this time she's traveling in December of 2022

13 while her -- she knew her company was under criminal

14 investigation.

15     She didn't stay abroad or go to China, did she?

16 **A.**   No, but she did have conversations when she came back

17 about the opening of the foreign bank accounts, and also she

18 expressed with Yue Wang her fear of being arrested.

19 **Q.**   But she did come back a few days before making -- having

20 those conversations; correct?

21 **A.**   She did.

22 **Q.**   Okay.

23      **MR. BALLEW:**  No further questions.

24      **MS. NECHAY:**  Yes, thank you.

25 \\\

1        <u>CROSS-EXAMINATION</u>

2    BY MS. NECHAY:

3    Q.    Good morning.

4    A.    Good morning.

5    Q.    Agent Guzman, can you please tell me, what was -- what is

6    your highest level of education, please?

7    A.    I have a bachelor's degree.

8    Q.    So just to be clear, you don't have any special licenses

9    or degrees with respect to medicine?

10   A.    That is correct.

11   Q.    Okay.  When you became involved in this case,

12   approximately how much discovery would you anticipate you had

13   to review -- or would you guesstimate you had to review?

14   A.    When I first became involved, I knew there was going to be

15   quite a lot of discovery because of how big this case was, so I

16   was aware that there was going to be quite a few documents and

17   stuff.

18   Q.    When you say quite a few, in terms of terabytes of

19   discovery, how much was involved in this case?

20   A.    Oh.  I don't know how many -- how many terabytes.  I just

21   knew there -- like we just testified, like millions of

22   documents.  I don't know how that will translate into terabytes

23   but there was lots.

24   Q.    Understood.

25        Yesterday, you recall testifying about issues related to

1   Dr. Brody and his medical license; correct?

2   **A.**    Yes.

3   **Q.**    Okay.  I'd like to discuss that briefly.

4         So you are aware that the allegations that were the basis

5   for Dr. Brody's stipulated surrender of his license, those were

6   yours that were never litigated; correct?

7   **A.**    No, I believe the part of the stipulation was that he's

8   agreeing that these are factual and in order -- he's

9   stipulating to that so he doesn't have to have a hearing.

10  **Q.**    So back to my question.  The issues were never litigated.

11  And by litigated, I mean, that there was not a process of a

12  jury or award, that there was a stipulation, as you recall,

13  that, in part, Dr. Brody, based on financial reasons,

14  specifically -- withdrawn.

15        Let me put it simpler.

16        Dr. Brody entered into a stipulation with the Medical

17  Board of California; correct?

18  **A.**    He did.

19  **Q.**    And as we read yesterday, part of that was that there was

20  a financial reason that the burden, specifically the cost of

21  going to litigate the matter, was so great that that was the

22  reason he entered into a stipulation?

23              **MR. BODAPATI:**  Objection, Your Honor.

24              **THE COURT:**  I'm sorry.  Your question is, does he know

25  that the reason for entering the stipulation was that it was

1    too expensive for Dr. Brody to litigate it?  Is that the

2    question?

3              MS. NECHAY:  Correct.

4              THE COURT:  How would he know that?  How would he know

5    that?

6              MS. NECHAY:  Well, part of the stipulation, actually,

7    Your Honor.

8              THE COURT:  Maybe -- Number 1 it is misleading to

9    suggest to the jury that this proceeding was a jury proceeding.

10   I don't know that there was a jury available for a medical

11   board determination.  Maybe there is but it would surprise me.

12   It's an administrative proceeding.  That's Number 1.

13       Number 2 sort of suggests that a jury didn't make a

14   determination is misleading because a jury never makes a

15   determination in a medical proceeding.  It's done

16   administratively, Number 1.

17       Number 2, I don't believe this witness was called for

18   evidence on what were the circumstances surrounding the

19   stipulation.  He simply says in the record there is a

20   stipulation and this is what the stipulation says.  So you are

21   not permitted to ask him any questions about what it means.

22   Okay?  So let's -- with that guidance, you may proceed.

23             MS. NECHAY:  And certainly, Your Honor, I just want to

24   say I'm obviously not trying to mislead the jury here.  I'm

25   just trying to give examples -- draw the distinction between a

 1  stipulation versus a matter that is litigated.  They're --

 2       **THE COURT:**  Well, he -- he would have to know -- he'd

 3  have to be a witness coming in knowing what is the procedure

 4  before the board of medical examiners.  I must tell you, I

 5  don't know the procedure before the board of medical examiners.

 6  But I don't -- I don't know that there's a jury that sits

 7  around -- and I have no idea what things cost or don't cost,

 8  and I have no idea what the process is or not.  And I don't

 9  believe this witness knows it either, though he might.  But

10  even if he did, he's not called to testify on that basis.  His

11  simple testimony is this is what the record is and here is the

12  record.

13       Okay.  So with that guidance, let's proceed.

14       **MS. NECHAY:**  Understood.  Thank you.

15  BY MS. NECHAY:

16  **Q.**  Okay.  Moving on, you obviously came into possession of

17  documents related to the medical board proceeding; correct?

18  **A.**  Yes.

19  **Q.**  Okay.  This was -- the single patient that was the basis

20  of this was a woman by the name of Monica Yates; correct?

21  **A.**  I don't --

22       **THE COURT:**  Again, he wouldn't know that because it

23  may be that there were multiple patients and then they brought

24  a charge involving one patient.

25       He doesn't know that, he doesn't know anything about the

1    facts and circumstances of the document.

2         The document speaks for itself.  If you -- and I don't

3    think you can ask him any questions that go behind the

4    document, that is, what did the document represent?  How --

5    what was the investigation like?  What were the allegations

6    ultimately?  Or preliminarily?  What were the discussions?

7         You can't go into any of that because he doesn't know.  Or

8    if he knows, he didn't testify to it, because I wouldn't have

9    allowed it in anyway.

10        So because it's --

11             MS. NECHAY:  Your Honor, with all due respect, and I'm

12   not sure from the top of my head what the exhibit number was

13   but the Government did, by way of 404(b) yesterday, submit the

14   actual -- and I'm happy to have a discussion at sidebar but

15   this is important.

16             THE COURT:  No.  Put up the document.  I'll look at

17   it.  Put up the document.  What document is it?

18             MS. NECHAY:  One moment, please.

19             MR. BODAPATI:  It's Exhibit 2545.

20             MS. BELL:  Thank you very much.

21             THE COURT:  Okay.  Let's take a look at it.  If I'm

22   wrong, I'm wrong.

23             MS. NECHAY:  And specifically this was an

24   attachment --

25             THE COURT:  Go ahead.

1          MS. NECHAY:  With the allegations.  And there was a

2    foundation that was laid as to this witness with respect to the

3    knowledge of this document.  So this is what I'm probing.

4          THE COURT:  It may be knowledge that a document

5    exists.  Like I know a marriage license exists.  I don't know

6    why people got married but I sure know that their marriage

7    license exists.  So he's saying I did a search of the records

8    and here is the record, but you can't ask him questions about,

9    now, what is in the record?

10         I mean, it's -- the record is the record.  I don't want to

11   denigrate this witness's importance, but he is here and called

12   for the purpose of authenticating a record.

13         Where is it?  Is it up?

14         MS. NECHAY:  Okay.  One moment, please, Your Honor.

15         MR. BALLEW:  2545.

16         THE COURT:  If he knows something about it, you can

17   pose the question.

18         MS. NECHAY:  Okay.  And I'd like to actually go to a

19   few pages later where it lists the exhibit -- the attachment.

20   Let's keep going.

21         Yes, perfect.

22   BY MS. NECHAY:

23   Q.   Are you familiar with the attachment, the first amended

24   accusation?

25   A.   Yes.

GUZMAN - CROSS / NECHAY

1   Q.   Okay.  You have reviewed this document?

2   A.   Yes.

3   Q.   You are aware that the basis of the accusation was

4   regarding a single patient by the name of Monica Yates?

5        THE COURT:  That says this is the first amended

6   accusation.  That means that there was another accusation

7   before.  Are you asking him what were -- what else is in the

8   file?

9        MS. NECHAY:  No.  I'm asking the witness, Your Honor,

10  whether drawing the distinction between many different patients

11  being the subject of an accusation or whether there was a

12  single --

13       THE COURT:  The document speaks for itself.

14  BY MS. NECHAY:

15  Q.   You are aware that -- you are aware of a patient by the

16  name of Monica Yates; correct?

17  A.   No.  They don't list the patient's name in documents.

18  They keep them out of there for privacy.

19  Q.   Okay.

20  A.   So I'm not aware of that patient.

21  Q.   So as a part of your investigation, you did obtain the

22  medical board proceeding accusation; correct?

23  A.   Yes.

24  Q.   However, you did not do any further investigation, meaning

25  you did not obtain any additional patient records; correct?

GUZMAN - CROSS / NECHAY

1  A.    That's -- that's correct.  We just pulled down this

2  document off the medical board's website.

3  Q.    Great.

4        You did not interview this patient that was the subject of

5  this; correct?

6  A.    No.  She wasn't a Done patient.

7  Q.    Correct.

8        And there was actually no allegation that this patient was

9  harmed in any way?

10  A.    I am -- I am not sure.  I'm not aware.

11  Q.    By the -- your review of -- within the four pages of the

12  document that you had laid the foundation for, there was no

13  allegation that a patient -- that patient was harmed; correct?

14  A.    Well, I think the allegation is that the patient wasn't

15  treated properly.  So I'm not sure if there was patient harm in

16  that but I just know the patient was not treated or diagnosed

17  properly.

18  Q.    Exactly.  You don't know.

19        However, let me ask you this, Agent Guzman.  The --

20        MS. NECHAY:  And can we just kindly put back up --

21  thank you.

22        Let's go down to the next page, please.

23        And, I'm sorry, the next page after this.

24        The following page.  Following page, please.  Okay.

25  \\\

GUZMAN - CROSS / NECHAY

1  BY MS. NECHAY:

2  Q.   So I'd like to go ahead and have you read from 18.  So if

3  you could kindly, "on or about."

4  A.   (as read):

5         "On or about May 7th, 2015, respondent commenced

6       treating Patient 1, a then 39-year-old female,

7       through the Contra Costa County Health Services."

8  Q.   And let me stop you right there.

9       What is Contra Costa County Health Services?

10  A.   I believe it's a -- this is a countywide medical clinic

11  for people in Contra Costa County.

12  Q.   Okay.  And are you familiar whether Medicaid and Medicare

13  is -- these are Medicaid and Medicare recipient patients at

14  this clinic specifically?

15  A.   Yes, I believe they do go to this clinic.

16  Q.   Okay.  So this is a not-for-profit clinic; correct?

17  A.   Correct.

18  Q.   Okay.  Please continue reading, Agent Guzman.

19  A.   (as read):

20         "Patient 1 allegedly had complaints of

21       depression, was at significant risk of suicide or

22       self-harm, and had possible psychotic or dissociative

23       symptoms."

24  Q.   Thank you.  And onto Number 19, could you kindly continue

25  reading for us?

GUZMAN - CROSS / NECHAY

1   **A.**   (as read):

2          "In or about August 2017, respondent

3      subsequently left his position with the county

4      medical system and went into private practice.

5      Respondent continued to treat Patient 1 in his

6      private practice.  Respondent has no medical records

7      of his treatment of Patient 1 from August 2017

8      through July 2022.  Medical records from a pharmacy

9      show that Respondent prescribed controlled substances

10     to Patient 1 beginning in 2015."

11  **Q.**   Okay.  So I just want to establish that your understanding

12  here, it's correct, that this was a -- this was a patient from

13  Contra Costa County Health Services that Dr. Brody ended up

14  taking with him, that self-selected to go with Dr. Brody into

15  his private practice on -- in 2017; correct?

16  **A.**   It appears that's what it's saying here, yes.

17  **Q.**   Okay.  And this allegation is not stating that Dr. Brody

18  never had medical records for this patient.  This is simply

19  stating that there were some allegations that -- there were

20  some inadequacies in the recordkeeping when he took this

21  patient into private practice, correct?

22          **MR. BODAPATI:**  Objection, Your Honor.  The document

23  speaks for itself.

24          **THE COURT:**  Sustained.

25  \\\

GUZMAN - CROSS / NECHAY

 1   BY MS. NECHAY:

 2   Q.   I'd like to go ahead and take a look at Number 20.

 3       So this states that the patient had complaints of chronic

 4   pain related to lupus, rheumatoid arthritis, and fibromyalgia.

 5   And that there was a prescription for -- do you know how to

 6   pronounce this term?

 7   A.   I believe it's Carisoprodol.

 8   Q.   Okay.  Do you have any familiarity with that drug?

 9           THE COURT:  We're not going to go there.  He's not...

10       Go ahead, next.

11   BY MS. NECHAY:

12   Q.   There is, from your understanding, no actual allegation

13   here that this patient suffered from any of these conditions;

14   correct?

15   A.   I'm not sure I understand the question.

16   Q.   So on a previous -- there was a --

17           THE COURT:  It says here (as read):

18            "Patient 1 complained of chronic pain related to

19       lupus, rheumatoid arthritis, and/or fibromyalgia."

20       What is your question, that -- do we know whether she had

21   it or not?  I don't know.  Nobody knows.  Or somebody knows but

22   we don't know, and it's not relevant.

23           MS. NECHAY:  I'm happy to get to that -- on the very

24   next page, Your Honor.

25           THE COURT:  Okay.  Let's get to the next page then.

1    Okay?

2          MS. NECHAY:  Okay.  Certainly.

3       If we could just go to the next page, please.

4    BY MS. NECHAY:

5    Q.   Could you kindly read me what Number 22 says?

6    A.   (as read):

7            "In fact, there was no record of a history of

8       Patient One's rheumatological conditions such as

9       rheumatoid arthritis, lupus, and fibromyalgia.  There

10      were no" --

11   Q.   Thank you very much.  That was simply the issue as

12   demonstrated.  Okay.

13      And, again, I just want to clarify that the entire subject

14   of this medical board proceeding accusation was related to one

15   patient; correct?

16         MR. BODAPATI:  Objection.  Foundation.

17         THE COURT:  Sustained.

18         MS. NECHAY:  Your Honor, this --

19         THE COURT:  There's no way of knowing.  There could

20   have been one or more complaints.  I have no idea.  And this

21   witness is not suggesting that there were many complaints.

22   It -- it is what it is.  And he didn't conduct an -- this is

23   not the investigator of the medical proceeding.  All he did --

24   and I don't want to be condescending, but what he did was

25   simply go to a website, see a document, copy the document, and

1    testify that that's what the document was on the website.

2        That's the extent of his testimony, Counsel.  You can

3    cross-examine on did he actually go to the website, did he --

4    what time of the day did he go to the website, whatever you

5    want to ask about his actions, he did.

6        But he's not being offered here to explain what the

7    proceeding was and how it was conducted and what it's based on.

8    So this is simply a -- I think we should move to another

9    subject.  All right?  I think we've explored this subject

10   because of his limited experience in this area.

11           MS. NECHAY:  Your Honor, may I address this matter

12   with the Court at a sidebar?

13           THE COURT:  Well, you can do it later, but go ahead.

14   Go ahead.  Ask any -- ask your questions.  I don't want to cut

15   you off.

16   BY MS. NECHAY:

17   Q.   You did not conduct any type of investigation with respect

18   to Contra Costa County Health Services with respect to

19   investigating what the different patient populations were, for

20   example; correct?

21   A.   No.

22   Q.   You did not conduct any investigations with respect to

23   what the different clinical protocols were versus Done;

24   correct?

25   A.   No.

1   Q.   And, again, just to confirm, finally, you did not

2   investigate into the individual case that was the basis of the

3   Contra Costa County Medical Board proceeding issue; correct?

4   A.   No.  She wasn't a Done patient.  And, you know, that was

5   already investigated by the medical board, so we didn't look

6   into that.

7   Q.   So it's true that this is a completely unrelated

8   allegation from --

9        MR. BODAPATI:  Objection, Your Honor.

10       MS. NECHAY:  I didn't even finish my question, Your

11  Honor.

12       THE COURT:  Go ahead.  Finish your question.  You said

13  unrelated.  Unrelated.  And I'm not quite sure what you mean by

14  that, do you mean it has no bearing on anything in this case?

15  Is that your point?

16       MS. NECHAY:  No, Your Honor, I was simply stating -- I

17  was going to ask whether it was unrelated to any of his duties

18  or functions as the clinical president at Done.

19       THE COURT:  Well, that -- it's vague.  I don't -- it

20  was permitted into evidence because it is relevant.  It is

21  relevant and -- and the -- and the attorneys will argue its

22  relevancy.  The Court is not going to argue its relevancy.  But

23  the Court made a determination early on that this document was

24  relevant to the -- to the consideration of issues involving

25  your client.

1       So if you want a further discussion, if you want the Court

2    to explain why it's relevant, I will, but I don't need to.

3       But when you use words like it's not related to the case,

4    it is related to the case, otherwise I wouldn't have admitted

5    it.

6            **MS. NECHAY:**  Your Honor, respectfully, I didn't say

7    related to the case.  I said his performance of his duties as

8    clinical president of Done.

9            **THE COURT:**  Okay.  That's fine.  He's not -- he was

10   not -- this was not a patient of Done's and the allegation was

11   never made that it was a patient of Done's.

12   **BY MS. NECHAY:**

13   **Q.**   I want to turn your attention to some other issues that

14   were discussed regarding Dr. Brody.

15      There was testimony regarding some tax and mortgage

16   issues; correct?

17   **A.**   Yes, ma'am.

18   **Q.**   Okay.  And as part of your investigation, are you aware

19   that Dr. Brody has reached a tentative resolution with the tax

20   authorities for less than $10,000, a much smaller fraction of

21   what was -- he was alleged to have outstanding?

22   **A.**   I'm not aware of that.  I was just aware of the documents

23   we found on his phone.

24   **Q.**   So you did not conduct any further investigation into

25   these ancillary tax issues?

 1  **A.**   No.  We --

 2          **MR. BODAPATI:**  Objection to the characterization as

 3  ancillary.

 4          **MS. NECHAY:**  It's an administrative noncriminal

 5  proceeding, Your Honor.

 6          **THE COURT:**  Okay.  Well, what -- he didn't conduct an

 7  investigation into the tax issues.  Okay.  That's established.

 8      You may proceed.

 9  BY MS. NECHAY:

10  **Q.**   And just to be very clear, you said that you've reviewed

11  millions of documents in this case; correct?

12          **MR. BODAPATI:**  Objection.  Asked and answered.

13          **THE COURT:**  I don't think he said he reviewed

14  millions.

15  BY MS. NECHAY:

16  **Q.**   You've reviewed a voluminous amount of discovery in this

17  matter; correct?

18  **A.**   I have reviewed some of the discovery, but not all of it.

19  **Q.**   Okay.  And just to be very clear, there was never any

20  statement, to your knowledge, that Dr. Brody told Ruthia He or

21  anybody else, "If you pay me X amount of more money, I will --

22  I will conduct an illegal drug operation for you"?  A statement

23  like that was not made by Dr. Brody; correct?

24  **A.**   Not in those exact words.  I do know that -- like he did

25  talk about his order of preference for -- for job, and one of

 1  them was not to see patients.

 2  **Q.**   Okay.  Thank you.  That is not the question that I'm

 3  asking.

 4       There was never a quid pro quo -- you're familiar with

 5  that term; correct?

 6  **A.**   Yes, ma'am.

 7  **Q.**   What does quid pro quo mean?

 8            **THE COURT:**  This is going to ask him to draw a

 9  conclusion and that would be improper.  Okay?

10  **BY MS. NECHAY:**

11  **Q.**   To your knowledge, Dr. Brody was a salaried employee at

12  Done; correct?

13  **A.**   Yes, ma'am.

14  **Q.**   And the range of his salary was between 160,000 and

15  234,000; correct?

16  **A.**   I'm not sure what his salary was.  I don't -- I don't

17  recall.

18  **Q.**   Okay.  And, again, you're aware that with respect to the

19  tax issues that there has been absolutely no finality with

20  respect to those issues?

21            **MR. BODAPATI:**  Objection, Your Honor.  Asked and

22  answered.

23            **THE COURT:**  I'm sorry.  I don't know what is meant by

24  "finality."

25  \\\

1    BY MS. NECHAY:

2    Q.    There was no findings by the tax authorities, there were

3    only allegations, correct, Agent Guzman?

4    A.    I'm -- yeah, I'm not aware of what the -- what the outcome

5    has been with his tax.

6         MS. NECHAY:  Okay.  All right.  Thank you.  No further

7    questions at this time.

8         THE COURT:  Okay.  Anything further?

9         MR. BODAPATI:  Yes, Your Honor, briefly.

10                    REDIRECT EXAMINATION

11   BY MR. BODAPATI:

12   Q.    Special Agent Guzman, continuing from there, you were

13   asked about whether Brody asked for more money in order to do

14   what he did at Done; right?

15   A.    Yes.

16        MR. BODAPATI:  The Governments offers as Exhibit 504,

17   which is a letter from Defendant Brody to Defendant He.

18        THE COURT:  5 -- is it in evidence?

19        MR. BODAPATI:  The Government offers it.

20        THE COURT:  504 admitted.

21        (Trial Exhibit 504 received in evidence.)

22   BY MR. BODAPATI:

23   Q.    And looking at this, Special Agent Guzman, this is a

24   January 24th, 2022, letter from Defendant Brody to Defendant He

25   and the subject line is "proposal"?

GUZMAN - REDIRECT / BODAPATI

1   A.    Yes, it is.

2        MR. BODAPATI:  Ms. Braga, can we zoom back out?

3   BY MR. BODAPATI:

4   Q.    Now, looking here at the bottom half, Defendant Brody is

5   requesting an annual salary of 250,000?

6   A.    Yes, I see that.

7   Q.    And just below that, he says that (as read):

8        "In order to make Done's philosophy a reality,

9        it is necessary to have a physician leader who is

10        willing to take some risks"; right?

11  A.    That is correct.

12        MR. BODAPATI:  And can we turn to the next page?  And

13  can we zoom in at the top?

14  BY MS. BELL:

15  Q.    And does Defendant Brody continue that (as read):

16        "If acting without the guidance of a strong

17        clinical president, the vast majority of clinicians

18        would perceive the risks as great" --

19        THE COURT:  As great -- read-

20  BY MR. BODAPATI:

21  Q.    (as read):

22        "As greater than they actually are resulting in

23        actions and omissions antithetical to a patient-first

24        philosophy"?

25  A.    I see that, yes.

1    Q.    And just below that, does he describe almost all physician

2    leaders a company could hire as risk averse?

3    A.    Yes.

4         MR. BODAPATI:  Okay.  You can take that down.

5    BY MR. BODAPATI:

6    Q.    You were asked about the med board proceedings and whether

7    there was any risk of patient harm?

8    A.    Correct.

9         MR. BODAPATI:  Can we pull back up Exhibit 2545?

10   Turning to page 14, can we look at paragraph 18?

11   BY MR. BODAPATI:

12   Q.    Now, Special Agent Guzman, it says here that (as read):

13            "The patient in question was at significant risk

14        of suicide or self-harm and had possible psychotic or

15        dissociative symptoms"?

16   A.    Yes, it does.

17        MR. BODAPATI:  Turning to page 15, can we look at

18   paragraph 24?  Ms. Braga, can we look at paragraph 24 first?

19   BY MR. BODAPATI:

20   Q.    It says that the patient had been diagnosed with psychotic

21   features, post-traumatic stress disorder, seizure disorder,

22   atypical dissociative disorder, and was status post multiple

23   head traumas and memory loss.

24        MS. GREEN:  The jury can't see it.

25        THE COURTROOM DEPUTY:  One moment.

1    BY MR. BODAPATI:

2    Q.   I'll ask again.

3        And does it say here in this paragraph that the patient

4    had psychotic features, post-traumatic stress disorder, seizure

5    disorder, atypical dissociative disorder, and was status post

6    multiple head traumas and memory loss?

7    A.   It does.

8    Q.   And now looking at the next paragraph.

9        MS. NECHAY:   I would object under relevance and 403.

10   Counsel wasn't allowed to explore the details, and so --

11       THE COURT:   He's not exploring the details.  He's

12   simply reading the acquisitions, which I may point out, you

13   did.

14   BY MR. BODAPATI:

15   Q.   And in paragraph 25, it states that (as read):

16       "Defendant Brody's decision to prescribe

17       controlled substances did not appear to be based on

18       an adequate history and examination to establish an

19       appropriate medical indication for their use"?

20   A.   It does.

21   Q.   Okay.

22       MR. BODAPATI:   You can take that down.

23   BY MR. BODAPATI:

24   Q.   On cross-examination, you were asked about e-mails to

25   Defendant He from CoverMyMeds; right?

1    **A.**    Yes.

2    **Q.**    And you were asked whether the care team used

3    Defendant He's e-mail.

4        Is it that the care team used Defendant He's e-mail, or

5    did it use her log-in to CoverMyMeds?

6    **A.**    It appeared that they were using her log-in.

7    **Q.**    Yeah.  During the investigation, did agents ever see any

8    evidence that others were using Defendant He's e-mail

9    specifically?

10    **A.**    No, I don't recall.

11    **Q.**    Okay.  Now, you were asked on cross-examination about the

12    volume of discovery, you know, millions of documents; right?

13    **A.**    Yes.

14    **Q.**    And millions of documents, perhaps a document may slip

15    here and there?

16    **A.**    Possibly.

17    **Q.**    But before Defendant He was arrested and before the grand

18    jury returned its indictment, did Done produce any Signal

19    messages at all?

20    **A.**    No.

21    **Q.**    Did Done produce any WhatsApp messages at all?

22    **A.**    No.

23    **Q.**    Did Done produce any messages or communications from

24    Facebook Workplace?

25    **A.**    They did not.

1  Q.   Now, just a few questions on the travel.

2       On cross you were asked whether the grand jury issued its

3  subpoena a few weeks after Defendant He returned to the country

4  in September of 2022?

5  A.   That is correct.

6  Q.   When that happened, did Defendant He ever discuss it with

7  Yue Wang?

8  A.   Yes.

9       **MR. BODAPATI:**  Let's pull up Exhibit 739 in evidence.

10 Turning to page 3.  And could we zoom in?

11 **BY MR. BODAPATI:**

12 Q.   It's a little blurry, but it appears to be a message on

13 September 24th, 2022?

14      **THE COURTROOM DEPUTY:**  One moment.  The monitors take

15 time.

16      **MR. BODAPATI:**  Yep.

17      **THE COURTROOM DEPUTY:**  Thank you.

18      **THE WITNESS:**  Yes, September 24th, 2022.

19 **BY MR. BODAPATI:**

20 Q.   So a day or two after Done received the subpoena?

21 A.   That is correct.

22 Q.   What does Defendant He say here?

23 A.   (as read):

24          "Actually, it was a summons that that doctor at

25          Stanford and I received for a hearing in October.

1              And there are no specifics as to what to do."

2     **Q.**   Who's the doctor at Stanford?

3              **MS. NECHAY:**  Objection.  Speculation.

4              **THE COURT:**  Sustained.

5              **MR. BODAPATI:**  Okay.  Let's turn to page 4.

6     **BY MR. BODAPATI:**

7     **Q.**   What does Yue Wang say in the first two messages?

8     **A.**   (as read):

9              "Don't panic.  Worst-case scenario, just come

10    back to China."

11    **Q.**   Now, recall being asked whether Defendant He returned to

12    the United States in January 2nd, a few days before the

13    conversations with Yue Wang?

14    **A.**   Yes.

15    **Q.**   Now, during the conversation with Yue --

16             **MR. BALLEW:**  Objection, Your Honor.  Those

17    conversations we just read were from September of 2022 and she

18    returned in January of 2023.

19             **MR. BODAPATI:**  I was not referring to these

20    conversations.  I was saying they were before the messages that

21    Defendant He had with Yue Wang on January 9th, 2023.

22             **THE WITNESS:**  Yes, there were messages.

23             **MR. BODAPATI:**  Okay.  And let's pull up Exhibit 796.

24    And let's go to page 2, which is the English translation.

25    \\\

1    BY MR. BODAPATI:

2    **Q.**    Just below the emoji or sticker, could you read what

3    Defendant He says in these two messages?

4    **A.**    (as read):

5            "Today seems to have proven it.  We have an

6        intern who was contacted by the Department of

7        Homeland Security.  I've had enough of this

8        nonsense."

9    **Q.**    And did Defendant He ever discuss her travel with someone

10    named David Barrett?

11    **A.**    Yes.

12            **MR. BODAPATI:**  Let's pull up Exhibit 795.

13    BY MR. BODAPATI:

14    **Q.**    This is another WhatsApp chat?

15    **A.**    Yes.

16            **MR. BODAPATI:**  And can we zoom in on the first

17    message.

18    BY MR. BODAPATI:

19    **Q.**    So here it appears Defendant He is asking David Barrett

20    (as read):

21            "Do you have other plans to travel recently?"

22    **A.**    That is correct.

23            **MR. BODAPATI:**  Can we go to page 2 and zoom in on the

24    bottom message.

25    \\\

PROCEEDINGS

1  BY MR. BODAPATI:

2  **Q.**   What does Defendant He say?

3  **A.**   (as read):

4          "Ha Ha, I might have to travel if I'm getting

5      arrested."

6          **MR. BODAPATI:**  No further questions.

7          **THE COURT:**  Anything further?

8          **MR. BALLEW:**  Nothing further, Your Honor.

9          **THE COURT:**  Okay.  You're excused.  Thank you very

10 much.

11         **THE WITNESS:**  Thank you, Your Honor.

12     (Witness excused.)

13         **THE COURT:**  Call your next witness.

14         **THE COURTROOM DEPUTY:**  The court reporter needs a

15 break.

16         **THE COURT:**  Oh, then let's -- oh, I -- you know, I

17 apologize.  The court reporter has been here for the entirety

18 while we've all taken breaks.

19     Okay, certainly.  We'll break until 11:00.

20     Remember the admonition given to you:  Don't discuss the

21 case, allow anyone to discuss it with you, form or express any

22 opinion.

23               (Recess taken at 10:46 a.m.)

24             (Proceedings resumed at 11:01 a.m.)

25     (Proceedings were heard out of the presence of the jury.)

PETRON - DIRECT / FOSTER

1     **THE COURTROOM DEPUTY:**  Come to order.  Court is now in

2  session.

3     **THE COURT:**  Okay.  Bring in the jury.

4           (The jury enters the courtroom.)

5     (Proceedings were heard in the presence of the jury.)

6     **THE COURT:**  Okay.  Please be seated.  Let the record

7  reflect all parties are present, the jury is present.

8     You may call your next witness.

9     **MR. FOSTER:**  Thank you, Your Honor.  The Government

10  calls Michael Petron.

11     **THE COURTROOM DEPUTY:**  Please come up.

12     (Michael Petron steps forward to be sworn.)

13                 <u>**MICHAEL PETRON**</u>,

14  called as a witness for the Government, having been duly sworn,

15  testified as follows:

16     **THE WITNESS:**  I do.

17     **THE COURTROOM DEPUTY:**  Thank you.  You may be seated.

18     Please state your full name for your record and spell your

19  last name.

20     **THE WITNESS:**  My name is Michael Petron, P-E-T-R-O-N.

21                 <u>**DIRECT EXAMINATION**</u>

22  BY MR. FOSTER:

23  Q.   Mr. Petron, what do you do for work?

24  A.   I am a forensic accountant.

25  Q.   What does that mean?

**PETRON - DIRECT / FOSTER**

1  **A.**   That means I apply accounting, finance statistics, largely

2  in litigation or anticipation of litigation.

3  **Q.**   Did you go to school?

4  **A.**   I did.

5  **Q.**   What is your training?

6  **A.**   I have an undergraduate degree with a double major in

7  economics and statistics.  I have one master's degree in

8  statistics and a second master's degree in accounting.

9  **Q.**   What are your possessional qualifications?

10  **A.**   I'm a certified public accountant and certified fraud

11  examiner.

12  **Q.**   Do you engage in speaking engagements and other

13  professional activities?

14  **A.**   I do.

15  **Q.**   Can you briefly describe those?

16  **A.**   They range -- training sessions that range on the topics

17  of forensic accounting, data analysis, sampling, asset tracing.

18  I'm sure there are others.

19  **Q.**   Do you work for a company called Stout?

20  **A.**   I do.

21  **Q.**   Can you tell the jury what Stout is?

22  **A.**   My firm is a global investment bank and financial advisory

23  firm and I run our dispute practice in the firm.

24  **Q.**   How big is the dispute practice?

25  **A.**   My group is about 284 people.  We do roughly about

1    $150 million of revenue within the group.

2    Q.    Now, have you assisted the Department of Justice, the DEA,

3    and other agencies in their investigation of Defendant He and

4    Defendant Brody?

5    A.    I have.

6    Q.    Have you previously worked on other complex financial

7    investigations?

8    A.    Numerous.

9    Q.    Can you give an example to the jury?

10   A.    One example, one of my first was I worked originally on

11   the Enron investigation.    I have also worked on investigations

12   involving Airbus, Boeing, a number of very large

13   investigations.

14   Q.    Have you worked on other healthcare fraud and drug

15   distribution investigations?

16   A.    Numerous times.

17   Q.    And can you tell the jury about your length of experience

18   with those types of investigations in approximate numbers?

19   A.    I've probably worked on hundreds of those types of

20   investigations, and I would say that's over the last 20 years.

21   Q.    Now, do you do other work besides testifying with the U.S.

22   Federal Government?

23   A.    I do.

24   Q.    How much has Stout been paid for U.S. Federal Government

25   work that you've been associated with over the past five years?

**PETRON - DIRECT / FOSTER**

1   **A.**   Stout as a whole, I think that number is roughly

2   $34 million.

3   **Q.**   $34 million, that's a big number.  Can you explain what

4   services Stout provides to the U.S. Federal Government?

5   **A.**   We provide services to a lot of different federal

6   agencies, including the Department of Justice, the Department

7   of Health and Human Services, the Consumer Financial Protection

8   Bureau, the SEC.

9        My work in investigations in the specialties that I have

10   tend to lend themselves to litigation or investigations

11   involving some type of white-collar crime.

12   **Q.**   How many individual matters were involved in -- in that

13   number?

14   **A.**   In that?  Well over 1,000.  Probably closer to two --

15   2,000 individual investigations.

16   **Q.**   Now, you mentioned testimonial work.  How much of your

17   Federal Government work is non-testimonial?

18   **A.**   I would say the vast majority of my Federal Government

19   work does not involve sitting here today and testifying.  So

20   only a very small percentage gets to this point.

21   **Q.**   Do you assist the government in resolving corporate

22   matters before they're charged?

23   **A.**   I do.

24   **Q.**   And can you tell the jury about that?

25   **A.**   Sure.  There are oftentimes in investigations with

1  companies different financial issues that arise.  Whether that

2  be understanding and quantifying how much a company made off of

3  a crime or negotiating the financial terms of a resolution.

4  And I assist the department in negotiating those terms with the

5  companies.

6  Q.   How much money have you assisted the Federal Government in

7  recovering?

8  A.   Oh, billion, many billions.

9  Q.   Can you give an example of one case?

10 A.   I mentioned Airbus before.  I believe that agreement was a

11 $4 billion agreement just by itself.  But I'm talking about

12 hundreds of cases, tens of millions, hundreds of millions of

13 dollars.

14 Q.   Focusing on your testimonial work, how many times have you

15 testified in federal court?

16 A.   I'd say give or take about 50 times.

17 Q.   And do you only testify and work on behalf of the Federal

18 Government or are there cases where you have assisted the other

19 side?

20 A.   I have cases where I'm against the Federal Government.

21 Those cases I have not testified in but I have active matters

22 now against the department.

23 Q.   How is your work split between work for the government,

24 against the government, and other work?

25 A.   I mean, it obviously varies from time to time.  Today it's

1  all for the government.  But I would say, on average, over the

2  course of the year, it can fluctuate for the government between

3  a third to two-thirds, depending upon what's going on.

4  Q.  And against the government?

5  A.  I would say, again, depending upon what's going on, I

6  roughly would say 20 to 40 percent of the time against the

7  government.

8  Q.  Now, in this investigation, can you describe how many

9  people were on your team working on it?

10  A.  I would say over the course of the investigation, we had a

11  team of approximately a dozen, so about 12 people working on

12  this case or some offshoot of this case.

13  Q.  And how much are you paid per hour?

14  A.  $465.

15  Q.  What were you and your team asked to do in this case?

16  A.  We were asked a variety of things.  First and foremost I

17  would say is a data analysis comment of this investigation.  We

18  were given an extremely broad set of data that covers a variety

19  of different topics.

20      And that loosely, I would say, is the medical data side of

21  the case.  We were also provided a lot of financial records.

22  So I would classify our work into two buckets:  Data analysis

23  and financial analysis.

24  Q.  And did that include prescription data, as well as

25  electronic health records?

**PETRON - DIRECT / FOSTER**

1  **A.**   It did.

2  **Q.**   Did it include data with media, such as data from Zoom and

3  other video platforms?

4  **A.**   It did.

5  **Q.**   Did it include claims data for Medicare, Medicaid, private

6  insurance companies?

7  **A.**   It did.

8  **Q.**   And did it include prescription data?

9  **A.**   It did.

10  **Q.**   Now, in your professional experience, can you describe to

11  the jury the quality and nature and difficulty of the data

12  produced to the government in this case?

13  **A.**   I would say the data that I had in this case was worse,

14  absolutely worse than on average, if not some of the worst I've

15  seen.  Especially in the electronic medical records.  It was

16  complex.  I had numerous productions of the data that clearly

17  had some I would say inconsistencies and problems with it.

18      It was not a clean data set, as I'd say.

19  **Q.**   And how many different iterations of the data did you

20  receive?

21  **A.**   Well, for the electronic medical records, I believe I got

22  four different productions on those.  I was given numerous

23  productions of the prescription data, different sets of

24  productions for the same producing entity.  All in all, I would

25  say I received over probably roughly 20 to 25 different

1    productions of data.

2    **Q.**    Now -- and were those data -- were those productions

3    inconsistent or consistent with each other?

4    **A.**    Well, some were consistent with each other, some were not.

5    We spent a lot of time trying to research and determine just

6    that, whether the data was consistent or not.

7    **Q.**    Are you here today to make a conclusion or offer any

8    opinions in this matter?

9    **A.**    I am not.  I'm not here to offer an opinion.

10    **Q.**    Were you hired to give an opinion about any of the

11    defendants' guilt or innocence for any matter in this case?

12    **A.**    I was not.

13    **Q.**    Have you reviewed every document in this case?

14    **A.**    I have not.

15    **Q.**    Did you prepare some exhibits in this case, however?

16    **A.**    I did.

17    **Q.**    What kind of exhibits did you prepare?

18    **A.**    We call them summary exhibits.  So all of that data that

19    my team and I looked at, we then prepared exhibits to display

20    today.

21    **Q.**    What were these summary exhibits based on?

22    **A.**    The summary exhibits were all based upon the underlying

23    data sets that we just described, whether that be the

24    electronic medical records, the prescription data, the

25    financial data, the Zoom, you know, audiovisual data.  All of

1    that underlying data would feed into the charts that we'll look

2    at today.

3            MR. FOSTER:  And, Your Honor, at this time we'd offer

4    the general ledger exhibits that we discussed earlier, which

5    are 1319, 1321, 2828 to 2835, 2852, 2853, 1482, and 2847.

6            THE COURT:  Admitted.

7        (Trial Exhibits 1319, 1321, 1482, 2828, 2829, 2830, 2831,

8    2832, 2833, 2834, 2835, 2852, 2853, 2847 received in evidence.)

9    BY MR. FOSTER:

10   Q.   Now, in terms of these summary charts from the data, did

11   other people help you create them and did you personally review

12   them?

13   A.   Other people definitely helped me create these and I have

14   personally reviewed all of them.

15   Q.   And did the Government ask you to prepare things that we

16   might not even use today?

17   A.   Absolutely.

18   Q.   And is that common?

19   A.   It is.

20           MR. FOSTER:  Your Honor, we'd move to admit

21   Exhibit 4000, page 9, 11, 12, 14, and 17.

22           THE COURT:  Admitted.

23       (Trial Exhibit 4000 pages 9, 11, 12, 14, and 17 received

24   in evidence.)

25           MR. FOSTER:  And Ms. Braga, can we pull up 4000

1    page 9.

2    BY MR. FOSTER:

3    Q.   Mr. Petron, can you tell the jury what this is.

4    A.   This is a summary exhibit that totals the --

5             MR. FOSTER:  I don't believe the jury can see it.

6             THE COURTROOM DEPUTY:  It just takes a moment.

7             MR. FOSTER:  All right.

8             THE WITNESS:  Okay.  So this is an exhibit that totals

9    the total amount received by Done Global from their users

10   between March 2020 to January 2023.  I can see -- you can see

11   they received over $91 million.

12   BY MR. FOSTER:

13   Q.   Now, from January 2022 to January 2023, did you look at

14   what percentage of payments came from the initial appointments

15   as opposed to from the follow-ups?

16   A.   I did.  It was 75 percent.

17   Q.   75 percent from which one, the initial appointments or the

18   follow-ups?

19   A.   The follow-ups.

20   Q.   Now, you mentioned Done Global.  Did you look at financial

21   accounts from two companies?

22   A.   I did.

23   Q.   And turning to Done Health, did Done Health receive any

24   payments?

25   A.   They did not.

1   **Q.**   Did Done Health pay any prescribers?

2   **A.**   No.  Most of the financial flow was through Done Global.

3           **MR. FOSTER:**  Now, Your Honor, we'd move in

4   Exhibit 4000 at 15, 16, 30, and 44.

5           **THE COURT:**  15, 16?

6           **MR. FOSTER:**  30 and 44.

7           **THE COURT:**  Admitted.

8       (Trial Exhibit 4000, pages 15, 15, 30, and 44 received in

9   evidence.)

10          **MR. FOSTER:**  Ms. Braga, can we pull up 4000 at 15.

11  BY MR. FOSTER:

12  **Q.**   Mr. Petron, can you tell the jury what we're seeing here?

13  **A.**   Here, I analyzed the total amount of money that was spent

14  on advertising-related expenses for Done Global from March 2020

15  through January '23.  And as you can see, it's over $41 million

16  spent on advertising.

17  **Q.**   How did that compare to the amount of money received from

18  the users?

19  **A.**   It was just under half.

20  **Q.**   Did you look at a breakdown of what advertising platforms

21  Done Global spent money on?

22  **A.**   I did.

23          **MR. FOSTER:**  Ms. Braga, can we pull up 4000 at 16.

24          **THE WITNESS:**  So here we have a breakdown of the

25  $41 million in advertising expenses by vendor.

1      You can see the top three vendors make up the vast

2   majority of the expense:  Facebook, Google, and TikTok.

3   BY MR. FOSTER:

4   Q.   Is there a subset of advertising dollars that you looked

5   at related to China?

6   A.   There is.

7         MR. FOSTER:  Ms. Braga, can you pull up Exhibit 4000

8   at 30.

9   BY MR. FOSTER:

10  Q.   Mr. Petron, can you tell the jury what this shows?

11  A.   This is a chart showing the advertising-related payments

12  to China before and after April 15th, 2022, when there was an

13  indication that the marketing team -- they wanted to move

14  expenses to China.  So I'm showing you before that indication,

15  which is in the middle of the page, there was only $4,500 sent

16  to China for advertising expenses, and on the right-hand side,

17  post that middle block, you can see 4.5 million going to China

18  for advertising-related expenses from April 16th, 2022, through

19  July 31st, 2024.

20  Q.   And when you say advertising-related expenses, can you

21  explain to the jury what you mean?

22  A.   These are expenses that I was able to categorize related

23  to marketing or advertising based upon the accounting records

24  of the company.

25  Q.   And so when you say they went to China, does that refer to

1    advertising or marketing companies located in China that were

2    paid by Done?

3    **A.**    Correct.  My indication is the money went to China to a

4    company associated with advertising or marketing expenses.

5    **Q.**    Now, turning to Defendant He's ownership of Done.

6             **MR. FOSTER:**  Your Honor, we'd move to admit

7    Exhibits 4000 at 27, 28, and 32.

8             **THE COURT:**  Admitted.

9        (Trial Exhibit 4000 pages 27, 28, and 32 received in

10   evidence.)

11            **MR. FOSTER:**  Ms. Braga, can you pull up Exhibit 4000

12   at 32.

13   **BY MR. FOSTER:**

14   **Q.**    Mr. Petron, can you tell the jury what this shows?

15   **A.**    So what this shows is what's called a cap table or a

16   capitalization table.

17       This is a company document that explains who owns how many

18   shares of the company.  So the ownership.

19       On the particular document you can see that there are only

20   two owners with the defendant being a 99.4 percent owner of the

21   shares, 4 million shares out of the total of 4,022,000.

22   **Q.**    As the company increases in value, does Defendant He's

23   value increase?

24   **A.**    It does.  Defendant He's value would increase in relation

25   to the total value of the company increasing.  But I will say,

1   not necessarily at 99.4 percent.  There are other types of both

2   equity and debt that would potentially offset or dilute her

3   ownership percentage, but it would go up as the company's value

4   went up.

5   Q.   You say there are other types of equity or debt that could

6   dilute her ownership percentage.  Can you explain to the jury

7   what those are?

8   A.   Sure.  The company had, I'll put it, two main other types

9   of potential stock in the company.

10      One where company -- the company had restricted shares for

11  some of its employees and those restricted shares would become

12  unrestricted or potentially could become unrestricted.  And the

13  second is the company had some investors.  And those investors

14  could convert their debt investment into shares under certain

15  conditions.

16      And so while this chart is showing 99.4 percent ownership,

17  under certain conditions as the company increased in value,

18  this number could be what's called diluted over time.

19  Q.   So in the event of a sale could that reduce the amount

20  that she got?

21  A.   I would -- I would -- I think it would, yes.

22  Q.   Would she still receive a substantial amount?

23  A.   Yes.

24  Q.   Turning to Exhibit 4000 at page 28.

25      Can you tell the jury what this shows, Mr. Petron?

1  **A.**   So I examined a number of years of payments from different

2  employers to the defendant over time from 2017 to 2024.

3       You can see in 2017 and '18 the amount of money the

4  defendant received from employment at Meta and Facebook.  Then

5  in 2019, Renaissance paid just a little bit of money to the

6  defendant, and then Done or Okay Health started paying the

7  defendant in 2020.

8       You can see how the defendant's payment -- or the money

9  the defendant received grew from 2020 to 2023, and then

10  additionally in 2023 there's that lighter blue bar where there

11  were dividends on top of the normal compensation received.

12  **Q.**   What does this show about her relative compensation from

13  her various employers?

14  **A.**   Well, Done and Okay Health are clearly much larger than

15  the Meta and the Facebook and the Renaissance payments in the

16  earlier time period.

17  **Q.**   What's approximately the total amount that Defendant He

18  was paid by Done?

19  **A.**   Roughly a million dollars.

20  **Q.**   And what does it show about Renaissance and how much she

21  was able to make from that start-up?

22  **A.**   Very limited, very -- I don't remember the exact amount,

23  but less than $10,000.

24       **MR. FOSTER:**  Now, turning to Defendant Brody, we'd

25  move to admit Exhibit 4000 at 23, 25, and 26.

1    **THE COURT:**  Admitted.

2        (Trial Exhibit 4000 pages 23, 25, and 26 received in

3    evidence.)

4        **MR. FOSTER:**  And Ms. Braga, can you display

5    Exhibit 4000 at page 23.

6        **THE WITNESS:**  So this is Defendant Brody's gross pay

7    from Done from September 2020 through June 2024.  And you can

8    see it's over $730,000.

9    **BY MR. FOSTER:**

10   **Q.**   During this time that Defendant Brody was paid over

11   $730,000, did he stop paying his mortgage and enter into

12   mortgage forbearance?

13       **MS. NECHAY:**  Objection.  Lack of foundation.

14       **THE COURT:**  Lay a foundation.

15       **MR. FOSTER:**  Sure.  Can we pull up --

16   **BY MR. FOSTER:**

17   **Q.**   Well, did you look at mortgage and financial records for

18   Defendant Brody?

19   **A.**   I did.

20   **Q.**   And what did they show about whether he stopped paying his

21   mortgage and entered into mortgage forbearance?

22   **A.**   They showed those two facts.

23   **Q.**   And what did they show about transfers in this time period

24   to individuals in the country of Cambodia?

25   **A.**   There were transfers to Cambodia on a number of occasions

1   in large round-dollar amounts.

2   **Q.**   So pulling up what's been admitted as Exhibit 4000 at

3   page 25, does this reflect the amount of mortgage forbearance?

4   **A.**   That's correct.  This is the amount of mortgage that was

5   not paid pursuant to a forbearance from March 2020 through

6   October 2021.

7   **Q.**   And turning to what was admitted as Exhibit 4000 at

8   page 26.

9   **A.**   This is the total amount of money, 378,000, that was sent

10  for what were titled, I think, "family expenses" to Cambodia.

11  **Q.**   And, now, did you also look at the screening tools on

12  Done's platform?

13  **A.**   I did.

14       **MR. FOSTER:**  Your Honor, we'd move to admit

15  Exhibits 4000 at 29 and 58.

16       **THE COURT:**  Admitted.

17      (Trial Exhibit 4000 pages 29 and 58 received in evidence.)

18       **MR. FOSTER:**  And can we bring up Exhibit 4000 at

19  page 29, Ms. Braga.

20       **THE WITNESS:**  So here we have a screenshot of the

21  questionnaire that prospective Done users would fill out when

22  they first began on the platform.

23      Each of the questions would either increase the score or

24  not.  And so you can see the green, if you answered in green,

25  the score would go up.  If you answered in yellow, the score

1    did not go up.  And I put a box on the top left that the

2    percentage of responses that were scoring 4 or more were almost

3    95 percent of the time.

4    BY MR. FOSTER:

5    Q.    And so just to give an example, if you were a person who

6    answered "sometimes you often have trouble wrapping up the

7    final details of a project once the challenging parts have been

8    done," would the score go up?

9    A.    It would.

10   Q.    And if you answered with answers in that green box four

11   times, would you get a score of 4 or more?

12   A.    Correct.

13   Q.    And how many people taking this six-question screener

14   answered a score -- provided an answer that increased the score

15   four or more times?

16   A.    94.7 percent of the responses would have had 4 or more.

17           MR. FOSTER:  Ms. Braga, can you pull up 4000 at 58.

18   BY MR. FOSTER:

19   Q.    Now, you mentioned 94.7 percent had a score of 4 or more.

20   Can you explain to the jury how that relates to the orange

21   color here?

22   A.    So that orange color is essentially the volume of people

23   that make up the 94.7 percent I just described.  These are the

24   folks -- or the user IDs, I should say, that answered four or

25   more.  If you answered three or less, you're in the gray box.

1    And then finally, at the bottom, the blue box were people that

2    were under 18 or had identified some type of complex condition.

3    Q.    And so you have some responses to the right on the chart.

4    So just walking through those, for the group, the 94.7 percent

5    that answered four or more, where does this response come from?

6    A.    The response, as I understand it, is an automated response

7    from the platform that says "you seem like a fit."

8    Q.    And was that reflected, this screenshot, in a presentation

9    that Done transmitted?

10    A.    That's correct.

11    Q.    And you mentioned answering four or more and being able to

12    book an appointment.  What happened if a patient provided an

13    answer to the screening test that only resulted in a score of

14    1, 2, or 3?

15    A.    They would get the response that is in the gray box.

16    Q.    Were they still able, according to Done's internal

17    documents, to continue and confirm the diagnosis with our

18    providers?

19    A.    They were.

20    Q.    So based upon whatever the score was on the ASRS, was

21    there anything that screened them out from booking an

22    appointment?

23    A.    Nothing with respect to those scores.  I do believe the

24    blue did have some screening in it.

25    Q.    So focusing on the blue, does the blue refer to a question

 1  that was asked whether the patient was under the age of 18 or

 2  had other medical conditions such as bipolar, for example?

 3  A.   Correct.

 4  Q.   And if a patient answered, yes, would they be allowed to

 5  book an appointment?

 6  A.   I don't believe they would.

 7  Q.   What if the patient just denied having any of those

 8  conditions or denied being under 18?

 9  A.   Then they would be in the orange or the gray box.

10  Q.   Now, turning to -- did you also look at prescription data?

11  A.   I did.

12        MR. FOSTER:  And, Your Honor, we'd move to admit

13  Exhibits 4000 at 20 to 22; 4000, 36 to 37; 4000, 45 through 49;

14  4000, 60; 4000, 62; 4000, 68; 4000, 69; and 4000, 70.

15        THE COURT:  Admitted.

16        (Trial Exhibit 4000 pages 20, 21, 22, 36, 37, 45, 46, 47,

17  48, 49, 60, 62, 68, 69, and 70 received in evidence.)

18        MR. FOSTER:  Now, Ms. Braga, can you bring up

19  Exhibit 4000 at 37.

20  BY MR. FOSTER:

21  Q.   Mr. Petron, can you tell the jury what this is?

22  A.   This is what's just called a heat map that describes the

23  total number of pills, 37 million, that were prescribed by Done

24  prescribers.  And it shows the country as a whole.  The darker

25  states had more pills going to them, the lighter states have

1    less.  All states are represented.

2    Q.    And in terms of the location, does that reflect Done's

3    corporate location?

4    A.    The Done location here in San Francisco reflects the

5    corporate location.  The arrows represent the patients that

6    were receiving the medication.

7    Q.    And those patients, though, they received medication from

8    prescribers and pharmacies in the different states; is that

9    correct?

10   A.    Absolutely.  The -- Done is here.  The prescribers were

11   all over the country, and they obviously received the medicine

12   all over the country as well.

13   Q.    And in terms of the patients, did Done have them fill out

14   documents indicating whether they had experience with ADHD

15   medications?

16   A.    They did.

17            MR. FOSTER:  And Ms. Braga can you pull up 4000 at 45.

18            THE WITNESS:  So here is a pie chart indicating

19   whether or not the users of the platform had prior experience

20   with any ADHD medicine.  You can see that half of them did not,

21   36 percent did, and then there was a group of 14 of

22   inconclusive or unanswered.

23   BY MR. FOSTER:

24   Q.    And if we can look at -- did you look at whether the

25   patients received a stimulant influenced the amount of time

1    they stayed on the Done platform or stayed paying Done?

2    **A.**    I did.

3         **MR. FOSTER:**  And can we bring up 4000 at 62,

4    Ms. Braga.

5         **THE WITNESS:**  So here I'm examining the length of time

6    that a user was on the platform and putting it into particular

7    buckets.

8         So the first bucket is a user who receives a Schedule II

9    stimulant, and if they do, they're associated with the platform

10   for over 10 months.  If the user did not receive a Schedule II

11   stimulant but received some other type of prescription, they

12   interacted with the platform for about 1.7 months.  And a user

13   who did not receive any type of prescription at all essentially

14   had minimal interactions with the platform and their length of

15   time is less than a month.

16   **BY MR. FOSTER:**

17   **Q.**    Now, did you look at the pattern of appointments that

18   patients had on the platform?

19   **A.**    I did.

20        **MR. FOSTER:**  And, Your Honor, we'd move to admit

21   Exhibit 4000 at 52, 53, 54, 61, and 67.

22        **THE COURT:**  Admitted.

23        (Trial Exhibit 4000 pages 52, 53, 54, 61, 67 received in

24   evidence.)

25   \\\

**PETRON - DIRECT / FOSTER**

1          **MR. FOSTER:**  And Ms. Braga, can you bring up

2    Exhibit 4000 at 52.

3    **BY MR. FOSTER:**

4    **Q.**   Did you look at what happened after patients had their

5    initial appointment with a Done prescriber and were initiated

6    prescriptions?

7    **A.**   I did.  So what I looked at specifically for this

8    information is whether or not a patient got at least two

9    prescriptions.  And if they got at least two prescriptions, how

10   many or what percentage of them did not have a follow-up within

11   30 days of that first prescription.

12        So imagine you have two prescriptions, no follow-up for

13   30 days, and you can see that that type of timeline was present

14   for 88 percent of the individuals.

15   **Q.**   Now, you previously mentioned that half the patients

16   indicated they had no prior experience with ADHD medication.

17        What did the statistics look like for that subgroup?

18   **A.**   It was very similar.

19   **Q.**   Very similar to patients, so patients who had no prior

20   experience with ADHD medication, approximately how many

21   percentage -- what percentage of them didn't have a follow-up

22   within 30 days?

23   **A.**   I believe, if my memory serves, it's 87 percent.

24   **Q.**   And you mentioned not within 30 days.

25        Did you also look at how much time elapsed before there

1  was any follow-up at all?

2  **A.**   I did.

3  **Q.**   And was that approximately an average of 160 days?

4  **A.**   It was.

5  **Q.**   Looking at page 61 of Exhibit 4000, can you tell the jury

6  what this shows?

7  **A.**   So here what I did was, looking at all of the Schedule II

8  scripts for the patients, I went and looked for any change in

9  that Schedule II script.

10     So more pills, dosage goes up, so that you're changing the

11  prescription.

12     And I'm pointing out here the number of individuals that

13  had the change and had that change without an appointment with

14  a prescriber.

15  **Q.**   So 34,985 users had a change in their drugs or an increase

16  in dosage without an audiovisual appointment?

17  **A.**   Correct.

18          **MR. FOSTER:**  Ms. Braga, can you pull up page 67 of

19  Exhibit 4000.

20  **BY MR. FOSTER:**

21  **Q.**   Mr. Petron, can you tell the jury what this shows?

22  **A.**   So here I'm looking at the Schedule II stimulants and

23  they're, of course, prescribed to a user, and I'm putting them

24  into two classifications:  Those with no evidence of an

25  appointment in the prior 90 days and those with no evidence of

1  an appointment in the prior 180 days.

2      And so you can see how many scripts were written for both

3  categories, 340,000 and 158,000 respectively, covering

4  14 million and 6.6 million pills.

5  **Q.**  So focusing on the 180 days, you say 6.6 million pills,

6  158,000 plus prescriptions.

7      What -- can you explain to the jury what was occurring

8  there in terms of the pattern of appointments?

9  **A.**  This is them -- these scripts, these pills are sent to an

10 individual without an appointment in the prior 180 days.

11 **Q.**  The prior six months?

12 **A.**  Correct.

13 **Q.**  Did you also look at how appointments and prescriptions

14 changed over time?

15 **A.**  I did.

16     **MR. FOSTER:**  And Ms. Braga, can we pull up

17 Exhibit 2899.

18     **THE COURT:**  I'm sorry.  What?

19     **MR. FOSTER:**  2899.

20     **THE COURT:**  28?

21     **MR. FOSTER:**  99.

22     **THE COURT:**  Is that in evidence?

23     **MR. FOSTER:**  I believe it is.

24     **THE COURT:**  2899?  Well, I'll -- it's admitted.

25     (Trial Exhibit 2899 received in evidence.)

1  BY MR. FOSTER:

2  Q.   Now, Mr. Petron, do you see the column entitled -- there's

3  a column for revenue, cost of service, gross profit, gross

4  margin, and the other column here?

5  A.   They're rows --

6  Q.   The third row.

7  A.   -- not columns.  But yes, I see the rows.

8  Q.   That is why I'm not a statistician.

9       And do you see there's a star in October of 2020 where it

10  says (as read):

11           "Membership fee structure changed from hourly

12       rate to panel size"?

13  A.   I see that.

14  Q.   And can you tell the jury what happens to the gross --

15  well, can you tell the jury what gross margin is and what

16  happens to it after the membership fee structure is changed?

17  A.   So I will spare you all a long accounting lecture and just

18  say revenue is money in, costs are money out, gross profit is

19  how much you make.

20       Okay.  So when examining the gross profit, you can see in

21  Row Number 9, and Row Number 8, the gross profit and then the

22  gross profit margin.  Those two things, if you were looking at

23  a percentage, which is the way most people do, you can see

24  those percentages are 53, 47, 48, 54, 55.

25       When the membership fee structure changed in October of

PETRON - DIRECT / FOSTER

1  2020, you can see that gross margin percent starts to increase:

2  61, 62, 65, 71.  So the change in the way the membership fee

3  was structured had a direct impact on the profitability of the

4  company.

5  Q.   Did you also look -- this is the gross margin -- at the

6  clinician fees?

7  A.   I did.

8       MR. FOSTER:  And, Your Honor, we'd move to admit

9  Exhibit 4000 at 18, 19, 34, 35, 63, 65, and 66.

10      THE COURT:  Admitted.

11      (Trial Exhibit 4000 pages 18, 19, 34, 35, 63, 65, and 66

12  received in evidence.)

13      MR. FOSTER:  And, Ms. Braga, can you pull up page 19

14  of Exhibit 4000.

15  BY MR. FOSTER:

16  Q.   Can you explain, Mr. Petron, how the payments to the

17  prescribers changed after the change in the compensation

18  scheme?

19  A.   Sure.

20      So what I'm looking at here is I'm looking at a ratio of

21  payments to providers of follow-ups and transfers as a

22  percentage of all payments.  So prescribers were essentially

23  paid for initial appointments and for follow-ups and transfers.

24  There are some other small things but those are the big

25  categories.

So I'm looking at the ratio and I'm tracking how much are the prescribers getting for those respective things, the follow-ups and the transfers, against the initials.

So you can see before the compensation change, that's hovering between 40 and 50 percent.  Then the red line happens, the compensation change occurs, and you can see that ratio falls to below 10 percent and essentially hovers around 10 percent for the rest of the time period.

**Q.**   So the amount paid for follow-up care went from about 46 percent to down to around 7 percent after the compensation change?

**A.**   For the follow-up appointments and the transfers, yes.

**Q.**   And how does that reduction in payment for follow-ups and transfers relate to gross margin and profit?

**A.**   As we saw in the last slide, the gross profit went up.

          **MR. FOSTER:**  Now, Ms. Braga, can you pull up Exhibit 4000 at page 34.

**BY MR. FOSTER:**

**Q.**   What does this show, Mr. Petron?

**A.**   This is a -- basically, a timeline of two things, comparing two things.  The first is the users and the percentage increase in the user counts; i.e., the people counts, against the prescriber costs.  And so what I'm pointing out with the two big arrows on the right are that the user count is increasing twentyfold over this time period.  The

**PETRON - DIRECT / FOSTER**

1  prescriber costs are increasing sevenfold.

2  **Q.**   And how does that relate to profit?

3  **A.**   That is -- this would -- profits increased over this time

4  period on a percentage basis.

5  **Q.**   And how does the lack of follow-up care relate to new

6  appointments?

7  **A.**   The lack of follow-up care relate to new appointments?

8       So if the prescribers were not doing the follow-up care,

9  that would allow them to have more time available for new

10 appointments, hence the user counts can grow because the

11 prescribers have time -- more time for those than if they were

12 doing follow-ups on some type of consistent basis.

13       **MR. FOSTER:**  Ms. Braga, can you pull up page 66 of

14 Exhibit 4000.

15 **BY MR. FOSTER:**

16 **Q.**   You said that the amount paid for follow-ups went down.

17 Margin and profitability went up.

18      Did you look at what happened to the percentage of Done

19 users who had an appointment without a follow-up before

20 receiving a stimulant prescription?

21 **A.**   Right.  So I'm tracking the percentage of people that have

22 appointments after certain times periods, 30, 90, 180 days.

23 And I will say the left-hand side of this chart is squiggly

24 because the time period is pretty short.  The company had just

25 started.

1      So as you move to the right, you can see the lines become

2   far more consistent and the percentage of people with

3   follow-ups drops and then stays relatively consistent until I'd

4   say September of '22, where it increases a little bit.

5   **Q.**   And in terms of the blue line, what does the blue line

6   show?

7   **A.**   The blue line is 30 days, so this is the percentage of

8   people having the follow-ups within 30 days.  The orange is 90,

9   and the silver line is 180.

10  **Q.**   And why were you able to show the blue line but the silver

11  line and the orange lines are a little more squiggly before the

12  compensation change?

13  **A.**   Because 90 and 180 is longer than 30; right?  So you can

14  get a better sense of what's happening if we're only looking at

15  30-day groups as opposed to needing 90 or 180 days to

16  understand what's happening.

17  **Q.**   And in terms of the 30-day analysis, what did you discover

18  about the percentages of patients who were receiving -- or

19  sorry -- who were receiving scripts before and after the

20  compensation change?

21  **A.**   You can see that it was high, I would say close to

22  90 percent.  It drops in levels to around 60 percent.  And then

23  after the compensation change, it falls in line with everything

24  else to give or take 10 percent.

25  **Q.**   And in terms of the users issued Schedule II stimulant

1  prescriptions over 90 days from their last appointment, can you

2  describe the difference before and after the compensation

3  change to the jury?

4  **A.**   Sure.  So before the compensation change, call it

5  57 percent falls to 20, goes back up to 30 some, but then falls

6  again to that below-10-percent range.

7          **MR. FOSTER:**  So if we could pull up Exhibit 63.

8  Sorry, page 63 of Exhibit 4000.  Sorry.  Ms. Braga, can you

9  take that down?  If we could pull up page 65.

10  **BY MR. FOSTER:**

11  **Q.**   Now, we saw on that chart in late 2020 -- or in mid-2022,

12  the numbers going up.

13          Did you look at a specific analysis for something called

14  25-minute follow-up appointments?

15  **A.**   I did.

16          So the 25-minute follow-up was a particular type of

17  follow-up and I essentially was just tracking the volume of

18  those follow-ups.

19          And you can see the volume sort of is increasing over the

20  time period.  It spikes in I would say the middle part of 2022,

21  and then dramatically falls at the end of 2022.

22  **Q.**   Did you also look at patients who were transferred from

23  one prescriber to another?

24  **A.**   I did.

25          **MR. FOSTER:**  And we'd move to admit page 59 of

1  Exhibit 4000.

2       Your Honor, we move to admit page 59 of Exhibit 4000.

3          **THE COURT:**  Oh, I'm sorry.  Admitted.

4       (Trial Exhibit 4000 page 59 received in evidence.)

5  **BY MR. FOSTER:**

6  **Q.**   Mr. Petron, can you tell the jury what this shows?

7  **A.**   This is showing the Schedule II stimulants to the patients

8  and the prescribers having a prior appointment and not having a

9  follow-up within 30 days but they're still on the platform.  So

10  this is someone who is basically changing prescribers, there is

11  no appointment, and they're still getting Schedule II scripts?

12       And you can see there's 24,000, almost 25,000 individuals

13  that get 4 million in pills.  And if you look at the script in

14  which the new prescriber writes the script, there has been no

15  appointment on average for 206 days before that script was

16  written.  And then if you look at the next appointment after

17  that script was written by the new prescriber, there's an

18  additional on average 192 days.

19  **Q.**   And so you mentioned these were patients who were

20  transferred from one provider to another.  And so how many

21  pills were prescribed when the patient was not seen within the

22  subsequent 30 days after being transferred?

23  **A.**   4 million pills.

24  **Q.**   And what did the data show about how long they were going

25  both before and after the transfer before having an appointment

1  on average?

2  **A.**   I would say before, it's on average 206 days, after 192.

3  **Q.**   And it's an average.  Did you find examples that were much

4  longer than that?

5  **A.**   Yes.

6  **Q.**   Did you also look at prescriptions issued by

7  Defendant Brody?

8  **A.**   I did.

9         **MR. FOSTER:**  Your Honor, we'd move to admit

10 Exhibit 4000 at 39, 42, 43, 57, 72 and 73.

11        **THE COURT:**  Admitted.

12    (Trial Exhibit 4000 pages 39, 42, 43, 57, 72, and 73

13 received in evidence.)

14        **MR. FOSTER:**  Ms. Braga, can you pull up page 39 of

15 Exhibit 4000.

16 **BY MR. FOSTER:**

17 **Q.**   Mr. Petron, can you tell the jury what this shows?

18 **A.**   So here I'm examining Defendant Brody's scripts.  We saw

19 an earlier chart for the entire Done platform.  This is

20 specifically Defendant Brody, showing that there were scripts

21 written for 394,000 pills and they went to states all over the

22 country.

23 **Q.**   You say states all over the country.  Was Defendant Brody

24 writing presumptions for Done users in just one state or in

25 lots of states?

1  **A.**    I believe it's almost every state.

2         **MR. FOSTER:**  Ms. Braga, can you pull up page 42 of

3  Exhibit 4000.

4  **BY MR. FOSTER:**

5  **Q.**    Mr. Petron, can you tell the jury what this shows?

6  **A.**    This is showing how many of the scripts written by

7  Defendant Brody were for Schedule II stimulants versus

8  non-Schedule II stimulants.  So 93 percent of the time that a

9  script was written it was for a Schedule II stimulant.

10 **Q.**    How many Schedule II stimulant pills did Defendant Brody

11 prescribe?

12 **A.**    394,000.

13 **Q.**    Did you look at how quickly Defendant Brody wrote these

14 prescriptions?

15 **A.**    I did.

16        **MR. FOSTER:**  Ms. Braga, can you pull up page 72.

17 **BY MR. FOSTER:**

18 **Q.**    What did you find?

19 **A.**    So here I'm doing an analysis on the 10 fastest

20 prescribing periods.  And what I'm showing is the date, the

21 prescriptions signed, the minutes worked to sign those

22 prescriptions, and then finally, the average time per

23 prescription.

24        So for the worst day, the most day, Row Number 1,

25 December 19th, 2022, there were 79 presumptions signed in

1  40 minutes.  So on average, 32 seconds a prescription.

2  **Q.**   Do you mean 75?

3  **A.**   75?  I'm sorry if I misspoke.  75 prescriptions signed,

4  40 minutes worked, so an average time of 32 seconds per

5  prescription.

6  **Q.**   And his 10 fastest prescribing periods, what average time

7  did those range between?

8  **A.**   32 to 37 seconds.

9  **Q.**   How many prescriptions on average was Defendant Brody

10  signing daily?

11  **A.**   30.

12  **Q.**   And how many appointments did you find for Defendant Brody

13  for these prescriptions?

14  **A.**   Hardly any.

15  **Q.**   And looking at page 47 of Exhibit 4000 -- 57, sorry.

16       Did you also look at Done users for whom Defendant Brody

17  wrote prescriptions when they had not been seen in the 180 days

18  preceding that presumption?

19  **A.**   I did.  So this is a subset of all of the prescriptions

20  that Defendant Brody wrote.  87,000 of those pills were for

21  prescriptions for people that had not been seen in the last

22  180 days.

23  **Q.**   You mentioned healthcare insurance claims.

24       Did you look at payments by insurers for Done users'

25  Schedule II stimulant prescriptions?

1    **A.**    I did.

2            **MR. FOSTER:**  Your Honor, we move to admit

3    Exhibit 4000, page 71.

4            **THE COURT:**  Admitted.

5        (Trial Exhibit 4000 page 71 received in evidence.)

6            **MR. FOSTER:**  Ms. Braga.

7    **BY MR. FOSTER:**

8    **Q.**    Mr. Petron, can you tell the jury what this shows?

9    **A.**    So here, I am examining some medical claims data that

10   shows three things:  The first Medicare payments related to

11   Done user Schedule II prescriptions, Medicare paid over

12   $84,000, Medicaid paid over 510,000, and any other insurance

13   paid over $11 million.

14   **Q.**    Did these amounts include claims that had prior

15   authorizations associated with them?

16   **A.**    They did.

17   **Q.**    Do they include claims for prescriptions written by

18   Defendant Brody?

19   **A.**    They do.

20   **Q.**    Do they include claims for presumptions written by

21   Defendant He that had prior authorizations associated with

22   them?

23   **A.**    They do.

24   **Q.**    Did you also look at prescriptions for certain counts

25   charged in the indictment?

1   **A.**   I did.

2          **MR. FOSTER:**  Your Honor, we'd move to admit 4,000 at 1

3   through 7 -- 1 through 8, excuse me, as well as 57.

4          **THE COURT:**  Admitted.

5       (Trial Exhibit 4000 pages 1 through 8, and 57 received in

6   evidence.)

7          **MR. FOSTER:**  Ms. Braga, can you display Exhibit 4000

8   at page 1.

9   **BY MR. FOSTER:**

10  **Q.**   Mr. Petron, can you tell the jury what this is?

11  **A.**   Sure.  This is a summary of Counts 2 to 5 in the

12  indictment showing you the count number, the Done member name,

13  the prescriber, the approximate date of the prescription, and

14  the controlled substance that was prescribed.

15         **MR. FOSTER:**  Turning to page 2, Ms. Braga.

16  **BY MR. FOSTER:**

17  **Q.**   Now, for Count 2 pertaining to Mr. Band, what was the

18  length of the initial appointment with Mr. Band?

19  **A.**   So you can see in that left-hand box, the length of that

20  initial appointment on October 14th was 12.88 minutes.

21  **Q.**   Turning to page 3, and Count 3, what was the length of

22  time associated with the initial appointment for Count 3?

23  **A.**   Here it was 18 1/2 minutes.

24  **Q.**   Now, the charged count, did that relate to

25  Defendant Brody?

**PETRON - DIRECT / FOSTER**

1    **A.**    It does.  The prescriber is Defendant Brody.

2    **Q.**    And can you tell the jury the date of that prescription?

3    **A.**    It was July 27th, 2022.

4    **Q.**    And how long, approximately, was that after the initial

5    appointment?

6    **A.**    Call it 18 months more than 18 months.

7    **Q.**    And did you analyze how quickly Defendant Brody was

8    signing prescriptions that day?

9    **A.**    I did.

10        **MR. FOSTER:**  Ms. Braga can you bring up page 4 of

11    Exhibit 4000.

12        **THE WITNESS:**  So here on that day, the prescription

13    associated with the count, you can see I'm listing all of the

14    prescription detail between 1:00 and 2:00 a.m. that were

15    written.  I have the patient names, the date, the time of the

16    prescription, and the drug that was written for.

17        And so in this situation, I've highlighted for you the

18    count, the Adderall that was a 10-milligram extended-release

19    capsule.  And in total for this time period, there were

20    10 minutes worked, 18 prescriptions were signed, and an average

21    of 33 seconds was spent on each.

22    **BY MR. FOSTER:**

23    **Q.**    So what time did the prescriptions start and finish?

24    **A.**    Here they started at 1:09 a.m. and finished at 1:18 a.m.

25    **Q.**    How many patients were signed for in those nine to

PETRON - DIRECT / FOSTER

1   10 minutes?

2   A.   18.

3   Q.   Can you tell the jury --

4   A.   Well, I'm sorry.  Let me -- misspoke.  Some of these are

5   for the same patient.

6   Q.   How many prescriptions?  Sorry.

7   A.   18 prescriptions.

8   Q.   Okay.  And can you tell the jury when Defendant Brody

9   signed the prescription immediately before Trivedi and

10  immediately after?

11  A.   So immediately before is at 1:15 and immediately after is

12  in the same minute, 1:16.

13  Q.   In the same minute as when the Trivedi prescription was

14  signed?

15  A.   Yes.

16  Q.   And what was the average time he was taking to sign each

17  prescription?

18  A.   33 seconds.

19  Q.   Turning to Count 4, Exhibit 4000 at page 6.

20       This relates to a patient Vashti Oechsner-Souza.  How long

21  was the initial appointment for this patient?

22  A.   8.33 minutes.

23  Q.   And who signed the charged count prescription?

24  A.   Defendant Brody did.

25  Q.   And what was the date of the charged count?

1   A.   June 18th, 2021.

2   Q.   And what was the controlled substance?

3   A.   It was an amphetamine salt combo.

4        **MR. FOSTER:**  And Ms. Braga can you pull up

5   Exhibit 1942 at 2 in evidence.

6   **BY MR. FOSTER:**

7   Q.   And Defendant Brody signed this prescription on June 18th,

8   2021.  What was Ms. Oechsner-Souza prescribed in January,

9   March, and April of 2021?

10  A.   So in those preceding months, phentermine HCL was

11  prescribed.

12       **MR. FOSTER:**  And pulling up Exhibit 1941 at page 2.

13       In terms of the notes, if we can go to -- there's a note

14  here on October 10th, 2021, if we can go to the next page,

15  Ms. Braga.

16  **BY MR. FOSTER:**

17  Q.   Well, when reviewing this, were there any other notes

18  associated for the prescription with Defendant Brody's?

19  A.   There was.  I believe it's -- there's...

20  Q.   Or is this the only note found in the Exhibit --

21  A.   I --

22  Q.   -- on October 10th?

23  A.   This is the only note for October 10th.  I thought that

24  there was another note, though.

25       **MR. FOSTER:**  Ms. Braga, can you scroll through this

1    document.  Is that all the pages in the document?

2            **THE WITNESS:**  That's it.

3    **BY MR. FOSTER:**

4    **Q.**    Now, turning to Count 5, Exhibit 4000 at page 7.

5            Is this a prescription written to Nicholas Chieppa?

6    **A.**    Yes.

7    **Q.**    And how long was the initial appointment?

8    **A.**    22.8 minutes.

9    **Q.**    And who was the prescriber on the charged count?

10   **A.**    Shapard.

11   **Q.**    And what was the date of that prescription?

12   **A.**    October 7th, 2022.

13   **Q.**    And pulling up Exhibit 1844 at page 6, which was

14   previously admitted.

15           And looking at the clinician note, what happened on

16   January 24th, about eight or nine months before the charged

17   count?

18   **A.**    So the clinician received a call advising that the

19   client -- or the patient was placed on a 5150 and has symptoms

20   and characteristics of bipolar disease and they should not

21   receive any ADM meds for ADD/ADHD.

22   **Q.**    Did you look at the prescriptions that were issued for

23   this patient between the initial appointment and the charged

24   count?

25   **A.**    I did.

PROCEEDINGS

1    Q.    And pulling up page 8 of Exhibit 4000.

2          Can you tell the jury what this shows?

3    A.    This just shows the appointment and prescription history

4    for this patient.  You can see the initial appointment on

5    November the 3rd, 2021.  Each of the circles is a Schedule II

6    prescription that was issued with the identification of the

7    charged count, Count 5, on October 7, 2022.

8    Q.    How many presumptions were issued with no appointment at

9    all?

10   A.    There are 17.

11   Q.    And how many days were there between the initial

12   appointment and the charged count without an appointment?

13   A.    338.

14         MR. FOSTER:  Thank you.

15         No further questions, Your Honor.

16         THE COURT:  Okay, ladies and gentlemen, we're going to

17   take our recess now.  We'll be in recess until 1:00.  Remember

18   the admonition given to you:  Don't discuss the case, allow

19   anyone to discuss it with you, form or express any opinion.

20   We're in recess.

21                    (Recess taken at 12:04 p.m.)

22              (Proceedings resumed at 1:03 p.m.)

23      (Proceedings were heard out of the presence of the jury.)

24         MS. BELL:  Thank you, Your Honor.

25         So as the Court has ruled and consistent with the jointly

1   proffered limiting instruction, we believe there should be no

2   causation testimony.  It's not appropriate and so there are --

3   there are statements in the interview memoranda, which go to

4   the point of Done's medications or Done's treatment harming

5   this patient and we don't believe there should be any testimony

6   of that nature.

7       And I think Government counsel is maybe partially in

8   agreement but not fully in agreement, and so I just want to be

9   clear about what we will not be hearing or -- from the witness.

10  There are things in the interview memoranda along the lines of

11  "he's been robbed of his whole life."  The mother wonders who

12  would take care of him.  You know, he was doing totally fine

13  until he started being seen at Done, things of that nature, and

14  so I'm concerned about that type of testimony, notwithstanding

15  the curative --

16      **THE COURT:**  Well, don't have any of that kind of

17  testimony.

18      **MS. BELL:**  Thank you, Your Honor.

19      **THE COURT:**  Thank you.  Okay.

20      Okay.  We all set?  Bring in the jury.

21          (The jury enters the courtroom.)

22      (Proceedings were heard in the presence of the jury.)

23      **THE COURT:**  Okay.  Please be seated.  Let the record

24  reflect all jurors are present, all parties are present.

25      You may proceed.

1          **MR. BALLEW:**  Thank you, Your Honor.

2                          <u>**CROSS-EXAMINATION**</u>

3    **BY MR. BALLEW:**

4    **Q.**    Good afternoon.

5    **A.**    Good afternoon.

6    **Q.**    My name is Steven Ballew.  I represent the defendant

7    Ruthia He.

8          I want to start where you ended off about the slides

9    relating to Counts 2 to 5 in this case concerning prescriptions

10   to Done patients Harlan Band, Tapasya Trivedi, Vashti

11   Oechsner-Souza, and Nicholas Chieppa.

12         Do you recall that you ended your testimony speaking about

13   those slides?

14   **A.**    I do.

15   **Q.**    Okay.  And one of the things you testified about was the

16   initial appointment time that you calculated.

17         Do you recall that testimony?

18   **A.**    I do.

19   **Q.**    Those are the only slides in the slide deck, if I am --

20   remember correctly, that mention appointment times; is that

21   right?

22   **A.**    I believe that's correct.

23   **Q.**    So you didn't compare how those appointment times were in

24   relation to appointments for the other 105,000 patients on

25   Done's platform who ended up receiving a controlled stimulant

1  presumption?

2  **A.**   We made no comparison of time.

3  **Q.**   Okay.

4  **A.**   Appointment times.

5  **Q.**   You know that Done had an initial default appointment time

6  of 25 minutes?  Are you aware of that?

7  **A.**   I'm not.

8  **Q.**   Okay.

9         **MR. BALLEW:**  Can we pull up Trial Exhibit 4000 at

10  page 2.

11  **BY MR. BALLEW:**

12  **Q.**   So this is the slide for Count 2 related to Harlan Band

13  that you prepared; correct?

14  **A.**   It is.

15  **Q.**   And if we look at Footnote 1 in Notes 1, it says (as

16  read):

17         "Appointment date and time confirmed via

18         appointment confirmation e-mail and Doxy data."

19         Do you see that?

20  **A.**   I do.

21  **Q.**   So you looked -- are those the only two sources of -- of

22  data that you looked at to confirm the appointment time and the

23  appointment length of the appointment?

24  **A.**   I don't recall if we looked at other things.

25  **Q.**   Okay.  But those are the only ones that are listed in

1  Note 1?

2  **A.**    Correct.   Those are listed in Note 1.

3  **Q.**    Okay.  And so you say here that one of the sources you

4  looked at when you determined the initial appointment time for

5  these patients was data that the Government received from an

6  entity called Doxy; is that correct?

7  **A.**    Correct.

8  **Q.**    And you understand that Doxy is a videoconferencing

9  service that allows medical providers to have secure telehealth

10  appointments with their patients; correct?

11  **A.**    There's a lot in that question.  I understand that it was

12  the way that the patients and the doctors connected.

13  **Q.**    Okay.  So I want to show you the underlying Doxy records

14  that you used to calculate the initial appointment times for

15  these patients.

16       **MR. BALLEW:**  Let's pull up GX1716 in evidence, please.

17  BY MR. BALLEW:

18  **Q.**    And you can see here, this is the Doxy -- the underlying

19  Doxy data for -- I believe, three of the four patients were --

20  their appointment times were calculated using this specific

21  spreadsheet?

22  **A.**    I'm sorry.  Can you repeat that again.

23  **Q.**    So this -- this is an example of the Doxy data that you

24  were working with when you were calculating the initial

25  appointment times of the patients; is that correct?

PETRON - CROSS / BALLEW

1  **A.**   It does look familiar to me.  I don't recall it

2  specifically.

3  **Q.**   Okay.  And do you recall that there were multiple Doxy

4  spreadsheets like this, it wasn't just one Doxy spreadsheet

5  that had every appointment of everybody on the platform?

6  **A.**   I do recall that.

7  **Q.**   And this particular one has -- maybe you recall, maybe you

8  don't -- 40 providers and about 36,000 appointments?

9  **A.**   I don't recall that.

10  **Q.**   Okay.  If we look at the data that's on the spreadsheet,

11  you could see that you have the name of the provider, the first

12  and last name of the provider.

13       Do you see that?

14  **A.**   Yes.

15  **Q.**   You have the provider's e-mail address?

16  **A.**   I do see that.

17  **Q.**   You have the date of the appointment?

18  **A.**   Correct.

19  **Q.**   And then you have the start time of the appointment, the

20  end time of the appointment, and the duration of the

21  appointment in minutes.

22       Do you see that?

23  **A.**   I do.

24  **Q.**   What you don't see here are -- is any information about

25  who the patient is who is receiving the appointment; is that

PETRON - CROSS / BALLEW

1    right?

2    **A.**    That's correct.

3    **Q.**    So what you would have to do is cross-reference that to

4    some other source like the scheduling appointment e-mail that

5    we discussed you looked at for Harlan Band; is that correct?

6    **A.**    That's correct.

7    **Q.**    But if, for example, a provider's schedule got backlogged

8    or if the appointment changed, you wouldn't be able to tell

9    that -- any of these Doxy records are associated with any

10   specific patient without looking at some other source of

11   information; is that right?

12   **A.**    Well, I couldn't tie a particular record to a particular

13   patient without additional information.

14   **Q.**    Correct.

15        So, now, as you mentioned, you didn't do any sort of

16   analysis of kind of the average appointment time on the

17   platform; correct?

18        **MR. FOSTER:**  Asked and answered.

19        **THE COURT:**  I'll allow it.

20        **THE WITNESS:**  I did not.

21   BY MR. BALLEW:

22   **Q.**    And also on this Doxy spreadsheet that lists the duration,

23   there's -- it doesn't distinguish between what's an initial

24   appointment and what is a follow-up appointment; is that

25   correct?

A. I don't believe it does.

Q. Okay. So you can't tell whether any of these appointments are follow-ups or initials?

A. Correct, I cannot. Not from just this document.

Q. Okay. And if we sort this for the years 2020 and 2021 -- there's a couple of appointments from years before that -- you would see that there are 5,407 appointments in that time frame on this spreadsheet that were over the default initial appointment time of 25 minutes.

Did you look to see if that -- something like that was correct or not?

A. I have no idea if that's correct.

Q. Okay. And because you can't tell whether or not these are initial appointments or follow-up appointments, you're not able to tell if those -- whatever appointments are longer than 25 minutes, whether that accounts for 90 percent of the initial appointments or 20 percent of the initial appointments despite the fact that the initial appointment times' default that are set for providers is set for 25 minutes?

A. Again, I don't know if the 25-minute thing is the default and if that happens. I have not done any analysis on this data that would allow me to answer questions like that. I don't know.

Q. You did no analysis about how common it was for a provider to go longer than 25 minutes to schedule an appointment -- to

1    conduct an appointment?

2    **A.**    I've conducted no analysis like that.

3    **Q.**    Okay.  Moving along.

4          You spoke a little bit about data related to Dr. Brody's

5    prescribing trends.

6          Do you recall that testimony?

7    **A.**    I do.

8            **MR. BALLEW:**  If we could pull up Slide 41 of

9    Mr. Petron's summary slides.

10    **BY MR. BALLEW:**

11    **Q.**    So you testified that the records show that Dr. Brody

12    prescribed stimulants to 6,559 of the more than 105,000

13    patients that were prescribed a stimulant by a Done provider on

14    the platform; is that accurate?

15    **A.**    I believe that's accurate, yes.

16    **Q.**    And you had a slide that showed that Dr. Brody did not

17    have any appointments with the patients he prescribed on the

18    platform.

19          Do you recall that?

20    **A.**    I don't know if it was any, but I recall that slide that

21    discusses that topic.

22    **Q.**    Did you look to see whether -- for what Dr. Brody was

23    prescribing, whether any provider on the Done platform had

24    conducted an evaluation and diagnosed a patient before

25    Dr. Brody had issued a prescription?  In other words whether

PETRON - CROSS / BALLEW

1    Dr. Brody was the first provider to issue a prescription or

2    whether he was the second or the third or some -- sometime

3    afterwards?

4    **A.**   I believe -- I don't know this for every single one, but

5    I believe he was not the first for the majority of them.

6    **Q.**   So some other provider had diagnosed a patient with ADHD

7    or some other sort of condition and prescribed medication to

8    that patient?

9    **A.**   I frankly don't remember about the diagnosis codes.   I

10   would say I agree with the Schedule II stimulants.

11   **Q.**   Okay.   And your summary chart didn't include any data for

12   the average number of times that Dr. Brody prescribed a single

13   patient, did it?

14   **A.**   The average number of times -- so the average number of

15   times out of this 6,559?

16   **Q.**   Well, for one patient, how many times he would prescribe

17   any single patient.

18   **A.**   I don't recall doing that analysis.

19   **Q.**   So you don't know if, for the most part, he would issue

20   one prescription to a single patient or two prescriptions or

21   seven prescriptions for any single patient without ever seeing

22   them?

23   **A.**   I don't recall doing that analysis.

24   **Q.**   Okay.

25          **MR. BALLEW:**   Oh.   Your Honor, I'd like to admit this

1    page 41.  I'm informed it wasn't admitted.

2          **THE COURT:**  Admitted.

3          (Trial Exhibit 4000 page 41 received in evidence.)

4    **BY MR. BALLEW:**

5    **Q.**   You also had a slide that we looked at on the speed at

6    which Dr. Brody was writing prescriptions.

7          Do you recall seeing that?

8    **A.**   I do.

9          **MR. BALLEW:**  Can we go to page 72 of this

10   presentation.

11   **BY MR. BALLEW:**

12   **Q.**   And the source for these minute works and the average time

13   of prescription in seconds, that's a platform -- data from a

14   platform called Surescripts?

15   **A.**   That's correct.

16   **Q.**   And Surescripts is -- it's an e- -- some sort of

17   e-prescribing platform, is that your understanding?

18   **A.**   It's my understanding that it is some -- I would say -- I

19   don't know if the word "platform" is right but it is something

20   that they're using to get the scripts to the patients.

21   **Q.**   Yeah.  And so the amount of time per second or the amount

22   of minutes works, that shows how much time and how quickly he

23   was prescribing after he logged into whatever this platform is?

24   **A.**   He would have to be on the platform for it to capture his

25   information.

1  Q.   So it wouldn't capture any amount of work or any amount of

2  time he spent looking at a patient's medical records before

3  signing into the platform and issuing the prescriptions; is

4  that accurate?

5  A.   I mean, assuming that he did that.  I don't believe that

6  that data, the Surescripts data would be able to capture that

7  information.

8  Q.   Okay.  I want to talk to you about another slide.  And I'm

9  not sure if this one was admitted.  It's

10 Government Exhibit 4000, page 22.

11         MR. BALLEW:  I don't know if that one was admitted or

12 not, but --

13         THE COURT:  It's admitted.

14         MR. BALLEW:  It was admitted?  Okay.

15 BY MR. BALLEW:

16 Q.   So you testified about the average panel size per month

17 and some analysis that you did on that.

18      Do you recall that?

19 A.   I actually don't believe I did testify on that.

20 Q.   Oh, you didn't testify about that?

21      But that's what this slide shows?

22 A.   This slide -- because I don't believe we've spoken about

23 this so I will describe it.  This is a select group of six

24 providers where I'm looking at the documents and determining on

25 average what their, quote/unquote, panel size is, so how many

1   patients are in their panel.  And then just showing you the

2   month-over-month change of how many patients these six

3   providers on average are -- they're responsible for.

4   **Q.**   You're aware that there were hundreds of providers on the

5   Done platform, based on your review of the medical records in

6   this case; correct?

7   **A.**   I believe there are, yes.

8   **Q.**   So let me ask you a question:  How do you decide on these

9   six providers?

10  **A.**   So most of these providers, as I understand it, are --

11  have been charged, so they've been charged with a crime or are

12  somehow -- you know, the Government is directing, you know,

13  closer examination on these six.

14  **Q.**   So the prosecutors chose them for you, correct, to look

15  at?

16  **A.**   I did not choose them, no.

17  **Q.**   You did not choose them.

18      And you didn't -- you don't have a slide like this that

19  shows the average panel size per month for all of the hundreds

20  of providers who had ever practiced on the platform, do you?

21  You don't recall?

22  **A.**   I do not.  I have not done that analysis.

23  **Q.**   Okay.  So I want to talk to you now about some slides

24  about the demographics of the Done users that you were talking

25  about earlier.

1              MR. BALLEW:  And so let's pull up -- and I think this

2    is in evidence.  I could be mistaken.  Slide 49.  Of

3    Exhibit 4000, yes.

4         It's in evidence?  Yes?  Okay.

5    BY MR. FOSTER:

6    Q.   So these -- this shows -- it's -- the title is --

7              THE COURT:  49 admitted if it's not.

8              MR. BALLEW:  Okay.

9    BY MR. BALLEW:

10   Q.   So this shows Done users.  That's the title of this slide;

11   right?

12   A.   Correct.  This is my definitional that describes what a

13   Done user is.

14   Q.   And it says, you have in your notes, it says it's defined

15   as (as read):

16              "Individuals that have an appointment with

17        cancel type equal to not canceled and status

18        description not equal to canceled, no-show, or

19        provider no-show from March 2020 to January 2023."

20        That's what that says; correct?

21   A.   Correct.

22   Q.   Is that just a little bit more complicated way of saying

23   that these are all patients who scheduled an appointment,

24   showed up to the appointment, and had an appointment with a

25   provider on the Done platform?

1    **A.**    I would -- I would say that is the interpretation, I

2    think, that is correct.  But in the data, I can't say it like

3    you said it; right?  I have to respond to the data.  So this is

4    in the data the way I've determined what you just said.

5    **Q.**    Okay.

6            **MR. BALLEW:**  And if we can go to the next slide,

7    Slide 50.  And I'll ask for this to be admitted as well.

8            **THE COURT:**  Admitted.

9        (Trial Exhibit 4000 page 50 received in evidence.)

10   **BY MR. BALLEW:**

11   **Q.**    So these are Done users with Schedule II stimulant

12   prescriptions.

13           So in the last slide was anybody who had an appointment

14   and showed up to an appointment with a provider.  This slide

15   shows out of those, how many were prescribed a controlled

16   stimulant; is that correct?

17   **A.**    Exactly.

18   **Q.**    And so if my math is correct, that would mean that

19   approximately maybe a little more than one out of every four

20   patients who actually had an appointment with a Done provider

21   were not prescribed a stimulant after their appointment;

22   correct?

23   **A.**    Can you phrase it correctly again for me?  I'm sorry.  Can

24   you say it one more time?

25   **Q.**    So approximately one out of every four patients who had an

1  appointment with a Done provider did not receive a stimulant

2  prescription from their provider?

3  **A.**    So I would -- I'll repeat it back just to make sure we're

4  talking on the same wavelength.

5  **Q.**    Mm-hmm.

6  **A.**    The way I have calculated it, 78.4 percent received a

7  stimulant, so the inverse of that, right, 21.6 percent, so not

8  quite one out of four.

9  **Q.**    So maybe like one out of every four and a half,

10  approximately?

11  **A.**    How about 21.6 percent --

12  **Q.**    21.6 percent.  Okay.

13  **A.**    -- did not receive a stimulant.

14  **Q.**    Right.

15       And that's approximately, like, 29,000 people, if my math

16  is; right?

17  **A.**    Well, let's just -- 29,025.

18  **Q.**    Okay.  And you're not making any assessment about what

19  anybody's motivation going on a platform that advertises itself

20  as an ADHD treatment platform is when they're seeking the

21  platform out, are you?  That's nowhere part of your assessment

22  here?

23  **A.**    The first part is that my -- the motivation of people?  I

24  cannot testify to the motivation of people.

25  **Q.**    Okay.  You understand and you have had some slides on the

1  fact that a Done patient could schedule an appointment after

2  they had taken some sort of user assessment and that was the

3  bar -- the graph?

4         MR. BALLEW:  And we can go to page 58 of Slide --

5  Slide 58 of Exhibit 4000.

6  BY MR. BALLEW:

7  Q.   You talked about these user assessment groups?

8  A.   Yes.

9  Q.   And you have over here in orange, people who score greater

10  than 4 on the ASRS-A; is that correct?

11  A.   Correct.

12  Q.   And do you have any understanding what it means for when a

13  patient in a clinical setting is -- takes a ASRS, what a

14  greater than 4 -- or equal to 4 means on the assessment?

15  A.   I'm not a clinician so I don't --

16  Q.   Okay.

17  A.   I don't have any firsthand knowledge on that.

18  Q.   You don't know if it's calculated as people who are likely

19  to have ADHD based on their own self-report?

20         MR. FOSTER:  Objection.  Foundation.  He's not a

21  clinician.

22         THE COURT:  Sustained.

23         MR. BALLEW:  Okay.

24  BY MR. BALLEW:

25  Q.   And then you have in the gray, those are the people who

1  scored less than 3 but are not in that -- that blue category;

2  correct?

3  **A.**    Just to be precise, less than or equal to 3.

4  **Q.**    Oh.  Yes.  Less than or equal to 3.  Okay.

5       And you see -- you have messages here, and I believe you

6  said this was from an internal Done document, of what people in

7  orange would have in terms of "seems like a fit," and then what

8  people in gray would have is "you are in a good spot."

9       Do you see that?

10  **A.**    I do.

11  **Q.**    And the people who are told that they are in a good spot

12  are told (as read):

13          "Based on your responses, it's less likely you

14      have ADHD.  You could still continue and confirm the

15      diagnosis with our providers."

16      Do you see that?

17  **A.**    I do.

18  **Q.**    Do you have an understanding of whether they get this

19  message saying that they're not likely to have ADHD before or

20  after they're asked to shell over $200 for an initial

21  appointment with a provider?

22  **A.**    I don't know exactly the timing and the sequencing of when

23  this message would pop up versus when they would be asked for

24  money.

25  **Q.**    Well, let's look at the underlying document that you

 1  relied on to -- to get this message.

 2          **MR. BALLEW:**  Can we go to Exhibit 1363.

 3          **THE COURT:**  Is that in evidence?

 4          **MR. BALLEW:**  Yes, this is in evidence.

 5          **MR. FOSTER:**  It is.

 6          **THE COURT:**  Okay.  Thank you.

 7  BY MR. BALLEW:

 8  **Q.**  So if we can -- can we go to the page -- let's actually go

 9  through some of -- some of this.

10      Let's go -- let's start at page 3.

11      You see that this says (as read):

12          "Start at www.donefirst.com, click 'Get Started'

13      or 'Am I a Fit?'"

14      Do you see that?

15  **A.**  I do.

16  **Q.**  And then the next page shows a welcome screen and it has

17  some questions like (as read):

18          "What is your preferred gender pronoun?"

19          "What was your sex assigned at birth?"

20      Do you see that?

21  **A.**  I do.

22  **Q.**  And then the next page has that ASRS-A assessment, which

23  you said you don't have any sort of clinical knowledge about

24  how this is used in practice; right?

25  **A.**  Correct.

1    Q.    And so if we flip through until we get to page 8, this is

2    a screening -- complexity screener and I believe this is the

3    question that you discussed with Mr. Foster about that a

4    patient is asked (as read):

5            "Have you had bipolar, psychosis, schizophrenia,

6        suicidal attempts, or any mental health

7        hospitalization history in the past?"

8        Correct?

9    A.    Correct.

10   Q.    And your understanding was if they say yes to this, then

11   they do not -- they are not permitted to move forward for an

12   appointment?

13   A.    I would say I put them in the blue bar.  Whether or not

14   they can get an appointment I did not research.

15   Q.    Okay.  Can we go on to the next slide?

16       There's a slide that says (as read):

17           "Fraud protection & security:  Prevent attempts

18       to go back and change answers.  Prevent multiple

19       accounts from being created."

20       And it shows that someone has to put in their phone number

21   to verify their phone number before moving forward?

22   A.    I see this, yes.

23   Q.    Yep.

24       And then if we go to the next side, there's a two-factor

25   authentication.

1    Can you explain your understanding of what two-factor

2    authentication is?

3         **MR. FOSTER:**  Objection, Your Honor.  Consumption of

4    time.  It's all interesting but pretty far afield.

5         **THE COURT:**  I'll allow it.

6         **THE WITNESS:**  Two-factor authentication is the process

7    by which a lot of Internet and electronic platforms use.  So in

8    addition to the first factor usually being your password,

9    right, username and password, they will have a second factor,

10   which is, in this case, a text to your phone, right, here is

11   six digits, go enter it in.  So you have both your password,

12   first factor, and a direct communication with you, a second

13   factor.

14   **BY MR. BALLEW:**

15   **Q.**   And your understanding is that platforms or work or

16   anything like that, they do that to make sure you're actually

17   the person that was the one who did the first factor in the

18   authentication; right?

19        **MR. FOSTER:**  Objection, Your Honor.

20        **THE COURT:**  Well --

21        **THE WITNESS:**  My -- that is my common understanding of

22   why you would have two-factor authentication is because you

23   want to ensure that you're dealing with the person who

24   you're -- who you think that they are.

25        **MR. BALLEW:**  Okay.  Can we move on to the next slide?

1          THE COURT:  59?

2          MR. BALLEW:  No.  I meant in 1363 of the -- in this

3    document that we've been looking at, that is one of the

4    documents that's underlying the slide that Mr. Petron used to

5    create his -- his deck.

6          And then the next one.  The next one.

7    BY MR. BALLEW:

8    Q.   And so this is the message that you had for people in

9    the -- well, actually, you did not have this message on your

10   screen.  You had your -- we'll get to them in a second.

11         But this one was not in your slide deck; correct?

12   A.   Correct.  This is one that I would say is more associated

13   with the blue bar in my slide deck.

14   Q.   This would be associated with the blue bar, so someone who

15   is under 18, outside of a service area, or indicates that they

16   have a complex history, there's told they're not a fit for

17   service and they get a little red button underneath their

18   message that says "okay" instead of "continue," which leads

19   them back to the home page of the website instead of allowing

20   them to schedule an appointment?

21   A.   So there was a lot there.  I will say, it says (as read):

22              "You may not be a fit for our service."

23         The way I understand this document to work is the "okay"

24   would redirect back to the home page.

25   Q.   Okay.  And it says under "may not be a fit for service,"

1   (as read):

2           "Based on your responses, we recommend you to

3       visit a local clinic for a thorough evaluation and

4       in-person support."

5       Is that what it says?

6   **A.**    It is.  That is what it says.

7   **Q.**    And then we go to the next slide.  That's the one that you

8   had on the orange bar; is that correct, that message?

9   **A.**    Correct.

10  **Q.**    "You seem like a fit."

11      And then the next slide.  This was the one, "you're in a

12  good spot," that's what you had on the gray bar; right?

13  **A.**    Correct.

14  **Q.**    And then we're only going to go through a couple slides.

15  We don't have to go through more.

16      Next slide.  Next slide.

17      Then there's a slide that says "Pick appointment time."

18      And next slide.  There's a "Terms of Service" slide, and

19  then next slide, which says "Payment."

20      So based on this sequencing, is it your understanding that

21  you get those messages that either say you're a fit, you may

22  have -- you may not have ADHD but you can schedule an

23  appointment anyway, or we refer you to a local clinic before

24  anybody is asked to pay anything on the platform?

25  **A.**    That's correct.  That's my understanding of the way this

PETRON - CROSS / BALLEW

1   would work.

2   Q.   Okay.  So let's go back to your deck.

3        MR. BALLEW:  One moment, please.

4        All right.  So let's go back to page 50 of -- of 4000.

5   BY MR. BALLEW:

6   Q.   So you see that there are -- the hundred -- that's 105,000

7   people who were prescribed a controlled stimulant on the

8   platform; correct?

9   A.   Correct.

10  Q.   And then if we go back to 58.  And if you look at the

11  number on the blue bar of the people who were essentially

12  screened out for having a complex history, you could see that

13  that number is about 160,000 people?

14  A.   Yeah.  Some were.  The blue bar is probably in between 160

15  and 180.

16  Q.   So, in fact, more people got that message saying you

17  should be referred to a local clinic than actually were

18  prescribed a stimulant on the platform?

19  A.   That assumes that you're one to one here between my

20  definition of users and this definition of users -- user IDs.

21  Q.   Okay.

22  A.   So I don't really know the answer to that.

23  Q.   Okay.

24       MR. BALLEW:  No further questions.

25       MS. NECHAY:  Thank you.

1                    <u>CROSS-EXAMINATION</u>

2    BY MS. NECHAY:

3    Q.    Good afternoon?

4    A.    Good afternoon.

5              MS. NECHAY:    I'd like to pull up Exhibit 23 -- or

6    Slide 23 out of Exhibit 4000, please.    Perfect.

7    BY MS. NECHAY:

8    Q.    You testified that this was the amount that Dr. Brody

9    earned between the years 2020 and 2024 while at Done; correct?

10   A.    Correct.

11   Q.    And roughly that translates to, on average, $182,000 a

12   year; correct?

13   A.    I will trust your math, yes.

14   Q.    Okay.

15             MS. NECHAY:    I'd like to go ahead and then move on to

16   Exhibit -- slide Number 26, please.

17   BY MS. NECHAY:

18   Q.    I'll just lay a little bit of foundation with you for this

19   exhibit.

20         But you reviewed mortgage records that belonged to

21   Dr. Brody; correct?

22   A.    I did.

23   Q.    And his wife, Mayany Brody?

24   A.    Correct.

25   Q.    Okay.

```
 1              MS. NECHAY:  Can I kindly ask the Government to pull

 2    that up?  It's Slide 26, please.

 3              THE COURT:  What exhibit?

 4              MS. NECHAY:  Oh, it's from 4000.  It was the

 5    Slide Number 26 but it was Exhibit 4000.

 6              THE COURT:  26?  Thank you.

 7              MS. NECHAY:  Thank you very much.  I appreciate it.

 8    BY MS. NECHAY:

 9    Q.   Okay.  And you also testified that you learned in

10    connection with those mortgage records that Dr. Brody and his

11    wife, Mayany Brody, sent $378,000 roughly to family in

12    Cambodia; correct?

13    A.   Not quite correct.  I wouldn't say in conjunction with the

14    mortgage records I did not learn this fact.  This fact was from

15    the banking records that I saw, so --

16    Q.   Thank you for clarifying.

17    A.   Yeah.

18    Q.   Okay.  And then with respect -- to go back now to the

19    mortgage record issue, you did learn that, in fact, Dr. Brody

20    obtained a forbearance due to an expressed COVID hardship;

21    correct?

22    A.   That's my understanding.

23              MS. NECHAY:  Okay.  Thank you very much.  No further

24    questions.

25              MR. FOSTER:  Ms. Braga, can we bring up Exhibit 4000
```

PETRON - REDIRECT / FOSTER

1    at page 58.

2             THE COURT:  Page?

3             MR. FOSTER:  58.

4             THE COURT:  58.

5                      <u>REDIRECT EXAMINATION</u>

6    BY MR. FOSTER:

7    Q.   Mr. Petron, you were asked questions about this chart on

8    cross-examination.

9         Do you remember that?

10   A.   I do.

11   Q.   And the orange and gray bars, are those responses to the

12   ASRS-A questionnaire about ADHD?

13   A.   That's correct.

14             MR. FOSTER:  And Ms. Braga, can we pull up

15   Exhibit 4000 at page 29.

16   BY MR. FOSTER:

17   Q.   And is this the six ASRS-A questions that were asked of

18   patients to screen them before scheduling an appointment?

19   A.   That's correct.

20   Q.   And based upon your review of the data, was it your

21   understanding that whatever the patients answered on this

22   screening tool, they were able to go ahead and book an

23   appointment?

24        So whether --

25   A.   For these six, that's true, because the other screening

1  criteria had nothing to do with these six questions.

2  Q.    Now, you were also asked questions about matching to time

3  the Doxy data to the appointments themselves.

4       Do you recall those questions?

5  A.    I do.

6  Q.    And so can you explain to the jury how you did that?

7  A.    So for the counts at issue, those -- those Counts 2

8  through 5, because you saw the data and it had no patient

9  information, we went into the appointment confirmation e-mails,

10  so literally e-mails with those patients, found the start of

11  the appointments and went into the Doxy data to see if that

12  provider did indeed have an appointment that started, I think

13  it was within plus or minus 1 or 2 minutes.  I'm not recalling

14  which but it was -- it had a range, plus or minus something.

15  And then counted that as the -- as the length of the

16  appointment, however long that appointment was.

17  Q.    And so to give an example, with Mr. Band, did you review

18  appointment scheduling records for Mr. Band?

19  A.    I did.

20       MR. FOSTER:  Your Honor, we'd move to admit

21  Exhibit 1072.

22       THE COURT:  Admitted.

23       (Trial Exhibit 1072 received in evidence.)

24  BY MR. FOSTER:

25  Q.    And so is this an appointment scheduled for Mr. Band on

1    October 14th, 2020, with Nurse Rahimi?

2    **A.**    Exactly.  So this is the information that then we went

3    into the Doxy records and attempted to find on that day with

4    that provider around 11:30 Pacific is -- was there indeed a

5    meeting.

6    **Q.**    And did you have to convert that 11:30 Pacific Time to

7    something called UTC time?

8    **A.**    We did.

9    **Q.**    Can you explain that to the jury?

10   **A.**    So I said before, there was a lot of data and it was

11   messy.  This is one of things.

12        So we had to convert all time in the case into what's

13   called universal time, so that we know that time zones are not

14   affecting our interpretation of the date; right?  Whether it be

15   11:30 Pacific or 2:30 Eastern or whatever, you convert them

16   into a universal time.

17   **Q.**    And pulling up Exhibit 3072.

18        When you convert that time into UTC time, did that equate

19   to 6:30 p.m. on October 14th?

20   **A.**    I think that's right.  Seven hours from Pacific.

21   **Q.**    Do you want to see a UTC chart?

22   **A.**    Well, I'm getting kind of confused because of daylight

23   savings, because Eastern, I know it's -- I think 6:30 is right

24   so, yes, let's go with 6:30.

25           **MR. FOSTER:**  And looking at line 7, if we can

 1   highlight that, Ms. Braga.

 2   **BY MR. FOSTER:**

 3   Q.   How long was the appointment at that time?

 4   A.   12.8 minutes.

 5   Q.   And is that the appointment that you used for the initial

 6   appointment with Mr. Band?

 7   A.   It is.

 8   Q.   Now, you were also asked some questions about select Done

 9   prescribers.

10        Do you recall being asked that question?

11   A.   Correct.

12        **MR. FOSTER:**  And, Ms. Braga, can you pull up what

13   previously was admitted as Exhibit 4000 at page 68.

14   **BY MR. FOSTER:**

15   Q.   And is this an analysis that you did for the select Done

16   prescribers who you were asked about on cross-examination?

17   A.   It is.

18   Q.   And can you tell the jury what it shows?

19   A.   This shows a variety of statistics related to these six

20   providers.  So the first couple of columns relate to how much

21   they were paid, the average monthly pay, and then the max of

22   the monthly pay.

23        Then I'm showing you the number of users that were

24   prescribed Schedule II stimulants and the number of pills that

25   they were prescribed.

1        Then I'm telling you a percentage of users with an

2   appointment that received a Schedule II script, so how --

3   basically, what is the likelihood that someone got a script if

4   they saw these providers.  So you can see 90, 96, 98 percent,

5   and so forth.

6        And then lastly, I'm looking at for people that had no

7   appointment over the last 180 days, how many of them still got

8   a script without an appointment.  And you can see those rates,

9   89, 94, 93, 99, et cetera.

10  Q.   And in terms of the percent of users with an appointment

11  receiving a Schedule II stimulant prescription, approximately

12  how many other Done prescribers had prescription rates over

13  90 percent?

14  A.   There were 99 prescribers that had prescription rates over

15  90 percent.

16  Q.   Were stimulant prescriptions out of every patient who was

17  initially scheduled with them?

18  A.   That's correct.

19           MR. FOSTER:  No further questions, Your Honor.

20           THE COURT:  Anything further?

21           MR. BALLEW:  No further questions.

22           MS. NECHAY:  No, thank you.

23           THE COURT:  Thank you very much.  You're excused.

24           THE WITNESS:  Thank you, Your Honor.

25                     (Witness excused.)

 1          **THE COURT:**  Okay.  Ladies and gentlemen, you are now

 2    about to hear testimony from the mother of a former Done

 3    patient named -- patient's name is Nicholas Chieppa, who was

 4    diagnosed and treated for ADHD through the Done platform.

 5    There is no allegation that Done or any prescription issued by

 6    the practitioners at Done who treated Mr. Chieppa caused the

 7    manic or psychotic symptoms or the hospitalizations you may

 8    hear about.

 9        You may call the witness.

10          **MS. GREEN:**  Thank you, Your Honor.  The Government

11    calls Ms. Kimberly Chieppa.

12        (Kimberly Chieppa steps forward to be sworn.)

13                        <u>**KIMBERLY CHIEPPA**</u>,

14    called as a witness for the Government, having been duly sworn,

15    testified as follows:   yes

16          **THE WITNESS:**  Yes.

17          **THE COURTROOM DEPUTY:**  Thank you.  You may be seated.

18    Please state your full name for the record and spell your last

19    name.

20          **THE WITNESS:**  Kimberly Ann Chieppa, C-H-I-E-P-P-A.

21                        <u>**DIRECT EXAMINATION**</u>

22    BY MS. GREEN:

23    **Q.**   Good afternoon, Ms. Chieppa.  Where do you live?

24    **A.**   I live in Southern California in El Segundo.

25    **Q.**   Who do you live with?

**CHIEPPA - DIRECT / GREEN**

```
 1   A.   My husband.

 2   Q.   Where do you work?

 3   A.   I work for Hilton in El Segundo at the Embassy Suites.

 4   Q.   Do you have any children?

 5   A.   Yes.

 6   Q.   How many?

 7   A.   I have one son and a stepson.

 8   Q.   And how old is -- what's the name of your son?

 9   A.   Nicholas is 35 and Dustin is 45.

10   Q.   When was Nicholas born?

11   A.   June 22nd, 1990.

12   Q.   We're going to be talking about your son today.  Is it

13   okay if I refer to him as Nicholas?

14   A.   Yes.

15   Q.   Thank you.

16        For what periods -- does Nicholas live with you now?

17   A.   No, he does not.

18   Q.   For what periods of time did your son Nicholas live with

19   you?

20   A.   From the time he was born till -- I'm trying to think of

21   the year.

22        19 -- or I'm sorry, 2015.

23   Q.   About through childhood and high school?

24   A.   Yes.  Yes, of course, yep.

25   Q.   And then did he come back to live with you in around 2022?
```

**CHIEPPA - DIRECT / GREEN**

1  A.   Yes.

2  Q.   Okay.  Did Nicholas go to high school?

3  A.   Yes, he did.

4  Q.   And what did he do in terms of work after completing high

5  school?

6  A.   He worked for a retail store in Southern California.

7  Worked in a restaurant just for some side cash.  And then --

8  yeah, so, and was working at a restaurant as well.  The two

9  restaurants.

10 Q.   When Nicholas was a child, did you attend pediatrician

11 visits with him?

12 A.   Yes.

13 Q.   Was Nicholas diagnosed with ADHD as a child?

14 A.   No.

15 Q.   Was he prescribed stimulants for ADHD as a child?

16 A.   No.

17 Q.   Did Nicholas display any symptoms of inattention or

18 hyperactivity to you as a child?

19 A.   No.

20 Q.   Do you recall anyone at Nicholas' school telling you that

21 he should be sent for ADHD testing?

22 A.   No.

23 Q.   And you said Nicholas finished high school; correct?

24 A.   Yes.

25 Q.   Moving ahead a little.  In or around 2011 when Nicholas

1  was about 21, did he go to a rehab center?

2  **A.**    Yes.

3  **Q.**    What for?

4  **A.**    Opiates.

5  **Q.**    And how long was he in that rehab center for?

6  **A.**    Two weeks.

7  **Q.**    Do you know for -- when approximately that opiate issue

8  started?

9  **A.**    I believe it was after high school.

10  **Q.**    Are you familiar with a company called Done?

11  **A.**    Yes.

12  **Q.**    Did you come to learn at a point in time that your son had

13  become a Done member?

14  **A.**    Yes.

15  **Q.**    We're going to turn to the period of 2021.

16        How old was Nicholas at that point?

17  **A.**    31.

18  **Q.**    Where was he living?

19  **A.**    He was living in an apartment with a roommate in Manhattan

20  Beach.

21  **Q.**    Where was he working?

22  **A.**    He was working for Spider, which was a retail clothing

23  store.

24  **Q.**    And in early and mid-2021, how was Nicholas doing?

25  **A.**    He was doing well, very well.

CHIEPPA - DIRECT / GREEN

1  **Q.**   Where were you living?

2  **A.**   I was in El Segundo.

3  **Q.**   And for members of our jury that are less familiar with

4  that area, is Manhattan Beach close to El Segundo?

5  **A.**   Yes.  It's about three or four miles, depending on where

6  you're at, yes.

7  **Q.**   So how frequently were you interacting with your son

8  Nicholas in that time?

9  **A.**   On a weekly basis.

10  **Q.**   And was both, you know, through phone calls and visits?

11  **A.**   Visits and phone calls.

12  **Q.**   In late 2021, did you start noticing any changes in your

13  son's behavior?

14  **A.**   Yes.

15  **Q.**   Did that cause you concern?

16  **A.**   Yes.

17  **Q.**   Did you reach out to Done regarding your concerns about

18  your son in 2022?

19  **A.**   Yes.

20  **Q.**   We're going to talk about some of the factors before that.

21       What changes did you start noticing in your son in late

22  2021?

23  **A.**   Conversations with him began to -- just were not our

24  typical conversations.  They were -- he would discuss things

25  of -- have these grand ideas of things that he was going to do

1  and how he was going to do them.  But it wasn't typical

2  conversations with him.  They -- they weren't the typical

3  normal conversation.

4  Q.    Did the conversations make sense?

5  A.    Not all the time, no.

6  Q.    Did it seem like some of the points he was making were

7  divorced from reality?

8  A.    Yeah, a little bit, yup.

9  Q.    And around Christmastime 2021, do you remember any

10  particular observations about your son?

11  A.    Yeah.  We were at my other son's house celebrating

12  Christmas and he -- it was noticed from other people as well

13  that he was not -- asked if he was okay, was every everything

14  okay with him, because he seemed off and not his typical self.

15  He was very -- just wasn't himself.  It's just farfetched a

16  little bit on some of the things he was talking about.

17  Q.    Again, the way he was talking kind of didn't make sense to

18  others, essentially?

19  A.    Having a conversation, but talking about how -- how do I

20  put this?  Just things were -- if we would think about things

21  his way, that things would be easier and it wouldn't be so

22  hard, and if you just follow, you know, to do what he mentions

23  to do, then everything -- then that's -- that that would be the

24  right way to do it.

25  Q.    Okay.  Did you sometimes feel like it was a stream of

1  consciousness when he was speaking?

2  **A.**    Yes.  Mm-hmm.

3  **Q.**    And, you know, late 2021 into early 2022, did you notice

4  anything with respect to his appearance had changed?

5  **A.**    Yes.

6  **Q.**    What did you notice?

7  **A.**    Yes.  So in working in retail, he was always dressed,

8  everything matched.  Just he had a -- you know, he always

9  looked really sharp when he would leave for work.  And then

10  most recent -- and then, when things started to take a turn, or

11  things changed a bit, his -- just -- he just looked disheveled.

12  It just wasn't -- wasn't him.

13      Wasn't -- and didn't -- didn't want to say anything

14  because that was -- you know, he's -- everybody is their own

15  individual, but it wasn't typical of him to even leave the

16  house like that.

17  **Q.**    Did he look disheveled?

18  **A.**    Yes.

19  **Q.**    What did you notice about his sleep and whether he was

20  sleeping?

21  **A.**    Very -- very little sleep.  He would get up early in the

22  morning -- he would get up early in the morning and have a plan

23  and be gone all day, come back, do some things.  He maybe was

24  getting a couple hours of sleep.  Not -- but not the normal

25  eight hours, definitely not that.

1  Q.   Did he look tired when you observed his --

2  A.   All the time.

3  Q.   Apologies.  So you just have to let me finish my question

4  just so the court reporter can --

5  A.   Okay.  Sorry.

6  Q.   Not a problem.

7  A.   I'm sorry.

8  Q.   It's okay.  It's not a problem.

9       In January 2022, was your son hospitalized?

10 A.   Yes.

11 Q.   What led up -- what incidents led up to that

12 hospitalization?

13 A.   He was 5150'd.  He was -- so I had received a message from

14 a family friend that his behavior was very concerning and that

15 one of his friends was trying to reach me by phone.  And that

16 was on -- and just trying to alert me that his behavior was

17 alarming to them.  And it -- was he okay.  Was everything okay.

18      At the time, I was visiting with my mom and I was not at

19 the house at the time.  And I had reached out to my husband to

20 get an update on what was -- what the message was all about.

21      My husband had said that we didn't want to let you know

22 because you're dealing with your mom right now, but he's acting

23 extremely odd, very scary, and that was what led up to the

24 first 5150.

25 Q.   You said the behavior was very concerning.  Was he going

1  to people's houses barefoot?

2  **A.**    Yes, so he was -- he was going and knocking on doors.    He

3  knocked on somebody's door thinking it was the person that he

4  wanted to talk to and it was actually their neighbor and they

5  happened to catch it on a Ring.    And they had -- they were very

6  concerned about him and had asked me to please make sure that

7  he's okay.    But they had multiple friends that had reached out

8  and the group of friends that he had that -- had all

9  experienced the same thing.

10        Just, you know, follow me, come with me, pray with me.

11  Just something that he would never have done, ever.

12  **Q.**    Was he also yelling at his friends?

13  **A.**    Yes.

14  **Q.**    And did your husband actually stay with him the night

15  before the hospitalization?

16  **A.**    Yes.    The hospital -- yes, he had asked -- Nicholas had

17  asked for his dad to stay with him because he just -- something

18  was -- he didn't feel -- something didn't feel right.    And my

19  husband, of course, did.

20        And then everything -- you know, they stayed in the house.

21  The next morning my husband had gotten up to take a shower and

22  Nicholas had gotten up and couldn't find my husband because he

23  was in the bathroom, so he didn't physically make eye contact

24  with him.    And that's when he left the house and when he was

25  picked up by the police department.

1  Q.   And what led to the police picking him up?

2  A.   He was screaming and yelling at a woman that was walking

3  in -- near the -- near the church that's down the street from

4  us and yelling at -- calling her his wife.

5       And he's not married.  He has no kids.  He has -- you

6  know, he has no partner.  So the police had, at that point,

7  picked him up.

8  Q.   And did the police take him to the hospital?

9  A.   Yes.

10 Q.   Had your son ever been in trouble with the police before,

11 to your knowledge?

12 A.   No.

13 Q.   And was he placed on a 5150 psychiatric hold?

14 A.   Yes.

15 Q.   How long was he held for?

16 A.   48 hours.  Not the full 72.

17 Q.   And to your knowledge, what was that hospital's discharge

18 impression?

19 A.   That -- just delirium, psychotic.  I guess that --

20 Q.   Did they mention anything about bipolar?

21 A.   I --

22 Q.   That's okay if you don't remember.

23 A.   I don't remember that.

24 Q.   Yep.

25       Did you pick up Nicholas from the hospital?

1   A.    Yes, we did.  My husband and I did.

2   Q.    Where did Ms. -- Nicholas stay after the hospital visit?

3   A.    He stayed at -- with us.  At his request.

4   Q.    Did you observe what medications, if any, the hospital

5   prescribed when you took him home?

6   A.    They did not prescribe any medication.

7   Q.    Did they prescribe him stimulants?

8   A.    No.

9   Q.    And what did you observe about Nicholas' behavior when you

10  took him home from the hospital?

11  A.    He was -- he was angry.  I -- he was angry.  He was -- we

12  put him in there.  "Why did you call the police on me?"  He

13  just wasn't putting everything together.  It was something that

14  we thought was going to be an opportunity to go, "Okay, let's

15  get you some help.  Let's figure out what's happening here."

16  And he was just so angry with us.

17        And then, when we did get him home, it was a lot of

18  screaming and yelling.  And we ended up having to call the

19  police again.

20  Q.    Besides the screaming and yelling, what did you observe

21  about Nicholas' behavior between the January hospitalization

22  and February?

23  A.    Oh, to -- just a manic behavior for -- it was -- his

24  behavior was none that I've ever seen come from him.  It

25  wasn't -- he wasn't the same person.

1   Q.   Would he sort of make up stories or comments that seemed

2   unrealistic about sort of buying property, for example?

3   A.   Yeah.  So he -- when he would leave the house, I had

4   mentioned earlier about, you know, leaving early in the morning

5   and having a plan and he would go to talk to real estate people

6   about buying property and come home and have information about

7   a conversation he had about buying -- buying an acre of land in

8   Malibu for a hundred thousand dollars, and I said, "Boy, that's

9   a great deal," but I don't -- it just wasn't realistic, but it

10  wasn't about telling his -- just his thought process, it wasn't

11  logical and --

12  Q.   Would he sometimes repeat the same conversation over and

13  over again?

14  A.   Yes, verbatim.  And he would -- the rants would be

15  30 minutes long.  And the conversation -- and it would be the

16  exact same words, and I'm like how do you remember?  How does

17  this happen?  How do these words continue to come out?  Because

18  I would like -- I've heard this before.  You've said this

19  before.  We've talked about this before.

20       And then it would be -- it would just start all over

21  again.

22  Q.   Did he come to have any concerns about his Apple watch?

23  A.   Yes.  He thought there was protrons [sic] shooting out of

24  his Apple watch.  And they were sending signals.  Again, just

25  bizarre behavior.  Just behavior that I've never seen from him.

**CHIEPPA - DIRECT / GREEN**

1  Q.   Was -- you were living with him -- or he was living with

2  you at -- again, at this time; right?

3  A.   Yes.

4  Q.   Was he sleeping?

5  A.   No.

6  Q.   Was Nicholas employed at that time?

7  A.   He was.

8  Q.   Did you inform his job, though, about the ho- --

9  A.   I did.

10  Q.   About the hospitalization?

11  A.   Yes.

12  Q.   After that January 2022 hospitalization, did you become

13  aware that Nicholas had joined Done as a member?

14  A.   I did.

15  Q.   And how did you learn that?

16  A.   I saw a charge on my -- there was a -- we have a joint

17  account.  There was a charge on the account from that provider.

18  Q.   And did Nicholas receive stimulants from Done?

19  A.   I believe he was.

20  Q.   And how did you learn that?

21  A.   Because it was on my card, and then I also found bottles

22  in the -- in the space that he was staying in that had the name

23  of the provider on there.

24  Q.   Did you take pictures of those pill bottles?

25  A.   I did.

CHIEPPA - DIRECT / GREEN

1  Q.   And you said you saw the name of the Done provider on

2  those bottles.

3       Do you recall who that was?

4  A.   Katrina Pratcher.

5  Q.   When you found out about the stimulants being prescribed

6  by Done, were you concerned?

7  A.   Yes.

8  Q.   Why?

9  A.   I was concerned about him, just with his behavior and the

10 medication possibly having interaction, whether or not.  I

11 wanted to make sure that they knew about the hospitalization so

12 they could better care for him.  So the -- making sure the

13 medication and possible -- just making sure the medication was

14 the right -- so they knew exactly what was going on with him.

15 Q.   And when you say "they," are you referring to Done?

16 A.   Yes, yes.

17 Q.   And did you try to reach out to Done in January --

18 A.   I did, multiple times.

19 Q.   How easy was it to get hold of someone at Done?

20 A.   It was an -- almost next to impossible.

21 Q.   Almost next to impossible.

22      Would you get rerouted between different automated things?

23 A.   Yeah.  It was multiple phone calls, transfers.  I would

24 call the number back, constantly phoning them just to reach out

25 because -- because I had reached out to an organization for

1  support.  I had to deal with somebody that was having these

2  types of issues and was told that if I was to reach out to the

3  doctors to give them a heads up, they, of course, couldn't give

4  me information about his particular case, but me giving them

5  the information would help to better care for him.

6       So that's what I did.

7  Q.  And did you eventually speak with someone at Done in late

8  January, 2022?

9  A.  I did.

10 Q.  Okay.  And was that Ms. Pratcher or was that someone else?

11 A.  It was both.  So --

12 Q.  In January 2022?

13 A.  In January?  In January it was the -- the -- like an

14 admin.

15 Q.  Mm-hmm.  And what did you tell that admin?

16 A.  I told the admin, I explained to her that my son was

17 having some psychotic issues.  They seemed to be bipolar to me

18 just by me reading, and that I thought it was important that

19 they would -- that they knew -- that what -- that he was

20 hospitalized as well.

21 Q.  And did you mention that he had been on a 5150?

22 A.  I did.

23 Q.  And you said you mentioned -- I think you -- that he had

24 at least symptoms characteristic of bipolar; is that correct?

25 A.  Yes.

**CHIEPPA - DIRECT / GREEN**

1  Q.   Did you also mention anything about whether you felt they

2  should be giving meds to him?  Medications to him?

3  A.   I'm sorry?

4  Q.   Did you mention anything about whether you felt they

5  should be giving medications to him?

6  A.   I didn't want them to give them -- him the medications.

7  Q.   What response did you receive from Done, if any, after you

8  spoke to that employee in January 2022?

9  A.   After I spoke to the employee, I was given a phone number

10 for Ms. -- for Katrina Pratcher and had called her multiple

11 times, and at one point in time -- and I was given the phone

12 number by the receptionist or one of the gals that was

13 answering the phone.

14 Q.   And what is that in, like, March 2022 when you called her?

15 A.   Yes, I believe so.

16 Q.   Before we get to March --

17 A.   Okay.

18 Q.   -- after -- I just want to speak briefly about one other

19 topic.

20      After Nicholas's first 5150, did Nicholas meet with a

21 different psychiatrist in person?

22 A.   Yes.

23 Q.   Dr. Hill?

24 A.   Yes.

25 Q.   Why was that?

1   **A.**   We -- first of all, he needed an appointment when -- on

2   the books when he was released from the 5150, so we had to have

3   that.

4   **Q.**   And to your knowledge, was that psychiatrist affiliated

5   with Done?

6   **A.**   No.

7   **Q.**   Okay.  And when was his first visit with Dr. Hill,

8   approximately?

9   **A.**   It was before -- it was probably a week after the

10  appointment -- or the week after the hospitalization, the first

11  one.

12  **Q.**   The first hospitalization?

13  **A.**   Yes.

14  **Q.**   And did you intend -- attend the visits with Dr. Hill with

15  your son?

16  **A.**   No, I did not.

17  **Q.**   Did you meet with Dr. Hill separately?

18  **A.**   Yes.

19  **Q.**   Why did you want to meet with Dr. Hill?

20  **A.**   I wanted to make sure that he knew what was taking place.

21  And then also with regards to the medication, that I was

22  concerned about having an interaction.

23  **Q.**   An interaction given what you were observing with

24  Mr. Chieppa?

25  **A.**   Yes.

CHIEPPA - DIRECT / GREEN

1  Q.   And from your perspective, did you feel that Dr. Hill was

2  responsive to your concerns?

3  A.   Yes.

4  Q.   Okay.  Did Dr. Hill issue stimulant prescriptions to

5  Nicholas, to your knowledge?

6  A.   No, not to -- no.

7  Q.   How do you know that?

8  A.   Because Dr. Hill -- Nicholas had asked Dr. Hill to

9  prescribe the -- the prescription and he refused to.

10 Q.   Did it concern you that, to your knowledge, Dr. Hill had

11 refused but that Nicholas was receiving stimulants from Done?

12 A.   Yes.

13 Q.   In or around February 2022, was Nicholas hospitalized

14 again?

15 A.   Yes.

16 Q.   And whose decision was it to go to the hospital that time?

17 A.   Both of ours.

18 Q.   Yours and Nicholas'?

19 A.   And his, yes.

20 Q.   Was that hospital UCLA?

21 A.   Yes.

22 Q.   What incidents or behaviors instigated that decision to go

23 to the hospital?

24 A.   There was a series of incidences that occurred.  One

25 specifically was he had left -- done one of his "I'm leaving

1    for the day," and I -- and he was gone for the day, and that

2    evening I get a phone call from a woman that said that they

3    picked up my son on the side of the freeway.  And he was

4    walking without his shoes, just the clothes on his back, and

5    they were asking -- they wanted to make sure that I was going

6    to be home because they were going to bring him home.

7         And they ended up bringing him home, and then the -- I

8    said -- when he got in the house and he was, like, on the phone

9    call with him, he had gotten the phone from the people that

10   had -- were kind enough to pick him up, thank God, and I said,

11   "Where is your phone?  What happened to your phone?"

12        "Where is your car?"  And he didn't know where it was.  He

13   didn't know what happened to it.

14        So I ended up calling into the local police in El Segundo

15   and asked them to please, help me, how do I find his vehicle.

16        And they assisted me and we ended up finding the vehicle,

17   but he didn't have his phone.  He had no cell phone.  Again,

18   his car was there, his backpack was in the front seat.  The LA

19   County Sheriff's Department sat there until I was able to --

20   somebody was able to go pick up the car.

21        That's one of the incidences that happened.  It was like,

22   "Where is your car?"  I mean, how do you lose your car?  And

23   just leaving it there and then taking off and walking on the

24   side of the freeway.  It was -- it was horrible.

25   Q.   And if you need a moment, if you want to take water or

CHIEPPA - DIRECT / GREEN

1   anything, just let me --

2   A.   Thank you.

3   Q.   -- just let me know.

4   A.   Yup.

5        Thank you.

6   Q.   Also, prior to going into the hospital, had Nicholas

7   seemed concerned about his own safety?

8   A.   Yes.

9   Q.   Did he ask you or your husband to stay with him?

10  A.   Yes.

11  Q.   Based on your observations, did it seem like he wanted

12  help?

13  A.   Yes.

14  Q.   You took him to the hospital?

15  A.   I did.

16  Q.   And do you know -- was he again placed on a 5150?

17  A.   Yes.

18  Q.   Do you know how long he was held in a hospital for?

19  A.   He was there for six days.

20  Q.   Do you know what diagnostic impression the hospital made?

21  A.   I do not.

22  Q.   Following that hospital stay, did Nicholas return home

23  with you again?

24  A.   Yes.

25  Q.   Did you observe what medications, if any, he was

CHIEPPA - DIRECT / GREEN

1   prescribed by the hospital?

2   **A.**   Yes.

3   **Q.**   Did the hospital give him stimulants?

4   **A.**   No.

5   **Q.**   To your knowledge, was Nicholas still receiving stimulant

6   prescriptions from Done after February 2022?

7   **A.**   Yes.

8   **Q.**   Did you also again observe the pills?

9   **A.**   Yes.

10  **Q.**   Were you concerned after that second hospital visit?

11  **A.**   Extremely.

12  **Q.**   Was one of the things you were doing counting the Adderall

13  pills?

14  **A.**   Yes.

15  **Q.**   Why?

16  **A.**   To make sure that he wasn't taking more medication than

17  what was being prescribed.

18  **Q.**   Did you feel like you had a -- to assume a role to care

19  for his safety?

20  **A.**   Yeah, I did.  I -- I would monitor the pills and remind

21  him to please take -- you know, this one you have to take at

22  night, this one you take in the middle of the day.  Again,

23  and -- to not give -- not giving him any of the Adderall

24  because that wasn't part of the prescription plan that was

25  given to him when he was discharged.

CHIEPPA - DIRECT / GREEN

1   Q.   So when you were saying you would tell him which pills to

2   take, you were referring to the ones prescribed from the

3   hospital that you wanted to ensure he took?

4   A.   Yes.

5   Q.   But you weren't telling him to take the Adderall?

6   A.   Correct.

7   Q.   Did you continue to attempt to contact Done after that

8   February 2022 hospitalization?

9   A.   Yes.

10  Q.   Again, was it hard to get through to someone?

11  A.   Yes.

12  Q.   Do you know approximately how many times you tried to call

13  Done between January and March 2022?

14  A.   More than 10.  A lot more than -- a lot.

15  Q.   And why again in this post-February 2022 time frame, why

16  were you so desperate to get ahold of someone at Done?

17  A.   Just to make sure that he was telling them everything that

18  was taking place.  So, you know, letting them know about the

19  second hospitalization, making sure that they were aware of

20  what was happening in his life so they can better care for him.

21  Q.   And you said at one point you were able to speak to his

22  Done provider, Ms. Pratcher; is that right?

23  A.   Mm-hmm.

24  Q.   And what did you -- was that around March 3rd, 2022?

25  A.   Yes.

CHIEPPA - DIRECT / GREEN

1   Q.   What did you say to Ms. Pratcher?

2   A.   I mentioned to her that I was concerned about the

3   prescription and wanted just to make sure, because he had

4   been -- his behavior was still consistent with what had taken

5   place when he was hospitalized and wanted to make sure that she

6   was aware of the medication that he was on and that he had the

7   second 20 -- 5150, that I didn't feel comfortable that Nicholas

8   was going to share that information and wanted to make sure

9   that she had -- that she knew so she could better care for him.

10  Q.   Did you mention when you spoke to Done that he was

11  receiving medications related to antipsychotics and

12  antidepressants and others?

13  A.   Yes.

14  Q.   Did you mention that you were concerned that he should

15  not, Nicholas should not be getting prescriptions and that he

16  might be abusing them?

17  A.   Yes.

18  Q.   What was Ms. Pratcher -- was Ms. Pratcher responsive to

19  your concerns?

20  A.   She's more concerned about how I got her personal phone

21  call -- phone number and how, you know, that it was -- she kept

22  asking me, "How did you get my phone number?  How did you get

23  my phone number?"

24       I said, "I got it from your receptionist."

25       And she said, "You better get a handle on that son of

1    yours."

2         I'm like, "Excuse me?"

3         I found it to be extremely odd.  Why would a provider,

4    somebody who's supposed to be taking care of my son, respond to

5    me like that rather than say, "Thank you.  This is very

6    helpful.  I'll be sure to make a note of this next time I have

7    a session with them."

8         But that's not what happened at all.  It was quite

9    different.

10   Q.   And besides this conversation with Ms. Pratcher, did you

11   see -- receive any other outreach or responses from people at

12   Done?

13   A.   The -- not from Done, but indirect through Nicholas was

14   getting -- he was getting messages that some woman was calling

15   to interfere with the prescription and that the person that was

16   calling Done was your -- was his mother.  And that if he wanted

17   to -- that if it continued, that they would not continue to

18   give him medication.

19   Q.   Did you receive any other responses from Done directly?

20   A.   No.

21   Q.   How did the response or lack thereof from Done compare to

22   the response you received from Dr. Hill when you had raised

23   concerns with Dr. Hill?

24   A.   It's like night and day.  I mean, Dr. Hill was very

25   concerned.  Let me speak.  Listened.  Took time with Nicholas

**CHIEPPA - DIRECT / GREEN**

1    multiple times.  I -- you know, went as far as Nicholas was

2    late calling in to a call and, you know, it was very -- you

3    know, he was very kind and waited and said, "Well, we'll

4    reschedule for another hour.  You know, this is the time to

5    call back later on today."  And he couldn't have been more

6    kind.

7    **Q.**    What did you observe about whether or not Done was --

8    Nicholas was meeting face-to-face or by video with anyone at

9    Done?

10   **A.**    It was -- because I had mentioned, I said I don't know if

11   the -- if the Adderall is something that you should be taking

12   with these other medications.  It's really important -- I'm

13   sorry.

14   **Q.**    Did you -- did you ever observe Nicholas -- because he was

15   living with you at this time; right?

16   **A.**    Right.  Yes.

17   **Q.**    Did you observe him having video visits with Done?

18   **A.**    Yeah, no, never.  His comment was, "I can get those

19   prescriptions filled in five minutes."

20   **Q.**    Did that concern you?

21   **A.**    Yes.

22   **Q.**    Did you also go to the Saint Anthony pharmacy where

23   Nicholas had been filling some of the stimulant prescriptions?

24   **A.**    Yes.

25   **Q.**    Why?

1   **A.**   Because I was concerned and letting them know that he was

2   not having face-to-face or video calls and that I wanted to

3   make sure that they were aware of that.  And that was the

4   purpose of me going there.

5   **Q.**   Did that pharmacy stop filling the prescriptions?

6   **A.**   Yes.

7   **Q.**   Do you know whether Nicholas then started using a

8   different pharmacy in March 2022?

9   **A.**   Yes.

10   **Q.**   Was it Walgreens?

11   **A.**   Yes.

12   **Q.**   At some point later in the year, did you see a charge on

13   your account for a place called Honeybee?

14   **A.**   Yes.

15   **Q.**   Did you know what that was?

16   **A.**   I didn't.

17   **Q.**   Do you know whether Done continued to issue stimulants to

18   Nicholas after you spoke with Ms. Pratcher in March 2022?

19   **A.**   It stopped at one point and I don't know exactly when that

20   was.

21   **Q.**   Before it stopped, did you observe pill bottles still from

22   Done?

23   **A.**   Yes.  Oh, yes.

24   **Q.**   And did you observe that there was a different provider's

25   name on them?

**CHIEPPA - DIRECT / GREEN**

1  **A.**    Yes.    Yup.

2  **Q.**    So to go back to my first question.

3  **A.**    Yup, sorry.

4  **Q.**    To your knowledge, did stimulant prescriptions --

5  stimulant medications continue to be issued by Done at least

6  for a certain period of time after March 2022?

7  **A.**    Yes.

8  **Q.**    Did that surprise you?

9  **A.**    Yes.

10  **Q.**    Why?

11  **A.**    Because I had reached out so many times to give them a

12  heads up that to please go on and re- -- to have deeper

13  conversation so you could better care for -- for him.  I didn't

14  feel that they had given him the time -- I didn't feel they

15  gave him the time.

16  **Q.**    And from that period of March 2022 through say closer to

17  the end of 2022, what did you observe about Nicholas' behavior?

18  Had he vastly improved or was he still having --

19  **A.**    No, we -- we would have -- no.

20       There was no improvement.  Screaming to where we would

21  need to go through the house and close windows because we

22  didn't want anyone -- any of our neighbors to hear all the

23  screaming and yelling that was happening.  It would happen

24  frequently because he had -- he -- his thought process was one

25  that if we didn't do it his way, then we were doing everything

 1  wrong and that really kind of set him off.

 2  Q.   Was he still not sleeping?

 3  A.   Yes.

 4  Q.   Did he lose friendships?

 5  A.   Yes.

 6  Q.   In terms of when you spoke to him, did you feel like you

 7  were speaking to an adult or was it more like speaking to a

 8  child sometimes?

 9  A.   No, it was more -- not an adult.  It -- without making him

10  feel like he was 12, it was that process of having -- having a

11  conversation with a 12-year-old.

12  Q.   Was he engaging in erratic behavior like throwing things?

13  A.   Yes.

14  Q.   And these behaviors, were they observable only to you or,

15  to your knowledge, others as well?

16       **MS. BELL:**  Objection, Your Honor.  Foundation.

17  Speculation.

18       **THE COURT:**  Sustained.

19  **BY MS. GREEN:**

20  Q.   When you spoke with Nicholas, how was his tone?

21  A.   Very angry.

22  Q.   Do you know whether at some point in time Nicholas'

23  membership ended with Done?

24  A.   Yes.

25  Q.   Do you know why it ended?

1  A.    Because he -- his cards were maxed.  His credit card was

2  maxed out and they were no longer able to charge on the card.

3  Q.    And that's when, to your knowledge, the membership ended?

4  A.    Correct.

5  Q.    Can you describe to the jury how concerned you were for

6  your son in 2022?

7         MS. BELL:  Your Honor, cumulative.

8         THE COURT:  Sustained.

9  BY MS. GREEN:

10 Q.    Overall, what is your view of how Done treated your son?

11        MS. BELL:  Objection, Your Honor.  Same --

12        THE COURT:  Sustained.

13        MS. GREEN:  Your Honor, I don't --

14        THE COURT:  Sustained.

15        MS. GREEN:  One moment, Your Honor.

16 BY MS. GREEN:

17 Q.    What was your reaction with respect to the response you

18 received from Done when you reached out?

19        MS. BELL:  Objection, Your Honor.  Cumulative.  Asked

20 and answered.

21        THE COURT:  Sustained.  I think it's obvious.  She's

22 testified to it.

23        MS. GREEN:  One moment, Your Honor.

24              (Pause in proceedings.)

25        MS. GREEN:  Thank you.

 1              THE COURT:  Anything further?

 2                        CROSS-EXAMINATION

 3   BY MS. BELL:

 4   Q.   Good afternoon, Ms. Chieppa.  I only have a few questions

 5   for you today.

 6   A.   All right.

 7   Q.   So starting with your son's past diagnosis of ADHD, the

 8   prosecutor asked you about whether he had been diagnosed as a

 9   child.

10        Do you remember that?

11   A.   Mm-hmm.

12              MS. BELL:  Okay.  Could we go to Government

13   Exhibit 3051 at page 2?  This is already in evidence.

14        If we can just put that up for the jury.  Thank you.

15   BY MS. BELL:

16   Q.   So I'm showing you the hospital records from your son's

17   first hospitalization in January.

18   A.   Mm-hmm.

19              MS. BELL:  And if we could just go to page 9 of those

20   records at the bottom where it says -- sorry, page 8, please.

21   BY MS. BELL:

22   Q.   Okay.  Do you see there, there's a note that says (as

23   read):

24              "Diagnosis ADHD diagnosis in 2010."

25        Do you see that?

1    A.    Mm-hmm.

2    Q.    Okay.  And so that would have been about over 10 years

3    before 2021 when your son was first treated at Done?

4    A.    That sounds right.

5    Q.    Okay.  And then if we could just go to the next page,

6    page 9.

7         Do you see there it says (as read):

8              "CURES reviewed.  Adderall since 11"?

9    A.    That may be the case, but it wasn't anything that I was

10   aware of.

11   Q.    Completely understand.

12        And if we could just go to page 54, the physical

13   examination.

14        So you described this event with the woman which led to

15   the first hospitalization?

16   A.    Mm-hmm.

17   Q.    And do you see here, there was a physical examination done

18   and it seems like by the time Mr. Chieppa was at the hospital,

19   they found him to be in no acute distress.

20        Do you see that?

21   A.    Yup.

22   Q.    And then it says down there (as read):

23              "Neurological:  Alert and oriented to person,

24        place, time and situation."

25        Do you see that?

1   A.   At the very bottom?

2   Q.   Yes.  Just right next to "neurological."

3   A.   Mm-hmm.

4   Q.   Okay.

5           MS. BELL:  We can take that down.

6       And let's just take a quick look at the second -- the

7   records of the second hospitalization.  This is

8   Government Exhibit 3053, just the first page.

9           MS. GREEN:  Objection.  Foundation as to these

10  records.

11          THE COURT:  Overruled.

12  BY MS. BELL:

13  Q.   And do you see there, again we see this diagnosis of ADD?

14  A.   Mm-hmm.

15  Q.   And if we could go to page 9, the physical exam.

16      And do you see here again under neurological (as read):

17          "Alert and oriented to person, place and time."

18      It's down --

19  A.   I'm sorry.  At the very bottom of the page?

20  Q.   Yeah, down there at the bottom, exactly.

21  A.   Where it says neurological --

22  Q.   Right.

23  A.   General, yes, I see that.

24  Q.   Okay.  And up at the top, it says "General," he's not in

25  acute distress.

1    Do you see that?

2  **A.**   I do see that.

3  **Q.**   Okay.

4         **MS. BELL:**  We can -- we can take that down.

5  **BY MS. BELL:**

6  **Q.**   Now, you mentioned eventually your son was discharged from

7  the Done platform; right?

8  **A.**   Yep.

9  **Q.**   And after that --

10 **A.**   Not that he was discharged.  I just know that it -- the

11 prescription ended.

12 **Q.**   Yes.  Thank you for that.

13        And after that, he started seeing a psychiatrist named

14 Dr. Ayoosh Kakkar; right?

15        **MS. GREEN:**  Objection.  Foundation.

16        **THE COURT:**  Well, that's not the point.  The question

17 is whether it's relevant.  Now we're talking about subsequent

18 to Done's treatment.

19 **BY MS. BELL:**

20 **Q.**   Yes.  It was about two months after, in February.  Do you

21 recall telling the Government that when you met with them?

22 **A.**   Yes.

23 **Q.**   Okay.  And you know that your son was getting Adderall

24 prescriptions after he was treated at Done; right?

25        **MS. GREEN:**  Objection.  Relevance, 403.

1          THE COURT:  Overruled.

2     BY MS. BELL:

3     Q.   Do you recall telling the Government that your son was

4     getting Adderall prescriptions after his treatment at Done

5     ended?

6     A.   Yes.

7     Q.   Okay.  Now, you told us about your efforts to contact

8     Done.  And if I understood your testimony correctly, eventually

9     you did -- you connected with -- I think you described the

10    person as an admin; is that right, at Done?

11    A.   Or just somebody that was -- I'm not sure who -- I don't

12    remember what her name was but it was somebody that I was able

13    to finally get through to that would actually listen to me when

14    I did get through and she was kind enough to give me the phone

15    number for -- for Ms. Pratcher.  But that was after multiple

16    phone calls.

17    Q.   Understood.

18         And so you spoke with Ms. Pratcher and you did understand,

19    she told you that she couldn't discuss your son's care because

20    of HIPAA.

21         Do you recall that?

22    A.   I recall that.  And I also remember speaking to her and

23    saying I understand the HIPAA laws, that you can't discuss it

24    with me, but I can certainly tell you what I'm seeing so you

25    can better care for him.

CHIEPPA - CROSS / BELL

1   Q.   Understood.

2          MS. BELL:  Can we go to 1844, which is also in

3   evidence.

4   BY MS. BELL:

5   Q.   So, Ms. Chieppa, this is your son's patient record.  You

6   see his name there at the top.

7          And then do you see down at the bottom, it says (as read):

8             "Appointment History, November '21, initial

9          online, Christina [sic] Pratcher."

10         Do you see that?

11  A.   Mm-hmm.

12         MS. BELL:  Oh, I'm sorry.  Is this -- okay.  Great.

13         And hopefully the other exhibits were displayed?

14         Yes, okay.  Okay.  Great.

15  BY MS. BELL:

16  Q.   So do you see down here the appointment history with

17  Ms. Pratcher?

18         Do you see that?

19  A.   I see one appointment on there.

20  Q.   Yes.

21         And then you see below, it says (as read):

22            "Patient's History and Diagnosis."

23         And there's some evaluation tests there.  It says (as

24  read):

25            "Probable ADHD."

1     Do you see that?

2          **MS. GREEN:**  Objection.  Foundation and 403.

3          **THE COURT:**  Overruled.

4          **THE WITNESS:**  I do see it.

5          **MS. BELL:**  Okay.  If we could just zoom out then for a

6     moment.

7     **BY MS. BELL:**

8     **Q.**   And then do you see there under Section 2, the provider

9     name Elizabeth Shapard?

10    **A.**   Yes.

11    **Q.**   Okay.  And you testified on direct that you understood

12    that a certain point -- at a certain point in time, your son's

13    care was transferred from Nurse Pratcher to Nurse Shapard;

14    right?

15    **A.**   Mm-hmm.

16    **Q.**   Okay.

17         **MS. BELL:**  Now, if we could go to page 6, please.

18    **BY MS. BELL:**

19    **Q.**   Okay.  Do you see the date, January 24th, 2022?

20    **A.**   Yes.

21    **Q.**   And there's a note here.  Do you see that?  It says (as

22    read):

23         "Received call," and then, "from mother" -- it

24         looks like there's a typo -- "today advising that

25         client was placed on a 5150, and has symptoms

1          characteristic of bipolar disorder."

2   **A.**    Right.

3   **Q.**    (as read):

4              "Client should not admin meds for ADD/ADHD."

5          Do you see that?

6   **A.**    Yes.

7   **Q.**    Okay.  Now, you never had a chance to speak with Nurse

8   Shapard; right?

9   **A.**    No.

10  **Q.**    Okay.  And so you don't know whether Nurse Shapard missed

11  this note or why she made the decision to issue additional

12  prescriptions; right?

13         **MS. GREEN:**  Objection.  Foundation.  Calls for

14  speculation.

15         **THE COURT:**  Overruled.

16         **THE WITNESS:**  I'm sorry.  Can you say that again,

17  please.

18  BY MS. BELL:

19  **Q.**    Sure.

20         You didn't speak with Nurse Shapard and you don't know

21  whether she just missed this note?

22  **A.**    I did not speak with her.  That's all I can say.  I don't

23  know what -- I can't say what I think she -- that's not for me

24  to answer.

25         **MS. BELL:**  Thank you, Your Honor.  Nothing further.

1    **MS. NECHAY:**  No, thank you.  Pass on this witness,

2    Your Honor.

3                    <u>**REDIRECT EXAMINATION**</u>

4    **BY MS. GREEN:**

5    **Q.**   Thank you.  Ms. Bell looked at some pages of some hospital

6    records with you so let's look at that.

7              **MS. GREEN:**  Can we open Exhibit 3051, please, which

8    were the records from the first hospitalization that Ms. Bell

9    discussed with you.

10        And let's go to page 9, please.  And let's zoom in on the

11   top portion under "History of Present Illness."

12   **BY MS. GREEN:**

13   **Q.**   Ms. Bell read one portion of these records to you but did

14   they also say at the top (as read):

15            "31M BIB police on 5150 DTS due to attacking a

16            stranger; pinning her against the wall.  Appears

17            intoxicated"?

18   **A.**   Yes.

19            **MS. GREEN:**  And lower down, if we zoom out, please.

20   Looking at page 10, please.  And zooming in on the

21   "Assessment/Plan" section.

22   **BY MS. GREEN:**

23   **Q.**   Does it say acute delirium, acute psychosis, and also

24   mentioned things in the paragraph below like possible

25   hallucination relating to girlfriend, feels like he wasn't in

1    control of his actions, et cetera?

2    **A.**    Yes.

3    **Q.**    Okay.  And let's look at the next hospital record that

4    Ms. Bell showed you, please, from the February hospitalization.

5              **MS. GREEN:**  Exhibit 3053, page 8.  And focusing on the

6    history section, please.

7    **BY MS. GREEN:**

8    **Q.**    Again, Ms. Bell read you one portion of this record, but

9    does this record also say (as read):

10             "Mother is at bedside.  Brought him in due to a

11        concern for worsening problematic behavior for the

12        past two months."

13        And it mentions racing thoughts, excess spending, him not

14    sleeping.  (as read):

15             "Patient says he did not realize that something

16        was wrong with him until he saw that the people

17        around him were concerned.  During the physical exam

18        with Dr. Murphy, the patient was moving his hands but

19        thought Dr. Murphy was moving them for him."

20        Does it say that?

21    **A.**    Yes.

22    **Q.**    And looking at page 13, please.

23        Again, in the "History of Present Illness" section at the

24    bottom, does it say things like when he started on Adderall in

25    November and (as read):

1          "his sleep worsened, he grew increasingly

2      impulsive.  He spent large amounts of money

3      purchasing electronics, attempted to pitch a movie

4      idea to Pixar, attempted to enter a stranger's home

5      (mayor of El Segundo notified his mother of this),

6      referred to himself as 'God' (though he is not a

7      religious person)," et cetera?

8  A.    Yes.

9  Q.    Okay.  And Ms. Bell just showed you a medical record from

10 Done.  You hadn't seen that before; correct?

11 A.    My screen is blank.

12 Q.    Oh, no.

13 A.    Okay.

14 Q.    Ms. Bell showed you the medical record from Done that you

15 hadn't seen before; correct?

16 A.    Yes.

17 Q.    Okay.  But let's take a look at that now.

18        **MS. GREEN:**  Can we go to Exhibit 3 -- 1844, please.

19 BY MS. GREEN:

20 Q.    And I believe Ms. Bell showed you page 6 so let's look at

21 where she started.

22      And you see there was a note she was reading to you from

23 January 2022; correct?

24 A.    Yes.

25 Q.    Okay.  Let's zoom out of that and see what else is in

1   here.

2       Do you see the note right above follow -- a visit from --

3   or a note from February 20, 2022?

4   A.   Yes.

5   Q.   And you see this clinician notes that mentions -- there

6   was some template text, and then says (as read):

7           "Patient declined follow-up face-to-face

8       consultation."

9       Do you see that?

10  A.   Yes.

11      **MS. GREEN:**  And let's zoom out, please.  And let's go

12  to the page above, please.

13  **BY MS. GREEN:**

14  Q.   In -- that was February.  In March 2022, do you see any

15  notes of an actual visit with the patient?  Or the same

16  template text?

17  A.   Do I see the note in front of me?

18  Q.   Yeah.

19  A.   Yes.

20  Q.   Does it again say "no face-to-face consultation" at the

21  end?

22  A.   I don't -- oh, yes, yes.  I'm sorry.

23  Q.   Okay.  I'm not going to read all these out for you but

24  let's zoom out, please.

25      So that was in March.  Do you see the same note in April?

CHIEPPA - REDIRECT / GREEN

1   A.   Yes.

2   Q.   And let's zoom out.  And we can just scroll at this point,

3   please.  Let's scroll to the next page, please.

4        Page -- do you see the same note in June and July?

5        And scroll up, please --

6   A.   Yes.  Yup.

7   Q.   -- to the next page.

8        And in August and September and November, that same note?

9        Do you see any notes of an actual --

10  A.   Yes.

11  Q.   So between that January 2022 note and that last note that

12  you then saw in November 2022, did you see anything other than

13  a template text and no follow-up visit?

14  A.   No.

15            MS. GREEN:  Thank you, Your Honor.

16            THE COURT:  Anything further?

17            MS. BELL:  Nothing, Your Honor.  Thank you,

18  Ms. Chieppa.

19            THE COURT:  Thank you very much.  You're excused.

20            THE WITNESS:  All right.

21            MS. GREEN:  Oh, yeah.

22            THE WITNESS:  Am I done?

23            THE COURT:  Yes.

24            THE WITNESS:  All right.  Thank you.

25            THE COURT:  Thank you for coming.

PROCEEDINGS

```
1                     (Witness excused.)

2          MR. FOSTER:  Your Honor, we'd move to admit two

3    exhibits, 1073 and 1074.

4          THE COURT:  Admitted.

5      (Trial Exhibits 1073 and 1074 received in evidence.)

6          MR. FOSTER:  And at this point, Your Honor, the United

7    States will rest its case-in-chief.

8          THE COURT:  Okay.  Thank you.

9          So, ladies and gentlemen, the Government has concluded the

10   evidentiary portion of its case and let me talk a little bit

11   about scheduling.

12         As you know, we will be off on Tuesday and Wednesday.  So

13   after a consultation with the parties, we've decided to spend

14   Monday basically preparing for argument in the case to get to

15   the bottom.  I'm quite sure at some point next week you will

16   get the case for decision.  I can't tell you whether it would

17   be Thursday or Friday, but we anticipate that you will have the

18   case for decision.

19         And after that, basically, your scheduling will be up to

20   you within certain oversight by me, but it will be for yours to

21   decide.

22         So you will not come in on Monday because we feel that we

23   can spend the time doing a number of things that have to be

24   done in preparation of the next phase of the trial.

25         So I want to, first of all, thank you for your attention.
```

 1    It is not concluded, obviously, so I don't want you to think

 2    about the case, express or form any opinion about the case.  We

 3    have a number of things to accomplish before you actually

 4    receive the case for decision.

 5        But, again, let me thank you.  I will see you Thursday

 6    morning at 9:15.  And until then, you are in recess.  Thank

 7    you.

 8                    (The jury leaves the courtroom.)

 9        (Proceedings were heard out of the presence of the jury.)

10        **THE COURT:**  Okay.  Let the record reflect -- please be

11    seated -- the jury is out -- or the jury is no longer in the

12    courtroom.

13        So what -- what do we suggest doing now for the rest of

14    the day?

15        **MS. BELL:**  Well, Your Honor, we could make our very

16    brief motion for -- which for now will just be one sentence.

17        Under Federal Rule of Criminal Procedure 29, we would move

18    for judgment of acquittal on all elements of all counts.  And

19    we would further move for judgment of acquittal based on

20    insufficient proof of venue as to all counts.

21        **MS. NECHAY:**  And, Your Honor, I'd like to enter in a

22    joinder on behalf of Dr. Brody as well on that motion.

23        **THE COURT:**  Okay.  I hadn't thought about the venue

24    issue.  I don't know -- I mean, as to the first -- your first

25    part, the motion is denied.

PROCEEDINGS

1    But venue, I don't know what the argument is on venue.

2    What is the argument on venue?

3    **MS. BELL:**  Well, Your Honor, we'd be happy to file

4    something.  I think we want to look at, you know, what exactly

5    is in the record and what is not, but for now, that would be

6    our motion to preserve the issues pursuant to --

7    **THE COURT:**  Well, it's not very helpful to make a

8    motion without any explanation of what the basis of the motion

9    is.

10   **MS. BELL:**  Well, Your Honor, I think the proof of

11   venue, if any, I think, came in here very much today at the end

12   of the case.  And I'm not sure -- I think to us it seems that

13   it's not sufficient to meet the Government's burden, but we'd

14   need to look back at exactly what Mr. Petron said and what the

15   exhibits admitted substantiate on that basis.

16   **MR. FOSTER:**  I think there's ample evidence and

17   documents in the record that the company was based here in the

18   Northern District of California and carried on the prescription

19   activities, the technology platform, et cetera, et cetera from

20   this district.

21   **THE COURT:**  Okay.  Well, at any rate, I will take that

22   under submission, that aspect of it.

23   **MS. BELL:**  Thank you, Your Honor.

24   **THE COURT:**  Okay.  So now we've done that.  Now,

25   moving ahead -- no, we're not going to go the rest of the

**PROCEEDINGS**

1    afternoon.

2          **MS. BELL:**  I can tell, Your Honor, we are working on

3    our submission in response to the brief that the Government has

4    filed and we intend to file that today.  I think we will be

5    more prepared to have this discussion and answer Your Honor's

6    questions in light of the tentative and the Government's brief

7    if we could defer the discussion on the legal issues until

8    Monday.

9          **THE COURT:**  We can.

10          **MS. BELL:**  But we're happy to entertain any questions

11    otherwise that the Court --

12          **THE COURT:**  Well, okay, so let's -- the legal issues

13    will be discussed on Monday.  To the extent that you wish to --

14    I mean, we've had -- I don't know whether they've all been on

15    the record or not about discussions of witnesses and so forth.

16    I think for the most part, they have, but if there's -- I don't

17    want to preclude anybody from augmenting the record if they

18    think it should be.  But if you do want to augment the record

19    in terms of your presentation, please do so by noon tomorrow.

20          **MS. BELL:**  Yes, Your Honor.  As to the witnesses

21    for --

22          **THE COURT:**  Yes.

23          **MS. BELL:**  Yes, Your Honor.  We intend to file our

24    brief, as well as the Court had requested on the issue of the

25    documents, the different categories.  So we will make sure all

**PROCEEDINGS**

 1    of those filings are in.

 2            **MR. SCHACHTER:** And, Your Honor, I guess I should say,

 3    there are a number of defense exhibits which we have -- and

 4    what we are going to do this weekend is try to -- try to limit

 5    that to what is absolutely -- what we feel is absolutely

 6    necessary. And we're going to take the weekend to do that so

 7    that on Monday we'll be able to -- to the extent that we have

 8    issues, and we'll talk to the Government over the course of the

 9    weekend and see, you know, what objections, if any, they have.

10    And so we will try to narrow the issues that we have for the

11    defense case to be addressed Monday morning.

12            **THE COURT:** Yes, that's fine. But what I want to do

13    is take advantage of e-filing and the opportunity of this --

14    this weekend to look at it before Monday so I don't have to do

15    seat-of-the-pants-type of ruling.

16        I mean, there isn't a -- I quite understand that we're not

17    meeting on Tuesday and not meeting on Wednesday, but I'm rather

18    hopeful that at the close of business on Monday, the decisions

19    will be made in connection with the scope of the case, the

20    Defense scope, so that we can proceed expeditiously and -- as

21    well, so I would hope that be the case.

22        Anyway, okay. That's fine.

23            **MS. BELL:** Yes, Your Honor. And I think our hope

24    would be to give the Court and the Government an estimate of,

25    you know, if Your Honor were to allow us to do what we've set

1    out to do, and understanding the Court's rulings earlier today,

2    we will give a time estimate.  But our feeling is this would

3    be -- would take not even a full day is our goal, perhaps half

4    a day or something in that range.  So we are looking at our

5    case with an eye to time as well and we are happy to update

6    the Court in connection with our filings on those issues.

7         THE COURT:  Great.

8         MR. FOSTER:  May I raise one issue?

9         THE COURT:  Of course.

10        MR. FOSTER:  Just on Mr. Levy, Your Honor.

11        THE COURT:  Pardon?

12        MR. FOSTER:  Mr. Levy.  I think they want to examine

13   him for 10 minutes but it's on a topic he was already

14   cross-examined on.  And he was cross-examined for over eight

15   hours, so I think it would be well within the Court's

16   discretion not to recall a witness who was cross-examined for

17   that length on a topic he was already cross-examined on.

18        THE COURT:  It would really have to be something that

19   you didn't have notice of or have the opportunity to examine

20   him on.  Bringing back people is such a dreadful idea that,

21   you know -- also, it makes it look bizarre in front of the

22   jury.  Why didn't they -- they'll go back and they'll ask why

23   didn't they ask him then?  Why are we -- and then they'll come

24   to the conclusion, perhaps, that, well, that's because the

25   Defense doesn't have a defense.  I mean, really.  So I just

1  think you could be circumspect about it.  And you know what?  I

2  know you will be.

3      **MR. SCHACHTER:**  Of course.  Of course, Your Honor.

4  And, I mean, there are two alternative witnesses who have not

5  been called who are now under subpoena, but it -- it seems,

6  given the fact that Mr. Levy is under the Government's control,

7  it seems much easier just to do it through him as opposed to

8  bringing in these two different people.  So we thought that

9  will be the most efficient way of handling this.  It would be a

10 10-minute issue.

11     **MR. FOSTER:**  I don't think it was an issue that was

12 not known, as Your Honor suggested, or not --

13     **THE COURT:**  You know, we've had a lot of discussion

14 about state of mind.  So I read my learned colleague's opinion

15 and I think he's right, but, I mean, I don't know that it

16 necessarily proves what you want it to prove.

17     As I read that -- the 803(3) exception, the first thing is

18 to make a determination, is it hearsay?  That is, is it

19 introduced for the truth of the matter?

20     If the answer is it's not hearsay, then I don't -- then

21 that's -- then we don't look at the exception to the hearsay

22 rule.

23     On the other hand, statements such as "I want" -- an

24 example, "I want everybody to have a full examination,"

25 whatever.  Okay.

1          Now, that's hearsay because it is actually being

2    introduced for the truth of the matter that that is, she is

3    saying, I want full examinations.  And if so, if it is evidence

4    that she believed or she stated or she opined that that was --

5    that would be important, so it is actually hearsay.

6          Now, the question is, is it an exception to the hearsay

7    rule?  You move on.  You don't get to 803(3) unless you've

8    decided it's hearsay.  That's what Professor Louisell would

9    have told me at law school.

10         So, now going to is it an exception to the hearsay rule,

11   the answer is perhaps, but it has to have all the indicia of

12   not being a fabrication.  So, in other words, if somebody gets

13   up and says something that's exculpatory, having -- being --

14   and the theory of the case is that this is part of not what she

15   said, but, actually, her conduct was inconsistent with that --

16   with that statement, is -- is not her -- is not -- doesn't come

17   in as a state of mind.

18         The point of the state of mind is that it has to be fresh,

19   that is it's not unlike a spontaneous utterance, or it's not

20   unlike a -- it's not unlike a spontaneous utterance because it

21   is uttered without any opportunity for the person to reflect

22   and -- and -- and fabricate a story.  And that's why it's an

23   exception.  It shows immediately what she's thinking without

24   any -- any design that perhaps she's simply giving a false

25   statement and that's why it's admitted as an exception to the

1  hearsay rule.

2      So I'm not telling you -- I'm not telling you these

3  statements.  You -- but when you go through these statements

4  that you want, it's got to meet that test.  Okay?

5          MR. SCHACHTER:  Understood, Your Honor.

6          THE COURT:  That's my understanding of what the good

7  judge next door said, so -- which you brought to my attention.

8  Unfortunately, he's away so I can't congratulate him on his

9  sagacity.

10         MR. SCHACHTER:  Your Honor, I completely agree.

11 I guess, the one issue, of course, that the courts, in

12 circumstances like this, of course, need to grapple with is, is

13 this a -- is the Court going to -- is this, ultimately, a

14 question for the jury as to whether or not it is a statement

15 made with intent to fabricate, or is the Court going to remove

16 that and make the decision itself?

17         THE COURT:  Me.  It's a threshold question, it's an

18 evidentiary question.  The last thing I want to do is poll the

19 jury on whether they think some evidence should be admitted.

20         MR. SCHACHTER:  Well, I guess the question is -- at

21 times -- at times, depending on the circumstances, of course,

22 of the particular piece of evidence, the question is, is this

23 argument for the Government to say, well, but we all know that

24 she was trying to fabricate this.  This isn't true.  Is that an

25 argument that the jury -- that is within the province of the

**PROCEEDINGS**

1  jury?  Or in its gatekeeping function, is this a decision that

2  the Court is going --

3          **THE COURT:**  Okay.

4          **MR. SCHACHTER:**  -- to make that the jury should not

5  see --

6          **THE COURT:**  The answer is no and yes.  No, the jury

7  doesn't get it.  And yes, it is part of my gatekeeping

8  function.  I mean, which you can take exception to.  That's

9  fine.

10          **MR. SCHACHTER:**  Understood.  Thank you, Your Honor.

11          **THE COURT:**  Okay.  Anything else?  You were going to

12  indicate -- do you have anything to indicate?

13          **MS. NECHAY:**  No, Your Honor.  I'm going to be filing

14  my brief this weekend.

15          **THE COURT:**  Pardon me?

16          **MS. NECHAY:**  I'm going to be filing my brief this

17  weekend, updating the Court and counsel as to my witnesses and

18  my offer of proof.  But other than that, nope, that's all I've

19  got.

20          **MR. FOSTER:**  Thank you, Your Honor.

21          **THE COURT:**  Yes.

22          **MR. FOSTER:**  Thank you.  It's been a pleasure.

23          **THE COURT:**  Oh, thank you.

24          **MR. FOSTER:**  Thank you.

25          **THE COURT:**  There we go.  We're finished.

PROCEEDINGS

1          **MR. SCHACHTER:**  Your Honor, with apologies.  I just

2    wanted to say, we -- so I attempted to provide the Court with

3    the contours of our defense case now much more limited, and --

4    however, I don't mean to suggest that there isn't the

5    possibility of a -- of a, you know, five-minute witness on this

6    point or a five-minute witness on that point, which we'll

7    discuss with the Government.  For example, there remains the

8    authentication issue that we may need a witness for, but we'll

9    discuss with the Government.  There's another short witness

10   that we'll -- we've also already identified for the Government.

11          **MR. FOSTER:**  Of course.

12          **MR. SCHACHTER:**  Thank you.

13          **MS. BELL:**  Thank you.

14          **MS. NECHAY:**  Thank you.

15          **THE COURTROOM DEPUTY:**  What time do you want to meet

16   on Monday?

17          **THE COURT:**  Oh, wonderful.  Let's meet at 9:30.

18              (Proceedings adjourned at 2:56 p.m.)

19                      ---o0o---

20

21

22

23

24

25

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:   Friday, November 7, 2025

_____
Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG, CSR No. 12219
Official Reporter, U.S. District Court