**Volume 3**

**Pages 443 - 720**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )    **NO. 3:24-cr-00329-CRB** |
| | ) |
| RUTHIA HE and DAVID BRODY, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

San Francisco, California
Tuesday, September 30, 2025

**<u>TRANSCRIPT OF PROCEEDINGS</u> (CORRECTED)**

<u>**APPEARANCES**</u>:

For Plaintiff:

      CRAIG H. MISSAKIAN
      United States Attorney
      Northern District of California
      450 Golden Gate Avenue
      San Francisco, California 94102
  **BY: KRISTINA GREEN**
      **ASSISTANT UNITED STATES ATTORNEY**

      U.S. DEPARTMENT OF JUSTICE
      FRAUD SECTION
      950 Pennsylvania Avenue NW
      Washington, D.C. 20530
  **BY: JACOB N. FOSTER,**
      **ACTING CHIEF, HEALTHCARE FRAUD UNIT**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By: Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
      Official Reporter, CSR No. 12219

**APPEARANCES**:   (CONTINUED)

        U.S. DEPARTMENT OF JUSTICE
        CRIMINAL DIVISION
        1400 New York Avenue NW
        Washington, D.C. 20001
  BY: **EMILY GURSKIS, ASSISTANT CHIEF**

        JOSEPH NOCELLA, JR.
        United States Attorney
        Eastern District of New York
        271-A Cadman Plaza East
        Brooklyn, New York 11201
  BY: **ARUN BODAPATI, TRIAL ATTORNEY**

For Defendant He:

        WILLKIE FARR & GALLAGHER LLP
        2029 Century Park East - Suite 2900
        Los Angeles, California 90067
  BY: **KOREN L. BELL, ATTORNEY AT LAW**

        WILLKIE FARR & GALLAGHER LLP
        787 7th Avenue
        New York, New York 10019
  BY: **MICHAEL S. SCHACHTER, ATTORNEY AT LAW**
      **STEVEN J. BALLEW, ATTORNEY AT LAW**

For Defendant Brody:

        LAW OFFICE OF VALERY NECHAY
        Law Chambers Building
        345 Franklin Street
        San Francisco, California 94102
  BY: **VALERY NECHAY, ATTORNEY AT LAW**

Also Present: **Thifany Braga**
        **Simon Hall**
        **Andy Cepregi**
        **Ashley Moore**
        **Michael Yu Zhu, Mandarin Interpreter**
        **Barbara Hua Robinson, Mandarin Interpreter**

**I N D E X**

Tuesday, September 30, 2025 - Volume 3

| GOVERNMENT'S WITNESSES | PAGE | VOL. |
|---|---|---|
| **MENESINI, RICHARD** | | |
| (SWORN) | 449 | 3 |
| Direct Examination by Mr. Foster | 449 | 3 |
| Cross-Examination by Ms. Bell | 609 | 3 |
| | | |
| **STESKAL, CHRISTOPHER** | | |
| (SWORN) | 695 | 3 |
| Voir Dire Examination | 696 | 3 |

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 219 | | 534 | 3 |
| 230 | | 551 | 3 |
| 248 | 580 | | 3 |
| 249 | | 580 | 3 |
| 254 | | 570 | 3 |
| 256 | 454 | | 3 |
| 281 | | 583 | 3 |
| 283 | | 594 | 3 |
| 286 | | 479 | 3 |
| 297 | | 583 | 3 |
| 302 | | 545 | 3 |
| 304 | | 548 | 3 |
| 306 | | 479 | 3 |
| 325 | | 479 | 3 |
| 335 | | 583 | 3 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 343 | | 589 | 3 |
| 349 | | 479 | 3 |
| 364 | | 583 | 3 |
| 373 | | 516 | 3 |
| 393 | | 600 | 3 |
| 432 | | 606 | 3 |
| 433 | | 606 | 3 |
| 888 | | 538 | 3 |
| 908 | | 604 | 3 |
| 910 | | 521 | 3 |
| 915 | | 474 | 3 |
| 924 | | 599 | 3 |
| 952 | | 541 | 3 |
| 1337 | | 509 | 3 |
| 1492 | | 498 | 3 |
| 1824 | | 574 | 3 |
| 6035 | | 610 | 3 |
| 6037 | | 631 | 3 |
| 6038 | | 622 | 3 |
| 6048 | | 639 | 3 |
| 6049 | | 633 | 3 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 6050 | | 618 | 3 |
| 6129 | | 669 | 3 |
| 6130 | | 665 | 3 |
| 6131 | | 678 | 3 |
| 6247 | | 663 | 3 |
| 6338 | | 627 | 3 |

PROCEEDINGS

<u>Tuesday - September 30, 2025</u>                    <u>9:18 a.m.</u>

P R O C E E D I N G S

---o0o---

(Proceedings were heard out of the presence of the jury.)

**THE COURTROOM DEPUTY:**  All rise.  Court is now in session.  The Honorable Charles R. Breyer presiding.

You may be seated.

**THE COURT:**  Let the record reflect all parties are present.

As to the -- I forget what exhibit it's called.  What exhibit is a video?  Whatever exhibit that is, we'll have a discussion outside the presence of the jury and address the issues raised by that matter -- in that matter.

**MR. FOSTER:**  Thank you, Your Honor.

**THE COURT:**  Bring in the jury.

(The jury enters the courtroom.)

(Proceedings were heard in the presence of the jury.)

**THE COURTROOM DEPUTY:**  Please rise for the jury.

**THE COURT:**  Let the record reflect all jurors are present.  Parties are present.  You may proceed.

**MR. FOSTER:**  Thank you, Your Honor.  The United States calls Richard Menesini.

(Richard Menesini steps forward to be sworn.)

**THE COURTROOM DEPUTY:**  Please stand to be sworn.

\\\

1          **RICHARD MENESINI**,

2  called as a witness for the Government, having been duly sworn,

3  testified as follows:  Richard Menesini.

4          **THE COURTROOM DEPUTY:**  Please state your full.

5          **THE WITNESS:**  Richard Joseph Menesini,

6  M-E-N-E-S-I-N-I.

7                    **DIRECT EXAMINATION**

8  **BY MR. FOSTER:**

9  **Q.**    Good morning, Mr. Menesini.

10  **A.**    Good morning.

11  **Q.**    Where do you live?

12  **A.**    Seattle, Washington.

13  **Q.**    How long have you lived that in that area?

14  **A.**    About eight years.

15  **Q.**    What do you do for work?

16  **A.**    I work at startup called Auto Complete.  We do auto

17  insurance.  It's in insure tech.

18  **Q.**    Okay.  And you said a startup.  Do you work in the tech

19  industry?

20  **A.**    I do, yeah.  I have for quite a while.

21  **Q.**    Okay.  About how long have you worked in the tech

22  industry?

23  **A.**    About 12 years.

24  **Q.**    Did you go to college?

25  **A.**    I did, yes.

1 **Q.** Did you graduate?

2 **A.** I did not.

3 **Q.** Did there come a time when you became familiar with the

4 company called Done?

5 **A.** Yes.

6 **Q.** How did you become familiar with Done?

7 **A.** Originally, I was introduced to Ruthia through a friend

8 that, during COVID, introduced me because I was looking for a

9 job and so introduced me to Ruthia, and I started talking to

10 her about an opportunity.

11 **Q.** And did you have a job at the time?

12 **A.** I did not, no.

13 **Q.** And do you recognize Defendant He here in the courtroom?

14 **A.** I'm trying look.

15 Oh. Yes, I do.

16 **Q.** Can you identify her by an article of her clothing?

17 **A.** Yes, wearing the grayish sweater.

18 **THE COURT:** Let the record reflect that the witness

19 has identified the Defendant He.

20 **BY MR. FOSTER:**

21 **Q.** Did you take a job at Done?

22 **A.** I did, yes.

23 **Q.** And who hired you?

24 **A.** Ruthia did.

25 **Q.** And when you joined Done, who did you report to?

1    **A.**    Ruthia.

2    **Q.**    When you joined Done, were you excited about the

3    opportunity?

4    **A.**    Very much so, yeah.

5    **Q.**    Can you explain to the jury why you were excited about the

6    opportunity?

7    **A.**    I was excited about the opportunity because it was a role

8    that I was going to be passionate about because I myself have

9    ADHD, and I saw that, you know, there was this opportunity to

10   potentially create a, you know, platform that was going to be a

11   space that someone could go to talk to a doctor, you know,

12   psychiatrist, something like that, and get the help they need,

13   get diagnosed if needed, and, you know, get the prescriptions

14   and help that they're looking for.

15   **Q.**    And although you were passionate about the idea, did you

16   eventually leave Done?

17   **A.**    I did, yes.

18   **Q.**    Can you explain to the jury why you left Done?

19   **A.**    I left Done because of -- there was a lot of concerns I

20   had around the, you know, compliance and legal things that we

21   were doing, and so I was looking at opportunities to get out of

22   there as quickly as I could.

23   **Q.**    And when you said you were concerned about the compliance

24   and the legality of the things that you were doing, can you

25   explain to the jury what you mean?

1    **A.**    Yeah.  So as I said, when I started there or when I was

2    first learning about it and getting started there, I was

3    excited about this opportunity to get into a space that was

4    going to be around ADHD and help with that.

5        I realized over time as I got there and started learning

6    about operations and digging into all that that we had been

7    sort of not hitting the legal requirements, and there was a lot

8    of feedback from clinicians, doctors, that we weren't doing

9    things properly, and I just didn't feel comfortable with any of

10   that and wanted to -- to move on from there.

11   **Q.**    And when you say there was a lot of feedback from

12   clinicians and others that Done wasn't doing things legally

13   properly, who were they giving that feedback to?

14   **A.**    Ruthia, mostly.

15   **Q.**    And did she care?

16   **A.**    She did not seem to, no.

17   **Q.**    Now, I want to go back to when you started at Done.

18       When you started at Done, was there a core management

19   team?

20   **A.**    Yes.

21   **Q.**    Were you part of that core team?

22   **A.**    Yes, I was.

23   **Q.**    How big was the core team?

24   **A.**    I believe it was about four or five people at the time.

25   **Q.**    Initially, who was in charge of the core team?

1  **A.**   Ruthia was.

2  **Q.**   And who assigned you tasks at Done?

3  **A.**   Ruthia.

4  **Q.**   And what parts of Done's business did Defendant He involve

5  you with?

6  **A.**   A lot of them.  So finance, clinician provider management,

7  recruiting, compliance.  Just kind of working with everything

8  operationally.

9  **Q.**   And what about initial appointments?

10  **A.**   Yes, absolutely.

11  **Q.**   What about follow-up appointments?

12  **A.**   Yup.

13  **Q.**   What about provider compensation?

14  **A.**   Yes.

15  **Q.**   And in your role at Done, did you regularly talk with

16  Defendant He?

17  **A.**   Yeah, a lot.

18       **MR. FOSTER:**  And, Your Honor, we have a calendar

19  invite that's been marked for identification as Exhibit 256.

20       **THE COURT:**  256 admitted.

21     Is this for -- is this the witness's calendar?

22       **MR. FOSTER:**  It is, yeah.

23       **THE COURT:**  Okay.  Thank you.

24       **MR. FOSTER:**  Well, it's a calendar invite that

25  reflects the invitation going to the witness, Your Honor.

1    THE COURT:  Well, my question is whether this is a

2   document that's being introduced for demonstrative purposes or

3   whether it's a document that is associated with the witness, if

4   the witness created it or used it in connection with the

5   testimony that he's about to give.  Do you see?

6        MR. FOSTER:  I understand, Your Honor.  Let me --

7        THE COURT:  Maybe I haven't asked it --

8        MR. FOSTER:  No, you asked it correctly, Your Honor.

9   It's not the witness's exhibit, so let me ask him a question

10  about it.  I'll mark it for identification as Exhibit 256.

11       THE COURT:  Okay.

12   (Trial Exhibit 256 marked for identification)

13  BY MR. FOSTER:

14  Q.    Did you have daily meetings with Defendant He?

15  A.    Typically, yeah.

16  Q.    Okay.  How did those meetings occur?

17  A.    They would occur for a long time through an application

18  called Tandem, but I think before that, we were using either

19  Google Meet or Zoom.

20  Q.    Okay.  And can you explain to the jury what Tandem is?

21  A.    Tandem was an application that -- you would have these

22  channels that you could go into at any time.  You could see who

23  were in those channels, and you could just jump in and have a

24  voice chat with anyone that was in there.

25  Q.    And how frequent were your communications with

1    Defendant He?

2    **A.**    At least daily.

3    **Q.**    As a result of your conversations with Defendant He, were

4    you aware of Done's business model?

5    **A.**    Yes.

6    **Q.**    And Defendant He's plan for growth?

7    **A.**    Yes, absolutely.

8    **Q.**    And her involvement in clinical matters?

9    **A.**    Yup.

10   **Q.**    Were you also aware of Defendant Brody and his role in the

11   company?

12   **A.**    Yes.

13   **Q.**    Do you see Defendant Brody here in the courtroom?

14   **A.**    I do, yes.

15   **Q.**    Can you identify Defendant Brody by an article of his

16   clothing?

17   **A.**    The red, almost checkered tie.

18          **THE COURT:**  Let the record reflect that the witness

19   has identified the Defendant Brody.

20   **BY MR. FOSTER:**

21   **Q.**    And when you got to Done, did you learn about the

22   difference between a company called Done Global and a company

23   called Done Health?

24   **A.**    Yes.

25   **Q.**    And can you explain to the jury how that related to legal

1  compliance?

2  **A.**   Yeah.   So in order for Done to have a clinic that was,

3  you know, compliant --

4          **MS. BELL:**   Your Honor, objection.   I'm sorry.

5  Foundation and speculation.

6          **THE COURT:**   Lay a further foundation --

7  **BY MR. FOSTER:**

8  **Q.**   Did you talk to --

9          (Reporter interruption for clarity of the record.)

10          **THE COURT:**   One at a time.

11          **MR. FOSTER:**   Excuse me.   I'm sorry.

12  **BY MR. FOSTER:**

13  **Q.**   Did you talk to Defendant He about the two companies?

14  **A.**   Yes.

15  **Q.**   And did you talk to Defendant He about their relationship

16  to the corporate structure at Done?

17  **A.**   Yes.

18  **Q.**   And can you tell the jury what you talked about and how it

19  related to compliance?

20  **A.**   Yeah.   So the things we discussed were that Done -- there

21  was Done Global and Done Health.   Done Health was the clinic

22  side of things where we had to have a clinical president, so

23  someone that was overseeing that had a license, that's a

24  doctor, that could technically oversee the whole thing.

25          And then the Done Global was the like sort of management

1  company of that, the tech company, as it was labeled.

2  **Q.**  And was Defendant He a clinician?

3  **A.**  She was not, no.

4  **Q.**  And on paper, who controlled the clinical practices at

5  Done?

6         **MS. BELL:**  Objection.  Leading, Your Honor.

7         **THE COURT:**  Overruled.

8         **THE WITNESS:**  On paper, that was Dr. Brody.

9  **BY MR. FOSTER:**

10 **Q.**  Okay.  In fact, what was the reality of the situation?

11        **MS. BELL:**  Objection, Your Honor.

12        **THE COURT:**  What's the objection?

13        **MS. BELL:**  Leading, Your Honor, based on how the

14 question was posed.

15        **THE COURT:**  Overruled.  Okay.

16        **THE WITNESS:**  I'm sorry.  Can you repeat?

17 **BY MR. FOSTER:**

18 **Q.**  Yeah.  In fact, what was the reality of the situation?

19 **A.**  That Ruthia oversaw all of the operations.

20 **Q.**  How much control did Defendant He have over the clinical

21 practices at Done?

22 **A.**  A hundred percent.

23 **Q.**  How much control did Defendant He have over hiring?

24 **A.**  A hundred percent.

25 **Q.**  Did Defendant He decide who got hired or did she let the

1   clinicians decide?

2   **A.**   Ruthia did, yeah.

3   **Q.**   How much control did Defendant He have over the screening

4   of patients before they reached the clinicians?

5   **A.**   100 percent control.

6   **Q.**   Did Defendant He allow the clinicians to choose their

7   screening tools or did she choose the screening tools?

8   **A.**   Ruthia chose the screening tools.

9   **Q.**   How much control did Defendant He have over the initial

10  appointments?

11  **A.**   100 percent.

12  **Q.**   Did Defendant He choose the contours of the initial

13  appointments or did she let clinicians exercise their clinical

14  autonomy?

15  **A.**   Ruthia did, yeah.

16  **Q.**   How much control did Defendant He have over clinical

17  policies for accurately diagnosing patients and weeding out

18  drug-seekers?

19          **MS. NECHAY:**  Objection.  Compound.

20          **MR. FOSTER:**  I'll rephrase, Your Honor.

21          **THE COURT:**  Overruled.  Go ahead.

22          **THE WITNESS:**  100 percent control, yeah.

23  BY MR. FOSTER:

24  **Q.**   And how much control did she have over follow-up

25  appointments?

1    **A.**    100 percent.

2    **Q.**    And did Defendant He let the clinicians exercise their

3    autonomy in deciding how frequently they would follow up with

4    patients?

5              **MS. BELL:**  Objection, Your Honor.  Foundation.

6    Speculation.

7              **THE COURT:**  Sustained.

8    **BY MR. FOSTER:**

9    **Q.**    Did you become familiar with Done's follow-up policies?

10   **A.**    I did, yes.

11   **Q.**    And did you talk to Defendant He about them?

12   **A.**    Yes.

13   **Q.**    And were you present when clinicians complained to

14   Defendant He about the follow-up policies?

15   **A.**    Yes, absolutely.

16   **Q.**    And what would the clinicians say?

17   **A.**    The clinicians --

18             **MS. BELL:**  Objection, Your Honor.  Hearsay.

19             **THE COURT:**  Overruled.

20        (Reporter interruption for clarity of the record.)

21   **BY MR. FOSTER:**

22   **Q.**    When the clinicians would complain to Defendant He about

23   the follow-up policy, what would they say?

24   **A.**    The clinicians would say that the follow-ups were often

25   not -- were not often enough or were too short, basically that

1  they weren't able to do the follow-ups that they felt were

2  needed or necessary.

3  **Q.**   And what was Defendant He's reaction?

4  **A.**   She wouldn't have, like, a reaction directly but basically

5  would not ever change or adjust those policies, and if anybody

6  else pressed her, it was typically a -- you know, "We do what

7  the patients want" type of mindset.

8  **Q.**   And when you say, "We do what the patients want," did

9  Defendant He tell the clinicians to do what they wanted or what

10 the patients wanted?

11 **A.**   Typically what the patients wanted, yeah.

12 **Q.**   And in terms of the technology that Done had -- you talked

13 about Done Global -- did it have its own proprietary technology

14 for, say, videoconferencing?

15 **A.**   Not for videoconferencing, no.

16 **Q.**   Okay.  So explain to the jury what sort of software

17 programs Done used.

18 **A.**   Done utilized a few different software programs.  So there

19 was some -- I forget the exact name of it, but we had a

20 software system that was set up for the appointments and the

21 video that was specific around working in the healthcare

22 industry.

23 **Q.**   And did Done invent that technology or did it use others'

24 technology?

25 **A.**   Used others', yeah.

1    Q.    Okay.  And what about messaging?  Did Done invent any new

2    technology for messaging or did it use the technology of

3    others?

4    A.    It -- I think at one point we -- I don't know if you would

5    consider it invent, but there was some messaging created within

6    the -- the Done-coded side of things, so the system that was

7    created by Done.

8    Q.    And who controlled that messaging?

9    A.    Ruthia did.

10   Q.    And who controlled how many messages the patients and

11   clinicians could send?

12   A.    Ruthia did, yeah.

13   Q.    And how did -- well, did Defendant He control the

14   engineering and the design of the patient experience at Done?

15   A.    Yes, absolutely.

16   Q.    Can you explain to the jury how that occurred?

17   A.    How her --

18   Q.    How she used the engineering and design of the platform.

19   A.    Yeah.  So Ruthia was -- I think she was a product manager

20   prior.  She would work specifically with any of the engineers

21   on the team to create the sort of front-end of everything, so

22   the way the website looked, the way our ads were looking and

23   being posted in places, the way the assessment would work

24   through that process for a patient that came onto the platform,

25   clicked to, you know, have an appointment, signed up -- the

1  whole works.  And then it would get assessed through a

2  questionnaire and then would have that appointment with a

3  physician.

4      And then also on the back end that, you know, the user

5  wouldn't see, but like the clinicians and the care team and

6  stuff worked through as well.

7  **Q.**   And who controlled the engineering team at Done?

8  **A.**   Ruthia did, yeah.

9  **Q.**   And how did her control of the engineering team influence

10  her ability to control clinical practices?

11  **A.**   Because she could control all aspects of the product, she

12  was able to control anything related to what the patient might

13  see or use or also what the clinicians were able to do within

14  the product.

15  **Q.**   And how did her control of engineering relate to the

16  length of initial appointments?

17  **A.**   Initial appointments could be adjusted from the back end,

18  so she was able to control who -- you know, how often we were

19  having appointments and how long they were or if they -- we

20  could even have them available on the website.

21  **Q.**   And what did she tell you about how long she wanted the

22  initial appointments to be?

23  **A.**   Initial appointments were wanting to be at short as

24  possible so that we could fit as many of them in for each

25  clinician per day.

1  **Q.**   And when you say "fit as many of them in," were clinicians

2  able to schedule their own patients or did Done schedule the

3  patients?

4  **A.**   Clinicians were not able to schedule their own patients,

5  typically.  You know, if they had a specific ask for something,

6  they might be able to, you know, fit something in, but

7  99 percent-plus of appointments were all from ads coming into

8  the website, clicking the link, going through the process

9  through the assessment.

10  **Q.**   Now, while you were at Done, did you also speak with

11  Defendant Brody?

12  **A.**   I did, yes.

13  **Q.**   What did Defendant Brody tell you about his role at Done?

14  **A.**   I don't know if defend -- or Dr. Brody said much about his

15  own role to me.  Typically, I think, that was mostly told to me

16  from Ruthia.

17  **Q.**   Okay.  And what did Defendant He tell you about

18  Defendant Brody's role?

19  **A.**   That he was the clinical president and not too much beyond

20  that, other than he was needed to be around for the -- to be

21  labeled as a clinical president on the clinic side of things.

22  **Q.**   And in reality, did he act as the clinical president of

23  Done?

24  **A.**   I would say not typically, no.

25  **Q.**   And why would you say not typically?

1  **A.**   He was often absent, I would say, and not present to

2  really give too much, you know, guidance, advice, or anything

3  around that.

4      Most was created by Ruthia and given out to the team from

5  there.

6  **Q.**   And did you interact with Defendant Brody as well?

7  **A.**   I did, yes.

8  **Q.**   And based upon your interactions with him, what was his

9  understanding of his role?

10  **A.**   I -- I don't know quite what his understanding might have

11  been.

12      I know that he typically didn't want to be working too

13  much.  He seemed very much in -- I would say vacation mode all

14  the time when I would speak with him.

15      And, you know, we didn't -- he just wasn't around very

16  often, very absent.

17  **Q.**   Now, did you also become familiar with Done's bank

18  accounts?

19  **A.**   I did, yes.

20  **Q.**   And what did you discover about Done Health and which

21  companies were taking in the money and spending the money at

22  Done?

23  **A.**   Yeah.  So the money was coming into the tech side of

24  things, not the clinic side of things, and it was also going

25  out of the tech side of things, not the clinic side of things.

1  The clinic bank accounts were pretty much empty in most cases.

2  **Q.**   And did you develop concerns that the clinic bank accounts

3  were empty?

4  **A.**   Yes, because typically when you have a setup like this,

5  you want to create a sort of management structure of the

6  businesses so that the money that goes -- you know, the clinic

7  should be the one receiving the money and paying out to

8  clinicians, and then paying the management side of things, you

9  know, moving that money over so that the management company is

10  basically getting a fee for managing that clinic.

11  **Q.**   And based upon your understanding, which company was

12  supposed to be paying the clinicians?

13  **A.**   The clinic side, so Done Health.

14  **Q.**   And in reality, which side was paying the clinicians?

15  **A.**   The Done Global side, yeah.

16  **Q.**   And what was your reaction --

17       Well, did you speak with Defendant He about this issue?

18  **A.**   I did at one point, yeah.

19  **Q.**   And what did you tell her?

20  **A.**   I just brought up my concern about the way the structure

21  was.  When I had spoken with accountants about it and looked

22  at, you know, our finances and was working with the accountants

23  on all that, you know, there was advice from them as well my

24  own, you know, digging through what needed to be done to try to

25  make sure that we had set this up properly.  So just informed

1  her --

2       (Reporter interruption for clarity of the record.)

3  **BY MR. FOSTER:**

4  **Q.**   And what was your reaction to -- what was her reaction to

5  your concern that things weren't set up properly and that Done

6  Global was the one paying all the clinicians?

7  **A.**   She didn't seem concerned about it and just kind of wanted

8  us to worry about other things.

9  **Q.**   Now, you said that Defendant He had a hundred percent

10  control over clinical practices.  During your time at Done, did

11  you raise concern with her about her overruling clinicians?

12  **A.**   Yes.

13  **Q.**   And what did you tell her about overruling clinicians?

14  **A.**   That it just didn't -- you know, it didn't seem right.  We

15  should be listening to clinicians and listening to their

16  feedback.  We had been -- we had lost some clinicians that had

17  quit because of this feedback and not, you know, being heard.

18  At least some clinicians were, you know, fired because they

19  were pushing back too much as well.

20       And on top of that, we had, you know, a doctor that came

21  in and was giving and pushing this advice, and we -- there just

22  wasn't a lot of concern from her end on all of that.

23  **Q.**   And when you say there were clinicians who were fired for

24  pushing back, who fired them?

25  **A.**   Ruthia, yeah.

1  **Q.**   And when you say clinicians left because they couldn't

2  exercise their clinical autonomy, who prevented them from doing

3  that?

4  **A.**   Ruthia did, yeah.

5  **Q.**   And you talked about your concerns about her overruling

6  clinicians.  Were similar concerns raised with Defendant He by

7  Done Global employees?

8  **A.**   Yes.

9  **Q.**   Were similar concerns raised by Done's clinical

10 leadership?

11 **A.**   Yes.

12 **Q.**   Were similar concerns raised by the prescribers working on

13 the Done platform?

14 **A.**   Yes.

15 **Q.**   Were these concerns raised a few times or many times?

16 **A.**   Many times.

17 **Q.**   And what was Defendant He's reaction?

18 **A.**   A mix of, you know, ignoring it sometimes to if, you know,

19 she responded, it was, you know, we need to keep the patients

20 happy, do what the patients want.  It was very much focused on

21 the patient and not on, you know, what the clinicians thought

22 might be best for the patient.

23 **Q.**   And did clinicians raise concern about her attitude of

24 just giving the patients what they want?

25 **A.**   Yes, absolutely.

1    **Q.**    And what would they tell her?

2    **A.**    That it was, you know, potentially unsafe or not okay

3    when -- or legal in a lot of cases to be, you know, writing

4    prescriptions and having patients go through an assessment

5    that's not quite covering everything that should be covered or

6    where they can't -- or a clinician can't spend enough time in

7    the initial appointment or have a proper follow-up in order for

8    that, you know, patient to get the proper diagnosis and the

9    assistance they need.

10    **Q.**    And you talked about people being fired if they disagreed

11    with her.  Were you and others at Done concerned about losing

12    your jobs?

13    **A.**    Absolutely, yes.

14    **Q.**    And when you say "absolutely," can you explain to the jury

15    what you mean?

16    **A.**    So Done -- when I joined, it was during COVID, so

17    obviously there was a lot of people that were, you know,

18    stressed about work and their livelihood during that time

19    frame.

20         And so with Ruthia having so much control over everything

21    and seeing that, you know, some people might have got some

22    pushback around, you know, the direction of where the business

23    was going, were being let go, then a lot of us were, you know,

24    worried if we speak up or push too much, we would also lose our

25    job and our livelihood.

1   **Q.**   And did Defendant He micromanage operations at Done?

2   **A.**   Yes, I would say so.

3   **Q.**   And can you explain to the jury what you mean?

4   **A.**   She would pay attention to sort of, you know, all the

5   little details of what was happening between -- especially

6   for -- on the patient side where the patient was coming into

7   the platform.  She was very sort of focused on, you know, the

8   product and how patients saw that product and how they would

9   convert from, you know, clicking the link to seeing the

10  assessment to signing up for an appointment, subscribing as a

11  member, and then continuing on from there.

12  **Q.**   And did she tell you what she thought needed to be done to

13  convert patients to paying members?

14  **A.**   The patients should be basically given what they want in

15  order to convert.

16  **Q.**   And what did -- did she tell you what she thought the

17  patients wanted?

18  **A.**   In most cases, patients wanted stimulants is what she

19  would say, yeah.

20  **Q.**   Okay.  And you talk about conversion.  Did Defendant He

21  talk to you about the subscription model and how Done made

22  money?

23  **A.**   Yeah.  So we talked a lot about the subscription model.  I

24  was, you know, one who calculated a lot of the payments to the

25  clinicians, so I was very well aware of how that all worked.

1    The patients could come into the platform, see the

2  assessment, sign up for an initial appointment.  When they do

3  that, they would pay an initial fee for that initial

4  appointment.  And then from there, they would see a clinician,

5  whether that was a physician or a PMHNP, which is a psychiatric

6  nurse practitioner.

7    And so they would see one of those clinicians, get a

8  diagnosis, get a prescription.  From there, in order to

9  continue getting the prescriptions, they would have to keep

10 paying a monthly fee to Done.  So they would pay the monthly

11 fee to Done.  They would then get that monthly prescription

12 each month.

13 **Q.**  And could Done users continue to get that monthly

14 prescription if they didn't pay the monthly fee to Done?

15 **A.**  They would not, no.

16 **Q.**  And did Defendant He talk to you about growth?

17 **A.**  She did a lot, yes.

18 **Q.**  And when you say she talked to you a lot about growth, how

19 important was it to her?

20 **A.**  Growth was probably the most important thing.

21 **Q.**  And why did she say -- or when you say it's the most

22 important thing, can you explain what you mean?

23 **A.**  Everything was focused on growth.  So between, you know,

24 meetings, our, you know, goals, objectives, things like that,

25 along with -- you know, there was like a monthly report that

1    was sent out to investors as well as the entire team that was

2    directly related about growth.

3        Everything was focused on growth and converting members --

4    converting, you know, people that were getting on the platform

5    into paying subscribers so that we would continue to have a

6    growing membership.

7        There was a general concern around what might happen as,

8    you know -- as COVID went on and as certain things related to

9    COVID might start disappearing and our growth would

10   deteriorate, so there was this push to try to grow as quickly

11   as we could.

12   Q.   And you talked about concern.  Did Defendant He talk to

13   you about what she was concerned about and why there was such a

14   rush to grow?

15   A.   Yes, she did.

16   Q.   What did she tell you?

17   A.   So that -- during COVID, there was a waiver on the Ryan

18   Haight Act, which allowed Done as well as other, you know,

19   clinics to provide a prescription for something like Adderall

20   or a Schedule II substance via a telehealth appointment, so a

21   video appointment, whereas typically those would always have to

22   be in person for that initial appointment per the legal sort of

23   status.

24       So there was this waiver during COVID that allowed that to

25   not be required during that time frame.  And so because of that

1  and knowing that that waiver would, at some point unknown,

2  disappear and that all those legalities would go back into

3  place, there was a push to try to grow the membership base as

4  much as possible during that time frame.

5  **Q.**  And how concerned was she that if the epidemic waned,

6  patients would go back to brick-and-mortar clinics?

7  **A.**  I don't know if she ever specifically mentioned brick and

8  mortar, but she was definitely worried that people would

9  you know, leave the platform afterward.  We would have a drop

10  in membership, and then our growth would slow drastically.

11  **Q.**  And how did that relate to the changes she made in the

12  platform to make stimulants easier to get?

13  **A.**  It was pretty much directly related, because Ruthia made

14  changes on the assessment and continued to remove portions of

15  the assessment as well as reduce or remove appointment times so

16  that we could get more patients through the door.  That way we

17  could just -- basically reduced all barriers for someone coming

18  into the platform in order to have more patients.

19  **Q.**  And did Defendant He tell you how Done would acquire new

20  users?

21  **A.**  Yes.

22  **Q.**  And what did she tell you?

23  **A.**  Kind of as I already stated a little bit.  Users would

24  come into the platform through advertisements, typically

25  through Facebook.  I think there was a few other places --

1    TikTok -- that we had advertisements listed.  They would click

2    on these advertisements, get to the website.

3         From there, they would, you know, read about what Done did

4    or was, click to book an appointment.  When they did that, they

5    would take an assessment.  And then that assessment was

6    supposed to go to the provider when that appointment started,

7    and then the -- you know, from there they would go to that

8    appointment, see the provider, get a diagnosis, get a

9    prescription, and go from then.

10   **Q.**   And you mentioned the advertisements.  Were concerns

11   raised about Done's advertising?

12   **A.**   I believe there was.  I wasn't directly raising concerns

13   about the advertising.

14   **Q.**   Mm-hmm.

15        And were the advertisements -- how did that relate to the

16   primary way of attracting users to Done?

17   **A.**   It was the primary way.  I mean, pretty much everyone was

18   coming in these through advertisements.  So we were paying

19   large sums of money to Facebook, Google, things like that, for

20   these ads that would then drive these customers, patients, into

21   getting onto the website and going from there.

22   **Q.**   And did Defendant He talk to you about her background in

23   user experience?

24   **A.**   Not a lot, but I was aware of it, yeah.

25   **Q.**   Okay.  And can you tell the jury what you were aware of?

1   **A.**   That she had worked in product and user experience at

2   Facebook and that she was actually very good at building a

3   good-looking product and creating good user experience.

4   **Q.**   And did she tell you she had studied what Done users

5   wanted?

6   **A.**   She did, yeah.

7   **Q.**   And what did she tell you, based upon her studies, what

8   Done users wanted?

9   **A.**   They wanted a prescription.

10  **Q.**   And according to Defendant He, did Done's users want

11  actual psychiatric care or did they want just a prescription?

12  **A.**   A prescription, yeah.

13  **Q.**   And if we --

14          **MR. FOSTER:**  We have a document sent to and from this

15  witness and the defendant that's been marked as Exhibit 915,

16  and we'd move to admit it.

17          **THE COURT:**  915 admitted.

18      (Trial Exhibit 915 received in evidence.)

19  **BY MR. FOSTER:**

20  **Q.**   Do you recognize Exhibit 915, Mr. Menesini?

21  **A.**   Yes.

22  **Q.**   Okay.  And is this an exchange between you and

23  Defendant He?

24  **A.**   It is, yes.

25  **Q.**   Did you write to her (as read):

1          "Top three NPS scores out of the hundred biggest

2      grands:  1, Costco 79; 2, Starbucks, 77; 3, Samsung,

3      67."

4  A.    Yes.

5  Q.    Can you explain to the jury what an NPS score is?

6  A.    NPS is a net promoter score, which is a score -- if you've

7  ever been to a store or bought something online where you see

8  that survey -- it's a very small survey that says, you know:

9  From 1 to 10, would you recommend this service to a friend or

10 someone that you know?

11      When you choose that, it's creating this net promoter

12 score for that business, and so the -- I believe it's the 9 and

13 10s are positives, 8s are neutral, and anything below that are

14 negatives.

15      And so -- and then so that -- there's a bit of a small

16 algorithm, then creates this score from negative 100 up to 100

17 points.  And so a score of, you know, above 50 is actually a

18 very good score, typically, as far as some -- a user or someone

19 of a product wanting to recommend that to other people.

20 Q.    Did Defendant He tell you how high she wanted Done's NSP

21 scores to be?

22 A.    Yes.

23 Q.    What did she tell you?

24 A.    80 was typically the number I saw, but we -- she wanted us

25 to be higher than, you know, any competition, such as like what

1  you see here in Hims or even non-related businesses.

2  **Q.**   And how did -- what did she tell you about having a high

3  NPS score related to revenue?

4  **A.**   That it was, you know, almost directly related to revenue

5  because people are liking your product and, you know, saying

6  that they would recommend it to other people.  Then there will

7  be word of mouth and growth through that, and people are

8  wanting to use that product.

9  **Q.**   Did you have concerns about Defendant He comparing Done to

10 a company like Starbucks?

11 **A.**   Yes.

12 **Q.**   Can you tell the jury what your concerns were.

13 **A.**   I personally didn't feel like, you know, an NPS or a user

14 satisfaction was a good measure of how good we were doing

15 because we were a -- like a clinic that should be focused on

16 helping the patient, not doing what the patient wants.

17     So something like Starbucks, like the customer is always

18 right.  You order a latte, you should get a latte, but when you

19 go to the doctor, you should be listening to your doctor and

20 what the doctor is recommending.

21 **Q.**   And did you have conversations with Defendant He about the

22 difference between a customer and a patient?

23 **A.**   Yes.

24 **Q.**   And what was her reaction?

25 **A.**   Kind of, once again, it was either -- any time any

1    conversation like this occurred, it was either ignore or push

2    back that it was the patient first that we should be focused

3    on, what the patient wants.

4    **Q.**   And so when she said that Done should be focused on what

5    the patient wants, what would happen at Done when a patient

6    complained about not getting stimulants?

7    **A.**   They would be moved to see another physician or clinician

8    at the company so that -- and typically one that might be more

9    apt to give a diagnosis.

10   **Q.**   And when you say "more apt to give a diagnosis," can you

11   explain to the jury what you mean?

12   **A.**   So there was kind of two different kinds of clinicians, I

13   would say, at Done.  There was the group that was probably

14   larger that was, you know, concerned and not wanting to -- not

15   follow, you know, best practice.  So they wanted to have

16   follow-ups and see patients.

17       There were also clinicians that were happy to just grow

18   their patient panel because they got paid for a larger patient

19   panel, and so they would be much more willing to write a

20   prescription for someone because that person would then get

21   added to their panel.

22   **Q.**   And which group did Defendant He want you to send the

23   patients to if a patient complained about not getting

24   stimulants?

25   **A.**   Typically the one that was more willing to write the

1   prescriptions and had much larger patient panels.

2   **Q.**   And how did that relate to Defendant Brody?

3   **A.**   In a lot of cases, to either save time or in, you know,

4   cases where there was --

5          **MS. NECHAY:**  Objection.  Speculation.

6      (Reporter interruption for clarity of the record.)

7          **MR. FOSTER:**  I'll lay a foundation, Your Honor.

8   **BY MR. FOSTER:**

9   **Q.**   Did Defendant He talk to you about who she wanted

10  prescriptions to be sent to when the initial prescriber

11  declined to write them?

12  **A.**   Yes.  Dr. Brody.

13  **Q.**   And did -- were concerns raised with Defendant He about

14  this second opinion policy?

15  **A.**   Yes.

16  **Q.**   And can you tell the jury the concerns that were raised

17  with Defendant He about it?

18  **A.**   There was quite a few concerns raised from -- especially

19  by the clinicians that doing this would undermine the --

20  you know, the sort of clinical professionalism of Done as well

21  as it just didn't feel right to a lot of providers that if,

22  you know, they said, hey, this person doesn't have ADHD; I

23  don't think they should have a prescription, that then that

24  patient just got moved to somebody else that would say the

25  opposite.

1   **Q.**   Now, we've marked for admission Exhibits 3 -- well, 286,

2   306, 325, and 349, which are all communications between --

3          **THE COURT:**  Give me the numbers again.

4          **MR. FOSTER:**  286, 306, 325, and 349.

5          **THE COURT:**  Those four exhibits will be admitted.

6       (Trial Exhibits 286, 306, 325, 349 received in evidence.)

7          **MR. FOSTER:**  Thank you.

8   And, Ms. Braga, can you pull up Exhibit 325.

9   **BY MR. FOSTER:**

10  **Q.**   Mr. Menesini, do you recognize this as a monthly update

11  sent by Defendant He?

12  **A.**   I do, yes.

13  **Q.**   And can you tell the jury who these monthly updates went

14  to?

15  **A.**   They went to the entire team as well as to the investors.

16  **Q.**   And if we zoom in on the first box in Exhibit 325, under

17  monthly update, did Defendant He write (as read):

18       "We hit another growth record and achieved a

19      50 percent-plus month-over-month growth target"?

20  **A.**   Yes.

21  **Q.**   And if we zoom out and look under Highlights, did it

22  reflect a 51 percent increase in revenue and an NPS score of

23  80?

24  **A.**   Yes, it did.

25  **Q.**   And that NPS score of 80, was it higher or lower than

1  every major consumer brand in the United States?

2  **A.**   Higher than -- I don't know if it was higher than every

3  single major, but a large majority of pretty much major

4  consumer brands, yes.

5  **Q.**   Was it higher than Costco?

6  **A.**   Yes.

7  **Q.**   Was it higher than Starbucks?

8  **A.**   Yes.

9  **Q.**   And in terms of the revenue growth, how unusual is that

10  revenue growth in early-stage technology companies?

11         **MS. BELL:**  Objection.  Foundation.

12         **THE COURT:**  Sustained.

13  BY MR. FOSTER:

14  **Q.**   Mr. Menesini, have you -- can you tell the jury how long

15  you've worked in tech startup companies?

16  **A.**   At least 12 years, if not longer.

17  **Q.**   And have you become familiar with revenue growth across

18  various different technology companies?

19  **A.**   Yes, absolutely.

20  **Q.**   And based on your experience, did that revenue growth

21  strike you as unusual?

22  **A.**   I don't know if the growth percent was too usual, but the

23  total amount was very unusual, yes.

24  **Q.**   And when you say the total amount was very unusual, can

25  you explain to the jury what you mean?

**A.**    Typically, at a startup, you are spending a lot of money
to grow, and you're not making a lot back.  You might get --
you know, you might have some good growth number, even,
you know, 50 percent, but it might be going from, you know, 20K
to 40K, not, you know, 600,000 to 1.3 million.

The growth here was drastic and very quick as far as the
total amounts that were coming into the bank accounts.  I
believe when I started there, there was the -- basically the
seed fund that had been received from the investors initially
in the bank account, maybe a little bit more, and when I left,
it was, you know, 20x that.

**Q.**    And when you say the "seed," can you explain to the jury
what you mean by that?

**A.**    So when you are starting a business, and you have an idea
and maybe you have a little bit of revenue, you can reach out
to investors, and if an investor is interested, they will give
it a -- typically a seed fund.  Sometimes there's an angel
round, but -- that is giving you that initial money to get the
business, you know, off the ground and moving further from your
sort of -- you know, taking it from the garage to the -- the
first-level office you might have.

**Q.**    And you mentioned Done's bank accounts.  Did you become
familiar with Done's financial accounts in your work at Done?

**A.**    Yes, absolutely.

**Q.**    And did you observe the money coming into the Done Global

1    account?

2    **A.**    Yes.

3    **Q.**    And did you have concerns about the amount of money that

4    Done was making?

5    **A.**    Yes.

6    **Q.**    And how did -- what were your concerns?

7    **A.**    Kind of as I already stated little bit.  The growth of

8    this money was something I had never seen at another startup,

9    something that didn't really make a lot of sense, because it

10   had gone from such a small number to such a large number very

11   quickly.

12        Like I said, you're typically spending a lot of money for

13   this growth.  And a lot of money was spent on advertisement,

14   but there was so much money coming in and profit being made and

15   generated that it just -- it felt off and didn't feel right.

16   **Q.**    And when you say it "felt off and didn't feel right," how

17   did that relate to the legitimacy of the prescriptions and the

18   people coming to Done?

19        **MS. BELL:**  Objection, Your Honor.  Foundation,

20   speculation.

21        **THE COURT:**  Sustained.

22   **BY MR. FOSTER:**

23   **Q.**    Well, you mentioned NPS score.

24   **A.**    Uh-huh.

25   **Q.**    Did the NPS score of 80 give rise to concerns?

1    MS. BELL: Objection, Your Honor. Leading.

2    THE COURT: Overruled.

3  BY MS. GREEN:

4  Q.  And were those concerns heightened by the revenue growth?

5  A.  Yes, absolutely.

6    MS. BELL: Your Honor, objection. Leading.

7    THE COURT: Overruled.

8  BY MR. FOSTER:

9  Q.  And can you explain to the jury why that was?

10 A.  When you see the -- you know, kind of you take the whole

11 context of everything into the picture. The NPS scores, you

12 know, the focus on keeping patients happy and willing to sort

13 of change things to ensure they get a prescription so that they

14 are happy on top of the, you know, sort of bank account just

15 sort of growing so quickly, it leads to, you know, questioning

16 whether or not this is legitimate. Are we doing something

17 wrong. Sort of like it's -- you know, is it too good to be

18 true type of thing; right?

19    And so, yeah, it's just -- it was very -- it's hard to say

20 much other than it was very much concerning as you start, you

21 know, digging in and having the full context and everything.

22 Q.  And were concerns raised with Defendant He in your

23 presence about whether the people coming to Done all really

24 needed the stimulants?

25 A.  Yes.

1    **Q.**    And did she appear to care?

2    **A.**    Not really, no.

3    **Q.**    Did Defendant He also tell you about what Done paid

4    clinicians and how they paid them?

5    **A.**    Yes.

6    **Q.**    Did you -- can you tell the jury what the provider

7    compensation model was?

8    **A.**    Yeah.  So providers were paid -- they were given an hourly

9    rate sort of based on, you know, experience, what they might --

10   kind of what -- basically what they might accept as an hourly

11   rate.  And then they were paid for that initial appointment

12   based on that hourly rate, so how long an initial appointment

13   was, they would get that portion of it for the hourly rate.

14        And then they would also get a portion of that hourly

15   rate -- I believe it was 1/14 -- for every patient that was on

16   their panel.  So if somebody was -- you know, came onto the

17   platform, saw a doctor for the initial appointment, and then

18   got a prescription, they would be added to that provider's

19   panel, and then that provider would then receive 1/14 of the

20   hourly rate monthly for each of those patients.

21   **Q.**    So 1/14 of an hourly rate.  Can you explain to the jury

22   what that means in terms of -- like if a provider has a

23   patient, how long they're supposed to be spending with them

24   each month or how long they're compensated for?

25   **A.**    I believe that would be about 4.3 minutes, if I'm doing

1   the math correctly.

2       And so basically, yeah, if you're saying that the provider

3   should -- you know, are compensated for this amount and that

4   that amount is going to how much time they spend on that

5   patient, then it would be, yeah, I think 4.3 minutes per month.

6   **Q.**   And so if a provider had, say a hundred patients, after

7   the initial appointment, did they get paid any differently if

8   they saw those patients versus if they just wrote a

9   prescription?

10  **A.**   They did not, no.

11  **Q.**   And if a -- say a provider prescribed Adderall to a

12  patient who had never been diagnosed with ADHD before and they

13  wanted to meet with them the next month, would they get paid

14  anything additional for meeting with them?

15  **A.**   They will not, no.

16  **Q.**   And if a prescriber wanted to meet with a patient, say

17  every three months or every six months or every nine months or

18  whatever the time period was, would they get paid for that

19  meeting?

20  **A.**   They would not, no.

21  **Q.**   And what did Defendant He tell you about why Done didn't

22  pay for follow-up care?

23  **A.**   So that we wouldn't incentivize the providers to have

24  follow-ups too often with the patients because that reduced

25  their availability for initial appointments.

1  Q.  And when you say she said that "reduced their availability

2  for initial appointments," can you explain to the jury what you

3  mean?

4  A.  Yeah.  So a provider would -- they would choose their own

5  hours, so they might say, "I want to work, you know, Monday

6  through Wednesday for, you know, six hours a day," or something

7  along those lines.

8      What the -- what Ruthia wanted us to do was basically have

9  as many initial appointments filling those time slots as

10  possible so that they would increase the number of patients on

11  the platform, because a follow-up appointment doesn't increase

12  the platform's number of patients; it just -- it might stop

13  some attrition now and again, but that was much lower than

14  the -- and -- the growth you could get from having an initial

15  appointment.

16  Q.  In your conversations with Defendant He, did she talk more

17  about getting more users through initial appointments or more

18  about making sure there was safe care?

19  A.  Definitely about getting more users.

20  Q.  Did she talk more about getting more users or preventing

21  drug diversion and abuse?

22  A.  More users, absolutely.

23  Q.  Did she talk more about getting more users or providing

24  psychiatric care to people with ADHD?

25  A.  More users.

**Q.**   And did you raise --

Well, how did this compensation model influence the number

of patients that you saw some prescribers taking on?

**A.**   Some prescribers had very large patient panels.  I think I

saw some at 3,500 before I left -- that they were just -- their

patient panels were just ballooning and growing quite quickly

so that they could make more money.

**Q.**   3,500 patients?  Were concerns raised with Defendant He

about those types of ballooning numbers?

**A.**   Yes.

**Q.**   And what would clinicians and Done employees tell her

about their concerns?

**A.**   Similar to kind of some stuff we've already said, that

the -- it's concerning because can a provider really, you know,

provide care for these patients when they have that many

patients?

You know, if you are doing the proper follow-ups, you

should be doing one every 90 days, and --

**MS. BELL:**  Objection.  Foundation, speculation.

Sorry.

**MS. NECHAY:**  Objection.

**THE COURT:**  Lay a further foundation.

**MR. FOSTER:**  Sure.

BY MR. FOSTER:

**Q.**   Were you present when clinicians at Done told Defendant He

1  about the standard of care for follow-up appointments?

2  **A.**    Yes, absolutely.

3  **Q.**    And what did they tell her?

4  **A.**    That a follow-up should be done at a minimum every

5  90 days.

6  **Q.**    And were you present when clinicians at Done told

7  Defendant He about concerns that some prescribers simply had

8  too many patients?

9  **A.**    Yes, absolutely.

10  **Q.**    And what did they tell her about their concerns?

11  **A.**    That -- I'm sorry.  I lost kind of my train of thought on

12  that.

13          That the providers -- the providers were basically telling

14  Ruthia that we needed to -- or that they wanted to have more

15  time with the patients, so -- and they were concerned about

16  some of the providers taking on too much -- too many patients

17  and not being able to provide care for those patients.  And

18  sometimes patients would get moved from provider to provider,

19  and then they would be -- you know, they would be worried

20  because now they've gotten a patient that might be improperly

21  diagnosed, and they would have to try to, you know, have

22  another appointment and work through this.

23          And now -- now it becomes very difficult, because let's

24  say one provider gave a diagnosis and the new provider seeing

25  that patient, they don't think it was a proper diagnosis.  You

1    know, what are they to do at that point?

2        And there was -- a lot of them were at a loss, you know.

3    **Q.**    And did -- did providers raise concerns about feeling

4    pressure to prescribe?

5    **A.**    Absolutely, yes.

6    **Q.**    Did they raise concerns with Defendant He about how,

7    despite their best efforts, they were prescribing Adderall and

8    other stimulants that were unnecessary?

9    **A.**    Absolutely, yes.

10   **Q.**    And Adderall and other stimulants that were dangerous?

11   **A.**    Yes.

12   **Q.**    And did you raise concerns with Defendant He about the

13   compensation model?

14   **A.**    I did, yes.

15   **Q.**    And did you advocate to Defendant He for a different type

16   of compensation model for paying the clinicians?

17   **A.**    Yes, absolutely.

18   **Q.**    And what did you advocate for?

19   **A.**    I advocated pretty hard to have a model that would cover

20   the follow-ups and ensure that patients had proper follow-up

21   times with their clinician.  Because, as someone with ADHD,

22   it's very important to, you know, see and talk to your doctor

23   and spend time with them and understand the difficulties of

24   what you're going through and that diagnosis.

25       And, you know, the medication can cause side effects and

1    things like that, and you really want to be able to have that

2    sort of open stream of communication.

3        And so I felt that it was very important for that to occur

4    along with, you know, all the feedback from the other

5    clinicians pushing that way as well.

6    **Q.**    And the feedback from the other clinicians, was this one

7    clinicians or many clinicians?

8    **A.**    Many, yeah.

9    **Q.**    Was it something where there were a lot of clinicians

10   disputing things back and forth, or did they all feel similar?

11   **A.**    I hardly saw much dispute from the clinician side on this.

12   It was pretty clear.

13   **Q.**    And when you say you didn't see much dispute from the

14   clinician side, who was the person who was resistant to it?

15   **A.**    From the clinician side?

16   **Q.**    No.  In the company.

17   **A.**    Ruthia.

18   **Q.**    And did Defendant He ask you to research controlled

19   substances laws?

20   **A.**    Yes.

21   **Q.**    And did you research controlled substances laws?

22   **A.**    I did, yes.

23   **Q.**    And you mentioned the Ryan Haight Act?

24   **A.**    Yes.

25   **Q.**    And did the Ryan -- what did you find out about whether

1   the Ryan Haight Act made any other changes to controlled

2   substances laws besides that initial appointment?

3   **A.**   The waiver to the Ryan Haight Act was only related to --

4        **MS. BELL:**  Your Honor, objection.  I'm sorry.

5   Foundation, speculation, and hearsay, frankly.

6        **THE COURT:**  I'm sorry.  What?

7        **MS. BELL:**  My objections are foundation, speculation,

8   and hearsay.  We're having testimony about the laws --

9        **THE COURT:**  Well, foundation -- he's laid a foundation

10  that he did it.

11       Now, what's your second objection?  Speculation?  He's

12  testifying, as I understand -- I'll give a limiting

13  instruction.  I think that takes care of it.

14       Ladies and gentlemen, this witness, who I don't believe is

15  an attorney --

16       **MR. FOSTER:**  He's not.

17       **THE COURT:**  -- reviewed some laws or statutes

18  involving the Controlled Substance Act, and as a result, he

19  formed certain impressions, understandings, of these laws or

20  statutes.

21       And my understanding is that his testimony is going to

22  be -- though I don't know -- that he imparted in some measure

23  his understandings of the law to Defendant He.

24       You are to understand by this testimony that he is not

25  telling you what the law is.  As a matter of fact, that's my

1   function.

2       But this -- but you are to consider what his understanding

3   was as he imparted his understanding to the defendant.

4   Therefore, it goes to the state of mind.  It doesn't go to the

5   truth of the matter; that is, that the Ryan Haight Act, waiver,

6   or whatever it is with a controlled substance law, provided A,

7   B, C, and D.  Doesn't go to whether that's accurate or not.

8       What it goes to is what he understood the law to be, and

9   what did he say about the law to the defendant.

10      Okay?  That's the limiting instruction.

11      So with that understanding, you may proceed.

12          MR. FOSTER:  Yes.  Thank you, Your Honor.

13  BY MR. FOSTER:

14  Q.   And so Defendant He -- did she know you weren't a lawyer?

15  A.   She knew I was not a lawyer, yes.

16  Q.   And did she ask you to research controlled substances law?

17  A.   She did.  And I did so quite extensively.

18  Q.   And what did you tell her about the Ryan Haight Act and

19  whether it changed controlled substances laws?

20  A.   As far as I understood it is that it did not change any of

21  the laws around controlled substances other than just the

22  waiver that an initial appointment could be through

23  telemedicine.

24  Q.   And what did you tell Defendant He about controlled

25  substances being regulated?

1    **A.**    That they were strictly regulated.  There's a lot of

2    legalities around them.  I mean, it's a Schedule II substance,

3    so very clearly regulated.  You have to have a prescription.

4    You can only pick it up -- a single prescription at a time can

5    only be sent to a pharmacy.  You can't have like refills sent.

6         There's a lot of strictness around it.

7         **MS. NECHAY:**  Objection.  Calls for expert opinion.

8         **THE COURT:**  Overruled.

9    **BY MR. FOSTER:**

10   **Q.**    And what did you tell her about how it related to abuse

11   and diversion?

12   **A.**    That the strictness was directly related to the belief

13   that it is an abused drug, that it is oftentimes diverted, sold

14   to college kids or people looking to use it for something other

15   than an ADHD diagnosis.

16   **Q.**    And what did you tell her about it relating to needing --

17   the prescriptions needing to be in the usual course of

18   professional practice?

19   **A.**    That from my understanding of it all, it was required --

20   we were required to follow standard of care and best practice.

21   Her, you know, normal standard of care from clinicians.

22   **Q.**    And did you raise concerns with Defendant He that Done was

23   not complying with controlled substances laws?

24   **A.**    I did, yes.

25   **Q.**    And were you present at meetings where Defendant He

1   discussed legal concerns?

2   **A.**   Yes.

3   **Q.**   And what did Defendant He say about people who encountered

4   legal problems at Done?

5   **A.**   So there -- we would have some meetings now and again

6   around these legal concerns when some of us would try to,

7   you know, impart this information that we wanted some stuff

8   change and we wanted to follow these things.

9        And there was one point in time where she mentioned a --

10  she brought up this occurrence of when Uber -- I believe it was

11  the CEO of Uber -- had told their employees at the time that

12  when --

13          **MS. NECHAY:**   Objection.   Hearsay.

14          **THE COURT:**   Sorry?

15          **MS. NECHAY:**   Objection.   There's hearsay within the

16  witness's --

17          **THE COURT:**   It's -- hearsay.   It's a statement by the

18  defendant.   It's an exception to the hearsay rule.

19          **MR. FOSTER:**   Yes, Your Honor.

20          **THE COURT:**   It is admitted for the truth that is a

21  statement that she made.

22          **MR. FOSTER:**   Yes.

23          **THE COURT:**   Go ahead.

24          **THE WITNESS:**   So this was something Ruthia had said,

25  but it was -- she had said it was something coming from -- she

1    was like restating it from something that had happened or been

2    said at Uber.  I don't know if it actually had occurred at

3    Uber, but this is what Ruthia had said.

4         And that was that at Uber, the CEO was telling the

5    employees that the first person to get arrested in one of their

6    areas -- you know, one of the drivers that was driving in an

7    area that they weren't supposed to be driving in at the time.

8    One of the first persons -- people to get arrested would get a

9    free Tesla.  And so, like, Uber was sort of saying, like push

10   and break, you know, the boundaries of the law at the time.

11        And she had mentioned this as sort of like a defense

12   against the pushback to the concern about our, you know,

13   legalities and compliance issues.

14   **BY MR. FOSTER:**

15   **Q.**   And how did the Tesla relate to what she wanted you to do

16   at Done?

17   **A.**   I don't know if the Tesla related directly, but it was

18   sort of an idea that there might be some sort of incentive or

19   reward or praise for pushing those boundaries and breaking the

20   law, potentially.

21   **Q.**   Praise for breaking the law.

22        Did you and others at Done explain to Defendant He that

23   Done was different than companies like Uber?

24   **A.**   Yes, absolutely.

25   **Q.**   And can you explain to the jury why that is?

1   **A.**   Done was telehealth, and "health" being, I think, the

2   keyword there, focused around patients that we should be

3   helping and working towards, you know, getting them a proper

4   diagnosis.

5       With ADHD, it's sometimes very difficult to diagnose, and

6   you want to make sure that they're really spending time with

7   providers and getting to have that proper care, whereas Uber is

8   you're getting a ride somewhere.

9   **Q.**   And how concerned -- well, and how clear were people about

10  their concerns related to this comparison?

11  **A.**   I believe it was pretty clear.  I don't know how much

12  people said directly to Ruthia about, like, you know, the

13  specific comparison, but there was definitely some worry around

14  it.

15  **Q.**   And how worried were you?

16  **A.**   I was pretty worried.  I don't -- as someone who's managed

17  a lot of teams and managed people, I worry about the way a

18  leader tells things to their team because that affects their

19  behavior and, you know, what they're going to do.

20      And so it -- it concerns me when a leader of a company is

21  telling, you know, the teams these things.

22  **Q.**   And did Defendant He also talk to you about who she wanted

23  to place liability on if there were legal problems?

24  **A.**   Yes.  She had mentioned that the -- because we were sort

25  of operating, you know, a gig -- gig work system that --

1  because all of the clinicians were contractors, not employees

2  of the business, that their liability would fall on them.

3  **Q.**  And what did you tell her about whether she was actually

4  treating the clinicians as contractors?

5  **A.**  That they were not being treated as contractors.  They

6  were being treated as employees, as far as my understanding of

7  all HR and legalities around that and labor laws, that we were

8  treating them as employees because, you know, we controlled so

9  much of their work and what they were doing.  They had not a

10  lot of autonomy outside of their schedule.

11          **MS. NECHAY:**  Objection.

12          **MS. BELL:**  Objection, and move to strike.  That was

13  completely outside the realm of this expert -- of this

14  witness's expertise, and there was no foundation for that.

15          **THE COURT:**  He's not testifying as an expert.

16          **MR. FOSTER:**  He is not.

17          **THE COURT:**  He is testifying as to what his

18  understanding was and what the defendant's understanding was of

19  communications that occurred during this period of time.

20      So it's admissible on that basis with a limiting

21  instruction, as I've said before, that this witness is not an

22  expert offered to you as an expert as to what the law is;

23  however, his understanding of what the law is and what he

24  communicated his understanding to the defendant may be relevant

25  in your considerations.

1      Okay.  You may proceed.

2  BY MR. FOSTER:

3  Q.   And what was Defendant He's reaction when you told her

4  that she was treating the clinicians as employees, not

5  contractors?

6  A.   She wasn't concerned.  She wanted to us worry more about

7  growth.

8  Q.   Now, in terms of worrying about growth, did Defendant He

9  set metrics for Done employees to meet?

10 A.   Yes, absolutely.

11 Q.   And were you familiar with those metrics across the

12 business?

13 A.   Yes.

14      MR. FOSTER:  Your Honor, I have a spreadsheet that's

15 marked as 1492.

16      THE COURT:  1492 admitted.

17      (Trial Exhibit 1492 received in evidence.)

18 BY MR. FOSTER:

19 Q.   Pulling up Exhibit 1492.  Do you recognize this?

20 A.   I don't see anything yet.  Oh, there.

21 Q.   Sorry.

22 A.   Yep, I do.

23 Q.   And looking at lines 21 to 34 of the tab April to

24 July 2021, are those metrics for yourself?

25 A.   They are, yes.

1  Q.   And as a result of your role, were you familiar with other

2  metrics that Defendant He set both for yourself and others?

3  A.   I was, yes.

4  Q.   Okay.  And if we look at lines 13 to 14 of Exhibit 1492,

5  and -- so there's an objective.

6       And what's the objective on lines 13 to 14?

7  A.   "Achieve ADNPS."

8  Q.   Is there something called a "key result"?

9  A.   Yes, there is.

10 Q.   And what's the key result for lines 13 to 14?

11 A.   That is to get a Trustpilot rating above 4.6.

12 Q.   Can you explain to the jury what Trustpilot is?

13 A.   Trustpilot is a review platform similar to something like

14 Google reviews or Yelp.  It is -- it differs in that it is all

15 verified customers, people that actually use that service.

16      And so it is just a place that we would always use for

17 trying to gather reviews and share out on our platforms as, you

18 know, source of reviews for things.

19 Q.   How focused was Defendant He on negative reviews on

20 Trustpilot?

21 A.   Very focused, yeah.

22 Q.   And what would she want to do when there was a negative

23 review?

24 A.   Somehow get that review to be positive or removed.

25 Q.   And what did she tell you about the ways to turn a review

1  positive or remove it?

2  **A.**    We would do a few things.  One would be to potentially get

3  that user or patient to speak to another clinician instead of

4  the clinician they spoke to or offer them refunds.

5       Yeah, I think maybe even going so far as to pay them to

6  remove the review.

7  **Q.**    Were you concerned about offering patients refunds if they

8  didn't get stimulants?

9  **A.**    Yes, absolutely.

10  **Q.**    Can you explain to the jury why that concerned you?

11  **A.**    Because at that point, it's sort of like if you got onto

12  the platform and you didn't get a prescription, you were still

13  paying for -- to see a doctor, a clinician, but then we would

14  refund that.

15       And so it's sort of odd that you would come on this

16  platform and then get your money back if you aren't getting a

17  prescription, because you still should have gotten care from a

18  clinician.

19  **Q.**    And if we go to line 5 of Exhibit 1492.  Under "Achieve

20  ADNPS," is there result "80 percent medication fulfillment

21  rate"?

22  **A.**    Yes.

23  **Q.**    And can you explain to the jury what that means?

24  **A.**    The medication -- excuse me.

25       Medication fulfillment, that was in order to hit a rate of

1  fulfilling the patient's prescriptions, so ensuring that

2  they're getting those prescriptions and they're getting

3  fulfilled by the pharmacies.

4  **Q.**    And who was in charge of setting the objectives and key

5  results, the metrics we see here?

6  **A.**    Ruthia would work with the teams, but Ruthia was

7  ultimately in charge.

8  **Q.**    And 80 percent medication fulfillment.  When Defendant He

9  set that metric, did she know whether 80 percent of patients

10 would need medication after an appointment?

11 **A.**    She would not, no.

12 **Q.**    Did she care?

13 **A.**    Not that I was aware of, no.

14 **Q.**    And if we look at the tab August to October, and lines 20

15 to 31, do you see these?

16 **A.**    I do, yes.

17 **Q.**    And is the objective "Make patient smile happy"?

18 **A.**    Yes.

19 **Q.**    And was that something that -- how important was that to

20 Defendant He?

21 **A.**    Very important, because it led to, you know, further

22 growth, further revenue.

23 **Q.**    And how much pressure was there at Done to reach that

24 goal?

25 **A.**    A lot of pressure, yeah.

1  **Q.**  And when we look at the steps that Done employees were to

2  take to "make the patient smile happy," do you see that

3  Trustpilot rating?

4  **A.**  I do, yes.

5  **Q.**  And what change did she want the Trustpilot rating to have

6  over months?

7  **A.**  To go up from 4.6 up to 4.8 over those three months.

8  **Q.**  And how did Defendant He want the Trustpilot rating to go

9  up like that?

10  **A.**  How did she want it to go up?

11  **Q.**  Yeah.

12  **A.**  By -- it's just -- making customers happier, so doing what

13  we can to get the patients to bring those ratings up based on

14  what I previously stated.

15  **Q.**  And there's a patient conversion rate.  Do you see that?

16  **A.**  I do, yes.

17  **Q.**  And what did she want to have happen with the patient

18  conversion rate?

19  **A.**  So she wanted to increase patient conversion from 85 to

20  90 percent.  At least the goal is from 85 to 90 percent over

21  those three months.

22  **Q.**  Can you explain to the jury what patient conversion means?

23  **A.**  Yeah.  So customers that get to the platform and see the

24  platform, there's sort of these different conversion rates that

25  we would talk about, and those conversion rates were the ones

1    that would click the link from the ads.  They convert from ad

2    to the website.  But then there's the conversion from website

3    to appointment, but then there's the conversion from that

4    initial appointment to a patient.  And so that's where this

5    patient conversion comes in.

6         So someone who basically got on the platform and got a

7    diagnosis and a prescription.

8    **Q.**    And 90 percent patient conversion -- did you conduct

9    research regarding the prevalence of ADHD?

10   **A.**    I did, yes.

11   **Q.**    And did you talk to Defendant He about that research?

12   **A.**    I did, yes.

13   **Q.**    And did you read studies?

14   **A.**    I did, yes.

15   **Q.**    And what did you find out about the prevalence of ADHD in

16   the population?

17   **A.**    I found through reading a lot of different research

18   articles that the typical ADHD prevalence, albeit somewhat, you

19   know, fully understood, was lying anywhere from 2 percent up to

20   the highest end of 20 percent, but --

21            **MS. NECHAY:**  Objection.  Calls for expert opinion.

22            **THE COURT:**  He is testifying as to his understanding

23   of this information, and its relevance depends on whether he

24   communicated that to the defendant.

25        So subject to that.

1    MR. FOSTER:  And this one, I asked another way, so he

2    said he did already, Your Honor.

3           THE COURT:  Pardon?

4           MR. FOSTER:  He said he did convey it to the

5    defendant.  I asked him ahead of time -- to try to clear this

6    up.

7           THE COURT:  Overruled.  Go ahead.

8           THE WITNESS:  And so through my reading of this

9    research is that it -- the prevalence of ADHD was anywhere from

10   low end 2 percent up to the high end of 20 percent.  And

11   there's still a lot of learnings going on, but that tends to

12   seem to be the general range of the populace having ADHD.

13   BY MR. FOSTER:

14   Q.   And did you -- what -- based upon that reading, what

15   concerns did you have about the metrics that Defendant He was

16   setting?

17   A.   That it was a very high number.  I mean, there would

18   obviously be some sort of bias that would raise it from -- even

19   if we -- let's say we assume the highest end of 20 percent.

20   Even assuming that, and you have a bias of people clicking the

21   ad that have ADHD, it would be very difficult to, you know,

22   statistically get to the point of a 90 percent conversion rate.

23   Q.   And when you talked to Defendant He, what did you tell her

24   about these studies?

25   A.   I had mentioned the studies to Ruthia on several

1    occasions.

2    **Q.**    And on those several occasions, did you mention studies

3    showing 3 percent -- the types of numbers you were talking

4    about?

5    **A.**    Yes, absolutely.  The 2 to 20 percent.  We had discussed

6    this a few times, talking about the prevalence of ADHD in the

7    populace.

8    **Q.**    And given the percent and numbers of patients on the

9    platform, did you have concerns about patients being

10   misdiagnosed?

11   **A.**    Yes, absolutely.

12   **Q.**    And can you explain to the jury why?

13   **A.**    Because, as I kind of already stated, it's difficult for

14   me to, you know, use math to get to the point of a 20 percent.

15   Even bias maybe it brings up to 50 or 60 percent of people

16   coming to the platform having ADHD.

17        Our goal was, you know, as listed here, starting at

18   85 percent, quite drastically above that.  And so it's

19   concerning to me that we wouldn't be, you know, not diagnosing

20   ADHD with a lot more patients, especially on top of that, given

21   that through all of my research knowing -- or learning that

22   ADHD oftentimes either comorbid or misdiagnosed with anxiety

23   and depression, and so --

24        **MS. NECHAY:**  Objection.  Calls for expert opinion.

25        **THE COURT:**  Well, he's saying what he said to the

1  defendant.

2      Proceed.

3          **MR. FOSTER:**  And I can break it up, Your Honor.

4          **THE COURT:**  Yeah.

5  **BY MR. FOSTER:**

6  **Q.**  And so were you present when clinicians talked to

7  Defendant He about overlapping conditions, such as depression

8  and anxiety?

9  **A.**  Absolutely, yes.

10 **Q.**  And what did they tell Defendant He about ADHD overlapping

11 with conditions as such as depression and anxiety?

12 **A.**  That is it often comorbid or misdiagnosed for one or the

13 other.

14 **Q.**  And what did they tell Defendant He about the risks of

15 giving a stimulant to someone with anxiety, for example?

16 **A.**  That it was a risk, and a risk that should be fully

17 understood by spending time with the patient.

18 **Q.**  And what were the negative consequences they shared with

19 her about giving an anxious person a stimulant?

20 **A.**  I don't remember the exacts of what a provider said around

21 that specific question there.

22 **Q.**  Okay.  Fair enough.

23      Well, what were their concerns about giving stimulants to

24 patients with comorbidities?

25 **A.**  That giving a stimulant to someone who actually has

1   anxiety and depression could be dangerous to them because they

2   should be receiving other care.

3   **Q.**   And did Done offer that other care?

4   **A.**   We did not, no.

5   **Q.**   Did Done offer continued psychiatric care for patients?

6   **A.**   We did not, no.

7   **Q.**   What, if anything, did Done offer on an ongoing basis

8   besides stimulants?

9   **A.**   Nothing.

10   **Q.**   Now, did Defendant He --

11         **THE COURT:**  How much longer do you --

12         **MR. FOSTER:**  We can take a break.

13         **THE COURT:**  Ladies and gentlemen, we're going to take

14   our morning recess.

15       Remember the admonition given to you:  Don't discuss the

16   case, allow anyone to discuss it with you, form or express any

17   opinion.

18       And I will see you back here at a quarter of.

19            (The jury leaves the courtroom.)

20    (Proceedings were heard out of the presence of the jury.)

21         **THE COURT:**  Okay.  We're in recess.

22            (Recess taken at 10:34 a.m.)

23          (Proceedings resumed at 10:45 a.m.)

24    (Proceedings were heard out of the presence of the jury.)

25         **THE COURTROOM DEPUTY:**  Come to order.  Court is now in

1    session.

2           **THE COURT:**  Let the record reflect -- I want to --

3    would the Defense please ask Mr. Steskal to come to court

4    either at noon today or 4:00.

5           **MR. SCHACHTER:**  I will e-mail him right now.

6           **THE COURT:**  Yeah, thank you.

7       Okay.  Bring in the jury.

8                     (The jury enters the courtroom.)

9       (Proceedings were heard in the presence of the jury.)

10          **THE COURT:**  Okay.  Let the record reflect all jurors

11   are present, parties are present.  You may proceed.

12          **MR. FOSTER:**  Thank you, Your Honor.

13   **BY MR. FOSTER:**

14   **Q.**   When we broke, we were talking about recruiting.

15       Did Defendant He ask you to recruit prescribers for Done?

16   **A.**   Yes.

17   **Q.**   Did she give you instructions?

18   **A.**   Yes.

19   **Q.**   How did her instructions for recruiting relate to growth

20   and conversion?

21   **A.**   We were specifically looking for providers that would be

22   more comfortable with stimulants and more comfortable with ADHD

23   diagnoses and didn't have any pushback around like meeting,

24   needing specific follow-ups or those sorts of things.

25   **Q.**   Did Defendant He want you to look for prescribers with

1  lots of experience?

2  **A.**   Not necessarily, no.

3  **Q.**   And when you say "not necessarily," what was she primarily

4  concerned with?

5  **A.**   Experience wasn't really a focus.  It was -- the focus was

6  on, as I -- as I previously stated, to find providers that were

7  willing or -- or much more open to stimulants as well as not

8  looking for any specific sort of follow-up cadence.

9         **MR. FOSTER:**  And so we have an exhibit that's been

10 marked as 1337, Your Honor, a recruiting checklist.

11        **THE COURT:**  1337 admitted.

12     (Trial Exhibit 1337 received in evidence.)

13        **MR. FOSTER:**  And, Ms. Braga, can we pull up

14 Exhibit 1337.

15 **BY MR. FOSTER:**

16 **Q.**   Do you recognize this?

17 **A.**   I do, yes.

18 **Q.**   And what is this?

19 **A.**   This was a recruiting checklist for the providers that was

20 given to us by Ruthia.

21 **Q.**   And when we look under the requirements, did Done require

22 any certain years of experience?

23 **A.**   No.

24 **Q.**   Did Done require any references?

25 **A.**   No.

1  **Q.**   Did Defendant He want the most knowledgeable and

2  experienced nurses or something else?

3  **A.**   Something else.

4  **Q.**   What did she want?

5  **A.**   Kind of as I stated, providers that would be more willing

6  or were more open to stimulants and less follow-ups.

7  **Q.**   And what about the compensation she wanted to pay?

8  **A.**   That they needed to be open to that compensation model.

9  **Q.**   Okay.  Did she want to pay a lot of money or a little

10  money?

11  **A.**   Typically, as little as possible.

12  **Q.**   And when we look under Treatment Approach, if we can zoom

13  in on that, when Defendant He described the treatment approach,

14  did she leave the treatment approach solely and exclusively to

15  the providers?

16  **A.**   No.

17  **Q.**   Did she emphasize their clinical autonomy?

18  **A.**   She did not, no.

19  **Q.**   Did Defendant He want nurses who wanted clinical autonomy

20  to be hired?

21       **MS. BELL:**  Your Honor, leading, all of these

22  questions.  Objection.

23       **THE COURT:**  Overruled.

24       **THE WITNESS:**  As far as I'm aware, she did not want

25  that, no.

1  BY MR. FOSTER:

2  Q.   Okay.  And when we look at these questions, it says (as

3  read):

4       "Sharing our process, 30-minute initial

5       appointment with data pre-collected and preprocessed,

6       then online consultation with the option for patients

7       to book a follow-up appointment."

8  Do you see that?

9  A.   Mm-hmm.

10  Q.   And that reference to patients booking a follow-up

11  appointment, did the clinicians have the ability to book

12  follow-ups on their own?

13  A.   Not unless they were ones that specifically were like

14  pushing or asking pretty hard for that.

15  Q.   Okay.  And so what percentage of the clinicians was that?

16  A.   Very few.  I don't know an exact percentage, but it was

17  very few.

18  Q.   And in terms of the process, if someone said they weren't

19  comfortable with a 30-minute initial appointment for every

20  single patient, would they get hired?

21  A.   They would not get hired, no.

22  Q.   And if someone said they wanted to schedule their

23  follow-up appointments at a cadence that was based on the

24  individualized medical circumstances of the patient, would they

25  get hired?

1    **A.**    Typically not, no.

2    **Q.**    And if someone said they wanted the option to be able to

3    book follow-up appointments when they thought the patient

4    needed it, would they get hired?

5    **A.**    They would not, no.

6    **Q.**    Now, it says (as read):

7              "Communication with patients.  If the patient is

8         not happy with their treatment plan, how would you

9         handle it?"

10   Do you see that question?

11   **A.**    I do, yes.

12   **Q.**    And what would happen if a clinician said, I'd do what's

13   right for the patients, even if it doesn't make them happy?

14   **A.**    That was not what Ruthia was looking for in a provider, so

15   typically that provider would not be hired.

16   **Q.**    And it says (as read):

17            "Comfortable treating patients' symptoms not

18       fully meet the scale criteria."

19   Do you see that?

20   **A.**    I do, yes.

21   **Q.**    And what would happen if a provider said, I only prescribe

22   to patients who have ADHD and qualify for stimulants?

23   **A.**    If -- I mean, that specific statement, I don't know if

24   that would bar them, necessarily, but if they did, you know,

25   voice some uncomfortableness around maybe the sort of -- if --

1    if you were unsure, would you prescribe, then -- and if they

2    said no, then that would be a barring.

3    **Q.**   So if they say they were unsure if they would prescribe to

4    a patient who didn't meet the criteria for prescribing, would

5    that be a bar?

6    **A.**   Yes.

7    **Q.**   And it says (as read):

8           "What would be the reason to reject?  All our

9           patients are high-functioning."

10           Did you have concerns about that?

11   **A.**   Yes, because there's no -- there's no data or proof to

12   state that.

13   **Q.**   Did you -- did Defendant He want you to tell the truth to

14   clinicians or something else?

15   **A.**   She wanted us to tell this to clinicians.

16   **Q.**   And was that --

17           **MS. NECHAY:**  Objection.  Speculation.

18           **THE COURT:**  Lay a foundation.

19           **MR. FOSTER:**  Sure.

20   BY MR. FOSTER:

21   **Q.**   Did Defendant He talk to you about what she wanted you to

22   tell potential new hires at Done?

23   **A.**   Yes.

24   **Q.**   And what did she want you to tell them about Done's

25   patient population?

1   **A.**   That they were high-functioning, as is stated here.

2   **Q.**   And did you become familiar with what Done's patient

3   population was?

4   **A.**   Yes.

5   **Q.**   And was that true or a lie that all the patients were

6   high-functioning?

7   **A.**   I think it's an unknown, and so there's no -- it would be

8   a lie that they were all high-functioning.

9   **Q.**   And did -- were you present when clinicians raised

10  concerns about patients who weren't high-functioning?

11  **A.**   Yes, absolutely.

12  **Q.**   And it says (as read):

13          "We screen out for severe underlying conditions

14      such as psychosis or cardiac health problems."

15      Is that what Defendant He wanted you to tell clinicians?

16  **A.**   Yes.

17  **Q.**   And is that what was told to clinicians?

18  **A.**   Yes, absolutely.

19  **Q.**   And was that true or was that a lie?

20  **A.**   It was -- there was, I believe, one question in the

21  assessment related to this, but I -- I don't think that was

22  enough to state whether this is a -- you know, we're not

23  necessarily screening it out, because it's a self-assessment.

24  **Q.**   So when you say a "self-assessment," can you explain what

25  you mean and how that differs from screening someone out?

**A.** So when patients -- you know, users would come onto the platform and they would sign up for that appointment, they would go through the assessment. It would go through some questions, typically, from a few of the specific assessments that are normally required to figure out the criteria for different things around ADHD.

In there was just a single -- I believe it was a single question around the psychosis and the cardiac health problems, which is -- if they're self-assessing on this, they're -- you know, even if they have a cardiac health problem, they could say no. If they have psychosis, they could say no. It wasn't necessarily something that was followed up on or checked.

**Q.** Did Done do anything to screen patients out besides simply taking their word for it?

**A.** No.

**Q.** Did you have concerns about the hiring process?

**A.** Yes.

**Q.** Did you talk to Defendant He about them?

**A.** I did, yes.

**Q.** And what did you tell her?

**A.** That we should be, you know, finding providers that are wanting to do follow-ups and have proper, you know, care with the patients and really providing a good -- you know, a good doctor-patient relationship.

**Q.** And what was her reaction?

1    **A.**    That that's not what the patients want.

2    **Q.**    And pulling up --

3         **MR. FOSTER:**  Well, we have a communication between

4    Defendant He, the witness, and others that's been marked as

5    Exhibit 373.

6         **THE COURT:**  373 admitted.

7         (Trial Exhibit 373 received in evidence.)

8         **MR. FOSTER:**  And -- thank you.

9    **BY MR. FOSTER:**

10   **Q.**    And do you recognize this as a communication between

11   Defendant He, yourself, and others at Done?

12   **A.**    I do, yes.

13   **Q.**    And Defendant Brody as well?

14   **A.**    Yes.

15   **Q.**    And if we turn to page 2 of Exhibit 373 and we zoom in, is

16   this a communication between somebody named Bianca Rohr and

17   Defendant He?

18   **A.**    Yes, it is.

19   **Q.**    Who was Bianca Rohr?

20   **A.**    She was one of the recruiting contractors that we had

21   brought on to assist and bring on more providers.

22   **Q.**    And did Ms. Rohr say in terms of EKG, "It's a concern

23   85 percent of my candidates"?

24   **A.**    Yes.

25   **Q.**    And what did that refer to?

1  **A.**   That 85 percent of the potential candidates that she spoke

2  to, that the fact that we did not have EKGs from those patients

3  was a concern with them.

4  **Q.**   And when you say "We did not have EKGs," did Done have

5  testing such as EKGs?

6  **A.**   No.

7  **Q.**   And did you talk to Defendant He about it?

8  **A.**   Yes.

9  **Q.**   And what did Defendant He say about whether providers

10  should be able to have EKGs?

11  **A.**   That it was not something that we would do, and we would

12  focus on providing the current care we were.

13  **Q.**   And if we look at page 3, did Ms. Rohr say (as read):

14           "They just want to know that it's an option.  It

15       isn't something I tell them that it is standard, nor

16       do I encourage it.  I try to get them comfortable

17       that they have support all around them, given the

18       stigma on stimulants."

19       And Defendant He said (as read):

20           "Then we need to direct them to Dr. Brody or

21       screen them out, since they are not a fit to be on

22       our platform."

23  **A.**   Yes.

24  **Q.**   And is that consistent with what Defendant He would tell

25  you in terms of not hiring prescribers who wanted EKGs?

1    **A.**    Absolutely, yes.

2    **Q.**    What if a candidate just said that there might be some

3    situations where they needed an EKG?  Would they be hired?

4    **A.**    Typically not.

5    **Q.**    And what if a candidate said there might be some

6    situations where they needed something like a urine drug test;

7    would they be hired?

8    **A.**    Typically not.

9    **Q.**    And what if they said they felt like it was necessary to

10   detect patients who might be taking multiple drugs or seeking

11   drugs to get high?

12   **A.**    They typically wouldn't be hired, yeah.

13   **Q.**    And what about blood pressure and vitals?  Was that also a

14   concern that was raised?

15   **A.**    It was, yes.

16   **Q.**    And if a clinician said that they might need blood

17   pressure, vitals, would they be hired?

18   **A.**    Typically, not, no.

19   **Q.**    And why not?

20   **A.**    Because it wasn't something we were able to provide.

21   **Q.**    Now, shortly after arriving, did prescribers raise

22   concerns with Defendant He about the screening information

23   available to them?

24   **A.**    Yes, absolutely.

25   **Q.**    And did you become aware that Defendant He had changed the

1   screening questions?

2   **A.**   Yes.

3   **Q.**   And can you describe how you became aware of that to the

4   jury?

5   **A.**   I became aware of it through mostly the providers

6   informing me that the assessment information they were getting

7   was missing typical assessment questions that would exist from

8   the normal assessments that would be needed at the beginning of

9   one of these appointments.

10  **Q.**   And who changed them?

11  **A.**   Ruthia did.

12  **Q.**   And how did she change the screening?

13  **A.**   So in the beginning, we were doing the ASRS, which is the

14  ADHD questionnaire and assessment, as well as -- I believe it's

15  the PHQ and the GAD assessments, and those are for anxiety and

16  depression.

17       And so what -- what she had done, though, is removed the

18  anxiety and depression assessments, and then I think she even

19  removed some of the questions from the -- the ASRS, the ADHD

20  assessment.

21  **Q.**   And did she tell you what the purpose was of removing

22  those things?

23  **A.**   To reduce barriers so the patients could get to seeing a

24  provider faster.

25  **Q.**   And what did the clinicians tell Defendant He about

1  whether that was a violation of the standard of care?

2  **A.**   It -- they were pretty serious that this was a major

3  issue, to the point that a lot of providers would spend the --

4  a good portion of the very short amount of time they'd have on

5  that initial appointment going through this assessment.

6  **Q.**   And did clinicians raise a concern that they weren't able

7  to accurately diagnose patients in the limited time available

8  to them?

9  **A.**   Absolutely.

10  **Q.**   And how did that relate to her removal of the screening

11  questions?

12  **A.**   If they didn't have the time, as I kind of stated, they

13  would spend a lot of this time going through the assessment

14  with the patients because they needed those answers and -- to

15  go through that with the patient.  They didn't have that base

16  understanding from the patient to begin with, that it would dig

17  through most of that initial appointment time, making it very

18  difficult for them to make a correct diagnosis.

19  **Q.**   And did clinicians raise concerns with Defendant He that

20  they were writing prescriptions not truly knowing if the

21  patient had depression or anxiety or these other conditions?

22  **A.**   Yes, absolutely.

23  **Q.**   And what was her reaction to that?

24  **A.**   Similar to before.  You know, just that we need to do what

25  the patient wants and -- or she would ignore it or pass it off.

1  **Q.**  Now, we previously talked about Defendant Brody.  Who was,

2  on paper, the clinical president at Done who had the power to

3  address all these issues?

4  **A.**  On paper, Dr. Brody.

5  **Q.**  In fact, did Defendant Brody ever take any action that was

6  contrary to what Defendant He wanted to do?

7  **A.**  Typically not, no.

8  **Q.**  Okay.  Did Defendant He talk to you about how important

9  Defendant Brody was to Done?

10  **A.**  She did, yes.

11      **MR. FOSTER:**  And we have a communication between

12  Defendant He and the witness that's previously been marked as

13  Exhibit 910, Your Honor.

14      **THE COURT:**  Admitted.

15  (Trial Exhibit 910 received in evidence.)

16      **MR. FOSTER:**  Thank you.

17  BY MR. FOSTER:

18  **Q.**  And showing you Exhibit 910, do you recognize this?

19  **A.**  I do, yes.

20  **Q.**  And did Defendant He say (as read):

21      "We need to talk about Dr. Brody's arrangement.

22      He will be just doing light advising.  Full-time may

23      be risky because we cannot afford losing him.  Find a

24      psychiatrist to be our clinical president will take

25      half a year."

1   **A.**   Yes.

2   **Q.**   Do you see that?

3   **A.**   Mm-hmm.

4   **Q.**   And if we go to the next page of Exhibit 910, did she

5   say -- did Defendant He say, "It will destroy the

6   organization"?

7   **A.**   She did, yes.

8   **Q.**   And did you respond, "Wait, I'm confused.  Wouldn't

9   full-time be better, then?"

10  **A.**   I did, yes.

11  **Q.**   Why were you --

12          Well, when was this?

13  **A.**   This was December of 2020.

14  **Q.**   And how soon was this after you started?

15  **A.**   About a month, I think, maybe less.

16  **Q.**   Okay.  And why were you confused that Defendant He didn't

17  want the clinical president working full-time?

18  **A.**   Because it seemed really odd to me to not have the person

19  who should be advising and guiding the clinicians and the,

20  you know, medical side of the business to be absent, so I

21  really thought it was important that they would be there

22  full-time.

23  **Q.**   And did she say (as read):

24          "Full-time is just too intense, especially for

25          him.  I would rather play safe and keep him in an

1    advising role"?

2  **A.**    Yes.

3  **Q.**    And if we move on in the conversation, did you say (as

4  read):

5         "I think because he is so important as the

6         clinical president, we should definitely have a

7         longer conversation -- a longer discussion with him

8         about what he would rather do."

9         And did Defendant He respond (as read):

10        "We discussed a lot.  He's happy with current

11        role.  He dislikes seeing patients"?

12  **A.**    Yes.

13  **Q.**    And did she go on to say -- if we zoom out and we go to

14  the next page, did she say (as read):

15        "If he leaves the company, we'll just not be

16        able to operate"?

17  **A.**    Yes.

18  **Q.**    And how do you understand that to relate to what you

19  talked about earlier in terms of compliance with the practice

20  of medicine?

21  **A.**    Yeah.  So the -- because of the way the business was set

22  up with Done Health being the clinic side of things, it was

23  required to have a licensed professional, being a doctor, being

24  the head of that business.

25        And so he was the clinical president.  He was the owner,

1    technically, of that side of the business.

2    **Q.**    Now, Defendant He wrote that he dislikes seeing patients.

3         Even though Defendant Brody disliked seeing patients, did

4    he write prescriptions at Done?

5    **A.**    He did, yes.

6    **Q.**    And with prescribers -- well, you mentioned a lot of

7    prescribers quitting.

8         With the prescribers quitting because of the practices,

9    did Defendant He become concerned about what would happen to

10   their patients?

11   **A.**    Yes.

12   **Q.**    And explain how that related to subscription revenue and

13   retaining patients.

14   **A.**    Yeah.  So if -- you know, let's say a provider had 300

15   patients, which was, you know, a good amount for some of the

16   providers.  If they left the platform, they sort of, you know,

17   what do we do with those patients?

18        And so -- and they might -- the worst case would be when

19   they were in a state that we didn't have another licensed

20   provider in, and so in order to sort of save those patients so

21   that we wouldn't lose them, because if we lose them, we lose

22   their revenue, we move them to another provider.

23        And if there was no other provider in that state, they

24   would move to Dr. Brody, typically.

25   **Q.**    And did Defendant Brody then sign prescriptions for

1  Adderall and other stimulants?

2  **A.**   Yes.

3  **Q.**   Did Defendant Brody conduct an audiovisual consultation

4  with the patients?

5  **A.**   No.

6  **Q.**   Did Defendant Brody review electronic medical records or

7  access the electronic medical records system?

8          **MS. BELL:**  Objection, Your Honor.  Foundation,

9  speculation.

10         **MR. FOSTER:**  I'll lay a foundation, Your Honor.

11 **BY MR. FOSTER:**

12 **Q.**   Did you become familiar with Defendant Brody and his

13 technology skills?

14 **A.**   I did, yes.

15 **Q.**   And can you tell the jury what you found out?

16 **A.**   So it was often as difficult working with Dr. Brody around

17 his use of just basic technology, so, you know, if we're trying

18 to meet on a video call, you know, having him use the different

19 systems, it all took a lot of time.  He would have a lot of

20 problems with them.  We had a lot of -- we'd have to spend a

21 lot of time and effort working with him to get him to be able

22 to use these systems.

23     And there was constant issues, yeah.

24 **Q.**   And as a result of these constant issues getting him to

25 use Done's systems, what process was set up for him to sign

1  prescriptions?

2       **MS. NECHAY:**  Objection.  Vague as to "systems."

3  **BY MR. FOSTER:**

4  **Q.**  Well, did Defendant Brody have problems accessing Done's

5  electronic medical records system?

6       **MS. BELL:**  Objection, Your Honor.  Foundation, calls

7  for speculation.

8       **THE COURT:**  Well, I think he's the person who did it.

9       **MR. FOSTER:**  Yep.  He was familiar with it.

10      **MS. BELL:**  I'm sorry, Your Honor?

11      **THE COURT:**  I said I think he's the person who set up

12  the systems or was in charge of the systems.

13     Am I wrong?

14      **MR. FOSTER:**  I can lay a foundation --

15      **THE COURT:**  Lay a foundation.  I may be incorrect.

16  **BY MR. FOSTER:**

17  **Q.**  In your role at Done in operations, did you become

18  familiar with the process by which Defendant Brody signed

19  prescriptions?

20  **A.**  Yes.

21  **Q.**  Okay.  And why did you become familiar with that?

22  **A.**  I was working -- in my role, I worked with pretty much

23  everyone at the business through -- you know, in some time

24  frame or another, I set up a lot of systems.  I implemented a

25  lot of systems.

1    And so working with the care team that did a lot of the

2  like prior authorizations and prescription side of things,

3  working with the pharmacies, they would work really closely

4  with Dr. Brody, and I was involved in that in quite a few

5  cases.

6  **Q.**   Okay.  And as a result of your involvement with it, can

7  you describe your knowledge of the process by which

8  Defendant Brody would sign prescriptions?

9  **A.**   Yes.  He would basically have the patients handed to him

10 through the system.  He would go through and just go into the

11 EHR and sign those prescriptions without going into and reading

12 the charts and information, as far as I was aware and saw.

13 **Q.**   And in terms of these -- these patients who were leaving

14 other prescribers, in addition to Defendant Brody, were there

15 other practitioner at Done who Defendant He asked to do a

16 similar thing?

17 **A.**   Yes.

18 **Q.**   Okay.  And were there -- and can you tell the jury about

19 other practitioners at Done who were signing prescriptions for

20 patients who weren't theirs?

21 **A.**   Yeah.  So in cases where maybe there was another

22 practitioner in the same state, if a practitioner left or those

23 cases where the patient was unhappy and wanted to talk to

24 another provider and we would move them over, there was that

25 sort of specific set of providers that those would get moved

1  to, and those are, you know, the ones that I mentioned

2  previously that had typically very large patient panels already

3  were more willing to write these prescriptions and diagnose,

4  and so those would get moved over.

5      And many of these providers would provide the

6  prescriptions without any sort of like follow-ups or time spent

7  with the patient.

8  **Q.**  And you mentioned that this communication in December

9  occurred shortly after you started at Done.  It was COVID.  Did

10  you attend a holiday party in December 2020?

11  **A.**  I did, yes.

12  **Q.**  And was that holiday party in person or was it virtual?

13  **A.**  Virtual.

14  **Q.**  And can you describe to the jury what happened at that

15  holiday party?

16  **A.**  Yes.  So we were having a holiday party and, you know, a

17  lot -- I don't remember a lot of it, but there's a very

18  specific thing I remember because it was very memorable.

19      And that's -- you know, we were all kind of talking, just

20  hanging out.  It was meant to be sort of a team-building thing

21  where we just hang out online and chat with each other and not

22  worry about work too much.  And Dr. Brody wanted to give a

23  short speech to the teams.

24      So he started talking, and he mentioned something very

25  specific that stuck in my mind because it's concerned me to

1    this day, and that is he sort of compared us to Santa Claus

2    providing candy --

3            **MS. NECHAY:**  Objection.  Relevance.

4            **THE COURT:**  Relevance?

5            **MS. NECHAY:**  Relevance as to comments about Santa

6    Claus at a Christmas party.

7            **THE COURT:**  Okay.  Overruled.

8        Go ahead.  Start again.

9            **MR. FOSTER:**  Yes.

10   **BY MR. FOSTER:**

11   **Q.**   You were describing an event that was extremely concerning

12   to you at the Christmas party.  Can you describe to the jury

13   what happened?

14   **A.**   Yes.  And so he had compared us to Santa Claus handing out

15   candy.  And that was concerning to the point that myself and

16   several others like reached out to each other immediately after

17   and were kind of like, did he really just say that?

18       Because it was not something that you should compare any

19   controlled medication to.

20   **Q.**   And how concerned were you and others at Done?

21   **A.**   We were fairly concerned.  That's for sure.

22   **Q.**   And --

23           **MS. NECHAY:**  Objection.  Vague as to "we."

24   **BY MR. FOSTER:**

25   **Q.**   Did you talk to others about Defendant Brody's comments?

1    **A.**    I did, yes.

2    **Q.**    And can you tell the jury who you talked to and how

3    significant the concerns were?

4    **A.**    I don't remember specifically who --

5            **MS. NECHAY:**  Objection.  Compound.

6            **THE COURT:**  Overruled.  Go ahead.

7            **THE WITNESS:**  I don't remember specifically who.

8    There was a lot of these conversations happening on the side,

9    typically.

10         But we talked -- you know, there -- so there was like --

11    so there was an immediate reaction afterward of sort of like:

12    Did he really just say that?  Like that's not okay.

13            **MS. NECHAY:**  Again, Your Honor, objection.  Vague as

14    to who Mr. Menesini spoke to.

15            **THE COURT:**  I think his testimony was he doesn't

16    recall the people that he spoke to.

17            **MR. FOSTER:**  Yes, Your Honor.

18            **THE COURT:**  Okay.

19    BY MR. FOSTER:

20    **Q.**    Now, for part of your time there, was there someone named

21    Jayaram Brindala who worked at the company?

22    **A.**    Yes.

23    **Q.**    And can you tell the jury who Dr. Brindala was?

24    **A.**    Dr. Brindala was a doctor who -- he was brought on,

25    I believe, to be the chief medical officer, for a short period

1   of time anyway.  But he had a lot of really great experience,

2   and I was really happy to be working with him because of that

3   experience.

4       It was exciting, especially given that I had -- you know,

5   I had come on there and I think he started right around the

6   same time as me.  And he had experience, I believe, with the

7   Obama administration, managing hospitals.  He seemed to really

8   know what he was doing and talking about when it came to the

9   medical side of things.

10  **Q.**  And one thing, because we have the court reporter taking

11  down your testimony here, if you could just make sure to go

12  slow so she can get it down.

13  **A.**  Okay.

14  **Q.**  Thank you.

15      Now, did Dr. Brindala, the chief medical officer, start

16  raising concerns with Defendant He in your presence?

17  **A.**  Absolutely, yes.

18  **Q.**  And when you say "absolutely," what were the types of

19  concerns he was raising with her?

20  **A.**  A lot of those concerns we have already been discussing.

21  He just put it in a lot more clear format for a lot of people.

22  **Q.**  And when you say "a lot more clear format," was he

23  explicit about the controlled substances laws?

24  **A.**  Yes, absolutely.

25  **Q.**  And can you tell the jury how explicit he was and what he

1    would say?

2    **A.**   He was -- you know, as you said, very explicit, given that

3    he was very concerned about what -- you know, a lot of things

4    we've already kind of talked about.  But the -- that we were

5    pressuring providers to potentially provide prescriptions to

6    these patients without lengthy follow-ups or follow-ups at all,

7    and jamming initial appointments together as quickly as

8    possible.

9        He was very concerned that these weren't following

10   standards of practice and also following, you know, the legal

11   compliance side of it.

12   **Q.**   And did you attend meetings where he would disagree with

13   Defendant He?

14   **A.**   Yes, absolutely.

15   **Q.**   How strongly would he disagree?

16   **A.**   He was, I think, one of the only one of us that felt

17   comfortable disagreeing like vocally as much.

18       And so he would pretty strongly disagree to the point that

19   they would get in, you know, sort of a vocal argument.

20   **Q.**   And how frustrated was he by a lack of action?

21       **MS. BELL:**  Objection, Your Honor.  Foundation, calls

22   for speculation.

23       **MR. FOSTER:**  I'll lay a foundation.

24       **THE COURT:**  Lay a foundation.

25   \\\

BY MR. FOSTER:

**Q.** Did you speak with Dr. Brindala?

**A.** I did, yes.

**Q.** And did he express concerns to you?

**A.** Yes, absolutely.

**Q.** And how did that relate to his frustration with Defendant He?

MS. BELL: Objection, Your Honor. Hearsay.

THE COURT: Overruled.

THE WITNESS: It was pretty much directly related, because he had all these concerns and he would say them, and they would just kind of get ignored or thrown aside, and none of the changes that he was wanting to see occur were occurring.

BY MR. FOSTER:

**Q.** Did there come a time when he put together a written document?

**A.** Yes, he did.

**Q.** And can you describe the process of preparing it to the jury?

**A.** He went through all of the different --

MS. BELL: I'm sorry. Objection, Your Honor. Again, lack of foundation, calls for speculation as to what Dr. Brindala did.

MR. FOSTER: I'll rephrase, Your Honor.

\\\

1    BY MR. FOSTER:

2    Q.    Were you involved with Dr. Brindala in the process of

3    putting together a document?

4    A.    I was, yes.

5    Q.    Okay.  And can you describe that process to the jury?

6    A.    Yes.  So Dr. Brindala would basically collect all of the

7    concerns from clinicians, myself, others, into this document.

8    And, you know, we would -- he'd have me kind of look through

9    some of the compliance stuff and bring that forward to ensure

10   that this was in this document as well, and that way we could

11   have this document he would write up and sort of lay out in a

12   way that would -- the hope was to get an action plan and

13   movement forward on these so that we could resolve these

14   concerns and issues.

15        MR. FOSTER:  And we have a document that's been marked

16   as Exhibit 219, which was exchanged between the defendants,

17   Dr. Brindala, and the witness, Your Honor.

18        THE COURT:  219 admitted.

19        (Trial Exhibit 219 received in evidence.)

20   BY MR. FOSTER:

21   Q.    And looking at 219, it's entitled "Monthly Risk Mitigation

22   Report."

23        Do you recognize that?

24   A.    Yes.

25   Q.    And was this the document you were referring to?

1    **A.**    It is, yes.

2    **Q.**    And under Background --

3          Well, and was it sent by Dr. Brindala to yourself and both

4    defendants?

5    **A.**    It was, yes.

6    **Q.**    And under Background, did he write (as read):

7                "Healthcare represents a highly regulated

8          industry.  ADHD management frequently involved

9          stimulant controlled substances, which require

10         additional legal and regulatory compliance"?

11   **A.**    Yes.

12   **Q.**    Was that consistent with what you heard him tell

13   Defendant He orally?

14   **A.**    Yes.

15   **Q.**    And looking at the current risks he laid out, the first

16   one says (as read):

17               "Pressure to diagnose ADHD and prescribe

18         stimulants.  Multiple Done providers have

19         specifically expressed a perception of pressure to

20         diagnose ADHD and prescribe stimulants.  Reality:

21         Hilary Ortega and Shahara Stanfield both conveyed

22         that and other Done providers experienced this

23         perception of pressure."

24         Is that consistent with what Dr. Brindala was telling both

25   defendants orally?

1   **A.**   Yes.

2   **Q.**   And what was Defendant's reaction when you told her that

3   orally?

4   **A.**   Once again, Ruthia's was either to say that's not what

5   patients want or would ignore it and just kind of wait for

6   the -- you know, the pushback to blow over.

7            **MS. BELL:**  Your Honor, pardon the interruption, but we

8   have a headset that's not working, so I need a moment.

9            **THE COURT:**  What?

10           **MS. NECHAY:**  Pardon the interruption.  There's a

11  headset for Dr. Brody that's not working, so I need a moment to

12  fix it so he can hear the proceedings.

13      Thank you.

14           **THE COURT:**  Okay.

15                     (Pause in proceedings.)

16           **MS. NECHAY:**  Your Honor, there are no working

17  headsets, so I may need a brief recess to figure this out with

18  the clerk.  One moment, please.

19                     (Pause in proceedings.)

20           **MS. NECHAY:**  Your Honor, I'm so sorry.  Could we do

21  perhaps a check?

22           **THE COURT:**  Go ahead.

23           **MR. FOSTER:**  Testing.  We good?

24           **MS. NECHAY:**  Yes, we're good to go.  Thank you.

25           **THE COURT:**  Okay.

1  BY MR. FOSTER:

2  Q.    Now, Exhibit 219 references a nurse named --

3       Well, sorry.  Let me ask a question.

4       The recommendation is to emphasize the clinical autonomy

5  of the providers.

6       Did Defendant He want that to happen?

7  A.    No.

8  Q.    And explain to the jury.

9  A.    She wanted providers to follow, you know, the -- the

10 guidelines of -- of Done so that we could get more patients.

11 Q.    And it references Hilary Ortega.

12       MR. FOSTER:  Your Honor, we have a communication

13 marked as Exhibit 888.

14       MS. BELL:  I'm sorry, Your Honor.  Objection.  This

15 witness is not on that document.  There's no foundation for it.

16 There are multiple problems with that exhibit.

17       So objection.

18       THE COURT:  Well, that document -- this document -- it

19 doesn't have to be the witness's document.  The question is:

20 Is there a basis for admission of that document, 888?

21       MR. FOSTER:  Yes, Your Honor.  And I'll lay a

22 foundation for it.

23       MS. BELL:  Your Honor, it's also a -- an excerpt of

24 something larger --

25       THE COURT:  Well, whether it's complete or not is

1    another issue.  Okay?

2        But first we have to see whether it's admissible.  So

3    let's take a moment.  888; is that right?

4            MR. FOSTER:  Can we bring it up just for the witness?

5            THE COURT:  Yes.

6            MR. FOSTER:  Ms. Braga, can you show the witness 888.

7    BY MR. FOSTER:

8    Q.    Do you recognize this, Mr. Menesini?

9    A.    I do, yes.

10   Q.    And how do you recognize it?

11   A.    This is in the provider channel of Slack.

12   Q.    And how do you recognize what was in the provider channel

13   of Slack?

14   A.    Because I was also on the provider channel of Slack.

15           MR. FOSTER:  We'd move 888 for admission.

16           THE COURT:  Admitted.

17       (Trial Exhibit 888 received in evidence.)

18           MR. FOSTER:  And may we publish, Your Honor?

19           THE COURT:  Yes.

20   BY MR. FOSTER:

21   Q.    And in Exhibit 888, did Defendant Brody write (as read):

22           "Hi, prescribers.  Looking forward to hearing

23       any questions or concerns.  David Brody"?

24   A.    Yes.

25   Q.    And did Ms. Ortega respond (as read):

1          "How about three-month follow-ups, and not an

2      endless unrealistic new patient additions while

3      expecting to manage a patient for 1/14 an hourly rate

4      per month, and stop treating controlled medications

5      like Lexapro refills?"

6  **A.**    Yes.

7  **Q.**    And so in regards to this 1/14 an hourly rate per month,

8  how did that relate to the compensation structure that

9  Defendant He imposed?

10 **A.**    That was the compensation structure that existed.

11 **Q.**    And so, for example, if a provider had a thousand patients

12 on their patient panel, how would they get paid for that?

13 **A.**    They would get paid 1/14 of that for each patient on that

14 panel.

15 **Q.**    And were they paid for any services besides writing a

16 prescription?

17 **A.**    Not -- it was considered to be included in the 1/14, so

18 not directly, no.  No increase of payment.

19 **Q.**    Sorry.

20     And if they didn't write prescriptions, what would happen

21 to those patients?

22 **A.**    The patients would leave the platform.

23         **MS. BELL:**  Objection, Your Honor.  Move to strike.

24 Lack of foundation.

25         **THE COURT:**  Sustained.

BY MR. FOSTER:

Q.   Did you become familiar with complaints from patients who didn't get their medication?

A.   Yes.

Q.   And can you tell the jury about those complaints?

A.   Typically, if a patient didn't get their medication for whatever reason, if -- and if we wouldn't get them to a provider that could get them medication, there would be no reason for that patient to stay on the platform, because otherwise they're paying a monthly fee for nothing, so they would stop paying.

Q.   And how did that relate to the pressure to prescribe that Ms. Ortega was talking about?

A.   The -- they were -- you know, if they didn't prescribe, they didn't get patients on their panel, so they weren't making money.

Q.   And --

A.   So providers would have to continue to prescribe in order to get more patients on their panel in order to make money.

Q.   And Ms. Ortega wrote (as read):

     "Stop treating controlled medications like
     Lexapro refills."

     What did that refer to?

A.   That would be her saying that we were treating the prescriptions such as Adderall as if they were an

1  antidepressant refill.  Lexapro is an SSRI.

2  **Q.**  And is Lexapro a controlled substance?

3  **A.**  It is not, no.

4       **MR. FOSTER:**  And we have an e-mail from Ms. Ortega to

5  Mr. Menesini.  It's previously been marked as Exhibit 952, Your

6  Honor.

7       **THE COURT:**  952 admitted.

8       (Trial Exhibit 952 received in evidence.)

9       **MR. FOSTER:**  And, Ms. Braga, if we can show

10  Exhibit 952 at 2 to 3.  Yeah.

11  **BY MR. FOSTER:**

12  **Q.**  And so was that an e-mail from Ms. Ortega that was sent to

13  you?

14  **A.**  Yes, it was.

15       **MR. FOSTER:**  And if we go to page 7 to 8.  Go to

16  page 7.  I'm sorry.

17  **BY MR. FOSTER:**

18  **Q.**  Did Ms. Ortega write (as read):

19       "Providers had also expressed that they were

20       incentivized not to administer follow-ups due to the

21       limited capacity in their schedule and were told to

22       fill their schedule with new patients in order to

23       break even.  Only including new patients is a very

24       obvious tactic to increase revenue due to the higher

25       payout rate with an initial consult."

1    Do you see that?

2  **A.**   Yes.

3  **Q.**   And how does that relate to the concerns with the

4  compensation model you were discussing?

5  **A.**   Directly related in that, as I was saying, we would focus

6  on trying to increase the initial appointments for providers

7  and reduce any follow-ups or remove follow-ups as much as

8  possible so that we could give them more of those initial

9  consults so that they would increase their patient load,

10  because not only would they get the initial appointment fee

11  paid, but they would also add those patients to their panel and

12  continue to make more money.

13  **Q.**   And did Nurse Ortega go on to say (as read):

14    "Providers also express distrust with no

15    guidance on inclusion of necessary documentation

16    despite the company stating in their contracts to

17    give trials of stimulants even if the provider does

18    not fully expect the diagnosis of ADHD"?

19  **A.**   Yes.

20  **Q.**   And then is what's shown below something that you're

21  familiar with as part of the Done contract?

22  **A.**   Yes.

23  **Q.**   And was the concern about medication trials and their

24  appropriateness raised with Defendant He?

25  **A.**   It was, yes.

1    Q.   And what was the concern raised by clinicians about giving

2    medication trials to patients?

3         MS. NECHAY:  Objection.  Vague as to "clinicians."

4    Who specifically?

5         THE COURT:  Overruled.

6         THE WITNESS:  Clinicians were concerned about the fact

7    that they were expected to give a trial of ADHD medication,

8    being a controlled substance, to someone that they weren't sure

9    had ADHD.

10   BY MR. FOSTER:

11   Q.   And did Nurse Ortega go on to say (as read):

12        "Upon an exit interview with one provider

13        leaving the company, had stated that she rejected a

14        diagnosis of ADHD and then was told by the Done staff

15        to reconsider the diagnosis.  Furthermore, the

16        company policy was to fire any provider who had a

17        poor customer rating three times, which instilled

18        incentive to prescribe stimulants as patients were

19        primarily seeking medication for ADHD and stimulants

20        are the recommended option if the diagnosis is

21        present.

22        "This correlated with the idea of Done being

23        concierge ADHD treatment with placing patient wants

24        above providers' clinical decision-making" --

25        (Reporter interruption for clarity of the record.)

1    BY MR. FOSTER:

2    Q.    (as read):

3            "This correlated with the idea of Done being

4        concierge ADHD treatment with placing patient wants

5        above providers' clinical decision-making in fear of

6        providers losing their job."

7        And were you present when that concern was shared with

8    Defendant He?

9    A.    Yes.

10   Q.    And what was her reaction?

11   A.    Once again, we should be focusing on the patients' wants

12   and increasing growth.

13   Q.    And if we turn back to Exhibit 219, the risk mitigation

14   report, at pages 2 -- at page 2, did Dr. Brindala also raise a

15   concern about the follow-up policy at Done?

16   A.    He did, yes.

17   Q.    And turning to page 3, did Dr. Brindala write (as read):

18           "Traditional clinics and telemedicine platforms

19       use a standard of care of synchronous visits every

20       three months"?

21   A.    Yes.

22   Q.    (as read):

23           "Even more synchronous visits occur when

24       initiating treatment or when managing

25       higher-complexity patients."

1   A.   Yes, absolutely.

2   Q.   And did he write that (as read):

3        "Emereum, Hines, Morar, and Ortega all separated

4        from the company.  Other Done providers continue to

5        refill stimulant prescriptions without synchronous

6        visits, which puts their licenses and the company at

7        risk for legal consequences"?

8   A.   Yes.

9   Q.   And is that consistent with what he had previously told

10  Defendant He orally?

11  A.   Yes, absolutely.

12  Q.   And what was her reaction that the company was at risk of

13  legal consequences if it didn't allow follow-up care for

14  patients?

15  A.   Once again, just to push it back on:  We should follow

16  what patients want and continue with what we were doing.

17  Q.   And if we look at --

18       MR. FOSTER:  And we have an exhibit previously marked

19  as Exhibit 302, which is an e-mail between Defendant Brody, a

20  provider, and this witness.

21       THE COURT:  302 admitted.

22       (Trial Exhibit 302 received in evidence.)

23  BY MR. FOSTER:

24  Q.   And do you recognize this, Mr. Menesini?

25  A.   It just popped up.  One second.

1    **Q.**    Yeah.

2    **A.**    Yes, I do.

3    **Q.**    And what is this?

4    **A.**    This was a message from Svetlana Zak to me with David and

5    Jake and Michelle cc'd.

6    **Q.**    And if we look at --

7          Well, who was Ms. Zak?

8    **A.**    She was one of the clinicians on the platform.

9    **Q.**    And when we look at Ms. Zak's e-mail or Nurse Zak's

10   e-mail, did she write (as read):

11          "These issues have some urgency.  about

12          85 percent of my patients are new to ADHD treatment

13          and are starting on medication for the first time.

14          Starting on a new medication such as a stimulant or

15          any medication, for that matter, requires a follow-up

16          appointment."

17          And did she go on to say (as read):

18          "I am asking to be able to meet the community

19          standard of care"?

20   **A.**    Yes, absolutely.

21   **Q.**    Did Defendant Brody respond to this message?

22   **A.**    I don't believe so.

23   **Q.**    Okay.  Did Defendant Brody, in your presence, ever appear

24   to care about these clinician concerns?

25   **A.**    I -- I typically would try to create meetings between them

1  so that they had someone to talk to.  It's hard for me to know

2  if they ever actually occurred or that he cared about it.

3  **Q.**  Did you have issues reaching Defendant Brody?

4  **A.**  Yes, absolutely.

5  **Q.**  And can you talk about that to the jury?

6  **A.**  Once again, you know, his difficulty with tech made it

7  very difficult to get in touch with him, to the point that I'd

8  have to use a mix of communication modes to try to get him to

9  respond to certain things.

10  **Q.**  And what was your experience as to whether he would

11  respond to concerns like this in a timely manner?

12  **A.**  It didn't commonly happen in any timely manner.  That's

13  for sure.

14  **Q.**  And if we look at the bottom of this message, did Nurse

15  Zak write (as read):

16        "99.9 percent of the patients have questions.

17     It is not safe to limit the amount of messages a

18     patient can send"?

19  **A.**  Yes.

20  **Q.**  What was she referring to when she said it's not safe to

21  limit the amount of messages a patient can send?

22  **A.**  I believe she's referring to the messaging platform that

23  was on our system at the time where we would in -- I believe

24  for certain periods of time, we actually limited the amount of

25  messages that could be sent from the patient to the provider.

1   And even then, most often, the messaging didn't get to a

2   provider; it went to the care team.

3   **Q.**   So who limited the amount of messages a patient could send

4   to their provider?

5   **A.**   Ruthia was in charge of all this.

6   **Q.**   And who determined that the messages wouldn't go to the

7   clinician directly but would go to the care team?

8   **A.**   Ruthia.

9   **Q.**   And do you know where the care team was located?

10  **A.**   Majority was located in the Philippines.

11  **Q.**   And do you know whether the members of the care team were

12  medical professionals?

13  **A.**   I do not, no.

14  **Q.**   Okay.  Now, if we can --

15          **MR. FOSTER:**  We have another e-mail from Nurse Zak to

16  Mr. Menesini.  It's previously been marked as 304.

17          **MS. BELL:**  I'm sorry.  Which exhibit?

18          **THE COURT:**  304.  Admitted.

19      (Trial Exhibit 304 received in evidence.)

20  **BY MR. FOSTER:**

21  **Q.**   Do you recognize this?

22  **A.**   I do, yes.

23  **Q.**   And what happened with Ms. Zak?

24  **A.**   She had resigned.

25  **Q.**   And did she say (as read):

1          "I resign effective immediately.  I have

2      discussed my concerns of unsafe medication

3      prescribing and unsafe medical treatment"?

4  **A.**   Yes.

5  **Q.**   And did the policies that Ms. Zak was concerned about in

6  terms of follow-up appointments continue after she left?

7  **A.**   Yes.

8  **Q.**   Okay.  And going back to Exhibit 219, if we go to page 3.

9      You previously talked about the process of transferring

10  patients when prescribers quit.

11      Do you recall that?

12  **A.**   Yes.

13  **Q.**   And was Dr. Brindala also concerned about that?

14  **A.**   Yes, absolutely.

15  **Q.**   And did he say that (as read):

16          "Until a transferred patient completes a

17      synchronous visit with a new provider, short refill

18      bridges of seven days would be consistent with the

19      standard of care"?

20  **A.**   Yes.

21  **Q.**   And did he write (as read):

22          "Reality:  Thousands of patients have been

23      transferred to new providers one time, two times,

24      three times, or more.  The company has encouraged

25      stimulant refills with chart review without

1      necessarily conducting a synchronous visit in a

2      timely manner.  This practice puts the company

3      providers and the company at risk for legal

4      consequences"?

5  A.   Yes.

6  Q.   And was that consistent with what he had told Defendant He

7  previously orally?

8  A.   Yes, absolutely.

9  Q.   And he did he write (as read):

10      "Recommendation:  The company must require

11      transferred patients to complete a synchronous visit

12      with a new provider prior to stimulant refills beyond

13      seven days"?

14  Q.   Did that happen?

15  A.   It did not, no.

16  Q.   Why not?

17  A.   Because Ruthia was the decision-maker.

18  Q.   And what did she say about whether she wanted that to

19  happen?

20  A.   She did not want it to happen because it would take time

21  away from those providers seeing new patients.

22  Q.   And if we go to --

23      Well, after this first risk mitigation report was sent,

24  did you have conversations with Defendant He and Brody?

25  A.   Yes.

1    **MR. FOSTER:**  And showing an e-mail that's been marked

2  as 230, which is a communication between both defendants and

3  the witness.

4    **THE COURT:**  230, admitted.

5    (Trial Exhibit 230 received in evidence.)

6  **BY MR. FOSTER:**

7  **Q.**  Did Defendant He and Brody respond by an e-mail to the

8  risk mitigation report?

9  **A.**  They did, yes.

10  **Q.**  And did they include Dr. Brindala when they responded?

11  **A.**  They did not.

12  **Q.**  And did Dr. Brody write and then Defendant He respond?

13  **A.**  Yes.

14  **Q.**  Okay.  And so are the comments of Defendant He in the bold

15  and the words of Brody in gray?

16  **A.**  I believe so, yes.

17  **Q.**  And so did Defendant Brody write (as read):

18      "Overall comment:  To have all of this written

19      down in an official document circulated among 10

20      people with the potential for leaks to more was not

21      wise, in my opinion.  I have no idea if it would be

22      considered discoverable in a legal sense, but if it

23      was, it would be evidence to be used against us if

24      someone wished"?

25  **A.**  Yes.

1  **Q.**  And in your conversations with Defendants He and Brody,

2  were they more concerned about fixing the problems or

3  preventing people from finding out about them?

4  **A.**  Preventing people from finding out for sure.

5  **Q.**  And can you explain that to the jury?

6  **A.**  Yes.  Well, initially, if you -- you know, this e-mail

7  thread was actually not -- you know, it wasn't sent to the

8  entire team.  So we were basically told to not have this

9  information out to the whole team because there was concern

10 that, as what's listed here, it could be leaked.

11       And the concern was all around this and, you know, what

12 we're writing down in here could be us admitting that we're

13 doing something wrong instead of, hey, we should look at this

14 and like take it seriously and try to solve these things.

15 **Q.**  And did that concern you?

16 **A.**  Absolutely, yes.

17 **Q.**  And why did it concern you?

18 **A.**  Because I thought we should take it seriously and resolve

19 these issues.

20 **Q.**  Was there a call held with Dr. Brindala and both

21 defendants and yourself regarding his risk mitigation report?

22 **A.**  Yes.

23 **Q.**  And in the call, how hard was Dr. Brindala pushing that

24 Done shouldn't violate the law?

25 **A.**  He pushed pretty hard in any conversation that was around

1   this.

2   **Q.**   And in that conversation, did it feel like the defendants

3   took him seriously?

4   **A.**   It did not, no.

5   **Q.**   Now, did Dr. Brindala, after this first risk mitigation

6   report, continue to generate them?

7   **A.**   Yes, absolutely.

8   **Q.**   And in December, did you learn about a patient of Done's

9   named Harlan Band?

10  **A.**   Yes.

11  **Q.**   Who was Harlan Band?

12  **A.**   He was a patient that a provider had seen prior to me

13  being there, I believe, that had passed away from what we were

14  being told, anyway, was an overdose.

15          **MS. BELL:**  Objection, Your Honor.  Sidebar, please.

16          **MS. NECHAY:**  Objection.

17          **THE COURT:**  Okay.  The question is -- well, I'm going

18  to strike it.  I'm going to ask that you lay a foundation as to

19  what conversations he had with what people and what he was

20  told.

21          **MS. BELL:**  Your Honor, I'm sorry.  May we approach?

22      I didn't mean to speak over the Court.

23          **THE COURT:**  Pardon?

24          **MS. BELL:**  I said I'm sorry.  I didn't mean to speak

25  over Your Honor --

1       THE COURT:  That's all right.

2       MS. BELL:  -- but may we approach for a moment?

3   There's a further matter on this point --

4       THE COURT:  Well, you know what we'll do?  I think

5   we'll take a recess.

6       And, ladies and gentlemen, it's a little early, but we

7   will recess until a quarter of 1:00.

8       Remember the admonition given to you:  Don't discuss the

9   case, allow anyone to discuss it with you, form or express any

10  opinion.

11      Okay.  We're in recess.

12                  (The jury leaves the courtroom.)

13   (Proceedings were heard out of the presence of the jury.)

14      THE COURT:  Okay.  Let the record reflect -- please be

15  seated -- all the jurors have retired.

16      Yes, Ms. Bell.

17      MR. FOSTER:  Do we want to excuse the witness, Your

18  Honor?

19      THE COURT:  Sure.

20      THE WITNESS:  Come back at 12:45?

21      THE COURT:  Yes, please.

22                  (Witness leaves the courtroom.)

23      THE COURT:  Ms. Bell.

24      MS. BELL:  Thank you, Your Honor.

25      As we discussed during motion practice, we think it would

1　be highly improper, and I think the Government agrees, to leave

2　the jury with the misimpression that Mr. Band passed away from

3　anything related to Adderall or Ms. He's platform.

4　　　I was not anticipating that this would be elicited from

5　this witness, but I believe it is incumbent on the Government

6　-- not on cross-examination, not on us -- but incumbent on

7　the Government to clarify and elicit in questioning any

8　witnesses on this point that there is no suggestion whatsoever,

9　period.

10　　　　THE COURT:  Yes.  That's fine.

11　　　　MS. BELL:  And perhaps we need some type of limiting

12　instruction, because what happened was the witness -- and I'm

13　sure that Mr. Foster did not anticipate this -- but the witness

14　says, "Well, what we were told, at least," as if there was some

15　suggestion that maybe that was not true and perhaps he died

16　from something else, and we must correct that.

17　　　　THE COURT:  Well, I don't know what he was told.

18　Okay.  The answer is that I agree with you --

19　　　　MS. BELL:  Thank you.

20　　　　THE COURT:  -- that the Government should clarify with

21　this witness the basis -- that whatever he was told did not

22　turn out to be the case, or however you want to -- however you

23　want to deal with it.

24　　　I certainly can give an instruction on this as well, but I

25　prefer not doing so.  I prefer that the Government clarify that

1   point.  Okay?

2          MR. FOSTER:  I agree with Ms. Bell, and it will be

3   made clear.

4          THE COURT:  Okay.

5          MS. BELL:  Thank you, Your Honor.

6      And just to be clear, I don't think that the witness was

7   told anything -- as far as I know, there's no suggestion that

8   Mr. Band might have passed away from anything to do with Done,

9   so I -- I don't think that he would have even been told that,

10  and I don't think we should be -- if he were told that, then I

11  don't think --

12         THE COURT:  Well, all he said he was told that the

13  decedent passed away from an overdose.  As I understand, that

14  may be accurate, but that the overdose had nothing to do with

15  Done or the defendants.

16         MS. BELL:  Yes, Your Honor.  And I don't think we need

17  to get into an overdose, period, particularly with this

18  witness.  I think the fact that he passed away and it was

19  unrelated to Done is the best way to handle this.

20     Once we start getting involved in overdose and he already

21  spontaneously suggested to the jury that perhaps he had been

22  misled, the entire tenor of this testimony is that everything

23  was false and illegal at the company, and so I think it's quite

24  damaging --

25         THE COURT:  I think Ms. Bell has a point.  In other

1    words, in the context of the testimony in the case, to suggest

2    that the person died of on overdose -- which, by the way, may

3    be the truth, which may be the truth -- is possibly prejudicial

4    because it corroborates the dangerousness of controlled

5    substances or -- or -- well, the dangerousness of controlled

6    substances or drug use and so forth.

7         So I think that's a good point, and you can clarify.

8         **MS. BELL:**  It's actually a fentanyl overdose, Your

9    Honor, so there could be nothing more inflammatory, I think, in

10   this day and age to put out there.  I don't think it's -- it's

11   certainly not the right witness and the right time, and if

12   there's something --

13        **THE COURT:**  I think that there is a 403 problem.  I

14   think that the prejudicial effect can easily outweigh its

15   probative value, and therefore, I think that type of testimony

16   should not be elicited.

17        What the cause of death of any of these individuals, which

18   I understand to be not as a result of the operation of Done or

19   of the defendants' activities, it would be -- would be

20   prejudicial and therefore should be excluded.

21        **MR. FOSTER:**  I think -- and I'll lay the foundation

22   and make it clear.  I think you're going to see risk mitigation

23   reports on that topic that go to the defendants, and so --

24        **THE COURT:**  Well, that's a different story.

25        **MR. FOSTER:**  -- he's involved in them, which is why

1   we're asking about this.

2          **THE COURT:**  That's a different story.  Okay.  That's a

3   different story.

4       Okay.  So we're all on the same page.

5          **MR. FOSTER:**  Yes, Your Honor.

6          **MS. BELL:**  Yes, Your Honor.

7          **THE COURT:**  Now, what's the story about Mr. Steskal?

8          **MR. SCHACHTER:**  Your Honor, he'll be here at 4:00 p.m.

9          **THE COURT:**  All right.

10         **MS. NECHAY:**  Your Honor, I did want to make a comment

11  on Dr. Brody's behalf and specifically related to this issue.

12      My particular objection is with the fact that even if

13  there are some additional risk mitigation reports concerning

14  the decedent, how is that relevant to this witness?  What is

15  this witness contributing to these issues?

16      He's not an expert.  He's not --

17         **THE COURT:**  I didn't understand that there are -- I

18  didn't understand -- I'm sorry.

19      There are some additional mitigation memos.  And your

20  objection is what?

21         **MS. NECHAY:**  There's no foundation.  He did not write

22  these reports himself, and so I'm objecting to foundation, to

23  relevance.  I don't know how this witness could possibly

24  contribute.  Just what is the relationship to these reports and

25  this witness?

**PROCEEDINGS**

1          THE COURT:  Okay.  So your objection is that this

2   witness can't testify as to those documents; is that right?

3          MS. NECHAY:  Yes.

4          THE COURT:  And the response?

5          MR. FOSTER:  He received them.  He was involved.

6          THE COURT:  He received them.  That's enough.  That's

7   enough.  He does have familiarity with the documents.

8       So on that basis, it's overruled.

9          MS. NECHAY:  Thank you.

10         THE COURT:  Anything else?

11         MR. FOSTER:  No, Your Honor.

12         THE COURT:  Yes?

13         MR. FOSTER:  The next witness, Your Honor, after this

14  one -- I imagine it will be a little bit of time with cross and

15  everything, but the next witness is Ms. Emereum, and so there's

16  been a motion filed and an opposition to certain exhibits with

17  Ms. Emereum's testimony.

18      So before she testifies on direct, we would --

19         THE COURT:  This is -- we might as well take some time

20  and go through this.  We have some time.

21         MR. FOSTER:  This is the question of whether agency

22  statements are admissible under the exception to the hearsay

23  rule for agents of the defendant, namely, nurse practitioners

24  at Done.

25         THE COURT:  And the particular witness is?

1    MS. GURSKIS:  She is Nwamaka Emereum.  She was a nurse

2    practitioner at Done.

3    THE COURT:  And the basis of the objection, as I

4    understand it, is that the Defense contends that these are not

5    admissible because these individuals are not agents of the

6    defendant; is that correct?

7    MR. SCHACHTER:  That is correct, Your Honor.  These

8    are text messages on a private platform with some people that

9    even no longer work there.  They are independent contractors.

10    THE COURT:  Well, did they make the statements -- did

11    they make the statements at the time that they were not there?

12    MR. SCHACHTER:  I believe that some of the statements

13    in the text message are made --

14    THE COURT:  The Government indicates no.  But I --

15    let's treat -- let's start with the assumption that these

16    statements were made during the course of the relationship that

17    existed -- I'll call it relationship -- existed between the

18    declarant and -- and Done.  Let's assume that.

19    If they're not there, that's another issue, and I can hear

20    some discussion about that.

21    But to the extent that they're there -- that they are

22    there, the question is:  What is the relationship between these

23    individuals and the corporation?

24    And as I understand it, the rule is that it would be

25    admissible as a statement of an agent if, in fact, it occurs

1  during the course of the agency.  And I don't know that it has

2  to be, I mean, there's sort of --

3      It's not the admission of a coconspirator.  It's -- so it

4  has to be simply an admission or a statement made by the -- by

5  an agent who is acting within the scope of their employment.

6  That's as I understand the rule to be.

7      I also understand -- oh, well.  You can supplement it, but

8  I understand the fact that a person is an employee or an

9  independent contractor is -- may be relevant, but it's not

10  definitive.  That is, it's not "the test" as to whether or not

11  an individual was an agent.  They can be neither an employee

12  nor an independent contractor and they could still act as an

13  agent for the corporation.

14      Okay.  That's -- as I understand, that's the status of the

15  law.  Am I --

16          **MS. GURSKIS:**  May I make one adjustment, Your Honor?

17          **THE COURT:**  Yes, go ahead.  Make all the adjustments

18  you want.

19          **MS. GURSKIS:**  So I think Your Honor is absolutely

20  correct as to the agency.  Employment relationship must have

21  existed.  The statement needs to be made during the

22  relationship.  I think what it sounds like --

23          **THE COURT:**  That's what I'm saying.

24          **MS. GURSKIS:**  -- and then concerning a matter within

25  the scope of the agency, so I think it doesn't necessarily have

1  to be, oh, this was made during a meeting at work; it can still

2  be about work, about an event at work, but maybe was made after

3  hours or, in this particular instance, a text message.

4      THE COURT:  Yes, I think that's correct.  In other

5  words, it has to be a statement made about the -- about the

6  relationship about her, basically her relationship with the

7  company and what was occurring within the company.  I think

8  that's right.

9      If, for example, she were to say, oh, by the way, I killed

10  somebody, or -- no, then that's not about her employment, and

11  so it's not -- it would not be admissible.

12      Mr. Schachter.

13      MR. SCHACHTER:  I think the critical issue is -- and

14  it's *United States v. Bonds* --

15      THE COURT:  *United States v.* --

16      MR. SCHACHTER:  *Bonds*.

17      THE COURT:  I've heard of that.

18      MR. SCHACHTER:  Yep.  Ninth Circuit, 608 F.3d 495 at

19  503, which we cite in our papers -- makes it clear that

20  actually the distinction between independent contractor and

21  employee is a very significant one, and it goes through and

22  analyzes and excludes statements which the Government sought to

23  introduce as statements by an agent, because the Ninth Circuit

24  ruled that the athletic trainer was an independent contractor

25  rather than an employee.

1      And in this circumstance, these are independent

2  contractors.  Your Honor saw the agreements.  These women in

3  particular signed the platform access agreement, which --

4      I'm sorry, Your Honor.

5          THE COURT:  Okay.  No, I understand your point.

6      You cite *Bonds* for the proposition that if they're an

7  independent contractor, it's not admissible, and the Government

8  takes the position, as I understand it, they weren't

9  independent contractors.

10     Now, I don't know.  I'm not suggesting it.  But is that --

11  is it the Government's position they were or were not

12  independent contractors and that's the distinction between the

13  *Bonds* case and this case?

14          MS. GURSKIS:  Certainly not, Your Honor.  I think the

15  rule itself incorporates the agency part of it, not just the

16  employment.  It's an agent or an employer, as Your Honor

17  recognized.

18     And so in this particular instance, I think regardless of

19  the contours of the contract, which I think, based on the

20  testimony from Ms. Amour Ross, it's quite clear were not

21  followed, and Mr. Menesini supported that as well, they were

22  treated like employees.  They were treated like agents.

23     And under *Bonds*, it's all about control.  And I think

24  we've seen already on the record from the prior two witnesses

25  the degree of control that the defendants were asserting and

1   exerting over these witnesses.

2       **THE COURT:**  So your position is they are not

3   independent contractors, which is what I -- your position is

4   they are agents; they're not acting as independent contractors.

5   Whether employees or not, I don't know.  They may for certain

6   purposes have been treated like employees; they may for certain

7   purposes not be treated like employees.  For example, how is

8   their compensation reflected in their tax documents and so

9   forth, but that for purpose of agents -- agency, they acted as

10  agents.

11      So my question to you, Mr. Schachter, is:  Are you

12  relying -- is your argument basically these people were

13  independent contractors and therefore -- period, and therefore,

14  under *Bonds*, it's -- it's excludable or not admissible --

15  putting it the other way because the Government bears the

16  burden -- that's your point?

17      **MR. SCHACHTER:**  Well, I think there are several

18  points.

19      **THE COURT:**  Go ahead.

20      **MR. SCHACHTER:**  First is their agreement is with Done,

21  not with Ms. He.  So that's a separate separation.

22      And so a threshold issue is:  Are they agents of Done?

23  And then somehow by virtue of the fact that they are agents of

24  Done -- if that was the case, which it is not -- then does that

25  make them agents of Ms. He individually?

1      And the -- *Bonds* lays out a seven-factor test that the

2  Government has to prove by substantial evidence is what the

3  Ninth Circuit says in order to establish the agency

4  relationship.

5      And core to this question, I think, are two points.

6      One is:  Well, what were these nurse practitioners --

7  these are all nurse practitioners -- what were they doing?

8      Well, their core role was to diagnose and treat patients,

9  and they all, nurse practitioners, will testify that nobody

10  told them what to diagnose or how to diagnose or what to

11  prescribe or not to prescribe.

12      In fact, the witnesses in their communications, which the

13  Government is seeking to introduce, and we quote them on page 5

14  of our submission, specifically say they don't -- they don't do

15  that.  One says (as read):

16          "Our contract states that they are not

17      authorized to tell us how and when to prescribe for

18      our patients."

19      Response:  "I will not be doing the refill system."

20      Another text:  "I don't do them" about the refill system.

21          "I think I'm going to flat-out refuse."

22          **THE COURT:**  Mr. Schachter.

23          **MR. SCHACHTER:**  I'm sorry.

24          **THE COURT:**  I'm sorry for interrupting you, but you

25  are saying that that's a disputed issue as to whether or not

1   they are independent contractors or not.  And I -- and you are

2   disputing it.  The Government says there is ample evidence in

3   the record even to date that they were treated as employees.

4   Okay.

5        I'm not commenting.  I think there was -- by the way, yes,

6   I can comment on this.

7        I think there is ample evidence that they were treated as

8   employees.  Notwithstanding documents that called them

9   something else and notwithstanding any documents that said A,

10  B, C, and D, those documents were essentially ignored, overrun,

11  or overlooked by the practice as it occurred.

12       And after all, I'm to decide the admissibility based upon

13  the evidence in the record, which would include these documents

14  but not include them at -- not exclusively review them.

15       So I think what I need to do is to figure out --

16       By the way -- is that a jury question as to -- everybody

17  says no?

18       No.  Okay.

19       So then I make a determination as to whether or not the

20  evidence is such that would permit the jury to consider this

21  evidence against Ruthia He; is that right?  I make the

22  determination?

23            MR. SCHACHTER:  Yes.

24            MS. GURSKIS:  Your Honor --

25            THE COURT:  Okay.  Then I'll do it.

 1          MS. GURSKIS:  I'm sorry.

 2          THE COURT:  No, I have nothing more to say.  I mean,

 3     I'll want to read the *Barry Bonds* case.  I lived through it,

 4     but I didn't adjudicate it.  Anyway...

 5          MS. GURSKIS:  I just wanted to add some context to the

 6     exhibits that Mr. Schachter was flagging, which is that when

 7     the providers are commenting on the contract, they're

 8     commenting on Defendant He acting inconsistently with the

 9     contract and directing them to do things that they felt were

10     outside the normal course of professional practice and

11     inconsistent with the contract.

12          They're saying, oh, this is such a joke.  They're treating

13     us like we're independent contractors, but then she's messaging

14     patients unbeknownst to me.  She's refilling prescriptions

15     unbeknownst to me.

16          So I think that bared some context.

17          MR. SCHACHTER:  Right.  They're saying that Done lacks

18     the power and authority to ask us to do these things, and we

19     are not going to do them.  That is evidence that they're

20     independent contractors --

21          THE COURT:  No, I don't think that's what they're

22     saying.  I think they're saying that notwithstanding the power

23     and authority, they chose not to do it that way.  They chose to

24     do it in a different way.  They chose to exercise their

25     authority in a different way and in a way inconsistent with

1    what the documents provided.  That's what they're saying.

2         So I want to think about it, and I will have lunch.

3         **MR. SCHACHTER:**  Thank you, Your Honor.

4    I just want to raise one last thing --

5         **THE COURT:**  Yes.

6         **MR. SCHACHTER:**  -- which is we also, at the end of --

7    our response is just about six pages.  At the very end, we

8    raised two 403 issues to statements in the text messages that

9    "that woman is evil, God is good, and I'm so thankful he saved

10   me from that place.  That woman is evil, and Ruthia handled the

11   incident in the cold-blooded way you would expect."

12        This is a lengthy text message exchange among some angry

13   folks, and that is unnecessary and it is highly prejudicial.

14        **THE COURT:**  It's highly prejudicial.  I just don't

15   know that it has any probative value.

16        **MR. SCHACHTER:**  Agreed.

17        **THE COURT:**  Of course, it does answer the question

18   about completeness.

19        **MR. SCHACHTER:**  Well, I think they are certainly --

20   when Your Honor looks at the text messages --

21        **THE COURT:**  I got it.

22        **MR. SCHACHTER:**  -- obviously, they're not necessary to

23   complete.

24        **THE COURT:**  Thank you for raising that.  All right.

25   There we go.

1    Can we take a break?

2         **MS. GURSKIS:**  We can redact those comments, Your

3    Honor.

4         **THE COURT:**  Redact those.  That's the right thing to

5    do.  Okay.

6         **MR. SCHACHTER:**  Thank you.

7         **THE COURT:**  And my belief is, subject to my reading

8    *Bonds*, is that they're admissible.

9    Okay.

10        **MS. GURSKIS:**  Thank you, Your Honor.

11                    (Recess taken at 12:02 p.m.)

12              (Proceedings resumed at 12:46 p.m.)

13       (Proceedings were heard out of the presence of the jury.)

14        **THE COURTROOM DEPUTY:**  Come to order.  Court is now in

15    session.

16        **MR. SCHACHTER:**  Your Honor, we're missing our client.

17        **THE COURT:**  Sorry?

18        **MR. SCHACHTER:**  We're missing our client.

19        **THE COURTROOM DEPUTY:**  Waiting for Ms. He.

20        **THE COURT:**  Oh.  Yeah.  We have to wait.

21                    (Pause in proceedings.)

22        **THE COURT:**  So I think I should strike the last

23    answer.

24        **MR. FOSTER:**  Yes, Your Honor.  That's fine.

25        **THE COURT:**  And we'll proceed.

1          (Pause in proceedings.)

2          THE COURT:  Do you have an estimate as how long you'll

3    be?

4          MR. FOSTER:  I think 20 to 30 minutes at most.

5          (Pause in proceedings.)

6          THE COURTROOM DEPUTY:  Please rise for the jury.

7          (The jury enters the courtroom.)

8      (Proceedings were heard in the presence of the jury.)

9          THE COURTROOM DEPUTY:  You may be seated.

10         THE COURT:  Let the record reflect all jurors are

11   present, parties are present.

12       As to the last answer, it's stricken.  The jury is

13   admonished to disregard it.

14       You may proceed.

15         MR. FOSTER:  Thank you, Your Honor.

16       Your Honor, we have Exhibits 248, 254 -- 248 and 254,

17   which are documents sent to and from Mr. Menesini.

18         THE COURT:  248 and 254 admitted.

19       (Trial Exhibit 254 received in evidence.)

20   BY MR. FOSTER:

21   Q.   And, Mr. Menesini, did Dr. Brindala continue to send risk

22   mitigation reports?

23   A.   He did, yes.

24   Q.   And did the December risk mitigation report concern a

25   patient named Harlan Band?

1    **A.**    I believe that was the one that did, yes.

2    **Q.**    And was the inclusion in the risk mitigation report

3    precipitated by a communication from Mr. Band's mother?

4    **A.**    Yes.

5    **Q.**    And did you receive that communication?

6    **A.**    I did, yes.

7    **Q.**    And in terms of the risk mitigation report, Exhibit 254 --

8         **MR. FOSTER:**  Can we bring that up, Ms. Braga.

9         **THE COURTROOM DEPUTY:**  It just takes time.

10        **MR. FOSTER:**  Thank you.

11   **BY MR. FOSTER:**

12   **Q.**    If we look at 254 at page 2, is this the risk mitigation

13   report we were talking about?

14   **A.**    Yes, it is.

15   **Q.**    I want to be absolutely clear about something.  The risk

16   mitigation report refers to a deceased patient, but was it your

17   understanding that this patient became deceased with something

18   that had nothing to do with Done?

19   **A.**    As far as I understood, yes.

20   **Q.**    Okay.  And in terms of the communication from the mother

21   regarding the deceased patient, did that relate to a

22   prescription that Done had written for Adderall or other

23   stimulant that was unrelated to his direct cause of death?

24   **A.**    Yes.

25   **Q.**    Okay.  And so in the risk mitigation report, did

1  Dr. Brindala review the circumstances of Done's prescription to

2  Mr. Band?

3  **A.**   Yes.

4  **Q.**   And did you have conversations with Defendants He and

5  Brody about the mother's communications and the Band situation?

6  **A.**   Definitely, Ruthia.  I don't remember if I had spoken to

7  Dr. Brody about it.

8  **Q.**   Okay.  Although the risk mitigation report -- was that

9  address to both defendants?

10 **A.**   Yes, it was, absolutely.

11 **Q.**   Okay.  And so did Dr. Brindala write (as read):

12      "A patient of Shabnam Rahimi was reported to be

13      deceased.  It remains unclear whether the

14      prescription drug monitoring program record was

15      appropriately reviewed.  Additionally, Shabnam noted

16      that she did not have a collaborating physician,

17      given her expectation that Done would provide one.

18      "Also, Shabnam did not have the PMHNP

19      credential, which makes her less qualified to

20      diagnose and manage ADHD."

21      Do you see that?

22 **A.**   Yes.

23 **Q.**   And did this -- well, were you involved in the

24 investigation in this situation?

25 **A.**   Yes.

1  **Q.**  Okay.  And it says (as read):

2        "It remains unclear whether the prescription

3        drug monitoring program record was appropriately

4        reviewed."

5        Can you explain to the jury what that means?

6  **A.**  So when a provider is writing a prescription, they are

7  supposed to look at the -- the PDMP, which is the prescription

8  drug monitoring program, which is something that all pharmacies

9  submit their information to so that you can see all of that

10 patient's past prescriptions that they have and the dates that

11 they had them, did they pick them up or not.  There's a lot of

12 information that those show.

13      And so this is relating to that -- we -- we couldn't tell

14 if Shabnam had actually reviewed this, based on what we found

15 in it.

16      **MR. FOSTER:**  And we have a document that's been marked

17 as 1824, which is Shabnam Rahimi's patient record for this

18 patient.  We'd like to admit that.

19      **MS. BELL:**  Your Honor, objection.  The foundation -- I

20 don't think this witness is on those documents or --

21      **MR. FOSTER:**  I can lay the foundation, Your Honor.

22      **MS. BELL:**  And I'm sorry.  I also have to raise an

23 issue with 248.  And I can confer with counsel for a moment to

24 see if we can resolve it --

25      **THE COURT:**  See if you can resolve it.

1      MS. BELL:  Okay.

2                    (Conferring.)

3      THE COURT:  Now we're on which?

4      MR. FOSTER:  We're on 1824, Your Honor.

5   Ms. Braga, can we bring that up for the witness only.

6      THE COURT:  Admitted.

7   (Trial Exhibit 1824 received in evidence.)

8 BY MR. FOSTER:

9 Q.   Do you recognize this?

10 A.   I don't see anything yet.

11      MR. FOSTER:  Sorry.  There you go.

12      MS. BELL:  I did have an objection to that.  I think

13 you were going to lay a foundation.

14      MR. FOSTER:  Yes, I'm about to.

15 BY MR. FOSTER:

16 Q.   Do you recognize this, Mr. Menesini?

17 A.   Yes.

18 Q.   What is it?

19 A.   This is the chart that comes out of the Done system that

20 shows information such as provider notes and what prescriptions

21 were written.

22 Q.   And how are you familiar with it?

23 A.   This is part of just the process that we had at Done for,

24 you know, having this as information available and the -- it

25 was supposed to be created by the providers.

1  **Q.**   Okay.  And this particular record, if we look at page 2 of

2  Exhibit 1824, do you recognize an entry for substance use

3  disorder and a notation "no" there?

4  **A.**   I do, yes.

5  **Q.**   And what was the concern that was raised regarding that

6  notation in regards to the prescription to Harlan Band?

7  **A.**   That the PDMP alluded to the fact that he likely had a

8  substance use disorder, given past prescriptions that he had.

9  **Q.**   What were the past prescriptions in the PDMP?

10  **A.**   I believe it was Suboxone, if I remember correctly.

11  **Q.**   And can you explain to the jury how Suboxone relates to a

12  substance use disorder?

13         **MS. BELL:**  Your Honor, I'm sorry.  Objection.  Again,

14  foundation, speculation.  This witness is not a medical

15  provider.  This is just inappropriate.

16         **MR. FOSTER:**  I can lay a foundation, Your Honor.

17         **THE COURT:**  Yes.

18         **MR. FOSTER:**  Sure.

19  BY MR. FOSTER:

20  **Q.**   Were you involved in investigating what happened with

21  Mr. Band at Done?

22  **A.**   I was, yes.

23  **Q.**   Okay.  And as part of your investigation, did you review

24  the records and the PDMP?

25  **A.**   I did, yes.

1    **Q.**    And did you talk with Defendant He about it?

2    **A.**    Yes.

3    **Q.**    And did you talk with Dr. Brindala about it?

4    **A.**    Yes, definitely.

5    **Q.**    And what were the concerns that were discussed with

6    Defendant He about the PDMP?

7    **A.**    That there was Suboxone on there and that Suboxone is

8    typically used for addiction treatment, so people who are

9    addicted to opiates, heroin, things like that, would take it

10   for their treatment to come off of it.

11        **MS. BELL:**  Your Honor, I'm sorry.  I'm going to object

12   on hearsay grounds, because my understanding is that the

13   witness is relaying what Dr. -- I don't know whether -- which

14   doctor it was, but I understood that to be double layers of

15   communication --

16        **THE COURT:**  I think what he is saying is he's advised

17   your client of these concerns, so it goes to the state of mind

18   of your client.

19        It does not necessarily go -- doesn't necessarily go to

20   the accuracy of the analysis of whether this drug is given for

21   this purpose or that purpose.  It simply goes to what was your

22   client told about this drug or about the usage of this drug.

23        So it goes to her state of mind.  It goes to his state of

24   mind.

25        **MR. FOSTER:**  Yes.

1  BY MR. FOSTER:

2  Q.   And turning back to Exhibit 219 at page 4, and -- in this

3  original November risk mitigation report, you know, prior to

4  being notified of the situation with Mr. Band, had Dr. Brindala

5  written under Reality (as read):

6          "The company knowingly permitted Shabnam Rahimi

7       to practice on the platform in California without

8       documentation of the required collaborating physician

9       and without the PMHNP credential"?

10  A.   Yes.

11  Q.   And what concern was discussed relating on practicing

12  without a required collaborating physician in California?

13  A.   I mean, it's a requirement per -- as far as I'm

14  understanding or have always understood it that certain states

15  require a collaborating physician any time a nurse practitioner

16  is going to be prescribing medications like this.

17        Not all states, I believe, require it; only certain ones,

18  California being one of those.

19  Q.   And based upon your investigation and your conversations

20  with Defendant He and Dr. Brindala, who was the person at Done

21  who knowingly permitted Shabnam Rahimi to practice without

22  that?

23  A.   Ruthia.

24        MS. BELL:   Again, Your Honor, objection.  This is

25  double layers of hearsay here.  He's relaying what someone else

1  told the witness and then the witness told our client,

2  purportedly.

3          THE COURT:  That's the whole point, isn't it?  What

4  did the witness tell your client?

5          MS. BELL:  No, I'm sorry.  My objection is, as I'm

6  understanding the question, the information originated with

7  someone else.  It was transmitted to this witness.

8          THE COURT:  Right.

9          MS. BELL:  This witness is saying then it was

10  transmitted but that the origin of fact is with another

11  witness.  So I believe that would be hearsay.

12          THE COURT:  No, because it's not being introduced for

13  the truth of the matter.  It's being introduced for your

14  client's state of mind.

15      In other words, if a third party says X, and X may or may

16  not be true, and this witness says to your client X, that goes

17  to your client's state of mind and it goes to this witness's

18  state of mind.

19      So I will give the limiting -- that's true, as a matter of

20  evidence.  Whether I get agreement or not from the Defense,

21  that is the law of evidence.

22      And therefore, it comes in with the limitation it's not

23  being introduced for the truth of the matter; that is, what is

24  actually -- what is true about the statement or not true about

25  the statement.  It's simply being introduced that this

1    statement was told, if you believe this witness -- by the way,

2    and that's your sole job -- I mean not your sole job.  I don't

3    do it.  They don't do.  You do it.  You are the judges of

4    credibility.

5         So in other words, if you believe this witness to be

6    credible, then that statement -- that is, that he had a

7    conversation or told Defendant He about this fact or this

8    statement -- then it comes in for her state of mind.  That is,

9    she had that in her state of mind.  That was part of it.

10        Okay.  You may proceed.

11             MR. FOSTER:  Thank you, Your Honor.

12   BY MR. FOSTER:

13   Q.   And did Mr. Band's mom, subsequent to this first risk

14   mitigation report, contact Done?

15   A.   Yes.

16   Q.   And did she contact you?

17   A.   Yes.

18   Q.   And did you talk to Defendant He about this contact?

19   A.   Yes.

20   Q.   Okay.

21             MR. FOSTER:  And, Your Honor, we have Exhibit 249.

22             THE COURT:  249 admitted.

23             THE COURTROOM DEPUTY:  Did you want 1824 admitted?

24             THE COURT:  What did you do about 248?  Did we have an

25   agreement?

1        MR. FOSTER:  We do have an agreement.  We'll redact

2  something from it.

3       But also, 249, I believe, contains a substantial portion

4  of what I was going to ask about in terms of 248.

5        THE COURT:  Okay.  You may proceed.

6        MR. FOSTER:  Okay.

7        THE COURT:  And we'll simply mark 248 for

8  identification purposes at this point.

9       (Trial Exhibit 248 marked for identification)

10       MR. FOSTER:  Thank you, Your Honor.

11      Can we bring up Exhibit 249.

12  BY MR. FOSTER:

13  Q.   Do you recognize this as an exchange that you had with

14  Mr. Band's mother?

15  A.   I do, yes.

16       MR. FOSTER:  Can we turn to page 2 of Exhibit 249.

17       THE COURTROOM DEPUTY:  Is this admitted?

18       MR. FOSTER:  249 is.

19       THE COURT:  249 admitted.

20      (Trial Exhibit 249 received in evidence.)

21       THE COURTROOM DEPUTY:  Thank you.

22  BY MR. FOSTER:

23  Q.   And did Ms. Dion write (as read):

24          "I'm looking into this prescription.  Looking at

25      your website, it looks as if getting amphetamines is

1     as easy as one, two, three.  I wonder if any part of

2     your work is assessing whether or not you are dealing

3     with an addict."

4     Do you see that?

5 **A.**   I do, yes.

6 **Q.**   And then do you see where it says please -- and then if we

7 go up to page 1.  Did you write (as read):

8     "Please note that we are unable to share

9     information about an individual"?

10 **A.**   I did, yes.

11 **Q.**   And if we go up to her response, did she write (as read):

12     "Excuse me.  Harlan is dead, and I am next of

13     kin.  You seem to be handing out Adderall very simply

14     over there, and it is criminal."

15     Do you see that?

16 **A.**   Yes.

17 **Q.**   And did you discuss this with Defendant He?

18 **A.**   Yes.

19 **Q.**   And what was Defendant He's reaction?

20 **A.**   It was -- excuse me.

21     I believe it was more so just worried about:  Is this

22 going to be like a legal issue?  Do we need to, you know, do

23 something about this?

24     And then from there, just kind of was:  Can we get rid of

25 this and move on?

1  **Q.**  And get rid of this and move on -- how did that relate to

2  the response to Ms. Dion of not giving the chart?

3  **A.**  I actually don't know if it related specifically to that

4  response, given that was, you know, a response that we were

5  actually trying to be accurate and careful with.

6  But it was, I think, in a way sort of -- it solved both

7  issues.  It was both true and good, but also an easy way to not

8  have to worry about anything unless, you know, further contact

9  was made.

10  **Q.**  Did Defendant He suggest to you, well, we should increase

11  the rigor of our procedures for detecting drug abusers?

12  **A.**  No.

13  **Q.**  How much was -- how much did Defendant He talk about

14  making sure it didn't get out as compared to changing the Done

15  platform?

16  **A.**  We definitely didn't talk about changing the Done

17  platform.  We only discussed how to make sure this wasn't going

18  to be a problem.

19  **Q.**  And after this December 2020 risk mitigation report, did

20  Dr. Brindala continue to send risk mitigation reports each

21  month?

22  **A.**  He did, yes, absolutely.

23  **MR. FOSTER:**  And so, Your Honor, we'd move in Exhibits

24  281, 297, 335, and 364.

25  **THE COURT:**  281, 297, and next one?

1          **MR. FOSTER:**  335.

2          **THE COURT:**  335.

3          **MR. FOSTER:**  And 364.

4          **THE COURT:**  364 admitted.

5       (Trial Exhibits 281, 297, 335, and 364 received in

6    evidence.)

7          **MR. FOSTER:**  Thank you.

8       Can we pull up Exhibit 364, and can we turn to page 2.

9       Can we actually turn to page 3 for a minute.

10   **BY MR. FOSTER:**

11   **Q.**   So this one refers to there not being new risks identified

12   in February, March, and April.

13   **A.**   Yes.

14   **Q.**   Did Dr. Brindala send around the risk mitigation report

15   again in those months, even though there were no new risks

16   identified?

17   **A.**   Yes.  Not to the same group of people, but to a smaller

18   core team group, yeah.

19   **Q.**   Okay.  And why was he now sending it to a smaller group?

20   **A.**   Because of the pushback from Ruthia and Dr. Brody on

21   sending it out to the larger group on -- and worried about

22   leaks.

23   **Q.**   And why would he send it around again if there were no new

24   risks identified in that month?

25   **A.**   Because the previous risks hadn't been resolved or

1    anything done with them yet.

2            **MS. NECHAY:**  Objection.  Speculation.  Move to strike.

3            **THE COURT:**  Lay a foundation.

4            **MR. FOSTER:**  Sure.

5    **BY MR. FOSTER:**

6    **Q.**   Did you speak with Dr. Brindala about the risk mitigation

7    reports?

8    **A.**   Yes.

9    **Q.**   And did you talk to him about why he was continuing to

10   send out the risk mitigation reports?

11   **A.**   Yes, absolutely.

12   **Q.**   And did you also interact with Defendants He and Brody

13   around the risk mitigation reports?

14   **A.**   Yes.

15   **Q.**   Okay.  And can you tell the jury what was occurring?  What

16   was the attitude of Dr. Brindala and Defendants He and Brody?

17   **A.**   Yeah.  So Dr. Brindala was very much concerned about

18   everything we're doing here as I talked to him about it and led

19   me to being very concerned through all of this because we

20   continued to have these risks that we weren't resolving.

21   You know, they were things that were raised by him, raised by

22   other clinicians, myself, you know, continually wanting these

23   changes to be made, and just there weren't ever changes being

24   made?

25       And so he wanted to continue sending this out as sort of

1    a -- you know, "cover his own butt" type of situation.  He

2    wanted to make sure that it was known that he was actually

3    trying to push and change these things.

4    **Q.**   And when we look at page 1 of Exhibit 364, was there a

5    cover e-mail that he sent out each month?

6    **A.**   I don't know if it was every single month, but I believe

7    so.

8    **Q.**   Yeah.  And if we look at this, did he say that (as read):

9           "As you review the risks, you will readily

10          appreciate the seriousness and magnitude of the

11          issues."

12   **A.**   Yes.

13   **Q.**   (as read):

14          "We must adhere to standard of care, best

15          practices, and evidence-based medicine within all

16          relevant laws and regulations."

17   **A.**   Yes.

18   **Q.**   (as read):

19          "We can still innovate outside.  We can even

20          creatively push the limits in undefined gray areas,

21          especially during the COVID-19 pandemic.  We must

22          ultimately keep our focus on adhering to all relevant

23          laws and regulations."

24   **A.**   Yes.

25   **Q.**   And so was Dr. Brindala open to doing things in some gray

1  areas?

2  **A.**  He was definitely willing to, you know, look through and

3  think through the idea of like -- you know, the Ryan Haight Act

4  was being -- that waiver, and so like how can we take advantage

5  of that in this situation but still make sure we're doing

6  things properly in all other aspects.

7  **Q.**  And how clear was he that the risks identified in the

8  report weren't gray areas, but something that had to be

9  followed?

10 **A.**  Very clear.

11 **Q.**  And if we turn to page 2 of Exhibit 364.

12    Did he identify a risk in May 2021, "Second opinions from

13 company providers"?

14 **A.**  Yes.

15 **Q.**  And did he write (as read):

16       "If patients are transferred to different

17    company providers when they do not receive stimulant

18    prescriptions, poor optics can also result from the

19    appearance of prescribing stimulants at all costs

20    despite initial providers judging them to be

21    clinically inappropriate.  The latter result can lead

22    to compounded legal and regulatory risks"?

23 **A.**  Yes.

24 **Q.**  And so can you describe how, mechanically, this was done

25 in terms of patients getting second opinions at Done?

1    **A.**    Yeah.  So I think it was something we've kind of talked

2    about a little bit already is that when -- you know, patients

3    might leave a bad review or be upset that they did not get a

4    prescription, and so those patients would get moved in order to

5    try to raise those reviews.  They'd get moved to another

6    provider, typically one of those providers, as I've discussed,

7    would have larger patient panels, would be more apt to write

8    these prescriptions, or to Dr. Brody in many cases in order to

9    get those prescriptions out to those patients.

10        And that was just done through the system, and they were

11   shifted over and moved through the system for those providers

12   to have on their panel.

13   **Q.**   And can you describe to the jury what role Defendant He

14   played in this process?

15   **A.**   She was the decision-maker, so, you know, the -- you can

16   say the director, the person telling people what to do.

17   **Q.**   And outside of Defendant He and Brody, were you aware of

18   anyone at Done who supported this practice?

19   **A.**   Maybe a provider or two, but not -- you know, definitely

20   no majority or consensus.

21   **Q.**   Okay.  And what was the majority or consensus opinion?

22   **A.**   That this was not an okay practice.  It didn't follow

23   standard of care.

24   **Q.**   And Dr. Brindala wrote (as read):

25           "Recommendation:  The company must immediately

1          stop all second opinions."

2   **A.**    Yes.

3   **Q.**    Did Done stop immediately all second opinions?

4   **A.**    No.

5   **Q.**    Why not?

6   **A.**    Because it was not a decision that Ruthia wanted to move

7   forward with.

8   **Q.**    And, I mean, Dr. Brindala was the chief medical officer.

9   Why couldn't he stop the second opinions?

10         **MS. BELL:**  Objection, Your Honor.  Foundation, calls

11  for speculation.

12         **THE COURT:**  Sustained.

13  **BY MR. FOSTER:**

14  **Q.**    Okay.  Were you aware of Dr. Brindala's role at Done?

15  **A.**    I was, yes.

16  **Q.**    And did you see him interact with Defendant He?

17  **A.**    Yes, absolutely.

18  **Q.**    And on clinical matters, was Dr. Brindala in charge or was

19  Defendant He in charge?

20  **A.**    Ruthia was.

21         **MS. BELL:**  Same objection, Your Honor.

22         **THE COURT:**  Lay a further foundation.

23         **MR. FOSTER:**  Sure.

24  **BY MR. FOSTER:**

25  **Q.**    When you see -- when you saw Dr. Brindala and Defendant He

1  interact, what happened if they disagreed?

2  **A.**    Ruthia had the final decision, so she would be the one

3  that would decide on what occurred.

4  **Q.**    Now, showing you --

5         **MR. FOSTER:**  We have a document that's been marked as

6  Exhibit 343, a communication between the defendants and the

7  witness.

8         **THE COURT:**  343 admitted.

9       (Trial Exhibit 343 received in evidence.)

10        **MR. FOSTER:**  And, Ms. Braga, can we pull up

11  Exhibit 343, please.

12  **BY MR. FOSTER:**

13  **Q.**   And do you recognize this as a communication between

14  Defendant He and you and Defendant Brody and others at Done?

15  **A.**    Yes.

16        **MR. FOSTER:**  And if we zoom out and zoom in on what

17  Defendant He wrote.

18  **BY MR. FOSTER:**

19  **Q.**   Did she write in this message (as read):

20            "What patients care about is simply to get their

21       refill.  For us, the only goal is to help them get

22       it"?

23  **A.**    Yes.

24  **Q.**   And was that consistent with things that Defendant He

25  would say on other occasions?

1  **A.**   Yes, absolutely.

2  **Q.**   And what -- what language is she writing in in this

3  communication?

4  **A.**   English.

5  **Q.**   And what language did you speak to her at Done?

6  **A.**   English.

7  **Q.**   And did she have any difficulty responding to you in

8  English?

9  **A.**   No.

10 **Q.**   Did she have any difficulty conversing with you in

11 English?

12 **A.**   She did not, no.

13 **Q.**   And in her communications with the companies, did she

14 write in English or did she write in some other language?

15 **A.**   In English, yeah.

16 **Q.**   And were you concerned that Defendant He's focus or the

17 only goal at the company was to give a refill?

18 **A.**   Yes, absolutely.

19 **Q.**   And did you observe many others raise the same concern

20 with her?

21 **A.**   Yes, absolutely.

22 **Q.**   And what was her reaction?

23 **A.**   Once again, she would constantly restate that, you know,

24 we need to be helping the patients, what the patients want, and

25 it -- just kind of ignore or continue to just push people back

1    to doing what we were doing.

2    **Q.**    Now, did there come a time when you became aware of

3    pharmacists refusing to fill Done prescriptions?

4    **A.**    Yes.

5    **Q.**    And did you become aware of concerns that pharmacists were

6    raising that the prescriptions were not legitimate?

7    **A.**    Yes.

8    **Q.**    How did you become familiar with that?

9    **A.**    There was a fairly large operational hiccup that occurred

10   at one point where several pharmacies, some of the large ones,

11   decided to stop taking all prescriptions from -- from us.  And

12   so that was -- you know, I think we had several hundred

13   prescriptions that had been sent to get filled at these

14   pharmacies that then had to be rerouted -- which is a pretty

15   big process when it comes to Schedule II substances, because

16   you have to have the clinician rewrite a prescription,

17   basically, and send it to the new pharmacy.

18        So we had our care team actually going and calling out to

19   all these pharmacies, trying to find places that would both

20   accept it as well as have it in stock so that the patient could

21   receive it.

22   **Q.**    And what were some of the pharmacies that refused to fill

23   all Done prescriptions?

24   **A.**    I believe it was either CVS or Walgreens.  Maybe both,

25   even, at one point.  So definitely some of the large pharmacies

1    that caused some problems.

2    **Q.**   And even before they stopped filling the prescriptions

3    completely, were there pharmacists raising concerns about red

4    flags with the prescriptions?

5    **A.**   Yes.  There was a few smaller pharmacies or, you know, ad

6    hoc we'd get one here or there that would stop writing or

7    filling the prescriptions for the -- a specific provider in

8    that area.

9    **Q.**   And what types of concerns were pharmacists raising in

10   terms of patients who were doctor shopping?

11   **A.**   That was a concern.  They were worried that the patients

12   would be trying to, you know, do this without a diagnosis,

13   you know, that --

14       They were mainly focused on the fact that we were a

15   telemedicine business, and they didn't trust a telemedicine

16   business to be able to do a proper diagnosis for ADHD without

17   the, you know, proper guidelines and standards of care.

18   **Q.**   And what red flags or concerns did they raise in terms of

19   whether the prescriptions were rubber-stamped or the product of

20   a real medical consultation?

21   **A.**   I don't know for certain.  I don't quite recall exactly

22   what they were saying around that specific question.

23       But there was definitely a continuance of concerns from

24   pharmacies that grew.

25   **Q.**   And when the pharmacies raised concerns about Done's

1  prescriptions, did you speak with Defendant He about this?

2  **A.**   Yes, absolutely.

3  **Q.**   And was Defendant He concerned about the legitimacy of the

4  prescriptions or how it would impact revenue?

5  **A.**   How it impacted the growth, which would in turn impact

6  revenue, yeah.

7  **Q.**   And what did Defendant He say should be done if a

8  pharmacist or pharmacy refused to fill a Done prescription?

9  **A.**   We should move that prescription to another pharmacy --

10  **Q.**   And --

11  **A.**   -- that would, as I was stating earlier.

12  **Q.**   Sorry.  What was that?

13  **A.**   We would move that prescription to another pharmacy that

14  would fill that prescription.

15  **Q.**   Would any investigation be conducted of whether the

16  prescription was legitimate?

17  **A.**   No.

18  **Q.**   Would the new pharmacy be told that the prescription had

19  previously been denied by another pharmacist?

20  **A.**   No.

21  **Q.**   What did Defendant He -- when these bigger pharmacy chains

22  started to refuse to fill Done's prescriptions, what did she

23  ask you to do about finding pharmacy partners?

24  **A.**   To look for more pharmacy partners.  We had one large one

25  we were working with for a while it, and we wanted -- the

1  goal -- she wanted me to find more like that one so we could

2  expand and have much more trusting pharmacy partner that we

3  could have to send these to that wouldn't be blocking or having

4  issues with.

5  **Q.**  Did she want you to find big, reputable, national

6  pharmacies or something else?

7  **A.**  Anything that we could basically get that would approve

8  and guarantee approval.

9  **Q.**  And what -- when you say "guarantee approval," what did

10  Defendant He tell you to tell pharmacies about what Done was

11  doing?

12  **A.**  To tell them that we were following all legalities.  She

13  basically would tell me to just get these contracts set up and

14  moving forward with them if we could.

15      **MR. FOSTER:**  And we have Exhibit 283, which is a

16  communication from Defendant He to a pharmacy, copying this

17  witness.

18      **THE COURT:**  283 admitted.

19    (Trial Exhibit 283 received in evidence.)

20      **MR. FOSTER:**  And, Ms. Braga, can we pull up

21  Exhibit 283.

22  **BY MR. FOSTER:**

23  **Q.**  And do you recognize this?

24  **A.**  I do, yes.

25  **Q.**  And this is an e-mail from Defendant He to someone named

1  John Eaton at Scripx.  Who was John Eaton?

2  **A.**   He was, I believe, one of the executives at Scripx.  We

3  were working with him to set up this trusted pharmacy partner

4  that we could send these scripts to.

5  **Q.**   And can you explain to the jury what Scripx was?

6  **A.**   Scripx was a delivery pharmacy in -- I believe it was

7  Texas or a few other states that we were trying to set this

8  partnership up with because they would, you know, guarantee

9  that they would do these, have this in stock and be able to get

10  this prescription to the patients.

11      But also, on top of that, it was a delivery service, so it

12  would be delivered to the patients, so it was kind of a win-win

13  for the business.

14  **Q.**   And did Scripx ask about Done's prescription practice?

15  **A.**   They did, yes.

16  **Q.**   And here, did Scripx ask Defendant He in terms of whether

17  the legal requirements were being met?

18  **A.**   They did, yes.

19  **Q.**   And did Defendant He write (as read):

20          "The prescription is issued for a legitimate

21      medical purpose by a practitioner acting in the usual

22      course of his/her professional practice."

23      And did she write "yes"?

24  **A.**   She did, yes.

25  **Q.**   And was the date of this e-mail February 2021?

1   **A.**   It is, yes.

2   **Q.**   Did Defendant He tell Scripx that Dr. Brindala had written

3   to her that traditional clinics and telemedicine platforms use

4   a standard of care of synchronous visits every three months and

5   that Done was not doing that?

6   **A.**   She did not tell Scripx that.

7   **Q.**   Did Defendant He tell Scripx that Dr. Brindala had written

8   that until a transferred patient completes a visit with a new

9   provider, only short bridges of seven days would be consistent

10   with the standard of care and that Done was not following that?

11   **A.**   She did not tell Scripx that, no.

12   **Q.**   Did Defendant He tell Scripx about any of the other ways

13   we've talked about that Done was not following the standard of

14   care?

15   **A.**   She did not, no.

16   **Q.**   And did you have concerns that Defendant He was not

17   telling Scripx and other pharmacy partners the truth?

18   **A.**   Yes.

19   **Q.**   Can you tell the jury about those concerns?

20   **A.**   Yeah.  Given that these, you know, pharmacy partners were

21   asking for the specific information and wanting us to be,

22   you know, very clear with these answers on it and that we were

23   you know, basically straight up lying to them, it was a major

24   concern, because obviously they want us to be following these

25   regulations the same way our clinicians did, the same way,

1  you know, Dr. Brindala and anyone else that I would speak to

2  would want us to be doing these things, and we weren't doing

3  them.

4  **Q.**   And Defendant He also wrote (as read):

5         "The telemedicine communication is conducted

6      using an audiovisual real-time two-way interactive

7      communication system."

8      And she wrote "yes."

9      Do you see that?

10 **A.**   Yes.

11 **Q.**   Was that true or false as to the prescriptions that

12 Defendant Brody was writing?

13 **A.**   False, I would say.

14 **Q.**   And what about other prescriptions being written on the

15 platform?

16 **A.**   It was true for initial consults, typically, but any

17 follow-up or anything beyond that, it was untrue for.

18 **Q.**   And it says (as read):

19         "The practitioner is acting in accordance with

20      applicable federal and state law."

21      You previously talked about Defendant Brody writing

22 prescriptions in states across the country.  Can you tell the

23 jury whether this statement was --

24      **MS. NECHAY:**  Objection.  Calls for a legal conclusion,

25 outside the scope, expert opinion.

1            **MR. FOSTER:**  No, Your Honor.

2            **THE COURT:**  Well, I think he could say what his

3    understanding is.

4            **MR. FOSTER:**  Of course.

5            **THE COURT:**  Yeah.

6            **MR. FOSTER:**  He's not an expert.

7            **THE COURT:**  Pardon?

8            **MR. FOSTER:**  He's not an expert.  He's just testifying

9    about what the discussions were.

10   **BY MR. FOSTER:**

11   **Q.**   So can you tell the jury whether that statement was true

12   or false?

13   **A.**   It was false.

14   **Q.**   And explain to the jury why.

15   **A.**   Because the statement was saying that we do -- we had all

16   of our providers licensed in Texas with collaborating

17   physicians, but there were quite a few cases where when a

18   provider would leave or was not around and a patient needed a

19   prescription, it would go to Dr. Brody or even sometimes

20   another provider to write that prescription.

21   **Q.**   Did she tell Scripx that she had knowingly permitted

22   Nurse Rahimi to practice on the platform in violation of

23   California law?

24   **A.**   She did not.

25           **MR. FOSTER:**  And we have a document that's been marked

1  as Exhibit 924, a communication between this witness and

2  Defendant He and others.

3          THE COURT:  924 admitted.

4      (Trial Exhibit 924 received in evidence.)

5  BY MR. FOSTER:

6  Q.   And did Defendant He ask you to make similar statements to

7  pharmacy partners?

8  A.   She asked me to ensure that we would -- she didn't

9  specifically say "Make these statements," but she would tell me

10 to make sure that we got these partnerships created with

11 pharmacy partners and anywhere else that was asking statements

12 similarly.

13 Q.   And do you recognize Exhibit 924?

14 A.   I do, yes.

15 Q.   And what's Exhibit 924?

16 A.   This is a LegitScript certification e-mail that was coming

17 from us to Calvin -- I was cc'd -- on our application for a

18 LegitScript certification.

19 Q.   And can you tell the jury what LegitScript is.

20 A.   Yeah.  So LegitScript is a third-party service that Google

21 and other ad agencies require you to have if you're doing any

22 ads related to healthcare.  So they say in order -- they want

23 to make sure and verify that you are legitimately putting these

24 ads up for something that you have the right to do, basically.

25 Q.   And what did Defendant He want LegitScripts to be told?

1    A.    Whatever would get us the certification.

2    Q.    And why was that important to Done's business?

3    A.    We would not be able to run ads without a LegitScript

4    certification on certain platforms, and without running ads, we

5    would have very little growth, given a large majority of the

6    growth came from ad clicks.

7         MR. FOSTER:   And we have Exhibit 393, which is a

8    message between --

9         THE COURT:   393 admitted.

10    (Trial Exhibit 393 received in evidence.)

11        MR. FOSTER:   Can we pull up Exhibit 393.

12   BY MR. FOSTER:

13   Q.    And do you recognize this?

14   A.    Yes, I do.

15   Q.    And if we look at this, did someone name TJ Williams write

16   (as read):

17        "Ruthia He, pharmacy declines to fill

18        prescriptions have affected up to 440 of the 1,100

19        scripts."

20        Do you see that?

21   A.    Yes.

22   Q.    And did he go on to say under Number 4 (as read):

23        "Kentucky, Aaron Kim.  Major pharmacy chains,

24        Safeway, CVS, et cetera, have stated they will not

25        fill her prescriptions."

1       And then does it say under Number 5 (as read):

2           "Florida, all providers.  Similar to Kentucky,

3       pharmacies stated that they are no longer accepting

4       out-of-state provider prescriptions per rules from

5       the Florida Board of Pharmacy.  Providers need to

6       conduct face-to-face consultations."

7       Do you see that?

8    A.    Yes.

9    Q.    And if we go to page 2, did Defendant He respond (as

10   read):

11          "Kentucky.  How many patients do we have there?

12      If below 20, then we can stop serving this state.  If

13      more than 20, then we can prioritize finding a mail

14      order pharmacy there"?

15   A.    Yes.

16   Q.    And under Florida, did she write (as read):

17          "Florida.  Let's inform all Florida providers to

18      reroute to ASP."

19      Do you see that?

20   A.    Yes.

21   Q.    And was Defendant He concerned about complying with the

22   state laws or growth of Done?

23   A.    Growth of Done.

24   Q.    And when it said "Let's inform all Florida providers to

25   reroute to ASP," what does that mean?

1          MS. BELL:  Objection, Your Honor.  Foundation,

2    speculation.

3          MR. FOSTER:  I'll lay the foundation, Your Honor.

4    BY MR. FOSTER:

5    Q.   Are you familiar with what that was referring to?

6    A.   Yes, I believe so.  I'm trying to remember exactly the

7    acronym, but I'm pretty sure that was one of the pharmacies we

8    worked with in Florida.

9    Q.   Okay.  And if we --

10         And was that a brick-and-mortar pharmacy or an online

11   pharmacy?

12   A.   An online pharmacy, I believe, yeah.

13   Q.   Okay.  And so after being told that in Florida, providers

14   need to conduct face-to-face consultations, did Defendant He

15   have the providers do that or did she do something else?

16   A.   She did something else.

17   Q.   And what did she do?

18   A.   She told us to reroute to a different pharmacy instead of

19   trying to see if there's a solution to the problem that the

20   pharmacies are saying.

21   Q.   Now, at Done, did you become familiar with prior

22   authorizations?

23   A.   Yes.

24   Q.   Can you tell the jury what prior authorizations are?

25   A.   Yeah.  So prior authorizations are when you are, you know,

1   going to the pharmacy to get your prescription, oftentimes your

2   insurance will pop up and tell you or say that, you know, we

3   don't think you should have this medication because it's either

4   too expensive or we want you to try some other medications

5   first, those sorts of things.

6        And so we would help manage those prior authorizations for

7   those patients, given that the prior authorization has to come

8   from the doctor or the clinician in order to get the medication

9   through that the insurance doesn't want to cover.

10  **Q.**   And did Defendant He talk about how the insurance coverage

11  related to revenue and growth?

12  **A.**   Yes.

13  **Q.**   And what did she say?

14  **A.**   That if patients have to pay out-of-pocket, it will likely

15  reduce how many patients we will have, because they'll try to

16  go elsewhere to find their prescriptions.

17  **Q.**   And how important was it to Defendant He to get the prior

18  authorizations approved?

19  **A.**   I would say very important.

20  **Q.**   And did Defendant He have the clinicians deal with the

21  prior authorization or did she do something different?

22  **A.**   Something different.

23  **Q.**   What did she do?

24  **A.**   Created a template of the prior authorization.  Instead of

25  having one of -- the clinician should fill out and write a

1   reason that goes to the insurance company, there was a

2   pre-created template that would -- had all the answers that

3   should typically get it approved through the insurance.

4          **MR. FOSTER:**  And so we have Exhibit 908, which is a

5   communication between Defendant He and the witness.

6          **THE COURT:**  908 admitted.

7       (Trial Exhibit 908 received in evidence.)

8          **MR. FOSTER:**  Can we pull up Exhibit 908, please.

9   **BY MR. FOSTER:**

10  **Q.**   And do you recognize this Mr. Menesini?

11  **A.**   I do, yes.

12  **Q.**   And so was part of the prior authorization process that

13  the insurers would ask for clinical notes?

14  **A.**   Yes.

15  **Q.**   And what was the problem with Done's notes?

16  **A.**   They were templatized.

17  **Q.**   And in this -- well, what is Asana?

18  **A.**   Asana is a task management platform we used for a while.

19  You can create tasks, assign them to people, comment on them,

20  forward them.

21      And so this one was a task on evaluating the e-prescribing

22  tool "approve all" feature.

23         **MR. FOSTER:**  And if we can zoom out, Ms. Braga, and

24  zoom in on Defendant He's message.

25  \\\

1  BY MR. FOSTER:

2  Q.   Did she write (as read):

3          "The immediate improvement we can make next

4       month is to automatically add this note template when

5       they refill."

6       And then did it say (as read):

7          "Provider notes.  PDMP reviewed, chart

8       reviewed"?

9  A.   Yes.

10 Q.   And how did this note related to -- relate to getting the

11 prior authorizations approved?

12 A.   As I was kind of already stating, this is that templatized

13 sort of note that should be written by the provider in most

14 cases, but instead was templatized and written here in order to

15 get sent to the pharmacy so that they could supply it to

16 insurance to get that approved.

17 Q.   And so in regards to the provider notes, PDMP reviewed and

18 chart review for Defendant Brody, for example, was that true or

19 was that a lie to insurers?

20 A.   I would say, in most cases, that was a lie.

21 Q.   And explain to the jury why.

22 A.   Brody would get sent large lists of these prescriptions

23 through the e-prescribing tool that we had to just go through

24 and approve, and he wasn't typically the one to review the PDMP

25 or the chart.  Usually that was done by the care team first,

1  and then he would just go through and approve them after.

2      **MR. FOSTER:**  And, Your Honor, we have Exhibit 432 and

3  433, which are communications from a nurse with the witness.

4      **THE COURT:**  432 and 433 admitted.

5      (Trial Exhibits 432 and 433 received in evidence.)

6      **MR. FOSTER:**  And if we can pull up 433.

7  **BY MR. FOSTER:**

8  **Q.**  Did there come a time when you became aware that the care

9  team at Done was forging nurses' signatures on the prior

10  authorizations?

11  **A.**  Yes.

12  **Q.**  And how did you become aware of that?

13  **A.**  Nurse Memphis Sandoval had informed me when she was very

14  upset about when she found out about it.

15  **Q.**  And after finding out about it, did the practice continue

16  at Done?

17  **A.**  Yes.

18  **Q.**  And how did that practice relate to the metrics set by

19  Defendant He?

20  **A.**  Because if you reduce the amount of time providers have to

21  spend on a patient's chart and getting that patient a

22  prescription, you can have that provider see more patients and

23  add more patients to the platform.

24      On top of that, providers would be, you know, slower than

25  the care team to respond to patients if there was a message

1    that lived there, and so the care team was on basically 24/7,

2    they would be able to respond very quickly and then get this

3    out to those pharmacies and whatnot any time they occurred.

4        So it caused a lot less delay for the patients in getting

5    a fill if it -- if it did actually have to go to a provider.

6    **Q.**    Now, I think you mentioned at the outset that when you

7    started, you were attracted to the mission because of your

8    personal experience with ADHD; correct?

9    **A.**    Absolutely, yes.

10   **Q.**    And did you use Done Health services for your ADHD

11   medication while you worked there?

12   **A.**    I did not.  Not once.

13   **Q.**    Why didn't you use Done's services not once when you had

14   ADHD and were working in an ADHD company?

15   **A.**    When I initially started, I thought, you know, before I

16   really got into it, I was thinking that it would be something I

17   would probably do at some point and switch over.

18       But as I, you know, spent more time and was working there

19   and really seeing the operations and the lack of time and

20   effort and care that was being able to be given to patients, I

21   didn't want that for myself.

22       I think it's important for someone with ADHD to be able to

23   talk with their doctor, spend time with their doctor,

24   understand the differences in the medications, understand,

25   you know, how that's going to affect your mental well-being and

1    different changes of mood, and be able to really have a good

2    doctor-patient relationship.

3         So I continued to see my own doctor, even though it was

4    fairly difficult through the COVID time frame.

5    **Q.**   And did you eventually come to leave Done?

6    **A.**   I did, yes.

7    **Q.**   And can you explain to the jury why you left?

8    **A.**   I left Done for mostly the reason of just the fact that --

9    you know, all of these concerns that were never going to be

10   addressed, so just continued to see that we're doing things

11   noncompliantly.  You know, every time that something's brought

12   up, and it's brought up time and time and time again by

13   Dr. Brindala, myself, other clinicians, it's never really

14   addressed.  It's ignored.  It's pushed away.  And that nothing

15   was ever going to change.

16   **Q.**   And who was ignoring and pushing it away?

17   **A.**   Ruthia.

18   **Q.**   And you mentioned how much money the company was making.

19        How hard was it to walk away from an early-stage tech

20   company making tons of money?

21   **A.**   It was oddly very easy because of how concerned I was.

22        **MR. FOSTER:**  Thank you.

23   No further questions, Your Honor.

24        **THE COURT:**  Okay.  Cross?

25        **MS. BELL:**  Yes, Your Honor.  Thank you, Your Honor.

1    Might we take a break?

2        THE COURT:  Sure.

3    Okay, ladies and gentlemen.  We're going to take -- we're

4 going to break until five to.

5    Remember the admonition given to you:  Don't discuss the

6 case, allow anyone to discuss it with you, form or express any

7 opinion.

8                (The jury leaves the courtroom.)

9    (Proceedings were heard out of the presence of the jury.)

10        THE COURT:  Okay.  We're in recess.

11                (Recess taken at 1:37 p.m.)

12            (Proceedings resumed at 2:01 p.m.)

13    (Proceedings were heard out of the presence of the jury.)

14        THE COURTROOM DEPUTY:  Come to order.  Court is now in

15 session.

16        THE COURT:  Okay.  Bring in the jury.

17                (The jury enters the courtroom.)

18    (Proceedings were heard in the presence of the jury.)

19        THE COURT:  Okay.  Please be seated.  Let the record

20 reflect all jurors are present, parties are present.

21    Ms. Bell.

22                    **CROSS-EXAMINATION**

23 BY MS. BELL:

24 Q.   Good afternoon, Mr. Menesini.

25 A.   Good afternoon.

1    **Q.**    You applied to Done in summer of 2020; correct?

2    **A.**    I don't know if you would call it an application, per se.

3    **Q.**    Okay.  You first met with Ruthia --

4    **A.**    Yes.

5    **Q.**    -- in the summer of 2020?

6    **A.**    Sometime in that time frame, yeah.

7    **Q.**    And you did provide your résumé as part of that process;

8    right?

9    **A.**    I believe I did, yeah.

10   **Q.**    Okay.  And you had fairly extensive experience in

11   operations and scaling companies; right?

12   **A.**    Yes, absolutely.

13   **Q.**    And actually, I'd like to put your résumé up and maybe we

14   can talk through your experience.

15          **MS. BELL:**  This is Exhibit 6035, if I may offer that,

16   Your Honor?

17          **MR. FOSTER:**  No objection.

18          **THE COURT:**  6035 admitted.

19      (Trial Exhibit 6035 received in evidence.)

20   **BY MS. BELL:**

21   **Q.**    Now, can you see that?  It's rather small.

22   **A.**    Uh-huh.

23   **Q.**    Okay.  So perhaps we could just start at the bottom.

24   We've got a position here as head of logistics.  And could you

25   tell us what that was?

1    **A.**    That was for company called Outco, down in San Diego,

2    where I was working on the logistics for a new cannabis startup

3    that was building fairly large cannabis grow operations

4    following the new California regulations at the time.

5    **Q.**    And in the first bullet, you write that you contributed to

6    "maximum efficiency of operations through implementation of new

7    processes and procedures."

8         What was -- what was that about?

9    **A.**    It being a new business, fairly new company, new business

10    I was jumping into down there, it related to a fairly large

11    group of things.  Anywhere from, you know, how we would move

12    product from one location to another, you know, how our sales

13    operations would look, how our dispensary operations were

14    looking and how that would all sort of integrate together.

15    **Q.**    And in terms of efficiency, maximizing efficiency, what

16    exactly did you do in that role?

17    **A.**    Just found any way we could to make sure we increased

18    profit and revenue.

19    **Q.**    Now, your next position, COO and founder, could you tell

20    us about that?

21    **A.**    Yeah.  So there was actually a break-off from Outco.

22    Because of the regulations of California, you couldn't have a

23    fully vertical business, so we had to create a different

24    business in order to do the delivery operations.

25         (Reporter interruption for clarity of the record.)

BY MS. BELL:

Q.   And there -- at the third bullet point there, you say that you built out an entire business plan with a five-year financial -- five-year financial projections to maximize investment efforts?

A.   Yes.

Q.   Could you tell us what that means, what that meant there?

A.   Because we had to create a separate business that actually couldn't have funding from the original one, we had to try and receive funding outside of that.  So it was creating a business plan in order to -- an attempt to try to get funding for that business through investors.

Q.   Okay.  Let's take the next one.

So here you were Seattle general manager.  And could you tell us about that position?

A.   Yes.  This is a company called HomeShare.  I actually worked at HomeShare even prior to working at Outco, and then I came back to HomeShare later.

And so when I was working at HomeShare, I was working on, once again, operations in all forms, but when I came back, I came back with the agreement that I would be launching the Seattle market and managing the Seattle market.

During that time frame, our New York manager had quit, and so I had to sort of manage Seattle and then fly in and work out of New York for about a half a year.

1    **Q.**   Okay.  And you there -- let's see.  Bullet point second

2    from the bottom.  If you could tell us what went into the

3    "building out KPIs and analytics to understand and push for

4    metrics-driven results."

5         What did that mean, "metrics-driven results"?

6    **A.**   You can't change anything if you can't measure it, so

7    obviously I was working at trying to build out a way that we

8    could collect the data on how we were doing as a business and

9    use that data to inform our future decisions and push for

10   changes and creating, you know, more efficiency, more profit,

11   more revenue.

12   **Q.**   Efficiency and profit?

13   **A.**   Mm-hmm.

14   **Q.**   Okay.  And then the first bullet point there, you talk

15   about securing partnerships in market to launch.

16        What does "market to launch" mean?

17   **A.**   I secured partnerships within that market.

18   **Q.**   I see.

19   **A.**   So I was looking for partnerships within those markets to

20   launch HomeShare within those buildings.  So would reach out to

21   different apartments, different condo owners, anywhere that we

22   could find units that would be willing to do the HomeShare

23   model for co-living.

24   **Q.**   Okay.  All right.  Let's take the top -- the top job.

25        Seattle general manager.  Tell us about that.

1   **A.**     So this was at a place called Zeus Living.  Once again, I

2   was managing the Seattle market.  This was a little similar to

3   HomeShare, but it was more related to B to B, so business

4   rentals for companies like Amazon, Facebook, things like that.

5   We would basically set up corporate rental units for them but

6   then list them as long-term rentals on the website as well, so

7   the -- you know, a general person could still go on and

8   actually rent those for those time frames if they wanted to.

9   **Q.**     So there, the bottom bullet, you talk about "brought the

10  market from launch to 334 managed units."

11         Can you tell us what that means?

12  **A.**     So as I was saying, we would get units from these

13  apartments and create them as corporate rental.

14         So what this was was a -- me working with my team.  I

15  hired, I think, 24 people through that time frame and was able

16  to get us from 0 units to start, because I had launched in the

17  market, up to 334 units that we were managing.  And those were

18  all available for the Amazon, the Facebook, or anyone else who

19  could rent them.

20  **Q.**     Okay.  And so then at the very top of your résumé, you

21  summarized some different skills here.

22         Logistics, you talk about procedure creation and

23  implementation there.  And can you read to us what you have

24  there?

25  **A.**     Yeah.  (as read):

1           "Procedure creation and implementation.

2     Assesses and changes processes as needed to create

3     efficiency and best practice models."

4   **Q.**   So it seems like you're touting your ability to create

5   processes that improve efficiency in order to support companies

6   to grow; is that fair?

7   **A.**   Absolutely, when given the authority to do so, yeah.

8   **Q.**   And then what about the third one, "data-driven"?

9   **A.**   (as read):

10          "Use any and all data available to check and

11    balance the adequacy of procedures."

12  **Q.**   Okay.  And then on the left there, you have your

13  education.  If we can go scroll left there.

14        And you say that you were pre-med there, in neuroscience,

15  but you don't have a medical degree; right?

16  **A.**   I do not, no.

17  **Q.**   You don't have a nursing degree?

18  **A.**   I don't, no.

19  **Q.**   You don't have a license to prescribe; right?

20  **A.**   Absolutely not, no.

21  **Q.**   And that's something you never did?

22  **A.**   No.

23  **Q.**   Okay.  And you also don't have any legal training; is that

24  right?

25  **A.**   I do not, no.

1    **Q.**    Okay.  So you met with Ruthia in the summer, and I think

2    you've told us that you were very excited about this

3    opportunity?

4    **A.**    I was, yeah.

5    **Q.**    Fair to say.

6          And you actually told her, "I love what Done is doing."

7          Do you remember that?

8    **A.**    Yeah.

9    **Q.**    "And what you've built so far"?

10   **A.**    Yeah.

11   **Q.**    And what did you understand about the stage of the company

12   at that point?

13   **A.**    That it was a platform in which patients could go online,

14   see a clinician, get, you know, a possible diagnosis if they

15   needed it, and then would be able to get help after that.

16   **Q.**    But in terms of the stage of the business, this was in the

17   very beginning phases; right?

18   **A.**    Yeah.  It was still operational, though.

19   **Q.**    And you told her you were passionate about what she was

20   doing?

21   **A.**    Absolutely.  As I stated before, I was very passionate

22   about something that related to ADHD, yeah.

23   **Q.**    And it wasn't just that; it was the idea that this was

24   something innovative; right?  It was something -- telehealth at

25   that point in time was not as common as it is today; right?

1  **A.**   Yeah, it was some -- we could potentially help people with

2  ADHD was my thought process.

3  **Q.**   And the model was to connect independent licensed medical

4  specialists with adult patients in need; right?

5  **A.**   Yes, as I understood it at the time.

6  **Q.**   Okay.  And you mentioned that you had some conversations;

7  right?  You were ultimately hired in November, but the

8  conversations started back in the summer?

9  **A.**   Yes.

10  **Q.**   And you were so enthusiastic that you actually offered to

11  do some free work.  Do you remember that?

12  **A.**   I -- I don't specifically, but it is something I would

13  probably have done.

14       **MS. BELL:**  Could we put up 6050.

15       **THE COURT:**  6050 admitted.

16       **MR. FOSTER:**  I don't know if we've been given that

17  your Honor.

18       **MS. BELL:**  If we could put it up -- sorry.  I should

19  specify.  Just for the witness and the Government and

20  the Court, unless -- I do have paper copies.

21       **THE COURT:**  Not admitted.

22       **MR. SCHACHTER:**  Would Your Honor like me to --

23       **THE COURT:**  I can see it on here.

24       **MS. BELL:**  Okay.  Great.

25  \\\

1    BY MS. BELL:

2    Q.   And so if you -- if we could go to the --

3         Well, let me ask you:  Do you recognize this as a

4    conversation between you and Ruthia dating back to August 2020?

5    A.   Yeah, I believe so.  I have no reason to discount this.

6              MS. BELL:  And, Your Honor, I'd offer this.

7              MR. FOSTER:  No objection, Your Honor.

8              THE COURT:  Okay.  Admitted.

9         (Trial Exhibit 6050 received in evidence.)

10   BY MS. BELL:

11   Q.   So if we could go to time stamp 7:48 p.m.  And here,

12   you're offering -- you say (as read):

13              "And I'm still happy to give my thoughts and

14        advice on anything you're working on, no matter what

15        you want to do, as I'm very passionate about what

16        you're doing."

17   A.   Mm-hmm.

18   Q.   And at this point in time, you were following up to see

19   what the status of your application was; right?

20   A.   Yeah.  She continued to ask me for advice, and being,

21   you know, without a job at the time, it was quite difficult,

22   and I was looking for a role somewhere.

23   Q.   Okay.  So if we could scroll up a bit.  And I think you

24   repeat at -- although -- at 7:46 p.m., you repeat again, "I'm

25   happy to give you advice" -- do you see that? -- "on anything

1   you're working on, no matter what you want to do, as I'm very

2   passionate about what you're doing."

3       Right?

4   **A.**   At which time?  I'm sorry.

5   **Q.**   This is 7:46.

6   **A.**   Oh, yes.  I see that.

7   **Q.**   Okay.  And so then if we can scroll up a little bit

8   further to 5:31 -- or I'm sorry.  5:25 p.m.

9       (Reporter interruption for clarity of the record.)

10          **MS. BELL:**  These are time stamps, yes.  These are time

11  stamps in a chat.

12  **BY MS. BELL:**

13  **Q.**   Okay.  And so do you see that Ruthia is -- she's telling

14  you (as read):

15          "Some providers want to see patients every

16          month, though it is not necessary."

17      Do you see that, at 5:25?

18  **A.**   I do, yes.

19  **Q.**   And then what does she say next?

20  **A.**   "To earn more."

21  **Q.**   "To earn more."  Okay.

22      And she's asking you advice about that, and what do you

23  tell her at 5:31?

24  **A.**   (as read):

25          "Maybe you can create schedule guidelines that

1  you want the providers to follow, and providers who

2  don't follow those guidelines, you have the right to

3  decide to not work with.

4  "Just spitballing while I'm drinking my Sunday

5  morning coffee."

6  **Q.**  Okay.  So ultimately, she does offer you a job in November

7  of 2020?

8  **A.**  Mm-hmm.

9  **Q.**  And you join the company?

10  **A.**  Yes.

11  **Q.**  And your role was very much all things operations, because

12  it was still a company at the very early stages of formation;

13  right?

14  **A.**  Yeah.

15  **Q.**  And so you were helping to get things off the ground;

16  right?

17  **A.**  Yep.

18  **Q.**  By hiring providers?

19  **A.**  Yep.

20  **Q.**  Setting up payroll?

21  **A.**  Yes.

22  **Q.**  Recruiting a COO?

23  **A.**  I don't think I recruited a COO.

24  **Q.**  You didn't recruit Riley Levy?  No?

25  **A.**  Uh-uh.

1   **Q.**   Okay.  But ultimately, there was someone who became your

2   superior; right?  But for a while, you were the operations

3   manager?

4   **A.**   Yeah.  I believe the first person that was my superior was

5   TJ.

6   **Q.**   TJ.  Okay.  And --

7   **A.**   Which I was actually excited about at the time to have a

8   barrier between myself and Ruthia.

9   **Q.**   We'll get to that.

10      So you were basically managing anything that came up on

11  business-related matters between the point you started and when

12  TJ joined; right?

13  **A.**   Not everything, I would say, but a lot of things.

14  **Q.**   Okay.  Anything that came your way?

15  **A.**   I would manage it as much as I was able to, yes.

16  **Q.**   And you were working on your expertise, which was trying

17  to develop systems and processes; right?

18  **A.**   Mm-hmm, absolutely.

19  **Q.**   And you were doing that as part of trying to grow and

20  scale the business; right?

21  **A.**   Mm-hmm.

22  **Q.**   Which you understood to be the goal?

23  **A.**   Yes, absolutely.

24  **Q.**   And there were constant fires to put out?

25  **A.**   Yes.

1    Q.    As tends to happen in a startup; right?

2    A.    Yes, absolutely.

3    Q.    And the systems and the processes, they were evolving, and

4    things were not perfect yet; right?

5    A.    Correct, yeah.

6    Q.    And your view, nonetheless, was that you were trying to

7    grow and scale a legitimate business and that there were some

8    growing pains through that process; right?

9    A.    Initially, yes.

10          MS. BELL:  Okay.  Let's take a look at 6038.

11          THE COURT:  6038.

12          MS. BELL:  And, again, just shown to the Government

13    and the witness and Your Honor, if we could.

14          THE COURT:  Any objection?

15          MR. FOSTER:  No, Your Honor.

16          THE COURT:  6038, admitted.

17    (Trial Exhibit 6038 received in evidence.)

18    BY MS. BELL:

19    Q.    Okay.  And so here a provider reached out to you to ask

20    about the number of patients on his panel.

21    A.    Mm-hmm.

22    Q.    And if you could read to us your response there.  It's

23    at -- if we could scroll down a bit -- at 5:57.

24          So this is January, so you've been there just a handful of

25    months?

1   **A.**   Yes.  Would you like me to read the entire thing?

2   **Q.**   Yes, please.

3   **A.**   (as read):

4          "Good morning.  Unfortunately, the panel number

5      in the EHR does not count patients that convert into

6      members or any same-month cancellations, et cetera.

7      We're working on cleaning that up so that it's more

8      accurate.  But there's a few larger issues in the

9      system that are requiring our engineering team's

10     focus before that gets fixed.  I do know that with

11     you specifically, the care team has had to transfer

12     patients that weren't getting refills or responses in

13     a timely manner.  We get a constant flow of e-mails

14     into our support team about patients not getting a

15     response from you, and you seem to not really be

16     around in Slack with any reliability compared with

17     other providers on our platform.

18         "As far as the consults decreasing, I don't know

19     why they would occur.  Full top-of-funnel bookings

20     has been at an all-time high.  This is something we

21     can look into."

22  **Q.**   And if we could just scroll down to the very bottom

23  message.  This is time stamp 11:54.  And if you could read this

24  to us.

25  **A.**   (as read):

1          "Hey, sorry.  I've been in meetings all day so

2      far.  I don't have an actual number right now due to

3      it needing to be handled manually.  Niki and her team

4      manually track quite a bit of info right now that we

5      use to calculate the amounts at the end of each month

6      as far as pay goes, but I do know you were at 184 at

7      the end of last month while the EHR showed 240.  Of

8      the 240, 43 were initial appointments, while 13 had

9      canceled their memberships, which equated out to the

10     184.

11         "Going forward, since the V2 migration patients

12     are automatically enrolled into membership patients,

13     would have to opt out instead of opting in, so I'm

14     assuming we should see quite a few of the initials

15     converting into memberships."

16     Would you like me to keep going?

17  **Q.**  Yes.  Sorry.  This one's a mouthful, but we won't do much

18  more of this, I promise.  Not these big ones.

19  **A.**  (as read):

20         "Currently, the EHR shows 247 for you.  I could

21     subtract out all of your initial appointments so far,

22     but it might not be accurate, as I assume it would go

23     up as patients convert into members automatically.  I

24     also don't have an easy way to pull how many of your

25     patients were transferred or canceled right now

1    without asking the care team to manually look through

2    the data.

3        "I can assure you nothing is going on, and we're

4    not playing games.  We're trying to grow and scale a

5    legitimate business, and we're hitting some growing

6    pains through that process.  I do agree it doesn't

7    make sense that a provider cannot look up your exact

8    base of patients at any given time.  That being my --

9    that being said, it is my goal to work with our

10   product team to ensure we're providing a system that

11   is honest and transparent with our providers, one

12   that you'll be able to look up this number along with

13   many more data points and not have to wonder about

14   this information.  This will take time.

15       "We're a small team, and we want to try and make

16   sure we make new features/processes that makes sense

17   long-term.  We're first fixing items that are much

18   more of a concern to our operation than what the

19   exact number of patients are on a provider's panel in

20   any given moment

21       "In the meantime, because we are a small team

22   and many of our wanted features aren't able to be

23   implemented for a while, we rely a lot on good

24   communication and utilization of the tools we do

25   have, such as Slack.  I know you stated that it might

1          take one or two days for refills, but from what I

2          hear from the care team is that refills and the

3          answering of questions to patients in EHR often takes

4          much longer than one or two days, to the point that

5          the only way we can keep the patient on our platform

6          is by transferring them to another provider."

7     Q.   Thank you for getting through all of that.  It was a lot.

8          So you mentioned the V2 migration.  That was a -- maybe

9     you can explain what that was.

10    A.   I actually don't remember specifically.  I know we had a

11    big update to our system.

12    Q.   All right.

13    A.   I don't remember what changes were included there.

14    Q.   But suffice it to say there was a lot going on in January

15    of 2021?

16    A.   Absolutely.  There was always a lot going on.

17    Q.   Okay.  Always a lot going on.

18         And at that point, you told this person, and that was what

19    you believed, that you were trying to grow and scale a

20    legitimate business and were hitting some growing pains through

21    that process; right?

22    A.   It's what I was telling a provider, yes.

23    Q.   Right.  Okay.  And then fast-forward to August 31st of

24    '21, same year.

25         You actually referred a friend to the platform; right?

1    **A.**    I did, yes.

2    **Q.**    Okay.  And you were asking for a discount for that friend;

3    right?

4    **A.**    I did, yes.

5    **Q.**    And so at that point in time, you still believed that it

6    was not only a legitimate business, but a good place to get

7    care, didn't you?

8    **A.**    I -- that's not what I said.

9    **Q.**    Okay.  Let's take a look at that communication if we

10   could.

11          **MS. BELL:**  Do we have it marked?

12          **MR. BALLEW:**  It's 6338.

13          **MS. BELL:**  If we could just display it for the witness

14   and Your Honor and -- this is another exhibit.

15          **THE COURT:**  What document is it?

16          **MS. BELL:**  It's 6038?

17          **THE COURT:**  6338?

18          **MS. BELL:**  6338.

19          **MR. FOSTER:**  No objection, Your Honor.

20          **MS. BELL:**  Thank you.

21          **THE COURT:**  Admitted.

22       (Trial Exhibit 6338 received in evidence.)

23          **MS. BELL:**  Thank you, Your Honor.

24       If we could display it.  Thank you.

25   \\\

1    BY MS. BELL:

2    Q.    Okay.  So here you are in August of 2021, so you've been

3    there since November, so quite a few months.

4          And can you read to us what you -- what you write, third

5    line down.

6    A.    (as read):

7               "So do you know if we offer discounts to friends

8          or anything?  I have a friend who I'm pretty sure has

9          ADHD, but he's struggling finding a provider, but he

10         also doesn't want to drop $199."

11   Q.    Okay.  And you're writing to Nikita Mercado --

12   A.    Mm-hmm.

13   Q.    -- who is the person who runs the care team; right?

14   A.    Yes, absolutely.

15   Q.    And that's the team that helps patients; right?

16   A.    Yes.

17   Q.    The team that you were talking about the insurance forms

18   before, they help with that --

19   A.    Yeah.

20   Q.    -- right?  They help with scheduling; right?

21   A.    Yes.

22   Q.    They help with back-office support so providers can focus

23   on meeting with patients through the telehealth platform;

24   right?

25   A.    Yes, absolutely.

1  **Q.**   Okay.  So you're asking her, and what does she tell you?

2  **A.**   (as read):

3        "I think we have an employee discount free

4        initial and 50 percent membership.  They can sign up.

5        Then we can refund."

6  **Q.**   And you mentioned that your friend was struggling to find

7  a provider?

8  **A.**   Mm-hmm.

9  **Q.**   Can you tell us about that?

10 **A.**   Yeah.  During this time frame, this was still -- there was

11 a lot of aftereffects of COVID going on, and it was very

12 difficult for a lot of people to find providers.  He had,

13 you know, thought that he might have ADHD for a long time, and

14 I spoke with him for a while.  And he had an appointment that

15 was scheduled something out like eight months from that date,

16 and so I was hoping that we could actually get him with one of

17 the good providers on our platform.

18 **Q.**   Mm-hmm.  And you, yourself, know what that's like because

19 I think you've told us that this is a condition you also suffer

20 from?

21 **A.**   Absolutely, yeah.

22 **Q.**   And you take Vyvanse; is that right?

23 **A.**   I do currently, yes.

24 **Q.**   Okay.  That's a stimulant medication; right?

25 **A.**   Yes.

1  **Q.**   And can you tell us how ADHD affected your life and how

2  the medication has helped you?

3  **A.**   Yeah.  ADHD makes things very difficult when it comes to

4  tasks.  It typically -- with your executive function, you're

5  not able to start a task.

6       As far as the way I understand it in the brain, there's a

7  lack of dopamine when you go to try to initiate any task that

8  you might want to do, and so because of that, even if you want

9  to do something, you can't necessarily.

10      What oftentimes will happen with the stimulant medication

11 it sort of gives your brain a little bit of that dopamine up

12 front so you can start a task and then go and do the things

13 that a normal person who does not have ADHD can do.

14      So without a stimulant, if you do have ADHD, it's

15 difficult to get through things like school or work, where

16 you're expected to have tasks that you're completing on a

17 regular basis.

18 **Q.**   Okay.  Thank you.  And how has the medication helped you?

19 **A.**   It was life-changing.  I'll say that.

20      **MS. BELL:**  So thank.  You we can take that down.

21 BY MS. BELL:

22 **Q.**   So about a year after you started, so in November of '21,

23 your title changed.  Do you remember that?

24      And all of a sudden you had started as operations manager,

25 and then you had this associate operations title, which felt to

1   you like a pretty big step back on your résumé.

2       Do you remember that?

3   **A.**   I don't specifically.

4           **MS. BELL:**  Okay.  Maybe we can pull up just, again,

5   for the witness and the Court and the Government 6037.

6           **THE COURT:**  60?

7           **MS. BELL:**  6037.  Sorry, Your Honor.

8           **THE COURT:**  Okay.  Admitted.

9       (Trial Exhibit 6037 received in evidence.)

10          **MS. BELL:**  Thank you.

11      And so I'm hoping we can find the spot where you say

12  that --

13          **MR. FOSTER:**  Excuse me.  Is it possible to get a copy?

14          **THE COURT:**  I'm sorry.  What is it that you want him

15  to look at, Counsel?

16          **MS. BELL:**  So this should be time stamp -- let's see.

17      So it could be time stamp 5:05:26 p.m.  If we could scroll

18  down, I guess, a bit.

19          **MR. BALLEW:**  It's not on the box.  It's on the screen.

20          **MR. FOSTER:**  Yeah, I don't know.

21          **MS. BELL:**  Let me share my copy.

22      Sorry about that.  I apologize.

23          **MR. FOSTER:**  I don't have any objection, Your Honor.

24  If we could just have a copy of the exhibit.

25          **THE COURT:**  Admitted.  Admitted.

1    **MR. FOSTER:**  I want to ask him questions too.

2    **MS. BELL:**  Sorry about that.

3    **MR. FOSTER:**  It's okay.

4    BY MS. BELL:

5    **Q.**   Okay.  Do you see that up there?

6    **A.**   Yes.

7    **Q.**   Okay.  And so could you read that to us.

8    **A.**   (as read):

9         "Got it.  Is the plan to keep me as an

10    associate?  I'm not above any specific task job, but

11    I do know what I'm qualified for, can do, and what

12    I'm worth, and I'd like my title/compensation to be

13    reflective of such.

14         "My last role, I was GM and I managed a team of

15    20-ish that I was the hiring manager for, and I would

16    have been in the executive leader section of this

17    chart.  I'm not asking for that, but being labeled an

18    associate is a pretty big step backward on my

19    résumé."

20    **Q.**   Okay.  And so that is 12 months after you started at Done;

21    right?

22    **A.**   Mm-hmm, yeah.

23    **Q.**   Now, earlier today you told us that you left because you

24    had concerns around legality, and you said you wanted to get

25    out of there as quickly as you could.

1        Do you remember that testimony?

2   **A.**   Yes.

3   **Q.**   Okay.  But, in fact, you ended up staying about 14 months

4   total; right?

5   **A.**   Yes.  This was during the COVID pandemic, and there were

6   not a lot of operational jobs available at the time.

7   **Q.**   Okay.  And when you ultimately left, you told Ruthia that

8   it had been a great experience working there; right?

9   **A.**   I don't like to burn bridges when I'm leaving something,

10  yes.

11  **Q.**   You told her, "I want to show my appreciation."

12       Do you remember that?

13  **A.**   I don't, but I probably did say that.

14       **MS. BELL:**  Let's take a look at the exhibit if we

15  could.  This is 6049.

16       **THE COURT:**  6049 admitted.

17     (Trial Exhibit 6049 received in evidence.)

18       **MS. BELL:**  I'm sorry.  Also -- it's my fault.  I

19  should be more clear.  Just for the Court, the witness --

20       **THE COURT:**  No, I'm admitting it.  I'm admitting it.

21       **MS. BELL:**  You're -- okay.

22  **BY MS. BELL:**

23  **Q.**   Could you read to us what you said to Ruthia in January of

24  2022 -- so about 13, 14 months after you started -- when you

25  let her know that you were going to be leaving the company.

1   A.   Yeah.  I said (as read):

2        "Hi.  I just wanted to show my appreciation.

3   You started a company at a difficult time in a

4   confusing landscape among so much that's not easy to

5   understand, and you've had to take a lot of risks to

6   do that, including in every hire you make, and one of

7   those was me.  I've really enjoyed my time here.  I

8   was able to really dig deep and learn about a whole

9   new-to-me industry and strategize around how to make

10  decisions in it.  I got to wear quite a few different

11  hats, and I really enjoyed the challenge.

12       "I'll be moving on to another new industry and

13  figuring out all new challenges, but I'll always

14  remember my time here at Done.  I definitely wish you

15  and everyone else at Done the best, and please keep

16  in touch.  if you're ever in the Seattle area, let me

17  know.  Thank you"

18  Q.   Okay.  And how did Ruthia respond?

19  A.   (as read):

20       "Thank you, Rick.  I'm at the airport now but

21  really want to say you're a great coworker and

22  collaborator.  Will hit you up if I come to Seattle.

23  Hope you and your family have a wonderful long

24  weekend."

25  Q.   So you told her, "I really enjoyed my time"; right?

1    **A.**    I did, yes.

2    **Q.**    And you told her that she had started a company at a

3    difficult time?

4    **A.**    Mm-hmm.

5    **Q.**    What did you mean by that?

6    **A.**    COVID.  I mean, it was a major, you know, hurdle for most

7    businesses.

8    **Q.**    Mm-hmm.

9          And for Done, it turned out to be an opportunity; right?

10   Because --

11   **A.**    It did, yeah.

12   **Q.**    -- like your friend, there were so many people looking for

13   care; right?

14   **A.**    Yes.

15   **Q.**    Okay.  And that's part of what contributed to its success;

16   right?  Connecting people via telehealth at a time when the

17   world had shut down; right?

18   **A.**    Yes, absolutely.

19   **Q.**    Now, what did you mean by "in a confusing landscape"?

20   **A.**    I believe I was just talking about the regulations and

21   compliance.

22   **Q.**    Mm-hmm.  Because it was evolving rapidly; right?  There

23   was a lot to keep track of?

24   **A.**    I wouldn't say it evolved or a lot to keep track of.  I

25   would say that it was just confusing for anyone who's not,

1  you know, a lawyer or specifically spending time in it.

2  **Q.**    Right.  And then you say, "among so much that's not easy

3  to understand."

4  **A.**    Mm-hmm.

5  **Q.**    What did you mean by that?

6  **A.**    I mean, similarly, I think.  Just a lot of stuff to go on

7  in a new industry and in something that's not really been quite

8  done like that before that it's difficult to really know

9  everything.

10  **Q.**    Mm-hmm.

11      And you told her that she had to take a lot of risks,

12  including in every hire; right?

13  **A.**    Yes.  I was specifically talking about her hiring me in is

14  this sentence.

15  **Q.**    Let's look back at your résumé for a moment.

16  **A.**    Mm-hmm.

17  **Q.**    That was 6035.

18      Now, is there anything at all that you can point us to

19  that would indicate to someone who wanted to run a drug dealing

20  operation, an illegal drug trafficking operation, that you

21  would be a good fit, based on your qualifications?

22  **A.**    Not that I'm aware of.

23  **Q.**    Okay.

24          **MS. BELL:**  You can take that down.  Thank you.

25  \\\

1    BY MS. BELL:

2    Q.   So the real reason why you left is because Ruthia was very

3    difficult to work with; isn't that fair to say?

4    A.   I would say in -- with the full context of difficult to

5    work with along with, you know, including that she wouldn't

6    listen to everyone's feedback around what was happening.

7    Q.   She was stubborn, very stubborn; right?

8    A.   Absolutely.

9    Q.   And Ruthia's background was technology; right?

10   A.   Like I stated before, I believe product at Facebook.

11   Q.   Product at Facebook, right.  And specifically a role where

12   she was in charge of streamlining a product, creating a

13   streamlined product with a good interface; right?

14   A.   Yes.

15   Q.   Okay.  Can you tell us what that means in non-tech speak?

16   A.   So creating a UI/UX, so a user interface or user

17   experience that makes it as efficient and streamlined while

18   still looking good to the consumer.  And so I believe that's

19   where most of her background was, as far as I was aware.

20   Q.   Mm-hmm.

21        So a lot of improving the user experience; right?

22   A.   Mm-hmm.

23   Q.   Making it more efficient and work well; right?

24   A.   Yes.

25   Q.   And that was somewhat of a match with you in terms of

1    your -- you're on the operations side, but you also were

2    experienced in how to make businesses efficient in order to

3    scale them to bigger proportions; right?

4    **A.**    Absolutely, but I always do that through listening to

5    those around me.

6    **Q.**    And she, by contrast, in your experience, was the most

7    difficult person you had ever worked with; right?

8    **A.**    I would state that, yes.

9    **Q.**    She was also inexperienced in the healthcare industry;

10   right?

11   **A.**    Did you say "inexperienced"?

12   **Q.**    Inexperienced.

13   **A.**    That is correct, yeah.

14   **Q.**    Correct, yes.

15        And so you felt like she was someone who knew how to make

16   a good product, but she was not a good leader; right?

17   **A.**    Absolutely.

18   **Q.**    And, in fact, you actually recommended that she get some

19   executive coaching.

20        Do you remember that?

21   **A.**    I believe so, yeah.

22        **MS. BELL:**    Okay.  And maybe we could look at Defense

23   Exhibit 6048, just for the Government and the Court and the

24   witness.

25        **THE COURT:**    6048 admitted.

1    (Trial Exhibit 6048 received in evidence.)

2         **MS. BELL:**  Thank you, Your Honor.

3  **BY MS. BELL:**

4  **Q.**  And if we could -- if you could read to us what you tell

5  her.  So this is about in your first month of work; right?  And

6  you're already finding she's a challenge for you?

7  **A.**  Yes, absolutely.

8  **Q.**  And can you read to us what you suggest that she do.

9  **A.**  (as read):

10        "You had mentioned that you hadn't had much

11       people management experience before.  Have you

12       thought about getting some leadership CEO coaching

13       and/or lessons of some type?"

14  **Q.**  Okay.  And what does she tell you?

15  **A.**  (as read):

16        "Yes.  I already did one last week and will do

17       more."

18  **Q.**  Sorry.  Thank you.  If you could please read on.

19  **A.**  (as read):

20        "If you can send me the link to that personal

21       coach, I can see if I can book an initial

22       consultation.  Also, please keep reminding me if I'm

23       blocking anything for you.  The problem is more on me

24       having too many things in my plate.  If I just focus

25       on few things, I should be able to do well.  Same

1      problem we want to fix for our users."

2  **Q.**   Let me just ask you --

3          **MS. BELL:**  If we could scroll up for a moment.

4  **BY MS. BELL:**

5  **Q.**   So what did you understand her -- when she said, "Also,

6  please keep reminding me if I'm blocking anything for you,"

7  what does -- what did that mean?

8  **A.**   If I needed her for any specific tasks that she had

9  assigned to me.

10  **Q.**   I see.  And then she tells you, "Same problem we want to

11  fix for our users" with an exclamation point.

12          How did you understand that?

13  **A.**   That she wants to lower the amount of things they have to

14  focus on.

15  **Q.**   Okay.  And could you continue.

16  **A.**   (as read):

17          "Thanks for helping me identify the issues of me

18          having too many direct reports previously."

19  **Q.**   Okay.  Thank you.

20          So you stayed till January of 2022; right?

21  **A.**   That is correct.

22  **Q.**   And you mentioned to us that in December of 2020, which

23  was actually the month after you started, you said you heard

24  Dr. Brody say something at the Christmas party; right?

25  **A.**   Mm-hmm.

**Q.** And you told us that was extremely troubling to you and very disturbing; right?

**A.** Absolutely, yeah.

**Q.** But you stayed for nearly -- actually, more than another year; right?

**A.** Yeah, just about.

**Q.** And you also told us about something Ruthia said related to Uber or something like that, and you said that was also extremely disturbing to you; right? That's what you said today?

**A.** Absolutely, yeah.

**Q.** But you stayed for months and months and months?

**A.** I did, yes.

**Q.** Yeah. Okay.

So you also told us that it was very scary to raise concerns and you were worried about being fired.

Do you remember that?

**A.** Yeah.

**Q.** But you also told us that you were very vocal in raising your concerns; right?

**A.** To a point.

**Q.** All right.

**A.** I could have been much more vocal. I was very kind about the way I raised the concerns --

**Q.** Okay.

1    A.    -- because I was worried that if I were to push too hard

2    on something -- so I would mention them and raise them and say

3    that these are problems, but I wouldn't, you know, like create

4    ultimatums or cause a scene or an issue about it.

5    Q.    And you were not fired; right?

6    A.    I was not, no.

7    Q.    You chose to leave?

8    A.    I did, yes.

9    Q.    So let's try and walk through the way Done actually worked

10   for patients, prospective patients coming to the platform if we

11   could.

12        So as someone coming to the platform, you mentioned that

13   there were some pre-appointment screening tools in place?

14   A.    Yes.

15   Q.    And do you remember that there was a complex condition

16   question which asked people just one question, but there were

17   some --

18        Actually, let me back up.

19        There was a question that asked about age.

20        Do you remember that?

21   A.    I believe so, yeah.

22   Q.    Okay.  And the idea was this was an adult-focused ADHD

23   telehealth platform; right?

24   A.    Correct, yeah.

25   Q.    So the idea was if you were under 18, this feature would

1   screen you out because you were not going to be a fit for this

2   platform; right?

3   **A.**   Correct, yeah.

4   **Q.**   And then the same thing about the complex condition

5   question.  This was for, you know, bipolar, schizophrenia,

6   psychosis, mental health hospitalizations.

7          Do you recall that?

8   **A.**   I do, but once again, it was a self-assessment, so...

9   **Q.**   Self-assessment; right?

10  **A.**   Yeah.

11  **Q.**   You're relying on people, on prospective patients, to tell

12  you the truth; right?

13  **A.**   Absolutely, yeah.

14  **Q.**   Yeah, which, by the way, happens also when you go to the

15  doctor; right?  When you go to see your doctor --

16  **A.**   Yeah, but when I initially got diagnosed with ADHD, I

17  spent probably two hours with the doctor.

18  **Q.**   Yeah.  That was a different model; right?

19  **A.**   Yes.

20  **Q.**   But part of what attracted you to Done was it was

21  something new and different; right?

22  **A.**   Yeah, new and different.

23  **Q.**   Right.  So -- so after that -- that question about the

24  serious mental health problems, then there was an initial

25  self-assessment for ADHD.  It was actually part of the same set

1    of questions; right?  And it was a set of six questions.

2        Do you remember that?

3    A.    Yes.

4    Q.    Okay.  And the idea was that you were kind of creating a

5    funnel of sorts such that by the time you get to the initial

6    appointment, when someone actually pays money and is meeting

7    with the provider, you have a set of people who are more likely

8    to be a fit than when you started with the general population;

9    right?

10   A.    Yes.

11   Q.    Okay.  And then the model was -- and you talked about

12   this -- that the patient, after paying $199 -- that was the

13   initial appointment fee; right?

14   A.    Mm-hmm.

15   Q.    -- would meet with the -- an independent medical

16   specialist; right?

17   A.    Either a PMHNP or a physician.

18   Q.    Mm-hmm.

19       And what is -- I'm not even going to try to say the

20   acronym even though I've been working on this case for a long

21   time because every time I stumble over the letters.

22       So could you tell us what the specialist nurse

23   practitioners -- what their full title is?

24   A.    Yeah, psychiatric mental health nurse practitioner.

25   Q.    Mm-hmm.

1      And what exactly does that mean?

2  **A.**   That they have a certificate for psychiatric mental

3  health.

4  **Q.**   So this is a specialist nurse practitioner; right?

5  **A.**   Yes.

6  **Q.**   So they get their bachelor's degree; right?

7  **A.**   Yes.

8  **Q.**   And then they go on to do additional training; right?  In

9  a mental health specialty?

10  **A.**   I believe they would have a master's as well first.

11  **Q.**   And they actually get special treatment in ADHD too;

12  right?

13  **A.**   I don't know if there's specific ADHD training with that.

14  **Q.**   Okay.  But certainly, you do know that they get mental

15  health --

16  **A.**   Yes.

17  **Q.**   -- specialty training?

18  **A.**   Absolutely.

19  **Q.**   And so the network of independent licensed specialists,

20  you said, was these psychiatric mental health nurse

21  practitioners or doctors?

22  **A.**   Yeah.

23  **Q.**   But largely the nurse practitioners?

24  **A.**   Largely, yeah.

25  **Q.**   Okay.  And so a patient, after paying their money, the

1    199, a prospective patient --

2    A.    Mm-hmm.

3    Q.    -- they would meet with one of these independent licensed

4    medical specialists; right?

5    A.    Yes.

6    Q.    And these licensed medical specialists were in all

7    different places throughout the country; right?

8    A.    Yes, yeah.

9    Q.    And they were actually independent contractors; right?

10    A.    They were, yes.

11    Q.    Okay.  And the only two people in that telehealth meeting

12    were the patient -- the prospective patient and the independent

13    licensed medical specialist; right?

14    A.    Yes.

15    Q.    Nobody else was there?

16    A.    That is correct.

17    Q.    Okay.  And those appointments were the 30-minute standard

18    appointment slots we discussed; right?

19    A.    I believe there was at one point some that were reduced to

20    15 minutes.

21    Q.    The 15 minutes was for follow-ups.

22    A.    There was some initials that were reduced to 15 minutes as

23    well.

24    Q.    Well, we'll talk about that.

25          But the only two people in the actual meeting were the

1   independent specialist and the patient.  We'll get back to the

2   amount of time, but there was a standard time slot?

3   A.   Yes.

4   Q.   And there -- then thereafter, the patient would have the

5   option of continuing care if, but only if, the independent

6   licensed medical specialist made a determination in the

7   exercise of their judgment that that person has ADHD; right?

8   A.   As far as I'm aware around all that, I would say yes, but

9   I think given the context of things, there's a -- you know, an

10  incentive and a disincentive for different outcomes.

11  Q.   Yes, and we will talk about all of that.

12       But when you referred your friend, for example, in August

13  of 2021 to the platform, what you were expecting for your

14  friend was that he or she would have the opportunity to meet

15  with an independent licensed medical specialist; right?

16  A.   And I believe I actually tried to get him with a specific

17  one that I knew took the time and care with their patients.

18  Q.   Mm-hmm.  Right.

19       And because there were many, many, many independent

20  licensed specialists on the platform; right?  Even at that

21  point?

22  A.   Yup.

23  Q.   Eventually hundreds; right?

24  A.   Maybe after I left.  I think we were like around 60 or 70

25  by the time --

1   **Q.**   But quite a few?

2   **A.**   Yes.

3   **Q.**   Okay.  And so there would be -- if there was a diagnosis,

4   then the patient would have the option of paying a monthly fee,

5   which went from $59, and at one point it was $79; right?

6   **A.**   I think so, yeah.

7   **Q.**   Okay.  And that was the fee for ongoing care?

8   **A.**   Yes.

9   **Q.**   Okay.  Now, you talked about the structure of Done, where

10   you had the Done, the telehealth company, and then you had the

11   Done medical professional corporation.

12   Remember that?

13   **A.**   Yeah.

14   **Q.**   And the way the company was structured was that the --

15   that Done -- and Ruthia was the CEO of Done.  Done was in

16   charge of the telehealth platform, and then you had the medical

17   professional corporation and the independent contractors who

18   were actually contracted with the medical professional

19   corporation; right?

20   **A.**   On paper, yes.

21   **Q.**   Okay.  And you're aware that that is a very common method

22   for telehealth companies across the country in the for-profit

23   industry to structure?

24   **A.**   I'm aware of it as a fairly common structure in a lot of

25   industries.  I wasn't aware of it at the time until digging

1   further into it that it might be the standard for a telehealth

2   company.

3   **Q.**   Got it.  Okay.

4       And you knew that there was actually a legal contract

5   setting out this structure; right?

6   **A.**   I actually was unaware of that.

7   **Q.**   Okay.  And you're not a lawyer, so you couldn't be able to

8   interpret that contract even if you had seen it, would you?

9   **A.**   I've spent a lot of time with contracts.  I would probably

10  be able to interpret it to a fairly good degree.  Obviously not

11  what a lawyer could, but I would say my understanding of

12  contracts is fairly high.

13  **Q.**   Oh, wow.  That's impressive.

14      Some of us who study years still struggle with contracts.

15  They can be rather dense.

16      But in this instance, you have not seen the contract;

17  correct?

18  **A.**   I did not, no.

19  **Q.**   Okay.  But you did tell the jury that you thought there

20  was something fishy with this structure -- right? -- on your

21  direct testimony?

22  **A.**   Yes.  And I had -- I believe, if I remember correctly, I

23  had requested some sort of contract given after I talked to the

24  accountants.  They were -- they even mentioned there should be

25  some sort of managerial contract between the two so that we

1  could have the funds be separated and going to the right

2  entities correctly.

3  **Q.**   Okay.  But you haven't seen that contract?

4  **A.**   No.

5  **Q.**   Okay.  And also, there are contracts for the independent

6  contractors, the licensed medical specialists?  Those are also

7  legal contracts; right?

8  **A.**   Yes.

9  **Q.**   You didn't write those either?

10 **A.**   I did not, no.

11 **Q.**   And you also have not applied your layperson legal

12 knowledge --

13 **A.**   I didn't spend any time with those, no.

14 **Q.**   Okay.  Now, even with the platform, there were systems

15 that were evolving, as we looked at earlier; right?

16 **A.**   Yeah.

17 **Q.**   Like, for example, the EHR system was minimal to start,

18 but then it became more robust over time?

19 **A.**   Yes, absolutely.

20 **Q.**   And there were certain limitations of telehealth.  For

21 example, since you're not in a physical office, you -- the

22 providers couldn't measure blood pressure; right?

23 **A.**   That is correct, yeah.

24 **Q.**   But you know that there are studies showing that measuring

25 blood pressure with regards to stimulants is not necessary;

1    right?

2    **A.**    That's correct in many cases.

3    **Q.**    Now, you talked a little bit about the -- certain

4    different initial assessments that were offered on the

5    platform; right?

6         So we spoke about the initial assessment with the complex

7    questions and the six-question ADHD self-screener, right?

8         But there were these other screening evaluations you

9    mentioned, and they were also a mouthful, lots of acronyms, but

10   essentially, there was a longer-form assessment for screening

11   ADHD; right?

12   **A.**    Yes, to determine the potential for ADHD versus the

13   comorbidities of anxiety and depression, typically.

14   **Q.**    There are actually three separate screening tests; right?

15   **A.**    Yes.

16   **Q.**    Okay.  And they were -- it was quite a few questions at

17   various points in time; right?

18   **A.**    Yeah, absolutely.

19   **Q.**    And you know that people with ADHD struggle with

20   inattention?  That can be certainly one set of symptoms for

21   people; right?

22   **A.**    For -- in certain specific scenarios, yes.

23   **Q.**    Yes.  And so you also know that Dr. Tsang and Dr. Brody

24   made the decision to remove additional questions at one point

25   in time to make the initial screening test less burdensome

1  because there were so many questions for people before they

2  could even get to an initial appointment.

3      You know that; right?

4  **A.**   I don't recall that specifically.

5  **Q.**   Okay.

6  **A.**   I -- my understanding is Ruthia was the decision-maker in

7  most things.

8  **Q.**   Yes, you did tell us that on direct.  But I'm asking you

9  now -- and it sounds you don't recall one way or another --

10 whether Dr. Brody and Dr. Tsang had recommended a reduction in

11 the number of --

12 **A.**   I don't remember that ever being the case, no.

13 **Q.**   You don't remember.  Okay.

14     But what you do know is that Ruthia wanted the product to

15 have as little barriers as possible; right?

16 **A.**   Yes.

17 **Q.**   And she was constantly trying to minimize what the patient

18 was going through on the website; right?

19 **A.**   Yes.

20 **Q.**   She was someone who looked at things from the vantage

21 point of technology; right?

22 **A.**   Yes.

23 **Q.**   And how technology could make things quicker and more

24 efficient for the user; right?

25 **A.**   Yes.

1 **Q.** That was what she -- her background went. She came from

2 Facebook, and that was her experience; right?

3 **A.** Yes.

4 **Q.** Okay. But you told us that people pushed back on this

5 change, that when these questions -- when the forms were

6 reduced -- and we're talking about that longer form, the one

7 that has the extra ADHD questions plus the questions for

8 anxiety plus the questions for depression; right?

9 **A.** Yeah.

10 **Q.** Okay. And so there was pushback because these independent

11 licensed medical specialists from around the country, some of

12 them -- some of them -- started saying, well, wait a second.

13 Part of my ability to work well on this platform with a

14 30-minute initial appointment is that I get this information

15 through the forms prior to the appointment, so it helps me

16 because I can make super-efficient use of my time when I have

17 the face-to-face appointment if I get this extra information;

18 right?

19 **A.** Yes.

20 **Q.** Right. And so Ruthia was a little stubborn in pushing

21 back initially on that; right?

22 **A.** I would say that's a light way to put that.

23 **Q.** A light way to put it. As we talked about, she was the

24 most difficult person you had ever worked with; right? I don't

25 know if that's still true today, but at least --

1  **A.**  Yes.

2  **Q.**  -- it was true.

3      So she did not want to do that.  And, again, her view was

4  removing barriers to access, as we talked about; right?

5  **A.**  Yes.

6  **Q.**  But it took at least a month or two to convince her to

7  bring the questions back in; right?

8  **A.**  I don't know if they were ever brought back in fully.

9  **Q.**  Well, you did tell the Government -- you did meet with the

10  Government.  You remember that; right?  You met with the

11  Government on a number of occasions; correct?

12  **A.**  I believe so.  I mean, I don't know exactly what you're

13  talking about, but --

14  **Q.**  Sorry.  Let me take this more slowly.

15      So you initially were interviewed by the Government back

16  in September of 2022.

17      Do you remember that?

18  **A.**  Yes.

19  **Q.**  So far ago.  So long ago at this point.

20      And so that was actually the same year you left Done.

21  **A.**  Yes.

22  **Q.**  You left in January, and by September of 2022, the

23  Government, the federal government, interviewed you; right?

24  **A.**  Yes.

25  **Q.**  But at that point, there were no federal criminal charges.

1    This case had not yet come to be -- it was -- they were

2    investigating; right?

3    **A.**    Mm-hmm.

4    **Q.**    And they asked to meet with you; right?

5    **A.**    They showed up at my doorstep, yes.

6    **Q.**    They showed up at your doorstep.  Okay.

7          And you agreed to meet with them; right?

8    **A.**    I walked outside and spoke with them, yes.

9    **Q.**    Okay.  And they were taking notes; right?

10   **A.**    I believe so.

11   **Q.**    Okay.  And you told them back in September of 2022 that it

12   took at least a month or two to convince Ruthia to bring the

13   questions back in.

14         Do you remember that?

15   **A.**    I don't specifically remember that.  It was a long time

16   ago.

17   **Q.**    Totally understandable.  It really was a long time.

18         **MS. BELL:**  Let's put up, if we could, just for the

19   witness and the Government and the Court, Defense Exhibit 9009,

20   which is a memorandum.

21         And this would be --

22   **BY MS. BELL:**

23   **Q.**    If we could just have you look at paragraph 15 and see if

24   this refreshes your recollection on this.

25         I'm sorry.  It should be paragraph 15.

1    **MS. BELL:** 15. Maybe if you could scroll one more

2  page, please. There is no -- I'm sorry.

3         **THE WITNESS:** There it is.

4         **MS. BELL:** Thank you.

5         **THE WITNESS:** Do you want me to read this?

6         **THE COURT:** No, read it to yourself.

7         **MS. BELL:** It may actually be the next line.

8         **THE COURT:** Well, wait a minute. Put it back on.

9     Okay. Read that to yourself first.

10        **MS. BELL:** I think it's my fault, actually, Your

11 Honor, and I apologize, because I believe we may have our cite

12 wrong, because this is the second memorandum of interview, and

13 I believe we're looking for the first one.

14        **MR. BALLEW:** That's 9008.

15        **MS. BELL:** It's the September one.

16        **MR. BALLEW:** 9008.

17        **THE COURTROOM DEPUTY:** This is 9008?

18        **MS. BELL:** Well, this may be just be something we'll

19 have to --

20        **THE COURT:** Return to.

21        **MS. BELL:** -- return to.

22        **THE COURT:** Okay. Moving on.

23        **MS. BELL:** I apologize.

24 BY MS. BELL:

25 **Q.** Okay. We'll come back to that.

1    But let me just be clear:  You do remember that the

2  questions came back in.  What you're not sure about is was it

3  the full set of questions, or was there some kind of shortened

4  set of questions that came back into the screening test?

5  **A.**   Given that I specifically remember complaints from the

6  clinicians continuing through my time there --

7  **Q.**   Yes.

8  **A.**   -- I highly doubt that the full set or the set that the

9  clinicians wanted to be existing there were back in there.

10 **Q.**   Not the full set; right?

11 **A.**   No.

12 **Q.**   Okay.  And you've talked a lot about clinicians sort of in

13 the vague sense without saying who.

14    But to be clear, when you say "clinicians," it's some

15 number of people that have come to you and made their

16 complaints known; right?

17 **A.**   Yes.

18 **Q.**   But, as we talked about, there were many, many, many, many

19 independent contractor providers on the platform; right?

20 **A.**   Yes.

21 **Q.**   Okay.  And you have not been specific in the direct

22 testimony -- we didn't really hear names from you about, oh, I

23 remember, you know, this person came to me or that person came

24 to me; right?

25 **A.**   Correct.

1    **Q.**   You just have -- which is fair.  I mean, here we are in

2    2025.  But I just want to be clear:  When you say "clinicians,"

3    it might be one, two, three, depending on the specific issue

4    we're discussing; right?

5    **A.**   I would say it was, in any of these, a minimum of 30 or

6    40 percent of the clinicians.

7    **Q.**   Okay.  Well, we haven't talked about who they would be or

8    who -- their names were.  That was not something that you

9    offered us or was asked on direct; right?

10   **A.**   Correct.

11   **Q.**   And also, we talked about a lot of issues, which we'll get

12   into; right?

13   **A.**   Mm-hmm.

14   **Q.**   Okay.  Okay.  So -- but just so we're clear, you believe

15   there were questions put back in?  Ruthia agreed to put the

16   questions back in; right?

17   **A.**   Like I said, I don't actually fully remember if she put

18   questions back in or how many she put back in, if so.

19   **Q.**   Okay.  We will get this cite.

20        **MS. BELL:**  If we could get that straightened out, that

21   would be helpful.  I believe it's 9009.

22   **BY MS. BELL:**

23   **Q.**   But in any event, you stayed, and things proceeded.  And

24   there were doctors who you've talked to us about who were part

25   of the Done medical leadership; right?

1   **A.**    Yes.

2   **Q.**    And that included Dr. Brody; right?

3   **A.**    Yes.

4   **Q.**    And he is a Stanford-trained, board-certified clinical

5   psychiatrist; right?

6   **A.**    I am not aware of Stanford-trained, but I would assume

7   that's correct.

8   **Q.**    Okay.  And he has decades of experience as a clinician?

9   **A.**    As far as I'm aware, yes.

10  **Q.**    He has experience as a medical director at various

11  hospitals and psychiatry clinics?

12  **A.**    I'm not aware of that, but I would assume probably

13  correct.

14  **Q.**    Okay.  And teaching experience too, quite a few years of

15  teaching experience, including at UCSF; right?

16  **A.**    Once again, I'm not aware of that, but I would assume

17  that's correct.

18  **Q.**    Okay.  Then there was also -- we've talked about

19  Dr. Brindala.  We'll come back to him in a minute.

20      But there was also another psychiatrist that was part of

21  medical leadership named Dr. Les Tsang; right?

22  **A.**    I believe so, but I had very little interaction.

23  I believe he left or had already left by the time I was working

24  there.

25  **Q.**    Dr. Tsang -- we'll go through some documents, but

1    Dr. Tsang was a UCLA-trained psychiatrist who spent 12 years at

2    Kaiser Permanente?

3              **MR. FOSTER:**  Objection, Your Honor.

4              **THE COURT:**  Sustained.  The jury is ordered to

5    disregard it.

6         Questions are not evidence.  Questions are not evidence.

7    Answers are evidence.

8    **BY MS. BELL:**

9    **Q.**   Do you recall hearing about Dr. Tsang and his credentials

10   or no?

11   **A.**   No.

12   **Q.**   But you did know --

13   **A.**   I recall Les Tsang, but not his credentials.

14   **Q.**   Okay.  But you knew he was a psychiatrist?

15   **A.**   Yes.

16   **Q.**   And that he was or had been part of medical leadership?

17   **A.**   Yes.

18   **Q.**   And then there was Dr. Brindala; right?

19   **A.**   Yes.

20   **Q.**   Triple-board-certified?

21   **A.**   Mm-hmm.

22   **Q.**   Stanford-trained.  He had an --

23             **THE COURT:**  I think he didn't --

24   I'm sorry.  Go ahead.

25             **MS. BELL:**  No, I'm sorry, Your Honor.

1         **THE COURT:** No, no. Did he know that? I think you

2 should establish -- I think you should establish that this

3 witness knew those things. They -- he may have.

4         **MS. BELL:** Thank you, Your Honor. I will.

5 **BY MS. BELL:**

6 **Q.** Dr. Brindala -- did you know about his qualifications?

7 **A.** I knew some of them, yes.

8 **Q.** You mentioned on direct that you really trusted

9 Dr. Brindala; right?

10 **A.** Yes.

11 **Q.** And I think you said that was because, in part, he had

12 these triple board certifications; right?

13 **A.** Mm-hmm.

14 **Q.** Including in addiction medicine?

15 **A.** I don't know if I said that, but that would be one of the

16 reasons, yeah.

17 **Q.** Okay. And he had also worked in the Obama administration?

18 **A.** Yes.

19 **Q.** As a healthcare policy adviser?

20 **A.** I believe that was it, yeah.

21 **Q.** The one credential he didn't have amongst all of his very

22 impressive credentials was board-certified psychiatrist; right?

23 He was not a psychiatrist?

24 **A.** That is correct, but I believe he managed psychiatrists

25 when he ran a hospital.

1    Q.    Mm-hmm.  He had --

2          He came with operations experience; right?

3    A.    Yes.

4    Q.    Policy experience?

5    A.    Yeah, absolutely.

6    Q.    So startup experience, that kind of stuff; right?

7    A.    I don't know startup.  Much more solidified corporate

8    style, I would say.

9    Q.    Okay.  More from the management side?

10   A.    Yes.

11   Q.    And not -- not as a treating clinician; right?

12   A.    I -- I think his more recent experience, yeah.

13   Q.    So Dr. Brindala and Dr. Brody were there for --

14         Dr. Brody was there for your entire tenure; right?

15   A.    Yes.

16   Q.    And Dr. Brindala was there through -- for months and

17   months, through January; right?

18   A.    Mm-hmm.

19   Q.    And then he continued to be involved in an advisory role

20   for quite a number of months more; right?

21   A.    For a few more months, yeah.

22   Q.    Now, you mentioned that Ruthia controlled a hundred

23   percent of various different things at the company.

24         Do you remember that?

25   A.    Yes.

1  Q.   Okay.  And so you said that she controlled recruiting;

2  right?

3  A.   Yes.

4  Q.   But, in fact, it was Dr. Brindala that made hiring

5  decisions; right?

6  A.   I don't believe that was the case, no.

7  Q.   Let's go ahead and look at some documents.

8       MS. BELL:  Defense Exhibit 6247.

9       THE COURT:  6247.

10      MS. BELL:  And this should just be displayed, again,

11  for the Government and the Court and the witness.

12      MR. FOSTER:  No objection.

13      THE COURT:  6247 admitted.

14  (Trial Exhibit 6247 received in evidence.)

15      MS. BELL:  And if we can put it up, please.

16  BY MS. BELL:

17  Q.   So if we could go to time stamp -- it's 12/10/20 at

18  11:26:03 if we could.

19      And if you could just read that for us, Mr. Menesini.

20  A.   At 11:23?

21  Q.   Yes, please.

22  A.   (as read):

23       "KK, this pulls from my sheet, so I'm now

24       calculating fractional providers based on how many

25       different licenses they have with a few manual edits

1    on those that I know have much larger loads from

2    specific states.  So like some providers are listed

3    as .33 of a person for three different states or .33

4    of a person for one state and .67 of a person for the

5    other.

6        "So if someone is .33 of a person, we're

7    assuming 15 total average hours, so five hours in the

8    state they're -- that they're .33 for."

9    **Q.**  Okay.  And then could you -- I'm sorry.  Could you please

10   continue reading down to the 11:26 time stamp.  So you say --

11   I'll help.  It's a lot of reading for one person.

12       So you say, again (as read):

13       "You can see my provider breakdown here.  Let me

14   know if you see any issues with this sort of

15   calculation."

16       And then Dr. Brindala says (as read):

17       "This is perfect.  Thank you for your diligence

18   in considering and accounting for the details.  I

19   will begin to hire for existing states based on this

20   sheet."

21       Do you see that?

22   **A.**  Yes.

23   **Q.**  Okay.  That's December of 2020, so the month after you

24   started; right?

25   **A.**  Yes.

1    **Q.**   Okay.  And one provider that Dr. Brindala chose not to

2    move forward with was someone named Patrick Schoenecker.

3         Do you remember that?

4    **A.**   I don't specifically remember that, no.

5    **Q.**   Okay.  Let's go to --

6    **A.**   I don't doubt it, but...

7    **Q.**   I don't blame you.  It's been quite a while.

8         **MS. BELL:**  So Defense Exhibit 6130, if we could do

9    that.  And, again, for the Government and the Court and the

10   witness, please.

11        **THE COURT:**  6130 admitted.

12        **MR. FOSTER:**  No objection, Your Honor.

13        **THE COURT:**  6130 admitted.

14   (Trial Exhibit 6130 received in evidence.)

15   **BY MS. BELL:**

16   **Q.**   Okay.  So if you could -- well, I'm going to help you.

17   This is too much reading.

18        So I'm going to read Sydney Jiminez.  But Sydney Jiminez

19   was a recruiter; right?

20   **A.**   Yes, she was.

21   **Q.**   Okay.  And so just to set the stage here, we are -- let's

22   decide where to read from.

23        We are in January of 2021; right?

24   **A.**   Yes.

25   **Q.**   And the subject is "Recruiting Team."

1        You see that?

2    A.   Yes.

3    Q.   And there's Dr. Brindala up there; right?

4    A.   Mm-hmm.

5    Q.   And you're up there too.

6         Okay.  And so Sydney Jiminez says (as read):

7             "Patrick Schoenecker, PMHNP" -- so that's the

8         psychiatric mental health nurse practitioner, the

9         specialist nurse practitioner -- "collab not

10        required"

11        -- meaning a collaborating physician is not required;

12   right?

13   A.   In that state, I believe.

14   Q.   In that particular state.  So that was one of the -- back

15   when you said to Ruthia this was a confusing landscape, part of

16   it is there's federal law, then there's state laws.

17        The state laws are different by state; right?

18   A.   Yes.

19   Q.   And so it's like a lot to keep track of; right?

20   A.   Yeah, in -- somewhat easy to keep track of some of that,

21   though, I would say.

22   Q.   Well, I guess it all depends on one's perspective.

23   A.   Mm-hmm.

24   Q.   But --

25             MR. FOSTER:  Objection, Your Honor.

1          **THE COURTROOM DEPUTY:**  Your mic.

2          **MR. FOSTER:**  Objection, Your Honor.  That's not a

3    question.

4          **THE COURT:**  Ask the question.

5    BY MS. BELL:

6    **Q.**   So to continue:

7              "Patrick Schoenecker has -- currently has 600

8         patients, all adults.  Our ADHD 50 are seriously ill

9         patients."

10        Wow.  This is actually a little bit difficult, so let me

11   cut to the chase here.

12        So midway through, she says (as read):

13             "I had explained to him the payment structure

14        and also the process."

15        Meaning of Done; right?

16   **A.**   Yes.

17   **Q.**   (as read):

18             "He's a little unsure because we don't do urine

19        testing, EKG, and et cetera, as his practice does

20        provide that.  Also a little unsure as he's used to

21        seeing patients often after consultation."

22        Meaning seeing patients face-to-face often; right?

23   **A.**   Mm-hmm.

24   **Q.**   (as read):

25             "Do we have some kind of writing for this that I

1          can send to him?  Really good candidate if we can

2          convince him."

3          Okay.  And then Dr. Brindala -- what does Dr. Brindala say

4    to the whole group at 8:55 p.m.?

5    A.   Would you like me to read it?

6    Q.   Would you mind?

7    A.   Yeah.  He's directing this at Sydney (as read):

8          "He sounds like a good provider but may not be a

9          great fit for our platform.  I suggest leaving him on

10         the backup list for now.  If you really like him, I

11         can speak with him to go over the clinical details."

12   Q.   And what does Sydney respond?

13   A.   "I agree."

14   Q.   Okay.  So Dr. Brindala says about Patrick Schoenecker that

15   he sounds like a good provider, but he may not be a great fit

16   for our platform; right?

17   A.   He says that, I think, with the sort of realism mindset of

18   what we were currently doing at Done would not work for a

19   provider like that.

20   Q.   Right, because he wants to do all the things that Sydney

21   Jimenez mentioned; right?

22   A.   Yes.

23   Q.   And Dr. Brindala is saying that's not a fit for our

24   platform.  EKGs, not a fit for our platform.  Urine testing,

25   not a fit for our platform.  Right?

1  A.   He's saying that if -- someone who would want to do those

2  is not going to work out on the platform.

3  Q.   And someone who is used to seeing patients often after

4  consultations.  Dr. Brindala says:  Sounds like that's not the

5  right fit for our platform.  He's good, just not the right fit.

6       Right?

7  A.   Yeah.

8  Q.   And you made the same decision about your own medical

9  care.  Even though you referred your friend to Done, you,

10  yourself -- it's not a fit for you.

11       You told us that; right?

12  A.   Mm-hmm.

13  Q.   You like going to see your provider the way you do; right?

14  A.   Yes.

15  Q.   Okay.  So Patrick Schoenecker did not get a job?

16  A.   I don't believe so.

17       MS. BELL:  Okay.  Let's go to Defense Exhibit 6129.

18       THE COURT:  6129.

19       MS. BELL:  This is, again, just for the witness and --

20       THE COURT:  Admitted.

21       MS. BELL:  Thank you, Your Honor.

22       (Trial Exhibit 6129 received in evidence.)

23  BY MS. BELL:

24  Q.   Now, here we have TJ Williams, who we spoke about before.

25  So you mentioned you were happy to have TJ Williams come on

1    board.

2         So he became the operations superior to you; is that

3    right?

4    A.   Yes.

5    Q.   Okay.  And that was -- here we are in June of '21?

6    A.   Mm-hmm.

7    Q.   And let's see.  You are talking about recruiting here and

8    what to tell prospective candidates; right?

9    A.   That's what this looks like, I would say, yeah.

10   Q.   Okay.  So I will share the reading so it's not all on you.

11        So TJ Williams says to Dr. Brindala --

12        And by the way -- let's see.

13        MS. BELL:  Can we scroll up a bit or scroll to the

14   first page.  Okay.

15   BY MS. BELL:

16   Q.   So on the first page, we've got you and we've got

17   Dr. Brindala.  We've got TJ Williams?

18   A.   Mm-hmm.

19   Q.   And who is Kristin?

20   A.   She was one of the provider managers, I would say.

21   Q.   And then we've got a Jacob?

22   A.   Mm-hmm.  He worked --

23   Q.   Who was Jacob?

24   A.   He worked alongside Kristin.

25   Q.   He worked with Kristin?

1  **A.**  Yeah.

2  **Q.**  Okay.  And we do not have Ruthia on this; right?

3  **A.**  I do not see Ruthia on this, no.

4  **Q.**  Okay.  So now let's go back to the message itself.  And we

5  have TJ Williams asking Dr. Brindala (as read):

6  　　　"Would you mind sending us the language that you

7  　　　mentioned -- that you mentioned about, 'Are you

8  　　　comfortable providing stimulants' that you mentioned

9  　　　on our call.  We should use more precise language in

10 　　　the interview process if we're not doing so already."

11 **A.**  Mm-hmm.

12 **Q.**  And Dr. Brindala -- what language does Dr. Brindala send

13 back as the recruiting language?

14 **A.**  Can you clarify what you're asking for, exactly?

15 **Q.**  Oh, sorry.  Would you mind reading to us Dr. Brindala's

16 response, please.

17 **A.**  Yes (as read):

18 　　　"Are you comfortable prescribing stimulants

19 　　　given the following characteristics of the platform

20 　　　different from traditional settings:

21 　　　"Inability to check vital signs, i.e., blood

22 　　　pressure and heart rate; lack of urine drug testing;

23 　　　absence of controlled substances contract/agreement;

24 　　　no corroborating information other than PDNP report;

25 　　　current status of platform for timeliness,

1          availability, nature, and flow of synch/asynch

2          interactions after initial eval; existing platform

3          arrangement for backup coverage outside of individual

4          provider available hours."

5     **Q.**   Okay.  So let's break this down about what Dr. Brindala is

6     saying in terms of the information that needs to be

7     communicated to prospective independent specialist providers

8     when they interview for a job.

9          First, he says "inability to check vital signs, blood

10    pressure and heart rate"; right?

11    **A.**   Mm-hmm.

12    **Q.**   And, again, that's because if it's telehealth, there are

13    lots of benefits of telehealth, but you're not physically in a

14    doctor's office where you can say:  Well, let me test your

15    physical body.

16         Right?

17    **A.**   Mm-hmm.

18    **Q.**   So that's Point 1 that Dr. Brindala thinks we should

19    definitely communicate this to people, because there could be

20    people like Patrick Schoenecker who are not a fit for the Done

21    platform.  It's doesn't mean they're not good; it just means

22    they're not a fit.

23         Right?

24    **A.**   Yes.

25    **Q.**   Okay.  And then number two, lack of urine drug testing.

1  Again, same thing:  Hard to do that if you're not in a physical

2  brick-and-mortar location; right?

3  **A.**    Correct.

4  **Q.**    The price of innovation; right?

5  **A.**    I don't know if that's correct.

6  **Q.**    Well, you know, there are some things you give up, like

7  urine drug testing --

8      **THE COURT:**  Well, I don't know.  Are you offering an

9  opinion as to the value of technology over medical science?  I

10  don't know -- you said the price of innovation.  I don't know

11  if it's the price of innovation.  Maybe it's appropriate; maybe

12  it's inappropriate.  Maybe it's a price; maybe it's not a price

13  worth taking.  I have no idea.

14      I don't think you should comment on -- I don't think you

15  should ask this witness about does he believe this is the price

16  of innovation.  That's another issue.

17      **MS. BELL:**  Yes, Your Honor.  I'm sorry if that was

18  confusing.  What I was a trying to say is --

19      **THE COURT:**  I wasn't confused.  I'm just saying that

20  that's not a proper question to ask the witness.

21      **MS. BELL:**  Understood, Your Honor.

22      **THE COURT:**  Ask a different question.

23      **MS. BELL:**  Understood.

24  **BY MS. BELL:**

25  **Q.**    So Dr. Brindala is laying out that Done has an inability

1    to do these things.  That was what I was trying to say.

2         So inability to do Number 1; a lack of ability to do

3    Number 2; an absence of controlled substances contract

4    agreement, Number 3; no corroborating information other than

5    PDMP report.

6         So we talked about -- I believe you testified about the

7    PDMP report on direct?

8    A.    Yes.

9    Q.    Can you remind us again what that is, please?

10   A.    That is the prescription drug monitoring platform that is

11   where the -- all the medications for a patient will show up

12   from the pharmacies.  They list -- they'll always be having

13   availability of them, and they always input when the medication

14   is prescribed, fulfilled, and given to a patient.  And all

15   doctors typically have access to see that for every patient

16   through different electronic systems.

17   Q.    And this was something that was pulled and provided as

18   part of Done's service to the provider; right?

19   A.    Yes, typically.

20   Q.    Okay.  And the report tells you things like:  Is my

21   patient picking up their prescription on a monthly basis?

22        Right?

23   A.    Mm-hmm.

24   Q.    It tells you:  Is my patient doctor shopping?  Are they

25   going around to different doctors?  Have they gotten other

1  prescriptions for the same medication that I'm prescribing?

2      Right?

3  A.   Correct, yeah.

4  Q.   Or it will also tell you what other medications they may

5  have gotten in the same month; right?

6  A.   Correct, yes.

7  Q.   So it gives the prescribing medical specialist information

8  about whether the person has picked up any prescriptions and

9  what those prescriptions are to inform their decision to write

10  a prescription every month -- right? -- before they write the

11  prescription every month?

12  A.   Correct.

13  Q.   Okay.  But what Dr. Brindala is saying is besides that,

14  there's no corroborating information; right?

15  A.   Correct.

16  Q.   And what do you understand corroborating information to

17  be?  Corroborating information to a PDMP?

18  A.   I think information around, you know, how someone would be

19  acting or reacting to certain questions or stimuli while a

20  provider is meeting with them.

21  Q.   Okay.  And then we've got "Current status of platform for

22  timelines, availability, nature and flow of synch/asynch

23  interactions after initial eval."

24      Do you see that?

25  A.   Yes.

1    **Q.**   Okay.  So "synch" refers to synchronous communication;

2    right?  So that --

3    **A.**   Yes.

4    **Q.**   That's like face-to-face on the telehealth platform when

5    you have your initial appointment, for example.  And if you

6    have a follow-up appointment that's a face-to-face, that would

7    be what's referencing -- he referred to as "synchronous" or

8    "synch"; right?

9    **A.**   Yes; correct.

10   **Q.**   And then asynch is online messaging or e-mail or phone,

11   something other than face-to-face; right?

12   **A.**   Correct, yes.

13   **Q.**   Okay.  And Dr. Brindala is saying that that's part of the

14   model, both the synch and the asynch; right?

15   **A.**   Yes.

16   **Q.**   And so he wants to make sure that people -- prospective

17   candidates understand that the way this model works is a

18   combination of synchronous and asynchronous communication with

19   the patient; right?

20   **A.**   Correct, yes.

21   **Q.**   And then the last one is "Existing platform arrangement

22   for backup coverage outside of individual provider available

23   hours."

24        Do you see that?

25   **A.**   Yes.

1  **Q.**   So backup coverage would be if a provider is unavailable

2  for some reason or leaves the platform, but that really

3  wouldn't apply to a prospective candidate.

4      But there was a system in place to make sure that patients

5  would not be left without prescriptions if they needed a

6  monthly refill; right?

7  **A.**   Correct, yes.

8  **Q.**   Okay.  And so Dr. Brindala wanted to make sure that those

9  six points were communicated to prospective applicants in the

10 recruiting process; right?

11 **A.**   Correct, yes.

12 **Q.**   And then, Kristin says (as read):

13          "I would add to that the 25-minute consult

14      duration."

15      Do you see that?

16 **A.**   Yes.

17 **Q.**   And that's what we spoke about, the 25 minutes.

18      Now, I think we've heard both 30 minutes and 25 minutes,

19 and the reason why is the time slot scheduled was 30 minutes?

20 **A.**   It's 30 minutes, but they would only have 25 minutes with

21 the patient.

22 **Q.**   Correct.  The idea was 20 minutes for the face-to-face,

23 and then the five minutes for documenting the chart; right?

24 **A.**   25 minutes for the face-to-face and then the five minutes

25 for the chart, yeah.

1   **Q.**   Correct.   Okay.

2        And then TJ Williams, what does he ask you to do?

3   **A.**   (as read):

4            "Would it be possible to add these questions to

5        the recruiter's interview question bank if they're

6        not there already?  Feel free to chime in if you have

7        any concerns with doing this."

8   **Q.**   Okay.

9        Now, when you began working at Done, hiring was one of the

10  company's primary goals; right?

11  **A.**   Yes.

12  **Q.**   Because the company was in an expansion -- a period of

13  expansion and scaling; right?

14  **A.**   Absolutely.

15  **Q.**   And that was part of what, based on your résumé, made you

16  a good fit; right?

17  **A.**   Yeah, part of, yeah.

18            **MS. BELL:**  Okay.  And so if we could go to Defense

19  Exhibit 6131, again, just for the Court --

20            **THE COURT:**  6131 admitted.

21        (Trial Exhibit 6131 received in evidence.)

22            **MS. BELL:**  Okay.

23        And if we could -- if we could go to -- yes, there we go.

24  **BY MS. BELL:**

25  **Q.**   And, again, we see here Dr. Brindala -- he's saying (as

1    read):

2              "Hire, hire, hire anywhere, everywhere, as long

3         as all our criteria are met, irrespective of

4         geography and office availability.  We can maximize

5         the membership and pivot at the 60-day notice mark

6         for the Done 2.0 new patient strategy."

7         Do you see that?

8    A.   Yes.

9    Q.   And so the Done 2.0, is that the new interface you

10   mentioned earlier when we looked at the document?  There was an

11   update?

12   A.   I believe so, yeah.

13   Q.   Okay.  And so now let's go back to the Government's -- a

14   document the Government showed you, those recruiting

15   guidelines.  That was Government Exhibit 1337, if we could.

16   And this is very tiny.  Okay.

17        So the Government asked you about -- suggested that there

18   were really no special qualifications, I think was your

19   testimony.

20        But, in fact, we see requirement Number 1.  What's

21   requirement Number 1?

22   A.   A PMHMP.

23   Q.   Okay.  Or a psychiatrist; right?

24   A.   Yeah, or a psychiatrist.

25   Q.   So this is the provider recruiting checklist, the criteria

1   that the recruiting team is getting to look for "who will these

2   independent licensed medical specialists be"; right?  Who's

3   going to comprise the network for Done; right?

4   A.   Correct.

5   Q.   Okay.  So psychiatrist or psychiatric nurse practitioner.

6   These are the psychiatric mental health nurse practitioners,

7   the ones that have the specialized training we talked about;

8   right?

9   A.   Correct.

10  Q.   So that is -- those are specialists because they have to

11  do that extra training we talked about; right?

12  A.   Correct.

13  Q.   They're not an ordinary nurse?

14  A.   They are not an ordinary nurse.

15  Q.   And they're not an ordinary nurse practitioner; right?

16  A.   That is correct.

17  Q.   Okay.  Then they've got to have a DEA/state license.

18  Collaborating physician -- that's, again, what we talked about,

19  which is part of the kind of confusing nature of the various

20  laws; right?

21  A.   Mm-hmm.  Correct, yeah.

22  Q.   And then physical location preferred.

23       Why is that there?

24  A.   That is there, I believe, because if they have a physical

25  location in the future when the Ryan Haight Act waiver might go

1  away, if they did have a physical location, there would be

2  availability for them to see patients on a going-forward basis

3  to meet the legal requirements.

4  **Q.**  Okay.  So Done was foreseeing the fact that telehealth

5  might not be forever at that point in time; right?

6  **A.**  Correct, yeah.

7  **Q.**  That some of the changes in the law that you described

8  were just going to be for COVID, and telehealth was really a

9  COVID thing and it wasn't going to be part of our lives as it

10  is; right?

11  **A.**  For getting a controlled substance prescription; correct.

12  **Q.**  Okay.  So Done was planning for that, and that's why they

13  were looking for candidates that had a physical location;

14  right?

15  **A.**  It was preferred.

16  **Q.**  That was preferred.  Not mandated, because at the time,

17  telehealth was still -- and now, as we know, continues to be --

18  perfectly permissible; right?

19  **A.**  Correct.

20  **Q.**  And then there's some details there about when they can

21  start, how -- what their time availability is.

22        So more than 10 hours a week; right?

23  **A.**  Mm-hmm.

24  **Q.**  But there was flexibility there; right?

25  **A.**  Mm-hmm.

1   **Q.** And that was what made it a benefit for some independent

2   licensed specialists who had other jobs and this -- they wanted

3   to combine -- combine things; right?

4   **A.** Correct, yeah.

5   **Q.** The flexibility of "I can do this from my home"; right?

6       "I can do this on my own schedule"; right?

7   **A.** Correct, yeah.

8   **Q.** "If I only want to work, you know, some number of hours,

9   as long as it's 10 or more, that's sufficient for Done"; right?

10  **A.** Correct.

11  **Q.** Okay. And then it says "comfortable prescribing

12  stimulants"; right?

13  **A.** Correct.

14  **Q.** Okay. Sharing our process. 30-minute initial

15  appointment; right?

16      And that -- we just saw Dr. Brindala talking about that.

17  That was Kristin's suggestion; right?

18  **A.** Correct.

19  **Q.** "With data precollected and preprocessed"; right?

20  **A.** That's what this says, yeah.

21  **Q.** And that's the assessments, which we'll get back to in a

22  moment, that we were talking about; right?

23  **A.** Correct, yes.

24  **Q.** And not just the assessments. There was some brief intake

25  information and things of the like; right?

1   A.   Mm-hmm.

2   Q.   And as we talked about, there was that complex condition

3   question that screened out people who answered "yes" to serious

4   mental health problems; right?

5   A.   That asked the question about serious mental health

6   problems, yes.

7   Q.   And relied on people to answer honestly; right?

8   A.   Correct.

9   Q.   And then online consultation with the option for patients

10  to book a follow-up appointment; right?

11  A.   Mm-hmm.

12  Q.   And then what's the next thing -- what's the next thing

13  the recruiting guideline says?

14  A.   "Communication with patients, caring, listening."

15  Q.   Mm-hmm.

16  A.   "If the patient is not happy with their treatment plan,

17  how would you handle it?"

18  Q.   Right.  And then "comfortable treating patients' symptoms,

19  not fully meeting the scale criteria."

20       Do you see that?

21  A.   I do, yes.

22  Q.   Okay.  And "what would be the reason to reject"; right?

23  A.   Mm-hmm.

24  Q.   Okay.  "All of our patients are high-functioning."

25       And then what about the next one?

**A.**   (as read):

"There is a stigma with adults with ADHD are

only drug-seeking.  We are looking to provide

patients a safe, no-judgment experience, and need to

ensure the provider feels the same."

**Q.**   Okay.  And then there's the question about we screen out;

right?

**A.**   Mm-hmm.

**Q.**   Okay.  So I want to go back very briefly to that document,

if we could.

**MS. BELL:**  So I believe this is 9009.  I think I had

it right the first time.

And I think it is paragraph 15.  If we could just show it

only to the witness.

And then it's the very bottom of paragraph 15, although on

my screen, it is -- okay.

Yes, if we could go to paragraph 15.  And if we go --

yeah.  It's at the top of that next page, so scroll -- right.

Exactly.  Okay.

**BY MS. BELL:**

**Q.**   And so if you could just read that sentence to yourself,

the --

**A.**   Which sentence?

**Q.**   I'm sorry.  The last sentence in that paragraph.  It's the

second clause after the comma -- is what I wanted to ask you

1    about.

2         Do you see that?

3    **A.**   I do, yes.

4    **Q.**   Okay.

5         **THE COURT:**  Okay.  Fine.  That's not going to be

6    permitted.  It's not inconsistent with his testimony.

7         **MS. BELL:**  Oh, no, Your Honor.  I'm not suggesting it

8    was.

9         **THE COURT:**  Then there's no point in asking it.

10        **MS. BELL:**  Well, it was to refresh his memory, because

11   he said he did not remember --

12        **THE COURT:**  No, what he said was -- right.  He didn't

13   remember having a conversation.

14        The question is he did remember that he -- that the

15   Defendant He did put in some questions.  He didn't know whether

16   they were all the questions or some of the questions.

17        And this statement is consistent with that testimony.  And

18   that's why we don't go back to FBI reports and so forth,

19   because if his testimony is consistent, it is actually not

20   germane to the proceeding.

21        So I'm not going to allow it.  I can have a discussion

22   outside the presence of the jury if you wish.

23        **MS. BELL:**  Very well, Your Honor.  I'm glad that the

24   record is clear in that respect.

25        **THE COURT:**  I think it is.

1       **MS. BELL:**  Okay.  Great.  Then we can move on.  Okay.

2  **BY MS. BELL:**

3  **Q.**  So let us go back to the question of initial appointments

4  time.

5       So members of Done's medical leadership approved of the

6  30-minute initial appointment time; right?

7            **MR. FOSTER:**  Objection.  Misstates the testimony.

8            **THE COURT:**  Well, why don't you ask it again.

9  **BY MS. BELL:**

10  **Q.**  So first of all, we just saw the document with

11  Dr. Brindala and Kristin talking about what questions to ask

12  and what information to provide to providers; right?

13  **A.**  Correct, yeah.

14  **Q.**  But in addition, Dr. Brody, a psychiatrist, came up with

15  Done's patient visit process; right?

16  **A.**  I'm -- can you say that one more time?  Sorry.

17  **Q.**  Sorry.  It was a mouthful for me.

18       Dr. Brody, who's a psychiatrist, board-certified, came up

19  with Done's patient visit process; right?

20  **A.**  I'm not certain of that.

21  **Q.**  Well, that is something you also discussed with the

22  federal government when they came to your house in September of

23  2022.

24       Do you remember that?

25  **A.**  I do not recall that, no.

1    **Q.**    Okay.  Let's go ahead and look at 9 --

2           **MS. BELL:**  This should be 9008.  Not the one we just

3    looked at, but 9008.  And we should be at page 2.  And this

4    is -- I'm sorry -- just for you and the Court and the

5    Government.  And it's the second paragraph down.

6         The first line of the second paragraph.  Can you highlight

7    that, please.  No, that one.

8         Okay.

9    **BY MS. BELL:**

10   **Q.**    Does that refresh your recollection about what you told

11   the Government when you met with them in September of 2022?

12   **A.**    It does not.  I mean, I'm assuming I did say this, given

13   it's written down.

14   **Q.**    Okay.

15   **A.**    But I don't recall this -- you know, stating this to them.

16   **Q.**    Okay.  So you don't dispute that you told the Government

17   that Dr. Brody came up with Done's patient visit process?

18   **A.**    No.

19           **MR. FOSTER:**  Objection, Your Honor.

20           **THE COURT:**  No, I think that's a fair question.

21           **THE WITNESS:**  I'm not disputing that right now.

22   **BY MS. BELL:**

23   **Q.**    Okay.  And Dr. Brody was also responsible for Done's

24   initial patient visits being scheduled for a half an hour;

25   right?

1    **A.**    That's what that said, but I -- my recollection is not

2    quite the same, I would say right now.

3    **Q.**    Okay.  So do you dispute that you told the federal

4    government when you met with them in September of 2022 that

5    Dr. Brody was also responsible for Done's initial patient

6    visits being scheduled for half an hour?

7    **A.**    I was asked a lot of questions during that time frame, and

8    it was very stressful.  I had no idea what was going on.  So

9    I'm not -- I can only tell you what I remember right now.

10   **Q.**    Okay.

11   **A.**    And I -- I'm not disputing that I said this to them at

12   all.  I'm trying to re-remember what -- what was in existence,

13   what occurred.

14        I don't remember Dr. Brody creating the patient visit

15   process or being the one that decided on a half-hour for the

16   initial patients.

17   **Q.**    Okay.  You don't remember that?

18   **A.**    I don't remember that, no.

19   **Q.**    And are you disputing that you told them that?

20   **A.**    I'm not disputing that I told them that, no.

21   **Q.**    Okay.  And what about this:  That Dr. Brody had determined

22   that a half-hour was enough time for the initial visit?

23   **A.**    Once again, I'm not -- I can only tell you what I remember

24   in this moment.

25   **Q.**    Okay.

1    **A.**    Now, I might have said that at that time.  I don't

2    remember that being the exact case.  It might have been; it

3    might not have been.

4    **Q.**    Do you recall telling the Government that?

5    **A.**    I don't recall telling them that, no.

6    **Q.**    Do you dispute that you told them?

7    **A.**    I do not dispute it.

8    **Q.**    Okay.  Do you recall that Dr. Brindala also agreed that

9    30 minutes was an appropriate standard initial appointment

10   time, meaning enough time in most cases?

11   **A.**    I -- I believe Dr. Brindala had mentioned in -- with the

12   correct information and the right setup, it would be enough

13   time for a trained professional to be able to do so.

14   **Q.**    Okay.  And, in fact, Done was paying providers for the

15   initial appointment at half their hourly rate.

16        Do you remember that?

17   **A.**    Yes.

18   **Q.**    Okay.  Because earlier, you said something about, oh, I

19   think maybe at some time there were 15-minute appointments.

20        But that never happened; right?  Providers were always

21   paid --

22   **A.**    They were always paid for --

23   **Q.**    They were always paid.

24        What happened was some people, some of these independent

25   medical providers, even though Done was paying for 30 minutes,

1   they, on their own accord, took a fraction of the time.

2      That happened; right?

3   **A.**   I don't know if it was of their own accord.  I mean, it

4   might have been an agreement between them and people at Done.

5   **Q.**   Okay.  But then you'd be speculating, because you,

6   certainly, were not present for any agreement where --

7   **A.**   I was not, no.

8   **Q.**   -- a provider would say:  Let's agree, Done.  You pay me

9   for 30 minutes of my time, but let's agree that I'm only going

10   to spend 15 and get paid for 30.

11      You weren't present for any agreement like that; right?

12   **A.**   I mean, I don't know if it was a written agreement, but if

13   you're stating that providers did of their own accord, it was

14   likely of their own accord with the praise of certain people at

15   Done.

16   **Q.**   Okay.  But I'm actually not asking you to speculate.  I'm

17   only asking you what you know.

18      And what I'm trying to clarify is you were never present

19   for any kind of agreement where that happened, where Done said:

20   Oh, okay, no problem.  I'll pay you for 30 minutes.  You can

21   just work 15 -- 15 minutes.

22      That didn't happen?

23   **A.**   There must have been some form of -- of discussion about

24   it, given that the schedules were changed for those providers

25   to accommodate that.

1    **Q.**    Okay.  I'm simply asking what you know --

2    **A.**    About --

3    **Q.**    -- not what must have been.

4    **A.**    I know that that had to have occurred.

5    **Q.**    Okay.  Because you're saying that there was some kind of

6    scheduling change, some --

7    **A.**    You would have to do a schedule change.  If the provider's

8    goal was to get more patients added, you would have to do a

9    schedule change.  They couldn't just do it fully of their own

10   accord.  It would have to be a joint effort between the two.

11   **Q.**    Okay.  And that would have been with the care team who did

12   the scheduling?  That's what you think happened?

13   **A.**    Yeah, absolutely.

14   **Q.**    But you don't know that happened?  You haven't brought us

15   an example that that happened here today in court to show us?

16   **A.**    I didn't bring any examples of anything today.

17        **THE COURT:**  There are a lot of ways that people can

18   know things.  They can know them because they were told it.

19   They could know because they've observed it.  They could know

20   consequences, see consequences of actions.

21        So "know" is not a precise term.

22        Okay.  Let's move on.

23        **MS. BELL:**  Let's move on.

24        **THE COURT:**  I think he answered the question.

25        Let me ask you this, Ms. Bell, and I'm not suggesting you

1   don't have more questions, but I'm trying to do some

2   scheduling.

3          MS. BELL:  Yes, Your Honor.

4          THE COURT:  What is your anticipated time?

5          MS. BELL:  Well, Your Honor, I don't believe I will

6   conclude today.

7          THE COURT:  Okay.  All right.  That's fine.

8       So I think what I'm going to do is I want to discuss

9   certain things with the jury.  We'll take a break now from the

10  testimony, and we'll resume it tomorrow at 9:15.

11         MS. BELL:  Very well, Your Honor.  Thank you.

12         THE COURT:  Now, ladies and gentlemen of the jury --

13      And you can step down.

14                    (Witness excused.)

15         THE COURT:  As I'm sure you will read in the paper or

16  hear on news reports or people may say that it appears that the

17  government is going to shut down as of midnight tonight, and

18  maybe you have more recent information than I have, but I've

19  been -- I'm operating on the assumption that it will shut down.

20  Obviously, if it doesn't, everything I say doesn't make any

21  difference.

22      But if it does shut down, as I indicated to you, there

23  will -- the trial will proceed.  We may have to make certain

24  accommodations as we go along in terms of the compensation you

25  receive as jurors.  When I say "arrangements," I am saying that

1   all of you will be paid eventually.  I'm trying to explain what

2   "eventually" means.

3        As I understand it now, your jury fees as well as your

4   mileage is paid on a -- generally on a monthly basis.  That's

5   what I've been told.  I don't know whether that's accurate or

6   not or whether you've been told that, but I don't believe you

7   get compensation on a daily basis; that is, that you go up to

8   the jury commissioner and you get your jury fees and your

9   mileage.  I've been told that you don't, but obviously, I've

10  just been told that.

11       Now, you do, however, get your parking validated, and so

12  you don't have to go out-of-pocket for your parking.

13       So I want to just emphasize the importance of your -- if

14  you are driving in, parking at one of the lots and maybe -- I

15  know there was one; maybe there were multiple lots in which

16  your parking can be validated, and be sure to go to the jury

17  office, if you do, on a daily basis and get your parking

18  validated, because also, it's my understanding if it's

19  validated, you don't have to pay out any money or it's not

20  charged to you.  I hope that's the case.

21       So, again, I will just simply keep you advised.

22       As you know, this week we will end by noon tomorrow, and

23  there will be no trial for the remainder of the week, but we

24  will resume on Monday morning.  And I think on Monday morning,

25  I may be able to give you some further information about times

1   that we won't meet or that we will meet -- or I may even be

2   able to do that tomorrow.  I'll see, but I'm not going to speak

3   about it today.

4        So I hope you don't have any questions.  If you do, please

5   ask Lashanda.

6        And remember the admonition given to you:  Don't discuss

7   the case, allow anyone to discuss it with you, form or express

8   any opinion.

9        And I'll see you at 9:15 tomorrow.

10                  (The jury leaves the courtroom.)

11      (Proceedings were heard out of the presence of the jury.)

12        **THE COURT:**  Okay.  Let the record reflect the jurors

13   have left.

14        I'd like to take up the matter with -- about this exhibit.

15   I don't have the paper in front of me, unfortunately.  It's

16   what exhibit number?  And how is it referred to?  And is there

17   a date of it?

18                  (Discussion off the record.)

19        **THE COURT:**  Is Mr. Steskal here?  Yes, he is.

20        **MR. SCHACHTER:**  It's Exhibit 5186.

21        **THE COURT:**  I'm sorry.  It's Exhibit --

22        **MR. SCHACHTER:**  5186.

23        **THE COURT:**  5186.  Thank you very much.

24        And there was a -- I thought I brought it all here, but I

25   didn't.

1    There was a document that refers to it, and what document

2  is that?

3    **MR. SCHACHTER:**  That is attached to our motion as an

4  e-mail dated November 26, 2020, which has an embedded hyperlink

5  within that e-mail entitled "Onboarding Session Part 2."

6    **THE COURT:**  Great.  Okay.  So that's what we're

7  talking about.

8    Good afternoon, Mr. Steskal.

9    **MR. STESKAL:**  Good afternoon, Your Honor.  Chris

10  Steskal of Fenwick & West on behalf of Done Global, Inc.

11    **THE COURT:**  Now, Mr. Steskal, I have a number of

12  questions.  It may be better if you take the stand.  This is a

13  proceeding, and so would you take the witness stand and you

14  will be sworn in by Ms. Scott.

15    **MR. STESKAL:**  It's my lucky day, Your Honor.

16    **THE COURTROOM DEPUTY:**  Please stand and raise your

17  right hand.

18    <u>**CHRISTOPHER STESKAL**</u>,

19  called as a witness by the Court, having been duly sworn,

20  testified as follows:

21    **THE WITNESS:**  I do.

22    **THE COURTROOM DEPUTY:**  Please be seated.

23    Please state your name for the record.  Thank you.

24    **THE WITNESS:**  Christopher James Steskal.

25  S-T-E-S-K-A-L.

## VOIR DIRE EXAMINATION

1    **THE COURT:**  Okay.  Good afternoon.

2    It's a pleasure to see you again, Mr. Steskal.  And

3    because you were an assistant U.S. attorney in this court for

4    many years -- how many years?

5    **THE WITNESS:**  Six.

6    **THE COURT:**  Six.  Seems like longer, but welcome back.

7    You are, as I understand it -- just to try to get to the

8    point quickly, you were counsel -- or you are counsel for an

9    entity called Done, Inc.?

10    **THE WITNESS:**  Done Global, Inc.

11    **THE COURT:**  Done Global, Inc.

12    **THE WITNESS:**  Correct.

13    **THE COURT:**  Okay.  And you received in that capacity a

14    grand jury subpoena for certain documents?

15    **THE WITNESS:**  Correct.

16    **THE COURT:**  And among the -- and I don't have it.  We

17    can put it in, and maybe we should.

18    But before I get there, you produced documents in

19    connection with that grand jury subpoena; is that correct?

20    **THE WITNESS:**  I did, as well as counsel who

21    represented Done Global before me.

22    **THE COURT:**  Okay.  And in your production -- now I'm

23    going off my memory, but in your production, there is a

24    document dated November 26, 2020, and that refers to, by the

1    body of the document, a -- a -- I don't know whether I'd call

2    it a video or a -- I guess it is a video of some length; is

3    that correct?

4         THE WITNESS:  That's my understanding, Your Honor, but

5    the document itself was produced in March 2023 by prior

6    counsel.  I was retained around April 1, 2023, so a few weeks

7    after it was produced.

8         THE COURT:  Oh, so that was actually not your

9    document; it was somebody else's document?

10        THE WITNESS:  Correct.

11        THE COURT:  Previous counsel.  All right.  Thank you.

12    At the time that the document -- that you came on board,

13    had the -- this video which is referred to in the November 26,

14    2020, letter -- had that been in existence in the files of the

15    company?

16        THE WITNESS:  I don't know.

17        THE COURT:  When was the first time you became aware

18    of its existence as -- as an object, as a -- well, as an

19    object?

20        THE WITNESS:  Last night.

21        THE COURT:  Last night.  Okay.

22    So at some point, I have to assume before last night, that

23    document was -- that video was produced to the defendants.

24    Do you know when?

25        THE WITNESS:  I don't, other than what I've read in

1    the pleadings.

2              THE COURT:  Okay.

3              MR. FOSTER:  May I clarify, Your Honor?

4              THE COURT:  Yes, okay.  So those are my preliminary

5    questions, and you may proceed.

6              MR. FOSTER:  Okay.

7         And so the video -- do you understand this was a video

8    that was produced by defendant Ruthia He to the Government?

9              THE WITNESS:  Is that a question, Jake?

10             MR. FOSTER:  Yes.  Do you understand that?

11             THE WITNESS:  I understand that.

12             MR. FOSTER:  Good to see your face.  How are you

13   doing?

14        You understand that it was produced by the defendant to

15   the Government?

16             THE WITNESS:  That's my understanding.

17             MR. FOSTER:  And is it your understanding that that

18   video was never produced by Done Global to the Government?

19             THE WITNESS:  That's what I'm told.

20             MR. FOSTER:  And have you reviewed the defendants'

21   exhibit list?

22             THE WITNESS:  No.

23             MR. FOSTER:  Have you reviewed it to see how many

24   documents there are on defendants' exhibit list that were never

25   produced to the Government by Done Global?

1          THE WITNESS:  No.

2          MR. FOSTER:  Are you aware that there is a significant

3    number of exhibits on the exhibit list that are designated as

4    "no Bates," reflecting that they do not have a Bates number of

5    anything that was produced to the Government by Done Global?

6          THE WITNESS:  I'm not aware.

7          MR. FOSTER:  And in regards to this video, the video,

8    the Government's been informed, came from Defendant He's Google

9    drive.

10      Are you aware of that?

11         THE WITNESS:  No.

12         MR. FOSTER:  Did Defendant He provide you with access

13   to the contents of her Google drive for the purposes of

14   preparing the response to the subpoena on behalf of Done

15   Global?

16         THE WITNESS:  I believe it was collected.

17         MR. FOSTER:  You believe that it was collected?

18         THE WITNESS:  Correct.

19         MR. FOSTER:  And do you have an understanding of why

20   this video would not have been collected?

21         THE WITNESS:  I do.

22         MR. FOSTER:  Okay.  And what is your understanding?

23         THE WITNESS:  Well, first let me say I think it was

24   collected.  It was collected by Consilio, the e-discovery

25   vendor.

1    When we produced the e-mails that reference the video, it

2  was hyperlinked.  The way that the Google Suite works is that

3  it hyperlinks attachments, unlike Microsoft Office, where you

4  could actually attach the document.

5    So we produced the e-mail.  I then got a very good

6  question from AUSA Green in April asking about the attachments

7  to the documents.  I replied that the -- we would look into it.

8  And what I discovered was that when Consilio collected the

9  data, they didn't have the ability to associate the attachments

10 to the actual documents, to the hyperlinked documents.  There

11 was no automated way to do that.  It would be all manual.

12   So I wrote to AUSA Green and explained that.  We then had

13 a phone call on April 15th where Mr. Foster was there,

14 Ms. Green was that, and Mr. Beckering was there.  I

15 explained --

16   (Reporter interrupts for clarity of the record.)

17       **MR. FOSTER:**  Let's talk about that.

18 So was --

19       **THE COURT:**  Are you finished?

20       **THE WITNESS:**  No.

21       **THE COURT:**  Go ahead.

22       **MR. FOSTER:**  Go ahead.

23       **THE WITNESS:**  Well, this is important.

24   So we had a phone call on April 15th where we discussed

25 this problem.  There was no automated way to associate the

1    hyperlinked documents to the e-mails.  So what I explained was

2    that if the department would like a particular document that is

3    hyperlinked in one of the e-mails, then it should just ask.

4    And AUSA Green offered to provide a list of hyperlinked

5    documents that the department wanted, but never provided said

6    list.

7         **MR. FOSTER:**  Okay.  So let's talk about that.

8         That -- the request is Request 27, correct, for onboarding

9    videos?

10        **THE WITNESS:**  Correct.

11        **MR. FOSTER:**  And in the letter you provided, you

12   provided your response to an entirely different request related

13   to e-mails; correct?

14        **THE WITNESS:**  I think that's correct, yeah.

15        **MR. FOSTER:**  So when you were talking about

16   hyperlinks, you were talking about a different document request

17   than the request for onboarding videos; correct?

18        **THE WITNESS:**  Correct.

19        **MR. FOSTER:**  And in the response to the request for

20   onboarding videos, there was no reference to any issue

21   collecting onboarding videos; correct?

22        **THE WITNESS:**  There was no issue, but I'm happy to

23   explain how we did that collection.

24        **MR. FOSTER:**  Well, let me ask you this:  Was one of

25   the issues also for hyperlinks that when you click on the

1    hyperlink, for example, to a Google drive, a Google Suite, if

2    that is a Google Suite that is in control of the defendant, it

3    would require her password to access it?

4             THE WITNESS:  I don't know that.

5             MR. FOSTER:  Okay.  And -- well, was that, in fact,

6    one of the problems?  For example, when these things were

7    produced to the Government, the Government couldn't simply

8    access them by clicking on hyperlinks because they were

9    accounts in the name of the defendant and they required her

10   passwords?

11            THE WITNESS:  I was never told that.

12            MR. FOSTER:  Okay.  And did Defendant He ever tell you

13   that she had materials like onboarding videos that were

14   responsive to the Government's request Number 27 that weren't

15   produced?

16            THE WITNESS:  I don't recall having that conversation,

17   but if I did, it would be privileged.

18            MR. FOSTER:  Well, did you know that Defendant He was

19   talking to other third parties about whether to make a fulsome

20   production and produce all the records responsive to the

21   subpoena or whether she should only selectively give things to

22   the Government?

23            THE WITNESS:  I don't know what you're referring to.

24            MR. FOSTER:  And was the first time you learned about

25   this onboarding video on Sunday night when the defendants

1  produced it to the Government?

2       THE WITNESS:  When I was -- yeah, when I was informed

3  by defense counsel for Defendant He.

4       MR. FOSTER:  And do you know where they got that video

5  from?

6       THE WITNESS:  I don't.

7       MR. FOSTER:  That's all I got, Your Honor.

8       THE COURT:  I'm trying to figure out --

9       THE WITNESS:  Yeah.

10      THE COURT:  -- you're dealing with somebody, as you

11  well know, who technologically is challenged.

12      A video is taken.  Okay?  I think we all agree there was

13  this thing called a video, and that's a thing.  It's not a

14  paper.  It's a thing.  Okay.

15      At some point, this thing becomes an attachment to -- or

16  in some it's referenced as an attachment.  I understand what

17  the Government says, but just hear me out on this.

18      It becomes -- while it's still a thing, it -- it's

19  transformed into something called an attachment, I think, or

20  it's labeled an attachment.

21      What I'm asking you, Mr. Steskal, is if I look at the

22  letter that -- of November 26, '20, is that where the

23  production was?  Where was the production?

24      MR. FOSTER:  So the subpoena is 2362, and the

25  production, as Mr. Steskal indicates, was by prior counsel at

1    Hooper Lundy of this e-mail.

2        And in regards to this specific request to onboarding,

3    materials it was represented to the Government that that

4    request was complete, and there's an affidavit regarding --

5            **THE COURT:**  I'm not asking that.  I assume that.

6        But I'm asking:  The document that went to the Government

7    that referred to in some manner this video, what's the date of

8    that document?

9            **THE WITNESS:**  November 26, 2020?

10            **MR. BALLEW:**  I believe it's November of -- that

11    November of 2020 is the date of the document.

12            **THE COURT:**  I think it's November 26.

13            **MR. BALLEW:**  Yeah, of 2020.

14            **THE COURT:**  Okay.  So on November 26, there's a

15    document that goes to the United States Government purportedly

16    in response to a grand jury subpoena, as I understand it, in

17    which this thing that is the video is now listed as -- I don't

18    know whether it would be an attachment or on the face of it,

19    but it's not in the form of the video; it's a reference to a

20    video.

21            **THE WITNESS:**  Correct, a link.

22            **THE COURT:**  It's called a hyperlink.

23            **THE WITNESS:**  Correct.

24            **THE COURT:**  Okay.  It's a hyperlink.

25        So at some point, the video becomes a hyperlink.  My

 1   question is:  At that point, what happens to the video itself?

 2   Does the video -- it doesn't disappear from the files of the

 3   corporation.  What happens to it?  Isn't it still --

 4        Or putting it another way, Mr. Steskal, it's still a thing

 5   that is in the possession of the corporation, but now there's a

 6   way to reference it by way of a hyperlink.

 7             **THE WITNESS:**  Correct.  It's a --

 8        **THE COURT:**  So it's not transformative.  It's simply

 9   the thing, and the thing is now referenced either by way of the

10   thing or by a hyperlink, and that's what I understand.

11        And tell me if I'm wrong, Mr. Steskal, because I certainly

12   can be wrong, as we know.

13        That's my understanding.  My understanding is a simple

14   understanding:  Government serves a grand jury subpoena.  This

15   object -- we're now talking about the video -- is, arguably,

16   responsive to that request.  That request is responded to by

17   the company, and the company, in a letter of November 26, 2020,

18   tells the United States Government that this object exists in

19   the form of a hyperlink.  And it also says your

20   follow-through -- you write a letter, and I don't know whether

21   we're talking about cross-purposes or not, but giving it --

22   giving it your take on it, you say:  By the way, if you want

23   access to any of the hyperlinks, let me know.

24        And you never receive an inquiry from the Government.

25        That's, as I understand, the scope of your testimony.

1          THE WITNESS:  Correct.

2          THE COURT:  Is there anything I've left out or don't

3     quite understand?

4          THE WITNESS:  No.  There's a date issue, which is that

5     the document was produced in -- March 16, 2020, and the

6     document itself is dated November 26 -- or I'm screwing up now.

7     It was produced March 16, 2023.  The original document is dated

8     November 26, 2020.

9          THE COURT:  Okay.

10         MR. FOSTER:  There is a factual issue, Your Honor, a

11    misunderstanding I think I can clear up.

12         THE COURT:  Okay.  Go ahead.

13         MR. FOSTER:  Now, Mr. Steskal, did the Government have

14    a request for e-mail communications of certain individuals at

15    Done?

16         THE WITNESS:  It had a request for categories of

17    information that we responded to by producing e-mails for

18    certain individuals.

19         MR. FOSTER:  Right.  And did the Government also have

20    a separate request for onboarding videos?

21         THE WITNESS:  It did, which we searched for.

22         MR. FOSTER:  And in regards to the Government's

23    request for onboarding videos, did Done either identify this

24    video or identify this specific e-mail?

25         THE WITNESS:  Well, we produced the e-mail, so the

1    e-mail was produced with the hyperlink to the video.

2         We used search terms to search the Google database, which

3    obviously aren't very effective for videos, so they didn't

4    return the video.

5         **MR. FOSTER:**  And so the question in regards to your

6    response to the request for videos by the Government:  Did Done

7    Global reference the existence of the video or this document,

8    Request 27?

9              **THE WITNESS:**  Ask it again.

10             **MR. FOSTER:**  In regards to Done's response to Request

11   27 and your letter, which also responded request by request

12   when it was responding to Request 27, did Done Global tell the

13   Government about the existence of this video or this e-mail?

14             **THE WITNESS:**  Well, first, it was Fenwick who was

15   making those representations, myself personally who was making

16   those representations.  And I don't think by responding to

17   Request 27 and having a couple sentences of text, I was

18   intending to limit the response to that request to those couple

19   of sentences.  The production is the response.

20             **MR. FOSTER:**  And so would you agree with me that this

21   is just like a situation where there might be an e-mail that's

22   responsive to a request for e-mails where someone's talking

23   about events, and they say a video exists in the e-mail, but

24   the company never produced the video?

25             **THE WITNESS:**  Well, so the subpoena is not for e-mails

1   writ large.  The subpoena is for categories of information

2   which were responded to by collecting and producing e-mails,

3   running search terms through a Google database, and then also

4   self-collecting with people who might have the relevant

5   documents.

6       Going through all that process, we produced what we're

7   able to produce.  If this video wasn't there, I would have to

8   investigate as to why, but it wasn't caught up in that process

9   that we used.

10          MR. FOSTER:  Well, Mr. Steskal, isn't is it true that

11  the Government had a separate request for communications?

12          THE WITNESS:  Regarding certain topics, not

13  communications --

14          MR. FOSTER:  Yeah, communications regarding topics;

15  correct?

16          THE WITNESS:  Right.  So the subpoena is structured

17  appropriately by categories of subject matters.

18          MR. FOSTER:  Correct.

19          THE WITNESS:  And it covers communications, videos,

20  and other types of data files.

21          MR. FOSTER:  Right.  And in regards to the request for

22  communications, you responded to that and referenced this

23  hyperlink issue; correct?

24          THE WITNESS:  Again, I don't think there's a request

25  for communications by itself.

1      **MR. FOSTER:**  Mr. Steskal, you responded to the request

2    in your letter that you submitted in connection with this

3    matter, responded on a request-by-request basis; correct?

4      **THE WITNESS:**  I was asked by the department to point

5    where I responded to certain requests.  It wasn't intended to

6    be if I said something about Request 27, that meant everything

7    else that was produced didn't relate to Request 27.  There may

8    be other e-mails and documents that we produced that would be

9    responsive to Request 27.

10     (Reporter interrupts for clarity of the record.)

11     **MR. FOSTER:**  Let me try to make it simple.

12     In -- the Government had a Request 27 for onboarding

13   materials; correct?

14     **THE WITNESS:**  Correct.

15     **MR. FOSTER:**  And in the letter you wrote to the

16   Government, you addressed the requests on a request-by-request

17   basis in your letter; correct?

18     **THE WITNESS:**  Correct.  I was asked by the department

19   to explain how I responded -- how Fenwick responded to the

20   subpoena, and we did our best to identify areas where we

21   responded.

22     **MR. FOSTER:**  Okay.  And in regards to Request 27 for

23   onboarding materials, did you identify the existence of this

24   video?

25     **THE WITNESS:**  I don't know, but I take it at your word

1    that we did not.

2         MR. FOSTER:  Okay.  And in your response to Request

3    Number 27, did you identify the existence of the communication

4    that hyperlinked the video?

5         THE WITNESS:  I did not, but I wouldn't have done so.

6    We produced entire categories of e-mails and communications

7    from particular custodians that would be responsive to all the

8    requests and including none of the requests.  They had both

9    responsive and nonresponsive information that we produced in

10   bulk categories of documents.

11        MR. FOSTER:  Well, let me --

12        THE WITNESS:  -- for --

13   (Reporter interrupts for clarity of the record.)

14        THE WITNESS:  We produced categories of -- we produced

15   custodial e-mails and Slack messages in bulk in response to the

16   entire subpoena.  Those documents would include a number of

17   documents that are responsive to different categories within

18   the subpoena.  They would also include documents that aren't

19   responsive to the subpoena, because that's how we decided to

20   make the production and how the department wanted the

21   production.

22        MR. FOSTER:  And sitting here today, do you have an

23   understanding of whether Defendant He has documents,

24   information, video belonging to Done Global that is not in your

25   possession as company counsel?

1          THE WITNESS:  Sitting here today, my understanding of

2     Defendant He is that she's been in custody for over a year and

3     doesn't have possession of anything.

4          MR. FOSTER:  Well, have you looked at her exhibit

5     list?

6          THE WITNESS:  No.

7          MR. FOSTER:  Okay.

8          THE WITNESS:  Her counsel may have possession of many

9     documents, but my understanding is Defendant He doesn't have

10    possession of documents.

11         MR. FOSTER:  And is it your understanding that her

12    counsel is in possession of documents such as videos that

13    belong to Done Global that are not in the company's possession?

14         THE WITNESS:  That's what I'm told.

15         MR. FOSTER:  Thank you, Your Honor.

16         THE COURT:  Any examination?

17         MR. SCHACHTER:  I mean, I can ask a few questions.

18         THE COURT:  Well, ask whatever you want.

19         MR. SCHACHTER:  Sure.

20         Mr. Steskal, can you describe to the Court how -- how

21    massive the requests were that were placed by the Government in

22    this case and how companies go about trying to respond to

23    those, and can you also describe how counsel will describe how

24    they're conducting their searches and what they are looking for

25    and being open with the Government about what they are not

1    looking for and what they are expecting the Government to do

2    with the materials that are produced to them?

3              **THE COURT:**  Well, that's --

4              **MR. SCHACHTER:**  That's many questions.  Let me try to

5    rephrase.

6              **THE COURT:**  Let's do the first one first.  How massive

7    was this endeavor to obtain documents from Done Global?

8              **THE WITNESS:**  It was significant and massive, to use

9    counsel's words.  And in context, this is a small company.

10   They're not -- we're not -- it's not IBM.  It's not Microsoft.

11   It doesn't have the resources to hire an army of lawyers and

12   review every document, document by document, to determine

13   whether or not a document is responsive to each category of the

14   subpoena.

15        So we had to come up with strategies to produce the

16   documents requested by the Government that would be effective

17   and efficient, and we described -- ensured those strategies

18   with the Government.  And I'm not going to say they consented,

19   but they understood our approach.

20             **THE COURT:**  Well, in doing so, and without disclosing

21   the content of any conversations, did you have any

22   conversations with the defendant in that regard?

23             **THE WITNESS:**  The approach that we took to discovery

24   was approved by my client, which included the defendant, but

25   the approach was always the intent to get the Government what

1   it was requesting in a cooperative and a professional way.

2           **THE COURT:**  Yeah, but I'm trying to figure out -- you

3   say this is a small company with limited resources.  You're

4   responding to a large request from the Government.

5           And so I'm thinking my -- what was reasonable under the

6   circumstances and was in any way --

7           So I need to know, did you discuss -- did you -- not any

8   particular document, but did you discuss how documents were

9   maintained in the company in order to conduct the search that

10  you conducted to respond to the Government's request?

11          **THE WITNESS:**  And --

12          **THE COURT:**  And I'm not asking you about what she may

13  have said about it.  I'm only asking you did you have a

14  conversation with her on that subject.

15          **THE WITNESS:**  The same conversations I had with the

16  Government were also had with my client in terms of how we were

17  approaching the response to the subpoena.

18          **MR. SCHACHTER:**  And did you produce to the Government

19  an e-mail with a hyperlink that said onboarding session part 2

20  with a link that said .MP4, such that if the government was

21  interested in searching documents relating to onboarding, it

22  quickly would have come to this particular e-mail, and then

23  could they have done exactly what you invited them to do, which

24  is if you see anything in a hyperlink, that's difficult for us

25  to produce, it's difficult for us to collect, but if you want

1    something like that, simply ask for it?

2        Is that what happened?

3            THE WITNESS:  Yes to all those questions.

4            THE COURT:  Okay.

5            MR. SCHACHTER:  And did the Government ever ask you

6    to -- we've seen an e-mail in the documents that you've

7    produced that says "OnboardingSession.mp4," so that's a video.

8    Mr. Steskal, can you please give us that hyperlink?  You told

9    us that if we want any hyperlinked documents, we should ask you

10   for it.

11       Did they ever ask you for it?

12   **A.**   No, they did not, to the best of my recollection.  And I

13   did invite it by letter and I invited it during a conference

14   call with the prosecution team on May 15, 2023.

15           THE COURT:  Mr. Steskal, the object itself, the video

16   itself -- does it exist?

17           THE WITNESS:  It does exist as a data file, Your

18   Honor.

19           THE COURT:  It exists in its form as a video?

20           THE WITNESS:  It's a data file that is run through an

21   application that makes it into a video.

22           THE COURT:  And where was it located with respect to

23   the defendants' file -- to the company's files?  Where was it

24   located, this object?

25           THE WITNESS:  I don't know, since this is new to me

1    but -- as of last night, but my assumption is that it's located

2    in the Google Suite of documents on a Google server, and if you

3    click the hyperlink, that's what you would go to is that

4    document in that Google Suite.

5         THE COURT:  So it doesn't exist -- your understanding

6    is it doesn't exist as an object; it exists as a hyperlink to

7    the object?

8         In other words, the object isn't tangible; the object is

9    some hyperlink or protected by a hyperlink?

10        THE WITNESS:  I think the way it works, Your Honor, is

11   that the data file exists on a server the way you would --

12   server, the way you would save it like on a computer, and the

13   hyperlink is a mechanism by which you find the file.

14        So if you -- if I sent you a hyperlink to www.fenwick.com,

15   you would click on it and it would send you to a server where

16   you could see our web page.  It's the same principle.

17        THE COURT:  Right.  Okay.

18        Any other questions?

19        MR. FOSTER:  No other questions for the witness, Your

20   Honor.

21        THE COURT:  Okay.  Thank you, Mr. Steskal.  You are

22   excused.

23        THE WITNESS:  Thank you, Your Honor.

24        MS. NECHAY:  Your Honor, I just have one question on

25   behalf of Dr. Brody.

1      **THE COURT:**  Oh, okay.  Yes, of course.

2      **MS. NECHAY:**  Just one question for clarification.

3  So, Mr. Steskal, you presently represent Done Global?

4      **THE WITNESS:**  Done Global, Inc., a Delaware company,

5  yes.

6      **MS. NECHAY:**  Thank you.  No further questions.

7      **THE COURT:**  Well, I think --

8  Thank you.  You can step down.

9                  (Witness excused.)

10     **THE COURT:**  I think there are two issues here, at

11 least two that I'm going to invite comment on and maybe

12 briefing on.

13     One is -- is the issue of production that took place in

14 response to the grand jury subpoena; that is to say, was it

15 something that should have been produced in response to the

16 grand jury subpoena in a form that it was readily identifiable

17 by the -- or evident to the Government what it was.

18     That is, it was an object; it was a video, and the -- what

19 exists -- what was produced to the Government, whether it was

20 in response to that request or some other request, was a

21 hyperlink to it.

22     So it's not the same thing as the object itself, but it

23 may be argued, and I think the Defense would argue, it's the

24 equivalent of the object itself in today's technological world.

25 So there's no difference, really, between an object and a

 1    hyperlink to the object, and therefore, to the extent it was

 2    given to the Government, you satisfied your production.

 3         All right.  And that, I think, goes to the issue of

 4    whether it would be excluded in its entirety.

 5         Assuming that it would -- that it would not be excluded in

 6    the entirety, the question then becomes:  What about using this

 7    video with respect to the witness who had testified about --

 8    about the subject matter of it?  Because clearly, she did not

 9    have the benefit in her witness preparation of having her

10    recollection refreshed, which is what happens all the time in

11    witness preparation, and therefore, the argument could be made

12    that she concealed some significant portion of whatever --

13    whatever the impeaching or refreshing recollections are.

14         And as to that, I would think that either -- that if I did

15    rule that it was -- that it's a proper document, that is, that

16    the Defense can utilize it, then my concern, of course, is that

17    they gave it to the Government a couple of hours the evening

18    before the testimony.

19         And, Mr. Schachter, as you so eloquently pointed out,

20    there's no way to prepare a witness unless for two days you

21    have all of this material so you can go over it.  So I accept

22    that.

23         And so I would say as to that witness -- I would say as to

24    that witness, I'd give the Government the opportunity to recall

25    her if they wish to and ask any questions about the event

 1   that's -- about the testimony.

 2        However, I think what I need to do is get briefing from

 3   you on the subject of whether this document in its entirety

 4   should be excluded as a violation of the grand jury subpoena.

 5   That's what I need to know.

 6             **MR. FOSTER:**  Yes, Your Honor.  We'll do that.

 7             **THE COURT:**  Okay.  And just before you use it, let's

 8   make sure you brief it and set your own schedule.  I mean,

 9   you know.

10             **MR. SCHACHTER:**  The witness is off the stand.  There's

11   no particular rush.

12             **THE COURT:**  Yeah, I think there's no particular rush.

13             **MR. FOSTER:**  Yeah.  I think it may implicate other

14   exhibits, but we will confer with counsel.

15             **THE COURT:**  Okay.  So we're all set.

16        Tomorrow we'll start at 9:15.

17             **MR. FOSTER:**  One other issue, Your Honor.

18             **THE COURT:**  Yeah, before I do that, I just want to ask

19   Ms. Bell.

20        What do you anticipate the length of your --

21             **MS. BELL:**  That is a good question, Your Honor, and I

22   will reassess, but I believe it will be certainly shorter than

23   what we've been through, and I will make it as short as

24   possible, which is the benefit of the night because you can

25   really condense.  So I promise you that's what I'm going to go

1    back and do, make it very chop-chop.

2         **THE COURT:**  I appreciate that.  Thank you very much.

3    Yes.  Then there was some other issue.

4         **MR. FOSTER:**  One other issue, Your Honor.

5    You may remember yesterday with Ms. Ross there was an

6    issue in regards to Exhibit 3049, I believe it was, and a page

7    at -- that defense counsel sought to insert into the end of the

8    contract, and we objected that it was not part of the same

9    document, that these were separate documents.

10        And then on redirect, she testified, in fact, they were

11   not part of the same document, that that one page that counsel

12   had sought to put in the document was separately sent to her

13   afterwards, so --

14        **THE COURT:**  Well, I don't think that's an issue.  I

15   think that was clarified by the witness.  She said she numbered

16   that, and I think the question was asked in good faith.  She

17   went through and she numbered.  She said those are her numbers

18   on the document.  So it was Number 21, which follows Number 20,

19   and there would be no reason necessarily to believe that it

20   wasn't included in it, but since it wasn't included in it, I

21   think the jurors have been told it wasn't included in it, and I

22   don't know that there needs to be any further clarification.

23        **MR. FOSTER:**  No need for clarification, Your Honor,

24   except for the record that the version of 3049 that was

25   admitted was the Government's original version without that

1    page.

2            **THE COURT:**  Well, then, I think what we should do is

3    take page 2021 and just give it a new number.

4            **MR. FOSTER:**  Exactly, Your Honor.

5            **THE COURT:**  Okay.  We'll do that.  You can confer and

6    pick a number.

7            **MR. SCHACHTER:**  We'll do our best.

8            **THE COURT:**  Thank you.  Good night.

9            (Proceedings adjourned at 4:22 p.m.)

10                          ---o0o---

11                    <u>**CERTIFICATE OF REPORTER**</u>

12           I certify that the foregoing is a correct transcript

13    from the record of proceedings in the above-entitled matter.

14

15   DATE:   Wednesday, October 1, 2025

16

17

18

19

20   _____
     Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG, CSR No. 12219
            Official Reporter, U.S. District Court

21

22

23

24

25