UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **NO. 3:24-cr-00329-CRB** |
| | ) | |
| RUTHIA HE and DAVID BRODY, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

San Francisco, California
Tuesday, October 28, 2025

**TRANSCRIPT OF PROCEEDINGS** (CORRECTED)

**APPEARANCES**:

For Plaintiff:

      CRAIG H. MISSAKIAN
      United States Attorney
      Northern District of California
      450 Golden Gate Avenue
      San Francisco, California 94102
    **BY: KRISTINA GREEN**
    **ASSISTANT UNITED STATES ATTORNEY**

      U.S. DEPARTMENT OF JUSTICE
      FRAUD SECTION
      950 Pennsylvania Avenue NW
      Washington, D.C. 20530
    **BY: JACOB N. FOSTER,**
    **ACTING CHIEF, HEALTHCARE FRAUD UNIT**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By: Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
      Official Reporter, CSR No. 12219

<u>**APPEARANCES**</u>:  (CONTINUED)

                    U.S. DEPARTMENT OF JUSTICE
                    CRIMINAL DIVISION
                    1400 New York Avenue NW
                    Washington, D.C. 20001
        BY:  **EMILY GURSKIS, ASSISTANT CHIEF**

                    JOSEPH NOCELLA, JR.
                    United States Attorney
                    Eastern District of New York
                    271-A Cadman Plaza East
                    Brooklyn, New York 11201
        BY:  **ARUN BODAPATI, TRIAL ATTORNEY**

For Defendant He:
                    WILLKIE FARR & GALLAGHER LLP
                    2029 Century Park East - Suite 2900
                    Los Angeles, California 90067
        BY:  **KOREN L. BELL, ATTORNEY AT LAW**

                    WILLKIE FARR & GALLAGHER LLP
                    787 7th Avenue
                    New York, New York 10019
        BY:  **MICHAEL S. SCHACHTER, ATTORNEY AT LAW**
              **STEVEN J. BALLEW, ATTORNEY AT LAW**


For Defendant Brody:
                    LAW OFFICE OF VALERY NECHAY
                    Law Chambers Building
                    345 Franklin Street
                    San Francisco, California 94102
        BY:  **VALERY NECHAY, ATTORNEY AT LAW**


**Also Present:**  **Thifany Braga**
                 **Simon Hall**
                 **Mackenzie Slater**
                 **Andy Cepregi**
                 **Ashley Moore**
                 **Barbara Hua Robinson, Mandarin Interpreter**
                 **Jeff Dinn, Mandarin Interpreter**

I N D E X

Tuesday, October 28, 2025 - Volume 14

| GOVERNMENT'S WITNESSES | PAGE | VOL. |
|---|---|---|
| **LEVY, RILEY** | | |
| (SWORN) | 2929 | 14 |
| Direct Examination by Mr. Foster | 2929 | 14 |
| Cross-Examination by Mr. Schachter | 3042 | 14 |

E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 243 | | 3027 | 14 |
| 454 | | 2934 | 14 |
| 468 | | 2990 | 14 |
| 494 | | 2944 | 14 |
| 495 | | 3133 | 14 |
| 505 | | 3014 | 14 |
| 532 | | 2939 | 14 |
| 536 | | 3066 | 14 |
| 541 | | 2957 | 14 |
| 544 | | 2957 | 14 |
| 546 | | 2941 | 14 |
| 548 | | 2957 | 14 |
| 551 | | 2960 | 14 |
| 553 | | 2960 | 14 |
| 554 | | 2957 | 14 |
| 556 | | 2952 | 14 |
| 580 | | 2974 | 14 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 584 | | 2968 | 14 |
| 591 | | 2939 | 14 |
| 601 | | 3010 | 14 |
| 602 | | 2981 | 14 |
| 603 | | 3016 | 14 |
| 606 | | 3001 | 14 |
| 607 | | 3010 | 14 |
| 621 | | 3010 | 14 |
| 622 | | 3010 | 14 |
| 623 | | 2990 | 14 |
| 631 | | 3001 | 14 |
| 635 | | 2974 | 14 |
| 637 | | 2974 | 14 |
| 641 | | 3010 | 14 |
| 646 | | 2981 | 14 |
| 647 | | 2981 | 14 |
| 651 | | 2981 | 14 |
| 656 | | 2981 | 14 |
| 662 | | 2974 | 14 |
| 665 | | 2974 | 14 |
| 666 | | 3001 | 14 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 670 | | 2990 | 14 |
| 674 | | 2990 | 14 |
| 687 | | 2990 | 14 |
| 694 | | 2964 | 14 |
| 696 | | 3016 | 14 |
| 700 | | 3010 | 14 |
| 709 | | 3014 | 14 |
| 719 | | 2990 | 14 |
| 721 | | 2981 | 14 |
| 724 | | 3138 | 14 |
| 725 | | 3001 | 14 |
| 738 | | 2981 | 14 |
| 766 | | 3004 | 14 |
| 789 | | 2974 | 14 |
| 931 | | 2981 | 14 |
| 962 | | 2997 | 14 |
| 966 | | 3001 | 14 |
| 986 | | 3021 | 14 |
| 994 | | 2990 | 14 |
| 995 | | 2990 | 14 |
| 997 | | 3016 | 14 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 1005 | | 2993 | 14 |
| 1006 | | 2990 | 14 |
| 1013 | | 2990 | 14 |
| 1014 | | 2949 | 14 |
| 1017 | | 3008 | 14 |
| 1039 | | 2951 | 14 |
| 1324 | | 3027 | 14 |
| 1329 | | 3027 | 14 |
| 1330 | | 3027 | 14 |
| 1332 | | 3027 | 14 |
| 1334 | | 2968 | 14 |
| 1335 | | 2968 | 14 |
| 1336 | | 3027 | 14 |
| 1338 | | 3027 | 14 |
| 1348 | | 3027 | 14 |
| 1359 | | 3027 | 14 |
| 1366 | | 3027 | 14 |
| 1371 | | 3027 | 14 |
| 1384 | | 3027 | 14 |
| 1389 | | 3021 | 14 |
| 1392 | | 3024 | 14 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 1393 | | 3024 | 14 |
| 1395 | | 2990 | 14 |
| 1412 | | 3027 | 14 |
| 1416 | | 2968 | 14 |
| 1424 | | 3027 | 14 |
| 1426 | | 3027 | 14 |
| 1428 | | 3027 | 14 |
| 1429 | | 3027 | 14 |
| 1430 | | 3027 | 14 |
| 1431 | | 3027 | 14 |
| 1438 | | 3027 | 14 |
| 1441 | | 3027 | 14 |
| 1444 | | 3027 | 14 |
| 1445 | | 3027 | 14 |
| 1446 | | 3027 | 14 |
| 1447 | | 3027 | 14 |
| 1448 | | 3027 | 14 |
| 1449 | | 3027 | 14 |
| 1450 | | 3027 | 14 |
| 1451 | | 3027 | 14 |
| 1452 | | 3027 | 14 |

**<u>I N D E X</u>**

**<u>E X H I B I T S</u>**

| <u>TRIAL EXHIBITS</u> | <u>IDEN</u> | <u>EVID</u> | <u>VOL.</u> |
|---|---|---|---|
| 1453 | | 3027 | 14 |
| 1454 | | 3027 | 14 |
| 1455 | | 3027 | 14 |
| 1456 | | 3027 | 14 |
| 1457 | | 3027 | 14 |
| 1458 | | 3027 | 14 |
| 1459 | | 3027 | 14 |
| 1462 | | 3027 | 14 |
| 1467 | | 3027 | 14 |
| 1472 | | 3027 | 14 |
| 1473 | | 3027 | 14 |
| 1476 | | 3027 | 14 |
| 1479 | | 3027 | 14 |
| 1483 | | 3027 | 14 |
| 1484 | | 3027 | 14 |
| 1486 | | 3027 | 14 |
| 1487 | | 3027 | 14 |
| 1489 | | 3027 | 14 |
| 1490 | | 3027 | 14 |
| 1493 | | 3027 | 14 |
| 2361 | | 3021 | 14 |

# I N D E X

## E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 2362 | | 3021 | 14 |
| 3056 | | 3026 | 14 |
| 3091 | | 3027 | 14 |
| 6861 portion | | 3063 | 14 |
| 7101 | | 3120 | 14 |
| 7104 | | 3044 | 14 |
| 7105 | | 3044 | 14 |
| 7107 | | 3059 | 14 |
| 7109 | | 3059 | 14 |
| 7110 portions | | 3059 | 14 |
| 7115 portions | | 3083 | 14 |
| 7115 | | 3088 | 14 |
| 7120 | | 3092 | 14 |
| 7121 | | 3104 | 14 |
| 7238 | | 3102 | 14 |
| 7467 | | 3098 | 14 |

<u>**Tuesday - October 28, 2025**</u>                              <u>**9:14 a.m.**</u>

**P R O C E E D I N G S**

---o0o---

(Proceedings were heard out of the presence of the jury.)

**THE COURTROOM DEPUTY:**  All rise.  Court is now in session, the Honorable Charles R. Breyer presiding.

You may be seated.

**THE COURT:**  Let the record show all parties are present.

The Court received a motion to strike a certain portion of Kristin Bowen's cross-examination, so the Defense should respond to that in writing.  Okay.  I'll take a look at it.

**MR. FOSTER:**  Thank you.

**THE COURT:**  Are we all set?

**MR. FOSTER:**  Yeah, we are.

Good to see you, Your Honor.

**THE COURT:**  Okay.

(The jury enters the courtroom.)

(Proceedings were heard in the presence of the jury.)

(Riley Levy steps forward to be sworn.)

**THE COURT:**  Okay.  Please be seated.

Let the record reflect all jurors are present.  Parties are present.

Welcome back, ladies and gentlemen of the jury.  I don't know how late you stayed up last night watching the baseball

1    game, but it was -- it was truly a remarkable, remarkable

2    baseball game.

3        So you may call your next witness.

4            MR. FOSTER:  Yes, Your Honor.  The United States calls

5    Riley Levy.

6            THE COURT:  Okay.

7            THE COURTROOM DEPUTY:  Please stand to be sworn.

8                          **RILEY LEVY**,

9    called as a witness for the plaintiff, having been duly sworn,

10   testified as follows:

11           THE WITNESS:  I do.

12           THE COURTROOM DEPUTY:  Thank you.  Please be seated.

13       Please state your full name for the record and spell your

14   null name.

15           THE WITNESS:  Riley Alan Levy, R-I-L-E-Y, A-L-A-N,

16   L-E-V-Y.

17           THE COURTROOM DEPUTY:  Thank you.

18                      **DIRECT EXAMINATION**

19   BY MR. FOSTER:

20   **Q.**   Good morning, Mr. Levy.  When did you work at Done and

21   what was your position there?

22   **A.**   I started at Done in October of 2022 through 2020 -- or

23   2021 -- sorry -- through 2022, and I was the executive lead of

24   operations and strategy.

25   **Q.**   And who did you report to as the executive lead of

1    operations and strategy?

2    **A.**    Ruthia He.

3    **Q.**    Mr. Levy, what crime did you plead guilty to committing

4    while at Done?

5    **A.**    I pled guilty to a conspiracy to dispense a controlled

6    substance by means of the Internet.

7    **Q.**    Can you describe the conspiracy to the jury?

8    **A.**    So Done was a platform and a service that ultimately

9    provided a way for patients to sign up for a membership and

10   receive a prescription for a controlled substance, often

11   without a visit, or a refill for it without a visit.  My

12   components of that were communicating with pharmacies and

13   others that contained false information and lies to have them

14   continue to fill the prescriptions for Done to maintain

15   memberships and continue to grow revenue.

16   **Q.**    Did you know that if pharmacies knew the true facts, they

17   wouldn't fill the scripts and Done's business would fail?

18   **A.**    I did.

19   **Q.**    And did you know that Defendant Brody and other clinicians

20   were rubber-stamping illegal prescriptions?

21   **A.**    I did.

22   **Q.**    Were there other people involved in the conspiracy?

23   **A.**    There were.

24   **Q.**    Do you see anyone in the courtroom who was involved in the

25   conspiracy?

1  **A.**   I do.

2  **Q.**   Can you identify them by an article of their clothing?

3  **A.**   So the woman in the back left, I can't see the clothing.

4  Wearing beige, I believe.  Beige jacket.  And then Dr. Brody,

5  wearing a beige blazer.

6          **THE COURT:**  Let the record reflect the witness has

7  identified both defendants.

8          **MR. FOSTER:**  Thank you, Your Honor.

9  **BY MR. FOSTER:**

10 **BY MR. FOSTER:**

11 **Q.**   Did you sign a plea agreement and agree to cooperate?

12 **A.**   I did.

13 **Q.**   What's your principal obligation in testifying?

14 **A.**   Only to tell the truth.

15 **Q.**   What could happen if you were to lie?

16 **A.**   I would be charged with another crime.

17 **Q.**   What's the maximum sentence you face under your plea

18 agreement?

19 **A.**   Five years in prison and a $250,000 fine.

20 **Q.**   Who determines your sentence and any reduction for

21 cooperating?

22 **A.**   The judge.

23 **Q.**   Have I or anyone else promised you whether that will

24 happen?

25 **A.**   No.

1  **Q.**   Why did you plead guilty, and what's your hope in

2  testifying here today?

3  **A.**   I pled guilty to accept responsibility for my actions and

4  continue to cooperate in hopes of ideally, hopefully, getting

5  credit for that when sentencing comes.

6  **Q.**   Now, Mr. Levy, before we discuss Done, let's talk about

7  some of the lies you told.

8      Did you lie about your experience as a pharmacist and

9  exaggerate your level of knowledge?

10 **A.**   I did.

11 **Q.**   And can you explain that to the jury?

12 **A.**   So at times, especially when communicating externally, I

13 boasted that I had credentials that I did not, such as being a

14 pharmacist, while communicating with pharmacies to build a

15 false level of trust with them so they would believe what I had

16 to say.

17 **Q.**   Did you have some experience in pharmacy?

18 **A.**   I did.  So I was a certified pharmacy technician for

19 several years.

20 **Q.**   Now, you were recruited to Done by investors.  Were you

21 initially excited about its financial prospects?

22 **A.**   I was.

23 **Q.**   And did you ask for and obtain a raise?

24 **A.**   I did.

25 **Q.**   Did there come a time when you hoped that the defendants

1  would be essentially fired by the investors?

2  **A.**   There was.

3  **Q.**   And why did you hope for that?

4  **A.**   Well, I saw what was going on at Done, the illegal

5  activity and the noncompliance and unwilling to become

6  compliant, and hoped that somebody -- anybody could have run it

7  better.

8  **Q.**   What did you learn about whether the investors had the

9  power to remove Defendant He?

10  **A.**   Later I learned that they did not have the authority to do

11  so.

12  **Q.**   How did that relate to the structure of Done?

13  **A.**   Well, it -- Done itself was a corporation that -- one

14  person owned over 80 percent of it.

15  **Q.**   And who was that person?

16  **A.**   Ruthia.

17  **Q.**   Did you decide to leave and start your own telehealth

18  company?

19  **A.**   I did.

20  **Q.**   And did you tell Defendant He about this?

21  **A.**   Only on my final day.

22  **Q.**   How does your company differ from Done?

23  **A.**   So we focus on chronic and acute primary care conditions

24  and taking longevity care of patients, and our -- one of our

25  principal guiding facts is that we ban the prescription of

1    controlled substances for all of our clinicians.

2    **Q.**   Now, after you started at Done, did you come to understand

3    that the law required separation between Done Global, the

4    technology company, and Done Health PC?

5    **A.**   I did.

6    **Q.**   Who was supposed to control the medical practices under

7    the law, and who actually controlled them at Done?

8    **A.**   So under the law, Dr. Brody was supposed to be in control

9    of that, and what was actually going on was Ruthia was

10   providing all oversight.

11   **Q.**   Did Defendant He tell you that she used compensation,

12   money, to control the prescribers at Done?

13   **A.**   She did.

14        **MR. FOSTER:**  Your Honor, we'd move to admit

15   Exhibit 454.

16        **THE COURT:**  454 admitted.

17      (Trial Exhibit 454 received in evidence.)

18        **MR. FOSTER:**  And, Ms. Braga, can we pull up 454 at

19   page 5.

20      I don't think we can see it yet, Your Honor.

21        **THE COURTROOM DEPUTY:**  Let me take the system down and

22   turn off the system and restart it.

23        **MR. FOSTER:**  Okay.

24                    (Pause in proceedings.)

25   \\\

1   **BY MR. FOSTER:**

2           **MR. FOSTER:**  Okay.  Your Honor, I think we're good.

3           **THE COURT:**  Proceed.

4   **BY MR. FOSTER:**

5   **Q.**   Exhibit 454 -- is this on one of your first days at Done?

6   **A.**   Yes.  I believe this is my third day at Done.

7   **Q.**   And did Defendant He tell you the ones who work 40 hours

8   with us can quickly get compensated for 250- to $300,000?

9   **A.**   Yes.

10  **Q.**   And did you say 150,000 max per year?

11  **A.**   I did.

12          **MR. FOSTER:**  If we can go to page 6, Ms. Braga, of

13  454.

14  **BY MR. FOSTER:**

15  **Q.**   Did Defendant He say (as read):

16          "I think the highest one paid in September got

17      $432,000 per year"?

18  **A.**   She --

19          **MR. FOSTER:**  And, Ms. Braga, can you zoom out and zoom

20  in on the top message.

21          **THE WITNESS:**  She did, yes.  I'm sorry.  It went away

22  on my screen.  There it is.

23  **BY MR. FOSTER:**

24  **Q.**   Do you see that?

25  **A.**   Yes.

1          **MR. FOSTER:**  If we can go to page 7.

2     **BY MR. FOSTER:**

3     **Q.**   Did she say (as read):

4               "So previously we paid hourly.  The problem is

5          the provider would try their best to spend more time

6          with patients even if the patients don't want to"?

7     **A.**   Yes.

8     **Q.**   And did you respond (as read):

9               "That sounds like a solvable problem, though.

10         We should have very clear guidelines for when a

11         patient needs to follow up"?

12    **A.**   I did.

13         **MR. FOSTER:**  And if we can go to page 7 to 8,

14    Ms. Braga.

15    **BY MR. FOSTER:**

16    **Q.**   Can did Defendant He respond on page 7 at the bottom (as

17    read):

18               "I agree, but it was really hard to enforce them

19         to do things in certain way previously"?

20    **A.**   Yes.

21         **MR. FOSTER:**  And if we can go to page 8.

22    **BY MR. FOSTER:**

23    **Q.**   Did she say (as read):

24               "Now, even Dr. David and Dr. Zoe don't just tell

25         NPs what to do"?

1  **A.**   Yes.

2         **MR. FOSTER:**  Scroll down, Ms. Braga.

3  **BY MR. FOSTER:**

4  **Q.**  (as read):

5         "And we use the comp structure to disencourage

6     them to do follow-ups"?

7  **A.**   Yes.

8  **Q.**   What did Defendant He describe to you using the

9  compensation structure to enforce?

10 **A.**   So to disencourage providers from doing follow-ups and

11 ultimately achieving more new patients and increasing the

12 conversion and retention of those by continuing to prescribe.

13 **Q.**   And did Defendant He's compensation model reward

14 prescribers for following medical standards or for writing

15 prescriptions?

16 **A.**   For writing prescriptions.

17 **Q.**   Did prescribers tell Defendant He that this structure led

18 them to prescribe illegally?

19 **A.**   Sorry.  Can you repeat the question?

20 **Q.**   Did prescribers at Done tell Defendant He that this

21 structure led to illegal prescriptions?

22 **A.**   Yeah.

23 **Q.**   What was -- it says Done was paying $432,000 a year to

24 nurses to write Adderall prescriptions.

25         Was there any legitimate reason to pay that much to write

1   Adderall prescriptions?

2   **A.**   None that I can think of.

3   **Q.**   Now, when you started at Done --

4        **MR. FOSTER:**  And we can take that down, Ms. Braga.

5   **BY MR. FOSTER:**

6   **Q.**   -- in October 2021, did Defendant He tell you about

7   concerns raised by former employees between March 2020 and the

8   time that you started?

9   **A.**   No, I had not heard.

10   **Q.**   Did she tell you about Nurse Ross or Nurse Emeruem or

11   Nurse Ortega or Mr. Menesini or Kristin Bowen or

12   Jayaram Brindala when you started?

13   **A.**   I did not, no.  I knew one of those people.

14   **Q.**   And did she tell you about their concerns?

15   **A.**   No.

16   **Q.**   When you started, how much did you want to implement

17   Defendant He's model for Done?

18   **A.**   When I first started, I was all in on growth and assisting

19   in implementing the model.

20   **Q.**   Who did you rely on for information?

21   **A.**   Ruthia.

22   **Q.**   As time went on, what did you discover about whether

23   Ruthia told you the truth?

24   **A.**   I through my own discovery learned that a lot of it was a

25   lie.

1  **Q.**   For example, she told you the providers tried to spend too

2  much time with the patients.  Was that actually the problem at

3  Done?

4  **A.**   No.  They were just trying to fulfill their duties of

5  care.

6  **Q.**   You mentioned that California requires doctors to control

7  the medical practices, like Defendant Brody.  Did you attempt

8  to get Defendant Brody to issue clinical policies to require

9  follow-ups and comply with the law?

10 **A.**   I did.

11       **MR. FOSTER:**  Your Honor, we'd move to admit Exhibits

12 532 and 591.

13       **THE COURT:**  Admitted.

14       (Trial Exhibits 532 and 591 received in evidence.)

15       **MR. FOSTER:**  And, Ms. Braga, can we bring up 532.

16 **BY MR. FOSTER:**

17 **Q.**   And is this an e-mail that you sent to both defendants?

18 **A.**   It is.

19 **Q.**   And did you tell them that "This is about general clinical

20 standards" --

21       **MR. FOSTER:**  If you can zoom in, Ms. Braga, on --

22 thank you.

23 **BY MR. FOSTER:**

24 **Q.**    (as read):

25           "The noticeability of Done is right around the

1          corner.  This is a perfect example of why I've been

2          pushing and rearranging the priorities of clinical

3          leadership and provider success teams to develop,

4          review, and publish enforceable policies and

5          procedures.  All teams are looking to us to provide

6          them black-and-white text on expectations"?

7     A.   Yes, I did write that.

8     Q.   And going to page 2, did you write(as read):

9              "The importance of the policies and procedures,

10         I feel, has been lost on many.  They allow for a

11         clear black-and-white line to be drawn on many

12         aspects of what we allow and disallow.  They serve as

13         a safeguard for external forces -- regulators,

14         investors, et cetera -- that want to review our

15         standards.  None of the above is solvable or handled

16         through Zoom calls with providers"?

17    A.   Yes.

18    Q.   What happened when you asked Defendant Brody to write

19    policies to require follow-ups and prevent prescription drug

20    abuse?

21    A.   So I established a project management flow for them, and

22    those tasks that were assigned to Dr. Brody to write, he

23    assigned them back to me.

24    Q.   He assigned them back to you.

25         Was the provider handbook issued by the time that you left

1    in 2023?

2    A.    It was not.

3    Q.    Who blocked issuance of clear requirements to prevent drug

4    abuse and require follow-ups?

5    A.    Both Dr. Brody and Ruthia.

6            MR. FOSTER:   Now -- we can take that down, Ms. Braga.

7    BY MR. FOSTER:

8    Q.    You mentioned that Zoom calls with providers are not a

9    substitute for written policies and providers.   Did you learn

10   that Defendant Brody was telling prescribers to break the law

11   in one-on-one meetings?

12   A.    I did.

13           MR. FOSTER:   And if we can pull up Exhibit 546.

14           THE COURTROOM DEPUTY:   Is that admitted?

15           THE COURT:   546 admitted.

16   (Trial Exhibit 546 received in evidence.)

17           MR. FOSTER:   And if we can go to page 2.

18   BY MR. FOSTER:

19   Q.    Now, did you learn that (as read):

20           "In a one-on-one meeting with a nurse, Alyssa

21       Larson, Dr. Brody specifically talked over her and

22       she felt she was less than below him.   One thing that

23       made her nervous working here was she asked about

24       patients on other meds, and Dr. Brody stated she

25       should be prescribing medications to patients no

1    matter what and not to worry about going to jail"?

2  A.    Yes.

3  Q.    And is that consistent with similar statements that

4  Defendant Brody made to practitioners on other occasions?

5  A.    Yes, it is.

6         MR. FOSTER:   If we can go to page 1 of this chain.

7  BY MR. FOSTER:

8  Q.    Did you tell Defendant He and others that (as read):

9         "David has demonstrated he cannot be responsible

10        or trustworthy"?

11 A.    I did.

12        MR. FOSTER:   If we can go to page 2.

13 BY MR. FOSTER:

14 Q.    Did you continue by saying (as read):

15        "Sarah Barker has asked if she can really trust

16        his clinical judgment.  Sussan stated that she was

17        scared to talk to him"?

18 A.    Yes.

19 Q.    And were those members of Done's clinical leadership?

20 A.    They were.

21 Q.    When you told Defendant He that Defendant Brody was

22 instructing prescribers to break the law, who did she end up

23 firing?

24 A.    She actually ended up firing our head of HR, Elle Monus.

25 Q.    She fired the head of HR and not Defendant Brody.  Why?

1  **A.**   Well, Ruthia thought that Elle should just get Dr. Brody

2  to apologize, and Elle and I were both trying to actually

3  remove Dr. Brody, and she did not want to do that.

4  **Q.**   What did that tell you about whether Defendant He wanted

5  prescribers to follow the law?

6  **A.**   That she didn't want them to.

7  **Q.**   How much -- Elle Monus was fired.  How much did employees

8  fear being fired if they raised concerns about illegal

9  prescribing to Defendant He?

10 **A.**   It was a pretty consistent theme.

11 **Q.**   Can you explain to the jury how important loyalty was to

12 Defendant He and how that influenced interactions with her?

13 **A.**   Yeah.  Absolutely.

14      Most of the time folks were scared to speak publicly or

15 bring things up because they were worried that it would go

16 against Ruthia, and Ruthia valued loyalty with not only the

17 employees of Done but the providers of Done to ensure that the

18 growth and the overall, you know, revenue increase was reached.

19 And employees stopped raising concerns out of fear of losing

20 their jobs.

21 **Q.**   And how frequently and how quickly were employees fired?

22 **A.**   If the concern was raised, they most of the time removed

23 immediately.

24 **Q.**   Now, why didn't Defendant He and Brody want written

25 policies requiring prescribers to follow the law?

1  **A.**   Well, I mean -- because it would show that we weren't

2  following the law, so the truth would be there.

3  **Q.**   And Zooms and one-on-ones, did that allow Defendant Brody

4  to counsel prescribers to break the law without there being

5  written evidence?

6  **A.**   Yes.

7  **Q.**   And did Defendant Brody also make clear to you that he was

8  doing things at Done that no other clinician was willing to do?

9  **A.**   Yes.

10      **MR. FOSTER:**  Your Honor, we'd move to admit

11 Exhibit 494.

12      **THE COURT:**  Exhibit what?

13      **MR. FOSTER:**  494, Your Honor.

14      **THE COURT:**  494 admitted.

15  (Trial Exhibit 494 received in evidence.)

16 **BY MR. FOSTER:**

17 **Q.**   Now, did Defendant Brody write to you that (as read):

18      "Our, meaning my family's, not the company's,

19      cash flow problems that were evident even then and

20      are now fully visible reminding me of a hydra raising

21      its multiple ugly heads"?

22 **A.**   Yes.

23 **Q.**   And this is --

24      **MR. FOSTER:**  Thank you, Ms. Braga.

25 **BY MR. FOSTER:**

1  **Q.**  Did he request an increase in his annual salary in early

2  2022?

3  **A.**  He did.

4      **MR. FOSTER:**  And if we can zoom out and zoom in on the

5  paragraph that begins "I have sowed."

6  **BY MR. FOSTER:**

7  **Q.**  Did Defendant Brody write (as read):

8      "My goal is to make the patient-first philosophy

9      of Done an everyday reality.  In order to achieve

10     this, it is necessary to have a physician leader who

11     is willing to take some risks.  My opinion is that

12     those risks are not great.  However, the vast

13     majority of clinicians perceive the risks as

14     significant enough to not take them"?

15  **A.**  Yes.

16     **MR. FOSTER:**  And if we can zoom out, Ms. Braga, and

17  zoom in on the paragraph beginning "Every day."

18  **BY MR. FOSTER:**

19  **Q.**  Did he say (as read):

20     "Every day I read several bad reviews with a

21     consistent theme, a patient complaint generated by a

22     provider practicing defensively rather than with a

23     patient first orientation.  It will be difficult or

24     impossible to find someone willing to walk the walk."

25     **MR. FOSTER:**  And then if you can zoom out, Ms. Braga.

1  **BY MR. FOSTER:**

2  **Q.**   Did he star that, and then underneath his signature write

3  (as read):

4              "Except me" with an emoji?

5  **A.**   Yes.

6  **Q.**   Now, did Defendant He give Defendant Brody a raise?

7  **A.**   She did.

8  **Q.**   And after Defendant He gave Defendant Brody a raise for

9  being willing to take risks that the vast majority of

10  clinicians would not take, what did you --

11              **MS. NECHAY:**   Objection, speculation.

12              **THE COURT:**   Sustained.

13  **BY MR. FOSTER:**

14  **Q.**   After Defendant He gave Defendant Brody the raise, what

15  did you understand about what Defendant He valued in

16  prescribers?

17              **MR. SCHACHTER:**   Objection, calls for speculation.

18              **THE COURT:**   Overruled.

19              **THE WITNESS:**   Sorry.  Can you repeat the question?

20              **MR. FOSTER:**   Sure.

21  **BY MR. FOSTER:**

22  **Q.**   After Defendant He gave Defendant Brody a raise, what did

23  you understand about what Defendant He valued in prescribers?

24  **A.**   Ultimately prescribers that would just write

25  prescriptions.

1  **Q.** Did Defendant He continue to ask Defendant He to meet with

2  prescribers after he said to prescribe no matter what and not

3  worry about going to jail?

4        **MS. NECHAY:** Objection, lack of foundation.

5        **MR. FOSTER:** I can lay a foundation, Your Honor.

6  BY MR. FOSTER:

7  **Q.** Are you familiar with Defendant He asking Defendant Brody

8  to counsel prescribers one-on-one after this date?

9  **A.** Yes.

10  **Q.** And can you explain what types of prescribers she would

11  want to be counseled?

12  **A.** It was typically prescribers that were receiving negative

13  or less than five-star reviews, oftentimes because the patient

14  was complaining they did not get a stimulant prescription.

15  **Q.** And what was your understanding of why she wanted

16  Defendant He to counsel these prescribers?

17  **A.** To encourage them to write the stimulant prescriptions.

18        **MR. FOSTER:** And we can take that down, Ms. Braga.

19  BY MR. FOSTER:

20  **Q.** Now, Defendant Brody said he was taking risks the vast

21  majority of clinicians wouldn't take.

22  When prescribers complained to Defendant He that the Done

23  model was unsafe, what did she tell them?

24  **A.** Either it was wrong, was gaslighting of them, or

25  dismissive.

1  **Q.**    What would she say about risk?

2  **A.**    Well, ultimately a provider that was scared of the risk

3  wasn't someone that fit on our platform.

4  **Q.**    What did Defendant He tell you about compliance with

5  controlled substance laws?

6  **A.**    Well, at first it was we are compliant with them, and then

7  later not to worry about it; we have to push the boundary on

8  things, potentially violate them to become a unicorn.

9  **Q.**    You say "violate them to become a unicorn."  What did

10  Defendant He tell you about the relationship between breaking

11  the law and financial success?

12  **A.**    So it was alluded or discussed around companies like Uber

13  and Facebook and other companies who had had legal challenges

14  to reach their success.

15  **Q.**    And what did she say?

16  **A.**    Well, that we needed to do the same.

17  **Q.**    What did you tell Defendant He about whether Done was like

18  these other companies?

19  **A.**    Well, I said that it's vastly different.  Those companies

20  often were facing administrative, and these were criminal-based

21  things that we were dealing with at Done.

22  **Q.**    Did Defendant He -- you mentioned becoming a unicorn.  How

23  important was that and growth to her?

24  **A.**    Growth was essentially the only priority at Done.

25  **Q.**    Growth was the only priority.  Were you involved in

1   discussions with investors?

2   **A.**   I was.

3   **Q.**   And were similar talking points about what Done was doing

4   used with the media, pharmacies, and investors?

5   **A.**   They were.

6   **Q.**   And what did the media, pharmacies, and investors

7   ultimately all want to know about Done?

8   **A.**   Our prescribing practices and ultimately if we were

9   compliant with the law or not.

10         **MR. FOSTER:**   Your Honor, we'd move to admit Exhibit

11  1014.

12         **THE COURT:**   1014 admitted.

13     (Trial Exhibit 1014 received in evidence.)

14         **MR. FOSTER:**   Can we pull that up, Ms. Braga?

15  BY MR. FOSTER:

16  **Q.**   And did Defendant He write about Tiger?  Is that an

17  investor?

18  **A.**   I believe so, yes.

19  **Q.**   And did she say (as read):

20         "For Tiger, one, we never encourage our doctors

21     to prescribe more and inform them to discharge

22     patients.  Two, our initial screening has been pretty

23     effective in terms of screening out of over

24     95 percent of patients.  Three, we have a process

25     dedicated team to monitor the PDMP"?

1    **A.**    Yes.

2    **Q.**    Was this the truth?

3    **A.**    It was not the truth.

4    **Q.**    Can you explain to the jury why this was a lie?

5    **A.**    So our financial -- the way that providers were

6    complicated encouraged providers to prescribe more as opposed

7    to discharge them.

8        And in addition, our initial screening was six questions

9    to get them to schedule an appointment, and screening out

10   95 percent of patients, it really was people that just hit our

11   website.  It wasn't people that in its entirety that actually

12   completed those six questions, let alone a full screening.

13       And in addition, the PDMP monitoring was done -- I

14   wouldn't call it monitoring.  The PDMP look-up was done by a

15   team in the Philippines that was not -- that were not

16   clinicians.

17   **Q.**    And in terms of the screening, the 95 percent, can you

18   explain to the jury the difference between people hitting the

19   website and Done actually screening them out?

20   **A.**    Yes.  So there were essentially people that were just on

21   the website looking to decide if they wanted to sign up, and

22   there's, you know, a million and one reasons why you might

23   leave a website, and so that number would have been 100 percent

24   that hit the website, and only essentially 95 percent of those

25   came in to book an appointment at the end of the day by filling

1  out the first six questions.

2  **Q.**   And paying for the --

3  **A.**   And paying for their initial appointment.

4  **Q.**   Okay.  And in terms of the questions, who selected those,

5  Defendant He or the clinicians?

6  **A.**   Ruthia.

7  **Q.**   And unless a patient self-identified as being complex or

8  being under the age of 18, was there anything to affirmatively

9  prevent them from booking an appointment?

10 **A.**   There was not.

11 **Q.**   And in terms of the Philippines, did Defendant He want to

12 hide information about the care team from investors and the

13 media and pharmacies?

14 **A.**   Yeah.  Ultimately, "the team wasn't in the Philippines,"

15 was the goal.

16      **MR. FOSTER:**  Your Honor, we'd move to admit

17 Exhibit 1039.

18      **THE COURT:**  1039 admitted.

19   (Trial Exhibit 1039 received in evidence.)

20      **MR. FOSTER:**  And going to page 2, Ms. Braga.

21 **BY MR. FOSTER:**

22 **Q.**   In regards to inquiries from Bloomberg about the care

23 team, did Defendant He say (as read):

24      "I think we can try to share minimal information

25      about the care team members as possible (or nothing

1    at all just in case they have any follow-up

2    questions)"?

3  A.    Yes.

4  Q.    Now, turning to the media, did Defendant He tell similar

5  lies to the media?

6  A.    Yes.

7         MR. FOSTER:  And we'd move to admit Exhibit 556.

8         THE COURT:  556 admitted.

9    (Trial Exhibit 556 received in evidence.)

10 BY MR. FOSTER:

11 Q.    Is this an exchange with Defendant He about a Wall Street

12 Journal article?

13 A.    It is.

14 Q.    When the Wall Street Journal started reporting on Done,

15 was Defendant He concerned that the company could implode?

16 A.    Yes, she was.

17 Q.    Did she write (as read):

18        "The reporter is hoping to find out if our

19    medical team is advising the team to prescribe over

20    95 percent of patients, like what Cerebral did, for

21    which we have always asked clinicians to follow their

22    clinical judgment"?

23 A.    Yes.

24 Q.    Was that the truth?

25 A.    It was not.

1 **Q.** Can you explain that to the jury?

2 **A.** Well, we were prescribing more than -- than Cerebral was,

3 I discovered later. In addition, clinicians were incentivized

4 to prescribe as opposed to use their judgment.

5 **Q.** Did Defendant He also have metrics for conversion?

6 **A.** She did.

7 **Q.** How did those relate to prescriptions?

8 **A.** Well, if a patient converted to being a full member, it

9 meant that they got a prescription, and that was very

10 important.

11 **Q.** Now, did Defendant He also write that (as read):

12      "The reporter collected the documents, including

13      a handbook and a risk mitigation report. The

14      document could be used as proof"?

15 **A.** Yes.

16 **Q.** How concerned was Defendant He about access to Done's

17 internal handbooks and the risk mitigation report?

18 **A.** Very. And we had a later conversation trying to hunt down

19 how it got -- got released.

20 **Q.** And if -- did she go on to say (as read):

21      "One, we can" --

22      Did she go on to say (as read):

23      "We can still take some actions to mitigate the

24      risks. Here are some thoughts. One, prevent more

25      people from talking to the press"

A.    Yes.

Q.    (as read):

"Two, continue to decline the information the reporter collected"?

A.    Yes.

Q.    (as read):

"Potentially redirect the attention from overprescribing without ethics and safety measures to, A, how the stigma around ADHD prevents patients from getting affordable care and how we have safety measures in place to prevent abuse"?

A.    Yes.

Q.    (as read):

"B, present ourselves as a small company and redirect the attention to other bigger telehealth companies' practices"?

A.    Yes.

Q.    Can you tell the jury how Defendant He wanted to silence employees and cover up the crimes?

A.    So there was one employee in specific that comes to mind where we had discussed firing that person for speaking with the press.  Ultimately, it didn't end up happening, but it was definitely a pretty charged statement that we were trying to hunt down and figure out if we could remove them and how to do so.

1  **Q.**  What was your understanding of why you and Defendant He

2  didn't want information becoming public?

3  **A.**  Well, information becoming public would have caused the

4  company to implode.  We would have not had any new patients.

5  Pharmacies wouldn't fill our prescriptions.

6  **Q.**  Why?  What was it about the prescription practices?

7  **A.**  They were illegal.

8  **Q.**  Now, she says "redirect the attention."  What did that

9  mean?

10  **A.**  So it was a deflection.  There were multiple instances of

11  different ways of trying to redirect attention away from Done

12  to other different things.  There's a litany of them.

13  **Q.**  And how did Defendant He use the access to care narrative

14  and the harms of undiagnosed ADHD to try and redirect the

15  attention?

16  **A.**  Well, while those are great things to discuss, getting

17  access to care didn't mean getting access to a prescription,

18  but at Done it did, and so that was really the goal, by using

19  access as a mirror or smoke and mirrors to get patients to use

20  it.

21  **Q.**  Why did you participate in the conspiracy and lie that

22  Done was compliant and try and distract attention from its

23  overprescribing?

24  **A.**  I wanted to maintain my role, and I was hopeful of

25  maintaining relationships with investors to start my own

1     company.

2   **Q.**    Now, if we can look down, she says (as read):

3       "Three, have the clinical protocol reviewed.

4       Are we still doing chart review with providers

5       monthly or quarterly for selected patient charts or

6       have the collaborating physicians been supervising

7       the clinicians"?

8   **A.**    Yes, she did ask that.

9       **MR. FOSTER:**   And if we can zoom out, Ms. Braga.

10   **BY MR. FOSTER:**

11   **Q.**    Did you respond (as read):

12       "We are. This is one of the precise reasons

13       that I've been pushing for new clinical protocols,

14       though. They are not robust enough to defend

15       anything. Chart reviews are still occurring"?

16   **A.**    I did.

17   **Q.**    And so when chart reviews occurred, what did they show

18   about Done's clinical practices?

19   **A.**    That for whatever reason, we weren't meeting the standard

20   of care on multiple of those charts.

21   **Q.**    Now --

22       **MR. FOSTER:**   Your Honor, we'd move to admit

23   Exhibits 541, 544, 548, and 554, responses to the Wall Street

24   Journal.

25       **THE COURT:**   541, 544? 5 what?

1     **MR. FOSTER:**  48.

2     **THE COURT:**  -48 and --

3     **MR. FOSTER:**  554.

4     **THE COURT:**  -- and 554.  All of those are admitted.

5     **MR. FOSTER:**  Thank you.

6          And, Ms. Braga, can you please bring up Exhibit 548.

7          (Trial Exhibits 541, 544, 548, and 554 received in

8     evidence.)

9     **BY MR. FOSTER:**

10    **Q.**   Is this an e-mail from a PR firm to you and Defendant He?

11    **A.**   It is.

12    **Q.**   And did the PR firm make clear that answers to the Wall

13    Street Journal needed to accurately portray Done's corporate

14    policies and practices?

15    **A.**   It did.  Or he did.

16    **Q.**   Who hired the PR firm?

17    **A.**   Ruthia did.

18    **Q.**   Did she pay a significant amount of money for her?

19    **A.**   Yes.

20    **Q.**   Can you explain that to the jury?

21    **A.**   Every single day we were removing a tool or a service and

22    not wanting to spend any money unless it was geared towards

23    growth at the company.  And, you know, there were often layoffs

24    and things like that, so any money going out to an external

25    service was considered a lot, because it was infrequent and

1    almost impossible.

2    **Q.**   And how important was PR and messaging to Defendant He?

3    **A.**   Very.

4    **Q.**   Who approved each set as accurate?

5    **A.**   Each set of answers?

6    **Q.**   Yeah.

7    **A.**   Ruthia did.

8    **Q.**   And was a press@donefirst e-mail account created that

9    Defendant He received e-mails at?

10   **A.**   It was.

11   **Q.**   Turning to Exhibit 554, Defendant He said (as read):

12        "The risk mitigation report could be used as proof."

13        When the Wall Street Journal asked about the risk

14   mitigation report, did Defendant He tell them (as read):

15        "We found the reports to be irrelevant to our

16        business and asked the consultant to stop submitting

17        these reports"?

18   **A.**   She did.

19   **Q.**   Had you heard of the risk mitigation reports before the

20   Wall Street Journal started inquiring about them?

21   **A.**   I had not.

22   **Q.**   And can you tell the jury what your thought process was

23   when you learned about it?

24   **A.**   Well, when I saw them for the first time, I was actually

25   shocked that they existed, being told that they weren't or that

1  they were irrelevant, and they were a lot of the same concerns

2  that I had started raising.

3  **Q.**   Did Defendant He initially resist giving you a copy of the

4  risk mitigation reports when you asked about them?

5  **A.**   She did.

6  **Q.**   And when you ultimately got them, what did you think about

7  her telling the Wall Street Journal that these reports were

8  irrelevant to Done's business?

9  **A.**   They were very relevant to Done, and I was quite upset.

10  It was not a good look for the company to deny the existence of

11  them or not handle anything in them.

12  **Q.**   Not handle anything in them.  The problems that

13  Dr. Brindala identified in terms of pressure to prescribe, not

14  following up with patients, transfer patients being seen, and

15  his warnings of legal consequences, were all those practices

16  still going on while you were there?

17  **A.**   They were.

18  **Q.**   And did they continue until you departed?

19  **A.**   They did.

20  **Q.**   When you joined Done, did Defendant He make you aware of

21  any recommendations that Dr. Brindala had made for

22  evidence-based medicine?

23  **A.**   No.  I actually didn't know who Dr. Brindala was.

24  **Q.**   Were there any of his recommendations disseminated to

25  prescribers during your time at Done?

1  **A.**    To my knowledge, no, they were not.

2  **Q.**    Later on, when the federal grand jury served its subpoena

3  for documents on Done, did Defendant He want to produce the

4  risk mitigation reports to the government?

5  **A.**    To my recollection, no, because the narrative had already

6  been published that they didn't exist.

7  **Q.**    And explain to the jury what her resistance was in terms

8  of -- well, were those documents easy to find on Done's

9  systems?

10  **A.**    No, they were not.  They were very challenging.  Only --

11  to my knowledge, only two people had access to them.

12  **Q.**    And who were those people?

13  **A.**    Myself and Ruthia.

14  **Q.**    Now, Defendant He said the handbook also could be used as

15  proof.

16        **MR. FOSTER:**  We'd move to admit Exhibit 551 and 553,

17  Your Honor.

18        **THE COURT:**  551 and 553 admitted.

19      (Trial Exhibit 551 and 553 received in evidence.)

20        **MR. FOSTER:**  Can we pull up Exhibit 551.

21  **BY MR. FOSTER:**

22  **Q.**    Did you tell Defendant He (as read):

23          "I think we need to change this.  Our handbook

24      does not state that providers should consider

25      medication trials because our handbook from 2020-2021

1      does say this"?

2  **A.**   I did say that, yes.

3  **Q.**   Did Defendant He respond (as read):

4      "But it doesn't say we should do it.  Do you

5      want me to disable this public link?"

6  **A.**   Yes, she did.

7  **Q.**   And did you respond at page 2, quoting the document (as

8  read):

9      "Still might be worth doing a medication trial"?

10  **A.**   I did.

11     **MR. FOSTER:**  Can we pull up Exhibit 553 at page 8,

12  Ms. Braga.

13  **BY MR. FOSTER:**

14  **Q.**   When the Wall Street Journal asked (as read):

15      "Our reporting indicates that your employee

16      handbook in 2020 stated that even for patients who

17      don't meet DSM-5 criteria for ADHD, it may still be

18      worth putting them on a medication trial and that

19      such trials involved low doses of Adderall.  Is that

20      accurate?"

21     Did Defendant He approve a response (as read):

22     "This is inaccurate"?

23  **A.**   Yes.

24  **Q.**   Did Defendant He refuse to answer honestly even though you

25  told her to change an answer?

1          MR. SCHACHTER:  Objection, leading.

2          THE COURT:  Sustained.

3   BY MR. FOSTER:

4   Q.   Did -- what did Defendant He do, if anything, to change

5   the answer after you told her it needed to be changed?

6   A.   She did not.  She approved the one where -- denying it was

7   the course of action.

8   Q.   And what was Defendant He focused on in terms of leaks of

9   the document she referred to as proof?

10  A.   Sourcing who actually leaked it and making sure that the

11  leaks stopped.

12  Q.   How focused was she on silencing whistleblowers and

13  preventing leaks?

14  A.   It was a pretty recurring theme within Done, so very

15  important.

16  Q.   Why did you assist her in that effort?

17  A.   I was all in on Done for a long time, and I wanted to save

18  the company.

19          MR. FOSTER:  Ms. Braga, can we pull up Exhibit 554 at

20  page 1 to 2.

21  BY MR. FOSTER:

22  Q.   Did the Wall Street Journal ask a series of questions

23  about Done's clinical protocol, prescribing protocol, and

24  clinical practices, and can Defendant He approve a response to

25  all of them that said (as read):

1           "The medical operations are managed by an

2      independent PC"?

3  A.   She did.

4           MR. FOSTER:  And, Ms. Braga, we can look at the next

5  page, page 2.  See a series of answers about high standard of

6  care.  You can scroll down.

7      You can scroll down, Ms. Braga.

8  BY MR. FOSTER:

9  Q.   Now, did Defendant He lie about her role in clinical

10 decisions?

11 A.   Yes.

12          MR. FOSTER:  And if we can go to page 4 of

13 Exhibit 554.

14 BY MR. FOSTER:

15 Q.   Was -- did the Wall Street Journal ask (as read):

16          "Our reporting indicates that CEO Ruthia He

17      removed psychiatric screening questionnaires from the

18      sign-up process, specifically the GAD-7 and the

19      PHQ-9, in order to speed the process for patients to

20      be seen by clinicians.  Is that accurate?"

21     And did Defendant He approve a response that said (as

22 read):

23          "This is inaccurate"?

24 A.   She did.

25 Q.   And did the Wall Street Journal ask at page 5 (as read):

1          "Our reporting indicates she made this decision

2     against the recommendation of her chief medical

3     officer and others on staff.  Is that accurate?"

4     And did Defendant He approve a response (as read):

5     "This is inaccurate.  The situation did not occur"?

6  **A.**   She did.

7  **Q.**   What did you find out about whether Defendant He lied

8  about this?

9  **A.**   I found multiple providers had raised concerns about the

10 adjustment or changes to removing of questions in the screening

11 questionnaire and the overall intake, in addition to in the

12 risk mitigation reports, there was identification from other

13 clinicians that Dr. Brindala had gathered related to the

14 screening being modified without anyone being told.

15 **Q.**   And was that what he referred to as "pressure to

16 prescribe"?

17 **A.**   Yes.

18       **MR. FOSTER:**  Now, Your Honor, we'd move to admit

19 Exhibit 694.

20       **THE COURT:**  Admitted.

21    (Trial Exhibit 694 received in evidence.)

22       **MR. FOSTER:**  And, Ms. Braga, can you pull up page 6.

23 BY MR. FOSTER:

24 **Q.**   Did the Wall Street Journal later inquire about

25 prescriptions to a patient, Harlan Band?

1  **A.**   They did.

2  **Q.**   And did they ask about information that they had received

3  that the clinician Ms. Rahimi said she felt (as read):

4         "Done's practices were morally wrong, that she

5     felt pressure to prescribe stimulants, that she would

6     be reprimanded if patients complained about not

7     getting stimulants, and finally, that she felt like

8     Done prioritized keeping patients happy over her

9     medical impressions"?

10 **A.**   Yes.

11 **Q.**   And did Defendant He approve a response that providers

12 must use their own clinical judgment?

13 **A.**   Yes.

14 **Q.**   What was Defendant He repeatedly told about whether

15 providers were, in fact, able to use their own independent

16 clinical judgment?

17       **MR. SCHACHTER:**  Objection, leading, foundation.

18       **THE COURT:**  Overruled.

19       **THE WITNESS:**  That --

20       **THE COURT:**  Foundation, actually -- foundation is a

21 proper objection.  Leading is not.

22 **BY MR. FOSTER:**

23 **Q.**   Were you present when clinicians complained to

24 Defendant He about Done's prescribing practices?

25 **A.**   I was.

1    Q.   And what did they tell her about whether they were able to

2    use their own clinical judgment?

3    A.   That ultimately they weren't -- with the way that the

4    practices were set up and the way that the system was built,

5    they felt a pressure and continued to prescribe so that they

6    could ultimately meet the standards of Done.

7    Q.   And, in fact, in regard to this particular prescription

8    for Mr. Band, was Defendant He told (as read):

9           "Ms. Rahimi said she didn't have time to delve

10          into patients' detailed medical histories because

11          appointments might be shorter than 30 minutes,

12          including because the company double-booked

13          appointment slots"?

14   A.   Yes, I do recall that.  I don't see it here.

15   Q.   Oh.

16          MR. FOSTER:  Ms. Braga, can you scroll down, please,

17   and zoom in on the paragraph below.  Ms. Rahimi.  The one

18   below.

19          THE WITNESS:  Yes.

20   BY MR. FOSTER:

21   Q.   Okay.  And did you investigate the Band prescription and

22   talk to Defendant He about it?

23   A.   I did.

24   Q.   Did Defendant He want to change Done's clinical practices

25   because of it?

**A.** No.

**Q.** Were the same concerns raised by Nurse Rahimi, that she wasn't able to prescribe safely, repeatedly told to Defendant He in your presence?

**A.** They were.

**Q.** When you spoke with --

Did you investigate this prescription as part of responding to the media?

**A.** Yes.

**Q.** And as part of that investigation, what did you find out about concerns related to Defendant He deleting evidence?

**A.** So when I looked up this patient in our EHR, it had a different medical record than the actual medical record for this patient. There was a provider who had never seen this patient that was assigned to this chart, and it indicated that she signed off on the chart. When I spoke with the clinician, she said she had never done that.

And so I dug a little deeper and spoke with other team members who were at Done at the time of this, and they actually had downloaded and saved the original medical record of this patient, and it was entirely different.

**Q.** And what were you told about why they downloaded and saved them?

**A.** They were fearful it was going to be deleted.

**Q.** By whom?

1   **A.**   What --

2   **Q.**   By who?

3   **A.**   Niki Mercado.

4   **Q.**   No, who did they think --

5   **A.**   Oh, by Ruthia.  Yes, Niki Mercado had it.

6   **Q.**   Did Defendant Brody also prepare draft media responses

7   regarding Done's three strikes policy?

8   **A.**   Yes.

9        **MR. FOSTER:**  We'd move to admit Exhibits 584, 1334,

10   1335, and 1416.

11        **THE COURT:**  Admitted.

12        (Trial Exhibits 584, 1334, 1335, and 1416 received in

13   evidence.)

14        **MR. FOSTER:**  Ms. Braga, can you bring up Exhibit 1416.

15   **BY MR. FOSTER:**

16   **Q.**   Are these draft comments that Defendant Brody made on

17   responses to inquiries from Bloomberg?

18   **A.**   Yes.  The guest user was Dr. Brody.

19        **THE COURTROOM DEPUTY:**  One moment.

20   **BY MR. FOSTER:**

21   **Q.**   Did Bloomberg inquire (as read):

22        "The company has had a policy of firing a

23        prescribing clinician if they receive three negative

24        customer reviews"?

25        And did Defendant Brody comment (as read):

1          "In itself, that is clearly a good policy for a

2      company that is built around a patient equals

3      customer first philosophy"?

4  A.   Yes.

5  Q.   And did Bloomberg inquire (as read):

6          "Former clinicians we spoke with said this

7      policy created pressure to prescribe amphetamines,

8      even if cases where they were not warranted, in part

9      because the totality of Done's ads and website

10     material lead customers to believe they will get

11     prescribed amphetamines"?

12     And did Defendant Brody comment (as read):

13         "If clinicians are former, there is a good

14     chance they were among those fired for negative

15     customer reviews"?

16  A.  Yes.

17     **MR. FOSTER:**  Can we pull up Exhibit 584 at page 3,

18  Ms. Braga.

19  **BY MR. FOSTER:**

20  Q.   When Defendant He responded to Bloomberg in regards to the

21  question "What is the purpose of the company's three negative

22  review policy," did she respond (as read):

23         "Done does not have such a policy for our

24     providers"?

25  A.   Yes, she did.

1          MR. FOSTER:  Can we go to page 5, Ms. Braga.

2     BY MR. FOSTER:

3     Q.   Did Defendant Brody also respond to Bloomberg when it

4     asked "What is the purpose of the company's three negative

5     review policy" (as read):

6               "We don't have such a policy"?

7     A.   Yes, he did.

8          MR. FOSTER:  Ms. Braga, can we pull up Exhibit 554 at

9     6.

10    BY MR. FOSTER:

11    Q.   In regards to questions about Done's second opinion policy

12    in a best practices document, did the response state (as read):

13              "Done does not provide a list of best practices

14         to providers"?

15    A.   It did.

16         MR. FOSTER:  And, Ms. Braga, can you pull up

17    Exhibit 584 at page 3.

18    BY MR. FOSTER:

19    Q.   When Bloomberg asked the same question about discharge of

20    patients, did the defendants respond (as read):

21              "Providers working on the Done platform have

22         autonomy in treatment decisions.  Specifically, they

23         are free to discharge a patient"?

24    A.   Yes.

25    Q.   Did prescribers at Done have autonomy to discharge a

1    patient on their own?

2    **A.**    No.

3    **Q.**    Can you explain to the jury who blocked that?

4    **A.**    Well, both Ruthia and Dr. Brody did.

5    **Q.**    Did the second opinion policy that prescribers needed to

6    e-mail support or clinical leadership if they wanted to deny a

7    patient continue after these responses were provided to the

8    Wall Street Journal and Bloomberg?

9    **A.**    It did.

10   **Q.**    How did this policy relate to Defendant He's focus on

11   negative reviews?

12   **A.**    Well, negative reviews were often associated with the

13   patient not getting a stimulant prescription, and so if the

14   provider was receiving negative reviews, the same policy

15   applied where the patient's chart would be moved to another

16   provider who would prescribe them stimulants.

17   **Q.**    And were Defendants He and Brody repeatedly told by

18   clinicians that this policy was wrong and that the prescribing

19   nurse should have the autonomy to discharge a patient if they

20   wanted to?

21   **A.**    Yes.

22   **Q.**    When these media articles were published or before they

23   were published, did you originally believe that the media

24   attention would cause the defendants to be removed from running

25   the company?

1  **A.**   I did.

2  **Q.**   And did Defendant He ask you to interface with journalists

3  as well?

4  **A.**   Yes, she did.

5  **Q.**   And ultimately, after these articles were published, what

6  did you learn about how much power Defendant He had versus the

7  investors in Done?

8  **A.**   The investors basically had -- had none besides providing

9  an opinion, and Ruthia had absolute autonomy.

10  **Q.**   After the media articles were published quoting experts

11  and others saying Done's practices were unsafe, did

12  Defendant He want to change them?

13  **A.**   No, she did not.

14  **Q.**   Did it cause you to review and look into prescription data

15  and try and find out more about what was occurring at Done?

16  **A.**   It did.

17  **Q.**   Can you explain to the jury why you did that?

18  **A.**   Well, we had been having these concerns raised publicly

19  and internally, and at the time, I didn't have a full grasp of

20  what was available to me and/or what others were seeing.

21     So I worked with my team to dive into every prescription

22  issued in a 30-day window as well as a handful of other things

23  such as visit times, using Zoom and other -- or other data

24  points to determine what was actually going on at Done.

25  **Q.**   And what did you discover about whether Done was dependent

1  on high-volume prescribers who were prescribing large

2  quantities of Adderall to patients?

3  **A.**    So that -- from my recollection, about, you know, the top

4  10 providers had about 30 to 40 percent of all patients under

5  their panels, so they were very -- Done was very reliant on

6  them continuing to fill presumptions for those patients to

7  continue their recurring revenue.

8  **Q.**    How protective was Defendant He of those high-volume

9  prescribers?

10 **A.**    Very.  They were revered as the best.

11 **Q.**    Revered as the best by who?

12 **A.**    Ruthia.

13 **Q.**    What did other clinicians and members of clinical

14 leadership tell Defendant He about these high-volume

15 prescribers?

16 **A.**    Some that -- some should be removed, some should have

17 their panels taken down because it was unsafe for them to be

18 prescribing this much.  Some weren't seeing their patients, and

19 that was shared with Ruthia as well.

20     A lot of them, the oomph was behind actually having them

21 removed from the platform.

22 **Q.**    And did Defendant He follow the recommendations of

23 clinical leadership to remove them?

24 **A.**    She did not.

25 **Q.**    How did that relate to growth and investors?

1    **A.**   Well, growth was everything at Done.  It was the highest

2    priority.  And having providers that were able to maintain

3    these large numbers of patients for recurring review, which was

4    what investors valued more than new revenue, was a key priority

5    at Done as well, and new clinicians having small panels and

6    tons of availability to get more members was also a tangent

7    priority to that.

8    **Q.**   Can you explain to the jury how not having follow-ups

9    related to the profit Done made and the concept of recurring

10   revenue you just mentioned?

11   **A.**   Yes.  So patients paid a monthly fee to maintain on the

12   Done platform.  They would not pay that fee if they weren't

13   receiving their prescription medication, and so anything that

14   was a barrier to that in terms of the patient not just having

15   is sent directly to the pharmacy was a problem and it was often

16   removed.

17       So follow-ups not occurring, for example, is one.

18   Patients not even having to message in for refills and them

19   just having it sent directly to a pharmacy is another.

20       So it was all about just keeping the patient paying a

21   monthly fee.

22       **MR. FOSTER:**  Your Honor, we'd move to admit Exhibits

23   580, 635, 637, 662, 665, and 789.

24       **THE COURT:**  Admitted.

25       (Trial Exhibits 580, 635, 637, 662, 665, and 789 received

1    in evidence.)

2             **MR. FOSTER:**  Ms. Braga, can you pull up Exhibit 580.

3    **BY MR. FOSTER:**

4    **Q.**   Now, Mr. Levy, were there concerns about the scripts being

5    unsafe at Done?

6    **A.**   I can't see anything on my screen.

7             But there were concerns, yes.

8    **Q.**   Okay.

9             **THE WITNESS:**  Thank you.

10   **BY MR. FOSTER:**

11   **Q.**   And so did Nurse Barker say (as read):

12            "Just had a provider who ordered a 71-year-old

13            who's also on Suboxone and Lyrica Adderall IR 30

14            milligram BID, so expect another death notice"?

15   **A.**   Yes.

16            **MR. FOSTER:**  And going to page 2 of Exhibit 580.

17   **BY MR. FOSTER:**

18   **Q.**   Did she also say (as read):

19            "Also had a provider who thought the ASRS score

20            determines diagnosis, so yeah"?

21   **A.**   Yes, she did.

22   **Q.**   And can you explain how that related to the experience

23   level of the clinicians that Defendant He wanted to recruit and

24   what she was referring to there?

25   **A.**   So clinicians could be finishing their program for their

1  nurse practitioner certificate and be hired so that the day

2  that they got their license, they were starting on the Done

3  platform, essentially being able to train them the Done way.

4      And the clinicians with little experience would rely on

5  whatever information was put in front of them to prescribe the

6  medication without referring to things such as the DSM to make

7  a proper diagnosis.

8      So the ASRS, even though it was only part of it, the

9  clinician was using that to issue a prescription to a patient

10  without completing a full diagnosis.

11  **Q.**  And what did clinical leadership tell Defendant He about

12  how that related to the short amount of time for initial

13  appointments?

14  **A.**  That to get through a full diagnostic, the visit time

15  needed to be longer.

16  **Q.**  Going to Exhibit 789, did a collaborating physician write

17  about concerns in regards to prescriptions a nurse had

18  prescribed to patients (as read):

19      "Like John Hopping, 51-year-old on chronic

20      testosterone supplements and anabolic steroids and is

21      being prescribed a stimulant.  Anabolic steroids add

22      fuel to the fire.  If this patient is having

23      difficulties concentrating at work, then he needs to

24      stop juicing up"?

25  **A.**  Yes.

1  **Q.**  And in regards to Brenda Hill (as read):

2  "61-year-old with opioid abuse problems on

3  Vicodin three times a day, also getting Adderall 20

4  milligrams BID.  I will not contribute to her

5  addiction problems"?

6  **A.**  Yes.

7  **Q.**  Did he go on to say (as read):

8  "I do not understand why there is a preference

9  specifically for Adderall, a substance that is so

10  addictive that has a high risk for diversion, high

11  risk for misuse.  I do not see patients being tried

12  on non-stimulants.  ADHD prescribing is a science,

13  not just a 'here is your Adderall'"?

14  **A.**  Yes.

15  **Q.**  Did Done offer non-stimulants or other modalities to treat

16  ADHD?

17  **A.**  No.

18  **Q.**  And what was your understanding of why, from your

19  conversations with Defendant He?

20  **A.**  Well, I was always told that stimulants were the first

21  choice for treatment of ADHD.  However, it also was what

22  patients were seeking, so that is what was prescribed to keep

23  the patients happy.

24  **Q.**  Now, did -- was Defendant He made aware that there were

25  prescribers like Erin Kim who weren't seeing their patients?

1    **A.**    Yes, she was.

2         **MR. FOSTER:**  And if we can go to Exhibit 662 at

3    page 9, Ms. Braga.

4    **BY MR. FOSTER:**

5    **Q.**    Did you write to an employee (as read):

6         "If I suspected Erin Kim was doing illegal

7         activity and needed to off-board her, is that even

8         possible"?

9    **A.**    I did.

10         **MR. FOSTER:**  And if we can go to page 11, Ms. Braga.

11   **BY MR. FOSTER:**

12   **Q.**    Did you write (as read):

13         "Every single one of her notes is identical.

14        Copy and paste.  Absolutely zero deviation"?

15   **A.**    Yes, I did.

16         **MR. FOSTER:**  And if we can go to page 10 of

17   Exhibit 662.

18   **BY MR. FOSTER:**

19   **Q.**    Did Ms. Faber respond (as read):

20         "I actually think we can do it if the providers

21        accept the transfers"?

22   **A.**    Yes, she did.

23   **Q.**    Did you tell Defendant -- well, did clinical leadership

24   and you tell Defendant He that Erin Kim should be fired for

25   illegal prescribing?

1   **A.**   Yes, they did.

2   **Q.**   Can you explain to the jury what her reaction was when you

3   talked to her about that?

4   **A.**   It was very dismissive.  A -- the response was can't we

5   just talk to her and get her to stop doing that.

6       And there was a review of her total patient panel through

7   the provider dashboard showing thousands and thousands of

8   patients under Erin Kim, and so it was a negative -- or it was

9   negative suggestion to have her removed because it would have

10  potentially meant a loss -- a massive loss of recurring

11  revenue.

12  **Q.**   You say there was a review of her patient dashboard.  Who

13  reviewed the patient dashboard?

14  **A.**   Ruthia and I did together in a Zoom call.

15  **Q.**   And in the Zoom call, what did Defendant He say about Erin

16  Kim's number of patients?

17  **A.**   That she's a great provider because she has so many

18  patients.

19  **Q.**   Did she appear to care that Erin Kim was not seeing them

20  and not providing an individualized clinical basis for the

21  prescriptions?

22  **A.**   No, she did not.

23  **Q.**   Was this a problem just with Erin Kim, or was it similar

24  with other prescribers with large panels?

25  **A.**   It was similar with other providers with large panels.

1   **Q.** Can you tell the jury about some of them who the

2   clinicians identified as prescribing too highly and not seeing

3   patients?

4   **A.** Yes. So Yina Cruz is a clinician. Elizabeth Shapard.

5   There were some collaborating physicians, Dr. Eric Miller,

6   Dr. Christopher Lucchese. There was Dr. Jonathan Decker that

7   was also on the list that was flagged, and I -- I'm pretty

8   confident in a few others in Texas that I -- Sussan actually

9   had a very large panel as well as a provider with the first

10  name of Titi. I do not recall her last name.

11  **Q.** And did you become aware of Erin Kim trying to quit Done

12  in November of 2022?

13  **A.** I did.

14  **Q.** Can you tell the jury what Defendant He did and what Nurse

15  Barker's reaction to it was?

16  **A.** Yes. So when Erin Kim decided to leave, both Ruthia had

17  roped in Sussan Nwogwugwu, who was another clinical leadership

18  team member, to go and actually convince her to stay, to speak

19  with her in one-on-one conversations and convince her to stay.

20  I don't recall -- there was some discussion about a different

21  compensation model for Erin Kim to keep her on board that was

22  shared, but I don't recall it right now.

23      And when it was mentioned that they were going to be

24  speaking with Erin Kim, Sarah Barker put Why are we doing this?

25  What's the point? She's a bad provider. She's not even seeing

1    her patients.

2         And Ruthia responded and said, I just need you to be nice,

3    basically.  There's no need to be mean.

4    **Q.**  Did Sarah Barker and others in clinical leadership

5    advocate for Done to adopt enforceable policies that required

6    longer initial appointments and a regular cadence of

7    follow-ups?

8    **A.**  Yes.

9         **MR. FOSTER:**  Your Honor, we'd move to admit

10   Exhibits 602, 646, 647, 651, 656, 721, 738, and 931.

11        **THE COURT:**  Admitted.

12        (Trial Exhibits 602, 646, 647, 651, 656, 721, 738, and 931

13   received in evidence.)

14        **THE COURT:**  Ladies and gentlemen, we will take our

15   recess now.  We'll be in recess until a quarter of 11:00.

16        Remember the admonition given to you:  Don't discuss the

17   case, allow anyone to discuss it with you, form or express any

18   opinion.

19        We're in recess.

20                    (The jury leaves the courtroom.)

21        (Proceedings were heard out of the presence of the jury.)

22                    (Recess taken at 10:27 a.m.)

23              (Proceedings resumed at 10:51 a.m.)

24        (Proceedings were heard out of the presence of the jury.)

25        **THE COURTROOM DEPUTY:**  Come to order.  Court is now in

1    session.

2              **THE COURT:**  Okay.  Bring them in.

3                   (The jury enters the courtroom.)

4         (Proceedings were heard in the presence of the jury.)

5              **THE COURT:**  Okay.  Please be seated.

6         Let the record reflect all jurors are present.  Our

7    parties are present.

8         You may proceed.

9              **MR. FOSTER:**  Thank you.  Ms. Braga, can we pull up

10   Exhibit 651.

11   **BY MR. FOSTER:**

12   **Q.**   Did Nurse Barker write to both defendants raising concerns

13   with Done's practices?

14   **A.**   Yes, she did.

15   **Q.**   What was the first concern she raised?

16   **A.**   The brief appointment times.

17   **Q.**   The second?

18   **A.**   Having no set follow-up standards.

19   **Q.**   The third?

20   **A.**   Having no follow-up appointment pay and how that

21   influences providers.

22   **Q.**   The fourth?

23   **A.**   Huge patient panels and how that reflects the quality of

24   care.

25   **Q.**   The fifth?

1    **A.**   Having no clinical guidelines definitively rolled out or

2    available.

3    **Q.**   The sixth?

4    **A.**   Having no suicide or emergency protocols.

5    **Q.**   The eighth?

6    **A.**   Having no standardized comprehensive documentation format.

7    **Q.**   The ninth?

8    **A.**   Having patients that have -- that are being prescribed

9    over FDA limits the stimulant medications.

10   **Q.**   The tenth?

11   **A.**   Explaining our auto-refill process and if that plays

12   against overall safety.

13   **Q.**   What did she then tell both defendants about legitimate

14   literature?

15   **A.**   That there's no legitimate literature to support Done's

16   practices.

17   **Q.**   What did she say about whether Done's practices went

18   against legitimate literature?

19   **A.**   That they went against what was out there.

20   **Q.**   What was Nurse Barker's recommendation?

21   **A.**   Well, to handle these and to fix them, so having our own

22   policies and procedures manual and other things.

23   **Q.**   Was that the same thing you had been pushing for since you

24   got there?

25   **A.**   It was.

1    **Q.**    And what did Nurse Barker say would happen if someone

2    tried to defend Done's practices?

3    **A.**    They couldn't.

4    **Q.**    And did she say here that (as read):

5            "It honestly may be better to not try to defend

6            or support some of our current practices because I

7            think we may wind up getting eaten alive"?

8    **A.**    Yes, she did.

9    **Q.**    How did you understand that?

10   **A.**    Well, depending on who got them, it would have meant that

11   Done could implode.

12   **Q.**    Well, was there a defense for what Done was doing in terms

13   of the practice of medicine?

14   **A.**    There was not.

15   **Q.**    Had these issues repeatedly been raised with Defendant He

16   since you arrived in October of 2021?

17   **A.**    By myself and others, yes.

18           **MR. FOSTER:**  Can we go to Exhibit 656 at page 3.

19   **BY MR. FOSTER:**

20   **Q.**    Did Defendant Brody respond by referencing e-mails he had

21   created which he said were not very formal?

22   **A.**    Yes, he did.

23   **Q.**    Did he say (as read):

24           "They are intended for use by clinicians, not

25           for showing that we are trying to satisfy every whim

1    of the powers that be, whether these be regulatory or

2    the fourth estate"?

3  **A.**   Yes.

4  **Q.**   And were these things regularly distributed to clinicians

5  that Defendant Brody wrote?

6  **A.**   Not to my knowledge.

7        **MR. FOSTER:**  And if we can go zoom out, Ms. Braga, and

8  look at what he wrote about frequency of follow-up visits.

9  **BY MR. FOSTER:**

10 **Q.**   Did Defendant Brody write (as read):

11       "In a typical adult community mental health

12       clinic, the default frequency for pharmacological

13       management is every four weeks"?

14 **A.**   Yes, he did.

15 **Q.**   Did he go on to say that at Done he believed (as read):

16       "A default visit frequency of every three months

17       was the appropriate standard of care"?

18 **A.**   He did write that, yes.

19       **MR. FOSTER:**  If we can go to page 5 of Exhibit 656.

20 **BY MR. FOSTER:**

21 **Q.**   Did Nurse Barker respond to Defendant Brody, saying at the

22 top (as read):

23       "David Brody.  I agree that Q3 to 6 months is

24       appropriate follow-up, but unfortunately, not many of

25       our providers do that because they don't get paid.

1    I've been asked to do bridge refills for some

2    patients who haven't been seen for almost two years,"

3    triple exclamation point?

4 **A.**   Yes, she did.

5 **Q.**   Was Defendant Brody signing prescriptions for patients who

6 had never seen -- who hadn't been seen for far longer than six

7 months?

8 **A.**   Yes, he was.

9 **Q.**   And was he signing prescriptions for states that he was

10 required to be licensed in but was not licensed in?

11 **A.**   Yes.

12 **Q.**   Now, did Defendant He also respond to Nurse Barker's

13 message?

14 **A.**   She did.

15    **MR. FOSTER:**  Can we pull up Exhibit 931.

16 **BY MR. FOSTER:**

17 **Q.**   Now, did Defendant He write things like (as read):

18    "The quality of the appointment matters more

19    than its length"?

20 **A.**   Yes.

21 **Q.**   And did she write (as read):

22    "The structure to only pay for synch follow-up

23    will disencourage the providers to be responsive"?

24 **A.**   Yes.

25 **Q.**   And did she say that (as read):

1        "Done's approach enabled providers to serve more

2      patients while at the same time taking safety

3      measures more strict than traditional hospitals"?

4  **A.**  Yes.

5  **Q.**  And how was this similar to the talking points that

6  Defendant He used with investors and pharmacies and external

7  parties?

8  **A.**  Well, they were -- they weren't true.  They were lies

9  about Done and the way that it operated.  We weren't safer than

10  hospitals.

11  **Q.**  And were the quality of appointments at Done high?

12  **A.**  It was not.

13  **Q.**  Okay.  And it says (as read):

14      "To pay for follow-ups will disencourage the

15      providers to be responsive."

16      What did clinicians tell her about that?

17  **A.**  Well, that it -- just, actually, disencouraged them from

18  going their follow-ups when they should have been doing their

19  follow-ups, and they seeked pay for that and -- and the concern

20  was more related to being responsive to messages and refill

21  requests as opposed to actually holding visits.

22  **Q.**  Did Defendant He appear to care about prescribers having

23  visits as long as they wrote refills?

24  **A.**  No.

25      **MR. FOSTER:**  If we can go to Exhibit 656 at page 5.

BY MR. FOSTER:

Q.   Did Nurse Barker respond (as read):

     "Ruthia He, thank you for your input on some of
     the issues, although I feel your answers are solely
     representing your own opinion or way of justifying
     our processes, which differs heavily from the actual
     perspective and opinions of our providers.  I'd love
     to see any research you have to support these
     decisions and processes, so whenever you get the time
     to share, that'd be great"?

A.   Yes.

Q.   Now, under the law, was it appropriate for Defendant He to
be debating clinical practices with her clinical leadership?

          MS. NECHAY:  Objection, calls for expert opinion.

          THE COURT:  One moment, please.

          MR. FOSTER:  I can lay a foundation, Your Honor, if
you want.

          THE COURT:  Sustained.  Lay a foundation.

BY MR. FOSTER:

Q.   Now, during your time at Done, did you have discussions
with Defendant He about the legal requirements for separating
the clinical practice and the technology practice?

A.   I did.

Q.   And based upon your discussions with her and your
understanding of the legal requirements, was it appropriate for

1  her to be debating clinical practices with her clinical

2  leadership?

3  **A.**   It was not.

4  **Q.**   And did -- Sarah Barker said she would love to see

5  research justifying Defendant He's views and opinions.

6  Did she ever provide any compelling research?

7  **A.**   Not to my knowledge.

8  **Q.**   Now, we can see there Defendant Brody -- he actually liked

9  Nurse Barker's post.

10  Who was the person on paper with the power to change

11  things and put in place all the clinical practices?

12  **A.**   Dr. Brody was.

13  **Q.**   In reality, did the actual perspectives and opinions of

14  clinicians control whether clinical practices were implemented

15  at Done?

16  **A.**   They did not.

17  **Q.**   Who controlled it?

18  **A.**   That was Ruthia.

19  **Q.**   Now, what did Defendant He tell you safe clinical

20  practices would do to retention and growth?

21  **A.**   It would stifle them.

22      **MR. FOSTER:**   Your Honor, we'd move to admit

23  Exhibits 468, 623, 670, 674, 687, 719, 994, 995, 1005, 1006,

24  1013, and 1395.

25      **MR. SCHACHTER:**   Your Honor, we have an objection to

1    1005.

2          **THE COURT:**  Okay.  Wait a minute.  10 -- the last one

3    was --

4          **MR. FOSTER:**  The last one was 1395, and I can lay a

5    foundation with 1005 separately if the Court would prefer.

6          **THE COURT:**  I'm sorry.  The last one was?

7          **MR. FOSTER:**  The last one was 1395, and there was an

8    objection to one exhibit, 1006, which I'm happy to lay a

9    foundation for.

10          **THE COURT:**  Okay.  Lay a foundation.  The others are

11    all admitted.  Lay a foundation for 1005.

12          (Trial Exhibits 468, 623, 670, 674, 687, 719, 994, 995,

13    1006, 1013, and 1395 received in evidence.)

14    **BY MR. FOSTER:**

15    **Q.**  Okay.  Now --

16          **MR. FOSTER:**  And I'll get there in a minute in the

17    sequencing if that's okay, Your Honor.

18          **THE COURT:**  Yes.

19          **MR. FOSTER:**  Thank you.

20    **BY MR. FOSTER:**

21    **Q.**  In June 2022, did the media attention and prescribers

22    quitting create a backlog of refills?

23    **A.**  It did.

24    **Q.**  And what did Defendant He want to be done with those

25    refills and whether a patient should be seen?

1   **A.**   Well, refills should just be sent out was the directive,

2   and it did not matter if the patient was seen or not.

3   **Q.**   What did Defendant He offer on a per-prescription basis?

4   **A.**   For some prescribers, they were offered a dollar amount

5   per prescription being sent out.

6   **Q.**   What was your view on whether that was appropriate?

7   **A.**   I disagreed with the practice of it unless the prescriber

8   was the supervising physician for those nurse practitioners.

9   **Q.**   And did Defendant Brody and lots of other prescribers sign

10  prescriptions for patients who never had a follow-up visit

11  before the prescription?

12  **A.**   Yes.

13  **Q.**   How big was this prescription backlog?

14  **A.**   Thousands.

15  **Q.**   And how big of it was it -- how big of a concern was it?

16  **A.**   It was a major concern for -- it was talked about every

17  day.

18         **MR. FOSTER:**   Can we pull up Exhibit 6186, Ms. Braga.

19  BY MR. FOSTER:

20  **Q.**   And was this an e-mail sent out about a six-month policy?

21  **A.**   It was.

22  **Q.**   How was the ability to send this e-mail influenced by

23  patient complaints and the refill backlog?

24  **A.**   Sorry.  I didn't understand the question.

25  **Q.**   How was the ability to send this policy out influenced by

1  patient complaints?

2  **A.**   We had to do it kind of in the dark of night.  We had to

3  get this policy sent out because it would have contradicted the

4  directive that we received to just send prescriptions out.

5  **Q.**   And how was that influenced during this moment by patients

6  complaining about not getting their refills?

7  **A.**   Well, it was counteracted and -- by patient complaints

8  because patients weren't receiving their refills, so there was

9  actually a secondary task related to this for the -- where it

10  was removed.

11  **Q.**   Okay.

12       **MR. FOSTER:**  And so can we pull up Exhibit 1006,

13  Ms. Braga.

14  **BY MR. FOSTER:**

15  **Q.**   If we can look at page 3.  After this policy was sent out,

16  did Defendant He complain that she thought a six-month

17  follow-up may result in more complaints and lower retentions?

18  **A.**   Yes, she did.

19  **Q.**   And did she say that she created --

20       **MR. FOSTER:**  If we can go to page 6, Ms. Braga.

21  **BY MR. FOSTER:**

22  **Q.**   -- an Asana task --

23       **MR. FOSTER:**  Or page 4.  Excuse me.

24  **BY MR. FOSTER:**

25  **Q.**   (as read):

1          "I created a task here, patient cannot get

2      refills after no-show for follow-ups"?

3   A.   Yes.

4   Q.   And did you become familiar with that Asana task?

5   A.   I did.

6          MR. FOSTER:  Your Honor, we'd move to admit

7   Exhibit 1005, the Asana task.

8          THE COURT:  Admitted.

9      (Trial Exhibit 1005 received in evidence.)

10         MR. FOSTER:  Can we pull up Exhibit 1006, Ms. Braga.

11  BY MR. FOSTER:

12  Q.   Is this a task that Defendant He created that said (as

13  read):

14         "Problem:  Patient cannot get refills after

15      no-show for follow-ups.  What will get improved if

16      the problem is solved?  Less patient complaints,

17      higher retention"?

18  A.   Yes.

19         MR. FOSTER:  And can we pull up Exhibit 1013,

20  Ms. Braga.  And if we can zoom in on this.

21  BY MR. FOSTER:

22  Q.   Did you respond to the Asana task that Defendant He

23  created?

24  A.   I did.

25  Q.   And looking at the bottom, did you say (as read):

1          "We should indicate that they're going to stop

2      receiving their refills if they miss their follow-up

3      appointment"?

4  **A.**    I did.

5  **Q.**    What happened here?

6  **A.**    Well, ultimately the patients were able to continue to get

7  their refills even if they didn't schedule or try to reach out

8  for a six-month follow-up.

9  **Q.**    Was there any enforcement of the six-month follow-up?

10 **A.**    No.  There was nothing built into the EHR related to that.

11 **Q.**    How did Defendant He use her control of engineering at

12 Done to block enforcement of the six-month policy?

13 **A.**    So for this one specifically, there was a directive not to

14 build out a six-month hard stop in the EHR where the patient

15 would essentially be blocked from requesting refills until they

16 had a follow-up, which is what we requested to be built, and

17 only things that were approved by Ruthia could be built.

18 **Q.**    Can you tell the jury what happened in November 2022 when

19 Defendant He found out that prescribers about being paid for

20 follow-ups and transfers?

21 **A.**    She voided the payroll for the providers.

22         **MR. FOSTER:**  Ms. Braga, can we bring up Exhibit 995.

23 And can we go to page 2.

24 **BY MR. FOSTER:**

25 **Q.**    You said that Defendant He voided the payroll for people

1    getting paid for follow-ups and transfers.

2        Did she do that after being told that clinicians thought

3    they would -- payment was necessary for them to do them?

4    **A.**    Yes.

5            **MR. FOSTER:**    Can you zoom in, Ms. Braga, on the

6    language "could you confirm."

7    **BY MR. FOSTER:**

8    **Q.**    Were clinicians telling Defendant He that a lot of the

9    providers did not feel comfortable going off the previous

10   provider's notes, so they needed to have at least 25-minute

11   initial appointments?

12   **A.**    Yeah, multiple times.

13           **MR. FOSTER:**    And can we pull up Exhibit 994 at page 2.

14   **BY MR. FOSTER:**

15   **Q.**    Did Defendant He order them not to be paid anyways?

16   **A.**    She did.

17   **Q.**    So did she write (as read):

18           "Six-month follow-up.  A video follow-up at six

19       month won't result in additional compensations"?

20   **A.**    Correct.

21   **Q.**    (as read):

22           "25-minute follow-up won't result in additional

23       compensations.  The only exception is a patient paid

24       video follow-up"?

25   **A.**    Yes.

1    Q.   So would a patient have to pay if they wanted a follow-up?

2    A.   Yes.

3    Q.   Did she write (as read):

4         "Complex patient follow-up won't result in

5    additional compensations"?

6    A.   Yes.

7    Q.   Did she write (as read):

8         "Transfer patients compensated as a 15-minute

9    video visit.  You can conduct as many video

10   follow-ups at any lengths based on different

11   patients' individual conditions, but they won't

12   result in additional compensations"?

13   A.   Yes.

14   Q.   You mentioned she voided payroll.

15        MR. FOSTER:  Ms. Braga, can we bring up Exhibit 2996.

16   BY MR. FOSTER:

17   Q.   Were clinicians sent e-mails that Done had noticed a

18   calculation mistake and not paying them for follow-up and

19   transfer visits?

20   A.   Yes, they were.

21   Q.   Calculation mistake -- was that a lie by Defendant He?

22   A.   It was a lie.

23   Q.   Can you explain that to the jury?

24   A.   So providers were being compensated for the total time of

25   transfer appointments, which was 25 minutes.  We treated it as

1    a new initial visit for that patient, essentially, because it

2    was the first time they were meeting with that provider.

3        And when that was noticed by Ruthia, the payroll was

4    voided and dropped down to the 15-minute window of time, even

5    though the providers had spent 25 minutes at minimum with those

6    patients.

7        And so it wasn't a mistake.  Those providers spent that

8    time with those patients.

9    **Q.**    And as a result, did providers continue to sign

10   prescriptions without seeing patients for months or even years?

11   **A.**    Yes.

12   **Q.**    Now, turning to the top of advertising, did you come to

13   learn that Defendant He was targeting drug seekers with

14   advertisements?

15   **A.**    I did.

16        **MR. FOSTER:**  We'd move to admit Exhibit 962, Your

17   Honor.

18        **THE COURT:**  Admitted.

19        (Trial Exhibit 962 received in evidence.)

20   **BY MR. FOSTER:**

21   **Q.**    And so in response to a media inquiry, was a message

22   circulated about promotional advertisements and keywords that

23   Done was using?

24   **A.**    It was.

25        **MR. FOSTER:**  And can we go to page 9 of Exhibit 962.

1    BY MR. FOSTER:

2    Q.    So was Done doing keyword advertising for phrases like

3    "Buy Adderall," "Buy Adderall online," "Buy Ritalin online,"

4    and other phrases relating to the purchase of Adderall?

5    A.    Yes.

6          MR. FOSTER:    And can we go to page 11 of 962.

7    BY MR. FOSTER:

8    Q.    Was it also advertising for phrases like "Order Adderall

9    without prescription"?

10   A.    Yes.

11   Q.    And can you explain what keyword advertising was and how

12   these keywords advertisings worked?

13   A.    So this was specific to Google search engine, and you

14   could purchase the order -- or you could bid to have the

15   highest payment back to Google if they clicked on your link

16   using the keywords that were purchased.    And so any time

17   someone were to search this, Done would have been either the

18   first or second option available to people that searched it on

19   Google because it was purchased.

20   Q.    And I think there was one I didn't mention, but we saw

21   advertisements for things like the color of pills, like "blue

22   Adderall pill."

23         Can you explain to the jury your understanding of why that

24   was promotional?

25   A.    Well, that was promotional.    I don't recall the specific

1   dose of Adderall, but it was a specific one that was common,

2   and so others would understand Adderall to be a blue pill and

3   they could search for that so that they could get it.

4   **Q.**   What did you tell Defendant He about these keyword

5   advertisements?

6   **A.**   I requested on multiple occasions that we stop advertising

7   the drug name or pictures of pill bottles or pictures of pills.

8   **Q.**   What did Defendant He tell you?

9   **A.**   No, those were the highest-converting advertisements, so

10  they served the business purpose.

11  **Q.**   How much was Done spending on advertising?

12  **A.**   It varied.  Anywhere -- millions per month.

13  **Q.**   Millions per month on advertising.  Did that give you

14  concern?

15  **A.**   It did.

16  **Q.**   Can you explain to the jury why?

17  **A.**   Well, we were throwing money at advertising on all

18  different platforms regularly, but we weren't willing to invest

19  in patient safety or quality of care or even pay our providers

20  a little bit more to spend more time with them -- with the

21  patients.

22       And it definitely felt that the priority of patient safety

23  and patient first was actually just get patients in, have them

24  pay a fee, get the drugs out the door as opposed to providing

25  high-quality care.

1  **Q.**  What, if any, concern did you have about abuse and

2  diversion?

3  **A.**  I was concerned particularly about the diversion of

4  Adderall.  From even being in college myself, I understood that

5  it was often easy for you to identify -- if you identified one

6  person in college that had the prescription, you could ask them

7  to purchase a pill, and I had been prescribed Adderall in

8  college and kids had approached me for that.  So it was

9  something that I was worried about pretty significantly.

10  **Q.**  Now, after you raised concerns about advertising, what did

11  Defendant He do in terms of your involvement in advertising

12  decisions?

13  **A.**  I was removed.

14  **Q.**  How did that relate to Defendant He's emphasis on loyalty?

15  **A.**  It was -- any time you got completely siloed or removed

16  from something, it meant that your -- according to her, your

17  loyalty was -- was fading, and so I was at that point

18  definitely fearful for my job as well as the job of others.

19  **Q.**  Turning to Defendant He's involvement in clinical

20  diagnoses, did Defendant He tell prescribers not to use the

21  DSM-5 criteria?

22  **A.**  Yes.

23      **MR. FOSTER:**  Your Honor, we'd move to admit Exhibits

24  606, 631, 666, 725, and 966.

25      **MR. SCHACHTER:**  Your Honor, we have an objection to

1    606.

2          MR. FOSTER:  I can lay a foundation for that, Your

3    Honor.

4          THE COURT:  All right.  With the exception of 606, all

5    the exhibits are admitted.

6       (Trial Exhibits 631, 666, 725, and 966 received in

7    evidence.)

8          MR. FOSTER:  Ms. Braga, can we bring up 606 just for

9    the witness.

10   BY MR. FOSTER:

11   Q.   Do you recognize Exhibit 606?

12   A.   I do.

13   Q.   And did you create an e-mail address, Done Executive

14   Leadership, leadership@donefirst.com?

15         MR. SCHACHTER:  Your Honor, I withdraw the objection.

16         THE COURT:  Okay.  Admitted.

17      (Trial Exhibit 606 received in evidence.)

18         MR. FOSTER:  And can we publish?

19   BY MR. FOSTER:

20   Q.   Now, did a clinician, a former --

21        Well, did you and Defendant He, after there was media

22   attention and it was reported that a federal grand jury was

23   investigating Done's competitors, prepare an e-mail to be sent

24   out?

25   A.   Yes.  Below the message being shown to me was the e-mail

1    that was sent out.

2    **Q.**   And did that track generally the talking points we've seen

3    used about Done being compliant?

4    **A.**   It did.

5    **Q.**   And did a former clinician respond to that?

6    **A.**   She did.

7    **Q.**   And did she write, in part (as read):

8         "When I finally realized this whole thing was

9         crazy is when I expressed concerns that patients were

10        not being screened out when they had replied they

11        have not had the symptoms before 12.  For all intents

12        and purposes, there are people wondering if they have

13        ADHD; right?

14        "I was met with a reply from Ruthia that in her

15        experience, that is not always the case.  Well,

16        I guess she knows better than the APA, so maybe we

17        should change the DSM.  Oh, wait.  Done had their own

18        DSM, as we were encouraged to trial patients on

19        medication even if they did not meet full criteria."

20        She did respond with that

21   **Q.**   Did Defendant He have any medical qualifications to tell

22   prescribers not to use the DSM-5?

23   **A.**   No.

24   **Q.**   And what did prescribers -- what did clinicians tell

25   Defendant He about whether the DSM-5 needed to be followed?

1    A.    Multiple clinicians raised concern that it did need to be

2    followed.

3              MR. FOSTER:  Can we bring up Exhibit 631.

4    BY MR. FOSTER:

5    Q.    Did clinical leadership --

6          Is this a message from Michelle Huynh, an employee at

7    Done, to you?

8    A.    Yes.

9              MR. FOSTER:  And if we can zoom in on the message at

10   the bottom, Ms. Braga.

11   BY MR. FOSTER:

12   Q.    Did she write (as read):

13              "Sarah helped put together a template that

14         medical leadership approved.  Ruthia is refusing to

15         change it"?

16   A.    Yes.

17   Q.    How did that relate to the DSM-5?

18   A.    The template that Sarah had put together with the

19   assistance of other clinicians as well had all the criteria for

20   ADHD diagnosis that was outlined in the DSM-5 built into it, in

21   addition to being a compliant note format for billing to

22   insurance and following CMS guidelines.

23   Q.    Was that ever implemented?

24   A.    It was not.

25   Q.    Who blocked it?

1   **A.**   Ruthia did.

2   **Q.**   Did there come a time when Good Morning America broadcast

3   a segment on Done?

4   **A.**   Yes.

5   **Q.**   Did you and Defendant He discuss watching the segment?

6   **A.**   We did.

7          **MR. FOSTER:**   Your Honor, we'd move to admit 766 and

8   2858.

9          **THE COURT:**   766 and --

10         **MR. FOSTER:**   2858.

11         **THE COURT:**   -- 2858 admitted.

12     (Trial Exhibit 766 received in evidence.)

13         **MR. SCHACHTER:**   May I just speak to Government counsel

14   for one second?

15         **MR. FOSTER:**   Sure.

16              (Counsel conferring.)

17         **MR. SCHACHTER:**   May I have just a moment, Your Honor?

18         **THE COURT:**   Sure.

19              (Pause in proceedings.)

20         **MR. SCHACHTER:**   Your Honor, there is a video I

21   believe --

22         **THE COURT:**   I'm sorry.  Could you speak in the

23   microphone.

24         **MR. SCHACHTER:**   Yeah.  We have an objection to this on

25   a 403 issue.  Perhaps we can take it up at the lunch break.  I

1  was unaware that this was the intent of the Government.

2  **MR. FOSTER:**  Your Honor, this goes to notice.  He said

3  they both watched the video, so it should come in with a

4  limiting instruction.  It's not coming in for the truth; it's

5  coming in for notice and intent of the defendants.

6  **THE COURT:**  Well, I guess my question is can we --

7  well, let's start this way:  How much longer do you have with

8  this witness?

9  **MR. FOSTER:**  I'm going to finish before lunch,

10  I believe, Your Honor, so maybe 20 minutes.

11  **THE COURT:**  Okay.  So why don't we do this:  Why don't

12  you -- when you finish with this witness with the exception of

13  this exhibit, let's take our luncheon recess and we can discuss

14  it.

15  **MR. SCHACHTER:**  Thank you, Your Honor.

16  **THE COURT:**  Thank you.  And this is Exhibit Number

17  what?

18  **MR. FOSTER:**  2858.

19  **THE COURT:**  Okay.

20  **MR. FOSTER:**  Ms. Braga, can you bring up Exhibit 766.

21  BY MR. FOSTER:

22  **Q.**  Is this an e-mail that you and Defendant He received about

23  the Good Morning America video?

24  **A.**  It is.

25  **Q.**  And in the e-mail, does it describe a Good Morning America

1  episode that involved tests of your online telemedicine

2  services by three volunteers?

3  **A.**    It does.

4  **Q.**    And did it say they took place under the supervision of an

5  expert?

6  **A.**    Yes.

7      **MR. FOSTER:**  If we can scroll down, Ms. Braga.

8  **BY MR. FOSTER:**

9  **Q.**    Did it discuss how volunteers who signed up for services

10  on the Done platform included those who had never been

11  diagnosed with ADHD and never had the condition?

12  **A.**    Yes.

13  **Q.**    And did the clinician at Done just offer the volunteer,

14  this e-mail reports, a choice of controlled substances?

15  **A.**    Yes.

16  **Q.**    And did the test patient describe (as read):

17      "It felt like I was at a candy store and just

18      could pick whichever one I wanted"?

19  **A.**    Yes.

20  **Q.**    And did the expert state (as read):

21      "I've never seen anything like that in my entire

22      career"?

23  **A.**    She did, yes.

24  **Q.**    Now, as a result of this video, did Done face consequences

25  for its pharmacy partnerships and its LegitScript

1  certification?

2  **A.**    It did.

3  **Q.**    Did Defendant He want to change any of Done's practices or

4  did she want to continue them?

5  **A.**    She wanted to continue them.

6  **Q.**    And what did you and Defendant He do in terms of

7  LegitScripts and the pharmacies?  Did you tell the truth about

8  the medication trial policy or did you lie?

9  **A.**    We lied.  We maintained the party line.

10  **Q.**    And why did you maintain the party line?

11  **A.**    Done would crumble had the party line been broken, and it

12  was the directive I received.

13        **MR. FOSTER:**  Ms. Braga, can you pull up Exhibit 1017,

14  and can we go to page 2, please.

15  **BY MR. FOSTER:**

16  **Q.**    Was part of the media response to claim that the

17  technology platform and the clinical practices were separate?

18  **A.**    That was part of the strategy, yes.

19  **Q.**    And was that part of the strategy in response to the Good

20  Morning America episode?

21  **A.**    It was.

22  **Q.**    And did Nurse Barker write to Defendant He and others that

23  (as read):

24            "This strategy of claiming there was separation

25        between the tech side and the clinical side was wrong

1  because if Done is truly just a technology platform

2  providing just a vehicle for providers to deliver

3  care, then each provider should be able to determine

4  their own pricing, clinical practices, prescreening

5  questions, scheduling/hours, visit time lengths,

6  follow-up regimens, et cetera, et cetera.  But the

7  company does stipulate all those things, so there is

8  definitely not this defined separation that the

9  response tries to portray"?

10  **A.**  Yes.

11  **THE COURT:**  Sorry, but is 1017 in evidence?

12  **MR. FOSTER:**  Was it not on my list?  I apologize, Your

13  Honor.

14  **THE COURT:**  Well, it may have been on your list.  I

15  don't think it made my list.

16  1017 admitted.

17  (Trial Exhibit 1017 received in evidence.)

18  **THE COURTROOM DEPUTY:**  Thank you.

19  **MR. FOSTER:**  My fault, Your Honor.  I apologize.

20  **BY MR. FOSTER:**

21  **Q.**  Did Defendant He acknowledge (as read):

22  "That's a good point.  From the tech side, there

23  is a hard limit on providers' clinical practices"?

24  **A.**  Yes.

25  **Q.**  Did she go on to say, though (as read):

1           "The tech platform" --

2       Or did she go on to say --

3           **MR. FOSTER:**  If we go to page 3, Ms. Braga.

4   BY MR. FOSTER:

5   **Q.**   (as read):

6           "However, some providers who are used to

7       traditional practices without getting enough

8       education and understanding of digital health and how

9       our platform is set up to help them may insist on

10      practicing in the old and inefficient way they have

11      been used to"?

12      And did Nurse Barker respond (as read):

13          "Ah, thanks for that explanation.  I will be

14      sure to direct any providers with concerns, then, to

15      you so you can better educate them on digital

16      healthcare and the new, more efficient ways to

17      practice rather than the old and inefficient

18      standards of practice we were taught in school"?

19  **A.**   Yes.

20  **Q.**   Can you tell the jury whether anything changed in terms of

21  Defendant He's control of the clinical practices after this?

22  **A.**   Nothing changed.

23  **Q.**   Now, I want to turn to pharmacies.  Did Defendant He offer

24  you equity in the company to focus on pharmacies instead of

25  interfering in her control of clinical practice?

1    **A.**    Yes.

2          **MR. FOSTER:**  Your Honor, we'd move to admit

3    Exhibits 601, 602, 607, 621, 622, 641, 665, and 700.

4          **THE COURT:**  Admitted.

5        (Trial Exhibits 601, 607, 621, 622, 641, and 700 received

6    in evidence.)

7          **MR. FOSTER:**  Can we pull up Exhibit 1012, Ms. Braga.

8    BY MR. FOSTER:

9    **Q.**    Now, you're writing here about Done Global bills patient.

10       Can you explain to the jury what you were referring to

11   there?

12   **A.**    Yes.  I was trying to establish how the entities should

13   integrate with one another, and Done Global was the corporate

14   name for Done.

15   **Q.**    And can you explain to the jury what the problem was in

16   how the finances were being treated?

17   **A.**    So the overall issue was that Done Global was just giving

18   money to essentially Done Health PC without actually

19   documenting anything, and then the money was distributed from

20   Done Health PC, but it was wired the day before, and then the

21   providers were paid.  They weren't running as two separate

22   entities, and so I wanted to work to establish that they should

23   be running as two separate entities with their own payroll

24   structures and other financial assets.

25   **Q.**    Who controlled the financial accounts of Done Health PC,

1    Defendant Brody or Defendant He?

2    **A.**    It was Ruthia.

3    **Q.**    And when you wanted to make things compliant, what did she

4    say about disagreement, and how upset was she with you?

5    **A.**    Well, she was upset.  We had previously had a conversation

6    on Zoom related to this, and we disagreed on several things in

7    that conversation.

8        And she wanted -- any time that she disagreed or there was

9    a disagreement on what you were focusing on, she worked to

10   re-prioritize you on what she wanted you to focus on, so she

11   informed me to go back to focusing on pharmacies as opposed to

12   continuing to try and take steps to make the company compliant.

13   **Q.**    What did Defendant He tell you about the importance of

14   pharmacies for the success of Done's business?

15   **A.**    That they were very important.  Without patients getting

16   their prescription, they weren't going to be paying their

17   membership fees.

18   **Q.**    And did you lie to the pharmacies using the similar

19   compliant talking points that Defendant He used with investors

20   and the media?

21   **A.**    I did.

22   **Q.**    Was a fraudulent document sent to pharmacies?

23   **A.**    It was.

24       **MR. FOSTER:**  And so bringing up Exhibit 539 at 1,

25   Ms. Braga.

1          **THE COURTROOM DEPUTY:**  Is that admitted?

2          **MR. FOSTER:**  It was previously admitted.

3     Going to page -- I believe it's 5.

4  **BY MR. FOSTER:**

5  **Q.**   So on patient intake, did this document describe a robust

6  screening practice?

7  **A.**   It did.

8  **Q.**   And in your oral conversations with pharmacies, did you

9  lie to them about Done's screening?

10  **A.**   I did.

11  **Q.**   And how did that relate to the lie that was told to

12  investors by Defendant He?

13  **A.**   It was the same.

14          **MR. FOSTER:**  And if we zoom out and go to page 6.

15  **BY MR. FOSTER:**

16  **Q.**   Did it also falsely portray a rigorous PDMP review

17  process?

18  **A.**   It did.

19  **Q.**   And, you know, when you were talking with pharmacies, did

20  you tell them that Defendant Brody was saying not to worry

21  about going to jail?

22  **A.**   No.

23  **Q.**   Did you tell them about Dr. Brindala's risk mitigation

24  report warning of legal consequences?

25  **A.**   I did not.

**Q.** Did you tell them Ms. Barker, you know, thought Done's practices went against all legitimate literature?

**A.** I did not.

**Q.** Why didn't you tell the pharmacies these things?

**A.** One of the key directives that I received in my role was to maintain the relationships with pharmacies so patients could continue to get their medications, and the way that Done made their money was by patients being able to get their medications from the pharmacies.

**Q.** After Done was blocked by CVS and Walmart, did Defendant He instruct you to recruit other pharmacies partners?

**A.** She did.

**Q.** And did you tell them the truth or did you lie to them?

**A.** I lied to them.

**Q.** And did you also lie about whether CVS and Walmart's actions were justified?

**A.** Yes.

**Q.** Why?

**A.** I was -- very much bought into Done in the mission that I was sold on when I joined the team, and a lot of time I was looking for any way or any reason to discredit the critic, and in this case, the critic was the pharmacies.

And they may not have told me point-blank exactly the concern, but I was finding them all out on my own in the background and wasn't sharing that they were the same.

1   **Q.**   Did these lies allow Done to obtain these new online

2   pharmacies partners?

3   **A.**   It did.

4   **Q.**   And did it prevent those pharmacies from exercising their

5   corresponding responsibility to block Done prescriptions?

6   **A.**   It did.

7   **Q.**   Now, turning to insurance.  Did insurers also notify done

8   that its prescriptions were medically unnecessary?

9   **A.**   They did, yes.

10          **MR. FOSTER:**  Your Honor, we'd move to admit

11  Exhibit 505 and 709.

12          **THE COURT:**  55 what?

13          **MR. FOSTER:**  505 and 709.

14          **THE COURT:**  Admitted.

15          **MR. FOSTER:**  And, Ms. Braga, turning to Exhibit 709 at

16  2.

17          **THE COURT:**  Admitted.

18      (Trial Exhibits 505 and 709 received in evidence.)

19  **BY MR. FOSTER:**

20  **Q.**   Is this a fraud notice that was forwarded to you about a

21  prescriber prescribing in a way that was indicative of

22  prescription drug fraud?

23  **A.**   Yes.

24  **Q.**   What did Defendant He tell you about the importance of

25  insurance coverage to the business?

1    **A.**    Well, patients who had insurance wanted to use their

2    insurance at the pharmacies, and if they weren't able to use

3    their insurance to purchase the medication, then it would

4    ultimately hurt the retention at Done, so the membership would

5    likely be canceled.  So it was very important that they were

6    able to use their insurance at pharmacies.

7    **Q.**    Did Defendant He want to tell insurers the truth about

8    Done's prescription practices?

9    **A.**    No.

10   **Q.**    Did insurers also require that the prescribers be

11   compliant with both state and federal law?

12   **A.**    They did.

13   **Q.**    And was Defendant Brody writing prescriptions in states he

14   was not licensed in?

15   **A.**    He was.

16   **Q.**    And did Defendant Brody also ask support staff to cheat on

17   licensing tests for him?

18   **A.**    Yes.

19        **MR. FOSTER:**  Can we bring up Exhibit 505.

20   **BY MR. FOSTER:**

21   **Q.**    Can you tell the jury what this is?

22   **A.**    This is a Slack message from Anas, who was brought on

23   board to be Dr. Brody's executive assistant for some time, and

24   this is him sending me a copy of Dr. Brody's licensure exam

25   for -- forgive me.  I think it's Missouri for MO.

1    **Q.**   And was Anas a clinical professional?

2    **A.**   He was not.

3    **Q.**   Was he answering licensing tests on behalf of

4    Defendant Brody?

5    **A.**   He was.

6    **Q.**   Did Defendant Brody also authorize the care team to sign

7    documents on his behalf, including prior authorizations?

8    **A.**   Yes, by sharing his DocuSign credentials.

9    **Q.**   Now, turning to obstruction of the government's

10   investigation, after a competitor, Cerebral, received a grand

11   jury subpoena, did you, Defendant He, and others begin to

12   obstruct justice?

13   **A.**   Yes.

14       **MR. FOSTER:**  Your Honor, we'd move to admit

15   Exhibit 603, 696, and 997.

16       **THE COURT:**  Admitted.

17       (Trial Exhibits 603, 696, and 997 received in evidence.)

18   **BY MR. FOSTER:**

19   **Q.**   Did you and Defendant He anticipate that the federal

20   government would begin investigating Done as well?

21   **A.**   We certainly anticipated a government, whether it be

22   federal or state, looking into us, yes.

23       **MR. FOSTER:**  Can we bring up Exhibit 603 at page 2,

24   Ms. Braga.

25   \\\

BY MR. FOSTER:

Q.   Did you write to Defendant He on WhatsApp (as read):

          "We should try to refrain talking about the

     articles and how it relates to us on company

     platforms"?

A.   I did.

Q.   And did you say (as read):

          "If they wanted to, they could subpoena our

     Slack records"?

A.   Yes.

Q.   How did refraining from talking on company platforms like

Slack obstruct a future grand jury investigation of Done?

A.   Well, it -- if it wasn't in Slack, it wasn't easy for the

government to receive or it wasn't produced at all.

Q.   And if we look --

A.   And -- oh, sorry.

Q.   Please continue.

A.   I was just going to add that there were a significant

number of Slack messages that were deleted, which would not

have been produced because they had been deleted.

          MR. FOSTER:   And if we can zoom out and zoom in on

Defendant He's response.

BY MR. FOSTER:

Q.   Did she say (as read):

          "I'll delete the Slack messages"?

1  **A.**  She did.

2      **MR. FOSTER:**  Can you zoom in on that, Ms. Braga.

3  **BY MR. FOSTER:**

4  **Q.**  And did you understand her -- what Slack messages did you

5  understand her to go delete after this?

6  **A.**  We were discussing how the Cerebral investigation could

7  relate to us and the articles related to that, and those were

8  the messages that were deleted.

9      **MR. FOSTER:**  And if we look at Exhibit 997.

10  **BY MR. FOSTER:**

11  **Q.**  Was it reported by an employee of Done to you and

12  Defendant He that (as read):

13      "Cerebral, by ceasing stimulant prescribing and

14      cooperating with the DEA, puts us in the crosshairs

15      for regulators"?

16  **A.**  Yes.

17  **Q.**  And was it suggested to Defendant He that Done should do

18  what its competitors did and stop prescribing stimulants

19  online?

20      Not in the message.  Generally, was that suggested?

21  **A.**  The suggestion was to temporarily stop while we regrouped.

22  **Q.**  And did Defendant He want to do that or did she want to do

23  something else?

24  **A.**  She wanted to continue to grow.

25  **Q.**  And where did Defendant He move operations to, and how did

1  that relate to making evidence harder for the grand jury to

2  obtain?

3  **A.**     So shortly after this, we had an influx of employees

4  joining the company that were out of China that most of our

5  team was unable to communicate with on a regular basis to do

6  our jobs, and that significantly impaired the ability to --

7  well, it would have significantly impaired the ability to

8  retrieve documents and patient charts and other things that

9  were responsive to the subpoena later on.

10  **Q.**     And did these Chinese employees primarily communicate over

11  Slack or did they use other methods of communication?

12  **A.**     They used other methods of communication.

13  **Q.**     What methods of communication?

14  **A.**     I understood them to use WeChat and Signal.

15         **MR. FOSTER:**  Can we pull up Exhibit 696.

16  **BY MR. FOSTER:**

17  **Q.**     Was Defendant He told that moving operations to China was

18  wrong?

19  **A.**     Yes, by many of us.

20  **Q.**     And is this an e-mail from an employee, a former employee,

21  who was terminated, Joe Sanfratello, where he wrote (as read):

22         "Corey also confirmed his concern about such a

23     significant shift to China-based marketing and

24     operations, including shifting money internationally,

25     and previously questioned what the real objective of

1      the company is while acknowledging concern of

2      potential corporate and industry compliance issues as

3      well as possible marketing platform violations"?

4  A.   Yes.

5           MR. FOSTER:  And can we go to page 2.

6  BY MR. FOSTER:

7  Q.   And if we look at the bullets at the bottom, did he write

8  (as read):

9           "So after the gaslighting and blocking and

10      seeing what the real objective from the company is,

11      to sell controlled substances/drugs as quickly as

12      possible, it was clear what the company was really

13      about, especially since Ruthia also informed me,

14      again, that the growth team is to inform the provider

15      teams where there was opportunity for the business to

16      grow and make money, which clearly puts profit over

17      patient care and is a significantly unethical issue

18      currently in the industry and media"?

19  A.   Yes.

20  Q.   And did you agree that Defendant He put profit over

21  patient care?

22  A.   Yes.

23  Q.   He refers to gaslighting.  Who was doing the gaslighting

24  at Done?

25  A.   Ruthia gaslit all of us, most -- multiple times over, on

1    various things.

2        And it was often one data point that was used as the proof

3    point, and you need to follow that one proof point and that was

4    the way that she instructed us to -- to act and work.

5    **Q.**   And what did you find when you investigated what

6    Defendant He told you about whether her proof point was out of

7    context?

8    **A.**   Most of the time it was out of context or off of

9    insufficient conversation with a, you know, one-off clinician

10   or investor.

11   **Q.**   And when you confronted her with that, would she change

12   what she was saying or keep doing the same thing?

13   **A.**   She would keep doing the same thing and push back off

14   asking sometimes for things that simply didn't exist.

15   **Q.**   Now, did there come a time when Done received a grand jury

16   subpoena?

17   **A.**   There did.  Or there was.

18           **MR. FOSTER:**  And, Your Honor, we'd move to admit

19   Exhibit 986, 1389, 2361, and 2362, although that one may have

20   been admitted already.

21           **THE COURT:**  Admitted.

22        (Trial Exhibits 986, 1389, 2361, and 2362 received in

23   evidence.)

24           **MR. FOSTER:**  Thank you.

25   \\\

**BY MR. FOSTER:**

**Q.**    And after Done was subpoenaed, who approved everything that went to the government?

**A.**    Ruthia did.

**Q.**    And after receiving the subpoena, how did Defendant He change her communications in terms of where she discussed company business?

**A.**    She instructed the company to use Signal and message folks on there.

**Q.**    And can you tell the jury what Signal is?

**A.**    Signal is a two-way encrypted communication app similar to WhatsApp or others that allows for conversations to be deleted after a certain set amount of time by the people in the conversation.

**Q.**    And for many of the conversations were something called disappearing messages enabled?

**A.**    It was.

**Q.**    And if disappearing messages were enabled, was it possible to retrieve what was said about company practices?

**A.**    It was not, no.

**Q.**    And after the Wall Street Journal published an article that Done was under investigation, did Defendant He post a blog online stating that there was no formal notice of it?

**A.**    Yes.

**Q.**    And what did you tell her after receiving the grand jury

1  subpoena?

2  **A.**    That we should remove that blog post.

3          **MR. FOSTER:**  And bringing up Exhibit 986.

4  **BY MR. FOSTER:**

5  **Q.**    Did Defendant He tell you to tell others that Done was not

6  under investigation and to deny the existence of the DEA's

7  interest?

8  **A.**    Yes.

9  **Q.**    And did you and others lie to pharmacies and other

10  external partners about it?

11  **A.**    Yes.

12  **Q.**    Now, after Done received the grand jury subpoena, did

13  Defendant He's deletion of Google and Slack accounts increase?

14  **A.**    It did.

15  **Q.**    Can you tell the jury what happened?

16  **A.**    After the subpoena, there was things that I was looking

17  for that I noticed were deleted, and there was also a very

18  large Asana task, which was our project management system, with

19  a list of Google accounts which contained our e-mail files and

20  Google drive, et cetera, so anything the employee really worked

21  on while they worked at Done that were requested to be deleted

22  and that actually the process did start -- the deletion process

23  did start on those, and I was able to log in and stop it and

24  then reported it back to Ruthia that we cannot be deleting

25  these things if they have not been produced yet.

1    **Q.**   And what did Defendant He do after you told her we cannot

2    be deleting things to the government's investigation?

3    **A.**   I was informed that they were not key employees, and so

4    therefore whatever they had in their accounts didn't matter.

5    It wasn't a big deal.  And the accounts ended up getting

6    deleted.

7    **Q.**   Who told you that?

8    **A.**   Ruthia did.

9    **Q.**   And did you tell her that that was wrong because it needed

10   to go to the grand jury?

11   **A.**   I did.  I said every employee's information needed to be

12   produced.

13   **Q.**   Did you go look for the medication trial document in the

14   process of responding to the subpoena?

15   **A.**   I did.

16        **MR. FOSTER:**  And can we bring up Exhibit 13 --

17        Your Honor, we'd move to admit 1392 and 1393.

18        **THE COURT:**  Admitted.

19        (Trial Exhibits 1392 and 1393 received in evidence.)

20        **MR. FOSTER:**  Bring up Exhibit 1392, and can we go to

21   page 4, Ms. Braga.  And can we zoom in on --

22   **BY MR. FOSTER:**

23   **Q.**   What did Defendant He do to the medication trial document

24   on October 4th, 2022?

25   **A.**   It was modified.

1    **Q.**   Was it -- what was deleted?

2    **A.**   I'm sorry.  I can't see very well on the screen.

3            **MR. FOSTER:**  Can we zoom out, Ms. Braga, and zoom in.

4            **THE WITNESS:**  The line relating to patients not

5    meeting full ADHD criteria was removed and that they might be

6    suitable for an alternative or a medication trial.

7    **BY MR. FOSTER:**

8    **Q.**   And how soon after the grand jury subpoena was it that

9    Defendant He went in and deleted this language?

10   **A.**   The subpoena, to my recollection, was September

11   20-something, so it was a few -- few days after.

12   **Q.**   And if this CODA document was produced without the version

13   history after this, what would it show in terms of the

14   medication trial language?

15   **A.**   It would show that it never existed if the version history

16   was not produced.

17   **Q.**   As a result of your concerns --

18           Well, did you have other concerns about Defendant He

19   making documents unavailable for the grand jury?

20   **A.**   I did.  There was a particular production of onboarding

21   documentation, and when I asked her if everything was complete

22   in that, she said yes, and it was produced.  I later found a

23   series of onboarding videos that were previously used for

24   providers.

25   **Q.**   So these were onboarding and training videos?

1    **A.**    Yes.

2              **MR. FOSTER:**  And, Your Honor, we'd move to admit

3    Exhibit 3056.

4              **THE COURT:**  Admitted.

5         (Trial Exhibit 3056 received in evidence.)

6              **MR. FOSTER:**  Can you display that, Ms. Braga.  And so

7    can we zoom in here.

8    **BY MR. FOSTER:**

9    **Q.**    So is this Done's drive under medical operations with

10   training videos?

11   **A.**    It is.

12   **Q.**    Is there a folder "Training Videos (Do Not Share)"?

13   **A.**    Yes.

14   **Q.**    And is that the training videos that you were talking

15   about that weren't produced?

16   **A.**    It is.

17   **Q.**    And as a result of your concerns about obstruction, did

18   you decide to assist the government?

19   **A.**    I did.

20   **Q.**    And did you assist the government in executing a warrant

21   to access Done's systems?

22   **A.**    I did.

23   **Q.**    Were you able to provide the government with all the

24   documents that Defendant He was not producing?

25   **A.**    No, I was not.

**Q.**   Why not?

**A.**   Various reasons.  Some were deleted by the time we got to

actually look.  Others were -- it was time constraint.  I

worked for only two business days retrieving documents and

others.  If I had opened them or logged in to that system, it

would have flagged Ruthia that I was in that system retrieving

things.

**Q.**   And were you trying to avoid her knowing?

**A.**   I was.

       **MR. FOSTER:**  Your Honor, we'd move to admit

Exhibits 243, 1324, 1329, 1330, 1332, 1334, 1335, 1336, 1338,

1348, 1359, 1366, 1371, 1384, 1392 and -93, 1412, 1424, 1426,

1428 through -31, 1438, 1441, 1444 through -59, 1462, 1467,

1472, 1473, 1476, 1479, 1483 and -84 --

       **THE COURT:**  14 what?

       **MR. FOSTER:**  -83 and -84, 1486 and -87, 1489 and 1490,

1493, 30 -- sorry.  3091.

       **THE COURT:**  I'm sorry?

       **MR. FOSTER:**  3091 is the last one. Your Honor.

       **THE COURT:**  3-0-9-1?

       **MR. FOSTER:**  Correct, Your Honor.

       **THE COURT:**  Admitted.

     (Trial Exhibits 243, 1324, 1329, 1330, 1332, 1336, 1338,

1348, 1359, 1366, 1371, 1384, 1412, 1424, 1426, 1428 through

1431, 1441, 1444 through 1459, 1462, 1467, 1472, 1473, 1476,

1  1479, 1483, 1484, 1486, 1487, 1489, 1490, 1493, and 3091

2  received in evidence.)

3  **BY MR. FOSTER:**

4  **Q.**   Now, turning to the question of organizational charts, did

5  the subpoena require Done to provide organizational charts?

6  **A.**   It did.

7        **MR. FOSTER:**  Can we pull up Exhibit 1446, Ms. Braga.

8  **BY MR. FOSTER:**

9  **Q.**   Can you explain to the jury what this is?

10  **A.**   So this is the organizational chart that existed within

11  our HR platform, so it was the way in which people were

12  structured to request time off, they were paid under those

13  people.  Those were their supervisors as it --

14        **MR. FOSTER:**  Sorry, Ms. Braga.  Just stay on 1446.

15  Yes, thank you.

16  **BY MR. FOSTER:**

17  **Q.**   Sorry.  Go ahead.

18  **A.**   So this was essentially the true and accurate

19  organizational chart of Done.

20  **Q.**   Under the true and accurate organizational chart at Done,

21  who did Defendant Brody report up to?

22  **A.**   Up to Ruthia through MJ.

23        **MR. FOSTER:**  And if we can go to Exhibit 1426.

24  **BY MR. FOSTER:**

25  **Q.**   Was an organizational chart prepared to respond to the

1    government's subpoena?

2    **A.**    Yes.  There was a custom one made.

3    **Q.**    You say there was a custom one made.  Can you explain to

4    the jury what you mean?

5    **A.**    So this was -- I forget the platform that it was created

6    in, but this was designed and produced as slides within a PDF

7    that didn't represent what we just saw.

8    **Q.**    And so did this provide a separate organizational chart

9    for Done Global Inc.?

10   **A.**    It did.

11   **Q.**    And was Defendant Brody listed as under Defendant He?

12   **A.**    Not on this one, no.

13   **Q.**    Okay.  And you say a custom one was created.  Who directed

14   its creation?

15   **A.**    Ruthia did.

16       **MR. FOSTER:**  Can we pull up Exhibit 3091.

17   **BY MR. FOSTER:**

18   **Q.**    Was a separate organizational chart prepared for Done

19   Health?

20   **A.**    It was.

21   **Q.**    And how did this differ from the organizational chart that

22   Done actually had?

23   **A.**    It showed that they were separate.

24   **Q.**    And what was your concern about the production of these

25   organizational charts to the government?

1    **A.**   It simply wasn't a true or accurate representation of

2    Done, and the request was true and accurate information.

3    **Q.**   And were you concerned that it was -- that it would

4    obstruct the Government's investigation?

5    **A.**   I was.

6    **Q.**   Now, you said that you had hoped that the defendants would

7    be removed so Done could be turned around.  Why was it -- what

8    prevented you from implementing changes at Done?

9    **A.**   Ruthia and Dr. Brody prevented me from doing so.

10   **Q.**   And when you went to resign, what did Defendant He tell

11   you?

12   **A.**   So in my final phone call with Ruthia, she said if

13   anything happens, I'll take responsibility of it.  If anyone

14   was going to go to jail, it was going to be her.

15       **MR. FOSTER:**  Thank you, Your Honor.  No further

16   questions.

17       **THE COURT:**  Okay.  Ladies and gentlemen, we have one

18   exhibit to deal with.  You may take luncheon hour.  I will see

19   you at 10 to 1:00 .

20       Remember the admonition given to you:  Don't discuss the

21   case, allow anyone to discuss it with you, form or express any

22   opinion.

23       Let's make it 1:00.  1:00.

24       **THE COURT:**  Okay.

25       (Proceedings were heard out of the presence of the jury.)

1          THE COURT:  Okay.  The jury has retired.  There's one

2     exhibit remaining.

3          MR. FOSTER:  May the witness be excused?

4          THE COURT:  Yeah.

5       That's Exhibit 1005?  No.

6          MR. SCHACHTER:  2858, Your Honor.

7          THE COURT:  2858.  Right.  Okay.  Let me look at it.

8     Is it a video?

9          MR. FOSTER:  It's a video, Your Honor.

10         THE COURT:  Why don't you play it.  I mean, I guess I

11    have to look at it; right?

12         MR. SCHACHTER:  If you wish, Your Honor. It's a Good

13    Morning America broadcast, which itself has effectively

14    un-cross-examined testimony from this woman psychiatrist who

15    we've had discussion about is she an expert, is she a

16    percipient witness.  Effectively, this is allowing her to

17    provide her expert testimony through this Good Morning America

18    broadcast.  It is highly prejudicial and it is also cumulative.

19       The Government offered and read in before the jury

20    Exhibit 766, which I'll hand up to the Court, which recounts

21    everything that the Government cares about from this video and

22    in fact, also refers to the psychiatrist on Good Morning

23    America as an expert.

24       So all of this information regarding this broadcast is

25    before the jury, and -- well -- the playing of the broadcast

1  itself, we have significant 403 concerns, particularly given

2  its cumulative nature, given the fact that it's already in the

3  e-mail that has been read to the jury.

4       And we have no ability to cross-examine --

5            THE COURT:  I understand that.

6            MR. FOSTER:  Your Honor, the central question for the

7  jury is the defendant's state of mind -- that's their

8  defense -- and the fact that the defendant watched this video

9  makes the contents highly relevant to her state of mind because

10 it is the contents of the video that show an expert explaining

11 why the prescriptions are outside the usual course.

12           THE COURT:  I'm going to exclude it under that it's

13 cumulative.  However, if the defendant testifies, she can be

14 cross-examined on it.

15           MR. SCHACHTER:  Thank you, Your Honor.

16           THE COURT:  Okay.  Thank you.  We're at lunch.

17                (Discussion off the record.)

18           THE COURT:  I should add you haven't done your cross,

19 so we'll have to watch.  It's always subject to your cross.  If

20 your cross introduces it or introduces the subject matter, then

21 it may be germane.

22           MR. SCHACHTER:  Understood.

23                (Recess taken at 12:01 p.m.)

24                (Proceedings resumed at 1:03 p.m.)

25      (Proceedings were heard out of the presence of the jury.)

1      **THE COURTROOM DEPUTY:**  Come to order.  Court is now in

2   session.

3      You may be seated.

4      **THE COURT:**  Let the record reflect parties are

5   present, jury is not.

6      Yes.

7      **MR. FOSTER:**  Thank you, Your Honor.  There was an

8   issue we wanted to take up before cross-examination.  The issue

9   relates to the waiver and then withdrawing the waiver of

10  privilege.

11     You may recall that the Defense originally waived on the

12  issue of legal advice related to DEA guidance during the

13  pandemic as to the frequency of visits and asynchronous

14  follow-up and then they withdrew that waiver.

15     This witness interacted with Done's attorneys on these

16  issues, and he then spoke to others based upon what attorneys

17  said and what Defendant He told him about what attorneys said.

18     Obviously, the Government has not been able to inquire

19  into this issue because of the withdrawing of the waiver,

20  including what else was told or not told to the lawyers, and so

21  therefore, we don't feel it's an appropriate grounds for

22  cross-examination.

23     **MR. SCHACHTER:**  I don't -- here's what I know.

24     I know that Mr. Levy told the Government back in 2023 that

25  his understanding was that the DEA said that you have to do

 1  follow-ups every two years.  He says that repeatedly in

 2  writing.  If that was a privileged communication, then the

 3  Government should never have elicited that from Mr. Levy

 4  back --

 5          **THE COURT:**  Wait.  Say it again.

 6          **MR. SCHACHTER:**  Sure.

 7          **THE COURT:**  What was the --

 8          **MR. SCHACHTER:**  Sure.  So let's start.

 9      So the Government elicited from Mr. Levy in his direct

10  testimony that it is unlawful, illegal, the practices at Done

11  were illegal in part because they only did follow-up sometimes

12  as much as two years.  There was repeated testimony on that.

13      We do intend to elicit from Mr. Levy that it was not only

14  his understanding that follow-up was only required every two

15  years, but that he also communicated that in multiple

16  communications which the Government has, and he told the

17  Government that back in 2023 when he first started

18  interviewing.

19      Now Mr. Foster says, well, if he -- I guess he would say

20  if Mr. Levy had told us that back in 2023, that was a

21  privileged communication that they never should have been

22  exposed to, never should have asked because that's covered by

23  privilege.  I don't know that.

24      All I know is that Mr. Levy's understanding is that you

25  have to follow up every two years.  We are not this -- I don't

1  think this implicates our reliance on advice of counsel

2  defense.  We aren't relying on advice of counsel.  I wouldn't

3  even be -- I'm not asking Mr. Levy what his source of the

4  information is and I'm not relying on advice of counsel.  I

5  couldn't, because that only covers communications between

6  counsel and Ms. He.

7          THE COURT:  No, counsel and the representative of the

8  corporation.  It's not her privilege.  I mean, it's not -- it's

9  the privilege of the corporation, I think.  I don't know how

10  far we explored that, but at least arguably it's -- arguably,

11  this witness could not have waived the privilege.  That's the

12  argument that I recall.

13          MR. SCHACHTER:  If it was privileged.  And I don't

14  know --

15          THE COURT:  If it was privileged, he didn't waive it.

16          MR. SCHACHTER:  And I don't have any -- correct, and I

17  don't have that information.  Presumably it was not privileged

18  because he shared it with the Government.  The Government

19  elicited it, and it's in multiple communications not with

20  counsel.

21          THE COURT:  Sorry.  Why is it presumably not

22  privileged?  I don't know whether -- I don't know that

23  they're --

24      Okay.  Let me start again.

25      You're right.  Presumably, it's not privileged.  Anything

1  a person says is presumably not privileged.  Otherwise, why

2  would they say it?  One.

3       Two.  However, if, in fact, they said it because they were

4  simply repeating the advice that they got from a lawyer, it

5  then is privileged.

6       Three, if those two things occurred and you get to the

7  third thing, you have to ask yourself the question:  Has it

8  been waived?

9       Four, it has not been waived.  It's been asserted as a

10  matter of fact.

11       So with that conclusion Number 4, you go back and you see

12  you can't explore two, three, and four.  You still could

13  explore, I believe, Number 1.  That -- when I say explore, all

14  I'm saying is you told the defendant X, didn't you?

15       But you can't say, what was the basis of that.

16       **MR. SCHACHTER:**  Agreed.

17       **MR. FOSTER:**  Let me connect it for you.  So the

18  Government asked Mr. Levy about this, and this was memorialized

19  in a report.  And he said the basis for that was what the

20  defendant told me lawyers had said.

21       And so then, of course, the Government can't inquire into

22  it because it's privileged.

23       **THE COURT:**  No.  No, they can say -- if this witness

24  is going to say the reason I said X was that the defendant said

25  X to me and you can -- you can say that.

1     What you can't say is did the defendant say anything else

2  about why she said it was X.

3          MR. SCHACHTER:  Agreed.

4      THE COURT:  And then because that is -- she said that

5  she was told by lawyers, and that's a full stop bleep.

6      However, what she was said -- it's not that a lawyer told

7  you something, therefore, if I go and say I can paint this red,

8  and that's a question:  Can I paint it red?  Yeah, I can paint

9  it red.  I can paint it red.  It's not interesting that I can

10 paint it red because my lawyer told me I can paint it red,

11 unless I want to rely on the fact that it was the lawyer who

12 told me I can paint it red.

13     So that's the inquiry.  And I think it's important for

14 this witness to understand in his testimony, you're going to be

15 asked questions about what you said to the defendant and what

16 the defendant said to you, which, of course, you should answer

17 fully.

18     However, to the extent that it would require you to say

19 she said or he said, that the reason X was said was because a

20 lawyer said X was said, you cannot mention.

21     Do you understand that?

22          THE WITNESS:  I do, yes.

23          MR. SCHACHTER:  Understood, Your Honor.

24      MR. FOSTER:  I think the issue -- and the witness can

25 answer because the witness has the facts, but I think the issue

1    is not what he said to the defendant, but I think he's going to

2    be cross-examined on what he said to third parties, and the

3    picture is going to be pointed that he believed you didn't need

4    to have follow-ups for two years, and it's not that he believed

5    that; it's that that stems from what lawyers said.

6        So it's not possible for the Government to redirect on,

7    well, you -- the lawyers weren't told X, Y, or Z.  You know?

8    So it all goes back --

9        THE COURT:  I think that you're bound, in my view, you

10   may be -- that a witness who is not the defendant in this

11   action said certain things to a third party, and he said those

12   things to a third party because a lawyer told him what to say,

13   is still privileged, I think.

14       MR. FOSTER:  And that's what I'm saying, Your Honor.

15   And they're going to cross-examine him on that.

16       THE COURT:  They can ask him, did you say to Jones,

17   blah-blah-blah.  Yes, I did.  And do the inquiry.

18       MR. SCHACHTER:  Agreed.  We'll comport ourselves

19   consistent with that.

20       THE COURT:  In a way, I got you.  In a way it seems

21   unfair because you can just go so far and not explain the

22   reason why people say what they say.

23       But, of course, that's exactly what the attorney-client

24   privilege is designed to protect; that is, it's designed to

25   protect communications between a lawyer and a client which may

1    or may not result in action or inaction, statements or

2    incorrect statements or whatever.

3         **MR. FOSTER:**  Well, I think these are communications,

4    Your Honor, which the company has said -- taken the position

5    were going to people that also share the privilege.

6         **THE COURT:**  Well -- well, then, you're saying that the

7    discussions -- this is going to get very complicated.  You're

8    saying discussions among codefendants in which there was a

9    discussion of a certain process or procedure or plan contained

10   within it.  The fact that it was the lawyers that told them

11   they could or could not say these things and therefore the

12   conversations were -- would be misleading or incomplete.

13        The other thing, I guess, what defense counsel is saying:

14   You asked about it.  You introduced the subject that I thought

15   that he -- what -- what was being said was you introduced

16   certain statements, and I want to inquire into those

17   statements, even though they were told to third persons.  But I

18   will not inquire as to whether a lawyer told him that.

19        I will -- I could, of course, inquire whether defendants

20   said those things, but if the defendants said or suggested they

21   could say those things because lawyers told them they could say

22   those things, that's not going to be inquired into.

23        **MR. FOSTER:**  So that's not correct, Your Honor.

24        **THE COURT:**  What's not correct?  What I just said or

25   --

1          **MR. FOSTER:**  That I opened the door to it.

2          **THE COURT:**  Oh, maybe not.

3          **MR. FOSTER:**  What the witness testified to was that

4    his understanding was that the prescriptions were illegal

5    because they didn't comply with the Controlled Substances Act

6    requirement that they be for a legitimate medical purpose in

7    the usual course of professional practice.

8          There's this totally unregulated regulation that has

9    nothing really to do with this case that says in circumstances

10   not present here, there's an outer bound of 24 months if you're

11   a covering practitioner taking over the care of another

12   practitioner's patients.

13         And they're apparently going to inquire about what the

14   defendant -- or what Mr. Levy told people about this DEA

15   regulation.  And so I don't think it was -- opened the door to

16   examination about this DEA regulation, given the direct.

17         **THE COURT:**  Okay.  I'm not sure I understand.

18         **MR. FOSTER:**  And that was the regulation that they had

19   originally waived and then withdrew the waiver on.

20         **THE COURT:**  So what is it -- what are you asking him

21   about the regulation?

22         **MR. SCHACHTER:**  Well, he -- I mean, Mr. Foster asked

23   many times why didn't Ms. -- defendants He and Brody want

24   policies to follow -- policies because that would show we were

25   not following the law.  Many questions about just generally

1    were the procedures in violation of the law.  And then in

2    specifically then inquired about was the follow-up frequency

3    procedures, did that result in patient safety issues and

4    violations of the law.

5        I simply intend to ask the witness, you understood that it

6    was appropriate to have follow-up every two years and so not

7    three months or six months.

8        I don't intend to ask him about what the basis was for his

9    understanding, merely that that was his understanding, and, in

10   fact, he told other people at Done the same thing.

11       That's it.  I don't intend to get into what his basis

12   is --

13       **THE COURT:**  Well, I think -- I've -- given the

14   parameters, I can't really say more than that.  We can't

15   explore more than that.  I think that -- I think I'm not even

16   saying who opened the door and where or when.

17       Let's hear the cross and we'll take it from there.

18       **MR. SCHACHTER:**  Understood.

19       **MR. FOSTER:**  Thank you.

20       **THE COURT:**  That's called not answering your question.

21                    (Laughter.)

22       **MR. FOSTER:**  I just --

23       **MR. SCHACHTER:**  I think it was clear, Your Honor.

24       **THE COURT:**  Bring in the jury.  Let's go.

25                    (The jury enters the courtroom.)

1    (Proceedings were heard in the presence of the jury.)

2         **THE COURT:**  Okay.  Please be seated.

3    Let the record reflect all jurors are present, parties are

4    present.

5    Cross-examination.

6                   <u>**CROSS-EXAMINATION**</u>

7         **MR. SCHACHTER:**  Thank you, Your Honor.

8    **BY MR. SCHACHTER:**

9    **Q.**   Good afternoon, Mr. Levy.

10   **A.**   Good afternoon.

11        **MR. SCHACHTER:**  And good afternoon, ladies and

12   gentlemen.

13   **BY MR. SCHACHTER:**

14   **Q.**   So, Mr. Levy, you were hired at Done after you had been

15   introduced to Ruthia by an entity called Craft Ventures; is

16   that correct?

17   **A.**   Yes.  I had been vetted by them.

18   **Q.**   I'm sorry?

19   **A.**   Yes, I had been vetted by them and sent over to Ruthia for

20   additional vetting.

21   **Q.**   Okay.  But my question is:  It's Craft Ventures that made

22   the introduction, as far as you're aware, to Ruthia; correct?

23   **A.**   Yes.

24   **Q.**   Okay.  And Craft Ventures was an investor in Done; is that

25   correct?

1    **A.**    Yes, they were.

2    **Q.**    And you were hired in around October of 2021?  Do I have

3    that right?

4    **A.**    Yes, that is correct.

5    **Q.**    All right.  Now, you were aware that Done had been started

6    about a year and a half earlier; is that correct?

7    **A.**    I believe so.  I recall the end of 2020 being when Done

8    had started.

9    **Q.**    Okay.  So about a year.  It had only been in operation,

10   your understanding at the time, about a year or a year and a

11   half, somewhere in there?

12   **A.**    Yes.

13   **Q.**    All right.

14         Now, I think you were aware at the time of your

15   introduction that Done had been experiencing significant growth

16   in that relatively short time?

17   **A.**    Yes.

18   **Q.**    And I believe that it was your understanding at that time

19   that that very rapid growth had created operational challenges,

20   at least in the eyes of Done's investors; is that correct?

21   **A.**    That is correct, yes.

22   **Q.**    All right.

23         **MR. SCHACHTER:**  Your Honor, we move to admit 7104 and

24   7105, which are Mr. Levy's résumé and the introduction e-mail

25   to Ms. He.

1          **THE COURT:**  Admitted.

2      (Trial Exhibits 7104 and 7105 received in evidence.)

3          **MR. SCHACHTER:**  If we can first look at 7104.  And,

4  Mr. Cepregi, if we could just look at the very top so we can

5  see who's on this e-mail.

6  **BY MR. SCHACHTER:**

7  **Q.**   Okay.  Do you recognize this to be your sort of

8  introduction e-mail that came from Craft Ventures to Ruthia?

9  **A.**   I believe I actually sent this e-mail to Ruthia.

10  **Q.**   Correct.  We can go further down.  Do you see an e-mail

11  from a man named Sam Jakola, J-A-K-O-L-A?

12  **A.**   Yes, I do see that.

13  **Q.**   Okay.  And this is Mr. Jakola, the investor, introducing

14  you as an experienced health tech operations lead.

15      Do you see that?

16  **A.**   Yes.

17  **Q.**   All right.  He describes that you recently moved on from a

18  company called Apostrophe, which we'll talk about in just a

19  moment.  But was that a telehealth business?

20  **A.**   It was, yes.

21  **Q.**   All right.

22      And Mr. Jakola writes (as read):

23          "Riley, please meet Ruthia He, founder and CEO

24      of Done.  Ruthia is looking for an experienced

25      operations lead to help the hypergrowth that Done is

1        undergoing."

2        Do you see that?

3    A.   I do.

4    Q.   All right.  Now, you're familiar with the term "building

5    the car while driving it"?  Is that something you're familiar

6    with?

7    A.   Well, I don't know if it was something that I said, but I

8    understand the term itself.

9    Q.   That's my only question.  You understand that term

10   "building the car while driving it"?

11   A.   Yes.

12   Q.   Okay.  And when Mr. Jakola introduced you to Done, did you

13   have an understanding that it was in its early days but was

14   facing operational challenges by virtue of the speed with which

15   it was growing?

16   A.   I think that's a fair characterization of what I was told.

17   Q.   Okay.  Now, and -- you understood at the time of your

18   introduction that you were being introduced as someone who

19   could assist Ruthia and Done in managing the significant growth

20   in operations that Done had been experiencing; is that right?

21   A.   Yes.

22   Q.   All right.  Now, I want to focus on your résumé?

23        MR. SCHACHTER:  If we can show that, 7105.

24   BY MR. SCHACHTER:

25   Q.   Okay.  You recognize this as your résumé?

1    A.    Yes.

2    Q.    Okay.  And I just want to go through the experience that

3    you are communicating through your résumé.

4          First of all, it talks about your experience at YoDerm

5    Apostrophe.

6          Do you see that?

7    A.    I do.

8    Q.    And you were head of operations?

9    A.    I was.

10   Q.    For about a year and a half -- or a year and four months?

11   A.    Yes.

12   Q.    Okay.  Can you describe for the jury what was this

13   telehealth platform that you had worked at?

14   A.    So Apostrophe was a dermatology telehealth company that I

15   worked with its own integrated pharmacy, compounding pharmacy

16   that dispensed medication after a board-certified dermatologist

17   reviewed the consult from the patient.

18   Q.    Okay.  And this is basically dermatology by telehealth?

19   A.    It was, yes.

20   Q.    People -- it was marketed as patients don't need to wait

21   for an appointment; they will get a relatively quick

22   appointment with a dermatologist; correct?

23   A.    Yes, it was a consult -- this was an asynchronous platform

24   where patients uploaded photos of their dermatological concern

25   and it was assigned to a dermatologist licensed in their state.

1  **Q.**  I see.  And the communication was not face-to-face over

2  video; it was through messaging?

3  **A.**  Correct.  Until later on.  I want to say August of 2021

4  was the first time we started doing video consultations.

5  **Q.**  Okay.  Apostrophe also had a pharmacy; is that correct?

6  **A.**  It did, yes.

7  **Q.**  And you managed revenue operations for the pharmacy?

8  **A.**  I did.

9  **Q.**  And I think in your experience you describe how you had

10  experience generating -- the fourth bullet point (as read):

11       "Generating and implementing business strategies

12       to increase revenue while executing on operational

13       development in a highly regulated space of

14       compounding 795 pharmacy protocols."

15       Do you see that?

16  **A.**  I do, yes.

17  **Q.**  Okay.  So the experience that's provided to Ruthia before

18  you're hired is that you are somebody who has significant

19  experience running operations in a highly regulated space; is

20  that correct?

21  **A.**  Yes.

22  **Q.**  All right.

23       And you left after YoDerm was acquired by Hims & Hers; is

24  that right?

25  **A.**  That is correct.

1  Q.   You also had experience -- if we can go a little bit

2  further down -- to a business called Phil, P-H-I-L; is that

3  right?

4  A.   Yes.

5  Q.   And can you describe what Phil was?

6  A.   Sure.  So Phil was a multidisciplinary specialty pharmacy

7  operation where we worked with -- primarily we worked with drug

8  manufacturers and developed our own wholesale channel.  So

9  manufacturers would sell to Phil, Phil would then work with the

10  sales reps for whatever the medication was out in the fields,

11  and doctors would send prescriptions to our pharmacy which

12  would then get routed to a local pharmacy for that patient to

13  be dispensed to them.  And it was primarily for specialty

14  medications.

15  Q.   Okay.  And that is also a highly regulated space, the

16  dispensing of medication; correct?

17  A.   It is, yes.

18  Q.   All right.  You wrote in your e-mail that you displayed

19  subject -- in the first paragraph under "Head of operations and

20  strategy," do you see where you wrote (as read):

21       "Displayed subject matter knowledge and acted as

22       escalation point for business compliance and

23       regulation questions associated with harsh government

24       regulatory bodies, including but not limited to

25       boards of pharmacy and medicine."

1      Do you see that?

2  A.   Yes, I do.

3  Q.   Okay.  All right.  And so in your résumé that gets sent to

4  Ruthia, you are describing yourself as somebody who has subject

5  matter knowledge, compliance, and regulation -- regulatory

6  knowledge in dealing with government regulatory bodies in the

7  dispensing of medication space; correct?

8  A.   That is correct.

9  Q.   All right.  By the way, you wrote harsh -- (as read):

10      "Questions associated with harsh government

11      regulatory bodies."

12      What did you mean by that?

13  A.   To be fair, I don't recall what I meant by that.  I think

14  that it was an emphasis on the fact that regulators have a lot

15  of boxes that you have to check, and so that was probably just

16  an emphasis on that, that we had to do that.

17  Q.   I see.  All right.

18      So you're saying through your résumé that even regulatory

19  bodies that are harsh or require a lot of information, you have

20  subject matter knowledge in that area; correct?

21  A.   Yes.

22  Q.   All right.

23      You also wrote in the fourth bullet point (as read):

24      "Articulated growth objectives and operating

25      plans to CEO, pushing growth from four states to 47

1     states over two years."

2          Can you describe that experience?  And also can you

3     explain why you wanted to highlight that in your résumé?

4     **A.**   Yes.  I very much enjoyed working in startups, and

5     startups generally are very hypergrowth, and that's why a lot

6     of the time you join a startup and you hope that the equity

7     works out, you know, in your favor.

8          I worked alongside the CEO at Phil while also working

9     alongside our compliance team to ensure that we were meeting

10    all state requirements as we opened up in each of those states,

11    and each one had a full launch plan that was developed prior to

12    it going live, and then we started to work with the pharma

13    partners in that state to generate business in those states.

14    **Q.**   I see.

15         So you had experience managing rapid growth but also in

16    managing regulatory requirements?

17    **A.**   Yes.

18    **Q.**   Okay.

19         You also worked at a place called Nurx, N-U-R-X.

20         **MR. SCHACHTER:**  Can we go a little bit further down,

21    Mr. Cepregi.

22    **BY MR. SCHACHTER:**

23    **Q.**   You were head of operations at something called Nurx?

24    **A.**   Yes, I was.

25    **Q.**   All right.  Can you describe what Nurx was?

1    **A.**    Sure.  So at the time that I was there, Nurx was an early

2    stage telehealth company that specialized in sexual health, so

3    birth control, PrEP.  We were the first providers for PrEP over

4    telehealth.  And we later developed a distribution model that

5    included owning our own pharmacy, and they continued to expand

6    into additional states after I departed.

7    **Q.**    Okay.  Also a highly regulated space?

8    **A.**    Yes.

9    **Q.**    All right.  Now, can you just explain -- your first

10   sentence says you (as read):

11            "Navigated an early startup in telemedicine to

12        monetize birth control, sexual health, and establish

13        the stage for never-ending expansion into new

14        specialties."

15        Do you see that?

16            **MR. FOSTER:**  Objection, Your Honor, 403.  This is all

17   very interesting, but consumption of time.

18            **THE COURT:**  Well, 403.  I mean, the question is how

19   much time you spent on this.

20        The witness in direct examination said that he had

21   misrepresented his position in his application.

22            **MR. FOSTER:**  Not these, Your Honor.

23            **THE COURT:**  Not this?

24            **MR. SCHACHTER:**  Not this.  I'm pretty much done, Your

25   Honor.

1          THE COURT:  All right.  Go ahead.

2     BY MR. SCHACHTER:

3     Q.   All right.  You also stated that you had experience in (as

4     read):

5          "Monitoring the ever-changing landscape of

6          telemedicine regulations" in the second sentence.

7          Can you just explain what that means, what your experience

8     was monitoring the ever-changing landscape of telemedicine

9     regulation?

10    A.   Yes.  Our organization was one of the pioneers of

11    telemedicine.  It was very new, and there were a lot of states

12    that had no regulation or law published yet at the time that we

13    were seeking to go into these states.

14         So with our CEO and our chief medical officer -- our CEO

15    was an attorney, our chief medical officer a physician -- we

16    would contact boards and -- boards of medicine to understand

17    how telemedicine is expected to work within their state and

18    build a launch plan for each of those while also watching or

19    maintaining eyes on the landscape, how those laws were going to

20    evolve, how the guidance of those boards was going to evolve

21    over time.

22    Q.   Okay.  Thank you.

23         And the first bullet that you identify is that you had

24    "enhanced patient satisfaction and delivery performance

25    metrics."

1      Do you see that?

2   **A.**   I do, yes.

3   **Q.**   And that was part of your focus at this business, this

4   telemedicine, was focusing on patients satisfaction and

5   delivery performance metrics?

6   **A.**   It was one of my areas, yes.

7   **Q.**   All right.  Okay.  And then without looking at your

8   résumé, you also had experience at Target; is that correct?

9   **A.**   I did, and CVS acquired them, and I worked for CVS at the

10  time in the pharmacy sector there.

11  **Q.**   All right.  Can you just briefly describe what you did at

12  Target or CVS?

13  **A.**   Sure.  So I was -- I went through -- they have something

14  called Target College, but as part of that, when I was in

15  school, I also was a licensed pharmacy technician for Target

16  and then CVS?

17      Once you go through that training, you're given this

18  title, executive lead title, because you've been given all of

19  Target's management training, and so then you're able to also

20  manage the retail operations of the store in the event that

21  you're called upon to do so or if you're scheduled to.  I was,

22  you know, on Black Friday scheduled to work 3:00 a.m. because I

23  had that training.  So it was primarily in the pharmacy, but we

24  also had to branch over into the retail sector.

25  **Q.**   Okay.

1          **MR. SCHACHTER:**  Mr. Cepregi, you can take that down.

2    BY MR. SCHACHTER:

3    **Q.**  So with all of this experience on your résumé, you met

4    with Ruthia and she hired you; is that correct?

5    **A.**  After meetings with her and several of the investors, yes,

6    she hired me.

7    **Q.**  Okay.  And by the way, it was clear to Ms. He that you

8    were being recommended by a major investor; correct?

9    **A.**  Yes, and I also interviewed with F7, another investor in

10   Done.

11   **Q.**  I see.  So you actually had contact with multiple

12   investors at Done prior to Ruthia then hiring you?

13   **A.**  It was requested of me, yeah, to speak with them, yes.

14   **Q.**  Okay.  You would agree with me that if what Ruthia wanted

15   to do was hide Done's practices from its investors, it wouldn't

16   have made sense to hire somebody who had been introduced by one

17   of its investors and who also met other investors?

18        Do you agree with me?

19          **MR. FOSTER:**  Objection, foundation, speculation.

20          **THE COURT:**  Sorry.  Sustained.

21   BY MR. SCHACHTER:

22   **Q.**  All right.  Okay.

23        You also, in the course of your interview, had told Ruthia

24   that you had particular experience with ADHD because you had

25   suffered from ADHD yourself; is that correct?

1   **A.**   I don't recall if I said that in my interview, but I

2   certainly was open about having ADHD.

3   **Q.**   All right.

4       Now, you testified on direct that you lied about being a

5   pharmacist, especially when communicating externally, in order

6   to build a false level of trust.

7       Do you remember that testimony?

8   **A.**   I do, yes.

9   **Q.**   All right.  But you lied about being -- so you're not a

10  pharmacist?

11  **A.**   Correct.  I am not.

12  **Q.**   Okay.  You didn't just lie about being a pharmacist

13  externally in dealing with pharmacies; correct?

14      Let me rephrase the question.

15      You also told people at Done that you were a pharmacist;

16  correct?

17  **A.**   At times, yes, I did.

18  **Q.**   Okay.  In fact, when you were interviewing with Ruthia,

19  you told her that you were a licensed pharmacist?

20  **A.**   I did not.

21  **Q.**   Okay.  You don't remember saying that you worked at Nurx,

22  first one to launch a pharmacy, that you had a license in

23  school, you didn't -- you don't recall saying that in your

24  interview?

25  **A.**   I was a licensed pharmacy technician in school.  I did not

1  say I was a pharmacist.

2  **Q.**  Okay.  I'm going to show you --

3      **MR. SCHACHTER:**  Your Honor, we move to admit

4  Exhibit 7107 and 7109 and 7110.

5      **MR. FOSTER:**  Objection, foundation, hearsay.  It's not

6  impeaching.

7      **MR. SCHACHTER:**  Your Honor, these are statements

8  where --

9      **THE COURT:**  Well, whatever they are, why don't you

10  hand them up to me.  Unless I have them in the binder here.  Do

11  I have them in the binder?

12      What -- what are the numbers again.

13      **MR. SCHACHTER:**  710 -- well, let me lay more

14  foundation.  We'll go through them one by one.

15      **THE COURT:**  I don't have them.

16      **MR. SCHACHTER:**  I'll just move through them.  I'll lay

17  more foundation document by document.

18      **THE COURT:**  Why don't I see them first?  I mean, let

19  me cut through this.

20              (Pause in proceedings.)

21      **THE COURT:**  And what do you want me to look at?  7107,

22  what I am looking at?

23      **MR. SCHACHTER:**  One moment, Your Honor.

24      **THE COURT:**  I took your copy.

25      **MR. SCHACHTER:**  Page 3 of 7107, the time stamp

1  communication between Ms. He and Mr. Levy at 4:47 on the third

2  page.

3                    (Pause in proceedings.)

4        THE COURT:  So I would allow it.  On 7 -- 7107,

5  page 3, the communications at 4:47.

6        MR. SCHACHTER:  Thank you, Your Honor.

7        THE COURT:  The two communications.  Okay.

8     Now, do you want to do the other ones or what?

9        MR. SCHACHTER:  Yes, Your Honor.

10       THE COURT:  7109?

11       MR. SCHACHTER:  7109.  It's the communication on the

12  second page between Dr. Brody and Mr. Levy, second page, at

13  6:04 and 6:05.

14       THE COURT:  Okay.

15                    (Pause in proceedings.)

16       MR. FOSTER:  And just to save time, Your Honor, we

17  don't think these are impeaching.  He's been pretty clear he

18  said he wasn't a pharmacist and he didn't tell the truth about

19  that.

20       MR. SCHACHTER:  He said that he spoke about it

21  externally and not internally.

22       MR. FOSTER:  He just testified that he did it

23  internally too.

24       THE COURT:  Well, what's not impeaching about it is

25  what somebody else said.  You're saying that these other people

1   said that they were going to say he was a pharmacist, and so

2   it's not impeaching one way or the other.  But your point is he

3   didn't correct them.

4   　　　　MR. SCHACHTER:  Did not correct, and in some of the

5   communications affirmatively states --

6   　　　　THE COURT:  Well, the two that I've now seen don't.

7   So okay is the third one?

8   　　　　MR. SCHACHTER:  7110.

9   　　　　THE COURT:  Okay.  Where do I look?

10  　　　　MR. SCHACHTER:  Page 10, communication between

11  Mr. Levy and Sara Faber, starting with Ms. Faber's

12  communication at the bottom of the page at 4:29, going to

13  Mr. Levy's response at 4:30.

14  　　　　THE COURT:  Okay.  You may read that.

15  　　　　MR. SCHACHTER:  Thank you, Your Honor.

16  BY MR. SCHACHTER:

17  Q.　Okay.  Starting with, then, 7107, do you see where Ms. He

18  says to you (as read):

19  　　　　"The GoGoMeds" --

20  　　　　MR. SCHACHTER:  It's not on the jurors' screens.

21  　　　　THE COURT:  Well, just read it.

22  　　　　MR. SCHACHTER:  Can we display it, Your Honor?

23  　　　　THE COURT:  No, because it's the whole document.

24  　　　　MR. SCHACHTER:  We'll redact the rest of it.

25  　　　　THE COURT:  Okay.

1          THE COURTROOM DEPUTY:  Admitted?

2          THE COURT:  You can display those portions of the

3   document.

4          MR. SCHACHTER:  Yes, Your Honor.

5          THE COURT:  So 7107, 7109, and 7110 portions.

6      Go ahead.

7      (Trial Exhibits 7107, 7109, and portions of 7110 received

8   in evidence.)

9          THE COURTROOM DEPUTY:  Portions are admitted.

10  BY MR. SCHACHTER:

11  Q.  So first we're looking at 7107, and Ms. He says (as read):

12          "The GoGoMeds partnership POC said it is going

13      through their compliance team review and I mentioned

14      you're a pharmacist so can provide more accurate

15      information, and she'd like to connect.  I'll start

16      an e-mail thread to connect you two."

17      Mr. Levy says (as read):

18          "Sounds great."

19          MR. SCHACHTER:  And if we can display 7109, the

20  limited portion.

21  BY MR. SCHACHTER:

22  Q.  This is a communication between Dr. Brody and you,

23  Mr. Levy, Dr. Brody says (as read):

24          "But wow.  I can tell you that you're slightly

25      younger than me, but I guess being a pharmacist has

1          its perks in terms of getting boosters."

2          And then you respond.  Do you see that?

3     A.   I do see that.

4     Q.   Okay.  And then a communication with Sara Faber, 7110.

5          Who was Sara Faber?

6     A.   Sara Faber was the manager for provider relationships.

7     Q.   Okay.  This is somebody at Done, not external; correct?

8     A.   Correct.

9     Q.   Okay.  And in this communication with Ms. Faber, you're

10    talking about a communication with somebody named Luke who is a

11    pharmacist at which pharmacy?  Do you recall?

12    A.   Luke was a pharmacist at Apostrophe.

13    Q.   And you write (as read):

14         "Luke is a straight-up pharmacist, and I think

15         he trusted my approval because I am as well."

16         Do you see that?

17    A.   I do see that.  I don't have the full context for the

18    conversation.

19    Q.   Uh-huh.  But you see where he said (as read):

20         "I think he trusted my approval because I am as

21         well"?

22    A.   I do.

23    Q.   Okay.  And then you go on to say (as read):

24         "Instead of questioning it, so it was a

25         double -- classic double blind.  We're both chemistry

1    doctorates."

2    Do you see that?

3    **A.**   Yes, I do see that.

4    **Q.**   Okay.  And then --

5        **MR. SCHACHTER:**  You can take that down.

6    **BY MR. SCHACHTER:**

7    **Q.**   You also told Sarah Barker that you had experience writing

8    pharmacy prescriptions; correct?  Or filling prescriptions?

9    **A.**   Yes, I did.

10   **Q.**   Okay.  And you also told --

11   You're familiar with somebody named Elizabeth Shapard?

12   **A.**   I am familiar with that provider, yes.

13   **Q.**   Okay.  That's a -- Ms. Shapard is -- was a psychiatric

14   mental health nurse practitioner at Done; correct?

15   **A.**   Correct.

16   **Q.**   You also told her that you're a pharmacist?

17   **A.**   I don't recall that conversation.

18       **MR. SCHACHTER:**  Your Honor, we move to admit 6861.

19       **MR. FOSTER:**  Objection, Your Honor.  If he wants to

20   refresh him, he can, but there's no foundation.

21       **MR. SCHACHTER:**  It's a false statement by a witness

22   whose credibility is at issue.

23       **THE COURT:**  Let's see what it is.  61?

24       **MR. SCHACHTER:**  6861.

25       **THE COURT:**  I need to see it.

1    **MR. FOSTER:**  If he doesn't recall, he can refresh his

2    recollection, and if says he recalls it, then it's impeaching

3    or not impeaching --

4         **MR. SCHACHTER:**  But the witness is making a false

5    statement.

6         **THE COURT:**  Where do you want me to look?  Where

7    should I look, Counsel?

8         **MR. SCHACHTER:**  The line that starts "I sat on the

9    call and argued with them about that for over an hour."

10   I believe it's on the screen now.

11        And then where Mr. Levy says --

12        **THE COURT:**  What time is it?

13        **MR. SCHACHTER:**  2:21.

14        **MR. FOSTER:**  What exhibit is this?

15        **MR. SCHACHTER:**  6861.

16        **MR. FOSTER:**  Do you have a copy?

17        **MR. SCHACHTER:**  Yeah.

18                    (Pause in proceedings.)

19        **MR. SCHACHTER:**  And, Your Honor, the relevant language

20   is also on the screen.

21                    (Pause in proceedings.)

22        **THE COURT:**  And your question was to them what?

23        **MR. SCHACHTER:**  In addition to speaking to people

24   internally at Done, two pharmacies, he also spoke to nurse

25   practitioners and said he was a pharmacist.

1    THE COURT:  Okay.  I'll allow it.

2    MR. FOSTER:  The question or -- I don't think that

3  question has been asked yet.

4    THE COURT:  Well, the question is -- I guess the

5  question is:  Did you tell other people, and now he wants to

6  introduce -- he's not for impeachment as to his testimony.

7  It's for his impeachment as to whether he's telling other

8  people the truth.

9    MR. SCHACHTER:  Sure.  It's a -- credibility of any

10  witness is obviously at issue.  This is another false statement

11  that Mr. Levy made.

12    THE COURT:  Okay, but it may or may not be one he's

13  admitted to.  The jury can figure that out.

14    But I'll allow it.  I'll allow it because it's easier to

15  allow than not.

16    So as to the 6861, a portion is admitted.

17    MR. SCHACHTER:  Thank you, Your Honor.

18    (Trial Exhibit portion of 6861 received in evidence.)

19    MR. SCHACHTER:  I don't think it's yet on the jurors'

20  screens.

21  BY MR. SCHACHTER:

22  Q.  Okay.  Do you see where you wrote to Elizabeth Shapard (as

23  read):

24         "Tried to level set.  We're all pharmacists.  We

25      know that sometimes things are twice daily."

1      Do you see that?

2  **A.**   I do, yes.

3  **Q.**   Okay.

4           **MR. SCHACHTER:**  All right.  You can take that down.

5  **BY MR. SCHACHTER:**

6  **Q.**   And by the way, just to ask, is there a difference between

7  a pharmacist and a PharmD, or are all pharmacists PharmDs?

8  **A.**   There's very few pharmacists who don't carry a PharmD

9  anymore.

10 **Q.**   Okay.

11 **A.**   Yes.  It's -- the bachelor's degree program is gone in

12 almost all 50 states.

13 **Q.**   Okay.  Do you recall in communicating with the different

14 pharmacies, you would sign your name Riley Levy, PharmD?  Do

15 you recall that?

16 **A.**   I recall one letter to Express Scripts that carried that

17 signature, but I -- I do not recall using it elsewhere.

18 **Q.**   Okay.  In that communication, you signed your name Riley

19 Levy, PharmD; correct?

20 **A.**   That's how my signature was on that, yes.

21 **Q.**   Okay.  All right.  Let's change topics.

22      You -- when you started at Done, you were excited about

23 the prospect, correct?

24 **A.**   Yeah, I absolutely was excited about Done.

25 **Q.**   And you believed in the mission of expanding access to

1  mental healthcare for people with ADHD?

2  **A.**   I believed in what I thought the mission of expanding

3  access meant, but came to learn that that was not the mission

4  at Done.

5  **Q.**   Mm-hmm.

6       Well, okay.  Even after spending six months at Done,

7  you -- the truth is that you still believed that Done helped an

8  enormous number of people; correct?

9  **A.**   There was a turning point, and I don't recall if it was at

10  six months or where it was.  I know that a lot of them -- a lot

11  of the time I was touting the party line to remain in good

12  graces with Ruthia and maintain my job.

13  **Q.**   Okay.  Well, Sarah Barker was a member of clinical

14  leadership; is that correct?

15  **A.**   She was, yes.

16  **Q.**   She, in fact, was somebody -- she was a nurse

17  practitioner?

18  **A.**   She was.  Or she is, yes.

19  **Q.**   You viewed her as being someone of great experience?

20  **A.**   Yes.

21  **Q.**   And, in fact, you were close with her; correct?

22  **A.**   We got close over my time at Done, yes.

23  **Q.**   Okay.

24       **MR. SCHACHTER:**  Your Honor, we move to admit

25  Exhibit 536, which is a Government exhibit.

1          **THE COURT:**  536 admitted.

2          (Trial Exhibit 536 received in evidence.)

3     **BY MR. SCHACHTER:**

4     **Q.**   And this is a communication that you had in -- on

5     March 11th.  Do you see that?

6     **A.**   Yes, I do.

7     **Q.**   With Sarah Barker?

8     **A.**   Yes.

9     **Q.**   All right.  And at this point in time, I guess you've been

10    there five or six months; is that correct?

11    **A.**   I believe that sounds about accurate, yeah.

12    **Q.**   All right.  And you talk about your experience as a COO

13    prior to coming to Done; correct?

14    **A.**   Yes.  That was an overexaggeration of my title from other

15    companies.

16    **Q.**   Okay.  You exaggerated your experience with Ms. Barker as

17    well?

18    **A.**   I exaggerated my title, yes.

19    **Q.**   Okay.  And Ms. Barker at the bottom writes (as read):

20              "I was looking into starting my own ADHD

21         company.  That's actually how I found Done, because I

22         was seeing what kind of specialty ADHD places there

23         were already."

24         You write (as read):

25              "Yeah, it's a great market and helps more than

1        what anyone else wants to admit."

2        Do you see that?

3    **A.**   I do see that, and I was all in on Done for quite some

4    time, and I believed that this was also part of Sarah Barker's

5    recruiting conversations to bring her on board to clinical

6    leadership.

7            **MR. SCHACHTER:**  Okay.  Great.  You can take that down,

8    Mr. Cepregi.

9    **BY MR. SCHACHTER:**

10   **Q.**   Now, I believe that you testified about Ms. He's -- what

11   you described as Ms. He's complete control over the operations

12   of Done; is that correct?

13   **A.**   I -- I would say that she maintained control of

14   operations, medical operations, all the above, financial

15   operations of the company, yes.

16   **Q.**   Okay.  That is what you are saying now, but the fact is

17   that at the time, you felt that it was you who were making the

18   day-to-day decisions at Done; isn't that correct?

19   **A.**   There was a time where I felt that I might have gained

20   leeway to do so, but any time that I put a decision in place, I

21   was quickly huddled or Zoom called by Ruthia within days to

22   undo the decision I had made.

23   **Q.**   All right.

24           **MR. SCHACHTER:**  Your Honor, we move to admit

25   Exhibit 7113.

1          MR. FOSTER:  Is there a foundation?

2          MR. SCHACHTER:  Yeah.

3          MR. FOSTER:  Can I have a copy?

4          MR. SCHACHTER:  Sure.

5      Your Honor, move to admit 7113.

6          MR. FOSTER:  Objection, foundation.

7          THE COURT:  Lay a foundation.

8          MR. SCHACHTER:  Sure.  Okay.

9  BY MR. SCHACHTER:

10 Q.   Mr. Levy, you knew somebody named Michelle Nam at Done; is

11 that correct?

12 A.   She was the attorney at Done, yes.

13 Q.   Okay.  And you told Ms. Nam --

14         THE COURT:  Well, wait a minute.

15         MR. FOSTER:  Objection.

16         THE COURT:  Let me see it.

17     So Ms. Nam was an attorney?

18         MR. SCHACHTER:  Correct.

19         THE COURT:  Okay.  So I'm sustaining the objection,

20 and we can have a discussion.

21         MR. SCHACHTER:  Okay.  It's not about legal advice or

22 anything like that.  It's just his --

23         THE COURT:  It's about a conversation you had with a

24 lawyer.

25         MR. SCHACHTER:  Sure.  I don't think --

1    **THE COURT:**  Well, I don't know.  I mean, usually

2  conversations with lawyers are legal advice.

3    **MR. SCHACHTER:**  The company had produced this document

4  redacting portions of it but not this because it's not --

5    **THE COURT:**  I'm not quarreling with your good faith.

6  I'm saying that it -- I'm going to sustain the objection

7  subject to an offer of proof.

8    **MR. SCHACHTER:**  Okay.  Understood.  I'll ask a

9  different question.

10  **BY MR. SCHACHTER:**

11  **Q.**  Mr. Levy, you told people at Done that, in fact, you

12  didn't think that Ruthia had done anything without you since

13  before Thanksgiving.

14    Do you recall that?

15  **A.**  I recall that everything I had to do and everything on a

16  day-to-day basis.  Ruthia and I were in a Zoom call, and I had

17  to get approval on everything that I was doing, so that would

18  be a characterization of what was going on.

19  **Q.**  Do you recall feeling back at the time that you worked at

20  Done that Ruthia actually hardly made any decisions, that every

21  decision made has been when you came to her and she'll ask how

22  do you think about this, so I make it sound like her decision

23  when I give it to her?

24    Do you recall that that was how you felt while you worked

25  at Done?

**A.**   I don't recall.  I don't know if that's a fair

characterization.  I know I had to put a lot of things that we

needed to get done at Done into terms that would allow for the

approval by Ruthia, so there's growth, how it was going to

impact revenue, how it was going to impact other things within

the organization to get it approved by her?

    Early on, I thought that we were on parallel paths there

and later came to the realization that we were not on parallel

paths.

**Q.**   All right.  Well, do you remember telling people at Done

that every decision that she makes happened after she comes to

you and you say -- and she says, how do you think about that,

and then you feed her your decision so that it makes her feel

like she made it?

    Do you recall telling people at Done that?

**A.**   I don't recall that conversation.  I recall that there was

tests of my knowledge and loyalty and how I thought about

things frequently.

**Q.**   Okay.

        **MR. SCHACHTER:**  Your Honor, may I just show 7113 just

for the witness just to see if it refreshes his recollection?

        **THE COURT:**  Yes.

        **MR. SCHACHTER:**  Just for the witness, Court, and

counsel.

        **MR. FOSTER:**  Your Honor, this is the same objection,

1  and I think what he's been referring to is the same

2  conversation that you sustained the objection on.

3      THE COURT:  Well, that he said something to somebody

4  else may not be the same thing as that person saying something

5  to him.  That's -- so I'm going to see if this refreshes his

6  recollection as to what he said to somebody else.

7      MR. SCHACHTER:  Thank you, Your Honor.  And it's just

8  his statements that --

9      THE COURT:  I --

10 BY MR. SCHACHTER:

11 Q.  Can you take a moment to look at this yourself.  Let us

12 know when you're done.

13 A.  (Witness examines document.)

14 Q.  Let me know when you're done.

15 A.  I've read it.

16 Q.  Okay.  Does that refresh your recollection that you said

17 Ruthia actually hardly makes decisions; yes or no?

18 A.  I wrote that on the page, yes.

19 Q.  Okay.  Does that refresh your recollection that you said

20 (as read):

21      "Every decision made has been Kristina and then,

22      when I came on, me"?

23      Did you say that?

24 A.  Yes.  That was a characterization I got from Kristina as

25 well when I joined.

1    **Q.**    Okay.  And then do you recall saying (as read):

2            "She will come to me and ask, How do you think

3        about this?  So I make it sound like her decision

4        when I give it to her"?

5        Do you say that?

6    **A.**    Yes, and I understood this to be testing my trust and

7    loyalty.

8    **Q.**    And then did you also say (as read):

9            "I don't think she's done anything really

10       without me since two weeks before Thanksgiving"?

11   **A.**    Yes, by pulling me into Zoom calls and maintaining

12   constant oversight of what I was doing, yes.

13   **Q.**    Okay.

14       Meaning she would loop you in for Zoom calls on lots of

15   decisions; correct?

16   **A.**    Particularly ones that she didn't want in writing, yes.

17   **Q.**    Okay.  All right.

18           **MR. SCHACHTER:**  You can take that down.

19   **BY MR. SCHACHTER:**

20   **Q.**    Now, let's talk about how you communicated with Ruthia

21   during the time that you worked there.  Okay?

22       You were asked when you first took the witness stand if

23   you recognized Ms. He in the courtroom; is that correct?

24   **A.**    Yes, I was.

25   **Q.**    The fact is that you only met Ruthia in person

1  face-to-face one time; correct?

2  **A.**   For some reason my memory says two, but I know of one for

3  sure.  I thought I came to San Francisco another time, though.

4  **Q.**   Okay.  Once or twice; that's it?

5  **A.**   In person; correct.

6  **Q.**   All right.  Now, when you were hired in October of 2021,

7  Ruthia was in China because her mother had been ill; correct?

8  **A.**   I don't recall her mother being ill, but I do recall her

9  being in China, yes.

10  **Q.**   All right.

11       And you -- do you recall that the only time that you were

12  able to speak to her was roughly between like 6:00 a.m. and

13  noon Pacific Time because of the time change with where she was

14  in China?

15  **A.**   In my early days, yes, I had to stay up late, a lot later

16  on to communicate with her and get things through and discuss

17  decisions with her.

18  **Q.**   Okay.  And that's because she's in a different time zone

19  in another part of the world?

20  **A.**   Correct.

21  **Q.**   All right.  Now, it wasn't just in October she was in

22  China.  All the way for roughly a year between October of 2021

23  when you started until September of 2022, she's in China that

24  whole time; is that correct?

25  **A.**   I believe that's correct, yes.

1   **Q.**   All right.

2       Okay.   Now, another question about how you would

3   communicate with Ms. He.

4       So -- I want to ask you about your experience with her

5   language skills.

6       You recall that there was an internal document posted on

7   the general or core team Slack channel by Ms. He that said that

8   she was -- that talked about how people should -- can

9   communicate with her; correct?

10  **A.**   I -- I don't recall that document.   It doesn't -- yeah.

11  **Q.**   Well, do you recall on October the 27th, just a couple of

12  days ago, telling the prosecutors that there was an internal

13  document that Ruthia wrote that said that she was fluent in

14  English but might need to -- need time to respond to complex

15  issues?

16      Do you recall telling that to the prosecutors just a

17  couple days ago?

18  **A.**   I recall identifying a document in CODA that discussed --

19  it was a document, I believe, titled "How to work with Ruthia,"

20  not how to communicate with her.

21  **Q.**   Okay.

22      Well, let me -- let's -- do you recall telling the

23  Government that they're -- in this internal document that

24  Ruthia wrote that she said that she was fluent in English but

25  might need time to respond to complex issues?

1    Do you remember telling that to the prosecutors just a

2  couple days ago?

3  **A.**   I do.  I recall with -- identifying that document, yes.

4  **Q.**   Okay.  Great.  I'm going to show you that document.

5       **MR. SCHACHTER:**  Your Honor, we'll move to admit

6  Exhibit 7581.

7       **MR. FOSTER:**  Objection, not impeaching, hearsay.

8       **MR. SCHACHTER:**  It's not impeachment, Your Honor.

9       **THE COURT:**  I'm sorry.  Who wrote this?

10       **MR. SCHACHTER:**  Your Honor, the witness testified that

11  was on the CODA system, posted for all employees to see.

12       **THE COURT:**  The question is who wrote it.

13       **MR. SCHACHTER:**  Ms. He.

14       **THE COURT:**  The defendant wrote it?

15       **MR. SCHACHTER:**  Correct.

16       **THE COURT:**  And you object to hearsay?

17       **MR. FOSTER:**  Yes.

18       **THE COURT:**  Sustained.

19  **BY MR. SCHACHTER:**

20  **Q.**   All right.

21       Let's talk about how -- thank you -- how Done was

22  structured.

23       **MR. SCHACHTER:**  Well, I'm not going to do it right

24  now, Your Honor.  I just want to lay a little bit more

25  foundation to take it up with the Court later.

1          THE COURT:  Sure.

2    BY MR. SCHACHTER:

3    Q.   Mr. Levy, the CODA system at Done was the way that

4    business records at Done were maintained in the ordinary course

5    of business; is that correct?

6    A.   I don't know that to be true of CODA.

7    Q.   Well, is CODA a central repository --

8          You testified a lot with Mr. Foster about materials that

9    were posted to CODA.

10         Do you recall that?

11   A.   I recall speaking about the single line that was deleted,

12   yes.  There were probably six to 10 central repositories that

13   Done had.  Information was everywhere and scattered, so I

14   wouldn't call it a central repository.

15   Q.   Okay.  Central or not, was CODA a place that people at

16   Done had access to?  They could look -- for example, the

17   clinical handbook was posted on CODA; correct?

18   A.   Yes, up until March it was available to people, yes.

19   Q.   Okay.  And various procedures that wanted to be -- that

20   were made available to various groups of employees were posted

21   to this CODA system; correct?

22   A.   Some of them.  I don't recall who, what, when, where, why.

23   Q.   Okay.  Fair enough.

24         Okay.  Let's talk about how Done was structured.

25         Done had, I believe you testified, two entities; is that

1   correct?

2   **A.**   From my understanding, yes.

3   **Q.**   Okay. All right. There was something called Done Global,

4   which was a technology company; correct?

5   **A.**   It called itself one, yes.

6   **Q.**   All right. And then separately, there was an entity

7   called Done Health; right?

8   **A.**   Yes.

9   **Q.**   All right. And Done Health was a medical professional

10   corporation; correct?

11   **A.**   That's how it was registered, yes.

12   **Q.**   All right.

13      Now, this -- and you understand that the medical practice,

14   the medical professional corporation, needed to be owned by a

15   physician; is that right?

16   **A.**   That is correct. That was my understanding.

17   **Q.**   All right. And your -- you're -- you -- you understood

18   that that structure is a common way that telehealth companies

19   are structured?

20   **A.**   Yes, with a very strong master service agreement between

21   the two to identify what each entity does and guardrails to

22   ensure that each entity does those things.

23   **Q.**   Great.

24      This management services agreement that you're talking

25   about, that is an agreement between the technology company and

1    the medical corporation that is very detailed and describes

2    what responsibility the technology company has and what

3    responsibilities the medical corporation has?

4    **A.**    In a typical telehealth setup, yes, that is exactly how it

5    works.

6    **Q.**    Okay.  I'm going to show you the management services

7    agreement.

8            **MR. SCHACHTER:**  We move to admit 5291 that governed

9    the relationship between Done Health and Done Global.

10           **MR. FOSTER:**  Objection, foundation.

11           **MR. SCHACHTER:**  I'll ask the witness.

12   BY MR. SCHACHTER:

13   **Q.**    Mr. Levy, during the course of your work, you reviewed the

14   management services agreement between Done Health and Done

15   Global, did you not?

16   **A.**    I don't recall reviewing -- I recall requesting it, but I

17   don't recall ever receiving a copy of it.

18   **Q.**    Okay.  I mean, you testified about a lot of things that

19   you said were improper for Ruthia to be doing as head of Done

20   Global.

21           Do you remember that testimony?

22   **A.**    Yes, and I crossed that line at times as well.

23   **Q.**    Okay.  You testified about how her role in certain

24   policies was improper, correct?

25   **A.**    Yes.

1    **Q.**   Okay.  Did you ever look at the management services

2    agreement which governed the relationship to see what, if

3    anything, it said specifically about how Done Global was

4    supposed to set policies for Done Health?

5    **A.**   I don't have a recollection of that document or seeing it.

6    And I know from my experience that it has never been from the

7    corporate side to establish those, and the guiding principle

8    has been that the medical corporation has the final blessing on

9    those documents to go out.

10   **Q.**   Okay.  You don't know about what role, if anything, Done

11   Global was supposed to have in setting policies for Done

12   Health?  You don't know?

13   **A.**   Not based on that agreement, no.

14   **Q.**   Fair enough.

15      You testified about how you were concerned about how the

16   financial part of the relationship with Done Health and Done

17   Global worked.

18      Do you recall that testimony?

19   **A.**   Yes.

20   **Q.**   Did you ever look at the portion of the management

21   services agreement which specifically talks about who bills the

22   patients, who pays the medical providers?

23      Before testifying that it's improper, did you ever look at

24   the agreement to understand what -- whether, in fact, Ms. He

25   was in complete compliance with it?

1   **A.**   I don't believe that agreement was what the law demands

2   because I never saw it.  The law demanded that money flow at a

3   certain way to avoid corporate practice of medicine, which was

4   what we were being told.

5   **Q.**   Okay.  You're not a lawyer; correct?

6   **A.**   No.  This was information that we received from counsel,

7   though.

8   **Q.**   Okay.  Well, I guess we don't want to get into that.

9        But this agreement -- you don't think Ms. He wrote it, do

10  you?

11             **MR. FOSTER:**  Objection, foundation.

12             **THE COURT:**  I think he said he didn't see it.

13             **MR. SCHACHTER:**  Okay.

14             **THE COURT:**  So that's the end of that.

15             **MR. SCHACHTER:**  Good enough.  That is the end of that.

16  BY MR. SCHACHTER:

17  **Q.**   All right.  Let's talk about the role that -- putting

18  aside the agreement, let's talk about how it worked while you

19  were there.

20       So Done, as a business, connected patients to licensed

21  medical providers; correct?

22  **A.**   Done did a lot more than that, yes.

23  **Q.**   Sorry.  That was a bad question.

24       One of the things that Done did was it connected patients

25  to licensed medical providers; correct?

1  **A.**   That's one of the things, yes.

2  **Q.**   All right.  And those medical providers would meet with

3  the patients that had been introduced to that medical provider

4  via a telehealth platform; correct?

5  **A.**   Yes.  Yes, they -- I mean, they would meet over Zoom after

6  an intake on -- you know, a partial intake or depending on the

7  time frame was completed, yes.

8  **Q.**   Great.  Thank you.

9      Now, you understand that each of those licensed medical

10  providers had an ethical obligation to act in the best interest

11  of their patients?

12  **A.**   Yes, I would agree with that.

13  **Q.**   All right.  They each had a duty to use their independent

14  clinical judgment when evaluating and diagnosing patients;

15  correct?

16  **A.**   They did have that duty, yes.

17  **Q.**   They each had an independent duty to only prescribe

18  medication, certainly controlled substances, to patients where

19  they believed that medication was in the patient's best

20  interest?  That was their duty; correct?

21  **A.**   That was their duty.  It was not the way in which Done was

22  set up.

23  **Q.**   Okay.  Well, putting aside how it's set up, you were not

24  in any visits between medical providers and patients; correct?

25  **A.**   I personally was never in one of those visits, no.  There

1  were other employees of Done that would join those visits to

2  monitor the providers, though, and particularly after

3  operations moved to China.

4  **Q.**  Mm-hmm.

5      I asked you, were you in any meetings, any visits, between

6  patients and providers?

7  **A.**  Personally, I was not.

8  **Q.**  Okay.  And -- withdrawn.

9      Okay.  All of the prescriptions were issued by licensed

10  medical providers during the time that you were there; correct?

11  **A.**  They were issued by providers.  I know that some were not

12  licensed in all the states that they needed to be, but they

13  held a license of some sort, yes.

14  **Q.**  Okay.  We're going to get into that in a moment.  Thank

15  you.

16      Okay.  And I am correct, am I not, that while you worked

17  there, you believed that it was the provider's obligation to

18  make their own decisions about whether they can prescribe

19  medications to patients; correct?

20  **A.**  I certainly made statements along those lines while

21  parroting back the party line that we had established in all of

22  our press calls and how to maintain the narrative within Done.

23  **Q.**  Let me show you one of the statements, and you can tell us

24  if you were parroting the party line.

25      **MR. SCHACHTER:**  Your Honor, we move to admit 7115.

1    **MR. FOSTER:** Objection, argumentative, Your Honor.

2  Hearsay, not impeaching, and consumption of time.

3    **THE COURT:** May I see it?

4    **MR. SCHACHTER:** Yes, Your Honor.

5    **THE COURT:** What do you want me to look at?

6    **MR. SCHACHTER:** The portion --

7    **THE COURT:** The time. The time.

8    **MR. SCHACHTER:** It's on the screen, Your Honor. It's

9  at 9:39 and a little bit before then.

10    **THE COURT:** Okay. Oh.

11            (Pause in proceedings.)

12    **THE COURT:** Okay. I'll allow it.

13    **THE COURTROOM DEPUTY:** Portions are admitted?

14    **THE COURT:** Portion.

15    **MR. SCHACHTER:** 7115.

16    (Trial Exhibit portions of 7115 received in evidence.)

17    **MR. SCHACHTER:** Can everybody see it?

18    Just for context, Your Honor, we'd like to start with

19  9:33 and take us to this portion at 9:40.

20    **THE COURT:** Okay. Go ahead.

21  **BY MR. SCHACHTER:**

22  **Q.** This is a communication that you had with Ms. Faber; is

23  that correct?

24  **A.** This appears to be, yes.

25  **Q.** All right. And can you just remind me again: What --

1  Ms. Faber's title was what?

2  **A.**   She was the, I believe, group lead was the title we

3  assigned of provider relationship management.

4  **Q.**   Is that somebody that reported to you or to somebody else?

5  **A.**   She reported -- she reported up in to me.  There was

6  someone in between.

7  **Q.**   Okay.  Now, you're talking about a medical provider named

8  Yina Cruz; is that correct?

9  **A.**   I believe so, yes.

10  **Q.**   All right.  And they're talking about how Ms. Cruz thinks

11  that due to COVID, she can prescribe medications in Texas.  She

12  says she's been doing it all year.

13       Do you see where Ms. Faber tees up the issue to discuss

14  with you?

15  **A.**   Yes, I do.

16  **Q.**   Okay.  And there was an issue during COVID where medical

17  providers were allowed to prescribe across state lines into

18  other states; is that correct?

19  **A.**   There was a DEA exemption, but the states still had

20  licensure requirements, which was a requirement for them to be

21  issuing controlled substances in that state.

22  **Q.**   Okay.  The DEA exemption, can you describe that?

23  **A.**   My understanding of the DEA exemption was that if a

24  provider had a valid and active DEA number in their home state

25  and one of their patients from their practice had to go

1  somewhere else in another state, they could issue a controlled

2  substance into that state so long as they met the state

3  requirements for licensure as well.

4  **Q.**   Okay.  Thank you.

5      And that idea of a COVID waiver, is that what Ms. Faber

6  speaks about in the next communication?

7  **A.**   Yes.  I don't know if Texas had those or did not.

8  **Q.**   Okay.  You write (as read):

9          "That's super super riskier on her part."

10  Do you see that?

11  **A.**   Yes.

12  **Q.**   Okay.  And then if we can look a little bit further down,

13  you then write (as read):

14          "That absolves us of liability.  She can make

15      her own decision on what she wants to do."

16  Do you see that?

17  **A.**   I did write that.  That was me parroting back the

18  information that I had received from Ruthia when I first

19  joined, and I had a lot of questions about the waiver and how

20  providers, you know, acted.

21  **Q.**   Okay.  In any event, Ruthia is not on this communication?

22  This is a communication between you and Ms. Faber; correct?

23  **A.**   That is correct, yes.

24  **Q.**   All right.  And what you're saying effectively here is

25  that this medical provider -- really, it's up to the medical

1  provider to make their own decision as to where they can

2  prescribe; correct?

3  **A.**   That is what I am saying here, yes.

4  **Q.**   Okay.  All right.

5       Now --

6            **MR. SCHACHTER:**  Okay.  You can take that down,

7  Mr. Cepregi.

8  **BY MR. SCHACHTER:**

9  **Q.**   Now, Done set policies on how much time would be set aside

10 for an initial meeting between the patient and provider; is

11 that correct?

12 **A.**   That's my understanding.  That was established well before

13 my time there.

14 **Q.**   Okay.  But during the time you were there, you understood

15 that's one of the policies that Done had put in place?

16 **A.**   Yes.

17 **Q.**   Okay.  Done set policies on how the providers would be

18 paid from the money that had been collected from the patients;

19 correct?

20 **A.**   Yes, and that was what I was believing to be wrong about

21 how it worked.  I thought that the PC should be establishing

22 that.

23 **Q.**   Sure.  We're going to get into your views of it, but for

24 now I'm simply asking:  You understood that Done set a policy

25 by which the medical providers were paid from the money that

1  Done was collecting from patients; correct?

2  **A.**   Correct.

3  **Q.**   All right.

4      You understood that Done's clinical president, Dr. Brody,

5  provided guidance and advice on what was the appropriate

6  standard of care for the diagnosis and treatment of ADHD;

7  correct?

8  **A.**   I'm not confident in what that was or how it got sent out

9  to providers.  I know of one-on-one Zoom calls that occurred,

10  but that's about it.

11  **Q.**   You're saying you didn't know about Dr. Brody providing

12  clinical guidance to the medical providers on the platform; is

13  that your testimony?

14  **A.**   Correct.  We saw the e-mail earlier related to that that

15  was copy-and-pasted into Slack, but I don't recall -- I was not

16  copied.  If those went out, I was not copied on them.

17  **Q.**   Okay.

18      **MR. SCHACHTER:**  We move to admit 7115, Your Honor,

19  which is the same document, just a different portion.

20      **MR. FOSTER:**  I don't know what it is, Your Honor.

21      **MR. SCHACHTER:**  I'm sorry.  7115.  We just talked

22  about it.  It was the communication with Ms. Faber focusing on

23  Mr. Levy's communication, Your Honor, on the top of page 2.

24      (Pause in proceedings.)

25      **THE COURT:**  Okay.  I'll allow it.

1        (Trial Exhibit 7115 received in evidence.)

2   BY MR. SCHACHTER:

3   Q.   Okay.  Mr. Levy, do you see where you wrote in this

4   communication with Ms. Faber (as read):

5        "The biggest thing we want to understand is what

6        he considers not to be an acceptable standard of

7        care.  Also, as much as Dr. Brody is a PITA to work

8        with on certain things, he has over 36 years of

9        clinical experience as a board-certified

10       psychiatrist, and he deems this a standard of care

11       consistent with what would be expected in person."

12       Do you see that?

13  A.   I do see that.

14  Q.   Okay.  And the term "PITA," does that stand for pain in

15  the A?

16  A.   It does.

17  Q.   Okay.  And to be clear, by the way --

18       Well, let me just ask you:  You did not like working with

19  Dr. Brody on a personal level; is that correct?

20  A.   I found it extremely challenging, and we had our personal

21  differences, yes.

22  Q.   Okay.  But -- well, withdrawn.

23       By the way, this communication is dated January 10 of

24  2022.  Do you see that?

25  A.   I do see that.

1   **Q.**   Okay.

2          **MR. SCHACHTER:**  You can take that down.

3   **BY MR. SCHACHTER:**

4   **Q.**   Now, you were not a doctor; correct?

5   **A.**   Correct.

6   **Q.**   You were not a medical professional; correct?

7   **A.**   Correct.

8   **Q.**   And what we see in that communication --

9          Well, you are saying that in your view, you are deferring

10  at that point in time to Dr. Brody's description of what is an

11  acceptable standard of care; correct?

12  **A.**   Can I see it again?

13  **Q.**   Sure.  You see when you wrote (as read):

14          "He has over 36 years of clinical experience as

15          a board-certified psychiatrist, and he deems this a

16          standard of care consistent with what would be

17          expected in person."

18          You see that?  And I'll now pose a question.

19  **A.**   I do see that, yes.

20  **Q.**   Okay.  What you are saying there is you are not a

21  psychiatrist; correct?

22  **A.**   I am not a psychiatrist.  I didn't say I wasn't there, but

23  I am not one; correct.

24  **Q.**   And when you are saying that Dr. Brody deems this an

25  acceptable standard of care, what you're saying is you,

1 personally, are not in a position to second-guess him as he

2 describes what is an acceptable standard of care; correct?

3 **A.** Correct, I was -- I am not in a position to do so.

4 **Q.** Okay. Now, you understood that Ms. He also is not a

5 psychiatrist; correct?

6 **A.** Correct.

7 **Q.** She, like you, was not a medical professional; correct?

8 **A.** Correct.

9      **MR. SCHACHTER:** All right. You can take that down.

10 **BY MR. SCHACHTER:**

11 **Q.** Now, you testified about -- I think concerns that had been

12 raised that you heard about the prescription of stimulants for

13 Done's patients.

14      Do you recall that general subject?

15 **A.** Yes. I raised countless concerns.

16 **Q.** Okay. You raised concerns about the prescription of

17 stimulants to Done's patients; correct?

18 **A.** Yes. I raised them on behalf of myself, by providers, by

19 everyone that I had spoken to that raised a concern to me.

20 **Q.** Okay. That is what you say now.

21      However, as someone with ADHD, you know that stimulants

22 are the first-line treatment for ADHD sufferers; is that

23 correct?

24 **A.** That was my understanding at the time, yes.

25 **Q.** Okay. And you, in fact, at the time talked to Ruthia

1    about your views that it was improper for providers to have a

2    preconceived notion that stimulants are bad.

3         Do you remember communicating your view to Ruthia about

4    that?

5    **A.**   I do not.

6         **MR. SCHACHTER:**  Your Honor, we move to admit 7120, a

7    communication between Mr. Levy and Ms. He on that subject.

8         **MR. FOSTER:**  I think there needs to be a foundation,

9    Your Honor.

10        **THE COURT:**  I need to see it.

11        **THE COURTROOM DEPUTY:**  Thank you.

12        **MR. SCHACHTER:**  Thank you, Your Honor.

13        **THE COURT:**  What do I look at?

14        **MR. SCHACHTER:**  Starting at 3:58.

15        **THE COURT:**  3:58?

16        **MR. SCHACHTER:**  Yes.

17        **THE COURT:**  I only have the 4:00.

18        **MR. SCHACHTER:**  I'm sorry.  It's at 4:11.

19        **THE COURT:**  4:11.

20        **MR. SCHACHTER:**  And it's on the screen, Your Honor.

21    And it goes on to the second page.

22        It continues on to the next page.

23        **THE COURT:**  Can you go back.

24        **MR. SCHACHTER:**  Mr. Cepregi, can you go back to the

25    previous page.

1      MR. FOSTER:  Your Honor, I think he's just -- because

2  we don't have the exhibits and there's no question being posed

3  to the witness, we don't know if it's hearsay.

4      MR. SCHACHTER:  The document itself, Your Honor, is

5  not hearsay.  It's information that Mr. -- it's views that

6  Mr. Levy has shared --

7      THE COURT:  Admitted.

8      (Trial Exhibit 7120 received in evidence.)

9      MR. SCHACHTER:  Thank you, Your Honor.

10  BY MR. SCHACHTER:

11  Q.   All right.  Mr. Levy, I'm showing you a communication that

12  you have with Ms. He in November of 2021.

13      Do you see that?

14  A.   Yes.

15  Q.   Okay.  And in this communication, Ms. --

16      MR. SCHACHTER:  Actually, if we can we go up to 3:58.

17  3:58, Mr. Cepregi, prior page.

18      Okay.

19  BY MR. SCHACHTER:

20  Q.   Just to set the context, do you see where Ms. He says (as

21  read):

22          "For all the new provider hire that we're

23          planning to onboard, how do you think about we can

24          send them to Dr. Brody to review before we extend an

25          offer?"

1          Do you see that?

2   **A.**   I do.

3   **Q.**   You write (as read):

4          "I think in theory that's fine."

5      You note some disagreement with what he said that day, but

6   then you go on to say (as read):

7          "He could put in effort to develop training

8          materials for them.  He could put in effort to hold

9          courses for them."

10     This is you expressing a view to Ms. He that it's

11  important that Dr. Brody provide educational information to the

12  providers on the platform; is that correct?

13  **A.**   That's part of this, yes.

14  **Q.**   Okay.

15          **MR. SCHACHTER:**  And if we could turn to the next page.

16  **BY MR. SCHACHTER:**

17  **Q.**   Ms. He writes at the beginning (as read):

18          "He agrees that we should grow fast and was more

19          like advocating for quality control in terms of

20          bringing in new providers and want to invest more in

21          educating existing providers."

22          **MR. SCHACHTER:**  And then if we can go to the next

23  page.

24  **BY MR. SCHACHTER:**

25  **Q.**   At 4:13 or -- actually, at the -- do you see where --

1        **MR. SCHACHTER:** If you can go to the next page. Oh,

2   there we are. I'm sorry. Back to where you were.

3   BY MR. SCHACHTER:

4   **Q.** Okay. Ms. He writes (as read):

5           She says, "Yes, I think for NP we probably need

6        to do screening, so you may be surprised, but most of

7        providers actually don't want to prescribe

8        stimulants."

9        You write (as read):

10           "Oh, I'm sure they don't."

11       She says (as read):

12           "And that's why recruiting interviews is also

13       like an educational session, just like how pharmacy

14       doesn't want to fill it."

15       She writes (as read):

16           "The whole system is against it.

17       You write (as read):

18           "We'll clarify a better interview process."

19       Then you go on to say (as read):

20           "I think new graduate NPs are actually our" --

21       all caps -- "BEST CANDIDATES. They don't have this

22       preconceived notion that stimulants are bad."

23       Do you see that?

24   **A.** I do see that.

25   **Q.** Okay. And what you are saying to Ms. He is that

1  medical -- some medical providers, and in particular, nurse

2  practitioners, will have concerns about prescribing stimulants;

3  correct?

4  **A.**   Yes.  I relayed that.

5  **Q.**   Okay.  And when you're talking about a preconceived notion

6  that stimulants are bad, what you're referring to is the fact

7  that they are regulated as controlled substances; is that

8  correct?

9  **A.**   Well, as health concerns that have been raised regarding

10  them, yes.

11  **Q.**   Okay.  And they're controlled substances?

12  **A.**   They are controlled substances, yes.

13  **Q.**   And you understand that there are medical providers that

14  are more reluctant to prescribe a controlled substance because

15  of the regulatory scrutiny that goes along with it; is that

16  correct?

17  **A.**   Yes.

18  **Q.**   Okay.  And what you are saying is that it is better to

19  hire younger nurse practitioners who will not come to the

20  evaluation and treatment of patients with a preconceived notion

21  that stimulants are bad?

22      That's what you're saying; correct?

23  **A.**   That is what I'm saying here.  This was prior to

24  understanding that we didn't actually have the educational

25  resources internally to effectively work on this plan.

1   **Q.**   Right.  But you're coming to this conversation with Ms. He

2   with experience as an ADHD sufferer yourself; correct?

3   **A.**   And I'm only one patient out of the whole equation, but,

4   yes, I was someone who suffered from ADHD.

5   **Q.**   And this statement that you make to Ms. He that newer

6   nurse practitioners may not have a preconceived notion that

7   stimulants are bad, was that informed in part by your

8   experience as an ADHD patient?

9   **A.**   No -- no.  My nurse practitioner had 20 years' experience,

10  the one that I saw in my adulthood and -- until I joined Done.

11  So no.

12  **Q.**   Okay.  All right.  Now --

13       **THE COURT:**  Let's take recess.

14       Ladies and gentlemen, we'll be in recess until 10 to 3:00.

15       Remember the admonition given to you:  Don't discuss the

16  case, allow anyone to discuss it with you, form or express any

17  opinion.

18                  (The jury leaves the courtroom.)

19       (Proceedings were heard out of the presence of the jury.)

20                  (Recess taken at 2:37 p.m.)

21                  (Proceedings resumed at 2:58 p.m.)

22       (Proceedings were heard out of the presence of the jury.)

23       **THE COURTROOM DEPUTY:**  Come to order.  Court is now in

24  session.

25       **THE COURT:**  Okay.  Bring in the jury.

1          (The jury enters the courtroom.)

2      (Proceedings were heard in the presence of the jury.)

3          THE COURT:  So congratulations to all of you who are

4  from Los Angeles.

5      Okay.  Please be seated.

6      Okay.  Let the record reflect all jurors are present,

7  parties are present.

8      You may proceed.

9          MR. SCHACHTER:  Thank you, Your Honor.

10 BY MR. SCHACHTER:

11 Q.  All right.  Mr. Levy, before the break we were looking at

12 a document in which, among other things, you had talked

13 about -- talked to Ruthia about Dr. Brody putting out

14 educational and training materials for the providers.

15     Do you recall that?

16 A.  I do, yes.

17 Q.  Okay.  And he did that.  You were aware that he sent out

18 clinical newsletters to the medical providers; is that correct?

19 A.  I was not aware that those went out.

20 Q.  Okay.

21         MR. SCHACHTER:  Your Honor, we move to admit 7467, a

22 clinical newsletter provided to Mr. Levy.

23         MR. FOSTER:  Hearsay.

24         MR. SCHACHTER:  It's not offered for truth, Your

25 Honor.

1     **THE COURT:**  Admitted.

2         (Trial Exhibit 7467 received in evidence.)

3         **MR. SCHACHTER:**  Actually, Mr. Cepregi, can you zoom

4     back out?

5     **BY MR. SCHACHTER:**

6     **Q.**   Mr. Levy, do you see a Done clinical newsletter which was

7     forwarded to you on July 1st, 2022?

8     **A.**   I do see that -- the subject line.  I haven't had a chance

9     to read the document yet.

10        **MR. SCHACHTER:**  Okay.  Now, can we zoom back out.

11    **BY MR. SCHACHTER:**

12    **Q.**   Do you see that this clinical newsletter which was

13    forwarded to you is under the subject "ADHD and Anxiety."

14    **A.**   I do see that subject, yes.

15    **Q.**   Okay.  And just to highlight a couple of portions, it goes

16    on to describe how (as read):

17            "ADHD patients are around two and a half times

18        more likely than the general adult population to have

19        an anxiety disorder.  Clinicians who treat ADHD must

20        understand the increased likelihood that their

21        patients are also experiencing anxiety, as both must

22        be carefully managed during treatment.  Some data

23        indicates treatment of ADHD can lower anxiety in

24        children and adults."

25        **MR. SCHACHTER:**  And then, if we can turn briefly to

1    the second page.

2    BY MR. SCHACHTER:

3    Q.    Focusing on the paragraph that starts (as read):

4             "The classic dilemma of treating comorbidities

5          arises when an effective treatment for disease A

6          worsens comorbid disease B.  That said, studies have

7          shown that patients who were treated with medication

8          for ADHD did not experience an increase in anxiety.

9          In fact, anxiety was decreased.  Another study found

10         that treating ADHD patients with a stimulant improved

11         their anxiety as well as their ADHD symptoms."

12    Okay.

13            MR. SCHACHTER:  You could take that down.

14    BY MR. SCHACHTER:

15    Q.    Now, in addition to clinical newsletters directed to the

16    providers, you were aware that Dr. Brody published blog posts

17    on Done's website on anxiety and ADHD and the treatment of

18    ADHD.

19         Are you aware of that?

20    A.    I was not aware of the blog that Dr. Brody published, no.

21    Q.    Okay.  During your time as executive lead in operations

22    and strategy, did you go on Done's website?

23    A.    I did go on Done's website from time to time, yes.

24    Q.    Okay.  And did you see -- and you worked there in June of

25    2022; is that correct?

1    **A.**    What was the question?  Sorry?  Did I work there?

2    **Q.**    You worked at Done in June of 2022?

3    **A.**    Yes, I did.

4    **Q.**    And in your review of the website did you happen to see a

5    blog published by Dr. Brody on the subject of ADHD and anxiety?

6    **A.**    I don't recall that blog.

7    **Q.**    Okay.  You worked there in December of 2021?

8    **A.**    I did.

9    **Q.**    Do you recall a blog -- a blog published on Done's website

10    entitled, "Stimulants are not the only treatment for ADHD"?

11    **A.**    I do not recall the blog at all.  That was -- I was siloed

12    away from a lot of the marketing and the communication that was

13    on the website and I was not part of the design or publishing

14    of the website.  So I -- I would visit it to log into my own

15    EHR login, but I would not explore the website or go around it

16    frequently.

17    **Q.**    Okay.  Well, you testified that you were concerned about

18    how Done's advertising was targeting drug seekers.

19         Do you remember that testimony?

20    **A.**    I do.

21    **Q.**    And part of the way that Done advertised was through its

22    website; correct?

23    **A.**    I'm not certain.  I -- it was a thought leadership

24    exercise if we're talking about blogs.  But I don't recall the

25    blogs, truthfully.

1  **Q.**  Okay.  Well, thought leadership exercise.  You're aware

2  that Done put out information on its website for patients and

3  prospective patients in order to educate on the evaluation and

4  treatment of ADHD; yes or no?

5  **A.**  I'm aware that there was language to get them to sign up,

6  and if that was part of that language, then I'm aware that that

7  existed.

8  **Q.**  Okay.  Well, but are you aware -- whether we call it a

9  blog or not -- about published thought pieces made available to

10  prospective patients that provided the reasons why stimulants

11  are not always the best treatment for ADHD?

12     Do you remember seeing that?

13  **A.**  I do not.

14  **Q.**  Do you remember any information on the website about the

15  variety of treatments that is available for people with ADHD

16  beyond stimulant medication?

17  **A.**  I do not recall the variety of options available or

18  published on the website.  I don't.

19  **Q.**  Okay.  Okay.

20     Now, there was a point in time at Done where you were made

21  aware of Dr. Brody's onboarding materials that were provided

22  for the education of new providers; correct?

23  **A.**  It's not -- I'm not recalling it right now.

24  **Q.**  Okay.

25     **MR. SCHACHTER:**  Your Honor, we will move to admit

1   Exhibit 7238, a comment from Mr. Levy with respect to provider

2   onboarding videos.

3          THE COURT:  Admitted.

4      (Trial Exhibit 7238 received in evidence.)

5   BY MR. SCHACHTER:

6   Q.   Okay.  And Mr. Levy, do you see -- is this what's referred

7   to at Done as an Asana task?

8   A.   Yes, this looks like an e-mail related to Asana.

9   Q.   Okay.

10  A.   This might actually be a Google Docs related e-mail.  I

11  don't -- I'm not certain.

12          MR. SCHACHTER:  Okay.  Can we blow out -- can we zoom

13  out.

14  BY MR. SCHACHTER:

15  Q.   Does that help you?

16      Well, withdrawn.  It doesn't matter -- putting aside

17  whether it's Google or Asana, do you see where it mentioned

18  that you had made a comment on the following document?

19  A.   I did add a comment.

20  Q.   Okay.  And the thing that you are commenting on is

21  provider onboarding notes documents, and then below that, you

22  had written under the subject "provider onboarding videos," you

23  wrote "Ruthia shared this with me."

24      Do you see that?

25  A.   Yes, I did write that.

1   **Q.**   You write (as read):

2           "We should review these videos and relevant

3       today."

4       Do you see that?

5   **A.**   Yes, I do.

6   **Q.**   Okay.

7       So, sir, you are familiar with an onboarding video

8   prepared by Dr. Brody titled "Our Values Clinical Standards."

9       Do you recall that?

10  **A.**   I do not recall that.  This appears to me to be referring

11  to technical training videos of how to use the platform.

12  **Q.**   Okay.  Well, putting aside this document, in the course of

13  your work, did you review onboarding videos provided -- created

14  by Dr. Brody to educate new providers on the evaluation and

15  treatment of ADHD?

16  **A.**   I do not recall seeing those videos.

17  **Q.**   And when you say, "We should review these videos," you

18  don't recall reviewing any videos?

19  **A.**   No.  And again, the reference to down below RXNT and EHR

20  ones, et cetera, so I believe that this is related to the

21  technical platforms at Done not related to the clinical

22  policies and procedures that we could never publish.

23  **Q.**   Okay.  Okay.

24          **MR. SCHACHTER:**  Okay.  You can take that down.

25  \\\

BY MR. SCHACHTER:

Q.   Different topic.

You had communications with Ms. He and others in which you expressed the view to her that there was virtually no risk that patients would be -- patients of Done would be abusing Adderall; do you recall that?

A.   I do not recall that.

MR. SCHACHTER:   Your Honor, we will move to admit 7121, a communication between Mr. Levy and Ms. He and others on that topic.

MR. FOSTER:   What page?

THE COURT:   Admitted.

(Trial Exhibit 7121 received in evidence.)

BY MR. SCHACHTER:

Q.   Okay.  All right.  Mr. Levy, do you see this communication that you had with Ms. He and a person named MJ Chey?

A.   I don't see my name in any of the messages, but I recognize this as a Slack group chain.

Q.   Okay.  We're going to get to your comments in this chain in a moment.  But you see you're there as part of the chain?

A.   Yes.

Q.   Okay.

And if we can -- well, MJ Chey, can you just describe for the jury who that person was -- is?

A.   So MJ was brought on around the same time that I was, the

1  same week.  And she was cast as an investor with a lot of

2  experience and then she ended up running the -- to my

3  understanding, running a lot of the financial decisions.  And

4  when there was a -- working relationship challenges between

5  myself and Dr. Brody, she stepped in to take over the

6  leadership portions of that.

7  **Q.**  Okay.  Thank you.

8      All right.  Ms. Chey says (as read):

9          "I met an investor who has ADHD.  He thinks the

10         fraction of abusers are ruining ADHD community and

11         hurting the reputation of business like ours."

12     She goes on and says (as read):

13         "And that ASRS" --

14     That's the adult screening tool for ADHD?

15  **A.**  The self report?

16  **Q.**  Yes.

17  **A.**  Yes.

18  **Q.**  (as read):

19         " -- and the PDMP are not to be called extensive

20     screening method."

21     And then going down in these comments she writes -- I'm

22  sorry.

23         **MR. SCHACHTER:**  No.  No can we go further back up.

24  Okay.

25  \\\

1  **BY MR. SCHACHTER:**

2  **Q.**   Focusing on the non-highlighted portion of her comment.

3  She writes (as read):

4        "It is one person's investor,"

5     And goes onto say (as read):

6        "Data to show our screening protocol is more

7        extensive than others."

8     And goes on.

9     Then, let's look at your comment in response to that.

10       **MR. SCHACHTER:**   No, no, further up, Mr. Cepregi.

11  Okay.   There we go.

12     Can you just blow up the bottom half of the page, please.

13  There you go.

14  **BY MR. SCHACHTER:**

15  **Q.**   All right.   You write (as read):

16        "Kaiser is notoriously horrific in terms of

17        getting ADHD care.   I can share an experience they

18        made an adult patient to go through to get care."

19     Do you see that?

20  **A.**   I do.

21  **Q.**   When you say Kaiser is notoriously horrific, does that

22  have to do with the difficulty in getting care through Kaiser?

23  **A.**   It had to do with the difficulties and all the hoops and

24  steps they had to take to get insurance approval because Kaiser

25  is a closed system.   So all the steps they had to take to

1  actually get the approval through the insurance, and then

2  actually be scheduled with a psychiatrist and a psychologist;

3  they had to see both, from my understanding.

4  **Q.**   Okay.  So what you are saying is that for somebody who

5  fears they're suffering from ADHD, it can be a long road

6  through Kaiser before you're ultimately able to be evaluated by

7  a mental health professional; is that right?

8  **A.**   That's -- that was my understanding at the time, yes.

9  **Q.**   Okay.  And then you go on to say (as read):

10      "I think an interesting point to make is that of

11      all the patients we have served there was one

12      confirmed case of abuse."

13      Do you see that?

14  **A.**   I do.

15  **Q.**   All right.  And what you're suggesting -- Ms. Chey is

16  talking about communicating with an investor.  And what you're

17  saying is that it may be an interesting point to make to that

18  investor is that of all the patients you've served, there was

19  one confirmed case of abuse.

20      Is that correct?

21  **A.**   Yes, I came to that conclusion or opinion on the very

22  small data set that I was exposed to of our patient population.

23  I didn't have the full picture when I said this.

24  **Q.**   Okay.  You'd been working there for about four months?

25  **A.**   Roughly.  Three and change, yes.

1    **Q.**    Okay.  Now Ms. Chey then asks you (as read):

2            "Well, does that mean that there was lots of

3        potential cases that we were not tracking?"

4        Do you see that?

5    **A.**    Yes, she does.

6    **Q.**    All right.  And you respond.  (as read):

7            "One confirmed case by -- one confirmed case by

8        law enforcement out of 40,000 patients."

9        Do you see that?

10   **A.**    I do.

11   **Q.**    Okay.  And so the limited experience that you're talking

12   about is, of 40,000 patients, there had been only one confirmed

13   case by law enforcement.

14       That's what you say?

15   **A.**    By law enforcement, yes.  I did not have access to

16   clinicians hoping to offboard patients they suspected of abuse

17   or pharmacies reporting patients for abuse.  I did not have any

18   of that information at the time.

19   **Q.**    Okay.  But this isn't a chat that you're communicating

20   with Ms. He; is that correct?

21   **A.**    Yes.  She was on this chain.

22   **Q.**    Okay.  And then you say (as read):

23           "We would find out if a patient was diverting.

24       Law enforcement notifies the prescribers on their

25       PMDP."

1      You mean PDMP; correct?

2   A.   I -- yes.

3   Q.   And then you go on to say -- towards the bottom you say --

4   well, Ms. Chey says (as read):

5          "Isn't it notoriously hard to catch diversion.

6      And also wouldn't catch the college kids that are

7      taking the meds themselves."

8      You respond, "Nothing would"?

9   A.   Yeah.  It would be very challenging to trace that.

10  Q.   Okay.  And, I mean -- okay.

11     And what you mean is that if, as you pointed out on

12  direct, that if a college kid happens to hand an Adderall to

13  somebody else, there's really -- it's very difficult to monitor

14  that?

15  A.   Yes.

16  Q.   Okay.  And by the way, I mean, we'll get to this, but

17  there's actually a point in time where Sarah Barker, a nurse

18  practitioner, says to you she's out of her Adderall and you say

19  you have stock bottles, and offered to share one with her; is

20  that correct?

21  A.   I did say that.  We never mailed anything between one

22  another regarding that.  And I was being overprescribed

23  Adderall by my previous PMHNP, so I had bottles that were

24  sitting there that I had yet to dispose of.

25  Q.   Okay.  And to be clear, you understood that Ms. Barker,

1   like you, had suffered from ADHD; correct?

2   **A.**   Correct.

3   **Q.**   And so -- I mean that is technically diversion, if you are

4   sharing your prescription medication with somebody else;

5   correct?

6   **A.**   It is.  And I never did.

7   **Q.**   Never did.  But she asked you -- I'm out of Adderall --

8   she says she's out of Adderall you say:  I have stock bottles.

9   I can give you some.

10  **A.**   I did say that and never mailed anything, and we stopped

11  the conversation there.

12  **Q.**   And, in fact, in that communication you recall you

13  specifically talked about dosage, what dosage you had, what

14  dosage she needed.

15      Do you remember that?

16  **A.**   I recall discussing what I had, yes.

17  **Q.**   Okay.  All right.

18      And then if we can turn to the next page.  You write at

19  the top of the page --

20          **MR. SCHACHTER:**  There we are.  Blow up just the top of

21  the next page.  Further down.  Further down.  Right.

22  **BY MR. SCHACHTER:**

23  **Q.**   You write (as read):

24          "Agreed.  I just think it also assumes all we

25      treat are drug abusers, and that's crappy."

1    Do you see that?

2   **A.**   Yes.

3   **Q.**   Okay.  There is a stigma -- do you agree with me that

4   there is a stigma that people that are -- that are prescribed

5   Adderall may be being prescribed that not because they have

6   ADHD but because they're drug seekers?

7   **A.**   I would certainly agree with you at the time that I felt

8   that.  I now understand the reason for the scrutiny behind it.

9   But at the time, I was also looking for any reason to validate

10  Done, and looking for any reason to discount any critics.

11  **Q.**   Right.  I guess -- we understand -- we heard your

12  testimony today.

13   But at the time -- at this time, in February of 2022, what

14  you were saying is it assumes that all we treat are drug

15  abusers, and you say "that's crappy."

16   Correct, at the time?

17  **A.**   Yes.

18  **Q.**   Okay.

19   And then if we can turn to the next page, page 4.

20       **MR. SCHACHTER:**  Bottom half of the page.  You know

21  what?  If we can start at Ms. Chey's communication at 10:56

22  p.m.  There.  If we can blow up from 10:57 -- no below.

23  10:57:34, to the bottom of the page.

24  **BY MR. SCHACHTER:**

25  **Q.**   Okay.  Ms. Chey writes (as read):

1          "Well, isn't it reasonable to assume a part of

2     that would be abusers?

3     You respond (as read):

4          "Maybe an extremely small amount.  But it's" --

5     all caps, "significantly more expensive to go through

6     Done than it is to buy cocaine, Adderall, or meth on

7     the street."

8     Do you see that?

9  **A.**   Yes, I did write that after a conversation with my brother

10    who is in law enforcement.

11 **Q.**   Okay.  And Ms. Chey says (as read):

12         "So the counterargument is it's cheaper for

13    abusers to buy Adderall on the street if they're

14    truly looking to get" --

15    And you say (as read):

16         "If they're truly looking to get high, yes."

17    Do you see that?

18 **A.**   Yes.

19 **Q.**   If we can go to the next page you stay at the top (as

20    read):

21         "In addition, we don't let patients fill their

22    prescriptions early.  They get a 30-day supply no

23    matter what."

24    Ms. Chey says (as read):

25         "I see.  Do you know how much the average is on

1      the street?"

2      And you go down to say (as read):

3          "They range from $4 per tablet to $15 per

4      tablet."

5      Do you see that?

6   A.  Yes.

7   Q.  Okay.  All right.

8      Now, if we can go to the next page, Ms. Chey writes (as

9   read):

10         "So brand meds are more expensive on the street,

11     interesting."

12     And then, if we go to the next page, Ms. Chey says (as

13  read):

14         "Hmm why is it less for adult patient

15     diversion?"

16     And you say (as read):

17         "I think we see a lot of professionals.  We

18     understand their social history in their visits."

19     And then if you go further down, Ms. Chey says (as read):

20         "I've heard a lot about taking Adderall in the

21     library in college.  Not sure if they got it on the

22     street."

23     You respond (as read):

24         "That's usually in the frat houses.  There's

25     always one you can go buy it from."

1          And then you say (as read):

2               "But we also don't serve college students" --

3    **A.**   I said, "only serve college students."  We do serve some

4    of them.

5    **Q.**   Okay.  You say (as read):

6               "We also don't only serve college students."

7          And Ms. Chey says (as read):

8               "Yeah, 80 percent of our patients are 25 and

9          older."

10         Okay.  And then if you can go to page 9 just a couple more

11   portions of this.  Do you see where at the bottom of page at

12   5:52, you write (as read):

13              "Adderall is definitely not a party drug

14         anymore."

15         Do you see that?

16   **A.**   At the very bottom, yes.

17   **Q.**   Right.  You write (as read):

18              "Kids will try Adderall once to study because

19         they never knew they needed it to be effective or

20         actually get through a tough subject.  If they want

21         to party, they do MDMA."

22   **A.**   Correct.

23   **Q.**   (as read):

24              "Adderall is definitely not a party drug

25         anymore."

1      You say?

2  **A.**   Correct.

3  **Q.**   Okay.  And then, if you can turn to the next page, this is

4  the last bit.  Page 11, actually.

5      And you write (as read):

6          "But if we don't start shaping the narrative

7          around how we want the public and regulators to see

8          Adderall, we shouldn't be in business or any ADHD

9          treatment for that reason."

10     Do you see that?

11 **A.**   I do see that and that was a conversation that Ruthia and

12 I had had for months since I had started.

13 **Q.**   Okay.  Great.  Thank you.  Okay.

14     And, in fact, you spoke to Ms. Barker about how it is

15 nearly impossible that anybody could overdose on a stimulant

16 causing death.

17     Do you recall that?

18 **A.**   I do recall that conversation with Sarah, yes.

19 **Q.**   Right.

20     She is a little sarcastic?

21 **A.**   Yeah, I believe we probably both were.

22 **Q.**   Okay.

23 **A.**   We had a very sarcastic form of communication.

24 **Q.**   You recall she wrote (as read):

25          "I will search some articles, probably titled

1          'Overdose on Adderall?  Nope.  That was cocaine and

2     Oxy.'"

3          Do you remember her making that remark?

4     **A.**   I wouldn't -- I have no reason to believe that she didn't

5     say that.

6     **Q.**   Okay.  All right.  Okay.

7          Let's switch topics.

8          So you started meeting with the prosecutors on

9     February 8th of 2023; is that correct?

10    **A.**   I believe so, yes.

11    **Q.**   And that was very early on in the -- did you understand it

12    to be very early on in their investigation?

13    **A.**   Yes.  I mean, I understood that the subpoena had come in

14    September, so a few months into the investigation at that

15    point.

16    **Q.**   Okay.  And I believe that you testified that -- well, let

17    me ask you:  Is it correct that you believed that if Ruthia was

18    forced out of Done, that the investors might make you CEO?

19    **A.**   There was a moment in time where I thought that that might

20    happen and I would be a temporary fill-in for the role, yes.

21    **Q.**   Okay.

22         Now, back to your meetings with prosecutors in February of

23    2023.  When -- is it fair to say that when you started meeting

24    with the prosecutors, you did not think that they would demand

25    that you plead guilty to anything?

**A.** Well, they never did demand that I plead guilty to anything. I was informed that I was being charged, and I chose to take responsibility. However, I -- I wasn't sure, when I made the decision to meet with the prosecutors, what was going to happen, and ensured that I protected all of my rights by having an attorney present.

**Q.** Okay. And how many times have you met with prosecutors, in total, before your testimony today?

**A.** I believe 11 times total.

**Q.** All right.

Now, when -- there came a point in time in 2024 where they told you that you were going to be charged with a crime; is that correct?

**A.** That's correct.

**Q.** And there -- you knew that you could have been charged with conspiracy to distribute illegal drugs; correct?

**A.** I -- I don't recall ever receiving a charging list or documents that had additional charges listed. I did plead guilty to the conspiracy to dispense a controlled substance by means of the Internet, which is a drug distribution charge.

**Q.** Right.

But I want to explore what you understood about the differences.

So the -- you pled guilty to one count; is that correct?

**A.** That's correct.

1  **Q.**  All right.  And you understood that that crime that you

2  pled guilty to, conspiracy to distribute controlled substances

3  by means of the Internet, that carries a maximum term of

4  imprisonment of five years; is that correct?

5  **A.**  That is correct.

6  **Q.**  You understood at the time -- and by the way, you -- at

7  the time that you pled guilty, you entered into a -- what's

8  called a cooperation agreement with the Government; is that

9  correct?

10  **A.**  That is correct.

11  **Q.**  All right.  And you understood that there were other

12  crimes that they could have charged you with that were

13  different than conspiracy to distribute controlled substances

14  by means of the Internet; correct?

15  **A.**  Yes.  I personally did not have that conversation with the

16  prosecutors, though.

17  **Q.**  Okay.  Just your understanding.  You understood that you

18  could have been charged with crimes that carry a maximum term

19  of imprisonment of 20 years; correct?

20  **A.**  I did not know the maximum.

21  **Q.**  You didn't know the maximum?

22  **A.**  I did not.

23  **Q.**  Okay.  You understood that you could have been charged

24  with obstruction of justice; correct?

25  **A.**  I don't recall that being something that I was told.

1  **Q.**  Not something you knew?

2  **A.**  I -- I'm not certain.

3  **MR. FOSTER:**  Your Honor, it sounds like we're getting

4  into conversations with his attorneys.  I'm not sure here.

5  **THE COURT:**  Well, I think you could ask him about his

6  state of mind, what did he think.

7  **MR. SCHACHTER:**  Thank you, Your Honor.

8  **THE COURT:**  Period.  I mean, not period, but that's

9  not --

10  **MR. SCHACHTER:**  I understand.

11  BY MR. SCHACHTER:

12  **Q.**  You understood that you could have been charged -- did you

13  understand that you could have been charged with conspiracy to

14  traffic in illegal drugs; did you understand that?

15  **A.**  I don't recall a trafficking discussion.

16  **Q.**  Okay.

17  **A.**  Yeah.

18  **Q.**  Did you -- and you were not charged with a crime that

19  carries a maximum term of imprisonment of 20 years for every

20  count?

21  **A.**  Correct, I was not.

22  **Q.**  Okay.  And you were not charged with obstruction of

23  justice?

24  **A.**  Correct, I was not.

25  **Q.**  Okay.  Now, you -- am I correct that you also understood

1  that there was something called the sentencing guidelines?

2  **A.**   I think it's something that judges have or judges use to

3  determine the sentence for someone.

4  **Q.**   Bingo.

5       You understand there is a guidelines book that judges

6  consider when fashioning a sentence; is that correct?

7  **A.**   I did not know it was a book, but --

8  **Q.**   Okay.  Okay.

9       Now, did you understand that your sentence could be

10  influenced by the quantity of controlled substances that you

11  were distributing or by the amount of financial harm you caused

12  or you were held responsible for causing, or the amount of

13  money you made; did you understand that those are factors that

14  could be relevant in determining your sentence?

15  **A.**   I understood that for the drug distribution count, yes.

16  **Q.**   Okay.  And how about the financial -- well, withdrawn.

17       **MR. SCHACHTER:**  Your Honor, we will move to admit

18  Mr. Levy's plea agreement, which is -- we've marked as 7101.

19       **THE COURT:**  Admitted.

20       (Trial Exhibit 7101 received in evidence.)

21  BY MR. SCHACHTER:

22  **Q.**   Okay.  Do you recognize your agreement with the

23  prosecutors?

24  **A.**   I do.

25  **Q.**   All right.  And if we can turn to the second page, do you

1  see where it says, "Restitution:  At least $7,991"?

2      Do you see that?

3  **A.**   I do.

4  **Q.**   Okay.  So and then it says, "Forfeiture:  23,760 and 4808

5  shares in Done Global."

6      Do you see that?

7  **A.**   I do.

8  **Q.**   Okay.  Now, you talked about a fine, a maximum fine of

9  $250,000 is something that you face as a result of your plea;

10  correct?

11 **A.**   Correct.

12 **Q.**   Okay.  Do you -- did you understand that you are getting a

13 benefit when the Government -- well, let me ask you

14 differently.

15     Did you understand it to be a benefit that you were

16 getting from the prosecutors by saying that the -- that the

17 loss that you caused is only $7,991?

18     Do you understand that to be a benefit?

19 **A.**   I did not.  And I did not know that that's how restitution

20 was calculated.

21 **Q.**   Okay.  Did you understand that the lower the loss figure

22 is, that that can have an impact on your sentence?

23         **MR. FOSTER:**  Objection, Your Honor.  Foundation and

24 that's not true for this offense.

25         **MR. SCHACHTER:**  I'm just asking.

1    MR. FOSTER:  For the drug distribution offense.

2    THE COURT:  You're asking what his understanding was.

3    MR. SCHACHTER:  I'm asking -- that's it.

4    THE COURT:  Go ahead.

5    THE WITNESS:  Can you repeat the question?

6    BY MR. SCHACHTER:

7    Q.   Sure.

8        Did you understand that the monetary harm reflected in the

9    restitution figure was at all relevant to your sentencing?

10   A.   I didn't.

11   THE COURT:  I don't know -- well, yes.  Go ahead.

12   THE WITNESS:  I did not.  I understood it to mean

13   something that I'm required to pay back, and in and of itself

14   is part of the sentence, but I didn't know that it influenced

15   anything related to the other portions of the sentence.

16   BY MR. SCHACHTER:

17   Q.   Okay.  And you see this forfeiture number of $23,760 and

18   some shares?

19   A.   I do.

20   Q.   You understand that to be the Government's view of how

21   much you made financially from the offense at least according

22   to their agreement with you?

23   A.   I -- I did not know that.  What I can tell you is that was

24   all my bonuses and I was bonused on communicating with

25   pharmacies.

1  Q.   Okay.  Well, did you view it to be a benefit that you were

2  receiving from the Government that they would agree that the

3  only amount of gain that you received, that you then needed to

4  forfeit, was $23,760 and some shares?

5  A.   I'm sorry.  I did not understand the question.

6  Q.   Okay.  Fair enough.

7      Did you understand it to be a benefit that you received in

8  your agreement with the prosecutors that you would only have to

9  forfeit a total amount of gain, to you, that your gain from

10 this offense -- well, withdrawn.  Let me try a shorter

11 question.

12     Did you understand that the Government, in their agreement

13 with you, were saying that we're going to agree that the only

14 amount that you gained financially from your offense was

15 $23,760 and 4808 shares of stock?

16     Did you understand that?

17 A.   I didn't understand it to be a benefit.  I understood it

18 to be repayment for what I had made for the offense outlined in

19 my plea agreement.

20 Q.   Right.  Right.

21     Okay.  So you understood forfeiture is to be the amount

22 that the Government is saying you made from this offense.

23 A.   I believe it's more narrow for the offenses related to

24 specifically outlined in the plea agreement.  That was what my

25 understanding was.

1  **Q.**  Okay.

2     Now, you understood also that one of the benefits that you

3  get from your plea agreement is that -- well, withdrawn.

4     You understood that one of the benefits you get by

5  entering into a plea agreement is that the -- that if the

6  Government concludes that you provided substantial assistance

7  in the prosecution or investigation of others, then they will

8  write a motion to the Court asking for leniency in your

9  sentence.

10     Did you understand that?

11  **A.**  I understand they have the option and they may or may not

12  do so, yes.

13  **Q.**  Okay.  Well, do you understand that they -- that option

14  that they have is to write a --

15     **MR. SCHACHTER:**  Well, let me take a moment, Your

16  Honor.

17     If I may turn to paragraph 11 on page 9.

18     **THE COURT:**  Paragraph 19 on page 12.

19     **MR. SCHACHTER:**  Even -- even better.  If we can turn

20  to paragraph 19, page 12.

21     Thank you, Your Honor.

22  **BY MR. SCHACHTER:**

23  **Q.**  Do you see where it says (as read):

24     "If, in its sole and exclusive judgement, the

25     Government decides that the defendant has cooperated

1      fully and truthfully, provided substantial assistance

2      to law enforcement authorities, and otherwise fully

3      complied with this agreement, it will file with

4      the Court a motion --"

5      Do you see that?

6 **A.**   I do, yes.

7 **Q.**   (as read):

8      " -- that explains the nature and extent of the

9      defendant's cooperation and recommends a downward

10     departure."

11     Do you see that?

12 **A.**   Yes.

13 **Q.**   You understand that to be an additional benefit that you

14 receive from your plea agreement is that if, in their sole and

15 exclusive judgment, they conclude that you provided substantial

16 assistance to law enforcement authorities, then if they make

17 that decision, then they will file this motion explaining your

18 cooperation and recommending a downward departure in your

19 sentence.

20     Do you understand that?

21 **A.**   I do understand this paragraph, yes.

22 **Q.**   So you understand that if you, for example, were to say

23 that the fact is that during the course of your work at Done,

24 you didn't think there were real risks of abuse of stimulants,

25 and that everybody was doing their best, you understood that

1  they would then not conclude that you had provided substantial

2  assistance --

3        **MR. FOSTER:**  Objection, Your Honor.

4  **BY MR. SCHACHTER:**

5  **Q.**  -- was that your understanding?

6        **THE COURT:**  Sorry?

7        **MR. FOSTER:**  Objection.  Compound.  Not accurate.

8        **MR. SCHACHTER:**  I can rephrase.

9     Although, Your Honor, I ask to restrict the colloquy.

10  **BY MR. SCHACHTER:**

11  **Q.**  The agreement says that if, in their sole and exclusive

12  judgment, they decide that you provided substantial assistance,

13  then they're going to write this motion.

14     You understand that; right?

15  **A.**  I do understand that that's what it says, yes.

16  **Q.**  And am I correct that your understanding is that if you

17  were to say on the witness stand, "I think we were all trying

18  our best and I don't think anybody committed a crime," you

19  understand that they would not view that to be substantial

20  assistance in the prosecution or investigation of others;

21  correct?

22  **A.**  I would not agree with that.  I -- every single time I

23  spoke with the Government, I was implored to tell the truth and

24  only the truth, providing color to every situation; and whether

25  it made anybody look good or bad my instruction was to tell the

1    truth and only the truth, and that is what I'm doing here

2    today.

3    **Q.**    Okay.  Just want to explore that for a moment.

4           You pled guilty to a crime?

5    **A.**    I have, yes.

6    **Q.**    You're going to face sentencing; correct?

7    **A.**    I am.

8    **Q.**    You want them to write a motion that describes the nature

9    and extent of your cooperation; correct?

10   **A.**    I would appreciate if they did, but I understand it's in

11   their discretion not to.

12   **Q.**    Okay.  And it's your testimony that you think that if you

13   were to take the witness stand today and say, "This was a

14   shifting regulatory landscape, and I don't really think anybody

15   committed a crime," you think they would still conclude that

16   you were providing substantial assistance to law enforcement

17   and they would still write this motion for a downward

18   departure; is that correct?

19          Is that your testimony?

20   **A.**    If that was the truth of what happened at Done, then I

21   would hope they would endorse the truth.

22   **Q.**    Okay.  All right.

23          In any event, you understand that this decision as to

24   whether to write this motion is in their sole and exclusive

25   judgment --

1     MR. FOSTER:  Objection.  Asked and answered.

2     THE COURT:  Sustained.

3  BY MR. SCHACHTER:

4  Q.   Okay.  All right.  Now, am I correct that it is your hope,

5  even as you testify here today, it is your hope that you will

6  never spend a day in jail?

7  A.   Yes.

8  Q.   And am I correct that the truth of the matter is you would

9  say just about anything to avoid jail?

10  A.   Absolutely not.

11  Q.   You will lie about being a pharmacist repeatedly and to

12  many people, but it is your testimony that you would not lie to

13  stay out of jail?

14  A.   Correct.  I told lies at Done and I own that, and I

15  understand that I did.  But my responsibility is simply to tell

16  the truth, including everything that happened at Done while I

17  was an employee there.

18  Q.   Okay.  All right.

19     Let's talk about your work at Done.  There was a

20  clinical --

21     MR. SCHACHTER:  You can take that down, Mr. Cepregi.

22  Thank you.

23  BY MR. SCHACHTER:

24  Q.   I want to talk to you about different facets of the

25  procedures at Done that you talked about with Mr. Foster.

1    Okay?

2    **A.**    Okay.

3    **Q.**    One of things that you talked about with Mr. Foster was

4    chart reviews conducted by clinical leadership.

5          Do you remember him asking you about that?

6    **A.**    I do.

7    **Q.**    And I also asked you about the process of discharging

8    patients.

9          Do you remember that?

10   **A.**    I do, yes.

11   **Q.**    Okay.  Now, there was a clinical leadership team at Done;

12   is that right?

13   **A.**    There was.

14   **Q.**    It was made up, during the time that you were there, of

15   Dr. Brody; correct?

16   **A.**    Correct.

17   **Q.**    Dr. Zoe Martinez?

18   **A.**    Correct.

19   **Q.**    You understood her to also be, like Dr. Brody, a

20   psychiatrist?

21   **A.**    Yes, she was.

22   **Q.**    Sussan Barker, the person who you, I think, liked and

23   developed a warm relationship with?

24   **A.**    Sarah Barker.

25   **Q.**    Sarah Barker.  Thank you.

1    And she was a psychiatric mental health nurse

2 practitioner?

3 **A.**   She was.

4 **Q.**   And Sussan -- how do you pronounce her last name?

5 **A.**   Nwogwugwu.

6 **Q.**   Nwogwugwu.  Okay.  There's a lot of consonants in there

7 that don't get sounded out?

8 **A.**   Yes.  At least that's my understanding.  I may have

9 butchered that.

10 **Q.**   Okay.  And she, Sussan, was also a psychiatric mental

11 health nurse practitioner?

12 **A.**   She was.

13 **Q.**   All right.  And now it was their job --

14         **THE COURT:**  Sarah.

15         **MR. SCHACHTER:**  Sarah Barker.

16         **THE WITNESS:**  There was Sarah and Sussan, yes.

17         **THE COURT:**  Is that who you're referring to?

18         **MR. SCHACHTER:**  Yes.  We have a Sarah Barker, which

19 Mr. Levy corrected me on.  And then we have Sussan Nwogwugwu --

20         **THE COURT:**  Oh, okay.  That's who you mean now?

21         **THE WITNESS:**  You're asking me about Sussan now.

22 **BY MR. SCHACHTER:**

23 **Q.**   I'm asking if those four made up clinical leadership

24 during the time that you were there.

25 **A.**   Understood.

1   **Q.**   All right.   Now, to be clear -- and part of their job as

2   clinical leaders was to review the quality of care that was

3   being provided by the medical providers on the platform; is

4   that correct?

5   **A.**   That was one of the responsibilities, yes.

6   **Q.**   All right.   Now, to be clear, Ms. He was not a member of

7   clinical leadership?

8   **A.**   She was not, no.

9   **Q.**   And you knew from your discussions with Ms. He that she

10  understood that clinical leaders were conducting regular

11  reviews of patient charts to ensure that the providers were

12  providing quality care; correct?

13  **A.**   The chart review process varied from month to month, day

14  to day, depending on what was going on at Done.   It was

15  sometimes just for the new providers within the first week of

16  their time on board.   Sometimes it was when there was patient

17  complaints and then negative reviews.   And sometimes it was

18  when the patient was being discharged.

19  **Q.**   Okay.   That's very helpful.   So I'm asking that -- there's

20  two different questions that I want to explore with you.

21      One is:   What was the chart review process?

22      And then the second is:   What conversations did you have

23  with Ms. He about her understanding that there was a chart

24  review process?

25      I'm going to separate those out.   Okay?

1   **A.**   Okay.

2   **Q.**   Okay.  But first, just to be clear, what you just

3   described is there was a process by which clinical leaders in

4   ways that changed would review medical charts of the providers

5   on the platform?

6   **A.**   There was a way in which they did that, but there was no

7   checklist or backing behind the process itself.  But they

8   opened charts of other providers.

9   **Q.**   One of whom was the person that you respected and liked,

10   Sarah Barker?

11   **A.**   Correct.

12   **Q.**   She conducted chart reviews; correct?

13   **A.**   She did.

14   **Q.**   Okay.  And so that is the -- there was this process in

15   place, but now I want to ask you about your communications with

16   Ruthia about chart reviews.

17        You had communications with Ms. He about her understanding

18   that clinical leaders were conducting, on some regular basis,

19   reviews of the charts of the patients on the Done platform;

20   correct?

21   **A.**   Yes, we would talk about it on Zoom and other platforms

22   regularly to go through what was going on.

23   **Q.**   Okay.  I'm going to --

24        **MR. SCHACHTER:**  Your Honor, I think it's already in,

25   495, Government Exhibit 495.

1      MR. FOSTER:  I believe so.

2  BY MR. SCHACHTER:

3  Q.   I'm going to show you what I believe to be in evidence as

4  495 --

5      MR. SCHACHTER:  We'll offer what the Government had

6  marked as 495.

7      THE COURT:  Admitted.

8      (Trial Exhibit 495 received in evidence.)

9  BY MR. SCHACHTER:

10 Q.   Okay.  This is a communication between you and Ms. He.

11     Do you see that?

12 A.   I do.

13 Q.   Okay.  And she wrote also (as read):

14         "I saw the discussion with Dr. Brody and we need

15     to check in with provider frequently to share the

16     feedback about their chart, patient review, and

17     clinical quality.  At second week as probation

18     period, and then every three months at least."

19     Did you see that?

20 A.   Yes.

21 Q.   You respond that Dr. Brody is going to need to work more

22 in order to do that; right?

23 A.   I did.

24     MR. SCHACHTER:  Okay.  And then if we can go to the

25 second page, do you see -- and that's why there's a portion

1  that says, yes, and that's why.

2      Skip further down.

3      Next page.

4      And the next page.

5      I should just pull it up.

6      Just a moment, Your Honor.

7                    (Pause in proceedings.)

8          **MR. SCHACHTER:**  May I have just a moment, Your Honor.

9          **THE COURT:**  Go ahead.

10                    (Pause in proceedings.)

11  **BY MR. SCHACHTER:**

12  **Q.**   Okay.  Do you see where Ms. He says that (as read):

13          "A provider got warned because Dr. Brody

14      reviewed her chart and found she's using some weird

15      treatment that's not meeting clinical standards, like

16      suggesting patients do a coffee enema."

17      Do you see that?

18  **A.**   I do.

19  **Q.**   You wrote open mouth, "crazy provider"?

20  **A.**   Yes.

21  **Q.**   And what Ms. He is referring to, what she's been informed

22  about how Dr. Brody had been reviewing patient charts and had

23  seen this what he viewed to be aberrant behavior; is that

24  correct?

25  **A.**   I believe so.  I don't have all the context of what

1    provider or when this occurred.  It sounds like it happened

2    before this step.

3         **MR. SCHACHTER:**  If you can go a little bit further

4    down.

5         Yeah.

6    **BY MR. SCHACHTER:**

7    **Q.**   And then Ms. He says (as read):

8              "Yes.  That's why we need to do chart review to

9         make sure the clinicians are meeting the standards.

10        They can vary a lot."

11        Do you see that?

12   **A.**   Yes, I do.

13   **Q.**   Okay.  And by the way, this is January of 2022.  Ms. He is

14   writing this communication to you from China; correct?

15   **A.**   I believe so, yes.

16   **Q.**   All right.  And then -- so this is January of 2022, Ms. He

17   continued to check in with you to confirm whether routine chart

18   reviews were occurring by clinical leadership; is that correct?

19   **A.**   I recall one other instance of her checking in with me.

20        And, again, we still had no backing of what those guiding

21   principles for the clinicians and the chart reviews should have

22   been.  So the chart reviews were -- look for completeness.  I

23   don't know what was even in those chart reviews because there

24   was nothing to back them up.

25   **Q.**   Right.  And I'm glad that you mentioned that because what

1   you're saying is that it is possible, in your view, that the

2   procedure to make sure that the clinical leaders were reviewing

3   the charts may have been deficient.  You're saying that?

4   **A.**   Yes.

5   **Q.**   But at no point in time did Ms. He say to you:  Riley, why

6   are we doing chart reviews?  All we want to do is distribute

7   illegal drugs.

8        She never said those words to you, did she?

9   **A.**   No, she did not.

10  **Q.**   She didn't say:  Spending time doing chart reviews is

11  getting in the way of me putting money in my pocket.  We got to

12  cancel that because all we want to do is hand out stimulants.

13       She didn't say that, did she?

14  **A.**   Not in those exact words.

15  **Q.**   What she did do is continue to check in with you.

16       I'm going to show you --

17            **MR. SCHACHTER:**  Your Honor, if it's not in evidence

18  556.  I'd like to move to admit what the Government has marked

19  as Exhibit 556.

20            **THE COURT:**  556 admitted.

21            **MR. FOSTER:**  It is in evidence.

22            **MR. SCHACHTER:**  It is in evidence, okay.  Great.

23  Thank you.

24  **BY MR. SCHACHTER:**

25  **Q.**   Okay.  If we can turn to -- there's a section with some

1  numbers.  Number.  Okay.  Ms. He --

2      MR. SCHACHTER:  You don't need to blow it up,

3  Mr. Cepregi.  Just leave it the way it is.

4  BY MR. SCHACHTER:

5  Q.  Okay.  This is a communication between you and Ms. He.

6  This is about two months after your last communication with the

7  chart reviews; correct?

8  A.  Correct.

9  Q.  Okay.  And what Ms. He -- and this is just you and Ms. He;

10  correct?

11  A.  Yes, this is our personal.

12  Q.  Okay.  And she is describing some things that she would

13  like to be done, and one of things -- if we can blow up

14  Number 3.

15      She asks you Number 3 (as read):

16          "Have the clinical protocol reviewed.  Are we

17          still doing routine chart reviews with providers

18          monthly or quarterly for selected patient charts or

19          have the collaborating physicians been supervising

20          the clinicians?"

21      Do you see that?

22  A.  I do.

23      MR. SCHACHTER:  Okay.  You could take that down.

24  BY MR. SCHACHTER:

25  Q.  You said that this is the only one that you -- was this

1    the one you remembered?

2    **A.**    I believe so.  I know that we discussed putting in place

3    chart reviews multiple times and needing a complete policies

4    and procedures manual to back them.

5    **Q.**    Okay.  I'm going to show you another one.

6          **MR. SCHACHTER:**  We move to admit what the Government

7    has marked as Exhibit 724.

8        Is that this evidence, 724?

9          **MR. FOSTER:**  No, I don't believe so.  Ms. Braga?

10          **MR. SCHACHTER:**  We move to admit Exhibit 724.

11          **THE COURT:**  Admitted.

12        (Trial Exhibit 724 received in evidence.)

13    **BY MR. SCHACHTER:**

14    **Q.**    This is a communication with -- it is a medical team Slack

15    channel; is that correct?

16    **A.**    It appears so, yes.

17    **Q.**    Okay.  We looked at a communication from January, then

18    March, and now we're looking at a communication from September

19    of 2022.  Do you see that?

20    **A.**    I do.

21    **Q.**    Okay.  And if we can go a little bit further down, Ms. He

22    asks a question of the medical team, which includes you.

23          **MR. SCHACHTER:**  Can we find the words "Do we review

24    their prescriptions during chart reviews"?

25    \\\

BY MR. SCHACHTER:

Q.   Do you see in September of 2022, again, Ms. He says (as read):

        "Do we review their prescriptions during chart

        reviews?  We should share this type of feedback and

        prescribing tips to providers."

     Do you see that?

A.   I do.

Q.   Okay.  And then Ms. Barker -- we're going to spend more time on this -- she says (as read):

        "We haven't gotten a chance to start a

        formalized chart auditing process because we are just

        now getting all the metrics together in one place."

     Do you see that?

A.   Yes.

Q.   Okay.  And we're going to come back to that, but you had -- in your discussion with Mr. Foster, you described, I think, a point in time where you started to look at various metrics, which we're going to talk about, about individual providers or some group of 10 providers; is that right?

A.   I don't remember the specific number of providers.  I think it was -- the question was around top 10, but we looked at all providers.

Q.   Okay.  And what Ms. Barker is talking about when she talks about the formalized chart auditing process, that is a

1    reference to a formalized audit that was undertaken in the

2    summer and fall of 2022 of those top 10 providers; correct?

3    **A.**    I am not certain.  I don't believe it was limited to those

4    top 10 providers.  I think it was all of them and we were

5    looking to develop a checklist and requirements for our

6    clinical leadership team to review the charts.

7    **Q.**    Okay.  But this auditing process is separate and apart

8    from the chart review process that you were talking about

9    earlier?

10   **A.**    I -- I can't say with certainty.  I know the audit that

11   we -- when we looked at individual prescription or prescribing

12   habits of providers that was part of it.  But from my

13   recollection, we were trying to build a robust chart review and

14   auditing process so providers could actually get a monthly

15   report for -- from a clinical leader.

16   **Q.**    Right, and if we could go a little bit further -- if you

17   can go a little bit further down in response to Ms. Barker's

18   comments, Ms. He says --

19           **MR. SCHACHTER:**  Blow up the top.

20   **BY MR. SCHACHTER:**

21   **Q.**    She says (as read):

22           "Are we doing monthly call with providers right

23           now?  I see it on SOP" --

24           That stands for standard operating procedure?

25   **A.**    Yes.

1  **Q.**   (as read):

2           " -- and it's a good opportunity to incorporate

3       this type of feedback."

4       Then she says (as read):

5           "I'm confused.  Are they happening now or not?

6       Or did you mean there are many scheduled but the

7       provider no-show?"

8       Do you see that?

9  **A.**   Yes.

10 **Q.**   Okay.  Okay.

11          **MR. SCHACHTER:**  You can take that down.

12          **THE COURT:**  Perhaps we should take our recess.

13          **MR. SCHACHTER:**  Yes, Your Honor.

14          **THE COURT:**  Ladies and gentlemen, we are taking our

15  evening recess.

16      Remember the admonition given to you:  Don't discuss the

17  case, allow anyone to discuss it with you, form or express any

18  opinion.  I'll see you tomorrow.

19                  (The jury leaves the courtroom.)

20      (Proceedings were heard out of the presence of the jury.)

21          **THE COURT:**  Okay.  You may step down.

22          **THE WITNESS:**  Thank you.

23                  (Witness excused.)

24          **THE COURT:**  Where are you in this?

25          **MR. SCHACHTER:**  I will be candid, as I always am with

 1   the Court.  I -- we understood that there were -- that Mr. Levy

 2   was at the very end of today.  I did not expect to be

 3   cross-examining him at all.  We understood, as of last night,

 4   that there were two witnesses that preceded him --

 5           **THE COURT:**  I'm not --

 6           **MR. SCHACHTER:**  So I still need to refine -- I think I

 7   will take the morning with him tomorrow, but I need to refine a

 8   great deal because I want -- there's subjects that I had

 9   expected would be covered; I think I can cut those out.

10       So the answer is I don't truly know.  That's my -- that's

11   my best estimate.

12           **THE COURT:**  Okay.

13           **MR. FOSTER:**  Two things, Your Honor, I guess --

14           **THE COURT:**  Be seated.

15           **MR. FOSTER:**  One just related to the preparation and,

16   this is unrelated to Mr. Schachter's comments, but I just

17   wanted to separately note because there were obviously motions

18   pretrial about the preparation needed for the case and multiple

19   motions filed along those lines.  So because of the Court's

20   order and the length of some of the cross-examinations,

21   Mr. Levy, for example, was disclosed 16 days before his

22   testimony as a witness.  I just wanted to put on the record

23   some of the other cooperators, Nikita Mercado was 11 days,

24   Elizabeth Shapard was six days, and in regards to some of the

25   other witnesses -- Nwamaka Emeruem was also 11 days as well.

 1     And I've just observed that, you know, there's been ample

 2  coordination between both parties, it appears, on the defense

 3  strategy and the cross-examination.  And I just wanted to put

 4  that on the record because there were motions and some comments

 5  made during trial related to that.  Not by Mr. Schachter, let

 6  me be clear.

 7          **MR. SCHACHTER:**  I don't know if I --

 8          **THE COURT:**  Okay.  Moving on.  Thank you.

 9          **MR. FOSTER:**  The other thing I would say is that in

10  regards to the length of the cross-examination, before the

11  break Your Honor observed an issue with hearsay, and I think

12  the length in part relates to reading documents to a witness

13  without any questions.

14     So, for example, we had, today, over objection, reading of

15  a lengthy document by Defendant Brody about anxiety and ADHD

16  with no -- no questions.  So we just urge the Court to, I

17  think -- I think we share the views that were expressed before

18  the break.

19          **MR. SCHACHTER:**  May I respond?

20          **THE COURT:**  Thank you very much.

21          **MR. SCHACHTER:**  Okay.  Yes, Your Honor.  Thank you

22  very much.

23          **THE COURT:**  See you tomorrow.

24          **MR. SCHACHTER:**  Thank you.

25          (Proceedings adjourned at 4:03 p.m.)

<u>**CERTIFICATE OF REPORTER**</u>

       I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:   Tuesday, October 28, 2025

_____
  Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG, CSR No. 12219
       Official Reporter, U.S. District Court