Volume 23

Pages 5083 - 5176

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

UNITED STATES OF AMERICA,    )
                             )
          Plaintiff,         )
                             )
  vs.                        )   NO. 3:24-cr-00329-CRB
                             )
RUTHIA HE and DAVID BRODY,   )
                             )
          Defendants.        )
_____)

                             San Francisco, California
                             Monday, November 10, 2025

             <u>TRANSCRIPT OF PROCEEDINGS</u>   (CORRECTED)

<u>APPEARANCES</u>:

For Plaintiff:
                         CRAIG H. MISSAKIAN
                         United States Attorney
                         Northern District of California
                         450 Golden Gate Avenue
                         San Francisco, California 94102
                    BY:  **KRISTINA GREEN**
                         **ASSISTANT UNITED STATES ATTORNEY**

                         U.S. DEPARTMENT OF JUSTICE
                         FRAUD SECTION
                         950 Pennsylvania Avenue NW
                         Washington, D.C. 20530
                    BY:  **JACOB N. FOSTER,**
                         **ACTING CHIEF, HEALTHCARE FRAUD UNIT**


         **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
              Official Reporter, CSR No. 12219

**APPEARANCES**:  (CONTINUED)

                    U.S. DEPARTMENT OF JUSTICE
                    CRIMINAL DIVISION
                    1400 New York Avenue NW
                    Washington, D.C. 20001
            BY:  **EMILY GURSKIS, ASSISTANT CHIEF**

                    JOSEPH NOCELLA, JR.
                    United States Attorney
                    Eastern District of New York
                    271-A Cadman Plaza East
                    Brooklyn, New York 11201
            BY:  **ARUN BODAPATI, TRIAL ATTORNEY**

For Defendant He:

                    WILLKIE FARR & GALLAGHER LLP
                    2029 Century Park East - Suite 2900
                    Los Angeles, California 90067
            BY:  **KOREN L. BELL, ATTORNEY AT LAW**

                    WILLKIE FARR & GALLAGHER LLP
                    787 7th Avenue
                    New York, New York 10019
            BY:  **MICHAEL S. SCHACHTER, ATTORNEY AT LAW**
                 **STEVEN J. BALLEW, ATTORNEY AT LAW**


For Defendant Brody:

                    LAW OFFICE OF VALERY NECHAY
                    Law Chambers Building
                    345 Franklin Street
                    San Francisco, California 94102
            BY:  **VALERY NECHAY, ATTORNEY AT LAW**


**Also Present:**  **Thifany Braga**
                 **Simon Hall**
                 **Mackenzie Slater**
                 **Andy Cepregi**
                 **Ashley Moore**
                 **Barbara Hua Robinson, Mandarin Interpreter**
                 **Jeff Dinn, Mandarin Interpreter**

**I N D E X**

Monday, November 10, 2025 - Volume 23

|                      | PAGE | VOL. |
|----------------------|------|------|
| Charging Conference  | 5141 | 23   |

<u>Monday - November 10, 2025</u>                                    <u>9:37 a.m.</u>

                        P R O C E E D I N G S

                            ---o0o---

(Proceedings were heard out of the presence of the jury.)

        **THE COURTROOM DEPUTY:**  All rise.  Court is now in

session, the Honorable Charles R. Breyer presiding.

    You may be seated.

        **THE COURT:**  Let the record show that all parties are

present except Dr. Brody.  And what's the story?

        **MS. NECHAY:**  Your Honor, good morning.  I apologize on

his behalf, but his symptoms of IBS started up again pretty

severely yesterday, and I ask that he be excused for today's

purposes.  I have permission, of course, to continue the

proceedings on his behalf and make all pertinent decisions on

his behalf.

        **THE COURT:**  Okay.  So we'll proceed.  We're not taking

any testimony today, so we'll proceed in his absence.

    Couple of things.

    First, in terms of scheduling, I obviously received quite

a few papers last night, if you call it last night when they're

filed at 3:00 a.m. I don't know that that's actually last

night.  I think it's more like this morning.

    But in any event, it makes -- that's not the point,

because even if I had been up at 3:15, I don't know that I

would have read it.

1           But I need to read these and the Government needs to

2    respond to those, and I think that they think it's appropriate

3    to respond to, given the things that I want to discuss this

4    morning.

5           So we'll proceed with a discussion of where we are in

6    these filings and what proof by way of the defendants' case

7    will be offered.

8           Then I want the parties to -- initially I said that

9    Wednesday would be an off day, which in part it is because I'm

10   participating in a meeting, but I was just told that the

11   meeting will start at 6:00 a.m. California time, so I will be

12   available by 1:30 in the afternoon.  And I suggest on

13   Wednesday, even though the jury won't be here, we gather at

14   1:30, and I'm sure there will be things to discuss, especially

15   since I will have had some period of time to consider the

16   offers of proof, consider the Defense -- pardon me -- the

17   Government's response.

18          However, on Wednesday, we will not have a court reporter.

19   We will be able, however, to record the proceedings by --

20   I guess it's Zoom or some magical electronic device, so it will

21   be on the record, but it won't be with our court reporter.

22          So let's talk about little things --

23          **THE COURTROOM DEPUTY:**  We might be able to have a

24   court reporter if they can find someone to cover for Ruth.

25          **THE COURT:**  Okay.  I'd prefer that, but it's not

PROCEEDINGS

 1    essential, because I want to make sure that our long-suffering

 2    and dedicated court reporter, who's been with us here, is able

 3    to honor commitments that she has made based upon my earlier

 4    view that we would not be meeting on Wednesday.  But since we

 5    are, since I want to accomplish a few things.  That's fine.

 6    That will be the position.

 7         So I think that there are a couple of things.  I want to

 8    sort of divide the discussion maybe today this morning into --

 9    into three parts.  The first is Dr. Brody's case; secondly is

10    Ms. He's case; and third is -- are the instructions with

11    respect to the criminal offense.

12         So let's take Dr. Brody's case first.

13         Counsel has filed an offer of proof in which she wishes to

14    call two individuals, Dr. Ernest Hook and Mr. Erik Christensen,

15    to testify to -- to offer opinion and reputation testimony to

16    establish Dr. Brody's -- and then she goes on "ethical

17    commitment to patient welfare, character for truthfulness and

18    transparency, knowledge that he worked in various institutions

19    that were nonprofits, longstanding professional conduct that

20    directly -- professional conduct."

21         So first of all, I would allow testimony by these two

22    witnesses provided that you establish the period of time that

23    they had contact with Dr. Brody.  It may be throughout this

24    period.  I don't know.  You don't say with respect to Dr. Hook.

25    You say he was a private patient of Dr. Brody for approximately

1    20 years, but you don't say when it started, when it stopped,

2    so I have no idea.

3        I mean, I understand 20 years, but what 20 were they,

4    you know?  That's -- were they during this period of time?

5    Were they some other period of time?  I don't know.

6            **MS. NECHAY:**  Correct, Your Honor.  Yes, it did overlap

7    with his time at Done.  But I'll clarify that specific nuance,

8    but I do know that it overlapped.

9            **THE COURT:**  Okay.  So I do want you to -- and provide

10   that to the Government.

11           **MS. NECHAY:**  Of course.

12           **THE COURT:**  Now, some -- these clearly would not be

13   admissible.  His knowledge -- their knowledge that he worked in

14   various institutions that were nonprofits, that's out.  That's

15   not relevant.

16           **MS. NECHAY:**  May I, Your Honor?

17           **THE COURT:**  Of course.

18           **MS. NECHAY:**  By way of reputation in the community.

19   So Dr. Hook is also a psychiatrist, a child psychiatrist, and

20   he became aware of Dr. Brody's reputation through his work in

21   these institutions.  So it's foundational with respect to his

22   ability to form an opinion about Dr. Brody's reputation.

23           **THE COURT:**  Out.  It's not -- it's not foundational to

24   say he knew Dr. Brody.

25       I thought you were talking about Dr. Christensen --

1    Dr. Hook, rather?

2              MS. NECHAY:  Dr. Hook, yes.

3              THE COURT:  Well, Dr. Hook was a patient; right?  He's

4    going to talk about -- Dr. Hook is going to talk about

5    Dr. Brody as his treating physician; is that correct?

6              MS. NECHAY:  That's true, Your Honor, but he just also

7    happens to be a physician and a professor and has direct

8    knowledge -- I believe that this also gets to motive here as

9    well, because the Government has painted this picture from the

10   beginning, even in their opening statement, as being motivated

11   by profit, and so it -- it directly rebuts that assertion.

12             THE COURT:  That a person may spend some time with a

13   nonprofit organization rebuts his --

14             MS. NECHAY:  He has a long, Your Honor, history of

15   working with low-income patients --

16             THE COURT:  Did he work -- okay.  Did he work at the

17   nonprofit during the period of time that he was at Done?

18             MS. NECHAY:  No, but --

19             THE COURT:  Okay.  Then it's not relevant.  Then it's

20   just not relevant.

21        That he spent some years working for a nonprofit doesn't

22   bear on whether he was motivated by profit during the time that

23   he was at Done.  They just don't go together.  It's a

24   non sequitur.  It's a non sequitur.

25        Anyway, I'm letting you call these witnesses.  They'll be

 1  able to testify, but not in that -- not to that fact, that

 2  area.

 3           **MR. FOSTER:**  Your Honor?

 4           **THE COURT:**  Yes.  Go ahead now.

 5           **MR. FOSTER:**  In terms of Mr. Christensen, we'd ask

 6  that he be excluded because not only was he not a Done patient,

 7  he's not even an ADHD patient.  He was treated for OCD, not

 8  ADHD.

 9       And when you look at these disclosures for both, actually,

10  it does seem to veer into impermissible character and

11  propensity evidence that's not permissible under 404(1), such

12  as "Mr. Christensen will testify that Brody's treatment

13  reflected a patient-centered ethical philosophy."  Even within

14  the administrative of confines of Done, he's not a Done

15  patient, so that could only be impermissible character

16  propensity evidence.  And he doesn't have ADHD.

17           **MS. NECHAY:**  I'm happy to respond to that, Your Honor.

18       It's -- well, Dr. Brody was -- first of all, there were --

19  there was 404(b) evidence that came into this case, various

20  allegations about his treatment of other conditions, if

21  Your Honor recalls.  And so this also establishes that not only

22  was he an ethical --

23           **THE COURT:**  Wait a minute.  I'm sorry.  I don't recall

24  that.

25       You're saying that there's evidence in the record?

PROCEEDINGS

1          MS. NECHAY:  The medical board proceeding matter.

2          THE COURT:  That -- pardon me?

3          MS. NECHAY:  The medical board proceedings that came

4    up.  Those were also, candidly, not related to treatment of

5    ADHD at all.  So in fairness --

6          THE COURT:  No, no.  You understand -- it's very

7    important you understand what the Government's theory is so you

8    don't get up and make an argument like that.  The argument --

9    the Government's theory was to show that, you know, the manner

10   in which he prescribed substances without -- I guess it's

11   without a proper examination or something to that effect.  I

12   haven't looked at the allegations of it.

13        But is that -- did you want to go -- you want to explore

14   what the basis was of the accusation?

15        I mean, yes, they introduced the accusation.  Yes, you are

16   entitled to come in, and if you have evidence to refute the

17   accusation or you want to have some testimony concerning the

18   accusation, that's fine.  That's proper.  I'd allow that in.

19        But I won't allow in the -- what you're suggesting as a

20   rebuttal.

21          MS. NECHAY:  Your Honor, it just affirms, again, that

22   he had longstanding professional conduct in his treatment of

23   his patients.

24          THE COURT:  I don't know how -- I mean, I -- I'll let

25   you do Dr. Hook to establish that.

1          Is it your -- you would put on Mr. Christiansen and say,

2     did you -- you were a patient of Dr. Brody's and over what

3     period of time did you see Dr. Brody and how often did you see

4     him, and that would be it?

5               MS. NECHAY:  Well, was he ethical -- first of all, he

6     has direct knowledge of Dr. Brody -- has been preaching

7     patient-first philosophy for decades.  So with respect to those

8     specific types -- he's familiar with Dr. Brody's philosophy as

9     a treating physician, what exactly he meant by that.  There was

10    a variety of statements that were introduced during the trial

11    about Dr. Brody taking risk and really a lot of nefarious

12    inferences.  These are direct patients that knew Dr. Brody and

13    knew that he was a good doctor.

14         And so we just want to have the right to be able to

15    present our defense in showing that, showing those qualities

16    that are permissible under 404(a)(2)(A), 403.

17         And I'm happy to provide, if I need to, supplemental

18    briefing on the second witness, but it would -- it would be a

19    remarkably short amount of time.  That is true.  And so it

20    really does not prejudice the people whatsoever, and it

21    certainly provides Dr. Brody with an opportunity to have a

22    fair --

23               THE COURT:  404 what?

24               MS. NECHAY:  404(a)(2)(A).

25               THE COURT:  Okay.  Wait.

1          MS. NECHAY:  And we're looking at the qualities of

2     honesty, integrity, ethics.

3          THE COURT:  Well, you could offer evidence of that.

4          MS. NECHAY:  So that's --

5          THE COURT:  But that -- I think it's a good idea that

6     you look at the code section, the Evidence Code section, and

7     ask the question based upon the code section.  But what you're

8     indicating now is not that.  Now you are indicating that.

9          Yes, yes, you can introduce evidence that -- along that

10    line.

11         MS. NECHAY:  As well with respect to his credibility,

12    his motive, his intent --

13         THE COURT:  Well, he's not testifying, is he?

14         MS. NECHAY:  No, I don't believe he is, but he has --

15         THE COURT:  Pardon?

16         MS. NECHAY:  No, but he has made a number of

17    statements in the trial that have been introduced against him.

18         THE COURT:  His credibility -- I'm trying to figure

19    out -- when the defendant fails to testify -- you could bring

20    in evidence of his honesty.  Yeah, I think you could also bring

21    in evidence of his -- well, I don't know.  He's charged with

22    insurance fraud, so that would be honesty.

23         MS. NECHAY:  Correct.  And with respect to --

24         THE COURT:  Pardon?

25         MS. NECHAY:  With respect to various actions that were

PROCEEDINGS

```
 1   taken in the case, the Government certainly painted a picture
 2   as if --
 3            THE COURT:  I know what the Government painted.  I'm
 4   trying to figure out what it is you're offering which will
 5   rebut what the Government painted.
 6            MS. NECHAY:  Well --
 7            THE COURT:  What is it?
 8            MS. NECHAY:  I will be careful, Your Honor, to tailor
 9   it --
10            THE COURT:  I don't care that you'll be careful.  Tell
11   me what it is that you want to rebut, and just say -- and how
12   it's done.
13       You see, you have to put him on and ask him questions, and
14   he's going to testify, and I want to know what he's going to
15   testify to.
16            MS. NECHAY:  As indicated in my briefing, Your Honor,
17   he would testify that Dr. Brody's treatment plan reflected his
18   patient-first philosophy and that he was transparent,
19   clinically cautious --
20            THE COURT:  How is he going to do -- a patient is
21   going to say that somebody -- that he's not a doctor; right?
22            MS. NECHAY:  He is a Ph.D.
23            THE COURT:  Oh, well, so am I.  I mean, I'm a JD.  So
24   what?  I mean, that's not anything.  He's a medical doctor or
25   he's not a medical doctor.
```

1    I don't know how a Ph.D. testifies as to clinical

2    appropriateness unless he's done research of the kind that you

3    have clinics.  Maybe he did.  I don't know.  Clinical

4    information.

5        What's he a Ph.D. in?

6            **MS. NECHAY:**  In public health.

7            **THE COURT:**  Maybe there's a basis there.

8            **MS. NECHAY:**  And additionally, Dr. Brody was honest,

9    was an ethical doctor, was -- treated him in a way that you

10   would expect a good doctor to treat him.

11       Also, he provides context for how Dr. Brody speaks.  I

12   know that there's been statements in the record introduced

13   about -- just jokes that Dr. Brody made.  And these are two

14   patients that have known him for a long time that can describe

15   how he had a jovial demeanor.  He was humorous and honest, an

16   honest, good doctor.

17       And I would carefully tailor to the parameters of

18   404(a)(2)(A) and 403, but I believe Dr. Brody would -- is

19   entitled to present that evidence.

20           **THE COURT:**  Well, I'll allow you to call your

21   witnesses, but there I just want you to know when you start

22   getting into all of this, you invite cross-examination in these

23   areas, so I'd be somewhat cautious.

24           **MS. NECHAY:**  Understood.

25           **THE COURT:**  But that's up to you.  That's your call.

PROCEEDINGS

1          **MS. NECHAY:**  Understood.  Thank you, Your Honor.

2          **THE COURT:**  Okay.  So that takes care --

3      Now, it's your understanding -- I mean, I'll have to ask

4  Dr. Brody this, but it's your understanding that Dr. Brody will

5  not testify; is that correct?

6          **MS. NECHAY:**  To date, that's my understanding.

7          **THE COURT:**  Pardon?

8          **MS. NECHAY:**  To date, that's my understanding.

9          **THE COURT:**  I mean, I'm trying to make plans for the

10 rest of the trial, so --

11         **MS. NECHAY:**  Absolutely.  But that is my

12 understanding, and I can confirm that in writing, of course.  I

13 still need to with Dr. Brody, but that's my understanding.

14         **THE COURT:**  Okay.  All right.  Okay.  So I think that

15 that -- and that would be at least two witnesses?

16         **MS. NECHAY:**  Correct.

17         **THE COURT:**  And how -- pardon me?

18         **MS. NECHAY:**  In addition to -- there's some joint

19 defense evidence that we have been discussing.

20         **THE COURT:**  Okay.  Let's get to that in a minute, but

21 let me just finish.

22     How long do you expect these two witnesses to take?

23 They're character witnesses.

24         **MS. NECHAY:**  No more than 30 minutes.

25         **THE COURT:**  Okay.  All right.  So let's go to -- the

1   videos.  That's the next thing of Dr. Brody.  Okay.  And as I

2   look at it, it's actually -- it's under the brief I received,

3   which is document Number 494, Defendant Ruthia He's Trial Brief

4   Regarding Four done Onboarding Videos and Webinars Prepared by

5   Dr. Les Tsang and David Brody.

6          **MR. FOSTER:**  Yes, and we had also filed a proposed

7   stipulation at Docket entry 489, Your Honor.

8          **THE COURT:**  Okay.  The proposed stipulation --

9          **MR. FOSTER:**  Or 488.  Excuse me.

10         **THE COURT:**  488?

11         **MR. FOSTER:**  Yeah.  I can hand it up if you'd like.

12         **THE COURT:**  Yeah, if you would.

13         **THE COURTROOM DEPUTY:**  Thank you.

14                  (Pause in proceedings.)

15         **THE COURT:**  Okay.  Is there any objection to this

16   stipulation?

17         **MS. BELL:**  Yes, Your Honor.  This is detailed in our

18   brief, 494 at page 2.  And we've gone on to both explain why

19   the stipulation misses the point, from our perspective, as well

20   as to make a specific --

21         **THE COURT:**  Well, I should say it would be my

22   intention to allow you to play one video, and -- and the

23   stipulation would refer to essentially the other videos, the

24   ones that are not shown to the jury, because they're highly

25   repetitive.  There may be a lot of other objections to them.

1    But, you know, I -- I think in terms of just basic

2  fairness, you should be allowed to show that Dr. Brody was

3  engaged in creating these videos, that he did eight of them.

4  If you want to -- if you want to have some number, whatever

5  that number is, that's fine.  You can put that in.

6    But playing the videos, playing all eight of them or

7  whatever that number is or anything more than one, I'd have to

8  be convinced that it's important to do more than one.

9        **MS. BELL:**  Yes, Your Honor.  We would --

10       **THE COURT:**  So that's really the context.

11       **MS. NECHAY:**  Understood, Your Honor.

12    So what we've done is we have selected very discrete clips

13  of four different videos.  It's a total of 45 minutes.  We've

14  laid that out for Your Honor in this brief at -- and made a

15  specific proffer of what each one of these segments -- the

16  content and why it's relevant here, and that's laid out at

17  pages 3 through 8, per video.

18    And, Your Honor, I think if you're -- it may be most

19  efficient, as Your Honor suggested at the outset, given that

20  our brief was filed this morning -- or in the middle of the

21  night; however Your Honor would characterize it -- for the

22  Court to have the opportunity to review that.

23    But, in essence, it's the substance of the videos that is

24  critical to us.  It's non-hearsay, the point is, and Your Honor

25  has ruled as such already.  Your Honor has already had hearings

**PROCEEDINGS**

1   on two of the four videos and has repeatedly held that this is

2   non-hearsay.  The reason why the stipulation is not sufficient

3   is because the point is the content, exactly the fact of the

4   words being transmitted to the providers, that they were being

5   instructed in a certain way, goes directly to rebut the

6   Government's central premise in the case.

7        And so I think it will -- we've laid that out more

8   specifically, but that's the problem with the stipulation.  If

9   they're highly relevant non-hearsay, as the Court, again, has

10  already ruled following argument and hearings, the Government

11  is just rehashing the same issues that it's brought to

12  Your Honor's attention, and I think it would be -- you know, it

13  will all be quite clear if Your Honor has the opportunity to

14  review what we filed and what our position is.

15            **THE COURT:**  Mr. Foster.

16            **MR. FOSTER:**  Your Honor, I mean, that's not correct.

17  The reason they want to play these videos is for the truth of

18  the matter asserted, un-cross-examined.  For example, they

19  contain lengthy discussions of Defendant Brody's view on the

20  propriety of the DSM-5.  The reason why these particular

21  excerpts have been selected is to further the Defense case, not

22  for the fact of that being given, and they would be

23  un-cross-examined.

24        Under 403, to the extent that the relevance is

25  Defendant Brody engaging in the activity, then, as we've

 1  briefed, the substantive contents of the videos have very

 2  little relevance.  They're outweighed by confusion of the

 3  issues, undue consumption of time, and the fact that at the end

 4  of the day, they're just trying to get their case on

 5  un-cross-examined through these videos, which, as we mentioned,

 6  have problems in terms of distribution.

 7       Did anyone watch them?  We've seen all sorts of witnesses

 8  say:  Yeah, an e-mail was sent.  I never looked at it.

 9       It gives a misleading impression to the jury.

10       And I think the Court's rulings when we were taking this

11  up earlier in the context of the trial, what the Court ruled

12  was that this wasn't an appropriate witness.  If you could lay

13  an appropriate foundation, such as with a witness in the

14  defense case, then Your Honor would consider it.

15       But I don't think that that was a suggestion that all

16  these videos could come in just on their own without that

17  foundation, and that wouldn't be appropriate for the reasons we

18  mentioned.

19            **THE COURT:**  I'm trying to figure out that a person

20  creates a lot of training materials and -- which then responds

21  to the, perhaps, speculation that he didn't do it or didn't

22  care about doing it, so it -- he creates all these training

23  materials, but there's no evidence as to who saw them.

24       They're put in a -- sure, they are -- they are in a -- an

25  e-mail that goes out to -- I don't know -- 100, 200, whatever

 1   the number is of providers.  It's a link.  But there's no

 2   evidence that anybody bothered checking it.

 3       So I look at it and I try to figure out, well, then,

 4   what -- what is-- you know, isn't it of -- it may be of some

 5   relevance, but isn't it limited by the fact that we have no

 6   information in the record to who actually saw it.  That it was

 7   available is not the same thing as it was viewed.  And that's

 8   what's concerning -- concerning to the Court.

 9       And, of course, it leaves the impression if it's

10   available, therefore it was viewed and therefore that's why --

11   that's why the providers did what they did.  They followed the

12   training in the videos.

13       I don't know whether they did or not.  I haven't seen the

14   videos, which I have to see.

15       Maybe the thing to do -- to cut the argument somewhat

16   short -- is for me to take a look at the videos and then get

17   back to you tomorrow afternoon -- is it -- no, Wednesday.  I

18   mean, I may get back to you tomorrow too, just issue an order

19   telling you what's in and what's out, but I want you to have

20   the opportunity of arguing it before I rule.  So that's today.

21           MS. BELL:  Your Honor, may I just respond?

22           THE COURT:  The day is yours.  Go ahead.

23           MS. BELL:  Thank you, Your Honor.

24       So we have made a specific evidentiary proffer as to each

25   of the videos regarding the foundation issue.  In one instance,

1    as you'll recall, Mr. Schachter actually had the witness on the

2    stand who was present in the video.  In other instances there

3    have been exhibits that were admitted reflecting the fact that,

4    as Your Honor said, not only were the videos circulated, but

5    importantly, Dr. Brody, for example, had the state of mind that

6    they were being reviewed.

7        He's made statements in exhibits that have been

8    admitted -- and again, those are cited -- where he is saying:

9    Notwithstanding the fact that my training video was sent out,

10   it appears that people have not seen it or aren't following it.

11       In any event, Your Honor --

12       **THE COURT:**  That's exactly what the Government is

13   saying.

14       **MS. BELL:**  But, Your Honor --

15       **THE COURT:**  You couldn't have quoted a more accurate

16   concern that by the defendant's admission, he seems to be of

17   the opinion that there's no -- that there's insufficient

18   evidence from which he could conclude that people are watching

19   it.

20       **MS. BELL:**  But, Your Honor --

21       **THE COURT:**  So what -- it may be relevant that he made

22   it, so that that has some relevance to it.  By the way, it has

23   some because it -- had he not made any videos, it would be hard

24   to argue that I'm there as the training person.

25       So he made videos.  So that -- that step has been

**PROCEEDINGS**

accomplished, and I would -- I certainly have said I certainly
would let that in and let it in in terms of the magnitude that
you wish to demonstrate to the jury:  It wasn't one video; it
was ten videos, or five, or eight, or whatever the thing is.

    But that's by way of a stipulation rather than spending --
introducing them all.  And absent evidence that people watched
it, I find it difficult to put in anything more than just one
so that they could -- so -- because one actually gives a
context, a partial context, you would argue, but it gives some
meaning to the stipulation.

    To talk about training videos and not to see one --

        **MS. BELL:**  But --

        **THE COURT:**  -- may be ineffective in terms of how you
want to present your evidence.  I know you want to do more, but
I just have to think of why you want to bring in as many
excerpts as you do when it's acknowledged that there's no
evidence in the record that anybody saw them.  Not one.

    I didn't -- maybe I missed it.  Did any witness say, "I
watched it"?

        **MS. BELL:**  Well, yes, Your Honor --

        **MR. SCHACHTER:**  Your Honor, first of all --

        **THE COURT:**  Go ahead, Mr. Schachter.

        **MR. SCHACHTER:**  Ms. Amour Ross was on the witness
stand.  You can see her face on the video.  I attempted to show
her a snippet of the photo -- well, the video showing that she

**PROCEEDINGS**

1    is listening to the video.  Your Honor cut me off and said

2    we'll do this another time.  This is to the side.

3        So first of all, with respect to that video,

4    unquestionably Ms. Ross is there, listening, asking questions.

5    There's no question.  Foundation laid.

6        With respect to the others, I think that Ms. Bell had not

7    really completed her thought.  What happens is Dr. Brody

8    says -- and we can help the Court with the particular

9    communications, but what happens is he says, "I sent out videos

10   that address this particular topic," and he's like, "If people

11   don't remember, then I'll" -- you know, "I'll do it again," or

12   something along those lines.

13       But he in no way -- and you can see it in our brief.  He

14   in no way says:  Nobody has been reviewing my videos.

15       What he says, to the contrary, is:  Look, I sent these out

16   and, you know, I don't know if you -- the other participant in

17   this conversation -- don't recall it.  Maybe I need to do it

18   again.

19       So that is one issue.

20       The other issue also is it goes to state of mind.  What

21   this defendant is saying goes to his state of mind.  It does

22   not matter whether he is right, wrong, or otherwise.  We are

23   not trying to show that what he is saying as a medical issue is

24   correct or not correct.  It does not matter.  Just like *Yagi*

25   and Judge Chen's opinion.  It does not matter whether or not

1  the defendant in *Yagi* in fact, was being discriminated against,

2  whether his job restrictions were, in fact, being curtailed.

3  The issue is these statements by the defendant show that's what

4  he thought.

5      And so Judge Chen says it's not hearsay.  Judge Chen also

6  go on to separately address 803(3) and says it also goes to

7  that defendant's state of mind.

8      But the point is it is non-hearsay because it is not --

9  we're not trying to prove that fact.  And also --

10         **THE COURT:**  We had this discussion yesterday, I

11  think -- or some day -- and I understand that it -- I

12  understand you are saying if I -- and you may correct me if I'm

13  mishearing you.

14      You are saying it's not hearsay because, in fact, it

15  addresses the defendant's state of mind.  That's why it's not

16  hearsay.  Okay.  And what you are saying -- just to finish the

17  sentence -- you are saying it's not hearsay because it's an

18  exception to the hearsay rule.  State of mind -- state of mind

19  is an exception to the hearsay rule.

20      It's not?

21         **MR. SCHACHTER:**  It's both, Your Honor.

22         **THE COURT:**  Well, wait a minute --

23         **MR. SCHACHTER:**  It is both.  As Judge Chen says in

24  *Yagi*, he addresses two different issues.  One is he says it is

25  not hearsay because it is not offered for the truth of the

PROCEEDINGS

1   matter asserted.

2       Then Judge Chen goes on to separately address 803(3) and

3   says not only is it non-hearsay; now let me also say it also --

4   if it were offered for truth, it falls within 803(3), which is

5   an exception.

6           THE COURT:  Okay.

7           MR. SCHACHTER:  These statements actually fall within

8   both.

9       But to be clear, the proponent of the evidence is offering

10  them not for the truth of the matter asserted.  We do not

11  intend to argue:  And, ladies and gentlemen, Dr. Brody was

12  right about what he said.

13      It doesn't matter.  What matters is what he thought.  We

14  are not --

15          THE COURT:  What he thought?

16          MR. SCHACHTER:  Correct.

17          THE COURT:  What he thought --

18          MR. SCHACHTER:  He's saying things --

19          THE COURT:  What he thought would be the exception to

20  the hearsay rule.

21          MR. SCHACHTER:  So I don't mean to quibble, but it's

22  both.  And Judge Chen lays it out by addressing them

23  separately.

24      When somebody says, "I think this," or when the defendant

25  in *Yagi* says, "I was being discriminated against," it

 1   doesn't -- they're not trying to prove that, in fact, the

 2   defendant was being discriminated against, and so it is not a

 3   hearsay statement because it is not being offered for the truth

 4   of the matter that it is asserted when the defendant says, "I

 5   am being discriminated against."

 6          **THE COURT:**  Yes, it is.

 7          **MR. SCHACHTER:**  It matters not -- well, that's --

 8   it --

 9          **THE COURT:**  Actually, it is.  He is saying it was a

10   case for discrimination.  He was saying:  I was discriminated

11   against.

12       And, I mean, I don't know.  I'll reread *Yagi*, but the

13   problem is, while in law school it may -- you can make these

14   sorts of distinctions, when you actually are facing the

15   statements, the statements are statements as -- I haven't seen

16   it so I don't know, so there's where I'm at a bit of a

17   disadvantage, but -- or you're -- maybe you're at the

18   disadvantage, since I haven't seen it.

19       But I think he is saying:  Here are the characteristics.

20   Here is the way you conduct the examination.  Here is what you

21   do.

22       I think that's probably what's in the video, I guess.

23          **MR. SCHACHTER:**  We think the Court should review it.

24   I think this would be helpful.

25          **THE COURT:**  Here is the standards.  Here is how to

PROCEEDINGS

 1  apply.  Here is how to evaluate.  Here is how to conduct a
 2  mental evaluation examination.  An examination.
 3      That's what he's saying.
 4      Now, you say:  Well, but that's not hearsay because it's
 5  not -- because we're not offering it for the truth of the
 6  matter, that that is the way mental examinations should be
 7  conducted.
 8      That's what you're saying.
 9      To which I say:  No, that's ridiculous.  That's exactly
10  why it's being offered.  It's being offered -- the case --
11      The issue in this case is whether or not --
12      Actually, I think it's just the issue in this case:  Were
13  examinations conducted, mental examinations, mental
14  evaluations.
15      Because let's get real into what the evidence is.
16  Obviously you could start at -- you could start at no
17  examination.  A person -- a patient comes in and says:  I've
18  got attention deficit disorder.
19      And the doctor says:  Oh, you do?  Well, we have a cure
20  for that or a treatment for that.  It's called Adderall, and if
21  you've got it, I'm giving it to you.
22      End.
23      Let's say that was the end.  Now, was it done for a
24  medical purpose?  Oh, you can argue, yes, it was, because the
25  treatment of attention deficit disorder is Adderall.

1        But what the Government says:  It's not for a medical

2    purpose unless you ascertain that the person has the condition

3    for which the medicine is a proper and appropriate treatment.

4        So we can move down the spectrum.  Zero examination, it's

5    obvious on its face that there is no medical evaluation.  He

6    may have ADHD.  He may have a terrible case of ADHD.  He may,

7    as a child, have had it from birth.  But it's not an

8    appropriate -- it's not an appropriate medical evaluation.

9        Now we start moving up the spectrum.  Let's say it was

10   five minutes.  Let's say it was 10 minutes.  Let's say it was

11   25 minutes, and let's say it's an hour.  As you move

12   through the process, the closer you get to -- according to a

13   witness -- which, by the way, may not be believed, but if

14   believed, the closest -- the closer you get to the one hour, 60

15   to 90 minutes, the more likely it is that the evaluation was an

16   appropriate evaluation and therefore the diagnosis was an

17   appropriate medical diagnosis; and therefore the prescription

18   was an appropriate medical purpose because this person had this

19   problem as ascertained by the doctor.

20       Okay.

21       So getting back -- that's a long story of getting back to

22   why you actually are introducing hearsay.  You want this doctor

23   to say, hey, 20 -- whatever he says on this tape -- and I

24   haven't seen it, so I can't really tell you.  I know he's not

25   saying don't examine them.  I know that.  But he's probably

**PROCEEDINGS**

1  saying something maybe short of the -- what Dr. Good- --

2         **MR. FOSTER:**  Goodman.

3         **THE COURT:**  -- Goodman said is essentially the

4  standard.  Maybe he says something short of it.  Okay.  I don't

5  know whether he does or not.  But if he does -- if he does --

6  then it's being introduced for the truth.

7       Now, there's an exception, which I think is what you ought

8  to grab onto, and you say the exception is it shows that he --

9  he, the defendant -- the defendant believed that that was the

10  appropriate medical standard, and therefore he may have been

11  mistaken, but that's what he believed.

12       And then the question is:  Okay.  Okay, does it fit within

13  that?  Because is it a then-existing mental state, belief, or

14  is it a preexisting and potentially fabricated mental state?

15       And the Government is arguing, no, it's preexisting.  He

16  always thought that.  It's not like, oh, I'm hot, or -- I

17  understand spontaneous utterances and so forth.  But "Oh, I

18  feel this," or, "Oh, I feel that," which is the generic

19  permission to allow this type of evidence in because there is

20  insufficient time to fabricate the explanation.

21       But here it's a classic over-time fabrication.  This isn't

22  one prescription, one time thinking what was his state at that

23  time.  It is encompassing an over two-year period, maybe three.

24  I don't know.

25       So there's ample evidence that it was not of recent

PROCEEDINGS

 1  vintage that he came to that mental state, and that's why it

 2  doesn't fit within that.

 3      However, after making that long explanation, I do think

 4  it's important on the other side of the ledger to let you

 5  demonstrate that what he did, what he did -- he's on trial?

 6  Show what he did.  And to that extent, I think the videos are

 7  informative.

 8      So I'll go -- I'll look at it.  I have to look at it to

 9  give you a fair reading, a fair ruling.  But I wanted to tell

10  you what my understanding of the law was because I'm not sure

11  you agree.  Number 1, I'm sure you don't agree with it, which

12  is -- that's fine, because greater minds than mine will tell

13  you you're right or you're not.  Maybe.

14      But that's the framework in which I have to view it.  But

15  I don't -- I don't accept that it's the same thing as *Yagi*.  I

16  did read *Yagi* at the time and I thought it was distinguishable.

17  But since it's my learned colleague next door, I'll give it

18  another read.

19      Yes, Ms. Bell.

20      **MS. BELL:**  Thank you, Your Honor.

21  I just want to complete the thought on this.

22      So Your Honor will see if Your Honor looks at our brief at

23  page 494 that we proffer a separate and independent non-hearsay

24  basis for the videos which goes to the fact they were made to

25  rebut the Government's central claim that there was a --

1        **THE COURT:**  I said I'd let that in.  You don't have to

2   argue that.  You're going to -- you are going to be able to

3   introduce into evidence whatever that number of videos is,

4   whatever that number of -- you will do it.  You will --

5        However, I will not allow four, eight, ten excerpts from

6   different videos be played, because then it is exactly what the

7   prosecution says it is.  It becomes a reeducation of the -- of

8   the argument about what is the medical evaluation standard as

9   distinct from necessarily what he thought.  And even if it is

10  what he thought, it's a recent fabrication.  That's the --

11  that's -- I mean, it's not a recent fabrication.  It's a

12  fabrication.  It's not a recent statement.

13       **MR. FOSTER:**  It's not contemporaneous without the

14  opportunity for reflection, which is the characteristic

15  exception.

16       **THE COURT:**  Anyway, I'll look at it.

17       **MS. BELL:**  Thank you, Your Honor.  I understand

18  the Court's ruling.  But just to make sure I'm clear, it's not

19  just the fact that can be encapsulated in a stipulation.  It is

20  exactly what was said and how it's said, which goes to rebut

21  the Government's central claim that the policies and practices

22  implemented deprived the clinicians of their ability to

23  exercise independent judgment, and I think that's a separate

24  and independent basis.  It's laid out very clearly.  I don't

25  need to rehash it, but I would just ask that Your Honor, in

PROCEEDINGS

1    connection with reviewing the clips that we will provide, look

2    back at the brief, because we took pains to make that issue

3    clear.  Since we had discussed the state of mind issue at

4    length, we wanted to explain what we meant by that, why we

5    needed -- we felt we needed to show these particular clips.

6        And Your Honor will also see at page 5 there the Dr. Brody

7    quote which I had referenced where he says, "Even with my

8    onboarding video being shown to all new clinicians and my

9    written treatment guidelines being sent out," and he then goes

10    on to make an observation.

11        So the Court will see that we've very much tried to

12    address the Government's arguments, and I think it would be

13    helpful to --

14        THE COURT:  But to some extent, you know, I want to --

15    I want to make sure that my evidentiary rulings don't actually

16    make the argument.  In other words, I think you may argue --

17    you have to have things in the record from which you can make

18    your argument.  What you have said to me this morning, you

19    could argue.  I'm not saying:  Oh, don't argue that.

20        You know, you can make your argument, just as -- as you

21    just said it to me, you could say it to the jury.

22        Then but the question is:  How does the evidentiary basis

23    for that come in?

24        That's where I -- there's my role, as I see it, and I'll

25    take a look at it in light of your argument, I probably --

PROCEEDINGS

 1          MS. BELL:  Thank you, Your Honor.

 2          THE COURT:  Yes, Mr. Foster.

 3          MR. FOSTER:  Just one thing, Your Honor.  I believe

 4   Mr. Schachter misspoke.  He suggested that Anna Amour Ross --

 5          THE COURT:  Yes.

 6          MR. FOSTER:  -- had watched the Brody videos, and so

 7   you may want to ask him about that, because I don't believe

 8   that Ms. Amour Ross was present for the Brody videos.

 9          MR. SCHACHTER:  As Your Honor will recall, it was --

10          THE COURT:  I won't recall anything.  You better get

11   the transcript.

12          MR. SCHACHTER:  It was one of --

13          THE COURT:  Mr. Schachter, all you have to do is give

14   me a line and page number.

15          MR. SCHACHTER:  It's in the brief.  And it was

16   Dr. Tsang's onboarding video, which we attempted to introduce

17   through Ms. Ross.  That's very clear in the record and it's

18   very clear in our brief.

19          THE COURT:  I don't know that I'm letting in

20   Dr. Tsang's video.

21          MR. FOSTER:  Not Dr. Brody, Your Honor.

22          MR. SCHACHTER:  Well, Your Honor, again, the issue is

23   the instructions that were given -- instructions are

24   non-hearsay.  It has to do with who is communicating the

25   policies.  As Your Honor heard time and time again, the

1  Government elicited testimony from non-clinician witness after

2  non-clinician witness who was in charge of the clinical

3  policies at Done.  The fact that it was being communicated to

4  the providers by the medical director and not by Ms. He is

5  very -- is 401, at a minimum, relevant as to who, in fact, was

6  providing clinical policies.

7      And also, it shows that -- that it is a board-certified

8  psychiatrist that is saying that as he is instructing -- which

9  cannot be hearsay.  These are instructions to Ms. Ross and

10  other providers as to what the follow-up frequency should be

11  that is coming from the medical director, a board-certified

12  psychiatrist, and not from Ms. He.

13      It is, as the Court recognized at the time when the Court

14  said I'm not going to take this up now because the issue --

15      **THE COURT:**  Could you explain to me something,

16  Mr. Schachter?  And you'll have to excuse the gap between when

17  you say something and when I actually think about it.

18      You say it's not hearsay.  Now, Dr. -- I haven't seen

19  these things, so I'm a bit at a loss of it, but I think I tried

20  to address it a couple of minutes ago.

21      But if -- you say instructions can't be hearsay, and I

22  don't know why they can't be hearsay.  You are -- if I instruct

23  you, I want to say:  You know what, Mr. Schachter?  I want to

24  tell you how to conduct a medical examination.  You do A, B, C,

25  and D.  You don't have to do D, E, and F.

1    Those are instructions I've given you.

2    Why are they not hearsay?  They're introduced for what is

3    the appropriate standard to be employed or the ordinary course

4    of medical practice.  They're telling them what to do.

5        **MR. SCHACHTER:**  Right.  Your Honor --

6        **THE COURT:**  And it's not hearsay because it's not

7    introduced for the truth of the matter?  What is it introduced

8    for?

9        **MR. SCHACHTER:**  Yeah.  Your Honor -- and we laid out

10   the law on page 4 of our brief --

11       **THE COURT:**  I'll look at.  Guess what?  I'll look at

12   it.

13       **MR. SCHACHTER:**  Thank you, Your Honor.

14       **THE COURT:**  I have almost nothing to do, so I'll look

15   at it.

16       **MS. BELL:**  And Your Honor will recall this video was

17   the subject of Mr. Steskal coming into court.  There was a

18   lengthy proceeding on this.  At the end of that proceeding,

19   Your Honor held that you would not exclude it in our

20   case-in-chief.

21   And so we've laid that all out in the brief because two of

22   the four videos have already been the subject of court rulings

23   that these would -- at least our understanding was these would

24   be admissible in our case-in-chief.  We've now taken snippets

25   of them and we've laid that out so Your Honor can see the

**PROCEEDINGS**

1    procedural history here.  We've attached the prior transcripts

2    on this issue.

3        So these have been, from the very outset of the case,

4    hotly debated issues that we believe Your Honor ruled could

5    come in in our case-in-chief --

6              THE COURT:  Okay.

7              MS. BELL:  -- and we've now tried to present that in

8    very abbreviated fashion for the Court and the jury.

9              THE COURT:  Thank you.  Moving on.

10       But this obviously affects Dr. Brody.

11             MS. BELL:  Yes, Your Honor.

12             THE COURT:  Ms. Nechay, you understand that?  I mean,

13   I assume you join in their arguments; right?

14             MS. NECHAY:  Absolutely.  As indicated --

15             THE COURT:  It's actually more appropriate to your

16   client than to their client.

17             MS. NECHAY:  Absolutely, Your Honor, and we've all

18   discussed this at length --

19             THE COURT:  Yeah.

20             MS. NECHAY:  -- and, of course, I support --

21             THE COURT:  I appreciate the fact that because you

22   haven't argued it in front of me doesn't mean that you're not

23   joining in or not being concerned about it or don't think it's

24   important.  You do think it's important, and I understand that.

25   It's part of your case.

1    But all I'm making the observation is that it may relate

2    much more so to Dr. Brody than it does to his codefendant.  I

3    don't know.  I'm not juggling at this point.

4         **MS. NECHAY:**  As indicated, just briefly, Your Honor,

5    there's intersectionality between both cases.  I would say it's

6    critical to both defense cases.

7         **THE COURT:**  I think that's right.  I think that's well

8    said.

9         Okay.  So let's talk about -- oh, okay.  I don't want to

10   talk about the other patients anymore.  This is -- I mean, two

11   things that you've asked for which I'm just denying.  One is

12   other patients coming in, and the other is the other records.

13   Okay?  Those things.

14        I've discussed it.  I've ruled.  If I change my mind, I'll

15   change my mind.  And I will look at it before -- before issuing

16   something on -- tomorrow, which will be probably a series of

17   bullet points in an effort to instruct you as to what the --

18   what you want to do -- how your case looks as distinct from all

19   reasons.  I don't want to get -- I just am too concerned about

20   what I have to do rather than what I can do or cannot do

21   depending on outcomes and so forth.

22        So tomorrow at some point I will give you some bullet

23   points as to this motion, this motion, this motion, but it

24   won't have the reasons behind it.

25        And I want to tell you, I'm pretty open-minded.  Not so

**PROCEEDINGS**

 1    open-minded about those two things, but there we are.

 2            **MS. BELL:**  Your Honor --

 3            **THE COURT:**  Maybe you'll convince me.

 4            **MS. BELL:**  I understand entirely, and I will not argue

 5    it now except to say that we have gone beyond what we've

 6    previously set forth for Your Honor on both of these issues,

 7    the medical records and the patient.  We've explained to

 8    the Court why we think this evidence is critically relevant,

 9    why it's not only -- you know, in keeping with what the

10    Government has done, but why, given the central theory of the

11    case, we feel that it's absolutely essential.

12        With respect to the patients, it does dovetail with the

13    problem we encounter now that we believe that the Government

14    has essentially made it such that our provider witnesses are

15    going to exercise their Fifth Amendment rights.  So we have an

16    entire swath of our case-in-chief which we cannot present

17    through the providers and which we believe we can alternatively

18    advance in part through the patients.

19        And I would just ask that Your Honor take -- look at our

20    briefing --

21            **THE COURT:**  Okay.  What you're saying --

22            **MS. BELL:**  Yes.

23            **THE COURT:**  -- to me is:  Look at that proffer in the

24    context that you will not be able to put on the providers.

25        So, therefore, it is -- it's a less than perfect but a

PROCEEDINGS

```
1   practical and essential -- I'll use your word -- essential way
2   of showing that which you want to show, because the original
3   avenue, the easiest avenue, has been foreclosed by the
4   patients -- pardon me -- the providers asserting their Fifth
5   Amendment right.
6        Okay.  I can do that.  I mean, I think that's -- I think
7   it's a fair request.  I think it's a fair request.  Everything
8   is in context.  I'm always shouting you down about context, so
9   I think it's fair that I take it into consideration.
10        MS. BELL:  Thank you, Your Honor.  That's all we ask
11   is that Your Honor give it a fresh look based on what we say in
12   there about how the Government's presented its case and where
13   we are now with our evidence.
14        Of course, we're separately asking the Court to grant
15   immunity for those witnesses, but we know that is a tall order,
16   so...
17        THE COURT:  Tall.  It's pretty tall.  I mean, what's
18   the story?  I mean, I think you've -- what is the Government's
19   position?  Is the Government's position I should immunize them?
20   Is it?
21        MR. FOSTER:  No, Your Honor.
22        THE COURT:  I thought not.
23        MR. FOSTER:  Your Honor, I also think it's important
24   to put some facts on the record --
25        THE COURT:  Go ahead.  Yes, I think you should.
```

1          **MR. FOSTER:**  -- given some of the things that were

2   said last week.

3          As is common and completely appropriate that when the

4   Government received the Defense witness list, its agents sought

5   to talk to some of the witnesses.  Some of them retained

6   counsel.  There was reference to things like threats.  My

7   understanding is that Mr. Beckering, the husband of Judge

8   Beckering, who's been an AUSA for many decades, was involved in

9   a request from counsel for some of these witnesses for a

10  reverse proffer presentation, that he provided some

11  information.  No threats or anything improper was made, is my

12  understanding.

13         And there was the statement made that the Defense lacked

14  access to information and lacked access to information about

15  what had occurred.  My understanding is that the reverse

16  proffer was given to pool counsel for the Done employees who

17  ultimately is paid through Defendant He's company itself under

18  Defendant He's control.

19         And so I do think that those representations about not

20  being able to get information -- I just wanted to state those

21  facts as I understand them on the record.  None of the

22  prosecutors in the courtroom have been involved in that aspect

23  of the investigation.

24         **MS. BELL:**  And I can -- if I can respond very briefly,

25  Your Honor.

PROCEEDINGS

         1          This is, again, set forth at Docket 491 at page 2, and I
         2    would ask that the Court at least look at it.  I understand
         3    it's a tall order, but it is -- we think this is not the
         4    ordinary course here.
         5          Our understanding is, first of all, we had a lengthy
         6    history of reaching out to these folks.  We have proffers of
         7    exactly what they would say, which is critically relevant to
         8    our case.  They were not only willing to cooperate and come
         9    testify in this case but were enthusiastic, at least in the
        10    case -- I think it's fair to say two of them, they were eager
        11    to tell the jury about the great care they think they're
        12    providing and the fact that their clinical judgment has never
        13    been constrained in any fashion by the policies and procedures.
        14          Once the Government knew, having investigated this case
        15    for years -- and, by the way, having specifically told one of
        16    the three that she was not -- had nothing to worry about, she
        17    affirmatively reached out to the DEA.  It's in the memo that we
        18    will pass up to the Court and file *in camera* later after court
        19    today.  She was specifically told:  You are not under
        20    investigation.  You have nothing to worry about.
        21          The minute we then give these names over to the
        22    Government, our understanding is these extraordinarily
        23    extensive subpoenas were served on these individuals.  Federal
        24    agents appear at their home.  Once counsel was provided to them
        25    to help them respond to these subpoenas, which made it quite

**PROCEEDINGS**

 1    clear that the Government would now treat them as if they

 2    personally were under investigation, they've effectively now

 3    been so informed.  And what we understand their counsel has

 4    been told is that there are practices that the Government

 5    believes deviate from what Dr. Goodman says is the usual

 6    practice, and therefore they face serious jeopardy not just as

 7    a matter of federal criminal law, but as a matter of state law

 8    and as a matter of state -- of licensing, administrative

 9    licensing issues, which, of course, is not the concern of the

10    Department of Justice or the province.

11        And so the counsel has been told that the deviation from

12    Dr. Goodman's stated position on what the usual practice is, is

13    what creates the jeopardy.  Of course, we take grave issue with

14    that.  As the Court knows through the cross-examination, we do

15    not believe that Dr. Goodman sets the dividing line between

16    what is criminal and noncriminal.

17        But the practical matter is that, unsurprisingly, their

18    counsel has now said:  Well, there are a whole host of issues.

19    If the Government is taking the position that they're -- you

20    know, any deviation from Dr. Goodman's standard is the dividing

21    line between criminal and noncriminal, then I can't let my

22    clients testify.

23        So that's deprived us of critical evidence to rebut a

24    central point in their case.

25            **THE COURT:**  What if the Government is right?  What if

 1    the Government -- what if the standard is as Dr. Goodman says

 2    the standard is and then there's a pattern by one of these

 3    providers to follow a different standard -- to follow a

 4    different standard?

 5        I mean, it seems to me -- look, practically speaking, of

 6    course that person isn't in -- in practical jeopardy of being

 7    prosecuted.  And because of the election -- the election that

 8    the Government made in this case.

 9        The election the Government made in this case was to

10    prosecute individuals who essentially were in the organization

11    of this platform:  The founder of it, the chief medical person,

12    and then we had three or four people come up, all of whom, in

13    my recollection -- but I may be wrong as to one, I may be

14    wrong -- were people who had a substantial role in the

15    administration of this -- I call it platform.  Call it whatever

16    you want to call it.  Okay?

17        So from a practical point of view, a single provider may

18    or may not be in jeopardy not because legally they're not in

19    jeopardy, but because practically they may not be in jeopardy

20    because of the manner in which the prosecution has designed

21    this -- this prosecution.

22        And, of course, the way the prosecution has designed it

23    makes sense.  That is to say, they want this case -- they want

24    this case to demonstrate for all telehealth platforms that

25    there are certain standards that have to be met for the

PROCEEDINGS

1  administration of controlled substances, for the prescription.

2  They may be right; they may be wrong.  Their choices are their

3  choices.  They're not the Court's choices.

4      But I don't see anything inconsistent with them saying, if

5  they did say or their investigators said:  By the way, we

6  believe that a failure to follow a particular type of standard

7  is -- is potentially criminal.

8          **MR. FOSTER:**  And I think, to put a finer point on it,

9  Your Honor, there's, as you noted, many providers, and so there

10  would be nothing unusual or improper in having seen these

11  providers, looked at what they did.  I believe there's one, for

12  example, who was prescribing stimulants in a state where under

13  state law it is not lawful to initiate care using telemedicine.

14  So in the context of a reverse proffer, there certainly would

15  be nothing inappropriate to say, hey, we looked at it.  Your

16  client was prescribing all these drugs in a state where it's

17  unlawful, and, you know, that's a newly discovered fact.

18      And I think as to the context point, none of these

19  nonimmunized doctors relate to the patient records or the

20  patients they're trying to get in, so I don't think there's a

21  relationship.

22          **THE COURT:**  Well, I'll take a look at it.

23          **MS. BELL:**  Thank you, Your Honor.

24          **THE COURT:**  But I'm not inclined to pursue it further;

25  that is, to have these people come in and assert their Fifth,

 1   and then make a decision as to whether or not they should be

 2   immunized.

 3        Okay.

 4        **MS. BELL:**  I understand the Court's ruling.  Just to

 5   complete the thought on this, there were hundreds -- there are

 6   hundreds of providers in the platform.  The platform, as

 7   Your Honor knows, was not shut down.  The conspiracy is alleged

 8   to have ended in 2023.  Hundreds of providers continue to

 9   practice under policies and procedures that Dr. Goodman may

10   opine were on the wrong side of the dividing line.

11        I think our issue is that the three that we have now

12   proffered as critical defense witnesses are all of a sudden

13   under the spotlight and told they have serious exposure when

14   the Government allowed hundreds of people to continue to

15   practice under these policies and procedures for years.

16        So in any event, that's the context from our perspective.

17   And, again, we would like the Court and ask the Court to look

18   at our specific proffer with respect to the patients in

19   conjunction with this issue because it puts us in a very tough

20   position when we believe there's powerful evidence to rebut the

21   Government's central claim that providers were deprived of

22   their clinical judgment and that therefore they issued,

23   consequently, prescriptions without a legitimate medical

24   purpose and outside the usual course of practice.

25        And we believe our patient witnesses, who are both

**PROCEEDINGS**

1    patients of Nurse Practitioner Shapard, the only --

2              **THE COURT:**  And you can go on, but the --

3              **MS. BELL:**  Okay.

4              **THE COURT:**  -- the fact of the matter is they're not

5    testifying.

6              **MS. BELL:**  Understood, Your Honor.  I just --

7              **THE COURT:**  You know, unless I order them immunized --

8              **MS. BELL:**  Yup.  Understood.

9              **THE COURT:**  I don't even know how that quite works

10   anyway.  It's -- okay.

11        Anyway, you've made your record on that.

12             **MS. BELL:**  Thank you.

13             **THE COURT:**  But I don't find anything inappropriate by

14   the Government or agents advising these people that there is

15   jeopardy.  In other words, I'd be very surprised if I would

16   find:  Oh, by the way, you're not in jeopardy.  You know, you

17   don't -- you're not validly exercising your Fifth Amendment

18   privilege.

19        I assume that they are, based upon what I hear.

20        And I don't know whether the test for validly exercising

21   your Fifth Amendment privilege is "What is the likelihood if on

22   a percentage or probability standard of prosecution?"  I don't

23   know if it works that way.

24        Anyway, let me move on.

25        So I think the remaining issue -- am I right?  Have we

1  gone through -- is there something that I've overlooked and

2  said I wasn't going to address?

3          **MS. BELL:**  Your Honor, there is a brief on the

4  training video, which was a separate video that came up.  This

5  is Dr. Luca's training video, and that's Docket 492.  We

6  certainly don't need to go through that.  It's actually a short

7  brief with an exhibit, and we would ask that Your Honor take a

8  look at that.  That's obviously also important to us and we

9  believe it's admissible.

10         **THE COURT:**  That's different these training videos?

11         **MS. BELL:**  Yes, Your Honor.  Yes.  This is the video

12  Your Honor may recall came up in the cross-examination of

13  Trevor Granger, who was on the stand, who was a witness who

14  worked in the product department, and who specifically

15  testified that Dr. Luca was opposed to on the 30-minute initial

16  appointment time.  And so we've proffered two independent bases

17  for this video.

18         **THE COURT:**  I'll take a look at it.

19         **MS. BELL:**  Thank you, Your Honor.

20      And we did also --

21         **MR. FOSTER:**  You ordered --

22         **THE COURT:**  Pardon?

23         **MR. FOSTER:**  You ruled last week that it was

24  inadmissible, this video, and the reason was it's hearsay.

25  It's being admitted for the truth.

**PROCEEDINGS**

 1          And it's not even impeachment.  As Your Honor said last

 2    week, the fact that he said X on a particular occasion, now you

 3    have evidence that on a different occasion that witness said

 4    Y -- that doesn't impeach the witness's testimony that they

 5    said X.  I think you said you don't impeach the witness that

 6    way and that if they wanted to call Dr. Luca, they could, but

 7    to introduce a video --

 8          **THE COURT:**  I'll take a look at it.

 9          **MR. FOSTER:**  Yeah.

10          **THE COURT:**  Thank you.

11       Okay.  So what remains is the very easy -- I'm sorry.

12       Go ahead, Ms. Bell.

13          **MS. BELL:**  No, Your Honor.  Thank you very much.

14       That would be -- there are two separate bases.  They're

15    laid out there.  We don't need to rehash that.

16          **THE COURT:**  I'll take a look at it.

17          **MS. BELL:**  I guess the only thing I would say is we

18    did bring Your Honor exhibits which I could just give to

19    Lashanda that relate to two of the briefs, the medical records

20    brief and the immunity brief, and so I will leave those and

21    we'll file those.

22          **THE COURT:**  That's great.  Okay -- sorry.  Is there --

23          **MS. BELL:**  Go ahead, Your Honor.

24          **THE COURT:**  My turn?

25          **MS. BELL:**  Yes, please.

1     THE COURT:  I mean, do you have anything more you want

2 to say?

3     MS. BELL:  Did Your Honor --

4     THE COURT:  I don't mean it's my turn.  I mean --

5     MS. BELL:  Not on the issues we've discussed.

6     THE COURT:  Okay.  So let me just now talk a little

7 bit globally, if I may.

8     So let's assume -- oh, am I correct in assuming that if I

9 pursue my indicative rulings about not letting this in or not

10 letting that in that -- that Defendant He will be offering no

11 live witnesses?  Is that true?

12     MS. BELL:  Not exactly, Your Honor.

13     THE COURT:  Okay.

14     MS. BELL:  So we have some very short witnesses.  We

15 have, first of all, Mr. Sujansky, who is our data witness who

16 responds to Mr. Petron, the Government's data witness.

17     THE COURT:  Okay.

18     MS. BELL:  We also have --

19     THE COURT:  And how long -- when you say "short," I

20 really need some positive -- I need some concrete --

21     This is a failure of concreteness from trial lawyers which

22 is not -- it's not unusual.  It's the usual course of practice,

23 I've found.

24     MS. BELL:  We promise Your Honor that if permitted to

25 do what we have asked for --

1          THE COURT:  No, I don't want a promise like that.  I

2    want to know how long is --

3          MS. BELL:  Mr. Sujansky?

4          THE COURT:  Yes.

5          MR. BALLEW:  I would say about 45 minutes or an hour

6    max.  It's not --

7          THE COURT:  Okay.  Well, that's a lot of time.  I

8    mean, I'm not saying it should be done in 10.  I'm just saying

9    that's a lot of time, because if it's -- if it's 45 minutes, my

10   guess is it would be a half an hour or so response.

11         MR. FOSTER:  Maybe, Your Honor.  I don't think it will

12   be lengthy on cross-examination, but, yeah.

13         THE COURT:  Okay.

14      Okay.  So I'm just looking at Thursday morning, obviously.

15      So that's one live witness on Thursday.  You indicated you

16   had several?

17         MS. BELL:  Yes, Your Honor.  There's a -- there's a

18   very -- there are two other very short witnesses who have

19   substantive testimony that I think will take 10 minutes or less

20   from -- on direct.

21         THE COURT:  And they are who?

22         MS. BELL:  Sam Santopoalo and a Mandarin interpreter

23   whose name -- we would have to give Your Honor the name of this

24   person, but it's a Mandarin interpreter.

25         THE COURT:  A Mandarin interpreter?

PROCEEDINGS

1           MS. BELL:  Yes.

2           THE COURT:  And the Mandarin interpreter will

3    interpret -- will testify as to what?  The state of the

4    defendant's language skills?

5           MS. BELL:  No, Your Honor.  It will be the translation

6    of a document that the Government has put into evidence.

7           THE COURT:  Okay.  Argue the translation.

8       Well, I'll tell you as to that, I will instruct you to

9    provide the Government by 3:00 p.m. today the proffer of

10   testimony, the concrete proffer, so they have an opportunity to

11   challenge it if they wish to challenge it.

12          MS. BELL:  Yes, Your Honor.  We will do so.

13          THE COURT:  Okay.  Okay.  And, of course, you're

14   entitled to do that.  Okay?  Not arguing that.  I just want

15   full disclosure as to exactly what the person is going to say.

16          MS. BELL:  Yes, Your Honor.  So we have those two

17   short witnesses.

18      In addition, we would have a -- one to two witnesses to

19   provide essentially foundation for certain documents that we

20   would hope to reach a stipulation with the Government on.

21      Do you want to give a little more color on this?

22          MR. BALLEW:  Correct.  So we have some screenshots of

23   drafting history of Google documents that we have had somebody

24   from our tech team pull from Ms. He's Google account that shows

25   how certain documents were drafted.  It just shows who wrote

1   whatever portion of what document that we want to get into

2   evidence.

3        If the Government were to stipulate that those -- these

4   people actually were the ones who drafted the history on the

5   document, we wouldn't have to have someone say:  I went on

6   Google drive.  This is how Google works.  And this is --

7        **THE COURT:**  I would like you, before the close of

8   business today, if you haven't done it -- and maybe you have --

9   provide the Government with the -- exactly the excerpt and what

10  you want to say about it so the Government can consider whether

11  they accept it or not.

12       It -- I assume it's relevant.  I assume -- I assume it is,

13  because there has been a certain amount of evidence as to going

14  back, and you can determine who wrote what and when, and it's

15  not evident from the final product; it's evident only if you go

16  back into the history.

17       So why don't you sit down with the Government, please, and

18  go through that.  Cite them and tell them what your position

19  is, and let the Government have the opportunity to conduct its

20  examination of the assertion.

21       **MR. FOSTER:**  Your Honor, who's Sam Santopoalo and what

22  are they going to say?

23       **THE COURT:**  Who's that?

24       **MS. BELL:**  That's a lawyer from our office who will

25  testify to certain records which were produced to the

**PROCEEDINGS**

```
 1   Government, so we're happy to talk with them about that.
 2           THE COURT:  Well, let me tell you.  I really need to
 3   know in very concrete terms, Number 1, what the attorney is
 4   going to say and what -- what he's going to say and then how
 5   it's related to it.
 6        The reason for my concern -- and I understand what it's in
 7   rebuttal to, but let me just say my concern is that, you know,
 8   it introduces a lawyer to come in and start talking about
 9   discovery issues and production issues, and I don't know to
10   what extent the cross has to be tailored to just what was said
11   on the direct.
12           MR. SCHACHTER:  Your Honor, that's not it.
13           THE COURT:  It's a high, high-risk proposition.
14        Okay.  Mr. Schachter.
15           MR. SCHACHTER:  It's not that at all.  It has to do
16   with her receipt in her personal e-mail of a particular --
17           THE COURT:  At 3:00 today, please advise in writing
18   the Government as to exactly what the witness would say.
19           MR. SCHACHTER:  Yes.  It has nothing to go with
20   production or discovery or --
21           THE COURT:  And I'm not necessarily --
22        Pardon me.  My fault.
23        I'm not necessarily asking for a stipulation.  I'm just --
24   I need to know what it is, they need to know what it is, and
25   then we'll figure out where to go from there.
```

1              MS. BELL:  And I'm happy to explain to the Court or we

2    can just deal with it --

3              THE COURT:  Deal with it with Mr. --

4              MS. BELL:  Okay.  We will do so, Your Honor.

5              THE COURT:  Okay.

6              MS. BELL:  Then we have --

7              THE COURT:  Let me ask you a question.

8              MS. BELL:  Yes.

9              THE COURT:  I read in your brief somewhere this

10   wonderful statement that then I could go back to sleep when I

11   saw it at 3:00 a.m., which is if we just get in these excerpts,

12   we can rest by noon.

13       Was I having a delusional spell at 3:00 a.m., Ms. Bell, or

14   were you?

15             MS. BELL:  You know, we had that exact conversation in

16   the car.  I think it's more realistic to say we will finish by

17   2:00 p.m.

18       However, if Your Honor were to say finish by noon, I am

19   letting you -- you can play clips.  You can bring a patient.

20   You can do these things, but you need to finish by noon -- we

21   would make it happen.  We would make it happen for Your Honor.

22       So we've presented the evidence we believe is critical --

23             THE COURT:  I'm going to take you up on it.  Just be

24   careful.

25             MS. BELL:  I would welcome that.  We really feel that

**PROCEEDINGS**

1   we need to have a chance to present a limited case, and we will

2   do it as -- very efficiently, mindful of the time.

3        **THE COURT:**  Is there anybody else now --

4        **MS. BELL:**  Yes.  So let me just -- so the only other

5   people would be hopefully a patient, at least one.

6      But Mr. Corbin -- I'm sorry.

7        **THE COURT:**  If I maintain my position that I'm not

8   allowing these people in generic ways -- in category ways -- to

9   testify, are you going to offer this person anyway?  I mean,

10  this person comes in as an exception or what?

11       **MS. BELL:**  Oh, the patient.  Well, just -- if

12  Your Honor will just humor me and read our brief.  We're

13  looking for just one -- we asked for two, but they're very

14  specific, and there's a reason why we really think these people

15  would bring a lot to the table.

16     But putting them aside, let me complete the thought about

17  any other live witnesses.  So --

18       **MR. SCHACHTER:**  The answer is no.

19       **MS. BELL:**  What?

20       **MR. SCHACHTER:**  May I have a moment?

21            (Defense counsel conferring.)

22       **MR. SCHACHTER:**  Your Honor, no, there's no other live

23  witnesses.  We have two other pockets of evidence.  One is

24  there is inconsistent testimony that was provided by a witness

25  named Mr. Corbin we wish to -- and this should come in by

1    stipulation.  The Government will say that agent so-and-so, if

2    called to testify, would say that at this interview, this

3    person made this statement which is inconsistent with the

4    testimony.  That's it.

5        So that's a stipulation.  That's not a live witness.

6            THE COURT:  And you've presented it to them?  They

7    have it?

8            MR. BALLEW:  Yes.  We sent them the stipulation on

9    Saturday.  We haven't heard the response.

10           THE COURT:  I don't want to hear what the answer is.

11   Just look at it and we'll think about it.

12           MR. SCHACHTER:  And then the only other thing is the

13   reading of communications which we submitted to the Court.

14           THE COURT:  Well, I have that.

15           MR. SCHACHTER:  Yes.  So -- but that's not a live

16   witnesses.  That is -- I mean, we may have --

17           THE COURT:  I know.

18           MR. SCHACHTER:  We may role play the one person says

19   this, one person says that.

20           THE COURT:  I don't think I'll do that.  And I'm glad

21   you raised it.  I want to be fair to both sides.

22       That's not what the -- that's not the way the Government

23   presented it.  They had a -- they had a lawyer -- the attorney

24   got up and simply read it.  It was shown.  And I think that's

25   better than -- as soon as everybody's into playacting --

1        MR. SCHACHTER:  Sure.

2        THE COURT:  It's something that I wanted to pursue as

3   a career but I gave it up for a different role.

4        So I don't particularly think it's a good idea.  I think

5   that to the extent I'll allow you to read those things that

6   aren't videoed, you simply stand up.  You may have them -- they

7   may be transcripts.  You may show them at the same time.  But

8   you do it just like the Government did it.

9        MR. SCHACHTER:  Agreed.  Thank you, Your Honor.

10       MR. FOSTER:  And we filed a brief this morning, Your

11   Honor -- it's 495 -- to respond to those documents.

12       THE COURT:  I understand that.

13       MR. FOSTER:  Yeah.  Thank you.

14       THE COURT:  I want to take a recess now for -- until

15   11:10 and then talk about the law.  Okay?  I want to give you a

16   proposed instruction for you to look at.  It's the Court's,

17   which means I have no vested interest in it at all, but it's a

18   point of departure because it doesn't do -- surprise,

19   surprise -- I mean, it doesn't do what you're asking me to do.

20       You're asking me essentially give the *Napoli* instruction.

21   It doesn't do that.  It doesn't do it for a variety of reasons,

22   but -- maybe they're interesting; maybe they're not from a

23   particular point of view.  I don't think they're particularly

24   interesting to spend a lot of time discussing.

25       The two cases are very different.  The law isn't very

 1  different, and you can argue -- you can argue -- well,

 2  you know, you've got to have -- if you said this about the law

 3  in -- two-years ago, you should say the same thing about the

 4  law today.  It's not changed.

 5      But the fact is that the cases were very, very different.

 6  And so what I said two-years ago or three years ago in *Napoli*,

 7  I don't know that I would say today.

 8      However -- however, I want you to take a look at it, and I

 9  want to have a discussion because I think that that's a -- in

10  my view, it's, you know -- and this could be -- you'll put this

11  on page 1 -- this is a very crucial trial issue.  And I have to

12  sort of figure out what the law is and then permit you to argue

13  from that, because you're both going to take away very

14  different interpretations, and you highlighted it today about

15  the usual course of medical procedure, medical practice, and

16  you are free to argue those things.

17      But what I say about it, if I say anything about it, is of

18  significance.  And I am -- well, why am I talking about it?

19      You go read it.

20      I'll see you at 11:10.

21              (Recess taken at 10:58 a.m.)

22            (Proceedings resumed at 11:11 a.m.)

23     (Proceedings were heard out of the presence of the jury.)

24          **THE COURTROOM DEPUTY:**  Come to order.  Court is now in

25  session.

 1          THE COURT:  Okay.

 2          THE COURTROOM DEPUTY:  You may be seated.

 3          THE COURT:  Let the record show all participants are

 4  present except for Dr. Brody, who has been excused.

 5      So let's address the instructions.

 6          THE COURT:  It's in the context of a conspiracy, but I

 7  think it applies equally, doesn't it, to the substantive counts

 8  as adapted?

 9          MR. FOSTER:  Yes.

10          THE COURT:  Doesn't it?

11          MS. BELL:  Well, no, Your Honor.  We would like to

12  address --

13          THE COURT:  Okay.  All right.  So let's start --

14          MS. BELL:  Yes.

15          THE COURT:  Let's start -- let's talk about the

16  conspiracy.  Let's see where we are on that.  And I'll hear

17  first from the Government and then I'll hear from the Defense.

18          MR. FOSTER:  Your Honor, I guess, I have two

19  categories of things to potentially discuss.

20          THE COURT:  Yes.

21          MR. FOSTER:  One, I could attempt to convince

22  Your Honor why it should not be conjunctive, but I don't need

23  to do that.

24      Two, if Your Honor is inclined to give the conjunctive

25  version of the instruction, I have comments on some additional

 1  things that I think would be very important to add here.

 2      So wherever you'd like me to start.

 3      **THE COURT:**  Let's assume -- let's assume for the sake

 4  of this discussion that I am going to give it in the

 5  conjunctive.  I've wrestled with the context -- to try to

 6  figure out -- and I've reread *Ruan* and trying to figure out how

 7  you define the legitimate medical purpose in conjunction with

 8  the usual course of medical practice.

 9      And it seems to me, just in my mind, that there -- they're

10  not like two free-floating different things out there.  One

11  really does define the other.

12      Now, I will say that I don't see any authority that thinks

13  exactly the way I think on this.  It's a bit confusing, and

14  maybe they were addressing just different issues.

15      But I am -- I guess what I'd like to start the discussion

16  with is assuming it's in the conjunctive, what is it that you

17  offer?  Because I will concede -- I will concede that it's, in

18  my view, a somewhat incomplete instruction.  It -- you can give

19  it to the jury -- and actually both sides think that.

20      You can give it to the jury and they'd say:  Oh, here are

21  our five questions.  What does this mean?  What does that mean?

22  Da-da-da-da-da.

23      So it doesn't even achieve the purpose of an instruction,

24  which is to lay out for a layperson what is the meaning of the

25  law.  Like what do the terms mean in their quest to see whether

1  or not the facts are established to prove the -- call it the

2  element or call it the definition.  Call it whatever you want

3  to call it.  That's the problem.

4      So I start out with a fair amount of sympathy to both

5  sides, saying that I think this is an incomplete instruction

6  and -- but it's a start.

7      So go ahead.

8          **MR. FOSTER:**  Well, I think, if I may, I'd like to

9  start with Your Honor's observation, which is a third path, and

10  the Government submitted this as a fallback for Your Honor.

11  And that is that this is a unitary standard.  The statute says

12  "except as authorized," and the regulation defines it not with

13  an "and" or an "or," but in one phrase, "not for a legitimate

14  medical purpose in the usual course of professional practice."

15      The Government urged, as a fallback, that the Court

16  consider that, and I do think that there is law consistent with

17  that.

18          **THE COURT:**  "Not for a legitimate medical purpose."

19          **MR. FOSTER:**  "In the usual course of professional

20  practice."

21      You know, Justice Scalia in dissent in *Gonzalez* observed

22  that there was little practical difference between the two

23  terms because it was difficult to imagine a prescription that

24  was not in the usual course of professional practice but was

25  for a legitimate medical purpose.

1    And that is because the key phrase is "legitimate" and,

2    "purpose," which the Supreme Court in *Ruan* in the majority

3    decision indicated imports objective criteria.  That's why the

4    idiosyncratic bad apple doctor doesn't get off, because the

5    greater the deviation between the objective standards and the

6    conduct, the greater the inference that they were not

7    subjectively acting with a lawful intent.

8    So I do think that there is law that would support that

9    instruction.

10    And if the conjunctive one is given, which the Government

11    submits is an incorrect legal instruction based upon the plain

12    meaning of the regulation, and there's another section of the

13    regulation where it phrases it in the disjunctive, with an

14    "or," but it would be incredibly important to modify it with an

15    instruction about what a legitimate medical purpose is, because

16    throughout this trial and in the briefing, the defense has

17    urged a theory that is contrary to the law that equates medical

18    purpose with need, medical purpose with the fact of whether or

19    not someone has ADHD.

20    And I think, as Your Honor observed, the Controlled

21    Substances Act is not a game of roulette.  In the example you

22    gave this morning where the doctor is just giving out

23    prescriptions to all comers, the fact that someone might have

24    ADHD is not determinative of whether they were acting with a

25    legitimate medical purpose in the usual course of professional

 1  practice.

 2      And so I think it would be misleading, improper, and

 3  contrary to the law for the Defense to be able to argue in

 4  closing that the standard is something that it is not, and I do

 5  think that that is a primary motivation of the urge for the

 6  conjunctive standard.  And there's a risk, a serious risk, of

 7  juror confusion absent a definition of what "legitimate medical

 8  purpose" is.

 9          THE COURT:  And what do you suggest is the definition

10  of "legitimate medical purpose"?

11          MR. FOSTER:  We can formulate a specific one, but I

12  believe it is -- it incorporates objective standards of

13  medicine such as the diagnostic process.

14      "Purpose" encapsulates an idea of process as distinct from

15  need.  And as Dr. Goodman testified -- but I think is the case

16  law also recognizes -- in assessing a legitimate medical

17  purpose, you look to all the things like:  Was the process

18  followed?  Was the patient diagnosed?  Did the clinician do the

19  things in the usual course of practice that are necessary to

20  establish that there is a legitimate medical purpose for the

21  prescription?

22      And if the practitioner does not go through the diagnostic

23  process, there's not a legitimate medical purpose for that

24  prescription, whether or not a patient has ADHD, just like if a

25  doctor gave out OxyContin to all comers, the fact that one

1  patient might have really severe pain would not make that

2  prescription lawful within the meaning of the Controlled

3  Substances Act.

4      **THE COURT:**  So the instruction that you, in so many

5  words, would like me to give or if I do say -- if I start out

6  by saying -- as I do on line 26 or 27, I guess, of the

7  proposal, "Accordingly the Government must prove the defendant

8  agreed to knowingly or intentionally distribute controlled

9  substances via prescription without a legitimate medical

10  purpose and outside the usual course of professional process."

11     "Not for a legitimate medical purpose" means in the usual

12  course of professional practice?

13     How does the instruction read?

14     I think I'm lost in your -- I understand each of your

15  points, but I'm trying to encapsulate it within an instruction.

16  How would it read?

17     **MR. FOSTER:**  I could wordsmith it, but I think along

18  the lines of:  A legitimate medical purpose is not the same

19  thing as a medical need and the fact that it --

20     **THE COURT:**  Well, I think you'd have to say a

21  legitimate medical purpose -- a legitimate -- while it may

22  consider or encompass -- or whatever the right word is --

23  consider a patient's need is defined as the process by which

24  the prescribing -- by which the defendant prescribed; i.e., the

25  defendant or prescribing physician or something -- prescribed

1    the controlled substance --

2         **MR. FOSTER:**  I think --

3         **THE COURT:**  -- would be the position -- pardon me.

4    Prescribed the controlled substance.

5         In other words, you want me to -- you want me to talk

6    about a process.  You say legitimate medical purpose is

7    actually a process.  That's what it is:  A process.

8         Now, you suggested, well, it's not need, but I -- of

9    course, I think it is need.  I mean, if somebody comes in and

10   says:  I have attention deficit disorder but I don't need any

11   drugs.  I feel great.  I like not being able to concentrate.

12        Maybe that person should be a judge.

13        Anyway, the point is that need is a component, can be.  I

14   would very surprised if a doctor ever said:  Well, the need is

15   no component.  The person needs the drug.

16        **MR. FOSTER:**  It's not that it's no component, but it's

17   a legitimate medical purpose needs to be defined in relation to

18   the generally accepted standards for assessing a patient in

19   determining that there is a legitimate medical purpose for the

20   prescription.

21        It's not that the fact that a patient has ADHD alone means

22   you can just prescribe controlled substances without a

23   diagnosis.  And I think if they were allowed to argue that that

24   alone is sufficient to result in an acquittal, that would be an

25   incorrect statement of the law.

 1          THE COURT:  I think that's true, if they were to argue

 2     that, because I have routine -- I have consistently ruled that

 3     the absence or presence of attention deficit disorder does not

 4     define the legitimacy of the -- of the -- of the prescription,

 5     that you can prescribe a -- you can prescribe and meet the

 6     criteria of -- of --

 7          MR. FOSTER:  ADHD.

 8          THE COURT:  -- issuing a controlled substance and not

 9     run afoul of the law even if the person doesn't have

10     attention-deficit disorder, or if the person does have --

11     putting it -- flipping it, if the person has attention deficit

12     disorder, it doesn't satisfy that prong.  It is not -- it does

13     not satisfy that prong.

14          MR. FOSTER:  And so we can prepare some specific

15     language, but I do think it's important the instruction

16     encapsulate that.

17          THE COURT:  Well, since we are talking about specific

18     language --

19          MR. FOSTER:  Okay.

20          THE COURT:  -- I think that we need -- I think you

21     need to give me something.  And then we'll talk about it.  I'm

22     not -- this is not the last time to address it, but I need some

23     specific language as suggested.

24          MR. FOSTER:  I think the other point if this

25     instruction is given is from *Ruan* that bad apples can't escape

1    liability by idiosyncratic views.

2        We've heard a lot of evidence in this case about

3    Defendant He not wanting to comply with the law,

4    Defendant Brody wanting to give drugs to everyone, and I think

5    the jury that should be instructed that these standards are an

6    objective criteria -- whether a prescription is for a

7    legitimate medical purpose in the usual course of professional

8    practice is an objective criteria.  There has to be subjective

9    knowledge, but the subjective knowledge can be proving

10   circumstantially through deviation from accepted norms.

11       **THE COURT:**  That statement is correct, I think.  I

12   think what you said before, I wouldn't give, because it's -- it

13   would exclude, for example, the case where -- let's say I'm --

14   and this is what I think in part -- in large part their defense

15   is.

16       They say, look, da-da-da-da-da-da-da, and besides,

17   you know, she's changing the -- based upon her observations,

18   her -- Dr. Brody's observations, they don't feel that a

19   90-minute, 60-minute examination is necessary.  They don't feel

20   that should be the usual course of practice.  They feel the

21   standard should be different, that they in 25 minutes can meet

22   the standard.

23       I think they are saying that, that it is -- maybe they're

24   not.  Maybe I'm just putting words in their mouth, but I think

25   they're saying that.

1          It can't meet Dr. Goodman's standard because that's

2    60 minutes.  They say 25 minutes or some variation of it with

3    you can extend it longer if you see, A, B, and C, and so forth.

4          But I think -- I -- I'm concerned about foreclosing a

5    person from -- I don't know whether the word is innovative or

6    challenging to medical science by rigidly adhering to -- to a

7    particular time period and so forth, if they can demonstrate

8    that -- that they can accomplish that which is required within

9    a shorter period of time.

10         That's really what they're saying, I think:  In

11   25 minutes, we can -- we can do the job.  This doctor says

12   nobody can do it in 60 minutes.  We can do it in 25.

13         You know?

14         So are we guilty because we did it in 25?  What if they

15   did it in 25?

16         In other words, what if they actually were able to satisfy

17   the -- the ascertainment of a mental evaluation -- which I know

18   the Government says can't be done.  That's their position:  It

19   just can't be done, and they have countless examples of why it

20   can't be done.

21         But --

22             MR. FOSTER:  So I don't dispute that that can be a

23   defense.  I just think it should not be argued to the jury that

24   that alone resolves the matter.  Of course someone can

25   subjectively want to be innovative, but that does not

1    necessarily equal an acquittal.  You have to look at what other

2    people said, what they were told, all of these types of things.

3        And so a subjectively held, even a very strong

4    subjectively held belief, does not insulate you from the

5    requirements of the Controlled Substances Act.

6        I mean, consider the doctor in *Moore*.  He thought he had

7    invented a whole new method of using methadone.  You know?  And

8    if you looked in his head, he might well have thought, "I'm

9    innovative."  But that doesn't mean that you cannot be

10   convicted under the Controlled Substances Act.

11       And that's the import of the Court's -- the majority's

12   instruction in *Ruan*, that even strongly subjectively held

13   beliefs, even under a subjective standard, are tethered to

14   deviations from the objective standard, the facts and

15   circumstances about what they were told.

16       And the Government's concern is that it -- if it is

17   suggested in closing that they could be acquitted because

18   Defendant Brody believes everyone should have drugs, or doesn't

19   believe in the Controlled Substances Act, and Defendant He

20   believes in innovation, that in and of itself would not be a

21   correct statement of the law without *Moore*.

22           MS. BELL:  Your Honor, may I address?

23           THE COURT:  Okay.  Go ahead.

24           MS. BELL:  Thank you, Your Honor.

25       So first, on the conjunctive versus disjunctive, we would

 1    respectfully submit that Your Honor does not have the ability

 2    to deviate from binding Ninth Circuit law construing the

 3    authorization element in the conjunctive.  Not a single circuit

 4    court, including the Ninth Circuit, has held that *Ruan*

 5    addressed this question or changed anything about the pre-*Ruan*

 6    circuit law.

 7        Under *Feingold* and a long series of cases which have

 8    affirmed *Feingold*, conjunctive jury instructions, which are all

 9    laid out at Docket 486, page 5, footnote 3, we have explained

10    that, and we've gone on to analyze the state of the law across

11    the country at pages 6 through 10, and described for Your Honor

12    how the circuit's split that existed prior to *Ruan* remains the

13    same and how multiple courts have held, just like courts in the

14    Ninth Circuit, including the Ninth Circuit, that *Ruan* did not

15    change pre-*Ruan* law about whether the conjunctive or

16    disjunctive standard applies.

17        So we do not believe, respectively, that Your Honor has

18    the freedom to adopt the Government's fallback language because

19    the law in the Ninth Circuit remains as it was prior to *Ruan*.

20    *Ruan* addressed one question, which was what is the mens rea

21    that applies to the authorization clause and held that the

22    Government must show proof of knowledge or intent that the --

23    that, indeed, the distribution is unauthorized.

24        It did not address:  What does authorization itself mean?

25    Is that a conjunctive or disjunctive construction?

1    And so therefore, we think that matter is settled law, and

2    there's no reason to discuss further the Government's fallback

3    position.  That's a position for another day, but not this day,

4    because the law is settled in this circuit.

5         **THE COURT:**  Let me just stop you there.

6         **MS. BELL:**  Yes.

7         **THE COURT:**  Well, so the proposal that I issued is as

8    good as -- I mean, from your point of view, while you want to

9    add things to it, as a basic instruction, it's correct.

10        **MS. BELL:**  On the conjunctive issue, yes, Your Honor.

11   However, under *Ruan* and *Feingold*, there is an issue with the

12   placement of the mens rea language.

13        If I could just hand up Your Honor's instructions on this

14   issue in *Napoli* on the placement -- Your Honor got it exactly

15   right.  Now *Ruan* has confirmed that what should the placement

16   of the mens rea knowingly and intentionally -- where does that

17   language need to go?

18        It needs to go in front of "not for a legitimate medical

19   purpose" and "outside the usual course of practice."

20        Your Honor can see there that the way you phrased it at

21   page 19 of your *Napoli* instructions was perfect under *Ruan*,

22   because the Court made clear that the jury must find that the

23   distribution was (as read):

24             "(1) By means of a prescription issued by a

25        practitioner not for a legitimate medical purpose and

1      not in the usual course of professional practice,"

2      and (as read):

3          "(2) knowing and intending that the distribution

4      was by means of a prescription issued by a physician

5      not for a legitimate medical purpose and not in the

6      usual course of professional practice."

7      That second, "The knowledge and intent that the

8  distribution was by means of a prescription issued by a

9  physician not for a legitimate medical purpose and not in the

10 usual course of professional practice" is a critical aspect of

11 the jury instruction.

12     And so we would need to adjust that here in Your Honor's

13 tentative such that there's another "knowingly and

14 intentionally" inserted prior to the final conjunctive clause.

15         THE COURT:  So the instruction in *Napoli*, which you

16 cite to on page 19, you said I got it exactly right.  How would

17 that be modified under your suggestion?

18         MS. BELL:  How would Your Honor's tentative be

19 modified?

20         THE COURT:  Oh, the tentative.

21         MS. BELL:  The tentative -- no, *Napoli* is exactly

22 right.  We would modify the tentative to track the language in

23 *Napoli*.

24         THE COURT:  Okay.  Now let me ask you --

25     Okay.  I got that point --

 1          MS. BELL:  Yes, thank you.

 2          THE COURT:  And you've made it repeatedly.

 3      Now I have a question.

 4          MS. BELL:  Yes.

 5          THE COURT:  Is it important to explain in the

 6  instruction what it means, what the term "legitimate medical

 7  practice" means?

 8          MS. BELL:  Yes, Your Honor.  And we would hand up our

 9  proposed instruction.  This gets to the Government's last point

10  about just that issue.  So here's a proposed instruction on the

11  intentional malpractice issue, which is taken directly from

12  *Feingold* and directly from *Napoli*.

13      But our position is legitimate under the Ninth Circuit law

14  and the Ninth Circuit's construction of the Supreme Court law

15  in *Gonzalez* and in *Moore*, the animating principle behind the

16  Controlled Substances Act, when applied to medical providers,

17  is the purpose, whether they are acting with a medical purpose

18  or a nonmedical purpose.

19      And so the Government gets -- it's backwards, in our view,

20  when they say:  Well, medical purpose, what it really means is

21  course of practice.

22      It's the opposite.  What it means to practice, to -- to --

23  to be practicing in the ordinary course is to be practicing as

24  a medical provider as opposed to as a drug pusher.

25      The distinction that Your Honor drew in *Napoli* comes from

 1  not only *Feingold*, but *Feingold's* construction of the Supreme

 2  Court's law in *Gonzalez* and *Moore*.

 3       And let me just say -- so *Feingold* says (as read):

 4            "A practitioner becomes a criminal not when he

 5       or she is a bad or negligent medical provider, but

 6       when he or she ceases to be a medical provider at

 7       all."

 8       Then *Feingold* goes on to analyze the *Moore* case and

 9  says -- well -- and this is at 1010. (as read):

10            "The Supreme Court described 841(a) as

11       prohibiting the significantly greater offense of

12       acting as a drug pusher.  These statements suggest

13       that the *Moore* court based its decision not merely on

14       the fact that the doctor had committed malpractice or

15       even intentional malpractice, but rather on the fact

16       that his actions completely betrayed any semblance of

17       legitimate medical treatment."

18       Citing *United States v. Moore*, 423 U.S. 122-1975.

19       There's also *Gonzalez v. Oregon*, another Supreme Court

20  case, 546 U.S. 243 at 270, where the court found that (as

21  read):

22            "The Controlled Substances Act bars doctors from

23       using their prescription-writing powers as a means to

24       engage in illicit drug dealing and trafficking as

25       conventionally understood but does not regulate the

**CHARGING CONFERENCE**

1      practice of medicine more generally."

2          The parties are in agreement -- and the Government

3   actually previously proffered a jury instruction, which they've

4   now retracted, at Docket 380 which has been cited in our

5   papers.

6          But everyone agrees that proof of intentional malpractice

7   is not enough.  So when the Government talks about deviation

8   from the usual course of practice, that sounds just like or

9   very close to intentional malpractice.  I'm not sure what the

10  difference is.

11         But what the --

12             **THE COURT:**  Yeah, I'll stop you there.

13             **MS. BELL:**  Yeah.

14             **THE COURT:**  I'm trying to -- ad that's one of the

15  things that really puzzled me, this term "intentional

16  malpractice."  What does that mean?

17         There's malpractice, which generally talks about

18  negligence and failure to exercise appropriate care and the

19  standards.

20         Now we say -- we say "intentional."  That is, I've decided

21  I'm not going to follow the standards of care.

22         Now, that's this case, isn't it?  That's exactly this

23  case.

24         And so I'm trying to -- maybe it's more; maybe it's less,

25  da-da-da, there's this and that.

1    But I don't see -- if I said to them, the jury,

2 intentional malpractice -- if this is intentional malpractice,

3 you must acquit.  Actually -- actually, I think that's a

4 Rule 29 issue.  I think the evidence is it wasn't -- I think

5 there is sufficient evidence -- and I don't -- that there was

6 intentional malpractice.  And I have to think about it more

7 than I just am saying, but -- but I don't see the line, though

8 it's written here.  I got it.

9    A lot of times judges write things that they don't -- they

10 don't think about all of the possible consequences.  And I

11 don't understand how intentional malpractice isn't criminal.

12 If I -- if I say, you know, I know that's standard out there.

13 I'm not going to do it.  I know what the usual course of

14 practice is.  I'm not going to do it.

15    Well, that's -- that's exactly -- the Controlled

16 Substances Act is saying you've got to do it, because if you

17 don't, you're a criminal.

18    Now, these words about drug pushers and these words about

19 intentional malpractice are big words that they carry all sorts

20 of emotional baggage to it, but they don't help you.  They

21 don't -- if I say a drug pusher.  A drug pusher?  I mean, you

22 know, you sort of -- you have a view of what a drug pusher is,

23 and does a doctor look like a drug pusher?

24    A doctor can act like a drug pusher because a doctor can

25 simply ignore, willfully ignore, the standards that are used

1  for prescribing medicine.  Then he acts like a drug pusher.

2      But he's not really a drug pusher.  He's committing

3  intentional malpractice.

4      I can't think that I would use those words to the jury,

5  because if I were seated where you are, I would get up and say

6  it's over.  It's over.  The worst you think about these

7  people -- you may not like them.  You may think they're

8  terrible doctors, a terrible doctor.  You may think that your

9  client took advantage of all of this, and intentionally.

10     But that's malpractice, and you can't convict a person for

11 malpractice.

12     So I don't -- I'm really loath to give the term

13 "intentional malpractice" because I believe it's the same thing

14 as the criminal conduct.

15     Now, if you think it's not, if you can point to me that

16 nice line between intentional malpractice and what the evidence

17 might show, I'll be quiet and listen to it.

18         MS. BELL:  Let me try.

19     So first of all, Your Honor, that -- this term comes from

20 not *Napoli*, but *Feingold*.  So Your Honor took it verbatim from

21 *Feingold*, and it's right here at page 110, where the Court

22 said --

23         THE COURT:  Wait a minute, wait a minute.

24         MS. BELL:  Okay.

25         THE COURT:  So we'll make this productive.

1          MS. BELL:  Yes, let me --

2          THE COURT:  As I said, judges use words all the time

3    that they think fit a particular situation, and they haven't

4    thought through its implications and they use these words.

5        I want you to give me an example of why you think

6    "intentional malpractice" is not the same thing as failing to

7    make a legitimate -- "for a legitimate medical purpose."

8          MS. BELL:  Yes, Your Honor.  Let me do that.

9          THE COURT:  Give me that example.

10         MS. BELL:  Okay.  So a doctor decides that someone has

11   a stomach ache, and they say:  You know what?  You have a

12   medical condition, and even though there is no scientific

13   literature -- I'm not aware of any off-label use of Adderall

14   for stomach aches, however, I believe, I think that this

15   medicine, Adderall, may help to treat your medical condition.

16   And by the way, I've heard this from witnesses in this case,

17   okay, that IBS or something -- I'm not sure there's any, you

18   know, scientific or evidentiary basis for that, but they

19   believe that there is a medical purpose.  It's not for the

20   purposes of recreation.  It's not for the purposes of

21   addiction.  It's not for the purpose of simply handing out a

22   pill to anyone who comes in and says:  Here's $5; I'd like some

23   Adderall.

24       It's because this doctor believes that there is a medical

25   purpose for this treatment.

1        **THE COURT:**  Okay.

2        **MS. BELL:**  However --

3        **THE COURT:**  Let me stop you.

4        **MS. BELL:**  Yes.

5        **THE COURT:**  Because you can't give an Adderall for an

6    upset stomach.  Okay?  So there's no marriage between the

7    prescription of the drug and the stated condition.  And you say

8    that would be -- that would be intentional malpractice.  And

9    you know what?  You're right.  It would be.  I understand that.

10       But that's not this case.

11       This case is where every patient who got medicine

12   demonstrated -- not every, because I didn't see 137,000 -- but

13   everything I saw suggested they demonstrated some indication of

14   attention deficit disorder for which it is stipulated that

15   Adderall is an appropriate prescription.  Okay.

16       So what you're telling me is if that's been met, if that's

17   been met, no crime.  And what I'm saying to you is, I don't

18   know you're right.  I don't think so.  I don't think so.  I --

19   and my example this morning was I come in and I say to the

20   doctor:  Hey, I'm nervous.  Oh, I have anxiety.  I can't work.

21       Oh, okay.  Here's an Adderall.

22       That's it.  That's it.  No examination, maybe not even a

23   viewing.  Maybe not a viewing.  But the person's got attention

24   deficit disorder, and the proper prescription is Adderall for

25   that condition.

 1        So that's not a good example.

 2            MS. BELL:  Well, I mean --

 3            THE COURT:  You got another one?  Other than:  It's in

 4    the book.

 5            MS. BELL:  Well, the dividing line, as *Feingold* puts

 6    it, and I think as the -- frankly, the Supreme Court has put

 7    it, is that a practitioner becomes a criminal -- this is right

 8    here at 1011 -- not when he is a bad or negligent physician,

 9    but when he ceases to be a physician at all.

10        And so the work that --

11            THE COURT:  Bad or negligent?  I don't see

12    "intentional malpractice."

13            MS. BELL:  But that's also in there.

14            THE COURT:  That was my word?

15            MS. BELL:  No.  It's *Feingold*.  Let me pass it up to

16    Your Honor.

17            THE COURT:  Oh, God.  Who said that?

18            MS. BELL:  It's the Ninth Circuit, Your Honor, right

19    at the top.  It's 1010.  And that's where Your Honor got it,

20    quoting from *Feingold*.  And *Feingold* is discussing *Moore*, the

21    Supreme Court decision.

22            THE COURT:  Hold on.

23                    (Pause in proceedings.)

24            THE COURT:  Hold on.  I know I shouldn't do this.  See

25    who wrote it.

1          MR. FOSTER:  Perhaps I can clear some things up, Your

2     Honor.

3          MS. BELL:  Well, let me just say, Your Honor, just to

4     complete the thought.

5          THE COURT:  I hope the record is not reflecting my

6     reaction.

7          MS. BELL:  Is this because of the authors, Your Honor?

8          THE COURT:  No, no.  I wouldn't even possibly think

9     that.  Why would I possibly think that?  Okay.  I got it.

10         MS. BELL:  Okay, Your Honor.  So the point is, though,

11    that the critical dividing line between what is criminal and

12    noncriminal under the Controlled Substances Act is the medical

13    purpose versus a nonmedical purpose.

14         The word "legitimate," Your Honor is in front of "medical

15    purpose" to address the Government's concern that it's not

16    merely -- it doesn't rise and fall on mere subjective proof of

17    medical purpose, although, of course, we preserve our argument

18    in our briefs that we would ask the Court to strike

19    "legitimate."

20         But as the Ninth Circuit formulation currently stands, it

21    includes "legitimate" and it includes "usual."

22         And the point is that you have to look at the prescriber's

23    purpose, but you can look at circumstantial evidence of what is

24    done in the community.  Right?

25         And so that all feeds in, and the jury ultimately has to

 1    decide was this written without a legitimate medical purpose

 2    and outside the usual course of professional practice.

 3          **THE COURT:**  I think what you are -- in a sense, you

 4    can argue negligence or a bad physician or not -- not a good

 5    physician.  Not somebody who -- I mean, you can -- you can

 6    argue that this is -- that Dr. Brody was, in this case, a bad

 7    physician or a careless, negligent physician.

 8          I don't think that you can argue that -- if he was

 9    intentionally bad.  If he's intentionally bad, he escapes

10    criminal liability.  And the reason I think that is because I

11    can't conjure up some scenario that takes care of all those

12    cases in which the person simply intentionally disregards,

13    essentially, the Controlled Substances Act.

14          After all, I mean, I know what the evidence is.  I mean,

15    I -- and the evidence is certainly consistent, consistent with

16    this defendant willfully and knowingly maintaining that the

17    standards of the Controlled Substances Act are to be

18    disregarded.  That's the evidence in the case.

19          Whether it's -- whether it's the only evidence, of course

20    not.  Whether it's convincing, who knows.

21          But there's ample evidence that he has a low disregard for

22    the Controlled Substances -- he's not to be punished for his

23    attitude.  I've got a lot of attitudes myself.  That's fine.

24          But when he takes his attitude and issues prescriptions

25    for controlled substances, that becomes the subject of

1  scrutiny.  And when he simply does it, has a disregard for it,

2  that's a different issue.

3      And that's not the same thing as negligence.  In other

4  words, I can appreciate, especially in medical science with

5  evolving standards and learning new things all the time that

6  you may want to try A, B, C, and D, even though a good practice

7  wouldn't dictate that you should do that.

8      But intentionally disregarding the legitimate medical

9  purpose or ordinary course of the practice, I think that is

10 actionable, criminally actionable.

11     Anyway, I think this is what I'd like to do.  Why don't --

12 I'd like to see the Government's and yours, if you want to

13 write something.  Give it to me -- give it to me today.  I'll

14 take a look at it and probably issue something tomorrow that is

15 at least my thoughts in the matter so that when we meet on

16 Wednesday, we can go over all of the issues once more.

17         **MS. BELL:**  Thank you, Your Honor.

18         **THE COURT:**  Once more.  Encore.

19         **MS. BELL:**  We will do so.  And I will just note we're

20 submitting a supplemental request for a venue instruction.

21 That's at the back end of -- to return to our discussion the

22 other day.  So we'll have all of that filed to the extent we

23 have any supplemental requests for jury instructions.

24         **THE COURT:**  Venue has come out of left field, but,

25 you know, I mean, the Government has to respond to it, but they

1    haven't seen what you've written.

2        Let them say it.  From your point of view, hopefully

3    there's evidence in the record, because if there isn't, the

4    case is over.

5            **MR. FOSTER:**  Yes, there is ample evidence, Your Honor.

6            **THE COURT:**  Okay.

7            **MR. FOSTER:**  Just on --

8            **THE COURT:**  By the way, I don't know that it has to be

9    ample.

10           **MR. FOSTER:**  Yeah, it doesn't.

11       Just on the statement that there's controlling binding law

12   in the Ninth Circuit, I want to place some of this in context.

13       What the Ninth Circuit was doing in *Feingold* was trying to

14   figure out what mens rea applied to the authorization clause,

15   and what it found was that there has to be a mens rea addressed

16   to outside the usual course of professional practice.  It

17   didn't consider without a legitimate medical purpose, the issue

18   Your Honor later grappled with in *Napoli* and held that it

19   applied to both, as the *Ruan* court later did.

20       Now, the court in *Feingold*, it described that either

21   requiring a mens rea or requiring the two prongs in the

22   conjunctive, either one of those could adequately cover the

23   statutory requirements.

24       The court did not say that was the only permissible

25   reading of how the statute worked.  And, you know, obviously it

 1  was nearly two decades before *Ruan*, which places the emphasis

 2  on the subjective mens rea standard.

 3          **THE COURT:**  Okay.

 4          **MR. FOSTER:**  Thank you.

 5          **THE COURT:**  Please give me -- it would be very helpful

 6  if I get it by 4:00 today, your proposed instruction.

 7          **MR. FOSTER:**  Yes, Your Honor.

 8          **THE COURT:**  On this issue.

 9          **MS. BELL:**  Yes, Your Honor.  We will.

10          **MR. FOSTER:**  One other thing, Your Honor.  Given the

11  length of the defense case in terms of closing arguments --

12          **THE COURT:**  I want to talk about that in a minute.

13          **MR. FOSTER:**  Yeah.

14              (Defense counsel conferring.)

15          **MS. BELL:**  I think Mr. Schachter has something to add

16  to make sure it was clear in my argument.

17          **MR. SCHACHTER:**  I think it was clear, and we'll make

18  it clear in the instruction as well.

19      But just to be clear, Your Honor, we quote *Gonzalez v.*

20  *Oregon* in the --

21      Yeah.  This is not intended to regulate the practice of

22  medicine.  The Supreme Court makes clear the Controlled

23  Substances Act is not about what standards a doctor should

24  apply when the doctor is practicing medicine.  Rather, the

25  question under the Controlled Substances Act is:  Are they

1   acting as a doctor at all or are they acting differently?

2       For example, a doctor who is handing out heroin on the

3   street --

4           **THE COURT:**  Yeah, okay.

5           **MR. SCHACHTER:**  -- cannot say:  I'm a doctor.  I'll

6   sell you heroin for a hundred dollars.

7           **THE COURT:**  All right.  That's a characterization

8   which I think everybody accepts.  It's correct.

9       But what they're saying is:  When you intentionally

10  disregard and fail to follow certain standards, you are not

11  acting as a doctor.  That's what they're saying.  And they're

12  quarreling with the language in *Feingold*, to the extent you are

13  relying on it for -- for excusing from criminal liability acts

14  of intentional malpractice.

15      It's nice and clear.  You know, everybody is -- it's

16  clear.  It's clear what's going on.  I mean, I'm not suggesting

17  anything underhanded is going on.  There's just a division

18  of -- of viewing how the law works here and what it -- what it

19  is, and it's not clear.  It isn't absolutely clear.

20      And, you know, obviously -- well, I think I now have to

21  turn to it.

22      Let me talk about closings.

23          **MS. BELL:**  Can I ask Your Honor one question which I

24  think will help both parties?

25      Your Honor started today by saying you believe *Napoli* was

1    a different case.  I certainly understand Your Honor is

2    entitled to change your mind about this intentional malpractice

3    language, but to the extent you believe *Napoli* is different, is

4    there anything more you can tell us that will help us address

5    Your Honor's concern in connection with our filing, what you

6    think is different about this case or otherwise?

7            **THE COURT:**  Well, you know, you run into -- *Napoli*, if

8    I recall correctly, there was no -- *Napoli* was a system, wasn't

9    it, where somebody would go online and they would say, I'm

10   overweight -- they'd fill out a questionnaire, and the

11   questionnaire -- and I thought it was -- maybe I've got the

12   wrong -- maybe I'm -- am I mixing up several cases?

13          The one I remember was the one where it was -- basically

14   an offshore operation with a brick-and-mortar place in the

15   South, and there was also doctor in New Jersey, and what they

16   would do is they would simply get the questionnaire.

17          Are you overweight?  What is your -- you know, what do you

18   weigh?  They'd say, what do you weigh and what is your -- how

19   old are you, and how tall are you, questions like that.

20          So there was -- it's a different -- it's a different sort

21   of thing.  There was just no attempt, zero attempt to conduct

22   an individualized -- a verifiable individual thing.

23          For example, in *Napoli*, somebody wrote, Well, I weigh

24   190 pounds and I'm, you know, 4 feet 11.  Oh, no, they write

25   I'm 5 feet 8.  So reject.  You would go back.  Weight and size

1   are appropriate.

2        So then the patient would cross out that I'm 5-11 and

3   write 4-11, and then the prescription would issue.

4        I mean, it was so obvious that something had to be done to

5   verify the accuracy of the information.

6        Here, it's not just a function of accuracy of the

7   information in the sense that somebody isn't saying it.  It's a

8   function of verifiable, that the doctors use his or her own

9   judgment to verify the accuracy of the various statements.

10       And thus, you run into the problem of refills.  Certainly,

11  if a patient is stable, is stable on 20 milligrams or whatever

12  it is of Adderall, there's no reason to change it.  But the

13  person says he's stable is not the same thing as the person

14  being stable.

15       Maybe and maybe not.

16       So intentional malpractice is I'll just -- intentional

17  malpractice is whatever they say, I will accept.  That's

18  intentional malpractice.

19       You know?

20            MR. SCHACHTER:  Well, I --

21            THE COURT:  That's why I think it's a crime.  I mean,

22  I -- I couldn't put it any more simply.

23       It may not be in any given case a crime.  It may only --

24  it may appear to be a crime or proven to be a crime if there

25  are enough examples over time and if other circumstantial

1  evidence demonstrates that it was ignored or rejected in a

2  number of cases.  So it doesn't -- it has to rise to some level

3  over negligence.

4       MR. SCHACHTER:  Your Honor, I think -- I mean, I think

5  the term "intentional malpractice" that Your Honor used and

6  that *Feingold* used -- I mean, it seems relatively clear to me,

7  and that is -- I mean, malpractice is:  I didn't pay attention

8  to the relevant standard of care and I'm -- so I missed it.

9       That's negligent malpractice.

10      THE COURT:  Yes.

11      MR. SCHACHTER:  Intentional malpractice is:  I

12  understand that that is the standard of care in the community.

13  I am not going to do it --

14      THE COURT:  Yes.

15      MR. SCHACHTER:  -- but I have a legitimate medical

16  purpose.  In my mind, in my clinical judgment, this is the

17  right thing to do, even though I recognize, I know it is beyond

18  and different than the standard of care.

19      THE COURT:  Is that criminal?

20      MR. SCHACHTER:  No.

21      THE COURT:  I think it is.  And that's what's nice

22  about it -- in a sense --is that you and I just have a basic

23  disagreement.  You think intentional malpractice -- and this is

24  good because it does raise an issue and a serious issue and one

25  that the courts can resolve.

1        I think intentional malpractice, depending on other

2   circumstances -- I don't want to limit it to some grand

3   statement --

4            MR. FOSTER:  Yes.

5            THE COURT:  -- like they make it in opinions that I

6   read.

7        I think that intentional malpractice with other

8   circumstances may very well be criminal.  And the fact is --

9   call it intentional malpractice as a justification -- as an

10  excuse to a criminal liability is not correct and it's

11  misleading.

12       Anyway, let's --

13           MR. SCHACHTER:  May I just make one last point, which

14  is what that, I think, ignores is that this statute is not

15  intended to regulate the practice of medicine.

16       The question is:  Are they acting as a doctor?

17       And if a doctor is in good faith saying, "I disagree with

18  the standard of care.  I recognize it's the standard of care.

19  I'm departing from it," he's acting like a doctor.  And if

20  the Court thinks that the issue of -- that the Controlled

21  Substances Act is intended to assess whether or not the doctor

22  is appropriately acting as a doctor --

23           THE COURT:  No, it's not.

24           MR. SCHACHTER:  -- then we've done what the Supreme

25  Court says cannot be done, which is the statute is not here to

1    regulate --

2         **THE COURT:**  It is not addressed to that.  What it's

3    addressed to is that it gives guidance, serious guidance, to

4    physicians for a procedure, a process by which they must follow

5    in order to act like a doctor.

6         That's what I'm saying -- I'm attracted to the

7    Government's term "process," because it is a process.

8         If you chose -- if you choose to willfully, intentionally,

9    knowingly not follow the process, I think it can be criminal

10    given other circumstances, which I understand you do not.

11         Now, I just want to talk about argument for a moment,

12    because I'm not going to see you further today.

13         How long are you going to take?

14         I'll ask the Government.

15         **MR. FOSTER:**  So we anticipate between our closing and

16    the rebuttal two and a half hours, approximately an hour and a

17    half to hour 45 for the closing, and 45 minutes to an hour for

18    the rebuttal.

19         **THE COURT:**  Okay.  Okay.

20         **MR. SCHACHTER:**  And, Your Honor, so with respect to

21    the timing, I think we're roughly in the same ballpark.

22         What we have proposed to the Government -- the one issue

23    that I have is what I will call the -- if it's pejorative, I

24    don't mean it -- a sandbagging issue for rebuttal.

25         Rebuttal -- the Government's main summation should be the

1  lion's share of its argument so that we can respond to it.  The

2  problem with rebuttal -- they get it because they have the

3  burden of proof.  Fair enough.  But the problem is I have no

4  opportunity to respond to it.

5          **THE COURT:**  I know how it works.

6          **MR. SCHACHTER:**  Okay.  Your Honor, here's our

7  proposal --

8          **THE COURT:**  I haven't found a single defense lawyer

9  who has come in and said to me, you know what?  I'm willing to

10 trade the Government.  I'll take the rebuttal in exchange for

11 the presumption of innocence.  Okay?  There isn't a lawyer

12 around who won't say that.  I got it.

13      I have a rule, which is that you can't sandbag, that you

14 have to put your principal arguments in on your case-in-chief

15 and the rebuttal must rebut.  It must point to or -- either

16 directly or inferentially, something the Defense has said.

17      You're not going to be sandbagged here.  I just know it.

18 I know sandbagging, and that's -- this is not going to happen.

19 And if it is, if I feel you've been sandbagged, I can adjust

20 it.  I can let you get up and say something.  But I have to be

21 convinced that you've been sandbagged.

22      So don't worry about that.  Put that out of your mind.

23 And if they go --

24      I sort of see argument on Friday.  But Friday, you start

25 with argument.  I would like -- and I haven't asked you, but

 1   obviously you have an argument that you want to make and so

 2   forth.

 3        Between the two of you, decide who goes first.  I don't

 4   care.  It's up to you.

 5             MR. SCHACHTER:  Our proposed --

 6             THE COURT:  I'd like it all to be concluded in a

 7   single day.  So that ought to make sure that you move pretty

 8   quickly on Thursday because if it's not, I'll start the

 9   Government's argument and then they argue in the beginning of

10   Friday and they come back on Monday and argue some more.  You

11   don't want that.  So --

12             MR. SCHACHTER:  Understood.

13        Our proposal, Your Honor, and I think it fits, is the

14   Government takes a maximum of two hours and 15 minutes for its

15   main summation.  The Defense, dividing it up --

16             THE COURT:  I'm not going to -- you know what?  I

17   don't believe in time limits in a criminal case.  I don't

18   believe in it.  It's too important.

19             MR. SCHACHTER:  I will --

20             THE COURT:  On both sides.  So I give you reasonable

21   time to do it.

22        I want to do it all in one day.  That's what I'd like.

23   It's the fairest thing to both parties.  And just figure it

24   out.

25        So if you take up hours and hours and hours, if you do,

**CHARGING CONFERENCE**

1   okay.  On Monday morning we start with the Government or

2   wherever we are on it.

3        Thank you.

4        Okay.  We're in recess.  I'll see you at 1:30 on

5   Wednesday.

6            **MR. SCHACHTER:**  Thank you, Your Honor.

7            **MS. BELL:**  Thank you.

8                (Proceedings adjourned at 12:07 p.m.)

9                         ---oOo---

10

11                  <u>**CERTIFICATE OF REPORTER**</u>

12        I certify that the foregoing is a correct transcript

13   from the record of proceedings in the above-entitled matter.

14

15   DATE:   Tuesday, November 11, 2025

16

17

18

19

20   _____
     Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG, CSR No. 12219
21            Official Reporter, U.S. District Court

22

23

24

25