**THE CHAPMAN LAW FIRM**
Ronald W. Chapman, II, LL.M. *(pro hac vice)*
456 E. Milwaukee Avenue
Detroit, Michigan 48202
Ph: 346-242-7626
E: Ron@Chapmanandassociates.com

**DOWLING DEFENSE GROUP LLC**
John J. Dowling III. *(pro hac vice)*
6201 Fairview Road, Suite 200
Charlotte, North Carolina 28210
Ph: 631-574-7905
E: john@dowlingdefensegroup.com

**ROBERTO ESCOBAR**
CA Bar No. 217352
201 N. Brand Blvd., Suite 200
Glendale, California 91203
Ph: 818-281-0541
E: bobby@elaw.business

Attorneys for Defendant David Brody

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RUTHIA HE, A/K/A RUJIA HE, and DAVID BRODY,<br><br>Defendants. | CASE NO.:  3:24-CR-00329-CRB<br><br>**DAVID BRODY'S SENTENCING MEMORANDUM** |

3:24-CR-00329-CRB

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................................ 4

ARGUMENT ....................................................................................................................................... 7

    I.   The Guidelines analysis.......................................................................................................... 7

        A.  The correct base offense level for Dr. Brody is 12, not 38. ...................................... 7

            1.   Applicable law. .......................................................................................... 7

            2.   Analysis...................................................................................................... 8

                a.  The drug weight associated with the patients in Counts 2-5 can be included in the calculation… ......................................................................... 8

                b.  … but the PSR improperly treats all refills as unauthorized. ............................... 8

                c.  Dr. Brody did not override decisions of other providers. .................................... 12

    II.  The section 3553(a) factors support a below-Guidelines sentence. ............................................. 13

        A.  The nature and circumstances of the offense. ...................................................... 14

            1.   Dr. Brody helped thousands of patients at Done. ............................................ 14

            2.   Dr. Brody was not "enriched" and never sought to be "enriched." .......................... 14

        B.  History and characteristics of Dr. David Brody..................................................... 15

            1.   A lifetime of service to the vulnerable for virtually no financial benefit. ................. 15

            2.   The voices of those who knew him best. ..................................................... 17

            3.   Much of Dr. Brody's career can only be described as charitable. ............................ 22

        C.  There is virtually no risk of recidivism. ............................................................... 23

        D.  Dr. Brody has already suffered serious collateral consequences as a result of the charge and conviction. ....................................................................................... 24

        E.  Dr. Brody's medical conditions would be poorly managed in prison. ............................. 25

            1.   The severity of his conditions. ................................................................ 26

            2.   The Bureau of Prisons cannot adequately manage these conditions. ........................ 26

        F.  Each day spent in prison for Dr. Brody would be "especially laborious." ......................... 28

        G.  Probation's Guideline calculation yields a draconian sentencing range............................ 30

CONCLUSION.................................................................................................................................. 31

3:24-CR-00329-CRB

# TABLE OF AUTHORITIES

**Cases**

*Spears v. United States*, 555 U.S. 261 (2009)............................................................................... 14

*United States v. Lenagh*, No. 8:07CR346, 2009 WL 296999 (D. Neb. Feb. 6, 2009)............................. 29

*Gall v. United States*, 552 U.S. 38 (2007) ................................................................... 13, 24, 28

*Pepper v. United States*, 562 U.S. 476 (2011).......................................................... 13, 15, 24, 28

*Kimbrough v. United States*, 552 U.S. 85, 111 (2007............................................................. 14

*Solem v. Helm*, 463 U.S. 277 (1983)........................................................................................ 30

*United States v. Angelos*, 345 F. Supp. 2d 1227 (D. Utah 2004),

    *aff'd*, 433 F.3d 738 (10th Cir. 2006) ................................................................................ 5, 30

*United States v. Beck*, 425 F. Supp. 3d 573 (M.D.N.C. 2019) .................................................. 29

*United States v. Jeffery*, 631 F.3d 669, (4th Cir. 2011); 18 U.S.C. § 3553(a) .......................... 13

*United States v. Nesbeth*, 188 F. Supp. 3d 179 (E.D.N.Y. 2016) ............................................. 24

*United States v. Pauley*, 511 F.3d 468 (4th Cir. 2007) ........................................................... 24

*United States v. Perez*, 962 F.3d 420 (9th Cir. 2020) .......................................................... 7, 12

*United States v. Poetz*, 582 F.3d 835 (7th Cir. 2009) ............................................................. 28

*United States v. Shope*, No. 2:12-cr-48 (S.D. Ohio 2020)....................................................... 28

*United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009) ............................................................. 25

*United States v. Vrdolyak*, 593 F.3d 676 (7th Cir. 2010)........................................................ 22

*United States v. Warner*, 792 F.3d 847 (7th Cir. 2015) .......................................................... 23

**Statutes & Other Authorities**

18 U.S.C. § 3553........................................................... 6, 13, 14, 19, 23, 24, 25, 28, 29

21 U.S.C. § 829................................................................................................... 5, 9, 12

21 U.S.C. § 841....................................................................................................... 7, 15

21 U.S.C. § 846............................................................................................................. 7

USSG § 1B1.3............................................................................................................... 7

USSG § 2A3.1............................................................................................................ 31

USSG § 2A4.1............................................................................................................ 31

USSG § 2D1.1.............................................................................................................. 7

USSG § 2G2.2............................................................................................................ 30

**INTRODUCTION**

For the reasons described in detail below, Dr. Brody respectfully requests that the Court sentence him to a period of two years probation, with a special condition of home confinement, a fine of $100,000, and three years of supervised release.

\* \* \*

Dr. David Brody served as a staff psychiatrist, and later medical director, at the RAMS Community Mental Health Center in San Francisco for nearly twenty years. He worked in two prisons and spent several years on a forensic unit at Napa State Hospital dedicated to helping patients found too mentally ill to stand trial. And he served as a psychiatrist at the Marin General Adult Psychiatric Intensive Outpatient Program.

In contrast to the Government's theory at trial, so much of Dr. Brody's career can only be described as charitable, rather than profit-driven. So much of his work over the last three decades was offered in exchange for a far reduced rate, or on a pro bono basis. The letter from Alishia Mosher, Dr. Brody's billing specialist of thirty years, explains that "[o]n many occasions, he treated patients for months, and sometimes years, knowing he would not ever be paid, but continuing on, because these patients had no other options." *See* Exhibit 1, Character Ltrs at pp. 3-4.[1] Andrew Brown, a retired psychologist who has known Dr. Brody for over forty years, explains that he has "observed David navigate some of the most challenging environments in the mental health field," including "[t]reating unhoused individuals who suffer from chronic schizophrenia and major mood disorders . . ." *Id*. at pp. 5-6. Once again, even when funding was lacking, Dr. Brody stepped up: Brown explains that Dr. Brody "frequently stepped forward to protect the interests of the underserved when essential programs faced budget cuts or elimination." As his wife Mayany Brody explains, he has "an almost legendary disinterest in money." *Id*. 33-39. Instead of cashing out and working for a pharmaceutical company, which many of his former peers did, Dr. Brody

---

[1] The character letters are included in a single PDF as Exhibit 1, filed contemporaneously herewith.

pursued one of his true passions: teaching.  He held no fewer than five faculty appointments at academic institutions.

Towards the end of his career, a young woman seeking to innovate in the health care industry handpicked Dr. Brody to serve in a clinical role in her large and well-funded telemedicine company.  Dr. Brody educated numerous providers on ADHD treatment, and personally assisted in treating thousands of patients.  As the Court itself recognized at trial, the Court was "convinced that there was a vast number of people on this platform" who appropriately prescribed medication to patients with ADHD.  Trial Tr. 5207:20-5208:12.  Now, he stands convicted of conspiracy to dispense and distribute those ADHD medications, several substantive counts of distribution, and health care fraud.

The Probation Department prepared a PSR that calls for a life sentence in federal prison.  That Guideline range is incorrect as a technical matter, and absurd as a commonsense matter.  As explained thoroughly below, if Dr. Brody kidnapped someone, sexually abused someone, or shared child sexual abuse material, his sentence would be lower than what Probation's Guideline calculation yields.  As former federal Judge Paul Cassell has explained when conducting this exact comparative analysis, "[t]he irrationality of these differences is manifest and can be objectively proven."  *United States v. Angelos*, 345 F. Supp. 2d 1227, 1247 (D. Utah 2004), *aff'd*, 433 F.3d 738 (10th Cir. 2006).

As a technical matter, the Government only proved (and the jury only considered) sixteen patients at trial.  But the PSR incorrectly assumes that every refill Dr. Brody prescribed for thousands of patients was also unauthorized because Dr. Brody never saw the patients in person.  That rationale is wrong.

The PSR does not point to any rule, regulation, or statute which proscribes the refilling of controlled substances for patients who are under the care of a known colleague.  In other words, the PSR has artificially created a requirement that Dr. Brody have met with each patient before he issued a refill.  To the contrary, federal law expressly authorizes a practitioner to issue a refill for a colleague when the colleague is temporarily unavailable.  *See* 21 U.S.C. § 829(e)(2)(A)(ii).  Further, the DEA's own guidance

expressly confirmed that, if the primary provider had previously evaluated the patient (which was the case with every refill Dr. Brody issued), then a covering practitioner could "conduct any needed follow-up evaluation *by any method*: in person, telemedicine, telephone, email, etc." and could "issue any needed" medication. *See* Figure A, *supra* (emphasis added). Finally, the PSR also reasons that many of the refills Dr. Brody issued were over the previous declination or objection of the primary provider—and were therefore unauthorized. *See* PSR, Adden. ¶ 10. Other than brief testimony suggesting that, on *limited* occasions, Dr. Brody was told some of the providers wanted another follow up visit before issuing a refill, the Government has not presented any evidence suggesting that Dr. Brody was (or would have been) aware of another provider first wanting a follow up—and there is certainly no evidence in the record suggesting that *all* of the refills Dr. Brody issued were over the previous objection of a colleague.

As for the section 3553(a) factors, many of them strongly counsel in favor of a below-Guidelines sentence. Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary," and the individualized assessment here supports a sentence below the advisory Guidelines. *First*, the nature and circumstances of the offense include that Dr. Brody joined Done as a clinician and educator to expand access to ADHD care, helped large numbers of patients, and did neither sought nor obtained any large financial benefit. *Second*, his history and characteristics reflect a lifetime of service to vulnerable populations, extensive pro bono and reduced-fee care, and compelling character support from family, colleagues, and former patients. *Third*, the risk of recidivism is virtually nonexistent given his age, lack of criminal history, offense profile, and the surrender of his medical license. *Fourth*, he has already suffered severe collateral consequences, including the end of his medical career, which bear directly on just punishment and deterrence. *Fifth*, his serious and complex medical conditions cannot be effectively managed in prison, and incarceration would be especially onerous for him due to age and health, making a custodial term greater than necessary to accomplish the statutory purposes of federal sentencing.

**ARGUMENT**

**I.     The Guidelines analysis.**

**A.     The correct base offense level for Dr. Brody is 12, not 38.**

The correct base offense level for Dr. Brody is 12.  That number reflects the 3 grams of amphetamine that the grand jury indicted him on and the jury convicted him on under Counts 2-5.  *See* USSG § 2D1.1(a)(5), (c)(14).  The PSR goes far beyond the counts of conviction, and instead includes every single pill Dr. Brody prescribed or refilled for any patient over the course of his entire tenure at Done.  *See* PSR ¶ 47.  Probation therefore concluded that the total converted drug weight yields a base offense level of 38.  *Id.*

The PSR is incorrect, and the Government cannot meet its burden to prove by a preponderance of the evidence that all of Dr. Brody's refills were unauthorized.  *See United States v. Perez*, 962 F.3d 420, 448 (9th Cir. 2020).

**1.     Applicable law.**

It is blackletter law that when the applicability of particular sentencing guidelines or enhancements turn on factual issues, the Government bears the burden of proving the requisite facts by a preponderance of the evidence.  *United States v. Perez*, 962 F.3d 420, 448 (9th Cir. 2020).

The drug guideline at USSG § 2D1.1 controls the calculation of the offense level for those convicted of narcotics offenses under 21 U.S.C. §§ 841(a)(1) and 846.  Because Dr. Brody was not convicted under any of the statutory provisions specified in USSG § 2D1.1(a)(1)-(4), his offense level is determined by looking to the Drug Quantity Table.  USSG § 2D1.1(a)(5).

Under the framework of relevant conduct laid out in USSG § 1B1.3, the only prescriptions that this Court can consider are those that were issued unlawfully (i) within the scope of the conspiracy and (ii) in furtherance of the conspiracy.  USSG § 1B1.3(a)(1)(B).

**2.      Analysis.**

> **a.      The drug weight associated with the patients in Counts 2-5 can be included in the calculation…**

The Government can prove by a preponderance of the evidence that the drug quantity associated with the patients in Counts 2-5 should be included in the drug quantity; the jury found beyond a reasonable doubt that these prescriptions were unauthorized.

> **b.      … but the PSR improperly treats all refills as unauthorized.**

The PSR, however, has included every single pill Dr. Brody prescribed or refilled for any patient over the course of his entire tenure at Done.  *See* PSR ¶ 47.  This theory of accountability is not supported by the facts, principles of relevant conduct, or the law regarding refills.

Start with Dr. Brody's lack of interaction with patients.  Probation's rationale is that, because Dr. Brody never met with any of the patients he issued refills for, he could not possibly have made a determination that the refills were authorized.  *See* PSR, Adden. ¶ 10.  Specifically, the PSR reasons that "[t]rial evidence showed that Brody was issuing 'blind' prescriptions, as he never met with any of the patients and never reviewed medical records."  *Id.*  This rationale ignores a fundamental reality of medical practice: Practitioners *routinely* issue refills for colleagues' patients when the primary provider is unavailable to issue the refill themselves.  The PSR does not point to any rule, regulation, or statute which proscribes the refilling of controlled substances for patients who are under the care of a known colleague.  In other words, the PSR has artificially created a requirement that Dr. Brody have met with each patient before he issued a refill.

Dr. Brody's prescriptions were short-term *refill* prescriptions issued to patients who had (i) already been diagnosed with ADHD (ii) by another licensed medical specialist on the Done platform—a specialist psychiatric mental health nurse practitioner, and (iii) prescribed ADHD medication by this licensed specialist Done provider.  Dr. Brody's refill prescriptions were therefore referred to at Done as "urgent" or "bridge" refill prescriptions; they were not prescriptions issued to first-time patients.  *See* Tr. 3621:

3:24-CR-00329-CRB

17-3622:1; 3623: 4-12 (Government witness Hill-Alvarez explaining that Dr. Brody's urgent refills were to "cover" instances where a provider was on vacation or a patient was switching providers to prevent a gap in care); *see also* Ex. 127; Tr. 1327: 2-3.

It is entirely legal under federal law for a licensed medical practitioner to issue a refill prescription for a patient they have never seen where, as here, the treating provider is unavailable to issue the refill themselves. The CSA expressly permits a "covering practitioner" who has never had a face-to-face encounter with a patient to issue a controlled substance prescription. 21 U.S.C § 829(e)(2)(A)(ii). As long as a primary provider has conducted a previous medical evaluation of the patient (which was the case with *all* of Dr. Brody's refills), then Dr. Brody could refill the patients' medication if the primary provider was temporarily unavailable. *Id.*

Further, the DEA's own guidance expressly confirmed that, if the primary provider had previously evaluated the patient (whether in person, or via telemedicine), then a covering practitioner could "conduct any needed follow-up evaluation *by any method*: in person, telemedicine, telephone, email, etc." and could "issue any needed" medication. *See* Figure A, *supra* (emphasis added).[2]

---

[2] In response to the COVID-19 public health emergency declared on January 31, 2020, DEA worked with HHS to allow DEA-registered practitioners to begin issuing prescriptions for controlled substances to patients for whom they had not conducted an in-person medical evaluation. Under the Ryan Haight Online Pharmacy Consumer Protection Act of 2008, such in-person evaluation had previously been required. The DEA granted these temporary exceptions via two letters published in March 2020, authorizing practitioners to prescribe Schedule II-V controlled substances via telemedicine. The DEA extended these flexibilities twice. *See Temporary Extension of COVID-19 Telemedicine Flexibilities for Prescription of Controlled Medications*, 88 Fed. Reg. 30037; *Second Temporary Extension of COVID-19 Telemedicine Flexibilities for Prescription of Controlled Medications*, 88 Fed. Reg. 69879. All of the conduct charged in the Indictment occurred while these modifications were in effect.

*Figure B—DEA Guidance on Telemedicine Prescribing During Public Health Emergency*



Source: Exhibit 2.

Finally, Dr. Brody's prescriptions fall squarely within the definition of even *the Government's expert's* definition of a bridge refill:

> A bridge refill is if my colleague asks me to cover his practice. I know my colleague. I know the nature of his practice. I know the nature of his patients. And so while he's away on vacation for a couple of weeks, I will write a prescription for a patient who runs out of a medication. I know the clinician. I know their practice. I have a sense of how they practice and their patient population. And so that's a bridge refill, to get to the next appointment.

Trial Tr. 3949:10-17. That is literally what Dr. Brody did.

A review of the trial evidence reveals how innocuous—and medically necessary—these refills were. Figure A, below, is an excerpt from one of the emails that Nikki Mercado would routinely send to Dr. Brody and which captured the list of patients whose primary providers were unavailable to provide care. As the email reflects, so many of the refills were needed because the primary provider was "unresponsive."

*Figure B—Excerpt from Trial Exhibit 0350*

Sent:    5/7/2021 11:39:06 PM
To:      "nikita mercado <nikita@donefirst.com>" <nikita@donefirst.com>, "david brody <david.brody@donefirst.com>" <david.brody@donefirst.com>, nikita mercado <>
Subject: D01BQ94BA5C - 2021/05/07

**Nikita Mercado**
05/07/2021 11:39:06 PM
David Brody here is our today's list. 1. ▮▮▮▮▮▮▮▮▮▮ Adderall 5 MG PO Tablet 1 Tablet, Daily for 30 days | 30 Tablets Reason: Resend, Rx was cancelled for unknown reason by unknown 2. ▮▮▮▮▮▮ ▮▮▮▮▮ Medications Instruction: Adderall XR 20 MG PO Capsule Extended Release 24 Hour 1 Capsule Extended Release 24 Hour, Daily for 30 days | 30 Capsules Urgent - Resend Prescription 3. ▮▮▮▮▮ 03/29/1989 - Amphetamine-Dextroamphetamine 10 MG PO Tablet take 1 Tablet Daily for 30 days | 30 Tablets -Adderall XR 25 MG PO Capsule Extended Release 24 Hour take 1 cap PO QAM PRN Inattention/focus | 30 Capsules Reason: Titi Johnson's Patient 4. ▮▮▮▮▮▮▮▮▮▮▮▮ -Adderall 10 MG PO Tablet Take 1/2 tablet (5mg) PO every afternoon (no later than 2pm) as needed | 15 Tablets -Adderall XR 10 MG PO Capsule Extended Release 24 Hour Take 1 capsule PO daily | 30 Capsules 5. ▮▮▮▮▮▮ Adderall 5 MG PO Tablet Take at 8 am and at noon as needed for focus and concentration | 60 Tablets Reason: Former Svetlana Zak patient. 6. ▮▮▮▮▮▮▮▮▮▮ Adderall XR: 5mg 1 tablet daily 30 days Reason: Unresponsive provider 7. ▮▮▮▮▮▮▮▮ - Adzenys XR-ODT 9.4 MG PO Tablet Extended Release Disintegrating take one tab PO QAM PRN ADHD | 30 Tablets Reason: Out of medication. The patient needs to

The PSR concludes that all of Dr. Brody's refills for these patients were unauthorized, and therefore should be included in calculating the drug weight. PSR ¶ 47; PSR, Adden. ¶ 10. But the lists are simply catalogues of real patients, with real needs, with real providers who were really unresponsive. For Dr.

11

Brody to have thought this was criminal or outside the usual course of medical practice would have been a fundamentally alien concept for him, for others at Done, and for practitioners across the country who routinely issue refills for patients of their colleagues.

At bottom, in order for the Court to include all of Dr. Brody's refills in uncharged conduct in the drug weight calculation, the Government would have to prove by a preponderance of the evidence that the refills were unauthorized. *Perez*, 962 F.3d at 448. The simple fact that Dr. Brody never met with these patients is not even close to enough to satisfy that burden for the very simple reason that covering refills for colleagues is a routine and *lawful* feature of medical practices nationwide. *See* 21 U.S.C. § 829(e)(2)(A)(ii).

### c.     Dr. Brody did not override decisions of other providers.

The PSR also reasons that many of the refills Dr. Brody issued were over the previous declination or objection of the primary provider. *See* PSR, Adden. ¶ 10. Specifically, the PSR reasons that "the evidence demonstrated that patients were referred to Brody when other providers would not prescribe medication to patients, and an analysis of the prescriptions Brody issued reflected that he often overrode medical decisions from other providers in issuing the refill prescriptions." *Id.* There is no support in the record for this conclusion.

Other than brief testimony suggesting that, on *limited* occasions, Dr. Brody was told some of the providers wanted another follow up visit before issuing a refill, the Government has not presented any evidence suggesting that Dr. Brody was (or would have been) aware of another provider first wanting a follow up—and there is certainly no evidence in the record suggesting that *all* of the refills Dr. Brody issued were over the previous objection of a colleague. If it is true, as the PSR concludes, that Dr. Brody "often overrode medical decisions from other providers in issuing the refill prescriptions," PSR, Adden. ¶ 10, then that should be an easy fact for the Government to prove by simply producing (a) medical records reflecting the pause on refills and (b) evidence that Dr. Brody either reviewed those records or was

otherwise made aware of the pause on refills.  But the Government has not done so.  As a result, it cannot meet its burden to prove by a preponderance of the evidence that Dr. Brody "often overrode medical decisions from other providers in issuing the refill prescriptions."  PSR, Adden. ¶ 10.

Instead, Dr. Brody was receiving lists of patients whom he knew who had (i) already been diagnosed with ADHD (ii) by another licensed medical specialist on the Done platform—a specialist psychiatric mental health nurse practitioner, and (iii) prescribed ADHD medication by this licensed specialist Done provider.  The lists did not include a notation on whether the primary provider had previously declined to refill.

* * *

The correct base offense level is 12 because that is the number associated with the drug weight for the patients identified in Counts 2-5.

## II.     The section 3553(a) factors support a below-Guidelines sentence.

The task of crafting an individualized sentence rests almost exclusively in the province of district courts.  Within the boundaries of the vast kinds and degrees of punishments established by Congress for Dr. Brody's offenses, this Court has "extremely broad discretion" to impose a sentence that it finds "sufficient, but not greater than necessary" to advance the statutory goals of federal sentencing.  *United States v. Jeffery*, 631 F.3d 669, 679 (4th Cir. 2011); 18 U.S.C. § 3553(a). A sentencing court's role of making an "individualized assessment" of the offender before it, *Gall v. United States*, 552 U.S. 38, 49-50 (2007), is informed by the tradition that "the punishment should fit the offender and not merely the crime[,]" *Pepper v. United States*, 562 U.S. 476, 487-88 (2011).

Because there is no mandatory minimum sentence for the counts of conviction, this Court has wide latitude to design an appropriate sentencing package "to effectuate its sentencing intent."  *Pepper*, 562 U.S. at 507.  In designing that package, the Supreme Court has instructed that "district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process."  *Gall*,

3:24-CR-00329-CRB

552 U.S. at 50 n.6.    But the section 3553(a) factors remain the backbone of this Court's "final determination." *Spears v. United States*, 555 U.S. 261, 265 (2009) (quoting *Kimbrough v. United States*, 552 U.S. 85, 111 (2007)).

### A.    The nature and circumstances of the offense.

#### 1.    Dr. Brody helped thousands of patients at Done.

What has been remarkably left out of the picture throughout this entire case so far has been any material exploration of the amount of people Dr. Brody *helped* during his tenure at Done.    Due to the Court's evidentiary rulings at trial, the jury's snapshot of the historical facts was necessarily limited to the sixteen patients with whose charts Dr. Goodman took issue.    The reality, however, is that the jury's verdict was quite narrow: the jury necessarily concluded that the Defendants and Done essentially diagnosed too fast and prescribed too fast.    But the jury's verdict does *not* capture the conclusion that the 140,000 patients that Done treated *did not need* or *did not benefit* from the medication they received.    As the Court itself recognized at trial, the Court was "convinced that there was a vast number of people on this platform" who appropriately prescribed medication to patients with ADHD.    *See* Trial Tr. 5207:20-5208:12.

#### 2.    Dr. Brody was not "enriched" and never sought to be "enriched."

Contrary to the Government's theory at trial, Dr. Brody did not join Done to "enrich himself."    Dr. Brody joined Done Global, Inc. in 2021 not as an entrepreneur seeking equity or profit, but as a clinician and educator nearing the end of his career who believed that telemedicine could bring ADHD treatment to the millions of Americans who could not otherwise access it.    *See* Letter of Mayany Brody (Ex. 1 at pp. 33-39).    He was recruited by Done Global's founder, Ruthia He, who was attracted by his LinkedIn credentials, not by any prior business relationship or demonstrated appetite for financial risk.    *See* Letter of Mayany Brody.

His compensation at Done Global, Inc. consisted solely of a modest physician's salary and nominal bonuses totaling less than $10,000 over the entire course of his engagement.    He received no equity, no

revenue share, and no distributions beyond that salary—a fact corroborated by the terms of his Stock Restriction and Option Agreement with Done Health P.C., which contractually fixed the value of his 100% ownership interest at $1,000. *See* Exhibit 3, Declaration of David Brody ¶ 4; Exhibit 4 (Stock Restriction and Option Agreement, Done Health P.C.).  The Government's theory at trial that Dr. Brody joined Done Global to "enrich himself" is contradicted by every objective financial fact in the record.

This distinguishes Dr. Brody from the prototypical doctor convicted under 21 U.S.C. § 841(a)(1), or under the health care fraud statute, where the motive is often to earn a profit.  It also distinguishes Dr. Brody from co-defendant Ruthia He, who did not have any robust background in treating patients with mental health challenges.  Even Probation Officer Pepper Freisen agrees that "[t]he undersigned does believe that Mr. Brody began his position at Done motivated to help patients with ADHD, and that he truly wanted to make a difference in the field."  PSR, Sent. Rec., at 2.  Even after the conviction, Officer Freisen agrees that, to this day, "Mr. Brody appears genuine in his desire to create change in the mental health treatment community[.]"  *Id.*  Dr. Brody's wife Mayany explains it most aptly in telling the Court that he has "an almost legendary disinterest in money."  *Id.*

**B.** **History and characteristics of Dr. David Brody.**

**1.** **A lifetime of service to the vulnerable for virtually no financial benefit.**

For more than three decades, Dr. Brody devoted his professional life to populations that the healthcare system routinely abandons. He was a staff psychiatrist and later the medical director at the RAMS Community Mental Health Center in San Francisco from 1989 to 2008, where he supervised a staff of ten to fifteen physicians and personally maintained a significant patient caseload. *See* Letter of Mayany Brody.  The majority of his patients were survivors of the Cambodian Pol Pot holocaust who were profoundly traumatized individuals and whose PTSD and Major Depression placed them at the extreme end of psychiatric acuity.  *See* Letter of Mayany Brody(Ex. 1 at pp. 33-39).

3:24-CR-00329-CRB

Figure 1, below, is a letter from an old colleague at RAMS, written in 2008, in which she reminisces on her time working with Dr. Brody and how someone described him as an "uncorrupted soul . . . pure . . . kind like a child."

*Figure 1—2008 Letter*

He worked at two prisons and spent nearly three years on a forensic unit at Napa State Hospital dedicated to patients found not guilty by reason of insanity, half of whom had committed homicide. *See* Letter of Sue Brisk (Ex. 1 at pp. 50-54). He suffered two patient assaults during his career—one in an emergency room and one on a locked inpatient unit—and returned to work the next day both times. *See* Letter of Sue Brisk. Napa was such a challenging environment that one of the clinicians was murdered by a patient. *See id.* He did none of this for money. Community mental health and forensic psychiatry are among the lowest compensated and most dangerous specialties in medicine.

In his private practice, when patients lacked insurance or funds to pay, Dr. Brody routinely saw them at reduced rates or pro bono for months and years at a time, knowing he would never be compensated. *See* Letter of Alicia Mosher (Ex. 1 at pp 3-4). He held faculty appointments at no fewer than five institutions, one medical school, two osteopathic schools, and two graduate programs in clinical

3:24-CR-00329-CRB

psychology, because teaching was his genuine vocation.  *See* Letter of Mayany Brody (Ex. 1 at pp. 33-39).

### 2.    The voices of those who knew him best.

The character letters submitted to this Court describe the same man with remarkable consistency: a physician of extraordinary compassion, integrity, and decency who transformed lives precisely because he refused to treat patients as billable units.

Mayany Brody, Dr. Brody's wife of thirty-two years and a retired mental health rehabilitation specialist who worked alongside him for nearly two decades at RAMS, describes a man who stayed late, answered calls at midnight, and treated every patient as if they were his only one.  She writes of a marriage built on shared dedication to others, and of the cruelty of facing their seventies apart if incarceration is imposed.  *See* Letter of Mayany Brody (Ex. 1 at pp. 33-39).

*Figure 2—Photo of Dr. Brody and wife Mayany in 1994*



Jonathan Ehrlich, Dr. Brody's stepson, now a registered nurse of eleven years, met Dr. Brody when he was eight years old.  He writes that the dinner table in their home was filled with stories of Dr. Brody

3:24-CR-00329-CRB

fighting for his patients even when it meant standing in opposition to his superiors, and that as a child he remembers thinking: "I hope that one day I can fight for others as David does." He credits those conversations, and countless hours of help with his homework, with cultivating in him the love of science and health that led him to a nursing career.  He describes a stepfather who filled their home with art and music, who never gave up on him through the difficulties of adolescence, and who raised him with the same warmth and love no matter how hard he made it—a constancy he writes "has made all the difference in my life."  Ltr. of Jonathan Ehrlich (Ex. 1 at pp. 28-29).

Through Jonathan, Dr. Brody is now a grandfather to Bennett, age nine, and Skylar, age four. Jonathan writes that Dr. Brody takes the time to play, read, and share stories and ideas with them, that Skylar counts him among her favorite people, and that he "can induce a laugh out of her that might bring a tear to your eyes." As a registered nurse who understands clinical practice, Jonathan writes that he believes with professional conviction that Dr. Brody would never put a patient in harm's way. He asks this Court to allow his stepfather to spend his remaining years with the grandchildren who adore him. *Id*.

*Figure 3—Photo of Dr. Brody with stepson Jonathan and daughter Bethany.*



\* \* \*

These voices attest to the husband, father, the grandfather, and the man that David Brody is outside the walls of this prosecution.  Their voices—spanning generations of a family that has watched a devoted

physician lose his career, his freedom, and his standing—are a necessary part of the complete picture this Court must consider under section 3553(a)(1).

Alicia Mosher has been Dr. Brody's medical billing agent since 1998, nearly three decades. In that time, she has managed billing for over 100 mental health providers and has seen every variety of physician, from the genuinely dedicated to the genuinely indifferent. She writes without hesitation that David Brody is unlike any of them: a doctor who called her to reduce a bill when he learned a patient had fallen on hard times, who gave her referrals not to make money but to help patients find the right provider, and who never once treated medicine as a business. Ltr. of Alicia Mosher (Ex. 1 at pp. 3-4).

Rachelle Salazar was Dr. Brody's patient for approximately seven years—treated entirely on a pro bono basis because she lacked health insurance. She writes that before coming to Dr. Brody, she had "been with another physician for over twenty years" and had seen "many psychiatrists," but that her experience with them "was often limited to medication without meaningful discussion of my history or concerns." Dr. Brody was different. He "took the time to truly listen" and "understand my background before making any treatment decisions," regularly encouraged her to reach out when she was struggling with suicidal thoughts, and even contacted her former provider on her behalf in an effort to help her maintain continuity of care at no cost—an effort that ultimately proved impossible but that she has never forgotten. She suffers from PTSD, major depression, anxiety disorders, agoraphobia, and attention deficit disorder. Prior to Dr. Brody's care, she "experienced severe dissociation and self-harm behaviors." Through "careful monitoring and thoughtful adjustment" of her medications, Dr. Brody helped stabilize her symptoms to the point where she "has not experienced dissociation or engaged in self-harm for many years."

Her ADHD, never properly treated before, was addressed with "appropriate treatment and consistent support," enabling her to "obtain employment—something I previously struggled to achieve." She closes by writing: "Dr. Brody provided not only medical care, but also the encouragement and support

that helped me regain confidence, motivation, and independence." (Letter of Rachelle Salazar, former patient of Dr. Brody (Ex. 1 at pp. 40-41).)

Sue Brisk, Dr. Brody's cousin of sixty years, provides perhaps the most comprehensive portrait of the whole man. She describes his intellectual curiosity, his love of birds and nature photography, his generosity to strangers—including the injured child he stopped to help on the side of a road in Cambodia when everyone around him urged him to walk away—and the daily suffering his illness causes. She describes the home raid in visceral terms and writes plainly that a custodial sentence would be a death sentence.  Ltr. of Sue Brisk (Ex. 1 at pp. 50-54).

Former patients—Eric Christensen, who credits Dr. Brody with enabling him to complete a PhD in mental health leadership and marry his partner; Ida Da Roza, who describes a "new will to live" after Dr. Brody diagnosed her late-in-life ADHD when others had missed it entirely; and James Holets, who recalls that Dr. Brody brought his family to watch him perform in a play—write not of a fraudster but of a healer.  *See* Letters of Eric Christensen, Ida Da Roza, and James Holets (Ex. 1 at pp. 14-16, 20-22, 23-24).

Dr. Brody's career has been filled with patients and colleagues who admired him not only for his medical mind, but for his heartfelt sense of humanity.  Photos below capture the going away party patients and colleagues held for Dr. Brody when he left his role as a psychiatrist at the Marin General Adult Psychiatric Intensive Outpatient Program.

3:24-CR-00329-CRB

*Figures 4-5*




Quite the opposite of a fraudster or a criminal, Dr. Brody interests throughout life have consistently been grounded in altruism, the sciences, writing, and medicine:

*Figure 6—1973 Photo of Dr. Brody in High School Next to Neil deGrasse Tyson at Science Retreat*



21

*Figure 7—1992 Excerpt from St. Luke's Hospital Article*



### MEDICAL DIRECTOR LOVES TO TRAVEL WRITE

Dr. David Brody, the Medical Director at St. Luke's Hospital Partial Hospitalization Program enjoys the challenge to write about his travels. He loves to travel and write and has found an interest in combining the two. His interest in the travel writing field came about when he found himself writing journals about his travels. He writes about his reactions and impressions of the different places he has traveled to. Chile, Peru, Bolivia, South America, Kenya, Tamaroon, Africa, Europe, Hawaii, quite a few places in the United States, Mexico, Jamacia, and England are some of the different destinations he has traveled to and found thrilling to write about.

Dr. Brody is originally from New York and now resides in San Francisco.

He received his BA degree in Natural Sciences and Science Writing from the University of California at Santa Cruz. His original interest was becoming an astronomer. He earned his MD from University of California at Irvine. His Post-Doctoral Training and Residency were completed at Stanford University.

Since residency, Dr. Brody has established his own private practice. In addition, he served as Clinical Supervisor and Psychiatrist at Mt. Zion Crisis Clinic, as a Psychiatrist at Narvaez Mental Health Clinic, and as Medical Director of St. Luke's Hospital inpatient unit.

"I feel Partial Hospitalization is much less restrictive than the inpatient setting," Dr. Brody said. "When patients are in the hospital everything seems to come to a

*Dr. David Brody*

halt, and they may end up losing control of different aspects in their life. I think people should be hospitalized only when absolutely necessary."

### 3.    Much of Dr. Brody's career can only be described as charitable.

As explained above, so much of Dr. Brody's time with patients can only be described as charitable. To be sure, many white collar offenders can point to large financial donations to various organizations. But courts have recognized that an offender's charitable works or contributions must be viewed with caution. For example, the Seventh Circuit has described that "[w]ealthy people commonly make gifts to charity. They are to be commended for doing so but should not be allowed to treat charity as a get-out-of-jail card." *United States v. Vrdolyak*, 593 F.3d 676, 682 (7th Cir. 2010). The Seventh Circuit has explained that "charitable works must be exceptional before they will support a more-lenient sentence, for it is usual and ordinary, in the prosecution of similar white-collar crimes involving high-ranking corporate executives to find that a defendant was involved as a leader in community charities, civic organizations, and church efforts." *Id.* (cleaned up) (citations omitted). "To allow any affluent offender to point to the good his money has performed and to receive a downward departure from the calculated offense level on that basis is to make a mockery of the Guidelines." *Id.*

The Seventh Circuit later retreated from the "exceptional standard," holding instead that a defendant's charitable works "must be sufficient to justify the variant sentence, but they need not

22

necessarily be exceptional." *United States v. Warner*, 792 F.3d 847, 857 (7th Cir. 2015).  The *Warner* court correctly explained that, when it comes to charity work, the focus is not "on the number of checks" one wrote "or their dollar amounts." *Id.* at 858.  Instead, the focus is on what the defendant's "charitable acts reveal about his *character*, which is exactly what § 3553(a)(1) directs [courts] to consider." *Id.* (emphasis in original).

Under whatever standard the Court were to use—exceptionally charitable, sufficiently charitable, charitable character, etc.—Dr. Brody's lifetime of providing charity to those in need distinguishes him from the overwhelming vast majority of not only offenders, but of people in general.  Dr. Brody did not spend years donating money.  Dr. Brody's charity took a markedly different form, over a markedly longer timeframe.  He donated his time, care, and attention to thousands of patients over thousands of hours, over several decades for those suffering from some of the hardest challenges man can face: challenges in the mind.  As in *Warner*, Dr. Brody's "generosity went back many years," and "his motivations were sincere." 792 F.3d at 857.

### C.      There is virtually no risk of recidivism.

Under section 3553(a)(2)(C), the Court must also consider the risk that Dr. Brody will re-offend.  Prison has a much greater significance for those imprisoned for the first time, and thus a reduction in sentence is appropriate for first time offenders and consistent with the goals of "just punishment" in section § 3553(a)(2)(A) and "adequate deterrence" in section 3553(a)(2)(B). "Because white collar criminals have extremely low recidivism rates, restraint through incarceration arguably provides only marginal societal benefit." J. Strader*, White Collar Crime and Punishment: Reflections on Michal, Martha and Milberg Weiss*, 15 GEO. MASON. L. REV. 45, 102 (2007).  The likelihood that Dr. Brody would commit future crimes is all but non-existent.

He lived a life as a law-abiding, productive member of society for his entire life prior to this case.  Dr. Brody fits every statistical category that puts him in a unique class of offenders who statistical

likelihood of re-offending is exceedingly low: (a) his age, (b) the nature of the offense, and (c) his lack of any prior criminal history.

First, the Commission's data shows that there is only a 12.4% chance that offenders above 50 when released will re-offend. *See Older Offenders in the Federal System* at 42, U.S. Sent. Comm'n (Jul. 26, 2022), https://shorturl.at/gAZPC. That figure is even lower for offenders over the age of 70. *Id.* Second, studies continue to show that those who commit white collar crimes are like less to re-offend than those who commit violent crimes or sex crimes. *See* Strader, *supra*. Third, those who are above 70 and have no criminal history are yet even *less* likely to re-offend. *See generally Older Offenders in the Federal System*, *supra*.

On a more general level, Dr. Brody's California medical license was surrendered in June 2025, and he is no longer licensed to practice medicine in any state. He cannot prescribe. He cannot treat patients. He cannot serve as a clinical officer or medical director for any healthcare company. The very conduct underlying this conviction is structurally impossible for him to repeat.

**D.    Dr. Brody has already suffered serious collateral consequences as a result of the charge and conviction.**

The Court should consider the substantial, irreversible hardship that has ensued (and will persist) for Dr. Brody based on the collateral consequences of the conviction.

Collateral consequences of a felony conviction are appropriately considered for both "just punishment" and "adequate deterrence" under 18 U.S.C. § 3553(a)(2)(A)-(B). *United States v. Nesbeth*, 188 F. Supp. 3d 179, 181 (E.D.N.Y. 2016) (discussing the issue at length); *United States v. Pauley*, 511 F.3d 468, 474 (4th Cir. 2007) (loss of teaching permissions and state pension appropriately considered under § 3553(a)(2)(A)-(B)). Indeed, the district court's duty to make an "individualized assessment" of the offender before it, *Gall*, 552 U.S. at 49-50, and the tradition that "the punishment should fit the offender and not merely the crime[,]" *Pepper*, 562 U.S. at 487-88, underscores the importance of

3:24-CR-00329-CRB

considering the weight and detriment a particular punishment (whether direct or collateral) will have on an individual offender.

In a case like this, sometimes the "conviction *itself* already visits substantial punishment on the defendant." *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (emphasis added) (quoting the lower court). "It is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence." *Id.*

In Dr. Brody's case, he can no longer pursue his lifelong passion of treating patients with mental health challenges. This collateral consequence alone visits such a profound and fundamental hit to Dr. Brody's entire sense of being that cuts deeper and harder than any prison sentence could. To add a term of imprisonment on top of that would be to impose a sentence greater than necessary to accomplish the purposes of sentencing.

Further, Dr. Brody has been under constant legal jeopardy for the last three years of his life. He has endured the execution of a search warrant—something most people will never (thankfully) experience—during which his daughter was handcuffed. He was arrested, prosecuted, tried, and convicted. He has endured extended home detention, including a restriction from stepping into his own backyard—a particularly impactful consequence for a man whose love of birds and nature photography has long been a source of solace. *See* Ltr. of Sue Brisk (Ex. 1 at pp. 50-54).

As Officer Freisen explains, "[h]is age, this conviction, and the fact that he is no longer board-certified means that his career is effectively over, and he will be hard-pressed to find other employment after service of his sentence." PSR, Sent. Rec., at 2.

**E.    Dr. Brody's medical conditions would be poorly managed in prison.**

This Court can—and should—consider the impact prison would have on Dr. Brody's medical condition. Section 3553(a)(2)(D) expressly requires that the Court consider the need for the sentence imposed "to provide the defendant with needed . . . medical care . . . in the most effective manner[.]"

3:24-CR-00329-CRB

**1.    The severity of his conditions.**

Dr. Brody suffers from a constellation of serious, chronic, and poorly managed gastrointestinal conditions: Irritable Bowel Syndrome (Constipation-Predominant Type), Dyssynergic Defecation, and Diverticulosis with a history of severe diverticulitis. Ltr. of Mayany Brody (Ex. 1 at pp. 33-39); Declaration of William Weber, M.D., MPH, Exhibit 5 (the "Weber Decl."). Together, these conditions cause pain his wife describes as "torture," and require him to spend two to four hours per day on the toilet for basic symptom management.  Ltr. of Sue Brisk (Ex. 1 at pp. 50-54). His cousin reports that he spends at least half of his waking hours in moderate to severe abdominal pain, with daily flare-ups severe enough that he cries out.  *Id*.

Dr. Brody previously suffered an intestinal perforation—one of the most dangerous complications of diverticulitis—that required computerized tomographic guidance to drain a pelvic abscess and which likely would have resulted in a colostomy or worse but for the proximity of a hospital with that specialized imaging capability.  *See* Ltrs. of Mayany Brody and Sue Brisk (Ex. 1 at pp. 33-39, 50-54); Weber Decl. He has since required multiple emergency room visits and hospitalizations totaling approximately one month, and ongoing monitoring by his primary care physician of nearly 20 years, Dr. Elizabeth Etemad, and his gastroenterologist of approximately two and a half years, Dr. Connie Wang.  *Id*.

Beyond his gastrointestinal conditions, Dr. Brody suffers from bilateral hearing loss (both conductive and sensorineural), degenerative disc disease of the lumbar spine (previously requiring an opioid prescription and referral to a spine surgeon), an umbilical hernia with diastasis recti requiring surgical repair, and an enlarged prostate. Weber Decl., *passim*.  Each of these conditions is progressive. Each is expected to worsen.

**2.    The Bureau of Prisons cannot adequately manage these conditions.**

Dr. William Weber, M.D., MPH, a board-certified emergency physician, Medical Director of the Medical Justice Alliance, and Chair of the American College of Emergency Physicians' Public Health and

3:24-CR-00329-CRB

Injury Prevention Committee, reviewed approximately 600 pages of Dr. Brody's medical records and submitted a signed declaration with this memorandum. Weber Decl. ¶ 4. His conclusion is unambiguous:

> Based on my review of Dr. David Brody's medical records, he is an elderly man with numerous significant medical problems. His significant abdominal problems would make it **difficult to function** in a facility where time constraints might limit his ability to spend significant time on the toilet, where it is **unclear whether he could receive** pelvic floor physiotherapy, and where the **drastically different diet** could flare his symptoms. He is at risk of abdominal infections and worsening of his hernia and diastasis recti, both of which could require hospitalization and surgery. He would already be among the oldest in custody when admitted and he suffers from many conditions related to the aging process that could **jeopardize his ability to manage life in a facility and are expected to worsen over time**. Due to his tenuous medical state, I would recommend that the court consider alternatives to confinement at a carceral facility so that he can better try to manage his difficult medical conditions.

Weber Decl. ¶ 12 (bold added).

Dr. Weber's declaration documents the specific mechanisms by which BOP confinement would cause serious harm:

• Dyssynergic Defecation requires pelvic floor physiotherapy with biofeedback as its sole clinically established treatment—"the only available treatment" and "critical to proceed," in the words of Dr. Brody's own treating physician. Weber Decl. ¶ 7 (citing 6/20/24 medical record). Medications are not effective as standalone treatment. *Id*. It is unclear whether BOP facilities provide this treatment.

• Dr. Brody requires hours of uninterrupted, private toilet access daily for basic bowel management, including manual disimpaction. Weber Decl. ¶ 6. Prison facilities do not provide private, time-unlimited bathroom access.

• Dr. Brody's diet—primarily salads with seafood protein, fresh fruit, and yogurt, high in fiber and probiotics—is specifically tailored to manage his gastrointestinal symptoms. Weber Decl. ¶ 9. Federal prisons do not provide this diet. Without it, his constipation and pain will worsen.

• At age 70, Dr. Brody is older than more than 97% of the Bureau of Prisons population. Weber Decl. ¶ 10. His progressive hearing and vision loss create specific safety risks in a custodial environment:

3:24-CR-00329-CRB

inability to hear guards' instructions during security incidents, and difficulty navigating physical spaces safely. Weber Decl. ¶ 11.

The risk is not abstract.  Dr. Brody has already suffered one intestinal perforation that required specialist intervention unavailable at most BOP facilities. A recurrence in a custodial setting—where CT-guided drainage may not be immediately available—could mean a colostomy, or worse. Weber Decl. ¶¶ 6, 12.

To be sure, sometimes courts will defer to the Bureau of Prisons when it comes to anticipating whether a defendant's medical conditions can be adequately managed in prison.  *See, e.g.*, *United States v. Poetz*, 582 F.3d 835 (7th Cir. 2009) (upholding prison sentence because "BOP medical staff informed the court that it was capable of providing Poetz with the necessary medical care to treat her various conditions.").  But there is a big difference between what the BOP might claim it is *capable* of doing compared to what it will *actually* do.  *See, e.g.*, *United States v. Shope*, No. 2:12-cr-48 (S.D. Ohio 2020) (granting motion for compassionate release for defendant who had his leg amputated in prison due to substandard medical care).  As Dr. Weber explains in his declaration, Dr. Brody's delicate medical situation poses serious risks that are unlikely to be managed properly in a federal prison.  Weber Decl., *passim*.

In sum, there is no doubt that a sentence involving incarceration in a federal prison would not "provide [Dr. Brody] with needed . . . medical care . . . in the most effective manner[.]" § 3553(a)(2)(D).

**F.      Each day spent in prison for Dr. Brody would be "especially laborious."**

As explained above, the Supreme Court has instructed that sentencing courts make an "individualized assessment" of the offender, *Gall*, 552 U.S. at 49-50, and that "the punishment should fit the offender and not merely the crime[.]" *Pepper*, 562 U.S. at 487-88.  In that respect, the Court should acknowledge that people experience prison very differently depending on various factors, including and especially their age and medical conditions.

For this reason, courts have recognized that a sentence of "even" 24 months "is a significant sentence, *especially* to an offender who has never been incarcerated at all." *United States v. Lenagh*, No. 8:07CR346, 2009 WL 296999, at *6 (D. Neb. Feb. 6, 2009) (emphasis added).  When a sentence is "significantly more laborious than that served by most inmates," a defendant may not need to serve his full sentence. *United States v. Beck*, 425 F. Supp. 3d 573, 586 (M.D.N.C. 2019) (granting compassionate release).  Cases like *Lenagh* and *Beck* stand for the non-controversial proposition that people experience prison differently.  Counting the days of a year in prison for the hardened criminal cannot compare to a first-time offender of advanced age enduring that same length of time.

Because of his advanced age and medical conditions described above, any time Dr. Brody would spend in prison would be "significantly more laborious than that served by most inmates." *Beck*, 425 F. Supp. 3d at 586.

Relatedly, any term of incarceration imposed on a seventy-year-old defendant consumes a far greater proportion of his remaining life than the same sentence imposed on a younger individual. Available actuarial data suggests that Dr. Brody's life expectancy is approximately 85 years, leaving him with, at most, fifteen years to live. A six-year sentence, as recommended by Probation, would therefore require him to spend nearly half of his remaining life in prison—for a non-violent offense.

Courts have long recognized that the severity of a sentence cannot be measured solely in absolute years; it must also be understood in human terms.  Here, a six-year sentence for Dr. Brody is not equivalent to six years for a younger defendant—it is, in effect, a far harsher punishment. Imposing a sentence that consumes such a substantial portion of his remaining life would be greater than necessary to achieve the purposes of sentencing under 18 U.S.C. § 3553(a).

To put this in perspective, imposing a sentence that consumes nearly half of a younger defendant's expected remaining lifespan would require a dramatically longer term of imprisonment—one that would

29

3:24-CR-00329-CRB

plainly be viewed as excessive in a non-violent case. The same principle applies here. A just sentence must account for the reality that, for Dr. Brody, time is a rapidly diminishing resource.

### G.      Probation's Guideline calculation yields a draconian sentencing range.

The Supreme Court has explained that, generally, "[i]f more serious crimes are subject to the same penalty, or to less serious penalties, that is some indication that the punishment at issue may be excessive." *Solem v. Helm*, 463 U.S. 277, 291 (1983).

To illustrate how absurd it would be to sentence Dr. Brody based on the PSR's sentencing calculation, consider what the sentence would be if he had committed a sexually disgusting crime or a violent crime.  For example, if he had been convicted of disseminating child sexual abuse material, his sentence would be lower than what the Government is asking for.  *See* USSG § 2G2.2(a)(1) (offense level 18).  If Dr. Brody had kidnapped someone, his sentence would be lower than what the Government is asking for.  *See* USSG § 2A4.1(a) (offense level 32).  If he had sexually abused someone, his sentence would be lower than what the Government is asking for.  *See* USSG § 2A3.1(a)(2) (offense level 30).  As former federal Judge Paul Cassell has explained when conducting this exact comparative analysis, "[t]he irrationality of these differences is manifest and can be objectively proven."  *United States v. Angelos*, 345 F. Supp. 2d 1227, 1247 (D. Utah 2004), *aff'd*, 433 F.3d 738 (10th Cir. 2006).  The notion that Dr. Brody is as culpable as a kidnapper or as a sex predator is ridiculous.

3:24-CR-00329-CRB

**CONCLUSION**

For the above reasons, Dr. Brody respectfully requests that the Court sentence him to a period of two years probation, with a special condition of home confinement, a fine of $100,000, and three years of supervised release.

Dated: March 30, 2026

THE CHAPMAN LAW FIRM

By:      */s/   Ronald W. Chapman*
           Ronald W. Chapman, II, LL.M.

DOWLING DEFENSE GROUP LLC

By:      */s/   John J. Dowling III.*


ROBERTO ESCOBAR

           */s/   Roberto Escobar*

           *Attorneys for Defendant*
           *David Brody*

31

3:24-CR-00329-CRB