CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

JEFF MITCHELL (CABN 236225)
Chief, Criminal Division

LORINDA I. LARYEA (DCBN 99769)
Chief, Fraud Section

JACOB FOSTER (CABN 250785)
Acting Chief, Health Care Fraud Unit
EMILY GURSKIS (VABN 85973)
Assistant Chief, Fraud Section
ARUN BODAPATI (NYBN 5581137)
Trial Attorney, Fraud Section

      U.S. Department of Justice, Fraud Section
      1400 New York Avenue NW
      Washington, DC 20005
      Telephone: 202-514-2000
      Jacob.Foster@usdoj.gov
      Emily.Gurskis@usdoj.gov
      Arun.Bodapati@usdoj.gov

KRISTINA GREEN (NYBN 5226204)
Assistant United States Attorney

      450 Golden Gate Avenue, Box 36055
      San Francisco, CA 94102-3495
      Telephone: (415) 436-7200
      Kristina.Green@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CASE NO. 24-CR-00329 CRB |
|     Plaintiff, | ) |
|   v. | ) **UNITED STATES' SENTENCING** |
| | ) **MEMORANDUM** |
| DAVID BRODY, | ) |
| | ) Hearing Date: April 15, 2026 |
|     Defendant. | ) Time: 10:00 AM |
| | ) |
| | ) |

Gov. Sentencing Memo. for Def. Brody
24-CR-00329 CRB

**TABLE OF CONTENTS**

I.      INTRODUCTION .................................................................................................1

II.     THE OFFENSE CONDUCT ................................................................................3

        A.    Defendants' Overprescribing Conspiracy ...............................................4

              1.    Defendant Brody's Role as Clinical President.............................4

              2.    Defendants Instituted Clinical Policies That They Knew Would Lead to Unauthorized Prescriptions...............................................7

              3.    Defendants Ignored Concerns About Done's Improper Practices..........................9

              4.    Defendant Brody's Thousands of Illegal Prescriptions .......................10

        B.    Health Care Fraud ................................................................................12

III.    PROCEDURAL HISTORY................................................................................13

IV.     THE SENTENCING GUIDELINES CALCULATION .................................................13

        A.    Defendant Brody's Objections to the PSR..............................................16

              1.    Objection Number 1: Base Offense Level Computation .....................................16

              2.    Objection Number 2: Amphetamine Drug Conversion .........................................17

              3.    Objections Number 3 and 5: The $12.4 Million Restitution and Loss Amount ...............19

              4.    Objection Number 4: Factual Recitation ............................................................21

V.      SENTENCING RECOMMENDATION .................................................................21

        A.    Legal Standard ..................................................................................21

        B.    The Government's Recommended Sentence Satisfies the 18 U.S.C. § 3553(a) Sentencing Factors ........................................................22

              1.    The nature and circumstances of the offense and the need for the punishment to reflect its seriousness, promote respect for the law, and provide just punishment................................22

              2.    The History and Characteristics of the Defendant.................................27

              3.    Need for the sentence to afford adequate deterrence to criminal conduct..........................29

              4.    Need to avoid unwarranted sentencing disparities.................................32

              5. Other Factors Warranting a Significant Sentence........................................33

VI.     RESTITUTION, FORFEITURE, AND FINE..........................................................33

A. The Court Should Order Restitution in the Amount of $12,397,160 ................................33

B. The Court Should Impose a $50,000 Fine .......................................................................33

C. The Court Should Order a Forfeiture Money Judgment in the Amount of $730,892 .........................................................................................................................34

VII.    CONCLUSION ..............................................................................................................34

**Cases**

*Gall v. United States*, 552 U.S. 38 (2007) ............................................................. 22

*Harmelin v. Michigan*, 501 U.S. 957 (1991) .......................................................... 30

*Libretti v. United States*, 516 U.S. 29 (1995) ........................................................ 35

*Sonora Diamond Corp. v. Superior Court of Tuolumne County*, 83 Cal. App. 4th 523 (Cal. Ct. App. 2000) ............................................................................................. 35

*United States v. Adelglass*, 20-CR-605 (S.D.N.Y.) (Rakoff, J.) .............................. 33

*United States v. Baldonado*, 21-CR-430 (D.N.J) (Wigenton, J.) ............................. 33

*United States v. Bergman*, 852 F.3d 1046 (11th Cir. 2017) ................................... 15

*United States v. Brown*, 880 F.3d 399 (7th Cir. 2018) .......................................... 30

*United States v. Canchola*, 19-CR-00473 (N.D. Tex. 2024) (Brown, J.) ................. 33

*United States v. Carty*, 520 F.3d 984 (9th Cir. 2008) ........................................... 22

*United States v. Casey*, 444 F.3d 1071 (9th Cir. 2006) ......................................... 35

*United States v. Davis*, 706 F.3d 1081 (9th Cir. 2013) ......................................... 35

*United States v. Houston*, 217. F.3 1204 (9th Cir. 2008) ....................................... 16

*United States v. Howard*, 28 F.4th 180 (11th Cir. 2022) ....................................... 31

*United States v. Lo*, 839 F.3d 777 (9th Cir. 2016) ................................................ 35

*United States v. Martin*, 455 F.3d 1227 (11th Cir. 2006) ...................................... 30

*United States v. Monsanto*, 491 U.S. 600 (1989) .................................................. 35

*United States v. Murphy*, 20-CR-291 (N.D. Ala.) (Coogler, J.) .............................. 33

*United States v. Newman*, 659 F.3d 1235 (9th Cir. 2011) ...................................... 35

*United States v. Popov*, 742 F.3d 911 (9th Cir. 2014) ..................................... 19, 20

*United States v. Ressam*, 679 F.3d 1069 (9th Cir. 2012) (en banc) ........................ 22

*United States v. Salahmand*, 651 F.3d 21 (D.C. Cir. 2011) ................................... 15

*United States v. Sherman*, 21-CR-20393 (Levy, J.) (E.D. Mich. 2024) ................... 34

*United States v. Suris*, 836 F. App'x 596 (9th Cir. 2021) ...................................... 20

Gov. Sentencing Memo. for Def. Brody
24-CR-0329 CRB

*United States v. Talbot*, 21-CR-00111 (E.D. La.) (Milazzo, J.) ................................................................ 33

*United States v. Thompson*, 130 F.4th 1158 (9th Cir. 2025) ................................................................ 30

*United States v. Young*, 21-CR-00417 (N.D. Tex. 2025) (Starr, J.) ........................................................ 33

**Statutes**

18 U.S.C. § 1349 ................................................................................................................................ 3

18 U.S.C. § 2 ..................................................................................................................................... 3

18 U.S.C. § 3553(a) .............................................................................................................. 21, 22, 32

18 U.S.C. § 3663A ........................................................................................................................... 19

21 U.S.C. § 841(a) and (b)(1)(C) ..................................................................................................... 3

**Rules and Other Authorities**

Fed. R. Crim. P. 32(i)(2) .................................................................................................................. 16

Fed. R. Crim. P. 32(i)(3)(B) ............................................................................................................. 16

U.S.S.G. §§3D1.2(d) and 3D1.3(b) ................................................................................................. 14

U.S.S.G. §2B1.1 cmt. 3(B) .............................................................................................................. 19

U.S.S.G. §2B1.1 cmt. 3(F)(viii) ...................................................................................................... 19

U.S.S.G. §2B1.1(a)(2) ..................................................................................................................... 15

U.S.S.G. §2B1.1(b)(1)(K) ................................................................................................................ 15

U.S.S.G. §2D1.1 .............................................................................................................................. 18

U.S.S.G. §2D1.1(a)(5), (c)(1) .......................................................................................................... 14

U.S.S.G. §2D1.1(b)(7) ................................................................................................................ 14, 15

U.S.S.G. §2D1.1(c) .......................................................................................................................... 18

U.S.S.G. §3A1.1(b)(1) ................................................................................................................. 14, 16

U.S.S.G. §3B1.1(a) ...................................................................................................................... 14, 16

U.S.S.G. §3B1.3 ........................................................................................................................... 14, 16

U.S.S.G. Ch 3 .............................................................................................................................. 14, 16

U.S.S.G. Ch. 2 ............................................................................................................................. 14, 15

Gov. Sentencing Memo. for Def. Brody
24-CR-0329 CRB

U.S.S.G. Ch. 5, Part A, n.2 ................................................................................................... 14

## I.     INTRODUCTION

Defendant David Brody wrote dangerous and illegal prescriptions without exercising any medical judgment, and he gave his codefendant Ruthia He the cover that she needed to perpetuate a massive scheme that distributed millions of addictive controlled substances to people who did not need them, all while defrauding insurers.  In several instances, the Schedule II amphetamines that he and his coconspirators prescribed exacerbated serious underlying conditions in Done's members, contributing to substance use disorder and amplifying side effects including insomnia, paranoia and psychosis. Defendant Brody's motivation for enabling this pervasive criminal activity was his own financial gain, rather than the medical needs of the patients.  For his crimes, a jury convicted Defendant Brody of six serious charges following a two-month trial featuring the testimony of twenty-five government witnesses and nearly 2,000 exhibits.  The Presentence Investigation Report ("PSR") correctly determined that based on the huge volume of controlled drugs prescribed by Brody and the Done conspiracy, the Guidelines sentence is life.  To ensure a just punishment for these offenses and deter this type of egregious conduct by a medical doctor, the Court should sentence Defendant Brody to 120 months imprisonment and order forfeiture in the amount of $730,892, restitution in the amount of $12,397,160, and a fine in the amount of $50,000.

Three mothers testified at trial about watching their children deteriorate in real time while Done continued to fill their prescriptions, some written by Brody directly.  Done's model — which Defendants Brody and He designed to operate without him ever seeing or speaking to a patient — was not medicine.  It was an assembly line for stimulants.  Even after the jury returned its verdict, Defendant Brody threw his headset across the table, stormed out of the courtroom, and told this Court, "I've never hurt a fly."  11/18/25 Hr'g Tr. at 4.  He is now reportedly planning a book about his experience.  This is not a man who has reckoned with the harm he caused.  A significant sentence is necessary to hold him accountable and to send a message to other licensed professionals who would place money above their patients' safety.

Defendant Brody personally wrote prescriptions for 394,324 Schedule II stimulant pills provided to 6,559 Done members whom he had never evaluated or reviewed medical records for.  Trial Ex. 4000 at 39, 41–43; Brody Sentencing Ex. 7.  In many instances, he wrote prescriptions after more

Gov. Sentencing Memo. for Def. Brody          1
24-CR-0329 CRB

conscientious providers either refused to or resigned from Done altogether. Defendant Brody even admitted that "it only [took him] 30 seconds per refill" prescription because he never checked patients' medical records. Trial Ex. 689. Defendant Brody then allowed Done's "care team" of unlicensed overseas contractors to prepare false prior authorizations in his name representing that Done's members had been properly evaluated and diagnosed, inducing pharmacies and insurers to provide and reimburse the costs of unneeded stimulants for Done's member base. Defendant Brody did not take these steps out of concern for legitimate care. As he told Defendant He, his dream job at Done would allow him to make money "WITHOUT EVER HAVING TO SEE OR TALK TO THE PATIENT[s]." Trial Ex. 210. The volume of Defendant Brody's prescriptions alone places him in the highest offense level contemplated by the Sentencing Guidelines.

As a licensed psychiatrist with decades of experience, Defendant Brody knew better than to enable this scheme. But he abdicated his responsibilities and abused the trust placed in him as a physician in exchange for easy money. He assumed the title of Clinical President for a sham entity called Done Health P.C. knowing that Defendant He dictated the clinical policies and practices of Done's medical providers to maximize her growth metrics first and foremost. Defendant Brody admitted at the time that his title as Clinical President served primarily "to satisfy regulatory requirements," while Defendant He would "make the final decision" on all matters at Done, whether clinical or otherwise. Trial Ex. 107 at 2–4. The Defendants' agreement ultimately restricted and undermined the independent clinical judgment of conscientious practitioners, replacing safe and effective care with policies and procedures aimed at increasing Done's profit margins and expanding its subscriber base by providing easy access to drugs for a fee.

Defendant Brody was not purely a passive bystander at Done, either. When Defendant He needed assistance persuading medical practitioners to follow policies that served no legitimate medical purpose, Defendant Brody used his veneer of authority and experience to influence practitioners to follow the Done model rather than their own training and experience. As Defendant Brody put it when asking Defendant He for a raise, she needed him to act as a "physician leader" who could persuade Done's practitioners to "take some risks" that the "vast majority" of clinicians would not. Trial Ex. 504. And Defendant Brody fulfilled that role, circulating emails, policies, and contracts that favored

Gov. Sentencing Memo. for Def. Brody        2
24-CR-0329 CRB

prescribing addictive stimulants to patients who did not have ADHD and then blindly refilling those prescriptions without conducting follow up appointments for months or even years. In addition to his own prescriptions, Defendant Brody caused Done's practitioners to prescribe stimulants for illegitimate purposes, far outside the usual course of professional practice.

The Done conspiracy also defrauded private and public medical insurers, causing fraudulent prior authorizations and illegal claims totaling more than $12 million. Defendant Brody also directly profited from the scheme. The Court should accordingly order forfeiture in the amount of $730,892, restitution of $12,397,160, and a $50,000 fine.

Ultimately, a substantial sentence in this case will further the goals of sentencing and promote respect for the law, which Defendant Brody disdains to this day. The government's requested sentence appropriately reflects the nature and circumstances of Defendant Brody's offense, as well as his history and characteristics. And imposing this sentence will deter medical practitioners from following Defendant Brody's example and risking patient harm as telehealth companies continue to develop and proliferate in the future. On balance, a sentence of 120 months imprisonment is sufficient, and no greater than necessary, to ensure that the ends of justice are achieved.

## II.    THE OFFENSE CONDUCT

After a two-month trial, a jury found Defendant Brody guilty of all six counts that it considered against him: (1) one count of conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 846, (2) four counts of distribution or aiding and abetting the distribution of controlled substances, in violation of 21 U.S.C. § 841(a) and (b)(1)(C) and 18 U.S.C. § 2, and (3) one count of conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349. PSR ¶¶ 1-2.

In reality, Done provided its members with one product—easy access to drug prescriptions, particularly for Schedule II controlled substances including the stimulants amphetamine-dextroamphetamine (commonly called Adderall) and methylphenidate (commonly called Ritalin). PSR ¶¶ 6, 13. Prescriptions for these addictive controlled substances are authorized under federal law only if issued for a legitimate medical purpose in the usual course of professional practice. PSR ¶ 9.

Defendant Brody was hired to act as Clinical President by codefendant Ruthia He, Done's founder and CEO. PSR ¶ 13. After a prior unsuccessful start-up venture, Defendant He founded Done

Gov. Sentencing Memo. for Def. Brody          3
24-CR-0329 CRB

in early 2020 with the ultimate goal of building a billion-dollar technology company.  PSR ¶ 13; Ex. 897 at 114.  But Defendant He was not a medical practitioner, and California's corporate practice of medicine rules prohibited her from engaging in the practice of medicine.  Accordingly, after six months of operating illegally, Defendant He hired Defendant Brody to serve as the face of Done Health P.C. This corporate structure was a sham:  Defendant Brody worked with Defendant He to conceal the effective lack of separation between Done's clinical and nonclinical sides, which they used to shape Done into a highly lucrative stimulant prescribing machine.

Under the Done model, Defendants and their coconspirators pressured and incentivized Done providers to prescribe drugs to as many Done members as possible, regardless of whether there was a legitimate medical purpose for the prescriptions and without sufficient controls to ensure safe, compliant prescribing in the usual course of professional practice.  Defendants' scheme worked.  During the conspiracy period, from March 2020 to January 2023, Done received $91,311,290 in payments from members.  Trial Ex. 4000 at 9.

### A.  Defendants' Overprescribing Conspiracy

#### 1.  Defendant Brody's Role as Clinical President

Defendant Brody played a critical role in ensuring the success of the drug distribution conspiracy.  Because Defendant He could not openly dictate clinical practices and policies under California's corporate practice of medicine laws, she needed a medical practitioner to serve as Clinical President of Done Health P.C.  PSR ¶¶ 17–18.  As a licensed physician in a position of trust, Defendant Brody assumed that mantle and formally joined the company in August of 2020.  PSR ¶¶ 17, 41. And as a physician and a scofflaw who regularly griped about the DEA and the Controlled Substances Act, Defendant Brody knew he was uniquely suited to this role at Done.

Defendant Brody's decision to join Done was motivated by money, rather than patient care. *See, e.g.,* Trial Ex. 494 (Brody writes, "[M]y family's . . . cash flow problems . . . are now fully visible reminding me of a hydra raising its multiple ugly heads.").  He owed $88,919 in taxes for the years 2014, 2017, and 2018 alone, all while deferring $203,030 in mortgage payments between March 2020 to October 2021.  Brody Sentencing Ex. 6; Trial Ex. 4000 at 25; Trial Ex. 1064 (expressing worry to Defendant He that he "still owe[d] taxes on all years from 2014 to [2020]"); Trial Ex. 574 (expressing

Gov. Sentencing Memo. for Def. Brody                4
24-CR-0329 CRB

worry about his tax debt to a tax preparer).  And Defendant Brody could not address these financial needs through his prior employment at other medical clinics.  He admitted that he had lost his employment at Sonoma County when seeking mortgage forbearance the same year that he joined Done, and he represented to the mortgage servicer that he was altogether unemployed until just one month before joining Done.  Trial Ex. 191.  Defendant Brody's employment issues were at least partially a product of his practice of prescribing controlled substances outside the usual course of professional practice in settings including Contra Costa County; eventually, Defendant Brody surrendered his medical license while admitting that the California State Medical Board could prove he had engaged in improper prescribing practices between 2017 and 2022.  Trial Ex. 2545.  While Defendant Brody's improper prescribing practices were a source of concern for legitimate clinics, those practices made him valuable as a clinical leader at Done.  And Done compensated him lucratively for his role in enabling the criminal schemes charged in the indictment, paying him $730,892 in total during his tenure.  Trial Ex. 4000 at 23.

In his position as Clinical President, Defendant Brody directed others and otherwise oversaw and executed aspects of the criminal scheme with Defendant He.  PSR ¶ 41.  Despite occupying a leadership position, Defendant Brody did not operate Done Health P.C. as a medical entity independent from Done Global.  PSR ¶ 17.  Instead, Done Health P.C. effectively functioned as a sham entity that never received any payments from members nor made any payments to Done's medical providers.  PSR ¶ 17; Trial Ex. 4000 at 12, 14; Brody Sentencing Ex. 5.  This was a deliberate decision by Defendant Brody and Defendant He.  Defendant He's communications with her friend Aakash Prasad reflect the intent with which she hired Defendant Brody.  On August 8, 2020, she wrote to Prasad: "Healthcare is such a profitable space. Telehealth service. Easily 60%+ margin . . . So I started this private practice with that doctor from Stan[]ford [Defendant Brody].  Now I can have more control of the providers."  Trial Ex. 897 at 152–53.

Defendant Brody's communications with Defendant He show that he understood his role as Clinical President was to convey a false appearance of legitimacy while allowing Defendant He to be the final decisionmaker on clinical matters.  PSR ¶ 18; *see also, e.g.*, Trial Ex. 107 at 2 (Defendant Brody stating that "my understanding of the role I was hired for was that it was more to satisfy regulatory

Gov. Sentencing Memo. for Def. Brody            5
24-CR-0329 CRB

requirements."); Trial Ex. 107 at 3–4 (HE: "But this role would be only supporting the business direction and I'll of course consider your feedback but it's still going to be my decision about how to run the company . . . as a business there is only one decision maker . . . ."  BRODY: "My conception is this: I will be an advisor on clinical issues.  You use my advice as one of many inputs to make ALL the decisions that will affect the business. . . .  Honestly, it will be a relief to have someone else make the final decision."); Trial Tr. 1329:25-1330:7 (witness Kristin Bowen testifying that Defendant Brody would "typically . . . defer to [Defendant He and] say it's her company."); Trial Ex. 587 at 1–2 (coconspirator Riley Levy observing that "Protect Dr. Brody at all costs is the mission right now. . . . Because he does exactly as she [HE] asks.  Even if it's not clinically appropriate.").

As Clinical President, Defendant Brody also used his apparent authority to influence Done practitioners to write illegal prescriptions that they otherwise might not.  As Defendant Brody put it when asking Defendant He and coconspirator Riley Levy for a raise, Done required a "physician leader" who was "willing to take some risks" that the "vast majority" of other clinicians would not, and that "almost all physician-leaders a company could hire today" would not "walk the walk" or "talk the talk" that Done required to perpetuate its illegal scheme.  PSR ¶ 34; Trial Exs. 494, 504.

Defendant Brody exercised this role despite fully admitting to Defendant He that he was "not an expert on ADHD."  PSR ¶ 18; Ex. 94 at 5.  He encouraged Done's practitioners to disregard the widely accepted DSM-V criteria for diagnosing ADHD and instead prescribe addictive stimulants for those who did not satisfy those criteria.  PSR ¶ 18.  Indeed, Defendant Brody described these addictive substances to Done employees as candy that Done providers handed out like Santa Claus.  PSR ¶ 34; 9/30/25 Trial Tr. at 529:11–19 (testimony of Rick Menesini); 10/14/25 Trial Tr. at 1835:13–16 (testimony of Nikita Mercado).

And he acknowledged that Done's practices were "on the edge" of the law, remarking that people who were "really into the law" were not his cup of tea.  PSR ¶ 34; Trial Ex. 139 at 2.  Defendant Brody did not keep his views on legality to himself, either.  When one prescriber expressed concerns about the legality of Done's prescribing practices, Defendant Brody told her that she should prescribe stimulants to patients "no matter what and not worry about going to jail."  PSR ¶ 34; Trial Ex. 546 at 2. Defendant He even remarked to others that Defendant Brody said he would prescribe Adderall to others

Gov. Sentencing Memo. for Def. Brody          6
24-CR-0329 CRB

even if the government executed him for doing so.  PSR ¶ 34; Trial Ex. 897 at 22.

Instead of acting as a legitimate Clinical President, Defendant Brody worked closely with Defendant He to enable her ongoing control of clinical practices governing Done's patient intake, patient transfers, appointment lengths, appointment frequencies, and compensation for Done practitioners.  PSR ¶¶ 14, 16.  As described further below, Defendants and their coconspirators at Done consistently prioritized growth and profit over patient care, despite a range of warnings and efforts to correct Done's practices.  PSR ¶¶ 14, 16.  In light of their shared profit motive, Defendants knowingly and intentionally established and maintained a prescribing model that led to — and effectively depended on — the issuance of illegal prescriptions for Schedule II controlled substances.  PSR ¶¶ 15, 16.

### 2. Defendants Instituted Clinical Policies That They Knew Would Lead to Unauthorized Prescriptions

Together with Defendant He, Defendant Brody endorsed and implemented clinical policies that virtually ensured Done members received stimulant prescriptions and remained on Done's platform, even where those prescriptions were illegitimate and posed serious health risks for members.  PSR ¶ 23.

These policies took multiple forms.  One of Defendants' policies restricted initial patient evaluations, which typically run from 60 to 90 minutes, to a mere 25 minutes.  PSR ¶ 25.  While numerous providers raised concerns about these restricted appointment times to both Defendants, they nonetheless maintained Done's 25-minute appointment time for initial visits, even though Defendant Brody himself knew that time period was too short.  PSR ¶ 25; Sentencing Ex. 1 at 3 (Brody wrote, "[O]fficially are the assessment[s] scheduled for only 25 minutes?  If that's true it might be a little skimpy on time, it would not be my ideal but in many cases perhaps it is enough . . . I would not enjoy operating that way, too much time pressure").  In tandem with coconspirators, Done's leadership effectively prevented Done practitioners from evaluating patients for longer by filling their schedules with as many initial appointments as possible to bring in new members.  PSR ¶ 25; *see also* 11/6/25 Trial Tr. at 4781:24–4782:7 (former Done employee Trevor Granger explaining that he did not believe providers would extend beyond the 25-minute appointment time because they were "pressured and directed not to.  And in many cases . . . their schedule wouldn't allow it.").  As expert witness Dr. David Goodman testified at trial, it was "impossible to do a comprehensive psychiatric evaluation" in this time.

Gov. Sentencing Memo. for Def. Brody          7
24-CR-0329 CRB

PSR ¶ 25; 11/3/25 Trial Tr. at 3910:7–14.  Unauthorized prescriptions for Adderall were the inevitable and intended result of Defendant Brody's improper restrictions on independent clinical practice.

Defendant Brody also supported Defendant He's efforts to prioritize profits over patients by circulating policies that discouraged follow-up appointments, which Defendant He saw as a significant threat to her profit margins.  PSR ¶ 27.  Defendant Brody deferred to Defendant He even on how to answer questions from providers about clinical policy.  *E.g.,* Trial Ex. 121 (Brody forwarding new provider's questions to Defendant He and Mercado, writing, "I am hoping either one or both of you can help me answer.").  In October 2020, Defendant Brody helped implement and circulate new provider contracts that removed any compensation for follow-up appointments whatsoever and instead compensated providers based on the number of Done members on their patient panel — regardless of whether the providers saw those members for follow-up appointments as required in the usual course of professional practice.  PSR ¶ 27; Trial Ex. 1308.  As with the 25-minute initial appointments, this passive "panel pay" policy remained in effect throughout the conspiracy despite providers' expressed concerns.  PSR ¶ 27.  This policy ultimately resulted in illegal prescriptions as well, as providers regularly continued prescribing controlled substances for Done members without actually conducting follow-up appointments to confirm that the prescriptions continued to be necessary, safe, and for a legitimate medical purpose.  PSR ¶¶ 27–30; Trial Exs. 454 at 8, 495 at 23–24.

As noted above, Defendant Brody also knowingly encouraged Done's practitioners to disregard the usual course of professional practice by prescribing stimulants for patients who did not meet the DSM-V criteria for ADHD.  PSR ¶ 26.  Specifically, Defendant Brody disseminated guidance telling providers that it "still might be worth doing a medication trial" even if Done's members didn't "fully meet the criteria" for ADHD, with that guidance memorialized in providers' employment contracts. PSR ¶ 26; Trial Exs. 1308, 3049.  Defendant Brody circulated these contracts to Done providers as early as October 2020, even though he acknowledged that the DSM-V contained the standard criteria for diagnosis.  PSR ¶ 26; Trial Ex. 464 (Defendant Brody acknowledging that DSM-V criteria are considered within the usual course); Trial Ex. 946 (circulating "medication trial" language).  As with the other policies noted above, this policy resulted in the prescription of addictive stimulants for people who concededly did not have ADHD, or any other recognized medical need for the substances.  Defendant

Brody acknowledged this to Defendant He, even as they falsely denied that Done was engaged in illegitimate practices in public responses to the Wall Street Journal. *See* Trial Exs. 561 at 3, 554 at 6 (Done email to Wall Street Journal denying the existence of materials encouraging Adderall trials for patients not meeting the DSM-V criteria for ADHD).

Collectively, the policies and practices that both Defendants implemented from above resulted in a business model that provided unauthorized prescriptions for members' subscriptions. 11/3/25 Trial Tr. at 3923:18–3924:4, 3987:12–18. Defendant Brody knew and intended that result, remarking to Defendant He that, under the Done model, they would "wind up prescribing stimulants to at least a few people who do not have ADHD. And perhaps to more than a few." Trial Ex. 561 at 3 (Defendant Brody writing to Defendant He in March 2022). Dr. Goodman reviewed medical records for sixteen Done members, including four members who were the subject of charged counts. These members had initial evaluations with fifteen different Done providers and, in total, 36 different Done prescribers prescribed medication to these 16 members over the course of their treatment at Done. 11/3/25 Trial Tr. at 3903:2–6. Dr. Goodman found that not a single one of these members met the diagnostic criteria for ADHD, yet all of them received monthly stimulant prescriptions from Done. *Id.* at 3899:19–6. He also found that none of the prescriptions to these members were written for a legitimate medical purpose within the usual course of professional practice. *Id.* at 3900:7–12. Dr. Goodman testified that, in forty years of clinical practice, he had never seen clinical practices as egregious as what he observed at Done. *Id.* at 3900:24-3901:2.

### 3. Defendants Ignored Concerns About Done's Improper Practices

As alluded to above, Defendant Brody and his coconspirators intentionally implemented and preserved these policies despite repeated warnings that they resulted in the unauthorized distribution of controlled substances. As former Done employee Kristin Bowen testified, Defendant Brody's response to such concerns was to minimize, deflect, and say "[s]timulants have never really killed anybody . . . . [It's] just like a strong cup of coffee," and that he has been sued lots of times and it's "not a big deal." 10/7/25 Trial Tr. at 1329:4–14. Far from changing Done's policies to address well-founded concerns by providers and employees, Defendant Brody actually stopped Done employees from implementing meaningful procedural changes at Done. 10/28/25 Trial Tr. at 3030:6–9 (testimony of Riley Levy).

Gov. Sentencing Memo. for Def. Brody          9
24-CR-0329 CRB

Perhaps the starkest example of Defendant Brody's disregard for these warnings is his reaction to the risk mitigation reports prepared by Done's Chief Medical Officer Jayaram Brindala between November 2020 and May of 2021. Dr. Brindala flagged a series of serious clinical and legal risks relating to Done policies including the ones identified above, summarizing provider concerns and the potential for illegitimate prescribing if those policies remained unchanged. PSR ¶ 32; Trial Exs. 219, 254, 364. Upon receiving the first risk mitigation report, Defendant Brody stated that it could be "evidence to be used against us" if discovered, focusing on the potential for leaks rather than the need to address the legitimate concerns raised therein. PSR ¶ 33; Trial Ex. 230.

Defendant Brody and his coconspirators did not seriously address the many issues raised in the risk mitigation reports, prompting Dr. Brindala to recirculate updated versions roughly every month until his resignation as Chief Medication Officer after May 2021. Dr. Brindala also bluntly expressed his concerns by other means, explaining to the Defendants in one May 2021 Slack messaging thread that "If we simply try to find a way for every patient to get the stimulant they want, we will truly be a pill mill. . . . We already have multiple elements of illegitimacy. We cannot hide behind excuses to prescribe more stimulants inappropriately." Trial Exs. 354, 355. Dr. Brindala then outlined seven Done practices that led to inappropriate stimulant prescribing, including offering second opinions when the first Done provider did not prescribe a stimulant, prescribing stimulants across state lines without seeing patients and reviewing charts, refusing to put DSM-5 criteria in note templates, and disproportionately weighting negative provider reviews from patients who did not receive a stimulant. *Id.*

But by the time Dr. Brindala circulated his last risk mitigation report in May 2021, Defendant Brody simply texted Defendant He saying "Perhaps if we do not agree with it, we simply ignore it." PSR ¶ 33; Trial Ex. 362. Neither Defendant was willing to change Done's clinical policies in order to mitigate the concerns raised by the providers and Dr. Brindala. Defendants similarly refused to change course in 2022 when numerous media reports were published and televised raising concerns about Done's prescribing practices, including pressure to prescribe, lack of follow-up appointments, and initial visits that were too short. Sentencing Ex. 2; Trial Exs. 766, 2861.

### 4. Defendant Brody's Thousands of Illegal Prescriptions

Defendant Brody's role in the drug distribution conspiracy was not limited to setting or

endorsing the foregoing policies, either.  He personally wrote thousands of stimulant prescriptions for Done members he never met or evaluated, including when other Done practitioners either refused to authorize those prescriptions or resigned from Done entirely.  PSR ¶¶ 19, 31; 9/30/25 Trial Tr. at 478:9–25 (Richard Menesini testifying that Defendant He rerouted prescriptions to Defendant Brody when the initial prescriber didn't think a stimulant prescription was clinically appropriate).  Indeed, Defendant Brody signed all of these prescriptions without even reviewing the Done members' medical records to check whether the prescriptions might not be appropriate.  PSR ¶ 19; 9/30/25 Trial Tr. at 527:10–12 (Menesini testifying that Defendant Brody would "sign[ ] prescriptions without going into and reading the charts and information"); 10/7/25 Trial Tr. at 1345:18–1346:3 (Kristin Bowen testifying that Defendant Brody did not even create a log-in for the medical records for patients he wrote prescriptions for, and never met a single patient, during her tenure at Done).  Dr. Goodman testified that such blind refills are not in the usual course of professional practice.  PSR ¶ 19; 11/3/25 Trial Tr. at 3950:8–19.

During the conspiracy, Defendant Brody prescribed 394,324 Schedule II stimulant pills to 6,559 Done members whom he had never met, throughout all fifty states in the country.  PSR ¶ 19; Trial Ex. 4000 at 39, 41–43.  In many of these instances, Defendant Brody wrote these prescriptions even though prior Done practitioners had valid reasons not to do so, such as suspected bipolar disorder or a history of substance abuse.  PSR ¶ 20.  In writing these prescriptions regardless, and without personally evaluating the patient or checking records, Defendant Brody not only undermined the independent clinical judgment of the providers but also endangered the Done members.  PSR ¶ 20.  In other instances, Defendant Brody prescribed a total of 87,885 pills for 1,555 Done members who had not been seen by any Done provider for an appointment in over 180 days.  Ex. 4000 at 57.  Dr. Brindala had specifically warned Defendant Brody in the Risk Mitigation Reports that he would face legal consequences for such prescriptions that occurred without more frequent synchronous visits.

Again, Defendants He and Brody knowingly agreed to issue these thousands of prescriptions outside the usual course of professional practice.  On his 10 swiftest prescribing days, Brody signed an average of 30 prescriptions daily with an average time of approximately 33 seconds per prescription.  PSR ¶ 19; Trial Ex. 4000 at 72; 11/7/25 Trial Tr. at 4991:19–4992:11 (Testimony of Forensic Accountant Michael Petron).  Defendant Brody fully acknowledged that he signed prescriptions at this

illegitimate rate, explaining that "it only takes me 30 seconds per refill since as you know I do not check the EHR [electronic health record]." Trial Ex. 689. Defendant Brody similarly made no secret of his desire not to engage in clinically appropriate assessment of his patients' health and medical needs. *See, e.g.*, Trial Ex. 126 at 2 (Defendant Brody telling Defendant He that "when I joined [Done], one of the big attractions was not doing any clinical work"); Trial Ex. 210 (Defendant Brody telling Defendant He "my dreams are as follows, in order of preference: . . . 3. "Dealing with clinical psychiatric issues WITHOUT EVER HAVING TO SEE OR TALK TO THE PATIENT"). Defendant He knowingly encouraged Defendant Brody's worst instincts, stating that "you don't even need to see patient at all just click buttons on e-prescribing too[l]." Trial Ex. 127 at 3. Her reason was clear: as Defendant He explained to witness Rick Menesini in December 2020, "If [Defendant Brody] leaves the company will just not be able to operate. . . . He dislikes seeing patients. And it will destroy the organization. . . . we cannot afford losing him." Trial Ex. 910 at 1–3. Defendant Brody was foundational to the success of the drug distribution conspiracy.

Given Defendant Brody's consistent, pervasive practice of prescribing controlled substances for patients who he never evaluated, and whose medical charts he never reviewed, all of the controlled substances that he prescribed were not for a legitimate medical purpose in the usual course of professional practice. PSR ¶ 40. Even this quantity alone — 5,532,567 milligrams of amphetamine (Adderall) and 356,771 milligrams of methylphenidate (Ritalin) — results in the maximum base offense level under the Sentencing Guidelines. PSR ¶ 40.

### B. Health Care Fraud

Defendant Brody also knowingly joined a conspiracy to defraud health care insurers, which he and his coconspirators effected by a variety of means including (1) causing the issuance of controlled substance prescriptions that were unnecessary knowing and intending that they would be paid for by insurance and filled at pharmacies; (2) submitting fraudulent prior authorizations that induced insurers to cover prescriptions that they otherwise may have denied, such as submitting prior authorizations that falsely claimed Done prescribers had followed DSM-5 diagnostic criteria; and (3) defrauding pharmacies to induce them to keep filling Done's prescriptions by lying to the pharmacies about Done's prescribing policies. PSR ¶ 36. As a result of these fraudulent and false measures, Medicare, Medicaid,

Gov. Sentencing Memo. for Def. Brody          12
24-CR-0329 CRB

and other insurers paid a total of $12,397,160 for Schedule II stimulant prescriptions provided to Done members ($84,525 from Medicare, $510,053 from Medicaid, and $11,802,583 from other insurers). *Id.*

Defendant Brody furthered this conspiracy by knowingly allowing non-medical practitioners, such as the "Care Team" of contractors in the Philippines, to submit false cut-and-paste prior authorizations in his name to pharmacies and insurers in order to obtain reimbursement for the drugs provided to Done members. PSR ¶ 37; Trial Exs. 690, 754, 934. As one insurance program witness, Sussan Maddux, testified, insurance companies like UnitedHealthGroup (UHG) and its subsidiary OptumRx operate on a trust-based system, trusting that claims are submitted for authorized, medically necessary prescriptions pursuant to an established provider-patient relationship and reimbursing accordingly. PSR ¶ 37. And as Walmart employee Chad Corbin explained, when a prescriber like Defendant Brody writes a prescription that is not medically necessary or conceals information about prescribing practices, that leads pharmacies like Walmart to unwittingly submit false claims to the insurers. 10/20/25 Trial Tr. at 2827:1–9.

Defendant Brody betrayed this trust by knowingly endorsing the use of his name to submit false prior authorizations for drugs provided to Done members who he had never evaluated. PSR ¶ 37; *see also, e.g.*, Trial Exs. 1232, 1233, 1262, 1264, 1265, 1268, 1269, 1273, 1276 (examples of Defendant Brody's prior authorizations). As the head of the Care Team, Nikita Mercado, testified, these prior authorizations and related documentation contained a range of falsehoods, such as the representation that Done members had received various screening tests or been diagnosed pursuant to the DSM-V. PSR ¶ 38; Trial Exs. 1258, 1264, 1265, 1268, 1269, 1270, 1273. But as noted above, Defendant Brody directly encouraged providers to disregard the DSM-V through policies and practices including the revised provider contracts that he circulated in October 2020.

## III.    PROCEDURAL HISTORY

Beginning on September 28, 2025, Defendant's trial spanned seven weeks, during which nearly 2000 exhibits were admitted and 32 witnesses testified, 26 in the government's case-in-chief. On November 18, 2025, the jury found Defendant He and Defendant Brody guilty on all counts.

## IV.    THE SENTENCING GUIDELINES CALCULATION

The government agrees with the United States Probation Department's determination that

Defendant Brody's crimes result in an Offense Level of 43.  PSR ¶¶ 47–56.  The Probation Department calculated Defendant Brody's Offense Level as follows, relying on the offense level for Count One because it yielded the highest offense level pursuant to U.S.S.G. §§ 3D1.2(d) and 3D1.3(b) (PSR ¶ 46):

    a.      Base Offense Level, U.S.S.G. §2D1.1(a)(5), (c)(1):        38

    b.      Specific offense characteristics under U.S.S.G. Ch. 2:

          Mass marketing by means of an interactive computer service; §2D1.1(b)(7)    +2

    c.      Role Adjustments under U.S.S.G. Ch 3:

          Leadership Role, U.S.S.G. §3B1.1(a):    +4

          Abuse of Trust, U.S.S.G. § 3B1.3:    +2

    d.      Adjusted Offense Level (Subtotal):    46

    e.      Total Offense Level, U.S.S.G. Ch. 5, Part A, n.2:    43

Defendant Brody falls within Criminal History Category I, PSR ¶¶ 60–61, and the Sentencing Guidelines provide for a term of life imprisonment.  This effectively amounts to a sentence of 1,320 months imprisonment in light of the statutory maximum sentences for Counts One through Six.  PSR ¶¶ 84–85.

While the Government agrees that Defendant Brody's total offense level is 43 in light of Chapter 5's offense level cap, the government believes that Defendant Brody's adjusted offense level should be 48 rather than 46.  Specifically, Brody's offense level should include an additional two-level enhancement under U.S.S.G. § 3A1.1(b)(1) for the same reasons addressed in greater detail in Defendant He's sentencing memorandum because Brody "knew or should have known that a victim of the offense was a vulnerable victim."  As the evidence at trial established, Defendants knew or should have known that they were illegally distributing controlled substances to vulnerable victims like H.B. and N.C. via Done.  These victims suffered from mental health disorders including bipolar disorder and substance abuse disorder, and providing them with stimulants presented serious risks of exacerbating the negative effects of those conditions.  *See, e.g.* 11/3/25 Trial Tr. at 3954:14–19 (Dr. Goodman testifying that stimulants can lead patients with bipolar disorder to "become agitated, suspicious, paranoid, frankly

Gov. Sentencing Memo. for Def. Brody        14
24-CR-0329 CRB

psychotic, and potentially dangerous to themselves and other people"); *id.* at 3920 (noting that particular care and caution are required before prescribing addictive stimulants to a drug addict). And Courts regularly apply this enhancement to victims suffering from such disorders. *See, e.g., United States v. Salahmand*, 651 F.3d 21 (D.C. Cir. 2011) (defendant pled guilty to identity theft for "treating" patients while falsely representing that he was a licensed physician; enhancement applied based on five minor patients with mental health conditions); *United States v. Bergman*, 852 F.3d 1046, 1072 (11th Cir. 2017) (affirming vulnerable victim enhancement for patient recruiter for purported mental health facility that did not provide psychiatric care because certain patients "actually needed help and did not receive it," including substance abusers and those with memory problems).

Similarly, while the government agrees with Probation that Defendant Brody's Guidelines range must be based on the offense level for Count One, since that yields the highest offense level, the government notes for the Court's consideration that Defendant Brody's offense level for the healthcare fraud conspiracy charged in Count Six would be 36. That offense level follows from the Guidelines calculations set forth below, based on the $12.4 million in losses paid by insurers to Done:

    a.    Base Offense Level, U.S.S.G. §2B1.1(a)(2):    6

    b.    Specific offense characteristics under U.S.S.G. Ch. 2:

        Mass marketing by means of an interactive computer service; §2D1.1(b)(7)    +2

        Loss between $9.5 Million and $25 million; §2B1.1(b)(1)(K)    +20

    c.    Adjustments under U.S.S.G. Ch 3:

        Vulnerable Victims; §3A1.1(b)(1)    +2

        Leadership Role, U.S.S.G. §3B1.1(a):    +4

        Abuse of Trust, U.S.S.G. § 3B1.3:    +2

    d.    Adjusted Offense Level (Subtotal):    36

    e.    Total Offense Level:    36

### A.   Defendant Brody's Objections to the PSR

The defendant lodged five objections to the Presentence Report.  *See* PSR pp. 30–33.  The government addresses each below.  The Court, in order to resolve disputes with a presentence report, "must . . . rule on that dispute, or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing."  Fed. R. Crim. P. 32(i)(3)(B).  The sentencing Court's ruling must be explicit.  *United States v. Houston*, 217. F.3 1204, 1208 (9th Cir. 2008).   The Court may order an evidentiary hearing and permit the parties to introduce evidence on the objections.  Fed. R. Crim. P. 32(i)(2).

### 1.   Objection Number 1: Base Offense Level Computation

In his first objection, Defendant Brody argues that his base offense level should be 12 rather than 38, based on an allegation that all of his prescriptions except for the ones at issue in Counts Two through Five were permissible "urgent" or "bridge" refills meant to prevent gaps in care for Done members whose providers were unavailable or resigned.  PSR p. 30.  Probation correctly rejected this objection.

In addition to his leadership position, Defendant Brody engaged in the unauthorized distribution of prescription medication by signing off on thousands of stimulant prescriptions for patients he not only had never met, but for which he had never reviewed records.  Dr. Goodman explained that Defendant Brody's refills were illegitimate "blind refills," rather than permissible "bridge refills" that are written by a covering prescriber who knows the treating clinician, understands the nature of that clinician's practice and patient population, has a basis for clinical confidence in the original prescription, and writes a short term prescription to tide the patient over until the next appointment.  11/3/25 Trial Tr. at 3949:10–14.  "A blind refill is written by a prescriber who has no clinical information on the patient. They don't know the . . . primary provider, they don't know the nature of their credential, they don't know the nature of their credential, they don't know the nature of their practice, they don't know anything about the patient. And so simply they are writing a prescription at the request of someone to write a prescription for someone they have no clinical information on."  *Id.* at 3949:20–3950:2.  Blind refills are not written in the usual course of professional practice and have serious safety concerns for patients.  *Id.* at 3950:8–19.  Stimulants can pose particularly severe issues for patients with underlying physical conditions, such as cardiac conditions, and mental health disorders, such as bipolar disorder,

Gov. Sentencing Memo. for Def. Brody          16
24-CR-0329 CRB

anxiety or substance abuse disorder, making blind refills for such drugs particularly risky. *See id.* 3954:12–19.

It is undisputed that Defendant Brody never met with a single Done patient and did not review a single patient file—but nonetheless prescribed 394,324 Schedule II stimulant pills to 6,559 Done members located throughout the United States. Trial Ex. 4000 at 39, 41. And as government witnesses like Nikita Mercado testified, the ADHD medications that Defendant Brody prescribed were not in fact "urgent," and that that notation was simply a false statement in prior authorizations intended to induce the filling and reimbursement of illegitimate prescriptions. PSR ¶ 38.

Defendant Brody cannot seriously contend that the massive volume of pills that he prescribed to these 6,559 Done members were simply intended to fill "gaps in care." The evidence at trial showed that Done members went many months or even years without seeing a clinician, even while they got stimulant prescriptions every month from clinicians like Defendant Brody. Former Done employee Kristin Bowen — who worked closely with Defendant Brody and conducted an internal analysis of his prescriptions — testified unequivocally that his refills "were not bridge refills," as the care team simply provided Dr. Brody with a "giant spreadsheet" of patient names, dates of birth, and pharmacy locations, with no clinical notes, no reason column, and no chart information. 10/7/25 Trial Tr. at 1346–47. He would then "just go through and . . . send, send, send, send, send." *Id.* at 1347. Bowen further testified that many of these prescriptions had been rejected by the Done provider initially assigned to the member for valid reasons, such as the provider suspecting the patient had bipolar disorder, or a history of substance abuse. *Id.* at 1347:12–1350:13. Data analyst and forensic accountant Michael Petron testified that on Defendant Brody's ten fastest prescribing sessions, he averaged 32 to 37 seconds per prescription — on one day signing 75 Schedule II stimulant prescriptions in 40 minutes. Trial Ex. 4000 at 72. Given Defendant Brody's own admission that he wrote prescriptions 30 seconds at a time without ever checking the medical records, the evidence plainly establishes that his prescriptions were categorically unauthorized and in furtherance of a criminal drug distribution scheme.

### 2. Objection Number 2: Amphetamine Drug Conversion

Defendant Brody next joins in Defendant He's objection to Probation's calculation of the drug weight used to determine his base offense level, arguing that Adderall and other stimulants are not

Gov. Sentencing Memo. for Def. Brody          17
24-CR-0329 CRB

"pure" amphetamines but instead "mixtures" containing amphetamines.  PSR p. 31.  But as Probation correctly observes, the "mixed amphetamine salts" in drugs like Adderall are all simply different salts, isomers, salts of isomers, and analogues of amphetamine, and the dosages that Probation relied upon to calculate the drug weight accurately reflect the dosages of actual amphetamine as a result.

The drug quantity table in § 2D1.1(c) assigns a defendant's base offense level based on (1) drug type and (2) drug quantity.  Once the quantity of pills involved is established, the court must use the offense level determined by the entire weight of the mixture or substance containing the controlled substance or the offense level determined by the weight of "PCP (actual), amphetamine (actual), or methamphetamine (actual), whichever is greater." U.S.S.G. § 2D1.1(c).  Probation correctly determined Defendant Brody's base offense level by calculating the weight of actual amphetamine based on the amount of amphetamine in each prescribed tablet.  As application note 6 to § 2D1.1 states, "Except as otherwise provided, any reference to a particular controlled substance in these guidelines includes all salts, isomers, all salts of isomers, and any analogue of that controlled substance." U.S.S.G. § 2D1.1 cmt. n. 6.  Reading these provisions together, note B states that only the weight of the controlled substance counts toward the converted drug weight of "amphetamine (actual)," and application note 6 states what counts as a controlled substance: not only the "particular controlled substance," but also all salts, isomers, salts of isomers, and analogues of that controlled substance.

Here, the amount of actual amphetamine contained in Adderall pills is known because, for example, a 10 mg Adderall pill contains 10 mg of mixed amphetamine salts and a 20 mg Adderall pill contains 20 mg of mixed amphetamine salts. So it is appropriate to consider as the "actual" methamphetamine weight the dosage (e.g., 10 mg, 20 mg, etc.) associated with the pills.  The total mass of the pill (including fillers, binders, and dyes) is greater than the dosage, typically weighing several hundred milligrams, but the active ingredient weight is determined by the dosage (e.g., 5, 10, 20, or 30 mg).  *See, e.g.,* Adderall (CII), FDA, https://www.accessdata.fda.gov/drugsatfda_docs/label/2007/011522s040lbl.pdf (revised March 2007) (listing inactive ingredients in Adderall).  Accordingly, a calculation based on the weight of each pill could result in an even greater drug quantity, showing Probation's conservative approach.

Gov. Sentencing Memo. for Def. Brody                    18
24-CR-0329 CRB

### 3. Objections Number 3 and 5: The $12.4 Million Restitution and Loss Amount

In his third and fifth objections, Defendant Brody disputes that the $12.4 million in payments by insurers for Done prescriptions accurately captures the loss or restitution amount associated with the healthcare fraud conspiracy charged in Count Six. *See* PSR pp. 31–32. Broadly speaking, he argues that $12.4 million is not a reasonable estimate of the loss because the government did not prove that every reimbursed claim was fraudulent, and that no restitution is appropriate because the jury did not find the loss amount beyond a reasonable doubt. *See id.*

As Probation correctly noted, restitution is not only appropriate but required under the mandatory provisions of 18 U.S.C. § 3663A. PSR p. 33. And $12.4 million is the appropriate restitution figure under the weight of precedent. Importantly, the Guidelines provide that courts "need only make a reasonable estimate of the loss," U.S.S.G. § 2B1.1 cmt. 3(B), and "[i]n health care fraud cases, the amount billed to an insurer shall constitute prima facie evidence of intended loss." *United States v. Popov*, 742 F.3d 911, 916 (9th Cir. 2014); *see also* U.S.S.G. § 2B1.1 cmt. 3(F)(viii) ("the aggregate dollar amount of fraudulent bills submitted to the Government health care program shall constitute prima facie evidence of the amount of the intended loss."); *United States v. Suris*, 836 F. App'x 596, 597 (9th Cir. 2021). If such evidence is not rebutted, it "shall constitute sufficient evidence to establish the intended loss by a preponderance of the evidence." *Popov*, 742 F.3d at 916.

Defendants were convicted of healthcare fraud conspiracy related to their agreement to defraud insurers to induce them to pay for unauthorized Done prescriptions. The actual $12.4 million loss to insurers was calculated with precision based on the evidence introduced at trial and is the appropriate metric for loss based on this crime. *See* Trial Exs. 1601 (Optum/UHG); 1604 (CVS Caremark); 1605 (Humana); 1607 (Medicare); 1609 (Express Scripts). *See also* Trial Exs. 1731 (Done Medical Records); 4000 (summarizing data). Evidence regarding the healthcare fraud scheme more broadly reinforces that this figure reasonably estimates the loss arising from the scheme. The figure is broken down in the table below and is limited to the duration of the healthcare fraud conspiracy as charged in the indictment.

| Total Paid Amount by Medicare | Total Paid Amount by Medicaid | Total Paid Amount by Other Insurer | Total |
|---|---|---|---|
| $84,525 | $510,053 | $11,802,583 | **$12,397,160** |

Defendants conspired to defraud health care insurers through multiple means:

***Medically Unnecessary Prescriptions.*** Defendants conspired to cause the issuance of prescriptions for medically unnecessary controlled substances that knowing and intending that they would be paid for by insurance and filled at pharmacies.  As the testimony at trial reflected, insurers only knowingly pay for medically necessary prescriptions.  Similarly, pharmacies only knowingly fill and bill insurers for medically necessary prescriptions.  Trial testimony included Susan Maddux of UHG, Chad Corbin of Walmart, and Nicole Harrington of CVS.  Ms. Maddux explained that UHG, which also serves as a pharmacy benefits manager for Medicare and Medicaid programs, would not have reimbursed for Done prescriptions had it known that they were being issued to patients who did not have a valid patient-provider relationship, and where the DSM criteria had not been used to validly diagnose the patient.  *E.g.,* 10/17/25 Trial Tr. at 2715:1–2716:23.  Similarly, Mr. Corbin testified that pharmacists "rely on the medical judgment of the professionals diagnosing patients and trust they're writing prescriptions based on medical judgment and accurate diagnosis."  10/20/25 Trial Tr. at 2825–26.  Providers writing medically unnecessary prescriptions that Walmart submits to insurance for reimbursement cause Walmart to submit false claims.  *Id.* at 2827.  Ms. Maddux, Mr. Corbin, and Ms. Harrington all testified that had their respective companies and programs had an accurate understanding of Done's policies and procedures, they would not have issued/covered *any* Done prescriptions.  After Dr. Goodman reviewed patient files, he concluded that the patients' prescriptions were not accompanied by legitimate diagnoses and legitimate ongoing evaluations, as is expected by the insurers and the pharmacies.  The jury was shown cookie-cutter, non-sensical patient files.  Dr. Goodman described the files as containing no clinically relevant information and said Done had "the worst set of medical records [he has] seen in 40 years of clinical practice."  11/3/25 Trial Tr. 3905:21–22.

***False Prior Authorizations.***  Defendants agreed to and did submit fraudulent prior authorizations that induced insurers to cover prescriptions, such as submitting prior authorizations that falsely claimed Done prescribers had followed DSM-5 diagnostic criteria or performed urine drug screens.  Done submitted as many as 9,000 false prior authorizations, Trial Ex. 894, with Defendant Mercado testifying that Defendant He ordered her to falsify the prior authorizations in order to hit an arbitrary and unrealistic target rate of 95% approvals.  PSR ¶ 38.  Prior authorizations were submitted under

Gov. Sentencing Memo. for Def. Brody            20
24-CR-0329 CRB

Defendant Brody's name, along with other providers. *See, e.g.* Trial Exs. 1276, 3058.

***Lies to Pharmacies.*** Defendants lied and caused lies to pharmacies, including Walmart, ScripX, and CVS about Done's clinical policies to induce them to keep filling Done's prescriptions, which were in turn paid for by insurance. *See, e.g.*, Trial Exs. 539, 1014, 283. Mercado and Levy testified that they lied to pharmacies about Done's clinical policies at Defendant He's direction. Trial Tr. 1914:3–12; 3011:12–20.

The $12.4 million figure is therefore more than a reasonable estimation of the loss and restitution owed in this case, and Defendant Brody has provided nothing of substance to rebut the concrete evidence in favor of that presumption.

### 4. Objection Number 4: Factual Recitation

Finally, Defendant Brody joins in Defendant He's claim that the PSR "almost exclusively recites the government's litigation position, without consideration of additional material and contradictory evidence elucidated by the defense." PSR p. 32. But as Probation correctly observes, all of the specific language at issue was supported by the evidence introduced at trial. *Id.* at 32–33. The PSR relies on the evidence presented at trial that led the jury to convict Defendants on each count it considered. The Defendants point to no specific facts in the PSR not supported by the trial evidence, and do not provide any additional facts that they claim were supported by evidence that must be included. None of Defendants' complaints regarding the factual recitation in the PSR warrant any relief.

### V.    SENTENCING RECOMMENDATION

The Court should sentence Defendant Brody to 120 months' imprisonment, order forfeiture in the amount of $730,892, order restitution in the amount of $12,397,160 and impose a fine of $50,000.

### A.    Legal Standard

The overarching goal of a sentencing court is to impose a sentence that is sufficient to "reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed education or vocational training, medical care, or other correctional treatment." *United States v. Ressam*, 679 F.3d 1069, 1088–89 (9th Cir. 2012) (en banc); *see United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008); 18 U.S.C. § 3553(a). The Court should begin the sentencing process by correctly calculating the

applicable Guidelines range and must "remain cognizant of them throughout the sentencing process." *Gall v. United States*, 552 U.S. 38, 50 n.6 (2007). The Court should then consider the factors outlined in Section 3553(a) to determine the appropriate sentence. *Ressam*, 679 F.3d at 1089. If the Court determines that a sentence outside of the Guidelines range is warranted, it must ensure that the "justification is sufficiently compelling to support the degree of the variance." *Id.* (internal quotation omitted). "[A] major departure should be supported by a more significant justification than a minor one." *Gall*, 552 U.S. at 50.

### B. The Government's Recommended Sentence Satisfies the 18 U.S.C. § 3553(a) Sentencing Factors

The just punishment for Defendant Brody's offenses is a sentence of 120 months imprisonment. While the government agrees that a Guidelines sentence of 1,320 months is greater than necessary in light of Defendant Brody's age and health issues, the government respectfully submits that Probation's recommended sentence of 72 months does not fully capture the context of Defendant Brody's wrongdoing and the potential impact that an overly lenient sentence may have for future practitioners. Ultimately, the government's recommended sentence accurately reflects the seriousness and circumstances of the offense as well as Defendant Brody's demonstrated disrespect for the law, Defendant Brody's history and characteristics as a licensed psychiatrist in a position of trust, and the need to deter other practitioners from placing corporate metrics above clinical standards.

### 1. The nature and circumstances of the offense and the need for the punishment to reflect its seriousness, promote respect for the law, and provide just punishment

As Defendant Brody put it himself, his motivation was simple: money. His dream was to get paid by Done "WITHOUT EVER HAVING TO SEE OR TALK TO THE PATIENT[s]." Trial Ex. 210. He even wrote that prescribing to patients in this manner was akin to a "drug-induced fantasy of some hookah smoking caterpillar sitting on a mushroom." *Id.* Defendant Brody was positively unemployed until taking a part-time job just one month before joining Done, Trial Ex. 191, and he amassed significant tax and mortgage debt that he needed to pay off. Trial Exs. 574, 1064, 4000 at 25. It is no coincidence that Defendant Brody was seeking a raise when he told Defendant He that she would not find a "physician leader" like him anywhere else, and that the "vast majority" of clinicians would not

Gov. Sentencing Memo. for Def. Brody                22
24-CR-0329 CRB

cooperate with her criminal scheme unless he persuaded them to do so.  Trial Ex. 504.  As a result, he spent, in his own words, only "30 seconds" on each prescription.

Ultimately, easy money was the only incentive for him to take "risks" that no other clinician would.  The evidence at trial makes clear that Defendant Brody was thoroughly tired of caring for patients, and that he sought to make easy money while preserving enough leisure time for pursuits like photography and writing instead.  *See, e.g.*, Trial Ex. 104.   No physician, no matter how experienced, can sincerely put a patient first if he refuses to even take the bare minimum step of seeing their condition or hearing their concerns.

The consequences of Defendant Brody's greed for patients were direct and staggering.  Done members like H.B., N.C., and C.C. all struggled with mental health issues, and each of their mothers testified about the deterioration that they observed in their children while they were prescribed stimulants on the Done platform.  Even though the mothers of all three of these Done members all reached out to notify Done about these serious health issues, Done did not change course.  Instead, Defendant Brody persisted in endorsing policies and practices that were clearly improper, including short initial visits where the members were not adequately evaluated, consistent stimulant prescriptions until the member died or ceased payment; and lack of follow-up care or evaluations while the member was on the Done platform.

Certain examples illustrate the egregiousness of Defendant Brody's prescription practices.  In one instance, Defendant Brody wrote that he would be "resistant to prescribing [phentermine and Adderall] together" because they are both stimulants and therefore it would not be necessary to prescribe both at the same time.  Trial Ex. 337.  But because he did not exercise any medical judgment before prescribing, Defendant Brody even blindly prescribed stimulants for patients like T.T.  and V.S.  T.T. had an initial appointment with a Done provider for approximately 19 minutes.  After the visit, the provider found that T.T.'s symptoms "did not point to ADHD at all but more like severe anxiety. She was very adamant about getting started on stimulants despite having severe anxiety. Declined treatment for her anxiety and other treatment options for ADHD."  Even with that finding, consistent with Done's policies, the provider prescribed Adderall.  Trial Ex. 160 at 2.  T.T. continued to receive stimulant prescriptions from Done **for over two years** without ever receiving a follow-up appointment.  These

Gov. Sentencing Memo. for Def. Brody                23
24-CR-0329 CRB

prescriptions included a blind prescription from Defendant Brody.  Trial Ex. 678; Trial Ex. 2521 (Defendant Brody's Adderall prescription to T.T.).  What is more, Adderall is known to worsen anxiety symptoms.  11/3/25 Trial Tr. at 3914:14–22.

As another example, patient V.S. received a stimulant prescription after an eight-minute initial appointment with her Done provider.  There were no clinical evaluation notes in the Done records supporting an ADHD diagnosis or stimulant prescription.  V.S continued to receive stimulant prescriptions after the initial visit, including a blind prescription from Defendant Brody—even though she had filled multiple phentermine prescriptions from a different provider.  Trial Exs. 1942, 2520.  Dr. Goodman explained that a provider must carefully assess the appropriateness of prescribing a stimulant with phentermine (also a stimulant) because the combination of the two stimulants together runs certain health risks, including increasing blood pressure, increasing heart rate, and increasing anxiety. 11/3/25 Trial Tr. at 3983:24–3984:4.  Prior to writing the prescription V.S., Defendant Brody wrote that he would be "resistant to prescribing [phentermine and Adderall] together . . . . They would have to give a really good reason."  Trial Ex. 337. This message, as well as the non-existent patient chart notes, indicate Defendant did not review CURES or the patient records prior to writing the prescription.

The scale of the unauthorized prescribing at Done was immense, and Defendant Brody contributed to it both directly and indirectly.  Defendant Brody personally prescribed almost 400,000 stimulant pills for 6,559 different people, in as little as thirty seconds at a time, all without ever once seeing them or even reviewing their records to consider the potential consequences of giving them addictive, potentially dangerous amphetamines.  Trial Ex. 4000 at 39, 41–43. 1,555—nearly 25 percent—of those individuals had not even seen *any* practitioner for over half a year, further reinforcing the lack of any legitimate medical purpose for Defendant Brody's prescriptions.  *Id.* at 57.  The quantity of Defendant Brody's blind prescriptions alone places him in the highest possible offense level contemplated by the Sentencing Guidelines.  Trial Ex. 4000 at 39, 41–43; PSR ¶ 40.  For purposes of the Guidelines, it is impossible to treat a drug distribution offense more seriously.

Defendant Brody's direct prescriptions do not come close to capturing the full scope of his wrongful conduct, either.  As such, the jury rightfully convicted Defendant Brody for his role in the overarching conspiracy; he was not engaged in the practice of medicine in his prescriptions and

Gov. Sentencing Memo. for Def. Brody                24
24-CR-0329 CRB

leadership at Done.  As Clinical President, Defendant Brody had a responsibility to oversee Done's clinicians and ensure that they practiced in an appropriate manner.  But Defendant Brody abdicated that responsibility, choosing instead to act as a rubber stamp in Defendant He's hands.

Defendant Brody also failed to properly handle issues with patients that came his way and implemented policies that contradicted basic medical principles, all leading to improper and dangerous prescriptions.  For example, after N.C.'s initial visit with Done, N.C. received stimulant prescriptions from Done for over a year without a follow-up appointment.  K.C., N.C.'s mother, testified about N.C.'s decline during his Done membership, including changes in speech, appearance, insomnia, knocking on neighbors doors, and, during one episode, screaming at a woman that she was his wife, manic behavior, screaming, repetitive and illogical speech and made up stories, paranoia, walking on the freeway with no shoes, and concerns for his own safety.  11/7/25 Trial Tr. 5034:20–5049:13.  K.C. called Done "more than 10 times," including to inform them of 5150 psychiatric holds on N.C.  *Id.* at 5044; 5051; Trial Ex. 1844 at 6.  These concerns made their way to Defendant Brody through communications from N.C.'s initial provider, who told him that she wanted to discharge N.C. because of the 5150.  Trial Exs. 527; 529.  N.C. was not discharged; he was instead transferred to Elizabeth Shapard, who continued to write prescriptions without conducting a visit.  And, as K.C. testified, his condition continued to deteriorate and destabilize.  In another instance, another concerned Done provider contacted Defendant Brody requesting guidance, this time due to health and safety concerns with prescribing stimulants to A.K., who had cardiac issues and anxiety.  Trial Ex. 476.  Instead of addressing those concerns, patient A.K. was rerouted to another provider who prescribed stimulants.  11/3/25 Trial Tr. at 3938–43; Trial Ex. 2515.

The evidence at trial established beyond any reasonable doubt that Defendant He ultimately decided Done's clinical policies, and that Defendant Brody's role was to help persuade Done's practitioners to follow them.  *See, e.g.*, Trial Ex. 107 at 3–4 (Defendant He telling Defendant Brody that "it's still going to be my decision about how to run the company," with Defendant Brody agreeing that Defendant He could simply use his advice "as one of many inputs to make ALL the decisions that will affect the business").  Defendant Brody complied, advocating for policies and practices that he knew were not within the usual course of professional practice, such as the purposeful disincentivizing of

Gov. Sentencing Memo. for Def. Brody              25
24-CR-0329 CRB

follow-up appointments and the encouragement of "medication trials" for individuals who concededly did not have ADHD.  Trial Ex. 946; Trial Ex. 1308; Trial Ex. 561 at 3 (Defendant Brody writing to Defendant He in March 2022 that, under the Done model, they would "wind up prescribing stimulants to at least a few people who do not have ADHD. And perhaps to more than a few.").  Done's practitioners, including no less than five who pleaded guilty to participating in this criminal conspiracy, followed his lead in prescribing controlled substances with no legitimate medical purpose at an unprecedented scale.

The circumstances of the offense only reinforce the need for a serious punishment.  Throughout the entirety of the conspiracy, well-meaning professionals and practitioners repeatedly warned both defendants that Done's business model prevented proper clinical practice, threatened patient harm, and risked a host of legal liabilities.  But Defendant Brody minimized and criticized these efforts to correct course at every juncture.  Defendant Brody compared stimulants to coffee and claimed they never killed anyone, or even candy that a child might receive during Christmas.  10/7/25 Trial Tr. at 1329:4–14.  He told Done's employees that legal liability was no big deal, simply because he got sued all the time.  And when the warnings were too stark to simply reduce to a joke, like Dr. Brindala's risk mitigation reports, Defendant Brody solely focused on whether those reports would be "evidence to be used against" him, rather than how to address those genuine concerns.  Trial Exs. 230, 362.  There were many opportunities to turn Done into a legitimate healthcare company throughout the course of this three-year scheme.  Rather than doing so, Defendant Brody ultimately deferred to Defendant He's singular focus on growing Done into a billion-dollar tech "unicorn" and even supported her in preventing the implementation of meaningful reforms.  10/28/25 Trial Tr. at 3030:6–9.

Finally, a serious sentence is needed to promote respect for the law.  As the government detailed at length in its sentencing submission for Defendant He, Done was practically built upon disrespect for the law.  Defendant He repeatedly reiterated her philosophy that Done needed to break the law to become a successful company, encouraging her employees to do so with promises of a Tesla for the first employee to go to jail.  Defendant Brody shared her deep disdain for the law.  Defendant Brody positively discouraged Defendant He from hiring employees with law enforcement backgrounds, explaining that he disliked people who were "really into the law" and that they would view Done's practices as "on the edge" at best.  Trial Ex. 139 at 2.  Defendant Brody repeatedly told Done employees

Gov. Sentencing Memo. for Def. Brody                26
24-CR-0329 CRB

that getting sued was "no big deal," and that Done's providers should prescribe stimulants to patients "no matter what and not worry about going to jail."  Trial Ex. 546 at 2.  Defendant Brody recruited Dr. Zoe Martinez to the scheme, who told her friend, "I was recently hired on for a pill mill as regional medical director" and discussed Done's practices of giving out Adderall for recreational use.  Trial Ex. 330.  At times, Defendant Brody's disregard for the law was so blatant that even Defendant He remarked on it, as Aakash Prasad noted when he reminded her of Defendant Brody's absurd stance that he would keep prescribing Adderall even if it resulted in his execution.  Trial Ex. 897 at 22.  The law must be taken seriously, and only a serious sentence will demonstrate that.

Defendant Brody's conduct since the verdict confirms that the need for just punishment is acute. After the jury convicted him on all six counts, Defendant Brody threw his headset across the table mid-hearing and stormed out of the courtroom rather than comply with the Court's release conditions.  He then refused to put on the ankle monitor and cooperate with Pretrial Services.  When he finally appeared, he told the Court — having just heard three mothers testify about their children's deterioration — "I've never hurt a fly."  He is now reportedly planning to write a book about the trial experience and continuing his hobbies.  PSR ¶ 71.  These are not the acts of a man who has recognized the gravity of what he did.  They are the acts of a man who still believes the law does not apply to him — exactly what he told his co-conspirators at Done.

### 2.    The History and Characteristics of the Defendant

Defendant Brody's history and characteristics reinforce the need for a substantial sentence in this case.  The defendant was a licensed psychiatrist for decades, dating back to the 1980s.  PSR ¶¶ 77, 79. During that time, he practiced at clinics in San Francisco, Sonoma County, and Contra Costa County, even taking positions as a Medical Director.  PSR ¶¶ 77, 79.  He enjoyed a position of trust as a medical professional, had adequate training in how to properly practice psychiatry, and had the benefit of legitimate, gainful employment at established locations across California.  Despite all of these advantages and opportunities, Defendant Brody abused the trust that was placed in him to overprescribe addictive controlled substances for patients who he never met, without any knowledge of their present medical conditions, their past medical histories, their relationship with their primary care providers, or their broader social circumstances and stressors.  As a psychiatrist for decades, Defendant Brody

Gov. Sentencing Memo. for Def. Brody          27
24-CR-0329 CRB

undoubtedly knew that his prescribing practices were not only inappropriate but positively illegal. And as a medical director, tasked with overseeing other practitioners, he clearly understood that his words and actions could influence the way in which other medical professionals conducted their practice. He willfully abused that authority at Done to steer young, inexperienced nurse practitioners away from the usual course of practice and towards an illegitimate model designed to benefit Defendant He rather than patients. There is no excuse for Defendant Brody's perversion of his duties and responsibilities as a physician. As noted below in Section II.B.4, courts regularly impose stiff sentences on physicians who abandon their Hippocratic oath in favor of personal profit, including physicians with a similar age and health conditions. Bearing in mind that the government's recommended sentence is already a drastic departure from the advisory Guidelines sentence, there is no reason to impose an even more lenient sentence.

Defendant Brody's history does not require a different result. While this is his first criminal conviction, that understates the history of escalating misconduct that he has engaged in for at least the past decade. As witnesses testified at trial, he blithely boasted to Done employees about how often he had been sued. And the broader evidence produced at trial and otherwise gathered over the course of the government's investigation reveal that Defendant Brody had been flagged for improperly prescribing controlled substances even before joining Done. As the evidence at trial showed, Defendant Brody's prescribing practices from 2017 through 2022 eventually resulted in the stipulated surrender of his medical license, with Defendant Brody admitting that the California Medical Board had a basis for its allegations against him. *See* Trial Ex. 2545. Those allegations revealed that Defendant Brody had prescribed controlled substances including benzodiazepines to a patient who had been diagnosed with major depression with psychotic features, PTSD, seizure disorder, dissociative disorder, and who had suffered multiple head traumas and memory loss, all without any evidence that he had completed an adequate psychiatric evaluation or follow up visits to determine whether those medications were indicated or continued to be safe and effective after first being prescribed. *Id.* at 15. The Medical Board thus concluded that Defendant Brody's "decision to prescribe the controlled substances while in private practice [did] not appear to be based on an adequate history and examination to establish an appropriate medical indication for their use." *Id.* Similar allegations led Defendant Brody to resign from Contra

Costa County Health Services, misleadingly describing his fellow practitioners' concerns about his overprescribing as "interference with [his] patient care decisions." Trial Ex. 2694. One practitioner at Contra Costa who assumed care of Defendant Brody's patients noted that Defendant Brody had been criticized and eventually fired for his excessive use of benzodiazepines, despite warnings by her, Defendant Brody's supervisor, and even the highest-level directors at Contra Costa. Trial Ex. 4222 at 2, 4–5.

Despite repeated indications that his prescribing practices were improper, Defendant Brody did not change his practices. On the contrary, he simply found in Done a business that would enable his dangerous disregard for proper medical care, and then used his position of authority there to influence other practitioners to prescribe addictive stimulants regardless of the potential for patient harm. Done was not an aberration — it was the culmination of a decade of escalating misconduct. Imposing a lenient sentence simply because this is Defendant Brody's first criminal offense would simply ignore his broader history of prescribing controlled substances illegitimately, and it would only reinforce his long-held view that the law can be taken lightly. That is not a just punishment.

### 3.     Need for the sentence to afford adequate deterrence to criminal conduct

A substantial sentence proportionate to the criminal conduct is necessary to promote general deterrence of like-minded, educated, calculating prospective offenders. Defendant Brody's scheme cloaked criminal drug distribution under a veil of legitimacy and Silicon Valley ingenuity. Deterrence, both general and specific, is critically needed to stem these crimes—particularly when committed in the health care system by a highly educated physician. Sprawling conspiracies like this one can be difficult to detect and prosecute, heightening the need for general deterrence. *See, e.g.*, *Harmelin v. Michigan*, 501 U.S. 957, 989 (1991) ("[S]ince deterrent effect depends not only upon the amount of the penalty but upon its certainty, crimes that are less grave but significantly more difficult to detect may warrant substantially higher penalties.").

Moreover, Defendant Brody's offenses were not sudden crimes of passion. Because white collar criminals "often calculate the financial gain and risk of loss" of their crimes, an overly lenient sentence sends the message "that would-be white-collar criminals stand to lose little more than a portion of their ill-gotten gains and practically none of their liberty." *United States v. Martin*, 455 F.3d 1227, 1240

Gov. Sentencing Memo. for Def. Brody          29
24-CR-0329 CRB

(11th Cir. 2006); *see also United States v. Thompson*, 130 F.4th 1158, 1167 (9th Cir. 2025) ("Fraud crimes like those at issue here are typically calculated, and, as a result, are particularly amenable to general deterrence."); *United States v. Brown*, 880 F.3d 399, 405 (7th Cir. 2018) (agreeing with the "widely accepted principle" that white collar crimes are "prime candidates for general deterrence").

The risk to patients and public of crimes committed by physicians and other licensed medical providers under the guise of medical care are significant factors in assessing deterrence. A significant sentence is needed to send a message to other medical practitioners who might similarly be tempted to abandon their medical principles for profit.

As noted in the government's sentencing memorandum for Defendant He, corporate telemedicine is a growing space, and similar pressures to prescribe will undoubtedly arise as new companies come to the fore. The DEA has repeatedly extended COVID-era telehealth flexibilities for controlled substance prescribing — most recently through December 31, 2026 — while it finalizes regulations. During that regulatory window, the telehealth prescribing market is expanding rapidly. Done had direct competitors under investigation for the same conduct and while others exited the particularly ADHD business, there is a robust market of direct-to-consumer telehealth companies. The sentence imposed here will be the benchmark that licensed practitioners and telehealth entrepreneurs consult when calculating whether the risk of prosecution is worth the reward of an easy-money prescribing platform. A sentence of 120 months sends a clear, quantified message. A sentence of 72 months does not.

Further, at Done alone, several other practitioners who joined Defendant Brody in knowingly prescribing controlled substances without a medical purpose, later accepted responsibility for their actions, and face sentencing in the coming months. (Elizabeth Shapard (25-CR-00142 CRB), Christopher Lucchese (24-CR-00357 CRB), Erin Kim (24-CR-00170, M.D. Fla.), Yina Cruz (24-CR-0090 CRB), Ginger Simor (25-CR-00194 CRB). Another practitioner faces trial in September in the Western District of Michigan. (Jonathan Decker, 25-CR-00066, W.D. Mich.). And there are still other Done practitioners who have yet to be charged. A substantial sentence is necessary to ensure that other doctors and other licensed medical providers do not put patients at risk to line their own pockets.

Gov. Sentencing Memo. for Def. Brody          30
24-CR-0329 CRB

Physicians and nurse practitioners, like most defendants, experience collateral consequences as the result of criminal convictions.  But courts have flatly rejected the idea that the specter of losing a medical license serves a comparable deterrent effect to a prison sentence commensurate with a defendant's culpability.  *See, e.g., United States v. Howard*, 28 F.4th 180, 208 (11th Cir. 2022) (finding probationary sentence substantively unreasonable for physician "prescription writing machine" who caused more than $3.5 million loss based on illegitimate prescriptions).  Treating a defendant's exploitation of a trusted professional position as a mitigating factor because of a loss of a license would invert the logic of the abuse-of-trust enhancement that the Sentencing Commission specifically created to address this situation.

As to specific deterrence, Defendant Brody has shown himself to be recalcitrant and unremorseful.  While the government is mindful that Defendant Brody relinquished his license prior to the trial and no longer treats patients, the need for specific deterrence remains.  First, the loss of an employment or career position should not be a basis for departure when that loss was the direct result of the defendant abusing the trust inherent in that very position—an abuse of trust for which the guidelines require an enhancement.  Second, as Probation notes, he has refused to accept responsibility and instead maintained his innocence throughout the process.  He is even contemplating writing a book about his experiences—once again seeking to profit from this criminal enterprise.  *See* PSR ¶ 71.  After the jury reached its verdict, the Court ordered home confinement for Defendant Brody, who, mid-pronouncement, threw his headset across a table and angrily stormed out of the courtroom.  11/18/25 Trial Tr. at 5706–07.  The Court then had to hold another hearing later that afternoon after Defendant Brody refused to put on the ankle monitor and otherwise cooperate with Pretrial Services.  Despite hearing all the evidence at trial, including devastating testimony from three mothers of patients, Defendant Brody told the Court, "I've never hurt a fly."  11/18/25 Hr'g Tr. at 4.  This is not an individual who has seen the error of his ways and intends to make amends.  Bearing in mind his repeated history of encouraging others to disregard the law, as described above, he could continue to encourage others to engage in criminal conduct even if he no longer has prescribing authority himself.  After all, it was his medical degree and professional credentials, not his DEA license, and his views on authority, that made him the ideal Clinical President for a company such as Done.

Gov. Sentencing Memo. for Def. Brody          31
24-CR-0329 CRB

### 4.    Need to avoid unwarranted sentencing disparities

When imposing a sentence, district courts must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).  Defendant Brody could not have committed these crimes were he not a doctor, so sentences for other physicians who have similarly weaponized their medical licenses are instructive.  First, courts across the country have sentenced physicians to 10-year terms for the comparatively less serious offense of rubber-stamping orders for orthotic braces or genetic tests without seeing patients — with no controlled substances, no patient harm, and no pattern of escalating misconduct.  *See, e.g., United States v. Young*, 21-CR-00417 (N.D. Tex. 2025) (Starr, J.) (10-year sentence for physician who signed orders for orthotic braces and genetic tests for patients he did not see, speak to, or otherwise treat, causing $70 million in fraudulent billing to Medicare); *United States v. Canchola*, 19-CR-00473 (N.D. Tex. 2024) (Brown, J.) (10-year sentence for physician who signed orders for orthotic braces and genetic tests for patients he did not see, speak to, or otherwise treat, causing $54 million in fraudulent billing to Medicare); *United States v. Baldonado*, 21-CR-430 (D.N.J) (Wigenton, J.) (7-year sentence for physician who signed orders for orthotic braces and genetic tests for patients he did not see, speak to, or otherwise treat, causing $24 million in fraudulent billing to Medicare).  In cases involving illegal prescribing of controlled substances — directly analogous to the conduct proven here — courts have imposed sentences of 87 months to 20 years, with 10 years a common benchmark.  *E.g., United States v. Adelglass*, 20-CR-605 (S.D.N.Y.) (Rakoff, J.) (10-year sentence for physician who prescribed more than 1.3 million oxycodone pills); *United States v. Talbot*, 21-CR-00111 (E.D. La.) (Milazzo, J.) (87-month sentence for physician who illegally distributed over 1.8 million doses of controlled substances like oxycodone, hydrocodone, and morphine and for defrauding health insurers of more than $5.4 million); *United States v. Murphy*, 20-CR-291 (N.D. Ala.) (Coogler, J.) (20-year sentence for 66-year-old physician who unlawfully distributed more than 10 million opioid pills and caused more than $280 million in fraudulent billing); *United States v. Sherman*, 21-CR-20393 (Levy, J.) (E.D. Mich. 2024) (13-year sentence for 75-year-old physician who issued more than 270,000 dosage units of Schedule II opioids).  Defendant Brody's conduct — nearly 400,000 pills, 6,559 patients he never met, a three-year conspiracy, documented patient harm, and unrepentant post-

conviction conduct — sits at the more serious end of this range.

### 5. Other Factors Warranting a Significant Sentence

A lower sentence here, including one in line with the Probation recommendation of 72 months, would not adequately take into account at least four factors that distinguish this case. First, Defendant Brody was not a passive participant: he was a linchpin of Done's criminal scheme, without whom — as Defendant He explicitly stated — "the company will just not be able to operate." Second, Defendant Brody's prescribing conduct — 394,324 pills in as little as 30 seconds apiece — is not typical even within the universe of illegal prescription cases; it reflects an extraordinary and deliberate abdication of the most basic medical obligations. Third, Defendant Brody's post-conviction conduct, including his outburst in this Court and his refusal to cooperate with Pretrial Services, reflects not remorse but contempt. Fourth, the deterrence needs here are uniquely significant and this case is closely watched by the telehealth industry, and will set the benchmark for the industry. A significant sentence for a medical professional who made this scheme possible will send the appropriate message to others contemplating running a telehealth pill mill.

## VI.    RESTITUTION, FORFEITURE, AND FINE

### A.    The Court Should Order Restitution in the Amount of $12,397,160

As the government has already explained in Section I.B.3 above, the Court should order restitution in the amount of $12,397,160, as that is the amount Medicare, Medicaid, and other insurers paid Done for Schedule II stimulant prescriptions that they would not have reimbursed but for Defendants' actions in furtherance of the healthcare fraud conspiracy. PSR ¶ 36.

### B.    The Court Should Impose a $50,000 Fine

The government also joins in Probation's recommendation that the Court impose an additional fine of $50,000 for Defendant Brody in light of his financial condition. PSR p. 37. In terms of Defendant Brody's financial condition and ability to pay a fine, it bears noting that in addition to his Done salary and the property he owns, during the conspiracy, from December 2020 to November 2022, Defendant Brody and his wife transferred approximately $378,020 to family members located in Cambodia. Trial Ex. 4000 at 26.

Gov. Sentencing Memo. for Def. Brody         33
24-CR-0329 CRB

**C.    The Court Should Order a Forfeiture Money Judgment in the Amount of $730,892**

The government also respectfully submits that the Court should order Defendant Brody to forfeit $730,892, which represents the gross pay that he received during his employment at Done. Criminal forfeiture is a mandatory part of the sentence to be imposed on the defendant for his crimes. *United States v. Monsanto*, 491 U.S. 600, 606 (1989); *United States v. Davis*, 706 F.3d 1081, 1084 (9th Cir. 2013); *United States v. Newman*, 659 F.3d 1235, 1239 (9th Cir. 2011). The government need only establish the appropriate forfeiture amount by a preponderance of the evidence. *Libretti v. United States*, 516 U.S. 29 (1995). One of the chief goals of forfeiture is to remove the profit from crime by separating the criminal from his or her dishonest gains. *See Newman*, 659 F.3d at 1242; *United States v. Casey*, 444 F.3d 1071, 1073 (9th Cir. 2006). To that end, forfeiture is not limited to specific assets directly traceable to the offense: it can also take the form of an in personam judgment against the defendant. *United States v. Lo*, 839 F.3d 777 (9th Cir. 2016). And "when the corporate form is used to perpetrate a fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose, the courts will ignore the corporate entity and deem the corporation's acts to be those of the persons or organizations actually controlling the corporation, corporation, in most instances the equitable owners." *Sonora Diamond Corp. v. Superior Court of Tuolumne County*, 83 Cal. App. 4th 523, 538 (Cal. Ct. App. 2000).

Because forfeiture aims to strip the dishonest gains that Defendant Brody made as Clinical President of Done Health P.C., the appropriate forfeiture amount should consider both the money that defendant Brody personally received as an employee of Done as well as the unlawful gains that his company Done Health P.C. accrued as a result of the unlawful drug distribution and fraud schemes. However, as already noted above, Done Health P.C. was effectively a sham entity that neither received nor made any payments at any point during its existence. PSR ¶ 17; Trial Ex. 4000 at 12–14. The appropriate forfeiture money judgment is consequently limited to the money that Defendant Brody himself made as a result of his work with Done. As the evidence at trial established, that amount is $730,892. Trial Ex. 4000 at 23.

**VII.    CONCLUSION**

For the reasons set forth above, the Court should sentence Defendant Brody to 120 months'

Gov. Sentencing Memo. for Def. Brody                34
24-CR-0329 CRB

imprisonment, order forfeiture in the amount of $730,892, order restitution in the amount of $12,397,160 and impose a fine of $50,000.

Dated: March 30, 2026                                      Respectfully submitted,

                                                          CRAIG H. MISSAKIAN
                                                          United States Attorney


                                                          LORINDA I. LARYEA
                                                          Acting Chief, Fraud Section
                                                          U.S. Department of Justice


                                                          /s/ Kristina Green
                                                          KRISTINA GREEN
                                                          Assistant United States Attorney


                                                          JACOB FOSTER
                                                          Acting Chief
                                                          EMILY GURSKIS
                                                          Assistant Chief
                                                          ARUN BODAPATI
                                                          Trial Attorney
                                                          Department of Justice
                                                          Criminal Division, Fraud Section