WILLKIE FARR & GALLAGHER LLP
Koren Bell (SBN 268614)
  kbell@willkie.com
2029 Century Park East
Los Angeles, CA 90067
T: 310-855-3016
F: 310-855-3099

Michael S. Schachter (*Pro Hac Vice*)
Steven J. Ballew (*Pro Hac Vice*)
  mschachter@willkie.com
  sballew@willkie.com
787 Seventh Avenue
New York, NY 10019-6099
T: 212-728-8102
F: 212-728-9102

Attorneys for Defendant
RUTHIA HE

LAW OFFICE OF JOHN D. CLINE
John D. Cline
  cline@johndclinelaw.com
600 Stewart Street, Suite 400
Seattle, WA 98101
T: 360-320-6435

Of Counsel for Defendant
RUTHIA HE

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RUTHIA HE, A/K/A RUJIA HE, and DAVID BRODY,<br><br>Defendants. | CASE NO. 3:24-cr-00329-CRB<br><br>**DEFENDANT RUTHIA HE'S SENTENCING MEMORANDUM AND OBJECTIONS TO PRESENTENCE REPORT**<br><br>Sentencing Date: April 15, 2026<br>Sentencing Time: 10:00 a.m. |

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

I.  CONSIDERATION OF THE SECTION 3553(A) FACTORS MERITS A
SENTENCE OF 41 MONTHS. ...................................................................................5

   A.  Ms. He's History and Characteristics are Highly Mitigating. ......................6

   B.  A Sentence of 41 Months Would Avoid Unwarranted Sentencing Disparities
Caused by the Extreme Collateral Consequences Ms. He Faces. ..............11

   C.  The Need for Deterrence Does Not Require the Imposition of an Additional
Lengthy Prison Term. ..................................................................................17

   D.  The Nature and Circumstances of the Offense Support a 41-Month Sentence. .........20

      1.  ADHD is Significantly Underdiagnosed and Undertreated in the United
States and Done Was Created to Alleviate That Problem. ...........................20

      2.  Stimulant Medication—the "First Line" Treatment for ADHD—Is Generally
Non-Addictive When Prescribed and Taken in Therapeutic Doses and Can
Have a "Life-Changing" Impact on ADHD Patients. ...................................21

      3.  Each of Done's "Policies" Was Approved By Licensed and Qualified
Medical Professionals. ..................................................................................22

      4.  Done Turned Away More Patients Than It Accepted and Implemented
Features Demonstrating that "Greed" Was Not the Motivating Factor Behind
the Platform. ..................................................................................................25

II.  A "RITUALISTIC" APPLICATION OF THE SENTENCING GUIDELINES
WOULD FAIL TO MEET THE GOALS OF SENTENCING. .................................26

   A.  As in *Napoli*, The Drug Quantity Table, Which Drives the PSR's Guidelines
Computation, is a Poor Proxy for Ms. He's Culpability. .............................27

   B.  The Guidelines "Loss" Table is Also a Poor Proxy for Culpability Here .................30

   C.  The Guidelines Calculation Set Forth in the Final PSR Is Incorrect. .........................34

      1.  The Government Did Not—and Cannot—Prove that Every Prescription
Written by Dr. Brody was Unauthorized and that Ms. He is Responsible. .....34

      2.  The PSR Incorrectly Utilized the Weight of the "Actual" Amount of
Amphetamine, as Opposed to the Weight of a "Mixture or Substance"
Containing Amphetamine. ..............................................................................39

i

3. The Recommendation of Restitution in the PSR is Incorrect.........................41

CONCLUSION.................................................................................................41

Appendix I
Objections to the Final PSR

Appendix II
Sample Patient Reviews Confirming Done's Life Changing Impact on Patient Health

Appendix III
16 Patients Reviewed by Government Expert Dr. David Goodman

Appendix IV
Data From U.S. Sentencing Commission Concerning Sentences of Drug Offenders Between 2000 and 2024

Appendix V
Chart Concerning Sentences Imposed in *United States v. Napoli*, 3:10-cr-00642-CRB

Appendix VI
Comparison of Offense Conduct in *Napoli* and *He*

DEFENDANT RUTHIA HE'S SENTENCING MEMORANDUM AND OBJECTIONS TO PRESENTENCE REPORT
Case No. 3:24-cr-00329-CRB

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Apprendi v. New Jersey*,
530 U.S. 466 (2000)..................................................................................................41

*Ellingburg v. United States*,
2026 WL 135982 (2026)............................................................................................41

*Gall v. United States*,
552 U.S. 38 (2007)................................................................................................5, 26

*Kimborough v. United States*,
552 U.S. 85 (2007).......................................................................................................5

*Rita v. United States*,
551 U.S. 338 (2007).....................................................................................................5

*United States. v. Agarwal*,
1:19-CR-864, ECF No. 850 (N.D. Ill. Aug. 19, 2024) ..............................................16

*United States v. Babich*,
1:16-cr-10343 (D. Mass).................................................................................32, 33, 34

*United States v. Bakeas*,
987 F.Supp. 44 (D. Mass. 1997) ...............................................................................15

*United States v. Bakhit*,
218 F. Supp. 2d 1232 (C.D. Cal. 2002) .....................................................................32

*United States v. Cabrera*,
567 F.Supp.2d 271 (D. Mass. 2008) ..........................................................................27

*United States v. Carrillo*,
440 F.Supp.3d 1148 (E.D. Ca. 2020).........................................................................16

*United States v. Carty*,
520 F.3d 984 (9th Cir. 2008) .......................................................................................5

*United States v. Chube II*,
538 F.3d 693 (7th Cir. 2008) ......................................................................................38

DEFENDANT RUTHIA HE'S SENTENCING MEMORANDUM AND OBJECTIONS TO
PRESENTENCE REPORT
Case No. 3:24-cr-00329-CRB

*United States. v. Cohen*,
  No. 19-CR-741, ECF 48 (S.D.N.Y. 2020)...............................................................................17

*United States v. Connolly*
  No. 16-CR-370, ECF 451, at 91:4-12 (S.D.N.Y. 2019) ..........................................................16

*United States v. Craig*,
  703 F.3d 1001 (7th Cir. 2012) ................................................................................................19

*United States v. Evans*,
  2017 WL 568333 (S.D. Tex. Febr. 13, 2017)..........................................................................38

*United States v. Farouil*,
  124 F.3 838, 847 (7th Cir. 1997) ............................................................................................15

*United States v. Feingold*,
  454 F.3d 1001 (9th Circ. 2006)...............................................................................................36

*United States v. Flores*,
  725 F.3d 1028 (9th Cir. 2013) ......................................................................................34, 36, 39

*United States v. Gupta*,
  904 F. Supp. 2d 349 (S.D.N.Y. 2012)......................................................................................31

*United States v. Hayes*,
  948 F. Supp. 2d 1009 (N.D. Iowa 2013)..................................................................................27

*United States v. Hussain*
  3:16-cr-00462-CRB, ECF No. 562, at 51:11-52:24 (N.D. Cal. May 14, 2019); .....................16

*United States v. Johnson*,
  No. 16-CR-457-1 (NGG), 2018 WL 1997975 (E.D.N.Y. Apr. 27, 2018)...............................31

*United States. v. Lewis*,
  No. 23-CR-370, ECF 66, 67, 69 (S.D.N.Y. 2024)...................................................................17

*United States v. Napoli*,
  3:10-cr-00642-CRB, ECF No. 1114 (N.D. Cal. Jan. 18, 2013)...............................................28

*United States v. Napoli*,
  3:10-cr-00642-CRB, ECF No. 1290 (June 5, 2013) ........................................................ *passim*

*United States v. Velazquez*,
  No. 16-cr-233, 2017 WL 2782037 (S.D.N.Y. May 26, 2017)..................................................19

iv

DEFENDANT RUTHIA HE'S SENTENCING MEMORANDUM AND OBJECTIONS TO
PRESENTENCE REPORT
Case No. 3:24-cr-00329-CRB

*United States. v. Walchli*,
  No. 20-CR-497, ECF 110, 111 (S.D.N.Y. 2024)..................................................................17

*United States v. Zafaranchi*,
  2026 WL 658435 (W.D. Wash. Mar. 9, 2026) ...........................................................41

**Statutes**

8 U.S.C. § 1101...........................................................................................................12

18 U.S.C. § 3553 ................................................................................................ *passim*

18 U.S.C. § 3632...........................................................................................................12

18 U.S.C. § 3663A..........................................................................................................41

21 U.S.C. § 829.............................................................................................................38

21 U.S.C. § 841.............................................................................................................20

21 U.S.C. § 846.............................................................................................................20

CARES Act...................................................................................................................13

First Step Act ...........................................................................................................2, 12

U.S.S.G. Sec. 2B1.1......................................................................................................31

**Other Authorities**

Barry Boss & Kara Kapp, *How the Economic Loss Guideline Lost its Way, and
  How to Save It*, 18 Ohio St. J. of Cr. Law 605, 605-06 (2021)................................31

Centers for Medicare and Medicaid Services, Capitation and Pre-payment, (last
  visited March 10, 2026), https://www.cms.gov/priorities/innovation/key-
  concepts/capitation-and-pre-
  payment#:~:text=Defining%20key%20terms:,than%20the%20average%20Me
  dicare%20patient...................................................................................................24

Christopher M. Whaley et al, An Employer-Provider Direct Payment Program Is
  Associated With Lower Episode Costs, Health Affairs (March 2021),
  https://www.healthaffairs.org/doi/10.1377/hlthaff. 2020.01488 ............................24

Drug Enforcement Agency, *Orange Book List of Controlled Substances*, at 1
  (March 2026)
  https://www.deadiversion.usdoj.gov/schedules/orangebook/d_cs_drugcode.pd
  f ...............................................................................................................................40

v

DEFENDANT RUTHIA HE'S SENTENCING MEMORANDUM AND OBJECTIONS TO
PRESENTENCE REPORT
Case No. 3:24-cr-00329-CRB

Erica Zunkel & Alison Siegler, *The Federal Judiciary's Role in Drug Reform in an Era of Congressional Dysfunction*, 18 Ohio St. J. of Crim. L. 283, 320 ..........................27

FDA-approved Label For Adderall, *available at* https://www.accessdata.fda.gov/drugsatfda_docs/label/2017/011522s043lbl.pdf (last accessed March 30, 2026).................................................................................40

Gregory Herrold and Eric Bolden, *Sentencing Strategies in Federal Fraud Cases: Key Takeaways for White Collar Practitioners From the ABA's Annual White Collar Conference*, White Collar Criminal Law Blog (March 13, 2026) https://blogs.duanemorris.com/whitecollarcriminallaw/2026/03/13/sentencing-strategies-in-federal-fraud-cases-key-takeaways-for-white-collar-practitioners-from-the-abas-annual-white-collar-conference/ .......................................................31

*Deaths in ICE Custody Are Growing. "They Let Him Rot in There,"* N.Y. Times (Mar. 29, 2026) ...............................................................................................14

Lauren J. Tanz, et al., *Drug Overdose Deaths Involving Stimulants - United States, January 2018-June 2024*, Centers for Disease Control, (Aug. 8, 2025), https://www.cdc.gov/mmwr/volumes/74/wr/mm7432a1.htm ................................21

Marvin Luiz, *Five to Inspire with Ruthia He*, Medium (Feb. 12, 2017) https://medium.com/five-to-inspire/five-to-inspire-with-ruthia-he-a5ecd601414d ............................................................................................................7

United States Sentencing Commission, *2025 Proposed Amendments on Drug Offenses* (February 2025)...........................................................................................27

United States Sentencing Commission, *2025 Proposed Amendments on Drug Offenses*, (February 2025 *Available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/data-briefings/transcript_2025-Drug-Offenses.pdf#:~:text=Part%20A%20of%20the%20proposed%20amendment%20includes%20two%20subparts%20to%20address%20concerns%20that%20the%20Drug%20%0AQuantity%20Table%20at%20%C2%A72D1.1%28c%29%20overly%20relies%20on%20drug%20type%20and%20quantity%20as%20a%20measure%20of%20offense%20%0Aculpability%20and%20results%20in%20sentences%20greater%20than%20necessary%20to%20accomplish%20the%20purposes%20of%20%0Asentencing (last accessed March 29, 2026) ...........................................27

Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 448-49 (2007)..............................................................................................................19

DEFENDANT RUTHIA HE'S SENTENCING MEMORANDUM AND OBJECTIONS TO PRESENTENCE REPORT
Case No. 3:24-cr-00329-CRB

# INTRODUCTION

Ruthia He, 34, awaits sentencing after having spent nearly two years in custody, pursuant to her convictions in connection with the adult ADHD-focused telehealth company she founded in 2020, when she was 29 years old, before the start of the COVID-19 pandemic.  Ms. He's convictions and the time she has spent in custody—a first for her in a life otherwise distinguished by hard work, commitment to family, and a desire to see a better world—have irreparably changed her future, exposing her to severe collateral consequences far beyond the reach of this Court's power to calibrate a punishment that fits the crime.  Ms. He has reflected deeply and learned difficult lessons, and the magnitude of her fall from grace has sent a powerful message not only to her, but to start-up founders in the Bay Area and far beyond.

The letters authored by family, friends, former classmates and colleagues, innovators, investors, and fellow inmates in custody and submitted to the Court present an unusually clear, consistent, and compelling picture of who Ms. He is and who she has always been.  While character letters are of course commonplace at sentencing, the breadth and depth of the authors' collective perspective—from those who have known her for decades to those who have met her at her lowest point in prison—as well as the diversity of their experiences with her and the concrete examples they cite each illustrate how Ms. He has conducted herself from childhood through today.  As the letters attest, Ruthia is deeply devoted to her ailing parents as well as her friends, her fellow immigrants and innovators.  She is remarkably talented, relentlessly hard-working, and has had a life-long love for technology.  Her goal has long been to use technology to innovate solutions to real-world problems.  It was this goal that compelled her to leave her home in China to pursue a graduate degree in this country, and to settle in the Bay Area.  And, as the letters describe, it was this goal—of using technology to close the gap in adult ADHD care caused by a traditional healthcare system that had failed thousands suffering from this disorder—together with Ms. He's personal experience with, and interest in, mental health challenges, that motivated her to start

1

DEFENDANT RUTHIA HE'S SENTENCING MEMORANDUM AND OBJECTIONS TO
PRESENTENCE REPORT
Case No. 3:24-cr-00329-CRB

Done, not greed. As the Presentence Report ("Final PSR") submitted to the Court concludes: "The undersigned believes that Ms. He founded Done with a genuine desire to help people with ADHD." (ECF No. 591 at 38.) Indeed, even after Done's extraordinary success, Ms. He continued to live a simple life, with few material possessions. She is intent, and has always been, on making a positive impact on the world—sometimes in big ways, but often in small ones, when no one is watching.

It is also clear, based on the letters and attached declarations from prison consultants and an immigration expert, that Ms. He's future hangs in the balance at this stage in a way that goes beyond the usual question of what her sentence will be. Due to her non-citizen status, if Ms. He is sentenced to an additional lengthy term in prison, her custodial sentence will be significantly longer in actual time served, and substantially more harsh and dangerous in terms of the conditions of her confinement, than it would for any similarly-situated U.S. citizen defendant. In particular, unlike a U.S. citizen with identical characteristics to Ms. He, she will not be permitted to serve any portion of her sentence in a prison camp and will instead be designated to a low-security Federal Correctional Institution far from her Bay Area connections, where the environment is more punitive, more dangerous, and more restrictive in rules for movement and visitation. Despite the positive impact that the First Step Act has had on inmates and their families, and on reducing recidivism, Ms. He will, at best, benefit from only a fraction of its intended prison time reductions, and she will also be ineligible for the Residential Drug Abuse Program ("RDAP"). The result is that the actual time Ms. He serves in prison will be significantly longer than that served by a comparable U.S. citizen. And after her sentence, Ms. He will be deported. But before that takes place, she will be transported to and held in an ICE facility for processing, possibly for months, not only lengthening her sentence, but subjecting her to another dangerous and harsh term of confinement that this Court cannot control. These collateral consequences—consequences that

DEFENDANT RUTHIA HE'S SENTENCING MEMORANDUM AND OBJECTIONS TO
PRESENTENCE REPORT
Case No. 3:24-cr-00329-CRB

neither her co-defendant, nor other similarly situated defendants face—are substantial additional punishment in and of themselves.

The facts about the nature and circumstances of the offense are also mitigating here, and set this "first-of-its-kind" prosecution—premised on the claim that Ms. He controlled Done and that Done's policies "caused" or "pressured" independent licensed medical providers to issue unauthorized prescriptions, *see* Indictment ¶¶ 65-70—sharply apart from the "heartland" of roughly comparable drug trafficking cases. This important distinction the Court recognized in the course of trial: "There's no question in my mind—and this separates this case from *Napoli* and all the other cases that I've seen, is that these people prescribed for a—an appropriate medication, appropriate to the condition that the person complained about, and that is a medical exercise." Tr. 5208: 2-6 (emphasis added).

Consistent with the novel premise of this prosecution, the focus of the Government's trial presentation was the deviation of Done's policies from usual medical standards and the risk that posed to patients. S*ee, e.g.*, Tr. 225:1-17; 232:21-233:2; 5144:20-5415:1. The Government has never tried to prove that Done's medical professionals prescribed to patients they knew did not have a medical need for ADHD medication, or that Ms. He intended such a result, or that any patient was actually harmed by the prescriptions for ADHD medication written by Done medical providers. Indeed, the Court described the case as follows during trial: "I am convinced that there was a vast number of people on this platform that prescribed medication, an appropriate medication for the disease attention-deficit disorder. . .What is different and why it's a crime is because it doesn't meet generally accepted standards of the medical profession . . . " *See* Tr. 5207: 20-5208: 12 (emphasis added);  *see also* Tr. 5161: 5-25 ("This case is [one] where every patient who got medicine demonstrated—not every, because I didn't see 137,000 [patient files]—but everything I saw suggested [the patient] demonstrated some indication of attention deficit disorder for which it

3

DEFENDANT RUTHIA HE'S SENTENCING MEMORANDUM AND OBJECTIONS TO PRESENTENCE REPORT
Case No. 3:24-cr-00329-CRB

is stipulated that Adderall is an appropriate prescription.")[1] As the Court explained, "putting it another way, the Government has not produced evidence that would show that the standard, that is [the] [']medical purpose['] standard, isn't met." Tr. 5208: 16-18.  Similarly, the Court has long recognized that this case has never involved any allegation that "Done or any prescription issued by the independent licensed medical specialists treating these patients caused" the patients any harm.  Tr. 2265:25-2266:6.  To the contrary, as the hundreds of contemporaneous positive patient reviews (*see* Appendix II and Ex. K), and the video prepared for this Court from an ordinary Done patient attests (*see* Ex. A), the medical services delivered through Done's telehealth platform did in fact impact many lives for the better.

In light of all of these factors, the imposition of a lengthy additional term of incarceration on Ms. He would not fulfill any goal of sentencing.  Ms. He has tremendous potential to do good in the world and rebuild her life in a positive fashion, as well as a community that stands ready to support her.  Ms. He submits that, in consideration of the sentencing factors set forth in 18 U.S.C. § 3553(a) and the parsimony principle, a sentence of 41 months of incarceration is sufficient, but not greater than necessary, to fulfill the goals of sentencing.  Any additional term of incarceration imposed on Ms. He will result in a sentence significantly more severe than if the same sentence were imposed on a U.S. citizen, given the disparity in actual time served described above, and the fact that her U.S. citizen counterpart would serve a further term in a camp facility without any additional term of imprisonment in an ICE facility at the back-end of her term.

---

[1] Consistent with this view, the Court also expressly rejected any allegation that <u>all</u> of the prescriptions issued by Done prescribers were unauthorized.  *See* Tr. 5195:8-18 (The Court (addressing defense counsel): "You maintain that it's the Government's position that every pill was improperly prescribed, every patient shouldn't have gotten medicine. I don't think <u>-- if that's their point -- and we had this discussion months ago. If that's their point, they failed to prove their case, and I will throw it out on that basis.</u> Throw it out on that basis . . . because it never struck me that they were going to argue or maintain that every pill that came out of here -- out of this process was improper.") (emphasis added).

4

DEFENDANT RUTHIA HE'S SENTENCING MEMORANDUM AND OBJECTIONS TO PRESENTENCE REPORT
Case No. 3:24-cr-00329-CRB

**I.     CONSIDERATION OF THE SECTION 3553(A) FACTORS MERITS A SENTENCE OF 41 MONTHS.**

As the Supreme Court has observed, a Court's sentencing responsibilities carry the obligation to "consider every convicted person as an individual and every case as a unique study," and, for that reason, judges are given both flexibility and deference under 18 U.S.C. 3553(a)," so that they may freely exercise compassion in the face of the "the human failings" that can, and do, lead good people temporarily astray. *Gall v. United States*, 552 U.S. 38, 52 (2007) (internal citations omitted). Under § 3553(a), the Court must look at (1) the history and characteristics of the defendant; (2) the nature and circumstances of the offense; (3) the need to protect the public from further crimes of the defendant; (4) the need to afford adequate deterrence; and (5) the need to avoid unwarranted sentence disparities.

While the Court may consider the Federal Sentencing Guidelines (the "Guidelines") in making its determination, the Court "may not presume that the Guidelines range is reasonable" and "must make an individualized assessment based on the facts presented." *Gall*, 552 U.S. at 50. The Court, not the Sentencing Commission, is "in a superior position to find facts and judge their import under § 3553(a)," with the goal of imposing a particularized sentence minimally sufficient to accomplish the statutory aims of sentencing. *Kimborough v. United States*, 552 U.S. 85, 109 (2007) (citation omitted); s*ee also United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (citing *Gall*, 552 U.S. at 50); *Rita v. United States*, 551 U.S. 338, 351 (2007).

As set forth below in Section III, and further detailed in Appendix I (Objections to the Final PSR), the parties disagree sharply over the proper Guidelines computation based on the base offense level determined by the drug quantity table. But in this case especially, a "ritualistic" application of the Guidelines, as this Court has termed it, is inconsistent with the purposes of sentencing, *see United States v. Napoli*, ECF No. 1290, at Tr. 10:15-11:5 (June 5, 2013), whereas consideration of the statutory factors under § 3553(a) permits the Court to arrive at a sentence that is sufficient, and not greater than is necessary, in this case.

DEFENDANT RUTHIA HE'S SENTENCING MEMORANDUM AND OBJECTIONS TO PRESENTENCE REPORT
Case No. 3:24-cr-00329-CRB

**A.       Ms. He's History and Characteristics are Highly Mitigating.**

Born and raised in China in a modest apartment, Ms. He had a passion for technology—and using technology to solve problems in the world—from an early age. *See* Ex. B, Sentencing Mitigation Report at 2; Ex. C, Character Letters at 38 (Ms. He's parents) ("She showed an early passion for computers, participating in computer competitions from elementary school and winning awards."). An only child to two prominent scholars from the Chinese Academy of Social Sciences, who were both busy professionals, Ms. He spent much of her time alone studying and exploring the power of technology with the family's computer. *See id.* Her parents' early emphasis on intellectual curiosity, hard work, and academic excellence instilled in Ms. He these values, which became core to her life. *See id.* The same is true for her parents' frugal lifestyle, and the lack of value placed on material possessions—which likewise became a defining characteristic of Ms. He's life as an adult, even after Done's success. *See id.* at 39.

Ms. He's early passion for technology blossomed in high school and college, where she served as the art designer for the school magazine, using computers to design layouts and images. *Id.* at 28. Ms. He was admitted to Peking University, majoring in advertising, and together with her classmates, she developed software that allowed students to conveniently select courses, classrooms, and library resources online—free of charge. *Id.* As her parents explain in their letter to the Court, Ms. He often expressed that her "life ideal was to use her technical skills – 'to make the world a little better." *Id.*

Ms. He's interest in innovation, and desire to study and work in what she viewed as the most creative place on earth, moved her to immigrate to the United States in 2013 to attend school at Carnegie Mellon University. *Id.* at 29. After earning a Masters in Product Development, Ms. He began working at Facebook as a product designer, and obtained an EB-1 visa, an employment-based visa for individuals with extraordinary ability. Ex. B at 3. There, she worked on a range of Facebook's creative products, including Quick, Slide Show, Messenger, and Moments, and gained

6

greater insight into how technology can improve the world.  As Ms. He stated in an interview while working for Facebook in 2017, she hoped that, through her career in technology, she would "creat[e] new experiences that hopefully . . . make people's lives slightly better."[2]

Ms. He left Facebook and founded a music streaming startup called Renaissance in 2018. While she enjoyed the creativity and challenge associated with building Renaissance, she did not feel personally fulfilled growing the company.  As she explained to a friend in an email from December 2019, around the time she began working on Done:

> I've been thinking about if doing startups is what I truly want. I think making money and competing with other people have been rewarding to me, but I can never do it too well cuz they're not the things that will make me smile when waking up every day. What attracts me is always the creativity part. I like to create things that are valuable to people, create solutions that can solve problems.

EX 7631 (emphasis added);[3] see also EX 7611 (Ms. He: "I think my problem is I wanted to change the world.  Not do companies like running coffee shops.  Even if I do 5 companies it's still not completely solve my problem.  Like since Google, Facebook, Amazon, I rarely see startups that can really change the world. Like something will make [] history by pushing the human being forward.") (emphasis added).

It was this worldview—that technology has the power to make a positive difference in the world—███████████████████████████████████████████████████, that motivated Ms. He to build Done.  As Ms. He's parents describe, "[Ruthia] explained to us that the motivation for founding Done came from seeing a close friend with ADHD struggle to obtain medical treatment. She sincerely wanted to use internet technology to help this vulnerable group overcome barriers to care."  Ex. C at 39.  ███████, the friend who

---

[2] Marvin Luiz, *Five to Inspire with Ruthia He*, Medium (Feb. 12, 2017) https://medium.com/five-to-inspire/five-to-inspire-with-ruthia-he-a5ecd601414d.

[3] "TX" are admitted trial exhibits.  "EX" are exhibits that were marked but not admitted as evidence. Additional exhibits, that are neither TX or EX, are marked by exhibit letter alone.

DEFENDANT RUTHIA HE'S SENTENCING MEMORANDUM AND OBJECTIONS TO PRESENTENCE REPORT
Case No. 3:24-cr-00329-CRB

witnessed the inception of Done firsthand and "potentially inspired it," explains in his letter to the Court that "Ruthia's company lifted a huge weight and helped me get the treatment I needed," and Ms. He's "dedication was visible in every interaction we had." *Id.* at 5.  Mr. ███ recalls Ms. He "earnestly trying to learn as much as she could about ADHD healthcare" and that her dedication to her mission was so great that she would "sleep[] on the floor of her office because she refused to take a higher salary." *Id.*

Another friend, Tao Hu, also describes how, in 2020, right as Ms. He was beginning the process of building Done,  Ms. He "████████████████████████████." *Id.* at 47.   Mr. Hu recalls that rather than giving up, Ms. He "turned to self-education. She began studying psychology intensely." *Id*.  Mr. Hu explains that "[i]t was from this personal pain and healing that the idea for her mental health startup emerged. She told me she wanted to build a platform that would make the kind of help she needed accessible to ordinary people."  *Id*.; *see also id.* at 7 (Letter from friend Alexander Terekhov noting that in early 2020  "Ms. He was experiencing significant psychological stress. Rather than turning inward, she began exploring the mental health space with the goal of helping herself and others facing similar challenges, and only secondarily as a business endeavor."); *id.* at 44 (Letter from friend Sasha Dai explaining "Ruthia was never like the rest" of the tech entrepreneurs she had met in Silicon Valley because, unlike others who were preoccupied with becoming rich, Ruthia "wanted to use technology to be a lifeline for those who felt abandoned.").

Unlike many defendants who come before the Court convicted of white collar criminal offenses, Ms. He did not lead a lavish lifestyle.  To the contrary, as Government witness Aakash Prasad explains, "despite professional success, [Ruthia] lived an extremely modest life in San Francisco. She slept on a mattress on the floor, owned very little, and avoided any display of wealth or luxury. Her motivation was never money, status, or indulgence. If anything, she was unusually restrained and inwardly driven." *Id.* at 3.  Another friend, Yixi Jin, recalls that "[i]n all the years

DEFENDANT RUTHIA HE'S SENTENCING MEMORANDUM AND OBJECTIONS TO PRESENCE REPORT
Case No. 3:24-cr-00329-CRB

I have known [Ruthia], I have never seen her pursue luxury or material comfort." *Id.* at 55.  One childhood friend from China remembers visiting Ms. He's apartment in San Francisco and being "surprised to learn that she shared a two-bedroom unit with a roommate. Even after working for nearly five years and being financially capable of a more comfortable lifestyle, she had retained her frugal and practical habits." *Id*. at 35.

While perhaps unusual in the business world, Ms. He's selfless nature and lack of interest in material comfort is no surprise to those who have known her for years.  Letters from those who grew up with Ms. He cite example after example of altruism towards friends and strangers alike. Jingwen Jin, a childhood friend, describes how, as a young girl, Ms. He took the extra time to help her with math problems that she struggled to understand. *Id.* at 17.  A high school friend, Ruobi Li, recounts how, on a class trip to the Great Wall of China, Ms. He encouraged and supported him as he struggled to get to the finish line of a seven hour hike after he became tired and had fallen behind. *Id.* at 35.  Ms. He's cousin recalls a time when he and Ruthia were driving and came upon an old woman struggling to walk down a road carrying a heavy bag.  Unlike most people who would drive on by without blinking an eye, Ms. He insisted that they stop the car and give the woman—a complete stranger—a ride to her destination.  *Id.* at 36.  Another friend, Jian Lin describes how, after the tragic Butte County Camp Fire in 2018, Ms. He took it upon herself to organize a concert to raise money for the victims.  *Id* at 16.  Such acts of selflessness are a consistent refrain in the letters submitted to the Court.  *Id.* at 46 (Letter from Tao Hu, explaining that Ms. He's "generosity extends far beyond her own projects; she actively helps others succeed without expecting anything in return"); *id* at 42 (Letter from Shaonan Liu describing how "Ruthia embodies an innate 'altruistic' spirit."); *id.* at 13 (Letter from Jason Gui explaining how, in his 10 years of friendship with Ms. He, "Ruthia was always about helping others.").  Even a Government witness, Aakash Prasad, who testified against Ruthia at trial, wrote to the Court to describe his own familiarity with Ruthia's unselfish soul.  *Id.* at 3  ("In the years I knew Ruthia. . .she was a

DEFENDANT RUTHIA HE'S SENTENCING MEMORANDUM AND OBJECTIONS TO
PRESENTENCE REPORT
Case No. 3:24-cr-00329-CRB

consistently loyal and present friend. Over several years, she was there for me whenever I needed support—emotionally and personally—without expecting anything in return. There was no transaction, no advantage, and no benefit to her. She showed up simply because that is who she was as a person. That quiet loyalty, extended without self-interest, is the version of Ruthia that I knew.")

Ms. He's desire to help those in need has long drawn her to nonprofit work. When she was in middle school, Ruthia "participated in social practice projects, designing a social survey focused on the LGBTQ hope [sic] to pay attention to vulnerable groups." *Id.* at 38. Ms. He's school friend Yixi Jin explains that while "most of our peers were focused solely on studying for exams. . . Ruthia was already thinking about advocating for the rights of vulnerable groups," particularly in the LGBTQ community. *Id.* at 39. In college, Ms. He "volunteered with the United Nations Anti-Human Trafficking Office in Beijing, assisting trafficked women." *Id.* 38. And "[i]n 2023, Ruthia started the Olivia research project, an AI companion to support low-income communities, especially immigrants and individuals who are not English speakers" who struggled to find accessible mental health support." Ex. B at 12

Ms. He's kindhearted and generous nature has shone through even at her lowest point—while she has been in custody. One fellow inmate, Yueming Lin explains that, while in custody, "Ruthia [was] a kind, gentle, and genuinely compassionate person. She consistently treated others with respect, patience, and understanding. Even in difficult circumstances, she maintained a calm, peaceful attitude and never engaged in conflict. She offered help to others whenever she could, and her caring nature stood out to many of us." Ex. C at 59. Ms. Lin recalls how Ms. He helped her read and pronounce English words and even reviewed her GED assignments. *Id.* Another inmate, Jessica Ke Yuan describes how Ms. He's "generosity and service to others" made her stand out from other incarcerated persons. *Id.* at 15. Ms. Yuan describes how "Ruthia regularly shared her food, personal items, and books with inmates who had little or nothing" and "spent time

10

DEFENDANT RUTHIA HE'S SENTENCING MEMORANDUM AND OBJECTIONS TO
PRESENTENCE REPORT
Case No. 3:24-cr-00329-CRB

teaching other inmates the Chinese language, helping them stay mentally engaged, learn a new skill, and find purpose during a difficult period." *Id.* While "[m]any people inside custody withdraw or focus only on themselves; Ruthia consistently looked outward and lifted others up." *Id.*

**B.      A Sentence of 41 Months Would Avoid Unwarranted Sentencing Disparities Caused by the Extreme Collateral Consequences Ms. He Faces.**

Ms. He faces a number of separate and distinct forms of punishment that her co-defendant in this case, and other similarly-situated defendants, will not face, which are further detailed in the declarations submitted by prison consultants Joel Sickler and Janet Perdue and immigration expert Stacy Tolchin. These severe collateral consequences magnify greatly the impact of her conviction and any additional lengthy term in prison.

First, although she is a lawful permanent resident, Ms. He is not a United States citizen despite having lived in this country for much of her adult life. Therefore, due to the nature of her conviction and regardless of the sentence imposed by the Court, she will be deported to China. Her deportation will also permanently bar her from reentering the United States, forcing her to leave behind forever a professional and personal support network to attempt to rebuild her life in China under challenging circumstances.  Ex. D, Declaration of Stacy Tolchin ("Tolchin Decl.") at ¶¶ 10-15.  Whatever sentence is imposed, the impact of her deportation will be devastating, and she faces a troubled and difficult future. As her parents explain:

> She has lived in the US for 13 years and is now 34 years old. Both her work and life since graduating from school and entering the workforce have been spent in the US, and her life is now deeply intertwined with American society. If she were to be deported to China after serving her sentence, she would have to abandon all her social connections, career achievements, and professional networks in the US, losing all the fruits of her over-a-decade-long efforts.
>
> If she were to return to China, due to her long-term disconnection from Chinese society, she would face difficulties in readapting to a new environment and rebuilding her life from scratch. China has a large population and intense competition, especially during the current economic difficulties. As a middle-aged woman—a vulnerable group in society—she would have to compete with

11

DEFENDANT RUTHIA HE'S SENTENCING MEMORANDUM AND OBJECTIONS TO PRESENTENCE REPORT
Case No. 3:24-cr-00329-CRB

numerous young people and face multiple hardships, including difficulties in employment, marriage, and raising children. This would be a great challenge for her.

Ex. C at 40.

Second, as the declarations explain, another ramification arising from Ms. He's status as a non-citizen is that she will be ineligible for reductions via the First Step Act. At best, she will benefit only from a portion of the First Step Act. "A prisoner is ineligible to apply time credits under subparagraph (C) if the prisoner is the subject of a final order of removal under any provision of the immigration laws (as such term is defined in section 101(a)(17) of the Immigration and Nationality Act (8 U.S.C. § 1101 (a)(17))." 18 U.S.C. § 3632(d)(4)(E)(i). Consistent with this statute, once a final order of removal is entered, a non-citizen cannot earn any FSA reductions. Provided a final order of removal has not been entered, a non-citizen could earn up to 365 days of Reduction in Sentence ("RIS") credit during the prisoners first 26 months of incarceration. Ex. E, Declaration of Janet M. Perdue in Support of Defendant Ruthia He's Sentencing Memorandum ("Perdue Decl.") at ¶¶ 10-12; Ex. F, Declaration of Joel A. Sickler in Support of Defendant Ruthia He's Sentencing Memorandum ("Sickler Decl.") at ¶¶ 25-26. Earning these credits depends on matters unrelated to the prisoner's good conduct or the amount of programming performed, but rather on the timing of the appeal and immigration court processes; that is, when a final conviction and order of removal is ultimately entered.

It is at this point that any uncertainty ends. Whether a non-citizen earns the one year of RIS credit that is available, a non-citizen cannot benefit from any FSA credit toward early release to a halfway house or home confinement. Perdue Decl. at ¶ 12. This inequity means that a U.S. citizen would serve less than half of their sentence in prison while a non-citizen would serve substantially more time. Sickler Decl. at ¶ 26 (explaining that this "could add over a year to her sentence"). Indeed, as the declarations explain, rather than being transferred to a half-way house or home-confinement when her custodial sentence nears its end (likely between six and twelve

12

DEFENDANT RUTHIA HE'S SENTENCING MEMORANDUM AND OBJECTIONS TO PRESENCE REPORT
Case No. 3:24-cr-00329-CRB

months before her release date), a non-citizen like Ruthia will serve out their full custodial sentence. Perdue Decl. at ¶ 12; Sickler Decl. at ¶¶ 26-28. This compounds the inequity in actual time served when the same sentence is imposed on a legal permanent resident, like Ruthia, versus a U.S. citizen. A comparable U.S. citizen can also reduce their sentence by an additional one year for successfully completing the Residential Drug Abuse Program, which is unavailable to non-citizens, and which will therefore be unavailable to Ms. He. Perdue Decl. at ¶ 15; Sickler Decl. at ¶ 24. And non-citizens are not eligible for furloughs to address family medical issues or deaths, and they cannot be released to home confinement pursuant to the CARES Act, for example in the event of a medical situation similar to the COVID-19 pandemic. Perdue Decl. at ¶ 14.

Third, Ms. He's post-incarceration release will be complicated by an ICE detainer that will be placed during BOP incarceration to eventually accommodate the process of deporting a foreign national at the completion of their sentence. Sickler Decl. at ¶ 29 (explaining that "armed ICE agents would transport Ms. He (probably by bus) to a detention center once she is formally released from BOP custody to await the process of being physically removed from the U.S."). Once any direct appeal is concluded, Ms. He will then be subjected to ICE custody for an undetermined period, possibly for months, until deportation is effectuated. Sickler Decl. at ¶¶ 29-31.

Fourth, in an additional set of inequities related to Ms. He's status as a lawful permanent resident ordinarily, after the imposition of a sentence of imprisonment, a U.S. citizen defendant with her (non-violent) offense, who has no history of violence, no prior criminal record, and no outstanding detainers would be eligible to be designated by the BOP to a minimum-security prison camp. However, as the declarations explain, her status as a "Deportable Alien" means that she, unlike her U.S. citizen counterpart, will be ineligible to be designated by the BOP to a minimum-security prison camp. Instead, she will be designated as a low-security inmate, rather than as a minimum-security one. Perdue Decl. at ¶ 16; Sickler Decl. at ¶ 10-11. The differences are "stark." Perdue Decl. at ¶ 26. Low-security prisons generally have security protocols and living conditions

DEFENDANT RUTHIA HE'S SENTENCING MEMORANDUM AND OBJECTIONS TO PRESENTENCE REPORT
Case No. 3:24-cr-00329-CRB

far harsher than what exist at the minimum-security, camp level, and Ms. He is likely to be housed with someone with a much more serious criminal background than she has.  Perdue Decl. at ¶¶ 13, 28; Sickler Decl. at ¶¶ 11, 20, 22.  Given her high-profile trial and her professional background, she is particularly vulnerable and at risk of becoming victimized, especially while serving a term of confinement in a low-security facility. This is a risk that U.S. citizen inmates are not likely to face in a minimum-security prison camp.  Perdue Decl. at ¶¶ 29, 52.

Fifth, the current conditions in low-security BOP and ICE facilities are deplorable. Sickler Decl. at ¶¶ 18-20, 34, 44-56. Female inmates in BOP custody face a much harsher confinement due to undeterred sexual abuse and unsafe conditions. Perdue Decl. at ¶¶ 30-46. As if these issues weren't enough to create an unwarranted disparity, the influx of ICE detainees and resulting unsafe and inhumane conditions add another layer and lack of humanity.  Just yesterday, the New York Times reported that the number of immigrants in ICE custody has doubled in the last 14 months, which has further deteriorated conditions and led to 46 deaths since President Trump took office last year.[4] *See also* Ex. B at 14-15 (describing how the influx of ICE detainees is even making conditions worse at BOP facilities due to the Trump administration's use of federal prison to house migrant detainees, which has "let to severe overcrowding, with reports of women being packed into broken, unsanitary facilities, small cells, forced to sleep on concrete floors, reduced food portions, and facing limited access to basic sanitation.").

Sixth, another significant, non-traditional punishment Ms. He may suffer from a lengthy additional sentence is the potential lost opportunity to become pregnant and have children.  As her parents' letter attests, having children is deeply important to Ms. He.  Ex. C at 40.  But at the age of 34, Ms. He finds herself facing a sentence that could thwart that dream, or at a minimum make a successful pregnancy more difficult and heighten the medical risks associated.

---

[4] Jazmine Ulloa et. al, *Deaths in ICE Custody Are Growing. "They Let Him Rot in There,"* N.Y. Times (Mar. 29, 2026), https://www.nytimes.com/2026/03/29/us/ice-detention-deaths-immigrants.html?smid=nytcore-ios-share.

14

DEFENDANT RUTHIA HE'S SENTENCING MEMORANDUM AND OBJECTIONS TO PRESENTENCE REPORT
Case No. 3:24-cr-00329-CRB

Finally,

The Court can and should account for these collateral consequences—which impose significant and unwarranted additional punishment—that Ms. He will face under § 3553(a).[5] Even before the guidelines became advisory, for example, courts were permitted to grant a downward departure from the increased severity in punishment resulting from non-citizenship. *See*, *e.g.*, *United States v. Farouil*, 124 F.3 838, 847 (7th Cir. 1997) ("The district court is thus free to consider whether Farouil's status as a deportable alien has resulted in unusual or exceptional hardship in his conditions of confinement."); *United States v. Bakeas*, 987 F.Supp. 44, 49 (D. Mass. 1997) (granting downward departure because "[p]rison camp and a medium security prison

---

[5] The increased severity in punishment Ms. He faces, including based on being a non-citizen immigrant to the U.S., is relevant to considering the "history and characteristics of the defendant" under 3553(a)(1), the need to "provide just punishment for the offense" under 3553(a)(2)(A) (emphasis added), "to afford adequate deterrence" under 3553(a)(2)(B), to provide "correctional treatment in the most effective manner" under 3553(a)(2)(D), "the kinds of sentences available" under 3553(a)(3), "to avoid unwarranted sentencing disparities," under 3553(a)(6), and to the overall consideration that courts impose a sentence "sufficient, but not greater than necessary," to fulfill purposes of sentencing set forth in 3553(a)(2).

15

DEFENDANT RUTHIA HE'S SENTENCING MEMORANDUM AND OBJECTIONS TO PRESENTENCE REPORT
Case No. 3:24-cr-00329-CRB

are as different in kind as are home detention and community confinement, and they have as great an impact on whether [the defendant's] sentence is 'greater than necessary.' It would be inconsistent for the guidelines to instruct me to consider the latter difference and forbid me to consider the former.").

Since the Guidelines have become advisory, courts—including this Court—have increasingly recognized and acted to mitigate the increased punishment imposed on non-citizens, particularly where, as here, the defendant was otherwise lawfully in the United States.  For example, in *United States v. Hussain*, this Court varied downward from the Guidelines of 87 to 108 months to a sentence of 60 months in part because the defendant was an alien who wouldn't be eligible for a camp.  *See* 3:16-cr-00462-CRB, ECF No. 562, at 51:11-52:24 (N.D. Cal. May 14, 2019);  *see also United States. v. Agarwal*, 1:19-CR-864, ECF No. 850, at 99:4-100:9 (N.D. Ill. Aug. 19, 2024) (following highly-publicized trial conviction for what the Government called a "billion dollar" fraud scheme, departing downward to impose a sentence of three-years' probation in a halfway house for the president and founder of healthcare advertising startup Outcome Health based in part on the disparity caused by her non-citizen status); *United States v. Carrillo*, 440 F.Supp.3d 1148, 1156-1157 (E.D. Ca. 2020) (Mueller, J.) (sentencing methamphetamine dealer to a term of imprisonment 50% below the low-end of the Guidelines range based on the view that drug quantity guideline was a poor proxy for culpability and considering circumstances unique to defendant such as the fact that he would be deported after sentencing and, because of his immigrant status, he would be ineligible for good time credit and participation in BOP programs).  And in *United States v. Connolly*, a fraud case in the Southern District of New York, Judge McMahon observed:

> If I could sentence Mr. Black to a term of incarceration—a brief term of incarceration—knowing that he would go to a facility appropriate to his criminal conduct, I would do it. But I know that I can't. I know that simply because he is a noncitizen—and I use that term advisedly. He is not an illegal alien. But because he is a non-citizen, he will not be eligible to serve his sentence in the same way that

DEFENDANT RUTHIA HE'S SENTENCING MEMORANDUM AND OBJECTIONS TO PRESENTENCE REPORT
Case No. 3:24-cr-00329-CRB

any American citizen who stood convicted of this crime would serve. And that's not right.

No. 16-CR-370, ECF 451, at 91:4-12 (S.D.N.Y. 2019).  Facing a Guideline range of 57-71 months, Mr. Black was sentenced to time served and nine months home confinement in the U.K., his native country. *Id*. at 95:6-9.  Other courts have similarly accounted for non-citizens facing incarceration in an unnecessarily harsh prison environment based on their citizenship status. *See*, *e.g.*, *United States. v. Walchli*, No. 20-CR-497, ECF 110, 111 at 44  (S.D.N.Y. 2024) (defendant faced a Guideline range of 18-24 months, sentenced to time served); *United States. v. Lewis*, No. 23-CR-370, ECF 66, 67, 69  (S.D.N.Y. 2024) (defendant facing a Guideline range of 18-24 months was sentenced to three years' probation in home country); *United States. v. Cohen*, No. 19-CR-741, ECF 48 at 38:4-5, 44:17-45:10 (S.D.N.Y. 2020) (defendant facing Guideline range of 30-37 months, sentenced to time served plus one year of supervised release with the condition of home detention. Defendant ordered to return to his home country upon completion of sentence).

C.      **The Need for Deterrence Does Not Require the Imposition of an Additional Lengthy Prison Term.**

The magnitude that Ms. He's fall from grace has had on her, and the start-up community—including, in particular, the life-altering consequences she faces as a result of her conviction—have already had a specific and general deterrence effect.  Letters from those in the startup community make clear that similarly situated businesspeople view Ms. He's case as a cautionary tale and have already learned important lessons. *See, e.g.*, Ex. C at 25 (Joey Wang, a software engineer based in San Francisco writes: "Many of my past and current coworkers are immigrants, and this case has received significant attention among them. Over the past year, I have personally spoken with five to ten peers about Ms. He's situation. What I have observed is that people are taking the right lesson from this case: founders are now thinking more seriously about legal compliance from the start, seeking legal advice earlier, and making sure they understand the rules before building. In my view, the public trial, the damage to her reputation, and the uncertainty Ms.

17

He has already gone through have sent a clear message about the importance of following the law. The community has heard that message.").

Those who are closest to Ms. He and best understand her character also attest to her remorse and share with the Court their view that Ms. He—who has no prior criminal record—is not a recidivism risk, and has tremendous potential to rebuild her life in a way that has a positive impact on the world. Government trial witness, Aakash Prasad writes: "Based on my long personal relationship with her, I do not believe Ruthia poses any risk of reoffending. The consequences she now faces are life-altering. Following sentencing, she will be deported to China, separated from the country she built her adult life in, and forced to rebuild from nothing. She is an only child, and her only support there consists of elderly parents. The weight of these consequences is not theoretical — it is permanent and profound." *Id.* at 3; *see also id.* at 26 (Letter from Joseph Lai: "I also believe Ruthia has reflected on her decisions. In our conversations over the past months, she has discussed this without qualification, as someone acknowledging what she should have done differently"); *id.* at 40 (Letter from Ruthia's parents: "Through phone calls from detention, she has repeatedly expressed deep remorse and reflection. . . She has repeatedly expressed profound regret for the worry and harm caused to us as her parents and hopes to begin anew after returning to society").

Additionally, unlike many federal offenders, Ms. He has a robust support network that will help her reintegrate into society once she is released from prison. *See, e.g., Id.* at 47 (Letter from Tao Hu: "I am fully committed to supporting Ruthia's rehabilitation and reintegration into society . . . On a personal level, knowing the mental health challenges she has faced, I pledge to remain a steady presence in her life. I plan to meet with her regularly—at least once a month—to check on her well-being and provide a sounding board for her decisions."); *id.* at 24 (Letter from Joey Wang: "I am committed to supporting her in that future-including mentorship, introductions, accountability check-ins, and practical help to support sound decision-making and continued

18

DEFENDANT RUTHIA HE'S SENTENCING MEMORANDUM AND OBJECTIONS TO
PRESENTENCE REPORT
Case No. 3:24-cr-00329-CRB

growth in the AI industry."); *id.* at 18 (Letter from Jingwen Jin: "If Ruthia is able to return to her normal life, I would be willing to support her in exploring ways to apply technology to educational and charitable efforts . . . . Based on more than two decades of firsthand observation, I genuinely believe she has both the intention and the capacity to contribute positively to society."); *id.* at 27 (Letter from Kevin Blasko: "I am committed to supporting Ruthia, whatever comes next.").

These letters support the conclusion that any additional prison term imposed on Ms. He does not need to be lengthy to ensure that she will lead a law-abiding life going forward, or for the public to recognize the severity of the offense and deter other entrepreneurs from committing similar crimes. By the time she is sentenced, Ms. He will already have served close to two years in prison. "Current empirical research on general deterrence shows that while certainty of punishment has a deterrent effect, increases in severity of punishments do not yield significant (if any) marginal deterrent effect . . . Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." *United States v. Velazquez*, No. 16-cr-233, 2017 WL 2782037, at *4 (S.D.N.Y. May 26, 2017). And, as to white collar crime in particular, "there is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders." Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 448-49 (2007). Thus, "[s]entencing judges should try to be realistic about the incremental deterrent effect of extremely long sentences," if any. *See United States v. Craig*, 703 F.3d 1001, 1004 (7th Cir. 2012) (Posner, J., concurring).

In short, the marginal deterrent effect of a lengthy additional sentence in this case would at best be minimal—particularly given the high profile nature of Ms. He's fall from grace, the term of imprisonment she has already served, and the severe personal and professional collateral consequences of her conviction.

19

DEFENDANT RUTHIA HE'S SENTENCING MEMORANDUM AND OBJECTIONS TO
PRESENTENCE REPORT
Case No. 3:24-cr-00329-CRB

**D.   The Nature and Circumstances of the Offense Support a 41-Month Sentence.**

As this Court has recognized, *see supra* pages 2-3, this case bears few similarities to the "heartland" of drug trafficking cases.

> *1.     ADHD is Significantly Underdiagnosed and Undertreated in the United States and Done Was Created to Alleviate That Problem.*

There is a world of difference between the circumstances present in this case and the "street drug" trafficking cases that make up the typical prosecution under 21 U.S.C. §§ 841 and 846.

Done was created to connect persons suffering from ADHD with medical providers who treat ADHD, even when those individuals were not within driving distance.  It was undisputed at trial that ADHD is notoriously undertreated because many people suffering from the disorder lack access to the care that they need.  Tr. 3997:12-16 (Government expert Dr. David Goodman testifying that four out of every five adults with ADHD go undiagnosed and untreated).  As the trial evidence showed, licensed specialists who can treat ADHD are in short supply in much of the country.  Half of the counties in the United States lack a single psychiatrist and more than 150 million people live in federally designated mental health professional shortage areas.  To add to the national shortage of psychiatric providers, approximately 45% of psychiatrists don't take insurance, and many will not even accept Medicaid.  Tr. 4001:8-10, 4001:17-19.  Psychiatric care, without insurance, is expensive.  Indeed, Government expert Dr. David Goodman admitted that he charges $1,400 for an initial ADHD evaluation lasting 90 minutes and $250 for every follow up appointment—prices out of reach for the average American. Tr. 4000:19-22, 4072:17-22.  Done's payment model, on the other hand, was aimed at being affordable for the everyday American: patients could receive an initial evaluation for $199, and if diagnosed, ongoing care for a recurring monthly fee of $79.  In other words, the intention behind Done, unlike in a street drug case, was aimed at reducing real barriers to medical care.

DEFENDANT RUTHIA HE'S SENTENCING MEMORANDUM AND OBJECTIONS TO PRESENTENCE REPORT
Case No. 3:24-cr-00329-CRB

**2.** ***Stimulant Medication—the "First Line" Treatment for ADHD—Is Generally Non-Addictive When Prescribed and Taken in Therapeutic Doses and Can Have a "Life-Changing" Impact on ADHD Patients.***

As Government witness Dr. Goodman testified, stimulants like Adderall are the "first-line" treatment for ADHD. Tr. 4006:1-11. Thus, as compared to "street drug" cases—or even the "opioid" cases involving prescribing doctors—the controlled substance at issue here is meaningfully different than in other criminal cases. While these medications are Schedule II controlled substances that must be prescribed by a licensed provider, they are much less addictive and dangerous than other Schedule II stimulants, like cocaine and methamphetamine. Tr. 4014:13-4018:22; EX 6200 at 29.[6] And, unlike other types of prescription medication such as opioids, which have a high risk of addiction even when taken as appropriately prescribed by a doctor, studies show that the risk that a patient with ADHD will become addicted to their stimulant medication when prescribed in therapeutic doses is low. Tr. 4020:1-4021:10 (Dr. Goodman confirming that risk of patients developing an addiction to long-acting stimulant medication is low).

In this case the Government did not even attempt to prove—because it could not do so—that Done had a practice or policy of prescribing stimulant medication in amounts that exceeded the therapeutic dose recommended by the FDA. Moreover, the trial evidence was undisputed that this relatively low-risk medication can be "life-changing" for ADHD patients when prescribed and taken in therapeutic doses. Tr. 630:1-19. In other words, unlike in street drug cases, or cases involving pain doctors whose prescribing habits contributed to the so-called opioid "epidemic," this case is premised on a much safer, far less addictive medication that has been FDA approved

---

[6] Lauren J. Tanz, et al., *Drug Overdose Deaths Involving Stimulants ― United States, January 2018–June 2024*, Centers for Disease Control, (Aug. 8, 2025), https://www.cdc.gov/mmwr/volumes/74/wr/mm7432a1.htm.

21

DEFENDANT RUTHIA HE'S SENTENCING MEMORANDUM AND OBJECTIONS TO PRESENTENCE REPORT
Case No. 3:24-cr-00329-CRB

and prescribed—including to millions of children—for decades. In considering culpability, and the "harm" caused by the offense conduct, that difference merits meaningful consideration.

The fact is, and the evidence demonstrates, that Done did provide life-changing care to many patients, as the video submitted to the Court from one of Done's patients (*see* Ex. A) attests. While the Government's trial presentation emphasized the 16 patients whose charts were reviewed and critiqued by Government expert witness Dr. Goodman, there were thousands and thousands of patients who utilized the Done platform and found the care to be exemplary. A small sample of their reviews has been compiled at Appendix II and is aimed at giving the Court a sense for the many thousands of Done patients whose lives were changed for the better as a result of the care received through the Done platform. *See also* Ex. K. Indeed, even the Government's expert witness, Dr. Goodman, admitted that he could not say that the 16 patients whose charts he had reviewed did not need stimulant medication and he agreed that he had no basis to testify that the medication prescribed to these 16 patients harmed them in any way. Tr. 4237:15-4238:10. The fact that so many patients benefitted from the care they received via the Done platform is a material distinction between this case and other "drug-trafficking" cases.

### 3. Each of Done's "Policies" Was Approved By Licensed and Qualified Medical Professionals.

The Government presented evidence at trial that various Done employees or independent contractors disagreed with certain of Done's "policies." But the trial evidence also demonstrated that that Ms. He chose to hire multiple doctors with vast experience and impressive credentials to be Done's medical leaders (as opposed to any hack with a medical license)—and that these experienced medical doctors blessed each of these policies. Co-defendant Dr. David Brody is a Stanford trained board-certified psychiatrist with 35 years of clinical experience, a background as a Medical Director, and decades of teaching experience, and he was hired to serve as the Clinical President and owner of Done's affiliated medical professional corporation—Done P.C. In addition

DEFENDANT RUTHIA HE'S SENTENCING MEMORANDUM AND OBJECTIONS TO PRESENTENCE REPORT
Case No. 3:24-cr-00329-CRB

to Dr. Brody, Ms. He also hired other highly-credentialed medical leadership, including Dr. Tsang[7] and Dr. Martinez.[8]  Dr. Brindala, Done's first medical director, was a Stanford-trained, triple-board-certified expert in addiction medicine, who was also President Obama's former health policy advisor.

Every one of the at-issue policies were approved by at least one member of Done's highly-credentialed medical leadership.  *See, e.g.*, TX 6405, TX 6129, Tr. 689:8-13 (30-minute initial appointment); TX 6287, TX 118, TX 6816, TX 5154, Tr. 757:12-25, Tr. 4205:1-4; 17-23 (follow-up frequency); TX 6703, TX 7714, TX 6816, TX 6077, TX 6090, TX 6300 (patient panel size and panel pay); TX 6291, TX 6403 (auto-refills); TX 6517 (bridge refills); Tr. 4784:14-4785:1 (discharges); TX 585 (reviews); Tr. 2487:20-2488:3, TX 6146, TX 6377, TX 5789, TX 5791 (medication trial).  In considering what would be a sufficient, but not greater than necessary, sentence for Ms. He, it is important that each of the "policies" that are now criticized by the Government were each policies that Ms. He knew and understood to have been green-lit by very impressive and experienced medical doctors.

Furthermore, as critical as the Government was regarding these "policies," the intention behind them was to address the undisputed problem that millions of individuals suffering from ADHD did not have access to affordable and convenient ADHD care.  In order to provide services to so many patients at a price point that would not exclude Done's target market—those who

---

[7] Dr. Les Tang is a UCLA trained psychiatrist who had more than a decade of experience before joining Done. Prior to working at Done, Dr. Tsang spent 12 years at Kaiser Permanente where he was appointed to create a Behavioral Medicine curriculum for a new residency training program.  He was a respected teacher at Kaiser, serving as Co-Director of Behavioral Medicine and Wellness and receiving a Faculty Teaching Award in 2016 for outstanding contribution to behavioral medicine and resident wellness.

[8] Dr. Zoe Martinez was also a Medical Director at Done and part of Done's clinical leadership team.  She was a UC, San Diego trained psychiatrist with 20 years of experience. Prior to joining Done, Dr. Martinez served as the Psychiatric Medical Director for Napa County Mental Health, the Chief of Psychiatry at MedStar Southern Maryland Hospital Center, and a child, adolescent, and adult psychiatrist for a number of mental health services. Dr. Martinez has also earned a number of distinguished honors, including a NIMH Outstanding Resident Award and AACAP Outstanding General Psychiatry Resident Award.

23

DEFENDANT RUTHIA HE'S SENTENCING MEMORANDUM AND OBJECTIONS TO
PRESENTENCE REPORT
Case No. 3:24-cr-00329-CRB

sought ADHD care but could not afford to pay rates that psychiatrists like Dr. Goodman charge—it was necessary to run the business in a way that kept costs low.  For example, Done's default 30-minute initial appointment time—endorsed by Dr. Brindala, who the Government cast as a responsible professional, *see* Tr.  689:8-13; TX 6405—was designed for someone who could not afford to spend $1,400 for a 90-minute appointment with a psychiatrist.  Even Dr. Goodman conceded that there exist no written medical guidelines that say an initial evaluation for a patient needs to be 60 to 90 minutes before a patient can be diagnosed with ADHD, Tr. 4073:11-16, and that primary care physicians who treat most ADHD patients likely do not spend 60 to 90 minutes with those patients.  Tr. 4041:23-4043:23, 4073:25-4075:3.  Done's policy of encouraging providers to follow up with patients via asynchronous messaging, instead of face-to-face appointments, was aimed at reducing the costs of unnecessary appointments.  Dr. Tsang—a board certified psychiatrist with a decade of experience working at Kaiser Permanente—told Ms. He that requiring repeated and face-to-face follow-up appointments was not "clinically necessary," was required by "absolutely no standard of medical practice," and constituted "a poor use of provider resources."  TX 6287.  Done's "panel pay" structure mirrored the "capitation" models that many private and public healthcare systems like Medicaid and Medicare have adopted in order to reduce healthcare costs.[9]   And Done's bridge prescription policy—another policy Dr. Brindala

---

[9] *See* Christopher M. Whaley et al, An Employer-Provider Direct Payment Program Is Associated With Lower Episode Costs, Health Affairs (March 2021), https://www.healthaffairs.org/doi/10.1377/hlthaff. 2020.01488 (emphasis added). Insurers have adopted capitation in order to lower the costs associated with paying providers for time spent with patients (known as "fee-for-service").  As one academic article explains, "[a] potential adverse consequence of fee-for-service medicine is the financial incentive to overtreat while failing to incentivize high-value care.  At the same time, administrative inefficiencies further increase costs of care under fee-for service reimbursement models."  *Id.*  Under capitation models, "[i]nstead of being paid for each health care service or product, health care providers . . . may be paid a set amount of money per patient, for a set amount of time, for a certain set of services."  *See* Centers for Medicare and Medicaid Services, Capitation and Pre-payment, (last visited March 10, 2026), https://www.cms.gov/priorities/innovation/key-concepts/capitation-and-pre-payment#:~:text=Defining%20key%20terms:,than%20the%20average%20Medicare%20patient.

24

DEFENDANT RUTHIA HE'S SENTENCING MEMORANDUM AND OBJECTIONS TO
PRESENTENCE REPORT
Case No. 3:24-cr-00329-CRB

spearheaded and numerous doctors supported—*see infra* at n. 14, was established in order to ensure that ADHD patients who needed stimulants to function would not be left without medication if their provider was unavailable or left the platform.  *See* Tr. 3621:17-3622:1; 3623:4-12 (Government witness Hill-Alvarez explaining that Dr. Brody's urgent refills were to "cover" instances where a provider was on vacation or a patient was switching providers to prevent a gap in care); *see also* TX 127; Tr. 1327: 2-3; Tr. 3622:15-17.  Even if the jury found that these policies fell below the standard of care, there is no evidence that any was adopted for a purpose other than expanding access to medical care.  No evidence was presented to establish that these policies were intended to facilitate abuse or addiction and that fact should have some import in considering an appropriate sentence.  Indeed, as discussed above, even the Final PSR, in recommending a sentence to the Court, found that "Ms. He founded Done with a genuine desire to help people with ADHD."  (ECF No. 591 at 38.)

> **4.     *Done Turned Away More Patients Than It Accepted and Implemented Features Demonstrating that "Greed" Was Not the Motivating Factor Behind the Platform.***

Although the Government's arguments to the jury suggested that Done was a platform where "anyone" could get an ADHD diagnosis, in fact, the undisputed trial evidence demonstrated that Done excluded over 160,000 people from its platform based on pre-appointment screening. The actual data proves that the number of patients precluded from scheduling an initial appointment actually <u>exceeded</u> the number of patients seen on the Done platform during the conspiracy period. Tr. 5022:10-20; TX 4000 at 49.

Done also implemented features such as fraud protection and two-factor authentication in order to prevent patients from creating multiple accounts and changing answers to the screening questionnaires after they submitted their responses.  TX 1363 at 54; Tr. 5018:17–5019:24.  In an effort to ensure that its patients were being accurately diagnosed, Done also sought out specialist providers with far more training than what was required to prescribe ADHD medication—namely,

DEFENDANT RUTHIA HE'S SENTENCING MEMORANDUM AND OBJECTIONS TO PRESENTENCE REPORT
Case No. 3:24-cr-00329-CRB

psychiatric mental health nurse practitioners ("PMHNP") or psychiatrists, preferably with experience treating ADHD.   Tr. 356:15-357:9; Tr. 950:15-20; *see also* Tr. 644:11-645:24 (confirming the specialized mental health training that Done's PMHNP's receive before becoming certified); TX 1337 (recruiting checklist showing that it was a "requirement" that a provider either be a psychiatrist or PMHNP).  And, while perhaps not always followed in practice, Done's policies required its care team, before a provider issues a refill, to check prescription drug monitoring program ("PDMP") database to make sure that there were no red flags in a patient's prescribing history.  TX 5305 (Done's PDMP checklist); TX 7169 (email from Done's leadership to providers reminding them that they are required to check PDMP before writing a prescription).  These protections, which would have the impact of reducing Done's patient base, makes this case different from traditional drug trafficking cases, where drug dealers rarely, if ever, turn any "customers" away.

## II.     A "RITUALISTIC" APPLICATION OF THE SENTENCING GUIDELINES WOULD FAIL TO MEET THE GOALS OF SENTENCING.

As described above, although a sentencing court must accurately calculate the Guidelines range, it "may not presume the Guidelines range is reasonable." *Gall v. United States*, 552 U.S. 38, 50 (2007).  In this case, the length of a "Guidelines" sentence is almost entirely driven by the drug quantity table and, as set forth below in Section III, the parties disagree sharply over how that table should be utilized in this case.  This Court, however, has previously observed, in *Napoli*, that there are cases where a "ritualistic" application of the Guidelines is simply inconsistent with the purposes of sentencing. *See United States v. Napoli*, 3:10-cr-00642-CRB, ECF No. 1290, at Tr. 8:25-9:2 (June 5, 2013).  This is one of those cases.  That a technical application of the Guidelines makes little sense here is plainly illustrated by the vast difference between the PSR that was drafted by Probation and submitted to the parties on March 2, 2026 (the "Initial PSR") and which (correctly) computed a base offense level of 12, *see* Ex. G, and the "final" PSR's (incorrect)

computation which included a 3-fold increase in that offense level, resulting in an adjustment from Probation's initial 33-to-41 month Guidelines computation to a term of <u>life in prison</u>.

**A.    As in _Napoli_, The Drug Quantity Table, Which Drives the PSR's Guidelines Computation, is a Poor Proxy for Ms. He's Culpability.**

The Guidelines calculation of life imprisonment that is found in the Final PSR is driven almost entirely by the <u>quantity</u> of stimulant medication that Done providers issued to patients who sought out the platform for their ADHD treatment.  But, as many courts and commentators have observed, drug quantity is a poor proxy for a defendant's culpability—and that is especially true here where Ms. He herself never treated any patients or prescribed any medication. _See, e.g._, Erica Zunkel & Alison Siegler, _The Federal Judiciary's Role in Drug Reform in an Era of Congressional Dysfunction_, 18 Ohio St. J. of Crim. L. 283, 320 (noting that judges "have railed against the drug guidelines' misguided use of drug type and quantity as a proxy for culpability"); United States Sentencing Commission, _2025 Proposed Amendments on Drug Offenses_, (February 2025)[10] (discussing "concerns that the Drug Quantity Table at §2D1.1(c) overly relies on drug type and quantity as a measure of offense culpability and results in sentences greater than necessary to accomplish the purposes of sentencing"); _see also United States v. Hayes_, 948 F. Supp. 2d 1009, 1022-31 (N.D. Iowa 2013) (deciding, as a matter of the court's practice, to impose a one-third reduction in the sentence for methamphetamine offenders on the grounds that drug quantity and purity are poor proxies for criminal culpability); _United States v. Cabrera_, 567 F.Supp.2d 271, 276

---

[10] _Available at_ https://www.ussc.gov/sites/default/files/pdf/research-and-publications/data-briefings/transcript_2025-Drug-Offenses.pdf#:~:text=Part%20A%20of%20the%20proposed%20amendment%20includes%20two%20subparts%20to%20address%20concerns%20that%20the%20Drug%20%0AQuantity%20Table%20at%20%C2%A72D1.1%28c%29%20overly%20relies%20on%20drug%20type%20and%20quantity%20as%20a%20measure%20of%20offense%20%0Aculpability%20and%20results%20in%20sentences%20greater%20than%20necessary%20to%20accomplish%20the%20purposes%20of%20%0Asentencing (last accessed March 29, 2026).

DEFENDANT RUTHIA HE'S SENTENCING MEMORANDUM AND OBJECTIONS TO PRESENTENCE REPORT
Case No. 3:24-cr-00329-CRB

(D. Mass. 2008) (the "Sentencing Commission has never explained how drug quantity is meant to measure offense seriousness, and significantly, how it correlates with the purposes of sentencing under 18 U.S.C § 3553(a)"). Given this widespread criticism, it is unsurprising that federal district courts frequently vary downward from the Guidelines sentence in drug trafficking cases—and significantly so. As the chart contained at Appendix IV to this Submission demonstrates, data from the U.S. Sentencing Commission proves that the vast majority of federal drug offenders receive below-Guidelines sentences and the sentencing reduction is substantial.

Your Honor's sentencing decision in *Napoli* is consistent with the approach taken by other courts and commentators. *Napoli* involved defendants who ran internet pharmacy websites selling various Schedule III and Schedule IV controlled substances. *See* Superseding Indictment, *Napoli*, 10-cr-00642-CRB, ECF No. 144 at ¶¶ 1, 14, 24. The online pharmacies partnered with doctors who would issue prescriptions without ever having a face-to-face interaction with the customers or "[m]aking any effort to confirm the accuracy of the information provided by the customers in the on-line questionnaires." *Id*. at ¶¶ 3, 16, 26. In some cases, the persons authorizing the prescriptions were not doctors at all, but were individuals who stole the identity of, and were impersonating, a doctor. United States' Sentencing Memorandum, *United States v. Napoli*, 3:10-cr-00642-CRB, ECF No. 1114 at 15 (N.D. Cal. Jan. 18, 2013) ("*Napoli* Sentencing Memorandum").

Before the *Napoli* defendants were to be sentenced, the Government moved the court for an upward departure from the sentencing Guidelines based on the quantity of drugs the defendants sold as part of the conspiracy. *Id*. at 12-15 (N.D. Cal. Jan. 18, 2013). Because the defendants in *Napoli* sold Schedule III and IV controlled substances, their Guidelines sentence was capped at level 20 for 40,000 pills—even though the trial evidence proved that millions of pills had been sold. *Id*. at 6. The Government sought upward departures because, in its view, the excessive

28

DEFENDANT RUTHIA HE'S SENTENCING MEMORANDUM AND OBJECTIONS TO
PRESENTENCE REPORT
Case No. 3:24-cr-00329-CRB

quantity of pills sold rendered defendants' conduct "substantially more egregious than the most serious offense contemplated by the Guidelines." *Napoli* Sentencing Memorandum at 6.

In considering an appropriate sentence, Your Honor explained:

> . . .[T]here were two types of harm that were caused by the defendants. One was the failure to evaluate in a meaningful way, the suitability of any individual for the drugs that were prescribed. Secondly, there was a failure to provide or at least offer the opportunity—a meaningful opportunity to provide ongoing supervision or continuing supervision of the use of the drugs. These are two types of harm. They are somewhat distinct. <u>And they are harm that is, in the Court's view, a potential harm. That is to say, that one can't look at all the drugs that were prescribed and all the individuals who received these drugs and say, "Well, for every drug that was prescribed, for every pill that was provided, the harm was caused." And you can't say that because there were—and this point was made abundantly clear by the defense in the case—that there were people who otherwise would have qualified for the medication that they received and took the appropriate dose and—in those cases, the medication may have helped them, or putting it another way, may not have harmed them</u>.

Sentencing Transcript, *Napoli*, ECF No. 1290 at 8:25-9:2 (June 5, 2013) (emphasis added). In light of the fact that the harm was largely "potential" harm, the Court concluded that a focus on drug "quantity" did not appropriately reflect the defendants' conduct:

> The Court does not accept the Government's motion for an upward departure, based upon quantity. <u>And . . . I think, as simply and accurately as possible, is that it simply doesn't make sense to take a quantity of drugs in which there's a potential harm. . . and sort of folding them into the language of the guidelines.</u> I agree the Government is absolutely correct when you take the language of the guidelines, that is, quantity, Internet, you know, distribution, Schedule III, Schedule IV, it fits. It fits the sentencing guidelines, if one is going to use that sort of -- what I say rather ritualistic or technical approach to the guidelines. But there was nothing that was called to the Court's attention that suggested that the sentencing commission in formulating these guidelines and these application notes had in mind the particular type of operation that the defendants engaged in. <u>And so not only does the Court believe that an upward adjustment is inappropriate, the Court has serious concerns as to whether or not the sentencing guidelines themselves</u>, even without an upward adjustment, <u>accurately reflect or encompassed within it the type of conduct that the defendants have been convicted of.</u>

*Id.* (emphases added).

DEFENDANT RUTHIA HE'S SENTENCING MEMORANDUM AND OBJECTIONS TO PRESENTENCE REPORT
Case No. 3:24-cr-00329-CRB

The same conclusion applies here. The Court has already determined that this case is different than *Napoli* and that the conduct there was more egregious than the conduct here. *See* Tr. 5208: 2-6 ("There's no question in my mind—and this separates this case from *Napoli* and all the other cases that I've seen, is that these people prescribed for a—an appropriate medication, appropriate to the condition that the person complained about, and that is a medical exercise.") (emphasis added); *see also* Tr. 5169:7–5170:5. The Court has also found that the Government did not prove that every prescription written by a Done provider was unlawful, and it is undisputed that the Government's case did not involve an allegation that any patient was harmed as a result of the ADHD medication prescribed by a Done provider. Tr. 5195:8-18; Tr. 2265:25-2266:6. As described above, thousands of patients received life-changing improvements to their health as a result of medication prescribed to them through a Done provider. Ultimately, and as described in Appendix V, Your Honor, in *Napoli*, not only denied the Government's motion for an upward departure, but actually gave downward variances to every defendant who stood trial, with sentences ranging from 24 months to 60 months in prison. These sentences serve as a reference point for the sentence the Court should impose on Ms. He in order to avoid unwarranted sentencing disparities. And considering that there were meaningful aggravating factors in *Napoli* that were not present here—*see* Appendix VI—a sentence of 41 months, which Probation initially calculated as the high end of the Guidelines range, would be an entirely appropriate sentence here.

**B.**      **The Guidelines "Loss" Table is Also a Poor Proxy for Culpability Here.**

Alternatively, the Government argues that the PSR should include an offense level calculation for Ms. He's health care fraud conspiracy conviction. PSR at 31, Objection No 2. 2. Probation correctly rejected the Government's request. *Id.* A Guidelines sentence driven by the Government's calculated loss amount of $12,397,160 is equally inconsistent with the goals for sentencing that Congress articulated in 18 U.S.C. § 3553(a).

DEFENDANT RUTHIA HE'S SENTENCING MEMORANDUM AND OBJECTIONS TO PRESENTENCE REPORT
Case No. 3:24-cr-00329-CRB

A Guidelines range for a fraud conviction is premised on the calculated loss amount. The Government's calculated loss amount is based on the amount that Medicare, Medicaid, and private insurers paid for <u>every</u> prescription for stimulant ADHD medication that was filled by an insured Done patient. PSR ¶ 36. Even if that was an appropriate way to calculate loss—which it is not[11]—using the "loss" table to decide Ms. He's sentence would result in a sentence that is far too severe for the actual offense conduct.

To begin, like the drug quantity table, determining a fraud defendant's culpability based primarily on the loss table "makes little sense," as this Court recently remarked.[12] Your Honor is not alone in this criticism. Both scholars and judges have observed that the way Section 2B1.1 of the Guidelines calculates loss for economic crimes routinely results in "arbitrary, disproportionate, and often draconian sentences" especially for "first-time offenders of economic crimes." Barry Boss & Kara Kapp, *How the Economic Loss Guideline Lost its Way, and How to Save It*, 18 Ohio St. J. of Cr. Law 605, 605-06 (2021); *see also United States v. Johnson*, No. 16-CR-457-1 (NGG), 2018 WL 1997975, at *3 (E.D.N.Y. Apr. 27, 2018) ("[T]he Sentencing Commission's loss-enhancement numbers do not result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime."); *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) ("By making a Guidelines sentence turn, for all

---

[11]As noted, *see supra* note 1, the Court has already expressly rejected any allegation that <u>all</u> of the prescriptions issued by Done prescribers were unauthorized. *See* Tr. 5195:8-18 ("<u>If that's their point, they failed to prove their case, and I will throw it out on that basis</u>.") (emphasis added).

[12] Gregory Herrold and Eric Bolden, *Sentencing Strategies in Federal Fraud Cases: Key Takeaways for White Collar Practitioners From the ABA's Annual White Collar Conference*, White Collar Criminal Law Blog (March 13, 2026) https://blogs.duanemorris.com/whitecollarcriminallaw/2026/03/13/sentencing-strategies-in-federal-fraud-cases-key-takeaways-for-white-collar-practitioners-from-the-abas-annual-white-collar-conference/ ("The fraud guidelines (U.S.S.G. Sec. 2B1.1) have drawn criticism from many district judges, including Judge Breyer, who remarked during the panel that the loss table makes "little sense," noting that—unlike the tables for many other criminal offenses—the current, operative version of the fraud loss table was not empirically derived but instead evolved over time, largely as a reaction by the Sentencing Commission to punish fraud more severely in the wake of Sarbanes–Oxley.")

31

DEFENDANT RUTHIA HE'S SENTENCING MEMORANDUM AND OBJECTIONS TO
PRESENTENCE REPORT
Case No. 3:24-cr-00329-CRB

practical purposes, on this single factor [loss or gain], the Sentencing Commission ignored [§ 3553(a)] and . . . effectively guaranteed that many such sentences would be irrational on their face."); *United States v. Bakhit*, 218 F. Supp. 2d 1232, 1234 (C.D. Cal. 2002) ("The base offense level for fraud is fixed at 6, but can increase by as much as three times, to 24, when loss is taken into account. . . . [T]he basis for this vast disparity in sentence is governed only by the United States Sentencing Commission Guideline's vague standards of loss.").

In 2014, an ABA Criminal Justice Task Force on the Reform of Federal Sentencing for Economic Crimes—which included distinguished jurists Judge Gerard Lynch, Judge Jed Rakoff, and then-Judge John Gleeson—submitted a proposal to the Sentencing Commission seeking substantial revisions of the Sentencing Guidelines for economic crimes. (Ex. H, "A Report on Behalf of the American Bar Association Criminal Justice Section Task Force on the Reform of Federal Sentencing for Economic Crimes," American Bar Association, Nov. 10, 2014).) In particular, the ABA Task Force singled-out "gatekeeping" offenses to be on the lower end of culpability, regardless of the amount of "loss" since such "offenses are not specifically intended to cause loss or even to shift the risk of loss." (Ex. H at 3.) The ABA Task Force described "billing Medicare for medically necessary goods and services that are actually provided without the appropriate third-party verification of medical necessity" as a prototypical gatekeeping offense. *Id.* (emphasis added). Ms. He's healthcare fraud conviction fits the mold of such a gatekeeping offense. There is no evidence that Ms. He intended to steal from or impose loss on health insurers and the medication prescribed is the undisputed "first line" treatment for ADHD, rather than a particularly expensive or esoteric treatment. Done itself received no money from any insurance plan, as all of Done's revenue was derived from patients paying Done directly for their initial visits and subscription membership.

A Guidelines sentence based on loss amount in this case, which the Government calculates as 188–235 months, would be entirely out of proportion with sentences imposed in cases with far

32

DEFENDANT RUTHIA HE'S SENTENCING MEMORANDUM AND OBJECTIONS TO PRESENTENCE REPORT
Case No. 3:24-cr-00329-CRB

more egregious conduct. *United States v. Babich*, 1:16-cr-10343 (D. Mass) serves as a helpful comparison. Babich involved executives—including the CEO and founder of the Company—who worked for a pharmaceutical company that manufactured a "fentanyl spray" for cancer pain. The executives paid sales representatives to push doctors to prescribe up to 16 times the FDA-approved dosage of the fentanyl spray. Memorandum and Order on Defendants' Motion for Judgment of Acquittal and for a New Trial, *Babich*, ECF No. 1028 at 2, 4-5 (Nov. 26, 2019). Part of the scheme to push high volume (and high dose) prescriptions of the fentanyl medication included getting health insurance companies to pay for the prescriptions. To accomplish this, the executives hired prior authorization specialists who (unlike Done's care team) were paid bonuses for getting prior authorizations approved so that insurance companies would pay for the prescriptions. *Id.* at 11-13. Those prior authorizations contained false representations about the use of the medication and the illness suffered by the patients. *Id.* The Government calculated that commercial insurers paid approximately $170 million and Medicare paid approximately $168 million in claims for medically unnecessary fentanyl medication prescriptions (compared to the $12 million that insurers paid for ADHD medication prescribed by Done). United States' Consolidated Sentencing Memorandum, *Babich*, ECF No. 1064 at 11 (Dec. 18, 2019). Moreover, unlike in this case, there was an actual financial benefit to the defendants' company from the insurance scheme, since as a manufacturer, the company profited from the increased volume of prescribed medication. Based on these facts, prosecutors recommended sentences ranging from 60 to 180 months. *Id.* at 1.

However, the sentences imposed by Judge Burroughs were far less draconian than that sought by the prosecutors and ranged from 27 to 66 months for the founder and CEO. *See* Docket Sheet, *Babich*, 1:16-cr-10343 (D. Mass). Given that the most culpable defendant in a scheme to push fentanyl—a far more dangerous drug than the ADHD medication at issue in Ms. He's case—and which caused insurers almost 30 times more in alleged loss, received a 66-month prison sentence, it seems clear that Ms. He, who engaged in far less culpable conduct, should receive a

33

more lenient sentence. This is particularly true in light of the disparity in actual time served and the more severe conditions she will face due to her immigration status. *See supra* at 11-13.

**C.     The Guidelines Calculation Set Forth in the Final PSR Is Incorrect.**

In any event, the Guidelines calculation contained in the Final PSR—which included a 3-fold increase in the base offense level, resulting in an adjustment from Probation's initial 33-to-41 month Guidelines computation to a term of <u>life in prison</u>—is erroneous. *See* Ex. G (Initial PSR setting forth Probation's first, correct computation of the Guidelines). As described above, the primary driver of Probation's Guidelines assessment in the Final PSR is drug quantity and Ms. He submits that the Government did not, and cannot, meet its burden on that issue.

> ### 1.     The Government Did Not—and Cannot—Prove that Every Prescription Written by Dr. Brody was Unauthorized and that Ms. He Is Responsible.

It is the Government's burden to establish drug quantity with specificity and reliability as to <u>each</u> defendant. *United States v. Flores*, 725 F.3d 1028, 1036-37 (9th Cir. 2013). Moreover, because "a sentence will vary greatly based on these approximations" of quantity, the Ninth Circuit has stressed that "courts must exercise caution in selecting the method of calculation." *Id*. Here, Probation initially got it right. In the March 2 Initial PSR, Probation determined that the "specificity" and "reliability" requirements described above were met only with respect to the four specific prescriptions that the jury concluded were unlawful in Counts Two through Five, which the jury was instructed were the objects of the conspiracy charged in Count I. Including the drug quantity for these four counts led to a base offense level of 12. Ex. G (March 2, 2026 Initial PSR at ¶¶ 43-44, 52.) In arriving at this calculation, Probation rejected the Government's insistence that "every pill was prescribed without a legitimate medical purpose and outside of the usual course of professional practice." *Id.* at ¶ 43. Instead, Probation found that, even assuming the "policies and procedures of Done were outside of the usual course of professional practice," "<u>the evidence at trial did not demonstrate that every prescribed pill was issued without a legitimate medical purpose</u>." *Id.* at 43. (emphasis added). After including aggravating adjustments for distributing

34

controlled substances through mass-marketing by means of an interactive computer, obstruction of justice, and Ms. He's leadership role in the offense, Probation calculated the total offense level to be 20. *Id.* at ¶¶ 52-61. Because Ms. He has no prior criminal history, Probation determined that the Guidelines range for imprisonment was 33 to a high end of 41 months—a sentence that is fair and appropriate for Ms. He. *Id.* at ¶ 92.

Three days later, Probation informed the parties that it intended change its Guidelines calculation and more than triple the base offense level from 12 to 38, which, after including the aggravating adjustments, resulted in an increase from the initial 33 to 41 months Guidelines assessment to that of life imprisonment. Ex. I (March 5, 2026 email from Probation to the parties). The change arose after the Government complained that all of the prescriptions that Dr. Brody wrote to Done members should have been included in Ms. He's Guidelines calculation. Probation agreed to include all those prescriptions ostensibly on the basis that "the evidence at trial showed [Dr. Brody] wrote 'blind' prescriptions and never met with any patient," and therefore "all of the dugs he prescribed were outside of the usual course of professional practice, and therefore there was no way for him to determine if there were legitimate medical purposes for the prescriptions." *Id.* (emphasis added).[13]

The Guidelines computation set forth in the Initial PSR was the correct computation. As the Court instructed the jury (and without waiver of Ms. He's position that the instructions were nonetheless erroneous and that her convictions lacked sufficient evidence), a prescription is only unauthorized, and thus unlawful, when a provider knows or intends both that the prescription is outside the usual course of professional practice and is for no legitimate medical purpose. Tr.

---

[13] The Government provided Probation with drug quantities for all prescriptions (1) by Done providers who pled guilty, (2) to the 16 patients reviewed by Dr. Goodman, (3) to patients who received no follow up appointments, and (4) to patients who received no follow-up appointment for more than 180 days, and argued that all of those pills should also be included in the drug quantity calculation. Probation did not assess whether those quantities should be included in the calculation because Dr. Brody's prescriptions resulted in a maximum base level offense. PSR ¶ 43. The Court should decline to include all of these prescriptions in the drug quantity calculation for the same reasons set forth in Appendix I.

DEFENDANT RUTHIA HE'S SENTENCING MEMORANDUM AND OBJECTIONS TO
PRESENTENCE REPORT
Case No. 3:24-cr-00329-CRB

5467:18-22 ("The Government must prove the defendant knowingly or intentionally agreed to distribute controlled substances by means of a prescription <u>knowingly or intentionally</u> issued by a physician or nurse practitioner without a legitimate medical purpose <u>and</u> outside the usual course of professional practice."); *see also United States v. Feingold*, 454 F.3d 1001, 1012 (9th Circ. 2006) (proof "beyond a reasonable doubt that the defendant prescribed or distributed the controlled substance other than for a legitimate medical purpose and not in the usual course of professional practice" "correctly articulated the standard for criminal liability under § 841(a)").  A "finding" that Dr. Brody had no way of knowing—one way or the other—whether the prescriptions were for a legitimate medical purpose, as Probation found,  is insufficient to satisfy this legal standard.

Moreover, the Government did not prove that <u>all</u> of Dr. Brody's prescriptions were for no legitimate medical purpose, much less that Ms. He was "actually responsible" for those prescriptions being unauthorized.  *Flores*, 725 F.3d 1028, 1036-37 (requiring the Government to bear the burden of proving the drug quantity that each individual defendant was "actually responsible" for, prior to sentencing).   Dr. Brody's prescriptions were short-term <u>refill</u> prescriptions issued to patients who had already been diagnosed with ADHD and issued a prescription by another provider on the Done platform.   Dr. Brody's refill prescriptions were therefore referred to at Done as "urgent" or "bridge" refill prescriptions; they were not prescriptions issued to first-time patients.   *See* Tr. 3621:17-3622:1; 3623:4-12 (Government witness Hill-Alvarez explaining that Dr. Brody's urgent refills were to "cover" instances where a provider was on vacation or a patient was switching providers to prevent a gap in care); *see also* TX 127; Tr. 1327: 2-3. This distinction is critical.  Even the Government's expert, Dr. Goodman confirmed that it is a common and accepted practice to for a covering practitioner to issue bridge refills to patients they had not seen.

> A bridge refill is if my colleague asks me to cover his practice. I know my colleague. I know the nature of his practice. I know the nature of his patients. And so while he's away on vacation for a couple of weeks, <u>I will write a prescription for a patient who runs out of a medication. I know the clinician</u>. I know their practice.

36

I have a sense of how they practice and their patient population. And so that's a bridge refill, to get to the next appointment.

Tr. 3949:10-17 (emphasis added).  Although Dr. Goodman went on to distinguish between a permissible "bridge" prescription, and what he deemed an impermissible "blind" prescription, the factors he identified do not convert all of Dr. Brody's prescriptions from "bridge" to "blind." *Compare* Tr. 3949: 18-24 ("So a blind refill is written by a prescriber who has no clinical information on the patient. They don't know the—they don't know the primary provider, they don't know the nature of their credential, they don't know the nature of their practice, they don't know anything about the patient.").  Indeed, contrary to the "blind" scenario Dr. Goodman posited, Dr. Brody's prescriptions were issued—with the express support of Dr. Brindala and other experienced members of Done medical leadership[14]—to patients who had (i) already been diagnosed with ADHD (ii) by another licensed medical specialist on the Done platform, and (iii) prescribed ADHD medication by this licensed specialist Done provider.

Moreover, as was demonstrated at trial, during the COVID-19 pandemic's public health emergency, the DEA explicitly permitted providers to issue refill prescriptions "by any method," including "in person, telemedicine, email, etc." as long as a patient had been previously examined in person.  TX 5000; *see also* TX 5456; Tr. 2867:7-19 (Walmart's head of controlled substance compliance confirming his understanding that, during the pandemic's public health emergency, the requirement that a patient be seen "in person" before being prescribed via telehealth was replaced with a requirement that the patient be seen at least once through real-time audio visual videoconference).  Additionally, the law recognizes that a "covering practitioner" may prescribe a controlled substance via telemedicine without seeing a patient so long as another provider who

---

[14] *See* TX 6517 (Dr. Brindala proving of Dr. Brody issuing bridge refills for patients that he had never seen before); *see also* EX 6116 (Dr. Brindala to Ruthia and others: "I spoke to Dr. Brody. . .David would be glad to do urgent refills and other urgent clinical tasks as needed."); Ex. J (Dr. Brindala to Ms. He: "Ruthia He I would like David Brody to start refills now. David Brody mentioned to me 2 weeks ago that he would like to start refills. We could use his time on these tasks right away for business need.").

37

DEFENDANT RUTHIA HE'S SENTENCING MEMORANDUM AND OBJECTIONS TO PRESENTENCE REPORT
Case No. 3:24-cr-00329-CRB

is temporarily unavailable has conducted at least one in-person evaluation or an evaluation via telemedicine within the previous 24 months.  21 U.S.C. § 829(e)(2).  In other words, Dr. Brody was permitted by law to issue refill prescriptions without interacting with patients face-to-face.

Moreover, even if some of Dr. Brody's prescriptions were written outside the usual course of professional practice, it does not follow that, for purposes of calculating the Guidelines range, they should <u>all</u> be counted as being for no legitimate medical purpose.  Courts have held that where there is evidence that the provider issued prescriptions to "real" patients seeking "real" care, it is improper to assume that all prescriptions were issued for no legitimate medical purpose.  *See United States v. Chube II*, 538 F.3d 693, 702-03 (7th Cir. 2008) (holding that it was reversible error to calculate drug quantity based on every prescription in 98 patient files admitted into evidence and Government's expert testimony about the patient files because, even assuming that the prescriptions were prescribed outside usual standard of care, the evidence did not demonstrate that all the prescriptions were intentionally prescribed for no legitimate medical purpose (as opposed to carelessness); *see also United States v. Evans*, 2017 WL 568333, at * 4 (S.D. Tex. Febr. 13, 2017) ("The testimony of [the expert] tendered by the government in support of its unlawful distribution claims and for forfeiture does little to distinguish prescriptions that were 'medically unnecessary' or 'carelessly' issued from those that were, indeed, unlawful and issued without a legitimate medical purpose. This is so because it is undisputed that Dr. Evans treated 'real' patients with 'real' pain. . . . In light of the evidence and case law presented, the Court determines that the proposed extrapolation presented by the government is improper. Unlike a determination of 'guilty,' where the defendant allegedly engaged in dispensing drugs 'outside the course of professional practice and not for a legitimate medical purpose,' the government does not enjoy a presumption that every prescription issued to the alleged 879 Schedule II patients was outside the course of professional practice and not for a legitimate medical purpose.").

DEFENDANT RUTHIA HE'S SENTENCING MEMORANDUM AND OBJECTIONS TO PRESENTENCE REPORT
Case No. 3:24-cr-00329-CRB

Reliance on Dr. Goodman's testimony about the practice of "blind" prescriptions to establish that all of Dr. Brody's prescriptions were issued for no legitimate medical purpose is thus improper. As the Court stated, "I don't know how [Dr. Goodman] can—how he can testify as to what [the provider's] purpose was. That's the problem." Tr. 4272:8-25. At most, Dr. Goodman's testimony established for sentencing purposes that some of Dr. Brody's prescriptions may have been outside the usual course of professional practice, to the extent they constituted "blind" refills, as distinguished from "bridge" refills, which Dr. Goodman himself recognized were proper.[15] But that testimony could not establish that all of Dr. Brody's prescriptions fit that mold or, importantly, how many should be considered unauthorized for purposes of sentencing.

There is thus no basis to determine that Ms. He "is more likely than not actually responsible," as *Flores* requires, for any of the prescriptions issued by Dr. Brody—with the exception of the two that the jury was expressly asked to pass judgment on—and no basis for utilizing the total quantity of Dr. Brody's refill prescriptions as a basis for Ms. He's Guidelines computation.

> **2.    *The PSR Incorrectly Utilized the Weight of the "Actual" Amount of Amphetamine, as Opposed to the Weight of a "Mixture or Substance" Containing Amphetamine.***

The Final PSR is also incorrect because it relies on the "actual" amphetamine weight for the medication that was prescribed to patients on the Done platform instead of the weight of the "mixture or substance" containing amphetamines or methylphenidate, in calculating drug weight. The Schedule II controlled substance contained in certain prescription stimulants like Adderall is

---

[15] Indeed, it is factually inaccurate to say that all of Dr. Brody's refills could be characterized as "blind." The trial record contained examples where Dr. Brody would asked to see a patient's medical records before prescribing if he had questions. *See, e.g.*, Tr. 1880:18-20; 2092:13-2093:3; TX 6755. And, contrary to the characterization that Dr. Brody would consistently issue prescriptions to patients when Done's providers refused to do so, the record made clear that clinical leadership, including Dr. Brody, would routinely approve providers' requests to discharge patients. *See* TX 6784.

39

DEFENDANT RUTHIA HE'S SENTENCING MEMORANDUM AND OBJECTIONS TO PRESENTENCE REPORT<br>Case No. 3:24-cr-00329-CRB

"amphetamine" and the controlled substance in other stimulants like Ritalin is "methylphenidate."[16]    The active ingredients in these medications, however, are not "pure" amphetamines or methylphenidates.  In fact, the controlled substance makes up only a fraction of the prescription dosage.  For example, the FDA-approved package insert for Adderall notes that the medication is made up of four different amphetamine "salts" that contain other elements aside from amphetamine, such as sulphate and aspartate, which are not controlled.[17]  In fact, as the label makes clear, for every 5 mg tablet of Adderall, only 3.13 mg is "amphetamine base equivalence." *Id.*  In other words, every 5 mg pill of Adderall does <u>not</u> contain 5mg of the controlled substance amphetamine; to the contrary, it is 5 mg mixture or substance containing 3.13  mg of amphetamine.

By using the "actual" amphetamine weight, as opposed to the weight of the mixture or substance containing Adderall, the Final PSR overstates the Guidelines sentence.  As  Note B to the Drug Quantity Table explains:

> The terms "PCP (actual)", "Amphetamine (actual)", and "Methamphetamine (actual)" refer <u>to the weight of the controlled substance, itself, contained in the mixture or substance</u>. For example, a mixture weighing 10 grams containing PCP at 50% purity contains 5 grams of PCP (actual). In the case of a mixture or substance containing PCP, amphetamine, or methamphetamine, use the offense level determined by the entire weight of the mixture or substance, or the offense level determined by the weight of the PCP (actual), amphetamine (actual), or methamphetamine (actual), whichever is greater.

This is a meaningful error in calculation. The Government would only need to prove 4.5 kg or more in (actual) amphetamine drug weight in order to get a maximum base offense level of 38 according to the drug quantity table.  However, the Government must prove 45 kg or more of amphetamine-based mixtures or substances containing amphetamines in order to get to a

---

[16] *See* Drug Enforcement Agency, *Orange Book List of Controlled Substances*, at 1 (March 2026) https://www.deadiversion.usdoj.gov/schedules/orangebook/d_cs_drugcode.pdf.

[17] FDA-approved Label For Adderall, *available at* https://www.accessdata.fda.gov/drugsatfda_docs/label/2017/011522s043lbl.pdf (last accessed March 30, 2026).

40

DEFENDANT RUTHIA HE'S SENTENCING MEMORANDUM AND OBJECTIONS TO PRESENTENCE REPORT
Case No. 3:24-cr-00329-CRB

maximum base offense level of 38. Given this clear error in calculation, the Final PSR's "actual" drug weight calculations should be disregarded.

### 3.    The Recommendation of Restitution in the PSR is Incorrect.[18]

The Final PSR states that "[p]ursuant to 18 U.S.C. § 3663A, restitution in an amount to be determined shall be ordered in this case." PSR ¶¶ 104-105. As a threshold matter, the Court lacks the power to impose any restitution order in this case because the jury here made no findings beyond a reasonable doubt as to the amount of any loss suffered by the alleged victims. *See Ellingburg v. United States*, 2026 WL 135982 (2026). As the Supreme Court made clear in *Ellingburg*, restitution is criminal punishment. *Id.* at *4. Therefore, Ms. He submits that, under the rule of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), any facts necessary to the imposition of a criminal restitution order must be found by a jury beyond a reasonable doubt, which they were not here, *see Apprendi,* 530 U.S. at 476, although she acknowledges that at least one court in this Circuit has rejected her argument in the wake of *Ellingsburg*. *See United States v. Zafaranchi*, 2026 WL 658435, at *2 (W.D. Wash. Mar. 9, 2026).

### CONCLUSION

For the foregoing reasons, we respectfully request that the Court impose a sentence of 41 months on Ms. He, consistent with Probation's recommendation in the Initial PSR, which we submit is sufficient but not greater than necessary to satisfy the objectives of sentencing.

Dated: March 30, 2026                              WILLKIE FARR & GALLAGHER LLP

                                             By:    /s/ Koren Bell
                                                    Koren Bell
                                                    Michael S. Schachter
                                                    Steven J. Ballew

---

[18] Ms. He also objects to various factual inaccuracies that are set forth in the Final PSR, as well as the Government's alternative approaches to computing a Guidelines range of life in prison. Those are detailed in Appendix I.

41

DEFENDANT RUTHIA HE'S SENTENCING MEMORANDUM AND OBJECTIONS TO PRESENTENCE REPORT
Case No. 3:24-cr-00329-CRB

Dated:  March 30, 2026                    LAW OFFICE OF JOHN D. CLINE


                                   By:     /s/ John D. Cline
                                           John D. Cline

                                           *Attorneys for Defendant*
                                           RUTHIA HE

DEFENDANT RUTHIA HE'S SENTENCING MEMORANDUM AND OBJECTIONS TO
PRESENTENCE REPORT
Case No. 3:24-cr-00329-CRB