CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

JEFF MITCHELL (CABN 236225)
Chief, Criminal Division

LORINDA I. LARYEA (DCBN 99769)
Chief, Fraud Section

JACOB FOSTER (CABN 250785)
Acting Chief, Health Care Fraud Unit
EMILY GURSKIS (VABN 85973)
Assistant Chief, Fraud Section
ARUN BODAPATI (NYBN 5581137)
Trial Attorney, Fraud Section

      U.S. Department of Justice, Fraud Section
      1400 New York Avenue NW
      Washington, DC 20005
      Telephone: 202-514-2000
      Jacob.Foster@usdoj.gov
      Emily.Gurskis@usdoj.gov
      Arun.Bodapati@usdoj.gov

KRISTINA GREEN (NYBN 5226204)
Assistant United States Attorney

      450 Golden Gate Avenue, Box 36055
      San Francisco, CA 94102-3495
      Telephone: (415) 436-7200
      Kristina.Green@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>RUTHIA HE, A/K/A RUJIA HE,<br><br>    Defendant. | CASE NO. 24-CR-00329 CRB<br><br>**UNITED STATES' SENTENCING MEMORANDUM FOR DEFENDANT HE**<br><br>Hearing Date:  April 15, 2026<br>Time:  10:00 AM |

Gov. Sentencing Memo. for Def. R. He
24-CR-00329 CRB

**TABLE OF CONTENTS**

I.      INTRODUCTION ......................................................................................................1

II.     THE OFFENSE CONDUCT ....................................................................................4

        A.    Drug Distribution ..........................................................................................5

              1.    Advertising that Attracted Drug Seekers ...........................................5

              2.    Defendant's Control Over Clinical Practices.....................................6

              3.    Defendant Knew Her Policies Would Lead to Unauthorized
                    Prescriptions.......................................................................................8

              4.    Defendant Ignored Warnings that Done's Policies Were Leading to
                    Illegal Prescriptions .......................................................................12

        B.    The Health Care Fraud...............................................................................13

        C.    Obstruction of Justice ................................................................................16

III.    PROCEDURAL HISTORY....................................................................................20

IV.     THE SENTENCING GUIDELINES CALCULATION ........................................20

        A.    Drug Quantity .............................................................................................20

              1.    The Standard ....................................................................................20

              2.    The Proof .........................................................................................21

                    a.    Quantity Prescribed by Defendant Brody ..............................22

                    b.    Quantity Prescribed by Convicted Co-Conspirators...............23

                    c.    Quantity Prescribed to Members with No Follow-Up
                          Appointments.........................................................................24

                    d.    No Follow-Up Appointment for 180 Days or Longer ............24

                    e.    Goodman's 16 Done Members................................................24

                    f.    Consolidated and De-Duplicated Quantity of Drugs Outlined in
                          Sections 2(a) through 2(e).......................................................25

              3.    Use of the Actual Amphetamine Drug Conversion .............................25

              4.    Defendant's Arguments About Drug Quantity are Make-Weight........26

        B.    The Vulnerable Victim Enhancement..........................................................27

        C.    Fraud Loss..................................................................................................30

Gov. Sentencing Memo. for Def. R. He
24-CR-00329 CRB

V.    ARGUMENT ...................................................................................................................29

    A.  Legal Standard ...........................................................................................20

    B.  Government's Recommendation ................................................................20

       1.  The Nature and Circumstances (18 U.S.C. § 3553(a)(1))......................30

          a.  Defendant Caused Serious Harm to Patients .............................32

          b.  Defendant Harmed Employees ...................................................32

          c.  The Health Care Fraud Conduct .................................................33

          d.   The Obstruction .........................................................................33

          e.  Harm to Investors.......................................................................33

       2.  The History and Characteristics of the Defendant.................................34

       3.  General Deterrence ................................................................................36

       4.  Specific Deterrence................................................................................37

       5.  The Need to Avoid Unwarranted Disparities (18 U.S.C. § 3553(a)(6))...............37

VI.   RESTITUTION, FORFEITURE, AND FINE.................................................................38

    A.  Defendant Should Be Ordered to Pay $12,397,160 to Health Care Insurers......................38

    B.  Defendant Should Be Ordered to Forfeit the $91,311,290 in Proceeds She Received

as a Result of Her Crimes ...................................................................................39

       1.  Legal Standard ......................................................................................39

       2.  The Money Judgment ............................................................................40

    C.  The Court Should Impose a Fine of $24,794,320 ...........................................45

VII.  CONCLUSION................................................................................................................46

Gov. Sentencing Memo. for Def. R. He
24-CR-00329 CRB

# TABLE OF AUTHORITIES

## Cases

*Associated Vendors, Inc. v. Oakland Meat Co.*, 210 Cal. App. 2d 825 (Cal. Ct. App. 1962) ............ 43, 44

*Automotriz Del Golfo De California S.A. De C.V. v. Resnick*, 306 P.2d 1 (Cal. 1957)...................... 40, 44

*Gall v. United States*, 552 U.S. 38 (2007) ................................................................................... 29, 30

*Libretti v. United States*, 516 U.S. 29 (1995) ...................................................................................... 39

*Sonora Diamond Corp. v. Superior Court of Tuolumne County*, 83 Cal. App. 4th 523 (Cal. Ct. App. 2000) ..................................................................................................................................... 40

*United States v. Adebimpe*, 649 F. App'x 449 (9th Cir. 2016) .................................................... 38

*United States v. Anieze-Smith*, 923 F.3d 565 (9th Cir. 2019) .................................................... 38

*United States v. Bergman*, 852 F.3d 1046 (11th Cir. 2017)........................................................ 27

*United States v. Bikundi*, 926 F.3d 761 (D.C. Cir. 2019)................................................. 41, 42

*United States v. Casey*, 444 F.3d 1071 (9th Cir. 2006)................................................................ 39

*United States v. Davis*, 706 F.3d 1081 (9th Cir. 2013) ............................................................... 39

*United States v. Gladden*, 78 F. 4th 1232 (11th Cir. 2023)........................................... 41, 42

*United States v. Haggard*, 41 F.3d 1320 (9th Cir. 1994)............................................................ 27

*United States v. Jankowski*, 24-CR-1404 .......................................................................... 42, 43

*United States v. Kilby*, 443 F.3d 1135 (9th Cir. 2006)................................................................ 21

*United States v. Laurienti*, 611 F.3d 530 (9th Cir. 2010) .......................................................... 28

*United States v. Lo*, 839 F.3d 777 (9th Cir. 2016) ...................................................................... 39

*United States v. Monsanto*, 491 U.S. 600 (1989) ....................................................................... 39

*United States v. Montes-Vargas*, 750 F. App'x 595 (9th Cir. 2019) ........................................ 21

*United States v. Newman*, 659 F.3d 1235 (9th Cir. 2011) .......................................................... 39

*United States v. O'Brien*, 50 F.3d 751 (9th Cir. 1995) ............................................................... 27

*United States v. Omidi*, 125 F.4th 1283 (9th Cir. 2025)........................................... 39, 42, 43

*United States v. Popov*, 743 F.3d 911 (9th Cir. 2014)........................................................... 28, 29

Gov. Sentencing Memo. for Def. R. He
24-CR-00329 CRB

*United States v. Prasad*, 18 F.4th 313 (9th Cir. 2021) ........................................................ 39

*United States v. Reed*, 575 F.3d 900 (9th Cir. 2009) .......................................................... 20

*United States v. Ressam*, 679 F.3d 1069 (9th Cir. 2012) .................................................... 29

*United States v. Salahmand,* 651 F.3d 21 (D.C. Cir. 2011)................................................ 27

*United States v. Sanders*, 952 F.3d 263 (5th Cir. 2020) ..................................................... 43

*United States v. Suris*, 836 F. App'x 596 (9th Cir. 2021)................................................... 29

*United States v. Warshak*, 631 F.3d 266 (6th Cir. 2010)......................................... 39, 41, 43

*United States v. Zats*, 298 F.3d 182 (3d Cir. 2002) ........................................................... 27

## Statutes

18 U.S.C. § 3553(a) ...........................................................................................*passim*

18 U.S.C. § 3571(d) .......................................................................................... 45

18 U.S.C. § 3664.............................................................................................. 38

18 U.S.C. § 982(a)(7) ........................................................................................ 39

21 U.S.C. § 853(a)(1)......................................................................................... 39

## Rules

U.S.S.G. § 2D1.1 .................................................................................. 20, 21, 25, 29

U.S.S.G. § 2B1.1................................................................................... 28, 29

U.S.S.G. § 3A1.1 .................................................................................. 27, 29

U.S.S.G. § 3B1.1................................................................................... 20, 29

U.S.S.G. § 3C1.1.................................................................................. 29

U.S.S.G. § 5E1.2.................................................................................. 45

U.S.S.G. § 5G1.2 ................................................................................. 20

U.S.S.G. §5K1.1 .................................................................................. 37

Gov. Sentencing Memo. for Def. R. He
24-CR-00329 CRB

## I.     INTRODUCTION

Defendant He is, in her own words, someone who ran a "drug biz" that was operating illegally – about which she explicitly dismissed concerns because "at the early stage . . . [other startup companies] were all illegal." Trial Ex. 897 at 143, 172.  The reason she broke the law was greed, plain and simple: "Right now I just want to be a billionaire." *Id*. at 143.  She harmed patients suffering from severe mental health conditions; repeatedly lied to health care insurers, pharmacies, the news media, and even her own investors; ignored direct warnings from employees, her Chief Medical Officer, and her close friend that she would face legal consequences like Elizabeth Holmes and Sam Bankman-Fried; and, at every decision point, she chose illegality, concealment, and systematic obstruction of the investigation over respect for the law.  While patients were suffering, Defendant had, in her own words, "realized the pandemic's silver lining: no more traffic jams, no more restaurant queues.  So now you might find me working while wine tasting at a Napa Valley winery; or dialing into meetings at a Half Moon Bay hotel restaurant, enjoying the chef's creations while watching the tides roll in and out." Sentencing Ex. 1.  A sentence of 240 months is appropriate for three reasons.

**First, the Guidelines calculation is correct and yields a range of life imprisonment**. Probation found Offense Level 43, Criminal History Category I, with no departure basis identified.  PSR ¶¶ 113–114.  The drug quantity supporting that calculation is conservative.  The government does not ask this Court to attribute to Defendant all 37 million stimulant pills.  Instead, the government identified discrete, independently provable sub-categories of unauthorized prescriptions – including (1) Co-defendant David Brody's 394,324 blind refills written without reviewing a single patient chart; (2) the 8.9 million pills prescribed by six convicted co-conspirators; (3) the 6.3 million pills issued to members who received prescriptions and never had any follow-up at all; (4) the 6.4 million pills issued to members who went six or more months without any follow-up appointment; and (5) the prescriptions written to the sixteen patients whose records were personally reviewed by expert Dr. David Goodman. *Each sub-category **standing alone** yields a base offense level of 38—save only the Goodman sixteen, which independently yields a level 32.*  The government has consolidated and de-duplicated all five categories, and the result is 16.3 million pills.

The quantity in the categories above is, if anything, understated.  Dr. Goodman testified after

reviewing all sixteen patient files that not a single one met the diagnostic criteria for ADHD, that none of their prescriptions were written for a legitimate medical purpose within the usual course of professional practice, and that in his 40 years of practice he had never seen clinical practices as egregious as what he observed at Done, which he characterized as "a model of subscription for prescription" rather than medical care.  11/3/25 Trial Tr. at 3900:24–3901:2; 3987:12–18.

Defendant argues that quantity should be limited to the four charged substantive counts, but Defendant was convicted of conspiracy.  The quantity of pills involved in the offense is so staggering that the Court could find that less than one percent of Done's prescriptions were illegal and the base offense level would remain a 38.

**Second, every § 3553(a) factor supports a substantial sentence, and none supports the dramatic downward variance Defendant urges**.  Defendant exploited Americans struggling during a once-in-a-generation pandemic through $41 million in deceptive advertising that falsely implied that most people who struggled to focus had undiagnosed ADHD, just at a time that people were struggling to focus because of a loss of structure due to stay-at-home orders.  She flooded this country with drugs that can destabilize mood disorders, precipitate psychosis, worsen cardiovascular conditions, and fuel addiction – dispensed through evaluations so abbreviated and follow-up care so deliberately eliminated that, as Dr. Goodman testified, there was a "complete negligence of oversight" and "disregard for patient safety."  11/3/25 Trial Tr. at 3961:1–3.  The jury heard from three mothers who watched their children psychiatrically hospitalize, deteriorate, or become unrecognizable while Done kept sending addictive prescriptions — including to a patient whose mother called more than ten times to report involuntary psychiatric holds and diagnosis of Adderall psychosis, only to have the prescriptions transferred (pursuant to Defendant's second opinion policy) to a different provider who continued prescribing Adderall without a single follow-up.  11/7/25 Trial Tr. at 5051:1–5058:4.

Defendant attempted to portray herself at trial as a misguided technology entrepreneur, but her own words establish that she was engaged in a "drug thing," "drug startup," "selling drugs," "drug biz," and "drug delivery."  Trial Ex. 897 at 172, 174.  She decided to violate the law because, in her words, "regulation makes no biz make money."  *Id*. at 83.  By April 2020, she had "brainwashed so many people, including psychiatrists, to do this drug thing" and explained that her motivation was simple: "To

me it's more like making money." *Id.* at 158. When employees raised concerns that Done was violating the Controlled Substances Act, she told them that she would buy a Tesla for the first person who went to jail for Done. 9/30/25 Trial Tr. at 494:24–495:20 (R. Menesini); 10/7/25 Trial Tr. at 1327:4–17 (K. Bowen); 10/30/25 Trial Tr. at 3433:4–16 (C. Hill-Alvarez). When a member later wrote to complain that Done was "legal drug dealers profiting off of addiction," Defendant's response was not concern or denial. It was agreement, framed as her core business philosophy: "Most successful companies usually profit out of addiction." Trial Ex. 897 at 151.

Defendant directed every element of the health care fraud (which independently yields at least an Offense Level 36) and obstruction conspiracies. These were not impulsive acts; it was a multi-year campaign of lies to insurance companies, pharmacies, insurers, and then sustained efforts to undermine the judicial process itself. She did not, when confronted by questions from insurers or pharmacies, pause. She did not, when competitors exited the business because of legal concerns, reconsider; she saw it as an opportunity to steal their customers. She did not, when a grand jury subpoena arrived, comply. Instead, she moved her marketing team to China. She deleted Slack messages. She falsified organizational charts. She created a Hong Kong shell company. She searched for non-extradition countries. She was literally stopped on the way to the airport. She has accepted no responsibility and expressed no remorse.

Courts frequently look to post-arrest conduct as a window into a defendant's character and the need for specific deterrence. Here, every action Defendant took after she began to fear a law enforcement investigation confirms that she poses a continuing threat. This defendant lied not only to media, insurers, and pharmacies — but to *this Court* in *this courtroom*. Over six separate hearings and in numerous filings, Defendant falsely represented that she had surrendered her only travel document, while concealing the existence of the Chinese travel document she had secretly obtained. She also lied to Pretrial Services, and presumably her own lawyers, about this fact.

**Third, Probation's recommendation of 84 months (a 95% reduction from the Guidelines) rests on two misplaced factual premises.** Probation found that Defendant was motivated by "a genuine desire to help people" – a characterization the jury necessarily rejected and the trial evidence wholly refuted. Probation also treated deportation as a mitigating collateral consequence. It is the

Gov. Sentencing Memorandum for Def. R. He       3
24-CR-0329 CRB

opposite: a defendant who has already established Makebelieve Asia and offshore business infrastructure funded with fake invoices, who researched non-extradition countries, and who attempted to flee faces no meaningful check on recidivism once she is deported to China. The longer the sentence, the longer it will take for that threat to occur. 240 months is far below the Guidelines range (life) and the statutory cap of 130 years. It is supported by the JSIN data from defendants in an identical Guidelines cell — Offense Level 43, Criminal History Category I, primary guideline § 2D1.1 — for whom the median sentence imposed over the last five fiscal years is 240 months. The government asks for exactly that. PSR ¶ 111.

Defendant herself understood what was at stake. After a *Good Morning America* investigation exposed Done's prescribing practices, she sent a private Signal message: "If the government checks on us and we have no way of proving that the prescription has a medical basis, the doctor may be subject to a 20-year imprisonment." Trial Ex. 769 at 7. Her closest confidante explicitly warned her that she would face prosecution: "the regulators aren't going to go after each and every provider saying they wrote these prescriptions, they are going to go after the platform for enabling them and incentivizing them to do quick appointments and refills and not be thorough about the diagnosis." Trial Ex. 897 at 66–67. Her friend described Done as a "ticking time bomb": "I do not want you to go to jail potentially." *Id.* at 6–14. Having consciously weighed the risk of a 20-year sentence and chosen to proceed, Defendant cannot credibly argue she deserves a day less than 240 months.

## II.    THE OFFENSE CONDUCT

Defendant is the founder, CEO, and >99% owner of Done. Trial Ex. 4000 at 32. After a prior unsuccessful tech start-up venture, Defendant founded Done with the goal of building a billion-dollar company. Trial Ex. 897 at 114. Although California's corporate practice of medicine rules prohibit non-medical practitioners from engaging in the practice of medicine, Defendant operated Done for over six months in violation of such rules before she established Done Health PC in August 2020 and hired Brody. *Id.* at 172 (dismissing the legal requirements because, in her view, "at the early stage . . . Uber and Lyft were all illegal"). In reality, Defendant He, with Brody's consent, controlled clinical policies and practices at Done. She used this control to create a highly lucrative and profitable stimulant prescribing machine. Under the Done model, providers were pressured and incentivized to prescribe

drugs to as many members as possible regardless of whether there was a legitimate medical purpose within the usual course of professional practice.  Defendant's scheme worked.  During the conspiracy period, Done received $91,311,290 in payments.  Trial Ex. 4000 at 9.

### A.    Drug Distribution

#### 1.    Advertising that Attracted Drug Seekers

Defendant used social media ads that were designed to confuse Americans struggling with mental health conditions or simply the psychological fallout of the pandemic lockdown era.  PSR ¶¶ 21–22; Trial Tr. 1184:9–12 (D.C. "felt like [Done] was a place to shop for Adderall ... like it was easy ... Come here, shop for, you know, Adderall, get a quick diagnosis.").  The ads touted a 1-minute assessment and "easy automatic refills."  *See, e.g.*, Trial Exs. 1119, 1120, 1123–1132, 2709, 3035.

Defendant used internet search advertisements (examples below) to target buyers seeking pills as opposed to those wanting medical care, including phrases like "Adderall blue pill," "Adderall without prescription," "buy adderall," "buy adderall online," "buy ritalin online," "buy vyvanse online," and "order adderall online."  Trial Exs. 962 at 9, 11; 4000 at 44.



Done's advertising was dangerous precisely because the symptoms it promised to cure — difficulty focusing, inattentiveness, feeling scattered — are shared by anxiety, depression, bipolar disorder, PTSD, sleep deprivation, and the pervasive COVID-era stress that millions of Americans were

Gov. Sentencing Memorandum for Def. R. He        5
24-CR-0329 CRB

experiencing; as former Done provider Anna Ross testified, "there's a lot of overlap in symptoms in mental health," making it impossible to distinguish genuine ADHD from other serious conditions without a comprehensive evaluation. 9/29/25 Trial Tr. at 328:16–17. Dr. Goodman similarly explained: "[i]n the age of Internet and Tiktok and Dr. Google, people can go and look up psychological symptoms. It doesn't mean they necessarily have ADHD. It means that the description of the psychological experience resonates with what they believe they have . . . This is problematic because if you rely on self-diagnosis at the evaluation, and you abbreviate your evaluation, you end up prescribing medication to people who don't have ADHD." 11/3/25 Trial Tr. at 3917:9–13; 19–21. Done's own providers told Defendant this directly — that 30 minutes was categorically insufficient to rule out those competing diagnoses, and that the advertising and subscription service was attracting patients with fixed expectations of a stimulant prescription rather than patients seeking a thorough psychiatric evaluation — and she removed the intake screening questions designed to catch exactly these patients without telling the clinicians she had done so. Trial Ex. 38; 10/6/25 Trial Tr. at 1000:4–17; 1030:15–10:31:7 (N. Emeruem); 10/7/25 Trial Tr. at 1331:1–14 (K. Bowen). Defendant flooded TikTok, Instagram, and Google with deceptive ads because, as she told her operations head, attracting people who wanted drugs was the point: they were "the highest-converting advertisements, so they served the business purpose." PSR ¶ 22; 10/28/25 Trial Tr. at 2999:4:10.

### 2. Defendant's Control Over Clinical Practices

Defendant was the ultimate decisionmaker when it came to clinical policies and practices at Done. PSR ¶ 14. She dictated clinical policies related to Done's intake process, initial appointment length, frequency of follow-up appointments, provider compensation, and transfer of patients. *Id.* Defendant used her control of clinical policies to prioritize revenue and growth over lawful prescribing practices. PSR ¶¶ 15, 16. Levy and others testified that Defendant's "patient first" mantra in practice meant a prioritization of ensuring a potential customer became a member, paid the fee, and then getting the drugs out the door, as opposed to providing patient care. PSR ¶ 16; *see also* Trial Tr. 3418:6-8 (Christina Hill-Alvarez testifying that Defendant's "patient first" philosophy meant do "[w]hatever the patient wanted.") Trevor Granger similarly explained that Defendant was "laser focused" on growth to the detriment of "patient safety, compliance, and ethical, medical guidelines." *Id.*

Gov. Sentencing Memorandum for Def. R. He      6
24-CR-0329 CRB

To carry out her scheme, Defendant required a clinical leader who was willing to defer to her on clinical decisions.  Defendant He's intent in hiring Brody was evident in her communications: "Healthcare is such a profitable space. Telehealth service. Easily 60%+ margin . . . So I started this private practice with that doctor from Stan[]ford [reference to Brody].  **Now I can have more control of the providers."**  Trial Ex. 897 at 152–53 (emphasis added).  Brody understood the role he was expected to fill: satisfy legal requirements and allow Defendant He to be the final decisionmaker on clinical decisions.[1]  Defendant He knew that Brody was not someone she should rely upon for clinical advice, as Prasad wrote that Defendant He told him that Brody was "saying things like he will prescribe Adderall even if the govt executes him"; in Prasad's words, "dr brody is crazy. . . like what lawyer or regulator is going to take him seriously."  PSR ¶ 34; Trial Ex. 897 at 22.

fulfilled another function vital to Defendant He's vision for Done: blind refills.  PSR ¶ 19; Trial Ex. 689 (Brody: "it only takes me 30 seconds per refill since as you know I do not check the EHR [electronic health record]").  Numerous former employees, as well as Dr. Goodman, testified that such blind refills are not the usual course of professional practice.  11/3/25 Trial Tr. at 3950:8–19.  Defendant He knew that Brody did not do clinical work and was not an expert, and she encouraged his blind refills.  Trial Ex. 126 at 2 ("when I joined, one of the big attractions was not doing any clinical work"); Trial Ex. 210 ("my dreams are as follows, in order of preference… "Dealing with clinical psychiatric issues WITHOUT EVER HAVING TO SEE OR TALK TO THE PATIENT"); Trial Ex. 94 at 5 (Brody informing He that he is "not an expert on ADHD."); Ex. 127 at 3 (He: "you don't even need to see patient at all just click buttons on e-prescribing too[l].").  Defendant He wrote that Brody was crucial: If [Dr. Brody] leaves the company will just not be able to operate…He dislikes seeing patients.  And it will destroy the organization…we cannot afford losing him."  Trial Ex. 910 at 1–3.

Defendant used a combination of sticks and carrots to control Done's prescribers.  Providers that were unwilling to bend their practices to comply with the Done model, such as Emeruem and Ross, left the Done platform or were never hired in the first place, such as Schoenecker.  Others were bribed by

---

[1] 11/7/25 Trial Tr. 1329:25–1330:7 (when asked how BRODY would respond when asked for his opinion on HE's clinical decisions, Bowen replied, "[T]ypically, he would defer to Ruthia.  He would say it's her company."); Trial Ex. 587 at 1–2 (Levy: "Protect Dr. Brody at all costs is the mission right now. . . .  Because he does exactly as she [HE] asks.  Even if it's not clinically appropriate.").

Defendant to write unauthorized prescriptions. Co-conspirator Shapard, for example, was paid over *$40,000 a month*; Defendant paid co-conspirator Kim a similar amount and refused to fire her as employees urged even after being told Kim was not seeing patients.

### 3.   Defendant Knew Her Policies Would Lead to Unauthorized Prescriptions

Defendant established clinical policies that she was directly warned by her CMO would lead to "legal consequences." Defendant ignored the warnings. Defendant changed the intake screening result from "no diagnosis" to "less likely" to avoid reducing diagnosis rate and member growth. PSR ¶ 24; Trial Ex. 276. She removed standard intake screening questionnaires—the GAD-7 (for anxiety), PHQ-9 (for depression), and ASRS-B (for ADHD)—from Done's platform *without consulting the clinicians* who relied on them to protect patient safety. PSR ¶ 24; Trial Exs. 353, 356, 958. By removing these questions and then making these answers unavailable in the EHR for those who had been previously collected, Defendant controlled the information that providers received. She knew that positive responses to these questions would make providers less likely to prescribe. For example, a patient answered honestly that he had taken hard drugs at his Done on-boarding – but his Done Medical Record didn't indicate as such. That patient later went on to exhibit drug seeking behavior, sought appointments, was told he didn't need them, and ultimately died of a fentanyl overdose. This was deliberate product design by a CEO who viewed patient safety screening as "friction" that impeded growth.

Defendant set initial visits for 25 minutes (plus 5 minutes for notes) and controlled providers' schedules to ensure they were filled with initial visits as opposed to follow-ups. PSR ¶ 25. Despite providers repeatedly warning that 30 minutes was insufficient to accurately diagnose ADHD, Defendant refused to increase the appointment length. *Id*.; Trial Exs. 38, 348; 11/6/25 Trial Tr. at 4781:24–4782:7.

Done's subscription model required members to pay a high initial fee followed by lower monthly payments. In order to maximize profit margin, Defendant sought to (1) maximize the number of initial appointments held by Done providers to grow member numbers; (2) limit follow-up visits so that providers' schedules could be filled with initial appointments; and (3) disincentivize providers from holding follow-up visits. Trial Ex. 48 at 5 (He writing in 2020 business plan: "Biggest problem: due to

the cofounder disagreement, there was a 2-month delay in implementing asynchronized[2] follow-up experience.  It resulted in problems below: 1) slow growth…2) lower margin – the margin of video follow-up appointments is very low (result in 80% revenue lost)."  In October 2020, Defendants changed the provider compensation structure so that providers were no longer paid for conducting follow-up visits.  PSR ¶ 27; Trial Ex. 1308 at 324.  This compensation structure discouraged providers from conducting follow-up visits.[3]  PSR ¶¶ 27–28.  The no follow-up policy was a business decision to facilitate illegal prescriptions, not a medical one.

In November 2020, Defendant, without consulting with Done providers, issued a new refill policy to Done members that highlighted that follow-up appointments were no longer a requirement.  PSR ¶ 29; Trial Ex. 214 at 2.  Around the same time, she directed the head of the Provider Care Team to cancel at least 175 follow-up appointments that were already scheduled again without consulting Done providers.  *Id.*  When members inquired about the cancellations, Defendant replied directly to the member (without consulting with their clinician) that the member could obtain refills without appointments, rendering them unnecessary.  *Id.*  In March 2021, Defendant took it one step further, instituting an auto-renewal policy: Done members could opt-in on their phones, which would generate monthly, automatic prescription requests to be completed by Done providers. *Id.*; Trial Ex. 326.  This policy was also instituted without Done providers' input.  PSR ¶ 29; Trial Ex. 326.  Medical care was so lacking that prescribers issued controlled substances to patients months after the patients had died because the patient accounts were on "auto-refill."  Dr. Goodman explained that such follow-up and auto-refill policies were outside the usual course of professional practice, which requires a follow-up within the first month of the appointment and approximately every four months after that.  PSR ¶ 30; 11/3/25 Trial Tr. at 3933:9–18.

---

[2] Witnesses testified at trial that when Defendant He uses the term asynchronous, she is referring to just an exchange of electronic messages between the member and either an administrative employee or provider at Done. In reality, members could obtain their refills through submitting essentially an automatic refill request without having to meet with a provider for any follow-up assessment.

[3] *See also* Trial Ex. 454 at 8; Trial Ex. 495 at 23–24; 9/30/25 Trial Tr. at 485:21–25 (Menesini testifying that Defendant He did not pay for follow-up care because she did not want to incentivize follow-ups because that would reduce availability for initial appointments); 11/6/25 Trial Tr. at 4765:19–4766:7 (Granger: [HE's] concerns around friction centered around patients' access . . . [to] prescription refills . . . . [I]n Ms. He's mind follow-up appointments themselves were a form of friction to be avoided.").

Gov. Sentencing Memorandum for Def. R. He       9
24-CR-0329 CRB

Finally, Defendant established policies to directly cause illegal stimulant prescriptions.  For example, Defendants' practice guidelines, which were included in provider contracts, encouraged providers to offer medication as a trial even if the member did not meet the DSM-5 criteria.  PSR ¶ 26.[4] In addition, Defendant dictated that Done members who did not initially receive a prescription could be transferred to a provider more likely to write the desired prescription, such as Brody or Elizabeth Shapard (a convicted co-conspirator).  PSR ¶ 31; *see also, e.g.,* Trial Exs. 1927, 2515.

Dr. Goodman reviewed Done medical records for sixteen Done members who received prescriptions from 36 different Done prescribers.  11/3/25 Trial Tr. 3903:2–6.  Dr. Goodman found that not even one of these members met the diagnostic criteria for ADHD.  *Id*. at 3899:19–6.  Dr. Goodman also found that none of the prescriptions to these members were written for a legitimate medical purpose within the usual course of professional practice.  *Id.* at 3900:7–12.  Done's clinical practices reflected a customer satisfaction priority whereby customers were just given what they wanted (a stimulant) not the treatment that was necessitated following a legitimate and accurate medical diagnosis, and such practices reflected "a business model, not a medical model."  *Id.* at 3923:18–3924:4.  Done's clinical practices consisted of "patient-dictative treatment" where there was "inadequate evaluation that led to inaccurate diagnoses with the prescription of medications," "infrequent follow-up," and "patients received their automatic refills as a function of their subscription to the Done model."  *Id.* at 3987:12–17.

The jury also heard from witnesses who observed the impact of Done's clinical policies on individual Done members.  Each member had previously struggled with other mental health issues; however, Done's treatment of them was consistent with each other and with others at Done: short initial visits where the members were not adequately evaluated; consistent stimulant prescriptions until the member died or ceased payment; and lack of follow-up care or evaluations.

- **H.B.** had substance abuse disorder.  H.B. was prescribed stimulants following a 13-minute visit by nurse practitioner Shabnam Rahimi in October 2020.  Trial Ex. 4000 at 2.  Rahimi did not have a collaborating physician (a requirement in California), a fact known by Defendants.  H.B. had a history of substance abuse, which would have been evident to a provider who reviewed his CURES records that documented his buprenorphine and naloxone prescriptions.  Trial Ex. 1805

---

[4] Trial Ex. 561 at 3 (Brody writing to Defendant He in March 2022 that, under the Done model, they would "wind up prescribing stimulants to at least a few people who do not have ADHD. And perhaps to more than a few).

Gov. Sentencing Memorandum for Def. R. He       10
24-CR-0329 CRB

at 1; 11/3/25 Trial Tr. at 3976 (Testimony of Dr. Goodman). D.D., H.B.'s mother, testified that H.B. continued to receive Adderall prescriptions from Done in late 2020 even after his condition declined. 10/15/25 Trial Tr. at 2278. Former employee Menesini testified that he spoke to Defendant about D.D.'s concerns, including how easy it was to obtain stimulant prescriptions on the Done platform. 10/1/25 Trial Tr. at 572:4–6. *See also* Trial Ex. 249 (D.D.'s email to Mr. Menesini that "Looking at your website, it looks like getting stimulants is as easy as 1-2-3. I wonder if any part of your work is assessing whether or not you are dealing with an addict."; this email was forwarded to jane@donefirst.com, an email address used by Defendant). Menesini looked into H.B.'s treatment and informed Defendant that H.B. was prescribed Suboxone and that "Suboxone is typically used for addiction treatment, so people who are addicted to opiates, heroin, things like that, would take it for their treatment to come off of it." 10/1/25 Trial Tr. at 575:1–576:10. Clinicians were raising concerns to Defendant, but nothing changed. *See e.g. id.* at 478:13–25. 588:3–7.

- **N.C.** has bipolar disorder. After N.C.'s initial visit with Done in November 2021, he received stimulant prescriptions for the duration of the conspiracy period (until January 2023) without a single follow-up evaluation. N.C.'s mother, K.C., testified that she had observed a marked decline in the mental well-being of her son during the time he was prescribed by Done, including changes in speech, appearance, insomnia, knocking on neighbors doors, and, during one episode, screaming at a woman that she was his wife, manic behavior, screaming, repetitive and illogical speech and made up stories, paranoia, walking on the freeway with no shoes, and concerns for his own safety. 11/7/25 Trial Tr. 5034:20–5049:13. K.C. called Done "more than 10 times," including to inform them of 5150 psychiatric holds on N.C. *Id.* at 5044; 5051; Trial Ex. 1844 at 6 (patient record noting that in January 2022 K.C. called about the 5150 hold and that N.C. should not receive ADHD medication); Trial Ex. 648 (in June 2022, N.C. is transferred to Elizabeth Shapard, who prescribes him Adderall). In January and February 2022, following psychotic episodes, N.C. was placed on 5150 involuntary psychiatric holds and hospitalized. After both of these hospital visits, K.C. notified Done of the hospitalizations and asked that Done not continue to issue stimulant prescriptions. Exs. 1844, 527, 529, 531. This was a direct result of the policies and procedures implemented by. N.C. went a year without seeing a Done provider, but continued to get prescriptions from Done as his condition obviously declined. Done only ceased to issue prescriptions to N.C. when his "credit card was maxed out and they were no longer able to charge [the] card." 11/7/25 Trial Tr. 5058:1–4.

- **C.C.** suffers from anxiety and bipolar disorder. D.C. testified about her daughter C.C., who dropped out of college due to mental health issues and entered a residential program for anxiety and trauma. 10/7/25 Trial Tr. at 1178:5–6. After C.C. joined Done, D.C. noticed a profound change in C.C.'s behavior. C.C. became paranoid and delusional. She was convinced that people were following her. *Id.* at 1187; 1192. D.C. took C.C. to the hospital multiple times out of concern for C.C.'s wellbeing. The treating physician at the emergency department recommended detox from Adderall. Trial Ex. 2483 at 3. In November 2021, six months after Dr. Brindala's latest round of warnings to both Defendants were issued in a risk mitigation report (Trial Ex. 364) and approximately one year after his first warnings (Trial Ex. 219), D.C. sent LinkedIn messages to Done (Trial Ex. 471), emailed a Done that Defendant had access to (Trial Ex. 450) that her daughter was in a "life threatening state" and "suffering from Adderall Psychosis," and posted a Facebook comment on Done's page (Trial Ex. 487). These described the "rapid decline in [C.C.'s] physical and mental health over the past 6 months [] blatantly obvious," and that C.C. was refusing other medical help because "she is confident that she is under the care of Done." Trial Ex. 471. Despite this, Done continued to prescribe stimulants to C.C. C.C. received stimulant prescriptions from Done for approximately fifteen months (from March 2021 until June 2022), including dosage increases, but only had one follow-up visit in December 2021. Trial Exs. 2677, 2499.

### 4.    Defendant Ignored Warnings that Done's Policies Were Leading to Illegal Prescriptions

Multiple witnesses testified, and documentary evidence corroborated, that Defendant was repeatedly warned by medical providers that her policies were illegal, but Defendant told them not to worry about breaking the law.  PSR ¶ 34.  Defendant He was present when Brody compared Done to Santa Claus handing out candy and separately became aware that he informed a provider that she should prescribe stimulants to patients "no matter what and not worry about going to jail.  *Id.*; Ex. 546 at 2. Defendant He refused to fire Brody, as employees urged her to.

Dr. Brindala sent monthly risk mitigation reports between November 2020 and May 2021 that flatly warned Defendant that she would face "legal consequences" because of her policies, including pressure to diagnose ADHD and prescribe stimulants, refilling stimulant prescriptions without follow-up visits, and transferring members to alternative Done providers when the first did not write a stimulant prescription.  PSR ¶ 32; Exs. 219, 364, 355.  As Dr. Brindala bluntly explained to Defendants in a slack message in May 2021, "@ruthia **If we simply try to find a way for every patient to get the stimulant they want, we will truly be a pill mill. . . . We already have multiple elements of illegitimacy.** @ruthia We cannot hide behind excuses to prescribe more stimulants inappropriately."  Trial Exs. 354 (emphasis added), 355.  Defendants' response to Dr. Brindala's warnings was to "simply ignore" them, expressing concern not about Done's illegal practices, but, instead, that the reports were "evidence to be used against us."  PSR ¶ 33; Trial Exs. 230, 362.

When media scrutiny arrived, Defendant lied to keep the public from understanding Done's prescription policies.  Trial Exs. 2861, 766; Sentencing Ex. 2.  She approved false responses to the *Wall Street Journal* denying that she had removed the psychiatric screening questionnaires ("This is inaccurate. The situation did not occur"), lying about the risk mitigation reports, and falsely claiming that clinical operations were managed by an independent professional corporation.  Trial Exs. 553; 554. She denied to Bloomberg that Done had a policy terminating providers after three negative patient reviews, even as Brody was privately writing, "When I wrote to the PR team that we used to have a policy, I said that because it is true."  Trial Ex. 582.  This matters at sentencing because it demonstrates

the defendant's character: every lie to the media was a lie calculated to prevent the pharmacies, insurers, regulators, and the public from intervening to stop the harm — and for over a year, it worked.

After viewing the *Good Morning America* segment — in which journalists enrolled on Done's platform, saw a provider, and were offered prescriptions by a clinician who acknowledged they did not have ADHD — this Court itself described it in clear terms: "What it . . . shows and demonstrates that *everything the Government said is right about how things are done and everything the Defense said was wrong*. It's [Done's] a sham, essentially." 11/5/25 Trial Tr. 4541–42 (emphasis added). The Court excluded the video at trial, but it should consider it at sentencing. Defendant's response was not to change the platform. It was to threaten to sue ABC to make them *take the video down* as defamatory, while secretly sending a Signal message to an associate in China expressing concerns about 20-year imprisonment. Trial Exs. 731, 769 at 9. The prescriptions continued, including by the same doctor who was the subject of the Good Morning America investigation, who continued to be paid by Done and write prescriptions. Defendant's response to the video confirms that the conspiracy was deliberate, its operation was visible to anyone who looked, and that Defendant's choice, on seeing that confirmation, was to suppress the evidence rather than stop the harm.

### B.    The Health Care Fraud

Defendant's drug distribution conspiracy could not have operated without a parallel scheme to defraud the health care system. Defendant understood from the outset that insurance coverage was essential to her business. If members had to pay out-of-pocket for monthly stimulant prescriptions, many would stop paying their subscription fees. Insurance coverage kept them on the platform. As Defendant wrote to Mercado and Brody: "The ideal approach is for them to use insurance on meds so they don't have to worry about the payment at all." Trial Ex. 451 at 2. Mercado testified that Defendant told her directly: "the insurance and coverage for these pills is very important to our patients because that's how our model would work. If we can't get this medication as cheap as possible for the patients, the patients will go and get out of our platform." 10/14/25 Trial Tr. at 1838:14–19. Defendant similarly told Levy that pharmacies were "very important" because "without patients getting their prescription, they weren't going to be paying their membership fees." 10/28/25 Trial Tr. at 3011:14–16.

Sussan Maddux, the Chief Pharmacy Officer at United Healthcare, explained that insurance would only cover prescriptions where they are issued for legitimate medical use, the patient has been diagnosed appropriately, and that prior authorization requirements are met.  10/17/25 Trial Tr. at 2711:8–16, 2715:4–2716:23.  Insurers operate on a trust-based system, in which they trust that the provider/practice cause the submission of only truthful and medically necessary claims, there is an established physician-patient relationship, and that patient notes are accurate and individualized  Id. at 2713:11–2714:12, 2724:4–14.  Ms. Maddux testified that United Healthcare would not have reimbursed a single Done claim had it known that Done's diagnoses were the product of 25-minute evaluations using no validated screening tools, that many providers had never met the patients they were prescribing to, and that Done's clinical notes were 82% boilerplate template (as Dr. Goodman found) rather than individualized records. 10/17/25 Trial Tr. at 2715:1–2716:23; 2717:7–19; 2738:2–17.

Defendant conspired to defraud health care insurers through a variety of means, including (1) causing the issuance of illegal prescriptions intending that they would be paid for by insurance at pharmacies; (2) submitting fraudulent prior authorizations, such as that falsely claimed Done prescribers had followed DSM-5 diagnostic criteria; and (3) defrauding pharmacies to induce them to keep billing insurance and filling Done's prescriptions by lying about Done's prescribing policies.  PSR ¶ 36.  These included prescriptions written by Brody.  PSR ¶ 37; Trial Ex. 4993.

For prescriptions that triggered prior authorization requirements, Defendant directed the care team to fabricate the authorizations outright.  PSR ¶ 38; 10/14/25 Trial Tr. at 1808:8–11; 1837:11–16; Trial Ex. 451 at 2.  At trial, Mercado testified that she pled guilty to making false statements and conspiracy to commit healthcare fraud, and that she committed those crimes at "Ruthia's direction" by "falsif[ying] clinical records and prior authorization forms."  10/14/25 Trial Tr. at 1808:8–11.  Mercado was corroborated by Defendant's own metrics, which required a 95% prior authorization approval rate, which was impossible to achieve without fraud.  Trial Ex. 1492; 10/14/25 Trial Tr. at 1839:8–15, 21–23.  Defendant required that "if the prior authorizations are denied in the first one, she would ask us to resubmit them with the false information."  Id. at 1839:20–22.  Defendant personally monitored prior authorization approval rates on a daily basis, and "would get mad and pull the team together" if approval rates fell below her targets.  Trial Ex. 60; 10/14/25 Trial Tr. at 1840:6–13; 1841:1–8.

Gov. Sentencing Memorandum for Def. R. He          14
24-CR-0329 CRB

When insurers asked whether urine drug screening had been conducted, Defendant told the care team to "just say yes, because if they're in our platform, they probably have done it before" — without checking the medical records. 10/14/25 Trial Tr. at 1835:12–18. Defendant said to attest that DSM-5 diagnostic criteria had been used — while simultaneously telling prescribers it was "a waste of time" to use those criteria. *Id*. at 1843:14–21. She instructed the team to add a boilerplate note template to clinical records stating "PDMP reviewed, chart reviewed," even for Brody's blind refill prescriptions, for whom no PDMP or chart had been reviewed. Trial Ex. 217; 10/14/25 Trial Tr. at 1854:8–22; Trial Ex. 217 (Defendant: "But the immediate improvement we can make next month is to automatically add this note template when they refill."). Defendant also directed the care team to misuse the expedited review process — a process insurers reserve for life-threatening conditions like cancer — for Adderall prescriptions because she had "investors looking at this review." 10/14/25 Trial Tr. at 1843:4–14.

Defendant's care team regularly forged provider signatures on prior authorization forms submitted to insurers. Trial Ex. 1201 shows a prior authorization submitted under the name of prescriber Solomon Okwueze — not signed by Okwueze — and then a second authorization submitted under the name of prescriber Rosemary Kwaven bearing the identical forged signature. 10/14/25 Trial Tr. at 1852:22–1853:18. When Done's head of operations, TJ Williams, discovered the forgeries and fired the care team member responsible (Judee Nemeno), Defendant overruled the firing, sent Nemeno a gift basket, and rehired her under her husband's profile so the forgeries could continue. *Id*. at 1851:19–1852:13. She then fired Williams — the employee trying to stop the fraud. *Id*. at 1852:11–12. The care team continued to forge signatures. *Id*. at 1853:18–19.

Pharmacies are the final checkpoint before a controlled substance prescription is filled and an insurance claim is submitted. Corbin, a witness from Walmart, confirmed that when providers or clinics are deceitful that inhibits the pharmacists' ability to assess the legitimacy of a prescription, and causes the pharmacies, in turn, to submit false claims to insurance. 10/20/25 Trial Tr. at 2826. Defendant instructed the care team to lie to pharmacies about Done's clinical practices on a routine basis: to claim that Done conducted follow-up appointments when it did not; to represent that Done was "a legitimate platform" with "robust intake forms"; and to misrepresent Done's stimulant prescribing rate. PSR ¶ 39; Exs. 283, 539, 1014. Levy confirmed the same practice from the operations side: he was directed to use

Gov. Sentencing Memorandum for Def. R. He        15
24-CR-0329 CRB

"compliant talking points" with pharmacies identical to those used with investors and the media; he sent pharmacies a fraudulent document falsely portraying a rigorous screening and PDMP review process (Trial Ex. 539); and he lied in oral conversations about Done's practices because "one of the key directives that I received in my role was to maintain the relationships with pharmacies so patients could continue to get their medications, and the way that Done made their money was by patients being able to get their medications from the pharmacies." 10/28/25 Trial Tr. at 3011:17–3013:5. Pharmacies were never told about Brody's statements that he would prescribe "no matter what and not worry about going to jail." Nor about Dr. Brindala's written warnings of legal consequences. It was concealed that Done's practices "went against all legitimate literature." *Id*. at 3013:7–17.

When CVS and Walmart independently concluded that Done's prescriptions were illegal and blocked them entirely, Defendant did not stop. She directed Levy and Mercado to recruit "mom and pop" independent pharmacies and to lie to them as well, including lying about why the nation's largest pharmacy chains had refused to fill Done's prescriptions. 10/28/25 Trial Tr. at 4956:1–4968:25. When additional pharmacies blocked Done prescribers, she renamed the company Mindful Mental Wellness specifically to circumvent the pharmacy blocks. Defendant stated: "if we change our name and then the pharmacy won't know the prescriptions are from Done, and with a new name we can say, you know, this is from my MMW, and they wouldn't know. The pharmacy wouldn't know and will prescribe." Trial Ex. 875; 10/14/25 Trial Tr. at 1917:6–14. Nothing changed in Done's prescription practices — only the name on the paperwork. *Id*. at 1917:15–17.

### C.    Obstruction of Justice

***Phase One: Anticipatory Obstruction (April–August 2022).*** On April 15, 2022 — the same day Bloomberg contacted Done to inquire about its advertising practices — Defendant sent a WeChat message to Yue Wang in China: "Let's move the marketing team to China as soon as possible. Feel that we will be investigated for the advertisements sooner or later." Trial Ex. 577. After this message, Done increased its advertising-related payments in China from $4,500 to over $4.5 million. *Id*. In May 2022, Levy messaged Defendant on an encrypted messaging application, WhatsApp, stating that they should not discuss news articles on "company platforms" because "if they wanted to they could subpoena our slack records." *Id*. Defendant replied that she would "delete the slack messages." *Id*. Levy confirmed

at trial that the messages Defendant agreed to delete concerned the potential federal investigation. Mercado also testified that Done deleted internal Slack channels in which providers discussed Done being a "pill mill"—records that were directly responsive to the subsequent grand jury investigation.

***Phase Two: Active Obstruction After the Subpoena (September 2022–June 2023).*** In September 2022, the government served grand jury subpoenas. Trial Exs. 2361, 2362. Six days later, Defendant deleted the "medication trial language" that encouraged providers to prescribe stimulants to patients who did not fully meet the DSM-V from Done's clinician quick start guide.

After receipt of the grand jury subpoena, Defendant instructed Done employees to move to encrypted messaging applications, such as Signal and WhatsApp, to discuss sensitive company business, instead of using official company platforms that were being collected by Done's attorneys for production to the government. PSR ¶ 41; 10/28/25 Trial Tr. at 3022:2–6; Trial Ex. 768. Mercado testified that Defendant asked Mercado to lie to the government that their WhatsApp messages were personal only. PSR ¶ 41; 10/14/25 Trial Tr. at 1932:12–18. Defendant also turned on "disappearing messages" in her communications with Done colleagues, rendering it impossible to obtain such messages. PSR ¶ 41; Trial Exs. 865 at 1, 880 at 2, 866 at 3. Defendant directed Mercado not to produce her WhatsApp messages to the grand jury. 10/14/25 Trial Tr. at 1932:12–1933:2. Defendant herself produced nothing from these messaging platforms. The evidence of the obstruction came primarily from devices seized and from cooperating co-conspirators—not from Defendant's compliance with the grand jury's legal demands.

Defendant also took steps to conceal her leadership role at Done as the government's investigation progressed. PSR ¶ 42. She submitted to the government a false org chart in which she appeared only as head of "innovation"—with Brody shown as the head of clinical operations. Trial Ex. 2654; 10/14/25 Trial Tr. at 1926:13–18 (N. Mercado). The actual org chart, which was never produced, showed Defendant He at the top with Brody directly below her. Trial Exs. 1444, 1446. Defendant instructed Mercado and her team to lie to the DEA agents and, if contacted, falsely say that Defendant was "just chief like innovation officer and she's not part of Done's day-to-day operations anymore." 10/14/25 Trial Tr. 1926:12–18. In an organizational chart from July 2023, she included reference to a Board (which did not exist), listed another employee (H. Zhu) as Head of North America, and falsely

listed herself only as Head of Innovation.  Trial Ex. 2654 at 8.  In reality, Zhu was just a figurehead who worked at the direction of Defendant, as was evident through certain messages.  For example, in July 2023, Zhu asked another employee (Bianca Rohr) to "edit the approval channel and remove everything that's mentioning Ruthia."  Trial Ex. 844 at 2.  Zhu recognized that Defendant used her to "serve as a shield" with "little real power" or money; that the team questioned whether when talking to Zhu, they were really talking to Defendant HE; and that she was there to help "Old He evade all legal risks by saying that I [Zhu] was making all the decisions."  Trial Exs. 843 at 2, 840 ("I mean, Hayley is Ruthia lol.").  Zhu also took steps to conceal Defendant's role by establishing Yue Wang as a figurehead leader.  Trial Ex. 859 at 6 (Zhu writes: "Actually, it's best if Ruthia does not appear on this kind of asana approval, because she said the DOJ that she will step down, so that Yue's approval is R's approval.").

Further, Defendant did not produce documents responsive to the subpoena.  *Id.*  For example, she did not produce training videos, instead storing them in a folder that she labeled as shouldn't be shared with the government.  A training video in that folder showed a Done provider prescribed stimulants to a member despite acknowledging that the member did not have ADHD.  Trial Ex. 1348.

***Phase Three: Flight Planning and the Secret Passport (January–June 2023).***  As the investigation closed in, Defendant began planning her escape.  On January 9, 2023, she exchanged WeChat messages with Yue Wang discussing where she could open a bank account outside the United States: "Teacher, I think I need to think about the future. In April, if what they say is true, I will be arrested or will be fined."  Trial Ex. 794.  Wang recommended transferring funds to the Cayman Islands or Hong Kong in advance.  He then noted: *"Our situation is that right now the Government may suspect us of cross border FD"*—translated as an abbreviation for "drug trafficking"—"It's best to avoid cross border entities."  Trial Exs. 794, 796.  Between December 2023 and July 2024, Done transferred $1.5m to Makebelieve in Hong Kong. Trial Exs. 1400, 1401, 1500, 2787.  Invoices related to Done's payments to Makebelieve had indicia of fabrication, including being on Done letterhead despite being a supposed invoice from Makebelieve, and not detailing the services to be rendered.

She researched non-extradition countries on her MacBook and saved a screenshot of the results:



Exs. 2372, 2375.  She noted that Singapore "has an extradition clause."  She wished she had already opened an account in Hong Kong.  On February 18, 2023, agents intercepted Defendant on her way to the airport, bound for a flight to Hong Kong.  Trial Ex. 2346; 11/6/25 Trial Tr. at 4859:25–4860:6 (A. Guzman).  She surrendered her passport and was warned that leaving the country would result in arrest.  11/6/25 Trial Tr. at 4860:7–13.

Four months later, however, in June 2023, unbeknownst to the government and presumably her own counsel, she obtained a Chinese travel document that would allow her to travel to China.  ECF No. 112 at 2.  The document was valid for travel "to all countries."  Trial Ex. 2646.  In June 2024, Defendant was charged and arrested.  Defendant's pretrial detention status was then extensively litigated before the Court.  She never disclosed the travel document.  After multiple rounds of briefing and six court appearances, the Court ultimately decided to release Defendant pretrial under strict conditions to mitigate her flight risk, including based on repeated assertions by counsel that Defendant could not flee because she had surrendered her passport.  ECF No. 112.  She sat in court while her attorneys obtained bond based on the false pretense that she had surrendered her only travel document, and then violated

her bail conditions by failing to surrender this document.  PSR ¶ 4.  On the day of her release, law enforcement agents located the Chinese Travel Document during the search and she was remanded.

## III.  PROCEDURAL HISTORY

Beginning on September 28, 2025, Defendant's trial spanned seven weeks, during which nearly 2000 exhibits were admitted and 32 witnesses testified, 26 in the government's case-in-chief.  On November 18, 2025, the jury found Defendant He and Defendant Brody guilty on all counts.

## IV.  THE SENTENCING GUIDELINES CALCULATION

The PSR calculates the total offense level as follows:

a.  Base Offense Level, U.S.S.G. § 2D1.1(c)(1):    38

b.  Specific offense characteristics under U.S.S.G. Ch. 2:

The defendant distributed a controlled substance through mass marketing by means of an interactive computer service; U.S.S.G. § 2D1.1(b)(7)    +2

The defendant obstructed justice; U.S.S.G. § 2D1.1(b)(16)(D)    +2

c.  Adjustment for role in the offense, U.S.S.G. § 3B1.1(c)    +4

d.  Adjusted Offense Level:    43[5]

Defendant falls within Criminal History Category I.  Thus, for Offense Level 43, the Guidelines recommend a sentence of life imprisonment.  Because the advisory Guidelines range (life) exceeds the statutory maximum on any single count, § 5G1.2(d) directs that sentences on individual counts shall run consecutively to the extent necessary to produce a combined sentence equal to the total punishment.  In determining the Guidelines range, the Government discusses (1) Defendant's objections to the drug quantity; (2) Defendant's objections to the fraud loss amount; and (3) the vulnerable victim enhancement, which Probation did not apply.

### A.  Drug Quantity

#### 1.  The Standard

The government bears the burden of establishing drug quantity by a preponderance.  *United States v. Reed*, 575 F.3d 900, 924 (9th Cir. 2009).  Types and quantities of drugs not specified in the

---

[5] A level of more than 43 is to be treated as 43.  U.S.S.G. Ch. 5, Part A app. n. 2.

count of conviction may be considered.  U.S.S.G. § 2D1.1 app. 5.  Where there is no drug amount seized or the amount seized does not reflect the scale of the offense, "the district court must approximate the drug quantity."  *Id.*  In "estimating" quantity, the Court "may rely on evidence demonstrating the average frequency and amount" of illegitimate prescriptions "over a given period." *Id.*  The estimate may not be "merely speculative"; it should be "fair, accurate, and conservative." *Id.*

To reach a base offense level of 38—the highest available for a drug conspiracy conviction—the converted weight of the drugs must equal or exceed 90,000 kilograms.  *See* U.S.S.G. § 2D1.1(c)(1).  Converted drug weight is calculated by determining the quantity of each relevant drug and using the Guidelines' conversion table.  U.S.S.G. § 2D1.1 app. 8.  Here, the relevant drugs include the amphetamine (actual), methamphetamine (actual) and methylphenidate pills.

Because Defendant was convicted of a conspiracy, the proper drug weight encompasses all reasonably foreseeable acts in furtherance of the jointly undertaken criminal activity.  *United States v. Montes-Vargas*, 750 F. App'x 595, 596 (9th Cir. 2019) (citing *United States v. Kilby*, 443 F.3d 1135, 1142 (9th Cir. 2006)); U.S.S.G. § 2D1.1, cmt. 5.

### 2.    The Proof

The trial evidence showed a drug quantity far in excess of the threshold for a level 38.  During the conspiracy, Done providers issued prescriptions for over 37 million Schedule II stimulant pills, or over 10.4 million kilograms in converted drug weight.  Even if only ***one percent*** of Done's prescriptions were unauthorized, it would result in an offense level 38.[6]

---

[6] 90,000 KG or more of converted drug weight is a base offense level of 38 under § 2D1.1(c). Done's 37 million pills produced over 10,403,019 kilograms of converted drug weight — more than 115 times the Level 38 threshold.  To reach Level 38, the Court need find only that approximately **321,000 pills** out of 37 million — fewer than 1 in 100 of Done's total prescriptions — were unlawfully issued. The below table reflects the total pills prescribed by Done practitioners during the conspiracy period.

| Drug Type | No. of Pills | Total MG | Converted Weight |
|---|---|---|---|
| Amphetamine (actual) | 34,857,468 | 519,935,158 | 10,398,703.16 KG |
| Methamphetamine (actual) | 4,050 | 20,250 | 405 KG |
| Methylphenidate | 2,304,833 | 39,112,401 | 3,911.24 |
| | | | 10,403,019.4 KG |

Here, the government has proposed specific categories that each independently lead to a level 38. They are supported by testimony, plea agreements, internal documents, Dr. Goodman's 16-patient analysis, and overwhelming evidence.

### a.    Quantity Prescribed by Defendant Brody

Brody prescribed 394,324 pills to 6,559 Done members.  PSR ¶ 19; Trial Ex. 4000 at 39, 41. Brody's prescriptions alone result in the maximum offense level.

|  | Pills | Total MG |
|---|---|---|
| **Amphetamine (Actual)** | 373,091 | 5,532,367 |
| **Methamphetamine (Actual)** | 0 | 0 |
| **Methylphenidate** | 21,233 | 356,771 |

There was no dispute that Brody never evaluated a single Done patient or reviewed a single patient file.  The evidence showed that Done members could go months or even years without seeing anyone, even while they got stimulant prescriptions every month.  Dr. Goodman testified clearly to a distinction: a bridge refill is written by a covering prescriber who knows the treating clinician, understands the nature of that clinician's practice and patient population, has a basis for clinical confidence in the original prescription, and writes a *very short-term* prescription to tide the patient over until the next appointment.  The trial evidence showed that Brody and the other providers who wrote blind refills at Done did the opposite.  Done employee Kristin Bowen — who worked closely with Brody and conducted an internal analysis of his prescriptions — testified unequivocally that his refills "were not bridge refills."   10/7/25 Trial Tr. at 1346–47.  She described the mechanics: the care team provided Dr. Brody a "giant spreadsheet" of patient names, dates of birth, and pharmacy locations, with no clinical notes, no reason column, and no chart information.  He would then "just go through and . . . send, send, send, send, send." *Id.* at 1347.  Data analyst Petron testified that on Brody's ten fastest prescribing sessions, he averaged 32 to 37 seconds per prescription — on one day signing 75 Schedule II stimulant prescriptions in 40 minutes.  Ex. 4000 at 72.  Brody himself acknowledged he was not reviewing electronic health records.

In its objections to the PSR, Defendant attempted to suggest that various medical professionals, including Drs. Tsang and Brindala, approved of bridge refills.  But Tsang quit rather continuing to sign blind refills.  Trial Ex. 238.  And Brindala authored a risk-mitigation report warning that bridge refills of

Gov. Sentencing Memorandum for Def. R. He        22
24-CR-0329 CRB

over 7 days would put Defendants at risk of legal consequences.  Trial Ex. 219.  Brody wrote 30-day prescriptions, consecutively, for patients he had never met and who hadn't been seen by any medical professional in months or, in some instances, years.  These were exactly the type of refills that Brindala and others warned Defendants were illegal.

### b.        Quantity Prescribed by Convicted Co-Conspirators

Christopher Lucchese, Ginger Simor, Yina Cruz, Erin Kim, Katrina Pratcher, and Elizabeth Shapard pled guilty to the conspiracy.  Petron's summary analysis (Trial Ex. 4000 at 68) showed that five of these six providers — paid far above-market salaries by Defendant, in some cases exceeding $50,000 per month — prescribed Schedule II stimulants to 90% to 99% of the patients they saw, and continued issuing prescriptions to 89% to 99% of patients who had not had a single appointment in the prior 180 days. 11/7/25 Trial Tr. at 5028:21–5029:9.  Levy testified that Defendant was personally aware that Kim was not seeing patients — "every single one of her notes is identical, copy and paste, absolutely zero deviation" — that clinical leadership urged Defendant to fire Kim for illegal prescribing, and that Defendant refused.  10/28/25 Trial Tr. at 2980:20–2981:3.  Levy confirmed the same pattern extended beyond Kim to Cruz, Lucchese, and others with large panels.  *Id*. at 2980:3–9.

The defense argues that the plea agreements do not establish that *every* prescription was unauthorized.  But Simor only did blind refills – the same as Brody – and her prescriptions independently establish a Level 38.  And together, these six providers prescribed over 145 kilograms of amphetamine (actual).  Even individually, each of these co-conspirators prescribed a drug quantity of amphetamine (actual) that would reach the maximum offense level.  Six guilty-plea providers, operating within a platform structurally designed to eliminate diagnostic rigor and follow-up care, paid above-market rates to maintain high prescription volumes, personally retained by Defendant over the explicit objections of her own clinical leadership — that record more than satisfies the preponderance standard given that the quantity of their prescriptions so far exceed the quantity threshold for level 38.

Gov. Sentencing Memorandum for Def. R. He        23
24-CR-0329 CRB

| Provider | Amphetamine (actual) | | Methamphetamine | | Methylphenidate | |
|---|---|---|---|---|---|---|
| | Pills | Total MG | Pills | Total MG | Pills | Total MG |
| Cruz, Yina | 1,254,613 | 18,530,865 | 120 | 600 | 34,133 | 680,112 |
| Kim, Erin | 2,586,262 | 46,043,947 | | | 83,769 | 1,699,768 |
| Lucchese, Christopher | 1,453,841 | 22,588,638 | | | 198,121 | 3,581,847 |
| Pratcher, Katrina | 730,166 | 9,635,342 | 120 | 600 | 3,180 | 67,650 |
| Shapard, Elizabeth | 2,238,393 | 38,485,189 | | | 89,099 | 1,479,132 |
| Simor, Ginger | 628,064 | 9,997,707 | 240 | 1,200 | 36,287 | 656,491 |
| **Grand Total** | **8,891,339** | **145,281,687** | **480** | **2,400** | **444,589** | **8,165,000** |

### c.   Quantity Prescribed to Members with No Follow-Up Appointments

The drug quantity calculated below is based on the Schedule II stimulant prescriptions written to Done members who received two or more prescriptions without any follow-up appointments at all. Even just looking at the amphetamine (actual), this amount would be level 38.

| | Pills | Total MG |
|---|---|---|
| **Amphetamine (Actual)** | 6,254,937 | 86,399,089 |
| **Methamphetamine (Actual)** | 1,320 | 6,600 |
| **Methylphenidate** | 463,604 | 7,801,720 |

### d.   No Follow-Up Appointment for 180 Days or Longer

The following table captures the quantity of drugs prescribed to Done members who did not receive a follow-up appointment for more than 180 days.  Again, even just viewing the amphetamine (actual) amount, the offense level is 38.

| | Pills | Total MG |
|---|---|---|
| **Amphetamine (Actual)** | 6,408,905 | 99,569,055 |
| **Methamphetamine (Actual)** | 390 | 1,950 |
| **Methylphenidate** | 227,421 | 4,189,498 |

### e.   Goodman's 16 Done Members

The prescribed to these sixteen Done members alone represents an offense level 32:

| | Pills | Total MG |
|---|---|---|
| **Amphetamine (Actual)** | 13,962 | 288,114 |
| **Methamphetamine (Actual)** | 120 | 600 |
| **Methylphenidate** | 180 | 1,800 |

Gov. Sentencing Memorandum for Def. R. He       24
24-CR-0329 CRB

**f.     Consolidated and De-Duplicated Quantity of Drugs Outlined in
Sections 2(a) through 2(e)**

The government has consolidated these sub-categories and de-duplicated any repeated prescriptions, which also result in level 38:

|  | Pills | Total MG |
|---|---|---|
| **Amphetamine (Actual)** | 16,266,188 | 248,459,515 |
| **Methamphetamine (Actual)** | 2,070 | 10,350 |
| **Methylphenidate** | 958,868 | 16,878,287 |

**3.     Use of the Actual Amphetamine Drug Conversion**

Under § 2D1.1(a)(5), Defendant's base offense level is derived from the drug quantity table, § 2D1.1(c), which assigns a base offense level that is based on (1) drug type and (2) drug quantity.  Once the quantity of pills involved is established, the court must use the offense level determined by the entire weight of the mixture or substance containing the controlled substance or the offense level determined by the weight of "PCP (actual), amphetamine (actual), or methamphetamine (actual), whichever is greater."  U.S.S.G. § 2D1.1(c) n. A and B.  Probation correctly determined Defendant's base offense level by calculating the weight of actual amphetamine based on the amount of amphetamine in each prescribed tablet.  As application note 6 to § 2D1.1 states, "Except as otherwise provided, any reference to a particular controlled substance in these guidelines includes all salts, isomers, all salts of isomers, and any analogue of that controlled substance."  U.S.S.G. § 2D1.1 cmt. n. 6.  Note B states that only the weight of the controlled substance counts toward the converted drug weight of "amphetamine (actual)," and application note 6 states what counts as a controlled substance: not only the "particular controlled substance," but also all salts, isomers, salts of isomers, and analogues of that controlled substance.

Here, the amount of actual amphetamine contained in Adderall pills is known because, for example, a 10 mg Adderall pill contains 10 mg of mixed amphetamine salts and a 20 mg Adderall pill contains 20 mg of mixed amphetamine salts.  So it is appropriate to consider as the "actual" methamphetamine weight the dosage (e.g., 10 mg, 20 mg, etc.) associated with the pills.  The total mass of the pill (including fillers, binders, and dyes) is greater than the dosage, typically weighing several hundred milligrams, but the active ingredient weight is determined by the dosage (e.g., 5, 10, 20, or 30 mg).  Adderall (CII), FDA,

Gov. Sentencing Memorandum for Def. R. He     25
24-CR-0329 CRB

https://www.accessdata.fda.gov/drugsatfda_docs/label/2007/011522s040lbl.pdf (listing inactive ingredients in Adderall). Accordingly, a calculation based on the weight of each pill could result in an even greater drug quantity, showing the conservativeness of Probation's approach.

### 4.    Defendant's Arguments About Drug Quantity are Make-Weight

In spite of well-established principles of conspiracy law and the evidence at trial, Defendant has argued that her Guidelines should be limited to the four substantive counts of conviction. But from the outset of this case, the government has been clear about its theory: this is a policies and procedures case. Defendant did not stand at a pharmacy counter handing out pills – she came up with a prescribing model that, by her own design, would generate unauthorized prescriptions at an unprecedented scale.

The defense objections to the PSR extensively quoted the Court's mid-trial statement that not "every pill" was improperly prescribed (11/12/25 Trial Tr. 5195:8–18) and that it was "convinced that there was a vast number of people on this platform that prescribed medication, an appropriate medication for the disease attention-deficit disorder." *Id.* at 5207–5208. The Court's mid-trial observations are fully consistent with the government's position. The five sub-categories include patients who received Adderall indefinitely, without a single clinical check-in, from a system designed to keep them paying regardless of their medical status.

Indeed, Defendant's attempt to take the Court's statement out-of-context and construe it as requiring proof that each individual patient didn't need stimulants was squarely rejected by the Court later in the trial, when it rejected the defense's attempt to limit culpability to individual prescriptions: "The Controlled Substances Act is not a slot machine. You don't just put money in and if you get three cherries, it was a good investment and if you don't, it wasn't. You're gambling. That's the point. The prohibition is against the gambling not against the result. 11/10/25 Trial Tr. at 4308:20–4309:3. It is therefore entirely unsurprising — indeed, it is the logical and predictable consequence of those policies — that many more of the prescriptions written through Done's platform beyond the five sub-categories were unauthorized: the platform was built to produce that outcome, as confirmed by the co-conspirators, Dr. Goodman, Defendants' own words, and the judgment of the nation's largest pharmacy chains, which blocked Done's prescriptions entirely upon concluding that the platform's model was generating illegal prescriptions. Thus, the categories above understate the drug quantity resulting from the conspiracy.

### B.    Vulnerable Victim Enhancement

The government objects to Probation not applying the vulnerable victim enhancement.  The enhancement applies where, as here, "the defendant knew or should have known that a victim of the offense was a vulnerable victim."  U.S.S.G. § 3A1.1(b)(1).  In rejecting its application, Probation limited the enhancement's application to defendants who "purposefully target" the vulnerable victims.  *See* PSR Addendum at 1.  This is not the law, but the facts here even satisfy this incorrect legal standard.

First. Defendant, in fact, targeted vulnerable victims.  Defendant was warned that he entire advertising strategy deceiving Americans struggling during the COVID-19 pandemic – including those with serious mental health conditions.  Her advertising strategy — using keywords like "order Adderall without prescription" — was explicitly designed to reach people who were already seeking drugs outside normal medical channels, a population that disproportionately includes people with underlying mental health and drug addiction issues.  She also removed the intake questionnaires that screened for anxiety, depression, and suicidality — screening that was specifically designed to protect vulnerable patients.  Removing that protection was itself a purposeful act directed at enabling vulnerable patients to remain on the platform.  Indeed, the Guidelines provide that "adjustments in Chapter Three, shall be determined on the basis of . . . all acts and omissions committed . . . or willfully caused by the defendant . . . that occurred during the commission of the offense of conviction." *Id.* § 1B1.3(a)(1); *United States v. Haggard*, 41 F.3d 1320, 1326 (9th Cir. 1994); *United States v. Salahmand,* 651 F.3d 21, 27 (D.C. Cir. 2011); *United States v. Zats*, 298 F.3d 182, 187 (3d Cir. 2002).  Courts have considered individuals suffering from mental health disorders "vulnerable victims" under the Guidelines.  *See, e.g., Salahmand*, 651 F.3d at 28 (D.C. Cir. 2011); *United States v. Bergman*, 852 F.3d 1046, 1072 (11th Cir. 2017).

Second, even if Defendant did not intentionally target vulnerable victims, that is not what the law requires.  Under Ninth Circuit precedent, the government must show that Defendant should have known that at least one victim of the offense was a vulnerable victim.  *See United States v. O'Brien*, 50 F.3d 751, 755 (9th Cir. 1995).  Here, Defendants received repeated verbal and written warnings about the potentially devastating effects of stimulant drugs on individuals with certain health conditions and that Defendants nonetheless continued their criminal enterprise.  *E.g.*, Trial Ex. 254 (2021 risk mitigation report identifying "substantially negative outcomes" for patients); 10/7/25 Trial Tr. at 1326:3–1327:4

(K. Bowen testified that Defendant dismissed concerns about the risks to patients).

The jury heard about the obvious decline of H.B., C.C., and N.C. while on the Done platform. In addition to C.C., N.C., and H.B., Dr. Goodman analyzed the medical records of other vulnerable patients: (1) T.T. (history of anxiety); (2) A.K. (Done provider had concerns about A.K.'s cardiac condition and refused to prescribe Adderall, so Done rerouted A.K. to a provider who would prescribe); (3) B.H. (initial Done prescriber concerned about B.H.'s opioid use and would not prescribe, so Done rerouted B.H. to someone who would); (4) A.L. (substance abuse history; initial Done prescriber refused to prescribe Adderall, so Done rerouted her to someone who would prescribe); and (5) V.O. (Brody prescribed V.O. Adderall even though V.O. was on phentermine). Any person who observed these patients or read their records would have known they were vulnerable, and Defendants should have known. But they were just clicking and signing, not providing care. Trial Ex. 127.

## C.    Fraud Loss

As Probation correctly noted, "the healthcare fraud conspiracy count does not influence the offense level computation, as the offense level is driven by the drug conspiracy" no matter the loss figure. PSR Addendum at 4. Even so, the Court should still make a factual finding as to the loss figure to show that the drug distribution is the greater of the two, and as it bears on restitution. "Because [Defendant] was convicted of conspiracy, and because the losses were incurred because of that conspiracy, the 'preponderance of the evidence' standard applies." *United States v. Laurienti*, 611 F.3d 530, 556 (9th Cir. 2010); *id*. at 557 (noting a court may infer in the conspiracy context all investors who purchased a particular security were duped by the conspiracy). As the evidence at trial showed, insurers would not have paid for any of the Done prescriptions had the insurers known the truth. Trial Exs. 1601, 1604, 1605, 1607, 1609, 4000.

Courts "need only make a reasonable estimate of the loss," (U.S.S.G. § 2B1.1 cmt. 3(B) and "[i]n health care fraud cases, the amount billed to an insurer shall constitute prima facie evidence of intended loss." *United States v. Popov*, 743 F.3d 911, 916 (9th Cir. 2014); U.S.S.G. § 2B1.1 cmt. 3(F)(viii) ("the aggregate dollar amount of fraudulent bills submitted to the Government health care program shall constitute prima facie evidence of the amount of the intended loss."); *United States v. Suris*, 836 F. App'x 596, 597 (9th Cir. 2021). If such evidence is not rebutted, it "shall constitute

sufficient evidence to establish the intended loss by a preponderance of the evidence." *Popov*, 742 F.3d at 916.

Here, the actual loss to insurers has been calculated with precision. Defendant has not rebutted the presumption by bringing forward evidence of any legitimate prescriptions. U.S.S.G. § 2B1.1 cmt. 3(F)(viii). Accordingly, the Court should adopt the loss amount of $12,397,160.

As the Court evaluates the propriety of a variance on Counts 1 to 5 under § 2D1.1, the calculation under § 2B1.1 is instructive. Under § 2B1.1, Defendant's offense level is 36 without the vulnerable victims enhancement, putting her at a 188 to 235-month Guidelines range, or 38 with the vulnerable victims enhancement, putting her at a 235 to 293-month Guidelines range.[7]

## V.    ARGUMENT

### A.    Legal Standard

The overarching goal of a sentencing court is to impose a sentence that is sufficient to "reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed education or vocational training, medical care, or other correctional treatment." *United States v. Ressam*, 679 F.3d 1069, 1088–89 (9th Cir. 2012) (en banc); 18 U.S.C. § 3553(a). The Court should begin the sentencing process by correctly calculating the applicable Guidelines and must "remain cognizant of them throughout." *Gall v. United States*, 552 U.S. 38, 50 n.6 (2007). The Court should then consider the factors outlined in Section 3553(a). *Ressam*, 679 F.3d at 1089. If the Court determines that a sentence outside of the Guidelines range is warranted, it must ensure that the "justification is sufficiently compelling to support the degree of the variance." *Id*. "[A] major departure should be supported by a more significant justification than a minor one." *Gall*, 552 U.S. at 50.

---

|   |   |   |   |
|---|---|---|---|
| a. | [7] Base Offense Level, U.S.S.G. § 2B1.1(a): | | 6 |
| b. | Specific offense characteristics under U.S.S.G. Ch. 2: | | |
| | | Loss more than $9,500,000, U.S.S.G. § 2B1.1(b)(1)(K) | +20 |
| | | The offense was committed through mass marketing, | +2 |
| | | Relocating a scheme to another jurisdiction, U.S.S.G. § 2B1.1(b)(10) | +2 |
| | | Adjustment for vulnerable victims, U.S.S.G. § 3A1.1(b) | (+2) |
| c. | Adjustment for role in the offense, U.S.S.G. § 3B1.1(c)[7] | | +4 |
| d. | Adjustment for obstruction, U.S.S.G. § 3C1.1 | | +2 |
| e. | Adjusted Offense Level: | | 38 (36) |

B.        Government's Recommendation

The sentencing factors support a sentence of at least 240 months' imprisonment.

1.        The Nature and Circumstances (18 U.S.C. § 3553(a)(1))

a.        Defendant Caused Serious Harm to Patients

The defense will likely argue that Done served an underserved population.  The trial record refutes this.  The harm Defendant caused was medical, psychological, social, and permanent.  It was visited upon thousands of patients who came to Done seeking healthcare and instead received drugs dispensed by an algorithm engineered to maximize revenue.

**Defendant's Responsibility**.  There is little dispute that Defendant is personally responsible for this patient harm.  Defendant controlled and micromanaged everything at Done.

**The Chorus of Warnings**.  The trial record establishes warnings from her chief medical officer, clinical staff, her own friend, providers, pharmacies, investors, and journalists – each of which she acknowledged, dismissed, and overrode.  Barker explicitly warned that they "would wind up getting eaten alive" if they tried to defend Defendant's policies.  Trial Ex. 651.  There is no possibility of rehabilitation here; the evidence regarding the nature and circumstances of the offense shows a person incapable of accepting legal constraints on her desire to make money.

Defendant argued at trial that telehealth prescribing standards were ambiguous during COVID.  But (a) Defendant's private communications (to Prasad, Levy, and Brody) confirm she knew the business was illegal from the outset; (b) she was warned in the most explicit terms; and (c) other telehealth companies (competitors who stopped prescribing stimulants when the media raised concerns) behaved entirely differently when confronted with the same regulatory environment.

**Harm to Patients**.  During the trial, numerous witnesses testified about the harm she caused.  Dr. Goodman, for example, described the psychiatric risks (anxiety, panic attacks, and destabilize mood disorders); psychological risks (patient experience framed as having ADHD); and risks of worsening the condition of someone who has bipolar disorder, anxiety, or panic attacks.  11/3/25 Trial Tr. at 3927:5–23; 3914:14–22.  For example, a stimulant could cause destabilization in someone suffering from bipolar disorder, including causing the person to become insomnic, agitated, suspicious, paranoid, psychotic, and potentially dangerous to themselves and others.  *Id.* at 3954:14-19.  Dr. Goodman also explained the

caution with which stimulants should be prescribed to individuals with a substance use history because of their addictive potential. *Id.* at 3920:3–23.

Both K.C. and D.C. repeatedly reached out to Done after their children were hospitalized but Done nevertheless persisted in issuing stimulant prescriptions without follow-up evaluations, in accordance with the Done model, further endangering the health of these members. The note in N.C.'s medical record reads: "Received call from mother today advising that client was placed on a 5150 and has symptoms characteristic of bipolar disorder. Client should not add meds for ADD/ADHD." Trial Ex. 1844. The initial provider even requested that N.C. be discharged, but, in accordance with Defendant's model, Done sent him to a new provider, Shapard, as one of 125 patients transferred in a single day; Shapard, when asked at trial why she wrote the charged prescription, gave a simple answer: "Because I was being paid very well." 10/16/25 Trial Tr. at 2372:13.

**Widespread Harm**. These cases were not an outlier—it was the system working as designed. Done prescribed to almost 135,000 members across the United States. Trial Ex. 4000 at 49. Approximately 34,985 Done users had a change in their drug or dosage increase without any appointment. *Id.* at 61. Over 6 million pills were distributed to patients who had had no appointment in the prior 180 days. Dr. Goodman explained what this meant in practice: patients "suffered," they "decompensated," and they were "psychiatrically hospitalized" — "a devastating and frightening occurrence." 11/5/25 Trial Tr. at 4467:10–15.

Defendant dismissed the risks caused by prescribing stimulants illegally and instead encouraged Done providers to adhere to the Done model. Bowen testified that when employees cautioned Defendant of the risks of serious negative outcomes as a result of prescribing illegally, Defendant's response was that if such outcomes occurred she would blame the providers—a strategy Defendant also adopted throughout her trial. 10/7/25 Trial Tr. at 1328:16–22. When providers expressed concerns that stimulants were being prescribed illegally, Defendant's response was to criticize providers as weak or inexperienced and encourage them to break the law. *Id.* at 1326:3–17. She compared Done to Uber or Airbnb, stating that laws often have to be broken at start-ups. *Id.* Defendant's response when providers raised concerns about losing their licenses as a result of illegal prescribing was similarly cavalier, stating that Done could pay to get the licenses back. *Id.* at 1328:23–25.

Gov. Sentencing Memorandum for Def. R. He        31
24-CR-0329 CRB

**b.    Defendant Harmed Employees**

The defense will likely portray Done as an imperfect attempt to expand access during a pandemic. The employees at Done tell a different story of trust betrayed and careers sacrificed by Defendant in pursuit of growth. These witnesses are powerful voices because they were believers who came to Done in good faith and were deceived, exploited, and in many cases fired for having a conscience. The harm to Done's employees is a distinct dimension under § 3553(a)(1).

Many employees came to Done inspired by its purported mission because they suffer from ADHD themselves and were hoping to help others. *See, e.g.* 9/30/25 Trial Tr. at 451:7–14 (R. Menesini); 10/7/25 Trial Tr. at 1316:18–20 (K. Bowen; she and two of her children have ADHD); 10/17/25 Trial Tr. at 2757:6–8 (J. Jones); 10/28/25 Trial Tr. at 3055:1–2 (R. Levy). Jones, a recruiter at Done and a person with ADHD himself, testified that he joined because he believed in "helping folks in need with that type of mental condition." 10/17/25 Trial Tr. at 2757:10–12. Menesini, the first operations manager at Done, who also has ADHD, was similarly excited and passionate about what he thought the job would be. He quit without having another job lined up and, when asked why he ultimately left Done, he said it was because of "all of these concerns that were never going to be addressed, so just continued to see that we're doing things noncompliantly." 9/30/25 Trial Tr. at 608:5–11. Defendant's former assistant, Hill-Alvarez, described her time at Done as causing "the death of [her] idealism" because "There was a time in the beginning where there was this synergy of momentum, where the team felt like magic, like we were really changing things, and to slowly see people fall away, it became clear that the company was about profit." 10/31/25 Trial Tr. at 3674:24; 3675:5–6. Granger—Done's Head of Product, a Dartmouth and Columbia-educated technology professional with thirteen years in the health technology sector—came to Done expecting to expand access to care. By the time he left—fired by Defendant for raising concerns—he was, in his own words, "frustrated" and "disillusioned," having concluded that Done was "actually doing as much or more harm than any good." 11/6/25 Trial Tr. at 4701:13–24.

Defendant actively designed a workforce structured around suppression of dissent. For those who expressed opinions that conflicted with He's direction, Jones explained: "you would be forced out and shunned." 10/17/25 Trial Tr. at 2759:11–24. Hill-Alvarez testified to the toll this environment took

on individual employees: "Everyone was afraid to lose their job."  10/30/25 Trial Tr. at 3419:9–10.

Defendant's conduct exposed employees to legal liability; it caused career and financial damage; and it ruined their good-faith professional commitment to a cause they believed in.  Several employees who trusted Defendant's initial assurances about Done's legitimacy later became criminally complicit themselves.  Granger, Bowen, Hill-Alvarez, Menesini, Jones, and others quit, were fired, or pushed out, with the result of losing income.  Multiple employee witnesses expressed a sense of genuine grief.

### c.    The Health Care Fraud Conduct

The health care fraud conspiracy is a window into Defendant's character: Defendant's fraud was deliberate, sustained, and designed to corrupt checks that exist to protect patients, taxpayers, and the public.  This is not the conduct of a misguided entrepreneur who cut corners under pandemic pressure.  This is a person who, when confronted with institutional resistance — insurers requiring documentation and pharmacies asking questions — responded each time with a new and more sophisticated lie.

Health care fraud is not a victimless economic crime.  Every dollar stolen from Medicare and Medicaid is a dollar taken from programs funded by taxpayers to serve the elderly, the disabled, and the poor.  Every fraudulent claim submitted to private insurers drives up premiums for every policyholder.

### d.    The Obstruction

The obstruction conspiracy was pervasive and extensive.  It was a systematic, multi-year campaign to deny the grand jury the evidence it needed, using every tool available to a sophisticated, well-resourced CEO.  This included encrypted foreign messaging platforms, offshore corporate structures, falsified organizational records, directed witness non-cooperation, and ultimately attempted flight to a non-extradition country.

When Defendant believed that employees like Riley Levy were meeting with the government, she even ended Done's indemnity of their legal bills.  10/31/25 Trial Tr. 3674:16–21.  Defendant's obstructive conduct exemplifies her complete disregard for the law, and scant hope of rehabilitation.

### e.    Harm to Investors

Defendant also defrauded investors in order to fund the conspiracy in the first place.  Kelly Graziadei, cofounder of F7 Ventures, testified that she invested one million dollars — the largest check F7 had written at the time — based on Defendant's false representation that Done was a "managed

marketplace" in which independent licensed clinicians exercised their own professional judgment to provide real ongoing care to patients who needed it.  10/31/25 Trial Tr. at 3757–66; Trial Ex. 3041.  Graziadei has a son with ADHD and invested because she believed Defendant had no involvement in clinical operations.  Defendant did not present Done honestly to F7 because it was a purpose-driven investment and F7 would not have invested in what in reality was a "drug startup" whose purpose was "making money."  The investor harm is relevant both as a financial matter of relevant conduct loss, but also as a further window into Defendant's character: she raised funds from people who believed in expanding access to healthcare, and used their money and trust to build the opposite.

### 2. The History and Characteristics of the Defendant

Defendant's history and characteristics also merit a substantial sentence.  She does not have prior criminal convictions, however, in certain respects that makes her even less deserving of leniency from the Court.  Unlike many defendants that come before this Court, Defendant had opportunities to pursue a law-abiding career that served the public.  She is highly educated, speaks two languages fluently, has a supportive family, and had a successful prior career as a product designer at Facebook.  PSR ¶¶ 85–88.

At the core of the § 3553 analysis of Defendant's characteristics is a question that the record answers clearly: what motivated her?  The answer, in her own words, was money.  As early as February 2020 — before Done had seen a single patient — she wrote to her friend Prasad that her work at Done was "more like making money."  Ex. 897 at 157; 11/5/25 Trial Tr. at 4507–08.  By August 2020, as she was building out the clinical structure and hiring Brody to serve as a regulatory figurehead, she was writing that "healthcare is such a profitable space" with "easily 60%+ margin."  Trial Ex. 897 at 152–53; 11/5/25 Trial Tr. at 4508–09.  She repeatedly expressed a desire to become a billionaire, and even googled the "10 richest self-made young billionaires" who she aimed to surpass.  Trial Exs. 897 at 143, 2656; 11/5/25 Trial Tr. at 4510–11.  And by October 2022 — after the media published investigations, after the grand jury had served its subpoena, and after her own employees and her closest confidant had all told her the practices were illegal and dangerous — Defendant's private assessment was that she would not comply with the law because she wouldn't "make money."  Ex. 897 at 83–85; 11/5/25 Trial Tr. at 4523–24.  This is not a defendant who made a tragic mistake born of misplaced idealism.  This is a defendant who knew it was illegal and kept going because the profits were too attractive to stop.

Defendant's false representations about her passport are also indicative of her character. ECF No. 112. Concealing her passport, Defendant believes that she is above the law, again a sentiment that she openly expressed during her execution of the overprescribing conspiracy.

Defendant's deceptive character is also evident in the representations she made to the Court regarding Makebelieve. During the detention proceedings, the government had flagged the payments as suspect given issues on the invoices (such as them being on Done letterhead), lack of clarity as to the services provided, and the increase in amount of these payments the month that Defendant was arrested. ECF No. 77. Defense counsel initially claimed to the Court that Makebelieve was an entity used to pay contractors in China for which they could provide legitimate invoices, and later claimed that it was difficult to obtain additional information about the entity to alleviate any concerns of the Court because it was a foreign entity. Counsel had simultaneously during the detention proceedings presented Hayley Zhu as one of five purportedly independent managers of Done while Defendant was detained. Defendant never volunteered to the Court, however, that Ms. Zhu was the owner of Makebelieve – the government later uncovered that information in its investigation. Given Ms. Zhu's role at Done as Defendant's personal assistant, Defendant should have readily been able to provide additional information to the Court about Makebelieve (if legitimate) to assuage any concerns, however, that evidence was never presented either during the detention proceedings or at trial.

Probation notes Defendant's ACE score of 2 out of 10 and characterizes her upbringing sympathetically. But that cuts both ways. She had the ability, means, and knowledge to make Done a compliant company and consciously chose, with full awareness of the regulatory environment, to build a business model she knew was illegal — as reflected in her own private communications. Her sophistication is not a mitigating factor; it is an aggravating one.

Most fundamentally, Defendant has shown no remorse. She has not accepted responsibility, offered an apology to patients, or acknowledged that her choices caused harm. At every turn — in her pretrial representations to this Court about her passport, in her trial defense, and in her post-conviction filings — she has maintained that Done's practices were completely legitimate. This is not a defendant whose sentence should be shaped by rehabilitation potential.

Defendant contends that she had a difficult childhood, but her ACE score of 2/10 (PSR ¶ 82) is

in the lowest-risk category for behavioral problems. The PSR says a score of 2 out of 10 reflects "lower risk." Defendant's boarding school, bullying, and assault history is regrettable if true, but nothing in her background mitigates a years-long deliberate scheme to distribute drugs, obstruct an investigation, and flee justice — conduct she engaged in as a highly educated adult with every advantage.

Defendant may argue that her elderly parents depend on her, but her parents are described in the PSR as retired professors with close relationships, not as dependent on defendant for their care. Hardship to family members does not warrant a variance, particularly given the conduct here.

### 3.    General Deterrence

This is precisely the type of case where general deterrence has maximum effect. Defendant was not a street-level drug dealer making impulsive choices. She is a Carnegie Mellon-educated technology executive who, by her own account, specifically contemplated the risk of a 20-year imprisonment and consciously chose to continue. The population of telehealth executives who might follow her model are rational actors who will respond to the signal this sentence sends.

The interests of general deterrence are weighty here because the lesson that Defendant took from other technology companies such as Uber and Airbnb is that breaking the law was not only without significant consequence, but that it was actually advantageous in building a billion-dollar technology company. A sentence of 240 months will communicate to similarly situated technology executives — people who, like Defendant, are sophisticated enough to make the cost-benefit calculation she made — that the expected cost of this conduct exceeds its significant expected return (which Defendant expected would amount in the billions of dollars).

Indeed, telehealth is part of the future of the delivery of health care in this country and has incredible potential for providing increased access to care, assuming companies are run in a legally compliant fashion. Done, at the time of charging, was a top Adderall prescriber in the country, illustrating how the vast reach that telehealth provides creates the potential for unprecedented impact, both negative and positive. The sentence in this case is being closely watched by the telehealth industry for the consequences for executives in the telehealth industry when they break the law.

Gov. Sentencing Memorandum for Def. R. He        36
24-CR-0329 CRB

### 4.    Specific Deterrence

The final and perhaps most compelling factor under § 3553(a)(2)(C)—the need to protect the public from further crimes of the defendant—requires a sentence long enough to incapacitate Defendant for a substantial period.  The trial record contains direct evidence that Defendant planned to flee to a non-extradition country, has the infrastructure, associates, and resources in China to continue operating a telehealth enterprise (whether Done or a new company/scheme), and has demonstrated that no legal warning, professional concern, or regulatory action will deter her from this business model.  Deportation is not a collateral consequence, as Probation believed – it's an aggravating one.  This is particularly true for a Defendant who publicly tweeted that about the "perks of living in Asia" and referred to it as a "no-brainer!"  Sentencing Ex. 3.

### 5.    The Need to Avoid Unwarranted Disparities (18 U.S.C. § 3553(a)(6))

The JSIN data also supports the government's sentencing recommendation of 240 months.  PSR ¶¶ 110–111.  During the last five fiscal years (FY2020–2024), there were 16 offenders whose primary guideline was § 2D1.1, with a Final Offense Level of 43 and a Criminal History Category of I, after excluding offenders who received a §5K1.1.  *Id.*  For the 16 offenders (100%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 200 months and the median length of imprisonment imposed was 240 months.  *Id.*  Defendant's offense involves the largest-scale telehealth drug distribution conspiracy ever prosecuted, a four-level leadership enhancement, a 2-level obstruction enhancement, no acceptance of responsibility, documented flight planning, and lies to this Court.  There is no principled basis for a sentence below the national median.  A sentence of 84 months—Probation's recommendation—would be *below the bottom quartile* of this distribution and would represent the most dramatic possible downward departure from what comparable defendants have received.  It also would be a middle of the range sentence for an offense level of only 27 – nearly *20 levels* below the offense level of 46 found by Probation. The sentence sought by the government avoids unwarranted sentencing disparities and is directly at the median of 240 months.

# VI.    RESTITUTION, FORFEITURE, AND FINE

## A.    Defendant Should Be Ordered to Pay $12,397,160 to Health Care Insurers

When a case involves a conviction for a crime that "requires as an element proof of a scheme, restitution may be ordered for all persons directly harmed by the entire scheme," and [s]uch restitution is not limited to harm caused by the particular counts of conviction." *United States v. Anieze-Smith*, 923 F.3d 565, 571–72 (9th Cir. 2019).  Any dispute shall be resolved by the court by a preponderance.  18 U.S.C. § 3664(e).

Here, Probation correctly determined that the conspiracy caused a financial loss to health care insurers.  PSR ¶ 36.  The conspiracy entailed (a) collecting insurance information from Done members; (b) transmitting that information to pharmacies; (c) submitting fraudulent prior authorizations to health care benefit programs; and (d) causing pharmacies to submit false and fraudulent claims to health care benefit programs.  *See* ECF No. 1 (Indictment), ¶¶ 71(a)–(c), (f), 77.  Obtaining coverage for their illegal prescriptions was essential to the Defendants' drug conspiracy, even if they did not directly collect insurance proceeds.  By eliminating or subsidizing the cost of prescriptions for Done members, the Defendants could attract more patients to Done and maintain Done's price parity with legitimate medical providers whose prescriptions would be covered.  Trial Ex. 451 at 2.

Defendants personally participated in defrauding health care benefit programs, and the loss Defendants caused was reasonably foreseeable.  *United States v. Adebimpe*, 649 F. App'x 449, 452–53 (9th Cir. 2016) ("In a conspiracy, restitution may be ordered against each defendant to the extent the victim's losses were reasonably foreseeable to that defendant.").  Specifically, the evidence introduced at trial showed, among other things, that: (a) the Defendants caused the issuance of controlled substance prescriptions that were medically unnecessary knowing and intending that they would be paid for by health care benefit programs (PSR ¶¶ 36, 37); (b) the Defendants submitted, or caused the submission of, fraudulent prior authorizations that induced health care benefit programs to cover medically unnecessary prescriptions (PSR ¶¶ 36, 37); (c) Defendant and her co-conspirators lied to pharmacies about Done's prescribing practices, which resulted in pharmacies continuing to submit claims for such prescriptions to health care benefit programs (PSR ¶¶ 36, 39); and (d) and Defendant created a new corporate entity (i.e., Mindful Mental Wellness or "MMW") to trick pharmacies into filling prescriptions

Gov. Sentencing Memorandum for Def. R. He        38
24-CR-0329 CRB

issued by Done's providers (*see, e.g.,* 10/14/25 Trial Tr. at 1917 (Testimony of Nikita Mercado)).

The evidence at trial showed that the interrelated conspiracies caused health care benefit programs to pay over $12 million just for Schedule II stimulant prescriptions dispensed to Done members.  11/7/25 Trial Tr. at 4992; Trial Ex. 4000 at 71; 11/7/25 Trial Tr. at 4993; PSR ¶ 36.

**B.**    **Defendant Should Be Ordered to Forfeit the $91,311,290 in Proceeds She Received as a Result of Her Crimes**

As requested in the government's Application for a Preliminary Order of Forfeiture (filed separately), the Court should impose a forfeiture money judgment in the amount of $91,311,290, which represents the proceeds Defendant obtained, directly or indirectly, as a result of her crimes.

**1.    Legal Standard**

Criminal forfeiture is mandatory.  *United States v. Monsanto*, 491 U.S. 600, 606 (1989); *United States v. Davis*, 706 F.3d 1081, 1084 (9th Cir. 2013); *United States v. Newman*, 659 F.3d 1235, 1239 (9th Cir. 2011).  The government need only prove forfeiture by a preponderance of the evidence. *Libretti v. United States*, 516 U.S. 29 (1995).  One of the chief goals of forfeiture is to remove the profit from crime by separating the criminal from his or her dishonest gains.  *See Newman*, 659 F.3d at 1242; *United States v. Casey*, 444 F.3d 1071, 1073 (9th Cir. 2006).  To that end, forfeiture is not limited to specific assets directly traceable to the offense; it can also take the form of an in personam judgment.  *United States v. Lo*, 839 F.3d 777 (9th Cir. 2016).

Drug distribution and healthcare fraud convictions require the forfeiture of property "constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation."  21 U.S.C. § 853(a)(1); 18 U.S.C. § 982(a)(7) ("The court, in imposing sentence on a person convicted of a Federal health care offense, shall order the person to forfeit property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.").  Because these provisions require forfeiture of proceeds derived indirectly from criminal activity, forfeiture may appropriately encompass the gross proceeds of a purported healthcare business even where that business may have engaged in legitimate transactions.  *See United States v. Omidi*, 125 F.4th 1283, 1289 (9th Cir. 2025) ("All proceeds directly or indirectly derived from a health care fraud scheme like Get Thin—even if a

Gov. Sentencing Memorandum for Def. R. He        39
24-CR-0329 CRB

downstream legitimate transaction conceivably generated some of those proceeds—must be forfeited"); *United States v. Prasad*, 18 F.4th 313, 326–327 (9th Cir. 2021); *see also, e.g.*, *United States v. Warshak*, 631 F.3d 266, 332 (6th Cir. 2010) (affirming "that the entirety of Berkeley's revenues are proceeds that resulted, whether directly or indirectly, from unlawful activity," and that "[a]ny money generated through [] potentially legitimate sales is nonetheless subject to forfeiture, as the sales all resulted 'directly or indirectly' from a conspiracy to commit fraud.").

Alternatively, "when the corporate form is used to perpetrate a fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose, the courts will ignore the corporate entity and deem the corporation's acts to be those of the persons or organizations actually controlling the corporation, in most instances the equitable owners." *Sonora Diamond Corp. v. Superior Court of Tuolumne County*, 83 Cal. App. 4th 523, 538 (Cal. Ct. App. 2000). "[T]he two requirements for the application of [the alter ego] doctrine are (1) that there be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow." *Automotriz Del Golfo De California S.A. De C.V. v. Resnick*, 306 P.2d 1, 3 (Cal. 1957).

### 2.    The Money Judgment

As requested in the government's Application for a Preliminary Order of Forfeiture, the Court should enter a forfeiture money judgment in the amount of $91,311,290, which represents the gross proceeds Defendant obtained, directly or indirectly, as a result of her crimes.

### a.    The Gross Proceeds

The jury convicted Defendant of engaging in a drug conspiracy through the illegal business model that she established at Done. As detailed above, Done operated illegally from its very inception. Trial Ex. 897 at 172 (Defendant dismissing California's corporate practice of medicine rules because, in her view, "at the early stage . . . Uber and Lyft were all illegal"). Done's operations remained illegal even after Brody assumed the figurehead of Clinical President, as Defendant controlled clinical policies and practices at Done, pressuring and incentivizing providers to prescribe drugs to as many members as possible without authorization. Defendant openly, repeatedly acknowledged that she ran Done illegally to achieve her dream of being a billionaire. *See, e.g.*, *id.*

at 143 (Defendant recognizing her "drug biz" had a "tricky legal situation" and responding "I don't care," because "I just want to be a billionaire").  Defendant's "baby," Done Global, earned gross proceeds of $91,311,290 because of her illegal scheme.  10/14/25 Trial Tr. at 1820 (Testimony of Nikita Mercado regarding Defendant's description of Done).  11/7/25 Trial Tr. at 4965–67 (testimony of Michael Petron that Done Global "received over $91 million" from its users during the conspiracy); Trial Ex. 4000 at 9; ECF No. 1 at 12, ¶ 55; *id.* at 18, ¶ 78.

Directly or indirectly, Done's revenues derived from the illegal model that Defendant He established.  As alleged in the Indictment, one purpose of the conspiracy was to "increase[e] revenue and caus[e] the value of Done to increase through the illegal distribution of controlled substances to Done members who paid subscription fees to Done on a monthly basis in exchange for Adderall and other stimulants[.]"  ECF No. 1 at ¶ 56(d).  Levy testified that "the priority of . . . patient first was actually just [to] get patients in, have them pay a fee, get the drugs out the door as opposed to provide high-quality care[.]"  PSR ¶ 16.  Granger, Menesini, and Mercado testified to similar effect.  *See* PSR ¶ 16; 9/30/25 Trial Tr. at 470–71; 10/14/25 Trial Tr. at 1819, 1824–25.

Circuit courts have consistently held that where a business's illegal activities are a "but for" cause for its continued operations, its gross proceeds are directly or indirectly attributable to the illegal activities and subject to forfeiture.  *See, e.g.*, *Warshak*, 631 F.3d at 332 (affirming conclusion that "the entirety of [the defendant's business] revenues are proceeds that resulted, whether directly or indirectly, from unlawful activity" and that "even after the company attempted to affect an air of legitimacy, the very nucleus of its business model remained rotten and malignant"); *United States v. Bikundi*, 926 F.3d 761, 792–93 (D.C. Cir. 2019) (ordering that two defendants forfeit the entirety of their business's $80 million in total proceeds where the business's "continuing operations were maintained based on fraudulent records in employee and patient files" and that the business "would not have operated *but for* [each] defendant's fraud," and that the approximately $80 million "was *only* paid due to the defendants' persistent and rampant fraudulent conduct"); *United States v. Gladden*, 78 F. 4th 1232, 1251 (11th Cir. 2023) (affirming forfeiture of gross proceeds where "in the absence of Gladden's—and the other conspirators'—conduct, it is unlikely that Global would have been able to continue operations in the manner that it did").

Gov. Sentencing Memorandum for Def. R. He        41
24-CR-0329 CRB

These decisions explicitly held that gross proceeds remained subject to forfeiture even if the businesses sometimes engaged in legitimate activity. *Warshak*, 631 F.3d at 332–33 ("[T]he argument that certain sales were legitimate gains no traction . . . as the sales all resulted 'directly or indirectly' from a conspiracy to commit fraud. . . . As a consequence, forfeiture of [the business's] revenues, including money generated through supposedly legitimate transactions, was appropriate."); *Bikundi*, 926 F.3d at 792 (affirming forfeiture of total proceeds where defendants argued "the Medicaid payments for certain legitimate services were not connected to the health care fraud offenses," as fraud was the "but for" cause of the business's continued operations); *Gladden*, 78 F. 4th at 1251 ("Even if Gladden did participate in some legitimate transactions during his time at Global, these transactions were propped up by the illegitimate transactions.").

The Ninth Circuit's controlling decision in *Omidi* follows the same reasoning and requires the same result. There, the Ninth Circuit affirmed a $98 million forfeiture judgment that encompassed the total proceeds of the defendant's fraudulent healthcare business "Get Thin." *See* 125 F.4th at 1285–1286. The Court recognized that while "conceivably some of the incoming funds ultimately paid for legitimate and medically necessary procedures," ultimately "any proceeds that directly or indirectly derive from the fraudulent scheme must be forfeited, even if particular proceeds were not profits from the offense itself." *Id.* at 1287. As "all Get Thin proceeds were derived from a single intake process that, by design, disregarded medical necessity in favor of profit as part of the larger fraudulent billing scheme," the Ninth Circuit concluded that "forfeiture of money generated through supposedly legitimate transactions[ ] was appropriate." *Id.* at 1289.

*United States v. Jankowski* is also directly on point, illustrating that this principle applies with undiminished force where the healthcare fraud is intertwined with the illegal distribution of controlled substances. *See generally,* Case No. 23-1404, 2024 WL 4554690 (6th Cir. Oct. 23, 2024). There, the district court ordered the defendant to pay over $35 million because his "corporate entities brought in $35.3 million in revenue." *Id.* at *7. The Sixth Circuit affirmed that the gross proceeds were forfeitable in full, despite the defendant's argument that "one corporate entity was a multispecialty group with at least some providers who were not involved in the scheme," as the district court had appropriately concluded that the "fraud scheme centered on [the

Gov. Sentencing Memorandum for Def. R. He          42
24-CR-0329 CRB

defendant's] illegal drug activities, all masquerading as legitimate medical services," and that the corporate entities were ultimately "tantamount to 'prescription mill[s].'" *Id.*

Given this wealth of precedent, Done's gross proceeds must be forfeited. Done's own medical director Zoe Martinez confirmed that Done was a "pill mill," no less that the "prescription mills" at issue in *Jankowski*. Much like the intake process in *Omidi*, Done's intake and follow up processes followed an illegitimate, one-size-fits-all policy that prioritized profit margins over patient's individual medical needs. And Defendant "concocted false advertisements, concealed the existence of" practices that investors would not condone, and "fed false information to" pharmacies and insurers in much the same way that the defendants and their company fed false information to merchant banks in *Warshak*. *See* 631 F.3d at 332. Even if some Done members suffered from ADHD and benefitted from the stimulants prescribed for them, that is only a byproduct of the broader criminal scheme at Done. Even those arguably legitimate proceeds derive indirectly from the illegal acts that allowed Done to thrive at all, and they must be forfeit as a result. *See, e.g., United States v. Sanders*, 952 F.3d 263, 286 (5th Cir. 2020) ("If the business couldn't have existed absent the fraud, then even [funds from legitimate business] trace[ ] to it.").

### b. Done's Proceeds were Defendant's, and It Would Be Inequitable Not to Attribute Done's Proceeds to Defendant

Alternatively, the evidence presented at trial established that Done Global was one of Defendant's alter egos. As a result, Done Global's revenue during the conspiracy should be attributed to Defendant for purposes of forfeiture.

First, Defendant owned Done Global. *Associated Vendors, Inc. v. Oakland Meat Co.*, 210 Cal. App. 2d 825, 838–40 (Cal. Ct. App. 1962) (noting that "sole ownership of all of the stock in a corporation by one individual or the members of a family" is a factor courts may consider in alter ego analysis). At trial, Petron testified that Done's corporate records showed that Defendant owns "99.4 percent" of Done Global or "4 million shares out of the total 4,022,000" shares. 11/7/25 Trial Tr. at 4970–71; Trial Ex. 4000 at 32. Although there "are other types of both equity and debt that would potentially offset or dilute [Defendant's] ownership percentage," Tr. at 4971, there is no evidence that equity has been issued or debt incurred. Additionally, Petron testified that Defendant's net worth

"would increase in relation to the total value of the company increasing" regardless of whether these forms of equity or debt actually exist. 11/7/25 Trial Tr. at 4970–71.

Second, Defendant controlled Done Global's bank accounts that received the proceeds of the drug conspiracy.  Notably, in practice, Defendant also controlled Done Health's bank accounts. Despite the fictitious independence of Done Health, Defendant also controlled its "financial accounts" in practice.  *See* 10/28/25 Trial Tr. at 3010–11 (Testimony of Riley Levy regarding Defendant's control of Done Health PC's financial accounts); Ex. 4000 at 11–14.

Third, Done Global's bank accounts received the proceeds of Defendant's offense and were used by Defendant in furtherance of the conspiracy.  Membership fees were exclusively deposited into Done Global's bank account during the conspiracy.  *See* Trial Ex. 4000 at 9 (Done Global: Payments Received from Users).  During the conspiracy, Done Global spent $41,624,500 on advertising and paid $22,394,748 to providers.  *See id.* at 9, 15, 20.  And who controlled those expenditures: Defendant. *See* PSR ¶¶ 21–22, 27.

Fourth, the evidence at trial established that Defendant controlled the operations of Done Global and Done Health.  Defendant was the founder and CEO of Done Global from December 2019 to June 2024. PSR ¶ 86.  She also controlled the operations of Done Health's "clinical policies and practices with [Defendant] Brody's agreement," PSR ¶ 23, which ultimately generated the proceeds of the offense.  This was supported by ample evidence at trial from multiple former employees who worked closely with Defendants.[8]  Indeed, when Done came under investigation, Defendant had sufficient control over Done to control it through proxies, even though it exposed those individuals to legal jeopardy.  PSR ¶ 42.  *Cf. Associated Vendors,* 210 Cal. App. 2d at 838–40 (noting that "the concealment and misrepresentation of the identity of the responsible ownership" is a factor courts may consider in alter ego analysis).  In sum, the evidence at trial showed that Defendant used Done Global as one of her

---

[8] Defendant oversaw "all of the operations" of Done Global and Done Health, including by controlling clinician scheduling and communication with patients and the "engineering and the design of the patient experience at Done."  9/30/25 Trial Tr. at 456–57; 460–62 (R. Menesini).  *See also* 10/7/25 Trial Tr. at 1325 (K. Bowen) (describing Defendant's control over patient intake, appointment length, and follow-ups); 10/14/25 Trial Tr. at 1856 (N. Mercado).

Gov. Sentencing Memorandum for Def. R. He          44
24-CR-0329 CRB

alter egos to commit the offenses, and the Court must order her to forfeit the proceeds Defendant's alter ego received as a result of the drug conspiracy.

If Done Global's "acts are treated as those of the corporation alone, an inequitable result will follow." *Automotriz Del Golfo De California S.A. De C.V.,* 306 P.2d at 3.  The evidence at trial showed that Defendant received $1,058,570 from Done Global between September 4, 2020 and June 14, 2024.  Trial Ex. 4000 at 26.  However, the real value of the crime to Defendant was not her regular compensation: it was Done Global's revenue and the prospect of eventually selling her shares.  10/14/25 Trial Tr. at 1819.  Although the value of Done Global is unclear, Defendant continues to own the vast majority of its shares, if not 99.4% of them.  The value of those shares have undoubtedly increased as Done Global acquired thousands of users during the course of the conspiracy as a direct result of Defendant's crimes.  To ignore Done Global's revenue in calculating forfeiture would be to ignore Defendant's principal benefit from the offense.

### C. The Court Should Impose a Fine of $24,794,320

The Court should impose a fine commensurate with the significant financial loss Defendant caused to her victims.  To be clear, repaying victims of her offenses and disgorging the proceeds of her criminal activities leaves Defendant where she was before she entered into the conspiracy.  But merely returning Defendant to where she was financially before she entered the conspiracy is not adequate.  *See* U.S.S.G. § 5E1.2(e) ("The amount of the fine should always be sufficient to ensure that the fine, taken together with other sanctions imposed, is punitive.").  A fine is also necessary in this case to adequately punish Defendant and deter others who may be tempted to tread in her footsteps.

A defendant who has been found guilty of an offense may be sentenced to pay a fine based on the gain or loss.  18 U.S.C. § 3571(d).  Because Defendant caused a loss of $12,397,160 to health care benefit programs, the fine is $24,794,320.

The Court should impose the maximum fine here.  Probation's recommended fine of $50,000 — less than one-twentieth of one percent of the proceeds Defendant extracted from her crimes — would function as a rounding error on the cost of drug dealing.  Throughout these proceedings, Defendant has gone to great lengths to obstruct justice, including by moving assets overseas that could have been used to satisfy her restitution and forfeiture obligations.  It is notable that Defendant and Yue Wang discussed

padding legitimate expenses with extra payments to provide her with assets overseas.  Despite her conviction for obstructing justice, Defendant also did not disclose her shares in Done Global to the Probation Office as an asset, despite its value dwarfing her other reported assets.  Imposing the maximum fine makes it less likely that Defendant will avoid any personal financial responsibility through selling her shares of Done Global, erecting additional shell corporations, or repatriating money that she wrongfully moved overseas years ago.

**VII.    CONCLUSION**

For these reasons, the Court should sentence Defendant to 240 months' imprisonment, forfeiture in the amount of $91,311,290, restitution in the amount of $12,397,160 and a fine of $24,794,320.


DATED: March 30, 2026                    Respectfully submitted,

                                         CRAIG H. MISSAKIAN
                                         United States Attorney


                                         LORINDA I. LARYEA
                                         Chief, Fraud Section



                                         _/s/_____
                                         JACOB FOSTER
                                         Acting Chief, Health Care Fraud Unit
                                         EMILY GURSKIS
                                         Assistant Chief
                                         ARUN BODAPATI
                                         Trial Attorney
                                         Fraud Section, U.S. Department of Justice


                                         _/s/_____
                                         KRISTINA GREEN
                                         Assistant United States Attorney

Gov. Sentencing Memorandum for Def. R. He        46
24-CR-0329 CRB