WILLKIE FARR & GALLAGHER LLP
Koren Bell (SBN 268614)
  kbell@willkie.com
2029 Century Park East
Los Angeles, CA 90067
T: 310-855-3016
F: 310-855-3099

Michael S. Schachter (*Pro Hac Vice*)
  mschachter@willkie.com
787 Seventh Avenue
New York, NY 10019-6099
T: 212-728-8102
F: 212-728-9102

LAW OFFICE OF JOHN D. CLINE
John D. Cline
  cline@johndclinelaw.com
600 Stewart Street, Suite 400
Seattle, WA 98101
T: 360-320-6435

Attorneys for Defendant
RUTHIA HE

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RUTHIA HE, A/K/A RUJIA HE, and DAVID BRODY,<br><br>Defendants. | CASE NO. 3:24-cr-00329-CRB<br><br>**DEFENDANT RUTHIA HE'S SUPPLEMENTAL SENTENCING MEMORANDUM**<br><br>Sentencing Date: July 7, 2026<br>Sentencing Time: 10:00 a.m. |

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................................1

I.    This Court Correctly Found That "This Case is Way Out of the Heartland." ...............5

    A.    The Evidence Demonstrates this Case is "Way Outside the Heartland." ...............6

    B.    The Caselaw Demonstrates this Case is "Way Outside the Heartland." ...............10

        1.    The Government's cases only confirm this case is "way outside the heartland." .................................................................................................10

        2.    *Napoli*—imposing a 60-month sentence on the most culpable—is more instructive...........................................................................................11

II.    The Court Correctly Found that the Base Offense Level is 12....................................13

    A.    The Government Cannot Prove that "All" of Dr. Brody's Prescriptions Were Unlawful—or that Ms. He Is "Actually Responsible," as *Flores* Requires. ..........................................................................................................14

    B.    The Government Cannot Prove that "All" Prescriptions Issued to 16 Patients Addressed by Dr. Goodman Were Unlawful—or that Ms. He is "Actually Responsible," as *Flores* Requires..........................................................15

    C.    The Government Cannot Satisfy Its Burden of Demonstrating that "All" of the Prescriptions in Any of it Other "Sub-Categories" Were Unlawful, or that Ms. He is "Actually Responsible," as *Flores* Requires. ................................16

CONCLUSION.................................................................................................................16

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Kimborough v. United States*,
  552 U.S. 85 (2007)..............................................................................................................4

*United States v. Babich*,
  ECF No. 1028 (Nov. 26, 2019).........................................................................................11

*United States v. Chube II*,
  538 F.3d 693 (7th Cir. 2008) ............................................................................................15

*United States v. Evans*,
  2017 WL 568333 (S.D. Tex. Febr. 13, 2017) ...................................................................15

*United States v. Feingold,*
  454 F.3d 1001, 1008 (9th Cir. 2006) ................................................................................15

*United States v. Flores*,
  725 F.3d 1028 (9th Cir. 2013) ...........................................................3, 13, 14, 15, 16

*United States v. Napoli*,
  3:10 cr-00642-CRB, ECF Nos. 1114, 1162, 1290 (N.D. Cal. 2013).............................. *passim*

**Statutes**

18 U.S.C. § 3553..................................................................................................1, 4, 10

21 U.S.C. § 829..................................................................................................................15

**Other Authorities**

Centers for Medicare and Medicaid Services, Capitation and Pre-payment, (last
  visited March 10, 2026), https://www.cms.gov/priorities/innovation/key-
  concepts/capitation-and-pre-
  payment#:~:text=Defining%20key%20terms:,than%20the%20average%20Me
  dicare%20patient......................................................................................................................9

Christopher M. Whaley et al, An Employer-Provider Direct Payment Program Is
  Associated With Lower Episode Costs, Health Affairs (March 2021),
  https://www.healthaffairs.org/doi/10.1377/hlthaff. 2020.01488 ...............................................9

**INTRODUCTION**

As set forth in Ms. He's sentencing submissions to date, ECF 598, 611, 613, the Government's position that Ms. He deserves a 20-year prison sentence—almost triple the sentence that Probation recommends (84 months) and six times the top of the guideline range that Probation initially concluded was correct (33-41 months)—is untethered to the facts of this "first-of-its-kind" drug trafficking prosecution, and contrary to the objectives of sentencing under 18 U.S.C. § 3553(a). This supplemental sentencing memorandum addresses the two issues that were the focus of the Court's inquiry at the initial sentencing hearing: (1) Whether this case is outside of the heartland of cases that the sentencing guidelines were intended to address, and (2) Whether there is a basis to change the Court's preliminary determination that the applicable guideline level in 2D1.1 is a base offense level of 12 based on the Government's proffered alternative computations.

**First**, at the hearing, the Court properly concluded: "[I]t seems to me it's fairly obvious [] that this case is <u>way out of the heartland of cases</u> in which the sentencing guidelines were intended to address . . . I can tell you what the heartland is very easily because I have it every day. . . And it's not the same crime that is addressed in the heartland of cases in the Court's view." 4/28/26 Tr. at 13: 10-14, 21-23 (emphasis added).

This conclusion echoes the Court's repeated recognition, during trial, that this novel prosecution—premised on Ms. He's knowing deviation from standard "processes" in delivering <u>medical</u> care—is markedly different from any comparable drug-trafficking case. Indeed, as the Probation Department concluded: "<u>Ms. He founded Done with a genuine desire to help people with ADHD</u>." ECF 591 at 38 (emphasis added). And as this Court observed at the initial sentencing hearing: "I think its inception was that Ruthia He saw that there was this opportunity to develop a business of prescription, <u>that there were a lot of people who were under – it was underreported and under – under prescribed and that people could benefit from a platform such as Done</u>." 4/28/26 Tr. at 37: 15-21 (emphasis added).

Unlike the street-level dealer or the doctor who abuses his license by distributing drugs without regard to medical need, intentionally facilitating abuse and addiction, Done was engaged in the delivery of <u>medical</u> care. The evidence demonstrates that this was Ms. He's goal in founding

1

DEFENDANT RUTHIA HE'S SUPPLEMENTAL SENTENCING MEMORANDUM
Case No. 3:24-cr-00329-CRB

Done, and that this is what Done did in practice through its network of 400-plus licensed medical specialists.

Thus, as the Court observed during trial: "There's no question in my mind—and this separates this case from *Napoli* and all the other cases that I've seen, is that these people prescribed for a—an appropriate medication, appropriate to the condition that the person complained about, and that is a medical exercise." Trial Tr. 5208: 2-6 (emphasis added); *see also* Tr. 5207: 20-5208:12 ("I am convinced that there was a vast number of people on this platform that prescribed medication, an appropriate medication for the disease attention-deficit disorder. . .What is different and why it's a crime is because it doesn't meet generally accepted standards of the medical profession . . . "). Tr. 5207: 20-5208: 12 (emphasis added); Tr. 5161: 5-25 ("[E]verything I saw suggested [the patient] demonstrated some indication of attention deficit disorder for which it is stipulated that Adderall is an appropriate prescription."). "[P]utting it another way, the Government has not produced evidence that would show that the standard, that is [the] [']medical purpose['] standard, isn't met." Tr. 5208: 16-18 (emphasis added).

Unsurprisingly, the Government did not—because it could not—identify a single case where a defendant remotely comparable to Ms. He received a sentence that is anywhere near the 20-year term it asks this Court to impose. Instead, when the Court pressed the Government on this point at the hearing, it pointed the Court to bald "JSIN" data, and a handful of inapposite cases cited in the Government's brief for Dr. Brody (not Ms. He) which involved doctors who "weaponized" their medical license to pump out medically unnecessary prescriptions for opioids, and who were sentenced under a different guideline. 4/28/26 Tr. at 36: 11-25 (citing ECF 597 at 32). None of those cases support the Government's 20-year request for Ms. He—double what it describes as the 10-year "common benchmark" for physicians who "weaponize" their medical licenses in this way, ECF 597 at 32—and instead only bolster the Court's conclusion that this case is "way out of the heartland."

**Second**, at the hearing, the Court properly concluded: "I would find that the guideline level in 2D1.1 should be a base – for both defendants – should be a base offense level of 12." 4/28/26 Tr. 17: 14-16. As the Court reasoned: "How do you – how do you state that these – that, therefore,

DEFENDANT RUTHIA HE'S SUPPLEMENTAL SENTENCING MEMORANDUM
Case No. 3:24-cr-00329-CRB

the process itself, which is the Government's position, the process itself, the program itself, the platform itself, since it allows these types of improper prescriptions to take place, how then – is it true then that everybody who utilizes this platform is not – is a – should be counted as an individual receiving improper medication and therefore laid at the foot of Ms. He.  <u>And it is the Court's view it is wrong, that's the wrong thing to do</u>."  4/28/26 Tr. 12: 5-13 (emphasis added).

The Government concedes, as the Court found, that not "all" prescriptions issued by the 400-plus licensed providers practicing on Done's platform were unlawful.  But it urges the Court to conclude that "all" prescriptions in various sub-categories should be deemed unauthorized, and then laid "at the foot of Ms. He," *see id.*, including (i) "all" of Dr. Brody's prescriptions and (ii) "all" prescriptions issued to the 16 patients Dr. Goodman reviewed.  None of the Government's alternative theories of computation—which purport to increase the base offense from level from 12 to 32 or above, and the advisory guidelines range from 33-41 months to life in prison—meet the Government's burden, under *United States v. Flores*, 725 F.3d 1028, 1036-37 (9th Cir. 2013), to establish drug quantity not specified in a conspiracy count of conviction, with specificity and "reliability" as to Ms. He, as described in the prior sentencing submissions.  *See* ECF 598 at 34-39 & Appendix I; ECF 611 at 20-27.

Specifically, the evidence refutes the Government's claim that "all" of Dr. Brody's prescriptions were unlawful, and that Ms. He is responsible, because they were issued to patients he not seen.  Dr. Brody's prescriptions were "urgent" or "bridge" refill prescriptions to cover instances where a provider was on vacation or a patient was switching providers to prevent a gap in care—not prescriptions issued to first-time patients.  As such, they were short-term prescriptions issued to Done patients who (i) had already been diagnosed with ADHD, (ii) by another licensed specialist provider on the Done platform, via a face-to-face initial appointment, following a pre-appointment screening process, and (iii) prescribed ADHD medication by this licensed specialist Done provider.  Done's Medical Director, Dr. Jayaram Brindala—whom the Government held out as a responsible actor—specifically requested that Dr. Brody issue these short-term refills, and all of Done's medical leadership believed this practice was appropriate.  Even the Government's expert, Dr. Goodman confirmed that it is a common and accepted practice to for a covering

DEFENDANT RUTHIA HE'S SUPPLEMENTAL SENTENCING MEMORANDUM
Case No. 3:24-cr-00329-CRB

practitioner to issue bridge refills to patients they had not seen, and his testimony provides no basis for deeming "all" of Dr. Brody's prescriptions unauthorized.

Likewise, the evidence refutes the Government's claim that "all" prescriptions issued to the 16 patients addressed by Dr. Goodman were unlawful, and that Ms. He is responsible. Dr. Goodman did not—and, as the Court recognized, could not—testify that these prescriptions were knowingly issued by the licensed medical providers "without a legitimate medical purpose," as Ninth Circuit law requires. As the Court observed: "I don't know how [Dr. Goodman] can -- how he can testify as to what [the provider's] purpose was. That's the problem." Tr. 4272: 8-25 (emphasis added). Moreover, the evidence about these patients' treatment undermines any claim that Done's licensed medical providers issued prescriptions to these patients "without a legitimate medical purpose." Dr. Goodman admitted that he could not tell whether the patients suffered from ADHD, and thus could not testify about whether the patients had a medical need for ADHD medication. Tr. 3949: 10-17. And 10 of the 16 patients whose records were reviewed by Dr. Goodman were, in fact, diagnosed with ADHD by medical practitioners who had no affiliation with Done, *see* Ex. A (attached hereto, reattaching ECF 598 Appendix III)—thus evidencing that these patients suffered from the medical condition their prescriptions were intended to treat.

Ultimately, this Court, not the Sentencing Commission, is "in a superior position to find facts and judge their import under § 3553(a)," with the goal of imposing a particularized sentence minimally sufficient to accomplish the statutory aims of sentencing. *Kimborough v. United States*, 552 U.S. 85, 109 (2007) (citation omitted). That is particularly true here. Not only is "this case is way out of the heartland of cases in which the sentencing guidelines were intended to address," 4/28/26 Tr. at 13:13, but as discussed in the prior sentencing submissions, there are compelling mitigating facts about Ms. He—including that her non-citizen status will expose her to severe collateral consequences far beyond the reach of this Court's power to calibrate a punishment that fits the crime. These collateral consequences mean that her custodial sentence will be significantly longer in actual time served, first in BOP and then in ICE custody, and substantially more harsh and dangerous in terms of the conditions of her confinement, than it would for any similarly-

DEFENDANT RUTHIA HE'S SUPPLEMENTAL SENTENCING MEMORANDUM
Case No. 3:24-cr-00329-CRB

situated U.S. citizen defendant. ECF 598 at 11-17 & Exs. D, E, F (Declarations from immigration and prison experts).

As such, in this case especially, a "ritualistic" application of the Guidelines is inconsistent with the purposes of sentencing, just as this Court determined it was in *Napoli* in sentencing the most culpable defendant—whose offense conduct was more aggravated than Ms. He's—to 60 months in prison. *See United States v. Napoli*, ECF No. 1290, at Tr. 10: 15-11:5 (June 5, 2013). Indeed, the *Napoli* defendants' sentences, which ranged from 24 to 60 months, are instructive because this Court has already determined that Done's engagement in a "medical exercise" "separates this case from *Napoli* and all the other cases that I've seen." Trial Tr. 5208: 2-6.

## I.    This Court Correctly Found That "This Case is Way Out of the Heartland."

From Indictment to trial, this "first-of-its-kind" drug-trafficking prosecution has always been about the deviation from standard "processes" in delivering medical care—not garden-variety drug trafficking. That was the premise of the Indictment. *See* Indictment ¶¶ 65-70 (alleging that Ms. He controlled Done and Done's policies "pressured" licensed medical providers to issue prescriptions outside of standard processes for treating adult ADHD). That was the focus of the Government's presentation at trial. *See, e.g.*, Tr. 225:1-17; 232:21-233:2; 5144:20-5415:1. And as the Court has repeatedly recognized, *see supra* page 2, that was the crime of conviction here—not an intent to facilitate drug abuse or addiction.

Only now, when faced with the lack of a single case to support the 20-year term it seeks, does the Government turn to a construct that is refuted by the evidence: That Ms. He sought to distribute medically inappropriate prescriptions like a garden variety drug dealer. Probation rightly rejected that view in finding that "Ms. He founded Done with a genuine desire to help people with ADHD," ECF 591 at 38, as did this Court. *See* 4/28/26 Tr. at 37: 15-21; 38: 22-23 ("I don't agree with the Government's characterization it was always built like that or at its inception. I think its inception was that Ruthia He saw. . .that people could benefit from a platform such as Done. . .she didn't set out to scam.") (emphasis added).

This Court correctly determined that this case is "way outside the heartland," and the evidence and the caselaw bear this out.

DEFENDANT RUTHIA HE'S SUPPLEMENTAL SENTENCING MEMORANDUM
Case No. 3:24-cr-00329-CRB

**A.    The Evidence Demonstrates this Case is "Way Outside the Heartland."**

**First**, the evidence demonstrates that ADHD is significantly underdiagnosed and undertreated in the United States, and that Ms. He created Done to alleviate that problem. *See* ECF 598 at 20. Ms. He's contemporaneous communications with her co-founder and alleged co-conspirators demonstrate that Ms. He's motive in founding Done was to find innovative ways to treat ADHD. ECF 611 at 3-6; 11-12. And the sentencing letters, ECF 598 at Ex. C, confirm that it was this goal—of using technology to close the gap in adult ADHD care caused by a traditional healthcare system that had failed thousands suffering from this disorder—together with Ms. He's experience with, and interest in, mental health treatment—that motivated her to start Done.

**Second**, the evidence demonstrates that stimulant medication—the "first line" treatment for ADHD—is generally non-addictive when prescribed and taken in therapeutic doses, and can have a "life-changing" impact on ADHD patients. ECF 598 at 21-22. Thus, unlike in street-drug cases, or cases involving pain doctors whose prescribing habits contributed to the so-called opioid "epidemic"—i.e., the cases the Government pointed the Court to at the hearing, 4/28/26 Tr. at 36: 11-25—this case is premised on a much safer, far less addictive medication that has been FDA approved and prescribed, including to millions of children, for decades. The Government did not even attempt to prove—because it could not do so—that Done had a practice of prescribing stimulant medication in amounts that exceeded the therapeutic dose. Indeed, even the Government's expert, Dr. Goodman, admitted that he could not say that the 16 patients whose charts he reviewed did not need stimulant medication and agreed that he had no basis to testify that the medication prescribed to these 16 patients harmed them in any way. Tr. 4237:15-4238:10. Moreover, there were hundreds of patients who utilized the Done platform and found the care to be exemplary. *See* ECF 598 at Ex. A (video from Done patient); Appx. II (sample reviews); Ex. K (full reviews).

**Third**, the evidence about the way in which Done operated confirms that Done was indeed involved in a "medical exercise," Trial Tr. 5208: 2-6, as the Court found, unlike the heartland drug-trafficker. ECF 598 at 25-26; 611 at 6-11.

DEFENDANT RUTHIA HE'S SUPPLEMENTAL SENTENCING MEMORANDUM
Case No. 3:24-cr-00329-CRB

- Ms. He chose to hire a slate of doctors with vast experience and sterling credentials to be Done's medical leaders (rather than any hack with a medical license): Clinical President Dr. Brody, a Stanford trained board-certified psychiatrist with 35 years of clinical experience, a background as a Medical Director, and decades of teaching experience; Dr. Brindala, a Stanford-trained, triple-board-certified expert in addiction medicine, who was President Obama's former health policy advisor, and Done's first Medical Director; [1] and Drs. Tsang and Martinez.[2]

- For its network of independent contractors, Done sought out specialist providers with far more training than what was required to prescribe ADHD medication—namely, psychiatric mental health nurse practitioners ("PMHNP") or psychiatrists, preferably with experience treating ADHD. Tr. 356:15-357:9; Tr. 950:15-20; see also Tr. 644:11-645:24 (confirming the specialized mental health training that Done's PMHNP's receive before becoming certified); TX 1337 (recruiting checklist showing that it was a "requirement" that a provider either be a psychiatrist or PMHNP).

- Before being able to schedule an appointment with a provider, patients were required to answer a pre-appointment screening survey which asked the patient whether they had a history of complex health conditions that might make them unsuitable for telehealth. TX 1363 at 18. Ultimately, based on their answers to the pre-appointment questionnaire, Done excluded as unsuitable for care over 160,000 people and prevented them from scheduling appointments on the platform—more than the number of patients seen on the Done platform during the conspiracy period. Tr. 5022:10-20; TX 4000 at 49. This striking metric is impossible to square with any conclusion other than that Ms. He's goal was to provide medical care to patients.

- Before a provider issued a refill, Done's policies required a monthly check of the prescription drug monitoring program ("PDMP") database to make sure that there were no red flags in a patient's prescribing history. TX 5305 (Done's PDMP checklist); TX 7169 (email from Done's leadership to providers reminding them that they are required to check PDMP before writing a prescription).

- Done also implemented features such as fraud protection and two-factor authentication in order to prevent patients from creating multiple accounts and changing answers to the screening questionnaires after they submitted their responses. TX 1363 at 54; Tr. 5018:17–5019:24. Together, these protections would have the impact of reducing Done's patient

---

[1] Notably, the evidence refutes the Government's attempt to paint Dr. Brindala's departure from Done as a protest over its policies. Dr. Brindala (whom the Government did not, tellingly, call to testify at trial) continued in a consulting role at Done for months after he left his position as Done's Medical Director. Tr. 2148:9-2150:3; TX 6553, 6554. Then, on January 7, 2022, Dr. Brindala wrote to Ms. He and asked to return to Done full time "to contribute in the ways that you think are most valuable." ECF 611 at Ex. S. Clearly, Dr. Brindala did not believe that Done's policies—many of which he approved, see infra pages 8-9—caused unlawful prescriptions.

[2] Dr. Les Tsang is a UCLA trained psychiatrist who spent 12 years at Kaiser Permanente before joining Done, where he was Co-Director of Behavioral Medicine and Wellness. Dr. Zoe Martinez was a UC San Diego trained psychiatrist who served as the Psychiatric Medical Director for Napa County Mental Health and the Chief of Psychiatry at MedStar Southern Maryland Hospital Center before joining Done.

7

DEFENDANT RUTHIA HE'S SUPPLEMENTAL SENTENCING MEMORANDUM
Case No. 3:24-cr-00329-CRB

base, just as the pre-appointment screening did—another fact wholly inconsistent with drug trafficking.

- Done posted informative articles on its website to help those struggling with ADHD, including articles specifically explaining how "Stimulants are not the only treatment for ADHD" and warning patients about "ADHD Misinformation and Social Media." EX 5370, 5381. When certain advertisements raised concerns, Ms. He instructed Done's staff to "pull out all the suspicious ads and social media posts ASAP" and "[p]repare medically reviewed responses," TX 7216, and Done created a process to have the company's medical team review them before they were published.  TX 7224; Tr. 3218:22-25.

- Done was not only transparent about, but expressly touted, its model of "fast, easy, efficient" care—and the contrast with the traditional healthcare system—in investor presentations as the innovation offered through its technology.  *See*, *e.g*., TX 3041, 9027 (contrasting Done's "25-minute" initial appointment time, follow-up cadence, and "one-click" refill policy with traditional "in-person" care).   This model of care made Done appealing to investors who understood the barriers that traditional healthcare settings erected in getting patients the help they needed.  Tr. 3813:20-3814:14 (Testimony of Government trial witness Kelly Graziadei, who invested in Done after being pitched that Done's model was to provide "fast, easy, convenient care," and remained an investor at the time of trial).

- And, while Done as a platform focused on medication management and not talk therapy, it offered its subscribers a 10% discount to the psychotherapy platform BetterHelp, informing them that "Psychotherapy focused on ADHD symptoms can be a useful supplement to medication therapy."  ECF 611 at Ex. R.

    **Finally**, the evidence demonstrates that the at-issue medical "processes" were approved by at least one member of Done's qualified medical leadership—which Ms. He, who did not have a medical license, knew and understood.  *See* ECF 598 at 22-25.[3]  Even if these processes fell below the standard, the intention behind them was to provide medical care—specifically, to address the undisputed problem that millions of individuals suffering from ADHD did not have access to affordable care.  For example:

- Done's default 30-minute initial appointment time—endorsed by Dr. Brindala, whom the Government cast as a responsible professional, *see* Tr.  689:8-13; TX 6405—was designed for someone who could not afford to spend $1,400 for a 90-minute appointment with a psychiatrist, which is what the Government's expert Dr. Goodman charges.  Even Dr. Goodman conceded that there exist no written medical guidelines that say an initial evaluation for a patient needs to be 60 to 90 minutes before a patient can be diagnosed with

---

[3] *See* ECF 598 at 23 (citing TX 6405, TX 6129, Tr. 689:8-13 (30-minute initial appointment); TX 6287, TX 118, TX 6816, TX 5154, Tr. 757:12-25, Tr. 4205:1-4; 17-23 (follow-up frequency); TX 6703, TX 7714, TX 6816, TX 6077, TX 6090, TX 6300 (patient panel size and panel pay); TX 6291, TX 6403 (auto-refills); TX 6517 (bridge refills); Tr. 4784:14-4785:1 (discharges); TX 585 (reviews); Tr. 2487:20-2488:3, TX 6146, TX 6377, TX 5789, TX 5791 (medication trial)).

DEFENDANT RUTHIA HE'S SUPPLEMENTAL SENTENCING MEMORANDUM
Case No. 3:24-cr-00329-CRB

ADHD, Tr. 4073:11-16, and that primary care physicians who treat most ADHD patients likely do not spend 60 to 90 minutes with those patients. Tr. 4041:23-4043:23, 4073:25-4075:3.[4]

- Done's policy of encouraging providers to follow up with patients via asynchronous messaging, instead of face-to-face appointments, was aimed at reducing the costs of unnecessary appointments. Dr. Tsang—a board certified psychiatrist with over a decade of experience working at Kaiser Permanente—told Ms. He that requiring repeated and face-to-face follow-up appointments was not "clinically necessary," was required by "absolutely no standard of medical practice," and constituted "a poor use of provider resources." TX 6287.

- Done's "panel pay" structure mirrored the "capitation" models that many private and public healthcare systems like Medicaid and Medicare have adopted in order to reduce healthcare costs. [5]

- And Done's "bridge" prescription policy—another policy Dr. Brindala spearheaded and numerous doctors supported[6]—was established in order to ensure that ADHD patients who needed stimulants to function would not be left without medication if their provider was unavailable or left the platform. *See* Tr. 3621:17-3622:1; 3623:4-12 (Government witness Hill-Alvarez explaining that Dr. Brody's urgent refills were to "cover" instances where a provider was on vacation or a patient was switching providers to prevent a gap in care); *see also* TX 127; Tr. 1327: 2-3; Tr. 3622:15-17.

---

[4] Moreover, while hundreds of Done's providers found this default initial appointment time to be sufficient in many cases, Done's providers also had thousands of appointments with patients that were longer than the default 25-minute initial appointment time. TX 1716; Tr. 50006:5-23. And Done providers were not required to diagnose patients after the initial appointment, whether they spent 25 minutes or more with a patient. Indeed, 29,025 of the 134,876 patients who had appointments with Done's providers were not prescribed a controlled stimulant. TX 4000 at 49-51. That means that Done's providers were either discharging or prescribing non-controlled medication to approximately 1 out of every 4 patients.

[5] *See* Christopher M. Whaley et al, An Employer-Provider Direct Payment Program Is Associated With Lower Episode Costs, Health Affairs (March 2021), https://www.healthaffairs.org/doi/10.1377/hlthaff. 2020.01488. Insurers have adopted capitation in order to lower the costs associated with paying providers for time spent with patients (known as "fee-for-service"). Under capitation models, "[i]nstead of being paid for each health care service or product, health care providers . . . may be paid a set amount of money per patient, for a set amount of time, for a certain set of services." *See* Centers for Medicare and Medicaid Services, Capitation and Pre-payment, (last visited March 10, 2026), https://www.cms.gov/priorities/innovation/key-concepts/capitation-and-pre-payment#:~:text=Defining%20 key%20terms:,than%20the%20average%20Medicare%20patient.

[6] *See* TX 6517 (Dr. Brindala approving of Dr. Brody issuing bridge refills for patients that he had never seen before); *see also* EX 6116 (Dr. Brindala to Ms. He and others: "I spoke to Dr. Brody. . . David would be glad to do urgent refills and other urgent clinical tasks as needed."); ECF 598 at Ex. J (Dr. Brindala to Ms. He: "Ruthia He I would like David Brody to start refills now. David Brody mentioned to me 2 weeks ago that he would like to start refills. We could use his time on these tasks right away for business need.").

9

DEFENDANT RUTHIA HE'S SUPPLEMENTAL SENTENCING MEMORANDUM
Case No. 3:24-cr-00329-CRB

**B.      The Caselaw Demonstrates this Case is "Way Outside the Heartland."**

**1.      The Government's cases only confirm this case is "way outside the heartland."**

The Government's cases also support the Court's conclusion that this case is "way out of the heartland," and undermine its position that Ms. He deserves a 20-year term—double what it deems the 10-year "common benchmark" for physicians who "weaponize" their medical licenses. ECF 597 at 32.

The Government initially sought to justify its 20-year request by referencing a snippet of JSIN data, which this Court rightly rejected as lacking any of the facts or context the Court needs to impose a sentence consistent with § 3553(a).  *See* 4/28/26 Tr. at 33: 24; 23: 5-16.[7]  Pressed for a case that would support the Government's position, the Government then pointed to its sentencing position paper for Dr. Brody, 4/28/26 Tr. at 36: 11-25 (citing ECF 597 at 32), which cites to inapposite cases involving opioids and a different guideline (2B1.1, not 2D1.1 at issue here), as examples of "physicians who have similarly weaponized their medical licenses" and received 10-year sentences as "a common benchmark." ECF 597 at 32.

These cases—involving doctors who "supplied addicts and dealers with medically unnecessary Oxycodone, knowing that the 'patients' had no legitimate medical need for prescription opioids,"[8] and wrote fraudulent prescriptions for patients they "did not see, speak to, or otherwise treat"[9]—bear no resemblance to the facts here.  Ms. He is not a physician who "weaponized" a medical license to write prescriptions without a medical purpose—nor did Done prescribe opioids, which as the Court recognized, are "a much more dangerous drug." 4/28/26 Tr. 51: 9.  Rather, Ms. He ran a telehealth platform that offered access to a specialist medical provider

---

[7] It is unclear what basis the Government had for its representation that the JSIN "does exclude street drugs." 4/28/26 at 35: 6-7.

[8] *See United States v. Adelglass*, ECF 174 at 1, 20-CR-605 (S.D.N.Y.) (cited at ECF 597 at 32); *see also* ECF 597 at 32 (citing other cases where defendant physicians pumped out opioids without a medical purpose, including *United States v. Talbot*, ECF 265 at 2-3, 21-CR-00111 (E.D. La.), *United States v. Murphy*, ECF 215 at 2-3, 20-CR-291 (N.D. Ala.), and *United States v. Sherman*, ECF 312 at 2-3, 21-CR-20393 (E.D. Mich. 2024)).

[9] ECF 597 at 32 (citing *United States v. Young*, 21-CR-00417 (N.D. Tex. 2025), *United States v. Canchola*, 19-CR-00473 (N.D. Tex. 2024), and *United States v. Baldonado*, 21-CR-430 (D.N.J.)).

DEFENDANT RUTHIA HE'S SUPPLEMENTAL SENTENCING MEMORANDUM
Case No. 3:24-cr-00329-CRB

who ultimately made the determination whether or not to prescribe ADHD medication to a patient. No patient received a prescription without first being seen for a face-to-face telehealth appointment and diagnosed by a licensed specialist, each of whom had an independent ethical obligation to only prescribe medication where they thought it was in the patient's best interest. Tr. 1087:25; 372:20-375:15. As such, Done was engaged in a "medical exercise," as this Court found, Trial Tr. 5208: 2-6, even if its "processes" fell below medical standards.

### 2. *Napoli*—imposing a 60-month sentence on the most culpable—is more instructive.

By contrast, the *Napoli* and *Babich*[10] cases discussed in Ms. He's prior sentencing submissions are more instructive, though both involved far more egregious conduct. ECF 598 at 28-30, 33-34; ECF 611 at 15-16.

The Court has already determined that this case is different than *Napoli* and that the conduct there was more egregious than the conduct here. *See* Tr. 5208: 2-6. Indeed, in *Napoli*:

- Defendants ran an internet pharmacy that directly sold Schedule III and Schedule IV controlled substances to customers, whereas Ms. He ran a telehealth platform that offered access to a medical provider who ultimately made the determination whether or not to prescribe controlled substances to a patient. Superseding Indictment, *Napoli*, 10-cr-00642-CRB, ECF 144 at ¶¶ 1, 3, 14, 16, 24, 26.

- Defendants sold drugs to patients based on an online questionnaire without having any face-to-face interaction with a medical provider whatsoever, or "[m]aking any effort to confirm the accuracy of the information provided by the customers in the on-line questionnaires," whereas Done Providers prescribed controlled substances after patients were scheduled to default 25-minute medical appointments (which could have been longer if the medical provider believed it was necessary, *see supra* note 4). Superseding Indictment, *Napoli*, 10-cr-00642-CRB, ECF 144 at ¶¶ 1, 3, 14, 16, 24, 26.

- Defendants paid doctors to prescribe without ever seeing a patient, whereas Done paid providers for 25-minute initial appointments (regardless of whether they prescribed a controlled substance at the conclusion of the appointment) and 1/14 of their hourly rate for the number of patients under their care. *See* Superseding Indictment, *Napoli*, 10-cr-00642-CRB, ECF 144 at ¶¶ 16, 17, 22.

[10] *U.S. v. Babich*, 1:16-cr-10343 (D. Mass), involved executives of a pharmaceutical company, including the CEO and founder, who were involved in a scheme to bribe doctors to prescribe high volume and high dose prescriptions of fentanyl medication regardless of whether a patient needed the medication. The most culpable defendant in that case—the CEO and founder—whose crime involved a far more dangerous drug than the ADHD medication at issue in Ms. He's case, and caused insurers almost 30 times more in alleged loss, received a 66-month sentence. *See* Memorandum and Order on Defendants' Motion for Judgment of Acquittal and for a New Trial, *United States v. Babich*, ECF No. 1028, at 7, 11-13 (Nov. 26, 2019); Kapoor Sentencing Transcript at 60:21-25.

DEFENDANT RUTHIA HE'S SUPPLEMENTAL SENTENCING MEMORANDUM
Case No. 3:24-cr-00329-CRB

- In some circumstances, patients were prescribed by individuals who stole the identify of, and were impersonating, a doctor, whereas in this case every single patient was prescribed by a licensed medical provider. *See* United States' Sentencing Memorandum, *United States v. Napoli*, 3:10 cr-00642-CRB, ECF 1114 at 12 (N.D. Cal. Jan. 18, 2013).

- Prescriptions were filled by small partner "fulfillment" pharmacies who were paid to fill the prescriptions, whereas in this case Done's prescriptions were filled by independent pharmacies, including national chains like CVS, Walgreens, and Walmart. *See* Superseding Indictment, *Napoli*, 10-cr-00642-CRB, ECF 144 at ¶¶ 4, 5, 7, 18.

- There was evidence that patients died as a result of prescriptions, whereas here there is no evidence that any patient was actually harmed. *See* Sentencing Memo and Motion for Upward Departure as to Michael Arnold, *United States v. Napoli*, 3:10-cr-00642-CRB, ECF No. 1114, at 11-16 (N.D. Cal March 19, 2013).

Yet, in *Napoli* this Court rejected the Government's motion for an upward departure and instead departed downward, sentencing the most culpable defendant to 60 months, *see* ECF 598 at Appendix V—despite the fact that defendant had a prior criminal history. *See* Sentencing Memo and Motion for Upward Departure as to Michael Arnold, *United States v. Napoli*, 3:10-cr-00642-CRB, ECF No. 1114, at 11-16 (N.D. Cal March 19, 2013). In so holding, the Court concluded that a focus on drug "quantity" did not appropriately reflect the defendants' conduct in light of the fact that the harm was largely "potential" harm:

> The Court does not accept the Government's motion for an upward departure, based upon quantity. And . . . I think, as simply and accurately as possible, is that it simply doesn't make sense to take a quantity of drugs in which there's a potential harm. . . and sort of folding them into the language of the guidelines. . .It fits the sentencing guidelines, if one is going to use that sort of -- what I say rather ritualistic or technical approach to the guidelines. But there was nothing that was called to the Court's attention that suggested that the sentencing commission in formulating these guidelines and these application notes had in mind the particular type of operation that the defendants engaged in. And so not only does the Court believe that an upward adjustment is inappropriate, the Court has serious concerns as to whether or not the sentencing guidelines themselves, even without an upward adjustment, accurately reflect or encompassed within it the type of conduct that the defendants have been convicted of.

*Id.* (emphases added). The same conclusion applies here, where the Government has admitted, and the jury was repeatedly instructed by this Court, that the offense conduct was not the cause of any actual harm to any patient, and the Government has repeatedly described the harm in terms of "risk" of negative consequences. *See* Trial Tr. 2265:25-2266:6; 5030:1-8; ECF 600 at 31.

DEFENDANT RUTHIA HE'S SUPPLEMENTAL SENTENCING MEMORANDUM
Case No. 3:24-cr-00329-CRB

The Court's *Napoli* sentences—ranging from 24 months to 60 months—serve as a reference point for the appropriate sentence here. And although the Government points to Ms. He's obstructive conduct as warranting a greater sentence than the *Napoli* defendants, in fact, the most culpable defendant there engaged in money laundering to make his crime harder for law enforcement to detect, lied to Probation about his assets during sentencing, and had assets located overseas. *See* Supplemental Sentencing Memorandum as to Michael Arnold, *United States v. Napoli*, 3:10-cr-00642-CRB, ECF 1162 (N.D. Cal March 19, 2013). Moreover, here Ms. He must contend with extreme collateral consequences as a result of her non-citizenship status which present unwarranted sentencing disparities and militate in favor of leniency.

## II.    The Court Correctly Found that the Base Offense Level is 12.

It is the Government's burden to establish drug quantity with specificity and "reliability" as to each defendant to prove the defendant is "actually responsible." *Flores*, 725 F.3d at 1036-37. Because "a sentence will vary greatly based on these approximations" of quantity, the Ninth Circuit has stressed that courts must exercise "caution" in selecting the method of calculation. *Id*.[11] Here, the Court got it right at the initial sentencing proceeding—just as Probation did in the March 2 Initial PSR, when it determined that the specificity and "reliability" requirements were met only with respect to the four specific prescriptions that the jury concluded were unlawful in Counts Two through Five, which the jury was instructed were the objects of the conspiracy charged in Count I. ECF 526 at 22-23 (Court's instructions). Including the drug quantity for these four counts results in a base offense level of 12, as the Court correctly determined. ECF 598 Ex. G (March 2, 2026 Initial PSR at ¶¶ 43-44, 52.). As described in Ms. He's prior sentencing submissions and summarized here for ease, none of the Government's proffered alternative theories of computation—which ask the Court to conclude that "all" prescriptions in five sub-categories

---

[11] The importance of the mandate that the court "err on the side of caution" in determining whether the Government has met its burden to prove, with reliable evidence, that the defendant at issue is "actually responsible" for the quantity computed is illustrated by the vast difference between the March 2 Report's (correct) computation of a base offense level of 12 and the March 5 email advising of 3-fold increase in the same—a life-changing increase from a 33-month low-end advisory guideline range to life. The change arose after the Government complained that all of the prescriptions that Dr. Brody wrote to Done members should have been included in Ms. He's Guidelines calculation, *see* 598 at Ex. I (March 5, 2026 email from Probation to the parties), which is incorrect for the reasons set forth in Ms. He's prior sentencing submissions and summarized above.

13

DEFENDANT RUTHIA HE'S SUPPLEMENTAL SENTENCING MEMORANDUM
Case No. 3:24-cr-00329-CRB

should be deemed unauthorized, and then laid "at the foot of Ms. He"—meet the Government's burden. *See* ECF 598 at 34-39 & Appendix I; ECF 611 at 20-27.

A.     **The Government Cannot Prove that "All" of Dr. Brody's Prescriptions Were Unlawful—or that Ms. He Is "Actually Responsible," as *Flores* Requires.**

The evidence refutes the Government's claim that "all" of Dr. Brody's prescriptions were unlawful, and that Ms. He is responsible, because they were issued to patients he not seen.

- Dr. Brody's prescriptions were not prescriptions issued to first-time patients, but rather "urgent" or "bridge" refill prescriptions. *See* Tr. 3621:17-3622:1; 3623:4-12 (Government witness Hill-Alvarez explaining that Dr. Brody's urgent refills were to "cover" instances where a provider was on vacation or a patient was switching providers to prevent a gap in care); *see also* TX 127; Tr. 1327: 2-3.

- As such, they were short-term prescriptions issued to Done patients who (i) had already been diagnosed with ADHD, (ii) by another licensed specialist provider on the Done platform, via a face-to-face initial appointment, following pre-appointment screening, and (iii) prescribed ADHD medication by this licensed specialist Done provider.

- Dr. Brindala—whom the Government, again, held out as a responsible actor—specifically requested that Dr. Brody issue refills for patients he had never seen, *see supra* note 6, and all of Done's medical leadership, as well as multiple different psychiatrists, believed it was appropriate to issue short-term refills as a covering physician to bridge the gap for patients where their treating provider was unavailable, or had left the Done platform, and Ms. He knew and understood this. Tr. 2083:21-2085:15 (Government witness Nikita Mercado confirming that Dr. Tsang and Dr. Martinez issued bridge refills); Tr. 2085:24-2086:19 (Government witness Nikita Mercado confirming that Dr. Cruser, Dr. Glenn, and Dr. Gill issued bridge refills); *see also* Tr. 806:21-807:19, 1681:5-22, 2084:3-2087:23, 2090:13-2091:4, EX 835 (confirming that Dr. Martinez and Lead PMHNP Sarah Barker wrote bridge prescriptions).

- Even the Government's expert, Dr. Goodman confirmed that it is a common and accepted practice to for a covering practitioner to issue bridge refills to patients they had not seen. Tr. 3949:10-17 (emphasis added) ("A bridge refill is if my colleague asks me to cover his practice. . . And so while he's away on vacation for a couple of weeks, I will write a prescription for a patient who runs out of a medication . . . And so that's a bridge refill, to get to the next appointment.").

- Dr. Brody was permitted by law to issue bridge refill prescriptions without interacting with patients face-to-face. During the COVID-19 pandemic's public health emergency, the DEA explicitly permitted providers to issue refill prescriptions "by any method," including "in person, telemedicine, email, etc." as long as a patient had been previously examined in person. TX 5000; *see also* TX 5456; Tr. 2867:7-19. The law also recognizes that a "covering practitioner" may prescribe a controlled substance via telemedicine without seeing a patient so long as another provider who is temporarily unavailable has conducted

14

DEFENDANT RUTHIA HE'S SUPPLEMENTAL SENTENCING MEMORANDUM
Case No. 3:24-cr-00329-CRB

at least one in-person evaluation or an evaluation via telemedicine within the previous 24 months.  21 U.S.C. § 829(e)(2).

- Moreover, even if some of Dr. Brody's prescriptions were written outside the usual course of professional practice, it does not follow that, for purposes of calculating the Guidelines range, they should all be counted as being for no legitimate medical purpose.  Courts have held that where there is evidence that the provider issued prescriptions to "real" patients seeking "real" care, it is improper to assume that all prescriptions were issued for no legitimate medical purpose.  *See United States v. Chube II*, 538 F.3d 693, 702-03 (7th Cir. 2008); *see also United States v. Evans*, 2017 WL 568333, at * 4 (S.D. Tex. Febr. 13, 2017).

- Reliance on Dr. Goodman's testimony about the practice of "blind" prescriptions to establish that all of Dr. Brody's prescriptions were issued for no legitimate medical purpose is thus improper.  As the Court stated, "I don't know how [Dr. Goodman] can—how he can testify as to what [the provider's] purpose was. That's the problem."  Tr. 4272:8-25.  At most, Dr. Goodman's testimony established for sentencing purposes that some of Dr. Brody's prescriptions may have been outside the usual course of professional practice, to the extent they constituted "blind" refills, as distinguished from "bridge" refills, which Dr. Goodman himself recognized were proper.[12]  But that testimony could not establish that all of Dr. Brody's prescriptions fit that mold or, importantly, how many should be considered unauthorized for purposes of sentencing Ms. He.

### B. The Government Cannot Prove that "All" Prescriptions Issued to 16 Patients Addressed by Dr. Goodman Were Unlawful—or that Ms. He is "Actually Responsible," as *Flores* Requires.

The evidence refutes the Government's claim that "all" prescriptions issued to the 16 patients addressed by Dr. Goodman were unlawful, and that Ms. He is responsible.

- Dr. Goodman did not—and, as the Court recognized, could not—testify that these prescriptions were issued by licensed medical providers both (i) "without a legitimate medical purpose" and (ii) "outside the usual course of professional practice," and that the providers knew or so intended, as Ninth Circuit law requires.  *See United States v. Feingold*, 454 F.3d 1001, 1008 (9th Cir. 2006); *see also* ECF 526 at 19 (Court's jury instructions).  As the Court confirmed, "I don't know how [Dr. Goodman] can -- how he can testify as to what [the provider's] purpose was. That's the problem." Tr. 4272:8-25.

- As such, at most, the testimony of Dr. Goodman established for sentencing purposes that the prescriptions were issued "outside the usual course of professional practice."  His testimony does not establish that they were also knowingly and intentionally issued "without a legitimate medical purpose," as the law requires before a prescription can be considered "unlawful."

---

[12] The evidence also refutes the claim that all of Dr. Brody's refills could be characterized as "blind."  The trial record contained examples where Dr. Brody would ask to see a patient's medical records before prescribing if he had questions. *See*, *e.g.*, Tr. 1880:18-20; 2092:13-2093:3; TX 6755. And, contrary to the characterization that Dr. Brody would consistently issue prescriptions to patients when Done's providers refused to do so, the record made clear that clinical leadership, including Dr. Brody, would routinely approve providers' requests to discharge patients. *See* TX 6784.

15

DEFENDANT RUTHIA HE'S SUPPLEMENTAL SENTENCING MEMORANDUM
Case No. 3:24-cr-00329-CRB

- Moreover, the record evidence about these patients' treatment further undermines any claim that Done's licensed medical providers issued prescriptions to these patients "without a legitimate medical purpose." Although he was critical of Done's practices, Dr. Goodman admitted that he could not tell whether the patients suffered from ADHD, and thus could not testify about whether the patients had a medical need for ADHD medication. Tr. 4237:15- 4238:10.

- In fact, 10 of the 16 patients whose records were reviewed by Dr. Goodman were, in fact, diagnosed with ADHD by medical practitioners who had no affiliation with Done. *See* Ex. A (attached hereto, reattaching ECF 598 at Appendix III). In other words, there is evidence that these patients suffered from the medical condition that the medication they were prescribed was intended to treat.

- Dr. Goodman also recognized that some of the providers who treated these 16 patients exercised good clinical judgment. For example, although Dr. Goodman disapproved of the lack of frequency of follow-up appointments for Done patient P.L., he conceded that P.L.'s first treating provider's notes "contained a reasonable amount of specifically solicited information concerning [her] possible ADHD symptoms and impairments" that was elicited in an initial 31-minute appointment. Tr. 4276:6-428:12. For another patient, S.F., Dr. Goodman testified that her initial provider "[p]rescribed an appropriate starting dose of medication per her judgment" and that nothing in her medical records indicated that she was a drug abuser looking to get high. Tr. 4300:8-4301:9. And with respect to patient C.C., while Dr. Goodman was highly critical of the prescribing practices of her initial Done provider, he testified that her second provider "intervened and exercised what I thought at that time was good clinical judgment," in switching her medication after she was involuntarily hospitalized for experiencing a mental health episode. Tr. 4417:6-4420:9.

C. **The Government Cannot Satisfy Its Burden of Demonstrating that "All" of the Prescriptions in Any of it Other "Sub-Categories" Were Unlawful, or that Ms. He is "Actually Responsible," as *Flores* Requires.**

As described in detail in Ms. He's prior sentencing submissions, ECF 611 at 22-25, and incorporated here, the evidence also refutes the Government's alternative claims that "all" prescriptions (i) written by Ms. He's alleged co-conspirators, (ii) written to patients who received two or more prescriptions without any follow-up appointments, and (iii) issued to patients who did not receive a follow-up for 180 days, were unlawful, and that Ms. He is responsible.

**CONCLUSION**

For the foregoing reasons, in addition to those discussed in the prior sentencing submissions, the Court properly concluded "that this case is way out of the heartland of cases in which the sentencing guidelines were intended to address" and "that the guideline level in 2D1.1

16

DEFENDANT RUTHIA HE'S SUPPLEMENTAL SENTENCING MEMORANDUM
Case No. 3:24-cr-00329-CRB

should be a base – for both defendants – should be a base offense level of 12." 4/28/26 Tr. at 13: 11-12 (emphasis added); 17:14-16.

Dated: June 23, 2026              WILLKIE FARR & GALLAGHER LLP


                                  By:     */s/* Koren Bell
                                          Koren Bell
                                          Michael S. Schachter

Dated: June 23, 2026              LAW OFFICE OF JOHN D. CLINE


                                  By:     */s/* John D. Cline
                                          John D. Cline

                                          *Attorneys for Defendant*
                                          RUTHIA HE

DEFENDANT RUTHIA HE'S SUPPLEMENTAL SENTENCING MEMORANDUM
Case No. 3:24-cr-00329-CRB