WILLKIE FARR & GALLAGHER LLP
Koren Bell (SBN 268614)
  kbell@willkie.com
2029 Century Park East
Los Angeles, CA 90067
T: 310-855-3016
F: 310-855-3099

Michael S. Schachter (*Pro Hac Vice*)
  mschachter@willkie.com
787 Seventh Avenue
New York, NY 10019-6099
T: 212-728-8102
F: 212-728-9102

LAW OFFICE OF JOHN D. CLINE
John D. Cline
  cline@johndclinelaw.com
600 Stewart Street, Suite 400
Seattle, WA 98101
T: 360-320-6435

Attorneys for Defendant
RUTHIA HE

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> RUTHIA HE, A/K/A RUJIA HE, and DAVID BRODY, <br><br> Defendants. | CASE NO. 3:24-cr-00329-CRB <br><br> **DEFENDANT RUTHIA HE'S RESPONSE IN SUPPORT OF SUPPLEMENTAL SENTENCING MEMORANDUM** <br><br> Sentencing Date: July 7, 2026 <br> Sentencing Time: 10:00 a.m. |

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. ii

    I.      The Government's Cases Confirm this Case is Far Outside the Heartland ................... 1

    II.     The Victim Statement Submissions Confirm this Case is Far Outside the Heartland. ............................................................................................................................. 7

CONCLUSION ................................................................................................................... 9

DEFENDANT RUTHIA HE'S RESPONSE IN SUPPORT OF SUPPLEMENTAL
SENTENCING MEMORANDUM
Case No. 3:24-cr-00329-CRB

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*United States v. Adelglass*,
   20-CR-605, ECF 174 (S.D.N.Y. 2025)................................................................................3

*United States v. Allingham*,
   Case No. 25-CR-002 (E.D. Va. 2025) ...........................................................................3, 4

*United States v. Bajwa*,
   Case No. 20-CR-060 (E.D. Va. 2020) ................................................................................5

*United States v. Baldonado*,
   21-CR-430, ECF 61 (D.N.J. 2025) .....................................................................................3

*United States v. Canchola*,
   19-CR-00473, ECF 35 (N.D. Tex. 2024)............................................................................3

*United States v. Hanny*,
   509 F.3d 916 (8th Cir. 2007) ..............................................................................................5

*United States v. Lee*,
   966 F.3d 310 (5th Cir. 2020) ..........................................................................................4, 5

*United States v. Talbot*,
   21-CR-00111,  ECF 265 (E.D. La. 2025) ...........................................................................3

*United States v. Young*,
   21-CR-00417, ECF 80 (N.D. Tex. 2025).............................................................................3

**Other Authorities**

American Hospital Association, CDC Issues Health Advisory Warning Following
   Telehealth Company Indictment in Alleged $100 Million Stimulant
   Distribution Scheme, June 13, 2024,
   https://www.aha.org/news/headline/2024-06-13-cdc-issues-health-advisory-
   warning-following-telehealth-company-indictment-alleged-100-million................................6

DEFENDANT RUTHIA HE'S RESPONSE IN SUPPORT OF SUPPLEMENTAL
SENTENCING MEMORANDUM
Case No. 3:24-cr-00329-CRB

**INTRODUCTION**

The Government's supplemental sentencing submission only confirms this Court's conclusion, at the initial sentencing hearing, "that this case is way out of the heartland of cases in which the sentencing guidelines were intended to address," 4/28/26 4/28/26 Tr. at 13:13, and that the base offense level is 12. This reply responds to two specific aspects of the Government's submissions which Ms. He has not had the opportunity to address: (1) the new caselaw the Government proffers, and (2) the victim impact statements submitted. Given the volume of the sentencing material already before the Court, Ms. He reserves the balance of her response for the hearing.

**I.     The Government's Cases Confirm this Case is Far Outside the Heartland.**

The Government's supplemental submission starts by missing the point: This case is not outside the heartland simply because "Adderall can have a medical use" or because the distribution involved a "technological platform," as the Government posits before addressing this straw man. *See* ECF 638 at 2. Rather, what makes Ms. He entirely unlike the garden-variety drug dealer is that Done was in fact engaged in a "medical exercise," as this Court repeatedly found, Trial Tr. 5208: 2-6, through its network of 400-plus licensed medical specialists, and that Ms. He had a medical purpose in founding Done, as Probation and this Court likewise concluded. *See* ECF 591 at 38 ("Ms. He founded Done with a genuine desire to help people with ADHD."), 4/28/26 Tr. at 37:15-21; 38: 22-23 ("I think its inception was that Ruthia He saw. . . that there were a lot of people who were under – it was underreported and under – under prescribed and that people could benefit from a platform such as Done."). By contrast, the garden-variety trafficker—i.e. the street-level dealer or physician who weaponizes his license to distribute medically unnecessary drugs—are not engaged in a "medical exercise," and instead facilitate abuse and addiction.

The Government's cases illustrate the critical distinction between Done's "medical exercise" and garden-variety trafficking by physicians, only confirming the Court's conclusion that this case—a case about the knowing deviation from medical process, not the knowing distribution of medically unnecessary ADHD prescriptions—is far outside the heartland. *See* ECF

DEFENDANT RUTHIA HE'S RESPONSE IN SUPPORT OF SUPPLEMENTAL
SENTENCING MEMORANDUM
Case No. 3:24-cr-00329-CRB

636 at 1-2 (Ms. He's supplemental sentencing submission citing this Court's findings on this point); *see also id.* at 6-9 (summarizing the evidence supporting this conclusion); *id.* at Ex. A (summarizing the evidence regarding Dr. Goodman's 16 patients which supports this conclusion).

At the April 28 sentencing hearing, the Court pressed the Government to provide a case that would call into question the Court's finding that this case is outside the heartland. The Government could not do so. Now, after a two-month opportunity to scour the country for such a case, it has again come up empty-handed—largely citing back to the same inapposite cases and several new ones, which only confirm that this case is one-of-a-kind. None of the Government's cases involve a defendant convicted of a drug distribution conspiracy under facts remotely similar to this case, where compelling evidence supports the Court's conclusion that Ms. He founded Done with a medical purpose and that Done was in fact engaged in a "medical exercise." *See* ECF 636 at 6-9 & Ex. A. Among other things, none of the Government's cases involve a defendant convicted for drug trafficking where patients were diagnosed (pursuant to an initial face-to-face appointment)[1] by independent, licensed specialists trained in mental health treatment who ultimately made the determination whether or not to prescribe ADHD medication—most of whom the Government does not claim were co-conspirators—following a pre-appointment screening survey which <u>excluded</u> as unsuitable for care over 160,000 people, more than the number of patients seen on the Done platform during the conspiracy period. Tr. 5022:10-20; TX 4000 at 49.

Instead, all of the Government's cases fall squarely within the heartland of physician traffickers who abuse their license to distribute drugs <u>without</u> a medical purpose or exercise. At the last hearing, when asked by the Court for a case to support its position, the Government initially pointed to its sentencing submission <u>for Dr. Brody</u>, 4/28/26 Tr. at 36: 11-25 (citing ECF 597 at 32), which cites to cases involving <u>opioids</u> and a different guideline (2B1.1, not 2D1.1 at issue here). In its supplemental submission, the Government again relies on those same inapposite cases,

---

[1] And, notably, Ms. He insisted on full-length initial appointments. *See* TX 6127 ("Each initial appointment needs to be 25 min full length and cannot end early."); *see also* TX 6285; TX 6282. "TX" are admitted trial exhibits. "EX" are exhibits that were marked but not admitted as evidence, and previously submitted with Ms. He's sentencing position paper and reply. ECF 598 & ECF 611. Additional exhibits, that are neither TX or EX, are marked by exhibit letter alone.

DEFENDANT RUTHIA HE'S RESPONSE IN SUPPORT OF SUPPLEMENTAL
SENTENCING MEMORANDUM
Case No. 3:24-cr-00329-CRB

adding one to this set. *See* ECF 638 at 21. But as Ms. He explained in her supplemental submission, these cases involve doctors who "supplied <u>addicts and dealers</u> with <u>medically unnecessary Oxycodone</u>, <u>knowing that the 'patients' had no legitimate medical need</u> for prescription opioids,"[2] and wrote fraudulent prescriptions, without any medical purpose or process, for patients they "did not see, speak to, or otherwise treat."[3]  These cases bear no resemblance to the facts here where Done was engaged in a "medical exercise," even if its medical processes knowingly fell below medical standards. *See* ECF 636 at 10-11; *see also* 4/28/26 Tr. 51: 9 (The Court: noting, in response to the Government's cases, that opioids are "a much more dangerous drug" than prescription ADHD stimulants).

The new opioid case added to this set in the Government's supplemental submission only underscores this conclusion. *See* ECF 638 at 21 (citing *United States v. Allingham*, Case No. 25-CR-002 (E.D. Va. 2025), together with the cases previously cited in its submission for Dr. Brody). There the defendant physician received a 13-year sentence after he "flooded the greater northern Virginia and Richmond areas" with oxycodone and amphetamine pills "prescribed <u>for no legitimate medical purpose</u>…<u>wreaking harm on hundreds of patients and the broader community by creating and fueling addictions, and tragically contributing to at least seven fatal drug overdoses of his patients</u>." *United States v. Allingham*, Case No. 25-CR-002, Govt. Sentencing Position, at ECF 22 at 1 (emphasis added).  On its face, the Government's sentencing position there powerfully

---

[2] *See United States v. Adelglass*, 20-CR-605, Govt. Sentencing Position, ECF 174 at 1 (S.D.N.Y. 2025) (emphasis added) (cited at ECF 597 at 32) (10-year term); *see also* ECF 597 at 32 (citing other cases where defendant physicians pumped out opioids without a medical purpose, including *United States v. Talbot*, 21-CR-00111, Govt. Sentencing Position, ECF 265 at 2-3 (E.D. La. 2025) (87-month term) (defendant physician "pre-determined" prescriptions "before patients could be evaluated" distributing "<u>doses to patients who were addicted to their medications and who showed signs of misusing and diverting those medications</u>," in exchange for monthly cash payments, "with Defendant's knowing full well that those patients were using their insurance benefits to fill the unlawful prescriptions") (emphasis added); *United States v. Sherman*, 21-CR-20393, Govt. Sentencing Position, ECF 312 at 1-2 (E.D. Mich. 2024) (13-year term) (conspired to "to unlawfully prescribe Oxymorphone, Oxycodone, and Percocet pills to 'patients' in exchange for cash payments from 'recruiters' and 'patients' <u>who had no medical need for them</u>," and "created falsified medical records" "to make the 'patients' appear legitimate") (emphasis added)).

[3] ECF 597 at 32 (citing cases involving 2B1.1 rather than 2D1.1, including *United States v. Young*, 21-CR-00417, ECF 80 at para. 1 (N.D. Tex. 2025) (defendant signed prescriptions for tests and devices that were "<u>medically unnecessary</u>" and induced through unlawful kickbacks and bribes) (emphasis added), *United States v. Canchola*, 19-CR-00473, ECF 35 (N.D. Tex. 2024) (same), and *United States v. Baldonado*, 21-CR-430, ECF 61 (D.N.J.) (same), and describing these cases that way).

3

DEFENDANT RUTHIA HE'S RESPONSE IN SUPPORT OF SUPPLEMENTAL
SENTENCING MEMORANDUM
Case No. 3:24-cr-00329-CRB

refutes the Government's suggestion here that the conduct of the defendant physician in *Allingham* bears any similarity to Ms. He's conduct:

- Defendant physician Allingham "distributed to patients whom he knew were drug addicts and drug dealers seeking to abuse or sell oxycodone." *Id.* ECF 22 at 8.

- Allingham "prescribed unconscionably high amounts of oxycodone," "as much as five times the CDC's recommendation pain patients," "for prolonged periods of time." *Id.* ECF 22 at 3.

- Allingham "not only ignored, but concealed, evidence that his patients were abusing street drugs, including fentanyl and heroin," and "fabricated and altered his medical records to create an appearance of legitimacy to his prescribing." *Id.* ECF 22 at 9.

- Allingham "lured such patients into a sense of comfort with and trust in his prescribing, assuring them that they could not become addicted at the level he prescribed, and that he was sponsored by 'the Feds' and the 'DEA' to prescribe opioids, at times referring to himself as a 'Federal Prescriber.'" *Id.* ECF 22 at 8.

- Allingham caused these patients "devastating consequences" and "irreparable harm," including that seven "patients died within hours, days, and weeks of receiving oxycodone prescriptions from the defendant" and "many struggle to this day with managing and recovery from the addiction they developed." *Id.* ECF 22 at 8-9.

- Allingham also "prescribed amphetamines to many of his opioid-receiving patients for the purpose of weight reduction, regardless of whether such patients were overweight, regardless of whether they wanted to lose weight, without a legitimate medical purpose, and knowingly in contravention of Virginia regulations specifically prohibiting the prescribing of amphetamines for weight reduction." *Id.* ECF 22 at 3.

- Allingham "offered amphetamines to an attorney who was not a patient of his while the two were dining together at a restaurant, telling her he would give her Adderall to lose weight in exchange for $350." *Id.* ECF 22 at 5.

*Allingham* is, in short, squarely within the heartland of physician traffickers who abuse their license to distribute drugs <u>without</u> a medical purpose or exercise, while this case is one-of-a-kind.

The Government's supplemental submission also discusses *United States v. Lee*, 966 F.3d 310, 317 (5th Cir. 2020), ECF 638 at 18-19, but like *Allingham*, this case supports this Court's conclusion that Ms. He's case is far outside the heartland. There, the trial evidence told the story of "a medical practice that <u>serves as a front for dealing prescription drugs</u>"—namely, <u>oxycodone</u> among other controlled substances. 966 F.3d at 317 (emphasis added). "It portrays a clinic <u>packed</u>

4

DEFENDANT RUTHIA HE'S RESPONSE IN SUPPORT OF SUPPLEMENTAL
SENTENCING MEMORANDUM
Case No. 3:24-cr-00329-CRB

with drug users and dealers, where one person would often pay for multiple patients' visits." *Id.* (emphasis added). Among the evidence "consistent with patients' trafficking drugs is that, on follow-up visits, many tested negative for the medication [defendant physician] had prescribed them. Others tested positive for illegal drugs like cocaine." *Id.* "A positive test for an illegal drug, such as cocaine, is a warning sign in flashing neon. Less apparent but no less damning is a negative test for a prescribed drug: it is a red flag that the so-called patient is selling medications rather than using them." *Id.* at 318. "Despite the red flags, [defendant physician] kept prescribing these patients drugs." *Id.* at 317. The physician defendant's co-conspirator, his office manager, was a nurse by training who "reviewed failed drug tests, knew some patients had substance abuse problems, and prewrote prescriptions for [physician defendant] to sign." *Id.* at 318.

*United States v. Bajwa*, Case No. 20-CR-060 (E.D. Va. 2020), also discussed in the Government's supplemental submission, ECF 638 at 20, fits the same "heartland" pattern. There, the physician defendant received a 10-year sentence after he "acted not as a medical practitioner, but as a drug dealer, doling out controlled substances to customers who personally abused the drugs and in some cases, sold them to others." *See id.*, Govt. Sentencing Position, ECF 50 at 6 (emphases added). His "conduct was sweeping in scope and serious in nature, and the harm inflicted on the community is difficult to quantify." *Id.* (emphasis added). And notably, in *United States v. Hanny*, 509 F.3d 916 (8th Cir. 2007), which the Government likewise points to, ECF 638 at 25, the defendant physician received a 33-month sentence for authorizing prescriptions without ever having even an initial face-to-face appointment with patients—something that never happened at Done.

Thus, the Government's cases merely confirm this Court's conclusion: "There's no question in my mind—and this separates this case from *Napoli* and all the other cases that I've seen, is that these people prescribed for a—an appropriate medication, appropriate to the condition that the person complained about, and that is a medical exercise." Trial Tr. 5208: 2-6 (emphasis added). "[P]utting it another way, the Government has not produced evidence that would show

5

that the standard, that is [the] ['] medical purpose['] standard, isn't met." Tr. 5208: 16-18 (emphasis added).

Dr. Goodman's review of 16 Government-selected patient files out of the 137,000 patients treated on the platform—purportedly the "worst of the worst"—underscore this point. Not only did he admit that he could not say that the 16 patients whose charts he reviewed did not need stimulant medication and agreed that he had no basis to testify that the medication prescribed to these 16 patients harmed them in any way. Tr. 4237:15-4238. What is more, the evidence about the 16 "worst-of-the-worst" patients' treatment undermines any claim that Done's licensed medical providers issued prescriptions to these patients without a legitimate medical purpose:

- 10 of the 16 patients whose records were reviewed by Dr. Goodman were, in fact, diagnosed with ADHD by medical practitioners who had no affiliation with Done—thus evidencing that these patients suffered from the medical condition their prescriptions were intended to treat.

- 3 patients of the patients who were treated prior to Done had their dose of ADHD medication reduced by Done medical providers.

- 12 of the 16 patients were prescribed medication entirely within the FDA's recommended treatment range.

- 7 of the 16 patients whose records were reviewed by Dr. Goodman were prescribed a low "child" dose of ADHD medication by Done providers after their ADHD assessment.

*See* ECF 636 at Ex. A (reattaching ECF 598 Appendix III).

And of course, there were thousands of other patients who utilized the Done platform and found the care to be exemplary. *See* ECF 598 at Ex. A (video from Done patient); Appx. II (sample reviews); Ex. K (full reviews). Indeed, the federal Government itself recognized that thousands of people were receiving treatment for their ADHD from Done. That is why, after Ms. He was arrested, the CDC issued an advisory warning: "Patients who rely on prescription stimulant medications to treat their ADHD and have been using [Done] or other similar subscription-based telehealth platforms could experience a disruption to their treatment and disrupted access to care. A disruption involving this large telehealth company could impact as many as 30,000 to 50,000 patients ages 18 years and older across all 50 U.S. states." *See* American Hospital Association,

DEFENDANT RUTHIA HE'S RESPONSE IN SUPPORT OF SUPPLEMENTAL
SENTENCING MEMORANDUM
Case No. 3:24-cr-00329-CRB

CDC Issues Health Advisory Warning Following Telehealth Company Indictment in Alleged $100 Million Stimulant Distribution Scheme, June 13, 2024, https://www.aha.org/news/headline/2024-06-13-cdc-issues-health-advisory-warning-following-telehealth-company-indictment-alleged-100-million.

II.    **The Victim Statement Submissions Confirm this Case is Far Outside the Heartland.**

Like the caselaw it proffers, the Government's "victim statement" submissions confirm this Court's conclusion that this case is far outside the heartland.

**First,** the Government has submitted letters from family members of patients who suffered from mental health episodes or passed away from overdoses of drugs other than Adderall. While these stories are heartbreaking, there is no evidence that Done or the Adderall that these patients were prescribed actually contributed to their loved one's relapses, deaths, or mental health issues. Even accepting that these patients received sub-standard care, the facts undermine any argument that Done medical specialists issued medically <u>unnecessary</u> prescriptions, much less that they did so knowingly, facilitating drug abuse or addiction, or that this is what Ms. He intended. For example:

- Patient K.D. – This Done patient reported being diagnosed with ADHD as a child, but her parents were uncomfortable with her receiving medication. Her Done provider initially prescribed her 10 mg of Adderall IR twice day, but later switched to Ritalin IR twice a day, when she complained of the medication making her anxious, both dosages of which are below the FDA maximum amount recommended by the FDA. EX 7455 at 1, 13; EX 7450 at 1. The provider then refused to increase the dosage when she asked for a higher dose. EX 7455 at 21. She died of a fentanyl overdose. There is no evidence that Adderall contributed to her death in any way.

- Patient N.C. – This Done patient was diagnosed with ADHD ten years before seeking treatment on Done's platform. In the years prior to starting treatment with Done, N.C. had been prescribed the controlled stimulant Vyvanse. While at Done, his stimulant prescription never exceeded 40 mg, which the FDA-approved package insert indicates is appropriate treatment for children over 6 years old. And after leaving Done, N.C. was diagnosed with ADHD and prescribed stimulants by a non-Done affiliated provider. Thus, N.C. has been diagnosed with ADHD and prescribed stimulants by at least two non-Done providers. TX 7457 at 2, 22-23; TX 5794; EX 6923; ECF 598 at Ex. L (N.C. medical records). As of July 2025, a couple of months before Ms. He's trial when she subpoenaed his medical records, he was still being prescribed Adderall by this non-Done provider apparently without incident. In fact, it is possible that N.C. is still being treated for ADHD

7

DEFENDANT RUTHIA HE'S RESPONSE IN SUPPORT OF SUPPLEMENTAL
SENTENCING MEMORANDUM
Case No. 3:24-cr-00329-CRB

with Adderall to this day (which his mother and brother nowhere mention in their letters). *See* ECF 598 at Ex. L.

- Patient H.B. – This Done patient was diagnosed with ADHD as a child and prescribed stimulant medication prior to his treatment at Done.  Tr. 2268:17-2269:4; TX 1820 at 32. He was prescribed 20 mg of Adderall XR and 5 mg of Adderall IR, which is well within the dosage range of 60 mg maximum recommended by the FDA. EX 7454 at 41; TX 7386A.  This patient died of a fentanyl overdose, TX 249, and there is no indication that the Adderall contributed to his death in any way.

- Patient J.L. – This patient was not included in the 16 patient files the Government submitted for Dr. Goodman's review, and thus he reached no opinions about this patient.[4]  However, this Done patient's cardiologist was interviewed by the Government and said that he did not believe there was any contraindication with her being prescribed Adderall due to her cardiovascular issues. Her cardiologist said "there was nothing of note on [her] ECG regarding her Adderall usage" and he "didn't feel there was an increased cardiovascular risk for [her]."  In other words, despite her parents saying in their letter that "She was not supposed to take Adderall, due to the cardiac myopathy and her anorexia," her own cardiologist disagreed.  *See* Ex. A (attached hereto) (Dr. Andraws DEA-6).

- Patient C.C. – While Dr. Goodman was highly critical of the prescribing practices of her initial Done provider, he testified that her second provider "intervened and exercised what I thought at that time was good clinical judgment," in switching C.C.'s medication after she was involuntarily hospitalized for experiencing a serious mental health episode.  Tr. 4417:6-4420:9.  In other words, Dr. Goodman did not opine that C.C.'s ADHD prescriptions were medically unnecessary; quite to the contrary.

- Patient R.H. – This patient is one of three (out of the 16) that Dr. Goodman did not address in his trial testimony.  His ASRS score (a widely recognized predictor of ADHD) was "Probable ADHD," and his prescriptions fell entirely within the maximum amount recommended by the FDA.  *See* Ex. B (attached hereto) (R.H.'s Done medical records).

**Second,** the only Done <u>patient</u> who wrote a victim impact statement was S.K., whose first appointment and Done prescription was in July 2024, more than a year after the charged conspiracy ended and two months after Ms. He was arrested.  *See* Ex. C (attached hereto) (S.K.'s Done medical records).

Moreover, the facts about S.K. only further underscore that this case is unlike the heartland cases because Done was engaged in a medical exercise.  Specifically, S.K. was discharged <u>twice</u> from the platform after his providers learned he was doctor shopping.  S.K. had an initial

---

[4] The Government likewise submitted statements from two other patients, M.A. and S.H., who were not included in the set of 16 patient filed Dr. Goodman was asked to review, and thus, he did not offer any opinions on them either.

DEFENDANT RUTHIA HE'S RESPONSE IN SUPPORT OF SUPPLEMENTAL
SENTENCING MEMORANDUM
Case No. 3:24-cr-00329-CRB

appointment on July 19, after which he received a prescription. He received prescriptions for two months and then was discharged from the platform after his provider realized that he was doctor-shopping and had been receiving stimulants from an outside provider. S.K. then created a second account with a new phone number because he was unable to login to the platform with his original phone number since Done blocked him from being able to use the platform. He was prescribed after an appointment with a second provider but was discharged again once Done realized that he was doctor-shopping. *See id.*

The example of this patient further highlights how this case is different than other drug trafficking cases. Even if Done's medical processes were outside the usual course of professional practice and someone like S.K. should never have been prescribed, the fact that once Done realized he was doctor-shopping and discharged him from the platform highlights that the goal was not to issue medically unnecessary prescriptions, facilitating drug abuse or addiction. If that was the purpose, S.K. would not have been discharged.

## CONCLUSION

For the foregoing reasons, in addition to those discussed in the prior sentencing submissions, the Court properly concluded that this case is far outside the heartland of cases the sentencing guidelines were intended to address. *See* 4/28/26 Tr. at 13: 11-12.

Dated: July 2, 2026                    WILLKIE FARR & GALLAGHER LLP


                                       By:    */s/* Koren Bell
                                              Koren Bell
                                              Michael S. Schachter

Dated: July 2, 2026                    LAW OFFICE OF JOHN D. CLINE


                                       By:    */s/* John D. Cline
                                              John D. Cline

                                              *Attorneys for Defendant*
                                              RUTHIA HE

9

DEFENDANT RUTHIA HE'S RESPONSE IN SUPPORT OF SUPPLEMENTAL
SENTENCING MEMORANDUM
Case No. 3:24-cr-00329-CRB