CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

JEFF MITCHELL (CABN 236225)
Chief, Criminal Division

COLIN M. MCDONALD
Assistant Attorney General, National Fraud Enforcement Division

JACOB FOSTER (CABN 250785)
Deputy Assistant Attorney General, National Fraud Enforcement Division
EMILY GURSKIS (VABN 85973)
Assistant Chief, Health Care Fraud Section
ARUN BODAPATI (NYBN 5581137)
Trial Attorney, Health Care Fraud Section

U.S. Department of Justice
1400 New York Avenue NW
Washington, DC 20005
Telephone: 202-514-2000
Jacob.Foster@usdoj.gov
Emily.Gurskis@usdoj.gov
Arun.Bodapati@usdoj.gov

KRISTINA GREEN (NYBN 5226204)
Assistant United States Attorney

450 Golden Gate Avenue, Box 36055
San Francisco, CA 94102-3495
Telephone: (415) 436-7200
Kristina.Green@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RUTHIA HE, A/K/A RUJIA HE, and<br><br>DAVID BRODY,<br><br>Defendants. | CASE NO. 24-CR-00329 CRB<br><br>**UNITED STATES' REPLY REGARDING RESTITUTION** |

Defendants offer no persuasive basis to reject the government's narrow estimate of the restitution owed in this case. On the contrary, Defendants largely ignore Ninth Circuit law and the government's efforts to account for even arguably legitimate payments, and they ask the Court to imagine whether insurers might have paid for pills distributed to Done members if Done prescribers had actually acted lawfully. These arguments are legally and factually unfounded, and the Court should reject them.

Defendants' opposition turns largely on the notion that the government has not "offset" its restitution figure to account for legitimate services. But the government has already offset even arguably legitimate expenses. That is why the government now asks this Court to order restitution in the amount of $5,507,382, rather than the total billing amount of $12,397,160 that the government argued for previously. *See* ECF No. 600 at 38. That offset, of more than 50%, reflects a conservative estimate limiting restitution to payments for the pills that the Court specifically found to be illegally distributed: those prescribed (1) by Defendant Brody; (2) by six convicted coconspirators; (3) for Done members who never had one follow up appointment; and (4) for the 16 members whose medical records Dr. Goodman reviewed and testified about. In short, Defendants' "offset" argument is moot.

Defendant Brody goes one step further, arguing that even for illegally distributed pills, the Court must consider whether insurers would have paid for the drugs if Defendants and their coconspirators had acted lawfully. Under his counterintuitive "lawful counterfactual" theory, the Court must "determine whether a compliant evaluation, truthful authorization, appropriate prescribing, and required follow-up would have resulted in covered treatment for the patients and payments at issue." ECF No. 746 at 9. But the only case that he cites for this speculative exercise does not remotely support his proposition. On the contrary, the only "lawful counterfactual" the Court must consider is how much insurers would have paid if Defendants submitted truthful claims, rather than false ones. As the testimony at trial established, that amount is zero. If anything, the $5.5 million restitution figure that the government now proposes, in a good faith effort to follow the Court's guidance to tie its restitution figure to a narrower set of payments for illegal distribution, is more generous than the facts favor.

The MVRA does not require the Court to stack hypotheticals on hypotheticals, imagining the results of evaluations, diagnoses, treatment decisions, and follow up appointments. It asks only for a reasonable estimate of loss and "minimally requires that facts be established by a preponderance of the

evidence." *United States v. Waknine*, 543 F.3d 546, 557 (9th Cir. 2008). The government's four categories of identified loss readily clear that bar. The Court should accordingly order both Defendants to pay $5,507,382 in restitution, jointly and severally.

## I. The Government Has Already Offset Even Arguably Legitimate Payments

Defendants' oppositions depend largely on the notion that the government's updated restitution figure does not account for potentially legitimate prescriptions. Both rely substantially on one Ninth Circuit case to argue that the MVRA requires this Court to "determine[e] whether lawful covered services warrant an offset." ECF No. 746 at 8–9 (citing *United States v. Solakyan*, 119 F.4th 575 (9th Cir. 2024)); ECF No. 747 at 2. *Solakyan* is inapposite, for several reasons.

First, *Solakyan* is moot because the government has already voluntarily offset even arguably legitimate payments. Before sentencing, the government argued for restitution in the full amount of insurer payments for pills distributed to Done members: $12,397,160. *See* ECF No. 600 at 38. The government has now cut that figure by over half, to $5,507,382, pursuant to the Court's guidance to propose a more limited figure tied to the illegal distribution established at trial. *See* July 7 Hr'g Tr. at 110. Accordingly, the government limited its restitution figure to cover only payments for the pills that the Court found to be illegally distributed, "for all the reasons stated in the Government's submissions." *Id.* at 26. The government's estimate is thus directly tied to four quantifiable sets of illegal prescriptions: (1) written by Defendant Brody; (2) written by Done prescribers who pleaded guilty to joining Defendants' distribution conspiracy; (3) written for patients who never had a single follow up appointment, in clear contravention of the standard of care; and (4) written for the 16 Done members whose medical records Dr. Goodman reviewed and testified about at trial. The government has already taken pains to offset even arguably legitimate expenses, rendering *Solakyan* uninformative.

Second, the facts in *Solakyan* are not remotely comparable. *Solakyan* does not stand for the proposition that courts must affirmatively determine whether prescriptions were legitimate. *Solakyan* addressed a narrow situation where a court reduced the loss amount to account for legitimate services when calculating a defendant's offense level, but did not similarly reduce the loss amount when calculating restitution. *See* 119 F.4th at 595–596. The Ninth Circuit simply remanded so the district court could explain why it chose a different figure for restitution purposes. *See generally id.* In this

case, the government's proposed restitution figure was specifically designed to track the offense level found by the Court. That is the exact opposite of the fact pattern at issue in *Solakyan*.[1]

Finally, *Solakyan* does not hold that the Court must further offset payments within the categories of illegal prescriptions that the government has identified. Far from it. The district court in *Solakyan* similarly used categories to reasonably estimate the legitimate services rendered, without any criticism by the Ninth Circuit on appeal. *See id.* at 595 (noting the court's efforts to estimate the value of legitimate MRIs by categorically "(1) evaluating MRIs performed only from 2013 to 2015; (2) including only patients who received four or more MRIs; (3) using conservative MRI reimbursement rates; and (4) offsetting MRIs within the narrowed pool that were deemed medically necessary"). If anything, *Solakyan* supports the government's conservative use of narrow categories to reasonably estimate the loss amount in this case.

## II. Defendant's "Lawful Counterfactual" Theory Is Legally and Factually Baseless

Defendant Brody next argues that the Court cannot order restitution, even for illegally distributed pills, unless it first "resolve[s] any supported claim for medically necessary, otherwise lawful treatment the insurers would have covered absent the offense." ECF No. 746 at 6. As Defendant Brody would have it, the MVRA requires the Court to ask: "compared with the lawful counterfactual, how much money did each victim actually lose because of that conduct?" *Id.* at 8. According to Defendant Brody, this requires the Court to "determine whether a compliant evaluation, truthful authorization, appropriate prescribing, and required follow-up would have resulted in covered treatment for the patients and payments at issue." *Id.* at 9.

But the only case that Defendant Brody cites does not remotely support his proposal. *See United States v. Bussell*, 504 F.3d 956 (9th Cir. 2007). *Bussell* addressed restitution for a defendant who concealed assets to commit bankruptcy fraud, under an older restitution statute called the VWPA. *See id.* at 964–965. The Ninth Circuit explained that to determine the loss cause by the concealment of

[1] The Sixth Circuit case that Defendant Brody cites is similarly inapposite. There, the district court calculated the defendant's offense level by reducing Probation's $7 million loss estimate by over $3.6 million to account for legitimate prescriptions, but it then ordered restitution in the original $7 million amount. *See United States v. Clay*, 162 F.4th 757, 773 (6th Cir. 2025). Here, the $5.5 million restitution figure proposed by the government is directly tied to the offense level found by the Court.

assets, the district court had to compare "what actually happened with what would have happened if the defendant had acted lawfully." *Id.* Applying that principle, the Court concluded that "had [the defendant] made full and complete disclosure of her financial affairs at the time of filing the bankruptcy petition, she would not have had $2,293,527.09 of debt discharged in bankruptcy." *Id.* at 965. Accordingly, that was the actual loss and restitution amount (minus a $9,000 payment that had already been paid).

In other words, *Bussell* simply asks the Court to consider how much money a defendant would have gained if it "made full and complete disclosure" of the facts to the payor. That question is easily answered here. As the insurer testimony at trial established, healthcare payors would not have reimbursed a single Done claim had they known that Done's diagnoses were the product of 25-minute evaluations using no validated screening tools, that many providers had never met the patients they were prescribing to, and that Done's clinical notes were 82% boilerplate template rather than individualized records. Trial Tr. at 2715–17, 2738.

With this context, Defendant Brody's proposed framework is legally baseless and factually unworkable. Effectively, he asks the Court to imagine how much insurers might have paid if thousands of Done members (1) hypothetically received a legitimate evaluation; that (2) hypothetically resulted in a diagnosis of ADHD, rather than another mental health disorder; that (3) the prescriber then determined a Schedule II stimulant was the appropriate treatment, rather than another medication or therapy; that (4) the prescriber hypothetically conducted follow up appointments at an appropriate cadence; and that (5) the hypothetical follow-ups either justified, or did not justify, the continued prescription of Schedule II amphetamines over time. The Court should reject this speculative exercise.

## III. Defendants' Opposition to the Government's Loss Categories Depends on Speculation

The MVRA's standard is far less burdensome. "A district court need not make its loss calculation with absolute precision; rather, it need only make a reasonable estimate of the loss based on the available information." *United States v. Walter-Eze*, 869 F.3d 891, 912 (9th Cir. 2017). And "all that is required is that the government prove the loss by a preponderance of the evidence." *United States v. Torlai*, 728 F.3d 932, 946 n.13 (9th Cir. 2013). The government's proposed restitution figure readily

clears that bar, and Defendant Brody's arguments to the contrary hinge on the baseless notion that the Court must instead imagine a world where he and his coconspirators prescribed lawfully.

***Defendant Brody's Prescriptions***. Defendant Brody argues that insurers' payments for his blind prescriptions are not losses, even as he concedes that the evidence at trial showed that he "signed refill prescriptions without personally seeing the patients or reviewing their charts" and allowed the Care Team to submit false prior authorizations representing otherwise to insurers. ECF No. 746 at 10. But his only basis for this argument is the distorted notion that the government had to prove every one of Defendant Brody's patients "lacked ADHD, did not medically require the medication, or would have generated no insurer payment after a compliant evaluation." *Id.*

That is untrue. As Dr. Goodman credibly testified at trial, the legitimacy of treatment cannot be divorced from the process used to arrive at that treatment. *See* Trial Tr. 3985 (explaining that "[w]ithout a comprehensive psychiatric evaluation, you don't fulfill the five criteria necessary to make a diagnosis . . . That is the basis for a legitimate medical purpose in prescribing any medication and especially given the vigilance that you need when prescribing potentially addictive drugs."). Given Defendant Brody's conceded practice of signing scripts every thirty seconds, without checking any medical records, there is no basis to find that even one of Defendant Brody's prescriptions was valid. Without even a semblance of medical evaluation, Defendant Brody could not validly confirm that a patient had ADHD. Without confirming that diagnosis, he could not validly conclude that the patient needed a Schedule II stimulant. And without following that usual course of professional practice, as he misrepresented that he did to insurers, he could not conceivably "have generated [an] insurer payment" for even one pill that he prescribed for a Done member.

***The Convicted Coconspirators' Prescriptions***. Defendant Brody's objections as to the admitted coconspirators' prescriptions are similarly unfounded. While acknowledging that the record contains "powerful evidence of unlawful conduct" and "pervasive misconduct" by these six convicted prescribers, he nonetheless claims that a "substantial amount" of illegal prescriptions does not support restitution for all of the coconspirators' prescriptions. ECF No. 746 at 11.

But the MVRA does not require mathematical certainty. It requires only a "reasonable estimate" of loss, by a minimal preponderance. The Ninth Circuit has repeatedly affirmed restitution orders for

the total amount of a prescriber's billing, even where the government did not prove that each and every claim submitted by that prescriber was fraudulent. *See, e.g.*, *United States v. Tcherniavsky*, 708 F. App'x 444, 445 (9th Cir. 2018) (affirming restitution in the amount of all the prescriber's billing, as "[t]he government presented sufficient evidence regarding Tcherniavsky's business to permit the district court to make the inference that most, if not all, of the Medicare billing was tainted by fraud"); *Walter-Eze*, 869 F.3d at 913 (affirming restitution as to all claims where "Although the government in presenting its case focused heavily on power wheelchairs, it presented sufficient evidence regarding the remainder of Walter-Eze's business to permit the district court to make an inference that most, if not all, of Ezcor's Medicare and Medi-Cal billing was tainted by fraud"). Indeed, the total amount billed by a prescriber is the default measure of loss in the Ninth Circuit. *See United States v. Popov*, 742 F.3d 911, 916 (9th Cir. 2014). There is no reason to break from the overwhelming weight of precedent here.

***The Done Members Without Any Follow Up Appointments***. Defendants next claim that insurers' payments for pills given to Done members are not losses unless the Court can "infer that every covered prescription paid for every member in the cohort would have been denied in a lawful course of care," and that the government "has not identified a claim-by-claim analysis, a representative sample, an extrapolation method, or another evidentiary bridge supporting that inference." ECF No. 746 at 12. Yet again, Defendants' arguments ignore the much lower bar that the MVRA actually sets.

The government's "evidentiary bridge" is significantly more reliable than the speculation that Defendants call for. At trial, the government admitted Done's electronic health records, which list every Done member without a recorded follow-up appointment. *See* Trial Ex. 1731. And the claims data admitted at trial permits an exact calculation of how much insurers paid for pills prescribed to those members. *See* Trial Exs. 1601, 1604, 1605, 1607, 1609. Finally, an insurer witness testified that they rely on prescribers to submit truthful and accurate representations that the "patient [has] a relationship with the physician or the care provider . . . [f]ollowing general standard practices . . . as they're evaluating patients and taking care of patients." Trial Tr. 2713–14. The trial record undisputedly established that follow-up appointments are "general standard practices" in the mental health space, and the Done providers who never scheduled a single follow up appointment for their Done members clearly

were not "taking care of patients." This evidence easily supports the reasonable inference that insurers would not have paid for pills dispensed to these members.

***The 16 Done Members Considered by Dr. Goodman***. Finally, Defendants' objection as to the 16 patients reviewed by Dr. Goodman shows that their proposed standard is practically impossible to satisfy. Dr. Goodman reviewed each patient's medical records at length before concluding that each of their prescriptions was invalid. But according to Defendants, even that is not enough to establish a loss. In Defendant Brody's words, while this may show "Done's process was inadequate . . . lawful alternative treatment cannot simply be assumed away." ECF No. 746 at 13. But as detailed above, Defendants' arguments are the ones that rely on assumptions. Rather than indulge this speculative exercise, the Court should adhere to the findings that it already made at sentencing: that "evidence has been presented to the Court establishing loss" as to all 16 members. July 7 Hr'g Tr. at 110.

## IV. CONCLUSION

For the reasons set forth above, the Court should order restitution in the amount of $5,507,382, jointly and severally against both Defendants.[2]

Dated: September 30, 2026

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

COLIN MCDONALD
Assistant Attorney General
JACOB FOSTER
Deputy Assistant Attorney General
National Fraud Enforcement Division

_/s/________________________
EMILY GURSKIS
Assistant Chief
ARUN BODAPATI
Trial Attorney

[2] Defendants' remaining arguments are easily dismissed. Defendant He claims that a restitution order requires jury findings beyond a reasonable doubt, but she admits the Ninth Circuit has foreclosed this argument. *See* ECF No. 747 at 1–2. And while Defendant Brody argues for apportionment, both courts declined to do so in the only cases that he cites. *See* ECF No. 746 at 15. There is no basis to deviate from the settled practice of imposing joint-and-several restitution here, either.

Health Care Fraud Section
U.S. Department of Justice

_/s/___________________________
KRISTINA GREEN
Assistant United States Attorney